IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 12 1999

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE GARCIA, Individually and as Representative of the Estate MANUEL CRUZ, IDALIA GARCIA, individually and CYNTHIA GARCIA | ) ) ) ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) ) | B-98-186 |
| BRK BRANDS, INC. | ) ) | |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT
BRK BRANDS, INC.'S MOTION TO DISMISS**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Jose Garcia, Individually and as Representative of the Estate of Manuel Cruz, Idalia Garcia, Individually and Cynthia Cox as next friend of Brittany Cox, plaintiffs in the above styled and numbered cause, by and through their attorneys of record, and file this their Supplemental Response to Defendant BRK Brands, Inc.'s Motion to Dismiss, and in support thereof would respectfully show the court as follows:

I.

The attempt of BRK to dismiss this death action because their product, even if defective, did not cause Manuel Cruz's death is a factual fallacy and corporate mindset of this defendant to wisp away rights of

1

parties by their ignorance of their responsibilities as manufacturers of life saving devices. Their acts may even show a continued intentional deception regarding the defectively manufactured smoke detector involved in Manuel Cruz's death.

Attached hereto, as Supplemental Exhibit A, is the deposition of David A. Minnis in **Gorton vs. BRK Brands**. Mr. Minnis, an employee of BRK testified, that when the smoke detectors defectiveness were showing up in field reports, the Vice President of the corporation instructed Mr. Minnis that, in spite of having serious problems sleeping at night because he knew of all of the defective smoke detectors out in the field, Mr. Minnis had to look at the defective smoke detector situation as a situation that the smoke detector is not causing the fire and that if someone dies in the fire, you can't blame the smoke detector because it didn't cause the fire. That Vice President was the head person in charge of quality control, Mr. Shoenfelder. Pages 140-144 of Plaintiffs' Supplemental Exhibit A.

BRK has been successfully sued and found liable for injuries and death throughout this country. See supplemental Exhibit B. Smoke detectors have been the subject of litigation in other actions. <u>Carruth v. Pittway Corp.</u>, 643 So. 2d 1340 (Ala. 994) (fact issues existed regarding whether placement instructions were adequate);

2

**Laaperi v. Sears, Roebuck & Co.**, 787 F.2d 726 (1st Cir. 1986) (failure to warn; smoke detector connected to house electrical system failed to activate when electrical power went out); **Coleman v. United Savings Ass'n of Texas**, 846 S.W.2d 128 (Tex.App.--Fort Worth 1993, n.w.h.)(duty to install smoke detector).

According to the defendant's analysis, a defective parachute manufacturer could not be held liable for causing someone's death because in fact, the ground killed the parachuters. Another way, a defective life jacket or ring manufacturer could not be held liable for a failure in their life saving equipment because it would be the water that would have drowned the victim. As will be shown below, there are factual scenarios that exist to show the culpability of defendant BRK in producing a defective smoke detector to such an extent that factual questions will exist as to them being grossly negligent and that their acts may sink to a level that may be in fact distastefully scandalous.

As mentioned above, Mr. Minnis's testimony shows that he worked for BRK and had a job position of electronic technician, assistanting project engineers in getting test samples built and tested and helped write reports and collected data. Supplemental Exhibit A, Pages 9 - 19.

3

That department was called the residential smoke detector department in charge of designing smoke detectors for use in residential applications installed by the consumer or construction industry. Supplemental Exhibit A, page 20. His job duties included putting the smoke detectors through a series of performance tests and replicate Underwriter's Laboratory type tests to prepare for Underwriter's Laboratory review. Supplemental Exhibit A, Page 23 to 25. In the UL certification process, failure rate analysis calculations as well as listing component parts and manufacturers had to be submitted to Underwriter's Laboratory and to provide ample number of samples for testing to see if an Underwriter's Laboratory label could be obtained. Pages 26 - 29. Even after certification, Underwriter's Laboratory requires that the company manufacturer make it in exactly the form it was submitted. Supplemental Exhibit A, Page 40. There was a log-in book kept for the samples that went to Underwriter's Laboratory and that log contained test results showing the unacceptability of the results by Underwriter's Laboratory, See Supplemental Exhibit A, Pages 42-43.

Mr. Minnis's role as a witness in cases against BRK is significant because in 1984 he was promoted as associate engineer with the responsibility of being liaison between Underwriter's Laboratories and

4

BRK electronics department for smoke detectors. He would initiate letters to Underwriter's Laboratories announcing either a new product or design change and would receive from UL an outline of what was necessary to get the UL approval. See supplemental exhibit A, pages 53-55. However, he became aware of fraudulently submitted products to Underwriter's Laboratory and he participated with others in BRK to submit an altered product that would not be representative of the manufactured product and on a second occasion, refused to again submit adultered samples for UL testing. See supplemental exhibit A, pages 88-92.

His opinion of the products that he was involved in testing for BRK namely, residential smoke detectors, was that a failure could occur any time to such an extent that they were having 50% failure rates and even had times when the failure rate was 75%. See supplemental exhibit A, pages 100-101. When BRK continued to submit adulterated test samples, Mr. Minnis felt that that was a violation of the UL's standard. Again, the Vice President in charge of quality control, Mr. Shoenfelder, when confronted by Mr. Minniss's concern of the high failure rate, Mr. Minnis was advised by the man that reported to BRK's president, that the design would not be changed because he would be admitting to Underwriter's Laboratory that BRK knew it had a problem. See supplemental exhibit A,

pages 120-122. In the end upon further protest, Mr. Minnis was told by Mr. Shoenfelder that if he wanted to keep his job to shut up and do as he was told. See Supplemental Exhibit A, pages 123-124. Mr. Minnis admits that upon instruction from BRK he was told to lie to Underwriter's Laboratory regarding the failures and defects in the product and that he became aware after his refusal to participate with the subsequent Underwriter's Laboratories' approval that BRK was able to get. See supplemental Exhibit A, Pages 128-133. Mr. Minnis could no longer stand the pressure of participating with the fraud of defective smoke detectors and reported that BRK had fraudulently submitted products to cover up the design products known by BRK to the Consumer Product Safety Commission. See Supplemental Exhibit A, page 75.

II.

Discovery is continuing in this case with expert reports being due on October 15, 1999. However the designation deadline has been met and reports have been filed by some of the experts. Included is the expert report of Morris Cranmer, Ph.D. which in great detail comes to the conclusion that the ionizing type smoke detector located in the home where Mr. Manuel Cruz slept had failed to sound a loud and sustainable audible alarm and as such failed to alert Mr. Cruz of the development of a

dangerous atmosphere from which he would have been able to escape. The amount of smoke and thus particulates in the air was of sufficient volume and density that the smoke detector should have sounded a loud and sustainable audible alarm hours before Mr. Cruz would have had any effect from carbon monoxide. Plaintiffs have submitted additional expert reports that supports causation and therefore plaintiffs have pled viable causes of action against the defendants. As mentioned above, there is evidence of breach of warranties and violations of the Texas Deceptive Trade Practices Act as well as proof of civil conspiracy. As to the Consumer Products Safety Act, Plaintiff believes that violations of the standards can be alleged and used as evidence of breach of the duty and standard of care required by this manufacturer of smoke detectors promoted as life saving devices.

Respectfully submitted this the _____12_____ day of October, 1999.

HARRIS & WATTS, P.C.
1926 E. Elizabeth
Brownsville, Texas   78520
(956)  546-0333
(956)  541-0255   FAX

_____
Ray R. Marchan
State Bar No. 12969050

## CERTIFICATE OF SERVICE

On this the ___12___ day of October, 1999, a true and correct copy of the foregoing instrument was forwarded to opposing counsel via fax, by hand-delivery or by certified mail, return receipt requested.

_____
RAY R. MARCHAN

8

# First Alert to pay $16.9M

DAVENPORT, Iowa — A jury ruled a company should pay $16.9 million to a couple who blamed a faulty smoke detector for the death of their young son.

BRK Brands, the parent company of First Alert, was ordered Wednesday to pay $12.5 million in punitive damages and $4.4 million in compensatory damages to Jennifer and Nathan Mercer.

A fire blamed on a baby monitor that overheated killed their 3-year-old son, Bradley, and disfigured their then-18-month-old son, Travis, on Jan. 18, 1993.