*109*

IN THE U.S. DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, Individually and as Representative of the Estate of MANUEL CRUZ, IDALIA GARCIA, Individually; and CYNTHIA COX as Next Best Friend of Brittany Cox, | : : : : : : : : : : | CIVIL ACTION<br><br>NO. B-98-186 |
| vs. | | |
| BRK BRANDS, INC. | | |

United States District Court
Southern District of Texas
FILED

JUN 0 1 2000

Michael N. Milby
Clerk of Court

**MOTION OF DEFENDANT BRK BRANDS, INC.
FOR A PROTECTIVE ORDER**

**I.**

**PRELIMINARY STATEMENT**

1. This action arises out of the December 1997 carbon monoxide poisoning death of Manual Cruz. Mr. Cruz died when a space heater, improperly fueled with propane gas and not vented to the outside of the house, produced fatal levels of carbon monoxide. Plaintiffs, representatives and heirs of Mr. Cruz, seek to impose liability upon BRK Brands, Inc. ("BRK") for Mr. Cruz' death by alleging that a BRK, First Alert brand smoke detector, model SA67D, failed to alarm in sufficient time to warn Mr. Cruz of the dangerous levels carbon monoxide in his house.

2. When plaintiffs filed their expert disclosures, they alleged that the smoke detector at issue did not alarm because it employed ionization technology. Plaintiffs' experts opined that had the detector employed photoelectric technology, it would have alarmed in sufficient time to save Mr. Cruz. (See report of B. Don Russell, Exhibit "A".)

3.  Recently, and without notice to defendants, plaintiffs have changed their theory of defect. Plaintiffs now allege that the model SA67D smoke detector did not alarm because internal components of the detector's horn, called the horn contacts, were corroded. Plaintiffs experts', by their own admission, cannot prove that the contacts were corroded and have not performed any tests to determine whether corrosion existed. Instead plaintiffs' experts base their opinions on an alleged "corrosion defect" claimed to have existed in a substantially different model smoke detector manufactured by Pittway Corporation, which is not a party to this case, nearly a decade before the smoke detector at issue in this case was manufactured by BRK.

4.  Plaintiffs have noticed the deposition of BRK representative Mark Devine, Vice President of Quality Assurance and Product Development, to obtain irrelevant and inflammatory information concerning alleged corrosion problems thought to have existed in a smoke detector different than the model in this case and manufactured over a decade ago by a company that is not a party to this litigation. Without requiring plaintiffs to offer some evidence connecting the alleged corrosion problems of the detector manufactured in the 1980's to the detector at issue here and without requiring plaintiffs to offer some evidence that the detector in this case was corroded, it would be unduly oppressive and burdensome to subject BRK to discovery concerning the wholly unrelated and utterly irrelevant issue of corrosion as it relates to other models of smoke detectors. Therefore, BRK respectfully requests this Court issue an order preventing plaintiffs from engaging in discovery related to these issues.

## II.

### BACKGROUND

5.  At about 11:30 p.m. on December 16, 1997, one of Mr. Cruz's girlfriends discovered his body in his home at 190 Thomae Lane, San Benito, Texas. The autopsy of Mr. Cruz determined that he died of carbon monoxide poisoning and that his lungs and trachea showed no signs of soot

2

or smoke deposits. The autopsy also showed that Mr. Cruz had been dead for in excess of 24 hours.

6.  The investigation into his death concluded that Mr. Cruz had incorrectly installed a gas fueled space heater in his house. The space heater, designed to burn natural gas, was instead fueled with propane. Additionally, Mr. Cruz failed to vent the space heater so that the gasses it produced, made more toxic because of the improper fuel, vented directly into the living quarters of his house. There was no fire or smoke in Mr. Cruz' house.

7.  Investigators also found a smoke detector in Mr. Cruz' house. This smoke detector was later identified by plaintiffs as a First Alert brand smoke detector manufactured by BRK, model SA67D.

A.  **Plaintiffs' Allegations Concerning The Model SA67D Smoke Detector In Mr. Cruz's Home**

8.  Plaintiffs have not offered any evidence to suggest that smoke detectors are intended to detect carbon monoxide. Indeed, plaintiffs have admitted that smoke detectors are not intended to provide early warning of carbon monoxide poisoning dangers. Instead, plaintiffs contend that soot produced by the heater should have triggered the smoke detector.

9.  In their designation of experts made pursuant to this Court's May 18, 1999 Order, plaintiffs' experts were exceedingly vague in their identification of a defect in the SA67D smoke detector allegedly in Mr. Cruz' house at the time of his death. However, those experts that did identify an alleged defect theorized that the SA67D smoke detector was defective because it employed ionization smoke sensing technology. Those experts opined that had the smoke detector employed different technology, it would have alarmed in sufficient time for Mr. Cruz to escape without injury. Plaintiffs and their experts have recently abandoned this theory of defect.[1]

---

[1]  At the May 10, 2000 deposition of plaintiffs' expert B. Don Russell, BRK learned that plaintiffs now believe the smoke detector in the Cruz residence did not alarm because its "contacts" had corroded. Russell testified the opinions expressed in his report of September 28, 1999, which was provided to defendants pursuant to plaintiffs mandatory disclosures, were irrelevant to this case. Russell testified that the detector did not alarm because it was corroded. Russell testified that his
(continued...)

3

10.  Plaintiffs' expert, B. Don Russell concluded that corrosion resulted in the Cruz detector failing to alarm by an "elimination of all other causes". (D. Russell, p. 61, Exhibit "B".) Yet, he admitted he has never been to the Cruz residence, has not spoken to any fact witnesses and, most importantly, has never seen or examined the smoke detector at issue. (D. Russell, pp. 14, 17-18, 55-56, Exhibit "B".)

11.  The smoke detector that plaintiffs contend was in the Cruz residence was a battery powered ionization type smoke detector, model SA67D. Dr. Russell admitted he does not know of any smoke detector of the model that was in the Cruz residence that ever failed to alarm because of corrosion. (D. Russell, p. 41, Exhibit "B".) Dr. Russell also admitted he does not know of any model battery powered smoke detector that ever failed to alarm because of corrosion. (D. Russell, p. 53, Exhibit "B".)

12.  Dr. Russell testified that the only detectors he knows of that allegedly did not alarm because of corrosion were manufactured by Pittway Corporation, not BRK. (D. Russell, p. 42, Exhibit "B".) Dr. Russell acknowledges that those detectors, which are identified as model 1839 and 2839 detectors, were AC powered (hard wired), not battery powered. (D. Russell, pp. 44-45, Exhibit "B".)

13.  Dr. Russell admits that the SA67D uses a different circuitry than the 1839 and 2839 detectors, a difference that he admits has been studied as to its effect upon corrosion. (D. Russell, pp. 44-46, Exhibit "B".) Dr. Russell further admits these studies concluded that as a result of the differences in the drive circuitry, battery operated detectors are resilient to the affects of corrosion. (*Id.*) In other words, Dr. Russell acknowledges that studies on this issue have concluded that corrosion will not prevent a battery-powered detector, such as the one in the Cruz residence, from

---

(...continued)
opinion changed a "long time ago". (See deposition of B. Don Russell, pp. 63, 235, Exhibit "B".).

alarming due to corrosion. Dr. Russell admitted he has not performed any research on this issue and cannot contradict that conclusion. (D. Russell, p. 58, Exhibit "B").

**B.     The Origination Of Plaintiffs' "Corrosion Theory"**

14.     Non-party Pittway Corporation ("Pittway") began manufacturing residential smoke detectors in the late 1960s and sold both ionization and photoelectric detectors.

15.     Smoke detectors, regardless of the manufacturer, generally consist of a sensing chamber to detect smoke, a horn to sound an alarm and electronic circuitry to transmit to the horn the electric charge which the sensing chamber emits when it is triggered. Smoke detectors may be hard-wired (powered by AC current from a home or building) or battery powered.

16.     Although Pittway manufactured mostly battery powered detectors, it also manufactured hard-wired detectors called the 1839 and 2839, from 1985 through 1990. In February, 1990, during the course of an ongoing internal program of quality assurance testing, Pittway noticed that its 1839 and 2839 detectors were experiencing a failure rate in excess of what it experienced with other model detectors.[2] After conducting a series of tests and analyses, Pittway determined that over time, corrosion built up on the interface between the contact points (between the electrical circuitry that would transmit the signal to the horn when the sensing chamber was triggered) and the disk for the horn. This corrosion created a barrier interfering with the flow of the charge from the circuitry into the horn to sound the alarm.

17.     The electrical circuitry of the 1839 and 2839 was unique to those detectors because they were designed for hard-wired rather than battery powered applications. Pittway ultimately determined that, unlike its other model smoke detectors, the electrical circuitry of the 1839 and 2839

---

[2]     Pittway usually experienced a failure rate of less than one percent, which is well below the levels generally recognized as adequate by fire protection professional. BRK has had a similar failure rate since 1992.

5

was not robust or strong enough to abrade or scrub through any corrosion that might exist on the horn contacts. If the corrosion were extensive enough, the horn would not sound even if the sensor was triggered. As previously stated, due to the differences in drive circuitry, even if the battery powered detectors, such as the SA67D were corroded, this would not prevent the detector from alarming.

### C.   BRK's Model SA67D Smoke Detector

   18.   In July of 1992, Pittway sold selected assets of its residential smoke detector business to THL-FA Operating Corporation, and has not been involved in the residential smoke detector business since that transaction was completed. THL-FA Operating Corporation incorporated BRK to begin marketing smoke detectors, and BRK has been manufacturing and selling residential smoke detectors ever since. BRK has no affiliation with Pittway.

   19.   As previously stated, the SA67D smoke detector in this case was a battery-powered smoke detector manufactured by BRK in January 1996. Because it was battery powered, it does not share the circuitry that was susceptible to corrosion in the 1839 and 2839 detectors.

   20.   Neither plaintiffs nor their experts can point to any evidence that suggests that the SA67D ever experienced the same type of corrosion problem as the 1839 and 2839 detectors. Presently, the only evidence plaintiffs have offered to support their corrosion allegations is the bare testimony of Dr. Russell, which, as discussed above at paragraphs 10-13, he is unable to support with any factual or scientific evidence.

   21.   Not only has Dr. Russell not examined the detector for evidence of corrosion, but no expert on plaintiffs' behalf has done so. Reed McClintock, the custodian of the smoke detector from January 23, 1998, when it was removed from Mr. Cruz' house, until July 27, 1999, when it was turned over to joint custody, testified that the only other person to examine the detector was BRK's

expert, Dr. Lori Streit. Since the detector has been in joint custody, no expert has examined the detector for evidence of corrosion.

22. Plaintiffs have recently noticed the deposition of BRK representative Mark Devine.[3] During this deposition, BRK anticipates that plaintiffs will seek testimony and information about the Pittway model smoke detectors which allegedly failed to alarm because of corrosion.

23. For the reasons cited herein, namely that plaintiffs have no evidence establishing corrosion on this detector, plaintiffs have no evidence that even if there was corrosion on this detector that it would have prevented the detector from alarming and because plaintiffs have no evidence tying the alleged corrosion problems of Pittway's 1839 and 2839 detectors to BRK's model SA67D, BRK brings this Motion for Protective Order seeking to preclude plaintiffs from requesting information related to the 1839 or 2839 model smoke detectors or the issue of corrosion as it relates to any model smoke detector, other than the SA67D, during the deposition of Mark Devine.

## III.

### ARGUMENT

24. Under Federal Rule of Civil Procedure 26(b)(1), parties are given great latitude to conduct discovery. Specifically, Rule 26(b)(1) states, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed. R. Civ. P. 26(b)(1). However, "[b]ecause of the liberality of pretrial discovery permitted by Rule 26(b)(1), it is necessary for the trial court to have the authority to issue protective orders conferred

---

[3] Plaintiffs also recently noticed the deposition of three Pittway Corporation employees, Fred Conforti, George Shoenfelder and Nicholas Bellavia and BRK anticipates that plaintiffs will seek testimony and information from these individuals specifically related to the issue of corrosion. BRK will file an appropriate motion to quash the subpoenas issued to these non-party witnesses. Pursuant to Fed.R.Civ.P. 26, BRK must file that motion in the District Court where the depositions are to be conducted.

by Rule 26(c)." <u>Seattle Time Co. v. Rhinehart</u>, 467 U.S. 20, 34 (1984) ("It is clear from experience that pretrial discovery by depositions and interrogatories has a significant potential for abuse.")

25. The necessity of restrictions on discovery in each case is left to the enlightened discretion of the district court. <u>Matter of Evangeline Refining Co.</u>, 890 F. 2d 1312 (5th Cir. 1989). Rule 26 provides, in pertinent part:

> Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party of person from annoyance, embarrassment, oppression, or undue burden, including . . .
>
> \* \* \*
>
> (4) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters.

Fed. R. Civ. P. 26(c)(4).

26. Plaintiffs' experts' recent change of opinion concerning why this detector did not alarm, and the absence of any basis for that opinion, suggests that plaintiffs have no theory of product defect. Plaintiffs' recent identification of corrosion as their theory of defect does not warrant an unfettered journey of discovery subjecting BRK and non-party witnesses to undue burden expense, annoyance and harassment. Discovery is not a device to enable a plaintiff to make a case when his complaint has failed to state a claim, but should follow the filing of a well-pleaded complaint. <u>Kaylor v. Fields</u>, 661 F.2d 1177, 1184 (8th Cir. 1981).

27. In order to determine the proper scope of discovery under Rule 26(b), plaintiffs must first define their legal claims and connect them to the case at issue. <u>Fine v. Facet Aerospace Products Co.</u>, 133 F.R.D. 439, 442 (S.D.N.Y. 1990), <u>Nalco Chemical Co. v. Hydro Technologies, Inc.</u>, 148

8

F.R.D. 608, 615 (E.D. Wis. 1993). The purpose of discovery is certainly not to provide unlimited access to information regarding allegations of defect that have no relation, even tangentially, to the facts of this case. This kind of intrusive and unwarranted discovery is precisely what BRK seeks to prevent. It is also the kind of discovery that courts have been quick to thwart.

A.  **Discovery Pertaining To Unrelated Products Is Impermissible**

28.     In <u>In re Richardson-Merrell, Inc. "Bendectin"Products Liability Litigation</u>, 624 F. Supp. 1212 (S.D. Ohio 1985) aff'd 857F.2d 290 (6th Cir. 1988), the court confined discovery to the drug at issue in the case and its component chemicals and refused to allow discovery regarding the defendant manufacturer's other products. The court discussed the mandate of Federal Rule of Civil Procedure 1, that the civil rules applicable to discovery be enforced "to secure the just, speedy, and inexpensive determination of every action," and the protection from annoyance, oppression, and undue burden afforded parties and witnesses by Rule 26(c). <u>Id.</u> at 1241. The court subsequently held that <u>to not</u> confine discovery as it had "would have necessarily opened all of the defendant's drugs to discovery--a result that would be truly oppressive and would thwart any attempt at a just, speedy, or inexpensive determination of the action." <u>Id.</u>

29.     In <u>Uitts v. General Motors Corp.</u>, 62 F.R.D. 560 (1974) the Court refused to permit discovery into the recall of engine mounts different from the type involved in the accident that injured plaintiffs. In <u>Uitts</u>, the court initially permitted discovery regarding vehicles manufactured by defendants with an identical spring. The Court refused to later expand discovery, observing "after two years of ongoing discovery, and while not abandoning [plaintiffs'] original theory, plaintiffs now seek to introduce a new alternative possibility as to the cause of the accident and ask this court to allow their embarkation upon an exploratory journey to determine its plausibility." The <u>Uitts</u> Court wisely declined to do so. Similarly, in <u>Cooper v. R.J. Reynolds Tobacco Co.</u>, 158 F. Supp.

9

22, 25 (D.C. Mass. 1957), aff'd, 256 F.2d 464 (1st Cir. 1958), cert. denied, 358 U.S. 875, 79 S.Ct. 112 (1950), the Court denied discovery into defendant's advertising that did not relate to the specific representations relied on by plaintiff.

30. The only conceivable use for of information relating to corrosion in this case would be to mislead the jury. Moreover, such information is completely irrelevant and its discovery is objectionable on that ground alone. The discovery of irrelevant information is contrary to the letter and purpose of the Federal Rules and should not be allowed. This Honorable court should not allow plaintiffs to embark on an exploratory journey to determine the plausibility of their recently concocted corrosion theory.

**B.    Plaintiffs Have Made No Threshold Demonstration Of Relevance To Warrant Discovery Regarding the 1839 and 2839 Detectors Or Any Corrosion Issue**

31. As a matter of fairness, plaintiffs must make some threshold showing of relevance before the doors of discovery are sprung wide open and plaintiffs are allowed to force the discovery of information which does not bear upon the issues of the case. Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992). When the relevancy of propounded discovery is not apparent its proponent has the burden to show the discovery relevant. Pulsecard, Inc. v. Discover Card Servs., Inc., 168 F.R.D. 295, 309 (D. Kan. 1996).

32. To determine whether discovery is relevant, the court examines the issues raised in the case. Id. (citing Caldwell v. Life Ins. Co. of N. Am., 165 F.R.D. 633, 638 (D. Kan. 1996)). "Discovery, like all matters of procedure, has ultimate and necessary boundaries." Opperheimer Fund v. Sanders, 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1977) (quoting Hickman v. Taylor, 329 U.S. 495, 501, 91 L. Ed. 451, 67 S. Ct. 385 (1947).

33. Simply because plaintiffs believe that the 1839 and 2839 detectors were alleged to have corrosion problems, plaintiffs are not relieved of their duty to identify a defect in the SA67D model smoke detector manufactured long after and by a different company than the 1839 and 2839

10

detectors. Plaintiffs must have some evidence that the defect they claim existed in SA67D smoke detectors generally, existed in this specific model and that the defect caused the alleged failure of the detector to sound an alarm.

34. Without any evidence or even the suggestion that the SA67D was substantially similar to these models, or any suggestion that the detector at issue in this case was or could be affected by corrosion, plaintiffs are not entitled to unfettered discovery regarding the 1839 and 2839 detectors or corrosion as it relates to any other model detector. Plaintiffs have not, and likely cannot, provide any evidence to suggest that corrosion played any part in this case or had any bearing on the alleged failure of the detector to sound an alarm.

35. Dr. Russell admits that the SA67D uses a different circuitry than the 1839 and 2839 detectors, a difference he admits has been linked to battery operated detectors being resilient to the affects of corrosion. Dr. Russell further admits he is not aware of any evidence connecting the SA67D detector to the corrosion issue. Dr. Russell also admits that he has never even seen the detector at issue in this case, nor has he done any research or study concerning the corrosion of horn contacts in smoke detectors. Not only has Dr. Russell not examined the detector for evidence of corrosion, but no expert on plaintiffs' behalf has done so.

36. The fact that plaintiffs have failed to articulate a plausible allegation of defect should not trigger boundless discovery. Some minimal evidence of relevance should be required before counsel for BRK is forced to fly to Chicago, spending days and countless dollars on discovery wholly unrelated to plaintiffs' claims.

## IV.

### CONCLUSION

37. Plaintiffs have no evidence that the SA67D smoke detector was susceptible to corrosion or to suggest that the specific detector at issue in this case was affected by corrosion.

11

Absent even a modicum of evidence to suggest the relevance of a corrosion issue in this case, BRK should be spared the burdensome, and extremely costly task of deposition testimony on issues unrelated and irrelevant to the case at bar.

**WHEREFORE**, defendant BRK Brands, Inc. respectfully requests that this Court enter an Order protecting BRK from the plaintiffs' discovery requests seeking information and/or materials concerning the 1839 or 2839 model smoke detectors and any corrosion issue related to smoke detector models other than the SA67D.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER**
855 West Price Road, Suite 9
Brownsville, TX 78520
Telephone: 956/542-5666
Facsimile: 956/542-0016

BY: _____
Rene O. Oliveira
Federal Bar No. 4033
State Bar No. 15254700
Elizabeth G. Neally
Federal Bar No. 8044
State Bar No. 14840400

**COZEN AND O'CONNOR**
JAMES HELLER
TERRY M. HENRY
1900 Market Street
Philadelphia, PA 19103
Tel: 215/665-2000
Fax: 215/665-2013

12

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certifies that a true and correct copy of the foregoing *Motion of Defendant BRI Brands Inc. for a Protective Order* has been served upon to Shiree Salinas, counsel for Plaintiff, at The Atrium, Suite 400, 1300 North Tenth Street, McAllen, TX 78501 and Mr. Ray Marchan, Harris & Watts, 1926 E. Elizabeth, Brownsville, TX 78520, on this ___1___ day of ~~May~~ June, 2000.



## CERTIFICATE OF CONFERENCE

I, Elizabeth G. Neally, hereby certifies that I have contacted Shiree Salinas by telephone on the 31st day of May, 2000 to discuss the facts surrounding BRK's Motion for Protective Order. As of June 1, 2000, Ms. Salinas has not returned my telephone call.

I, Elizabeth G. Neally further certify that Terry Henry has attempted to contact Ray Marchan regarding *Motion of Defendant BRK Brands, Inc. For a Protective Order* on the 31st day of June. On the 1st day of June, Mr. Marchan has not returned the telephone calls regarding BRK's filing of the motion for protective order.

As of the day of this filing, Defendant is unaware of whether Plaintiffs are opposed or unopposed as to the filing of the Motion of Defendant BRK Brands, Inc. for a Protective Order.

13