IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 13 2000

Michael N. Milby
Clerk of Court

| | |
|---|---|
| JOSE GARCIA, Individually and as Representative of the Estate MANUEL CRUZ, IDALIA GARCIA, individually and CYNTHIA GARCIA | ) ) ) ) ) CIVIL ACTION NO. |
| VS. | ) ) B-98-186 ) |
| BRK BRANDS, INC. | ) ) |

<u>PLAINTIFFS' INITIAL RESPONSE TO DEFENDANT BRK BRANDS, INC.
MOTION FOR PROTECTIVE ORDER AND MOTION FOR SANCTIONS</u>

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, PLAINTIFF CYNTHIA COX AS NEXT FRIEND OF BRITTANY COX, Plaintiffs in the above styled and numbered cause, by and through their attorney of record, HARRIS & WATTS, P.C., at 1926 E. Elizabeth, and files this their Initial Response to Defendant BRK Brands, Inc.'s Motion for Protective Order and Motion for Sanctions, and in support thereof would respectfully show the court as follows:

I.

One of Plaintiff's experts, Jesse Aronstein, has provided expert information as follows:

"The combinations of materials used in the piezo horn contacts in the BRK battery-powered smoke alarms, including the Model SA67D, is not suited for the application, and this constitutes a design

1

defect. On the basis of the information that I have been provided with, and assuming that the sensing element was sensitive enough to detect the combustion products from the heater, it is my conclusion that the smoke alarm's failure to sound was most likely due to high resistance at one or more of the contacts to the piezo disk."

See Jesse Aronstein's Expert Report attached as Plaintiff's Exhibit "A." Defendant's motions are indicative of the gamesmanship they have employed at various stages of their defense in this case. They critique plaintiffs' experts as not having examined the smoke detector regarding the horn contacts while at the same time refusing to allow plaintiff's experts to examine the smoke detector. This has occurred even though at every request of defendant, Plaintiffs have provided the smoke detector for examination. Accompanying this response is Plaintiff's motion to compel the production of the smoke detector for examination by plaintiff's experts.

In discussions with defense counsel, plaintiffs counsel indicate that it be necessary to take the deposition of Mark Devine, the Vice President of Quality Assurance and Product Development before Plaintiffs' experts would be able to give final opinion. Additionally, plaintiffs indicate that they needed the depositions of Fred Conforti, George Schoenfelder and Nick Bellavia in response even though defense counsel to produce such

individuals indicated that they will not produce Fred Conforti, George Schoenfelder and Nick Bellavia and that plaintiffs would have to subpoena those former employees to testify. As regards Mark Devine, defense counsel provided a date for his deposition and yet, prior to his deposition, filed a motion for protective order after agreeing to that deposition. As reflected in the opinion above and in the attached expert report of Mr. Aronstein, as well as opinions contained in the deposition of B. Don Russell, separable contacts of the piezo horn of the horn detector has been a design problem of this company's smoke detector in the past and continues through the present time.

Additionally, as pointed out to the court, a former defendant's employee Davis Minnis has provided testimony that the separable contacts problem of the smoke detector was covered up by the defendants in the Underwriters Laboratory testing procedures to falsify the results. This indeed is relevant information to take the deposition of Mr. Devine as well as the other former employees of BRK.

II.

The expert report and Curriculum Vitae of Mr. Aronstein has been provided to defense counsel. Unbeknownst to plaintiffs' counsel, the day before the deposition of Mr. McClintock was to be taken, he called advising

3

that he would be unable to proceed because of an illness of Bronchitis. He indicated that while he had been ill over a number of days, he had provided the available deposition dates believing that he would be well enough to go forward. However, his illness had not subsided by the date of his deposition so he requested a reset. However, on the date of his deposition, he turned over for defense counsel an extensive list and exhibits (See attached Exhibit "B") of which he relied upon. These included:

1. CV of Reed (Mac) McClintock
2. Affidavit of Reed "Mac" McClintock
3. Letter to Mac McClintock from Everardo Abrego, 1/20/98
4. Fax cover sheet to Mac Mc Clintock from Everardo Abrego 1/20/98
5. Letter to Everardo Abrego from Reed (Mac) McClintock, 1/20/98
6. Letter to Mac McClintock from Everardo Abrego 1/20/98
7. Check No. 8786 to Mac McClintock from Everardo Abrego, 1/22/98
8. Copies of Photographs
9. Field Notes of Reed (Mac) McClintock
10. Copy of 3-D drawings of house
11. Copy of digital photographs
12. Videotape of smoke alarm demonstration (Retained by Mr. Henry)
13. Letter to Mac McClintock from Everardo Abrego, 6/30/98
14. Letter to Everardo Abrego from Reed (Mac) McClintock, 7/31/98
15. Facsimile transmittal to Everardo Abrego from Mac McClintock, 60/30/98
16. Letter to Mac McClintock from Everardo Abrego, 7/29/98
17. Letter to Everardo Abrego from Reed (Mac) McClintock, 11/9/98
18. Letter to Mac McClintock from Everardo Abrego, 11/10/98

4

19. Letter to Mac McClintock from Ray Marchan, 7/8/99
20. Letter to Ray Marchan from Reed (Mac) McClintock, 7/27/99
21. Site Visit Report, 7/29/99
22. Memorandum to Ray Marchan from Mac McClintock, 7/29/99
23. Defendant BRK Brands, Inc.'s Second Amended Notice of Intention to Take the Oral and Videotaped Deposition of Expert Reed (Mac) McClintock
24. Invoice of McClintock Associates, Inc.

Additionally, though defendant complained of items he failed to turn over at his deposition, on May 17, 2000, Mac McClintock testified that in fact he was not in possession of the additional materials requested but would do his best to turn them over. On June 5, 2000, Mac McClintock did turn over the following items which were forwarded to defense counsel:

1. Inventory Signout Log;
2. UPS Shipping Records; and,
3. Copy of business card from International Flight Center (Willie Alva).

See attached Exhibit "C."

Defendants criticized Mr. McClintock for having opinions as regards smoke detectors even though plaintiffs had not requested that Mr. McClintock address those matters in the separate expert report other than his initial affidavit filed in plaintiff's response to defendant's motion to dismiss. It

5

was only when defense counsel inquired as to Mr. McClintock's actual factual experience with smoke detectors that he revealed his experience and information with Southwest Laboratories.

Defense counsel has been effective in neutralizing Plaintiffs' expert Mr. Bob Ross's testimony limiting it to only factual observations of the heater involved in this action. Yet, in spite of all the information they were able to gather during their trip to San Antonio, as well as the deposition of Mack McClintock lasting many hours, they complained of the expense of making their fruitful trip to San Antonio for the deposition.

Contrary to their stated position as regards Dr. Russell, Dr. Russell has not changed his opinions but has only become more precise in them. As he testified, he stated on page 62, lines 3 through 23 as follows:

"You know that smoke did reach the device because there's deposition of soot and smoke detector, on the parts of the house around the smoke detector, on the face of the smoke detector and inside the smoke detector, so there's no question there was smoke getting to the smoke detector. And the combination of those factors lead you to very few, if not only one alternative, concerning the reason why that detector wouldn't sound, and that is that if smoke did reach it, the smoke particles and so forth were of the type of particle which I've already discussed with you that would -- an ionization detector would be sensitive to, and it was a properly -- it was a standard ionization detector that was properly powered.
    The only thing left is an actual failure of the final terminal device which is the horn. So by eliminating all the other possibilities, you are

6

left with from an engineering probability perspective only one item that I can come up with, which is that the horn itself did not issue the final alarm."

In response to defense counsel's questions on page 63, line 22 and continuing through page 65, line 17.:

"Q. You have testified in other cases that there's been a debate between various people about the effectiveness of ionization and photoelectric detectors in the presence of smoke from expected residential fires.
A. Yes.
Q It's my understanding from your testimony that you don't believe that issue is relevant to this case.
A. Okay. That's going too far. If a properly designed and powered photoelectric smoke detector had been present in this fire, I believe it would have sounded. I believe the type of soot that was deposited on this residence walls and so forth is certainly indicative of the level and type of smoke that would trigger a photoelectric detector and it would have sounded. I also believe that had there been a combination detector there or photoelectric detector stand-alone by itself, that it was properly designed and installed and manufactured it would have sounded a timely alarm. I believe all that to be true.
I also believe, however, that all that same evidence indicates that there was sufficient smoke products for an ionization smoke detector to sound an alarm in this situation and that it might have been preferentially so in that there would have been a substantial amount of heat, there would have been a substantial amount of small particles coming from the type of combustion indicated from the studies that others did about this heater because of the production of carbon monoxide. As a result of that, a properly designed ionization detector should also have sounded.
So had there been a photoelectric chamber there in concert with the ionization chamber, we might have had some redundancy. If the photo-electric detector had a separate horn and that horn wasn't corroded and it might have sounded, then we might have had a timely alarm, whereas in this case we seem to not have had a timely alarm. So there are certainly

7

those issues, but I believe the primary issue here is why a properly powered ionization smoke detector that was in the path of substantial smoke products did not sound an alarm to those products and --"

He continued and further responded to defense counsel questions on Page 236, line 16 through 237, line 11.

"Q. Are there any statements in your September 28, 1999 report which are now relevant to your current opinion as to why this detector did no sound its alarm?

A. Well, in this report I point out that a properly designed and powered ionization smoke detector should have sounded an alarm under these conditions. That's still a relevant and accurate statement in my opinion.

Q Anything else?

A. I make a general reference to the deficiencies of ionization smoke detectors but I didn't spell those out. If I had spelled those out, they would have included such things as the lack of redundancy, the deficiencies in the single power supply and all the other single point failure modes that I have referred to previously in my depositions with you and others. So all those are still true. I just accumulated those into one statement that said that there were deficiencies."

Therefore, defense counsel's statement about Dr. Russell's changing his opinions are incorrect.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that defendant's motion for protective order and for sanctions be in all things denied, and the court grant relief to plaintiffs to allow plaintiffs inspection of the

8

smoke detector by plaintiffs expert and for such other and further relief, at law or in equity, to which they may show themselves to be justly entitled to receive.

Respectfully submitted on this the 13 day of June, 2000.

HARRIS & WATTS, P.C.
1926 E. Elizabeth
Brownsville, Texas  78520
(956) 546-0333

_____
RAY R. MARCHAN
For the Firm

## CERTIFICATE OF SERVICE

I hereby certify that on this the 13 day of June, 2000, a true and correct copy of the foregoing instrument was delivered to opposing counsel by hand-delivery, via fax or by certified mail, return receipt requested.

_____
RAY R. MARCHAN

9

STATE OF TEXAS            )
                          )
COUNTY OF CAMERON    )

BEFORE ME, the undersigned Notary Public, on this day personally appeared RAY R. MARCHAN, known to me, and first being by me duly sworn according to law upon his oath deposed and stated as follows:

"My name is RAY R. MARCHAN, I am a licensed attorney engaged in the general practice of law in Brownsville, Cameron County, Texas. I am attorney with HARRIS & WATTS, P.C., 1926 E. Elizabeth, Brownsville, Texas. The law firm of Harris & Watts, P.C., has been retained by Plaintiffs in connection with the above-referenced lawsuit.

I am of sound mind, capable of making this affidavit, and I have personal knowledge of each and every statement stated below. I hereby certify that the facts stated in Plaintiffs' Initial Response to Defendant BRK Brands, Inc. Motion for Protective Order and Motion for Sanctions.

I hereby certify that the copies attached as Exhibits "A", "B", and "C", respectively, are authentic true and correct copies of the originals."

Further affiant sayeth not.

_____
RAY R. MARCHAN

10

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said RAY R. MARCHAN, on the ___13___ day of June, 2000, to certify which witness my hand and seal of office.

*Rose P. Silva*
NOTARY PUBLIC, STATE OF TEXAS

ROSE P. SILVA
MY COMMISSION EXPIRES
April 26, 2003

11