152

**IN THE U.S. DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
Filed

APR 1 6 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

---

**BRIEF IN SUPPORT OF**
**MOTION OF DEFENDANT BRK BRANDS, INC.**
**TO EXCLUDE PLAINTIFFS' EXPERTS**

---

**ROERIG, OLIVEIRA & FISHER**
855 West Price Road, Suite 9
Brownsville, TX 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

Rene O. Oliveira
State Bar No. 15254700
Federal Bar No. 4033
Elizabeth G. Neally
State Bar No. 14840400
Federal Bar No. 8044

**COZEN O'CONNOR**
ROBERT W. HAYES
JAMES HELLER
TERRY M. HENRY
1900  Market Street
Philadelphia, PA   19103
Tel: 215/665-2000
Fax: 215/665-2013

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT  .......................................... 1

II.  BACKGROUND FACTS  ................................................ 4

  A. FACTS LENDING UP TO MR. CRUZ' DEATH ............................... 4

  B. THE DEVELOPMENT OF SMOKE DETECTORS .............................. 6

  C. SMOKE DETECTOR RESEARCH ........................................... 7

  D. SMOKE DETECTOR SENSITIVITY ....................................... 10

III.  PROCEDURAL HISTORY  ............................................ 12

  A. PLAINTIFFS' CLAIMS ................................................ 12

  B. PLAINTIFFS' BURDEN AND PLAINTIFFS' CASE ............................ 13

  C. PLAINTIFFS' EXPERT DISCLOSURES ................................... 14

IV.  ARGUMENT  ....................................................... 15

  A. THE COURT'S ROLE AS GATEKEEPER ................................... 15

  B. THE WITNESS MUST BE QUALIFIED AS AN EXPERT ........................ 17

    1. DOUGLAS HOLMES IS NOT QUALIFIED TO TESTIFY AS TO ANY OF THE ISSUES
       PRESENTED IN THIS ACTION ......................................... 19

    2. E. WAYNE MCCAIN IS NOT QUALIFIED TO TESTIFY CONCERNING THE OPERATION
       OF THE SMOKE DETECTOR ........................................... 21

    3. MICHAEL SCHULZ IS NOT QUALIFIED TO TESTIFY ABOUT THE SPACE HEATER.  . 22

    4. DR. MORRIS CRANMER IS NOT QUALIFIED TO OFFER OPINION TESTIMONY ABOUT
       THE OPERATION OF THE SMOKE DETECTOR OR THE SPACE HEATER. ......... 23

  C. THE PROPOSED TESTIMONY MUST BE RELIABLE .......................... 24

    1. DOUGLAS HOLMES' TESTIMONY RELATED TO THE OPERATION OF THE SMOKE
       DETECTOR AND THE SPACE HEATER IS PATENTLY UNRELIABLE. ............. 29

    2. E. WAYNE MCCAIN'S TESTIMONY RELATED TO THE OPERATION OF THE SMOKE
       DETECTOR AND THE SPACE HEATER IS PATENTLY UNRELIABLE .............. 34

i

3.  THE TESTIMONY OF MICHAEL SCHULZ IS NOT RELIABLE . . . . . . . . . . . . . . . . . . 37

4.  DR. RUSSELL'S OPINION THAT THE HORN CONTACTS WERE CORRODED AND
    CONCERNING CAUSATION ARE UNRELIABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

5.  THE TESTIMONY OF DR. JESSE ARONSTEIN CONCERNING CORROSION OF PEIZO-
    HORN CONTACTS IS NOT RELIABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

6.  THE PROPOSED TESTIMONY OF MORRIS CRANMER IS UNRELIABLE . . . . . . . . . . 49

D.  THE PROPOSED TESTIMONY MUST BE RELEVANT. . . . . . . . . . . . . . . . . . . . . . . . . 51

1.  PLAINTIFFS' EXPERTS CANNOT CONNECT THE FAILURE OF THE DETECTOR TO
    ALARM TO MR. CRUZ'S DEATH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

2.  EVEN IF THE "TESTS" CONDUCTED BY PLAINTIFFS' EXPERTS WERE RELIABLE,
    THEY DO NOT FIT THE FACTS OF THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    A)  MR. HOLMES' FLUE TEST, HOLMES-HARDIN TESTS AND GENERAL FIRE TESTS
        FAIL TO FIT THE FACTS OF THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . 55

    B)  MR. MCCAIN'S SMOKE TESTS FAIL TO FIT THE FACTS OF THIS CASE. . . 56

    C)  MR. SCHULZ'S DEMONSTRATIVE TEST FAILS TO FIT THE FACTS OF THIS
        CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    D)  MORRIS CRANMER'S IMPROMPTU EXPERIMENT FAILS TO FIT THE FACTS
        OF THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

3.  PLAINTIFFS CANNOT CONNECT BATTERY-POWERED DETECTORS, SUCH AS THE
    SA67B, TO THE CORROSION ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

E.  THE TESTIMONY OF PLAINTIFFS' EXPERTS SHOULD BE EXCLUDED PURSUANT
    TO RULE 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## **TABLE OF AUTHORITIES**

### CASES

Barrett v. Atlantic Richfield Co., 95 F.3d 375 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Bennett v. PRC Public Sector, Inc., 931 F. Supp. 484 (S.D. Tex. 1996) . . . . . . . . . . . . . . . 17, 56

Black v. Food Lion, Inc., 171 F.3d 308 (5rh Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Camp v. Lockheed Martin Corp., No. CIV.A.H.-97-1938,
　　　1998 WL 966002 (S.D. Tex. Dec. 29, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

Carroll v. Otis Elevator, 896 F.2d 210 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

Castellow v. Chevron USA, 97 F. Supp. 2d 780 (S.D. Tex. 2000) . . . . . . . . . . . . . . . . . . . . . 2, 28

Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . 65

Copley v. Smith & Nephew, Inc., No. CIV.A.H.-97-2910,
　　　2000 WL 223404 (S.D. Tex. Feb. 2, 2000) . . . . . . . . . . . . . . . . . . . 20, 21, 24, 30, 58

Cummins v. Lyle Industries, 93 F.3d 362 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Curtis v. M & S Petroleum, Inc., 174 F.3d 661 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 27, 28

Daubert v. Merrell Dow Pharmaceuticals, Co., 509 U.S. 579 (1993) . . 1, 2, 17, 18, 27, 28, 30, 56

Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995)19, 27, 28, 29, 30, 57

E.I. Du Pont De Nemours and Company, Inc. v. C.R. Robinson,
　　　923 S.W.2d 549 (Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Edmonds v. Illinois Central Gulf Railroad, 910 F.2d 1284 (5th Cir. 1990) . . . . . . . . . . . . . . . . 20

Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Habecker v. Clark Equipment Co., 36 F.3d 278 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 57

Jones v. Lincoln Electric Co., 188 F.3d 709 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Kloepfer v. Honda Motor Co., 898 F.2d 1452 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 18, 20

Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct. 1167 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Meister v. Medical Engineering Corp., 267 F.3d 1123 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . 31

Michaels v. Avitech, Inc., 202 F.3d 746 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Munoz v. Orr, 200 F.3d 291 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Porter v. Whitehall Laboratories, 9 F.3d 607 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 57

Porter v. Whitehall Laboratories, Inc., 791 F. Supp. 1335 (S.D. Ind. 1992),
      aff'd 9 F.3d 607 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Rothfos Corporation v. M/V Neuvo Leon, 123 F. Supp. 2d 362 (S.D. Tex. 2000) . . . . . 17, 18, 28

Saudi v. S/T Marine Atlantic, 159 F. Supp. 2d 512 (S.D. Tex. 2001) . . . . . . . . . . . . . . . . . 20, 29

Smith v. Ford Motor, Co., 882 F. Supp. 770 (N.D. Ind. 1995) . . . . . . . . . . . . . . . . . . . . . . . 22

Stull v. Fuqua Industries, Inc., 906 F.2d 1271 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 20

Tanner v. H. Wade Westbrook, 174 F.3d 542 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . 19, 20, 27

Thomas v. Newton International, Enterprises, 42 F.3d 1266 (9th Cir. 1994) . . . . . . . . . . . . . . 18

United States v. Downing, 753 F.2d 1224 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Watkins v. Telsmith, Inc., 121 F.3d 984 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 29

Werner v. Pittway Corporation, 90 F. Supp. 2d 1018 (W.D. Wisc. 2000) . . . . . . . . . . . . . . . . 47

**STATUTES**

F.R.C.P. 104(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

F.R.C.P. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 65

F.R.C.P. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 56

**TREATISES**

Peter w. Huber, *Galileo's Revenge: Junk science in the Courtroom*, 209 (1991) . . . . . . . . . . . . 30

1 WEINSTEIN & BERGER, WEINSTEIN'S EVIDENCE ¶ 403
      (Mathew Bender 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## I.
## PRELIMINARY STATEMENT

1.  Modern litigation has witnessed a proliferation of expert testimony in civil and criminal matters to unprecedented levels. The increasingly complicated issues presented in litigation occurring in our modern technology driven society is a significant factor in the explosion in the use of expert testimony. In these types of cases, expert testimony is not only helpful, but it is essential in assisting the court and jury in understanding the facts of a case, how those facts may relate to one another and why certain facts are important while others may be irrelevant. However, expert testimony is also unfortunately all too often offered as an illicit substitute for evidentiary support for a party's claims or defenses or in an effort to support speculative claims having no basis in accepted scientific reality. This use of so-called "junk science" frustrates the truth seeking function of litigation and has been rejected by the courts.

2.  In the seminal decision of <u>Daubert v. Merrell Dow Pharmaceuticals, Co.</u>, 509 U.S. 579 (1993), the Supreme Court addressed the proliferation of so-called expert testimony based upon untested scientific theories or analysis that ignores the fundamental principles of scientific research and methodologies. The Court stressed that a verdict should not be based upon untested scientific concepts and highlighted how easily a jury may be misled by expert testimony lacking any foundation in accepted scientific or technical knowledge. Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. This relaxation of the usual evidentiary requirement of firsthand knowledge is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. <u>Daubert</u>, 509 U.S. at 592. Because juries tend to invest substantial credibility in testimony that is designated as "expert," regardless of its validity, the assurances that the law places on the legitimacy of expert testimony are critical to the integrity of the legal process. See <u>Castellow v. Chevron USA</u>, 97 F.Supp.2d 780, 797 (S.D. Tex. 2000); <u>E.I. Du Pont De Nemours and Company, Inc. v. C.R. Robinson</u>, 923 S.W.2d 549, 553 (Tex. 1995). The <u>Daubert</u> Court

furthermore ruled that a courtroom is not the forum to develop new scientific theories:

> It is true that open debate is an essential part of both legal and scientific analyses. **Yet there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory.** Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. **Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final and binding legal judgment... about a particular set of events in the past.**

Daubert v. Merrell Dow Pharmaceutical Co., 509 U.S. 579, 596-97 (1993) (emphasis supplied). As such, as the Court in Daubert held, a district court must serve as a gatekeeper of expert evidence to insure that it is based on accepted scientific methodologies or research complying with the scientific method.

      3.   The expert testimony that plaintiffs have tendered in this action warrants special scrutiny. Plaintiffs seek to impose liability upon BRK because a smoke detector – a product intended to alarm in the presence of a sufficient quantity of smoke from a hostile fire – allegedly failed to perform the unintended function of alarming in time to alert plaintiffs' decedent, Manuel Cruz, of carbon monoxide accumulating in his home. This claim is legally deficient (liability cannot be imposed upon a manufacturer for the failure of a product to perform an unintended function) and factually unsupportable because there is no scientifically valid methodology to prove that the smoke detector could or should have alarmed before Mr. Cruz became incapacitated by the carbon monoxide produced by the space heater. To the contrary, it is commonly recognized that smoke detectors will not activate in response to carbon monoxide.

      4.   In a futile attempt to prove their claims, plaintiffs have resorted to a hodgepodge of conclusory and internally inconsistent assertions by a cadre of unqualified experts with no basis other than their frankly amateurish litigation motivated testimony. Rather than identifying an expert

with training or experience in designing or producing smoke detectors, fire detection or combustion sciences to explain how soot could activate the sensing mechanism of a smoke detector, plaintiffs have tendered the conclusory assertions of individuals, allegedly experienced in cause and origin investigations (i.e., investigations of where a hostile fire starts and how it spreads), that a smoke detector should react to soot from an improperly fueled and vented space heater. The only evidence that plaintiffs have mustered to support this assertion is that on one occasion a smoke detector of a model different from the smoke detector at issue here alarmed after the space heater was turned on (even though it was not generating soot). In attempting to prove that Mr. Cruz was not incapacitated before the time within which they assert the smoke detector would have alarmed, plaintiffs' toxicology expert admittedly failed to use commonly accepted methodologies to calculate carbon monoxide uptake. Additionally, plaintiffs' space heater expert could not offer any rational basis for his opinion as to when the space heater began to produce soot.

5.   This case presents some challenges that neither plaintiffs nor their experts can meet. There are undisputed facts for which the opinions of plaintiffs experts cannot account and questions of causation that plaintiffs experts do not answer. For example, none of plaintiffs' experts can explain why Mr. Cruz had no soot in his lungs. Plaintiffs' experts also offer no basis for their assumption that Mr. Cruz would have either ventilated or evacuated his house if his smoke detector would have alarmed as they believe it should have, in light of studies that suggest Mr. Cruz, in the absence of any perceived threat, would have simply removed the battery from his detector. Plaintiffs also fail to offer consistent theories of what defect supposedly caused the detector at issue to fail to alarm, with one expert contending that all ionization detectors are defective and another expert stating in deposition that any inherent defect in an ionization detector could not explain why the detector did not alarm.

3

6.   This is quintessential junk science.  As the gatekeeper for the admission of expert testimony, the Court should grant BRK's pending Motion to Exclude and preclude plaintiffs' experts from testifying.

## II.
## BACKGROUND FACTS

### A.    Facts Lending Up To Mr. Cruz' Death

7.   On December 16, 1997, Manual Cruz was discovered dead in his home at 190 Thomas Lane, San Benito, Texas.  Manuel Cruz's house was of relatively simple construction.  It had no central heating or air conditioning system.  To provide heat, Mr. Cruz installed a large, gas-fueled space heater with a supply of LP-Gas (liquid propane gas).  The heater he installed, however, was designed to burn natural gas.  To compound his error, the heater was designed for safe operation only when vented, but Mr. Cruz failed to provide exterior venting for the products of combustion from the heater.  His improper fueling and installation caused the gases from the fuel rich combustion process, including carbon monoxide, to be vented directly into the living space of his house.

8.   On Sunday, December 14, 1997, the day before he died, Manuel Cruz met with his friend Jose Garcia to prepare for a double date the two would have that evening.  Over the course of the evening, Mr. Cruz and Mr. Garcia drank nearly a case of beer and shared a bottle of wine with their dates.  In the early hours of Monday morning, after all of their guests had departed, Mr. Garcia felt too drunk to drive home, so he decided to stay the night.  At about 4:00 a.m., the two turned in for the evening, with Mr. Garcia sleeping on a couch in the living room beneath a window opened about an inch.  Between 6:00 and 6:30 a.m., Mr. Garcia woke with a headache and went home to sleep off what he thought was a hangover.  Interestingly, Mr. Garcia did not detect any soot in the house when he left, or on his clothes.  (*Cranmer*, Vol. II, Exhibit "I".)

4

9.  At 9:00 a.m. on Monday, Mr. Cruz was to have met his daughter, Brittany Cox, and her mother Cynthia at the Zoo. However, he never appeared. Between 10:00 a.m. and 12:00 noon, Cynthia Cox called Mr. Cruz at home to see if he would be joining them. No one answered the phone and she assumed that he had simply forgotten about the visit. On Tuesday night, December 17, 1997, Kenya Sosa, Mr. Cruz's date from Sunday night, became worried because she had not heard from Mr. Cruz for over two days. Around 11:30 p.m., she returned to his house to see if he was there. When she entered his house she discovered him dead on his bed where he was last seen by Mr. Garcia.

10.  The medical examiner concluded that Mr. Cruz died of carbon monoxide poisoning before he inhaled any smoke or soot. (Affidavit and Autopsy Report of Dewitt S. Davenport, M.D., Exhibit "Z"). Plaintiffs do not dispute that Mr. Cruz's asphyxiation was the result of carbon monoxide poisoning caused by the continuous operation of an un-vented and improperly fueled space heater in his home. (See, Deposition Testimony of Douglas Holmes ("*Holmes*"), pp. 217-18, attached hereto as Exhibit "L"; Deposition Testimony of E. Wayne McCain ("*McCain*"), p. 189, attached hereto as Exhibit "P").

11.  Plaintiffs contend that a BRK model SA67D smoke detector was installed high on the wall of the hall way leading from Mr. Cruz's living room, approximately seven to ten feet from the space heater. Plaintiffs have produced the smoke detector that they claim was installed in Mr. Cruz's home and it contains an ionization sensing device.

### B.    The Development of Smoke Detectors

12.    To evaluate plaintiffs' experts adequately, it is important to understand that residential smoke detectors were first developed in the late 1960's in response to the rising death rate from residential fires that occurred throughout the 20th century. Analysis of the manner in which the deaths occurred revealed that many deaths resulted because the residents did not discover the fire,

often because they were asleep, until it was too late to escape. It was believed that a warning device that would alarm in the presence of a fire before residents became incapacitated would significantly reduce the death and injury rate from residential fires. Smoke detectors were ultimately developed and mass marketed to address this long felt need.

13.    Smoke detectors basically consist of a sensing chamber, a horn, electronic circuitry and a power source. They are designed so that smoke from a fire will flow into the sensing chamber, which will be triggered when a sufficient volume of smoke enters the chamber. The electronics monitor the sensing chamber to determine when it is triggered and then transmit an electric impulse to the horn to cause it to sound. The physical design of the sensing chamber is crucial because it determines whether smoke will be able to enter the chamber and, if so, how quickly this will occur. For instance, the opening to the chamber must be of a sufficient size to allow the smoke particles of the dimensions hostile fires commonly generate to enter the chamber. Further, the chamber must be designed so that smoke can enter at basically the same rate regardless from where in the 360 degree circumference of the detector the smoke is flowing. (See, for example, the smoke velocity and directionality tests of UL 217, pp. 36-37, Exhibit "JJ.") These issues raise complex questions of flow dynamics, and BRK (as well as most smoke detector manufacturers), employs physicists to design its sensing chambers.

14.    Smoke detectors use basically two different types of sensing devices: ionization and photoelectric. An ionization sensor contains a small amount of radioactive material that, as it disintegrates, releases a relatively large number of negatively charged ions. The presence of these ions causes the air in the sensing chamber to be negatively charged. When smoke particles enter the chamber, the ions are attracted to certain of the elements commonly found in smoke which essentially neutralize the charged particles. This results in a reduction in "electricity" which is sensed by the detector's electronic components, triggering an alarm. (See generally, *National Fire*

6

*Alarm Code Handbook*, (NFPA 72) Third Edition, 1999 Edition, pp. 17, 22, Exhibit "FF"). A photoelectric smoke detector uses a source of light, rather than a source of radioactive material, in the detection chamber. (Id.) When smoke enters the chamber, the smoke particles cause the light to reflect and scatter until it eventually hits a sensor, thus triggering the alarm. (Id.) Despite the differences in sensing technology, all smoke detectors must pass the same series of tests at a qualified testing laboratory in order to be "listed." (Id.)

**C.    Smoke Detector Research**

15.    The performance characteristics of photoelectric and ionization smoke detectors have been repeatedly reviewed, evaluated and analyzed in the fire science and fire protection communities since the mid-1970's when published reports on a series of fire tests (the "Indiana Dunes" tests) first described in detail the different performance characteristics.[1] There have been over two hundred tests of smoke detectors since Indiana Dunes, in which they were tested under fire conditions. These studies were generally conducted in the scientific method, with multiple detectors, test monitors installed near each detector to determine when and how much smoke was reaching the detectors, monitoring of other products of combustion and tenability conditions and fires started from numerous different materials. Not one study has been published or accepted within the fire science or fire protection communities that concludes ionization detectors are defective or that calls for manufacturers to withdraw them from the market.[1] (See, *Studies Assess Performance of Residential Detectors*, by Dr. Richard Bukowski, (NFPA 87) January/February 1993 Edition, pp. 48-54, attached hereto as Exhibit "HH.") Rather, these studies consistently have concluded that there is no apparent difference in the lifesaving potential between ionization and photoelectric detectors under the fire conditions that can be expected within a home. (Id.)

---

[1]    Arguably, some studies are critical of ionization detectors, as are some of photoelectric detectors. However, no study claims ionization detectors are not adequate to provide early warning of an unwanted fire in the home.

7

16.    Following a dramatic reduction in fire related deaths that accompanied the introduction of smoke detectors as home safety devices in the 1970's, the fire protection and consumer health communities wanted to know why the reduction in fire related deaths began to level off.    In the early 1990's, in an attempt to resolve this issue, the Consumer Product Safety Commission (CPSC) joined the Congressional Fire Services Institute, U.S. Fire Administration and National Fire Protection Association (NFPA) in a joint undertaking called the National Smoke Detector Project. The project was aimed at accumulating data on the numbers and types of smoke detectors in households and sought to determine the ways those smoke detectors were or were not working.  The Department of Housing and Urban Development and many other public and quasi-public organizations also participated. Two studies were initially commissioned, the *Smoke Detector Operability Survey, Report on Findings*, CPSC, October 1994, "*Operability Survey*" attached hereto as Exhibit "GG" and the  *Fire Incident Study, National Smoke Detector Project*, CPSC, January 1995, "*Fire Incident Study*" attached hereto as Exhibit "EE." The *Operability Survey* collected data from household visits. The *Fire Incident Study* collected information following fires in which smoke detectors were present.  The conclusion of both studies was that the overwhelming majority of smoke detectors that failed to operate during the survey or in response to a fire did so because of no power source, either the battery had been disconnected, the battery had died or, if it was a hard-wired smoke detector, the wires were disconnected.  (*Operability Survey*, p. ii, Exhibit "GG"; *Fire Incident Study*, p. iii, Exhibit "EE.")

17.    During the *Operability Survey*, however, a curious anomaly arose.  A small number of smoke detectors that seemingly failed during field tests, operated within standards once back in the laboratory for evaluation.[2]  The CPSC engineer that discovered this aberration developed a

---

[2]    Smoke detectors that failed during field tests in the *Operability Survey* were replaced and taken to a CPSC laboratory for evaluation to determine the cause of the failure.

8

working hypothesis; corrosion developed on the contacts of the piezo-horn (the signaling device) that, in transportation to the CPSC laboratory, broke down and permitted the smoke detector to subsequently operate properly.  To determine if its premise was valid, the CPSC commissioned a further study, *Study of Deterioration of Separable Electrical Contacts in Smoke Detectors*, November 16, 1994, "*IITRI Study*", Exhibit "II."  To explore the CPSC's theory, IIT Research Institute performed a multi-part laboratory analysis of fifty smoke detectors from various manufacturers.  Forty-seven of the fifty test products were smoke detectors that had been removed from homes during the *Operability Survey* as inoperable, but tested appropriately in the CPSC laboratory.  Following an extensive laboratory analysis that involved materials evaluations and attempts to deliberately induce the type of corrosion thought to occur on the peizo-horn contacts, the *IITRI Study* concluded that "no life limiting mechanisms exist [in the smoke detector peizo-horns]. Overall smoke detector reliability is considered good." (*IITRI Study*, p. iii, Exhibit "II.")  Further, the study specifically commented that the type of horn used in BRK smoke detectors was "ruggedly constructed" and none of these type of horns failed during the tests. (*IITRI Study*, pp. 28, 32, Exhibit "II.")

18.    The data obtained from this large body of research have allowed manufacturers to improve their products and has provided information to fire protection agencies and fire departments to determine where smoke detectors should be installed.  For instance, the data from these tests has been invaluable in improving the design of smoke detection chambers and the size and opening of the chambers to promote uniform flow rate of smoke.  It has also allowed researchers and manufactures to better understand what volume of smoke is necessary to cause a detector to alarm.

19.    Additionally, fire science and fire protection professionals have used the data generated during the Indiana Dunes and other large scale testing of smoke detectors to develop and continually revise tests to evaluate the performance of smoke detectors and other household fire

alarm devises. The Underwriters Laboratories' Standard for Residential Smoke Alarms, known as UL 217, is one set of standards developed using this body of scientific knowledge. UL 217 requires smoke detectors to pass, in addition to numerous other performance tests, a series of fire tests. These tests are conducted under scientifically controlled conditions developed by a consensus of fire protection professionals with an intimate understanding of fire dynamics, the operation of smoke detectors and the testing required to properly evaluate smoke detector performance. The conditions under which these tests are conducted are strictly controlled because other outside factors, such as air temperature, air velocity, humidity and many others, can influence the operation of a smoke detector. (UL Standard 217, pp. 39-54A, Exhibit "JJ.") In evaluating smoke detectors under these stringent tests, UL must be reasonably certain that the smoke detectors are responding to smoke and not some other factor, such as dust or humidity. Therefore, the conditions for each test must meet a specific "fire profile" or the results are disregarded as unreliable.

### D.   Smoke Detector Sensitivity

20.    A smoke detector, regardless of its type, cannot and will not alarm immediately upon the ignition of a fire. (*McCain*, p. 90, Exhibit "P"; *Holmes*, pp. 131-32, Exhibit "L"). Rather, a smoke detector will only alarm when smoke reaches the detection chamber in sufficient quantities to trigger the detection device. (*Holmes*, p. 132, Exhibit "L"; Deposition Testimony of Dr. Morris Cranmer dated June 20, 2000 ("*Cranmer* Vol. II"), p. 139, attached hereto as Exhibit "I"). The quantity of smoke necessary to trigger the alarm will be partly a function of the sensitivity at which the particular detector is set. (*Holmes*, pp. 132-33, Exhibit "L.") The setting of the smoke detector is crucial because smoke from a hostile fire is no different than smoke from a friendly (intended) fire, such as cooking and space heaters, and, as of the date of the fire, there were no devices capable of distinguishing between smoke from a friendly fire and from a hostile fire. (*Holmes*, p. 134, Exhibit "L.") The only way to limit the number of times a smoke detector may alarm in the presence of smoke from a friendly fire (sometimes referred to as a nuisance alarm) is to distinguish between the

10

amount of smoke being generated on the assumption that a friendly fire will generally be a small, contained fire and generate little smoke. (*McCain*, p. 92, Exhibit "P"; *Holmes*, p. 133, Exhibit "L"). These are, of course, common sense facts concerning the operation of smoke detectors generally that any lay person with a basic knowledge of smoke detectors would recognize as being true.

21.    The problem with a smoke detector capable of alarming in response to the smallest quantity of smoke detectable, which may technically be feasible, is that a smoke detector will respond to practically all scenarios producing smoke. Nuisance alarms are a leading cause of disconnected power sources. (*Operability Survey*, p. ii, Exhibit "GG.") Because smoke detectors are intended to alarm in sufficient time to alert consumers to a fire before conditions become life threatening, but not to alarm in response to smoke from friendly or nuisance situations, the sensitivity of smoke detectors must be set so that they will not generally alarm in response to small quantities of smoke. (*McCain*, p. 92, Exhibit "P"; *Holmes*, p. 133, Exhibit "L").

22.    As such, it is undisputed that the small amount of smoke that may have been generated by the space heater would not cause the smoke detector to alarm. The smoke detector was not designed or intended to alarm from the operation of the space heater and Mr. Cruz would not have wanted it to do so because the smoke detector would have alarmed every time he turned on the space heater.

23.    As a result of the research and development efforts of smoke detector manufacturers such as BRK, as well as the independent research of the fire science and prevention agencies, smoke detectors have fulfilled their promise. It is commonly recognized that smoke detectors have reduced the death rate from residential fires and that a person is fifty percent less likely to die if a fire starts in his/her home if just one smoke detector is installed there.

24.    However, it is essential to understand that the risk against which smoke detectors protect is fire. Although there are many potentially dangerous conditions that may exist in a home, as plaintiffs' experts concede, smoke detectors are designed to protect against only one such hazard,

11

hostile fires. (*Holmes*, pp. 133-35, Exhibit "L"; *McCain*, p. 92, Exhibit "P").

25.    Carbon monoxide poisoning, on the other hand, is an entirely different hazard that may exist in any house.  Carbon monoxide is a colorless, odorless, tasteless gas that is produced by the incomplete burning of fuel, usually from gas-fueled appliances or a wood burning fire place in the home.  Smoke detectors are not designed to detect, nor do they claim to be able to detect, carbon monoxide from any source.  (*Holmes*, p. 127, Exhibit "L"; *McCain*, pp. 89, 218, Exhibit "P"; Deposition Testimony of Dr. Don Russell dated May 10, 2000 ("*Russell* Vol. I"), p. 144, attached hereto as Exhibit "S").  Carbon monoxide will not bind to the negative ions in an ionization chamber so as to reduce the charge sufficient to cause the detector to alarm.  Similarly, carbon monoxide will not cause the light beam in a photoelectric detector to scatter because it is a colorless and invisible gas.

26.    There are devices intended to detect carbon monoxide – but these are carbon monoxide detectors.  It is instructive to note that these detectors operate on a completely different type of technology than smoke detectors.  Like smoke detectors, there are different types of carbon monoxide sensing devices, but most employ some form of chemical reaction.  For example, one type of sensor used in a carbon monoxide detector manufactured by BRK is called "biomimetic" because it is designed to mimic the human body's response to carbon monoxide.  The biomimetic sensor chemically reacts with carbon monoxide and darkens at a rate slightly faster than carbon monoxide will bind to hemoglobin in the blood.  When the sensor becomes sufficiently darkened, it causes the detector to alarm.

### III.
### PROCEDURAL HISTORY

A.    **Plaintiffs' Claims**

27.    The basis of all of plaintiffs' claims against BRK rest upon the simple factual allegation that Mr. Cruz died of asphyxiation, "when the smoke detector in his home failed to warn him of the smoke in his house."  However, plaintiffs have represented to this Court that there was

12

no fire, that the smoke detector did not kill Mr. Cruz by asphyxiation and that there was no other source of the carbon monoxide but the heater. (Transcript of May 13, 1999 Hearing ("N.T. May 13, 1999"), pp.18, 33-34, attached hereto as Exhibit "BB"; Transcript of June 19, 2000 Hearing ("N.T. June 19, 2000"), p. 28, attached hereto as Exhibit "CC").

28.    BRK filed a Motion to Dismiss the Complaint on the grounds that product liability could not be extended to hold BRK liable for a smoke detector's purported failure to perform a function – alarm in response to a malfunctioning space heater – for which it was not intended. In response to this Motion, plaintiffs submitted that they should be afforded an opportunity to prove that the soot the space heater began to emit would have caused a properly functioning smoke detector to alarm and that the space heater began to emit soot in sufficient volume in time to cause the detector to alarm before Mr. Cruz became incapacitated. The Court denied the Motion to Dismiss to afford plaintiffs the opportunity to provide evidentiary support for these assertions.[2]

**B.    Plaintiffs' Burden and Plaintiffs' Case**

29.    To reach the jury in this case, plaintiffs' must establish that Mr. Cruz's smoke detector was defective, that the defect made it unreasonably dangerous and that it was the direct and proximate cause of Mr. Cruz's death. Because smoke detectors do not respond to carbon monoxide, plaintiffs' have to show:

> A properly operating ionization smoke detector would alarm in response to the emissions from a malfunctioning space heater;
> > The volume of emissions that would have to be emitted from the space heater in order to trigger the alarm;
> The existence of a defect in the BRK smoke detector which would prevent it from alarming in response to the volume of emissions that would cause a typical ionization smoke detector to alarm;
> > When a sufficient volume of emissions reached the smoke detector to cause a typical ionization smoke detector to alarm;
> Mr. Cruz did not become incapacitated until after a sufficient amount of emissions reached the smoke detector to cause a typical ionization smoke detector to alarm;
> The smoke detector did not alarm when it should have; and
> The smoke detector was adequately powered at the time it should have alarmed.

13

30. As discussed above, the facts of this case are not helpful to plaintiffs. The space heater had been operating through out the night, producing carbon monoxide and other products of combustion, but no perceptible soot. Additionally, Mr. Cruz's autopsy revealed that he died of carbon monoxide poisoning before he inhaled any soot or smoke. (Affidavit and Autopsy Report, Exhibit "Z.") To spin these rather conclusive facts in their favor, plaintiffs offer the opinion of their experts to explain why, in the absence of any evidence of smoke inhalation, the manufacturer of a smoke detector should be held liable for Mr. Cruz's carbon monoxide poisoning death. However, their experts lack the competence to address the subjects upon which they have attempted to opine and the experts' conclusions are unreliable, based upon analysis lacking any foundation in accepted scientific fact or methodologies, irrelevant and/or fail to fit the facts of this case.

C.     **Plaintiffs' Expert Disclosures**

31. In their initial reports,[3] plaintiffs' experts were exceedingly vague in their identification of a defect in the SA67D smoke detector allegedly in Mr. Cruz's house at the time of his death. Those experts that did offer an opinion theorized that the SA67D smoke detector was defective because it employed ionization sensing technology. Those experts opined that had the smoke detector employed a both photoelectric and ionization smoke sensing technology, it would have alarmed in sufficient time for Mr. Cruz to escape without injury. (See Initial Expert Reports of Dr. Russell and Mr. Holmes, attached hereto as Exhibits "R" and "K" respectively). However, plaintiffs and their experts have questioned the relevance of this theory of defect. (*Russell* Vol. I, pp. 63-65, Exhibit "S").

32. Plaintiffs now contend that Mr. Cruz's smoke detector was defective because its piezo-horn was susceptible to corrosion. Essentially, plaintiffs allege that the peizo-horn contacts on the BRK detector – the contacts through which the alarm signal is transmitted to the horn - became corroded through a "fretting" motion and this corrosion developed to the extent it blocked the transmission of the alarm signal to the horn. Fretting is the rubbing of the two horn contacts,

14

together through either the sounding of the horn or changes in environmental conditions that would cause the horn contacts to expand and contact. Plaintiffs acknowledge that corrosion will not cause a horn to malfunction until it develops to the point it can block the transmission of the alarm signal.

33.    Plaintiffs and their experts admit that smoke detectors are not intended to provide early warning of carbon monoxide poisoning dangers. (*Holmes*, p. 127, Exhibit "L"; *McCain*, p. 89, Exhibit "P"; *Russell* Vol. I, p. 144, Exhibit "S"). Therefore, for plaintiffs' theories of product defect to have any relevance to this case, plaintiffs must establish that the space heater released sufficient quantities of soot or emissions to cause the smoke detector to alarm before the carbon monoxide produced by the space heater created life threatening conditions in Mr. Cruz's house. As evidence that the smoke detector should have alarmed before Mr. Cruz became incapacitated, several of plaintiffs' experts conducted demonstrative "tests" purporting to create circumstances substantially similar what occurred in Mr. Cruz's house on December 15-16, 1997. From these simplistic demonstrations, plaintiffs' experts conclude that Mr. Cruz's smoke detector should have alarmed before he became incapacitated.

## IV.
## ARGUMENT

### A.    The Court's Role as Gatekeeper

34.    On questions of the admissibility of evidence, generally, the Federal Rules of Evidence give the Court a significant role:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.

F.R.C.P. 104(a); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993). The burden of proof is on the party proffering an expert witness to establish by a preponderance of the evidence the qualification of that witness and the admissibility of his/her testimony. Daubert, 509

15

U.S. at n.10 (quoting Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)); Rothfos Corporation
v. M/V Neuvo Leon, 123 F.Supp.2d 362, 371 (S.D. Tex. 2000); Bennett v. PRC Public Sector, Inc.,
931 F.Supp. 484, 490 (S.D. Tex. 1996).

35.    Faced with a proffer of expert testimony, the trial judge must determine at the outset
whether the expert is qualified and his testimony is admissible.  The primary source of this
obligation is Federal Rule of Evidence 702, which clearly contemplates a degree of regulation of the
subjects and theories about which an expert may testify.  Daubert, 509 U.S. at 589.  Rule 702 sets
forth the following standard for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill experience, training, or education,
> may testify thereto in the form of an opinion or otherwise.

Although Rule 702 does not directly address the legal standard for measuring the foundation upon
which an expert bases conclusions, that issue was addressed by the United States Supreme Court in
Daubert, 509 U.S. at 592-93. As the Supreme Court held in Daubert, a district court's inquiry is
three-fold: (1) does the witness possess the knowledge, skill, experience, training or experience
necessary to give expert testimony; (2) is the expert proposing to testify to "scientific knowledge"
(reliability of the proposed testimony); and (3) will the testimony assist the trier of fact (relevance
of the proposed testimony)?  See F.R.C.P. 702; Daubert, 509 U.S. at 592; see also Rothfos, 123
F.Supp.2d at 371; Thomas v. Newton Int'l. Enterprises, 42 F.3d 1266, 1269 (9th Cir. 1994); Carroll
v. Otis Elevator, 896 F.2d 210, 214-15 (7th Cir. 1990); Kloepfer v. Honda Motor Co., 898 F.2d 1452,
1458-59 (10th Cir. 1990).

36.    In Daubert,[4] the Supreme Court established a two-step analysis to be used by district
courts in exercising their gatekeeping function in regard to expert testimony, but only after the
district court assures itself that a proffered witness is qualified as an expert.  The criteria is simply

16

that the evidence is reliable and that it is relevant to the facts at issue in the case. See Tanner v. H. Wade Westbrook, 174 F.3d 542, 545 n.1 (5th Cir. 1999); Watkins v. Telsmith, Inc., 121 F.3d 984, 988 (5th Cir. 1997).

### B. The Witness Must Be Qualified As An Expert

37. Pursuant to Rule 702, a witness may offer an expert opinion only if he or she draws on some special "knowledge, skill, experience, training, or education" to formulate that opinion. F.R.C.P. 702. The Advisory Committee Notes to Rule 702 state that Rule 702 is "broadly phrased and intended to embrace more than a narrow definition of a qualified expert." On remand in Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995), however, the Ninth Circuit held that a court may exclude an expert who does not have the appropriate experience, education or training to offer a helpful opinion with regard to issues in controversy. Daubert, 43 F.3d at 1317-18.

38. The opinion must be an expert opinion (an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert. Jones v. Lincoln Electric Co., 188 F.3d 709, 723 (7th Cir. 1999) (quoting United States v. Benson, 941 F.2d 598, 604 (7th Cir. 1991)). In other words, in carrying out its gatekeeping function under Rule 104(a), when evaluating the qualifications of an "expert," the district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks. Watkins, 121 F.3d at 990-91 (quoting Cummins v. Lyle Indus., 93 F.3d 362 (7th Cir. 1996)); Reberger v. The Bic Corp., No. CIV.A.700CV005-R, 2001 WL 1143154, at *3 (N.D. Tex. Sept. 25, 2001).

39. Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education, if any, with the subject matter of the witness' testimony. Carroll, 896 F.2d at 212. For example, in Tanner, the Fifth Circuit held that plaintiffs' expert, whose education and experience was in the fields of obstetrics and neonatology, was qualified to testify about the standard of care to be given to a baby suffering

from asphyxia, but was not qualified to give expert testimony concerning the causes of cerebral palsy. See Tanner, 174 F.3d at 548.

40.    This Court has echoed the requirement that an expert demonstrate some special "knowledge, skill, experience, training, or education" in formulating their opinion. See Saudi v. S/T Marine Atlantic, 159 F.Supp.2d 512 (S.D. Tex. 2001); Copley v. Smith & Nephew, Inc., No. CIV.A.H.-97-2910, 2000 WL 223404, at *1 (S.D. Tex. Feb. 2, 2000). In Saudi, this Court barred the testimony of plaintiff's designated expert witnesses, Dr. Salah Mahmoud and the Plaintiff, himself, who both proffered testimony in the areas of lifting crane maintenance and inspection requirements. See Saudi, 159 F.Supp.2d at 516 and 521. In disregarding the testimony of Dr. Mahmoud, the Court emphasized that Dr. Mahmoud was not qualified to offer opinions concerning lifting crane maintenance and/or inspection requirements given his lack of training and experience in these areas, as well as his general unawareness of the rules, regulations and industry standards governing the maintenance and inspection of lifting cranes. See id. Likewise, the Court excluded the expert testimony of the plaintiff based upon its finding that plaintiff's experience as master of vessels, mooring master pilot and instruction pilot did not qualify him as an expert in crane inspection and maintenance.[5] See id. at 517 and 521.

41.    Similarly, in Copley, a product liability case involving the use of an internal fixation device during plaintiff's spinal fusion surgery, this Court barred plaintiff's expert, Dr. Aldrete, from offering expert opinions regarding spinal fixation devices, as well as the causal relationship, if any, between plaintiff's post-implantation pain and the alleged defect in the defendant/manufacturer's internal fixation device, based upon his lack of credentials in the areas of orthopedic surgery and neurology. See Copley, 2000 WL 223404, at *3-4. Specifically, the Court emphasized that Dr. Aldrete, an anesthesiologist who specialized in pain management, had no specific education or experience in the areas of orthopedic surgery or neurology, had not written scientific or other

18

publications in these specific fields, had not conducted scientific studies in these areas, did not teach any courses in orthopedic surgery or neurology, was not a member of any professional associations and did not hold any certifications in these areas. See id. Although Dr. Aldrete served as the attending anesthesiologist during many spinal surgeries, the Court stressed that his focus during those surgeries were on his responsibilities as an anesthesiologist, not on learning the intricacies of orthopedic surgery. See id. Accordingly, the Court concluded that although Dr. Aldrete may be a qualified expert in the area of pain management, he did not possess the specialized knowledge, education, training or experience required to provide an expert opinion on the issue of causation in this matter. See id.

42.    Although BRK does not concede the qualifications of any of plaintiffs' purported experts, and denies that any posses the qualifications necessary to offer reliable and relevant testimony in this case, BRK specifically challenges below the qualifications of Douglas Holmes, Wayne McCain, Michael Schulz and Morris Cranmer.

### 1.    Douglas Holmes Is Not Qualified To Testify As to Any of the Issues Presented in this Action

43.    Plaintiffs designated Douglas Holmes as an expert witness regarding the cause and origin of the fire and the accumulation of smoke and soot on the smoke detector at issue. (See Plaintiffs' Amended Initial Expert Disclosure, attached hereto as Exhibit "B"; Holmes, pp. 179-80, 184, Exhibit "L"). However, Mr. Holmes' qualifications are as a cause and origin investigator. (See Holmes Curriculum Vitae, Exhibit "J.") This specialty involves the analysis of burn patterns at a fire scene to determine where and how a fire started, and how it spread. While Mr. Holmes may be qualified to testify as to the cause and origin of a fire, which has no bearing here because there was no fire, he lacks the expertise to address any of the issues plaintiffs attempt to present in this case. See, e.g., Smith v. Ford Motor, Co., 882 F.Supp 770 (N.D. Ind. 1995) (automobile fire cause and

19

origin expert is not qualified to testify regarding design defects in automobile).

44.    To be qualified to render an expert opinion on the relevant issue, how the smoke detector could have prevented Mr. Cruz's carbon monoxide poisoning death if there was no soot in his lungs, Mr. Holmes must have specialized knowledge and expertise in the design and operation of smoke detectors to enable him to determine whether, under the conditions existing in Mr. Cruz's apartment at the time of the incident, the smoke detector should have alarmed. Further, Mr. Holmes should also be educated and knowledgeable in the areas of gas-fueled appliances or combustion science[6] to enable him to scientifically measure whether the subject space heater released sufficient quantities of soot or smoke to cause the smoke detector at issue to alarm before a dangerous quantity of carbon monoxide was produced to incapacitate Mr. Cruz. However, Mr. Holmes, a fire consultant specializing in the cause and origin of fires, has no specific education or experience in any of these areas. (See Holmes Curriculum Vitae, Exhibit "J".)

45.    As to his lack of expertise to offer relevant opinion testimony in this case, Mr. Holmes:

>    has never performed or participated in any tests or studies focusing on the internal design of residential smoke detectors (*Holmes*, pp. 89-91, Exhibit "L");
>
>    has never been called upon to test the integrity of residential smoke detectors (*Holmes*, pp. 89-91, Exhibit "L");
>
>    has no experience in designing, manufacturing or the selling of residential smoke detectors[3] (*Holmes*, pp. 79-82, Exhibit "L");
>
>    has not been accepted by any court as a residential smoke detector expert (*Holmes*, pp. 12, 89-91, Exhibit "L"); and
>
>    has never performed or participated in any test or study conducted for the specific purpose of measuring the rates in which products of combustion are produced and released from propane-fueled heaters. (*Holmes*, pp. 94-95, Exhibit "L").

---

[3]    Although Mr. Holmes cannot offer an opinion about whether a specific detector is defective, as a Fire Marshal, he has evaluated whether the application, installation and maintenance of smoke detectors was in compliance with industry standards. (*Holmes*, pp. 42-50, 80, Exhibit "L.")

46.     Mr. Holmes claims to have participated in numerous experiments purporting to test how battery powered ionization smoke detectors respond in fires. As is set forth hereinafter, these litigation motivated tests failed to comply with the rudimentary requirements of the scientific method and conferred no expertise upon Mr. Holmes. In any event, merely testing smoke detectors does not make Mr. Holmes an expert in their design, construction or operation. An expert in one field may often be exposed to the work of other experts, but this does not make this individual an expert in every field to which he was exposed. For instance, the anesthesiologist in <u>Copley v. Smith & Nephew, Inc.</u>, *supra*, participated in many surgeries where internal fixation devices were installed and, yet, he lacked sufficient expertise to testify that an internal fixation device was the cause of the plaintiff's pain.

47.     Mr. Holmes' expertise as a Fire Marshall and cause and origin expert has no bearing upon the issues presented in this case and he lacks the qualifications to address any issue of relevance here.

### 2.     E. Wayne McCain Is Not Qualified To Testify Concerning The Operation of the Smoke Detector.

48.     Plaintiffs designated E. Wayne McCain, as an expert witness, to testify regarding the allegedly defective and unreasonably dangerous smoke detector and the accumulation of smoke and soot to such an extent that the smoke detector would have sounded an alarm hours earlier than at the time of Mr. Cruz's demise. (<u>See</u> Plaintiffs' Amended Initial Expert Disclosure, Exhibit "B"). At best, Mr. McCain is an expert in gas-fueled appliances and in determining the cause and origin of fires. (<u>See</u> Curriculum Vitae of E. Wayne McCain, attached hereto as Exhibit "N.") Mr. McCain does not possess the special knowledge, training, expertise and education that is required to render an expert opinion in this case concerning the design and operation of the smoke detector. Specifically, Mr. McCain admittedly has no independent experience in designing, manufacturing or

21

the selling of residential smoke detectors. (*McCain*, pp. 45-46, 51-52, Exhibit "P"). In fact, his only experience with the use of residential smoke detectors has arisen through litigation. (*McCain*, pp. 45-46, Exhibit "P"). Although Mr. McCain conducted one set of tests relating to smoke detectors, as detailed in Section C, *infra*, he admits that his tests would not withstand the rigors of a <u>Daubert</u> challenge and are completely unreliable. As such, to the extent that Mr. McCain may have the expertise to address issues relating to the operation of the space heater, he cannot offer any opinion as to how the soot or other particles the space heater emitted would or should have affected the smoke detector.

### 3. Michael Schulz Is Not Qualified To Testify About the Space Heater.

49.    Plaintiffs designated Michael Schulz, as an expert witness, to testify regarding the accumulation of smoke and soot to such an extent that the smoke detector would have sounded an alarm before Mr. Cruz was incapacitated by carbon monoxide. (<u>See</u> Plaintiffs' Amended Initial Expert Disclosure, attached hereto as Exhibit "B"). However, Mr. Schulz lacks sufficient knowledge, skill, experience, training and education to offer expert testimony concerning this issue. (Deposition Testimony of Michael Schulz dated December 5, 2000 ("*Schulz* Vol. I"), pp. 67, 81, attached hereto as Exhibit "W").

50.    Specifically, Mr. Schulz is not qualified to offer expert testimony concerning the rates in which products of combustion are produced from propane-fueled heaters for the following reasons:

> he has never conducted nor participated in any tests or examinations of a space heater to measure the amount of carbon monoxide, soot, carbon dioxide or any other by-products of combustion or how products of combustion effect oxygen levels. (*Schulz* Vol. I, pp. 118-19, Exhibit "W"); and
>
> he has never been involved in a case where he was called upon to examine a gas-fueled space heater to determine the quantity or volume of the by-products of combustion from a propane-fired space heater. (*Schulz* Vol. I, p. 108, Exhibit "W").

51.    Moreover, Mr. Schulz has no training, experience or other expertise in the field of modeling.  He is not a fire protection engineer and professes no expertise in mathematical computer sciences.  He has no basis to opine as to how the soot or other emissions from the space heater would have dispersed throughout the room and has not even purported to use any of the numerous available peer reviewed and validated computer models. In light of the foregoing, BRK respectfully requests that this Court preclude Mr. Schulz from offering expert opinions regarding the rates in which products of combustion are produced from gas-fueled space heaters.

**4.    Dr. Morris Cranmer Is Not Qualified To Offer Opinion Testimony About The Operation Of The Smoke Detector Or The Space Heater.**

52.    Plaintiffs offer Dr. Cranmer to present a variety of opinions, including, that Mr. Cruz died at approximately 1:00 p.m. on Monday December 16, long after the smoke detector allegedly should have alarmed.  (See Expert Report of Morris Cranmer, Exhibit "W"; *Cranmer* Vol. II, p. 57 , Exhibit "I").  Dr. Cranmer is a toxicologist and, as such, may have had the expertise to use the correct methodology to determine when Mr. Cruz became incapacitated.  However, as with plaintiffs other experts, he attempts to transcend his stated expertise to conclude that the smoke detector should have alarmed by the time he believes Mr. Cruz became incapacitated.  To perform this analysis, Dr. Cranmer would be required to determine the rate at which the space heater produced combustion by-products, including, soot, carbon monoxide, carbon dioxide and nitrogen, and have an understanding of how smoke detectors respond under various environmental conditions.  Dr. Cranmer has admitted that he does not possess any of the necessary expertise and is not a:

combustion science expert (*Cranmer* Vol. II, p. 78, Exhibit "I");
smoke particulate expert (*Cranmer* Vol. II, p. 78, Exhibit "I");
soot formation expert; (*Cranmer* Vol. II, p. 79, Exhibit "I");
fire signature expert (*Cranmer* Vol. II, p. 79, Exhibit "I");
smoke detector expert (*Cranmer* Vol. II, pp. 79-80, Exhibit "I");
carbon monoxide detector expert (*Cranmer* Vol. II, p. 80, Exhibit "I");
fire protection engineer (*Cranmer* Vol. II, p. 80, Exhibit "I");

23

electrical engineer (*Cranmer* Vol. II, p. 80, Exhibit "I");

mechanical engineer (*Cranmer* Vol. II, p. 80, Exhibit "I");

materials engineer (*Cranmer* Vol. II, pp. 80-81, Exhibit "I");

chemical engineer (*Cranmer* Vol. II, p. 82, Exhibit "I"); and/or

cause and origin expert (*Cranmer* Vol. II, p. 82, Exhibit "I").

Consequently, Dr. Cranmer should not be permitted to offer any opinion concerning the production of soot, carbon monoxide or any other by-product of combustion by the space heater and should not be permitted to offer any opinions concerning the operation of the smoke detector.

### C.    The Proposed Testimony Must Be Reliable

53.    After a court considers whether a witness possesses the necessary training, education or experience to offer expert testimony, it must then engage in a rigorous two-part analysis. As part of this analysis, the court must satisfy itself that the principles, reasoning and methods underlying the proposed testimony must be deemed reliable. See Tanner, 174 F.3d at 546; Curtis v. M & S Petroleum, Inc., 174 F.3d 661, 668 (5th Cir. 1999). This means that the expert's bald assurance of validity is not enough. Daubert, 43 F.3d at 1316. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology. Id. Ultimately, the Court must determine nothing less than whether the expert's testimony reflects "scientific knowledge," whether his findings are "derived by the scientific method," and whether his work product amounts to "good science." Daubert, 509 U.S. at 590-94.

54.    "Scientific" implies a grounding in the methods and procedures of science. Daubert, 509 U.S. at 590. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. Id. With this in mind, the Court must scrupulously assess  (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data.  Rothfos, 123 F.Supp.2d at 371.  In other words, to be reliable, the proposed testimony must be supported by

appropriate validation -- i.e., "good grounds," based on what is known. Daubert, 509 U.S. at 590.

Moreover, "any step that renders the expert's analysis unreliable . . . renders the expert's testimony

inadmissible. This is true whether the step completely changes a reliable methodology or merely

misapplies that methodology." Curtis, 174 F.3d at 670-71 (internal citations omitted); Castellow v.

Chevron USA, 97 F.Supp.2d 780, 796 (S.D. Tex. 2000) (internal citations omitted).

55.    While declining to set forth a "definitive checklist or test," the Supreme Court did list

four, non-exclusive factors federal judges can consider in determining whether expert testimony is

reliable:

> whether the theory or technique has been subjected to peer review
> and publication;
>
> whether the theory or technique can be and has been tested;
>
> the known or potential rate of error of the method used and the
> existence and maintenance of standards controlling the technique's
> operation; and
>
> whether the theory or technique employed by the expert is generally
> accepted in the scientific community.

Daubert, 509 U.S. at 593-95. These factors are illustrative rather than exhaustive and they are not

equally applicable in every case.[7] Daubert, 43 F.3d at 1316-17.

56.    The intent of the examination is to determine whether the analysis supporting the

expert's testimony falls within the range of accepted standards governing how scientists conduct

their research and reach their conclusions. Id. The Supreme Court's purpose in requiring that the

expert's testimony be "reliable" was to make sure that when experts testify in court they adhere to

the same standards of intellectual rigor that are demanded in their professional work. Kumho Tire

Co., Ltd. v. Carmichael, 119 S.Ct. 1167, 1176 (1999); Black v. Food Lion, Inc., 171 F.3d 308, 311

(5th Cir. 1999); Watkins, 121 F.3d at 991; Saudi, 159 F.Supp.2d at 515 (internal citations omitted).

See also, Munoz v. Orr, 200 F.3d 291, 301 (5th Cir. 2000) (trial judge was justified in rejecting the

opinions of Dr. Benz, plaintiffs' expert witness, after it was determined that Dr. Benz's methods were not in accord with those of recognized experts in his field).

57.    In applying the Supreme Court's <u>Daubert</u> rulings, the courts have generally viewed expert testimony based upon research or analysis performed strictly for litigation with deep suspicion. For instance, on remand, the Ninth Circuit examined the work product of the plaintiffs' experts to determine if they were proposing to testify about matters growing naturally out of research they had conducted independent of the litigation or whether they had developed their opinions expressly for the purposes of testifying. <u>Daubert</u>, 43 F.3d at 1317. The court could not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office. <u>Id</u>. It reasoned that experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration. When an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. In the scientific community, a researcher's conclusion is subjected to normal scrutiny through peer review and publication. That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by others, i.e., that it meets at least the minimal criteria of good science. <u>Daubert</u>, 43 F.3d at 1318, citing, <u>Daubert</u>, 509 U.S. at 593-95; <u>see also</u> Peter W. Huber, *Galileo's Revenge: Junk science in the Courtroom*, 209 (1991) (the ultimate test of an expert's integrity is her readiness to publish and be damned).

58.    The Ninth Circuit observed that the only review of the analysis performed and conclusions reached by plaintiffs' experts was by judges and juries. The examination of a scientific study by a cadre of lawyers is not the same as its examination by others trained in the relevant field. <u>Daubert</u>, 43 F.3d at n8 (<u>quoting</u>, <u>Perry v. United States</u>, 755 F.2d 888, 892 (11th Cir. 1985). As such, the Court held that where a party's experts testify solely based upon litigation generated

26

analyses, their testimony will not be admitted unless the expert's analysis rigorously complies with the scientific method. The court further noted that despite the many years the Bendectin controversy brewed, no one in the scientific community deemed the studies by plaintiffs' experts worthy of verification, refutation or even comment. It concluded with the comment that, "It's as if there were a tacit understanding within the scientific community that what's going on here is not science at all, but litigation." Daubert, 43 F.3d at 1318; see also, Copley, 2000 WL 223404, at *4; Michaels v. Avitech, Inc., 202 F.3d 746, 753 (5th Cir. 2000).

59.    Such an analysis is equally persuasive here, where the performance characteristics of photoelectric and ionization smoke detectors have been repeatedly reviewed and analyzed within the fire science and fire protection communities over the last thirty years. Despite over two hundred tests of smoke detectors since Indiana Dunes, not one study has been published or accepted within the fire science or fire protection communities that concludes that ionization detectors are defective or calling for manufacturers to withdraw them from the market. (See, *Studies Assess Performance of Residential Detectors*, by Dr. Richard W. Bukowski, pp. 48-54, Exhibit "HH.") Rather, these studies consistently have concluded that there is no apparent difference in the lifesaving potential between ionization and photoelectric detectors under the fire conditions that can be expected within a home. As Dr. Bukowski's article demonstrates, the published studies on this issue overwhelmingly conclude that ionization-type smoke detectors, if properly powered and installed correctly provide adequate warning of hostile fires. On this basis alone, any opinion testimony concerning the inefficiencies of ionization technology should be precluded. See, Meister v. Medical Engineering Corp., 267 F.3d 1123 (D.C. Cir. 2001) (expert opinion did not meet Daubert standard because of overwhelming studies to the contrary).

60.    Likewise, only one study has ever been printed that evaluated peizo-electric horn contacts. (See, *"IITRI Study"*, Exhibit "II".) Following an extensive laboratory analysis that

27

involved materials evaluations and attempts to deliberately induce fretting corrosion, the *IITRI Study* concluded that "no life limiting mechanisms exist. Overall smoke detector reliability is considered good." (*IITRI Study*, p. iii, Exhibit "II.")

61.    As smoke detectors are not intended to protect against malfunctioning space heaters, there is no established body of scientific research evaluating whether smoke detectors will alarm in response to soot or other gases emitted from a malfunctioning space heater. Indeed, as is set forth previously, smoke detectors are designed not to alarm in response to the gases emitted from a properly functioning space heater, and it is known that carbon monoxide will not bond with ions to cause an ionization detector to alarm.

62.    Accordingly, in an effort to prove defect and causation, plaintiffs have relied upon the conclusory opinion that Douglas Holmes, E. Wayne McCain, Michael Schulz, Morris Cranmer, B. Don Russell and Jesse Aronstein have rendered within the litigation context. Even though these experts claim to have held their opinions for an extended period, not one has ventured outside the courtroom to vet their highly suspect "testing" protocols or to offer their analysis of defendant's products. Rather, they have confined their criticism of smoke detectors to expert reports and deposition testimony for no purpose other than monetary compensation, while avoiding, at all costs, peer review and the inevitable rejection by the scientific community.

63.    Plaintiffs' proffered expert analysis is accordingly inherently suspect and must be excluded unless plaintiffs can offer some independent validation. They plainly cannot as their analysis is fundamentally inconsistent with the scientific method and fails to meet even the most basic tests of reliability.

    **1.    Douglas Holmes' Testimony Related to the Operation of the Smoke Detector and the Space Heater is Patently Unreliable.**

64.    Mr. Holmes' has offered the unsubstantiated opinion that Mr. Cruz would be alive today had the subject smoke detector worked properly or contained appropriate consumer warnings. (*Holmes*, pp.190, 201-04, Exhibit "L.") With regard to the former, Mr. Holmes concludes that the quantity of soot produced by the space heater should have caused the subject smoke detector to alarm before a hazardous quantity of carbon monoxide would have been produced to incapacitate Mr. Cruz. (*Holmes*, pp. 190-92, Exhibit "L."). Even if Mr. Holmes were a qualified expert, which he is not, his unsubstantiated conclusions fail to meet the most basic requirements of reliability.

65.    Subsumed within these conclusory assertions is an unstated assessment of when Mr. Cruz became incapacitated, a determination that the space heater began to emit soot before Mr. Cruz became incapacitated, that the soot also reached the detector in sufficient quantities to cause it to alarm before Mr. Cruz became incapacitated and that the BRK SA67D smoke detector failed to alarm because of some defect in the detector. As these conclusions are unstated, Mr. Holmes, even though he was deposed, has not offered any scientific or any other basis for them. This precludes the Court from validating Mr. Holmes' methodology and, for this reason alone, his opinions should be excluded.

66.    Mr. Holmes claims to rely upon full-scale fire tests conducted by the Central Texas Fire Investigators Association (CTFIA) and the Alamo Area Law Enforcement Academy, in which he participated, to measure burn patterns of typical household items, such as furniture, televisions and fans. (*Holmes*, pp.42-43, Exhibit "L.") Mr. Holmes also claims that he was involved in various "tests" in which he burned and/or blew up houses, cars, boats and barns. (*Holmes*, pp. 88-89, Exhibit "L.") However, Mr. Holmes does not explain how he used any of the data gleaned from these tests to arrive at his conclusions. It would have been impossible to do so because these tests have nothing to do with the performance of smoke detectors. The CTFIA tests were used to instruct students in

determining the cause and origin of a fire by studying actual burn patterns caused by a fire, not to test or evaluate the performance of the smoke detector. (*Holmes*, p. 45, Exhibit "L.")  The structural fire tests were undertaken for a similar purpose. (*Holmes*, pp. 89, 91, Exhibit "L.")  Smoke detectors were sometimes incidentally installed in the structure, but there was no attempt made to analyze their performance systematically. Indeed, Mr. Holmes did not care which brand ionization detectors were used in these tests and admits that he never just went out to test detectors. (*Holmes*, p. 89, 92-94, Exhibit "L.")  Rather, the only reason smoke detectors were included in these burn tests was to ensure that the fuel load was the same as most common structure fires. (*Holmes*, p. 91, Exhibit "L.")

67.     Moreover, it is difficult to perceive what relevance these tests may have to the issues in this case because Mr. Holmes admits that all of the smoke detectors in these tests operated within limits.  (Holmes, p. 45, Exhibit "L.")  To the extent offered to prove a defect in BRK's smoke detector, the results of these tests are fatal to plaintiffs' claims.  If plaintiffs believe these tests show a baseline against which the performance of BRK's detectors should be measured, they are mistaken because none of these tests evaluated a smoke detector's performance in alarming in response to emissions from a malfunctioning smoke detector.  These "tests" all involved actual fires, unlike the instant case which involves soot emitted from a propane-fueled heater.  More importantly, none of these test fires were set using liquid propane gas nor conducted for the specific purpose of testing and evaluating the response time of smoke detectors. (*Holmes*, pp. 89-90, 94, Exhibit "L.").

68.     Similar to the above tests, in 1998, Mr. Holmes conducted a series of tests for a case captioned *Ayala v. BRK,* the "Holmes-Hardin" tests. (*Holmes*, pp. 95-96, Exhibit "L.")  These tests attempted to simulate a fire that occurred in the home of Mr. Ayala's girl friend that resulted from Mr. Ayala falling asleep on a couch while smoking a cigarette and were purportedly undertaken to evaluate whether a specific model of BRK detectors would alarm in time to alert a sleeping resident of the fire before he was incapacitated.  Once again, it is difficult to undertake the relevance of these tests. Most notably, the videotape of this test plainly demonstrates that the detectors alarmed before

30

the premises became untenable.   As such, to the extent offered to prove some defect  in BRK's detectors, the tests undermine, rather than support, Mr. Holmes' conclusions.  In any event, even if the BRK ionization detectors used in this test had failed to perform adequately, the results would be meaningless here.  The hallmark of the scientific method is the testing of a sufficient number of sample to obtain statistically significant results.  The results of one test are not statistically significant and demonstrate at most, that one smoke detector performed in a certain manner on a given occasion under the limited circumstances of the one test.  No broader conclusions may be drawn.

69.     In forming his opinion, Mr. Holmes also relied on the results of a meaningless experiment that Terry Dees, his assistant, concocted.  This test was a six-and-a-half-minute *ad-hoc* exercise conducted on September 29, 1999, in which Mr. Dees placed four battery-operated smoke detectors inside the flue vent located on the roof of his house in Dickinson, Texas and waited to see the smoke detectors would alarm.  (*Dees*, pp. 19-20, Exhibit "M"; *Holmes*, pp. 112, 115, Exhibit "L").  Neither Mr. Holmes nor Mr. Dees could offer any rational explanation for what they were trying to prove in putting smoke detector in a chimney.  It seems ridiculous to have to affirmatively state that such a test is not governed by any known testing protocol or smoke detector evaluation standard.  When asked at his deposition why Mr. Dees did not attempt to measure obscuration, heat, smoke, soot or anything of that nature, Mr. Holmes cavalierly responded by stating, "it's under the nature of a pregnancy test:  you are or you ain't, and it will alert or it don't alert..." (*Holmes*, p. 115, Exhibit "L.")  The scientific community demands more.

70.     Although  no  explanation  should  be  necessary,  The  *Terry  Dees  Flue  Test*  is scientifically unsound and unreliable for the following reasons:

> the flue vented a natural-gas furnace, not propane.  (*Dees*, p. 19, Exhibit "M"; *Holmes*, pp. 113-14, Exhibit "L");

> the thermostat setting was not noted.  (*Dees*, p. 24, Exhibit "M");

there was no attempt to identify and measure the particulates or calculate the velocity of the flue gases. (*Dees*, pp. 23, 30, Exhibit "M"; *Holmes*, pp. 114-15, 122, Exhibit "L");

Mr. Dees made no attempt to measure the outside air speed, wind velocity, temperature, relative humidity or dew point. (*Dees*, pp. 28-30, Exhibit "M");

each iteration used a model smoke detector different than the smoke detector at issue in this case. (*Holmes*, pp. 115-16, 119, Exhibit "L"); and

the sensitivity setting for the smoke detectors was not noted. (*Dees*, p. 27, Exhibit "M.")

71.    Moreover, only two of the four smoke detectors sounded an intermittent alarm, none went into full alarm (*Dees*, p. 35, 37, 43, Exhibit "M"; *Holmes*, pp. 115-16, 119, Exhibit "L"). Mr. Dees admits that he has no idea what caused the intermittent alarm and has no reason to believe that it was something other than the heat from the vent cap. (*Dees*, pp. 35-38, Exhibit "M."). As such, even if there were some meaningful purpose for this test, no meaningful conclusion could be drawn from therefrom.

72.    Even if the Court were to credit each of these tests, there still would not be a scientifically valid basis for Mr. Holmes' proffered testimony because he failed to use well established methodologies developed within the relevant fields to address each of the issue upon which he purports to opine. For instance, the calculation of when Mr. Cruz became incapacitated may only be made by using the medical peer reviewed tables for predicting carbon monoxide uptake. Assuming Mr. Holmes was competent to make this determination, which he is not, he simply did not attempt to do so. If he relied upon the analysis of plaintiffs' toxicologist, Dr. Cranmer, Mr. Holmes failed to so state in his report nor did he identify which of Dr. Cranmer's changing time lines he was adopting. Further, as will be set forth hereinafter, Dr. Cranmer admittedly did not properly apply the carbon monoxide uptake analysis.

73.    Moreover, in forming his opinion, Mr. Holmes also makes assumptions unsupported by the evidence and not reflective of scientific knowledge. Mr. Holmes bases his opinion on the postulation that soot always precedes carbon monoxide (which is contrary to Mr. McCain's

32

testimony), but does not offer any credible data or studies to substantiate this novel concept. (*Holmes*, p. 220, Exhibit "L"; *McCain*, pp. 8, 194-95, Exhibit "P.") Mr. Holmes simply ignores the undisputed evidence -- that there was no soot present when Mr. Garcia left Mr. Cruz's house between 6:00 and 6:30 a.m., and that he exhibited early signs of carbon monoxide poisoning. (*Holmes*, p. 221, Exhibit "L.") As such, to validate his conclusions, Mr. Holmes would have to determine when the space heater began to produce soot and when this soot reached the smoke detector in sufficient concentrations to trigger the sensor. As will be set forth in the hearing on this Motion, the only accepted methodology to determine when the space heater would have begun to generate soot and to calculate how smoke or other gasses would move within and fill an enclosed structure, which analyses implicate numerous variables, is a properly validated mathematical or computer assisted model. It is only through the use of such a model that Mr. Holmes could possibly predict when a sufficient amount of soot to trigger the sensor would have reached the detector. Yet, Mr. Holmes eschewed any use of such a model, undoubtedly because he does not have a clue how to use one. Moreover, Mr. Holmes had no information about such crucial variables as the rates of production of soot or carbon monoxide from the subject heater, does not know the length of time the heater produced soot or the quantity of soot produced and has no information nor has he considered the ventilation or air exchange in Mr. Cruz's home during the carbon monoxide poisoning incident. (*Holmes*, p.221, Exhibit "L.")

74. Moreover, Mr. Holmes does not have any information about the rate at which soot, rather than smoke – would enter the smoke detector's sensing chamber or the amount of soot that would be required to trigger the alarm. As is set forth previously at length, the configuration of a smoke detector's sensing chamber is crucial and determines the rate at which smoke will enter the chamber. Similarly, all detectors have a sensitivity setting and they will not alarm until that threshold is passed. While all of these issues have been well studied with respect to smoke, Mr. Holmes has none of this information. Not surprisingly then, and most tellingly, Mr. Holmes does

33

not have an opinion as to when the alarm should have sounded. (*Holmes*, p. 216, Exhibit "L.") Without this crucial piece of information, he cannot predict whether the smoke detector should have sounded before Mr. Cruz became incapacitated.

**2.    E. Wayne McCain's Testimony Related to the Operation
of the Smoke Detector and the Space Heater is Patently
Unreliable.**

75.    Plaintiffs will also offer Mr. McCain's opinion that the smoke detector in Mr. Cruz's house was defective because it failed to alarm prior to Mr. Cruz's death. (See Smoke Detector Examination – Report of Opinions By E. Wayne McCain, P.E., attached hereto as Exhibit "O"; *McCain*, p. 176, Exhibit "P.") While Mr. McCain may have greater expertise than Mr. Holmes in space heaters, his analysis suffers from the same flaws as he fails to make a determination of when Mr. Cruz died, fails to use any model and has no information about the performance criterion for smoke detectors. Mr. McCain bases his opinion that sufficient quantities of soot were generated to cause the smoke detector to alarm before Mr. Cruz became incapacitated solely on the amount of soot that was on the ceilings of the Cruz home and in the smoke detector itself. (*McCain*, p. 9, Exhibit "P.") For the reasons above, his conclusions are unreliable.

76.    Indeed, Mr. McCain's theory is rank speculation in light of his own admission that in order to determine when the smoke detector would alarm, one must know the amount of particulate matter being produced by the space heater which is impossible to determine in this case. (*McCain*, pp. 7-8, 113, 116, 121, Exhibit "P.") Specifically, Mr. McCain testified that it is not possible to predict how much and at what rate carbon monoxide verses soot was produced, unless the regulator setting and the gas flow rate are known. (*McCain*, pp. 7-8, 113, 116, 121, Exhibit "P.") Mr. McCain has his own ideas about what tests may provide the information he needs to render a useful opinion in this case, but plaintiffs have not provided him the heater for testing. (*McCain*, pp. 101, 126, Exhibit "P.") Because this information is unavailable, he cannot say with certainty whether

34

soot preceded the production of hazardous levels of carbon monoxide in this case. (*McCain*, p. 116, Exhibit "P.")  In fact, Mr. McCain conceded that he has absolutely no evidence that would suggest that the space heater produced soot before fatal levels of carbon monoxide were produced. (*McCain*, p. 194, Exhibit "P.")

77.    Mr. McCain's proposed opinion that the smoke detector should have sounded before Mr. Cruz died is strikingly similar to the inadmissible expert testimony in <u>Khumo Tire</u>.  Here, as in <u>Khumo Tire,</u> Mr. McCain's opinion about the smoke detector is belied by his methodology, which establishes that it is impossible for him to know whether the space heater produced sufficient quantities of soot to cause the smoke detector to alarm prior to the accumulation of incapacitating levels of carbon monoxide.  Consequently, the internal inconsistencies of Mr. McCain's opinions make them inherently unscientific, unreliable and ultimately inadmissible.

78.    Mr. McCain's liability theory is also unreliable because it apparently assumes that the subject smoke detector was defective because ionization detectors as a class do not adequately respond to slow smoldering fires. (*McCain*, pp. 9, 177, Exhibit "P.")  This theory of liability is flatly rebutted by B. Don Russell, another of plaintiffs' experts, who testified that soot, if it would trigger a smoke detector, would not have the characteristics of a slow smoldering fire (i.e., the type of fire ionization detectors are supposedly unable to detect adequately).    Mr. McCain bases his assumptions about the smoke detector, in part, on the results of two smoke tests ("Smoke Tests") that he conducted specifically for litigation[8] in 1996. (*McCain*, pp. 28, 172-75, Exhibit "P.")  With respect to his Smoke Tests, Mr. McCain claims that these tests show that battery-operated, ionization smoke detectors are unreasonably dangerous given the fact that they would not function for a period of approximately two hours when exposed to a slow, smoldering fire. (<u>See</u> McCain Expert Report, Exhibit "O"; *McCain*, p. 28, Exhibit "P.")  The Smoke Tests, which were performed in an abandoned house set for demolition, were conducted by Mr. McCain to determine how long it would take for

35

a battery-operated ionization smoke detector to alarm after three hot charcoal briquettes are placed on a couch. (*McCain*, pp. 62, 64, 73, Exhibit "P"; Trial Transcript, Dated December 2, 1996 in <u>Neal v. Pittway Corp.</u>, p. 62, attached hereto as Exhibit "AA.") This conclusion is meaningless, however, because the relevant determination is whether the smoke detectors alarmed before the premises became untenable. If the detector alarms before the tenability limit is reached, the resident will be alerted to the fire before he/she becomes incapacitated. By definition, a slow smoldering fire will take a significant time to develop and may generate little or no smoke for an extended period of time. It is therefore not surprising that a smoke detector may take two hours to alarm in response to the type of fire Mr. McCain was setting. Indeed by McCain's own admission, during the First Test, a fire never actually broke out, but the smoke detector sounded while conditions were still tenable. (*McCain*, pp. 70-71, Exhibit "P.") During the Second Test, conducted one week later, Mr. McCain lost control of the testing environment and accidentally burnt the house to the ground. (*McCain*, pp. 63, 74-75, Exhibit "P.")

     79.    Like Mr. Holmes' fire tests, Mr. McCain's Smoke Tests are unreliable for the following reasons:

> Mr. McCain does not know whether the model detector used in his smoke tests is similar to the model detector from the Cruz residence. (*McCain*, p. 63, Exhibit "P");
>
> The size of the testing area was nearly twice the size of the Cruz house. (*McCain*, pp. 67-68, Exhibit "P");
>
> Ventilation was different than in Mr. Cruz's house. (*McCain*, p. 66, Exhibit "P");
>
> No attempt was made to measure the soot, smoke or carbon monoxide production. (*McCain*, pp. 68-70, Exhibit "P");
>
> Mr. McCain did not retain the test protocol, data or results from these tests. (*McCain*, p. 28, Exhibit "P"); and
>
> Mr. McCain admits that his smoke tests are difficult to reproduce and would not meet the <u>Daubert</u> standard. (*McCain*, pp. 73-74, Exhibit "P.")

### 3.    The Testimony Of Michael Schulz is Not Reliable

80.    Assuming, *arguendo*, that Mr. Schulz is qualified to render expert testimony concerning the rates in which products of combustion were produced from the space heater at issue, his opinions are nevertheless inadmissible as they lack scientific reliability.  Michael Schulz opines that a properly operating battery-powered ionization type smoke detector should have alarmed in sufficient time to allow Mr. Cruz to escape the residence before he was incapacitated by carbon monoxide.  (See Expert Reports of Michael Schulz, dated October 29, 1999 and July 24, 2000, attached hereto as Exhibit "V"; *Schulz* Vol. I, pp. 44-45, Exhibit "W.")[9]  In an apparent attempt to circumvent the difficulties Mr. Holmes and Mr. McCain encountered in determining when the space heater began to emit soot, Mr. Schulz claims that any of the emissions from the space heater should have triggered the alarm.  Even if this conclusion were valid, which it is not, Mr. Schulz still has not presented any scientifically valid method of determining when the space heater emissions would have reached a significant volume to cause the detector to alarm.

81.    Moreover, Mr. Schulz principally bases this conclusion that any emissions should have caused the detector to alarm upon a demonstrative test he performed on April 18, 2000 at the Cruz residence.[4]  (*Schultz* Vol. I, pp. 24, 77, 81, Exhibit "W.")  Mr. Schulz placed a dual, photoelectric/ionization detector, First Alert/BRK Brands Model No. SA301B, in what he believed was the location of Mr. Cruz's smoke detector and turned on the heater that was in Mr. Cruz's house at the time he died.  (*Schultz* Vol. I, p. 23, 25, 149 Exhibit "W.")  According to Mr. Schulz, the smoke detector alarmed five minutes and twenty-four seconds after the heater was turned on.[5]  (*Schulz* Vol. I, p. 62, Exhibit "W.")  Mr. Schulz maintains that this test shows that the subject smoke detector should have alarmed from the flue gases (i.e. water vapor, carbon monoxide, carbon dioxide

---

[4]    Mr. Schulz's opinions do not rely in any way upon treatises, documents or books. (*Schulz* Vol. I, p. 194, Exhibit "W.")

[5]    Mr. Schulz's demonstration took approximately one hour and fifteen minutes to complete; 45 minutes to set up the equipment; the demonstration took approximately 10 minutes and it took another 10 to 15 minutes to disassemble the equipment and depart. (*Schulz* Vol. I, p. 66, Exhibit "W.")

and propane) that were released by the heater prior to the emission of soot and smoke and before lethal concentrations of carbon monoxide were produced within the Cruz residence at the time of the incident. (*Schulz* Vol. I, pp. 67, 144-45, Exhibit "W.")

82.    Mr. Schulz's demonstrative test is scientifically unreliable and borders on ridiculous -- particularly in light of Mr. Schulz's own admission that this test did not replicate, nor were the conditions substantially similar to, the conditions that existed at the time of Mr. Cruz's death. (*Schulz* Vol. I, pp. 69, 140, Exhibit "W.") As is previously set forth, the testing of one detector on a single occasion is not a statistically significant sample. Moreover, Mr. Schultz made no attempt to verify the operational condition of the smoke detector he used in the test. Despite the best efforts of smoke detector manufacturers, including BRK, smoke detectors will occasionally falsely alarm. As such, Mr. Schulz cannot show that the results of his tests were caused by anything other than a false alarm. One simply may not conclude, based on this one occurrence, that a smoke detector should respond to water vapor, carbon monoxide, carbon dioxide and propane fumes.

83    In fact, the only reasonable conclusion that may be drawn from this test is that the result Mr. Schultz obtained was an aberration caused by fundamental flaws in his testing protocols. Under the basic laws of physics and chemistry, carbon monoxide and carbon dioxide will not combine with the negatively charged ions in a smoke detector so as to reduce the electrical charge within the detector's ionization sensing chamber to trigger the alarm.[6] It is a basic scientific fact that these gases will not, certainly on a consistent basis, cause a smoke detector to alarm. Further, there is no evidence in the record that propane gases will bind with the negatively charged ions as this issue has never been independently studied.

84.    Moreover, if it were Mr. Schultz's purpose to demonstrate that there are some circumstances under which an ionization detector will respond to the fumes that a malfunctioning

---

[6]    Similarly, as is set forth previously, these colorless gases will not scatter the light because of a photoelectric detector so as to cause it to alarm.

space heater generates, his test provides no basis to conclude that a smoke detector should have alarmed in response to the conditions existing at any time before Mr. Cruz's death. Mr. Schulz testified the following components of his demonstrative test were not similar to the conditions that Mr. Cruz was exposed to on the night of his death:

> the external temperature during his test was approximately fifty degrees warmer (*Schulz* Vol. I, pp. 39-40, Exhibit "W");
>
> ventilation of the house (windows) was different (*Schulz* Vol. I, pp. 36-37, Exhibit "W");
>
> the doors to all of the bedrooms and the bathroom were open during his test (*Schulz* Vol. I, pp. 40-41, 58-59, Exhibit "W");
>
> no measurements of the temperature of the plume of the products of combustion were taken (*Schulz* Vol. I, pp. 162-63, Exhibit "W"; *Schulz* Vol. II, p. 251, Exhibit "X");
>
> ♦ no measurements were taken of soot, smoke and other products of combustion inside the heater, or the invisible production and release of these products into the testing atmosphere. (*Schultz* Vol. I, pp. 27, 62, 68, Exhibit "W"; *Schulz* Vol. II, p. 258, Exhibit "X");
>
> ♦ he cannot guarantee the heater was placed in the same location vis-a-vis the smoke detector (*Schultz* Vol. I, pp. 18-19, 149-50, Exhibit "W");
>
> ♦ the orifice of the heater opening was not measured. (*Schulz* Vol. I, pp. 32-33, Exhibit "W");
>
> ♦ the smoke detector was a completely different type, a combination ionization/photoelectric detector (*Schultz* Vol. I, pp. 25-26, Exhibit "W"); and
>
> ♦ he does not know which of the sensing chambers in the combination detector actually caused the detector to alarm (*Schulz* Vol. II, p. 259, Exhibit "X".)

85.    Although these specific details may seem trivial, they are important to evaluating the overall scientific reliability of Mr. Schulz's demonstration. For example, the temperature effects the speed by which the gas flows into the heater and ultimately affects the quantity/volume of the products of combustion that are emitted from the heater. (*Schulz* Vol. I, pp. 134-36. Exhibit "W"; *Schulz* Vol. II, p. 251, Exhibit "X.") Because the temperature differential was approximately fifty degrees warmer during Mr. Schulz's exercise, the results could be markedly different than what occurred at the time of Mr. Cruz's death. Also, during his demonstration, the heater may have been

39

placed in a position where the exhaust allowed products of combustion to more easily travel to the smoke detector, especially since all doors to the structure were open and the living room window was open 15 inches. (*Schulz* Vol. I, pp. 36, 40-41, 58-59, 151-52, Exhibit "W.")

86.     Although Mr. Schulz's demonstrative exercise was conducted inside the Cruz home, it is no more reliable than the other makeshift "tests" performed by plaintiffs' other experts. As such, Mr. Schulz's demonstrative test is unreliable and should be excluded, as there is no evidence that his testing procedures or the test data has been subjected to peer review or publication.

### 4.     Dr. Russell's Opinion That The Horn Contacts Were Corroded And Concerning Causation Are Unreliable.[9]

87.     As to causation Dr. Russell has no reasonable basis to assume that a smoke detector will alarm in response to the emissions from a malfunctioning space heater or that the space heater produced smoke that reached the smoke detector's ionization chamber before enough carbon monoxide was produced to incapacitate Mr. Cruz. Dr. Russell does not even address whether a smoke detector would normally respond to the emissions from a malfunctioning heater. He also has not studied the production of soot, smoke and carbon monoxide by this particular heater in this case. (*Russell* Vol. II, pp. 300-01, Exhibit "T.")

88.     Dr. Russell's opinion concerning the alleged corrosion theory is inherently unreliable because he lacks any in-depth knowledge of the science underlying the theory. For instance, Dr. Russell bases his opinion on two studies conducted in the early 1990s that he did not participate in, but merely read, the *Operability Survey* and *Fire Incident Study*. Dr. Russell does not know whether either study addresses smoke detectors substantially similar to the one at bar. (*Russell* Vol. I, p. 21, Exhibit "S"; *Russell* Vol. II, p. 306, Exhibit "T.") Dr. Russell, who has never performed any tests or studies regarding corrosion (*Russell* Vol. I, pp. 18, 29, 58, Exhibit "S"), is not a chemist and is unable to identify the type of metals that are involved in the alleged corrosion of the contacts on the subject smoke detector. (*Russell* Vol. I, p. 58, Exhibit "S"; *Russell* Vol. II, p. 276, Exhibit "T"). Dr.

Russell has read these studies, but he has never performed any analysis as to how these reports relate to the instant case. (*Russell* Vol. II, pp. 283-84, Exhibit "T"). Moreover, he is not familiar with the quantity of corrosion or amount of electrical resistance that would be necessary to cause the peizo-horn in this or any model smoke detector to not sound. (*Russell* Vol. II, p. 285, Exhibit "T"). Dr. Russell has not performed even one experiment or study to test his "corrosion" theory. (*Russell* Vol. I, pp. 62-63, Exhibit "S"; *Russell* Vol. II, pp. 271, 276, Exhibit "T").

89.    As to the substance of his opinion, a review of plaintiffs' corrosion theory demonstrates its inherent flaws. Plaintiffs acknowledge that corrosion will not cause a horn to malfunction until the corrosion develops to the point it can block the transmission of the alarm signal. Dr. Russell concedes that the potential for fretting corrosion to develop and interfere with the transmission of the alarm signal is unique to each type of detector, and may depend upon the types of materials used in the contacts and the kind of power source. Yet, Dr. Russell is unaware of any smoke detectors substantially similar to the detector at issue (i.e. with similar horn assemblies, drive circuitry and/or whose horn contacts are made from the same type of materials) that did not alarm because of corrosion of the horn contacts. (*Russell* Vol. I, p. 41, Exhibit "S"; *Russell* Vol. II, pp. 296-97, 306, Exhibit "T.") In fact, Dr. Russell does not know of any model battery-powered smoke detector that ever failed to alarm because of corrosion. (*Russell* Vol. I, p. 53, Exhibit "S.") The only model of smoke detector Dr. Russell knows of that allegedly did not alarm because of corrosion was the model 1839, a hard-wired detector, manufactured by Pittway Corporation, not BRK, between 1985 and 1990. (*Russell* Vol. I, pp. 42-45, Exhibit "S.") Dr. Russell also concedes that the circuitry of the 1839 detector is different than battery-powered smoke detectors and that studies have concluded that the differences in the drive circuitry make battery-operated detectors more resilient to the affects of corrosion.[10]

90.    As to causation Dr. Russell has no reasonable basis to assume that a smoke detector will alarm in response to the emissions from a malfunctioning space heater or that the space heater

produced smoke that reached the smoke detector's ionization chamber before enough carbon monoxide was produced to incapacitate Mr. Cruz. Dr. Russell does not even address whether a smoke detector would normally respond to the emissions from a malfunctioning heater. He also has not studied the production of soot, smoke and carbon monoxide by this particular heater in this case. (*Russell* Vol. II, pp. 300-01, Exhibit "T.")

91.    Dr. Russell's opinion concerning the alleged corrosion theory is inherently unreliable because he lacks any in-depth knowledge of the science underlying the theory. For instance, Dr. Russell bases his opinion on two studies conducted in the early 1990s that he did not participate in, but merely read, the *Operability Survey* and *Fire Incident Study*. Dr. Russell does not know whether either study addresses smoke detectors substantially similar to the one at bar. (*Russell* Vol. I, p. 21, Exhibit "S"; *Russell* Vol. II, p. 306, Exhibit "T.") Dr. Russell, who has never performed any tests or studies regarding corrosion (*Russell* Vol. I, pp. 18, 29, 58, Exhibit "S"), is not a chemist and is unable to identify the type of metals that are involved in the alleged corrosion of the contacts on the subject smoke detector. (*Russell* Vol. I, p. 58, Exhibit "S"; *Russell* Vol. II, p. 276, Exhibit "T"). Dr. Russell has read these studies, but he has never performed any analysis as to how these reports relate to the instant case. (*Russell* Vol. II, pp. 283-84, Exhibit "T"). Moreover, he is not familiar with the quantity of corrosion or amount of electrical resistance that would be necessary to cause the peizo-horn in this or any model smoke detector to not sound. (*Russell* Vol. II, p. 285, Exhibit "T"). Dr. Russell has not performed even one experiment or study to test his "corrosion" theory. (*Russell* Vol. I, pp. 62-63, Exhibit "S"; *Russell* Vol. II, pp. 271, 276, Exhibit "T").

92.    As to the substance of his opinion, a review of plaintiffs' corrosion theory demonstrates its inherent flaws. Plaintiffs acknowledge that corrosion will not cause a horn to malfunction until the corrosion develops to the point it can block the transmission of the alarm signal. Dr. Russell concedes that the potential for fretting corrosion to develop and interfere with the transmission of the alarm signal is unique to each type of detector, and may depend upon the

42

types of materials used in the contacts and the kind of power source. Yet, Dr. Russell is unaware of any smoke detectors substantially similar to the detector at issue (i.e. with similar horn assemblies, drive circuitry and/or whose horn contacts are made from the same type of materials) that did not alarm because of corrosion of the horn contacts. (*Russell* Vol. I, p. 41, Exhibit "S"; *Russell* Vol. II, pp. 296-97, 306, Exhibit "T.") In fact, Dr. Russell does not know of any model battery-powered smoke detector that ever failed to alarm because of corrosion. (*Russell* Vol. I, p. 53, Exhibit "S.") The only model of smoke detector Dr. Russell knows of that allegedly did not alarm because of corrosion was the model 1839, a hard-wired detector, manufactured by Pittway Corporation, not BRK, between 1985 and 1990. (*Russell* Vol. I, pp. 42-45, Exhibit "S.") Dr. Russell also concedes that the circuitry of the 1839 detector is different than battery-powered smoke detectors and that studies have concluded that the differences in the drive circuitry make battery-operated detectors more resilient to the affects of corrosion.[7] (*Russell* Vol. I, pp. 44-46, Exhibit "S.") Dr. Russell admits that he has not performed any research on this issue and cannot contradict the conclusions by this research. (Russell Vol. I, p. 58, Exhibit "S.")

93.    Dr. Russell has demonstrated a complete lack of qualifications in the area of smoke detectors and, in particular, on the issue of corrosion of the peizo horn contacts. Having no expertise in the area and never having participated in or performed studies on peizo horn contacts himself, Dr. Russell's opinion testimony is no more than mere speculation posited by someone with a Ph.D. Dr. Russell has failed to describe the methodology or supporting data he used to reach his conclusion that corrosion was at work on the peizo-horn contacts in the Cruz detector. In the case Werner v. Pittway Corporation, 90 F.Supp. 2d 1018, (W.D. Wisc. 2000), a case where Dr. Russell sought to provide similarly empty opinion testimony, the court held that Dr. Russell's opinion concerning the identification of a smoke detector had no scientific basis, but was "only a bare conclusion..." Werner,

---

[7]    The electrical circuitry of the 1839 was unique to those detectors because they were designed for hard-wired applications, not battery powered applications.

43

90 F.Supp. 2d at 1032. In granting defendants' motion for summary judgment, the court reasoned that an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process. Id. Simply because an opinion is offered by an otherwise educated person does not make his opinion scientific or reliable. Consequently, Dr. Russell's opinion should be precluded as inherently unreliable.

**5.    The Testimony of Dr. Jesse Aronstein Concerning Corrosion of Peizo-Horn Contacts is Not Reliable.**

94.    Likewise, Dr. Jesse Aronstein has opined that the subject smoke detector is defective and should have alarmed prior to Mr. Cruz becoming incapacitated by carbon monoxide, but malfunctioned due to high resistance, caused by fretting corrosion, between the piezo disk in the horn and one or more of the spring contacts connecting it to the circuit board. (See Expert Report of Jesse Aronstein, June 7, 2000, Exhibit "C"; *Aronstein* Vol. I, p. 46, Exhibit "D"; *Aronstein* Vol. II, p. 26, Exhibit "E.") Dr. Aronstein is of the opinion that the selection of materials used in the manufacture of the SA67D model detector's peizo-horn assembly (tin-plated stainless steel contacts and silver pads) are particularly susceptible to high resistance due to fretting corrosion, and therefore, the use of these materials constitutes a design defect. (*Aronstein* Vol. I, pp. 46, 51-52, Exhibit "D"; *Aronstein* Vol. II, p. 40, Exhibit "E.")

95.    Similar to Dr. Russell, Dr. Aronstein's opinion is neither relevant nor reliable, and should be excluded, given that it unreasonably assumes that the detector was properly powered at the time of the incident,[11] and sufficient soot particles were produced to alarm the detector before hazardous levels of carbon monoxide were produced to incapacitate Mr. Cruz.[8] (*Aronstein* Vol. I, pp. 91, 94, 100, 102-03, Exhibit "D"; *Aronstein* Vol. II, pp. 60, 113, 130-35, 139, Exhibit "E.") Further, Dr. Aronstein's opinion fails to eliminate other possible causes explaining why the smoke

---

[8]    Dr. Aronstein did nothing to verify that there was sufficient smoke or soot particles produced to activate the detector before Mr. Cruz became incapacitated by carbon monoxide. (*Aronstein* Vol. II, pp. 130, 132, 135, Exhibit "E.")

44

detector may have failed to alarm. (*Aronstein* Vol. II, pp. 162-64, Exhibit "E.")

96.     More significantly, Dr. Aronstein, himself, admits that the only way to precisely connect the problem of high contact resistance at the horn contacts to a particular smoke detector is to conduct "a sophisticated after-the-fact analysis [of the detector]," which cannot be achieved through mere guess work. (*Aronstein* Vol. I, p. 80, Exhibit "D.") Defendants agree. Accordingly, Dr. Aronstein's opinions concerning the issue of P-Horn corrosion should be excluded as he has done nothing more than hypothesize that the theoretical concern that a detector's horn contacts may become so corroded as to block the alarm signal was realized in this instance.

97.     Dr. Aronstein's entire opinion regarding fretting corrosion rests on the assumption that tin oxide was present on the detector's horn assembly at the time of the incident. (*Aronstein* Vol. I, pp. 113, 117, Exhibit "D"; *Aronstein* Vol. II, pp. 40-41, Exhibit "E.") However, Dr. Aronstein is not qualified, by his own admission, as a materials analyst, and cannot prove that tin oxide was in fact present. (*Aronstein* Vol. I, pp. 94, 123, Exhibit "D"; *Aronstein* Vol. II, p. 45, Exhibit "E.") Even the Scanning Electron Microscope Analysis ("SEM Analysis") that plaintiffs and defendant's experts conducted jointly on the subject smoke detector did not detect "tin oxide." Rather the SEM only detected the separate elements of "tin" and "oxygen." (*Aronstein* Vol. II, pp. 21, 41-42, Exhibit "E.")[9]

98.     Furthermore, Dr. Aronstein testified that, in this case, fretting motion could only have occurred when:  (1) the alarm was activated (through nuisance alarms or testing); and (2) from thermal conditions that it was exposed to in Mr. Cruz's home. (*Aronstein* Vol. I, pp. 64-66, Exhibit "D.")  However, Dr. Aronstein also testified that he does not know, and has not inquired into, the number of times the alarm activated before Mr. Cruz died. (*Aronstein* Vol. I, pp. 143-44, Exhibit

---

[9]     Notably, Dr. Aronstein admits that the presence of thin films of oxide and other corrosion films are normal and to be expected from the metal's exposure to the atmosphere. (*Aronstein* Vol. II, p. 48, Exhibit "E.")

"D.") Also, he has not conducted studies as to the environmental conditions of Mr. Cruz's home, to which the smoke detector was exposed. (*Aronstein* Vol. II, p. 100, Exhibit "E.")

99.    Even if fretting corrosion occurred, for the detector to be inoperable, there needs to be sufficient oxidation to increase resistance beyond the capability of the horn circuit (in excess of 10,000 ohms). (*Aronstein* Vol. I, p. 62, Exhibit "D"; *Aronstein* Vol. II, pp. 50, 58-59, 61, Exhibit "E.") The Cruz detector had three contacts -- the signal arm ("S"), feedback arm ("F") and the call to the back plane arm ("B"). (*Aronstein* Vol. II, p. 27, Exhibit "E.") Dr. Aronstein does not know which of the contacts, if any, had sufficiently high resistance levels at the time Mr. Cruz died to prevent the smoke detector from sounding its alarm. (*Aronstein* Vol. II, pp. 27-28, Exhibit "E.") His belief that one or more of these contacts had sufficiently high resistance to keep the piezo-horn from sounding is theoretical because there is no physical evidence to support this theory. (*Aronstein* Vol. II, p. 28, Exhibit "E.") To the contrary, the only physical evidence indicates that the resistance on the peizo-horn contacts was only 0.2 – 0.4 ohms. (*Aronstein* Vol. II, p. 34-35, Exhibit "E.") At this extremely low level, Dr. Aronstein admits that the electrical resistance would not be sufficient to prevent the peizo-horn from sounding. (*Aronstein* Vol. II, p. 35, Exhibit "E.")

100.    The inherent deficiencies on Dr. Aronstein's opinions are not limited to his inability to show that this specific detector was corroded. He freely admits that he knows of no battery-powered smoke detector of the type manufactured by BRK that has ever failed to operate because of corrosion of the piezo-horn contacts. (*Aronstein* Vol. I, pp. 57-60, 190-91, Exhibit "D.") In fact, Dr. Aronstein agrees that tin-plated stainless steel, such as used by BRK for its contacts, offers better corrosion resistance than un-plated stainless steel. (*Aronstein* Vol. I, pp. 111-12, 190, Exhibit "D.")

101.    Dr. Aronstein also claims to rely on the following four authorities written by peers to support his opinion:  (1) "Fretting Corrosion and Electrical Contacts" written by Bock & Whitley ("Bock & Whitley Article"); (2) "The Impact Of Fretting Parameter On Contact Degradation" written by Robert Malucci ("Malucci Article"); (3) "When Smoke Detectors Don't Work" by Julie Ayers;

46

and (4) the *IITRI Study*.[10]  However, none of these studies support (and some actually contradict) his theory regarding corrosion.

102.    The Bock & Whitley's Article does not support Dr. Aronstein's theory that fretting action caused the resistance of the contacts of the Cruz detector to increase above 10,000 ohms.  In fact, this study found that 1320 thermal cycles on tin/silver contacts only increases the contacts' resistance levels to 0.2 ohms.  (*Aronstein* Vol. II, pp.69-70, Exhibit "E.")  Notably, Dr. Aronstein was forced to admit that he misread this article.  (*Aronstein* Vol. II, pp. 67-68, Exhibit "E".)

103.    In the Malucci study, Dr. Aronstein concedes that Malucci's test data is relevant only because of the test conditions, specimens and materials Malucci used, not because of any relation to smoke detectors.  (*Aronstein* Vol. II, p. 101, Exhibit "E.")  This admission aside, the Malucci Article is irrelevant and fails to support Dr. Aronstein's corrosion theory for two important reasons.  First, the Malucci Article addresses phosphor bronze-to-tin plated nickel fretting, which is more susceptible to high resistance than tin-to-silver.  (*Aronstein* Vol. II, p. 102, Exhibit "E.")  Second, the detector at issue here was not exposed to the temperature changes approaching those used in the Malucci study.  Also in the Malucci study, resistance levels increased to, at most, single digit ohms.  Dr. Aronstein agrees that at single digit ohms, the resistance is not sufficient to prevent the horn in the subject detector from sounding its alarm.

104.    Dr. Aronstein also claims that the article "When Smoke Detectors Don't Work" by Julie Ayers, supports his theory regarding fretting corrosion.  (*Aronstein* Vol. II, p. 7, Exhibit "E.").  However, Dr. Aronstein misinterpreted this article to say that 10% of all detectors do not work because of corrosion.  (*Aronstein* Vol. II, pp. 109-111, Exhibit "E.")  The article does not conclude that a horn will corrode --- just that it may or can corrode.  (*Aronstein* Vol. II, p. 113, Exhibit "E.")

---

[10]     The Bock & Whitley, Malucci and *IITRI Study* all use thermal cycling -- rapid heating and cooling of electrical contacts at high temperatures -- to artificially induce fretting corrosion. Neither the Bock & Whitley nor the Malucci study involved smoke detectors. The Julie Ayers article is actually an abstract from her participation in the *Operability Survey*.

Further, this report does not cite to or reference any scientific or laboratory testing data of peizo-horn contacts. (*Aronstein* Vol. II, pp. 111-12, Exhibit "E.") Lastly, the article was not prepared for or intended to discuss in scientific detail the theoretical possibility of corrosion on peizo horn contacts. As discussed above, the thrust of the article, as well as the underlying study, is that by far the most common cause of smoke detector inoperability is lack of a functioning power supply.

105.    Lastly, Dr. Aronstein relies upon the *IITRI Study* to suggest that piezo-horn failure is due to fretting corrosion. (*Aronstein* Vol. I, pp. 57-58, Exhibit "D"; *Aronstein* Vol. II, p. 62, Exhibit "E.") However, this article is irrelevant and does not support Dr. Aronstein's opinion because it found that the type of horns that are constructed and have contacts most similar to the horn of the SA67D model smoke detector (those referred to as type "A" horns in the study) were put through 2000 thermal cycles without a failure. (*IITRI Study*, Exhibit "II"; *Aronstein* Vol. II, p. 88, Exhibit "E.") The *IITRI study* also concluded that the type "A" horns are "ruggedly constructed."

106.    Dr. Aronstein he is unable to determine the number of detectors referenced in this study that have horns made from the same materials as the Cruz horn (tin-silver contact). (*Aronstein* Vol. II, pp. 190-91, Exhibit "E.") Although, three failing horn assemblies from this study were made from un-plated stainless steel, there are numerous types of piezo-horns, and each type is affected differently by fretting corrosion. (*Aronstein* Vol. II, pp. 180, 191, Exhibit "E.") Because stainless steel is more susceptible to fretting corrosion, the study does not directly support the opinion that detectors with tin-plated stainless steel contacts over a silver pad could fail because of high resistance levels resulting from fretting corrosion. (*Aronstein* Vol. II, pp. 190-91, Exhibit "E.") Lastly, the detectors in the *IITRI Study* were exposed to temperature cycles much more extreme (temperatures ranging from 122 to 176 degrees Fahrenheit) than any temperature to which the Cruz horn would have been subjected. (*Aronstein* Vol. II, pp. 89-91, 99, Exhibit "E.")

107.    In sum, Dr. Aronstein's opinion is unreliable in that he is not a material analyst, has no physical evidence of corrosion or high resistances at any contact point, has not conducted any test

48

to determine whether fretting corrosion can cause resistance levels at contact points between tin and silver to exceed 10,000 ohms, and none of the literature he cited to support his opinions actually concludes that fretting action at such contact points causes resistance to exceed 10,000 ohms. Ergo, his opinion does not pass Daubert scrutiny.

### 6.    The Proposed Testimony of Morris Cranmer is Unreliable

108.    Plaintiffs offer Morris Cranmer as an expert to testify that Mr. Cruz died between 12:00 noon and 2:00 p.m. on Monday December 16, long after the smoke detector should have alarmed. (See Expert Report of Morris Cranmer, Exhibit "G"; *Cranmer* Vol. II, pp. 69-70, Exhibit "I"). To do so, Dr. Cranmer attempts to make calculations of the production of carbon monoxide by the heater and the rate at which Mr. Cruz would accumulate that carbon monoxide within his body (uptake). His underlying calculations, however, are seriously flawed in that he fails to account for known factors and does not follow a scientifically recognized procedure.

109.    To estimate the BTUs required of the space heater to maintain a comfortable atmosphere within Mr. Cruz's home, Dr. Cranmer relies upon, among other things, an estimated heat loss rate prepared for him by an HVAC consultant. He admits, however, that the heat exchange rate could be off by ten to fifteen percent. (*Cranmer* Vol. II, p. 28, Exhibit "I.") Although Dr. Cranmer concedes that the space heater would increase the air pressure within Mr. Cruz's house, thus affecting the air exchange, he did not consider the pressurization in his calculations nor did he perform any tests to determine the actual pressurization. (*Cranmer* Vol. II, p. 44, Exhibit "I.") More importantly, Dr. Cranmer did not actually calculate Mr. Cruz's carbon monoxide uptake. Rather, he figured Mr. Cruz's rate of uptake on a chart based on a constant exposure to a fixed rate of carbon monoxide. (*Cranmer* Vol. II, pp. 64-67, Exhibit "I.") Dr. Cranmer admits, however, that Mr. Cruz was not exposed to a constant rate of carbon monoxide production and may not fit the "standard man" depicted in his chart. (*Cranmer* Vol. II, p. 67, Exhibit "I.") Additionally, Dr. Cranmer did not perform calculations for the production of carbon dioxide, but concedes that rarely is carbon dioxide

49

not produced under circumstances such as in this case and would have the affect of increasing Mr. Cruz's respiration and, more importantly, his carbon monoxide uptake. (*Cranmer* Vol. II., pp. 98-99, Exhibit "I.")

110. In addition to the above factors that indicate his estimate of Mr. Cruz's carbon monoxide poisoning is not scientifically reliable, Dr. Cranmer admits that there are factors that would impact his estimates, such as the severity of Mr. Garcia's headache when he awoke in the morning and whether the heater, at some point in time, began producing large quantities of carbon monoxide. (*Cranmer* Vol. II, pp. 50, 54, Exhibit "I.") Dr. Cranmer also concedes that Mr. Cruz's failure to respond to Ms. Cox's 10:00 a.m. phone call would change his opinion concerning the estimated time of Mr. Cruz's death. (*Cranmer* Vol. II, p. 72, Exhibit "I.")

111. More importantly, however, Dr. Cranmer did not consider the Blood Alcohol Content ("BAC") measurement taken by the Baptist Valley Medical Center during Mr. Cruz's autopsy. If he had considered the BAC result, he agrees that Mr. Cruz would have become incapacitated and died much earlier than he had initially concluded. (*Cranmer* Vol. II, pp. 86-88, 96, Exhibit "I.") When considering both Mr. Cruz's BAC reading in combination with the likely increase in carbon dioxide that would have increased Mr. Cruz's carbon monoxide uptake, Dr. Cranmer believes that Mr. Cruz may have died even before 9:00 a.m. on Monday, December 16. The impact of these additional factors on Dr. Cranmer's opinion are the clearest demonstration that his proposed testimony is not scientifically based and inherently unreliable.

112. Dr. Cranmer also seeks to support his opinion based upon an impromptu experiment he conducted using the space heater. To conduct this "test," Dr. Cranmer placed a smoke detector on the wall near the space heater, then ignited the space heater. However, Dr. Cranmer's exercise in unreliable because:

> he did not measure the velocity of soot at the smoke detector (*Cranmer* Vol. II, p. 135, Exhibit "I");
>
> he did not measure the temperature at the smoke detector

50

> (*Cranmer* Vol. II, p. 135, Exhibit "I");
>
> he used a different smoke detector model  (*Cranmer* Vol. II, p. 134, Exhibit "I");
>
> he took no measurements of carbon monoxide, carbon dioxide or any other products of combustion (*Cranmer* Vol. II, p. 144, Exhibit "I");
>
> the smoke detector was placed in a different location vis-à-vis the heater (*Cranmer* Vol. II, p. 138, Exhibit "I"); and
>
> ventilation during his tests permitted an infinite dilution of gases (*Cranmer* Vol. II, p. 144, Exhibit "I".)

113.    Dr. Cranmer's failure to follow any recognized protocol in performing his heater exercise makes it scientifically unreliable and does not provide a reasoned basis upon which to form an expert opinion.

### D.    The Proposed Testimony Must Be Relevant.

114.    Rule 702 further requires that the proffered evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." F.R.C.P. 702. This condition goes primarily to relevance. Daubert, 509 U.S. at 591. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. Id. citing, 3 Weinstein & Berger P702[02], pp. 702-18.

115.    Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. Daubert, 509 U.S. at 592. In its analysis, the Supreme Court found insightful the Third Circuit's opinion in United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985), holding that expert testimony is relevant only if it is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. In other words, does the proffered testimony "fit" the case, or, put another way, "does the testimony logically advance a material aspect of the case?" See Daubert, 509 U.S. at 591; Bennett, 931 F.Supp. at 500. "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. Daubert, 509 U.S. at 592.

116.   On remand, the Ninth Circuit also addressed whether the proffered testimony of plaintiffs' expert "fit" the facts of their case.   In that case, as here, plaintiffs were not attempting to show causation directly; instead, they relied on their experts to present circumstantial proof of causation.   The theory plaintiffs' experts asserted was that Bendectin is a teratogen, that teratogens were linked to birth defects in animals and use of teratogens during pregnancy increased the risk of birth defects.[12]   Although plaintiffs were required to prove that their injuries were the result of Bendectin use and not some independent cause, the court recognized that birth defects, including limb reduction defects, occurred even when expectant mothers did not take Bendectin, and, in some circumstances, for no known reason.   Plaintiffs' burden was not to prove that Bendectin causes some birth defects, but that it caused their birth defects.   Daubert, 43 F.3d at 1321-22.   To reach this burden, the experts would have had to testify either that Bendectin actually caused plaintiffs' injuries or that Bendectin more than doubled the likelihood of limb reduction birth defects.   Because plaintiffs' experts were only willing to testify that Bendectin was "capable of causing" birth defects, the court rendered the proffered testimony irrelevant.   Id.

117.   An example where the proffered evidence does not fit an issue in the case can also be seen in Habecker v. Clark Equip. Co., 36 F.3d 278 (3d Cir. 1994).[11]   In Habecker, the testimony of an accident investigator regarding a simulation he had performed was offered.   See Habecker, 36 F.3d at 289.   The expert's simulation of the accident at issue, however, differed from the real accident in a number of important aspects.   See id. at 289-90.   The Third Circuit found not only that the simulation was not reliable, but also that the simulation evidence did not "fit" the facts of the case.   See id. at 290.   Accordingly, the court concluded that the simulation evidence was

---

[11]   See also, Porter v. Whitehall Lab, 9 F.3d 607 (7th Cir. 1993) (there was no fit between experts' theories and decedent's case where one expert could not rule out other causes for condition suffered by decedent and other expert could not relate his theory that foreign body aggravated decedent's condition to facts since he admittedly had to speculate as to chronology of events).

inadmissible because it would not have assisted the jury to determine how the accident occurred. See id.

118.    The fit requirement has been imposed by this Court as well. In Copley, Judge Atlas rejected the proffered testimony on causation of plaintiff's expert in a product liability case. Mr. Copley alleged that he was injured by the implantation of a defective internal fixation device, manufactured by the defendant, during a spinal fusion operation. See Copley, 2000 WL 223404, at *1. The Court observed that, in accordance with Texas law, the plaintiff had to prove not only that the defendant's product was defective, but that the defective product was the cause in fact of plaintiff's injury. See id. at *1 n.1 and *5. In Copley, the Court concluded that the opinion of plaintiff's expert --- that the implantation of defendant's device (without reference to any alleged defect) caused plaintiff's injury --- failed to satisfy Daubert's relevancy requirement, and therefore, was inadmissible. See id. at *5.

119.    Scientific evidence, even if trustworthy and reliable, has no place in the courtroom unless such evidence materially advances an issue in the case. As set forth in greater detail below, the proffered testimony from plaintiffs' experts is irrelevant, and therefore inadmissible, given that it fails to assist the trier of fact to understand the evidence or determine any of the ultimate issues in the instant case.

### 1.    Plaintiffs' Experts Cannot Connect the Failure of the Detector to Alarm to Mr. Cruz's Death.

120.    As set forth repeatedly above, there is no dispute that Mr. Cruz was found dead of carbon monoxide poisoning with no soot in the lungs. The reasonable conclusion to draw from this fact is that Mr. Cruz died before there was any soot or smoke in the atmosphere of his home for him to inhale. (See Affidavit and Autopsy Report of Dewitt S. Davenport, Exhibit "G"; McCain, p. 189, Exhibit "Z.") As such, even if this Court were to find that the opinions offered by plaintiffs' experts that space heaters produce soot before carbon monoxide generally, the absence of soot in Mr. Cruz's

lungs renders those opinions of no use to a jury in this case. Without a reasonably certain scientific explanation for why some amount of soot did not accompany the carbon monoxide to Mr. Cruz's bedroom and into his lungs, the opinions of plaintiffs' experts regarding the production of soot in relation to carbon monoxide must be precluded.

121. As discussed in some detail above, to prove when the smoke detector should have alarmed, plaintiffs' contend that they must know the amount of particulate matter being produced by the space heater. (*McCain*, p. 186, Exhibit "P.") The only way to know this within a reasonable degree of certainty is if they could know how much fuel is going to the burner element of the heater. (*McCain*, p. 186, Exhibit "P.") Because they do not know how much fuel was going to the burner element, plaintiff cannot know the rate of carbon monoxide production versus production soot. (*McCain*, p. 116, 186, Exhibit "P.") Consequently, any conclusory opinions plaintiffs' experts draw concerning when the smoke detector should have alarmed, will not assist a jury in this case as it is not based on anything but speculation.

122. Even if plaintiffs' experts were permitted to present their unsubstantiated opinions about the production of soot and carbon monoxide and when the detector could have sounded its alarm, plaintiffs are not able to tie those opinions to Mr. Cruz's carbon monoxide poisoning death because they have failed to determine whether Mr. Cruz could have heard the alarm if it had sounded. (*McCain*, p. 193, Exhibit "P.") To perform such an analysis, which can be found in any fire protection engineering handbook, plaintiffs would have had to take into account:

> the decibel level of the smoke detector's alarm;
> the distance from the detector to Mr. Cruz's bedroom door;
> that Mr. Cruz's door was closed;
> the thickness and composition of Mr. Cruz's door;
> the distance from the door to Mr. Cruz's head, where he lay sleeping on his bed; and
> Mr. Cruz's state of intoxication.

Plaintiffs' experts did no such calculations and have no evidence or testimony that Mr. Cruz could

54

have responded to the detector if it sounded.

123.    Perhaps more importantly, plaintiffs entire case rests on the presumption that had the smoke detector alarmed prior to the dangerous accumulation of carbon monoxide in his home, Mr. Cruz would have realized that that his space heater was emitting carbon monoxide, shut it off and evacuated or ventilated his house. This is absolute speculation. It is quite possible, particularly if the smoke detector alarmed before the production of visible soot, an hence any visible sign of trouble, that Mr. Cruz would simply have concluded that the detector falsely alarmed and would have removed or disconnected the battery from his smoke detector and gone back to sleep, which is what both the *Operability Survey* and *Fire Incident Study* found would be the most likely result. Consequently, the speculative and unsupportable opinions of plaintiffs' experts offer nothing to aid a jury in making this determination and should be precluded.

### 2.    Even If the "Tests" Conducted By Plaintiffs' Experts Were Reliable, They Do Not Fit the Facts of This Case.

124.    Assuming, *arguendo*, that the "tests" conducted by Plaintiffs' experts were performed with acceptable scientific methodology and reflect scientific knowledge, the opinions of Messrs. Holmes, McCain, Schulz and Dr. Cranmer are nevertheless inadmissible given that they are based upon the results of tests that have no factual relation to the facts of this case. As explained in detail in Section C, *supra*, the tests conducted, and relied upon, by these experts are strikingly dissimilar from the factual circumstances of the real incident. In light of this, any conclusions drawn from such tests are irrelevant, and will not shed light upon nor explain any of the relevant issues in this case.

### a)    Mr. Holmes' Flue Test, Holmes-Hardin Tests And General Fire Tests Fail To Fit The Facts Of This Case.

125.    Mr. Holmes' opinions are primarily premised upon the results of unrelated tests, such as the *Terry Dees Flue Test*, "Holmes-Hardin" tests, as well as several general "fire tests" that Mr. Holmes has conducted, participated in and/or observed. (*Holmes*, pp. 190-92, Exhibit "L.") None

of these tests are relevant to this case in that none involved soot emitted from a propane-fueled heater, liquid propane gas or was conducted for the specific purpose of testing and evaluating the response time of smoke detectors. (*Holmes*, pp. 45, 89-90, 94, Exhibit "L.") In fact, Mr. Holmes admitted that he did not care which brand of smoke detector was used during these fire tests, since his objective was never to test smoke detectors. (*Holmes*, pp. 44, 89, 92-94, Exhibit "L.").

126.    The Holmes-Hardin test certainly has no significance here as Mr. Holmes admits that there are numerous dissimilarities between the circumstances of the Ayala fire and Mr. Cruz's carbon monoxide poisoning death, such as: (1) the Ayala fire involved an uncontrolled fire, (*Holmes*, pp. 99-100, Exhibit "L"); (2) the Ayala smoke detector was installed in a different location in the house, (*Holmes*, p. 100, Exhibit "L"); (3) the Ayala smoke detector was located differently with reference to the source of smoke, (*Holmes*, p. 107, Exhibit "L"); (4) the home in Ayala was larger than the Cruz home, (*Holmes*, p. 101, Exhibit "L"); (5) the windows in the replica of the Ayala home were closed, but Mr. Cruz's living room window was partially open,(*Holmes*, p. 106, Exhibit "L"); and (6) the Ayala home had a HVAC system. (*Holmes*, p. 108, Exhibit "L.") These differences make the Holmes-Hardin tests substantially different from circumstances of this case and, thus, is not the type of a reliable scientific data upon which Mr. Holmes could form a reasoned, scientific opinion.

### b)    Mr. McCain's Smoke Tests Fail To Fit The Facts Of This Case.

127.    Like Mr. Holmes, Mr. McCain bases his opinion solely upon the results of the two Smoke Tests that he conducted, as detailed in Section (C)(2), *supra*. (See McCain Expert Report, Exhibit " O"; *McCain*, p. 28, Exhibit "P.") Mr. McCain's Smoke Tests would not help the jury determine whether the Cruz detector was unreasonably dangerous in light of the conspicuous discrepancies surrounding the circumstances in which the Smoke Tests were conducted and the factual circumstances of the instant case. Specifically, Mr. McCain's Smoke Tests do not fit the

facts of this case given that: (1) Mr. McCain does not know whether his test models are similar to the Cruz detector; (2) the size of Mr. McCain's testing area was nearly twice that of the Cruz residence; (3) the ventilation at the test site was different than in Mr. Cruz's house; and (4) these tests neither involved soot emitted from a propane-fueled heater nor liquid propane gas. (*McCain*, pp. 63, 66-68, Exhibit "P.") Thus, Mr. McCain's testimony relating to the smoke tests must be excluded as they were conducted under circumstances differing substantially from what occurred in this case.

### c)    Mr. Schulz's Demonstrative Test Fails To Fit The Facts Of This Case.

128.    Mr. Schulz relies on the demonstrative test that he performed at the Cruz residence on April 18, 2000 to support his conclusion that the Cruz detector should have alarmed from the flue gases that were released by the space heater prior to the emission of soot and smoke and before lethal concentrations of carbon monoxide were produced with the Cruz residence at the time of the incident. (*Schulz* Vol. I, pp, 24, 67, 77, 81, 144-45, Exhibit "W.")   However, Mr. Schulz's demonstrative evidence does not fit the facts of this case for the reasons set forth in Section (C)(3), *supra*, and particularly in light of Mr. Schulz's own admission that his demonstrative test did not replicate, nor was it substantially similar to, the conditions that existed at the time of Mr. Cruz's death. (*Schulz* Vol. I, pp. 69, 140, Exhibit "W") Accordingly, BRK respectfully requests that Mr. Schulz's opinions concerning the operation of the Cruz smoke detector and space heater be excluded as they would not help the jury determine when and if the Cruz detector should have alarmed at the time of the incident at the Cruz residence.

### d)    Morris Cranmer's Impromptu Experiment Fails To Fit The Facts Of This Case.

129.    As previously discussed, Dr. Cranmer bases his opinions, in part, upon the results of the impromptu experiment that he conducted using the space heater.  However, as described in detail in Section (C)(6), *supra*, Dr. Cranmer's exercise does not fit the facts of this case given that his test

conditions differed from the real incident in the following important respects: (1) the smoke detector used in his impromptu test was a different model from the Cruz detector; (2) the smoke detector was placed in a different location vis-a-vis the heater; and (3) the ventilation during Dr. Cranmer's test allowed for an indefinite dilution of the gases. (*Cranmer* Vol. II, pp. 134, 138, 144, Exhibit "I."). Thus, Dr. Cranmer's testimony relating to the operation of the Cruz detector and space heater must be excluded as it is improperly based upon the results of his impromptu exercise.

### 3.   Plaintiffs Cannot Connect Battery-Powered Detectors, Such As The SA67B, To The Corrosion Issue

130.   The theories plaintiffs' experts offer concerning corrosion of the peizo-horn contacts do not "fit" the facts of this case for numerous reasons.  As set forth in detail above, plaintiffs are unaware of any instances where an SA67D model smoke detector or any model battery powered smoke detector of the type manufactured by BRK failed to alarm because of corrosion. (*Russell* Vol. I, p. 41, 53, Exhibit "S"; *Holmes*, pp. 210-12, Exhibit "L; *Aronstein* Vol. I, pp. 57-60, Exhibit "D"; *Aronstein* Vol. II,  pp. 190-91, Exhibit "E.")

131.   Furthermore, plaintiffs' experts concede that there is no physical evidence that the Cruz detector had corrosion on its contacts which prevented it from sounding an alarm in the presence of the combustible products in the air during the days surrounding Mr. Cruz's death. (*Russell* Vol. I, pp. 60-61, Exhibit "S"; *Russell* Vol. II, p. 279, Exhibit "T.") The resistance on the peizo-horn contacts of the Cruz detector was only 0.2 – 0.4 ohms, which Dr. Aronstein admits would not be sufficient to prevent the peizo-horn from sounding. (*Aronstein* Vol. II, p. 34-35, Exhibit "E.") Consequently, even if plaintiffs theory of corrosion on the peizo-horn contacts was valid and reliable, plaintiffs' experts have failed to point to any evidence of such corrosion on the Cruz smoke detector to make testimony about their theory relevant.  Therefore, plaintiffs' should be precluded from offering any opinion testimony related to their corrosion theory.

**E.    The Testimony Of Plaintiffs' Experts Should Be Excluded Pursuant To Rule 403**

132.    Finally, the testimony of plaintiffs' experts should be excluded pursuant to Rule 403. Rule 403 of the Federal Rules of Procedure applies with as much force to expert opinions as it does to any other evidence.  See 1 Weinstein & Berger, Weinstein's Evidence ¶ 403(01) (Matthew Bender, 1989).  Thus, proffered testimony which passes Rule 702 and the Daubert test may nevertheless be inadmissible under Rule 403 considerations.  See Camp v. Lockheed Martin Corp., No. CIV.A.H-97-1938, 1998 WL 966002, *4 (S.D. Tex. Dec. 29, 1998).  Rule 403 provides:

> **Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time**
>
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence.
> F.R.C.P. 403.

133.    Rule 403 screens evidence whose probative value is substantially outweighed by the other considerations set forth in the Rule – prejudice, confusion, and waste of time.  Unlike Rule 702, which defines the admissibility thresholds for expert testimony, Rule 403 empowers a judge to exclude "otherwise admissible" evidence; however, it gives no discretion to admit evidence that is subject to exclusion under some other rule.  See Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1112 (5th Cir. 1991) (C.J. Clark, concurring) (disapproved on other grounds by Daubert, 509 U.S. 579 (1993)).

134.    Simply qualifying witnesses as experts carries the danger that their testimony may be accepted because of their stature as "experts" and not before of the validity of their testimony. See Christophersen, 939 F.2d at 1120 (C.J. Clark, concurring); see also Camp, 1998 WL 966002, at *2.  Thus, where there is doubt regarding the expert's qualifications or the admissibility of his testimony, the testimony should be excluded to prevent the jury from deciding to believe the testimony for an improper reason – because he is an "expert."  See Porter v. Whitehall Lab. Inc., 791

F. Supp. 1335 (S.D. Ind. 1992), aff'd 9 F.3d 607 (7th Cir. 1993).

135.    Messrs. Holmes, McCain and Schultz clearly know no more about the operation of smoke detectors than the average juror.  To permit their testimony concerning the smoke detector in this case would risk confusing the jury with unqualified and unsubstantiated opinions and vest in their testimony a significantly higher degree of meaning and import than their views would receive among their peers.  Rather, the Court should reserve opinion testimony to the strict mandates of Rule 702 and those that have designed, manufactured and/or studied the operation of smoke detectors.  For this reason, BRK respectfully submits that Messrs. Holmes, McCain and Schulz should be precluded from providing testimony on such matters.

136.    Likewise, Mr. Schulz, Mr. Holmes and Dr. Cranmer should not be permitted to offer testimony concerning the demonstrative tests they performed relating to this case.  Their various "one-time" *ad-hoc* tests hold no validity in the scientific community and prove nothing of significance.  To permit Mr. Schulz, Mr. Holmes or Dr. Cranmer to discuss their demonstrations would surely confuse the jury and leave it with the sense that the demonstrative exercise was some form of theory validating evaluation, when, in fact, it only demonstrates that Mr. Schulz, Mr. Holmes and Dr. Cranmer fail to understand what is necessary to scientifically substantiate a hypothesis.  Because of the substantial likelihood that any evidence or testimony about their smoke detector emissions tests would confuse and/or mislead the jury Mr. Schulz, Mr. Holmes and Dr. Cranmer should be precluded from offering any testimony about those tests.

## V.

## CONCLUSION

137.    For the reasons set forth herein, Defendant's Motion to Exclude Plaintiff's Experts should be granted.

Dated this __ day of _____, 2000.

60

Respectfully Submitted

**ROERIG, OLIVEIRA & FISHER**


BY: _Rene O. Oliveira_
   Rene O. Oliveira
   State Bar No. 15254700
   Federal Bar No. 4033
   Elizabeth G. Neally
   State Bar No. 14840400
   Federal Bar No. 8044
   855 West Price Road, Suite 9
   Brownsville, TX  78520
   Tel: 956/542-5666
   Fax: 956/542-0016

**COZEN O'CONNOR**
   ROBERT W. HAYES
   JAMES HELLER
   TERRY M. HENRY
   1900  Market Street
   Philadelphia, PA   19103
   Tel: 215/665-2000
   Fax: 215/665-2013

---

[1]   From 1976-1979, the United States Bureau of Standards, now known as the National Institute of Standards and Technology (NIST), conducted an extensive and complex series of fire tests in houses set for demolition.  Under stringent scientifically controlled test conditions, NIST evaluated the performance characteristics of numerous types of smoke and fire detectors under a variety of fire scenarios.   These milestone tests are recognized within the fire science and fire protection communities as Indiana Dunes I and II.

[2]   BRK will again challenge the legal sufficiency of plaintiffs' claims upon a motion for summary judgment.

[3]   In their initial Rule 26(a)(2) disclosure, plaintiffs identified eight witnesses that would provide expert testimony related to the cause and origin of the fire, the alleged defects in BRK's smoke detector and the cause of Mr. Cruz's death. (See Plaintiffs' Rule 26(a)(2) Disclosure, Exhibit "A"). However, plaintiffs subsequently converted two of their experts, Reed McClintock and Robert Ross, into fact witnesses. (See "N.T. June 19, 2000," pp. 50-52, attached hereto as Exhibit "CC"; Court Order dated June 26, 2000, attached hereto as Exhibit "DD.")

[4]   Prior to Daubert, the test for the admission of expert testimony was whether it had "gained general acceptance in the particular field in which it belongs." Frye v. United States, 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923). Frye, predating the Federal Rules of Evidence by half a century, was displaced by Fed.R.Evid. 702 and the Supreme Court's decision in Daubert reflects this

61

understanding.

5      See also Barrett v. Atlantic Richfield Co., 95 F.3d 375, 382 (5th Cir. 1996) (plaintiffs' expert, whose expertise was limited to behavior patterns of cotton rats and their interactions with the environment, was not qualified to provide testimony concerning the source of chromosomal damage exhibited by cotton rats or the correlation between the effects of chemical exposure on cotton rats and human beings); Edmonds v. Illinois Central Gulf Railroad, 910 F.2d 1284, 1287 (5th Cir. 1990) (clinical psychologist not permitted to testify that stress worsened a pre-existing heart condition, which was a medical issue). Other circuits are in accord. Cummins v. Lyle Industries, 93 F.3d 362 (7th Cir. 1996) (plaintiffs' expert, whose education and experience was in the area of agricultural engineering, was not qualified to give expert testimony concerning the adequacy of instructions and warnings on a piece of production machinery called a trim press); Kloepfer v. Honda Motor Co., 898 F.2d 1452,1458-59 (10th Cir. 1990) (children's accident preventionist precluded from testifying about the conduct of the adult driver of an all-terrain vehicle); Stull v. Fuqua Industries, Inc., 906 F.2d 1271 (8th Cir. 1990) (mechanical engineer not qualified to testify about how plaintiffs' leg broke during an accident because he lacked expertise in anatomy).

6      Combustion scientists predict the characteristics of specific fires based upon complex mathematical analysis and computer modeling that takes into account known scientific properties of physics and chemistry.

7      The Supreme Court has subsequently made it clear that the standard for admitting expert testimony it instituted in Daubert applies not only to "scientific" testimony, but to all testimony offered under Rule 702. In Kumho Tire Co., Ltd. v. Carmichael, 119 S.Ct. 1167 (1999), the Supreme Court held that Daubert's general holding applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. Kumho Tire, 119 S.Ct. at 1171; see also Black v. Food Lion, Inc., 171 F.3d 308, 310 (5rh Cir. 1999) (acknowledging that the Daubert principles regarding the admission of scientific testimony also apply to technical or specialized expert testimony).

8      Mr. McCain performed these smoke tests for the Plaintiffs in the case of Neal v. Pittway Corp., No. CIV.A.95-A-631-N, M.D. Alabama.

9      Mr. Schulz relies upon the testimony of plaintiffs' other experts to assume that the subject smoke detector: (1) was properly powered at the time of the incident; (2) did not alarm at the time of the incident; and (3) had a manufacturer's defect. (Schulz Vol. I, pp. 72-73, 163-64, Exhibit "W.")

10      **As for his ionization theory, Dr. Russell no longer believes that opinion is relevant to this case. (Russell, Vol. I, pp. 63-65.) With regard to the corrosion issue, Dr. Russell is of the opinion that, if prior to Mr. Cruz's death: (1) the space heater was producing the type of smoke particles that an ionization detector is most sensitive to; (2) the ionization chamber had detected this smoke; and (3) the P-Horn failed to alarm -- this failure was most likely due to corrosion on the P-Horn contacts. (Russell Vol. II, p. 300, Exhibit "T.")**

11      Dr. Aronstein admits that upon his own inspection of the battery, he was unable to determine whether the battery that he inspected was the identical battery that was in the Cruz detector at the time of the incident. (Aronstein Vol. II, p. 115, Exhibit "E.")

12      The scientific validity of whether Bendectin is a teratogen, whether teratogens cause birth defects in animals and whether they are related to birth defects in humans was seriously questioned by the court under the reliability prong.