154

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 3 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| CYTHIA COX AS NEXT FRIEND | § | |
| OF BRITTANY COX, ET AL | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO. B-98-186 |
| BRK BRANDS, INC. | § | |

## RESPONSE TO MOTION TO EXCLUDE PLAINTIFFS' EXPERTS

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes, Plaintiffs and Intervenors and file this their response to Defendant's Motion to Exclude Plaintiffs' Experts and in support thereof would respectfully show the court as follows:

I.

Plaintiffs and Intervenors refer this Court to all documents on file including its responses to the motion to dismiss identifying the falsification of results of the BRK detector in its efforts to secure Underwriters Laboratories listing.

Plaintiffs and intervenors seek to impose liability upon BRK because its detector, a product intended to alarm in the presence of sufficient quantities of by-products of combustion, failed to perform its intended function of timely alarming Manuel Cruz, decedent. This claim is legally sufficient in imposing liability upon BRK for the failure of its product to properly alarm and is supported by the facts because there is scientifically valid methodology to prove that the smoke detector should have alarmed before Mr. Cruz became incapacitated by the carbon monoxide produced by the space heater.

In defendant's futile attempts to defend this case, they have taken inconsistent positions and at times hypocritical posturing in its skewed zealousness. An example of their constant efforts to confuse the really very basic and straight forward issues in this case, they use terms such as hostile fire when they know all along that the detector is not able to distinguish between a confined fire in a space heater and an "ordinary" hostile fire.

## FACTS

As has been disclosed to the court and relied upon by the experts, Defendant broke its promise to the consumers of this country by the fraudulent acts in getting their detectors listed by Underwriter's Laboratory. This affront to honesty has created a risk of severe injury and death to those consumers who rely on the claimed safety of the BRK detector. Additionally, the defendant has used design processes which are affected by humidity and/or fretting to such an extent that the separable contacts upon the sounding mechanism will be affected. Additionally, plaintiffs have submitted through their experts design alternatives that would have prevented such a failure by the use of soldered contacts on the warning horn.

Mr. Cruz, a former police officer, was wary for his safety and took adequate precautions in attempting to ventilate his residence as well as placing the space heater in a position directly underneath the BRK detector. Additionally, plaintiffs have produced through expert testimony especially Morris Cranmer PhD, an industrial hygienist and toxicologist, that the sounding of a properly operating alarm would have alerted Mr. Cruz in sufficient time to have avoided his demise. In fact, he unfortunately relied upon the detector's alarm based on the representations by defendant of its product safety.

2

BRK admits that there is a large body of research that provides information to determine where a smoke detector should be installed.  However, BRK does not dispute that the use of the smoke detector at the distance determined to exist around the space heater was in any way improper.  BRK also sets forth that the body of research available allows experts to "better" understand what volume of smoke is necessary to cause a detector to "alarm."

## EXPERT QUALIFICATIONS

Plaintiffs' experts possess the knowledge, skill, experience, training, necessary to give reliable and relevant expert testimony.

### MICHAEL SCHULZ IS QUALIFIED TO TESTIFY ABOUT THE DETECTOR.

Plaintiffs designated Michael Schulz, as an expert witness, to demonstrate that a properly designed and operating smoke detector would detect the by-products of combustion from a propane fueled space heater.  This is a principle that is clearly within his areas of expertise.  Mr. Schulz does not intend to offer testimony regarding the numerical quantification rates in which products of combustion are produced from the propane-fueled heater.  Michael J. Schulz is a member of the National Fire Protection Association's (NFPA) Technical Committee on Fire Investigations having been appointed to the committee at the time of its formation by the Standards Council.  The NFPA Technical Committee on Fire Investigations is responsible for those National Fire Codes that address the investigation and analysis of fire and explosion incidents.

Since his appointment, he has made significant contributions to both National Fire Code 907M, entitled *Manual for the Determination of Electrical Fire Cause,* and national Fire Code 921, entitled *Guide for Fire and Explosion Investigations.*

He previously served as Chairman of the NFPA 921 Task Group on Collection and analysis of Physical Evidence. He now currently serves on the Task Group on Fire-Related Human Behavior and the Task Group on Origin Determination.

Mr. Schulz is a graduate of the National Fire Academy, a college instructor, a consultant to the United States Fire Administration, a Certified Fire and Explosion Investigator, a Certified Protection Specialist, a Certified Fire Investigation Instructor Level I and Level II, and a Forensic Fire Science and Laboratory Manager. Please see Curriculum Vitae attached as Exhibit "U" to defendant's motion.

MORRIS CRANMER'S QUALIFICATIONS

Even though it seems to pain the defendants to admit that Dr. Morris Cranmer who, among other things, is a toxicologist has the expertise to use the correct methodology to determine when Mr. Cruz became incapacitated, the defendant attempt to give the flavor that Dr. Cranmer did not address production of combustion by-products and an understanding of how the detectors respond under various environmental conditions. However, as Dr. Cranmer testimony reveals he undertook among other things to perform the following work:

1.   Dr. Cranmer obtained heat flow calculations through computer programming to determine the specific BTU's required for the residence. Deposition Volume 1 , pages 35 to 37

2.   Provided authoritative sources as to the symptoms of headaches and dizziness at varying percentages of carboxyhemoglobin. Volume 1, Page 89.

3.   Has conducted regression analysis and plotting of data on the calculations obtained by defendant's experts. Volume 1., pages 97 to 102

4.   He used his calculations to compose charts utilized to determine the flow

4

rates when the smoke detector sounded.  That information was attached as exhibit 10 to his deposition volume 1, page 138, see Attached Exhibit 1.

5.    He evaluated the delivery pressure of the propane being utilized. Volume 1, page 140 to 141.

6.    He identified in his tests the results of the defendant's experts calculations that the heater would produce measurable quantities of precursors and soot in sufficient quantities to trigger a properly working detector alarm before Mr. Cruz was incapacitated by carbon monoxide.  Volume 1, Pages 143 through 152.

7.    He explains the formula that can be used to determine the carboxyhemoglobin uptake.  Volume 1, Page 156 to 157.

8.    He conducted modeling as how much carbon monoxide was produced by this particular heater and identified graphically the parts per million concentration of carbon monoxide at different parts of the involved residence. He also determined the consumption rate of propane in cubic feet per hour. Such calculations were attached to his depositions as exhibits 32 to 34, Volume 2, pages 24 to 42  (attached hereto as Exhibit 3)

9.    He went on to calculate the reasonable time of death of Mr. Cruz taking into consideration hemoglobin levels, carbon monoxide levels, and carboxyhemoglobin levels and produced calculations of that subject attached to his deposition as Exhibit 38 (attached hereto as Exhibit 3).

10.    He identified equations used from authoritative sources such as exhibit 37 of his deposition authorized by KK Join titled "Carbon Monoxide Poisoning" (attached hereto as Exhibit 4) see volume 2 page 63 to 64.

11.    He produces exhibit 38 to his second deposition the calculation of carbon monoxide uptake or carboxyhemoglobin uptake.  In doing so, he explains the use

of an equation and explains the application of the formula to determine the rise of the carboxyhemoglobin level of Mr. Cruz. Volume 2, pages 88 to 91.

12.    He did regression analysis which included the modeling of production carbon dioxide in the calculation of how many cubic feet of propane were burned.

Of course, Dr. Cranmer's expertise and experiences are contained in his Curriculum Vitae listed as Exhibit F to defendant's motion. He has identified that he has been employed by and is trained as a Certified Industrial Hygienist, Diplomat of the American Board of Forensic Examiners and the American Board of Forensic Medicine. He would investigate for the State Department of Health complaints about carbon monoxide and had education training in chemistry engineering and toxicology. Volume 1, pages 171 to 172. He is a combustion science expert with respect to carbon monoxide levels and is qualified to do the calculations of the balances of combustion of propane, butane, methane, and the production of carbon monoxide, and the dilutions of carbon monoxide due to infiltration. Volume 2, page 78. He is a science fire expert in areas regarding the types of gases that are given off by fires when you burn various types of materials. He is capable of calculating quantities taking into account particular distribution in density and can look at the ratios of various gases at different temperatures in which such gases are produced. He can calculate flame temperature and take the concentration of gases and determine the rate of fuel consumption. He can model back the amounts of materials that would be used to produce certain atmospheres and is familiar with computer fire models developed by the U.S. Government. Volume 2, Pages 79 to 81. He has course study in organic chemistry which deals with the stoiciometric reactions that is how you balance equations dealing with oxidation of carbon products. He has course study in industrial chemistry which

included components on fuel and fuel efficiency. Another course in introduction on air contaminants where aerosols, carbon dioxide rates and test of various gas uptake in laboratory settings, as well as, courses in ventilation control and chemical process safety which included problems addressing production of combustion products from space heaters. He has post-PhD courses in recognition of combustion health hazards involving the emissions of carbon monoxide, as well as, additional course in comprehensive review of industrial hygiene, indoor air pollution, which include production of combustion products from space heaters including carbon monoxide and others. He has served on committees dealing with combustion, carbon monoxide poisoning and/or soot formation with the National Bureau of Standards in area of flammability research. He was on the Science Advisory Board on the Flammability Research Institute with the National Bureau of Standards and has been accepted to testify in court as to all of these subjects. Volume 2, pages 100 to 109.

<u>TESTIMONY OF MICHAEL SCHULZ IS RELIABLE.</u>

Mr. Schulz uses his best efforts to ensure the operational condition of a smoke detector he utilized in his demonstration by using a brand new BRK detector that was taken out of its original packaging just before the initiation of the demonstration. While BRK contends that the alarm sounding was actually a false alarm it would likewise mean that BRK admits that its product is often defective right out of the package. In fact, BRK's hypocritical contention of a coincidental false alarm occurring during Mr. Schulz's demonstration is quite unsupported in light of the alarm only sounding after the heater was lit, started operating and produced by-products of combustion in the same relative location that the heater and detector were found at the time of Mr. Cruz's death. Again in response to defendant trying to skew the facts in this case, at no time does Mr. Schulz contend that carbon monoxide, carbon dioxide or propane were the

only by-products of combustion being produced that would cause the detector to sound its alarm.

In Mr. Schulz's demonstration, the space heater was positioned according to the investigative photographs taken at Mr. Cruz's death. The doors and windows were positioned to the most favorable postion to the defendants in this case. This was done purposely to demonstrate that had the conditions actually approximated what existed on the early morning hours of Mr. Cruz's death, the results would have been significantly more favorable to the Plaintiffs' position. Again, the smoke detector utilized in the demonstration was chosen to demonstrate how a properly designed and operating smoke detector would respond to the by-products of combustion.

His testing methods are in compliance with NFPA 921 of which the court will remember, he was a contributor to such standards, that is, the Guide for Fire and Explosion Investigation attached hereto as exhibit 5.

### DR. ARONSTEIN IS A QUALIFIED EXPERT WHOSE TESTIMONY IS BOTH RELIABLE AND RELEVANT.

Dr. Aronstein is testifying to a degradation process properly called "fretting" also sometimes called "fretting corrosion." This is a specific deterioration process involving microscopic motions at a contact interface, and is quite different than "corrosion." As an overview of defendant's criticisms of Dr. Aronstein, many of the points set forth by them are matters taken out of context of the testimony of the testifying expert. This is true in the case of defendant's positions against Dr. Aronstein when they try to commit him to the properties of corrosion when in fact his criticisms of the defendant's product revolved about fretting. Dr. Aronstein, in fact, considered other possible causes of failure (component failure, defective surface board and defective sautering) and rules them out. A specific electron microscope exam of the contacts and piezo horn of the

subject smoke detector was conducted in a cooperated matter by all parties and revealed evidence of fretting.

Dr. Aronstein is well qualified to direct and interpret materials analysis. He has a Ph.D. in Materials Science, and his specialty is electrical contact technology, including the analysis of materials used in electrical contact and connections. His thesis work involved his personal understanding and actual operation of electron microscopes and the electron microprobe, which is the precursor of the modern AEM (analytical electron microscope). Dr. Aronstein, in common with defendant's experts, relies on electron microscope specialists to operate their equipment, which actually performs the materials analysis on objects such as the piezo horn contacts.

The scanning electron microscope analysis (SEM) results, in which specific sites and particles on the piezo horn contacts of the subject smoke detector were examined, provide information on the elemental constituents. For the specific particles and sites examined on the contacts of the piezo horn of the subject smoke detector, the elements tin and oxygen constitute clear evidence of tin oxide.

Dr. Aronstein has specifically investigated environmental factors such as temperature and humidity for electrical contacts in connection in residential wiring systems, and his research on this topic has been accepted by peer review and published. See CV publications list "Environment of Residential Connections." The presence of factoring and articles of tin oxide at the actual contact areas of the subject piezo horn contact provides the most available evidence of contact deterioration. In support for Dr. Aronstein's position in this case, plaintiffs refer to page 59 of his testimony:

"Q.    The battery-powered detectors that had this increased resistance, that prevented it from alarming, do you know if they were BRK detectors?

A.    Some of them were.

9

Q.    You couldn't testify that any of the detectors that were tested by IITRI, and displayed the resistance you just described, were BRK Brands detectors?

A.    I believe the detectors, the horns that they tested were horns that included the types that are used in the BRK battery-powered smoke detectors.

Q.    I'm differentiating the company BRK Brands from BRK Division of Pittway. I'm asking any of the horns that were tested by IITRI, were any of them manufactured by BRK Brands Inc."

a.    They are not identified by the manufacturer of the smoke detector in the report." …………..

continued on page 61:

A.    "What I do know was that the resistances that are reported for the type of horn that is used in the BRK products ran above, some samples ran above the point at which the BRK analysis for their driver circuit for the battery-powered alarms would fail to sound."

The IITRI study is singularly significant, since the units had already failed to sound in consumer's homes under careful test conditions prior to being examined by IITRI. Contrary to defendant's claims, the IITRI tests demonstrated significant deterioration on many of the test specimens, the majority of which were of the type used in the BRK smoke alarms. (Aronstein, deposition volume 2, page 89 et seq.)

Dr. Aronstein's opinions are based on a technology that has passed the Daubert criteria, in that the fretting phenomenon as it applies to all metal in contact, and to electrical contacts, and to the piezo horn contact in particular is well established in engineering literature and practice. As indicated in the list of published papers, there is an ample body of technical literature and research already available on this subject that

has passed peer review and is generally accepted by those involved in electric contact phenomenon.

Dr. Aronstein is quite qualified in every respect to testify as to the scientific and technical aspects of the piezo horn contacts and the evidence that demonstrates their failure, as his Ph.D. specialty is the study of electrical contact.

The theoretical basis of the fretting phenomenon has been explored by numerous investigators over at least a quarter of a century and the theory and investigative techniques involved have been well tested. The identification of fretting damage can be done unambiguously with electron microscope techniques, such as were employed in the examination of the contacts from the subject piezo horn. The engineering methodology involved is generally accepted in the scientific and engineering community that occurred prior to taking the measurement.

The documents referenced were supplied in response to request by defendant, and they represent a sample of the established technical literature on the process of fretting and, more specifically, on fretting as a cause of failure of smoke detectors to sound an alarm. Some of the referenced documents were provided in answer to specific requests by defendant's attorney in deposition. Dr. Aronstein does not rely on these documents to support" …. his theory regarding corrosion," as he has not put forth any "theory of corrosion" (as opposed to fretting) as a cause of failure of the smoke alarms to sound.

The documents provided clearly indicate a) that fretting is an active contact degradation mechanism, b) that tin plating is a particularly bad contact material with respect to fretting deterioration, c) that field testing of smoke detectors has identified horn contact failure (high resistance) as a significant contributor to horns not sounding, d) that fretting is identified by scientific testing as being a major mechanism of failure of

the piezo horns that do not sound, and e) that horns of the type that BRK and BRK Brands employs are the majority among those tested that had failed. The article "When Smoke Detectors Don't Work" provides information on the field operability survey from which certain conclusions can properly be drawn as to the portion of smoke detectors that may not sound properly because of piezo horn contact problems. There is no misinterpretation here by Dr. Aronstein, rather there are multiple misrepresentations by Defendant's attorney as to what Dr. Aronstein's testimony is.

## CONCLUSION

Plaintiffs and intervenors have addressed different experts in their responses and incorporate each other's filings. Based on the responses, defendant's motion to exclude plaintiffs' and intervenor's experts should be denied and they request that this case go forward to trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs and Intervenors herein pray that this Honorable Court deny Defendant's Motion to Exclude Plaintiffs' Experts and for such other and further relief, at law or in equity, to which they may show themselves to be justly entitled to receive.

Respectfully submitted this the ___30___ day of April, 2002.

WATTS & HEARD, L.L.P.
1926 E. Elizabeth
Brownsville, Texas 78520
(956) 546-0333
(956) 541-0255 FAX

Ray R. Marchan
Attorney for Plaintiff Cynthia Cox, et al
State Bar No. 12969050
Federal I.D. No. 9522

## CERTIFICATE OF SERVICE

On this the _____30_____ day of April, 2002, a true and correct copy of the foregoing instrument was forwarded to opposing counsel via fax, by hand-delivery or by certified mail, return receipt requested.

RAY R. MARCHAN

## **AFFIDAVIT OF AUTHENTICITY**

STATE OF TEXAS          )
                                         )
COUNTY OF CAMERON )

     BEFORE ME, the undersigned Notary Public, on this day personally appeared RAY R. MARCHAN, known to me, and first being by me duly sworn according to law upon his oath deposed and stated as follows:

     "My name is RAY R. MARCHAN, I am a licensed attorney engaged in the general practice of law in Brownsville, Cameron County, Texas. I am attorney with Watts & Heard, L.L.P., 1926 E. Elizabeth, Brownsville, Texas. The law firm of Watts & Heard, L.L.P., has been retained by Plaintiffs Cynthia Cox as next friend of Brittany Cox in connection with the above-referenced lawsuit.

     I am of sound mind, capable of making this affidavit, and I have personal knowledge of each and every statement stated below.

     I hereby certify that the copies attached as Exhibit "1," Exhibit "2,", Exhibit "3," Exhibit "4" and Exhibit "5" respectively, are authentic true and correct copies of the originals."

     Further affiant sayeth not.

                              _____
                                RAY R. MARCHAN

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said RAY R. MARCHAN, on the __30__ day of April, 2002, to certify which witness my hand and seal of office.

NOTARY PUBLIC, STATE OF TEXAS

Leticia Fierros Garza
Notary Public
State of Texas
My Commission Expires
July 26, 2004

STATE OF TEXAS        )
                               )
COUNTY OF CAMERON )

On this the _____ day of April, 2002, came before me, the undersigned authority, appeared RAY R. MARCHAN, who after being duly sworn upon his oath stated and deposed as follows:

"My name is Ray R. Marchan. I am over the age of 18 years and am fully competent and not disqualified by law to make this affidavit. I am the attorney for the Plaintiffs Cynthia Cox as next friend of Brittany Cox . I hereby certify that all of the facts stated in the foregoing Response to Motion to Exclude Plaintiffs' Experts are true and correct to my knowledge."

Signed this the _30_ day of April, 2002.

RAY R. MARCHAN

SWORN TO AND SUBSCRIBED on this the _30_ day of April, 2002.

NOTARY PUBLIC, STATE OF TEXAS



Leticia Fierros Garza
Notary Public
State of Texas
My Commission Expires
July 26, 2004

**16**

EXHIBIT NO. 10



AIR TO METHANE CONVERSION

Rank 1 Eqn 8162 [Line Robust Medium, Lorentzian Errors] y=a+bx

r²=1 DF Adj r²=1 FitStdErr=0 Fstat=1e+300

a=0
b=1.34

## P/N: FR2A05BVBN
### April 13, 2000

| FLOWRATE (SCFH AIR) | FLOWRATE (SCFH PROPANE) |
|---|---|
| 3 | 2.43 |
| 4 | 3.24 |
| 5 | 4.05 |
| 6 | 4.86 |
| 7 | 5.67 |
| 8 | 6.48 |
| 9 | 7.29 |
| 10 | 8.10 |
| 11 | 8.91 |
| 12 | 9.72 |
| 13 | 10.53 |
| 14 | 11.34 |
| 15 | 12.15 |
| 16 | 12.96 |
| 17 | 13.77 |
| 18 | 14.58 |
| 19 | 15.39 |
| 20 | 16.20 |
| 21 | 17.01 |
| 22 | 17.82 |
| 23 | 18.63 |
| 24 | 19.44 |
| 25 | 20.25 |
| 26 | 21.06 |
| 27 | 21.87 |
| 28 | 22.68 |
| 29 | 23.49 |
| 30 | 24.30 |

AIR TO PROPANE CONVERSION

Rank 1 Eqn 8162 [Line Robust Medium, Lorentzian Errors] y=a+bx

$r^2=1$ DF Adj $r^2=1$ FitStdErr=1.1837184e-18 Fstat=2.8924168e+38

a=0

b=0.81

FLOWRATE (SCFH AIR)

FLOWRATE (SCFH PROPANE)

**P/N: FR2A05BVBN**
**April 13, 2000**

| FLOWRATE (SCFH AIR) | FLOWRATE (SCFH METHANE) |
|---|---|
| 3 | 4.02 |
| 4 | 5.36 |
| 5 | 6.70 |
| 6 | 8.04 |
| 7 | 9.38 |
| 8 | 10.72 |
| 9 | 12.06 |
| 10 | 13.40 |
| 11 | 14.74 |
| 12 | 16.08 |
| 13 | 17.42 |
| 14 | 18.76 |
| 15 | 20.10 |
| 16 | 21.44 |
| 17 | 22.78 |
| 18 | 24.12 |
| 19 | 25.46 |
| 20 | 26.80 |
| 21 | 28.14 |
| 22 | 29.48 |
| 23 | 30.82 |
| 24 | 32.16 |
| 25 | 33.50 |
| 26 | 34.84 |
| 27 | 36.18 |
| 28 | 37.52 |
| 29 | 38.86 |
| 30 | 40.20 |

04-14-2000 02:44PM   FROM KEY INSTRUMENTS   TO   15012241947   P.02



AIR TO METHANE CONVERSION

Rank 1  Eqn 8162  [Line Robust Medium, Lorentzian Errors] y=a+bx

r²=1  DF Adj r²=1  FitStdErr=0  Fstat=1e+300

a=0

b=1.34

$O_2$ Depletion in $ft^3$/min x Propane:$O_2$ Ratio Based on $CO_2$:CO Ratio
Time vs. Flow Rate of Propane

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Time (hr) | Table 15 | Time (hr) | Table 16 | Time (hr) | Table 17 |
| 2 | 0.0833 | 53.28 | 0.0167 | 320.4 | 0.0167 | 168 |
| 3 | 0.1667 | 29.57 | 0.0833 | 45.8 | 0.0833 | 45.5 |
| 4 | 0.25 | 21.65 | 0.1667 | 29.01 | 0.1667 | 30.15 |
| 5 | 0.33 | 17.95 | 0.33 | 18.48 | 0.25 | 22.04 |
| 6 | 0.417 | 12.94 | 0.5 | 14.27 | 0.33 | 15.05 |
| 7 | 0.5 | 13.25 | 0.67 | 10.73 | 0.5 | 13.46 |
| 8 | 0.58 | 11.34 | 0.75 | 10.17 | 0.67 | 9.95 |
| 9 | 0.67 | 10.12 | | | 0.75 | 9.36 |
| 10 | 0.75 | 10.75 | | | | |

EXHIBIT
Cranmer
33



Carbon Monoxide Concentrations

## HOUSE TEMPERATURE

**Heat Loss, Walls, etc. = 14,000 BTU/hour**               (Riddick Engineering)

Equation from: *Industrial Ventilation*, ACGIH

Total BTU/hour of sensible heat $= 1.08 \times \Delta t \ ^\circ F \times \left[\dfrac{\text{air change/hr} \times 6{,}200}{60}\right]$

$$= 1.08 \times (70 - 35) \times \left[\dfrac{1.5 \times 6{,}200}{60}\right]$$

$$= 37.8 \times [155] \ = \ 5{,}859$$

**Heat Loss Radiant + Infiltration = Total**

**14,000 + 5,859 = 19,859 BTU**

2,500 BTU/ft$^3$ x 8 ft$^3$/hr = 20,000 BTU/hour



**Source: Combustion Science**

$\%COHb_t = \%COHb_0 (e^{-(t/2398B)}) = 218 (1 - e^{-(t/2398B)}) (0.0003 + [CO]/1316)$

$[CO] = 600$ ppm    $\%COHb_t = 50$    $\%COHb_0 = 0.8$   $B = 0.22$   (sleeping)    $t = ?$

$50 = (0.8) ( e^{-(t/527.56)}) + [(218) (1 - e^{-(t/527.56)}) (0.0003 + 600/1316)]$

$50 = (0.8) ( e^{-(t/527.56)}) + (99.4) (1 - e^{-(t/527.56)})$

$50 = (0.8) ( e^{-(t/527.56)}) + 99.4 - 99.4\, e^{-(t/527.56)}$

$-49.4 = (0.8) ( e^{-(t/527.56)}) - 99.4\, e^{-(t/527.56)}$

$-49.4 = (0.8 - 99.4) (e^{-(t/527.56)})$

$-49.4 = (-98.6) (e^{-(t/527.56)})$

$0.501 = e^{-(t/527.56)}$

$-0.691 = -t/527.56$

$t = 364.6$ minutes

$t = 6.07$ hours





Source: Jain KK. *Carbon Monoxide Poisoning*. Warren Green, Inc., St. Louis, MO 1990.

$$\frac{A[HbCO]_t - BV_{CO} - PI_{CO}}{A[HbCO]_0 - BV_{CO} - PI_{CO}} = e^{-tA/VbB}$$

$A = PC_{O_2}/M[HbO_2]$         $B = 1/DL_{CO} + PL/VA$

$A = 100 \text{ mmHg}/(218) (0.2 \text{ ml}) = 100/43.6 = 2.29$

$B = 1/30 \text{ ml} + 713/6000 = 0.033 + 0.119 = 0.152$

$(B) (V_{CO}) = (0.152) (0.007) = 0.00106$         $PI_{CO} = 0.456$

$[HbCO]_t = 50\% = 0.1 \text{ ml/ml}$     $[CO] = 600 \text{ ppm}$     $t = ?$

$$\frac{2.29 (0.1) - 0.00106 - 0.456}{2.29 (0.0016) - 0.00106 - 0.456} = e^{-tA/VbB}$$

$$\frac{0.229 - 0.00106 - 0.456}{0.003664 - 0.00106 - 0.456} = e^{-t(2.29/836)}$$

$$\frac{-0.228}{-0.456} = e^{-t(0.00274)}$$

$0.5055 = e^{-t(0.00274)}$

$-0.6822 = -t (0.00274)$

$t = 248.99$ minutes

$t = 4.15$ hours





# NFPA 921

# Guide for Fire and Explosion Investigations

# 2001 Edition



NFPA, 1 Batterymarch Park, PO Box 9101, Quincy, MA 02269-9101
An International Codes and Standards Organization

NFPA License Agreement

This document is copyrighted by the National Fire Protection Association (NFPA), 1 Batterymarch Park, Quincy, MA 02269-9101 USA.
All rights reserved.

NFPA grants you a license as follows: The right to download an electronic file of this NFPA document for temporary storage on one computer for purposes of viewing and/or printing one copy of the NFPA document for individual use. Neither the electronic file nor the hard copy print may be reproduced in any way. In addition, the electronic file may not be distributed elsewhere over computer networks or otherwise. The hard copy print may only be used personally or distributed to other employees for their internal use within your organization.



Copyright ©
NFPA
One Batterymarch Park
Quincy, Massachusetts 02269

## IMPORTANT NOTICE ABOUT THIS DOCUMENT

NFPA codes, standards, recommended practices, and guides, of which the document contained herein is one, are developed through a consensus standards development process approved by the American National Standards Institute. This process brings together volunteers representing varied viewpoints and interests to achieve consensus on fire and other safety issues. While the NFPA administers the process and establishes rules to promote fairness in the development of consensus, it does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in its codes and standards.

The NFPA disclaims liability for any personal injury, property or other damages of any nature whatsoever, whether special, indirect, consequential or compensatory, directly or indirectly resulting from the publication, use of, or reliance on this document. The NFPA also makes no guaranty or warranty as to the accuracy or completeness of any information published herein.

In issuing and making this document available, the NFPA is not undertaking to render professional or other services for or on behalf of any person or entity. Nor is the NFPA undertaking to perform any duty owed by any person or entity to someone else. Anyone using this document should rely on his or her own independent judgment or, as appropriate, seek the advice of a competent professional in determining the exercise of reasonable care in any given circumstances.

The NFPA has no power, nor does it undertake, to police or enforce compliance with the contents of this document. Nor does the NFPA list, certify, test or inspect products, designs, or installations for compliance with this document. Any certification or other statement of compliance with the requirements of this document shall not be attributable to the NFPA and is solely the responsibility of the certifier or maker of the statement.

*See inside back cover for additional important notices and information.*

## NOTICES

All questions or other communications relating to this document and all requests for information on NFPA procedures governing its codes and standards development process, including information on the procedures for requesting Formal Interpretations, for proposing Tentative Interim Amendments, and for proposing revisions to NFPA documents during regular revision cycles, should be sent to NFPA headquarters, addressed to the attention of the Secretary, Standards Council, National Fire Protection Association, 1 Batterymarch Park, P.O. Box 9101, Quincy, MA 02269-9101.

Users of this document should be aware that this document may be amended from time to time through the issuance of Tentative Interim Amendments, and that an official NFPA document at any point in time consists of the current edition of the document together with any Tentative Interim Amendments then in effect. In order to determine whether this document is the current edition and whether it has been amended through the issuance of Tentative Interim Amendments, consult appropriate NFPA publications such as the *National Fire Codes*® Subscription Service, visit the NFPA website at www.nfpa.org, or contact the NFPA at the address listed above.

A statement, written or oral, that is not processed in accordance with Section 6 of the Regulations Governing Committee Projects shall not be considered the official position of NFPA or any of its Committees and shall not be considered to be, nor be relied upon as, a Formal Interpretation.

The NFPA does not take any position with respect to the validity of any patent rights asserted in connection with any items which are mentioned in or are the subject of this document, and the NFPA disclaims liability for the infringement of any patent resulting from the use of or reliance on this document. Users of this document are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, is entirely their own responsibility.

Users of this document should consult applicable federal, state, and local laws and regulations. NFPA does not, by the publication of this document, intend to urge action that is not in compliance with applicable laws, and this document may not be construed as doing so.

## Licensing Policy

This document is copyrighted by the National Fire Protection Association (NFPA). By making this document available for use and adoption by public authorities and others, the NFPA does not waive any rights in copyright to this document.

**1. Adoption by Reference**—Public authorities and others are urged to reference this document in laws, ordinances, regulations, administrative orders, or similar instruments. Any deletions, additions, and changes desired by the adopting authority must be noted separately. Those using this method are requested to notify the NFPA (Attention: Secretary, Standards Council) in writing of such use. The term "adoption by reference" means the citing of title and publishing information only.

**2. Adoption by Transcription**—A. Public authorities with lawmaking or rule-making powers only, upon written notice to the NFPA (Attention: Secretary, Standards Council), will be granted a royalty-free license to print and republish this document in whole or in part, with changes and additions, if any, noted separately, in laws, ordinances, regulations, administrative orders, or similar instruments having the force of law, provided that: (1) due notice of NFPA's copyright is contained in each law and in each copy thereof; and (2) that such printing and republication is limited to numbers sufficient to satisfy the jurisdiction's lawmaking or rule-making process. B. Once this NFPA Code or Standard has been adopted into law, all printings of this document by public authorities with lawmaking or rule-making powers or any other persons desiring to reproduce this document or its contents as adopted by the jurisdiction in whole or in part, in any form, upon written request to NFPA (Attention: Secretary, Standards Council), will be granted a nonexclusive license to print, republish, and vend this document in whole or in part, with changes and additions, if any, noted separately, provided that due notice of NFPA's copyright is contained in each copy. Such license shall be granted only upon agreement to pay NFPA a royalty. This royalty is required to provide funds for the research and development necessary to continue the work of NFPA and its volunteers in continually updating and revising NFPA standards. Under certain circumstances, public authorities with lawmaking or rule-making powers may apply for and may receive a special royalty where the public interest will be served thereby.

**3. Scope of License Grant**—The terms and conditions set forth above do not extend to the index of this document.

(For further explanation, see the Policy Concerning the Adoption, Printing, and Publication of NFPA Documents, which is available upon request from the NFPA.)

8/80

921-1

Copyright © 2001 NFPA, All Rights Reserved

NFPA 921

Guide for

**Fire and Explosion Investigations**

**2001 Edition**

This edition of NFPA 921, *Guide for Fire and Explosion Investigations*, was prepared by the Technical Committee on Fire Investigations and acted on by the National Fire Protection Association, Inc., at its November Meeting held November 12–15, 2000, in Orlando, FL. It was issued by the Standards Council on January 13, 2001, with an effective date of February 9, 2001, and supersedes all previous editions.

This edition of NFPA 921 was approved as an American National Standard on February 9, 2001.

**Origin and Development of NFPA 921**

NFPA 921, *Guide for Fire and Explosion Investigations*, was developed by the Technical Committee on Fire Investigations to assist in improving the fire investigation process and the quality of information on fires resulting from the investigative process. The guide is intended for use by both public sector employees who have statutory responsibility for fire investigation and private sector persons conducting investigations for insurance companies or litigation purposes. The goal of the committee is to provide guidance to investigators that is based on accepted scientific principles or scientific research.

The first edition of the document, issued by NFPA in 1992, focused largely on the determination of origin and cause of fires and explosions involving structures. The second edition of the document included revised chapters on the collection and handling of physical evidence, safety, and explosions. NFPA 907M, *Manual for the Determination of Electrical Fire Causes*, was withdrawn as an individual document and was integrated with revisions into this document as a separate chapter. Elements of NFPA 907M that relate to other chapters of this document were relocated appropriately. New chapters dealing with the investigation of motor vehicle fires, management of major investigations, incendiary fires, and appliances were added.

The third edition of the document included a new chapter on fuel gas systems in buildings and the impact of fuel gases on fire and explosion investigations. The chapter on electricity and fire was rewritten to improve organization, clarify terminology, and add references. In the chapter on fire patterns, several sections were revised. Other revisions were made in the chapter on physical evidence on the subject of preservation of the fire scene and of physical evidence. The edition also included new text regarding ignitable liquid detection canine/handler teams.

The fourth edition of this document includes new chapters on building systems, fire-related human behavior, failure analysis and analytical tools, fire and explosion deaths and injuries, and wildfire investigations. An updated chapter on motor vehicle fires has been written. The document has been organized to group chapters into subjects that will make the document more usable.

921-106                          FIRE AND EXPLOSION INVESTIGATIONS

**Table 13.4.6 Design and Construction Drawing That May Be Available**

| Type | Information | Discipline |
|---|---|---|
| Topographical | Shows the varying grade of the land | Surveyor |
| Site plan | Shows the structure on the property with sewer, water, electrical distributions to the structure | Civil engineer |
| Floor plan | Shows the walls and rooms of structure as if you were looking down on it | Architect |
| Plumbing | Layout and size of piping for fresh and waste water | Mechanical engineer |
| Electrical | Size and arrangement of service entrance, switches and outlets, fixed electrical appliances | Electrical engineer |
| Mechanical | HVAC system | Mechanical engineer |
| Sprinkler/fire alarm | Self-explanatory | Fire protection engineer |
| Structural | Frame of building | Structural engineer |
| Elevations | Shows interior/exterior walls | Architect |
| Cross section | Shows what the inside of components look like if cut through | Architect |
| Details | Show close-ups of complex areas | All disciplines |

**13.5\* Specifications.** Architects and engineers prepare specifications to accompany their drawings. While the drawings show the geometry of the project, the specifications detail the quality of the materials, responsibilities of various contractors, and the general administration of the project. Specifications are usually divided into sections for the various components of the building. For the fire investigator, the properties of materials can be identified through a specification review and may assist in the analysis.

## Chapter 14   Physical Evidence

**14.1\* General.** During the course of any fire investigation, the fire investigator is likely to be responsible for locating, collecting, identifying, storing, examining, and arranging for testing of physical evidence. The fire investigator should be thoroughly familiar with the recommended and accepted methods of processing such physical evidence.

**14.2 Physical Evidence.** Physical evidence, defined generally, is any physical or tangible item that tends to prove or disprove a particular fact or issue. Physical evidence at the fire scene may be relevant to the issues of the origin, cause, spread, or the responsibility for the fire.

The decision on what physical evidence to collect at the incident scene for submission to a laboratory or other testing facility for examination and testing, or for support of a fact or opinion, rests with the fire investigator. This decision may be based on a variety of considerations, such as the scope of the investigation, legal requirements, or prohibition. (*See Section 9.2.*) Additional evidence may also be collected by others, including other investigators, insurance company representatives, manufacturer's representatives, owners, and occupants. The investigator should also be aware of issues related to spoliation of evidence.

**14.3\* Preservation of the Fire Scene and Physical Evidence.** Every attempt should be made to protect and preserve the fire scene as intact and undisturbed as possible, with the structure, contents, fixtures, and furnishings remaining in their pre-fire locations. (*See Figure 14.3.*)

**FIGURE 14.3   Physical evidence at a fire scene. Evidence such as this small paper match could easily be destroyed or lost in an improperly preserved fire scene.**



Generally, the cause of a fire or explosion is not known until near the end of the investigation. Therefore, the evidentiary or interpretative value of various pieces of physical evidence observed at the scene may not be known until, at, or near the end of the fire scene examination, or until the end of the complete investigation. As a result, the entire fire scene should be considered physical evidence and should be protected and preserved.

The responsibility for the preservation of the fire scene and physical evidence does not lie solely with the fire investigator, but should begin with arriving fire-fighting units or police authorities. Lack of preservation may result in the destruction, contamination, loss, or unnecessary movement of physical evidence. Initially, the incident commander and, later, the fire investigator should secure or ensure the security of the fire scene from unnecessary and unauthorized intrusions and should limit fire suppression activities to those that are necessary.

Evidence at the fire scene should be considered not only in a criminal context, such as in traditional forensic evidence (e.g., weapons, bodily fluids, footprints), nor should it be lim-

ited to arson-related evidence, items, or artifacts, such as incendiary devices or containers. Potential evidence at the fire scene and surrounding areas can include the physical structure, the contents, the artifacts, and any materials ignited or any material on which fire patterns appear.

**14.3.1 Fire Patterns as Physical Evidence.** The evidentiary and interpretative use of fire patterns may be valuable in the identification of a potential ignition source, such as an incendiary device in an arson fire or an appliance in an accidental fire. Fire patterns are the visible or measurable physical effects that remain after a fire. These include thermal effects on materials, such as charring, oxidation, consumption of combustibles, smoke and soot deposits, distortion, melting, color changes, changes in the character of materials, structural collapse, and other effects. (*See Section 4.3.*)

**14.3.2 Artifact Evidence.** Artifacts can be the remains of the material first ignited, the ignition source, or other items or components in some way related to the fire ignition, development, or spread. An artifact may also be an item on which fire patterns are present, in which case the preservation of the artifact is not for the item itself but for the fire pattern that is contained thereon.

**14.3.3 Protecting Evidence.** There are a number of methods that can be utilized to protect evidence from destruction. Some methods include posting a fire fighter or police officer as a sentry to prevent or limit access to a building, a room, or an area; use of traffic cones or numerical markers to identify evidence or areas that warrant further examination; covering the area or evidence with tarpaulins prior to overhaul; or isolating the room or area with rope, caution tape, or police line tape. The investigator may benefit from supervising overhaul and salvage operations.

Items found at the fire scene, such as empty boxes or buckets, may be placed over an artifact. However, these items may not clearly identify the artifact as evidence that should be preserved by fire fighters or others at the fire scene. If evidence is not clearly identified, it may be susceptible to movement or destruction at the scene.

**14.3.4 Role and Responsibilities of Fire Suppression Personnel in Preserving the Fire Scene.** Generally, fire officers and fire fighters have been instructed during basic fire training that they have a responsibility on the fire scene regarding fire investigation. In most cases, this responsibility is identified as recognizing the indicators of incendiarism, such as multiple fires, the presence of incendiary devices or trailers, and the presence of ignitable liquids at the area of origin *(see Chapter 19)*. While this is an important aspect of their responsibilities in the investigation of the fire cause, it is only a small part.

Prompt control and extinguishment of the fire protects evidence. The ability to preserve the fire scene is often an important element in the investigation. Even when fire officers and fire fighters are not responsible for actually determining the origin or cause of the fire, they play an integral part in the investigation by preserving the fire scene and physical evidence.

**14.3.4.1 Preservation.** Once an artifact or other evidence has been discovered, preliminary steps should be taken to preserve and protect the item from loss, destruction, or movement. The person making the discovery should notify the incident commander as soon as practical. The incident commander should notify the fire investigator or other appropri-

ate individual or agency with the authority and responsibility for the documentation and collection of the evidence.

**14.3.4.2 Caution in Fire Suppression Operations.** Fire crews should avoid causing unnecessary damage to evidence when using straight-stream hoselines, pulling ceilings, breaking windows, collapsing walls, and performing overhaul and salvage.

**14.3.4.2.1 Use of Water Lines and Hose Streams.** When possible, fire fighters should use caution with straight-stream applications, particularly at the base of the fire, because the base of the fire may be the area of origin. Evidence of the ignition source can sometimes be found at the area of origin. The use of hoselines, particularly straight-stream applications, can move, damage, or destroy physical evidence that may be present.

The use of water hoselines for overhaul operations like washing down, or for opening up walls or ceilings, should also be restricted to areas away from possible areas of origin.

The use of water should be controlled in areas where the investigator may wish to look at the floor for possible fire patterns. When draining the floor of standing water, the drain hole should be located so as to have the least impact on the fire scene and fire patterns.

**14.3.4.2.2 Overhaul.** It is during overhaul that any remaining evidence not damaged by the fire is susceptible to being destroyed or displaced. Excessive overhaul of the fire scene prior to the documentation and analysis of fire patterns can affect the investigation, including failure to determine the area of origin.

While the fire fighters have a responsibility to control and extinguish the fire and then check for fire extension, they are also responsible for the preservation of evidence. These two responsibilities may appear to be in conflict and, as a result, it is usually the evidence that is affected during the search for hidden fire. However, if overhaul operations are performed in a systematic manner, both responsibilities can be met successfully.

**14.3.4.2.3 Salvage.** The movement or removal of artifacts from a fire scene can make the reconstruction difficult for the investigator. If the investigator cannot determine the pre-fire location of the evidence, the analytical or interpretative value of the evidence may be lost. Moving, and particularly removing, contents and furnishings or other evidences at the fire scene should be avoided until the documentation, reconstruction, and analysis is completed.

**14.3.4.2.4 Movement of Knobs and Switches.** Fire fighters should refrain from turning knobs and operating switches on any equipment, appliances, or utility services at the fire scene. The position of components, such as the knobs and switches, may be a necessary element in the investigation, particularly in developing fire ignition scenarios or hypotheses. These components, which are often constructed of plastics, can become very brittle when subjected to heating. Their movement may alter the original post-fire state and may cause the switch to break or to become impossible to relocate in its original post-fire position. (*See 21.5.3.*)

**14.3.4.2.5 Use of Power Tools.** The use of gasoline- or diesel-powered tools and equipment should be controlled carefully in certain locations. The refueling of any fuel-powered equipment or tools should be done outside the perimeter of the fire scene. Whenever fuel-powered equipment is used on the fire scene, its use and location should be documented and the investigator advised.

**14.3.4.2.6 Limiting Access of Fire Fighters and Other Emergency Personnel.** Access to the fire scene should be limited to those persons who need to be there. This precaution includes limiting fire fighters and other emergency or rescue personnel to those necessary for the task at hand. When possible, the activity or operation should be postponed until the evidence has been documented, protected, evaluated, and collected.

**14.3.5 Role and Responsibilities of the Fire Investigator.** If the fire fighters have not taken the preliminary steps to preserve or protect the fire scene, then the fire investigator should assume the responsibility for doing so. Then, depending on the individual's authority and responsibility, the investigator should document, analyze, and collect the evidence.

**14.3.6 Practical Considerations.** The precautions in this section should not be interpreted as requiring the unsafe or infinite preservation of the fire scene. It may be necessary to repair or demolish the scene for safety or for other practical reasons. Once the scene has been documented by interested parties and the relevant evidence removed, there is no reason to continue to preserve the scene. The decision as to when sufficient steps have been taken to allow the resumption of normal activities should be made by all interested parties known at that time.

**14.4 Contamination of Physical Evidence.** Contamination of physical evidence can occur from improper methods of collection, storage, or shipment. Like improper preservation of the fire scene, any contamination of physical evidence may reduce the evidentiary value of the physical evidence.

**14.4.1 Contamination of Evidence Containers.** Unless care is taken, physical evidence may become contaminated through the use of contaminated evidence containers. For this reason, the fire investigator should take every reasonable precaution to ensure that new and uncontaminated evidence containers are stored separately from used containers or contaminated areas.

One practice that may help to limit a possible source of cross contamination of evidence collection containers, including steel paint cans or glass jars, is to seal them immediately after receipt from the supplier. The containers should remain sealed during storage and transportation to the evidence collection site. An evidence collection container should be opened only to receive evidence at the collection point, at which time it should be resealed pending laboratory examination.

**14.4.2* Contamination During Collection.** Most contamination of physical evidence occurs during its collection. This is especially true during the collection of liquid and solid accelerant evidence. The liquid and solid accelerant may be absorbed by the fire investigator's gloves or may be transferred onto the collection tools and instruments.

Avoiding cross-contamination of any subsequent physical evidence, therefore, becomes critical to the fire investigator. To prevent such cross-contamination, the fire investigator can wear disposable plastic gloves or place his or her hands into plastic bags during the collection of the liquid or solid accelerant evidence. New gloves or bags should always be used during the collection of each subsequent item of liquid or solid accelerant evidence.

An alternative method to limit contamination during collection is to utilize the evidence container itself as the collection tool. For example, the lid of a metal can may be used to scoop the physical evidence into the can, thereby eliminating any cross-contamination from the fire investigator's hands, gloves, or tools.

Similarly, any collection tools or overhaul equipment such as brooms, shovels, or squeegees utilized by the fire investigator need to be cleaned thoroughly between the collection of each item of liquid or solid accelerant evidence to prevent similar cross-contamination. The fire investigator should be careful, however, not to use waterless or other types of cleaners that may contain volatile solvents.

**14.4.3 Contamination by Fire Fighters.** Contamination is possible when fire fighters are using or refilling fuel-powered tools and equipment in an area where an investigator later tests for the presence or omission of an ignitable liquid. Fire fighters should take the necessary precautions to ensure that the possibility of contamination is kept to a minimum, and the investigator should be informed when the possibility of contamination exists.

**14.5 Methods of Collection.** The collection of physical evidence is an integral part of a properly conducted fire investigation. The method of collection of the physical evidence is determined by many factors including the following.

(a) *Physical State.* Whether the physical evidence is a solid, liquid, or gas

(b) *Physical Characteristics.* The size, shape, and weight of the physical evidence

(c) *Fragility.* How easily the physical evidence may be broken, damaged, or altered

(d) *Volatility.* How easily the physical evidence may evaporate

Regardless of which method of collection is employed, the fire investigator should be guided by the policies and procedures of the laboratory that will examine or test the physical evidence.

**14.5.1* Documenting the Collection of Physical Evidence.** Physical evidence should be thoroughly documented before it is moved. This documentation can be best accomplished through field notes, written reports, sketches, and diagrams, with accurate measurements and photography. The diagramming and photography should always be accomplished before the physical evidence is moved or disturbed. The investigator should strive to maintain a list of all evidence removed and of who removed it.

The purpose of such documentation is twofold. First, the documentation should assist the fire investigator in establishing the origin of the physical evidence, including not only its location at the time of discovery, but also its condition and relationship to the fire investigation. Second, the documentation should also assist the fire investigator in establishing that the physical evidence has not been contaminated or altered.

**14.5.2 Collection of Traditional Forensic Physical Evidence.** Traditional forensic physical evidence includes, but is not limited to, finger and palm prints, bodily fluids such as blood and saliva, hair and fibers, footwear impressions, tool marks, soils and sand, woods and sawdust, glass, paint, metals, handwriting, questioned documents, and general types of trace evidence. Although usually associated with other types of investigations, these types of physical evidence may also become part of a fire investigation. The recommended methods of collection of such traditional forensic physical evidence vary greatly. As such, the fire investigator should consult with the forensic laboratory that will examine or test the physical evidence.

PHYSICAL EVIDENCE                                                      921–109

**14.5.3 Collection of Evidence for Accelerant Testing.** An accelerant is any agent, often an ignitable liquid, used to initiate or speed the spread of fire. Accelerant may be found in any state: gas, liquid, or solid. Evidence for accelerant testing should be collected and tested in accordance with ASTM E 1387, *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris Samples by Gas Chromatography*, or with ASTM E 1618, *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris by Gas Chromatography–Mass Spectrometry*.

Liquid accelerants have unique characteristics that are directly related to their collection as physical evidence. These characteristics include the following:

(1) Liquid accelerants are readily absorbed by most structural components, interior furnishings, and other fire debris.

(2) Generally, liquid accelerants float when in contact with water (alcohol is a noted exception).

(3) Liquid accelerants have remarkable persistence (survivability) when trapped within porous material.

When a canine/handler team is used to detect possible evidence of accelerant use, the handler should be allowed to decide what areas (if any) of a building or site to examine. Prior to any search, the handler should carefully evaluate the site for safety and health risks such as collapse, falling, toxic materials, residual heat, and vapors and should be the final arbiter of whether the canine is allowed to search. It should also be the handler's decision whether to search all of a building or site, even areas not involved in the fire.

The canine/handler team can assist with the examination of debris (loose or packaged) removed from the immediate scene as a screening step to confirm whether the appropriate debris has been recovered for laboratory analysis.

**14.5.3.1 Collection of Liquid Samples for Accelerant Testing.** When a possible liquid accelerant is found in a liquid state, it can easily be collected using any one of a variety of methods. Whichever method is employed, however, the fire investigator should be certain that the evidence does not become contaminated.

If readily accessible, the liquid accelerant may be collected with a new syringe, eye dropper, pipette, siphoning device, or the evidence container itself. Sterile cotton balls or gauze pads may also be used to absorb the liquid. This method of collection results in the liquid accelerant's becoming absorbed by the cotton balls or gauze pads. The cotton balls or gauze pads and their absorbed contents then become the physical evidence that should be sealed in an airtight container and submitted to the laboratory for examination and testing.

**14.5.3.2 Collection of Liquid Evidence Absorbed by Solid Materials.** Often, liquid accelerant evidence may be found only where the liquid accelerant has been absorbed by solid materials, including soils and sands. This method of collection merely involves the collection of these solid materials with their absorbed contents. The collection of these solid materials may be accomplished by scooping them with the evidence container itself or by cutting, sawing, or scraping. Raw, unsealed, or sawed edges, ends, nail holes, cracks, knot holes, and other similar areas of wood, plaster, sheet rock, mortar, or even concrete are particularly good areas to sample. If deep penetration is suspected, the entire cross section of material should be removed and preserved for laboratory evaluation. In some solid material, such as soil or sand, the liquid accelerant may

absorb deeply into the material. The investigator should therefore remove samples from a greater depth.

In those situations where liquid accelerants are believed to have become trapped in porous material, such as a concrete floor, the fire investigator may use absorbent materials such as lime, diatomaceous earth, or non-self-rising flour. This method of collection involves spreading the absorbent onto the concrete surface, allowing it to stand for 20 to 30 minutes, and securing it in a clean, airtight container. The absorbent is then extracted in the laboratory. The investigator should be careful to use clean tools and containers for the recovery step since the absorbent is easily contaminated. A sample of the unused absorbent should be preserved separately for analysis as a comparison sample.

**14.5.3.3 Collection of Solid Samples for Accelerant Testing.** Solid accelerant may be common household materials and compounds or dangerous chemicals. Since some incendiary materials remain corrosive or reactive, care should be taken in packaging to ensure that the corrosive residues do not attack the packaging container. In addition, solid materials should be handled carefully by personnel for their own safety.

**14.5.3.4\* Comparison Samples.** When physical evidence is collected for examination and testing, it is often necessary to also collect comparison samples.

The collection of comparison samples is especially important in the collection of materials that are believed to contain liquid or solid accelerant. For example, the comparison sample for physical evidence consisting of a piece of carpeting believed to contain a liquid accelerant would be a piece of the same carpeting that does not contain any of the liquid accelerant. Comparison samples allow the laboratory to evaluate the possible contributions of volatile pyrolysis products to the analysis and also to estimate the flammability properties of the normal fuel present.

It is recognized that comparison samples may be unavailable due to the condition of the fire scene. It is also recognized that comparison samples are frequently unnecessary for the valid identification of ignitable liquid residue. The determination of whether comparison samples are necessary is made by the laboratory analyst, but because it is usually impossible for an investigator to return to a scene to collect comparison samples, they should be collected at the time of the initial investigation.

If mechanical or electrical equipment is suspected in the fire ignition, exemplar equipment may be identified and collected or purchased as a comparison sample.

**14.5.3.5\* Canine Teams.** Properly trained and validated ignitable liquid detection canine/handler teams have proven their ability to improve fire investigations by assisting in the location and collection of samples for laboratory analysis for the presence of ignitable liquids. The proper use of detection canines is to assist with the location and selection of samples.

In order for the presence or absence of an ignitable liquid to be scientifically confirmed in a sample, that sample should be analyzed by a laboratory in accordance with 14.5.3. Any canine alert not confirmed by laboratory analysis should not be considered validated.

Research has shown that canines have responded or have been alerted to pyrolysis products that are not produced by an ignitable liquid and have not always responded when an ignitable liquid accelerant was known to be present. If an investigator feels that there are indicators of an accelerant, samples should be taken even in the absence of a canine alert.

The canine olfactory system is believed capable of detecting gasoline at concentrations below those normally cited for laboratory methods. The detection limit, however, is not the sole criterion or even the most important criterion for any forensic technique. Specificity, the ability to distinguish between ignitable liquids and background materials, is even more important than sensitivity for detection of any ignitable liquid residues. Unlike explosive- or drug-detecting dogs, these canines are trained to detect substances that are common to our everyday environment. The techniques exist today for forensic laboratories to detect submicroliter quantities of ignitable liquids, but because these substances are intrinsic to our mechanized world, merely detecting such quantities is of limited evidential value.

Current research does not indicate which individual chemical compounds or classes of chemical compounds are the key "triggers" for canine alerts. Research reveals that most classes of compounds contained in ignitable liquids may be produced from the burning of common synthetic materials. Laboratories that use ASTM guidelines (see Section 14.10) have minimum standards that define those chemical compounds that must be present in order to make a positive determination. The sheer variety of pyrolysis products present in fire scenes suggests possible reasons for some unconfirmed alerts by canines. The discriminatory ability of the canine to distinguish between pyrolysis products and ignitable liquids is remarkable but not infallible.

The proper objective of the use of canine/handler teams is to assist with the selection of samples that have a higher probability of laboratory confirmation than samples selected without the canine's assistance.

Canine ignitable liquid detection should be used in conjunction with, and not in place of, the other fire investigation and analysis methods described in this guide.

**14.5.4 Collection of Gaseous Samples.** During certain types of fire and explosion investigations, especially those involving fuel gases, it may become necessary for the fire investigator to collect a gaseous sample. The collection of gaseous samples may be accomplished by several methods, one of which is shown in Figure 14.5.4.

**FIGURE 14.5.4  Gathering a gaseous sample.**



The first method involves the use of commercially available mechanical sampling devices. These devices merely draw a sample of the gaseous atmosphere and contain it in a sample chamber or draw it through a trap of charcoal- or polymer-adsorbing material for later analysis.

Another method is the utilization of evacuated air-sampling cans. These cans are specifically designed for taking gaseous samples.

**14.5.5 Collection of Electrical Equipment and Components.** Before attempting to collect electrical equipment or components, the fire investigator should verify that all sources of electricity are off or disconnected. All safety procedures described in Chapter 10 should be followed. Electrical equipment and components may be collected as physical evidence to assist the fire investigator in determining whether the component was related to the cause of the fire.

Electrical components, after being involved in a fire, may become brittle and subject to damage if mishandled. Therefore, methods and procedures used in collection should preserve, as far as practical, the condition in which the physical evidence was found. Before any electrical component is collected as physical evidence, it should be thoroughly documented, including being photographed and diagrammed. Electrical wiring can usually be cut easily and removed. This type of evidence may consist of a short piece, a severed or melted end, or it might be a much longer piece, including an unburned section where the wiring's insulation is still intact. The fire investigator should collect the longest section of wiring practicable so that any remaining insulation can also be examined. Before wires are cut, a photograph should be taken of the wire(s), and then both ends of the wire should be tagged and cut so that they can be identified as one of the following:

(1) The device or appliance to which it was attached or from which it was severed

(2) The circuit breaker or fuse number or location to which the wire was attached or from which it was severed

(3) The wire's path or the route it took between the device and the circuit protector

Electrical switches, receptacles, thermostats, relays, junction boxes, electrical distribution panels, and similar equipment and components are often collected as physical evidence. It is recommended that these types of electrical evidence be removed intact, in the condition in which they were found.

When practical, it is recommended that any fixtures housing such equipment and components be removed without disturbing the components within them. Electrical distribution panels, for example, should be removed intact. An alternative method, however, would be the removal of individual fuse holders or circuit breakers from the panel. If the removal of individual components becomes necessary, the fire investigator should be careful not to operate or manipulate them while being careful to document their position and their function in the overall electrical distribution system.

If the investigator is unfamiliar with the equipment, he or she should obtain assistance from someone knowledgeable regarding the equipment, prior to disassembly or on-scene testing, to prevent damage to the equipment or components.

**14.5.6 Collection of Appliances or Small Electrical Equipment.** Whenever an appliance or other type of equipment is believed to be part of the ignition scenario, it is recommended that the fire investigator have it examined or tested. Appliances may be collected as physical evidence to support the fire

investigator's determination that the appliance was or was not the cause of the fire. This type of physical evidence may include many diverse items, from the large (e.g., furnaces, water heaters, stoves, washers, dryers) to the small (e.g., toasters, coffee pots, radios, irons, lamps).

Where practical, the entire appliance or item of equipment should be collected as physical evidence. This includes any electrical power cords or fuel lines supplying or controlling it.

Where the size or damaged condition of an appliance or item of equipment makes it impractical to be removed in its entirety, it is recommended that it be secured in place for examination and testing. Often, however, only a single component or group of components in an appliance or item of equipment may be collected as physical evidence. In that case, the fire investigator should strive to ensure that the removal, transportation, and storage of such evidence maintains the physical evidence in its originally discovered condition.

**14.6 Evidence Containers.** Once collected, physical evidence should be placed and stored in an appropriate evidence container. Like the collection of the physical evidence itself, the selection of an appropriate evidence container also depends on the physical state, physical characteristics, fragility, and volatility of the physical evidence. The evidence container should preserve the integrity of the evidence and should prevent any change to or contamination of the evidence.

Evidence containers may be common items, such as envelopes, paper bags, plastic bags, glass containers, or metal cans, or they may be containers specifically designed for certain types of physical evidence. The investigator's selection of an appropriate evidence container should be guided by the policies and procedures of the laboratory that will examine or test the physical evidence or the use to which the evidence will be subjected.

**14.6.1 Liquid and Solid Accelerant Evidence Containers.** It is recommended that containers used for the collection of liquid and solid accelerant evidence be limited to four types. These include metal cans, glass jars, special evidence bags, and common plastic evidence bags.

The fire investigator should be concerned with preventing the evaporation of the accelerant and preventing its contamination. It is important, therefore, that the container used be completely sealed to prohibit such evaporation or contamination.

**14.6.1.1 Metal Cans.** The recommended container for the collection of liquid and solid accelerant evidence is an unused, clean metal can, as shown in Figure 14.6.1.1. In order to allow space for vapors to collect, the can should be not more than two-thirds full.

The advantages of using metal cans include their availability, economic price, durability, and ability to prevent the evaporation of volatile liquids.

The disadvantages, however, include the inability to view the evidence without opening the container, the space requirements for storage, and the tendency of the container to rust when stored for long periods of time. If metal cans are used to store bulk quantities of volatile liquids, such as gasoline, high storage temperatures [above 100°F (38°C)] can produce sufficient vapor pressure to force the lid open and cause loss of sample. For such samples, glass jars may be more appropriate.

**FIGURE 14.6.1.1  Various types of metal cans.**



**14.6.1.2 Glass Jars.** Glass jars can also be used for the collection of liquid and solid accelerant evidence. It is important that the jars not have glued cap liners or rubber seals, especially when bulk liquids are collected. The glue often contains traces of solvent that can contaminate the sample, and rubber seals can soften or even dissolve in the presence of liquid accelerants or their vapors, allowing leakage or loss of the sample. In order to allow space for vapor samples to be taken during examination and testing, the glass jar should be not more than two-thirds full.

The advantages of using glass jars include their availability, their low price, the ability to view the evidence without opening the jar, the ability to prevent the evaporation of volatile liquids, and their lack of deterioration when stored for long periods of time.

The disadvantages, however, include their tendency to break easily and their physical size, which often prohibits the storage of large quantities of physical evidence.

**14.6.1.3 Special Evidence Bags.** Special bags, designed specifically for liquid and solid accelerant evidence, can also be used for collection. Unlike common plastic evidence bags, these special evidence bags do not have a chemical composition that can cause erroneous test results during laboratory examination and during testing of the physical evidence contained in such bags.

The advantages of using special evidence bags include their availability in a variety of shapes and sizes, their economic price, the ability to view the evidence without opening the bag, their ease of storage, and the ability to prevent the evaporation of volatile liquids.

The disadvantages, however, are that they are susceptible to being damaged easily, resulting in the contamination of the physical evidence contained in them, and they may be difficult to seal adequately.

**14.6.1.4 Common Plastic Bags.** While they are not generally usable for volatile liquids, common (polyethylene) plastic bags can be used for some evidence packaging. They can be used for packaging incendiary devices or solid accelerant residues, but they could be permeable, allowing for loss and contamination.

The advantages of using common plastic bags include their availability in a variety of shapes and sizes, their economic price, the ability to view the evidence without opening the bag, and their ease of storage.

The disadvantages, however, are their susceptibility to easy damage (tearing and penetration), resulting in the contamination of the physical evidence contained in them, and their marked inability to retain light hydrocarbons and alcohols, resulting in loss of the sample, misidentification, or cross-contamination between containers in the same box.

**14.7 Identification of Physical Evidence.** All evidence should be marked or labeled for identification at the time of collection.

Recommended identification includes the name of the fire investigator collecting the physical evidence, the date and time of collection, an identification name or number, the case number and item designation, a description of the physical evidence, and where the physical evidence was located. This can be accomplished directly on the container (*see Figure 14.7*) or on a preprinted tag or label that is then securely fastened to the container.

**FIGURE 14.7  Marking of the evidence container.**



The fire investigator should be careful that the identification of the physical evidence cannot be easily damaged, lost, removed, or altered. The fire investigator also should be careful that the placement of the identification, especially adhesive labels, does not interfere with subsequent examination or testing of the physical evidence at the laboratory.

**14.8 Transportation and Storage of Physical Evidence.** Transportation of physical evidence to the laboratory or testing facility can be done either by hand delivery or by shipment.

**14.8.1 Hand Delivery.** Whenever possible, it is recommended that physical evidence be hand delivered for examination and testing. Hand delivery minimizes the potential of the physical evidence becoming damaged, misplaced, or stolen.

During such hand delivery, the fire investigator should take every precaution to preserve the integrity of the physical evidence. It is recommended that the physical evidence remain in the immediate possession and control of the fire investigator until arrival and transfer of custody at the laboratory or testing facility.

The fire investigator should define the scope of the examination or testing desired in writing. This request should

include the name, address, and telephone number of the fire investigator; a detailed listing of the physical evidence being submitted for examination and testing; and any other information required, dependent on the nature and scope of the examination and testing requested. This request may also include the facts and circumstances of the incident yielding the physical evidence.

**14.8.2 Shipment.** It may sometimes become necessary to ship physical evidence to a laboratory or testing facility for examination and testing. When shipping becomes necessary, the fire investigator should take every precaution to preserve the integrity of that physical evidence.

The fire investigator should choose a container of sufficient size to adequately hold all of the individual evidence containers from a single investigation. Physical evidence from more than one investigation should never be placed in the same shipment.

The individual evidence container should be packaged securely within the shipping container. A letter of transmittal should be included. The letter of transmittal is a written request for laboratory examination and testing. It should include the name, address, and telephone number of the fire investigator; a detailed listing of the physical evidence being submitted for examination and testing; the nature and scope of the examination and testing desired; and any other information required, depending on the nature and scope of the examination and testing requested. This letter of transmittal may also include the facts and circumstances of the incident yielding the physical evidence.

The sealed package should be shipped by registered United States mail or any commercial courier service. The fire investigator should, however, always request return receipts and signature surveillance.

**14.8.2.1 Shipping Electrical Evidence.** In addition to the procedures described in 14.8.2, the investigator should be aware that some electrical equipment components with sensitive electromechanical components may not be suitable for shipment. Examples include certain circuit breakers, relays, or thermostats. The fire investigator should consult personnel at laboratory or testing facilities for advice on how to transport the evidence.

**14.8.2.2 Volatile or Hazardous Materials.** The fire investigator is cautioned about shipping volatile or hazardous materials. The investigator should ensure that such shipments are made in accordance with applicable federal, state, and local law. When dealing with volatile evidence, it is important that the evidence be protected from extremes of temperature. Freezing or heating of the volatile materials may affect lab test results. Generally, the lower the temperature at which the evidence is stored, the better the volatile sample will be preserved, but it should not be allowed to freeze.

**14.8.3 Storage of Evidence.** Physical evidence should be maintained in the best possible condition until it is no longer needed. It should always be protected from loss, contamination, and degradation. Heat, sunlight, and moisture are the chief sources of degradation of most kinds of evidence. Dry and dark conditions are preferred, and the cooler the better. Refrigeration of volatile evidence is strongly recommended. If a sample is being collected for fire-debris analysis, it may be frozen, since freezing will prevent microbial and other biological degradation. However, freezing may interfere with flash point or other physical tests and may burst water-filled containers.

**14.9 Chain of Custody of Physical Evidence.** The value of physical evidence entirely depends on the fire investigator's efforts to maintain the security and integrity of that physical evidence from the time of its initial discovery and collection to its subsequent examination and testing. At all times after its discovery and collection, physical evidence should be stored in a secured location that is designed and designated for this purpose. Access to this storage location should be limited in order to limit the chain of custody to as few persons as possible. Wherever possible, the desired storage location is one that is under the sole control of the fire investigator.

When it is necessary to pass chain of custody from one person to another, it should be done using a form on which the receiving person signs for the physical evidence. Figure 14.9 shows an example of such a form.

**FIGURE 14.9 Chain of custody form.**

```
┌─────────────────────────────────────────────┐
│ Crime Scene Search Evidence Report           │
│ Name of subject _____ │
│ Offense _____  │
│ Date of incident _____ Time _____ a.m. p.m. │
│ Search officer _____  │
│ Evidence description _____  │
│ _____  │
│ _____  │
│ Location _____  │
│ _____  │
│                                               │
│ Chain of Possession                           │
│ Received from _____   │
│ By _____   │
│ Date _____ Time _____ a.m. p.m.     │
│                                               │
│ Received from _____   │
│ By _____   │
│ Date _____ Time _____ a.m. p.m.     │
│                                               │
│ Received from _____   │
│ By _____   │
│ Date _____ Time _____ a.m. p.m.     │
│                                               │
│ Received from _____   │
│ By _____   │
│ Date _____ Time _____ a.m. p.m.     │
└─────────────────────────────────────────────┘
```

**14.10 Examination and Testing of Physical Evidence.** Once collected, physical evidence is usually examined and tested in a laboratory or other testing facility. Physical evidence may be examined and tested to identify its chemical composition; to establish its physical properties; to determine its conformity or lack of conformity to certain legal standards; to establish its operation, inoperation, or malfunction; to determine its design sufficiency or deficiency, or other issues that will provide the fire investigator with an opportunity to understand and determine the origin of a fire, the specific cause of a fire, the contributing factors to a fire's spread, or the responsibility for a fire. The investigator should consult with the laboratory or other testing facility to determine what specific services are provided and what limitations are in effect.

**14.10.1 Laboratory Examination and Testing.** A wide variety of standardized tests are available, depending on the physical evidence and the issue or hypothesis being examined or tested. Such tests should be performed and carried out by procedures that have been standardized by some recognized group. Such conformance better ensures that the results are valid and that they will be comparable to results from other laboratories or testing facilities.

It should be noted that the results of many laboratory examinations and tests may be affected by a variety of factors. These factors include the abilities of the person conducting or interpreting the test, the capabilities of the particular test apparatus, the maintenance or condition of the particular test apparatus, sufficiency of the test protocol, and the quality of the sample or specimen being tested. Fire investigators should be aware of these factors when using the interpretations of test results.

If it is determined that testing might alter the evidence, interested parties should be notified prior to testing to allow them an opportunity to object or be present at the testing. Guidance regarding notification can be found in ASTM E 860, *Standard Practice for Examining and Testing Items That Are or May Become Involved in Product Liability Litigation.* (See also 14.5.3.4.)

**14.10.2 Test Methods.** The following is a listing of selected analytical methods and tests that are applicable to certain fire investigations. When utilizing laboratories to perform any of these tests, investigators should be aware of the quality of the laboratory results that can be expected.

**14.10.2.1 Gas Chromatography (GC).** The test method separates the mixtures into their individual components and then provides a graphical representation of each component and its relative amount. The method is useful for mixtures of gases or liquids that can be vaporized without decomposition. Gas chromatography is sometimes a preliminary test that may indicate the need for additional testing to specifically identify the components. For most petroleum distillate accelerants, gas chromatography provides adequate characterization if conducted according to accepted methods. These methods are described in ASTM E 1387, *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris Samples by Gas Chromatography.*

**14.10.2.2 Mass Spectrometry (MS).** This test method is usually employed in conjunction with gas chromatography. The method further analyzes the individual components that have been separated during gas chromatography. Methods of GC/MS analysis are described in ASTM E 1618, *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris by Gas Chromatography–Mass Spectrometry.*

**14.10.2.3 Infrared Spectrophotometer (IR).** This test method can identify some chemical species by their ability to absorb infrared light in specific wavelength regions.

**14.10.2.4 Atomic Absorption (AA).** This test method identifies the individual elements in nonvolatile substances such as metals, ceramics, or soils.

**14.10.2.5 X-Ray Fluorescence.** This test analyzes for metallic elements by evaluating an element's response to X-ray photons.

**14.10.2.6 Flash Point by Tag Closed Tester (ASTM D 56).** This test method, from ASTM D 56, *Standard Test Method for Flash Point by Tag Closed Tester,* covers the determination of the flash point, by tag closed tester, of liquids having low viscosity and a flash point below 200°F (93°C). Asphalt and those liquids that

921–114                                FIRE AND EXPLOSION INVESTIGATIONS

tend to form a surface film under test conditions and materials that contain suspended solids are tested using the Pensky-Martens (*see 14.10.2.8*) closed tester.

**14.10.2.7 Flash and Fire Points by Cleveland Open Cup (ASTM D 92).** This test method, from ASTM D 92, *Standard Test Method for Flash and Fire Points by Cleveland Open Cup,* covers determination of the flash and fire points of all petroleum products (except oils) and those products having an open-cup flash point below 175°F (79°C).

**14.10.2.8 Flash Point by Pensky-Martens Closed Tester (ASTM D 93).** This test method, from ASTM D 93, *Standard Test Method for Flash Point by Pensky-Martens Closed Cup Tester,* covers the determination of the flash point by Pensky-Martens closed-cup tester of fuel oils, lubricating oils, suspensions of solids, liquids that tend to form a surface film under test conditions, and other liquids.

**14.10.2.9 Flash Point and Fire Point of Liquids by Tag Open-Cup Apparatus (ASTM D 1310).** This test method, from ASTM D 1310, *Standard Test Method for Flash Point and Fire Point of Liquids by Tag Open-Cup Apparatus,* covers the determination by tag open-cup apparatus of the flash point and fire point of liquids having flash points between 0°F and 325°F (–18°C and 163°C) and fire points up to 325°F (163°C).

**14.10.2.10 Flash Point by Setaflash Closed Tester (ASTM D 3828).** This test method, from ASTM D 3828, *Standard Test Methods for Flash Point by Small Scale Closed Tester,* covers procedures for the determination of flash point by a Setaflash closed tester. Setaflash methods require smaller specimens than the other flash point tests.

**14.10.2.11 Autoignition Temperature of Liquid Chemicals (ASTM E 659).** This test method, from ASTM E 659, *Standard Test Method for Autoignition Temperature of Liquid Chemicals,* covers the determination of hot- and cool-flame autoignition temperatures of a liquid chemical in air at atmospheric pressure in a uniformly heated vessel.

**14.10.2.12 Heat of Combustion of Hydrocarbon Fuels by Bomb Calorimeter (High-Precision Method) (ASTM D 2382).** This test method, from ASTM D 2382, *Standard Test Method for Heat of Combustion of Hydrocarbon Fuels by Bomb Calorimeter (High Precision Method),* covers the determination of the heat of combustion of hydrocarbon fuels. It is designed specifically for use with aviation fuels when the permissible difference between duplicate determinations is of the order of 0.1 percent. It can be used for a wide range of volatile and nonvolatile materials where slightly greater differences in precision can be tolerated.

**14.10.2.13 Flammability of Apparel Textiles (ASTM D 1230).** This test method, from ASTM D 1230, *Standard Test Method for Flammability of Apparel Textiles,* covers the evaluation of the flammability of textile fabrics as they reach the consumer for or from apparel other than children's sleepwear or protective clothing.

**14.10.2.14 Cigarette Ignition Resistance of Mock-up Upholstered Furniture Assemblies (ASTM E 1352).** This test method, from ASTM E 1352, *Standard Test Method for Cigarette Ignition Resistance of Mock-up Upholstered Furniture Assemblies,* is intended to cover the assessment of the resistance of upholstered furniture mock-up assemblies to combustion after exposure to smoldering cigarettes under specified conditions.

**14.10.2.15 Cigarette Ignition Resistance of Components of Upholstered Furniture (ASTM E 1353).** This test method, from ASTM E 1353, *Standard Test Methods for Cigarette Ignition Resistance of Components of Upholstered Furniture,* is intended to evaluate the ignition resistance of upholstered furniture component assemblies when exposed to smoldering cigarettes under specified conditions.

**14.10.2.16 Flammability of Finished Textile Floor-Covering Materials (ASTM D 2859).** This test method, from ASTM D 2859, *Standard Test Method for Flammability of Finished Textile Floor Covering Materials,* covers the determination of the flammability of finished textile floor covering materials when exposed to an ignition source under controlled laboratory conditions. It is applicable to all types of textile floor coverings regardless of the method of fabrication or whether they are made from natural or manmade fibers. Although this test method may be applied to unfinished material, such a test is not considered satisfactory for the evaluation of a textile floor-covering material for ultimate consumer use.

**14.10.2.17 Flammability of Aerosol Products (ASTM D 3065).** This test method, from ASTM D 3065, *Standard Test Methods for Flammability of Aerosol Products,* covers the determination of flammability hazards for aerosol products.

**14.10.2.18 Surface Burning Characteristics of Building Materials (ASTM E 84).** This test method, from ASTM E 84, *Standard Test Method for Surface Burning Characteristics of Building Materials,* for the comparative surface burning behavior of building materials, is applicable to exposed surfaces, such as ceilings or walls, provided that the material or assembly of materials, by its own structural quality or the manner in which it is tested and intended for use, is capable of supporting itself in position or being supported during the test period. This test is conducted with the material in the ceiling position. This test is not recommended for use with cellular plastic.

**14.10.2.19 Fire Tests of Roof Coverings (ASTM E 108).** This test method, from ASTM E 108, *Standard Test Method for Fire Tests of Roof Coverings,* covers the measurement of relative fire characteristics of roof coverings under simulated fire originating outside the building. It is applicable to roof coverings intended for installation on either combustible or noncombustible decks, when applied as intended for use.

**14.10.2.20 Critical Radiant Flux of Floor-Covering Systems Using a Radiant Heat Energy Source (ASTM E 648).** This test method, from ASTM E 648, *Standard Test Method for Critical Radiant Flux of Floor-Covering Systems Using a Radiant Heat Energy Source,* describes a procedure for measuring the critical radiant flux of horizontally mounted floor covering systems exposed to a flaming ignition source in graded radiant heat energy environment in a test chamber. The specimen can be mounted over underlayment or to a simulated concrete structural floor, bonded to a simulated structural floor, or otherwise mounted in a typical and representative way.

**14.10.2.21 Room Fire Experiments (ASTM E 603).** This guide, ASTM E 603, *Standard Guide for Room Fire Experiments,* covers full-scale compartment fire experiments that are designed to evaluate the fire characteristics of materials, products, or systems under actual fire conditions. It is intended to serve as a guide for the design of the experiment and for the interpretation of its results. ASTM E 603 may be used as a guide for establishing laboratory conditions that simulate a given set of fire conditions to the greatest extent possible.

**14.10.2.22 Concentration Limits of Flammability of Chemicals (ASTM E 681).** This test method, from ASTM E 681, *Standard Test Method for Concentration Limits of Flammability of Chemicals,* covers the determination of the lower and upper concentration limits of flammability of chemicals having sufficient vapor pressure to form flammable mixtures in air at 1 atmosphere pressure at the test temperature. This method may be used to determine these limits in the presence of inert dilution gases. No oxidant stronger than air should be used.

**14.10.2.23 Measurement of Gases Present or Generated During Fires (ASTM E 800).** Analytical methods for the measurement of carbon monoxide, carbon dioxide, oxygen, nitrogen oxides, sulfur oxides, carbonyl sulfide, hydrogen halide, hydrogen cyanide, aldehydes, and hydrocarbons are described in ASTM E 800, *Standard Guide for Measurement of Gases Present or Generated During Fires,* along with sampling considerations. Many of these gases may be present in any fire environment. Several analytical techniques are described for each gaseous species, together with advantages and disadvantages of each. The test environment, sampling constraints, analytical range, and accuracy often dictate use of one analytical method over another.

**14.10.2.24 Heat and Visible Smoke Release Rates for Materials and Products (ASTM E 906).** This test method, from ASTM E 906, *Standard Test Method for Heat and Visible Smoke Release Rates for Materials and Products,* can be used to determine the release rates of heat and visible smoke from materials and products when exposed to different levels of radiant heat using the test apparatus, specimen configurations, and procedures described in this test method.

**14.10.2.25 Pressure and Rate of Pressure Rise for Combustible Dusts (ASTM E 1226).** This test method, from ASTM E 1226, *Test Method for Pressure and Rate of Pressure Rise for Combustible Dusts,* can be used to measure composition limits of explosibility, ease of ignition, and explosion pressures of dusts and gases.

**14.10.2.26 Heat and Visible Smoke Release Rates for Materials and Products Using an Oxygen Consumption Calorimeter (ASTM E 1354).** This test method, from ASTM E 1354, *Standard Test Method for Heat and Visible Smoke Release Rates for Materials and Products Using an Oxygen Consumption Calorimeter,* is a bench-scale laboratory instrument for measuring heat release rate, radiant ignitability, smoke production, mass loss rate, and certain toxic gases of materials.

**14.10.2.27 Ignition Properties of Plastics (ASTM D 1929).** This test method, from ASTM D 1929, *Standard Test Method for Determining Ignition Temperature of Plastics,* covers a laboratory determination of the self-ignition and flash-ignition temperatures of plastics using a hot-air ignition furnace.

**14.10.2.28 Flammability of Apparel Fabrics by Semi-Restraint Method (ASTM D 3659).** This test method, from ASTM D 3659, *Standard Test Method for Flammability of Apparel Fabrics by Semi-Restraint Method,* covers the evaluation of the flammable properties of fabrics in a vertical configuration.

**14.10.2.29 Dielectric Withstand Voltage (Mil-Std-202F Method 301).** This test method, from Mil-Std-202F, *Test Method for Electronic and Electrical Components,* also called high-potential/, over-potential/, voltage-breakdown/, or dielectric-strength/ test, consists of the application of a voltage higher than rated voltage for a specific time between mutually insulated portions of a component part or between insulated portions and ground.

**14.10.2.30 Insulation Resistance (Mil-Std-202F Method 302).** This test, from Mil-Std-202F, *Test Method for Electronic and Electrical Components,* measures the resistance offered by the insulating members of a component part to an impressed direct voltage tending to produce a leakage current through or on the surface of these members.

**14.10.3 Sufficiency of Samples.** Fire investigators often misunderstand the abilities of laboratory personnel and the capabilities of their scientific laboratory equipment. These misconceptions usually result in the fire investigator's collecting a quantity of physical evidence that is too small to examine or test.

Certainly, the fire investigator will not always have the opportunity to determine the quantity of physical evidence he or she can collect. Often, the fire investigator can collect only that quantity that is discovered during his or her investigation.

Each laboratory examination or test requires a certain minimum quantity of physical evidence to facilitate proper and accurate results. The fire investigator should be familiar with these minimum requirements. The laboratory that examines or tests the physical evidence should be consulted concerning these minimum quantities.

**14.10.4 Comparative Examination and Testing.** During the course of certain fire investigations, the fire investigator may wish to have appliances, electrical equipment, or other products examined to determine their compliance with recognized standards. Such standards are published by the American Society for Testing and Materials, Underwriters Laboratories Inc., and other agencies.

Another method of comparative examination and testing involves the use of an exemplar appliance or product. Utilizing an exemplar allows the testing of an undamaged example of a particular appliance or product to determine whether or not it was capable of causing the fire. The sample should be the same make and model as the product involved in the fire.

**14.11 Evidence Disposition.** The fire investigator is often faced with disposing of evidence after an investigation has been completed. The investigator should not destroy or discard evidence unless proper authorization is received. Circumstances may require that evidence be retained for many years and ultimately may be returned to the owner.

Criminal cases such as arson require that the evidence be kept until the case is adjudicated. During the trial, evidence submitted — such as reports, photographs, diagrams, and items of physical evidence — will become part of the court record and will be kept by the courts. Volatile or large physical items may be returned to the investigator by the court. There may be other evidence still in the investigator's possession that was not used in the trial. Once all appeals have been exhausted, the investigator may petition the court to either destroy or distribute all of the evidence accordingly. A written record of authorization to dispose of the evidence should be kept. The criminal investigator should be mindful of potential civil cases resulting from this incident, which may require retention of the evidence beyond the criminal proceedings.