IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 3 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE GARCIA, INDIVIDUALLY AND | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| IDALIA GARCIA, INDIVIDUALLY AND AS | | |
| REPRESENTATIVE OF THE ESTATE | | |
| OF MANUEL CRUZ, DECEASED, | | |
| | | |
| PLAINTIFFS | | |
| | | |
| CYNTHIA COX AS NEXT FRIEND | | |
| OF BRITTANY COX, | | |
| | | |
| PLAINTIFF | | |
| | | CIVIL ACTION NO. |
| | | |
| v. | | B98-186 |
| | | |
| BRK BRANDS, INC., | | |
| | | |
| DEFENDANT | | |

**PLAINTIFFS AND INTERVENOR'S OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE PLAINTIFFS' EXPERTS**

COMES NOW, Plaintiffs Jose Garcia, Individually and Idalia Garica, Individually and as

Representative of the Estate of Manuel Cruz, Deceased and Intervenor, Cynthia Cox as Next

Friend of Brittany Cox and file this their opposition to Defendant's Motion to Exclude Plaintiffs'

Experts.

**I.
PRELIMINARY STATEMENT**

1.      It is important to note in this proceeding that it is the public policy of the State of Texas

to allow persons similarly situated as Plaintiffs herein to have the right to seek redress for

personal injury or death as a result of defective or unreasonably dangerous products.

1

2.    If, as is the underlying philosophical underpinning of Defendant's argument that only industry insiders have the precise experience and qualifications necessary to qualify as expert witnesses with respect to defects in products, who then would ever speak for the victim. The truth here is that Mr. Manuel Cruz lost his life, in a situation in which a significant amount of soot and airborne particulate matter resulting from incomplete combustion processes was released, in spite of the presence of a BRK smoke detector that should have alarmed.

3.    The able and capable defense counsel for BRK herein obviously will expend any effort to derail this case from a decision by a fairly informed and impartial jury in the Southern District of Texas. Thus, the desperate and strident effort to impugn the integrity, qualifications and experience of Plaintiffs experts and to suggest that their testimony is nothing more than an "illicit substitute" for evidentiary support or that the conclusions and opinions methodology constitute "junk science".

4.    The fact of the matter is that in the presence of a product represented to protect the public when there was a release of significant soot and particulate matter, the subject smoke detector failed to alarm depriving Manuel Cruz of a opportunity to vacate the premises before exposure to a lethal dose of carbon monoxide gas. Counsel's rhetoric concerning "illicit substitutes" and "frankly amateurish" testing is the harbringer of the desperate and vacuous nature of their motion.

5.    The attempt to demean and diminish the evidence and experts presented is simply an effort to divert attention from the fact that Cruz would be alive today had the subject product performed properly. The fact of the matter is that Plaintiffs' experts are competent, qualified, reliable and their opinions should be allowed to be put before the jury.

6.     It is the province of the jury after all to sift through what the evidence consists of and to consider the theories and validity of the evidence and the argument of counsel through the prism of the ordinary and unbiased sensibilities of a fully informed jury.

## RESPONSE AND ARGUMENT

7.     Plaintiffs rely upon Daubert v. Merrell Dow  Pharmaceuticals, Inc., 509 U.S. 579, 113 S.CT 2786, 125 L.Ed. 2d 469 (1993) in support of their effort to strike Plaintiffs' experts.

Contrary to the Defendant's understandable position concerning the proliferation of so called "junk science" and improper expert testimony (a perspective that can only come from years of  callous disregard for the injuries and suffering of victims), it should not be overlooked that the assistance of persons qualified by skill, knowledge, education or experience in a particular area have been a key facilitating element when issues in controversy are complex and beyond the every-day familiarity of the lay jury.  Such is the case here.  Although this case is not of the most complex nature, nevertheless the issues are such that Plaintiffs' experts would assist the jury in deciding ultimate issues.

8.     It is interesting to note that in Daubert the United States Supreme Court in rejecting a "rigid general acceptance" requirement as had been the practice under the earlier Frye standard, stated that such a test "would also be at odds with the "liberal thrust" of the federal rules and the general approach of relaxing the traditional barriers to "opinion testimony"  Id (quoting Beech Aircraft Corporation vs. Rainey, 488 U.S. 153, 169, 109 S.CT 439, 102 L.ed 2d  445 (1988).

9.     Thus, although it would please  BRK and its counsel to no end that the standards be so rigid that only industry insiders would ever be allowed to testify, such is simply not the standard with respect to when expert may testify.  In fact, the decades long asbestos litigation in this country has clearly indicated that when industry insiders are the ones that set the protocols and

methodologies and particulars of any research or testing that their conclusions and opinions are highly suspect, biased, unreliable and ultimately dangerous to the safety of the consuming public.

10.    Futhermore the focus, according to   Daubert must be solely on principles and methodology not on the conclusions that they generate.  Daubert 509 U.S. at 594-95, 113 S.CT. at 2797.  Here, regardless of the qualifications, education, training or experience of  Plaintiffs' experts or in fact what testing or application of principles knowledge or experience they may have undertaken.  Defendants' simple response is that all of them are unqualified, improper and/or not reliable.

11.    These blanket assertions indicate that the Defendants true objection to Plaintiffs' experts is to the conclusions that they reached.

12.    The Supreme Court and the parties in Daubert viewed the criteria elucidated therein as a liberalization of the admissibility standards with regard to expert testimony.  The court stated at 596, 113 S.CT. 2786  "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky, but admissible evidence".

13.    A jury of ordinary sensibilities, unencumbered by bias to one side of the case or the other should be the ultimate arbiters of the credibility and validity of the evidence.

14.    Furthermore the court in Daubert indicated that the trial court retains the authority to direct a judgment or grant summary judgment in the event evidence was deemed insufficient. The court concluded: "These conventional devices, rather then wholesale exclusion under an uncompromising "general acceptance test", are the appropriate safeguard where the basis of scientific testimony meets the standards of Rule 702".  Id at 595-97, 113 S.CT. at 2798.

15.     Federal Rule of Evidence 702 which addresses the basis of opinion testimony by experts states - "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

16.     Federal Rules of Evidence 703 which addresses the basis of opinion testimony by experts states - "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."

17.     Where the opinion is based on facts in evidence, the witness can apply knowledge and experience and draw a conclusion through a simple process of deductive reasoning as indicated in the Texas case of Harris v. Belve, 974 S.W.2d 386 (Tex. App. – Tyler, 1988, pet. denied). Furthermore in Olin Corporation vs. Smith, 990 S.W.2d 789 (Tex. App. – Austin, 1999, pet. denied), the Appellate Court found the trial court properly admitted expert testimony supporting Plaintiffs' theory that Defendant's ammunition delay-fired a full second after triggering causing an injury.    The opinions were properly based on the experts "years of experience in

manufacturing fire arms, testing fire-arms, and training other to use fire-arms, along with personal observations of ammunition related hang fires lasting as long a two seconds". Id at 790.

18.    While Plaintiffs recognize the trial courts' "gate keeper" responsibility to screen out unreliable expert evidence, here not only is Plaintiffs' experts' evidence reliable, in addition Plaintiffs stress to the court that permitting juries to assess what weight should be given to each witness's testimony is the most fair and equitable procedure.

19.    Thus, any perceived flaws in the testimony of experts are properly to be tested in the crucible of adversarial proceedings and this court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. United States v. 14.38 Acres of Land, 80 F.3d 1074, 1079 (5TH Cir. 1996).

20.    Federal Rule 703 contemplates three sources of facts of data; that might underlie an expert's ; (1) facts within the expert's personal knowledge; (2) Facts presented to the expert at trial or outside of court, but not perceived by the expert personally; and, (3) inadmissible data if a type reasonably relied upon by experts in a particular field in forming an opinion or inferences upon the subject.

21.    Personal observation has always been an adequate basis for expert's opinion and indeed has been called the most desirable of all bases.    WEINSTEIN ET AL., WEINSTEIN's EVIDENCE section 703 – 7 (1995) (quoting FED. R. EVID. 703 Advisory Comm. note).

22.    Futhermore, an expert can rely on facts another expert observed and relied upon in forming his opinion even if the two experts draw different conclusion from the data. Harris v. Belve, 974 S.W.2d 386, 392-93 (Tex. App. – Tyler 1998, pet. denied). Defendants herein claim that Plaintiffs' expert testimony is quintessential "junk science". The only "junk science" here is the one that places defective and dangerous products into the stream of commerce that cause or

contribute to significant injury of death to those members of the consuming public who relied upon the representations of BRK.

23.    The Advisory Committee Notes to Rule 702 state that Rule 702 is "broadly phrased and intended to embrace more than a narrow definition of a qualified expert." However Defendants herein seek to impose an extremely narrow view.

24.    Defendants reliance on Copley v. Smith & Nephew, Inc., No. CIV.A.H.-97-2910, 2000 WL 223404, at *1 (S.D. Tex. Feb. 2, 2000) is misplaced. Cited by Defendant at pg. 520, 21, 24, 30, 1, 58 of Defendants Brief in support of Motion to Exclude. Lack of specialization does not affect the admissibility of expert opinion, but only the weight to be given to that opinion. Compton v. Subaru, Inc., 82 at F.3d 1513, 1517 (10th Cir. 1996), See also, Holbrook v. Lykes Bros.S.S., 80 F3d 777, 782 (3rd Cir. 1996) abuse of discretion to exclude testimony because court does not deem proposed expert to be the best qualified or have the specialization the court's considers most appropriate.

25.    Any expert's data and testimony does not have to prove the case by itself. It must merely constitute one piece of the puzzle that the parties attempting to assemble before the jury. City of Tuscaloosa vs. Harcros Chems., Inc., 158 at F.3d 548, 564-65 (11 Cir. 1998).

26.    Jose Garcia and Idalia Garcia and Cynthia Cox as Next Friend of Brittany Cox specifically respond herein to the challenges to Douglas Holmes, Wayne McCain and Don Russell.

27.    Plaintiffs herein furthermore incorporate by reference any responses of Cynthia Cox as Next Friend of Brittany Cox with respect to the qualifications, education training, validity, reliability and ability to testify of Michael Shultz Morris Cranmer and Dr. Aronstein.

## DOUG HOLMES IS A QUALIFIED EXPERT

28.     Doug Holmes is a qualified expert witness regarding the cause and origins of fire and accumulation of smoke and soot on the smoke detector at issue. (See attached Exhibit "A". Mr. Holmes Curriculum Vitae). Plaintiffs deny that it is a requisite for Mr. Holmes to testify herein that he had specialized knowledge and expertise in the design and operation of smoke detectors to enable him to determine whether, under the conditions existing in Mr. Cruz' apartment at the time of the incident this smoke detector should have alarmed. Nevertheless, Plaintiffs herein unqualifiedly state to the court that Mr. Holmes will not be presented with respect to issues concerning the design and operation of the smoke detector and therefore any challenge to Mr. Holmes should be denied on the basis that Doug Holmes will not testify a to whether the smoke detector is defective or with respect to the smoke detector design construction or operation.

## DOUGLAS HOLMES WILL NOT OFFER TO TESTIFY CONCERNING THE OPERATION OF THE SMOKE DETECTOR AND THE SPACE HEATER.

29.     Although asked at his deposition questions concerning the quantity of soot produced by the space heater which should have caused the subject smoke detector to alarm before hazardous quantity of carbon monoxide would have been produced to incapacitate   Mr. Cruz by Defendant's counsel Plaintiffs will not offer Mr. Holmes testimony on that issue.

## WAYNE MCCAIN'S TESTIMONY RELATED TO THE OPERATION OF THE SMOKE DETECTOR AND THE SPACE HEATER SHOULD BE ALLOWED

30.     Wayne McCain is an legitimately qualified expert (see the attached Exhibit "B", the Curriculum Vitae of Mr. McCain). Mr. McCain's opinions and conclusions are based on his observations and examinations, research and work that he has done. Such is proper and should

8

be allowed to be presented to the jury.  See deposition of Elmer Wayne McCain taken on

October 24, 2000 (attached herewith as Exhibit "C").  Wayne McCain stated on  Page 184 of his

deposition when asked,

> Q.    What evidence do you have that the smoke detector should
> have sounded an alarm before fatal levels of carbon monoxide
> were produced?
>
> A.    As I said earlier, the amount of gas being put into put into
> the heater, the amount of carbon monoxide and where the couch
> was located, he would receive less carbon monoxide than he would
> were back in the bedroom, in my opinion, because they've got the
> exit going toward the bedroom in which the gentleman who was
> killed is located.
>
> But the only thing that I have that tells me that it should
> have alarmed is the fact that you had so much soot, he had -- he
> was nauseous, etc. cetera, and where I have the couch marked.
> And you don't have this drawing, Page 4 or 5 of  Jose Garcia's
> affidavit.  There is not a date on it.  It was for Armstrong Forensic
> Laboratories this was done.
>
> But you would expect, based on the fact that the exit is
> going toward Manny's room, an exit is going toward the hall
> where the smoke detector is located -- I would, without question,
> expect it, the smoke detector, to alarm within 30 or 45 minutes of
> the outside, particularly with a man that's 20 feet away not having
> anything but nauseous headaches; and a man in the direction of the
> velocity of the heat and the carbon monoxide and soot, the heavy
> loading of it, is in the direction of the heater -- of where the heater
> is blowing these products and the smoke detector is closer than that
> as to  probably a foot a half, 2 feet.  It would go out first, in my
> opinion.
>
> Q.    But in order to determine when the smoke detector would
> alarm, you'd have to know the amount of products being produced
> by the space heater?  And by  that --
>
> A.    That's correct.
>
> Q.    -- I mean carbon, carbon dioxide, particulate matter, right?

A.    That's correct

Q.    And the only way you'd know that is if you know how much fuel is going into the burner element of the heater, right?

A.    That's right.

Q.    You've already testified that you don't know that, and you can't know that.

A.    You don't know that, Armstrong doesn't know it, nobody knows that because nobody knows what the regulator was set at, nobody know how much gas was going into it. Therefore with the sooting and so forth, you'd know there was a lot going in. What's "a lot"? Nobody knows, but that "lot" put enough soot in there to cause enough smoke to cause the alarm to go off. It should have gone off in my opinion. Now, that's my opinion based on what I've seen and what I surmise from looking at all the facts in the case, without all the fact witnesses. Excuse me. Page 187

On Page 188.

Q.    How do you know that that threshold or that level was reached before Mr. Cruz expired due to carbon monoxide poisoning?

A.    We don't know that; but based on the conditions, based on the statements that the gentleman made about the soot around the man's mouth and so forth and on his face and on the wall and on the ceiling by the smoke detector, an engineering certainty tells me, to a reasonable degree of engineering certainty, that it should have gone off from the soot.

31.    Wayne McCain's expert report, See Exhibit "D". That report contains qualifications, items reviewed and the opinions of Wayne McCain. Wayne McCain's Curriculum Vitae demonstrates that McCain is qualified and able to render opinions that would assist the trier of fact in this case determine items at issue which are outside the familiarity of a lay jury. To the extent that Plaintiffs claim that there are internal inconsistencies of Mr. McCain's opinions that make them be "unscientific, unreliable and absolutely inadmissible" it is important to note that

10

even if there are some internal inconsistencies, the degree, nature and ultimate importance of any such inconsistencies should be for the jury to determine and this goes to the weight of the evidence and not its admissibility.

## DR. RUSSELL SHOULD BE ALLOWED TO TESTIFY

32.    Dr. Russell is eminently qualified to provide expert testimony in this or any other case concerning smoke detectors and in particular corrosion of Piezo horn contacts. Dr. Russell is a registered professional engineer with a specialty in electrical engineering. Russell holds BS, MS and Ph.d degrees in Electrical Engineering. Dr. Russell is trained in all the underlying principles of electrical contact theory and the problem of corrosion and pressure contacts. His qualifications and education are set forth in the attached Exhibit "E" which is the Curriculum Vitae of Dr. Russell. The variety and degree of his knowledge, education, training, experience expertise is demonstrated by the information contained in said Exhibit "E".

33.    Plaintiffs argument that Dr. Russell's opinion concerning the alleged corrosion theories is unreliable because he lacks an in depth knowledge of the science underlying the theory is untrue.

34.    The fact of the matter is that he is in fact educated and trained in all the underlying principles of the electrical contact theory and he has relied on the foundational work of other engineers and scientists and applied their accepted principles to specific cases as has been address above and expert is able to rely on expert data which maybe perceived by, reviewed by or made know to the expert that or before the hearing. Here reliance on the work and knowledge of other engineers and scientists is valuable and accepted part of the scientific method.

35.    Contact corrosion is a known scientific principle, taught in all engineering universities, widely published in text books and widely documented in scientific literature.

11

36.    Defendant's position that Dr. Russell never participated in or performed studies regarding corrosion  himself leads to the conclusion that his opinion is no more that speculation is simply unsupported in law or fact.

37.    Plaintiffs rely on the case of Werner v Pittway Corporation, 90 F.Supp 2d 1018, (W.D. Wis. 2000), to argue that Dr. Russell's testimony should be excluded here.  That case is simply not applicable in the circumstances of this case and is not persuasive with respect to the issues before the court here and should be disregarded.  The court in Werner acknowledges that Dr. Russell has an extensive background in electrical engineering, the precise specialty at issue with respect to the Peizo-Horn on the corrosion issue.

38.    The critical injury inquiry there was that Dr. Russell's testimony was found to be speculation because the subject detector was destroyed and no longer existed and therefore the Plaintiff could not analyze it for any defect as to that particular detector and furthermore the undisputed evidence in that case was that the detector sounded which is not the case  here.

39.    Plaintiffs herein attach the affidavit of Dr. Russell and the attachments thereto  in support of their opposition to Plaintiffs' Motion to strike any incorporate said affidavit herein for all purposes as Exhibit "F".

40.    Plaintiff also attach the deposition of Dr. Russell as Exhibit "G" and "H".   With respect to the remainder of Plaintiffs' experts,  Plaintiffs herein urge that Dr. Jesse Aronstein, Mr. Morris Cranmer and Mr. Michael Shultz are in fact qualified, reliable and appropriate experts to provide expert testimony so that the jury is ultimate determines of the facts and of the reliability and credibility of each expert's testimony.  Plaintiffs herein incorporated by reference and response to Defendant's motion with respect to these experts.

12

## CONCLUSION

For all of the foregoing reasons, Plaintiffs and Intervenor urge that Defendant's Motion to

Exclude Plaintiff's Experts, after a hearing on same should in all things be denied.

Respectfully submitted,

**LAW OFFICE OF GLENN D. ROMERO, P.C.**

By:

JUAN A. GONZALEZ
State Bar No.  08129310
Federal I. D. No.:  3472
The Atrium
1300 N. 10th Street, Suite 400
McAllen, Texas  78501
Tel:  956/687-8181
Fax:  956/687-8868

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing instrument was delivered

via hand delivery, telefax, certified mail return receipt requested and/or regular mail to

the following counsel of record on this the _30th_ day April of 2002.


Rene Oliveira
Elizabeth Neally
**ROERIG, OLIVEIRA & FISHER**
855 West Price Rd, Suite 9
Brownsville, Texas 78520

Ray R. Marchan
**WATTS & HEARD, L.L.P.**
1926 East Elizabeth Street
Brownsville, Texas 78520

James Heller
Terry M. Henry
**COZEN O'CONNOR**
1900 Market Street
Philadelphia, PA 19103


Juan A. Gonzalez

# *Douglas   Lee   Holmes*

*Curriculum Vitae*

Fire Consultant
INTROSPECT
Federal Tax #:  76-0147024
1023 3rd Street
League City, Texas  77573
Office:  281/332-0613
   Fax:  281/332-0842

## *EDUCATION:*

1965  **Austin Senior High School**
      **Houston, Texas**

1969  **South Texas Junior College**
      **Associate of Arts - Police Administration**

1971  **South Texas Junior College**
      **Associate of Arts - Fire Administration**

1974  **Texas A & M University**
      **Teaching Methodology**

1977  **University of Houston at Clear Lake**
      **Bachelor of Science - Criminal Justice**

1980  **University of Houston at Clear Lake**
      **Masters of Arts - Public Administration**



PLAINTIFF'S EXHIBIT A

## *TECHNICAL EDUCATION:*

1968 **HOUSTON FIRE DEPARTMENT TRAINING ACADEMY** {480}

1968 **HOUSTON FIRE DEPARTMENT - IN-SERVICE TRAINING** {3,840}

1970 **BOMB ORDNANCE AND DISPOSAL SCHOOL** {08}
    United States Army.

1975 **PARAMEDIC** {600}
    City/State Health Department.

1976 **HIGH-RISE FIREFIGHTING** {16}
    Houston Fire Department Training Academy.

1977 **EMERGENCY COMMUNICATION SYSTEMS** {80}
    Houston Fire Department - Communications Division.

1977 **L.P.G. FIREFIGHTING SCHOOL** {8}
    Ranger Insurance Company.

1978 **INCENDIARY AND EXPLOSIVE SCHOOL** {16}
    U.S. Department of the Treasury.

1979 **STATE ARSON/CRIMINAL INVESTIGATION LICENSE** {472}
    Houston Arson Bureau.  Houston, Texas.  T.E.C.L.O.S.E

1979 **ARSON DETECTION** {16}
    National Fire Academy - Atlanta, Georgia.

1980 **FIRE AND ARSON INVESTIGATION** {80}
    National Fire Academy - Emmitsburg, Maryland.

1980 **TEXAS A & M UNIVERSITY** {40}
Fire Prevention V

1982 **ARSON FOR PROFIT** {40}
United States Treasury Department.

1984 **N.F.P.A LIFE SAFETY CODE #101** {24}
Texas A & M University.

1984 **INVESTIGATION OF ELECTRICAL FIRES** {24}
University of Wisconsin.  Drs. Be'land and Bernstein.

1985 **FIRE PREVENTION VI*** {36}
Texas A & M University.

1985 **KINESIC INTERVIEWING** - Link and Foster {24}
Sam Houston State University.

1986 **ADVANCED KINESIC INTERVIEWING** - Link and Foster {16}
Sam Houston State University.

1986 **VEHICLE FIRE INVESTIGATION*** {24}
National Institute Annual Conference, Galveston, Tx.

1987 **INVESTIGATION OF FIRES IN CLANDESTINE DRUG LABS** {08}
D.E.A and D.P.S. - Dallas, Texas.

1987 **FIRE INSPECTION PRACTICES*** {200}
Class "A" State Inspector's Certification.

1988 **SATANIC CULT INVESTIGATIONS** {24}
Killeen, Texas Police Academy.

3

1989 **32nd ANNUAL TEXAS FIRE INVESTIGATOR'S SEMINAR** {36}
  Texas A & M University & Texas State Fire Marshal's Office
  Austin, Texas.

1990 **VEHICLE FIRE INVESTIGATIONS** {24}
  Lee Cole - Dallas, Texas.

1990 **INTERPRETATION OF THE NATIONAL ELECTRIC CODE** {48}
  San Jacinto College - Houston, Texas.

1990 **42nd ANNUAL IAAI ARSON SEMINAR** - New Orleans, La. {35}
  Fire Modeling - Fire Investigation Techniques.

1990 **INTERVIEWING - SCIENTIFIC CONTENT ANALYSIS** {42}
  Laboratory for Scientific Interrogation
  Avinoam Sapir, Israel National Police.

1990 **SATANIC CULT INVESTIGATIONS** {3}
  Texas Advisory Council on Arson - Texas A & M.

1990 **FINGERPRINTS OF FIRE** – {32}
  University of Illinois, Chicago and the Chicago Bomb/Arson Squad.

1992 **ADVANCED ARSON FOR PROFIT** {24}
  Department of the Treasury, Houston, Texas

1992 **FIRE PROTECTION INSTITUTE** {40}
  F.M.N.A./ N. F. P. A John Bryan, Ph.D. and James Milke, Ph.D.
  Dept. of Fire Protection Engineering, University of Maryland.

1992 **FIRE MODELING - FPETOOL AND HAZARD I** {16}
  Bukowski/Peacock. Rockville, Maryland.

1992 **HIGH-RISE FIRE SAFETY\*** {20}
> The Fire Chief's Committee on High-Rise Fire Safety.
> Houston, Texas.  Chairperson.

1993 **38th ANNUAL TEXAS FIRE INVESTIGATORS SEMINAR**  {36}
> Texas A & M University & State Fire Marshal's Office. Austin, Texas.
> Fatal Fires; Arson Lab Procedures; Origin and Cause Determination;
> Mobile and Modular Home Fires; Juvenile Firesetters.

1993 **DETERMINING ELECTRICAL FIRE CAUSES\*** {02}
> Southeast Fire Investigator's Association.

1993 **"HIGH-RISE BUILDINGS - TARGETS FOR DISASTER\*"** {40}
> Fire Marshal's of North America.
> NFPA Annual Convention, Orlando, Florida.

1993 **CHEMISTRY AND PHYSICS OF FIRE\***  {24}
> Insurance Committee for Arson Control
> Atlanta, Georgia.

1993 **LITIGATING THE CIVIL ARSON CASE**  {16}
> American Bar Association - National Institute.
> New Orleans, Louisiana

1993 **ADVANCED FIRE AND ARSON INVESTIGATION\*** (TX:93357) {122}
> Houston Arson Bureau - Coordinator/Chief Instructor.

1993 **NATIONAL FIRE, ARSON, AND EXPLOSION INVESTIGATION** {36}
> N.F.P.A. and N.A.F.I. Chicago, Illinois.

1993 **HAZWOPER REFRESHER** {08}
> San Jacinto College Central.

**1994 FIRE INVESTIGATION THEORY APPLIED TO LIVE FIRES** {20}
Barker Davie/John D. DeHaan, Ph.D.
International Association of Arson Investigators – Galveston, Texas.

**1994 DIOGENES BEHAVIORAL ANALYSIS INTERVIEW TECHNIQUES** {32}
University of Houston D/T; Criminal Justice Department

**1994 38th ANNUAL TEXAS FIRE INVESTIGATORS SEMINAR** {36}
Texas A & M University & State Fire Marshal's Office; Austin, Texas.
Investigation of Electrical Fires; NFPA Standards and Gang Activities.

**1994 FORENSIC HYPNOTISM** {36}
University of Houston - Criminal Justice Department.

**1994 SOUTHEAST TEXAS FIRE INVESTIGATOR'S ASSOCIATION*** {24}
Instructor:  Identification, Collection, and Preservation of Evidence;
Fire Scene Photography.

**1994 FIREFIGHTER'S ROLE IN THE INVESTIGATION OF FIRES.** {04}
Pecan Grove Fire Department.

**1994 THE DESIGN, INSPECTION, AND PLAN REVIEW OF FIRE
SPRINKLER SYSTEMS** {24}  Austin, Texas.
National Fire Sprinkler Associations, Inc. and TAMU.

**1995 MECHANICAL CODE PRINCIPLES AND APPLICATIONS** {24}
Southern Building Code Congress International.

**1995 NFPA NATIONAL FIRE CODE #921 - SCENE DOCUMENTATION &
LEGAL CONSIDERATIONS*** {16}
Texas Commissions on Fire Protection/Law Enforcement.

**1996 FATAL FIRES; HOMICIDES, AND ACCIDENTAL DEATHS** {4}
Jay Evans, Harris County Medical Examiner's Office.

**1996 THE MECHANICS OF FIRE INVESTIGATION IN HAZARDOUS MATERIALS ATMOSPHERE [HAZWOPER]* {40}**
Harris County Fire Marshal Office.

**1996 ADVANCED LITIGATION SUPPORT-FORENSIC ACCOUNTING {17}**
American Institute of CPA's - New Orleans, Louisiana.

**1996 ELECTRICAL FIRE ANALYSIS {02}**
Southeast Fire Investigator's Association - Jasper, Texas.

**1996 TEXAS I.A.A.I. ARSON INVESTIGATION SEMINAR {16}**
Physics of Fire - Texas A&M University.   John D. DeHaan, Ph.D.

**1996 TUTORIAL - FIRE DYNAMICS {16}**
Fire Science and Technology Inc.  Vytenis Babrauskas, Ph.D., FPE.

**1997 THE INVESTIGATION OF VEHICLE FIRES* {4}**
Insurance Committee on Arson Control - Symposium in Houston, Tx.

**1997 ARSON CRIME SCENE VIDEOGRAPHER {08}**
National Police Forensic Video - Pleasanton, California.

**1997 CULTURAL DIVERSITY AND SPECIAL INVESTIGATIONS. {24}**
HCCS Police Academy – Houston, Texas.

**1997 ADVANCED FIRE ORIGIN AND CAUSE INVESTIGATION {24}**
Public Agency Training Council and The Alamo Area Regional Law Enforcement Academy. San Antonio, Texas

**1997 FIRE and ARSON SYMPOSIUM* (HRR/NFPA 921/K-9)  {40}**
Columbus, Georgia Fire Department and U. S. Treasury Department

**1997 FORGERY AND QUESTIONED DOCUMENTS {32}**
Alamo Area Regional Law Enforcement Academy/University of Houston

**1997 SECOND INTERNATIONAL CONFERENCE ON FIRE RESEARCH
AND ENGINEERING {08}**
National Institute of Standards and Technology - Gaithersburg, MD.
Society of Fire Protection Engineers

**1997 PRACTICAL FIRE/ARSON SCENE SEARCH AND EVIDENCE
RECOVERY. {16}**
Public Agency Training Council, Galveston, Texas.

**1997 UTILIZATION OF THE SCIENTIFIC METHOD IN THE
INVESTIGATION OF FIRES* {06}**
Harris County Fire Marshal's Office – Houston, Texas.
Texas Commissions on Fire Protection/Law Enforcement.

**1997 MANAGEMENT OF LARGE LOSS FIRES; CONDOMENIUM FIRES;
AND SCIENTIFIC METHODOLOGY UTILIZATION IN FIRE
INSPECTIONS AND INVESTIGATIONS.* {08}**
Gulfcoast Fire Prevention Association.
TEEX – TAMU.  Webster, Texas.

**1997 PRACTICAL ELECTRICAL FIRE INVESTIGATIONS {24}**
Public Agency Training Council – San Antonio, Texas.

**1998 43ʳᵈ TEXAS FIRE AND ARSON INVESTIGATORS SEMINAR {08}**
T.A.M.U., State Firemen's and Fire Marshals' Association of Texas.
Austin, Texas.

**1998 SCIENTIFIC INVESTIGATION OF ELECTRICAL & HVAC FIRES* {18}**
Harris County Fire Marshal's Office - Houston, Texas.

**1998 SCIENTIFIC METHODOLOGY IN THE INVESTIGATION OF FIRES* {04}**
Southeast Texas Fire Investigator's Association - Beaumont, Texas.

**1998 HAZARDOUS MATERIALS REFRESHER (HAZWOPER)\* {08}
AIRBORNE/BLOOD PATHOGENS and ASBESTOS**
Armstrong Consultants for the Environment - Austin, Texas.

**1998 FIRE COMMAND/INCIDENT COMMAND SYSTEM {08}**
Chief Alan Brunacini - Phoenix, Arizona.

**1998 GANG PROFILING FOR FIRE INVESTIGATIONS {02}**
Texas Advisory on Arson, Pasadena, Texas.

**1998 ARSON MOTIVES; INTERVIEWING TECHNIQUES; FULL-SCALE
FIRE PATTERN ANALYSIS.\* {12}** Texas A&M University.
Annual Fire School, Cuero, Texas.

**1998 HAZARDOUS MATERIAL INCIDENT: A TEAM APPROACH\* {09}**
Safety Issues of Fire Responders and Working with Canine Teams.
Three Rivers Area Health Education Center/Columbus Regional
Healthcare System. Columbus, Georgia.

**1998 SCIENTIFIC METHODOLOGY IN THE INVESTIGATION OF FIRES\* {04}**
15th Annual East Texas Fire Investigator's Seminar. Longview, Texas.

**1999 FIRE SUPPRESSION COMMAND.\* {16}**
Houston Fire Department – South Shore Harbour Seminar.

**1999 COMMAND FOR FIRE OFFICERS\* {06}**
Houston Fire Department - Training Academy.

**1999 HAZWOPER TRAINING – SUPERVISOR LEVEL\* {48}**
CFR 1910.120 Hazardous Materials Certification.
Armstrong Forensic Laboratory, Arlington, Texas.

**1999 LEGAL ASPECTS OF FIRE COMMAND\* {04}**
Houston Fire Department Training Academy

**1999 CULTURAL DIVERSITY AND FAMILY VIOLENCE {24}**
TECLOSE – Nassau Bay, Texas.

**1999 A.S.T.M. SEMI-ANNUAL SEMINAR {16}**
New Orleans, Louisiana.

**2000 SCIENTIFIC METHOD OF VEHICLE FIRE INVESTIGATION\* {08}**
Introspect - Houston, Texas.

**2000 FIRE AND ARSON INVESTIGATION CERTIFICATION\* {04}**
Interview Techniques – Galveston, Texas.  Galveston College.

**2000 FIRE AND ARSON INVESTIGATION CERTIFICATION\* {04}**
Report Writing – Galveston, Texas.  Galveston College.

**2000 FIREFIGHTER CERTIFICATION\* {02}**
Firefighters Responsibility in Arson Investigation.
League City, Texas.

**2000 FIRE AND ARSON INVESTIGATION CERTIFICATION\* {04}**
Photography - Evidence Collection and Preservation.
Galveston, Texas.  Galveston College.

**2000 FULL-SCALE FIRE BURN PATTERN TESTS\*{20}**
Central Texas Fire Investigators Association, San Marcos Fire
Department; Alamo Area Law Enforcement Academy.

## LICENSE/CERTIFICATIONS AWARDED DURING CAREER:

**Master Firefighter:** Texas Fire Commission.

**Master Instructor:** Texas Fire Commission  {All Subjects: F1-F23}.

**Master Fire Inspector:** Texas Fire Commission.

**Master Fire Investigator:** Texas Fire Commission..

**Certified Fire and Explosive Investigator:** N.A.F.I.

**Certified Fire Investigator Instructor:** N.A.F.I.

**Private Investigator:** Alabama, Georgia, Louisiana, and Texas.

**Master Peace Officer:** Texas Law Enforcement Commission.

**Peace Officer Instructor:** Texas Law Enforcement Commission.

**Forensic Hypnotist:** Texas Law Enforcement Commission.

**Certified Forgery and Questioned Documents Examiner** – U of H.

**Certified Paramedic:** Texas Department of Health {1975}.  [Inactive]

**Private Investigators Continuing Education Instructor Approval (I-332)**

**Certified Arson Crime Scene Videographer** - National Police Forensic Video

**Master - International Hazard Control Manager**

**CFR 1910.120 Hazardous Materials Certification and/or Training:**

- Hazardous Materials Worker [Hazwoper} (Supervisor Level)

- Confined Entry:  Worker; Attendant; and Supervisor

- Face Mask Fit Test (Qualified Fit Tester)

- Blood and Airborne Pathogens

**Services available in the following states: Arkansas, Alabama, Colorado, Georgia, Idaho, Kentucky, Louisiana, Mississippi, Missouri, Oklahoma, Texas, South Dakota, and Wyoming.**

## EMPLOYMENT EXPERIENCE:

1966 - 1968  **Houston Police Department** - Unclassified

1968 - 1969  **Spring Valley Police Department** - Patrolman

1968 - 1988  **Houston Fire Department**

1968 - 1971        **Firefighter**

1972 - 1973        **Pump Operator - Chauffeur**

1975 - 1976        **Captain - Rescue/Paramedic**

1976 - 1979        **Captain:  Fire Suppression-Structural/Shipboard**

1976 - 1979  **Houston Independent School District** - Teacher

1979 - 1985        **Senior Captain - Fire Chief's Staff - Fire Suppression**

1979 - 1985  **Houston Community College** - Instructor/
                 Consultant/Supervisor of Instructors

1979 - 1990  **City of League City** - Fire Marshal

1980 - 1983  **Galveston County Organized Crime Unit** - Special Agent

1986 - 1988  **N.A.S.A. - Fire Suppression** - H.F.D. Senior Captain

1990 -        **City of Nassau Bay** - Fire Marshal

1974 -        **Instructor of Regional Training Academies**
                 {Fire Investigation/Fire Sciences/Police Sciences}

13

## ORGANIZATIONS [CURRENT/PAST MEMBERSHIP]:

American Society of Testing and Materials - Member

A Texas Advisory Council on Arson [A.T.A.C.] - Member

Canine Accelerate Detection Association [CADA] - Member

Central Texas Fire Investigators Association - Member

Houston Fire Chief's High-Rise Fire Safety Committee - Chairman

Fire Marshal's of North America - Member

Gulf Coast Fire Prevention Association – Member

Harris County Firefighters Association - Member

Houston Professional Firefighter's Association - Local #341

International Association of Arson Investigators [I.A.A.I.] - Member

National Association of Fire Investigators [NAFI] - Member

National Fire Protection Association {N.F.P.A} - Member

National Fire Sprinkler Association, Inc. - Member

Southeast Texas Association of Fire Investigators - Member

Southern Building Code Congress International - Member

Texas Fire Marshal's and Firefighter's Association - Member

**PRACTICAL STUDY OF FIRE DYNAMICS**: While training thousands of fire/arson investigators, Mr. Holmes has set over 400 structural and vehicular fires. Also, he has performed detailed interviews of numerous fire-setters.

## PUBLICATIONS/PRESENTATIONS/DEMONSTRATIONS/HONORS:

**American Society of Testing Materials ASTM E-5 Fire Standards Committee.** Committee Member.

**American Society of Testing Materials ASTM E-30 Forensic Standards Committee.** Committee Member.

*Associate of Arts Degree - Fire and Arson Investigation.* Houston Community College {Curriculum Development}. Approved by Texas Education Agency, 1978.

**ASTM 13  Sub-Committee on Large Scale Fire Tests.** Member.

**ASTM 21  Sub-Committee on Smoke and Combustion Products.** Member.

**ASTM 22  Sub-Committee on Surface Burning.** Member.

*Calder Incendiary Fire Tests (Full-Scale) -- Incendiary Fires Utilizing Gasoline as the Accelerant of Choice with Manual and Device Ignitions.* Holmes, D. L. and Calderon, R. C. League City Fire Department Training Seminar, 1989.

*Characteristics of Aerosol Containers Under Fire Conditions.* Holmes, Doug, Armstrong, Ph.D., Andrew, and Holmes, B. D.; Calderon, R. C. Davie, Barker. Video,1993.

*Christmas Tree Full-Scale Fire Tests.* Holmes, D. L.; Dees, T. A.; Mansfield, B.; Hilton, T.; Lanphear, J.; and Holmes, H. K. Hardin Fire Department. 1998.

*Educational Consultant to the Houston Fire Chief.*

*FIREPOWER - Application of Science to Fire Investigation* (NFPA 921, HRR & Canines)  Babrauskas, Vytenis and Holmes, Doug.   Fire and Arson Symposium, Columbus, Georgia Fire Department and U. S. Treasury Department, 1997.

*Fire Training Consortium -* Houston Fire Department and Houston Community College".  *Curriculum for Basic Recruit Training.* Houston Fire Department Training Academy.  1978.

*Full-Scale Fire Burn Pattern Tests –* Holmes, D. L.; Young, P.E., L. et al. Central Texas Fire Investigators Association; Alamo Area Law Enforcement Academy; San Marcos Fire Department.  March, 2000.

*Hardin Ionization Smoke Detector Tests.*  Calderon, R. C.; Holmes, D. L.; Dees, C. Martin; T. A.; Mansfield, B.; Smith, R.; Beddow, J.; Lanphear, J.; and Holmes, H. K., 1997.  Hardin Fire Department, 1997.

*Heat Release Rates in Vehicle Fires.*  Holmes, D. L., Insurance Committee on Arson Control, 6th Annual Symposium, Houston, Texas. 1997.

*Heat Release Rates – Part I,* Fire Findings, Babrauskas, Vytenis and Holmes, Doug, 1998, Volume 6, Number 1, pp. 7 – 11.

*Heat Release Rates – Part II"* Fire Findings, Babrauskas, Vytenis, and Holmes, Doug.  1998, Volume 6, Number 2, pp. 7 - 11.

*Heat Release Rates - Part III,"* Fire Findings, Babrauskas, Vytenis and Holmes, Doug,1998, Volume 6, Number 3, pp.. 12 – 13.

*High-Rise Buildings - Targets for Disaster.*  Doug Holmes, Houston Fire Chief E. A. "Eddie" Corral,  Andrew Armstrong, Ph.D., Lucas Elliott, J. D. Fire Marshal's of North America, N.F.P.A. Annual Convention, Orlando, Florida. 1993.

*Honorary Houston Fire Chief's Award.*  Recognition of Excellence in
High-Rise Fire Safety.  Mayor and Fire Chief, 1992.
*Investigation of Fires and Explosions of Automobiles, Boats, and
Dwellings Utilizing Full-Scale Fire Analysis.*  Holmes, D. L., Houston
Community College and League City Fire Marshal's Office, 1984.

**NFPA 1033** *Standard for Professional Qualifications for Fire Investigator*
Principal Member - Technical Committee on Fire Investigator Professional
Qualifications, 1997.

*The Analysis of Living Room and Bedroom Fires – Accidental and
Incendiary. (Full-Scale)*  Holmes, D. L. and Williamson, C. D.; Certification
Academy for Fire and Arson Investigators.  Garland Fire Department, 1989.

**The Fire Investigator's Handbook.** Doug Holmes, The McFadin Press
P. O. Box 58538, Webster, Texas, 77598-8538.

*The French Colony Garden Apartment Fire Tests.*  Lanphear, Glenn
and Holmes, D. L.  League City Fire Marshal's Office. 1982.

*The Importance of the "K" Factor in Plume Development – Full-Scale
Compartment Tests.*  Holmes, D. L.; Dees, T. A.; Evans, J.; T. Kuehl;
Mansfield, B. D.; and Martin, C. W.  Cuero Fire Department Regional Fire
School, Cuero Fire Department. 1998.

*The Galleria Westchase Hotel Fatal Fire.  (Full-Scale Compartment Test)*
Emmons, B. W. and Holmes, D. L.  The Houston Arson Bureau and League City
Fire Marshal's Office. 1984.

*The Kitchen Range Grease Fire (Full-Scale and Modular Burns).*
Calderon, R.; Holmes, D.; Holmes, B. D.; C. Martin; and Dees, T. A.   League City
Fire Department, 1992.

**Vehicle Fire Investigation Manual.** Doug Holmes;  M. H. Paris, CFEI; Bryan
Holmes, CFEI.; and David Tannahill. The McFadin Press, Webster, Texas, 1989.

17

P.02

# DOUGLAS LEE HOLMES

*Curriculum Vitae*

Fire Consultant
**INTROSPECT** {Texas #: C-4800}
Federal #: 76-0147024 - $.125. per hour.
216-C North Wisconsin Street
League City, Texas 77573
Office: 281/332-0613
  Fax: 281/332-0842

## BIOGRAPHIC SKETCH:

 Birth: September 20, 1946 - Houston, Texas
Marital: Married, 3 children - Penny, Bryan, and Holly

## EDUCATION:

1965  **Austin Senior High School**
            **Houston, Texas**

1969  **South Texas Junior College**
            **Associate of Arts - Police Administration**

1971  **South Texas Junior College**
            **Associate of Arts - Fire Administration**

1974  **Texas A & M University**
            **Teaching Methodology**

1977  **University of Houston at Clear Lake**
            **Bachelor of Science - Criminal Justice**

1980  **University of Houston at Clear Lake**
            **Masters of Arts - Public Administration**

P.03

## TECHNICAL EDUCATION:

1968  HOUSTON FIRE DEPARTMENT TRAINING ACADEMY {480}

1968  HOUSTON FIRE DEPARTMENT - IN-SERVICE TRAINING {3,840}
       [1968 - 1988].

1970  BOMB ORDNANCE AND DISPOSAL SCHOOL {08}
       United States Army.

1975  PARAMEDIC {600}
       City/State Health Department.

1976  HIGH-RISE FIREFIGHTING {16}
       Houston Fire Department Training Academy.

1977  EMERGENCY COMMUNICATION SYSTEMS {80}
       Houston Fire Department - Communications Division.

1977  L.P.G. FIREFIGHTING SCHOOL {8}
       Ranger Insurance Company.

1978  INCENDIARY AND EXPLOSIVE SCHOOL {16}
       Bureau of Alcohol, Tobacco, and Firearms - Treasury.

1979  STATE ARSON/CRIMINAL INVESTIGATION LICENSE {472}
       Houston Arson Bureau.  Houston, Texas.  T.E.C.L.O.S.E

1979  ARSON DETECTION {16}
       National Fire Academy - Atlanta, Georgia.

1980  FIRE AND ARSON INVESTIGATION {80}
       National Fire Academy - Emmitsburg, Maryland.

1980  TEXAS A & M UNIVERSITY {40}
       Fire Prevention V

P.04

1982 **ARSON FOR PROFIT** {40}
　　　United States Treasury Department.

1984 **N.F.P.A LIFE SAFETY CODE #101** {24}
　　　Texas A & M University.

1984 **INVESTIGATION OF ELECTRICAL FIRES** {24}
　　　University of Wisconsin.  Dr. Be'land and Dr. Bernstein.

1985 **FIRE PREVENTION** {36}
　　　Texas A & M University.

1985 **KINESIC INTERVIEWING** - Link and Foster {24}
　　　Sam Houston State University.

1986 **ADVANCED KINESIC INTERVIEWING** - Link and Foster {16}
　　　Sam Houston State University.

1986 **VEHICLE FIRE INVESTIGATION** - Instructor {24}
　　　National Institute Annual Conference, Galveston, Tx.

1987 **INVESTIGATION OF FIRES IN CLANDESTINE DRUG LABS** {08}
　　　D.E.A and D.P.S. - Dallas, Texas.

1987 **FIRE INSPECTION PRACTICES** - Instructor {200}
　　　Class "A" State Inspector's Certification.

1988 **SATANIC CULT INVESTIGATIONS** {24}
　　　Killeen, Texas Police Academy.

1989 **32nd ANNUAL TEXAS FIRE INVESTIGATOR'S SEMINAR** {36}
　　　Texas A & M University & State Fire Marshal's Office
　　　Austin, Texas.

1990 **VEHICLE FIRE INVESTIGATIONS** {24}
　　　Lee Cole - Dallas, Texas.

P.05

1990 **INTERPRETATION OF THE NATIONAL ELECTRIC CODE** {48}
San Jacinto College - Houston, Texas.

1990 **42nd ANNUAL IAAI ARSON SEMINAR** - New Orleans, La. {35}
Fire Modeling - Fire Investigation Techniques.

1990 **INTERVIEWING - SCIENTIFIC CONTENT ANALYSIS** {42}
Laboratory for Scientific Interrogation
Avinoam Sapir, Israel National Police.

1990 **SATANIC CULT INVESTIGATIONS** {3}
Texas Advisory Council on Arson - Texas A & M.

1990 **FINGERPRINTS OF FIRE - FIRE CHEMISTRY** {24}
Ron Edwards, Ph.D., Chicago Bomb and Arson Squad
University of Illinois, Chicago, Illinois.

1992 **ADVANCED ARSON FOR PROFIT** {24}
Department of the Treasury
Houston, Texas

1992 **FIRE PROTECTION INSTITUTE** {40}
F.M.N.A./ N. F. P. A. John Bryan, Ph.D. and James Milke, Ph.D.
Dept. of Fire Protection Engineering, University of Maryland.

1992 **FIRE MODELING - FPETOOL AND HAZARD I** {16}
Bukowski/Peacock. Rockville, Maryland.

1992 **HIGH-RISE FIRE SAFETY** {20}
The Fire Chief's Committee on High-Rise Fire Safety.
Houston, Texas. Chairperson.

1993 **38th ANNUAL TEXAS FIRE INVESTIGATORS SEMINAR** {36}
Texas A & M University & State Fire Marshal's Office
Austin, Texas. Fatal Fires; Arson Lab Procedures;
Origin and Cause Determination; Mobile and Modular
Home Fires; Juvenile Firesetters.

P.05

1993 **DETERMINING ELECTRICAL FIRE CAUSES** {02}
      Southeast Fire Investigator's Association. Speaker.

1993 **"HIGH-RISE BUILDINGS - TARGETS FOR DISASTER"** {40}
      Fire Marshal's of North America - Speaker
      NFPA Annual Convention, Orlando, Florida.

1993 **CHEMISTRY AND PHYSICS OF FIRE** {24}
      Insurance Committee for Arson Control
      Atlanta, Georgia. Speaker.

1993 **LITIGATING THE CIVIL ARSON CASE** {16}
      American Bar Association - National Institute.
      New Orleans, Louisiana

1993 **ADVANCED FIRE AND ARSON INVESTIGATION** (TX:93357) {122}
      Houston Arson Bureau - Coordinator/Chief Instructor.

1993 **NATIONAL FIRE, ARSON, AND EXPLOSION INVESTIGATION** {36}
      N.F.P.A. and N.A.F.I. Chicago, Illinois.

1993 **HAZWOPER REFRESHER** {08}
      San Jacinto College Central.

1994 **FIRE INVESTIGATION THEORY APPLIED TO LIVE FIRES** {20}
      Barker Davie/John D. DeHaan, Ph.D.
      International Association of Arson Investigators.

1994 **DIOGENES BEHAVIORAL ANALYSIS INTERVIEW TECHNIQUES** {32}
      University of Houston D/T; Criminal Justice Dept.

1994 **38th ANNUAL TEXAS FIRE INVESTIGATORS SEMINAR** {36}
      Texas A & M University & State Fire Marshal's Office
      Austin, Texas. Investigation of Electrical Fires:
      NFPA Standards and Gang Activities.

1994 **FORENSIC HYPNOTISM** {36}
      University of Houston - Criminal Justice Department

1994  **SOUTHEAST TEXAS FIRE INVESTIGATOR'S ASSOCIATION** {24}
        Instructor:  Identification, Collection, and
        Preservation of Evidence; Fire Scene Photography.

1994  **PECAN GROVE FIRE DEPARTMENT** {04}
        Firefighters Role in the Investigation of Fires.

1994  **THE DESIGN, INSPECTION, AND PLAN REVIEW OF FIRE**
        **SPRINKLER SYSTEMS** {24}  Austin, Texas.
        National Fire Sprinkler Associations, Inc. and TAMU.

1995  **MECHANICAL CODE PRINCIPLES AND APPLICATIONS** {24}
        Southern Building Code Congress International.

1995  **NFPA NATIONAL FIRE CODE #921 - SCENE DOCUMENTATION &**
        **LEGALCONSIDERATIONS** {16}  Instructor
        Texas Commissions on Fire Protection/Law Enforcement.

1996  **FATAL FIRES; HOMICIDES, AND ACCIDENTAL DEATHS** {4}
        Jay Evans, Harris County Medical Examiner's Office.

1996  **THE MECHANICS OF FIRE INVESTIGATION IN HAZARDOUS**
        **MATERIALS ATMOSPHERE [HAZWOPER]** {40}
        Houston, Texas - E. Atkinson and D. Holmes.

1996  **ADVANCED LITIGATION SUPPORT - FORENSIC ACCOUNTING** {17}
        American Institute of CPA's - New Orleans, Louisiana.

1996  **TEXAS I.A.A.I. ARSON INVESTIGATION SEMINAR** {16}
        Physics of Fire - Texas A&M University.   John D. DeHaan, Ph.D.

1996  **TUTORIAL - FIRE DYNAMICS** {16}
        Fire Science and Technology Inc.  Vytenis Babrauskas, Ph.D., FPE.

1997  **THE INVESTIGATION OF VEHICLE FIRES** {4}
        Insurance Committee on Arson Control - Symposium in Houston, Tx.
        Doug Holmes.

P.09

# LICENSE/CERTIFICATIONS AWARDED DURING CAREER:

**Master Firefighter:** Texas Fire Commission.

**Master Instructor:** Texas Fire Commission {F1-F23}.

**Master Fire Inspector:** Texas Fire Commission.

**Master Fire Investigator:** Texas Fire Commission.

**Certified Fire and Explosive Investigator:** N.A.F.I.

**Certified Fire Investigator Instructor:** N.A.F.I.

**Master Peace Officer:** Texas Law Enforcement Commission.

**Peace Officer Instructor:** Texas Law Enforcement Commission.

**Forensic Hypnotist:** Texas Law Enforcement Commission.

**Certified Paramedic:** Texas Department of Health {1975}. [Inactive]

**Private Investigator: Texas** Board of Private Investigators

**Private Investigator: Louisiana** Board of Private Investigators

**Master - International Hazard Control Manager**

**CFR 1910.120 Certification and/or Training:**

- Hazardous Materials Worker [Hazwoper}

- Hazardous Materials Supervisor

- Confined Entry: Worker; Attendant; and Supervisor

- Face Mask Fit Test and Fit Tester

P. 09

## EMPLOYMENT EXPERIENCE:

1966 - 1968  **Houston Police Department** - Unclassified

1968 - 1969  **Spring Valley Police Department** - Patrolman

1968 - 1988  **Houston Fire Department**

1968 - 1971      **Firefighter**

1972 - 1973      **Pump Operator - Chauffeur**

1975 - 1976      **Captain - Rescue/Paramedic**

1976 - 1979      **Captain:  Fire Suppression-Structural/Shipboard**

1976 - 1979  **Houston Independent School District** - Teacher

1979 - 1985      **Senior Captain - Fire Chief's Staff - Fire Suppression**

1979 - 1985  **Houston Community College - Instructor/**
             Consultant/Supervisor of Instructors

1979 - 1990  **City of League City** - Fire Marshal

1980 - 1983  **Galveston County Organized Crime Unit**
             Special Agent

1986 - 1988  **N.A.S.A. - Fire Suppression** - H.F.D. Senior Captain

1990 -       **City of Nassau Bay** - Investigator/Inspector

1974 -       **Instructor of Regional Training Academies**
             {Fire Investigation/Fire Sciences/Police Sciences}

## ORGANIZATIONS [CURRENT/PAST MEMBERSHIP]:

A Texas Advisory Council on Arson [A.T.A.C.] - Member

Houston Fire Chief's High-Rise Fire Safety Committee - Chairman

Fire Marshal's of North America - Member

Harris County Firefighters Association - Member

Houston Professional Firefighter's Association - Local #341

International Association of Arson Investigators [I.A.A.I.] - Member

National Association of Fire Investigators [NAFI] - Member

National Fire Protection Association {N.F.P.A} - Member

National Fire Sprinkler Association, Inc. - Member

Southeast Texas Association of Fire Investigators - Member

Texas Fire Marshal's and Firefighter's Association - Member

Canine Accelerate Detection Association [CADA] - Member

## PRACTICAL STUDY OF FIRE DYNAMICS: While training thousands of fire/arson investigators, Mr. Holmes has set over 400 structural and vehicular fires. Also, he has performed detailed interviews of numerous firesetters.

## PUBLICATIONS/PRESENTATIONS/DEMONSTRATIONS/HONORS:

**"Associate of Arts - Fire and Arson Investigation."** Houston Community College {Curriculum Development}. Approved by Texas Education Agency, 1978.

**"Characteristics of Aerosol Containers Under Fire Conditions".** Doug Holmes, Andrew Armstrong, Ph.D., and Barker Davie. {Video 1993}

**"Fire Training Consortium - Houston Fire Department and Houston Community College".** *Curriculum for Basic Recruit Training.* Houston Fire Department Training Academy. 1978.

**"Heat Release Rates in Vehicle Fires".** Vytenis Babrauskas, Ph.D. and Doug Holmes. Insurance Committee on Arson Control, 6th Annual Symposium in Houston, Texas.

**"High-Rise Buildings - Targets for Disaster",** Doug Holmes, Houston Fire Chief E. A. "Eddie" Corral, Andrew Armstrong, Ph.D., Lucas Elliott, J.D. Fire Marshal's of North America, N. F. P. A. Annual Convention, Orlando, Florida. May 26, 1993.

**"Honorary Houston Fire Chief's Award"** (1992) Recognition of Excellence in High-Rise Fire Safety. Mayor and Fire Chief.

**"Procedures for Training Fire Investigators Utilizing Full-Scale Structure and Vehicle Fires".** Thomas J. Coles and Doug Holmes, 1992.

<u>**The Fire Investigator's Handbook.**</u> Doug Holmes. The McFadin Press P. O. Box 58538, Webster, Texas, 77598-8538.

<u>**Vehicle Fire Investigation Manual.**</u> Doug Holmes; M. H. Paris, CFEI; Bryan Holmes, CFEI.; and David Tannahill. The McFadin Press, P. O. Box 58538, Webster, Texas, 77598-8538.

### E. WAYNE MCCAIN, P.E.

```
===================================================
                          2000 MCCAIN PARKWAY
                       PELHAM, ALABAMA 35124
                  OFFICE:    (205) 663-7646
                  WATS:      (800) 437-3468
                  HOME:      (205) 663-2109
                  MOBILE:    (205) 531-2708
```



PLAINTIFF'S
EXHIBIT
B

## PROFESSIONAL EXPERIENCE

1987 to Present

E. WAYNE MCCAIN
Pelham, Alabama
Professional Engineering Consultant
Responsible for complete research and
evaluation for trial preparation
concerning product liability, Code
violations, control failures, and
industrial accidents including
explosions.

1963 to 1988

MCCAIN BOILER & ENGINEERING COMPANY
Pelham, Alabama
President/Chief Executive Officer
Responsible for overall leadership of
company engaged in the manufacture,
sale, service, repair, and engineering
of pressure vessels, gas-oil burner
systems, waste gas burner systems from
various chemical processes, oxygen
vaporizers, electrical control panels,
flame safeguard design and fabrication,
and incineration of red bag and
explosive materials.

1959 to 1963

MCCAIN BOILER & ENGINEERING COMPANY
Tarrant City, Alabama

EDUCATION

AUBURN UNIVERSITY
Auburn, Alabama
Bachelor of Science in Mechanical
Engineering
December 1959

| | |
|---|---|
| **TRAINING** | National Board Seminars, Basic Requirements for ASME Code Manufacturers, Section I, IV, VIII, Division I. |
| | National Board Seminars, Basic Requirements for ASME Code Manufacturers, Section PP, R, U, S, and A for Certificates of Authorization. |
| | Alabama Gas Corporation Seminars, Yearly |
| | Re-current Flight Training and Bi-Annual FAA |
| | NAFE Seminars, yearly |
| **LICENSES** | Alabama Professional Engineer, #6297 Louisiana Professional Engineer, #22572 Mississippi Professional Engineer, #9739 |
| **FLIGHT TIME:** | Single Engine Land and IFR - 4600 hours Helicopter                    - 1600 hours |

# AFFILIATIONS

Fellow, National Academy of Forensic Engineers

Board Certified Diplomate in Forensic Engineering by NAFE, a CSSB-member board

American Society of Safety Engineers

American Society of Mechanical Engineers

National Society of Professional Engineers

Alabama Society of Professional Engineers

American Welding Society

Master Gas Fitter, Alabama Plumbers and Gas Fitters Examining Board

Society of Automotive Engineers

National Fire Protection Association

American Society of Heating, Refrigeration, And Air Conditioning Engineer

Southern Building Code Congress International

Association of General Contractors

Airlines Owners & Pilots Association

7/3/97

# E. Wayne McCain

### PROFESSIONAL ENGINEER
2000 McCain Parkway
Pelham, Alabama 35124

(205) 663-7646
WATS 1-800-437-3468
FAX (205) 663-3830

## RATE SCHEDULE

A retainer fee of $2,500.00 will be required for all cases
which will be applied to the last invoice.

Payment will be due on receipt of invoice.

| | |
|---|---|
| Professional Engineering Services<br>(Testing, Calculating, Review of<br>Drawings and case file, instruction<br>manuals, scene work, testifying, etc.) | $150.00/Hour |
| Deposition (In my office) | $1,500.00/Flat Rate |
| Deposition (Travel) | $2,000.00/Flat Rate |

Plus Actual Expenses
(To be paid before deposition to begin)

| | |
|---|---|
| Engineer | $ 75.00/Hour |
| Research, Paralegal & Secretary | $ 30.00/Hour |
| Airplane Expense<br>     Plus Fuel | $ 90.00/Hour |
| Pilot Expense | $ 15.00/Hour |
| Mileage | $   .35/Mile |
| Copies (In-House) | $   .20/Each |
| 35mm Film | $  6.00/Each |
| Polaroid Film | $ 12.00/Each |
| 35mm Film Developing | AT COST |
| VCR Tape | $ 12.00/Each |

All Actual Expenses Incurred

# FLAMMABLE VAPOR CASES

| | |
|---|---|
| O'BRIEN VS RHEEM | TENNESSEE |
| HARPER VS STATE | W. VIRGINIA |
| ELLIS MITCHELL VS MOR FLÓ | TENNESSEE |
| SCHULTZ VS. STATE | COLORADO |
| SLATER VS. STATE | GEORGIA |
| KING VS. RHEEM | MISSISSIPPI |
| MILLER VS. RHEEM | MISSISSIPPI |
| MOSELY VS. STATE | ALABAMA |
| PARSONS VS. RHEEM | ALABAMA |
| WARREN VS. STATE | ALABAMA |
| GRANTLAND VS. RHEEM | ALABAMA |
| DAVERSON VS. RHEEM | ALABAMA |
| SCOTT VS. RHEEM | ALABAMA |
| AUSTIN VS. AMERICAN APPLIANCE | TEXAS |
| JONES VS. AMERICAN APPLIANCE | MISSOURI |
| HOGUE/MCDANIEL VS. S.A.B.H. | NEW MEXICO |
| NEWELL VS RHEEM | WISCONSIN |
| COLE VS RHEEM | MISSISSIPPI |
| MANDYCZ VS STATE | NEW JERSEY |
| WEST VS CRAFTMASTER | GEORGIA |
| WASHINGTON VS RHEEM | ALABAMA |
| KEATON VS STATE | GEORGIA |
| GUTHRIE VS STATE | TENNESSEE |

# BIBLIOGRAPHY
# FLAMMABLE VAPORS

## STANDARDS: BOOK 1

1.  ANSI Z223.1 - 1974          NFPA 54

2.  ANSI Z223.1A - 1978         NATIONAL FUEL GAS CODE, NFPA 54-1974

3.  ANSI Z223.1 1980            NATIONAL FUEL GAS CODE

4.  ANSI Z223.1-1984            NATIONAL FUEL GAS CODE

5.  ANSI Z223.1a-1987           ADDENDA TO NATIONAL FUEL GAS CODE

6.  ANSI Z223.1-1988            NATIONAL FUEL GAS CODE

## BOOK 2 – STANDARDS & LEGAL

7.  STANDARD GAS CODE          1973 EDITION - 301.5-301.12

8.  STANDARD GAS CODE          1988

BESSIE JENKINS MOSELEY, ADMINISTRATRIX OF THE ESTATE OF ANTONIO D. MOSELEY, PLAINTIFF; VS. STATE INDUSTRIES:

9.  COMPLAINT & SUMMONS - 11/27/91

10. SECOND NOTICE OF DEPOSITION - MARCH 3, 1993

## SUITS AGAINST SEARS:

11. ANSWER AND THIRD PARTY DEMAND - MARIE JAN DIMAURO AND STATE FARM FIRE AND CASUALTY COMPANY VS. DINAH G. REDONDO, ET AL, LOUISIANA 1982

12. CITATION, PETITION - CHARLES WATER V. LAFAYETTE INSURANCE COMPANY, ET AL, INCLUDING SEARS - LOUISIANA 1991

13. COMPLAINT - MARIA MUNTANER VS. MILLER GAS CO. AND SEARS, FLORIDA 1987

14.   PETITION - EMERZA S. TOUPS AND RICHARD S. TOUPS, SR. VS. SEARS ET ALS, LOUISIANA 1978

15.   SUMMONS - LINDA SATINGIN VS. SEARS 1990

16.   SUMMONS, COMPLAINT, CERTIFICATE OF ASSIGNMENT - MICHAEL C. SCHNOEBELEN ET AL VS. SEARS, CALIFORNIA 1986

17.   SUMMONS - RITA A PHILLIPS VS. SEARS ETC. NEW JERSEY 1987

18.   SUMMONS, COMPLAINT - SAFECO INSURANCE VS.  NELS LARSEN D/B/A/ DELTA ELECTRONICS - MICHIGAN 1986

19.   SUMMONS - SUZANNE MORRISON, ADMINISTRATRIX OF THE ESTATE OF ROBERT MORRISON, DECEASED, VS. SEARS - MICHIGAN 1976

20.   SUMMONS, COMPLAINT - ANGELO MACHDO VS. SEARS - WISCONSIN 1985

21.   SUMMONS, COMPLAINT - DANA JOHN ESTES, A MINOR, ET AL SEARS - CALIFORNIA 1981

22.   SUMMONS, COMPLAINT, DEMAND FOR JURY TRIAL STIPULATION, ORDER FOR SUBSTITUTION OF COUNSEL - CRAWLEY MCFADDEN, PERSONAL REPRESENTATIVE ESTATE OF THEADORE COBB,  VS. SEARS - MICHIGAN  1987

23.   SUMMONS, COMPLAINT - EDWARD BERNSTEIN, JEAN BERNSTEIN AND GREG BERNSTEIN, A MINOR V. FEDCO INC., SEARS, RIEGEL TEXTILE, ETC. - CALIFORNIA 1972

24.   SUMMONS, COMPLAINT, PROOF OF SERVICE - RONALD G. BROWN, ET AL VS. SEARS, CALIFORNIA 1979

## SUITS INVOLVING STATE INDUSTRIES:

25.   CITATION - STATE OF LOUISIANA (WILFRED J. PEREZ, JR. AND STEPHANIE P. PEREZ) VS. STATE INDUSTRIES ETC. FEB. 88

26.   CITATION - JOHN D. THOMAS, SR., ET AL VS. STATE INDUSTRIES, ET AL LOUISIANA 1986

27.   CIVIL SUMMONS - CHARLOTTE SOPER  V.  STATE INDUSTRIES KENTUCKY 1991

2

28.   COMPLAINT - ILAFEHI TILINI, INDIVIDUALLY, AS PROCHEIN AMI OF NAIOKA TILINI AND AS SPECIAL ADMINISTRATRIX OF THE ESTATE OF LAUMANU TILINI AND VALIAMI TILINI, VS. STATE INDUSTRIES, INC.;

PACIFIC RESOURCES, INC.; GASCO, INC.; JOHN DOES 1-10; DOE PARTNERSHIP 1-10; DOE CORPORATION 1-10; DOE ENTITIES 1-10; AND DOE TRUSTS 1-10. STATE OF HAWAII – 1988

29.   COMPLAINT - KENNETH M. HEATH, AS NEXT FRIEND OF KENDRA HEATH, AN INFANT  V.  STATE INDUSTRIES INC., A TENNESSEE CORPORATION, SERVE: W.H. LINDAHL, OLD FERRY ROAD, ASHLAND CITY, TN.- KENTUCKY 1984

30.   COMPLAINT - LORITA CHISM, ADMINISTRATRIX OF THE ESTATE OF TIMOTHY CHISM, DECEASED  VS.  STATE INDUSTRIES, INC., A TENNESSEE CORP., AND BAIRD & COMPANY; MISSISSIPPI

31.   COMPLAINT - MARGARET LOWERY VS STATE INDUSTRIES
&
COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS - BETH TAVARES, CLIFFORD TAVARES, INDIVIDUALLY AND AS GUARDIANS AD LITEM FOR SUZZAN TEALA TAVARES AND CLIFFORD TAVARES, JR., MINORS, VS. STATE INDUSTRIES, INC.; PACIFIC RESOURCES, INC.; GASCO, INC.; ETC. AND STATE INDUSTRIES, INC., THIRD PARTY, PLAINTIFF, VS. ILAFEHI TILINI AND VALIAMI TILINI THIRD-PARTY DEFENDANTS, STATE OF HAWAII, 1990

## BOOK III – LEGAL CONTINUED

32.   SUMMONS - EDWIN W. PEART AND ZELPHER PEART  VS.  VIOLET PEART; BROOKLYN FLOOR MAINTENANCE SUPPLY, EAST BROOKLYN CHURCHES; STATE INDUSTRIES, INC. - STATE OF NEW YORK 1991

33.   SUMMONS - DANIEL A. BIRKHOLZ VS. DEERE & CO., INC. A DELAWARE  CORPORATION  STATE  INDUSTRIES,  INC.,  HENRY MACMASTER,
BRUCE MACMASTER, AND KATHY MACMASTER - MINNESOTA 1984

34.   SUMMONS - DUSTIN LEE LAMINACK VS. DAVIS HOMES, INC.; STATE INDUSTRIES - INDIANA 1980

3

35. SUMMONS AND COMPLAINT - TRAVIS DUFF AND PATRICIA DUFF VS. STATE INDUSTRIES - ILLINOIS 1984

36. SUMMONS AND PETITION - ERIC CARY, ET AL VS. STATE INDUSTRIES OKLAHOMA 1990

37. SUMMONS AND PETITION - BRANDON BURR, ETC. VS. STATE INDUSTRIES TENNESSEE 1986

38. SUMMONS AND COMPLAINT - HILLARY THOR, ET AL VS. STATE INDUSTRIES - NEW JERSEY 1987

39. PETITION FOR DAMAGES - WRONGFUL DEATH CLAIM - VIVIAN LEE TURNER, THE NATURAL MOTHER OF EDWARD KELLERMAN, II; AND JAMES JOSEPH KELLERMAN, THE NATURAL FATHER OF EDWARD KELLERMAN, II, VS. STATE INDUSTRIES, INC.; KANSAS POWER AND LIGHT COMPANY; ANCHOR PLUMBING COMPANY AND WILLIAM STEVEN SMITH; - KANSAS CITY

40. TRIAL MEMO - DAVID L. LAMINACK AND GLADYS I. LAMINACK, GUARDIANS OF THE ESTATE OF DUSTIN LEE LAMINACK VS STATE INDUSTRIES, INC., A TENNESSEE CORPORATION

## CONSUMER PRODUCT SAFETY COMMISSION INFORMATION:

41. A. FIRE HAZARDS ASSOCIATED WITH GAS WATER HEATERS- NOVEMBER 1982
    B. ENGINEERING ANALYSIS OF GAS FIRED WATER HEATERS DECEMBER 1983

42. HAZARDOUS FLAMMABLE LIQUIDS - SAFETY REPORT- MARCH 1979

43. U.S. CONSUMER PRODUCT SAFETY COMMISSION REPORTS: NOV. 1992

    A. HAZARD IDENTIFICATION AND ANALYSIS, NATIONAL INJURY INFORMATION CLEARINGHOUSE 10/9/79.

    B. SUMMARIZATION OF 41 IN-DEPTH INVESTIGATIONS OF PRODUCT RELATED INJURIES: WATER HEATERS, GAS, WATER HEATERS, ELECTRIC AND WATER HEATERS, NOT OTHERWISE SPECIFIED.
    1974 - 1976

    C. SUMMARIZATION OF 80 IN-DEPTH INVESTIGATIONS OF PRODUCT RELATED INJURIES ASSOCIATED WITH WATER HEATERS: GAS WATER HEATERS, ELECTRIC WATER HEATERS,

OIL WATER HEATERS, WATER HEATERS, NOT OTHERWISE SPECIFIED JANUARY 20, 1975

44.  FACT SHEET: NO. 23 FLAMMABLE LIQUIDS - JUNE 1974 AND SEPTEMBER 1980 (REVISED)

45.  CONSUMER PRODUCT COMPUTER PRINTOUTS:

   A.  NATIONAL INJURY INFORMATION CLEARINGHOUSE, REPORTED INCIDENT FILE: WATER HEATERS/FURNACES/SPACE HEATERS - CO POISONING: 1988 TO PRESENT.

   B.  ACCIDENT INVESTIGATIONS

   C.  DEATH CERTIFICATE FILE

46.  TECH FILE: ANNUAL REPORTS TO THE PRESIDENT AND CONGRESS ON STUDIES OF DEATHS, INJURIES AND ECONOMIC LOSSES RESULTING FROM ACCIDENTAL BURNING OF PRODUCTS, FABRICS OR RELATED MATERIALS. REPORTS 1969 - 1972.

   A.  A REPORT TO PRESIDENT AND CONGRESS: STUDIES OF DEATH, INJURIES AND ECONOMIC LOSSES RESULTING FROM ACCIDENTAL BURNING OF PRODUCTS, FABRICS, OR RELATED MATERIALS 9/65 - 2/69: SUBMITTED BY THE SECRETARY OF HEALTH, EDUCATION AND WELFARE.

   B.  SECOND ANNUAL REPORT TO THE PRESIDENT AND THE CONGRESS: STUDIES OF DEATHS, INJURIES AND ECONOMIC LOSSES RESULTING FROM ACCIDENTAL BURNING OF PRODUCTS, FABRICS OR RELATED MATERIALS - THROUGH JUNE 1970: SUBMITTED BY THE SECRETARY OF HEALTH, EDUCATION AND WELFARE

   C.  THIRD ANNUAL REPORT TO THE PRESIDENT AND THE CONGRESS: STUDIES OF DEATHS, INJURIES AND ECONOMIC LOSSES RESULTING FROM ACCIDENTAL BURNING OF PRODUCTS, FABRICS OR RELATED MATERIALS - FISCAL YEAR 1971: SUBMITTED BY THE SECRETARY OF HEALTH, EDUCATION AND WELFARE

   D.  FOURTH ANNUAL REPORT TO THE PRESIDENT AND THE CONGRESS: STUDIES OF DEATHS, INJURIES AND ECONOMIC LOSSES RESULTING FROM ACCIDENTAL BURNING OF PRODUCTS, FABRICS OR RELATED MATERIALS - FISCAL YEAR 1972: SUBMITTED BY THE SECRETARY OF HEALTH, EDUCATION AND WELFARE

5

E.      WATER HEATERS: MANUALS ETC.  1/17/89

F.      WATER HEATERS SAFEGUARDS 1982

G.      WATER HEATERS: MEMO: INTEROFFICE  1970

H.      AN ANALYSIS OF CONTAINER INVOLVEMENT IN GASOLINE
        RELATED
        PERSONAL INJURY INCIDENTS - JANUARY 1975

I.      PRODUCT SAFETY FACT SHEET - NO. 65 - GAS WATER HEATERS -
        REVISED JANUARY 1979

J.      CPSC WORKING GROUP ON GAS STANDARDS - POSITION PAPER
        ON A STANDARD FOR GAS WATER HEATERS   TO PREVENT
        IGNITION OF FLAMMABLE VAPORS - FEBRUARY 1992


## BOOK IV – LEGAL CONT'D & CALSPAN ETC.


K.      OPTIONS PACKAGE FOR GAS-FIRED WATER HEATERS AND
        IGNITION OF FLAMMABLE VAPORS - 6-8-94

L.      BRIEFING PACKAGE FOR GAS-FIRED WATER HEATER IGNITION
        OF FLAMMABLE VAPORS


## CALSPAN REPORTS:

47.     CALSPAN   REPORT   NO.   YG-5569-D-2:   IDENTIFICATION   AND
        CLASSIFICATION OF POTENTIAL HAZARDS ASSOCIATED WITH THE
        USE OF RESIDENTIAL FLAME-FIRED FURNACES, HOT WATER
        HEATERS, CLOTHES DRYERS AND RANGES-FEBRUARY 1975
        (PREPARED FOR CPSC)

48.     CALSPAN REPORT FROM CPSC - INVESTIGATION OF SAFETY
        STANDARDS FOR FLAME-FIRE FURNACES, HOT WATER HEATERS,
        CLOTHES DRYERS AND RANGES. - JULY 1975

49.     CALSPAN REPORT - INVESTIGATION OF SAFETY STANDARDS FOR
        FLAME-FIRED SPACE HEATERS, FEBRUARY 1976

50. RESULTS OF GAMA REVIEW OF RESIDENTIAL GAS APPLIANCE STANDARDS - FEBRUARY 9, 1976 - CONDUCTED FOR THE CONSUMER PRODUCT SAFETY COMMISSION; BY CALSPAN CORPORATION.

## MISC. REPORTS/INFORMATION ON FLAMMABLE VAPORS:

51. PRODUCT WARRANTY - RESIDENTIAL WATER HEATER

52. GAS WATER HEATER STAND - 18" STAND: AND RHEEM WATER HEATER ACCESSORIES

53. HANDWRITTEN NOTES TITLED "OPINIONS"

54. MATERIAL SAFETY DATA SHEETS #467: AUTOMOTIVE GASOLINE, LEAD-FREE: BY GENIUM PUBLISHING CORPORATION.

55. NEISS NEWS: INJURIES ASSOCIATED WITH WATER HEATERS: AUGUST/SEPTEMBER 1974

56. PRESENTATION OF EDWARD F. DOWNING, III OF GAUTHIER & MURPHY BEFORE ANSI Z21.10.1 SUBCOMMITTEE ON STANDARDS FOR GAS FIRED WATER HEATERS - NOVEMBER 13, 1991

57.

58. SCOTT VS RHEEM PLAINTIFF'S CASE IN CHIEF RESUMES AND CLOSING ARGUMENTS

59. SHADOWGRAPH GASOLINE VAPOR VIDEO DEMONSTRATION

60. GAMA - INSTALLATION OPTIONS FOR WATER HEATERS INSTALLED IN GARAGES - AUGUST 1990

PHOTOGRAPHS

## BOOK V

STANDARDS

61. ANSI Z21.10.1-1975    GAS WATER HEATERS, VOL. I – AUTOMATIC STORAGE TYPE WATER HEATERS WITH INPUTS OF 75,000 BTU PER HOUR OR LESS

62. ANSI Z21.10.1 – 1990    GAS WATER HEATERS, VOL. I –

| 63. | ANSI Z21.11.1 ------> | STORAGE WATER HEATERS WITH INPUT RATINGS OF 75.000 BTU PER HOUR OR LESS PROPOSED REVISIONS TO STANDARD FOR GAS-FIRED ROOM HEATERS, VOL. I – VENTED ROOM HEATERS ANSI Z21.11.1 – 1981, Z21.11.1a – 1982, AND Z21.11.1b-1982 (PARTS I & 2 CONCERNING CONSTRUCTION AND PERFORMANCE) |
|---|---|---|
| 64. | ANSI Z21.22a – 1990 | ADDENDA TO Z21.22 – 1986, RELIEF VALVES AND AUTOMATIC GAS SHUTOFF DEVICES FOR HOT WATER SUPPLY SYSTEMS |
| 65. | ANSI Z21.22 –1986 | RELIEF VALVES AND AUTOMATIC GAS SHUTOFF DEVICES FOR HOT WATER SUPPLY SYSTEMS |
| 66. | ANSI Z223.1 – 1992 | NATIONAL FUEL GAS CODE, NFPA 54 |

## BOOK VI

| 67. | CALSPAN NO. 6608-D-1 | SAFETY DEVICES FOR GAS-FIRED APPLIANCES, MAY 1980 |
|---|---|---|
| 68. | CAL NO. YG-5569-D-3 | INVESTIGATION OF SAFETY STANDARDS FOR FLAME-FIRED FURNACES, HOT WATER HEATERS, CLOTHES DRYERS AND RANGES, JULY 1975. |
| 69. | CAL. NO. YG-5569-D-2 | IDENTIFICATION AND CLASSIFICATION OF POTENTIAL HAZARDS ASSOCIATED WITH THE USE OF RESIDENTIAL FLAME-FIRED FURNACES, HOT WATER HEATERS, CLOTHES DRYERS AND RANGES, FEBRUARY 1975. |
| 70. | UPC-1976 EDITION | UNIFORM PLUMBING CODE – INT'L ASSOC. OF PLUMBING AND MECHANICAL OFFICIALS |

8

**E. WAYNE MCCAIN, P.E.**

============================================================

2000 MCCAIN PARKWAY
PELHAM, ALABAMA 35124
OFFICE:   (205) 663-7646
WATS:     (800) 437-3468
HOME:     (205) 663-2109
MOBILE: . (205) 531-2708

| 1999 CASE LIST<br>CASE NAME | D/P | ATTORNEY |
|---|---|---|
| LAWRENCE VS. JENKINS BRICK | P | WESLEY PITTERS |
| BILLINGSLY VS. NISSAN | P | STEWARD SPRING |
| CHOATE VS. HOUSEHOLD MNF. | P | LEAH TAYLOR |
| MELINA FIORELL – AMERICAN LIBERTY | D | KEN BERNARD |
| ANNIE WATKINS VS FORD MOTOR | P | LABARRON BOONE |
| GRIMALDO VS. RHEEM | P | ANTHONY CONSTA |
| VILLAGER INN – BLASTING | D | ALAN JACKSON |
| BRIGHTON – WILLIE OLIVER | D | KEN BERNARD |
| BRUNO'S MONTCLAIR | D | PAM GLICK |
| SKIDDER CASE | P | J. COLE PORTIS |
| WILLIAMS WOODCHIPPER | P | SHANE SEABORNE |
| VIOLA LEVENS VS. KLEINERT'S | P | WESLEY PITTERS |
| HOLLAND VS. ENGINEERED REF. | P | SAM CHERRY |
| MARSHALL DURBIN – JASPER | D | ALAN JACKSON |
| ERNEST & ELOISE TAMPER | D | KEN BERNARD |
| JOHN DEERE CLASS ACTION | P | ANDY BURCHFIELD |
| GENE'S MARINE | D | KEN BERNARD |
| TOBACCO CLASS ACTION | P | ANDY BURCHFIELD |
| ALARID VS. AMERICAN APPLIANCE<br>UTAH | P | MITCH ZAGER<br>JAMES O'CALLAHA |
| JAMES & MATTIE HARRISON VS.<br>TRAVELERS & JIMMY WILSON/EXXON | D | JOHN D.<br>RICHARDSON |



| 1999 CASELIST | | |
| --- | --- | --- |
| CASE NAME | D/P | ATTORNEY |
| TIMMY YATES | D | ALAN JACKSON |
| SMOKE DETECTOR CASE | P | MARK CANTU |
| HART & COOLEY CLASS ACTION CASE | D | ROB BELL |
| VICTORY PITTMAN VS. NATIONAL BUTANE, INC. | P | FRANK HICKMAN |
| | | |

**1998**
**E. WAYNE McCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|-----------|----------|---|
| MANDYCZ VS. ROBERTSONS | BRIAN DRAZIN | P |
| THOMAS SIMMONS (CO) | JOHN G. HOLADAY | P |
| JAMES DAVIS -AUSTIN, TEXAS    (CO) | GARY W. DAVIS | D |
| NEWELL VS. RHEEM (FV) | MIKE JACQUES | P |
| MICHAEL COLE VS. RHEEM   (FV) | VICTOR HARDING | P |
| BENNIE G. PASSMAN VS. DAIKIN VS. ALLIED SIGNAL | BRAD WASH | P |
| MARCUS WEBB VS. COPELAND | SCOTT SHIPMAN | P |
| PETER HERALD VS. | JIM ALEXANDER | P |
| CANNON VS. WISCONSIN GAS  (CO) | KATE REDWINE | D |
| AMERICAN RUBBER/LAPORTE, IND | DIANE COOLEY | D |
| TREDEGAR INDUSTRIES | BILL ATKINSON | D |
| GEORGE LAWSON | KEN BERNARD | D |
| CAROL JACKSON | GRAHAM ISDALE | P |
| OPP FATALITIES | ALLAN WOODARD | P |
| NORWIN WHITE | TED TAYLOR | P |
| LP GAS TANK | GRAHAM ESDALE | P |
| TOMMY DOYAL | KEN BERNARD | D |
| MARK CARRADINE VS. DRUMMOND CO | ANDY HOLLIS | P |
| TIMOTHY L. COX & LINDA COX, AS ADMIN OF TELLY COX VS. DEERE & CO | MITCHELL SHELLY | P |

**1998**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|---|---|---|
| SANDRA CROW VS. S.E. WOOD TREAT | SCOTT SHIPMAN | P |
| OLE BELCO (TACO BELL) | JOHN RICHARDSON | D |
| DOUGLAS L. LYNCH VS. STAR ENTERPRISE & HY-TECH MACHINE | BARRY GUERK | P |
| VAN & KIM GLADNEY VS. D.R. HORTON D.B.A. REGENCY HOME (NO CASE) | JAMES FUHRMEISTER | P |
| OXFORD MACHINE | GREG HOLTSMAN ZURICH COMMERICIAL | D |
| MEISTER VS. AURORA | TIM JONES | D |
| FRANCES BELL VS. ALA POWER | ANDY SMITHART | P |
| TOYE BROWN VS. REGINA, ET AL | JAMES AYERS | P |
| DUNHAM ET AL VS. RUSSEL HARDY | JAMES MCGUIRE | P |
| MARIA GONZALES VS. STATE | | P |
| LEGRANDE/MCINTYRE | MIKE CROW | P |
| CATHERINE STATION | RANDOLPH PIEDRAHITA | P |
| MARTIN INDUSTRIES | DOUG WEINSTEIN | P |
| COMEDY CLUB | KEN BERNARD | D |
| MARY BUSH (ROOF) | TERRY HARDESTY | D |
| JULIO PEREZ VS. MORRIS & A.O. SMITH | MARK CANTU | P |
| JAN EMFINGER VS. JIM WALTERS & SELMAN FABS | GARY ABBOTT | D |

**1998**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|---|---|---|
| LENNOX CASE | CHRIS PAYNE | P |
| SCHMIDTH CASE (PYROTECH) | RICHARD KEITH | D |
| MARSHALL VS. CATERPILLAR | ANDY HOLLIS | P |
| ESSIE JONES VS. UNKNOWN | LABARRON BOONE | P |
| EVENFLO PORTABLE CRIB | TODD PADNOS | P |
| AMERICAN HOME VS. GNB | GERALD MALANGA | P |
| ALDRICH/LENINGER VS. CHAMBERSBURG HOSPITAL | LISA FLICKSTEIN | D |
| MARGARET HARRIS VS. TOYOTOMI | WHIT DRAKE | P |
| WELCH CASE | KENNETH INGRAM | P |
| VS. AMERICAN APPLIANCE | DONALD CONWAY | P |
| SMOKE DETECTOR CASE | JIM RAGAN | P |
| MORGAN VS. ARMSTRONG CONTRACTING | BLAINE STEVENS | P |
| ALTEC CITIZENS COMMUNICATIONS | DENISE WOOD - CNA | D |
| JOHN MONTGOMERY VS.. MARSHALL CO GAS DISTRICT, ET AL | STEVE BRUNSON RANGER INSURANCE | D |
| MCWANE CAST IRON PIPE | JIM GALVIN ST. PAUL | D |
| CULLMAN ELECTRIC CO-OP | JOHN RICHARDSON | D |
| DALTON FAGAN VS. HERSHELL EPPERSON | WHIT DRAKE | P |

**1998**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|---|---|---|
| | PAM GLICK | |
| CENTURY PLAZA | CNA RISK MGMNT | D |
| L.W. MILES FIRE | KENNETH INGRAM | P |
| WILLIAM HENNINGER | KEN WALLER | P |
| CRAIG VS. FRUEHAUF | SUSAN SILVERNAIL | P |
| JERNIGAN VS. STATE INDUSTRIES | DAVID KING | P |
| FRANK VS. STATE INDUSTRIES | MARK PEACOCK | P |
| CENTURY PLAZA II | PAM GLICK/CNA | D |
| THOMAS AND MELBA HOOD | AMERICAN LIBERTY MARY SINGLETON | D |
| LADDER CASE | JOHN KIZER MELISSA COLLINS | P |
| SUSAN WOFFORD | KEN WALLER | P |
| MODERN SOUTHERN HOME | ALAN JACKSON | D |
| MATTIE FINN VS. SWISS CLEANERS | BLAINE STEVENS | P |
| MARSHALL VICE VS. ????? | ANDY HOLLIS | P |
| PLANE CRASH (NO CASE) | GREG ALLEN | P |
| O'HEARN/MOULTON VS. HONDA, ET AL | BLAINE STEVENS | P |
| RODNEY THOMAS VS. HONDA | BLAINE STEVENS | P |
| DANA DAVIS VS. SUSAN SCHEIN MOTORS | JOHN KIZER MELISSA COLLINS | P |

**1998**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|---|---|---|
| STEVEN CLICK VS. ESTALENA CATES | BRENT TRAVELSTED | D |
| HWH | SUSAN SILVERNAIL | P |
| WILSON VS. MED CENTER EAST | JASON SCHAMBLIN | D |
| BOBBY HUDSON VS, STATE | COLE PORTIS | P |
| CITATION PRINTING | KEN BERNARD | D |
| LILY TINSLEY | PAT HENDRIX | D |
| JAMIE | DOUG WEINSTEIN | P |
| RICK HANNAH | DAVID MARSH | P |
| FRANK STRETCH & TOM MCCAIN | CLAY DUGAS | P |

**1997**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|---|---|---|
| CHARLIE EARL MARLER | GARY CONCHIN | P |
| PRESGRAVES | JOE LANE | P |
| RUSSELL HARRISON VS. GLEEN MCCLENDON TRUCKING | SCOTT TALKINGTON | P |
| CORNERSTONE SCHOOLS OF AL | KEN BERNARD | D |
| NEMAX (STOCKHAM VALVES) | DON STOOP | D |
| MICHAEL MELVIN (GAS EXPLOSION) | JOHN RICHARDSON | D |
| ESTATE OF OPAL WEGNER VS. HENRY ED BRIGHT & TRAIL BLAZER TRUCKING | THOMAS H. YOUNG | P |
| COMMERCIAL PROPERTIES, DOTHAN | JOHN RICHARDSON | D |
| PLUMBING SPECIALIST OF AL | KEN BERNARD | D |
| LANA RICHERZHAGEN | KEN BERNARD | D |
| PLASTIC BUCKLE CASE | DOUG WEINSTEIN | P |
| EPA TEXAS CASE | JOSE RUIZ | P |
| BLASTING CASES | BILLY CHURCH | P |
| ALBERT MENDOZA VS. BEXAR CONCRETE | RAUL RIOS JOSE RUIZ | P |
| SCHULTZ VS. GEMINI COATINGS | CONARD METCALF | P |
| JACK JOSLYN | KENNETH INGRAM | P |

**1997**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|-----------|----------|---|
| KING VS. RHEEM | PHILIP CARBY | P |
| BEN LATE | JOSÉ RUIZ | P |
| BANK OF HAMILTON | HARMON TURNER | D |
| STEPHENS VS. KELBELCO | BOB PARSONS | D |
| SUHL VS. COLMAC (REITER) | SANDY BRISLEM | D |
| CAMPBELL VS. WINN DIXIE | DONALD HARRISON | D |
| DR. & MRS. VANCE | KEN BERNARD | D |
| DAVIS HEATING & PLUMBING | DAVID LEE | D |
| CHRISTINE BURNS VS. VS. INVACARE, HARCO, ET AL | DON HARRISON | P |
| ZAVALA VS. TRUCUT AUTOMOTIVE | MARK GOLDSTEIN | P |
| JAIME GARCIA - ISUZU RODEO | MARCOS SALINAS | P |
| WILLIE FRANK FLOYD VS. NIGHTINGALE UNIFORM | ANDY CITRIN | D |
| ELLIS/MITCHELL VS. MOR FLO | KENNETH INGRAM | P |

**1997**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|---|---|---|
| BARBARA CHRISTIAN VS. NEWTON | ANDREW SMITHART | P |
| BAPTIST MEDICAL CENTER | SANDY SANBORNE | D |
| ALGIERS PIZZA | ANDY WATSON | D |
| GONZALES VS. ZINKALHOMA | MIKE GUNZBURG | P |
| VENT CLASS ACTION CASE | THOMAS METHVIN | P |
| MICHAEL STOUDEMIRE VS. S & C BEEF PROCESSORS | WILLIE HUNTLEY | P |
| HOLLINGSWORTH VS. CLEMCO | MICHAEL CLECKLER | P |
| SPRINKLER HEAD CASE | THOMAS METHVIN | P |
| LIBERT MUTUAL VS. CERTIFIED FURNACE | EARL LAWSON | D |
| JEFF & CONNIE NEWTON VS. DALLAS WALKER & DALLAS WHITE | EMILY NELSON | P |
| DAVID ALLEN REID VS. MCMILLIAN BLOEDELL PACKING CO | DAVID ALLRED | D |
| JAMES BIVENS VS. CASSVILLE SCHOOL | MIKE TEXTON | D |
| MICHAEL DAVIS VS. BELLSOUTH | BRAD WASH | P |
| CHARLIE COBB FIRE - JEMISON | HUGH PATTERSON | D |
| PATRICIA BURNS – KANSAS CITY LIGHTER CASE | KENNETH INGRAM | P |
| SOUTHTRUST BANK BUILDING MOBILE, AL - ROOFING | TERRY HARDESTY | D |

**1997**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|-----------|----------|---|
| SHERRIL VANSANT VS. GOODMAN | ROGER LUCAS | P |
| FEDDERS - TEXAS | JOSE RUIZ | P |
| TONY DEARMAN VS. WESTERN AUTO | DAVID DANIELL | D |
| REYNOLDS VS. BERMCO | MARTIN BLOOM | D |
| HOLLIS STACEY VS. ABC CONTRACTING | BLAINE STEPHENS | P |
| EADY/STEPHENS VS. WALMART | COLE PORTIS | P |
| O'BRIEN VS. RHEEM – NASHVILLE, TN | PHILLIP L. DAVIDSON | P |
| VIRGINIA HARPER VS. STATE (W. VA) | PHILLIP L. DAVIDSON | P |
| JOHN CURVIN VS. JAMES PIMYAN | BRAD WASH | P |
| COOK VS. HOLMES REGIONAL MEDICAL | JIM MCKENZIE | P |
| KEATON VS. STATE - FV | DERRICK MENDICINO | P |
| JOHN JOYCE | TOM METHVIN | P |
| TIMMERMAN VS. OPACICH HART & COOLEY | MARK OSTROWSKY | D |
| KI – TUPELO, MISSISSIPPI | JACKIE FREDERICK | D |
| JAIME SLAY VS. (CO – TEXAS) | JOSE RUIZ | P |
| CORA CROSBY | PHILIP CARBY | P |
| SHIRLEY DAUGHDRILL | ROGER LUCAS | P |
| FANNY LEE HOBDY VS. MOBILE GAS | SID JACKSON | P |

**1997**
**E. WAYNE MCCAIN, P.E.**

| <u>CASE NAME</u> | <u>ATTORNEY</u> | |
|---|---|---|
| THORNTON/HART & COLEY | DAN GRAVELYNE | D |
| HAIL VS. REGENCY TERRACE APTS | DAVID LEE | D |
| CLEO ROLLO | BOB PARSONS | D |
| JAMES HOLLADAY VS. INTERNATIONAL PAPER | LABARRON BOONE | P |
| LLOYD GUTHRIE, ADMIN OF JAMES GUTHRIE | COLE PORTIS GREG ALLEN | P |

**1996**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|-----------|----------|---|
| SNODDY CASE | DAVID LEE | D |
| JENNIFER DALTON | ALLSTATE INS<br>KEITH ADAMS | D |
| LENZING FIBER - MORRISTOWN, TN | JOHN RICHARDSON | D |
| HUNTER VS. BEECHCRAFT | JOHN WATERS | P |
| SULA W. HOWARD | BILLY CHURCH | P |
| ALABAMA LIMO | JOHN RICHARDSON | D |
| NEAL VS. PITTWAY | J. GREG ALLEN | P |
| DAVID KULHANEK VS. D&F EQUIP | GEORGE VAUGHN | P |
| STAN DAVIS | TAL BLACK | D |
| WILLIE MAE FELDER | RUSSELL NELSON | P |
| PADGETT VS. CONAGRA | CINDY JOHNSON | P |
| JAMES SPARKS | TAL BLACK | D |
| SHELIA PALLOCK | TAL BLACK | D |
| SLOSS INDUSTRIES | JOHN RICHARDSON | D |
| DR. BRUCE WINGO | TAL BLACK | D |
| AMTRAN BUS | J. GREG ALLEN | P |
| MARVIN DAVIES VS. 1ST ALERT | STEVE JACKSON | P |
| JANITROL FURNACE | MIKE WOODHAM | P |

1996
E. WAYNE MCCAIN, P.E.

| <u>CASE NAME</u> | <u>ATTORNEY</u> | |
|---|---|---|
| ETTA CAIN | DERRICK HOPKINS | P |
| JERRY STANLEY VS. HYSTER CO NACCO MATERIALS & BRUNGART | CARL UNDERWOOD III | P |
| BOWMAN VS. COLEMAN | RICHARD TAYLOR | P |
| JOE NORMAN - BELOIT PAPER COATER | J. GREG ALLEN | P |
| FRED RIVERS - TRAILER | FRANK WILSON | P |
| SWAIN VS. COATS | J. GREG ALLEN | P |
| PAMELA LAFITTE STATE WATER HEATER | RICHARD TAYLOR | P |
| RAYMOND HOLLINGSWORTH VS. RIVAL MFG, ET AL KEROSENE HEATER | RICHARD TAYLOR | P |
| LAURIE ANN DAVIS | ANDY HOLLIS | P |
| PATRICE GILLET, DECEASED SEAN P. DOYLE (PLANE CRASH) | CLIFF STERN | P |
| DAVID RUSSELL VS. GEO MITCHELL | BOB PARSONS | D |
| MR. ROBERTS | JOHN D. RICHARDSON | D |
| JOANN WESTON | TAL BLACK | D |
| MRS. ISABELL COLLINS | TAL BLACK | D |
| KIM MAPLES | RICHARD TAYLOR | P |
| BOBBY POWE VS. MTGY ELEV | WILLIE HUNTLEY | P |
| JESUS REVES | EARL HERRING | P |

**1996**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|---|---|---|
| GARDNER/CROW VS. NATL CEMENT | BILLY CHURCH | P |
| FLORA MCCALL | MAURY WEINER | P |
| REEVES VS. REMAX | JOHN BERQUIST | D |
| WINTZELL'S STEAMER<br>FRANK SHUNNARAH | DAVID COGGINS- ADJ<br>MARK SPEAR - RDSU | D |
| J.D. SCOTT CONSTRUCTION | TAL BLACK | D |
| BILLY & KIMBERLY LOTT<br>UNDERWOOD BUILDERS | TAL BLACK | D |
| SCOTT WILLIAMS VS. BLOUNT | JOE LANE | P |
| HART & COOLEY | DAN GRAVELYN | D |
| CARNIE FIRE | KENNETH INGRAM<br>WES LAIRD | P |
| DAVID CLARK | KENNY INGRAM | P |
| CAROLYN B. MORGAN<br>LANETT HOUSING AUTHORITY | EARNESTINE SAPP | P |
| LORIE SMITH VS. 1ST ALERT | RANDALL HAYNES | P |
| BEN & MELISSA STEWART | KEN BERNARD | D |
| DICK'S PLASTERING | KEN BERNARD | D |

## 1996
## E. WAYNE MCCAIN, P.E.

| CASE NAME | ATTORNEY | |
|---|---|---|
| ROGER CROWDER | TIM GROGAN | P |
| WILLIAM C. VEAL | TAL BLACK | D |
| WALEWEEN WILLIAMS | TAL BLACK | D |
| ROBBINS & ASSOC | TAL BLACK | D |
| DIANE OVERTON | TAL BLACK | D |
| GAIL MANN | GREG ALLEN | P |
| JOHNNY DUNKLIN VS. GLOBE METALLURGICAL | BOB BRADFORD | D |
| LINDEN CONSTRUCTION | KEN BERNARD | D |
| CHUCK SHIRLEY | ROGER LUCAS | P |
| LEWIS JONES, DALEVILLE | WILLIAM GILL | P |
| KNIGHTS ENERGY MGMT | TAL BLACK | D |
| HENRIETTA R. REED VS. (DR JUDGE) LEIGHTON AVE, INC. ET AL | DAVID LEE | D |
| JEFF VINES | DYKES BARBER | P |
| STEPHENS MOTORS | JOHN BARNETT | P |
| SUMMIT APARTMENTS VS. HENDERSON EXCAVATING | DAVID LEE | D |
| HERSCHEL DAY VS. ROCKWOOL | STEVE CLEM | P |

## 1996
## E. WAYNE MCCAIN, P.E.

| CASE NAME | ATTORNEY | |
|---|---|---|
| LAURIE SMITH VS. 1ST ALERT | RANDY HAYNES | P |
| CATHERINE ENGEL VS. ROY MARTIN CONST.  CV-95-375 CIRCUIT/ | JOHN BERGQUIST | D |
| CUNNINGHAM VS. TORCH ENERGY | SCOTT KRIST | P |
| MICHELLE ALLEN VS. MAX HUANG | BOB LAMAR | P |
| EMOGENE PENNINGTON | KEN BERNARD | D |
| BETTY C. ROSS | KEN BERNARD | D |
| ROBERT GRANT CONSTRUCTION | TAL BLACK | D |
| SCOTTY MILLER VS. RHEEM | DUNCAN LOTT | P |
| KEITH PEOPLES VS. EARTHGRAIN | SAM MAPLES | P |
| AMY MICHELLE WILSON VS. JERRY GUTHRIE | DAVID KIMBERLEY | P |
| JIMMY RICHEY | JACKIE FREDERICK | D |
| CHARLIE WEBB | TOM BOWRON | P |
| CURTIS WHITE CO. | TAL BLACK | D |
| WATER FILTER - OWENS | BOYD FEPELLI | D |
| WASHINGTON FIRE - BESSEMER | LARRY MORRIS | P |
| SHANKLE/SWITZER - TRINITY | KENNY INGRAM | P |
| ESTATE OF WILLIE SLATER VS. STATE INDUSTRIES | STEPHEN A. SMITH | P |

**1996**
**E. WAYNE MCCAIN, P.E.**

| CASE NAME | ATTORNEY | |
|-----------|----------|---|
| JOHNNY BREWSTER | KIRK DAVENPORT | P |
| ERNEST DIXON | JOE LANE | P |
| REDSTONE PROJECT | HAROLD SLUTSKY | P |
| WITCHEN VS. HUBBARD FOODKING | DEBRA PAYNE | P |
| ROSEMARY CHAMBERS | KEN BERNARD | D |

## 1995
## JOB NUMBERS

| CASE NAME | ATTORNEY | |
|---|---|---|
| JON & IDALIA MILLER FOR JON & MATT MILLER VS. FORD | DOUGLASS ANDERSON | (P) |
| SCOTT VS. RHEEM MFG | ED DOWNING | (P) |
| LEACH VS. USX | P. RUSSEL TARVER | (P) |
| EASLEY VS. MARTIN ENG | BLAINE STEVENS | (P) |
| LARRY SIDES | JEWELL ROBERTS | (D) |
| CURTIS & JENNIFER KELLEY | ANDY HOLLIS | (P) |
| POULTRY HOUSES-WINK ROGERS | J. E. SAWYER | (P) |
| HAGER VS. CAROLANE | DOUG ABRAMS | (P) |
| LUDIE DRISKELL | JOHN RICHARDSON | (D) |
| CANNON VS. MONTGOMERY ELEV | HARRY REVELL | (P) |
| EDDIE CALDWELL | BILLY CHURCH | (P) |
| JACK DOLLAR | BILLY CHURCH | (P) |
| ASTORGA VS. AMERICAN APPL | JAY CHAFETZ | (P) |
| CENTRAL STEEL | MIKE CAMPBELL | (P) |

1

1995

| CASE NAME | ATTORNEY | |
|---|---|---|
| TANK VALVE | HARMON TURNER | (D) |
| ROBERT GRIFFITH VS. MELLING TOOL, ET AL | JIM HICKMAN | (P) |
| J.C. MARTIN ACETYLENE TANK | ZEB LITTLE | (P) |
| DAVID HEETER (GATE) | TAL BLACK | (D) |
| PIGGLY WIGGLY (RAMP) | TAL BLACK | (D) |
| HUTCHINSON VS. FMC | BLAINE STEVENS | (P) |
| LARRY W. GUY | TAL BLACK | (D) |
| COMPASS BANK - EASTWOOD | PAT HENDRIX | (D) |
| PLYER VS. G & G STEEL & GENERAL SOUTHERN | DOUG ABRAMS | 3/95 |
| ROUSE VS. BIG DUTCH | ZEB LITTLE | 4/95 |
| TERRANCE SMITH HOT WATER HEATER | GREG ALLEN | 4/95 |
| ESTATE OF BUD HILL VS. CONAGRA POULTRY | JIM WHITFIELD BILL MELTON | 4/95 |
| TOMMIE C. PAUL | SID FULLER | 4/95 |
| PACEMAKER | BILLY CHURCH | 4/95 |
| BACKUP ALARM | SAM CHERRY | 4/95 |
| BOBBY BLANKENSHIP - WAVERUNNER | BRAD WASH | 4/95 |

2

1995

| CASE NAME | | ATTORNEY | DATE |
|---|---|---|---|
| JAMES DAWKINS - HELMET | | DOUG ABRAMS | 4/95 |
| SCARBROUGH - SOFTBALL HELMET | | COLE PORTIS | 4/95 |
| COSBY VS. SHADDIX PULPWOOD LOADER | | NAT BRYAN | 5/95 |
| WILDEWOOD APARTMENTS | I | MARY SINGLETON | 5/95 |
| HOUSE OF PLENTY (DRAKOS) | | JOHN RICHARDSON | 5/95 |
| WAYNE GENTRY | I | TAL BLACK | 5/95 |
| KITTLE - HELMET (NO CASE) | | COLE PORTIS | 5/95 |
| BILL CROLEY | | ANDY HOLLIS | 5/95 |
| PRIME SOURCE | I | | 5/95 |
| JACKSON VS. STRAWN | | MARK TANENBAUM | 5/95 |
| RICKY DAVIS - WELL PUMP | | GARY ALDRIDGE | 5/95 |
| WARD VS. GM (SEATBELT) | | BWAMC | 6/95 |
| SALTER (HWH) (FV) PARSONS | | GREG ALLEN | 6/7 |
| DONNIE GREEN (GAS TANKER) | | KAREN RABENAU | 6/13 |
| 30.06 SHOTGUN | | BRAD WASH | 6/7 |
| EDDIE JOE GRAHAM VS. GULLICK DOBSON | | JOHN W. STAHL | 6/6 |
| MOSES IVERSON VS. VULCAN ENGINEERING | (D) | DAVID LEE | 6/23 |

3

1995

| CASE NAME | ATTORNEY | DATE |
|-----------|----------|------|
| LA FARM BUREA VS. RHEEM | DENIS GAUBERT | 6/10 |
| HERBERT COOPER (ARI) | VIC MILLER | 5/95 |
| SADISCO (TRUCK) | TOM POWELL | 7/95 |
| LINDA WATTS (GADSDEN FIRE) | KENNETH INGRAMS | 7/95 |
| TRAIN CASE | FRANK HANSON | 7/95 |
| SCOTT ROTHSTEIN VS. PORT AUTHORITY | CHARLES NOLET | 7/28 |
| IRM INSURANCE | STEVE DEANTONIO | 7/31 |
| NEVADA TURNER VS. ALABAMA FEED PRODUCTS | JASON KNIGHT | 8/8 |
| CONCERNED CITIZENS OF DAWES COMMUNITY | WILLIE HUNTLEY | 8/16 |
| HOLIDAY INN | JOSEPH BROWN, JR. | 8/24 |
| GRANTLAND VS. RHEEM | TERRELL WYNN | 8/28 |
| JAMES & TINA STERRITT  I | TAL BLACK | 9/7 |
| PARTEK EXPLOSION  I | RUSSEL CALLAWAY | 9/12 |
| CARL ELLIOTT | TIM GROGAN | 9/12 |
| KIMBERLY WEST | LESLIE WAYCASTER | 9/15 |
| RUTLAND VS. APAR ISPEN | RUSS TARVER | 9/20 |

4

SMITHERMAN PROPANE TANKS          KATHRYN SUMRALL     9/22

## 1995

| CASE NAME | ATTORNEY | DATE |
|---|---|---|
| ROGER SALINAS VS. FEDDERS | JOE RUIZ | 9/20 |
| WILSON | MAX COHEN | 9/22 |
| BRENDA DAVERSON VS. RHEEM | TERRELL WYNN | 10/3 |
| | BILL SMITH | |
| RUSSELL/WARNICK VS. CSX | LINDA COLE | 10/9 |
| BRINKERS ROMANO'S MACARONI GRILL | JOHN RICHARDSON | 10/3 |
| BROYHILL FURNITURE | DOUG BEACH | 10/19 |
| SMITH VS. AMOCO | NEWTON SCHWARTZ | 10/23 |
| TIM & NANCY SELMAN          I | TAL BLACK | 10/19 |
| NEASE VS. AK STEEL | TOM POWELL | 10/95 |
| XAVIER HERNANDEZ & MARGARITO RODRIGUEZ (CARAVAN) | JOSE RUIZ | 11/16 |
| BERMCO | RODNEY MAX | 11/20 |
| SHALEEM PEGGINS VS. ZILDJIAN PERCUSSION | COLE PORTIS | 11/16 |
| GUADALUPE G. OROZCO, ET AL VS. EVERARDO MORALES | EARL HERRING | 11/29 |
| BOYD VS. PITTS TRAILER | GREG ALLEN | 12/18 |

5

END OF 1995 CASELIST

## BOOK VII

| LEGALS |
| --- |

RAMONA HOGUES VS. S.A.B.H. WATER HTR
- COMPLAINT TO RECOVER DAMAGES FOR PERSONAL INJURIES DUE TO UNSAFE PRODUCT

DAVID LAMINACK VS. STATE INDUSTRIES
- TRIAL MEMO

BESSIE J. MOSELY V. STATE INDUSTRIES
- SUMMONS
- COMPLAINT

STATE INDUSTRIES V. TILINI, TAVARES, ETC.
1. DEFENDANT STATE INDUSTRIES, INC.'S RESPONSE TO PLAINTIFFS TAVARES' FOURTH REQUEST FOR ANSWERS TO INTERROGATORIES TO DEFENDANT STATE INDUSTRIES, INC.
2. PLAINTIFFS TAVARES' MOTION TO COMPEL RESPONSES TO PLAINTIFFS TAVARES' FOURTH REQUEST FOR ANSWERS TO INTERROGATORIES AND PLAINTIFFS TAVARES' FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT STATE INDUSTRIES, INC.

ROSIE M. HARRIS VS. CITY OF SELMA
1. MOTION FOR SUMMARY JUDGMENT OF DEFENDANT FLOWERS PLUMBING COMPANY, INC.
2. PLAINTIFF'S FIRST INTERROGATIRES AND REQUEST FOR PRODUCTION TO DEFENDANT FLOWERS PLUMBING COMPANY, INC.

| PATENTS |
| --- |

| | | |
|---|---|---|
| 1. | 1,520,086 | WILLIAM G. SANDERSON, DEC. 23, 1924 – FIRE & GAS ALARM DEVICE |
| 2. | 3,603,954 | TUTAHARU TAKEUCHI, FEBRUARY 12, 1970 – GAS ALARM DEVICE |
| 3. | 4,223,692 | LANDIS H. PERRY, OCTOBER 19, 1977– RECREATIONAL VEHICLE SAFETY SYSTEM |
| 4. | 4,924,816 | HENRY J. MOORE, JR., MAY 1, 1989 – WATER HEATER WITH FLAME SPILL-OUT PREVENTION ARRANGEMENT |
| 5. | 4,397,296 | HENRY J. MOORE, JR., DEC. 07, 1981 – WATER HEATER WITH SUBMERGED COMBUSTION CHAMBER |
| 6. | 4,660,541 | HENRY J. MOORE, JR., SEPT. 5, 1986 – WATER HEATER WITH SUBMERGED COMBUSTION CHAMBER |

7.   4,662,314   HENRY J. MOORE, JR., SEPT. 25, 1985 – MAGNETIC
                 WATER CONDITIONING DEVICE

8.   4,766,883   A. LARSON CAMERON AND HENRY J. MOORE, JR.,
                 OCT. 07, 1987-FORCED DRAFT CONTROLLED MIXTURE
                 HEATING SYSTEM USING A CLOSED COMBUSTION
                 CHAMBER

9.   4,243,194   HENRY J. MOORE, JR. AND MYRON E. DENEAU,
                 MAY 29, 1979 – HOT WATER TANK SUPPORTING LEGS

10.  3,711,236   HOWARD R. KINSELLA, ET AL., AUG. 2, 1971 –
                 GAS BURNER CONTROL DEVICE WITH LOW PRESSURE
                 CUTOFF

11.  3,402,887   CHARLES D. VISOS, JUNE 16, 1966 – BURNER
                 CONTROL DEVICE FOR A WATER HEATER

12.  3,476,517   ALBERT H. SMITH, NOV. 22, 1965 – COMBUSTIBLE GAS
                 DETECTING DEVICE

10

**GARCIA VS BRK BRANDS INC**    CondenseIt™    **ELMER W McCAIN PE VOL I 10-24-00**

```
                                                    Page 4
 1  IN THE UNITED STATES DISTRICT COURT      1  ELMER WAYNE McCAIN, P.E.,
    FOR THE SOUTHERN DISTRICT OF TEXAS       2  having been first duly sworn, testified as follows:
 2         BROWNSVILLE DIVISION             3       EXAMINATION
 3                                           4  BY MR. HENRY:
 4  JOSE GARCIA, Individually               5    Q. Good morning, Mr. McCain. My name is Terry
    and as Representative
 5  of the ESTATE OF MANUEL                  6  Henry. We've met already this morning.
    CRUZ; IDALIA GARCIA,                     7    A. Good morning, sir.
 6  Individually; and                        8    Q. As you know, we represent BRK Brands in a
    CYNTHIA COX, as Next
 7  Friend of BRITTANY COX    *  CIVIL ACTION NO. B-98-186   9  case that was brought in the U.S. District Court for
 8  VS.                       *             10  the Southern District of Texas styled Garcia vs. BRK
 9  BRK BRANDS, INC.          *             11  Brands.
10  ***************************             12    A. Yes, sir.
11       ORAL DEPOSITION OF                 13    Q. I'd like to ask you a few questions,
12       ELMER WAYNE McCAIN, P.E.           14  preliminary ones.
13         OCTOBER 24, 2000                 15       Do you know personally or did you know
14           VOLUME 1                       16  personally Manuel Cruz?
15  ***************************             17    A. Who?
16    ORAL DEPOSITION of ELMER WAYNE McCAIN, P.E.,   18    A. Manuel Cruz.
17  produced as a witness at the instance of the     19    A. No.
18  Defendant, and duly sworn, was taken in the      20    Q. What about plaintiffs Jose and Idalia
19  above-styled and numbered cause on the 24th day of  21  Garcia?
20  October, 2000, from 9:27 a.m. to 3:48 p.m., before  22    A. No.
21  Stacie M. Conner, CSR in and for the State of Texas,  23    Q. Cynthia Cox or Brittany Cox?
22  reported by stenographic method, at the offices of  24    A. No.
23  Q & A Reporting, Inc., 2700 Post Oak Boulevard,    25    Q. Now I'm going to talk about some of the
24  Suite 1750, Houston, Texas, pursuant to the Federal
25  Rules of Civil Procedure.
```

```
                                      Page 2                              Page 5
 1       A P P E A R A N C E S             1  defense experts, and I wonder if you've met them
 2                                         2  either personally or professionally outside this
 3  FOR PLAINTIFFS JOSE GARCIA, INDIVIDUALLY AND AS   3  case. Dr. Rick Roby?
    REPRESENTATIVE OF THE ESTATE OF MANUEL CRUZ; AND  4    A. No. I've heard of him but don't know him,
 4  IDALIA GARCIA, INDIVIDUALLY:           5  never met him.
 5    Ms. Shiree D. Salinas                6    Q. Michael Classen?
    LAW OFFICE OF MARK A. CANTU            7    A. No. Well, Classen, I think I may have
 6  The Atrium
    1300 North 10th Street, Suite 400      8  met. Is he with Armstrong?
 7  McAllen, Texas 78501                   9    Q. Well, I think you met him at
 8                                        10  Dr. Armstrong's facility.
 9  FOR THE PLAINTIFF CYNTHIA COX, AS NEXT FRIEND OF  11    A. So I've met him, but I wouldn't know him if
    BRITTANY COX:                         12  he walked in the door.
10
11    Mr. Ray R. Marchan                  13    Q. Dr. Armstrong, Andrew Armstrong, did you --
    HARRIS & WATTS, P.C.                  14    A. I've met him.
12  1926 East Elizabeth Street            15    Q. You met him at his facility during this
    Brownsville, Texas 78520
13                                        16  case?
14  FOR THE DEFENDANT:                    17    A. Yes.
15    Mr. Terry M. Henry                  18    Q. Outside this case, do you know him?
    COZEN & O'CONNOR                      19    A. No.
16  The Atrium                            20    Q. Dr. Roy Striet?
    1900 Market Street
17  Philadelphia, Pennsylvania 19103      21    A. No.
18                                        22    Q. Richard Custer?
19                                        23    A. No.
20                                        24    Q. Alton Patton?
21                                        25    A. No.
22
23
24
25
```

```
                                      Page 3                              Page 6
 1            INDEX                         1    Q. Thomas Eagar?
 2  Appearances.....................    2   2    A. Thomas who?
 3  ELMER WAYNE McCAIN, P.E.               3    Q. Eagar.
      Examination by Mr. Henry......   4   4    A. No.
 4  Changes and signature..........  138   5    Q. Okay. As you know, this is a
 5  Reporter's Certificate.........  140   6  question-and-answer format. Please wait until I'm
 6            EXHIBITS                      7  done asking a question before you give me an
    NO.   DESCRIPTION           PAGE       8  answer. That makes sure that you hear the complete
 7  1   Notice of Deposition.      18      9  question and understand it. The court reporter has
 8  2   E. Wayne McCain, P.E., Curriculum Vitae.  29  10  an easier time taking down the transcript of our
 9  3   Report by E. Wayne McCain, P.E.   29  11  discussion today.
10  4   Three pages of handwritten notes  12        Please answer verbally. Shakes of the
        by Mr. McCain.           102      13  heads or "uh-huh's" and "huh-uh's" don't translate
11  5   Martin Industries Installation and  14  well in the transcript, and it's impossible to
        Operating Instructions.  104      15  determine what an answer is.
12  6   16 pages of photographs taken by   16    A. I understand.
13      Mr. McCain.              107      17    Q. Also, if you don't understand a question,
14  6A  Photograph taken by Mr. McCain of  18  please ask me to rephrase it or state it again; and
        the data plate.          177      19  I'll do so. It's important that you understand the
15  7   Page 921-139 from NFPA 921, 1988   20  question completely before answering so we can get a
16      edition, which has Section 19-4.3,  21  fair and accurate understanding of your answers.
        "Pressure Regulation."   137      22    A. Yes, sir.
17  8   Photograph.              149      23    Q. Now, you've been retained as an expert in
18  9   Photograph.              149      24  this case; is that right?
19  10  Photograph.              150      25    A. Yes, sir.
20  11  One page of handwritten notes by
        Mr. McCain.              174
21  12  "Smoke Detector Operability Survey
        Report on Findings."     159
22  13  "Fire Incident Study, National
        Smoke Detector Project."  166
23
24
25
```



PLAINTIFF'S EXHIBIT

GARCIA VS BRK BRANDS INC    CondenseIt™    ELMER W McCAIN PE VOL I 10-24-00

Page 7

1  Q. Are you going to provide an opinion
2  concerning the cause and origin of the carbon
3  monoxide that caused Mr. Cruz's death?
4  A. With respect to what? I'm lost. I know
5  I'm not here to ask questions, but obviously the
6  medical examiner said that that was the problem and
7  what killed him. However, I'm not going to express
8  an opinion about the heater because all I did was
9  look at the heater; and it was producing soot,
10  smoke, and carbon monoxide, obviously.
11  Q. Is your opinion going to discuss why it was
12  producing soot and carbon monoxide?
13  A. The fact that it was LP gas is the only --
14  only thing I would say and that the orifice size was
15  as -- I assume is correct -- Mr. Armstrong said,
16  which is 0.84.
17      I can't go any further than that
18  because I don't know the pressure that was being
19  input into the orifice and I don't think anyone else
20  knows that because we've never seen -- I've never
21  seen the regulator.
22      So beyond that -- it was producing
23  soot. I saw the soot on the roof. I saw the soot
24  on the heater. I know it was producing soot and
25  smoke and, with that, carbon monoxide because the

Page 8

1  man died of carbon monoxide. However, soot was
2  producing obviously by the pound in the thing. So
3  the heater pressure was obviously extremely high, LP
4  gas pressure.
5  Q. Okay. Will you provide opinion testimony
6  concerning the ratio at which carbon monoxide was
7  produced versus soot? And by that I mean was soot
8  produced first and then carbon monoxide or carbon
9  monoxide and then soot, or were they produced
10  together? Are you going to provide an expert on
11  that?
12  A. No, because it's an impossibility for
13  anyone to express an opinion about it because you
14  don't know when soot -- theoretically you could say,
15  but practically you can't say whether soot comes
16  before carbon monoxide or vice versa. You would
17  expect CO. Then you would expect soot as co builds
18  because soot is unburned carbon, but that's as far
19  as I could go because I don't know the pressure.
20  Q. Okay. Are you going to provide an opinion
21  concerning the operation of the smoke detector in
22  Mr. Cruz's house at the time of the incident?
23  A. At the time -- I'm hard of hearing.
24  Q. I'm sorry. Are you going to provide an
25  opinion concerning the operation of the smoke

Page 9

1  detector at the time Mr. Cruz died?
2  A. My -- yes.
3  Q. Okay. Are you going to provide an opinion
4  concerning any specific defect in that smoke
5  detector?
6  A. No.
7  Q. What is the opinion you're going to give
8  concerning the operation of the smoke detector?
9  A. That the smoke detector, with the amount of
10  soot that was residual on the ceilings and in the
11  smoke detector that I examined, should have alarmed
12  because it was soot and smoke inside the smoke
13  detector and it should have alarmed based on just
14  that fact, in my opinion.
15  Q. Are you going to provide an opinion
16  concerning the timing at which it should have
17  alarmed; in other words, that it should have alarmed
18  before Mr. Cruz died or at some point after he died?
19  A. In my opinion, it should have alarmed
20  before he died because of the amount of soot; and
21  with the air-fuel ratio that was obviously
22  available, it should have alarmed within 30,
23  45 minutes after the heater was fired up, in my
24  opinion. That's an opinion because I still don't
25  know that LP gas pressure, but I can stand by that

Page 10

1  opinion and do.
2  Q. Okay. Have you ever given deposition
3  testimony before in a carbon monoxide poisoning case
4  involving a space heater?
5  A. Yes.
6  Q. Was that as an expert witness?
7  A. Yes.
8  Q. All right. Approximately how many times,
9  approximately?
10  A. 20, 30.
11  Q. And in those 20 or 30 times where you
12  provided an expert opinion in a carbon monoxide
13  poisoning case involving a space heater, how many
14  times did soot play a role in that case or was soot
15  produced?
16  A. That's a very broad question. That covers
17  a wide variety of cases, and in some of those where
18  soot was produced --
19  Q. Well, let me just try to narrow it, then.
20  In how many of those cases do you recall that soot
21  was produced?
22  A. Probably four or five and I might not even
23  recall the names of those, but there were at least
24  four or five that involved soot production.
25  Q. So it's fair to say that soot isn't always

Page 11

1  produced when you have carbon monoxide being
2  produced; is that right?
3  A. That's a broad statement. Some soot, in
4  whatever size particles, is being produced when you
5  don't have enough oxygen to burn all of the carbon.
6  So with that in mind, some soot is being produced.
7      Now, whether it gathers so that you
8  see black spots like you would call soot or this
9  lady would that's taking this down is difficult to
10  say because you have soot when you have carbon
11  monoxide. You have excess carbon and not enough
12  oxygen.
13      So, yes, you're producing soot in each
14  one. How much is questionable based on the amount
15  of gas, the amount of air available, and so forth.
16  The theoretical end of it -- this is the practical
17  end I'm talking about.
18  Q. Okay.
19  A. Theoretically you could probably come up
20  with some answers, but they wouldn't be worth
21  2 cents in the field.
22  Q. But you'll agree that in not every case the
23  soot is visible?
24  A. That's correct.
25  Q. And there's a number of factors that impact

Page 12

1  whether the soot is visible, whether it accumulates
2  on walls and ceilings, and whether it's produced in
3  a sufficient amount that would cause a smoke
4  detector to alarm; is that correct?
5  A. That's correct.
6  Q. Okay. Do you recall the case of Sears vs.
7  Harris? It was a 1989 death case.
8  A. You've gone way back, haven't you?
9  Q. You recall that case?
10  A. State vs. Sears -- I mean, someone versus
11  State and Sears, yes. Greg Allen was the plaintiff
12  lawyer, and Lyman Harris was the defense lawyer.
13  Yes.
14  Q. Now, that case is a water heater case -- is
15  that right -- carbon monoxide poisoning due to a
16  water heater? Is that right?
17  A. That's correct.
18  Q. And the allegation in that case is that it
19  was burning an improper fuel -- LP gas instead of
20  natural gas -- and it was improperly ventilated; is
21  that right?
22  A. That's correct.
23  Q. Now, do you recall in that case whether or
24  not there was visible soot produced?
25  A. No.

Page 13

1  Q. "No," you don't recall?
2  A. I don't recall. I'm sorry.
3  Q. Okay. Do you recall a case of Seymore vs.
4  Register Propane?
5  A. That was the same case, Seymore vs. -- no,
6  that's a different case; and that's a different
7  city, too.
8  Q. Yeah. I believe it was a 1992 death case
9  involving a space heater in a mobile home.
10  A. Yeah, in Dothan, Alabama, or south of
11  Montgomery, yeah.
12  Q. And again, it was improperly venting and LP
13  gas instead of natural gas; is that right?
14  A. Don't those facts without looking at
15  a file that the attorney would have. However, I
16  recall the case for Kenny Mendleson; and I've
17  forgotten who defended it.
18  Q. Do you recall in that case whether or not
19  there was soot produced, visible soot produced?
20  A. As I recall in that case, strictly
21  recollection from '92 now -- and this is eight years
22  later -- there was soot produced in the area of the
23  heater that was misfueled, yes.
24  Q. In other words, there was soot in and
25  around the heater components?

Page 14

1  A. Yes.
2  Q. Was there any visible soot on the ceiling
3  or the walls, if you recall?
4  A. I don't recall. That's just been too long
5  ago. I'm sorry.
6  Q. That's fine. And there's only one other
7  case I wanted to ask you about, and that was a case
8  called Collins vs. Alabama Gas Corp.
9  A. Who?
10  Q. Collins or Perdue vs. Alabama Gas
11  Corporation. And again, I believe that's a 1992
12  case involving an improperly maintained space
13  heater. Do you recall that case?
14  A. No. Collins vs. Alagasco? What city? Do
15  you know, by chance?
16  Q. Let me see if I have that. I can tell you
17  the plaintiff's attorney was Delores Boyd. Does
18  that help?
19  A. Well, that -- no, because she always
20  associates, I think, her cases with Beasley, Wilson,
21  Allen, Main & Crow.
22  Q. It was venued in Montgomery County.
23  A. Collins vs. -- I don't recall the case and
24  I don't recall -- I've never worked directly for
25  Delores Boyd, even though I know the lady.

Page 15

1  Q. Well, there was a companion case called
2  Perdue vs. Avon-Avalon.
3  A. I'm sorry.
4  Q. That's fine.
5  A. If you could give me more facts about it, I
6  might recall it. I don't recall it.
7  Q. I don't know that I've got more facts.
8      Now, have you testified, again, as an
9  expert in these carbon monoxide poisoning cases at
10  trial as well?
11  A. Yes.
12  Q. And again, how many would that be?
13  A. At trial, state court, probably 80 percent
14  of those which I told you about a few moments ago so
15  far as the number; and probably the other 20 percent
16  has been in federal court in Montgomery County or
17  in -- there was one in Rome, Georgia. There's a
18  couple others in federal court.
19  Q. Okay. Have you ever given a deposition in
20  a case involving a claim that a smoke detector was
21  defective?
22  A. Yes.
23  Q. And how many times?
24  A. Twice that I can recall. One was for
25  Roberts in Gadsden, Alabama. The other was the

Page 16

1  deposition that you mentioned earlier, which was
2  Neal.
3  Q. Roberts and gas; is that correct?
4  A. No. Roberts was the lawyer.
5  Q. Okay.
6  A. In Gadsden, Alabama. The only reason I
7  recall, it was kind of the same time frame as Neal.
8  Q. And what were the facts of that case, the
9  case you did for Roberts?
10  A. Roberts?
11  Q. (Moving head up and down)
12  A. As best I can recall -- and it's been seven
13  or eight years ago, too -- there was a smoke
14  detector installed in a federal housing project, I
15  believe, and that was -- and the smoke detector did
16  not function properly when a fire occurred. A fire
17  occurred and carbon monoxide also was involved in
18  the deaths, but smoke inhalation is how they were
19  listed.
20  Q. Do you recall the manufacturer of the smoke
21  detector in that case?
22  A. No.
23  Q. Okay. You've also provided expert
24  testimony in a variety of other cases. For example,
25  in Mead Coated Board vs. Dempsey -- do you recall

Page 17

1  that case?
2  A. Yes.
3  Q. -- you gave an opinion regarding OSHA
4  regulations on the operation of sawmills; is that
5  right?
6  A. Yes. I've worked for OSHA in the past and
7  still do some consulting work for OSHA.
8  Q. In Hicks vs. Commercial Union -- do you
9  recall that case?
10  A. I remember Hicks vs. Commercial Union, but
11  I don't recall what the case was about.
12  Q. A 1994 case. You gave expert testimony
13  regarding the standard of care under ASME code for
14  inspections.
15  A. Yeah. Well, we run an ASME shop, have for
16  40 years.
17  Q. Olgesby vs. General Kinematics Corp., a
18  1995 case?
19  A. I recall Olgesby, but I don't know what the
20  case was about. You might enlighten me.
21  Q. You gave an expert opinion regarding the
22  defective design of a skip hoist in a charge
23  feeder.
24  A. Yeah, we had -- yes. There was no question
25  about that. That was federal court.

Page 18

1  Q. Jackson vs. Riel, R-i-e-l, a 1994 case. I
2  believe you gave expert testimony regarding the
3  failure to maintain a retracting device on a saw.
4  Do you recall that?
5  A. Yes.
6  Q. Okay.
7  A. Yes.
8  Q. Is it fair to say that in each one of those
9  cases we just discussed that your expert testimony
10  was basically relying on your background as a
11  mechanical engineer?
12  A. Mechanical. I also have done electrical
13  work. I own a -- owned at that time a general
14  contracting company that had saws and so forth. I
15  also owned an ASME code shop which does ASME code
16  construction work and general contracting throughout
17  the southeast and southwest. So all these things
18  were entwined in operations that I either had in the
19  past or had going on at that time, yes.
20  Q. Okay.
21  A. As well as OSHA.
22      MR. HENRY: I'd like to mark this as
23  McCain 1.
24      (Exhibit 1 marked)
25  Q. (BY MR. HENRY) Mr. McCain, I'm going to

Page 25

```
1   A. No.
2        MR. HENRY: I'd like to ask for a copy
3   of that binder.
4   A. That was -- that was right at the end of
5   the Neal case that that was produced to me from
6   CPSC. They were slow about getting it, as usual;
7   and it's just specific incidents. I'll be glad to
8   send one to the court reporter if you'd like, but
9   it's just incidents of various types of failures.
10  Q. (BY MR. HENRY) Did you rely on any
11  material in that binder for your opinion in this
12  case?
13  A. No. I looked through it entirely, each
14  page; but I did not rely on any particular page nor
15  any part -- part and parcel thereof because the
16  things that I looked at, I was aware of anyway.
17  Batteries not in, batteries in, smoke detectors
18  installed, those kinds of things are what they list
19  in those reports.
20  Q. Okay. That's part of -- is it fair to say
21  that's part of the material that you maintain on
22  smoke detectors?
23  A. It's some that I got back from a lawyer,
24  from Greg Allen, who was in the Neal case. He had
25  it. He has all that file. I don't keep files but
```

Page 26

```
1   he has all that information or had it and they
2   happened to have that available and I said, "Would
3   you mind sending me a copy?" And they did.
4        MR. HENRY: Again, I'd just like to
5   make a formal request for that binder.
6   Q. (BY MR. HENRY) You've also listed "News
7   from CPSC: Defective Alarm Prompts -- Recall of
8   Battery Powered Smoke Detectors." Did you bring
9   that with you today?
10  A. "Recall Info on Smoke Detectors"? Is that
11  what you said.
12  Q. No. Let's see. Under No. 4 it says,
13  Item C, "News from CPSC."
14  A. That's the information that I just talked
15  about.
16  Q. That you got from the other attorneys?
17  A. Yes.
18  Q. Okay.
19  A. From Mr. Allen.
20  Q. And you said you didn't bring that with you
21  today?
22  A. No. That's what I have one copy of that I
23  plan to keep now and I sent to -- one copy to
24  Ms. Salinas, but I'll send you a copy of it. It's
25  just bland reports that you probably --
```

Page 27

```
1        MR. HENRY: Again, I'd like to see a
2   copy of that.
3   Q. (BY MR. HENRY) "CPSC-C-93-1139 Study of
4   Deterioration of Separable Electrical Contacts in
5   Smoke Detectors"?
6   A. Looked at that, but I'm not -- I don't
7   intend -- yes, I looked at that, reviewed it, and
8   read it; but I don't intend to discuss it, frankly.
9   Q. "Fire Incident Study, National Smoke
10  Detector Project"?
11  A. Yes.
12  Q. Did you bring that with you today?
13  A. I think that's in either the box or in this
14  binder, one of the two.
15  Q. Okay. Is there anything in that report
16  that you're going to rely on for your opinion in
17  this case?
18  A. I rely on a lot of things that I've read.
19  I can't forget them.
20  Q. Okay.
21  A. And there are things in there that I
22  probably will bring up, yes, but not specific
23  details, not Paragraph 1, Page 6, or something like
24  that.
25  Q. Okay. What about the "Smoke Detector
```

Page 28

```
1   Operability Survey - Report on Findings"? Did you
2   bring that with you today?
3   A. That's in the box, should be in the box
4   over there.
5   Q. Okay. Did you bring anything with you
6   today related to the test, test protocol, or test
7   data and results from tests that you claim to have
8   performed on the SA67D smoke detector?
9   A. I don't have any of that. No, sir, I did
10  not. I don't have it. I attempted to get it, and I
11  couldn't get it. They -- it's so deep in their
12  archives, obviously.
13  Q. The test that we're talking about here on
14  the SA67D, is that a test that you did for the Neal
15  case?
16  A. Yes.
17  Q. And when you say it's "in their archives,"
18  you mean plaintiff's counsel's archives?
19  A. Yes, and the Court's, I guess, and
20  Mr. Sims'.
21  Q. Okay.
22  A. All had copies, and I sent all my copies to
23  the plaintiff lawyer or who I was working for. I
24  don't keep all that stuff.
25  Q. And that would include videotapes and still
```

Page 29

```
1   photographs that you took?
2   A. Yes, and the protocol if it's still -- if
3   it's still available. The house burned down. So it
4   burned the camera and the film and so forth. It may
5   not even be there.
6        MR. HENRY: Can I mark this as
7   Exhibit 2?
8        (Exhibit 2 marked)
9   Q. (BY MR. HENRY) Sir, I'm going to ask you
10  to take a look at this document. It was produced to
11  us. I believe it's your resume or your CV. If you
12  can just tell me if that's a complete and current
13  version of your curriculum vitae.
14  A. Yes, this is current and correct. I've
15  only had two. This is the -- this is the last one,
16  yes.
17  Q. Okay.
18        MR. HENRY: If you'd mark this as
19  Exhibit 3.
20        (Exhibit 3 marked)
21  A. This was produced to you?
22  Q. (BY MR. HENRY) It was, sir, along with
23  this, which I'm going to represent to you is your
24  report.
25  A. I have a copy that I was looking at, yes.
```

Page 30

```
1   Q. If you could just confirm that that is, in
2   fact, your report in this case.
3   A. That's correct, it is.
4   Q. Okay. And you have a copy of that there in
5   front of you; is that right?
6   A. I do.
7   Q. Okay. You're looking through documents
8   that are in a binder. Can you tell me what that
9   binder is?
10  A. This binder is what I call, for lack of a
11  better term, the "deposition and trial binder."
12  It's the binder that I use in the deposition and
13  documents which I feel that the lawyer that's taking
14  my deposition would want to review and I would carry
15  to trial with me, with any possible additions that I
16  might make to it during the deposition or
17  immediately thereafter. That's what it's called,
18  and that's what it's for.
19  Q. Okay.
20  A. It makes it simple for an engineer,
21  hopefully.
22  Q. If we could just briefly go through the
23  binder, and just tell me what's in it.
24  A. Sure. There's an index in the front which
25  will tell you everything that's in it -- general
```

Page 31

1  information, my opinions, supporting documents. And
2  there when it says "folder," that's actually that
3  box. These are reports in the box under Roman
4  Numeral IV, product information in the box, and
5  Roman Numeral V.
6      Notes are in the binder.
7  Correspondence is in the binder or box because some
8  stays with depositions and so forth that are sent.
9  Photographs, there are some in the binder which were
10 produced to me by, I think, a plaintiff expert but I
11 don't know, a gentleman, with some writing on the
12 photographs.
13      And then there's a very small packet
14 of film which I have in the box which I made myself,
15 produced myself, and produced today.
16     Q. Okay.
17     A. So these are all listed under this -- on
18 this page as "Index." That makes it all so simple,
19 hopefully, for me and everybody.
20     Q. Okay. And just so I get a basic idea, did
21 you participate in -- I'm sorry. You were going
22 to --
23     A. I wanted to go -- I didn't go to the second
24 page, and I didn't want to leave it out and you ask
25 me later.

Page 32

1      There are invoices in the back which
2  you asked me for, case lists, and so forth with
3  respect to plaintiffs and insurance companies that
4  I've worked for and legal documents that are in the
5  box, also. That's all that's shown in the index.
6      Q. Okay. Just so I'm clear, did you
7  participate in the July 23, 1999, inspection of the
8  heater, smoke detector, and Cruz house?
9      A. July 23, yes, with --
10     Q. Okay.
11     A. Yes. It was a very short inspection; but
12 yes, I was there.
13     Q. That's the one that was attended by --
14 there was other people there as well?
15     A. Yes.
16     Q. Okay. And did you also go to
17 Dr. Armstrong's facility for the initial inspection
18 and testing of the space heater?
19     A. Yes -- no -- yes, yes, I did, the initial
20 testing.
21     Q. The initial.
22      Have you done or participated in any
23 other examinations or testing since being at
24 Dr. Armstrong's facility?
25     A. No.

Page 33

1      Q. Okay. How about between July 23 and when
2  you went to Dr. Armstrong's facility, any other
3  examinations or testing?
4      A. Yes. August 12 I inspected the smoke
5  detector at Ms. Salinas' office -- or Ray Marchan's
6  office.
7      Q. That's right, because July 23 it was only
8  the space heater?
9      A. Yes.
10     Q. Okay.
11     A. And I was at the house one time. I don't
12 tie those together. Space heater was Brownsville, I
13 believe. This was at Ray's -- looking at the smoke
14 detector was Mr. Marchan's office. And then there
15 was a test up at Armstrong's place, as I recall.
16     Q. Okay. Your full name is Elmer Wayne
17 McCain; is that right?
18     A. Yes, sir.
19     Q. And is your current address 2000 McCain
20 Parkway; Pelham, Alabama?
21     A. That's my office address.
22     Q. Is McCain Parkway a private road?
23     A. No. It's an industrial park that I built
24 and named the road after my father.
25     Q. Telephone number (205) 663-7646?

Page 34

1      A. Yes.
2      Q. You attended Birmingham-Southern College;
3  is that right?
4      A. For a short period of time, probably two
5  quarters.
6      Q. When did you attend there?
7      A. After I got out of the service. Gosh, that
8  is a long time ago. I can't give you the years. It
9  was probably '56 or '7, somewhere along in there. I
10 went there two quarters to finish some math and
11 physics before going to Auburn University for a
12 Bachelor's Degree in Mechanical Engineering.
13     Q. Okay.
14     A. That was a very short stint. It was a
15 local college, and they had an excellent physics and
16 math department.
17     Q. Had you started -- had you started your
18 college education before you went into the service?
19     A. Yes. I was -- I played football at Auburn
20 University.
21     Q. So out of high school you went to Auburn?
22     A. Yes.
23     Q. Played football?
24     A. Yes.
25     Q. Joined the service, went to Korea?

Page 35

1      A. Yes.
2      Q. When were you discharged from the service?
3      A. Oh, Lord. These are all estimates. I'd
4  say '53 or '4. I mean --
5      Q. That's fine.
6      A. I went from there to the Federal Government
7  and went from there back to Birmingham-Southern and
8  Auburn.
9      Q. When you worked for the Federal Government,
10 it was the FBI; is that right?
11     A. Yes.
12     Q. And you played for the Chicago Bears at
13 that time, too?
14     A. No.
15     Q. That was separate?
16     A. I did that. That was a short stint in
17 between.
18     Q. Okay. And then you got back to Alabama,
19 and you went to Birmingham-Southern for a couple
20 quarters?
21     A. Yes.
22     Q. And then you went back to Auburn to finish
23 up your degree?
24     A. Yes, that's correct.
25     Q. And you got that degree in mechanical

Page 36

1  engineering in 1959?
2      A. That's correct.
3      Q. All right. During your university
4  studies -- and I understand this is 1959 -- did you
5  take any courses in fire science?
6      A. No.
7      Q. Fire protection?
8      A. No. The courses weren't called "fire
9  science." That's firemen and so forth and so on in
10 junior colleges, in my opinion. But no, we did not.
11     Q. What about electronics and electrical
12 engineering? Did you have courses in that?
13     A. Electrical engineering, yes, and
14 electronics was a branch of that and I took a couple
15 of quarters of not only electrical engineering but
16 also electronics because I knew I'd be working with
17 them when I got out, at my father's operation.
18     Q. Okay. What about smoke detection? Any
19 courses or studies in smoke detection?
20     A. No. That was after the -- after college,
21 on-the-job training as well as seminars with
22 FireEye, Honeywell, and those other companies
23 listed.
24     Q. What about on smoke or fire detectors
25 themselves? Any course study?

**GARCIA VS BRK BRAND INC**    **CondenseIt™**    **ELMO W McCAIN PE VOL I 10-24-00**

Page 37

1    A. Sorry?
2    Q. Any courses of study on smoke or fire
3 detectors?
4    A. Not that I recall, but that's 50 years
5 ago. So --
6    Q. Okay. Do you intend to do or have you done
7 any computer modeling in this case?
8    A. No. I have done none; I intend to do none.
9    Q. Okay. You list also on your resume
10 "National Board Seminars" --
11    A. Yes.
12    Q. -- that you take. What do those involve?
13    A. The national board seminars are seminars
14 that -- the ASME, which you mentioned a few minutes
15 ago, is the American Society of Mechanical
16 Engineers; and we have stamps that we put on vessels
17 and so forth and so on in the shops that I was
18 running.
19        The national board -- ASME does not
20 inspect a vessel. The national board inspects
21 vessels and looks at calculations and materials,
22 specs, and those kinds of things.
23        So the national board has schools and
24 seminars in Columbus, Ohio, for people who run ASME
25 code shops so that they can be in compliance and

Page 38

1 continue their ability to stamp vessels, which you
2 could not do if you didn't have ASME and national
3 board.
4    Q. When you use the term "vessel," you don't
5 mean a sailing ship; you mean a pressurized
6 container; is that right?
7    A. That's correct. I'm sorry. Yes. It's not
8 a ship. It's not a -- it's strictly a vessel that
9 could operate under pressures which have been set
10 out by either the client or the people manufacturing
11 the product.
12    Q. Okay. So those seminars have no relevance
13 to what you're asked to do in this case; is that
14 right?
15    A. No, other than general knowledge. And I
16 don't know that smoke detectors were ever mentioned,
17 but I wouldn't recall it probably if they were.
18    Q. Okay. What about the Alabama Gas -- the
19 Alagasco seminars?
20    A. Alagasco, yes. We covered fuels as well
21 as -- because Alagasco sells natural gas, and they
22 also had peak shaving plants, which is LP gas.
23        So, yes, there was discussions with
24 respect to equipment that could be used -- these are
25 seminars that we discussed the use of certain

Page 39

1 equipment to provide the proper mixture of LP gas
2 with natural gas as a peak shaving plant, if that
3 makes sense, a peak shaving plant.
4        When your curve would peak out, they
5 would have to begin putting LP and air in their
6 lines to drop their price because they were buying
7 Southern Natural Gas on a price break system.
8    Q. Do these Alagasco seminars involve the use
9 of consumer or residential --
10    A. Yes.
11    Q. -- gas-fueled appliances?
12    A. I'm sorry for talking over you.
13        Yes.
14    Q. Both natural gas and LP gas?
15    A. Yes.
16    Q. Does Alabama have regulations concerning
17 the use and distribution of natural or LP gas?
18    A. Oh, yes. Alabama Public Service Commission
19 provides the rules and regulations for that area.
20    Q. Have they adopted the NFPA code, or do they
21 have their own?
22    A. Alabama has -- to my knowledge, prior to my
23 retirement 10, 12 years ago, had adopted NFPA and
24 ASME as well as the other codes, standards, rules,
25 and regulations; but those are all set out in OSHA

Page 40

1 standards anyway. They're brought into OSHA as
2 part and parcel thereof; and OSHA is, without
3 question, in Alabama. So, yes. The answer is yes.
4    Q. Does OSHA have any impact on residential
5 and consumer use?
6    A. No.
7    Q. Okay. Do you know or are you familiar with
8 the Texas regulations concerning use and
9 distribution of natural or LP gas?
10    A. Somewhat, but I'd have to refresh my
11 memory. I've worked defending a gas company here,
12 Southern Union; but I can't recall specifics about
13 it.
14    Q. You also attend NAFE seminars annually?
15    A. Yes, National Academy of Forensic
16 Engineers.
17    Q. And what kind of --
18    A. The National Academy of Forensic Engineers
19 is an engineering group which does forensic
20 engineering work. It's certified by the engineering
21 specialty boards. It's one of the few groups that
22 is -- that is accepted and passed by the American
23 Society of Mechanical Engineers, which is the main
24 body of professional engineers in the United
25 States.

Page 41

1        So NAFE, I'm a member. I'm a charter
2 member. My number is 428. I have been for years,
3 and I attend those seminars and teach some of them.
4    Q. And what kind of courses have you taken?
5    A. We cover every kind, not only residential
6 but also industrial applications and --
7    Q. Anything that's relevant to this case?
8    A. Not specifically. The last seminar we had
9 covering smoke detectors was four or five years ago
10 and that was strictly a use and design and I don't
11 recall that much about it. I probably have the
12 manual on it, but I don't recall it.
13    Q. Your CV here lists licenses in Alabama,
14 Louisiana, and Mississippi as professional engineer?
15    A. Yes.
16    Q. Still current on those licenses?
17    A. I'm relatively certain that I am or
18 possibly on a retired basis, but I've been licensed
19 in probably 30 or 35 states. It was a requirement
20 as a general contractor, industrial contractor. So
21 I got licenses in all the states through reciprocity
22 and sometimes a test.
23    Q. Ever licensed in Texas?
24    A. I'm sure I have been. It would have been
25 15, 20 years ago if I was; but I'm sure I have been,

Page 42

1 probably through reciprocity, frankly.
2    Q. When you're licensed to practice
3 engineering in a state, does that mean that the
4 State monitors or can regulate your profession,
5 regulate the things that you do?
6    A. They do regulate your profession. It does
7 not mean that they can come out and tell you what to
8 do as long as you abide by the laws of the
9 Professional Engineering Society.
10    Q. And you could be disciplined if you violate
11 those laws?
12    A. Yes.
13    Q. Have you ever been disciplined in any
14 states in which you've been licensed?
15    A. Never.
16    Q. Do you have any other licenses or
17 certifications that you believe are relevant to your
18 work in this case?
19        MS. SALINAS: I'm sorry. Can you
20 repeat that question, please?
21        MR. HENRY: Certainly.
22    Q. (BY MR. HENRY) Do you have any other
23 certifications or licenses that you believe are
24 relevant to your work in this case?
25    A. That's a broad question. I don't recall

GARCIA VS BRK BRANDS iNC        CondenseIt™    ELMEk W McCAIN PE VOL I 10-24-00

Page 43

1 any. I've been licensed so many places. I'm
2 68 years old. So, you know, you --
3    Q. Do you have any licenses for the
4 distribution -- to be a distributor or licensee to
5 distribute natural or liquid propane gas?
6    A. No.
7    Q. Okay. I'm going into your work history now
8 specifically.
9    A. Sure.
10    Q. From 1959 to 1988, you were with McCain
11 Boiler & Engineering Company --
12    A. Yes.
13    Q. -- is that right?
14    A. That's correct.
15    Q. And what was your progression?
16    A. I started in 1959 as a -- as a person doing
17 anything my father wanted me to do as an engineer;
18 but, still, I cleaned the toilets, did whatever he
19 said do because that's the kind of guy my dad was.
20       But then I became a certified welder.
21 a master pipe fitter. I moved up the ladder through
22 becoming a welder foreman, et cetera, into finally
23 the office and became CEO of the corporation in
24 '19 -- I don't know -- about '83 or '84, I think,
25 maybe -- yeah, '83, '84, somewhere in there, maybe a

Page 44

1 little earlier than that.
2       And I grew the company from three or
3 four personnel to over 2,000 people as CEO. Sold it
4 to my sons in 1988 or '89, somewhere along in there.
5    Q. So between 1959 and the early 1980's, the
6 company didn't grow very much; it stayed relatively
7 small?
8    A. That's correct.
9    Q. And then when you took over in the early
10 1980's, you grew it to approximately 2,000, you
11 said?
12    A. Yes.
13    Q. Okay.
14    A. That includes contractors, subcontractors,
15 12 corporations, and all the other garbage I had put
16 together. We had a lot going on, yes.
17    Q. Now, McCain Boiler & Engineering Company,
18 that primarily involves the design, manufacture,
19 sale, and servicing of pressure vessels, gas-oil
20 burner systems, waste gas burner systems, oxygen
21 vaporizers, electrical control panels, flame
22 safeguard design and fabrication. Is that about
23 right?
24    A. And pathological incineration. And just
25 prior to my retirement, we started working with the

Page 45

1 Environmental Protection Agency with respect to
2 output for vessels which are much larger than we're
3 talking about here; but, still, it's the same
4 principle -- you're producing carbon monoxide or
5 carbon dioxide or whatever. You've got to monitor
6 in some way, which is what we used FireEye and
7 Honeywell for. We were Honeywell and FireEye
8 distributors for the Southeast.
9    Q. In your business, the McCain Boiler &
10 Engineering Company, you got extensive experience in
11 various heating systems such as coal, gas, fuel
12 heating systems; is that right?
13    A. Yes.
14    Q. Okay. That business did not sell smoke
15 detectors, did it?
16    A. No.
17    Q. And you personally have no background in
18 residential smoke detectors?
19    A. None other than -- no, none in residential
20 smoke detectors. In industrial, yes, and in use
21 of -- for First Alert and so forth, yes; but that's
22 only through experience and litigation.
23    Q. Okay. So your experience with First Alert
24 and other residential smoke detectors has come
25 through litigation, not through McCain Boiler &

Page 46

1 Engineering Company?
2    A. Basically, that's correct.
3    Q. Okay. And you sold that company to your
4 sons in 1988 or 1989, McCain Boiler --
5    A. That's correct. It's now McCain
6 Engineering Company. They dropped "Boiler" out of
7 the name, which is fine.
8    Q. Okay.
9       THE WITNESS: Is this a good time to
10 take a break?
11       MR. HENRY: Yeah, that's fine.
12       (Recess from 10:22 a.m. to 10:33 a.m.)
13    Q. (BY MR. HENRY) We're moving into E.
14 McCain. Now, it's my understanding in 1987 you
15 began E. Wayne McCain; is that correct?
16    A. Yes, P.E., Inc.
17    Q. So it's a corporation?
18    A. Yes.
19    Q. And what's the state of incorporation?
20    A. Alabama.
21    Q. Okay. And what is your position with the
22 corporation?
23    A. CEO.
24    Q. Since 1987?
25    A. Yes.

Page 47

1    Q. And as CEO, what are your duties and
2 responsibilities?
3    A. What are my duties? Anything nobody else
4 wants to do.
5    Q. Okay. You're responsible for the entire
6 corporation, everything it does?
7    A. Yes, yes.
8    Q. How many employees does the corporation
9 have?
10    A. Presently, six. If you would have asked me
11 that a year and a half ago, it would have been 20;
12 but it's going south.
13    Q. Does the corporation retain like a group of
14 independent contractors, consultants?
15    A. We -- I hire -- I hire engineers as -- if I
16 need them, when I need them, for what I need them if
17 they're expert in that field and interview them and
18 contract the work to them, yes.
19    Q. Okay. And those engineers that you hire
20 separately are not included in this six number of
21 employees that you've got?
22    A. No. I do some consulting work where I'm
23 asked to hire people for people and I do that, but I
24 really don't particularly care for that business.
25    Q. Do you have any family members as

Page 48

1 employees?
2    A. No.
3    Q. Have you hired any other consultants or
4 engineers for this case?
5    A. No.
6    Q. Anyone else at your company -- has anyone
7 else at your company done work in this case?
8    A. No. The filing has been done by my
9 secretary. That's all.
10    Q. Clerical work?
11    A. Yes.
12    Q. No substantive work?
13    A. No.
14    Q. And your consulting corporation, E. Wayne
15 McCain, does it provide consultation for anything
16 other than litigation?
17    A. Yes.
18    Q. Okay. And in what areas?
19    A. In the areas in which I was involved prior
20 to going into doing any consultation work with
21 insurance companies and plaintiff lawyers, those
22 being people like Georgia-Pacific, U.S. Steel,
23 Republic Steel Corporation, many paper companies,
24 petrochemical companies that I worked with, all
25 these people I worked with through the years.

Page 49

1 And they know I know their systems,
2 their operations, and their problems. So they call
3 me in and ask me by the hour to either supervise
4 their people or bring someone in to do work for them
5 to straighten out whatever their problem is so they
6 can go play golf, usually the chief engineer, while
7 I work.
8 Q. So you've capitalized on some of the
9 customer and client relations that you developed as
10 part of McCain Boiler & Engineering?
11 A. Well, I --
12 Q. And I don't mean that in a bad way.
13 A. Yeah. I do it if they call me. I don't go
14 out looking for them. If they need me, I'll help
15 them.
16 Q. E. Wayne McCain also consults for
17 litigation purposes, right?
18 A. Yes.
19 Q. And specifically in the areas of product
20 liability, code violations, control failures,
21 industrial accidents and explosions; is that right?
22 A. Yes, and combustion dealing with LP,
23 natural, and any other fuels that I've burned
24 throughout the years, electrical systems, those
25 types of things. Those all go hand in hand with

Page 50

1 what you mentioned, I think.
2 Q. Okay. Do you limit yourself to any kind of
3 products in particular or just product liability in
4 general?
5 A. Only -- I limit myself to only those which
6 I have experience and expertise in. I'm not going
7 to go out -- I don't do cars and trucks. People
8 call me all the time saying, "We've got an
9 automobile accident."
10 "So what?" I don't know anything
11 about -- I know you put gas in it and you drive it
12 and I know how to design an engine if I had to, but
13 I'm not -- I haven't worked for a manufacturer. I'm
14 not going to deal with the ins and outs of tie rod
15 ends breaking and so forth.
16 So I limit myself by my past
17 experience and work that I was doing prior to
18 retirement.
19 Q. Okay. Percentagewise, how much of your
20 work would you estimate is for litigation purposes
21 versus your other client base?
22 A. They cover a broad spectrum. They've got a
23 lot of land development, too, and so forth. But I'd
24 say 40 percent of my work is litigation for defense
25 or plaintiff lawyers or insurance companies

Page 51

1 directly. The other is land and working with --
2 consulting with industry that I've done work for
3 before.
4 Q. And for the litigation that you do, how
5 would you split it up percentagewise between
6 defendants, plaintiffs, and insurance companies, as
7 you broke it down?
8 A. I call insurance and defense one thing,
9 really.
10 Q. Okay.
11 A. But I would say that today -- this
12 changes -- but I'd say today it's probably
13 70 percent defense and 30 percent plaintiff work;
14 but a few years ago it was probably 50-50, something
15 like that.
16 Q. Okay. Now, in your work history with
17 either McCain Boiler & Engineering or E. Wayne
18 McCain, did you ever design a smoke detector?
19 A. No.
20 Q. Manufacture a smoke detector?
21 A. No.
22 Q. Sell a smoke detector?
23 A. No.
24 Q. Sell smoke detectors?
25 A. I'm sorry. What was the last one?

Page 52

1 Q. Sell smoke detectors.
2 A. No.
3 Q. Okay.
4 MS. SALINAS: By the way, I'd like to
5 go off the record for a moment.
6 (Discussion off the record)
7 Q. (BY MR. HENRY) On the report under
8 "Qualifications," No. 2, one of the things you list
9 is "continuing education courses in the field of
10 explosions, fires, electrical and mechanical
11 engineering, as well as data and information
12 developed by other experts in the field."
13 What kind of continuing education
14 courses do you mean? Who teaches them? You know,
15 how in depth are they?
16 A. NAFE as well as -- I still go to the
17 Alagasco seminars.
18 Q. So these are the ones that we talked about
19 already?
20 A. Yes.
21 Q. Okay. No. 3, you mention
22 "FireEye-Electronics Corporation of America
23 Technical School and Class." Now, those systems
24 that you dealt with there -- photoelectric,
25 ionization, ultraviolet safety detection systems --

Page 53

1 those are in regard to flame rectification systems;
2 is that correct?
3 A. Some are; some are not. They make a flame
4 rectification system using UV or using what we
5 call -- well, it's the lead cell system, which is a
6 different system than UV. But they also manufacture
7 systems which we used and we have been trained on --
8 I have been trained on as well as some of my -- some
9 of the technical people at the company now dealing
10 with smoke, soot because EPA and all the health
11 departments and so forth will only allow a certain
12 output per number of pounds of steam or whatever you
13 may be producing, your regulator.
14 So the regulations put us in a
15 position so we had no choice but to cover not only
16 UV systems but photoelectric and ionization systems
17 that are used in stacks, large stacks, small stacks
18 down to probably 6 or 8 inches in diameter and high
19 velocity.
20 Q. That generates a couple of questions. The
21 first one is: When you said "lead cell," do you
22 mean L-E-D?
23 A. No. LED, you're talking about the
24 printout. Lead cell is -- probably the best way to
25 explain it, it is the same type of cutoff mechanism

Page 54

1 used by the Germans on U2 rockets, which is a cell
2 that sees light.
3 Q. Right.
4 A. Maybe it does the same thing. But it will
5 see light; cut off the rocket engine; "bam," she
6 goes in. UV is ultraviolet, which we all know
7 about.
8 Q. Okay. Now, these systems, though, that
9 you're talking about there -- flame rectification,
10 and there are also these additional ones -- but
11 they're primarily for industrial use as far as
12 regulating or monitoring the products of industrial
13 combustion; is that right?
14 A. That's true. You take them and cut them
15 down, oh, by a hundred, maybe a thousand, depending
16 on the size you're using, on the upper end; and
17 you'd have the same thing as a smoke detector for
18 ionization or photoelectric.
19 That doesn't make sense?
20 Q. Well, it does. And I guess what I was
21 trying to think in my head was what do you base that
22 statement on?
23 A. My knowledge of the technical aspects of
24 both systems -- one being ionization that we used,
25 one being photoelectric that we used. The ones that

**GARCIA VS BRK BRANDS INC**     CondenseIt™     **ELMER W McCAIN PE VOL I 10-24-00**

Page 55

1 were larger photoelectric are nothing in the world
2 but an extremely large photoelectric system you'd
3 use today. You could take the same smoke detector,
4 put it in a vent. If we're generating a great deal
5 of smoke, it would cut off the system if you wired
6 it in properly.
7          So it's the same thing. It's just
8 larger on the systems that were FireEye, you're
9 talking about, as well as Honeywell. Cut it down,
10 and you've got what you hang on the ceiling today
11 and call a smoke detector.
12 Q. All right. Let me ask you, then -- let's
13 take, for example, the photoelectric sensor that
14 you're talking about for this industrial output.
15 A. Yes.
16 Q. First of all, what does it do? In other
17 words, when it reaches a certain threshold, does it
18 send a signal, does it stop the production of
19 combustion; or what does it do?
20 A. Several things you can do with it, and it
21 depends on how you wire it. First, you can -- if
22 you -- if you're sighted into a stack to begin with
23 and that beam of light is broken, then you might
24 drop to a lower firing rate on fuel, continue your
25 air at a higher rate, or maybe increase your air

Page 56

1 just by another mechanism using some Modutrol motors
2 made by Honeywell, which will decrease the amount of
3 output that you have which is smoke and increase the
4 amount of capacity, possibly, of the unit or maybe
5 even decrease the capacity of the unit.
6          If you cut it down so that you get to
7 the lower end of this thing and it cuts it off
8 entirely so that you can't see, you can't alter it
9 so that it will, in fact, change that mode of
10 operation of the control motors and so forth for air
11 and fuel, then it will shut the system down on
12 emergency shutdown and give you alarms. We set off
13 alarms and lights and bells and whistles and so
14 forth.
15 Q. Right. Now, does it -- what does it give
16 the operator -- or what does it send? Does it send,
17 for example, a percent of obscuration?
18 A. You can do that. You can do that with a
19 modem or you can simply give him a red or green
20 light or you can give him a yellow, red, or green
21 light or you can just set up a panel that says
22 you're at half-fire and here's the problem. The red
23 light is showing you that you've got too much smoke
24 output; you've got to decrease your fuel, increase
25 your air.

Page 57

1          So those things you do automatically
2 in the system; and, yet, you're showing them as
3 lights or a printout. You could print it out with a
4 clock, as you've seen, I'm sure, a graphic so that
5 management, when they look at it, will say, "Oh,
6 hell. We lost steam." Well, somebody's rear end is
7 in a crack when they lose steam because your
8 production goes down.
9 Q. Now, these photoelectric sensors that
10 you're talking about are direct beam sensors; is
11 that right?
12 A. Yes, that's correct.
13 Q. Do you have any experience with what they
14 called "scattered" or "scattered light" detectors,
15 sensors?
16 A. Scattered light detectors came on the
17 markets just about the time I retired, but that was
18 not of any -- I don't have the hands-on experience,
19 no. However, it's not something that's unknown to
20 me.
21 Q. Well, let me ask you about the ionization
22 sensors you're talking about. How do they operate?
23 A. Same way as the one that -- excuse me. Go
24 ahead and ask me about them.
25 Q. How do those operate inside the sensing

Page 58

1 chamber, if you could?
2 A. Inside the sensing chamber you've got the
3 same thing that you have here, americium or some
4 other material, which when smoke is dumped into that
5 system, it either breaks or makes other contacts to
6 operate or close or give warning signals and so
7 forth if you're smoking. If it's clean, everything
8 runs beautifully and you don't have any problems.
9          They do exactly the same thing.
10 Ionization, you can't change; photoelectric, you
11 can't change; UV, you can't change. I mean, it just
12 depends on how you adapt it.
13          I've taught courses on all three of
14 those to engineers, not to say that I understand all
15 of it; but I understand a good bit about it.
16 Q. For the ionization sensor, it works on a
17 principle of changing current; is that right?
18 A. That's correct.
19 Q. And it's possible to set the threshold or
20 the point at which it sends a signal --
21 A. That's correct.
22 Q. -- at certain currents?
23 A. That's correct.
24 Q. Higher or lower?
25 A. Yes.

Page 59

1 Q. Okay.
2 A. You have to be able to do that. If you
3 can't, you can't control the larger system or you
4 can't make it operate on the smaller system. If you
5 can't make those changes, then you have something
6 you can't use. You might as well throw it in the
7 scrap but -- it works, but it does not work as good
8 as photoelectric and UV. UV is better than all of
9 them, in my opinion.
10 Q. Okay.
11 A. That's a personal opinion.
12 Q. Okay. And why is that?
13 A. Because ultraviolet is a thing that we're
14 going to see regardless. Ionization might cause you
15 a problem. Photoelectric, you might be breaking the
16 beam, but UV is still going to be there. I mean,
17 you're going to see UV coming off. The waves are
18 going to be coming off. You're going to be able to
19 sense those with the UV detector.
20          The first one we had, we called a
21 "Purple Peeper" and I know you don't want me to
22 start preaching, but a Purple Peeper was a big
23 purple thing that was stuck on all this equipment.
24 It was a "Purple Peeper Eater," some people called
25 it, because of the song.

Page 60

1          But we used those, and those were
2 replacing these other two systems for one reason --
3 they were more accurate, but they were also
4 extremely expensive at first. So that held a lot of
5 people back.
6 Q. In your experience in these commercial and
7 industrial settings, were ionization sensors and
8 photoelectric sensors -- strike that.
9          The work you did with Honeywell, Inc.,
10 was the same as the FireEye technology, this fire
11 rectification and also the output control
12 mechanisms?
13 A. Yes, with the exception of the fact that
14 Honeywell had more products -- Modutrol motors and
15 motors which we could move, the dampers, and the
16 fuel input mechanisms.
17 Q. And those systems are all automated?
18 A. Oh, yes, yes.
19 Q. Based on what the sensor is doing in the
20 stack?
21 A. That's right, as well as the presstrol,
22 p-r-e-s-s-t-r-o-l, and other things which you don't
23 want to go into.
24 Q. Now, the ionization sensor that you're
25 talking about in these situations, does it actually

Page 61

1  give a readout like a voltage readout and it's from
2  that voltage readout that it sends the signal to the
3  rest of the system on what to do?
4     A. It depends. You can use it either of two
5  ways: You can use several ionization chambers and
6  cut it off and use what we call a high-low system,
7  which means that one would cut off, two would cut
8  off, three would cut off, four would cut off. That
9  might cut the unit off.
10     But you could also use the same system
11  to do nothing but move a potentiometer, that
12  potentiometer moving Modutrol valves which change
13  your fuel input. I don't know if that makes sense
14  or not. That's what you do with them. You can turn
15  it off with three or four tint if you want to, or
16  you can use one and simply make it modulate.
17     Q. Did you find the ionization sensing device
18  to be fairly accurate in these different current or
19  voltage levels, being able to determine between
20  them?
21     A. We had high shutdown rates on them because
22  of the mode of operation and that's the reason as
23  soon as photoelectric came out, we started using
24  that and that's the reason when UV came out, we
25  started using that. And ionization dropped out of

Page 62

1  the picture entirely, unless someone had an old,
2  old, old system.
3     Q. So the ionization sensors were fairly
4  sensitive, then?
5     A. They cut off relatively quickly is all I
6  can tell you.
7     Q. Okay.
8     A. And they might come on; they might not.
9  You had to reset them if they did not.
10     Q. I'm sorry. The work that you did with the
11  Local Engineering Planning Committee in Shelby
12  County, that had nothing to do with smoke detectors,
13  smoke alarms, none of that?
14     A. No. I was in charge of that for the
15  county; and that's meeting EPA and ADEM, which is
16  Alabama Department of Environmental Management --
17  fuel spills, those types of things. I had to get
18  the fire trucks out and so forth.
19     Q. Okay. I'd like to briefly discuss the
20  testing in the Neal case; and when I say that, I
21  mean the smoke tests that you did in the house.
22     A. All right, sir.
23     Q. You ran two tests, I believe.
24     A. Yes.
25     Q. Do you recall the date that those tests

Page 63

1  were run?
2     A. 11th and 17th, as I recall. Now, if I can
3  recall the month, we'll be okay, won't we? I don't
4  know. It may have been September but it was the
5  11th and 17th of -- in a house where we had
6  installed a smoke detector and used a couch, as you
7  know, since you've read the deposition.
8     Q. And you did those a week apart? A week
9  apart, right?
10     A. 11th and 17th. That's, yeah, about a week
11  apart.
12     Q. And where were the tests run?
13     A. Alabaster, Alabama.
14     Q. Alabaster. Do you recall the model smoke
15  detector that you used?
16     A. 83R, as I recall.
17     Q. Okay. And do you know the smoke detector
18  that was supposedly in Mr. Cruz's house, what model
19  number?
20     A. SA67D.
21     Q. Do you have any information or evidence
22  that would suggest that those two models are
23  similar, the 83R and the SA67D?
24     A. I've not gone into the internals of them.
25  That's somebody else's ball game.

Page 64

1     Q. But it's your understanding that they're
2  both battery-operated ionization detectors?
3     A. Ionization battery detectors, yes.
4     Q. Okay. Both manufactured by BRK?
5     A. Yes.
6     Q. What type of fire did you have in your
7  tests in the Neal case?
8     A. Let me think a minute. I know what kind of
9  fire it was; but we didn't have a fire, first of
10  all. We had a slow, smoldering, smoking
11  environment, which is, I think, what happened in
12  that case; but I'd have to look at the deposition
13  that you have to really -- we used -- I used
14  charcoal briquettes to put on a couch and to cause a
15  slow, smoldering output of smoke which enveloped the
16  room, the couch, and the smoke detector finally.
17     And we tested -- I tested the smoke
18  detector when I put it on the wall. I tested it
19  again on the wall. That was being filmed, and they
20  have the film. I wish I had it for you but, you
21  know.
22     The detector was on the wall, and I
23  put it on the couch and about the smoke beginning. I
24  drop the briquettes on it. I lit the briquettes
25  outside so they were red hot.

Page 65

1     Q. So you put hot briquettes on the couch?
2     A. Three hot briquettes on the couch. That's
3  the type fire. That's a long answer to a short
4  question, really. It was a briquette fire on a
5  couch.
6     Q. Okay. Did you have a protocol that you
7  used for the tests?
8     A. I always write a protocol for any test.
9  That would be in the files of both those attorneys
10  that I mentioned to you along with -- I guess it
11  would be. I know the Court would have it.
12     But, yes, it should be in the file
13  because I write a protocol. I send that to the
14  attorneys so they can correct or change or tell me
15  if they don't like it or do like it.
16     Q. Okay. So it was a protocol that you
17  developed as opposed to one that you adopted that is
18  either, you know, a UL, ASTM, or some other --
19     A. This is a -- excuse me.
20     Q. Go ahead. I'm sorry.
21     A. This was a real-world demonstration of a
22  fire in a house -- not attempting to meet UL, not
23  attempting to meet ANSI, OSHA, whoever. It was just
24  simply a real-world demonstration of a slow,
25  smoldering fire on a couch. That's all I was

Page 66

1  attempting to do.
2     Q. Do you know what the couch was made of,
3  what the materials were from the cushions?
4     A. No. It was cloth on the outside. It had,
5  it seems like, cotton. But I don't know whether it
6  was cotton or not but that soft material that you
7  sit on. It doesn't bother you, I don't guess.
8     But I don't know what the material
9  was. I couldn't tell you the spec on it.
10     Q. How large was the building in which you did
11  the test?
12     A. An estimate would be -- well, the building
13  was one size. The area which we used was another
14  size. You want the size of the whole thing? It was
15  probably around 2,000 square feet. That's a guess
16  back from seven or eight years ago. I think we used
17  probably twelve to 1500 square feet, as I recall.
18     Q. And you did that by using plywood to close
19  off doors -- is that right -- plywood sheets or
20  something to close off the doors?
21     A. Used a plywood sheet on maybe a couple, but
22  we also stapled plastic and sealed off all the
23  windows and the doors because they had been knocked
24  out by the state tax unit because they used the
25  house, too. I didn't find that out until later

GARCIA VS BRK BRANDS INC          CondenseIt™          ELMER W McCAIN PE VOL I 10-24-00

**Page 67**

1  but --
2  Q. Okay. Do you have any idea how large
3  Mr. Cruz's house was?
4  A. I've got a drawing of it that was made by
5  someone else. I don't know whether it has the
6  square footage on here or not, but it's 34 by 22.
7     Got a calculator? Engineers can't
8  multiply until they get out of college.
9     MR. MARCHAN: 748.
10  Q. (BY MR. HENRY) Does that sound right, 748?
11  A. I agree with that. If Mr. Marchan
12  multiplied it out, I'll go with that. 34 by
13  22 feet.
14  Q. So the test area in the Neal case was
15  roughly twice the size of the Cruz house?
16  A. Well, the house was; but the test area that
17  we used was 1500 to 2,000 square feet because we
18  only used one side of it. We blocked it off to a
19  hall.
20  Q. Right. I think you said the house was
21  2,000 square feet and the test area was between
22  twelve and 1500.
23  A. 1500, yeah.
24     THE WITNESS: So how many square feet
25  was it, sir?

**Page 68**

1     MR. MARCHAN: I came up with 748.
2  A. It was maybe twice, one and a half,
3  something like that.
4  Q. (BY MR. HENRY) Okay. Did you do any
5  measurement of the particles that were produced in
6  the smoldering fire that you got?
7  A. At Neal?
8  Q. At the Neal house.
9  A. No.
10  Q. Okay.
11  A. All we did was a real-world demonstration
12  to determine, again -- I won't go through that
13  terminology again -- to determine that the --
14  Q. I understand. Did you measure the
15  obscuration level at all?
16  A. No.
17  Q. Now, the house you used in the Neal case,
18  did it have HVAC in it?
19  A. No.
20  Q. Do you recall the distance of where the
21  detector was located from the couch where you
22  started the fire? How far away was it?
23  A. Oh, Lord. Anything I told you would be a
24  guess. I'd guess 15 or 20 feet, but I'm guessing.
25  That's strictly a guess from being there.

**Page 69**

1  Q. Okay. How many rooms away was it, or was
2  it in the same room?
3  A. The smoke detector was installed in a
4  hallway. The room that the couch was in was a
5  living room/dining room area, which was one room.
6  So that's probably 10 and 10 and 5. I'd say it was
7  probably 20 feet, round numbers; but that's strictly
8  from memory and a guess.
9  Q. You didn't have anything to measure
10  obscuration?
11  A. No. Didn't attempt to -- did not want to
12  measure it.
13  Q. Did you have anything to measure -- did you
14  have an ionization measuring device?
15  A. No.
16  Q. Did you have any thermal couples to measure
17  heat?
18  A. No. We had them, but we didn't use them.
19  I didn't want to use them. I was doing just a
20  real-world test of a smoke detector. That's all.
21  Q. Okay. Did you measure carbon monoxide
22  production?
23  A. No.
24  Q. And you said before you didn't have
25  anything to measure soot or smoke production?

**Page 70**

1  A. No.
2  Q. Okay. Now, in the first test, did it
3  actually erupt into flame at some point?
4  A. No.
5  Q. In fact, the detector eventually sounded,
6  didn't it?
7  A. Eventually, after two hours, two hours and
8  a half, something like that, as I recall; but it was
9  a long time. It did.
10  Q. But the conditions were still tenable in
11  the house at the time it alarmed. Do you understand
12  what I mean by that?
13  A. No.
14  Q. Could somebody survive in the house at the
15  time that the detector alarmed?
16  A. I couldn't see the couch from where I was
17  located. So smoke inhalation would probably have
18  gotten you. You wouldn't have stayed in there. I
19  wouldn't have. I don't think anyone in their right
20  mind would have stayed in the house with the
21  conditions as they were.
22     So it wasn't like this room. It
23  wasn't like a heavy smoking room. It was dense
24  smoke all the way from the floor to the ceiling.
25  Q. But you were in there?

**Page 71**

1  A. No. I stayed outside. I had it blocked.
2  I had a door blocked off, and I was outside that.
3  Q. You stood outside during the test?
4  A. Yes.
5  Q. But when the alarm went off, you went
6  inside?
7  A. I opened the door. That's correct.
8  Q. And you made sure it was filming the
9  couch. Then you turned the camera around, and you
10  filmed the detector -- is that right -- to show
11  where the smoke was at the detector?
12  A. You read the deposition. If you say that's
13  correct, that's correct. I'm pretty sure that's
14  what I did because I'd want to see the detector and
15  the couch. That's what I would assume I would
16  do. I'd do it today that way.
17  Q. And then you left?
18  A. Yes.
19  Q. And got somebody in to help extinguish the
20  fire and let the house clear out?
21  A. To take the cushions off the couch, not to
22  extinguish the fire because we didn't have a
23  full-fledged fire in the first incident.
24  Q. Okay. So it's fair to say that you were in
25  the house at the time the alarm went off, at least

**Page 72**

1  for a few seconds?
2  A. Yes.
3  Q. A few minutes?
4  A. No, not minutes; seconds. As quickly as I
5  could shoot the smoke detector and the couch or
6  where the couch was located, I was out the porch and
7  off the porch.
8  Q. Okay.
9  A. It was smoky.
10  Q. Certainly. Most fires are.
11     Okay. Now, was the test that you ran
12  on the 11th -- was it reproducible? In other words,
13  could you run it again any number of times to verify
14  the results that you got the first time?
15     Let me back up, and let me tell you
16  the basis for my question. That might help you
17  answer it.
18     When you run a test, some folks like
19  to run it more than once, you know, to make sure
20  that the results they got the first time make sense
21  and that it's repeatable and they get the same
22  result so that they can base a conclusion on that
23  test.
24  A. Yeah.
25  Q. So my question to you is: Was your test

**Page 73**

1 reproducible? Did you get, you know, the same
2 results; or were you even able to reproduce the test
3 again?
4     A. Well, there are probably two answers to
5 that. First of all, I reproduced the test on the
6 17th, or several days after the first one. So it
7 was reproducible but not to the — not based on
8 Daubert or Sole Tire [sic] and all those things that
9 you guys go through.
10        I was simply doing a real-world
11 examination of what the smoke detector would do with
12 a slow, smoldering fire. I wasn't attempting to put
13 together a — I could have used Fast; I have that
14 program. I have obscuration materials that I could
15 have used to read. I've got all kinds of things,
16 but I saw no reason to do that.
17        I wanted to put a fire on a couch that
18 gave me smoke only, a slow, smoking fire. I wanted
19 a detector located approximately where the one was
20 in that house —
21     Q. In the Neal case?
22     A. — and I wanted to see if it would alarm.
23 That's all I wanted to do.
24        Now, that could be reproduced very
25 easily and I did reproduce it on the 17th but the

**Page 74**

1 charcoal got too hot in the couch and the house
2 disappeared. It burned down..
3     Q. It's fair to say that it's difficult to
4 reproduce smoldering fire conditions on upholstery?
5     A. That's correct, unless you know what's —
6 exactly what's under it. I think it burned through,
7 but I didn't go in to look for that because that
8 wouldn't have been too smart.
9     Q. Did you use the same couch?
10     A. Yes.
11     Q. In other words, the same cushions that
12 you —
13     A. Different cushions. Three cushions on the
14 couch. I had tested one to be sure — I tested it
15 by putting some charcoal on it — to be sure that it
16 would give me slow, smoldering smoke —
17     Q. Right.
18     A. — not just flash up in a fire because
19 somebody could have put gasoline on the blasted
20 thing and here I am with a — and I didn't want
21 that. I wanted to see slow, smoldering smoke off a
22 couch.
23        So I did one that way; the second one,
24 I used on the 11th; the third one, I used on the
25 17th. I had all of those, which I'm sure one of the

**Page 75**

1 lawyers has. I would say this, but they may not
2 have. They're fools if they've got it, I guess. It
3 was in a sack, a plastic bag kept for them.
4     Q. The cushion?
5     A. Yes. And carried to the courtroom, which
6 the judge loved.
7     Q. All right. But the house literally burnt
8 to the ground on the second test?
9     A. Yes.
10     Q. Okay. And all the documents, photos,
11 video, anything related to that test are in the
12 possession of plaintiff's counsel, defense counsel,
13 or the Court in that Neal case; is that correct?
14     A. Yes. I don't have anything on it. I don't
15 keep files. But yes, they have them. I don't.
16     Q. Okay. Professional associations.
17        National Fire Protection Association?
18     A. Yes.
19     Q. Sit on any committees?
20     A. No, not now, no.
21     Q. American Society of Safety Engineers?
22     A. Yes.
23     Q. American Society of Mechanical Engineers?
24     A. Yes.
25     Q. Southern Building Code Congress

**Page 76**

1 International?
2     A. Yes.
3     Q. National Academy of Forensic Engineers?
4     A. Yes.
5     Q. Membership in all those organizations
6 current?
7     A. Yes.
8     Q. Okay. Do you sit on any committees for any
9 of those associations?
10     A. Yes. ASME, I've sat on the Pressure Vessel
11 Committee, the subcommittee which is pressure
12 vessels.
13        The National Safety Council, I was the
14 chairman of the Research and Development Committee
15 up until last year, at which time I resigned in
16 preparation for retirement within a year so — from
17 now.
18        And what were the other — there was
19 another one. NAFE, on the membership committee
20 there. I've forgotten the other one you ran by
21 there.
22     Q. Southern Building Code?
23     A. Southern Building Code Congress, I served
24 on their committees and set up several of the
25 committees back in — about 30 years ago.

**Page 77**

1     Q. Let me ask you about the Southern Building
2 Code Congress International.
3     A. Yes.
4     Q. Do you know if they have any regulations or
5 recommendations involving residential smoke
6 detectors?
7     A. Any residential — and I recall you asking
8 that question of someone else that you were
9 deposing.
10        But any recommendations that would be
11 had by Southern Standard Building Code Congress
12 would be a recommendation to meet the standards of
13 UL or some other group. We would not go out and
14 write our own standards for that purpose. So
15 anything that would fall in that gamut would be
16 UL —
17     Q. NFPA?
18     A. — NFPA, those types of things.
19     Q. They don't make a distinction between
20 photoelectric or ionization smoke detectors?
21     A. Don't recall. I'm sorry.
22     Q. In this case are you going to make — let
23 me go back and start that one again.
24        In this case do you make a distinction
25 between photoelectric and ionization detectors? Is

**Page 78**

1 that part of the — part of your opinion in this
2 case?
3     A. Yes.
4     Q. Okay. And why is it? Explain that for me,
5 please.
6     A. Well, there are two reasons — there are
7 several reasons but two that I can enumerate very
8 quickly. One is that ionization is, in my opinion,
9 what I would call "old engineering."
10        Photoelectric is newer. It is more
11 dependable. It will — according to all the data
12 that I've read, will actuate on slow, smoldering
13 fires, whereas ionization will not in a lot of
14 cases, which it didn't in my house that I burned
15 down.
16        And also, the fact that — and you may
17 or may not have a copy of this; you'll probably want
18 a copy or probably know about it — in Alabama where
19 BRK/First Alert is paying five or $6 million or
20 something plus a million and a half in attorney's
21 fees for — a small price to pay — for not telling
22 the public the difference between ionization and
23 photoelectric technology and the fact that
24 photoelectric is better than ionization. So those
25 things thrown together.

Page 79

1 And I have a copy of that here. I
2 don't have the whole file, just something from the
3 newspaper.
4 Q. And that's your understanding, that — I
5 believe you were referring to the Claybrook class
6 action case; is that right?
7 A. I don't know if it was Claybrook or not.
8 You guys look at the law. I don't —
9 Q. But, in any event, I mean, that's your
10 interpretation of what that settlement is; is that
11 right?
12 A. That's an engineer's interpretation of what
13 the lawyers are doing, and I don't attempt to tell
14 you what the lawyers are actually doing. This is
15 Watley. I know Joe Watley. I didn't even know he
16 was in it.
17 I don't see "Claybrook"; but if you
18 say it is, it is. You probably know a lot more
19 about it than I do at this point in time.
20 Q. I just want to make sure we're talking
21 about the same apples and not apples and oranges.
22 A. Joe Watley and Drake — yeah, it is
23 Claybrook, yeah.
24 Q. Okay. And is there something in that
25 notice there that says BRK says photoelectric are

Page 80

1 better than ionization smoke detectors, generally?
2 A. The only thing I can do is read you one
3 sentence that struck me: "The lawsuit involves
4 allegation that the defendant sold
5 ionization/photoelectric smoke alarms without
6 informing purchasers of the varying performance
7 characteristics of ionization and photoelectric
8 smoke alarm technology."
9 "Defendants" — I should continue.
10 "Defendants deny these allegations."
11 Q. Okay. You'll agree that photoelectric
12 smoke detectors are slower than ionization smoke
13 detectors in detecting fast, flaming fires, though?
14 A. Yes.
15 Q. Okay. Is it your understanding that under
16 the circumstances of this case, the Cruz case, that
17 the circumstances in his house at the time he died
18 were more analogous to a slow, smoldering fire than
19 a fast, flaming fire?
20 A. Yes.
21 Q. Okay. And that's why you think an
22 ionization detector wasn't as good in that situation
23 as a photoelectric would have been?
24 A. Yes.
25 Q. Okay. Did you ever sit on any committees,

Page 81

1 advisory panels for Underwriters Laboratory?
2 A. No.
3 Q. Ever sit on any committees or advisory
4 panels for the CPSC?
5 A. No.
6 Q. Did you ever write any letters or
7 recommendations or memoranda to either Underwriters
8 Laboratory or the CPSC concerning smoke detectors?
9 A. CPSC, I have. Underwriters Laboratories, I
10 have not. I don't have copies of the
11 correspondence. It was probably five years ago. It
12 was prior to or during the Neal case.
13 Q. Okay. And what did that correspondence
14 say?
15 A. It just said, in my opinion, the ionization
16 and photoelectric detectors — and this is my
17 recollection of it — should be tested in real-world
18 conditions to determine their ability to alarm when
19 a fire occurred. It was short and sweet, two or
20 three lines.
21 Q. Okay. Did you ever get any response to the
22 CPSC?
23 A. No. I wrote to Ann Brown, and I never
24 received a response.
25 Q. She's probably a pretty busy woman.

Page 82

1 A. Yeah. Well —
2 Q. Let me see. Five years ago, a Clinton
3 appointee; is that right?
4 A. Yeah.
5 Q. Are you familiar with what's been referred
6 to as the "Indiana Dunes Tests"?
7 A. No.
8 Q. Do you have any understanding that
9 real-world fire tests were ever conducted on
10 photoelectric/ionization smoke detectors?
11 A. Not to my knowledge.
12 Q. Okay. In your tests, your real-world fire
13 tests, in the Neal case, did you only have one
14 photo — I'm sorry — one ionization detector?
15 A. Yes.
16 Q. Did you use any photoelectric detectors?
17 A. No.
18 Q. And the detector that you used for Test 1
19 was the same detector that you used for Test 2; is
20 that right?
21 A. Correct.
22 Q. Before you did Test 2, did you test the
23 detector to make sure it still worked?
24 A. Yes. We tested it — I test it when I put
25 it on the wall again.

Page 83

1 Q. By pressing the "test" button?
2 A. Yes.
3 Q. Have we generally covered pretty much all
4 your work experience?
5 A. Yes.
6 Q. Okay. Is there anything that we haven't
7 mentioned that you believe would be relevant to your
8 work in this case?
9 A. No.
10 Q. Do you consider yourself an expert in fire
11 cause and origin?
12 A. I'm not a cause and origin expert, no.
13 Q. Okay. Have you ever done any investigation
14 or study where you observed the effects of soot and
15 smoke on a smoke detector? And by that I mean the
16 smoke patterns, the soot patterns, where the smoke
17 lays, where the soot lays when a detector is exposed
18 in a fire.
19 A. No, no, I haven't.
20 Q. Have you ever attended any seminars or had
21 any education concerning that subject?
22 A. In a seminar given at NAFE, that area was
23 covered. However, it was also pointed out that
24 velocities and movement of the fire, et cetera,
25 would change the direction of those markings. So it

Page 84

1 was not an exacting science, if you will.
2 Q. Okay. Have you ever testified either at
3 deposition or at trial about the effects of smoke or
4 soot on residential smoke detectors other than the
5 Neal case?
6 A. No.
7 Q. Okay. And you'll agree you did that in the
8 Neal case?
9 A. Yes.
10 Q. Okay. And specifically about whether the
11 battery was installed or not?
12 A. Yes.
13 Q. Okay. Do you consider yourself an electric
14 engineer — I'm sorry.
15 Would you consider yourself an expert
16 in the area of electrical engineering?
17 A. That depends — well, that depends on what
18 field. Not all fields of electrical engineering,
19 but nobody is. You know, I'm as competent as anyone
20 with respect to wiring up to 19,000 volts and down
21 to 12 volts but — and high amperages; but I don't
22 consider myself an expert in all fields of electric
23 engineering, no. But —
24 Q. Okay. And you're not an electrical
25 engineer?

Page 85

1    A. I'm not an electrical engineer. I've taken
2  a lot of electrical courses, and I've done a lot of
3  electrical work.
4    Q. And you're not a chemist or a chemical
5  engineer?
6    A. No.
7    Q. You're not a metallurgist or materials
8  specialist?
9    A. No.
10    Q. And you're not an expert in toxicology,
11  physiology, or forensic pathology?
12    A. No, sir.
13    Q. You're not an expert in -- I'm sorry.
14    And you haven't done any computer
15  modeling in this case?
16    A. I have not.
17    Q. Okay. And do you anticipate doing any?
18    A. No, sir.
19    Q. Are you an expert on the behavior of
20  smoke?
21    All right. I'll be fair to you. I
22  got that question out of the Neal transcript; and if
23  you'd like, I can read you what that was.
24    A. All right. I would appreciate that.
25    MS. SALINAS: Why don't you let him

Page 86

1  look at the deposition if you're going to be
2  cross-examining him on it?
3    MR. HENRY: All right. I want to make
4  sure I've got the right -- I may not have the right
5  cite.
6    MS. SALINAS: Do you have an extra
7  copy of that deposition with you so that he can
8  review it since you're asking him about that case?
9    MR. HENRY: I don't have an extra copy
10  with me.
11    MS. SALINAS: Maybe in the break we
12  can make a copy.
13    Q. (BY MR. HENRY) Well, I have the wrong
14  cite. So I won't even ask you that question now.
15    A. I didn't think I had addressed that.
16    MS. SALINAS: In the break do you
17  think that you can remind me or ask somebody to make
18  a copy of the deposition so that we can have that?
19    THE REPORTER: Sure.
20    MR. HENRY: Well, I'll tell you, I'm
21  not sure that I'm going to provide a copy of this
22  one because it's got my notes on it; and I don't
23  think it's appropriate to give you this copy for
24  that reason.
25    MS. SALINAS: And the only --

Page 87

1    MR. HENRY: To be fair --
2    MS. SALINAS: The only reason I'm
3  asking is because it seems that you're going to be
4  cross-examining him on what he may or may not have
5  said there, and I think it would be fair to allow
6  him the opportunity to review that document since it
7  was some time ago. That's the reason for my
8  request.
9    MR. HENRY: I understand. And to be
10  fair, at the break I'll take a look and see what's
11  coming up to see if there's sections I could give
12  you that don't have my notes on it or some way we
13  could redact it.
14    MS. SALINAS: In any event, I want a
15  copy of the deposition even if it's at a later
16  date.
17    MR. HENRY: Okay.
18    Q. (BY MR. HENRY) Would you agree with me
19  that smoke detectors were developed in an effort to
20  reduce the number of people injured or killed in
21  fires?
22    A. I would expect that's the case. I don't
23  know that for a fact.
24    Q. Okay. And would you agree or do you know
25  if, in developing smoke detectors, researchers

Page 88

1  sought to detect fires by developing devices that
2  sensed smoke as opposed to heat or something -- some
3  other gas produced by a fire?
4    A. I don't know.
5    Q. Okay. Smoke detectors, though, sense
6  smoke; is that right?
7    A. It's what they're supposed to do. It's
8  what they're -- yes.
9    Q. They don't sense carbon monoxide?
10    A. Well, that's a double-edged sword because
11  as I said earlier, you produce carbon monoxide prior
12  to getting to soot. So you'd have carbon monoxide
13  anyway. Would it be there if, in fact, you had
14  soot? Yes, it would be carbon monoxide, in my
15  opinion.
16    And I don't know the designers nor the
17  engineering people's -- I've never seen their notes,
18  don't know what they said we're going to determine
19  by designing the smoke detector; but I would expect
20  it was just smoke.
21    Now, they, I'm sure, took into
22  consideration the fact that in order to get smoke,
23  you've got to go through the carbon monoxide level.
24  It just makes sense to me if they were engineers.
25    Q. I'm not sure what the answer to that

Page 89

1  question was. But let me just ask you --
2    A. I'm not either.
3    Q. Smoke detectors are not designed to detect
4  carbon monoxide produced by a fire; is that right?
5    What I'm -- I guess the distinction I'm trying to
6  draw is you said, well, if they detect, if they go
7  off, then, you know, they're going to detect -- it's
8  going to allow you to know that carbon monoxide is
9  there, too.
10    Although that may be a benefit of
11  having a smoke detector, my question is very
12  specific: Is a smoke detector designed to detect
13  carbon monoxide?
14    A. The direct answer to your question is no,
15  but the side portion of it is as I stated before:
16  It has to go through that phase or you wouldn't have
17  smoke -- phase of carbon monoxide, soot, smoke, and
18  so forth.
19    Q. Okay.
20    A. That's what soot and smoke are, is unburned
21  carbon and unburned gases. So you've got to go
22  through carbon monoxide to get to smoke.
23    That's my answer. You know, I can't
24  change it because it's a fact.
25    Q. There is essentially two types of

Page 90

1  residential smoke detectors, ionization and
2  photoelectric; is that correct?
3    A. Yes.
4    Q. And both are subject to and must pass the
5  same test, UL 217?
6    A. That's correct.
7    Q. And it's the same standard for whether it's
8  ionization or photoelectric?
9    A. Generally, that's correct, yes.
10    Q. Can you think of any standard or any
11  performance evaluation, either Underwriters
12  Laboratory or otherwise, that's different depending
13  on whether your detector is ionization or
14  photoelectric?
15    A. No.
16    Q. Okay. Now, a smoke detector, whether it's
17  ionization or photoelectric, is only going to alarm
18  when smoke enters the sensor chamber; is that right?
19    A. Yes.
20    Q. Which means the smoke detector won't alarm
21  immediately upon ignition of a fire?
22    A. No.
23    Q. And if that smoke detector is separate from
24  the fire by either a room, a door, or some other
25  device, it's not going to be able to alarm until

GARCIA VS BRK BRANDS INC    CondenseIt™    ELMER W McCAIN PE VOL I 10-24-00

Page 91

1 smoke reaches it; is that correct?
2 A. That's correct.
3 Q. In a battery-powered smoke detector, the
4 battery has to be connected for it to alarm?
5 A. That's correct.
6 Q. And that battery has to have some level of
7 charge; it can't be a dead battery?
8 A. Yes.
9 Q. Do you know what that -- how much charge it
10 has to have?
11 A. Well, a 9-volt battery, you'd expect to
12 have 9 volts or thereabouts. I don't know what the
13 minimum would be for it to operate. I never have
14 looked at that data. But you would expect it to be
15 very close to 9 volts for a surge in current,
16 depending on the capacity of the battery when new;
17 and the type battery used by the smoke detector
18 manufacturer will determine that.
19 Q. And smoke detectors are designed to provide
20 early warning of fires that pose risks to humans?
21 A. Yes.
22 Q. And they're designed to alert during
23 abnormal -- they're designed to alert in response to
24 abnormal quantities of smoke?
25 A. Yes.

Page 92

1 Q. In other words, if I'm cooking a steak on
2 the stove and it, you know, has some smoke, my smoke
3 detector shouldn't alarm; is that right?
4 A. That's correct.
5 Q. If I have a candle lit in my house, the
6 smoke detector shouldn't alarm; is that right?
7 A. I don't know. Yes, that's correct. I was
8 going to say depending on what size your candle is,
9 but I don't -- yes, that's correct. You would not
10 expect it to unless you had a large candle.
11 Q. And I'm trying to, you know, differentiate
12 between a hostile fire and a friendly fire.
13 A. Sure. I know.
14 Q. And one of the ways a smoke detector tells
15 the difference is by the amount of smoke?
16 A. That's correct.
17 Q. So the smoke detector is set at some level,
18 some threshold, to alarm -- you know, "Smoke above
19 this level, I'm going to alarm"; is that right?
20 A. Yes.
21 Q. All right. So even when smoke first
22 reaches the smoke detector, it will not necessarily
23 alarm?
24 A. That's correct.
25 Q. Now, a smoke detector can only provide this

Page 93

1 early warning type of protection to people that can
2 hear it; is that right?
3 A. Yes.
4 Q. So if somebody is separated from that smoke
5 detector by a room or a closed door, they may not be
6 able to hear the smoke alarm?
7 MS. SALINAS: Objection, form.
8 A. That's possible; it may not be possible,
9 but, yes, depending how thick the door is, how well
10 they can hear. There are a lot of variables, you
11 know.
12 Q. (BY MR. HENRY) Whether they're awake or
13 asleep?
14 A. That's correct. You would expect to hear
15 it if you're asleep because if, in fact, they
16 design a product that will determine fires -- a
17 lot of people die in fires at night with smoke
18 inhalation -- you would expect it to be loud enough
19 to wake them up with the "beep, beep, beep."
20 However, I don't know who designed the buzzer. So I
21 can't tell you what their parameters were.
22 Q. Well, you'll agree that there's a standard
23 to which manufacturers must design and manufacture
24 their smoke detectors for the sound that the
25 detector gives off; is that right?

Page 94

1 A. Yes, that's correct.
2 Q. That's 85 decibels at 10 feet?
3 A. Yes.
4 Q. And are you aware that NFPA 72 has a
5 standard for new construction that requires smoke
6 detectors in sleeping rooms?
7 A. Uh-huh.
8 Q. You're aware of that?
9 A. Yes, I am.
10 Q. Okay. And that's so people that are
11 sleeping will hear the detector when it alarms?
12 A. Yes.
13 Q. Okay. In order for a smoke detector to be
14 as effective as it can be, it must be installed
15 correctly?
16 A. Yes.
17 Q. In other words, the correct placement on
18 the ceiling or the wall?
19 A. Yes.
20 Q. It must be connected to a power source?
21 A. Yes.
22 Q. You would agree that a homeowner should
23 clean their smoke detector periodically?
24 A. Yes.
25 Q. And test their smoke detector periodically?

Page 95

1 A. Yes.
2 Q. And smoke detectors are essentially an
3 electronical product made up of electronical
4 components?
5 A. Yes.
6 Q. Therefore, it should be expected that at
7 some point they may fail; is that right?
8 A. "At some point." What's that point? I sit
9 here and think about that because I think about
10 those kinds of things. At some point it might
11 fail. It should certainly operate during a certain
12 life span. I think the life span was, as I've read
13 it, that they speculate one failure in 30 years.
14 Well, that's kind of ridiculous, in my
15 opinion, but -- because they fail a lot sooner than
16 that based on the data that you'll be sent by
17 Ms. Salinas.
18 Q. Well, but for the reason that they are this
19 product made up of electrical components, it makes
20 it important that they're maintained and tested
21 periodically?
22 A. Yeah, sure.
23 Q. And to prevent the amount of time that a
24 smoke detector could be out of service because of
25 a -- you know, a predicted failure rate, it makes it

Page 96

1 equally important that they be tested and maintained
2 periodically?
3 A. Yes.
4 MR. HENRY: Okay. Do you want to take
5 a break for lunch? Because I'd like to have a
6 chance to look at the box and the binder, if I
7 could, and take a look at my questions going forward.
8 to see if there's going to be more Neal references.
9 Would that be all right?
10 THE WITNESS: That's fine with me.
11 MR. MARCHAN: Sure.
12 (Lunch recess from 11:34 a.m. to
13 1:07 p.m.)
14 Q. (BY MR. HENRY) I'd like to go back to the
15 piece of paper that you had in your binder there
16 regarding the Claybrook settlement.
17 A. Yes.
18 Q. Okay. Now, that's a notice of a proposed
19 settlement; is that right?
20 A. As I understand it, but I'm not a lawyer.
21 So --
22 Q. It's dated May 30, 2000?
23 A. Yes.
24 Q. Is that at or about the time that you saw
25 that notice, first saw that notice?

Page 97

1  A. I don't know.  It was in the Birmingham
2  Parade magazine, I believe.  I noticed it and cut it
3  out.
4  Q. Okay.
5  A. So I don't know when I saw it.  Don't know
6  if it was May 30 or not.
7  Q. Did you cut it out because you had already
8  been retained as an expert in this case?
9  A. Yes.
10  Q. Did you read the entire notice when you saw
11  it?
12  A. I didn't -- no.
13  Q. Did you realize at the time that you saw
14  the notice that there was a settlement -- or I'm
15  sorry -- a fairness hearing set for September, 2000?
16  A. No.  I didn't go into all the legalities.
17  I looked at it, BRK proposed settlement and so
18  forth; and I didn't go any further than that.
19  Q. Okay.
20  A. I didn't attempt to read the law part of
21  it, no.  I saw it was U.W. Clemon's court.  I know
22  him personally.  Other than that, I didn't do
23  anything.
24  Q. Did you call him?
25  A. No.

Page 98

1  Q. Find out the basis of the case --
2  A. No.
3  Q. -- you know, the terms of the settlement?
4  A. No.
5  Q. Did you read about the terms of the
6  settlement in the notice there?
7  A. No.
8  Q. Okay.
9  A. Generally I might have; but I don't know
10  the specifics, no.  I wasn't looking for specifics.
11  I wanted to send this to the lady here and to have
12  it myself.
13  Q. Okay.  Did you understand, you know, by
14  seeing that notice or reading whatever it was you
15  read in that notice that there was going to be a
16  fairness hearing to talk about the terms of the
17  settlement?
18  A. No.  The -- no.  The only thing that I
19  looked at in the notice once I scanned it was the
20  paragraph that I read to you, and that's as far as I
21  went.  I saw that a suit had been filed by someone
22  and just read the top part of it.  I didn't try to
23  get into the meat of it.  It was none of my
24  business.  Lawyers handle those types of things.  So
25  I stayed out of it.

Page 99

1  Q. Okay.  You didn't -- you didn't know or you
2  didn't understand that you could actually write to
3  the Court or, you know, appear at the Court at a
4  fairness hearing to talk about the terms of the
5  settlement?
6  A. No, did not intend to, didn't want to.
7  Q. Okay.  Now, we talked about earlier in your
8  deposition that you inspected the space heater in
9  the Cruz house on July 23, 1999, right?
10  A. Yes.
11  Q. Inspected the smoke detector on August 12,
12  1999?
13  A. Yes.
14  Q. And December 14, 1999?
15  A. I'm sorry?  I only saw the smoke detector
16  once.
17  Q. You did not see the smoke detector at
18  Dr. Armstrong's laboratory?
19  A. Oh, yes, it was there.  That's correct.  It
20  was brought up there.  That's correct.
21  Q. And that --
22  A. I didn't put my hands on it, didn't look at
23  it other than they had it.  I didn't do anything to
24  it.
25  Q. All right.  So you didn't do a second

Page 100

1  examination that day?
2  A. No.
3  Q. Okay.  So only on August 12?
4  A. That's correct.  I was observing when I was
5  at Armstrong's.
6  Q. Okay.  And at Dr. Armstrong's lab, you were
7  there to observe an initial, I'll say, "firing up"
8  of the heater on propane; is that right?
9  A. Yes.
10  Q. Okay.  When you went to Brownsville on
11  July 23, did you have any kind of plan for your
12  investigation that day for things you wanted to see
13  or do?
14  A. I don't know what you mean by "plan."  No,
15  I had no plan other than I was told the heater would
16  be there; and I went down to look at it.  I know
17  what a Martin heater is.  I'm familiar with that
18  plant in Florence, Alabama; and I had been involved
19  with them before.  So I knew what it was.
20  Q. Let me talk a little bit about the space
21  heater, then.  What did you know about the space
22  heater before you saw it on July 23?
23  A. Martin Stamping & Stove for years has built
24  a space heater, and I'm familiar with those.  I had
25  one installed before operating in a room, in a house

Page 101

1  outside of my building.
2  I think probably or possibly I've been
3  involved before with a carbon monoxide death
4  involving a Martin Stamping & Stove heater.
5  What else did I know about it?  I knew
6  it was a heater, and that was about it.  I was not
7  able to do anything to it down there other than look
8  at it, measure it, which I did; and then I got a
9  drawing and some data on the heater and saw it again
10  up at Armstrong's lab.  But that was about the sum
11  total of the involvement.
12  I thought it was coming to me for
13  testing later, but it did not.  So I dropped that
14  idea because they evidently changed their minds.
15  Q. Now, you knew it was a Martin Industries
16  heater before you saw it?  Somebody told you that?
17  A. I don't -- yes, I think someone had
18  mentioned that; and who, I don't know.
19  Q. And you've referred to it as a "stamping
20  stove heater"?
21  A. That's the name of the company years ago,
22  Martin Stamping & Stove is what the plant was called
23  prior to it being -- I guess "Martin" is all they
24  call it now.  Yeah, just "Martin" is all they
25  probably have on the heater now; but it was Martin

Page 102

1  Stamping & Stove Company in Florence, Alabama, a
2  small stamping company.
3  Q. And by "stamping," you mean like
4  stamped-out sheet metal parts and pieces?
5  A. Yes, yes, that's what I would assume they
6  were doing; but I only drove by the plant.  I didn't
7  see them.  So I don't know.
8  Q. Okay.
9  MR. HENRY:  Could I have this marked
10  as McCain 4?
11  (Exhibit 4 marked)
12  Q. (BY MR. HENRY)  Sir, what we've marked as
13  McCain Exhibit 4 -- and you can feel free to refer
14  to your original notes if you like -- but these are
15  three pages of notes that we made from pages that
16  are in your binder there.
17  A. Yes.
18  Q. Now, these are notes you made?
19  A. Yes.
20  Q. Notes you made on July 23?
21  A. Yes.
22  Q. Okay.  Now, you write there "Design
23  compliance with Z 21.11.1B"; is that right?
24  A. Yes.  That's just an ANSI standard, 1976
25  standard.

GARCIA VS BRK BRANDS INC          CondenseIt™          ELMER W McCAIN PE VOL I 10-24-00

Page 103

```
1   Q. For what?
2   A. I'm sorry?
3   Q. For what? Standard for what?
4   A. I would assume it's a standard for
5   manufacture of heaters of this type. I haven't
6   reviewed 21.11.1B, '76. But you would assume that
7   based on the fact that it's stamped on the heater
8   somewhere, on a plate.
9   Q. Okay. And "heaters of this type," meaning
10  vented heaters?
11  A. Yes. Or this type of heater, yes, they
12  would probably call a vented heater, yes. Vented
13  gas circulators are what Martin Industries calls it
14  now.
15  Q. Do you know if Martin Industries also
16  manufactured a propane space heater?
17  A. I haven't seen the data on it. I would
18  assume they would. It would be a change in the
19  orifice size, in my opinion. That's what I would
20  say today.
21  Q. Okay. Now, this is called a "vented
22  heater"; is that right?
23  A. Yes.
24  Q. What does that mean, "vented heater"?
25  A. It means it's supposed to be vented through
```

Page 104

```
1   a 4-inch opening in the back.
2   Q. To the outside?
3   A. Yes.
4   Q. Okay. That's supposed to get the products
5   of combustion out of the area that's being heated?
6   A. Yes.
7       MR. HENRY: Can we mark this as
8   Exhibit 5?
9       (Exhibit 5 marked)
10  Q. (BY MR. HENRY) Sir, what we've marked as
11  Exhibit 5 is -- I believe it's a data sheet also
12  taken from your binder. Can you take a look at
13  that?
14  A. Yes, I have it here.
15  Q. That is, in fact, a data sheet?
16  A. Yes.
17  Q. Is that the data sheet that applies to the
18  Martin Industries space heater that was involved in
19  this case?
20  A. Well, based on the information that I had
21  in all kinds of old catalogs and so forth, yes.
22  Because it's a V2430, it does not go past -- it
23  doesn't go into the 1M-2 -- 1MS-2, and it does not,
24  I don't believe, here, if I recall, in the parts
25  listed. But, yes, it's a V2430 based on the
```

Page 105

```
1   information I had.
2   Q. Now, did you have this data sheet already
3   in your possession when you got called about this
4   case; or is this something that you got from Martin
5   Industries later?
6   A. I couldn't tell you. Might have gotten it
7   later, might have had it in my possession. I
8   couldn't tell you.
9   Q. Okay.
10  A. I probably have some old Martin Stamping &
11  Stove catalogs, but I don't know that they would be
12  shown as Martin Industries nor that this would be
13  one of them.
14  Q. Now, here on the first page of your notes
15  down in the bottom third of the page, you have
16  written "connect to flue." Do you see that?
17  A. Yes.
18  Q. How come you wrote that down there?
19  A. Why?
20  Q. (Moving head up and down)
21  A. That's what it was. It was connected with
22  a hose, a 3/8-inch ID LP gas hose. They were tying
23  it with a hose to the heater.
24  Q. My question is: The "connect to flue,"
25  what does that refer to?
```

Page 106

```
1   A. Connected to the flue. It's supposed to be
2   connected to the flue at the back.
3   Q. Okay. And who was supposed to connect that
4   to the flue?
5   A. Whoever installed it.
6   Q. Okay. You also have written there on the
7   first page "Gas Nat." What does that refer to?
8   A. Where is "Gas Nat"? I'm lost.
9   Q. I'll tell you what. Let me point out a
10  bunch of stuff, and you can tell me. I think it all
11  came from the same place. All this information
12  right here, the whole way down, do you know where
13  all that information came from?
14  A. It came off the heater.
15  Q. Okay. And we're talking from the entry
16  that says "Model # V24301MS-2" --
17  A. Yes.
18  Q. -- down through -- how far down does that
19  go, everything that came off the heater itself?
20  A. Well, it's down through, I know, manual --
21  maximum gas pressure of 3.5 inches water column. I
22  don't know that it said, "May use blower 2400"; but
23  I would expect that it did.
24      "Connect to flue," I believe, was
25  attached -- was a plate or a small something
```

Page 107

```
1   attached to the back of the heater by the flue
2   opening, and that's just what I believe without
3   looking at the photographs you have in your hand.
4   Q. Okay.
5   A. So down through there would have been on --
6   and the "Martin Stamping & Stove" would probably
7   have been on the plate. "Florence, Alabama, 35630,"
8   I would expect that would be on the plate, also.
9       I'd have to look at the heater or at
10  the photographs to see if I photographed that
11  particular plate or not.
12  Q. Absolutely.
13      MR. HENRY: Could we mark this on the
14  back as McCain Exhibit 6?
15      (Exhibit 6 marked)
16  Q. (BY MR. HENRY) I've marked a photograph
17  McCain Exhibit 6; and, sir, this came out of a
18  packet of photographs that was in the file box that
19  you brought. Now, are these photographs that you've
20  taken?
21  A. Yes.
22  Q. All right. Do you recall taking that
23  photograph?
24  A. Yes.
25  Q. Do you know who that was holding the tape
```

Page 108

```
1   measure?
2   A. No.
3   Q. It was one of the other people there on
4   July 23, though, right?
5   A. I'm sorry?
6   Q. One of the other people there on July 23?
7   A. There were not any other people, did you
8   say?
9   Q. No, no. That's just one of the other
10  people there on July 23?
11  A. Yeah. There were four, five, or six people
12  wandering around, as I recall. But yes, I took a
13  picture of that -- I mean, that photograph; and that
14  is where I got the data that's here.
15  Q. Okay. That's the data plate?
16  A. Yeah.
17  Q. Now, did it say 3.5 inches water column on
18  it; or did it have some other form of measurement on
19  that data plate, if you recall, for the maximum
20  pressure -- or the manifold pressure, I believe that
21  is?
22      And I understand it's difficult to
23  tell from that photo. You've probably got to rely
24  on your --
25  A. And I don't understand your question,
```

GARCIA VS BRK BRAND...NC      CondenseIt™      ELME.. W McCAIN PE VOL I 10-24-00

Page 109

1 really.
2    Q. Well, my question is: This entry here
3 about manifold pressure, do you recall if it
4 specifically said on there 3.5 inches water column
5 or if it was 3.5 and some other form of measurement?
6    A. I don't know what other form of measurement
7 you're talking about. I don't know of another form
8 of measurement you could use to measure either
9 natural or LP gas. That's what we measure them at
10 unless you go to pounds per square inch.
11    Q. 3.5 inches water column is what natural gas
12 is typically delivered, manifold pressure, for a
13 space heater?
14    A. The normal delivery pressure is 6 to
15 8 inches water column to the outlet of the meter at
16 the home, if it's natural gas we're talking about,
17 and then from there into the house with whatever
18 pressure drops you take; but you take pressure drops
19 throughout that system.
20    So that pressure -- without looking at
21 the plate, that could indicate 3 1/2 inches at a
22 drilling on the manifold, you were calling it. It
23 also could indicate manifold pressure 3 1/2 inches
24 water column to the input of the valve.
25    Without a service manual on it, I

Page 110

1 couldn't tell you without really looking at it. It
2 does not tell you in this data.
3    Q. Are natural gas and propane delivered at
4 similar pressures?
5    A. No, no.
6    Q. When liquid propane gas is delivered in
7 the form of a tank, a cylinder, it's got two
8 regulators -- is that right -- a first stage and a
9 second stage?
10    A. Well, that's -- maybe so, maybe not. I've
11 got one at my place right now that has one pressure
12 regulator on it. The pressure regulators are on the
13 equipment as you go through the house and building.
14 So that doesn't -- no, that's not necessarily true.
15    Q. Okay. Do you know --
16    A. It can be or cannot be. If you're
17 delivering at pounds per square inch like 20 or
18 50 pounds per square inch, you might drop it twice;
19 but it isn't necessarily true.
20    Q. Is there an industry standard for -- is
21 there an industry standard for use of propane,
22 residential use?
23    A. LPGA, Liquid Propane Gas Association, might
24 have a standard; but I doubt it. I doubt it. I
25 would expect that they give you a delivery pressure,

Page 111

1 period; and that's it. Whatever regulator you want
2 to use is fine.
3    Q. Do you know if regulators used with propane
4 gas typically come with certain pressures, come with
5 delivery of certain pressures? Say, for example, if
6 I'm going to use propane in my barbecue grill or a
7 space heater in my home or, you know, some other
8 purpose in my home and I go down and I buy a propane
9 tank --
10    A. Yes.
11    Q. -- and I use that with, you know, the
12 regulator for my gas grill or whatever, do you know
13 if that's going to have generally a standard
14 pressure, delivery pressure?
15    A. No, it won't have because LP gas pressure
16 varies as does temperature. If you raise the
17 temperature in a room from -- well, at a house where
18 it's located outside with a 30-gallon tank like we
19 had here and it's at, say, 40 degrees Fahrenheit,
20 liquid propane gas will be at X, whatever pressure
21 that is on a chart that I'd have to pull out; and
22 then if it went to 95 or 100 degrees, that pressure
23 would increase proportionally, but not a straight
24 line function, until it got to a much higher
25 pressure.

Page 112

1    So you can't just say blanket -- make
2 a blanket statement like that that it's delivered at
3 a pressure, period.
4    Q. Well, now, when you're talking about
5 pressure variations depending on temperature --
6    A. Yes.
7    Q. -- that's the pressure primarily inside the
8 vessel itself, is it not?
9    A. That's right, but that's what comes out.
10    Q. That's right. But isn't the regulator
11 designed to control the pressure at which it's
12 delivered to the appliance?
13    A. It's designed, supposedly, to do that but
14 that's nothing but a spring-operated regulator and
15 that spring moves as does the inlet pressure to the
16 inlet side of it.
17    So you can't just say that it will
18 give you 5 pounds per square inch, just to use a
19 number, continually and at all times. You just
20 can't say that because as that spring wears, as
21 people move it, as people use it, then you get
22 varying pressures on the outlet side.
23    Q. But if we're talking variations -- and I
24 don't disagree that there might be some -- we're
25 talking perhaps a few inches water column as opposed

Page 113

1 to tens or hundreds of inches water column?
2    A. Yes.
3    Q. Perhaps 3 to 5 inches water column
4 variation?
5    A. Yes.
6    Q. Okay. You'd said earlier in your
7 deposition that it's -- that without having the
8 regulator and the fuel system for this specific
9 heater in the Cruz house, you don't know the
10 pressure at which the fuel was delivered; is that
11 right?
12    A. That's correct.
13    Q. Is there any way to make a reasonable
14 estimation of what that pressure would have been?
15    A. No.
16    Q. Why not?
17    A. You could say it would be to a maximum that
18 perhaps the tank would generate at that
19 temperature. That would be as high as it could go,
20 but you couldn't say how low it would go because you
21 don't know what regulator was on it. Was it a Regal
22 regulator, which is used on LP gas a lot, or EGO?
23    So you can't say with any certainty
24 what pressure it was set at because if a guy goes
25 down there and screws down a little bit every time

Page 114

1 he turns it and looks at the dial, he's increasing
2 the pressure, if there's a dial on it. He's
3 increasing that pressure. As he increases the
4 pressure, he increases the flow to the heater. As
5 you increase the flow to the heater, you increase
6 the soot output or smoke or whatever you may be
7 generating; or you may just get enough to burn the
8 heater.
9    Q. Within the pressure that the regulator
10 allows?
11    A. To some maximum that the spring intensity
12 will allow. That's correct.
13    Q. Right. And the variation being anywhere
14 from, you know, zero to a few inches water column?
15    A. The variation could be greater than that
16 because nothing -- regulators -- and I know you
17 don't want me to start teaching classes here because
18 it could get drawn out.
19    But regulators are made of springs and
20 orifices. As you screw down on that spring, you're
21 opening the orifices and causing them to meet
22 greater so that you get a full flow through there to
23 the point that you get to the point you're shooting
24 completely all you can get through there at that
25 pressure.

**Page 115**

1 Now, what pressure is that? I don't
2 know. Nobody knows what pressure that was. It was
3 high enough to create a lot of soot, we know that.
4 That's one thing we do know.
5 Now -- but that pressure in inches
6 water column we don't know because -- and you
7 wouldn't probably measure it in inches water column,
8 frankly. You'd probably get above a half pound of
9 LP gas pressure, but I can't tell you that until I
10 looked at the orifice size used by Martin.
11 Q. What's the conversion between what you just
12 said, the half pound -- is that right, half pound
13 pressure?
14 A. Uh-huh.
15 Q. -- and inches water column? Do you know?
16 A. I think -- and I could stand corrected
17 because engineers know a lot of numbers, but they
18 usually have to look them up. I think it's
19 35 approximate inches water column to 1 pound per
20 square inch, but that's to the best of my
21 recollection.
22 Q. So a half a pound would be roughly --
23 A. 17.
24 Q. There you go. Inches water column?
25 A. Yes.

**Page 116**

1 Q. Okay. But you don't know that?
2 A. That's pretty close. I've dealt with a lot
3 of LP gas. You know, I --
4 Q. And because you don't know the pressure,
5 it's impossible for you to predict how much carbon
6 monoxide was produced versus how much soot?
7 A. That's correct, because you don't know how
8 much gas you're putting in.
9 Q. And you don't know whether large amounts of
10 carbon monoxide preceded the soot production?
11 A. That's correct. But you know -- you know
12 how far open you can open the vanes, the air shutter
13 opening. You know how much air you can get in
14 there, but how much gas can you get through it?
15 Because all this blue and red flame stuff is a bunch
16 of mess; but when you get red, supposedly you're
17 creating more soot. That's not necessarily the
18 case. You might have a blue flame. I can create a
19 lot of soot with blue flame.
20 Now, if you could open that to just
21 infinity, that hole, that vane that you're opening
22 for air, primary air, then you could burn all the
23 gas. You could burn it out the front of the heater
24 and probably not create any soot, but you'd create a
25 lot of heat.

**Page 117**

1 Q. Right.
2 A. So you don't use all 2500 BTU's per gallon
3 that you have of LP gas ability to produce heat.
4 Q. But the BTU's that you have written here,
5 the 30,000 BTU's input max, that's based on natural
6 gas; is that right?
7 A. That's what the catalog said. That's
8 correct.
9 Q. And in fact, it would be higher for
10 propane?
11 A. You'd put more -- if you put the same
12 amount of gas through the same hole, you'd create
13 two and a half times as much. You'd use two and a
14 half times as much gas as you would natural gas.
15 Q. Okay.
16 A. It's 1,000 BTU's and 2500 BTU's. That's
17 the --
18 MR. MARCHAN: Ms. Court Reporter, on
19 the spelling of "vane," it's v-a-n-e.
20 THE REPORTER: Thanks.
21 (Discussion off the record)
22 Q. (BY MR. HENRY) Earlier in your deposition
23 when you were talking about the amount of soot
24 produced, you referred to it in pounds. You said
25 pounds of soot were produced; is that right? Do you

**Page 118**

1 recall that?
2 A. I recall that, but that was just a broad
3 statement. How many pounds, I don't know. I don't
4 know that a pound was produced. Soot is light.
5 Q. I'm not going to ask you how many --
6 A. Don't ask me how many pounds. Lord, we'd
7 be here all day. I could calculate it, but it would
8 be wrong because it would be a theoretical number.
9 Q. That's not where I was going.
10 You used that reference to say there
11 was a heck of a lot of soot produced?
12 A. That's what I meant.
13 Q. I understand.
14 A. Yes.
15 Q. Take a look at Page 2 of your notes, either
16 the exhibit here or your originals.
17 A. Yeah, uh-huh. All right, sir.
18 Q. Now, down there, there's something written
19 there that says "Normal soot inside heater"; is that
20 right?
21 A. Yes, on the burner. That's what I'm
22 referring to.
23 Q. On the burner?
24 A. Yes.
25 Q. Why do you think that there was normal soot

**Page 119**

1 on the burner, yet you had this impression that
2 there was lots of soot that was produced?
3 A. Because you blow it off. As you increase
4 pressure and increase capacity through the orifices
5 or the raised portions of the burner, you will blow
6 off -- that's where the soot comes from. You blow
7 it off and it comes out the back and goes up on the
8 ceiling because it's extremely light and it will
9 adhere to the walls or the ceiling or whatever or
10 you if you're standing there.
11 Q. Sticky stuff?
12 A. Yeah. So that's what I was referring to
13 there. I was looking at the burners particularly
14 because if the burner had been just clean as a
15 whistle and there had been no soot on the back at
16 the vent, I would have said, "Well, the soot didn't
17 come from this heater."
18 But when I saw that it was normal soot
19 in here but there was soot on the outlet inside the
20 heater that was knocked off at Armstrong's as well
21 as prior to that, I mean, on the floor, a pile of
22 it, I knew where it came from, from the heater.
23 Q. Is that a pretty clear sign that this was a
24 ventilation-controlled burn -- not enough oxygen,
25 too much fuel?

**Page 120**

1 A. Yes.
2 Q. Do you have any direct knowledge of how
3 this space heater was installed, the one in
4 Mr. Cruz's house?
5 A. No. It had probably or possibly been moved
6 before I ever saw it. It was sitting with the
7 outlet, the vent, in toward the bedroom and the
8 smoke detector, I was told, was mounted in the hall
9 on the right-hand side and the bedroom is in the
10 back past the bathroom.
11 That's the only thing that I know
12 about it. Directly, I have no direct knowledge.
13 Someone else had been there. As a matter of fact,
14 probably a number of people had been there.
15 Q. Okay. It's your understanding, though,
16 that this space heater was connected to propane gas
17 as opposed to natural gas?
18 A. Yes.
19 Q. And that there was no vent connected to --
20 or flue connected to the 4-inch vent in the back?
21 A. Yes.
22 Q. As part of your work in this case, did you
23 take a look at any regulations that might apply in
24 this case, such as NFPA 58 or 54 or the Texas
25 Railroad Commission regulations for distribution of

Page 121

1 gas, natural gas?
2   A. Of natural gas?
3   Q. Or liquid propane gas.
4   A. I was going to say, we didn't have any
5 natural gas there.
6        I'm very familiar with 54 and 58. I
7 served on a committee that wrote part of 58 but I --
8 I didn't have to look at them. What are you
9 referring to? I mean --
10   Q. No. I'm just asking if you referred to
11 them in this specific case, but you're saying that
12 you're familiar enough with them that you didn't
13 need to?
14   A. In my opinion, I am. Now, in your opinion,
15 I might not be; but in my opinion, I am.
16   Q. Have you had the opportunity to examine the
17 tank or the regulator that was involved in this
18 case?
19   A. I looked at the tank. There was no
20 regulator. I looked at a tank, a 30-gallon tank,
21 that was down there. I was told that there was a
22 30-gallon tank under the house.
23        But the regulator, I've never seen,
24 never heard of. I don't know where it went. As a
25 matter of fact, I don't even think I know where the

Page 122

1 tank went or I would have taken all the numbers and
2 taken pictures of it. There are no pictures of it,
3 are there?
4   Q. Of the tank?
5   A. Yes.
6   Q. There are no pictures of it here in this
7 pile of pictures you produced. However, I believe
8 that we have produced pictures of the tank in this
9 case.
10   A. With the regulator?
11   Q. No.
12   A. Okay. Sorry about that.
13   Q. No, no. That's fine.
14   A. I was going to say, let me see the
15 regulator.
16   Q. I'd be happy to show it to you if we had
17 it.
18        When did you see the tank?
19   A. Same day I saw the chickens.
20   Q. And by that, you mean -- was it July 23?
21 August 12, July 23, which was it?
22   A. Yes, I was out there. The day we were all
23 there, the tank was sitting under the house -- or a
24 tank, a 30-gallon tank, was sitting under the
25 house. Now, the piping and all had been taken

Page 123

1 loose. The heater would have been taken to, I
2 think, Brownsville.
3        The smoke detector was gone, but we
4 were looking at the house. And the most knowledge I
5 have from soot and so forth and so on prior to
6 removal are from these photographs that were
7 produced by someone.
8   Q. Right. I think that's the sheriff's
9 office?
10   A. Yeah.
11   Q. Are you familiar with NFPA 921?
12   A. 921? Generally, but not specifically.
13   Q. Would you agree that it's a reference used
14 in the investigation of fire and explosions?
15   A. Well, yes. However, that's used by cause
16 and origin people more so than engineers like myself
17 that -- I'm not a cause and origin expert. I can
18 tell you a lot more about a fire sometimes than the
19 cause and origin expert, I think; but that's just
20 ego.
21   Q. And I understand that. Let me show you
22 here what -- this is -- this is a 1988 edition of
23 NFPA 921, and what I've highlighted here is a
24 reference that talks about --
25   A. 1943?

Page 124

1   Q. Yeah -- pressure regulators and the working
2 pressure here.
3   A. Yeah.
4   Q. Can you take a look at that?
5   A. Sure. It's in one of two stages. See,
6 you could use one stage or two stages by
7 regulating to a working pressure of 11 inches to
8 14 1/2 inches. So that means if you take that and
9 square the amount of area that you've got on that
10 0.84, you're going to put probably, hell, five or
11 six times as much gas through it as you would if you
12 were dealing with just a natural gas orifice. I'm
13 just using some engineering. It's quick engineering
14 instead of explaining it, but that's what --
15   MS. SALINAS: Go ahead and wait for
16 him to ask a question, if you don't mind.
17   THE WITNESS: I'm sorry.
18   Q. (BY MR. HENRY) It's my understanding that
19 this section here is talking specifically about
20 propane.
21   A. It is.
22   Q. And from your review of this and from your
23 experience in working with, you know, pressure
24 vessels and regulators and gas-fueled appliances, is
25 this a fair representation where it talks about the

Page 125

1 working pressure, 11 inches water column and
2 14 inches water column?
3   A. Yes.
4   Q. Okay. I'm sorry.
5   A. That's all right. I was reading the last
6 sentence.
7   Q. And the reason I ask you that is, I mean,
8 we've talked now at length about it; and I'd asked
9 you if there's any way you could make a reasonable
10 assumption. And is it -- would it be a reasonable
11 assumption to assume that in this case the propane
12 was being delivered at the working pressure that
13 they talked about there in NFPA 921?
14   A. You just don't know.
15   Q. Okay.
16   A. When you start making assumptions like that
17 as an engineer, then you're stepping in mud. It
18 gets deeper as you go.
19   Q. Okay.
20   A. You've got to know, or don't do it. You
21 start making assumptions -- unless you're going to
22 let me assume the whole case, I can't assume.
23   Q. Fair enough.
24   MS. SALINAS: Excuse me, Mr. Henry.
25 Only because it was referred to, do you think that

Page 126

1 before the deposition is over we can get a copy of
2 that one page and attach it as an exhibit?
3   MR. HENRY: We could do that if you
4 like.
5   MS. SALINAS: Thank you.
6   Q. (BY MR. HENRY) You've had a chance to
7 examine the space heater?
8   A. Yes.
9   Q. Did you examine it as well at
10 Dr. Armstrong's laboratory the day you were there
11 to --
12   A. No.
13   Q. -- observe?
14   A. I looked at it, and that was all. It sat
15 on a table, and they installed it. I did not get
16 the opportunity to -- I was told it would come to me
17 after it left there. That's the reason I didn't go
18 into length about it.
19   Q. Did you have a chance to take a look at the
20 orifice to determine if it was configured for
21 propane or natural gas?
22   A. That's what I wanted to do when I got it,
23 but I never did get that chance. So the answer is
24 no.
25   Q. Okay. This specific space heater was

GARCIA VS BRK BRANDS INC          CondenseIt™          ELMER W McCAIN PE VOL I 10-24-00

**Page 127**

1 required to be vented, right?
2   A. Yes.
3   Q. And if it had been properly vented, the
4 flue connected to the vent on the back and piped to
5 the outside of the house, would that have prevented
6 the products of combustion from entering the house?
7   A. You don't know that until you run a test on
8 it because when you use LP instead of natural, it
9 could come out the front. As a matter of fact, I
10 would expect a lot of the products of combustion to
11 come out with the burn and with the heat and still
12 flow into the room because you have such increased
13 input and your output is the same and you can't get
14 it all through that 4-inch hole.
15   Q. Okay. Do you think properly venting the
16 space heater in this case would have had any impact
17 on the reduction of available oxygen within
18 Mr. Cruz's house?
19   A. You don't know, for the same reason.
20 Perhaps so. It should put some of the products of
21 combustion outside. If you assume -- and here we're
22 assuming now -- flow of air through under doors,
23 windows, if a window was cracked, and so forth, then
24 perhaps you would increase the amount of oxygen
25 available; but you might not, at the same time, if

**Page 128**

1 you leave that assumption out.
2   Q. Before we go off your notes, can I just
3 have you take a look at the third page?
4   A. Yes, sir, I have the third page now --
5 well, Page 2. I'm sorry. Yes.
6   Q. These are notes you made of Mr. Cruz's
7 house, the dimensions?
8   A. Yes.
9   Q. Okay. Down at the bottom away from the
10 house, there's a separate dimension there that
11 shows, you know, a line and then a U-shaped box,
12 6 1/4, 3 inches. Do you see that?
13   A. Yes.
14   Q. Is that the soffit that sticks down going
15 into the hallway of his house?
16   A. Yes.
17   Q. Can I have you take a look at Exhibit 5
18 now, which is the Martin Industries data sheet?
19   A. Sure.
20   Q. Down here in the second paragraph --
21   A. All right, sir.
22   Q. -- this says that the "heaters require
23 oxygen from the room for combustion."
24   A. Yes, sir.
25   Q. How is the oxygen in the room replenished?

**Page 129**

1 If this heater is burning the oxygen that's
2 available in the room, how is that oxygen
3 replenished?
4   A. Infiltration.
5   Q. From where?
6   A. Doors, windows, cracks.
7   Q. This paragraph goes on to say: "It is most
8 convenient to leave a window slightly open, or else
9 make an opening in the foundation and floor to allow
10 outside air into the room." Is that right, that's
11 what it says?
12   A. Yes.
13   Q. Does that mean that whoever is using this
14 heater has to make a provision -- either open a
15 door, a window, make some physical opening in the
16 house -- so that sufficient oxygen can be drawn in
17 to be burned?
18   A. Well, it says: "Sometimes it is most
19 convenient to leave a window slightly open" and so
20 forth, "sometimes." And if you see these when
21 you're installing and you read them, you would
22 expect them to say, "Well, I need to do one of these
23 unless I have enough air being infiltrated."
24     So "sometimes it is most convenient."
25 It doesn't say "always." That doesn't mean all the

**Page 130**

1 time it's convenient to do that. It doesn't mean
2 all the time that you see this document.
3   Q. If this heater, the one that's in
4 Mr. Cruz's house, is not properly vented and it's
5 venting all of the products of combustion into the
6 room, does that have any impact on the oxygen
7 available to burn?
8   A. Yes.
9   Q. Okay. And what impact is that?
10   A. It will decrease. As you increase heat
11 and -- you'll decrease the oxygen and increase the
12 heat and increase the carbon output.
13   Q. Typical oxygen available for us to breathe,
14 for example, even in this room is 20, 22 percent?
15   A. Well, yours is higher than mine. It's
16 21 percent, 20.9. That's all right. I'll go with
17 22.
18   Q. That's fair. And as a heater like this
19 continues to vent into the atmosphere that the
20 burner is in, it's going to reduce that as the
21 air -- or the available atmosphere becomes taken up
22 with carbon dioxide, water vapors, aerosols, carbon,
23 carbon monoxide? It literally pushes the other
24 oxygen out of the room; is that right?
25   A. Yeah, but --

**Page 131**

1     MS. SALINAS: Objection, form.
2   A. Yes, but a lot of those things you said are
3 so minute you wouldn't even calculate them. But
4 carbon monoxide, carbon dioxide, yes.
5   Q. (BY MR. HENRY) Okay. Now, based on your
6 knowledge and experience with gas-fueled appliances
7 and the applicable regulations -- okay?
8   A. Yes, sir.
9   Q. -- I want to go down and ask you a series
10 of questions about this specific heater.
11   A. All right.
12   Q. Was Mr. Cruz responsible to ensure that the
13 heater was properly configured to burn whatever fuel
14 was available? And by that I mean was Mr. Cruz
15 responsible to make sure that it either had the
16 proper orifice or the proper fuel?
17     MS. SALINAS: Objection, form.
18   A. I have no idea who was responsible. I have
19 no idea who furnished the heater, who installed the
20 heater, or who put the LP gas to it. So I don't
21 know.
22   Q. (BY MR. HENRY) Well, and in that vein, let
23 me ask you if the licensee or the distributor of LP
24 gas was responsible to make sure that he was
25 delivering propane for the proper appliance or

**Page 132**

1 selling propane for the proper appliance?
2   A. If he was delivering propane. See, people
3 go and pick up 30-gallon bottles; and nobody knows
4 what they're being used for -- like you said, a
5 cookout, a grill, et cetera. And so you just don't
6 know.
7     And the guy -- if XYZ installed it
8 before Cruz ever got there, or something to that
9 order, and he went down and picked up a bottle and
10 tied it to the line through not knowing, not reading
11 this, not even having a copy of it -- because this
12 thing probably wasn't even printed when he was still
13 alive. And I say it with tongue in cheek; but you
14 just don't know because you don't know these facts,
15 again, because you're leading into -- and I'm going
16 into facts that I'm not knowledgeable about, about
17 who did it, when they did it, how they did it, or
18 why they did it. I don't have those facts.
19   Q. Was Mr. Cruz responsible to ensure that the
20 space heater was properly vented?
21   A. You would expect him to know that if he
22 knew about heaters; but if he just needed heat and
23 fired up a heater that's sitting there, you wouldn't
24 expect him to worry about whether it's vented or
25 not. He might think that's where the heat comes

GARCIA VS BRK BRANDS, INC          CondenseIt™          ELMER W McCAIN PE VOL I 10-24-00

**Page 145**

1  A. Just that test.
2  Q. Okay.
3  A. They had the other tests, I think, that
4  they molded into and with that test.
5  Q. Okay. You also inspected the smoke
6  detector on August 12; is that right?
7  A. Yes.
8  Q. Did you touch the smoke detector at all?
9  A. Yes.
10 Q. Did you have anything on your hands to
11 protect, you know, from -- to protect the smoke
12 detector from disturbing the soot?
13 A. I had a pair of plastic gloves is all.
14 Q. Okay.
15 A. But it had been -- there were so many
16 handprints on it.
17 Q. What components, if any, did you
18 specifically examine? Did you look at anything
19 specific on that smoke detector?
20 A. I looked at the inside of the cover inside
21 of the smoke detector, the battery area, to see
22 that -- and stuck the battery down to be sure that
23 it covered the area that was -- where there was no
24 smoke, no soot. I looked to be sure that the
25 battery had been plugged in. That was one of my

**Page 146**

1  questions. The other was how much soot and smoke,
2  particularly smoke because soot had been knocked
3  out, was in the detector. Those are the areas I was
4  looking at.
5  Q. Did you look at the battery itself?
6  A. I looked at it, didn't test it. Yes.
7  Q. You didn't test the voltage on it or
8  anything?
9  A. No.
10 Q. Did you connect the battery when you were
11 examining it?
12 A. No, no. I did not want to do anything that
13 might change the look or anyone else's opinions
14 looking at the plug in, plug out, the female, male
15 fittings on that battery.
16 Q. Did you observe any -- or examine any parts
17 of the smoke detector microscopically or use any
18 other visual aids to --
19 A. No.
20 Q. Okay.
21 A. Took some pictures, which you have there in
22 that packet.
23 Q. Now that you mention the pictures, I
24 counted 32 pictures. Does that sound right?
25 A. If you -- it does to me if it does to you.

**Page 147**

1  Q. Okay. Those are being copied right now.
2  We're going to mark those later as an exhibit.
3  A. Sure.
4       MR. HENRY: And just to put on the
5  record to make it clear, because I made a statement
6  on the record before we took the break, the
7  photographs produced with the cover sheet that says
8  "Wayne McCain Photos, 24 pages" include a number of
9  photos that Mr. McCain did not take.
10      THE WITNESS: Yes.
11      MR. HENRY: So that's why we're going
12 to have his photographs marked and entered on the
13 record separately.
14 Q. (BY MR. HENRY) Okay. Now, you say you
15 looked to see if the battery was installed; is that
16 right?
17 A. Yes.
18 Q. And what did you determine?
19 A. It was installed. The battery was in place
20 when the smoke detector was in the area that the
21 smoke and soot entered the area --
22 Q. Now, when you --
23 A. -- in my opinion.
24 Q. -- when you say that the battery was
25 installed, you mean it was inside the retaining

**Page 148**

1  brackets; is that right?
2  A. It was clean and plugged in. The brackets
3  were clean -- the bracket was clean under it, as
4  well as the male and female fittings that it would
5  plug into were clean.
6  Q. All right. So it's your opinion that there
7  were no soot deposits on the male and female end?
8  A. That's correct.
9  Q. Okay. All right. What I'd like to do is
10 I'd like to show you some photographs that were
11 taken by Dr. Striet; and she took these photographs
12 on April 20, 1999. This was the first time that
13 we'd had an opportunity to take a look at the smoke
14 detector.
15      MS. SALINAS: Can I see them?
16      MR. HENRY: (Complies).
17      I was only going to show him like a
18 couple of those in there.
19      THE WITNESS: Please show me two.
20      MR. HENRY: Yeah. I don't think it's
21 necessary we go through all of them.
22      Now I'm going to mark -- let me see.
23 I'm sorry.
24      THE WITNESS: That's all right.
25      MR. HENRY: I just want to put it on

**Page 149**

1  the record. The photograph identified as Roll 874,
2  Frame 14, we'll mark as Exhibit 8; and the
3  photograph Roll 874, Frame 6 will be Exhibit 9.
4       (Exhibits 8 and 9 marked)
5  Q. (BY MR. HENRY) Now, Mr. McCain, I'm only
6  using these photographs because I think they
7  represent the smoke detector probably better than
8  the photographs you've taken; and also, your
9  photographs aren't here right now. They're being
10 copied.
11 A. Sure.
12 Q. And what I'd like to ask you is -- you've
13 already testified about this portion here within the
14 brackets is clean, and that indicates to you that a
15 battery was installed; is that right?
16 A. Yes, that's correct.
17 Q. You've also testified that the male and
18 female ends of the battery terminals on the detector
19 were clean.
20 A. Yes.
21 Q. Is that what this photograph depicts?
22 A. It does to me. This slides inside; this
23 slides outside. And even though you're looking at
24 the outside of this, see, you'd slide inside here
25 and outside here.

**Page 150**

1       Yes, it depicts -- it shows that
2  they're clean, to me, particularly as compared to
3  any other area that you have with soot and smoke out
4  here. If you're going to gather soot, particularly,
5  it will gather on metal parts and -- if they're
6  available. So it shows that to me.
7       But the best view of all that -- this
8  is Exhibits 8 and 9 I'm talking about.
9       The best view of that information is
10 looking at the female and male fittings in person, I
11 mean, by having them in front of you, of course,
12 because you're looking at a photograph where you're
13 looking down and you're seeing a shadow on top of
14 the female fitting on the left-hand side on
15 Exhibit 8. You're also looking at some shadows on
16 the right-hand side, which is the male fitting. So
17 shadows show more than you would think in a
18 photograph on metal of that type.
19      MR. HENRY: Okay. This is Roll 1061,
20 Frame 2 I'd like to have marked as Exhibit 10.
21      (Exhibit 10 marked)
22 Q. (BY MR. HENRY) Again, this is another
23 photograph taken by Dr. Striet of the smoke
24 detector.
25 A. Sure.

GARCIA VS BRK BRANDS INC        CondenseIt™    ELMER W McCAIN PE VOL I 10-24-00

Page 151

1  Q. And now we're looking straight down on
2  those battery terminals.
3  A. Sure.
4  Q. And is it your testimony that the darkness
5  we see here around the male terminal --
6  A. Where are you talking about "around" now?
7  Q. Well, both here on the base and also on the
8  portion that sticks out as well as -- yeah, I'm
9  sorry. This portion around here --
10  A. Well, see, you can get to that even if you
11  have your battery in there because it doesn't snug
12  up against that. It stops when it gets into this,
13  the female fitting, as far as it will go on this
14  side --
15  Q. Okay.
16  A. -- as well as here. So there's a very
17  small -- but it's there -- gap that you could get
18  anything into; and that's where soot and smoke will
19  gather, frankly.
20  Q. Okay. And this darkness here around the
21  outside and on the face of it is not soot?
22  A. On the face of it, you wouldn't have a
23  thing in the world anyway. No, it is not soot. It
24  was not soot when I looked at it, and you're showing
25  it here as a shadow here but no shadow here except

Page 152

1  until you move down. So --
2  Q. All right.
3  A. I'm sorry, but you're seeing a lot of
4  shadow work.
5  Q. Well, now, Exhibit 9 is the battery that
6  was --
7  A. Yes.
8  Q. -- produced with the smoke detector. Do
9  you see any soot anywhere on that battery?
10  A. Let me --
11  Q. Go ahead.
12  A. This is Exhibit 9. And inside on the
13  female fitting, you see how clean it is? You see
14  how clean the outside of this is? I mean, to your
15  eye it might show soot there; but it does not to
16  me. And when I looked at it personally, there was
17  no soot there.
18  Q. No, sir. I believe it's absolutely clean
19  as well. In fact --
20  A. Good. We agree on something.
21  Q. -- I'd like you to look at the entire
22  battery and tell me if you see soot anywhere on that
23  battery.
24  A. Some soot along the upper edge here maybe
25  if that's not a -- there's a shadow that's coming

Page 153

1  off that, too. It's a black battery. It's hard to
2  look for soot on a black battery, isn't it?
3  Q. We've got white words "Panasonic" there.
4  Do you see any soot there, sir?
5  A. No. But here again, you need to look at
6  the -- you need to take it and wipe it probably; and
7  somebody probably has, frankly. But it's white as
8  snow to me. Maybe my eyes are bad if you say
9  there's soot on it. I don't see any soot on it.
10  Q. No, sir, I don't see any either.
11  A. It appeared to me that the battery was
12  installed because I knew that --
13  Q. From the markings on the compartment?
14  A. Markings on the compartment and the
15  battery. The battery was turned around. When I got
16  there and looked at it, it was turned reverse. And
17  so I looked at it, looked at the fittings, looked at
18  the male/female fittings in and out on both ends;
19  and it was clean, in my opinion.
20  Q. Did you take any notes concerning the smoke
21  detector like you did on the heater?
22  A. Nothing but "1st Alert." This is -- I
23  stick something like this, "Soot and smoke inside";
24  "1st Alert - Aurora, Illinois"; "Model #SA67D" --
25  THE REPORTER: Slow down, sir.

Page 154

1  THE WITNESS: I'm sorry.
2  A. I said "1st Alert - Aurora, Illinois";
3  model, "Mod #SA67D"; "Soot & smoke inside." "SS
4  office." It was not SS's office, but "8/12/99."
5  Q. (BY MR. HENRY) Okay.
6  A. That occurred at Mr. Marchan's office.
7  Q. The bottom half of this piece of note
8  paper, there looks to be additional information
9  about the heater; is that right?
10  A. Same numbers that we looked at over there.
11  Yes, it is.
12  Q. That's right. And these were made on
13  December 14 when you went up to Dr. Armstrong's?
14  A. Yes.
15  MR. HENRY: I'd like to mark this as
16  Exhibit 7, but I'll mark a copy when we make a copy.
17  MS. SALINAS: We already have a 7.
18  MR. HENRY: I'm sorry. I meant 11.
19  We'll mark that as 11.
20  THE WITNESS: You want me to take it
21  out and put it over here?
22  MR. HENRY: If you'll take it out,
23  that way we'll remember.
24  Q. (BY MR. HENRY) Have you taken any
25  videotape at all in this case?

Page 155

1  A. No, sir.
2  Q. When you inspected Mr. Cruz's house, what
3  was the purpose of your inspection?
4  A. I guess I'm a nosy engineer. I wanted to
5  see what happened, where it happened, soot, smoke,
6  where the heater was, where the tank was, all the --
7  I like to put all those things together. I don't
8  want to hear somebody tell me those things. I want
9  to know because I saw them.
10  Q. Okay. And you say you recall seeing the
11  tank at his house on July 23?
12  A. I've got to rethink that. There may be and
13  may not have been. I know that one of the gentlemen
14  there said there was a 30-gallon tank sitting right
15  there, and I know there was some chickens out there
16  in some coops. I'll never forget those.
17  But whether there was a tank there or
18  not, I don't know. Unless it's in there or here, I
19  won't have that information; but it may not have
20  been there.
21  Q. All right. And the smoke detector wasn't
22  installed when you were at his house, was it?
23  A. No.
24  Q. Was there anything that you could rely on
25  to figure out where the smoke detector was when you

Page 156

1  were at his house?
2  A. No. The firemen's photographs and what I
3  had been told by people who were there -- I can't
4  remember the gentleman's name that took the
5  photographs of the smoke detector on the wall -- is
6  all I could go by.
7  Q. You took a lot of measurements when you
8  were out there?
9  A. Yes.
10  Q. Every room?
11  A. Yes.
12  Q. Every window?
13  A. Yes.
14  Q. Every door opening?
15  A. I can't say "every" but the ones that are
16  in my notes are the ones that I took and I took a
17  lot of them and then I was told that somebody was
18  going to make a drawing and send it to me.
19  But I took all the dimensions that are on Page, I
20  guess, 3 or 4 -- 3, yeah, of my notes.
21  Q. Right, which is Exhibit 4. And why were
22  those measurements important to you?
23  A. Again, I don't know what I'll need when I
24  go back to sit down and analyze what I have. I
25  don't know what people won't be trying to tell me. I

Q & A REPORTING, INC. (713) 439-7441

Page 157

1 want to know myself what's there, what the sizes
2 are, the dimensional data, et cetera.
3   Q. Okay. That's important when you're trying
4 to figure out how this space heater operated, right,
5 the amount of oxygen available, products of
6 combustion being produced?
7   A. To an engineer who's going to express
8 opinions in a case of this type, it's necessary, in
9 my opinion, to get all the data and information that
10 you can so that you render opinions which are
11 correct to the best of your knowledge and to an
12 engineering certainty. And that's the way -- the
13 reason I do all those things.
14   Q. Okay. One of the documents you listed in
15 your report is one called "CPSC Smoke Detector
16 Operability Survey Report on Findings." Are you
17 familiar with that document?
18   A. Unless it's in the binder -- that's listed
19 in my report itself, in my report that was given the
20 Court that we sent?
21   Q. It was.
22   A. Let me go back and see what you're talking
23 about. What page is it on, if you don't mind
24 leading me through my own report? It's probably on
25 2 or 3.

Page 158

1   Q. On Page 3, Item 4A.
2   A. 3 under product -- oh, CPSC information.
3 Is that what -- oh, "Smoke Detector Operability
4 Survey Report on Findings." It's either in this
5 binder, in the box, or I took it and read it at the
6 Birmingham Public Library, one of the three.
7   Q. Yes, sir. Well, my question is --
8   A. I don't recall reading it; and I don't
9 recall specifics about it, if that's what you're
10 asking.
11   Q. It is. Have you relied on that report or
12 material in that report in rendering your opinion in
13 this case?
14   A. I've relied on all of these things that I
15 said earlier. I can't just wipe out some things;
16 but that specific information, unless you pointed
17 out some information or I took it and read it again,
18 I wouldn't be able to point out any particular thing
19 about it.
20   Q. Okay. Did you review -- in this box of
21 materials there's a statement, an affidavit, of
22 Rosalinda Perez and I believe an affidavit from
23 Jose Garcia.
24   A. Yes.
25   Q. Do you recall those two documents?

Page 159

1   A. Yes. I read those.
2   Q. Okay. And there's also in that box a
3 series of documents that we produced -- "we" being
4 BRK -- produced this summer that dealt with the
5 issue of corrosion. Did you review those documents?
6   A. I looked at those documents. That's
7 right. I have Jose Garcia's here. I have his
8 drawing. But yes, I have looked at those documents
9 and either -- yes, I've looked at them.
10   Q. What I have here is the "Smoke Detector
11 Operability Survey Report on Findings," revised
12 October, 1994. I'm going to have this one marked as
13 Exhibit 12.
14       (Exhibit 12 marked)
15   A. Yes, I looked at this and scanned it and
16 looked at some of the information in it. I surely
17 did. None of it, in my opinion, was directly
18 applicable to this case. So I then put it back in
19 the box and kept it.
20   Q. (BY MR. HENRY) Are you going to testify
21 about contact corrosion in this case?
22   A. No.
23   Q. You have no opinion --
24   A. No.
25   Q. Do you have no opinion on contact corrosion

Page 160

1 in this case?
2   A. No, sir. That's -- I'm leaving -- that's
3 up to the gentleman who's handling contact
4 corrosion. I think it's Dr. Aronstein or
5 something. I read the initial deposition by him.
6 No, I'm not going to testify about it.
7   Q. Okay. It's your understanding, though,
8 that this report is not applicable to this case or
9 it's just not applicable to your opinion in this
10 case?
11   A. My opinions.
12   Q. All right. Are you aware that nearly
13 20 percent of the detectors from that sample were
14 found without power?
15   A. I would accept that if you say that.
16   Q. Do you agree that a central holding of that
17 report is that the most common cause of smoke
18 detector failure or smoke detectors being inoperable
19 was because of lack of power or a nonfunctioning
20 power source?
21   A. Whose data is being used to determine that
22 is what I was looking for.
23   Q. Fair enough. I'm just basically going
24 from -- these questions are coming from kind of like
25 the executive summary or the --

Page 161

1   A. Yeah, I saw it in here.
2       I would say this: Who's put this
3 together with respect to the data that you're
4 using? If it was BRK, I'd say we need to look at
5 it. If it was CPSC, I'd still say we need to look
6 at it because you don't have the -- if you look at
7 National Fire Incident Reporting System and NFPA and
8 average all these things together, I'd say you
9 probably have a reasonable number.
10       Now, the percentages, no, I didn't
11 look at those. It would shock me a little bit if I
12 was told and they substantiated that the lack of
13 power was the normal -- or 20 percent, I think you
14 said, causes of failures. But I've heard that from
15 Dr. Rork -- I guess he has a doctorate -- several
16 times.
17   Q. I'm specifically talking about this
18 report, which is the CPSC report, "this" one being
19 Exhibit 12?
20   A. Yes.
21   Q. And if you look on Page ii, the paragraph
22 next to the end?
23   A. ii in the --
24   Q. The very beginning.
25   A. All right. This is the "Executive

Page 162

1 Summary." What now? Where?
2   Q. The next to the last paragraph on the
3 second line, it begins: "This," meaning
4 nonfunctioning power sources, "was by far the most
5 common cause of smoke detector inoperability."
6   A. What paragraph are you on, again? I'm
7 sorry.
8   Q. That's all right.
9   A. ii?
10   Q. Right down here.
11   A. Well, they say -- yeah, I see that, yes.
12   Q. Okay.
13   A. But who did the interviews, where did they
14 do the interviews, and how many people did they
15 interview? That's kind of like a political -- some
16 of these political percentages we get. Who did it,
17 where did they do it, what part of the country did
18 they do it in, and who was doing them?
19       A total of 1,012 people were
20 interviewed, it says here, between October 1 and
21 December 23, '92. And how many million were sold?
22 What percentage is that? Probably a small
23 percentage. I would expect, a very small percentage.
24   Q. Well, when you find 20 percent out of
25 1,000, that's a fairly significant number, is it

GARCIA VS BRK BRANDS INC          CondenseIt™          ELMER W McCAIN PE VOL I 10-24-00

Page 163

```
1  not? 20 percent of the smoke detectors out of 1,000
2  or 1200 interviewed, that's a fairly large sample.
3  Wouldn't you agree?
4      A. That's right. And if they had known that
5  data -- I'm not going to redesign the smoke
6  detector -- but I'd say, "Hey, what you need to do
7  is make it a power source that cannot be removed.
8  That way you will be sure that you have power."
9          That would be my first -- if I was
10 chief engineer, which I'm not and never will be,
11 but, you know --
12     Q. Well, going back to my original question,
13 as far as this report goes, my question was simply:
14 Isn't that one of the central findings in this
15 report, that --
16     A. I accept it for what it's worth, and that's
17 what it states.
18     Q. And based on that, in this report, when you
19 have a smoke detector failure, everything else being
20 equal, wouldn't it be reasonable to believe that
21 perhaps it was because the smoke detector was
22 without power is the reason why it failed?
23         MS. SALINAS: Objection, form.
24     A. 20 percent of the cases, I'd say yes.
25     Q. (BY MR. HENRY) Okay. Do you know if in
```

Page 164

```
1  1996 BRK manufactured a smoke detector that was
2  battery-powered that you could not remove the
3  battery from?
4      A. In 1996?
5      Q. (Moving head up and down)
6      A. I don't know. I know they manufactured a
7  carbon monoxide detector that you couldn't remove it
8  from. Whether they manufactured -- I mean, it's a
9  crazy-looking battery. It's hard to install. You
10 probably have seen them. But whether they
11 manufactured a smoke detector, I do not know.
12     Q. Okay. Do you know if any, you know,
13 SA67D's were part of this study or report?
14     A. No.
15     Q. Do you know when any of these smoke
16 detectors were manufactured?
17     A. When were they?
18     Q. (Moving head up and down)
19     A. No.
20     Q. Who manufactured them?
21     A. No.
22         MS. SALINAS: You're making reference
23 to McCain Exhibit No. 12?
24         MR. HENRY: Yes, I'm sorry. That's
25 right.
```

Page 165

```
1      Q. (BY MR. HENRY) You didn't participate in
2  this test?
3      A. No.
4      Q. "This test," again, being McCain 12.
5          Never reviewed any of the data from
6  the CPSC operability study --
7      A. No.
8      Q. -- raw data?
9      A. No.
10     Q. Have you ever interviewed the people that
11 participated in the smoke detector operability
12 study?
13     A. No.
14     Q. Do you know who Charles Smith is?
15     A. No.
16     Q. Do you know who Julie Ayers is?
17     A. No.
18     Q. Do you know who Julie Shapiro is?
19     A. Who?
20     Q. Julie Shapiro.
21     A. No.
22     Q. And again, there's nothing in the smoke
23 detector operability study or survey that you're
24 going to rely on for your opinion in this case?
25     A. No.
```

Page 166

```
1      Q. In your report you also mention the CPSC
2  "Fire Incident Study, National Smoke Detector
3  Project."
4      A. Yes.
5      Q. Are you familiar with that report?
6      A. Basically I am, yes.
7      Q. Okay. Is there anything in that report
8  that you're going to rely upon in providing your
9  opinion in this case?
10     A. No.
11     Q. No?
12     A. No.
13     Q. Okay.
14         MR. HENRY: I'm going to mark the Fire
15 Incident Study as Exhibit 13.
16         (Exhibit 13 marked)
17     Q. (BY MR. HENRY) Now, you understand the
18 basis of this report was a survey of smoke detectors
19 found in actual fire situations; is that right?
20     A. That's correct.
21     Q. Okay. 314 smoke detectors were taken from
22 fires, 273 where they determined that the smoke
23 detectors should have sounded; is that right?
24     A. Yes.
25     Q. Okay. And of those 273 that they
```

Page 167

```
1  determined the smoke detector, under the
2  circumstances, should have sounded, they found 162
3  of those without power; is that right?
4      A. That's correct.
5      Q. Okay. That's 59 percent of the smoke
6  detectors.
7      A. That's right.
8      Q. Okay. Based on this study, would you agree
9  that where a smoke detector fails to alarm, it would
10 be reasonable to expect that it was because the
11 battery was disconnected or it was otherwise
12 disconnected from its power source?
13         MS. SALINAS: Objection, form.
14     A. That "reasonable to assume" gets you in
15 trouble. No. Unless I saw it, it would be
16 reasonable to assume if a car stops, it's out of
17 gas; but it might not be.
18         You know, I don't know that until I
19 look at it. That's the reason I said I go down and
20 I look at all these things. I don't take it for --
21 a report on -- a Fire Incident Study by someone that
22 sat in an office somewhere tells me nothing, really,
23 until I look at the incident, the incident scene,
24 the equipment. Then I know.
25     Q. Do you know if any of the smoke detectors
```

Page 168

```
1  that they analyzed in that study were Model SA67D's?
2      A. Not without reading through it.
3          MS. SALINAS: When you say "that
4  study," are you now discussing number --
5          MR. HENRY: The Fire Incident Study,
6  McCain Exhibit 13.
7      A. I don't know. And you don't want to take
8  the time for me to sit here and look through it. It
9  could be, could not be.
10     Q. (BY MR. HENRY) Well, I'll submit that the
11 report itself there does not identify any of the
12 model numbers; and, in fact, I don't believe it
13 identifies any of the manufacturers.
14     A. I don't think so either. I haven't seen
15 any.
16     Q. Well, let me ask you this: Have you ever
17 reviewed the raw data that went into making the Fire
18 Incident Study report?
19     A. No.
20     Q. Ever interviewed or talked to any of the
21 people that prepared the report?
22     A. None whatsoever.
23     Q. Do you know -- strike that.
24         All right, sir. That's enough for
25 that one.
```

Page 169

1 One of the other reports that you
2 mention in -- or one of the other studies that you
3 mention in your report is the IITRI report, "Study
4 of Deterioration of Separable Electrical Contacts in

Page 172

1 going to rely on in this case in giving your
2 opinion?
3 A. No.

Page 133

1 up. Who knows? I'm not going to belabor that
2 point. I can show you one a lot worse than this
3 will ever be.
4 Q. Was the licensee or the person who sold the
5 LP gas to Mr. Cruz responsible for ensuring that the
6 appliance was properly installed --
7 A. No.
8 Q. -- connected to a flue?
9 MS. SALINAS: Objection, form.
10 A. No. In my opinion, they have a
11 responsibility; but the responsibility is to be sure
12 it leaves their possession, when they sell it, in a
13 safe container that meets DOT regulations and not
14 what the man's going to use it for. They have to
15 assume that he knows what he's going to use it for.
16 Q. (BY MR. HENRY) Do you have any evidence
17 that the space heater in Mr. Cruz's house was
18 installed by someone licensed to make those
19 installations?
20 A. No.
21 Q. In fact, from the anecdotal evidence that
22 we have -- wrong fuel, no venting -- it's reasonable
23 to assume that it wasn't installed by a licensed
24 person?
25 A. Well, assumptions get you in trouble. You

Page 134

1 can assume that. I mean get me in trouble, not
2 you.
3 You could assume that but -- and you
4 would assume that if you put all that together like
5 you did, but I don't know that.
6 Q. Okay. Do you have any evidence that the
7 space heater was installed according to the Texas
8 Railroad Commission, the Texas Administrative Code,
9 or rules governing LP gas appliances?
10 A. It was not; but there was no one to install
11 it, obviously, to those rules and regulations.
12 Q. Do you have any evidence or information
13 that the heater was in a safe operating condition
14 and that it met LP gas safety regulations?
15 MS. SALINAS: Objection, form.
16 A. No.
17 Q. (BY MR. HENRY) You would agree that
18 although the heater itself was operating, that it
19 was not operating in accordance with the LP gas
20 safety regulations and rules?
21 A. That's correct.
22 Q. And we agree that this -- that the
23 operation of the space heater in this case can be
24 characterized as a ventilation-controlled burn?
25 A. Would you ask that again? I lost it

Page 135

1 somewhere.
2 Q. The operation of the space heater in
3 this case can be characterized as a
4 ventilation-controlled burn; in other words, the
5 generation of heat, the flame, is controlled by the
6 amount of oxygen available as opposed to the amount
7 of fuel available?
8 A. Okay. That makes better sense to me.
9 That's correct.
10 Q. Would you agree that ventilation-controlled
11 fires generally produce large amounts of carbon
12 monoxide?
13 A. Well, here you go again because if there's
14 enough ventilation in that controlled burn, you
15 don't; but if it's minuscule as compared to the
16 amount of heat and BTU's in the gas, then you do.
17 Q. Well, let's talk about Mr. Cruz's situation
18 where it's a ventilation-controlled burn; yet
19 because it is not vented, oxygen is continually
20 being reduced.
21 A. That's correct.
22 Q. In that situation we have copious amounts
23 of carbon monoxide being produced?
24 A. And soot after that and then -- yes, that's
25 correct.

Page 136

1 Q. And then soot after that?
2 A. Yes. It would begin forming -- and
3 another, as we've talked about before -- we don't
4 need to go through that again. But yes.
5 Q. All right. What I'd like to do is just
6 take care of an administrative thing, and that is
7 this: Sir, when we deposed Doug Holmes, one of the
8 things he had in his file are these, "Wayne McCain
9 Photos." Okay?
10 Can you just take a look at these and
11 tell me if these are, in fact, your photos? And
12 what I'd like to do is, if we could do this --
13 MS. SALINAS: Actually, those were
14 also part of the report that was turned over because
15 this top sheet -- I'll represent to you that this
16 top sheet was generated by the Law Office of Mark
17 Cantu so that you would not get confused as to where
18 the photos came from.
19 MR. HENRY: That's fine. That's fine.
20 Q. (BY MR. HENRY) What I'd like to do is have
21 you take a look at those photographs and then these
22 ones here, which I believe are the actual prints
23 that came in your file box, and I'd like to discuss
24 some of the differences because I'm not sure that
25 all the photos made it into the box and there's

Page 137

1 actually some additional prints there. If you could
2 do that while we take a short --
3 A. Yeah. There's some here I've never seen
4 before.
5 Q. Okay. Well, that's what I'd like to get to
6 the bottom of.
7 A. And I probably won't be able to tell you
8 unless you just match them.
9 Q. Well, that's why what I'd like to do is
10 take maybe a ten-minute break and do this off the
11 record.
12 (Recess from 2:00 p.m. to 2:14 p.m.)
13 (Exhibit 7 marked)
14 MR. HENRY: Before we begin, I'd like
15 to just put on the record we marked as Exhibit 7
16 Page 921-139 from NFPA 921, 1988 edition, which has
17 Section 19-4.3, "Pressure Regulation," in it that we
18 referred to earlier in the deposition.
19 MS. SALINAS: Thank you.
20 MR. HENRY: Anything, Shiree.
21 Q. (BY MR. HENRY) December 14, 1999, you
22 attended, at least as an observer, the initial
23 portion of testing done by Dr. Armstrong and
24 Dr. Classen at Dr. Armstrong's facility; is that
25 right?

Page 138

1 A. Yes, sir.
2 Q. Can you tell me what you were there to
3 observe or what you did observe?
4 A. I was there to observe the output of carbon
5 monoxide and soot of the heater while being fired on
6 LP gas. I observed same with instrumentation which
7 was not calibrated properly, according to their own
8 documentation; but I didn't have an argument about
9 that. I expected to see it later.
10 And I simply watched what they did and
11 was told by agreement with Mr. Marchan and them that
12 I would get the heater so I could do my thing with
13 it and never did see it again.
14 But I did not -- there were some
15 things that didn't meet muster so far as I was
16 concerned. Instead of sealing off the chamber that
17 they had it in, there was a hole open at the top.
18 The -- something happened. There was a crack in the
19 glass, and the carbon monoxide level went to nothing
20 just instantaneously.
21 So what I saw was not what I thought I
22 was going to see when I got there. I expected to
23 see it in a room approximately the same size, same
24 layout, smoke detector and all when I -- what I saw,
25 there to look and observe what I saw, but it was not

Page 175

1 SA67D as manufactured by BRK Brands is a defective
2 and unreasonably dangerous product."
3    A. Yes, sir.
4    Q. And you base that on the tests that you ran
5 that showed the detector would not function for a
6 period of approximately two hours?
7    A. Prior, yes.
8    Q. Now, that test is the one that you
9 testified about earlier today that you did in the
10 Neal case; is that right?
11    A. That's correct.
12    Q. Okay. Is there any other basis upon which
13 you're basing that statement, Statement A?
14    A. The only other thing is the fact that so
15 much soot gathered and the detector did not alarm;
16 and if it had gone off in a shorter period of time,
17 in my opinion, the man would have been awakened or
18 would have heard it and done something. But those
19 are the only two things.
20    Q. Okay. Do you have an opinion on what the
21 defect is or why it's unreasonable -- well, let me
22 go back.
23      Do you have an opinion as to what the
24 defect is?
25    A. Well, I've read so many things on smoke

Page 176

1 detectors over the last five or six years since the
2 Neal case started because I read everything I find
3 or see.
4      But the -- one of the things that
5 really struck my fancy or that I took very close --
6 paid very close attention to was the test button.
7 In using that test button and putting the pressure
8 on it that's required to cause it to alarm causes
9 problems with the electronic circuitry. That's in
10 some NFIRS documents, that and other reading that
11 I've done.
12      But the main thing, again, to go back
13 to my basis, is my inspection; my looking at where
14 it was; my looking at the amount of soot that was --
15 those are the things, really, that I base my opinion
16 on.
17    Q. Your opinion is essentially that the smoke
18 detector failed to alarm?
19    A. Yes.
20    Q. And that it should have alarmed prior to
21 Mr. Cruz dying?
22    A. Yes.
23    Q. And that because it didn't alarm, it's
24 defective and unreasonably dangerous?
25    A. That's correct.

Page 177

1    Q. You're not going to provide an opinion at
2 trial as to what the specific defect is, though, are
3 you?
4    A. No.
5      MS. SALINAS: Off the record.
6      (Discussion off the record)
7      (Exhibit 6A marked)
8      MR. HENRY: All right. I'd just like
9 to put on the record that initially we had marked a
10 photograph that Mr. McCain took during the initial
11 examination that shows the data plate on the back of
12 the Martin Industries space heater as Exhibit 6.
13      What we've done now is we've marked
14 that photograph as McCain 6A; and the entire packet
15 of 32 photos on 16 pages will be, in its entirety,
16 Exhibit 6.
17    Q. (BY MR. HENRY) Mr. McCain, if I could,
18 this packet of photographs includes not only your
19 initial examination of the heater, your inspection
20 of the Cruz house but it also includes photographs
21 from your December 14 observation of the testing
22 done at Dr. Armstrong's laboratory; is that correct?
23    A. Yes, sir.
24    Q. And these photographs of the regulator are,
25 in fact, the regulator that was used by

Page 178

1 Dr. Armstrong at that laboratory; is that right?
2    A. That's correct.
3    Q. And the photographs of this green
4 instrument is the carbon monoxide instrument that
5 you were talking about calibration on; is that
6 correct?
7    A. Yes.
8    Q. All right. Back to your opinions.
9 Opinion B where you discuss the battery markings --
10    A. Yes, sir.
11    Q. -- we've discussed that at length already
12 today; is that right?
13    A. Yes, sir.
14    Q. Do you have anything to add as the basis of
15 your opinion, Opinion B?
16    A. No, sir.
17    Q. Opinion C, you said: "The smoke detector,
18 as manufactured by Defendant BRK Brands, Inc. and
19 its printed circuit board was inspected and an
20 exemplar tested."
21    A. Uh-huh.
22    Q. What exemplar testing did you do?
23    A. Nothing except take a smoke detector in my
24 office and utilize a cigarette lighter to produce
25 smoke and cause it to alarm, and it did so.

Page 179

1    Q. Okay. And when did you do that?
2    A. It was just after I got back from Texas.
3 And it was not a long, drawn-out thing; no
4 protocol. I just did it. I wanted to tell you
5 about it. I did it because I wanted to see what it
6 would do. I wanted to see if that one would --
7    Q. When you say you did it when you got back
8 from Texas, we've talked about three different times
9 you came to Texas. Do you remember which --
10    A. When I came to Texas to see the smoke
11 detector.
12    Q. Okay. So that was after the August 12
13 visit?
14    A. Yeah. It was probably the next day.
15 That's the way I do things. I have them on my mind,
16 make a note, and do them.
17    Q. Did you take any notes?
18    A. No.
19    Q. Did you take any photographs that might be
20 in this packet of photographs here?
21    A. No, made no photographs.
22    Q. Do you recall what model smoke detector you
23 used?
24    A. 83R.
25    Q. Do you know when it was manufactured?

Page 180

1    A. No. It was manufactured prior to Neal
2 because it was on my shelf.
3    Q. Okay.
4    A. It came from Home Depot, I recall, because
5 it had "Home Depot" on the box is the only reason I
6 recall it.
7    Q. Had you used that smoke detector for
8 anything else?
9    A. No.
10    Q. First time you had opened the box?
11    A. Yes. I probably have 20 or 30 like that,
12 yes, just sitting on the shelf.
13    Q. What, if anything, did you learn from the
14 test you ran?
15    A. Nothing, nothing. It alarmed. Nothing.
16    Q. What was the purpose for the test?
17    A. To see what it would do -- engineer -- to
18 see what it would do.
19    Q. Okay.
20    A. It alarmed. That was it. Put it back in
21 the box, put it back on the shelf, marked it with a
22 check mark, period.
23    Q. Do you remember when the Neal case was?
24    A. No. It's probably in the case list. I
25 don't remember the year. Probably '96, '97,

GARCIA VS BRK BRANDS, IC          CondenseIt™    ELMER √ McCAIN PE VOL I 10-24-00

Page 181

1 somewhere along there.
2     Q. Well, the trial testimony that we have is
3 December, 1996.
4     A. So that was '97 it went to trial. The
5 trial testimony you have is —
6     Q. The trial testimony is December, 1996.
7     A. What was your question?
8     Q. That was — that's the first question.
9     A. That's when it was.
10     Q. My next question is going to be: You've
11 testified that you bought the 83R before the Neal
12 case.
13     A. Yeah.
14     Q. It's fair to say it was before 1996?
15     A. Yes.
16     Q. Was it before 1995?
17     A. No. It would have been within a couple of
18 months prior to the test that we did in the Neal
19 case, whatever the date is on that.
20     Q. Oh, so it would be prior to the test you
21 did in the Neal case?
22     A. Yes.
23     Q. Okay. All right.
24     A. Do you have the transcript of my trial
25 testimony?

Page 182

1     Q. I do, sir, and I just kind of glanced
2 through it now to see if I could find the date and I
3 couldn't.
4         You testified earlier in this case
5 that you would expect that the smoke detector would
6 have went off shortly after Mr. Cruz ignited or
7 started up his space heater. Do you remember that?
8     A. Yes.
9     Q. And that's because you believe, in addition
10 to carbon monoxide being produced, that there was
11 most likely — at least invisible products of
12 combustion, soot, being produced?
13     A. And probably heavy soot was being produced
14 based on what you see in the photographs on the
15 ceiling and so forth and the walls.
16         So I would expect it to go off
17 relatively quick, based on the amount of soot that
18 was being produced and the amount of LP gas that we
19 know was going into it because it had an orifice,
20 according to Mr. Armstrong, or Dr. Armstrong, for
21 natural gas and they were applying LP gas. So
22 that's why I surmise that.
23     Q. Do you have any evidence that it didn't go
24 off — excuse me.
25         Do you have any evidence that, in

Page 183

1 fact, it did go off when he lit it on the night of
2 December 14 but he pulled the battery out so that it
3 wouldn't alarm when he ran the heater?
4     A. No, I have no evidence at all.
5     Q. You said earlier that you reviewed the
6 statement and affidavits of Rosalinda Perez and
7 Jose Garcia; is that right?
8     A. Yes.
9     Q. And they're two of the people that spent —
10 or were the last two people that saw Mr. Cruz alive;
11 is that right?
12     A. That's what they said, yes, sir.
13     Q. Okay. And you understand that the night of
14 December 13 and 14, they were with Mr. Cruz until
15 the early hours of the morning?
16     A. Yes.
17     Q. And they also had testimony that Mr. Cruz
18 had the front door open, people were in and out of
19 the house up until perhaps 2:00, 2:30 in the
20 morning?
21     A. Sure.
22     Q. Okay. Would that have an effect on the
23 operation of that space heater in this house?
24     A. Yes. It would give you more oxygen,
25 decrease the amount of carbon monoxide, decrease the

Page 184

1 amount of sooting. It's air infiltration.
2     Q. Okay. And you also — you'd also agree
3 that Mr. Garcia has said in his affidavit that he
4 left Mr. Cruz's house between 6:00 and 6:30 in the
5 morning of December 14 and still didn't see any soot
6 being produced by the space heater?
7     A. That's correct, and that he had a headache
8 and was nauseous.
9     Q. Okay. So that's a pretty clear indication
10 that carbon monoxide was being produced before any
11 visible soot?
12         MR. MARCHAN: Objection, form.
13         MS. SALINAS: Join the objection.
14     A. That's an indication. However — yes,
15 that's an indication, he felt — he had a headache
16 and felt dizzy and nauseous —
17     Q. (BY MR. HENRY) Okay.
18     A. — at 6:00, 6:30 a.m.
19     Q. What evidence do you have that — based on
20 the testimony of Rosalinda Perez and Mr. Garcia
21 there, what evidence do you have that the smoke
22 detector should have sounded an alarm before fatal
23 levels of carbon monoxide were produced?
24     A. As I said earlier, the amount of gas being
25 put into the heater, the amount of carbon monoxide

Page 185

1 and where the couch was located, he would receive
2 less carbon monoxide than he would if he were back
3 in the bedroom, in my opinion, because they've got
4 the exit going toward the bedroom in which the
5 gentleman who was killed is located.
6         But the only thing that I have that
7 tells me that it should have alarmed is the fact
8 that you had so much soot, he had — he was
9 nauseous, et cetera, and where I have the couch
10 marked. And you don't have this drawing, Page 4 or
11 5 of Jose Garcia's affidavit. There's not a date on
12 it. It was for Armstrong Forensic Laboratories this
13 was done.
14         But you would expect, based on the
15 fact that the exit is going toward Manny's room, an
16 exit is going toward the hall where the smoke
17 detector is located — I would, without question,
18 expect it, the smoke detector, to alarm within 30 or
19 45 minutes at the outside, particularly with a man
20 that's 20 feet away not having anything but nauseous
21 headaches; and a man in the direction of the
22 velocity of the heat and the carbon monoxide and
23 soot, the heavy loading of it, is in the direction
24 of the heater — of where the heater is blowing
25 these products and the smoke detector is closer than

Page 186

1 that as to probably a foot and a half, 2 feet. It
2 would go off first, in my opinion.
3     Q. But in order to determine when the smoke
4 detector would alarm, you'd have to know the amount
5 of products being produced by the space heater? And
6 by that —
7     A. That's correct.
8     Q. — I mean carbon, carbon dioxide,
9 particulate matter, right?
10     A. That's correct.
11     Q. And the only way you'd know that is if you
12 know how much fuel is going into the burner element
13 of the heater, right?
14     A. That's right.
15     Q. You've already testified that you don't
16 know that, and you can't know that.
17     A. You don't know that, Armstrong doesn't know
18 it, nobody knows that because nobody knows what the
19 regulator was set at, nobody knows how much gas was
20 going into it. Therefore, with the sooting and so
21 forth, you'd know there was a lot going in. What's
22 "a lot"? Nobody knows, but that "lot" put enough
23 soot in there to cause enough smoke to cause the
24 alarm to go off. It should have gone off, in my
25 opinion.

Page 187

1   Now, that's my opinion based on what
2 I've seen and what I surmise from looking at all the
3 facts in the case, without all the fact witnesses.
4 Excuse me.
5   Q. That's fine. But not knowing how much fuel
6 was going to the burner and how much particulate
7 matter was being produced or how much carbon
8 monoxide was being produced, how can you state
9 within any reasonable degree of engineering
10 certainty that Mr. Cruz would have been alive -- or
11 that the smoke detector would have alarmed before
12 Mr. Cruz died?
13   A. Because it's so much closer to the heater
14 than is the decedent and the soot is closer to the
15 heater and the soot is rising to the smoke
16 detector. That's the only thing I can surmise from
17 the whole thing.
18   Q. How do you know that the soot that we see
19 in the house at the end of the problem wasn't
20 produced after Mr. Cruz died?
21   A. Some amount of it may have been. However,
22 producing any amount that would -- that's a heavy
23 amount of soot, I mean, a lot -- not tons, but a
24 lot.
25   Q. Pounds?

Page 188

1   A. Yeah, pounds. And you would expect that
2 smoke detector to alarm based on the fact that
3 you've got that soot building up and soot rising to
4 it. I would expect it to go off. It didn't go
5 off. The man's dead now.
6   That's what my opinions are.
7   Q. But you've testified earlier today -- and
8 we agree -- that smoke detectors aren't designed to
9 go off as soon as there's smoke produced. There's
10 some level at which they're designed to alarm?
11   A. That's correct. That's correct.
12   Q. How do you know that that threshold or that
13 level was reached before Mr. Cruz expired due to
14 carbon monoxide poisoning?
15   A. We don't know that; but based on the
16 conditions, based on the statement that the
17 gentleman made about the soot around the man's mouth
18 and so forth and on his face and on the wall and on
19 the ceiling by the smoke detector, an engineering
20 certainty tells me, to a reasonable degree of
21 engineering certainty, that it should have gone off
22 from the soot.
23   Q. Did you review the pathological report, the
24 coroner's report?
25   A. With respect to what? I know we had

Page 189

1 55 percent carbon monoxide, carboxyhemoglobin level.
2   Q. Did you also note there was no soot or
3 smoke found in his lungs or his throat?
4   A. Not unusual, not unusual for carbon
5 monoxide deaths due to something like this, no.
6 I've seen that many a time. I've seen it in fires
7 where people died of smoke inhalation.
8   Q. You think that might be an indication that
9 Mr. Cruz died before any soot was produced?
10   A. None, no.
11   Q. You agree that Mr. Cruz died of carbon
12 monoxide poisoning?
13   A. That's what the forensic report says.
14   Q. And that the carbon monoxide was produced
15 by the space heater?
16   A. That's correct.
17   Q. The space heater, to your understanding,
18 was fueled by LP gas?
19   A. That's correct.
20   Q. And the space heater was not properly
21 vented?
22   A. That's correct.
23   Q. Mr. Cruz did not die of smoke inhalation?
24   A. That's correct.
25   Q. And smoke detectors aren't designed to

Page 190

1 provide early warning of carbon monoxide poisoning
2 hazards?
3   A. That's correct.
4   Q. Do you have any evidence that would suggest
5 that the smoke detector was properly positioned or
6 installed?
7   A. Properly positioned in the hall?
8   Q. Wherever he had it, that it was installed
9 in accordance with NFPA 72 or the installation
10 manual.
11   A. There are two things I can say about that.
12 No. 1, it was in the hall. It was in the hall where
13 BRK shows: Put a smoke detector in the hall near
14 the sleeping rooms.
15   With that said, the fact that you had
16 so much soot coming directly to it -- really, I
17 don't care if you put it on the floor over here and
18 you shoot soot straight on it, which is tantamount
19 to smoke -- it should alarm.
20   I mean, if we talk about how it was
21 installed and where it was installed, it seemed to
22 me, based on what I saw, that it was reasonable for
23 it to be installed where it was.
24   Q. Okay. And that's all I'm asking. I mean,
25 there's certain places you don't install smoke

Page 191

1 detectors.
2   A. That's right. But this is one place you
3 could and do; and it was low enough and so forth
4 that, in my opinion, it was acceptable.
5   Q. And that's what I was getting at -- you
6 know, was it in dead air space and something like
7 that?
8   A. Yeah.
9   Q. "Yeah," meaning you understand my question,
10 not "yeah" --
11   A. Yes, I understand your question.
12   Q. Okay. Do you have any evidence that would
13 suggest that the smoke detector alarmed but then
14 stopped after the soot cleared?
15   A. None.
16   Q. Do you have any evidence that the smoke
17 detector sounded its alarm but stopped when the
18 battery died?
19   A. No.
20   Q. Do you have any evidence or information
21 that would suggest that between Sunday morning and
22 when Mr. Cruz's body was found Tuesday night that
23 the smoke detector failed to alarm at all in that
24 period of time?
25   A. I have no --

Page 192

1   MS. SALINAS: I'm sorry for
2 interrupting. Can you repeat that question,
3 please?
4   MR. HENRY: Certainly.
5   MR. HENRY: Yeah, in fact, I better.
6   Q. (BY MR. HENRY) Do you have any information
7 or evidence that would suggest that between Monday
8 morning at 6:30 and Tuesday evening when Mr. Cruz's
9 body was found that the smoke detector failed to
10 alarm at any point?
11   A. No.
12   Q. Do you have any -- never mind.
13   Assuming that the smoke detector did
14 not alarm, that Mr. Cruz would have heard the alarm
15 if it had?
16   A. You're assuming that? Is that a
17 hypothetical?
18   Q. Yeah. Assuming that the smoke detector
19 failed to alarm, do you have any evidence that would
20 suggest that if it had, Mr. Cruz would have been
21 able to hear it?
22   MS. SALINAS: Objection, form.
23   A. I don't have any evidence he wouldn't; I
24 don't have any evidence he would. But you would
25 expect him to, yes, hear it.

**GARCIA VS BRK BRANDS INC**   CondenseIt™   housing – last

housing [1] 16:14
Houston [2] 1:24
    200:22
huh-uh's [1] 6:13
humans [1] 91:20
Humidity [1] 169:22
hundred [1] 54:15
hundreds [1] 113:1
HVAC [1] 68:18
hypothetical [1] 192:17
ID [1] 105:22
Idalia [3] 1:5
    2:4   4:20
idea [6] 31:20   67:2
    101:14  131:18  131:19
    171:22
identified [1] 149:1
identifies [1] 168:13
    170:6
identify [1] 168:11
identity [1] 199:11
ignited [1] 182:6
ignition [1] 90:21
ii [3] 161:21  161:23
    162:9
IITRI [2] 169:3
    170:3
Illinois [1] 153:24
    154:2
immediate [1] 141:25
immediately [2] 30:17
    90:21
impact [5] 11:25
    40:4  127:16  130:6
    130:9
important [5] 6:19
    95:20  96:1  156:22
    157:3
impossibility [1]
    8:12
impossible [2] 6:14
    116:5
impression [1] 119:1
improper [1] 12:19
improperly [3] 12:20
    13:12  14:12
Inc [4] 1:8  1:23
    46:16  60:9  178:18
    200:21
incapacitating [1]
    194:15
inch [5] 109:10  110:17
    110:18  112:18  115:20
inches [2] 24:19
    53:18  106:21  108:17
    109:4  109:11  109:15
    109:21  109:23  112:25
    113:1  113:3  114:14
    115:5  115:7  115:15
    115:19  115:24  124:7
    124:8  125:1  125:2
    128:12
incident [13] 3:24

173:25  177:20  183:19
183:23  184:4  187:19
8:22  19:17  27:9
71:23  161:7  166:2
166:15  167:21  167:23
167:23  168:5  168:18
incidents [2] 24:20
    25:7  25:9
incineration [1] 44:24
include [2] 28:25
    147:8
included [1] 47:20
includes [3] 44:14
    177:18  177:20
incorporation [1]
    46:19
increase [13] 55:25
    56:3  56:24  111:23
    114:5  114:5  119:3
    119:4  127:24  130:10
    130:11  130:12  140:11
increased [1] 127:12
increases [1] 114:3
    114:4
increasing [2] 114:1
    114:3
independent [1] 47:14
index [4] 3:1
    30:24  31:18  32:5
Indiana [1] 82:6
indicate [2] 109:21
    109:23
indicated [1] 170:9
indicates [1] 149:14
indicating [2] 142:19
    172:23
indication [4] 184:9
    184:14  184:15  189:8
individual [2] 24:20
    169:9
Individually [4] 1:3
    1:5  2:3  2:4
industrial [10] 22:22
    33:23  41:6  41:20
    45:20  49:21  54:11
    54:12  55:14  60:7
Industries [3] 3:12
    101:15  103:13  103:15
    104:18  105:5  105:12
    128:18  177:12
industry [1] 51:2
    110:20  110:21
infiltrated [1] 129:23
infiltration [1] 129:4
    142:20  184:1
infinity [1] 116:21
Info [1] 26:10
information [28]
    24:6  26:1  26:14
    31:1  31:4  52:11
    63:21  104:20  105:1
    106:11  106:13  134:12
    144:12  144:16  150:9
    154:8  155:19  157:9
    158:2  158:16  158:17
    159:16  171:20  171:23
    171:24  191:20  192:6
    197:17
informing [1] 80:6

inhalation [6] 16:18
    70:17  93:18  189:7
    189:23  195:16
initial [9] 32:17
    32:19  32:21  100:7
    137:22  144:5  160:5
    177:10  177:19
injured [1] 87:20
inlet [2] 112:15  112:16
inoperability [1]
    162:5
inoperable [1] 160:18
input [4] 7:19  60:16
    61:13  109:24  117:5
    127:13
ins [1] 50:14
inside [16] 9:12
    57:25  58:2  71:6
    112:7  118:19  119:19
    141:19  145:20  145:20
    147:25  149:22  149:24
    152:12  153:23  154:3
inspect [1] 37:20
inspected [7] 33:4
    99:8  99:11  145:5
    155:2  170:16  178:19
inspection [6] 32:2
    32:11  32:17  155:3
    176:13  177:19
inspections [1] 17:14
inspects [1] 37:20
install [1] 134:10
    164:9  190:25
installation [3] 3:12
    190:9
installations [1] 133:19
installed [27] 16:14
    25:18  63:6  69:3
    84:11  94:14  100:25
    106:5  120:3  126:15
    131:19  132:7  133:6
    133:18  133:23  134:7
    147:15  147:19  147:25
    149:15  153:12  155:22
    190:6  190:8  190:21
    190:21  190:23
installing [1] 129:21
instance [1] 1:17
instantaneously [1]
    138:20  142:4
instead [5] 12:19
    13:13  124:14  127:8
    138:16
Instructions [1] 3:12
instrument [3] 19:15
    140:22  141:5  141:14
    141:15  178:4  178:4
    199:12
instrumentation [2]
    138:6  139:11
instruments [1] 140:25
insurance [2] 32:3
    48:21  50:25  51:6
    51:8
intend [7] 27:7
    27:8  37:6  37:8
    99:6  169:6  174:20

intensity [1] 114:11
interested [1] 200:11
internals [1] 63:24
International [2]
    76:1  77:2
interpretation [2]
    79:10  79:12
interrupting [2] 192:2
    196:13
interview [1] 47:17
    162:15  173:19
interviewed [1] 162:20
    163:2  165:10  168:20
    174:7
interviews [1] 162:13
    162:14
investigated [1] 24:21
investigation [4]
    19:17  83:13  100:12
    123:14
investigator [1] 24:22
invisible [1] 182:11
invoiced [1] 173:14
invoices [2] 32:1
    173:15
involve [1] 37:12
    39:8
involved [8] 10:24
    16:17  48:19  100:18
    101:3  104:18  121:17
    195:1
involvement [1] 101:11
involves [1] 44:18
    80:3
involving [1] 10:4
    10:13  13:9  14:12
    15:20  19:17  77:5
    101:4
ionization [33] 52:25
    53:16  54:18  54:24
    57:21  58:10  58:16
    59:14  60:7  60:24
    61:5  61:17  61:25
    62:3  64:2  64:3
    69:14  77:20  77:25
    78:8  78:13  78:22
    78:24  80:1  80:7
    80:12  80:22  81:15
    82:14  90:1  90:8
    90:13  90:17
ionization/photoelectric
    [1]  80:5
issue [2] 159:5  171:15
Item [2] 26:13  158:1
items [4] 22:4  170:9
    170:10  170:12
itself [6] 106:19  112:8
    134:18  146:5  157:19
    168:11
IV [7] 31:4  170:6
Jackson [1] 18:1
Joe [2] 79:15  79:22
Join [2] 184:13
Joined [1] 34:25
Jose [7] 1:3  2:3
    4:20  158:23  159:7

183:7  185:11
judge [1] 175:6
Julie [3] 165:16  165:18
    165:20
July [15] 32:7  32:9
    33:1  33:7  99:9
    100:11  100:22  102:20
    108:4  108:6  108:10
    122:20  122:21  155:11
    173:1
jumped [1] 23:23
junior [1] 36:10
keep [2] 25:25  26:23
    28:24  75:15
Kenny [1] 13:16
kept [2] 75:3  159:19
killed [1] 7:7
    87:20  185:5
kind [13] 16:7  40:17
    41:4  41:5  43:19
    50:2  52:13  64:8
    95:14  100:11  160:24
    162:15  182:1
kinds [5] 25:18  37:22
    73:15  95:10  104:21
Kinematics [1] 17:17
knew [7] 36:16  100:19
    101:5  101:15  119:22
    132:22  153:12
knocked [1] 66:23
    119:20  146:2
knowing [2] 132:10
    187:5
knowledge [9] 38:15
    39:22  54:23  82:11
    120:2  120:12  123:4
    131:6  157:11
knowledgeable [1]
    132:16
known [2] 163:4
    199:10
knows [9] 7:20
    115:2  132:3  133:1
    133:15  186:18  186:18
    186:19  186:22
Korea [1] 34:25
L-E-D [1] 53:22
lab [2] 100:6  101:10
Laboratories [2]
    81:9  185:12
laboratory [9] 81:1
    81:8  90:12  99:18
    126:10  144:7  144:17
    177:22  178:1
lack [3] 30:10  160:19
    161:12
ladder [1] 43:21
lady [2] 11:9  14:25
    98:11
land [2] 50:23  51:1
large [5] 53:17  55:2
    66:10  67:2  92:10
    116:9  135:11  163:2
larger [1] 45:2
    55:1  55:8  59:3
last [16] 22:5  23:23

29:15   41:8   51:25
76:15   125:5   162:2
176:1   183:10
**law** [4]   2:5   79:8
97:20   136:16
**laws** [2] 42:8   42:11
**lawsuit** [1]   80:3
**lawyer** [7]   12:12
12:12   16:4   25:23
28:23   30:13   96:20
**lawyers** [6]   48:21
50:25   75:1   79:13
79:14   98:24
**laying** [2]   170:25
171:4
**layout** [1]   138:24
**lays** [2] 83:17   83:17
**lead** [3]   53:5   53:21
53:24
**leading** [2]   132:15
157:24
**learn** [1] 180:13
**least** [4] 10:23   71:25
137:22   182:11
**leave** [5] 31:24   128:1
129:8   129:19   196:3
**leaves** [1]   133:12
**leaving** [1]   160:2
**lectures** [1]   20:10
**LED** [1] 53:23
**left** [8]   71:17   126:17
139:1   140:19   143:7
143:8   171:4   184:4
**left-hand** [2]   142:11
150:14
**legal** [1] 32:4
**legalities** [1]   97:16
**length** [4]   125:8
126:18   178:11   195:6
**LEPA** [1]   20:18
**less** [1]   185:2
**letters** [1]   81:6
**level** [13]   68:15
88:23   91:6   92:17
92:19   138:19   139:25
140:8   142:2   142:2
188:10   188:13   189:1
**levels** [5]   61:19
184:23   194:10   194:15
194:24
**liability** [2]   49:20
50:3
**Library** [2]   21:2
158:6
**licensed** [7]   41:18
41:23   42:2   42:14
43:1   133:18   133:23
**licensee** [2]   43:4
131:23   133:4
**licenses** [5]   41:13
41:16   41:21   42:16
42:23   43:3
**life** [4]   21:5   22:25
95:12   95:12
**light** [11] 54:2   54:5

55:23   56:20   56:21
56:23   57:14   57:16
118:4   119:8   143:11
**lighten** [1]   24:18
**lighter** [1]   178:24
**lights** [2]   56:13
57:3
**likely** [1]   182:11
**limit** [3] 50:2   50:5
50:16
**line** [6]   21:4   111:24
128:11   132:10   162:3
198:2
**lines** [2] 39:6   81:20
**liquid** [5]   43:5
110:6   110:23   111:20
121:3
**list** [7]   23:20   23:21
24:20   25:18   37:9
52:8   180:24
**listed** [14]   16:19
19:7   21:3   21:15
22:8   23:20   24:8
26:6   31:17   36:23
104:25   157:14   157:18
171:13
**listing** [1]   24:14
**lists** [3] 32:2   41:13
**lit** [3]   64:24   92:5
183:1
**literally** [2]   75:7
130:23
**litigation** [7]   45:22
45:25   48:16   49:17
50:20   50:24   51:4
**living** [1]   69:5
**load** [1] 24:18
**loading** [1]   185:23
**local** [3] 20:16   34:15
62:11
**located** [1]   68:21
70:17   72:6   73:19
111:18   185:1   185:5
185:17
**look** [43] 7:9   29:10
57:5   64:12   74:7
79:8   86:1   87:10
96:6   96:7   99:22
100:16   101:7   104:12
107:9   115:18   118:15
120:23   121:8   124:4
126:19   128:3   128:17
136:10   136:21   138:25
145:18   146:5   146:13
148:13   152:21   153:2
153:5   161:4   161:5
161:6   161:11   161:21
167:19   167:20   167:23
168:8   170:25
**looked** [32]   22:6
25:13   25:16   27:6
27:7   91:14   97:17
98:19   115:10   121:19
121:20   126:14   145:20
145:24   146:6   147:15
151:24   152:16   153:16
153:17   153:17   153:17
154:10   159:6   159:8

159:9   159:15   159:16
169:11   170:20   171:19
174:19
**looking** [23]   13:14
29:25   30:7   33:13
49:14   98:10   107:3
109:20   110:1   119:13
123:4   146:14   146:14
149:23   150:10   150:12
150:13   150:15   151:1
160:22   176:13   176:14
187:2
**looks** [3] 37:21   114:1
**loose** [1] 123:1
**Lord** [3] 35:3   68:23
118:6
**lose** [1]   57:7
**lost** [4]   7:4   57:6
106:8   134:25
**lots** [1]   119:2
**loud** [1] 93:18
**Louisiana** [1]   41:14
**loved** [1] 175:6
**low** [2]   113:20   191:3
**lower** [1]   55:24
56:7   58:24
**LP** [31]   7:13   8:3
9:25   12:19   13:12
38:22   39:1   39:5
39:14   39:17   40:9
49:22   105:22   109:9
111:15   113:22   115:9
116:3   117:3   127:8
131:20   131:23   135:5
134:9   134:14   134:19
138:6   142:10   182:18
182:21   189:18
**LPGA** [1]   110:23
**lunch** [2]   96:5
96:12
**lungs** [2] 189:3   195:19
**Lyman** [1]   21:12
**M** [1]   1:21   2:15
200:17
**magazine** [1]   97:2
**main** [3] 14:21   40:23
176:12
**maintain** [1]   18:3
25:21
**maintained** [3]   14:12
95:20   96:1
**makes** [10]   6:8
30:20   31:18   39:3
58:5   61:13   88:24
95:19   95:25   135:8
**male** [4] 146:14   148:4
148:7   149:17   150:10
150:16   151:5
**male/female** [1] 153:18
**man** [4]   8:1   175:17
185:19   185:21
**man's** [2]   133:14
188:5   188:17
**management** [2] 57:5
62:16
**manifold** [5]   108:20

109:3   109:12   109:22
109:23
**Manny's** [1]   185:15
**manual** [4]   41:12
106:20   109:25   190:10
**Manuel** [1]   1:4
2:3   4:16   4:18
**manufacture** [5] 44:18
51:20   53:6   93:23
103:5
**manufactured** [12]
64:4   103:16   164:1
164:6   164:8   164:11
164:16   164:20   175:1
178:18   179:25   180:1
**manufacturer** [4]
16:20   24:25   50:13
91:18
**manufacturers** [2]
93:23   168:13
**manufacturing** [1]
38:10
**Marchan** [10]   2:10
67:9   67:11   68:1
96:11   117:18   138:11
140:18   184:12   195:23
**Marchan's** [3]   33:5
33:14   154:6
**mark** [16]   2:5
18:22   29:6   29:18
104:7   107:13   136:16
147:2   148:22   149:2
154:15   154:16   154:19
166:14   170:19   180:22
**marked** [25]   18:24
29:8   29:20   102:9
102:11   102:12   104:9
104:10   107:15   107:16
137:13   137:15   147:12
149:4   150:20   150:21
159:12   159:14   166:16
174:12   177:7   177:9
177:13   180:21   185:10
**Market** [1]   2:16
**markets** [1]   57:17
**markings** [4]   83:25
153:13   153:14   178:9
**Martin** [19]   3:12
100:17   100:23   101:4
101:15   101:22   101:23
101:24   101:25   103:13
103:15   104:18   105:4
105:10   105:12   107:6
115:10   128:18   177:12
**master** [1]   43:21
**match** [1]   137:8
**material** [1]   25:11
25:21   58:4   66:6
66:8   158:12   174:13
193:2   196:22   197:3
197:12
**materials** [6]   37:21
66:3   73:14   85:7
158:21   197:6
**math** [2] 34:10   34:16
**matter** [2]   120:13
121:25   127:9   170:2
186:9   187:7

**max** [1]   117:5
**maximum** [4]   106:21
108:19   113:17   114:11
**may** [26] 5:7   29:4
53:13   63:4   75:1
78:16   78:17   86:4
87:4   87:4   89:10
93:5   93:8   95:7
96:22   97:6   106:22
114:6   114:7   155:12
155:13   155:19   170:17
170:24   171:4   187:21
**McAllen** [1]   2:7
**McCain** [49]   1:12
1:16   3:5   3:8
3:9   3:11   3:14
3:15   3:22   4:1
4:5   18:23   18:25
20:3   33:17   33:19
33:22   43:10   44:17
45:9   45:25   46:4
46:5   46:14   46:15
48:15   49:10   49:16
51:17   51:18   102:10
102:13   107:14   107:17
136:8   147:8   147:9
149:5   164:23   165:4
168:6   174:22   177:10
177:14   177:17   199:1
199:5   199:10   200:4
**Mead** [1]   16:25
**mean** [43]   8:7
12:10   28:18   35:4
38:5   38:5   42:3
42:7   49:12   52:14
53:22   58:11   59:16
62:21   70:12   79:9
83:15   100:14   102:3
103:24   108:13   119:21
121:9   122:20   125:7
129:13   129:25   130:1
131:14   134:1   139:13
143:8   147:25   150:11
152:14   164:8   171:3
174:1   174:2   186:8
187:23   190:20   190:24
**meaning** [3]   103:9
162:3   191:9
**means** [4]   61:7
90:20   103:25   124:8
**meant** [1]   118:12
154:18
**measure** [12]   68:14
69:9   69:12   69:13
69:16   69:21   69:25
101:8   108:1   109:8
109:9   115:7
**measurement** [6]
68:5   108:18   109:5
109:6   109:8   195:10
**measurements** [2]
156:7   156:22
**measuring** [1]   69:14
**meat** [1] 98:23
**mechanical** [6]   18:11
18:12   34:12   35:25
37:15   40:23   52:10
75:23
**mechanism** [2]   53:25
56:1

GARCIA VS BRK BRANDS, INC          CondenseIt™          mechanisms - observe

mechanisms [1] 60:12
60:16
medical [1]          7:6
meet [5] 65:22     65:23
77:12   114:21   138:15
meeting [1]          62:15
meets [1]          133:13
member [1]          41:1
41:2
members [1]          47:25
membership [1] 76:5
76:19
memoranda [1] 81:7
memory [2]          40:11
69:8
Mendleson [1]   13:16
mention [5]          52:21
146:23   166:1   169:2
169:3
mentioned [7]          16:1
37:14   38:16   50:1
65:10   83:7   101:18
mess [1] 116:16
met [9]   4:6          5:1
5:5          5:8          5:9
5:11   5:14   5:15
134:14
metal [3] 102:4   150:5
150:18
metallurgist [1] 85:7
meter [2]          109:15
140:6
method [1]          1:22
Michael [1]          5:6
microscopically [1]
146:17
might [31]          10:22
15:6   17:20   30:16
55:23   59:6   59:14
59:15   61:9   62:8
62:8   72:16   95:10
98:9   105:6   105:7
110:18   110:23   112:24
116:18   120:23   121:15
127:25   132:25   140:20
143:12   146:13   152:15
167:17   179:19   189:8
million [5]          78:19
78:20   140:14   142:4
162:21
mind [7] 11:6          26:3
70:20   124:16   157:23
179:15   192:12
minds [1]          101:14
mine [2] 23:21   130:15
minimum [1]          91:13
minus [1]          141:13
minuscule [1]   135:15
minute [2]          64:8
131:3
minutes [5]          9:23
37:14   72:3   72:4
185:19
misfueled [1]          13:23
Mississippi [1]   41:14
MIT [1] 174:15

mix [1]   143:10
mixture [1]          39:1
mobile [1]          13:9
Mod [2] 154:3
mode [2] 56:9          61:22
model [8]          63:14
63:18   106:16   153:24
154:3   168:1   168:12
179:22
modeling [2]          37:7
85:15
models [1]          63:22
modem [1]          56:19
modulate [1]   61:16
Modutrol [1]          56:1
60:14   61:12
molded [1]          145:4
moment [1]          52:5
moments [1]          15:14
Monday [2]          192:7
193:6
monitor [1]          45:5
139:13
monitoring [1]   54:12
monitors [1]          42:4
monoxide [65]          7:3
7:10   7:12   7:25
8:1   8:6   8:8
8:9   8:16   10:3
10:12   11:1   11:11
12:15   15:9   16:17
19:21   20:9   20:15
45:4   69:21   88:9
88:11   88:12   88:14
88:23   89:4   89:8
89:13   89:17   89:22
101:3   116:6   116:10
110:23   131:4   135:12
135:23   138:5   138:19
139:25   140:4   140:24
142:1   142:2   164:7
178:4   182:10   183:25
184:10   184:23   184:25
185:2   185:22   187:8
188:14   189:1   189:5
189:12   189:14   190:1
194:10   194:17   194:18
194:24
Montgomery [3]
13:11   14:22   15:16
month [1]          63:3
months [1]          181:18
morning [10]          4:5
4:6   4:7   183:15
183:20   184:5   191:21
192:8   193:4   193:6
most [4] 72:10   123:4
129:7   129:18   129:24
160:17   162:4   182:11
motors [1]          50:6
56:10   60:14   60:15
mount [1]          140:3
mounted [1]          120:8
mouth [1]          183:17
move [4] 60:15   61:11
112:21   152:1
moved [1]          43:21

120:5
movement [1]          83:24
moves [1]          112:15
moving [6]          16:11
46:13   61:12   105:20
164:5   164:18
Ms [42]   2:5          24:9
24:15   26:24   33:5
42:19   52:4   85:25
86:6   86:11   86:16
86:25   87:2   87:14
93:7   95:17   117:18
124:15   125:24   126:5
131:1   131:17   133:9
134:15   136:13   137:19
143:17   148:15   154:17
163:23   164:22   167:13
168:3   171:6   172:16
177:5   184:13   192:1
192:22   195:25   196:15
197:8
mud [1] 125:17
multiplied [1]          67:12
multiply [1]          67:8
must [4] 90:4          93:23
94:14   94:20
muster [1]          138:15
N [1]          2:1
NAFE [1]          40:14
41:1   52:16   76:19
83:22
name [6] 4:5          33:16
46:7   101:21   156:4
199:12
named [1]          33:24
names [2]          10:23
24:23
narrow [1]          10:19
Nat [2] 106:7   106:8
national [16]          3:24
20:23   27:9   37:10
37:13   37:19   37:20
37:23   38:2   40:15
40:18   75:17   76:3
76:13   161:7   166:2
natural [24]          12:20
13:13   38:21   39:2
39:7   39:14   39:17
40:9   43:5   49:23
109:9   109:11   109:16
110:3   117:5   117:14
120:17   121:1   121:2
121:5   124:12   126:21
127:8   182:21
nauseous [4]          184:8
184:16   185:9   185:20
Neal [29] 16:2          16:7
25:5   25:24   28:14
62:20   64:7   67:14
68:7   68:8   68:17
73:21   75:13   81:12
82:13   84:5   84:8
85:22   96:8   170:16
171:14   171:15   175:10
176:2   180:1   180:23
181:11   181:18   181:21
near [1] 190:13
nearly [1]          160:12

necessarily [4]          92:22
110:14   110:19   116:17
necessary [2]          148:21
157:8
need [14] 47:16          47:16
47:16   49:14   112:13
129:22   136:4   153:5
153:6   156:23   161:4
161:5   163:6   196:8
98:19
needed [1]          132:22
neither [1]          200:8
never [19]          5:5
7:20   7:20   14:24
42:15   81:23   88:17
91:13   121:23   121:24
126:23   137:3   138:13
141:6   155:16   163:10
165:5   173:22   192:12
new [2]   91:16          94:5
newer [1]          78:10
News [2]          26:6
26:13
newspaper [1]          79:3
next [7]   1:6          2:9
23:12   161:22   162:2
179:14   181:10
NFIRS [2]          169:9
176:10
NFPA [16]          3:16
20:21   20:23   22:25
39:20   39:23   77:17
77:18   94:4   120:24
123:11   123:23   125:13
137:16   161:7   190:9
night [5] 93:17   183:1
183:13   191:22   193:7
nobody [8]          47:3
84:19   115:2   132:3
186:18   186:18   186:19
186:22
none [10] 37:8          37:8
45:19   45:19   62:13
98:23   159:17   168:22
189:10   191:15
nonfunctioning [2]
160:19   162:4
nor [5]   25:14   88:16
105:12   144:12   200:9
normal [5]          109:14
118:19   118:25   119:18
161:13
North [1]          2:6
nosy [1] 155:4
NOTARY [1]          199:17
note [4] 154:7   179:16
189:2
notebook [1]          196:19
noted [1] 199:2
notes [19]          3:10
3:21   31:6   86:22
87:12   88:17   102:14
102:15   102:18   102:20
105:14   118:15   128:2
128:6   153:20   156:16
156:20   179:17   197:5
nothing [15]          24:4
55:1   61:11   62:12

112:14   114:16   138:19
153:22   165:22   167:22
178:23   180:15   180:15
180:15   196:12
notice [3]          3:7
79:25   96:18   96:25
96:25   97:10   97:14
98:6   98:14   98:15
98:19
noticed [2]          97:2
174:14
now [13] 4:25          6:23
11:7   12:14   12:23
13:21   15:8   24:5
26:23   43:7   44:17
46:5   46:14   51:16
52:23   53:9   54:8
56:15   57:9   60:24
63:2   68:17   70:2
72:11   73:24   75:20
76:17   86:14   88:21
90:16   92:25   96:18
99:7   101:15   101:24
101:25   102:18   102:22
103:14   103:21   105:2
105:14   107:19   108:17
110:11   112:4   115:7
115:5   116:20   118:18
121:14   122:25   125:8
127:22   128:4   128:18
131:5   141:10   142:5
144:4   146:23   147:1
147:14   147:22   148:22
149:5   149:9   151:1
151:6   152:5   161:10
162:1   166:17   168:4
170:24   175:8   177:13
182:2   187:1   188:5
193:13   194:22   196:7
nowhere [1]          172:17
number [27]          11:25
15:15   33:25   41:2
47:20   53:12   63:19
72:13   87:20   112:19
118:8   120:14   144:1
147:8   161:9   162:25
168:4
numbered [1]          1:19
numbers [5]          69:7
115:17   122:1   154:10
168:12
Numeral [3]          31:4
31:5   170:6
O'CONNOR [1]
2:15
O2 [2]   139:12
Oak [2]   1:23   200:21
oath [1] 199:11
objection [10]          93:7
131:1   131:17   133:9
134:15   163:23   167:13
184:12   184:13   192:22
obscuration [4] 56:17
68:15   69:10   73:14
observation [3] 144:6
144:16   177:21
observations [1]
172:4
observe [9]          100:7
126:13   138:3   138:3

GARCIA VS BRK BRANDS INC          CondenseIt™                    observed - person

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

138:4   138:25   144:2
144:23   146:16
**observed** [5]            83:14
138:6   173:4   173:4
173:6
**observer** [1]           137:22
**observing** [2]          100:4
173:9
**obviously** [7]           7:5
7:10   8:2   8:3
9:21   28:12   134:11
**occurred** [5]           16:16
16:17   24:21   81:19
154:6
**October** [6]           1:13
1:20   159:12   162:20
200:4   200:13
**off** [58]   52:5   52:6
54:5   55:5   56:7
56:12   59:17   59:18
61:6   61:7   61:8
61:8   61:8   61:9
61:15   62:5   66:19
66:20   66:22   67:18
71:2   71:5   71:21
71:25   72:7   74:21
89:7   93:25   106:14
106:19   117:21   119:3
119:6   119:7   119:20
128:2   137:10   138:16
139:13   140:7   140:8
140:9   153:1   175:16
177:5   177:6   182:6
182:16   182:24   183:1
186:2   186:24   186:24
188:4   188:5   188:9
188:21   194:22
**office** [15]            2:5
33:5   33:6   33:14
33:21   43:23   123:9
136:16   154:4   154:4
154:6   167:22   178:24
199:14   200:13
**officers** [1]           173:21
**offices** [1]            1:22
**Ohio** [1]   37:24
**old** [7]   43:2   62:1
62:2   62:2   78:9
104:21   105:10
**Olgesby** [2]   17:17
17:19
**on-the-job** [2]         36:21
once [85]   72:19   98:19
99:16
**one** [85]   3:21   11:14
14:6   15:17   15:24
18:8   23:12   23:23
24:7   25:8   26:22
26:23   27:14   29:15
32:13   33:11   40:21
51:8   51:25   52:8
53:21   54:24   54:25
57:23   59:20   60:2
61:7   61:16   65:17
66:13   67:18   68:2
69:5   73:6   73:19
74:14   74:23   74:23
74:24   74:25   76:19
76:20   77:23   78:8
80:2   82:13   82:14

86:22   92:14   95:13
100:25   105:13   108:3
108:6   108:9   110:11
110:11   115:4   120:3
124:5   124:6   126:2
129:22   130:3   133:2
134:10   136:7   139:17
144:1   145:25   155:13
157:14   157:15   158:6
159:12   161:18   163:14
168:25   169:1   169:2
175:8   176:4   179:6
191:2   196:18
**ones** [7]   4:14   52:18
54:10   54:25   136:22
156:15   156:16
**open** [10] 116:12   116:12
116:20   129:8   129:14
129:19   138:17   139:23
183:18   196:3
**opened** [2]            71:7
180:10
**opening** [11]          104:1
107:2   114:21   116:13
116:21   129:9   129:15
141:18   142:6   142:18
156:14
**operability** [8]   3:23
28:1   157:16   158:3
159:11   165:6   165:11
165:23
**operate** [7]            38:9
57:22   57:25   58:6
59:4   91:13   95:11
**operated** [4]          20:3
143:1   143:6   157:4
**operating** [5]   3:12
100:25   134:13   134:18
134:19   194:2
**operation** [12]   8:21
8:25   9:8   17:4
20:4   36:17   56:10
61:22   134:23   135:2
144:17   183:23
**operations** [2]   18:18
49:2
**operator** [1]          56:16
**opinion** [19]          7:1
7:8   7:11   8:5
8:13   8:20   8:25
9:3   9:7   9:14
9:15   9:19   9:24
9:24   10:1   10:12
17:3   17:21   25:11
27:16   36:10   59:9
59:11   78:1   78:8
81:15   88:15   95:15
103:19   121:14   121:14
121:15   133:10   140:1
141:2   142:23   142:23
144:8   144:17   144:22
144:25   147:23   148:6
153:19   157:9   158:12
160:9   165:24   166:9
169:13   171:11   172:2
174:25   175:17   175:20
175:23   176:15   176:17
177:1   178:9   178:15
178:15   178:17   185:3
186:2   186:25   187:1

191:4
**opinions** [9]           31:1
146:13   157:8   157:10
160:11   169:7   174:23
178:8   188:6
**opportunity** [7] 87:6
121:16   126:16   143:13
148:13
**opposed**            65:17
88:2   112:25   120:17
135:6
**ORAL** [3]           1:11
1:16   200:3
**oranges** [1]           79:21
**order** [4] 88:22   94:13
132:9   186:3
**organizations** [1]
76:5
**orifice**            7:14
7:19   103:19   115:10
124:12   126:20   131:16
182:19
**orifices** [3]           114:20
114:21   119:4
**origin** [6]            7:2
83:11   83:12   123:16
123:17   123:19
**original** [2]          102:14
163:12
**originals** [1]          118:16
**OSHA** [9]            17:3
17:6   17:7   18:21
39:25   40:1   40:2
40:4   65:23
**otherwise** [2]   90:12
167:11
**outlet** [4]            109:15
112:22   119:19   120:7
**output** [11]           45:2
53:12   55:14   56:3
56:24   60:11   64:15
114:6   127:13   130:13
138:4
**outs** [1]   50:14
**outside** [19]           5:2
5:18   64:25   66:4
71:1   71:2   71:3
101:1   104:2   111:18
127:5   127:21   129:10
149:23   149:24   149:25
151:21   152:14   185:19
**oven** [1]   142:9
**own** [7]   18:13   20:4
39:21   77:14   138:7
144:17   157:24
**owned** [2]            18:13
18:15
**oxygen** [19]           11:5
11:12   44:20   119:24
127:17   127:24   128:23
128:25   129:1   129:2
129:16   130:6   130:11
130:13   130:24   135:6
135:13   157:5   183:24
**P** [2]   2:1   2:1
p-r-e-s-s-t-r-o-l [1]
60:22
**P.C** [1]   2:11

**P.E** [11]   1:12   1:16
3:3   3:8   3:9
4:1   46:16   199:1
199:5   199:10   200:4
**p.m** [7]   1:20   96:13
137:12   137:12   174:11
174:11   197:24
**packet** [6]            31:13
107:18   146:22   177:14
177:18   179:20
**page** [23] 3:6   3:16
3:21   25:14   25:14
27:23   31:18   31:24
105:14   105:15   106:7
118:15   126:2   128:3
128:4   128:5   137:16
156:19   157:23   158:1
161:21   185:10   198:2
**pages** [7]            3:10
3:13   102:15   102:15
147:8   177:15   200:7
**paid** [1]   176:6
**pair** [1]   145:13
**Panasonic** [1]   153:3
**panel** [1] 56:21
**panels**            44:21
81:1   81:4
**paper** [2] 48:23   96:15
154:8
**Parade** [1]            97:2
**paragraph** [7]   27:23
98:20   128:20   129:7
161:21   162:2   162:6
**parameters** [1]   93:21
**parcel** [2]            25:15
40:2
**park** [1] 33:23
**Parkway** [2]            33:20
33:22
**part** [15] 25:15   25:15
25:20   25:21   40:2
49:10   78:1   78:1
97:20   98:22   120:22
121:7   136:14   162:17
164:13
**participate** [3]   31:21
32:7   165:1
**participated** [2] 32:22
165:11
**particles** [2]   11:4
68:5
**particular** [6]   25:14
50:3   107:11   139:14
141:13   158:18
**particularly** [6]   47:24
119:13   146:2   150:2
150:4   185:19
**particulate** [2]   186:9
187:6
**parties** [2]            200:9
200:11
**parts** [6] 102:4   104:24
140:13   142:3   146:16
150:5
**pass** [1]   90:4
**passed** [1]            40:22
**past** [5]   17:6   18:19

50:16   104:22   120:10
**pathological** [2] 44:24
188:23
**pathology** [1]           85:11
**patterns** [2]           83:16
83:16
**Patton** [1]            5:24
**pay** [1]   78:21
**paying** [1]            78:19
**peak** [4]   38:22   39:2
39:3   39:4
**Peeper** [2]            59:21
59:22   59:24
**Pelham** [1]            33:20
**Pennsylvania** [1]
2:17
**people** [40]           32:14
37:24   38:10   44:3
47:23   47:23   48:22
48:25   49:4   50:7
53:9   59:24   60:5
87:20   93:1   93:17
94:10   108:3   108:6
108:7   108:10   108:11
112:21   112:21   120:14
123:16   132:2   156:3
156:25   162:14   162:19
165:10   168:21   173:23
173:23   173:25   183:9
183:10   183:18   189:7
**people's** [1]           88:17
**per** [9]   53:12   109:10
110:17   110:18   112:18
115:19   117:2   140:14
142:3
**percent** [20]           15:13
15:15   50:24   51:13
51:13   56:17   130:14
130:16   140:7   140:8
140:9   140:10   141:13
160:13   161:13   162:24
163:1   163:24   167:5
189:1
**percentage** [3]   162:22
162:23   162:23
**percentages** [2] 161:10
162:16
**percentagewise** [2]
50:19   51:5
**Perdue** [2]            14:10
15:2
**Perez** [4] 158:22   183:6
184:20   193:2
**performance** [2] 80:6
90:11
**performed** [7]   28:8
143:25
**perhaps** [5]           112:25
113:3   113:18   127:20
127:24   163:21   183:19
**period** [9]            34:4
111:1   112:3   141:12
169:17   175:6   175:16
180:22   191:24
**periodically** [4] 94:23
94:25   95:21   96:2
**person** [3]            43:16
133:4   133:24   150:10

GARCIA VS BRK BRANDS INC          CondenseIt™                                    personal – put

199:12

personal [1]          59:11
personally [9]        4:15
4:16      5:2       45:17
97:22    141:6    141:6
152:16  199:10
personnel [1]        44:3
petrochemical [1]
48:24
phase [2]            89:16
89:17
Philadelphia [1] 2:17
photo [2]            82:14
108:23
photoelectric [28]
52:24    53:16    54:18
54:25    55:1      55:2
55:13    57:9      58:10
59:8      59:15    60:8
61:23    77:20    77:25
78:10    78:23    78:24
79:25    80:7      80:11
80:23    81:16    82:16
90:2      90:8      90:14
90:17
photoelectric/ionization
[1]      82:10      [1]
photograph [15] 3:15
3:18      3:19      3:20
107:16  107:23  108:13
149:1    149:3    149:21
150:12  150:18  150:23
177:10  177:14
photographed [1]
107:10
photographs [27]
3:13      29:1      31:9
31:12    107:3    107:10
107:18  107:19  123:6
136:21  147:7    147:12
148:10  148:11  149:6
149:8    149:9    156:2
156:5    177:18  177:20
177:24  178:3    179:19
179:20  179:21  182:14
photos [8]           75:10
136:9    136:11  136:18
136:25  147:8    147:9
177:15
physical [2]       129:15
173:17
physics [2]          34:11
34:15
physiology [1]     85:11
pick [1]    132:3
picked [1]            132:9
picture [2]          62:1
108:13
pictures [8]         122:2
122:2    122:6    122:7
122:8    146:21  146:23
146:24
piece [2] 96:15    154:7
pieces [1]            102:4
pile [2]  112:1    122:7
pipe [1]  43:21
piped [1]            127:4

piping [1]          122:25
place [5] 33:15    106:11
110:11  147:19  191:2
placement [1]      94:17
places [1]            43:1
190:25
plaintiff [9]          2:9
12:11    21:18    28:23
31:10    48:21    50:25
51:13
plaintiff's [1]      14:17
28:18    75:12
plaintiffs [4]         2:3
4:20      32:3      51:6
plaintiffs' [1]     171:24
plan [4]  26:23    100:11
100:14  100:15
plane [1] 171:2
planning [1]        20:17
62:11
plant [5] 39:2      39:3
100:18  101:22  102:6
plants [1]            38:22
plastic [3]          66:22
75:3      145:13
plate [10]            3:15
103:8    106:25  107:7
107:8    107:11  108:15
108:19  109:21  177:11
play [1] 10:14    49:6
played [3]            34:19
34:23    35:12
plug [1] 146:14  146:14
148:5
plugged [1]        145:25
148:2
plus [2] 78:20    141:12
plywood [1]        66:18
66:19    66:21
point [17]            9:18
58:20    70:3      79:19
95:7      95:8      95:8
95:10    106:9    114:23
114:23  133:2    140:12
158:18  169:24  192:10
196:7
pointed [2]          83:23
158:16
poisoning [1]       10:3
10:13    12:15    15:9
188:14  189:12  190:1
police [1]          173:21
political [2]        162:15
162:16
porch [2]            72:6
72:7
portion [5]          89:15
137:23  149:13  151:8
151:9
portions [1]        119:5
pose [1] 91:20
position [2]          46:21
53:15
positioned [2]      190:5
190:7
possession [4]      75:12

105:3    105:7    133:12
58:19    93:8      93:8
possibly [1]         41:18
56:4      101:2    120:5
Post [2]  1:23      200:21
potentiometer [2]
61:11    61:12
pound [7]              8:2
115:8    115:12  115:12
115:19  115:22  118:4
pounds [5]           53:12
109:10  110:17  110:18
112:18  117:24  117:25
118:3    118:6    187:25
188:1
power [11]          94:20
160:14  160:19  160:20
161:13  162:4    163:7
163:8    163:22  167:3
167:12
Powered [1]         26:8
practical [1]        11:16
practically [1]      8:15
practice [1]         42:2
preaching [1]       59:22
preceded [1]       116:10
preceding [1]      169:18
predict [1]          116:5
predicted [1]        95:25
preliminary [1]      4:14
preparation [1]     76:16
prepared [2]       143:14
143:15  168:21
Presently [1]       47:10
pressing [1]         83:1
presstrol [1]        60:21
pressure [56]        3:17
7:18      8:3      8:4
8:19      9:25      44:19
76:10    76:11    106:21
108:20  108:20  109:3
109:12  109:14  109:18
109:18  109:20  109:23
110:11  110:12  110:25
111:14  111:14  111:15
111:20  111:22  111:25
112:3    112:15  112:7
112:11  112:15  113:10
113:14  113:24  114:2
114:3    114:4    114:9
114:25  115:1    115:2
115:5    115:9    115:13
116:4    119:4    124:1
124:2    124:7    124:23
125:1    125:12  137:17
176:7
pressures [5]        38:9
110:4    111:4    111:5
112:22
pressurized [1]     38:5
pretty [1]           71:13
81:25    83:3      116:2
119:23  184:9
prevent [1]          95:23
prevented [1]       127:5
price [3] 39:6      39:7

78:21
primarily [3]        44:18
54:11    112:7
primary [1]         116:22
principle [2]        45:4
58:17
print [1] 57:3
printed [2]         132:12
178:19
printout [1]         53:24
57:3
prints [1]          136:22
137:1
private [1]          33:22
problem [6]          7:6
49:5      56:22    59:15
139:11  187:19
problems [1]         49:2
58:8      176:9
Procedure [1]        1:25
Proceedings [1]   197:24
produce [5]         88:11
117:3    135:11  140:3
178:24
produced [70]        1:17
8:7      8:8      8:9
10:15    10:18    10:21
11:1      11:2      11:4
11:6      12:2      12:24
13:19    13:19    13:22
19:10    20:25    21:18
24:10    24:24    25:5
29:10    29:21    31:10
31:15    31:15    68:5
88:3      89:4      116:6
117:24  117:25  118:4
118:11  119:2    122:7
122:8    123:7    135:23
140:24  142:15  147:7
152:8    157:6    159:3
159:4    182:10  182:12
182:13  182:18  184:6
184:10  184:23  186:5
187:7    187:8    187:20
188:9    189:9    189:14
194:9    194:10  194:13
194:16  194:18  194:21
195:6    195:12  196:9
producing [10]       7:9
7:12      7:22      7:24
8:2      11:13    45:4
53:13    187:22  194:5
product [11]         24:11
24:22    31:4      38:11
49:19    50:3      93:16
95:3      95:19    158:2
175:2
production [6]      10:24
55:18    57:8      69:22
69:25    116:10
products [12]        50:3
54:12    60:14    104:4
127:6    127:10  127:20
130:5    157:5    182:11
185:25  186:5
profession [2]       42:4
42:6
professional [1] 40:24
41:14    42:9      75:16

professionally [1]
5:2
program [1]          73:14
progression [1]    43:15
project [4]          3:25
16:14    27:10    166:3
Prompts [1]          26:7
propane [21]        13:4
43:5    100:8    103:16
110:3    110:6    110:20
110:23  111:3    111:6
111:8    111:20  117:10
120:16  121:3    124:20
125:11  126:21  131:25
132:1    132:2
proper [5]            39:1
131:16  131:16  131:25
132:1
properly [13]       16:16
55:6    127:3    127:15
130:4    131:13  132:20
133:6    138:7    189:20
190:5    190:7    193:24
proportionately [1]
111:23
proposed [1]        96:18
97:17
protect [2]        145:11
145:11
protection [8]      19:22
20:9    20:15    20:23
36:7    45:1    75:17
93:1
protocol [8]         28:6
29:2    65:6    65:8
65:13    65:16    139:3
179:4
proved [1]         199:11
provide [14]         7:1
8:5    8:10    8:20
8:24    9:3    9:15
39:1    48:15    86:21
91:19    92:25    177:1
190:1
provided [3]        10:12
16:23    174:14
provides [1]        39:19
providing [1]      168:8
provision [1]      129:14
public [5]           21:1
39:18    78:22    158:6
199:17
pull [1]  111:21
pulled [1]          171:1
183:2
pumped [1]         195:9
purchasers [1]     80:6
purple [4]          59:21
59:22    59:23    59:24
purpose [5]         77:14
111:8    143:1    155:3
180:16
purposes [3]        49:17
50:20    199:13
pursuant [1]         1:24
pushes [1]         130:23
put [38] 37:16    44:15

GARCIA VS BRK BRANDS INC          CondenseIt™                              putting – right

50:11  53:14  55:4
64:14  64:18  64:23
65:1  73:12  73:17
74:19  82:24  99:22
117:11  117:11  124:10
127:20  131:20  134:4
137:15  140:3  142:13
143:12  147:4  148:25
154:21  155:7  159:18
161:2  169:9  177:9
180:20  180:21  184:25
186:22  190:13  190:17
**putting** [4]          39:5
74:15  116:8  176:7
**Qualifications** [1]
52:8
**quantifiable** [1] 195:12
**quantities** [2]  91:24
194:14
**quantity** [1]        195:11
**quarters** [1]        34:5
34:10  35:20  36:15
**question-and-answer**
[1]      6:6
**questionable** [1]
11:14
**questions** [12]    4:13
7:5  19:13  53:20
96:7  131:10  146:1
160:24  195:22  195:24
196:1  196:9
**quick** [1]          21:10
124:13  182:17
**quickly** [3]        62:5
72:4  78:8
**R** [2]      2:1      2:10
**R-i-e-l** [1]      18:1
**Railroad** [2]      120:25
134:8
**raise** [1] 111:16
**raised** [1]        119:5
**ran** [2]  62:23  72:11
76:20  144:11  175:4
180:14  183:3  194:25
**rate** [3]  55:24  55:25
95:25
**rates** [1] 61:21
**ratio** [2] 8:6      9:21
**raw** [2]  165:8  168:17
**Ray** [2]  2:10    33:5
**Ray's** [1]        33:13
**re-call** [1]      196:8
**reached** [1]      188:13
**reaches** [3]       55:17
91:1  92:22
**read** [25] 27:8  27:18
63:7  71:12  73:15
78:12  80:2  85:23
95:12  97:10  97:20
98:5  98:15  98:20
98:22  129:21  158:5
158:17  159:1  160:5
175:25  176:2  193:1
196:12  199:1
**reading** [1]        19:5
98:14  125:5  132:10
140:12  140:20  140:21

158:8  168:2  176:10
**readout** [3]      61:1
61:1  61:2
**real-world** [1]
65:24  68:11  69:20
73:10  81:17  82:9
82:12
**realize** [1]       97:13
**really** [12]      47:24
51:9  64:13  65:4
109:1  110:1  143:8
167:22  171:3  176:5
176:15  190:16
**rear** [1]  57:6
**reason** [1]        16:6
60:2  61:22  61:24
73:16  86:24  87:2
87:7  95:18  125:7
126:17  127:19  139:18
157:13  163:22  167:19
171:12  171:13  171:19
180:5  198:2
**reasonable** [1] 113:13
125:9  125:10  133:22
161:9  163:20  167:10
167:14  167:16  187:9
188:20  190:22
**reasons** [2]      78:6
78:7
**recalibration** [1]
139:17
**receive** [1]      185:1
**received** [3]      81:24
196:23  197:6
**recess** [4]        46:12
96:12  137:12  174:11
**reciprocity** [1] 41:21
42:1
**recollection** [4] 13:21
81:17  115:21  172:20
**recommendation** [1]
77:12
**recommendations** [3]
77:5  77:10  81:7
**record** [12]      52:5
52:6  117:21  137:11
137:15  147:5  147:6
147:13  149:1  177:5
177:6  177:9
**rectification** [4] 53:1
53:4  54:9  60:11
**red** [6]  56:19  56:20
56:22  64:25  116:15
116:16
**redact** [1]        87:13
**redesign** [1]      163:5
**reduce** [1]        87:20
130:20
**reduced** [1]      135:20
**reduction** [1]    127:17
**refer** [4] 102:13  105:25
106:7  170:5
**reference** [1]     118:10
123:13  123:24  164:22
**references** [1]     96:8
**referred** [6]      82:5
101:19  117:24  121:10

125:25  137:18
**referring** [5]      79:5
118:22  119:12  121:9
170:2
**refresh** [1]        40:10
**Regal** [1]        113:21
**regard** [1]        24:24
53:1
**regarding** [7]      17:3
17:13  17:21  18:2
19:21  96:16  197:7
**regardless** [1]    59:14
**Register** [1]       13:4
**regulate** [3]       42:4
42:5  42:6
**regulating** [1]    54:12
124:7
**Regulation** [2]    3:17
137:17
**regulations** [14]   17:4
39:16  39:19  39:25
40:8  53:14  77:4
120:23  120:25  131:7
133:13  134:11  134:14
134:20
**regulator** [1]      7:21
53:13  110:12  111:1
111:12  112:10  112:14
113:8  113:21  113:22
114:9  121:17  121:20
121:23  122:10  122:15
177:24  177:25  186:19
**regulators** [7]    110:8
110:12  111:3  114:16
114:19  124:1  124:24
**related** [2]        28:6
75:11  200:9
**relating** [1]      22:23
**relations** [1]     49:9
**relative** [1]      200:10
**relatively** [1]    41:17
44:6  62:5  182:17
**relevance** [1]     38:12
**relevant** [4]      41:7
42:17  42:24  83:7
**reliable** [1]      142:23
144:9  144:13
**relied** [1]        158:11
158:14
**rely** [11] 25:10  25:14
27:16  27:18  108:23
155:24  165:24  166:8
169:12  171:10  172:1
**relying** [2]        18:10
170:2
**remember** [7]      17:10
154:23  156:4  179:9
180:23  180:25  182:7
**remind** [1]        86:17
**removal** [1]       123:6
**remove** [2]        164:2
164:7
**removed** [1]       163:7
**render** [2]        157:10
169:7
**rendering** [1]     158:12

169:13
**repeat** [2]        42:20
192:2
**repeatable** [1]    72:21
**rephrase** [1]      6:18
**replacing** [1]     60:2
**replenished** [2]  128:25
129:3
**report** [50]        3:9
3:23  21:3  21:14
27:15  28:1  29:24
30:2  52:7  136:14
143:14  143:14  143:20
143:22  157:15  157:16
157:19  157:19  157:24
158:4  158:11  158:12
159:11  160:8  160:17
161:18  161:18  163:13
163:15  163:18  164:13
166:1  166:5  166:7
166:18  167:21  168:11
168:18  168:21  169:3
169:3  169:8  169:12
170:3  170:22  170:23
174:22  188:23  188:24
189:13
**reported** [1]      1:22
**reporter** [8]      6:9
25:8  86:19  117:18
117:20  153:25  200:6
200:17
**Reporter's** [2]    3:5
200:3
**Reporting** [3]     1:23
161:7  200:21
**reports** [2]       25:19
26:25  31:3  144:21
169:1  170:7  171:7
196:20
**represent** [4]     4:8
29:23  136:15  149:7
**representation** [1]
124:25
**Representative** [2]
1:4      2:3
**reproduce** [2]     73:2
73:25  74:4
**reproduced** [2]    73:5
73:24
**reproducible** [3]
72:12  73:1  73:7
**Republic** [1]      48:23
**request** [2]       26:5
87:8
**require** [1]       128:22
**required** [2]      127:1
176:8
**requirement** [2]  41:19
**requires** [1]      94:5
**research** [2]      76:14
172:5
**researchers** [1]  87:25
**reserve** [2]       195:23
195:25
**reset** [1] 62:9
**residential** [3]   39:9
40:4  41:5  45:18

45:19  45:24  77:5
77:7  84:4  90:1
110:22
**residents** [2]     174:1
174:3
**residual** [1]      9:10
**resigned** [1]      76:15
**resort** [1]        21:1
**respect** [3]       7:4
21:19  32:3  38:24
45:1  84:20  161:3
188:25
**response** [2]      81:21
81:24  91:23
**responsibilities** [1]
47:2
**responsibility** [2]
133:11  133:11
**responsible** [2]   47:5
131:12  131:15  131:18
131:24  132:19  133:5
**responsive** [1]    19:7
19:9
**rest** [2]  61:3  139:22
189:13
**result** [1]        72:22
**results** [4]       28:7
72:14  72:20  73:2
**resume** [2]        29:11
37:9
**retain** [1]        47:13
**retained** [2]      6:23
97:8
**retaining** [1]     147:25
**rethink** [1]       155:12
**retired** [2]       41:18
57:17
**retirement** [4]    39:23
44:25  50:18  76:16
**retracting** [1]    18:3
**reverse** [1]       153:16
**review** [9]        19:2
30:14  86:8  87:6
124:22  143:13  158:20
159:5  188:23
**reviewed** [17]     22:4
22:5  22:8  22:16
24:3  27:7  103:6
143:20  144:20  165:5
168:17  169:10  171:25
172:8  173:11  174:18
183:5
**reviewing** [2]     171:2
174:13
**revised** [1]       159:11
**Richard** [1]       5:22
**Rick** [1] 5:3
**ridiculous** [1]    95:14
**Riel** [1]  18:1
**right** [139]       6:24
10:8  11:2  12:15
12:16  12:21  13:13
17:5  19:15  22:19
23:3  23:12  23:15
25:4  30:5  33:7
33:17  34:3  35:10
36:3  38:6  38:14

GARCIA VS BRK BRAND...NC    CondenseIt™    right-hand - signal

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 43:13 | 44:23 | 45:12 | | **room/dining** [1] 69:5 | | 167:15 183:10 190:22 | 83:22 |
| 49:17 | 49:21 | 54:3 | | **rooms** [3] | 69:1 | **sawmills** [1] 17:4 | **seminars** [13] 36:21 |
| 54:13 | 55:12 | 56:15 | | 94:6 190:14 | | **saws** [1] 18:14 | 37:10 37:13 37:13 |
| 57:11 | 58:17 | 60:21 | | **Rork** [8] 161:15 170:10 | | **says** [13] 26:12 31:2 | 37:24 38:12 38:19 |
| 62:22 | 63:9 | 66:19 | | 170:16 170:21 170:22 | | 56:21 79:25 79:25 | 38:25 39:8 40:14 |
| 67:10 | 67:20 | 70:19 | | 170:23 171:17 171:20 | | 106:16 118:19 128:22 | 41:3 52:17 83:20 |
| 71:10 | 74:17 | 75:7 | | **Rosalinda** [3] 158:22 | | 129:11 129:18 147:7 | **send** [11] 25:8 26:24 |
| 79:6 | 79:11 | 82:3 | | 183:6 184:20 | | 162:20 189:13 | 55:18 56:16 56:16 |
| 82:20 | 85:21 | 85:24 | | **roughly** [2] 67:15 | | **scan** [1] 169:8 | 65:13 98:11 139:16 |
| 86:3 | 86:4 | 86:4 | | 115:22 | | **scanned** [3] 98:19 | 156:18 171:5 171:6 |
| 88:6 | 89:4 | 90:18 | | **round** [1] 69:7 | | 159:15 169:10 | **sending** [1] 26:3 |
| 92:3 | 92:6 | 92:19 | | **Roy** [1] 5:20 | | **scattered** [2] 57:14 | **sends** [2] 58:20 |
| 92:21 | 93:2 | 93:25 | | **rules** [6] 1:25 39:19 | | 57:14 57:16 | 61:2 |
| 95:7 | 96:9 | 96:19 | | 39:24 134:9 134:11 | | **scene** [1] 167:23 | **sense** [9] 39:3 54:19 |
| 99:9 | 99:25 | 100:8 | | 134:20 | | **school** [2] 34:21 | 59:19 61:13 72:20 |
| 102:23 | 103:22 | 106:12 | | **run** [9] 37:23 | | 52:23 | 88:5 88:9 88:24 |
| 107:22 | 108:4 | 110:8 | | 63:1 63:12 72:13 | | **schools** [1] 37:23 | 135:8 |
| 110:11 | 112:9 | 112:10 | | 72:18 72:19 127:7 | | **science** [3] 36:5 | **sensed** [1] 88:2 |
| 113:11 | 114:13 | 115:12 | | 143:2 | | 36:9 84:1 | **sensing** [1] 57:25 |
| 117:1 | 117:6 | 117:25 | | **running** [1] 37:18 | | **scrap** [1] 59:7 | 58:2 61:17 |
| 118:17 | 118:20 | 123:8 | | **runs** [1] 58:8 | | **screw** [1] 114:20 | **sensitive** [1] 62:4 |
| 125:5 | 127:1 | 128:21 | | **rush** [1] 141:25 | | **screws** [1] 113:25 | **sensor** [6] 55:13 |
| 129:10 | 130:16 | 130:24 | | **S** [1] 2:1 | | **seal** [2] 199:14 200:13 | 58:16 60:19 60:24 |
| 131:11 | 136:5 | 137:25 | | **SA67D** [5] 28:8 | | **sealed** [1] 66:22 | 90:18 142:13 |
| 142:10 | 142:16 | 145:6 | | 28:14 63:20 63:23 | | **sealing** [1] 138:16 | **sensors** [7] 57:9 |
| 146:24 | 147:1 | 147:16 | | 175:1 | | **Sears** [3] 12:6 12:10 | 57:10 57:15 57:22 |
| 148:1 | 148:6 | 148:9 | | **SA67D's** [2] 164:13 | | 12:11 | 60:7 60:8 62:3 |
| 148:24 | 149:9 | 149:15 | | 168:1 | | **second** [7] 31:23 | **sent** [14] 24:9 24:13 |
| 152:2 | 154:9 | 154:12 | | **sack** [1] 75:3 | | 74:23 75:8 99:25 | 24:15 26:23 28:22 |
| 155:14 | 155:21 | 156:21 | | **safe** [2] 133:13 134:13 | | 110:9 128:20 162:3 | 31:8 95:16 157:20 |
| 157:4 | 159:7 | 160:12 | | **safeguard** [1] 44:22 | | **seconds** [2] 72:1 | 169:8 172:9 172:15 |
| 161:25 | 162:8 | 162:10 | | **safety** [10] 21:4 | | 72:4 | 172:16 173:12 174:15 |
| 163:4 | 164:25 | 166:19 | | 21:5 22:25 24:11 | | **secretary** [1] 48:9 | **sentence** [2] 80:3 |
| 166:23 | 167:3 | 167:7 | | 24:22 52:25 75:1 | | **section** [3] 3:17 | 125:6 |
| 168:24 | 171:16 | 172:10 | | 76:13 134:14 134:20 | | 124:19 137:17 | **Separable** [2] 27:4 |
| 175:10 | 177:8 | 178:1 | | **sailing** [1] 38:5 | | **sections** [2] 87:11 | 169:4 |
| 178:8 | 178:12 | 181:23 | | **saith** [1] 197:21 | | **see** [66] 11:8 14:16 | **separate** [3] 35:15 |
| 183:7 | 183:11 | 186:9 | | **sale** [1] 44:19 | | 23:20 26:12 27:1 | 90:23 128:10 |
| 186:13 | 186:14 | 191:2 | | **Salinas** [40] 2:5 | | 54:5 56:8 59:14 | **separated** [1] 93:4 |
| **right-hand** [3] 120:9 | | | | 24:9 24:15 26:24 | | 59:17 70:16 71:14 | **separately** [2] 47:20 |
| 141:24 150:16 | | | | 42:19 52:4 85:25 | | 73:22 74:21 79:17 | 147:13 |
| **rising** [2] 187:15 | | | | 86:6 86:11 86:16 | | 82:2 87:10 87:11 | **September** [2] 63:4 |
| 188:3 | | | | 86:25 87:2 87:14 | | 96:8 99:17 100:12 | 97:15 |
| **risks** [1] 91:20 | | | | 93:7 95:17 124:15 | | 102:7 105:16 107:10 | **series** [2] 131:9 |
| **road** [2] 33:22 33:24 | | | | 125:24 126:5 131:1 | | 122:14 122:18 124:5 | 159:3 |
| **Roberts** [5] 15:25 | | | | 131:17 133:9 134:15 | | 128:12 129:20 130:2 | **served** [2] 19:3 |
| 16:3 16:4 16:9 | | | | 136:13 137:19 143:17 | | 132:2 138:9 138:13 | 76:23 121:7 |
| 16:10 | | | | 148:15 154:17 163:23 | | 133:22 138:23 139:3 | **service** [8] 21:19 |
| **Roby** [5] 5:3 143:15 | | | | 164:22 167:13 168:3 | | 144:11 145:21 147:15 | 34:7 34:18 34:25 |
| 143:18 143:19 143:22 | | | | 171:6 172:16 177:5 | | 148:15 148:22 149:24 | 35:2 39:18 95:24 |
| **Roby's** [1] 144:21 | | | | 184:13 192:1 192:22 | | 151:5 151:10 152:9 | 109:25 |
| **rocket** [1] 54:5 | | | | 195:25 196:15 197:8 | | 152:13 152:13 152:22 | **Services** [3] 21:8 |
| **rockets** [1] 54:1 | | | | **Salinas'** [1] 33:5 | | 153:4 153:9 153:10 | 21:13 23:9 |
| **rod** [1] 50:14 | | | | **sample** [1] 160:13 | | 155:5 157:22 162:11 | **servicing** [1] 44:19 |
| **role** [1] 10:14 | | | | 163:2 | | 170:25 176:3 179:5 | **set** [11] 38:9 39:25 |
| **Roll** [2] 149:1 149:3 | | | | **San** [1] 169:16 | | 179:6 179:10 180:17 | 56:12 56:21 58:19 |
| 150:19 | | | | **sat** [3] 76:10 126:14 | | 180:18 182:2 182:14 | 76:24 92:17 97:15 |
| **Roman** [3] 31:3 | | | | 167:22 | | 184:5 187:18 196:3 | 113:24 139:14 186:19 |
| 31:5 170:6 | | | | **saw** [29] 7:23 7:23 | | 196:5 | **settings** [1] 60:7 |
| **Rome** [1] 15:17 | | | | 18:3 73:16 96:24 | | **seeing** [4] 98:14 | **settlement** [2] 79:10 |
| **roof** [1] 7:23 | | | | 96:25 97:5 97:10 | | 150:13 152:3 155:10 | 96:16 96:19 97:14 |
| **room** [23] 64:16 | | | | 97:13 97:21 98:21 | | **sees** [1] 54:2 | 97:17 98:3 98:6 |
| 69:2 69:4 69:5 | | | | 99:15 100:22 101:9 | | **sell** [5] 45:14 51:22 | 98:17 99:5 |
| 69:5 70:22 70:23 | | | | 101:16 119:18 120:6 | | 51:24 52:1 133:12 | **seven** [2] 16:12 |
| 90:24 93:5 100:25 | | | | 122:19 138:21 138:25 | | **selling** [1] 132:1 | 66:16 |
| 111:17 127:12 128:23 | | | | 139:1 140:15 144:5 | | **sells** [2] 38:21 | **several** [6] 55:20 |
| 128:25 129:2 129:10 | | | | 144:9 155:9 161:1 | | **seminar** [2] 41:8 | 61:5 73:6 76:24 |
| 130:6 130:14 130:24 | | | | | | | |
| 138:23 140:3 156:10 | | | | | | | |
| 185:15 | | | | | | | |
| 78:7 161:15 | | | | | | | |
| **Seymore** [2] 13:3 | | | | | | | |
| 13:5 | | | | | | | |
| **shadow** [5] 150:13 | | | | | | | |
| 151:17 151:25 152:4 | | | | | | | |
| 152:25 | | | | | | | |
| **shadows** [2] 150:15 | | | | | | | |
| 150:17 | | | | | | | |
| **Shakes** [1] 6:12 | | | | | | | |
| **Shapiro** [2] 165:18 | | | | | | | |
| 165:20 | | | | | | | |
| **shaving** [2] 38:22 | | | | | | | |
| 39:2 39:3 | | | | | | | |
| **sheet** [10] 66:21 | | | | | | | |
| 102:4 104:11 104:15 | | | | | | | |
| 104:17 105:2 128:18 | | | | | | | |
| 136:15 136:16 147:7 | | | | | | | |
| **sheets** [1] 66:19 | | | | | | | |
| **Shelby** [2] 20:17 | | | | | | | |
| 62:11 | | | | | | | |
| **shelf** [3] 180:2 180:12 | | | | | | | |
| 180:21 | | | | | | | |
| **sheriff's** [1] 123:8 | | | | | | | |
| **ship** [2] 38:5 38:8 | | | | | | | |
| **Shiree** [2] 2:5 | | | | | | | |
| 137:20 | | | | | | | |
| **shock** [1] 161:11 | | | | | | | |
| **shoot** [2] 72:5 190:18 | | | | | | | |
| **shooting** [1] 114:23 | | | | | | | |
| **shop** [2] 17:15 18:15 | | | | | | | |
| **shops** [2] 37:17 | | | | | | | |
| 37:25 | | | | | | | |
| **short** [7] 32:11 34:4 | | | | | | | |
| 34:14 35:16 65:3 | | | | | | | |
| 81:19 137:2 | | | | | | | |
| **short-circuit** [1] 22:10 | | | | | | | |
| **shorter** [1] 175:16 | | | | | | | |
| **shorthand** [2] 200:6 | | | | | | | |
| 200:17 | | | | | | | |
| **shortly** [1] 182:6 | | | | | | | |
| **show** [11] 19:1 | | | | | | | |
| 64:23 71:10 122:16 | | | | | | | |
| 123:21 133:2 148:10 | | | | | | | |
| 148:17 148:19 150:17 | | | | | | | |
| 152:15 | | | | | | | |
| **showed** [1] 175:5 | | | | | | | |
| **showing** [4] 56:23 | | | | | | | |
| 57:2 140:13 151:24 | | | | | | | |
| **shown** [1] 32:5 | | | | | | | |
| 105:12 | | | | | | | |
| **shows** [6] 128:11 | | | | | | | |
| 142:22 150:1 150:6 | | | | | | | |
| 177:11 190:13 | | | | | | | |
| **shut** [1] 56:11 | | | | | | | |
| **shutdown** [2] 56:12 | | | | | | | |
| 61:21 | | | | | | | |
| **shutter** [1] 116:12 | | | | | | | |
| **side** [11] 67:18 89:15 | | | | | | | |
| 112:16 112:22 120:9 | | | | | | | |
| 141:24 142:10 142:12 | | | | | | | |
| 150:14 150:16 151:14 | | | | | | | |
| **sighted** [1] 55:22 | | | | | | | |
| **sign** [1] 119:23 | | | | | | | |
| **signal** [3] 55:18 | | | | | | | |
| 58:20 61:2 | | | | | | | |

GARCIA VS BRK BRANDS INC          CondenseIt™                    signals – states

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| signals [1] | 58:6 | 41:9 | 45:14 | 45:18 | 74:21 | 78:12 | 80:18 | 194:20 | 195:7 | 195:12 |
| signature [3] | 3:4 | 45:20 | 45:24 | 51:18 | snow [1] 153:8 | | | 195:16 | | |
| 198:1 | 199:1 | 51:20 | 51:22 | 51:24 | snug [1] 151:11 | | | sooting [2] | | 184:1 |
| signed [2] | 172:16 | 52:1 | 53:10 | 54:17 | Society [5] | | 37:15 | 186:20 | | |
| 172:21 | | 55:3 | 55:5 | 55:11 | 40:23 | 42:9 | 75:21 | sorry [34] | | 8:24 |
| significant [2] | 144:1 | 56:3 | 56:23 | 58:4 | 75:23 | | | 13:2 | 14:5 | 15:3 |
| 162:25 | | 62:12 | 62:13 | 62:21 | soffit [1] 128:14 | | | 21:11 | 23:24 | 31:21 |
| similar [4] | 63:23 | 63:6 | 63:14 | 63:17 | soft [1] 66:6 | | | 37:1 | 38:7 | 39:12 |
| 110:4 | 171:15 | 64:15 | 64:16 | 64:17 | sold [7] | 20:1 | 20:6 | 42:19 | 51:25 | 62:10 |
| simple [2] | 30:20 | 64:23 | 69:3 | 69:20 | 44:3 | 46:3 | 80:4 | 65:20 | 77:21 | 82:14 |
| 31:18 | | 69:25 | 70:17 | 70:24 | 133:4 | 162:21 | | 84:14 | 85:13 | 97:15 |
| simply [7] | 22:7 | 71:11 | 72:5 | 73:11 | Sole [1] 73:8 | | | 99:15 | 103:2 | 108:5 |
| 56:19 | 61:16 | 65:24 | 73:18 | 74:16 | 74:21 | someone [11] | | 12:10 | 122:12 | 124:17 | 125:4 |
| 73:10 | 138:10 | 163:13 | 77:5 | 77:20 | 80:1 | 49:4 | 62:1 | 67:5 | 128:5 | 148:23 | 151:9 |
| Sims' [1] | 28:20 | 80:5 | 80:8 | 80:12 | 77:8 | 98:21 | 101:17 | 152:3 | 154:1 | 154:18 |
| sit [3] | 66:7 | 79:19 | 80:12 | 81:8 | 82:10 | 120:13 | 123:7 | 133:18 | 162:7 | 164:24 | 172:24 |
| 76:8 | 80:25 | 81:3 | 83:15 | 83:15 | 83:16 | 167:21 | | | 192:1 | 194:16 | 197:4 |
| 95:8 | 156:24 | 168:8 | 83:16 | 84:3 | 84:4 | sometimes [5] | | 41:22 | 197:11 | | |
| sitting [6] | 120:6 | 85:20 | 87:19 | 87:25 | 123:18 | 129:18 | 129:20 | sought [1] | | 88:1 |
| 122:23 | 122:24 | 132:23 | 88:2 | 88:5 | 88:6 | 129:24 | | | sound [3] | | 67:10 |
| 155:14 | 180:12 | | 88:19 | 88:20 | 88:22 | Somewhat [1] | | 40:10 | 93:24 | 146:24 | |
| situation [3] | 80:22 | 89:3 | 89:11 | 89:12 | somewhere [7] | | 34:9 | sounded [5] | | 70:5 |
| 135:17 | 135:22 | | 89:17 | 89:17 | 89:20 | 43:25 | 44:4 | 103:8 | 166:23 | 167:2 | 184:22 |
| situations [2] | 60:25 | 89:22 | 90:1 | 90:16 | 135:1 | 167:22 | 181:1 | 191:17 | | |
| 166:19 | | 90:18 | 90:20 | 90:23 | song [1] 59:25 | | | source [4] | | 94:20 |
| six [6] | 47:10 | 47:20 | 91:1 | 91:3 | 91:17 | sons [3] | 20:4 | 44:4 | 160:20 | 163:7 | 167:12 |
| 108:11 | 124:11 | 176:1 | 91:19 | 91:24 | 92:2 | 46:4 | | | sources [1] | | 162:4 |
| 193:20 | | 92:2 | 92:6 | 92:14 | soon [2] 61:23 | | 188:9 | south [2] 13:10 | | 47:12 |
| size [11] 7:14 | 11:4 | 92:15 | 92:17 | 92:18 | sooner [1] | | 95:15 | southeast [3] | | 18:17 |
| 54:16 | 66:13 | 66:14 | 92:21 | 92:22 | 92:25 | soot [125] | | 7:9 | 45:8 | | |
| 66:14 | 67:15 | 92:8 | 93:4 | 93:6 | 93:17 | 7:12 | 7:23 | 7:23 | Southern [9] | | 1:1 |
| 103:19 | 115:10 | 138:23 | 93:24 | 94:5 | 94:13 | 7:23 | 7:24 | 8:1 | 4:10 | 39:7 | 40:12 |
| sizes [1] 157:1 | | 94:23 | 94:25 | 95:2 | 8:7 | 8:7 | 8:9 | 75:25 | 76:22 | 76:23 |
| skip [1] 17:22 | | 95:24 | 99:11 | 99:15 | 8:14 | 8:15 | 8:17 | 77:1 | 77:11 | |
| sleeping [4] | 94:6 | 99:17 | 114:6 | 120:8 | 8:18 | 9:10 | 9:12 | southwest [1] | | 18:17 |
| 94:11 | 190:14 | 193:14 | 123:3 | 138:24 | 140:3 | 9:20 | 10:14 | 10:14 | space [44] | | 10:4 |
| slide [1] 149:24 | | 145:5 | 145:8 | 145:11 | 10:18 | 10:20 | 10:24 | 10:13 | 13:9 | 14:12 |
| slides [1] | 149:22 | 145:19 | 145:21 | 145:24 | 10:25 | 11:3 | 11:6 | 32:18 | 33:8 | 33:12 |
| 149:23 | | 146:1 | 146:2 | 146:17 | 11:8 | 11:10 | 11:13 | 99:8 | 100:20 | 100:21 |
| slightly [2] | 129:8 | 147:20 | 147:21 | 148:13 | 11:23 | 12:1 | 12:24 | 100:24 | 103:16 | 104:18 |
| 129:19 | | 149:7 | 150:3 | 150:23 | 13:19 | 13:19 | 13:22 | 109:13 | 111:7 | 120:3 |
| slow [11] 25:6 | 64:10 | 151:18 | 152:8 | 153:20 | 13:24 | 14:2 | 53:10 | 120:16 | 126:7 | 126:25 |
| 64:15 | 65:24 | 73:12 | 153:23 | 154:3 | 155:5 | 69:25 | 83:14 | 83:16 | 127:16 | 132:20 | 133:17 |
| 73:18 | 74:16 | 74:21 | 155:21 | 155:25 | 156:5 | 83:17 | 84:4 | 88:12 | 134:7 | 134:23 | 135:2 |
| 78:12 | 80:18 | 153:25 | 157:15 | 158:3 | 159:10 | 88:14 | 89:17 | 89:20 | 144:18 | 157:4 | 173:4 |
| slower [1] | 80:12 | 160:17 | 160:18 | 162:5 | 114:6 | 115:3 | 116:6 | 177:12 | 182:7 | 183:23 |
| small [9] 31:13 | 44:7 | 163:1 | 163:5 | 163:19 | 116:10 | 116:17 | 116:19 | 184:6 | 186:5 | 189:15 |
| 53:17 | 78:21 | 102:2 | 163:21 | 164:1 | 164:11 | 116:24 | 117:23 | 117:25 | 189:17 | 189:20 | 191:6 |
| 106:25 | 151:17 | 162:22 | 164:15 | 165:11 | 165:22 | 118:4 | 118:11 | 118:19 | 193:24 | 194:1 | 194:5 |
| 162:23 | | 166:2 | 166:18 | 166:21 | 118:25 | 119:2 | 119:6 | 194:9 | 194:19 | 195:6 |
| smaller [1] | 59:4 | 166:22 | 167:1 | 167:5 | 119:19 | 123:5 | 135:24 | 195:12 | | |
| smart [1] | 74:8 | 167:9 | 167:25 | 169:5 | 136:1 | 138:5 | 140:4 | span [2] 95:12 | | 95:12 |
| Smith [1] | 165:14 | 170:16 | 173:5 | 174:25 | 145:12 | 145:24 | 146:1 | spec [1] 66:9 | | |
| smoke [239] | 3:23 | 175:25 | 176:17 | 178:17 | 146:7 | 147:21 | 148:7 | specialist [1] | | 85:8 |
| 3:25 | 7:10 | 7:25 | 178:23 | 178:25 | 179:10 | 150:3 | 150:4 | 151:18 | specialty [1] | | 40:21 |
| 8:21 | 8:25 | 9:4 | 179:22 | 180:7 | 182:5 | 151:21 | 151:23 | 151:24 | specific [14] | | 9:4 |
| 9:8 | 9:9 | 9:11 | 184:21 | 185:16 | 185:18 | 152:9 | 152:15 | 152:17 | 19:12 | 24:25 | 25:7 |
| 9:12 | 9:12 | 12:3 | 185:25 | 186:3 | 186:23 | 152:22 | 152:24 | 153:2 | 27:22 | 89:12 | 113:8 |
| 15:20 | 16:13 | 16:15 | 187:11 | 187:15 | 188:2 | 153:4 | 153:9 | 153:9 | 121:11 | 126:25 | 131:10 |
| 16:18 | 16:20 | 19:18 | 188:8 | 188:9 | 188:10 | 153:23 | 154:3 | 155:5 | 145:19 | 158:16 | 173:2 |
| 19:21 | 20:8 | 20:14 | 189:3 | 189:7 | 189:23 | 175:15 | 176:14 | 182:12 | 177:2 | | |
| 20:19 | 24:6 | 25:17 | 189:25 | 190:5 | 190:13 | 182:13 | 182:17 | 184:5 | specifically [9] | | 41:8 |
| 25:22 | 26:8 | 26:10 | 190:19 | 190:25 | 191:13 | 184:11 | 185:8 | 185:23 | 43:8 | 49:19 | 84:10 |
| 27:5 | 27:9 | 27:25 | 191:16 | 191:23 | 192:9 | 186:23 | 187:14 | 187:15 | 109:4 | 123:12 | 124:19 |
| 28:8 | 32:8 | 33:4 | 192:13 | 192:18 | 194:14 | 187:18 | 187:23 | 188:3 | 145:18 | 161:17 | |
| 33:13 | 36:18 | 36:19 | 195:16 | 195:19 | 197:7 | 188:3 | 188:17 | 188:22 | specifics [4] | | 40:12 |
| 36:24 | 37:2 | 38:16 | 197:17 | | | 189:2 | 189:9 | 190:16 | 98:10 | 98:10 | 158:9 |
| | | smoking [4] | | 58:7 | 190:18 | 191:14 | 194:5 | specs [1] 37:22 | | |
| | | 64:10 | 70:23 | 73:18 | 194:9 | 194:13 | 194:15 | spectrum [1] | | 50:22 |
| | | smoky [1] | | 72:9 | | | | | | |
| | | smoldering [10] 84:10 | | | | | | | | |
| | | 64:15 | 65:25 | 68:6 | | | | | | |
| | | 73:12 | 74:4 | 74:16 | | | | | | |

| | | | |
|---|---|---|---|
| speculate [1] | | | 95:13 |
| spelling [1] | | | 117:19 |
| spent [1] 183:9 | | | |
| spills [1] 162:17 | | | |
| split [1] 51:5 | | | |
| spots [1] 11:8 | | | |
| spring [4] | | | 112:15 |
| 112:20 | 114:11 | 114:20 | |
| spring-operated [1] | | | |
| 112:14 | | | |
| springs [1] | | | 114:19 |
| square [12] | | | 66:15 |
| 66:17 | 67:6 | 67:17 | |
| 67:21 | 67:24 | 109:10 | |
| 110:17 | 110:18 | 112:18 | |
| 115:20 | 124:9 | | |
| SS [1] | | | 154:3 |
| SS's [1] | | | 154:4 |
| Stacie [1] | | | 1:21 |
| 200:17 | | | |
| stack [2] 55:22 | | | 60:20 |
| stacks [3] | | | 53:17 |
| 53:17 | 53:17 | | |
| stage [3] 110:8 | | | 110:9 |
| 124:6 | | | |
| stages [1] | | | 124:5 |
| 124:6 | | | |
| stamp [1] | | | 38:1 |
| stamped [1] | | | 103:7 |
| stamped-out [1] 102:4 | | | |
| stamping [9] | | | 100:23 |
| 101:4 | 101:19 | 101:22 | |
| 102:1 | 102:2 | 102:3 | |
| 105:10 | 107:6 | | |
| stamps [1] | | | 37:16 |
| stand [2] 9:25 | | | 115:16 |
| standard [14] | | | 17:13 |
| 77:11 | 90:7 | 90:10 | |
| 93:22 | 94:5 | 102:24 | |
| 102:25 | 103:3 | 103:4 | |
| 110:20 | 110:21 | 110:24 | |
| 111:13 | | | |
| standards [4] | | | 39:24 |
| 40:1 | 77:12 | 77:14 | |
| standing [1] | | | 119:10 |
| stapled [1] | | | 66:22 |
| start [8] 22:10 | | | 23:6 |
| 59:22 | 77:23 | 114:17 | |
| 125:16 | 125:21 | 172:25 | |
| started [9] | | | 34:17 |
| 34:17 | 43:16 | 44:25 | |
| 61:23 | 61:25 | 68:22 | |
| 176:2 | 182:7 | | |
| starter [1] | | | 193:22 |
| state [15] 1:21 | | | 6:18 |
| 12:10 | 12:11 | 15:13 | |
| 42:3 | 42:4 | 46:19 | |
| 66:24 | 187:8 | 199:7 | |
| 199:18 | 200:1 | 200:6 | |
| 200:18 | | | |
| statement [10] | | | 11:3 |
| 54:22 | 112:2 | 118:3 | |
| 147:5 | 158:21 | 175:13 | |
| 175:13 | 183:6 | 188:16 | |
| states [6] | | | 1:1 |
| 40:25 | 41:19 | 41:21 | |

Q & A REPORTING, INC. (713) 439–7441                    Index Page 16

**GARCIA VS BRK BRANDS, INC**                    **CondenseIt™**                    **stayed - translate**

| | | | | | | |
|---|---|---|---|---|---|---|
| 42:14 | 163:17 | submit [1] | 168:10 | 111:18 113:13 121:17 | 160:6 171:21 | 89:22 103:25 106:18 |

stayed [5]          44:6
70:18   70:20   71:1
98:25
stays [1] 31:8
steak [1] 92:1
steam [3]          53:12
57:6   57:7
Steel [2] 48:22   48:23
stenographic [1]
1:22
stepping [1]   125:17
stick [1] 153:23
sticks [2]          128:14
151:8
Sticky [1]          119:11
still [20] 9:24   17:7
19:24   28:25   29:2
29:3   41:16   43:18
45:3   52:16   59:16
70:10   82:23   127:11
132:12 140:13 161:5
184:5 194:5   195:1
stint [2] 34:14   35:16
stood [1] 171:3
stop [1] 55:18
stopped [2]   191:14
191:17
stops [2] 151:12 167:16
stove [4] 92:2   100:23
101:4 101:20 101:22
102:1 105:11 107:6
straight [1]   111:23
151:1 190:18
straighten [1]   49:5
Street [3]          2:6
2:11   2:16
strictly [5]          13:20
38:8   41:10   68:25
69:7
Strict [3] 5:20   148:11
150:23
strike [1]          60:8
168:23
struck [2]          80:3
176:5
stuck [2] 59:23   145:22
studies [3]          36:4
36:19   169:2
study [21]          3:24
27:3   27:9   36:25
37:2   83:14   164:13
165:6 165:12 165:23
166:2 166:15 167:8
167:21 168:1 168:4
168:5 168:18 169:3
169:15 169:20
stuff [4] 28:24   106:10
116:15 119:11
styled [1]          4:10
subcommittee [1]
76:11
subcontractors [1]
44:14
subject [2]          83:21
90:4

submit [1]          168:10
subpoena [3]          19:1
19:3   19:8
subscribed [2]   199:12
200:13
substantiated [1]
161:12
substantive [1]   48:12
such [2] 45:11   120:24
127:12
sufficient [2]   12:3
129:16 194:14
suggest [9]          63:22
190:4 191:13 191:21
192:7 192:20 193:16
194:8 194:13
suggests [2]   193:24
195:15
suit [1] 98:21
Suite [1] 1:24   2:6
200:21
sum [1] 101:10
summary [2]   160:25
162:1
summer [1]          159:4
Sunday [3]          171:3
191:21
supervise [1]   49:3
supporting [1]   31:1
supposed [7]          88:7
103:25 104:4 106:1
106:3 139:7 139:24
supposedly [2]   63:18
112:13 116:16
surely [1]          159:14
surge [1] 91:15
surmise [3]   182:22
187:2 187:16
survey [7]          3:23
28:1 157:16 158:4
159:11 165:23 166:18
survive [1]          70:14
sweet [1]          81:19
sword [1]          88:10
sworn [3]          1:18
4:2   200:13
system [18]          39:7
53:4 53:5 53:6
55:2 55:5 56:11
57:2 58:5 59:3
59:4 61:3 61:6
61:10 62:2 109:19
113:8 161:7
systems [19]   21:20
21:21 44:20 44:20
45:11 45:12 49:1
49:24 52:23 52:25
53:1 53:7 53:16
53:16 54:8 54:24
55:8 60:2 60:17

tab [1] 170:6
table [1] 126:15
taking [4]          6:10
11:9   30:13   107:22
talks [2] 123:24 124:25
tank [11] 110:7 111:9

111:18 113:13 121:17
121:19 121:20 121:20
121:22 122:1 122:4
122:8 122:18 122:23
122:24 122:24 142:10
155:6 155:11 155:14
155:17
tantamount [1] 190:18
tape [1] 107:25
taught [1]          58:13
tax [1] 66:24
teach [1] 41:3
teaches [1]          52:14
teaching [1]   114:17
technical [3]   52:23
53:9   54:23
technology [2]   60:10
78:23   80:8
Telephone [1]   33:25
telling [1]          78:21
139:18 141:8
tells [4] 92:14   167:22
185:7 188:20
temperature [5] 111:16
111:17 112:5 113:19
169:20
ten-minute [2] 137:10
174:9
tenable [1]          70:10
tens [1] 113:1
term [2] 30:11   38:4
terminal [1]   151:5
terminals [1]   149:18
151:2
terminology [1] 68:13
terms [4] 98:3   98:5
98:16   99:4
Terry [2] 2:15   4:5
test [53] 28:6   28:6
28:6   28:13   28:14
33:15   41:22   65:8
66:11   67:14   67:16
67:21   69:20   70:2
71:3   72:11   72:18
72:23   72:25   73:2
73:5   75:8   75:11
82:18   82:19   82:22
82:22 82:24   83:1
90:5   94:25   127:7
139:3 142:23 143:6
144:5 144:9 144:22
144:25 145:1 145:4
146:6 146:7 165:2
165:4 175:8 176:6
176:7 180:14 180:16
181:18 181:20 194:25
tested [11]          64:17
64:17 64:18 74:14
74:14 81:17 82:24
95:20 96:1 139:8
178:20
testified [10]   4:2
15:8 84:2 149:13
149:17 175:9 181:11
182:4 186:15 188:7
testifies [1]   171:18
testify [3]   159:20

testimony [15]   8:5
10:3   16:24   17:12
18:2   18:9   151:4
174:21 181:2 181:5
181:6 181:25 183:17
184:20 200:10
testing [11]          32:18
32:20   32:23   33:3
62:20 101:13 137:23
142:25 173:6 177:21
178:22
tests [17] 28:7   62:21
62:23 62:25 63:12
64:7 65:7 82:6
82:9 82:12 82:13
143:5 144:1 144:10
145:3 173:9 175:4
Texas [20]          1:1
1:21   1:24   2:7
2:12   4:10   40:8
41:23 120:24 134:7
134:8 169:16 179:2
179:8 179:9 179:10
200:1 200:6 200:18
200:22
Thank [2]          126:5
137:19
Thanks [1]          117:20
themselves [2]   36:25
139:15
theoretical [3]   11:16
118:8 195:2
theoretically [2] 8:14
11:19
thereabouts [1] 91:12
thereafter [1]   30:17
Therefore [2]   95:6
186:20
therein [1]          199:13
thereof [2]          25:15
40:2
thermal [1]          69:16
they've [3]          50:22
75:2   185:3
thick [2] 24:19   93:9
third [4] 74:24   105:15
128:3 128:4
Thomas [2]          6:1
6:2
thought [6]          23:22
24:16   24:17   101:12
138:21 140:1
thousand [1]   54:15
three [11]          3:10
44:2 58:13 61:8
61:15 65:2 74:13
81:20 102:15 158:6
179:8
threshold [4]   55:17
58:19 92:18 188:12
throat [1]          189:3
through [39]   19:5
25:13 30:7 30:22
41:21 42:1 43:21
45:22 45:25 45:25
48:25 68:12 73:9
74:6 88:23 89:16

89:22 103:25 106:18
106:20 107:5 110:13
114:22 114:24 116:14
117:12 119:4 124:11
127:14 127:22 130:17
136:4 140:17 148:21
157:24 168:2 168:8
182:2 199:11
throughout [3]   18:16
49:24 109:19
throw [1]          59:6
thrown [1]          78:25
tie [2]   33:12   50:14
tied [1] 132:10
times [11]          10:8
10:11 10:14 15:23
72:13 112:19 117:13
117:14 124:11 161:16
179:8
timing [1]          9:16
tint [1] 61:15
Tire [1] 73:8
today [27]          6:11
19:6 19:16 20:7
20:13 20:22 22:1
24:6 26:9 26:21
27:12 28:2 28:6
31:15 51:11 71:16
55:3 55:10 71:16
103:20 144:10 173:3
174:14 175:9 178:12
188:7 197:9
together [9]          8:10
33:12 44:16 73:13
78:25 134:4 155:7
161:3 161:8
toilets [1]          43:18
tongue [2]          132:13
143:7
tons [2] 187:23
too [12] 13:7   14:4
16:13 35:13 50:23
56:23 66:25 74:1
74:8 89:9 119:25
153:1
took [17] 29:1   36:14
44:9 88:21 108:12
146:21 147:6 148:11
156:4 156:7 156:16
156:16 156:19 158:5
158:17 176:5 177:10
top [6] 98:22 136:15
136:16 138:17 139:23
142:6 142:16 150:13
topic [1] 196:18
total [2] 101:11 162:19
touch [1] 145:8
touched [1]          141:6
toward [4]          120:7
185:4 185:15 185:16
toxicology [1]   54:16
trained [1]          53:7
53:8
training [1]          36:21
transcript [6]          6:10
6:14   85:22   181:24
translate [1]          6:13

**GARCIA VS BRK BRANDS INC**  CondenseIt™                                                    **trial – worth**

**trial** [14] 15:10    15:13
30:11    30:15    84:3
144:8    170:1    177:2
181:2    181:4    181:5
181:6    181:24    196:1
**tried** [1] 24:17
**trouble** [2]          133:25
134:1    167:15
**trucks** [1]          50:7
62:18
**true** [5]    54:14    110:14
110:19    199:2    200:7
**try** [2]    10:19    98:22
**trying** [5]          54:21
89:5    92:11    156:25
157:3
**Tuesday** [2]          191:22
192:8
**turn** [1]    61:14
**turned** [4]          71:9
136:14    153:15    153:16
**turns** [1] 114:1
**twelve** [1]          66:17
67:22
**twice** [4] 15:24    67:15
68:2    110:18
**two** [30]    27:14    29:15
34:4    34:10    60:2
61:4    61:7    62:23
63:22    70:7    70:7
73:4    78:6    78:7
81:19    89:25    110:7
117:13    117:13    124:5
124:6    148:19    158:25
170:10    171:7    175:6
175:19    183:9    183:10
190:11
**tying** [1] 105:22
**type** [17] 21:6    53:25
64:6    65:3    91:17
93:1    103:5    103:9
103:11    150:18    157:8
**types** [5] 25:9    49:25
62:17    77:18    89:25
98:24
**Typical** [1]          130:13
**typically** [2]          109:12
111:4
**typo** [2]    21:4    21:6
**U-shaped** [1]          128:11
**U.S** [2]    4:9    48:22
**U.W** [1] 97:21
**U2** [1]    9:4
**uh-huh's** [1]          6:13
**UL** [9]    21:17    21:19
22:1    23:16    65:18
65:22    77:13    77:16
90:5
**ULCVS** [4]          21:7
21:11    23:6    23:8
**ultraviolet** [1]    52:25
54:6    59:13
**unburned** [3]    8:18
89:20    89:21
**under** [24]          17:13
20:19    24:8    24:11
26:12    31:3    31:17
**38:9** 52:7    74:6
80:15    121:22    122:23
122:24    127:22    148:3
158:2    167:1    170:6
170:9    174:22    199:11
199:14    200:13
**undersigned** [1] 200:6
**understand** [2]    6:9
6:16    6:17    6:19
36:4    58:14    58:15
68:14    70:11    87:9
96:20    98:13    99:2
108:22    108:25    118:13
123:21    141:7    141:7
143:2    143:10    143:25
166:17    183:13    191:9
191:11    193:9    196:20
**Underwriters** [4]
81:1    81:7    81:9
90:11
**Union** [2]          17:8
17:10    40:12
**unit** [4]    56:4    56:5
61:9    66:24
**United** [2]          1:1
40:24
**university** [1]          34:11
34:20    36:3
**unknown** [1]          57:19
**unless** [12]          62:1
74:5    92:10    109:10
125:21    129:23    137:8
155:18    157:18    158:16
167:15    194:25
**unreasonable** [1]
175:21
**unreasonably** [2]
175:2    176:24
**unusual** [2]          189:4
189:4
**up** [40]    9:23    11:19
16:11    27:22    33:15
35:23    43:21    51:5
56:21    68:1    72:15
74:18    76:15    76:24
84:20    87:11    93:19
95:3    95:19    99:20
100:7    101:10    105:20
115:18    119:7    130:21
132:3    132:9    132:23
133:1    143:12    151:12
154:13    160:3    164:5
164:18    174:9    182:7
183:19    188:3
**upholstery** [1]    74:4
**upper** [2]          54:16
152:24
**used** [41] 20:10    20:16
38:24    45:6    53:7
53:17    54:1    54:24
54:25    60:1    63:6
63:15    64:13    64:13
65:18    66:13    66:16
66:21    66:24    67:17
67:18    68:17    73:13
73:15    74:24    74:24
82:18    82:19    91:17
113:3    113:22    115:10
118:10    123:13    123:15
132:4    139:12    160:21

**177:25** 179:23    180:7
**Users** [2]          21:11
23:8
**Users'** [1]          21:7
**using** [12]          53:4
53:4    54:16    56:1
61:23    61:25    66:18
124:13    129:13    149:6
161:4    176:7
**usual** [1] 25:6
**usually** [3]          24:23
49:6    115:18
**Utilization** [2]    22:2
23:13
**utilize** [1]          178:24
**UV** [11]    53:4    53:6
53:16    54:6    58:11
59:8    59:8    59:16
59:17    59:19    61:24
**V** [1]    31:5
**v-a-n-e** [1]          117:19
**V2430** [2]          104:22
104:25
**V24301MS-2** [1]
106:16
**valve** [1] 109:24
**valves** [1]          61:12
**vane** [2] 116:21    117:19
**vanes** [1]          116:12
**vaporizers** [1]    44:21
**vapors** [1]          130:22
**variables** [1]    93:10
**variation** [3]          113:4
114:13    114:15
**variations** [2]    112:5
112:23
**varies** [1]          111:16
**variety** [2]          10:17
16:24
**various** [1]          25:9
45:11
**varying** [1]          80:6
112:22
**vein** [2] 131:22
**velocities** [1]    83:24
**velocity** [2]          53:19
185:22
**vent** [7]    55:4    119:16
120:7    120:19    120:20
127:4    130:19
**vented** [14]          103:10
103:12    103:12    103:21
103:24    103:25    127:1
127:3    130:4    132:20
132:24    135:19    189:21
193:24
**ventilated** [1]    12:20
**ventilation** [1] 135:14
**ventilation-controlled**
[5]    119:24    134:24
135:4    135:10    135:18
**venting** [1]          13:12
127:15    130:5    133:22
**venued** [1]          14:22
**verbally** [2]          6:12

**197:18**
**verify** [1]          72:13
**versa** [1] 8:16
**version** [1]          29:13
**versus** [4]          8:7
12:10    50:21    116:6
**vessel** [5]          37:20
38:4    38:8    76:10
112:8
**vessels** [7]          37:16
37:21    38:1    44:19
45:2    76:12    124:24
**vice** [1]    8:16
**video** [1] 75:11
**videotape** [1]    154:25
**videotapes** [1]    28:25
**view** [2] 150:7    150:9
**violate** [1]          42:10
**violations** [1]    49:20
**visible** [6]          11:23
12:1    12:24    13:19
14:2    184:11
**visit** [1] 179:13
**visual** [1]          146:18
**vitae** [2] 3:8    29:13
**voltage** [1]          61:1
**volts** [4] 84:20    84:21
91:12    91:15
**VOLUME** [1]          1:14
**wait** [2] 6:6    124:15
**wake** [1] 93:19
**walked** [1]          5:12
**wall** [7]    64:18    64:19
64:22    82:25    94:18
156:5    188:18
**walls** [4] 12:2    14:3
119:9    182:15
**wandering** [1]    108:12
**wants** [1]          47:4
**warning** [4]          58:6
91:20    93:1    190:1
**waste** [1]          44:20
**watch** [1]          143:11
**watched** [3]          138:10
140:18    140:18
**water** [20]          12:14
12:16    106:21    108:17
109:4    109:11    109:15
109:24    112:25    113:1
113:3    114:14    115:6
115:7    115:15    115:19
115:24    125:1    125:2
130:22
**Watley** [3]          79:15
79:15    79:22
**WATTS** [1]          2:11
79:5    59:17
**waves** [1]          59:17
**Wayne** [18]          1:12
1:16    3:3    3:8
3:9    4:1    33:16
46:13    46:15    48:14
49:16    51:17    136:8
147:8    199:1    199:5
199:10    200:4

**ways** [2] 61:5    92:14
**wears** [1]          112:20
**weather** [1]          169:15
**week** [2] 63:8    63:8
63:10
**weekend** [1]          171:3
**welder** [1]          43:20
43:22
**whatsoever** [1] 168:22
**whereas** [1]          78:13
**Wherever** [1]    190:8
**whistle** [1]          119:15
**whistles** [1]    56:13
**white** [2] 153:3    153:7
**whole** [5]    66:14
79:2    106:12    125:22
172:18    187:17
**wide** [1] 10:17
**Wilson** [1]
**window** [5]          127:23
129:8    129:15    129:19
156:12
**windows** [1]    66:23
127:23    129:6
**wipe** [2] 153:6    158:15
**wire** [1] 55:21
**wired** [1]          55:5
**wiring** [1]          84:20
**wish** [1] 64:20
**within** [9]          9:22
76:16    114:9    127:17
149:13    174:9    181:17
185:18    187:9
**without** [16]          13:14
19:5    40:2    80:5
107:2    109:20    109:25
110:1    113:7    160:14
163:22    167:3    168:2
185:17    187:3    194:23
**witness** [19]          1:17
10:6    46:9    67:24
96:10    124:17    143:19
147:10    148:19    148:24
154:1    154:20    196:5
196:10    196:25    197:2
197:10    197:13    197:16
**witnesses** [1]    173:21
187:3
**woman** [1]          81:25
**wonder** [1]          5:1
**words** [9]          9:17
13:24    55:17    72:12
74:11    92:1    94:17
135:4    153:3
**worked** [9]          14:24
17:6    32:4    35:9
40:11    48:24    48:25
50:13    82:23
**works** [2]          58:16
59:7
**world** [1]          55:1
151:23
**worry** [1]          132:24
**worse** [1]          133:2
**worth** [2]          11:20

GARCIA VS BRK BRANDS INC    CondenseIt™    wrap - [sic]

163:16
**wrap** [1] 174:9
**write** [6] 65:8    65:13
  77:14    81:6    99:2
  102:22
**writing** [1]    31:11
**written** [6]    105:16
  106:6    117:4    118:18
  197:6    197:16
**wrong** [6]    86:13
  118:8    133:22    139:19
  139:21    140:5
**wrote** [3]    81:23
  105:18    121:7
**X** [1]    111:20
**XYZ** [1] 132:7
**year** [4] 47:11    76:15
  76:16    180:25
**years** [22]    13:21
  16:13    17:16    22:5
  34:8    37:4    39:23
  41:2    41:9    41:25
  43:2    48:25    49:24
  51:14    66:16    76:25
  81:11    82:2    95:13
  100:23    101:21    176:1
**yellow** [1]    56:20
**yet** [3]    57:2    119:1
  135:18
**yourself** [4]    50:2
  83:10    84:13    84:15
**Z** [1]    102:23
**zero** [2] 114:14    140:13
**ZIP** [3] 174:15    174:18
  174:19
**[sic]** [1]  73:8

**BIOGRAPHICAL DATA**
September 1999

B. Don Russell

| | | |
|---|---|---|
| Associate Vice Chancellor | Associate Dean for Research | Deputy Director |
| Engineering Research Programs | College of Engineering | Texas Engineering Experiment Station |
| Texas A&M University System | Texas A&M University | Texas A&M University System |

Birthplace: Denison, Texas (1948)        Citizenship: U.S.        Married: Becky (Crawford) Russell
Children: Christyn, John Paul, Jenny,
Security Clearance:    DOD Secret                        Elizabeth

Professional Interests:  Power System Protection, Control, and Automation;
Computer Relaying; Fire Detection Technology; Forensic Engineering;
Engineering Ethics and Professionalism

EDUCATION:

Ph.D.   Electrical Engineering, University of Oklahoma, 1975
M.E.    Electrical Engineering, Texas A&M University, 1971
B.S.    Electrical Engineering, Texas A&M University, 1970

EXPERIENCE:

*Administrative*

- Associate Vice Chancellor, Engineering Research, Texas A&M University System, 1996 - present
- Deputy Director, Texas Engineering Experiment Station, Texas A&M University System, 1996 - present
- Associate Dean for Research, College of Engineering, Texas A&M University, 1996 - present
- Executive Associate Dean, College of Engineering, 1994 - 1996
- Associate Vice Chancellor, Academic Programs, Texas A&M University System, 1994 - 1996
- Assistant Agency Director, Texas Engineering Experiment Station, 1994 - 1996
- Assistant Department Head, Electrical Engineering, 1986 - 1992
- Associate Director, Institute for Ventures in New Technology (INVENT), 1982 - 1985
- Director, Electric Power Institute, 1980 - 1981
- Project Administrator, TAMU Research Foundation, 1976 - present
- Project Director and Principal Investigator, Texas Engineering Experiment Station, 1976 - present

*Educational and Research*

- Professor, Electrical Engineering, Texas A&M University, 1988 - present
- Director, Power System Automation Laboratory, 1981 - present
- Research Engineer, Electric Power Institute, 1976 - present
- Member, Graduate Faculty, Texas A&M University, 1977 - present
- Associate Professor, Electrical Engineering, Texas A&M University, 1979 - 1988
- Assistant Professor, Electrical Engineering, Texas A&M University, 1976 - 1979
- Visiting Instructor, Electrical Engineering, University of Oklahoma, 1973
- Instructor of Physics and Member of Graduate Faculty, Abilene Christian University, 1971-73

- Graduate Teaching Assistant, Texas A&M University, 1970

*Industrial*

- President, Micon Engineering Inc., 1978 - 1990
- Consultant and Principal, Entek Associates, 1979 - 1980
- Power Systems Consultant, Electric Power Research Institute, 1975
- Power Systems Engineer, Oklahoma Gas and Electric Company, 1974
- Assistant Government Contracts Property Administrator and Manufacturing Engineering Assistant, Texas Instruments, Inc., Dallas, Texas
- Consultant, 1974 - present; Clients include:

  Hughes Research Laboratories, General Electric Company, 3M Corp., Westinghouse Electric, Boeing Aircraft, Rockwell International, Dow Chemical Company, Texas Restaurant Association, Texas Energy and Natural Resources Advisory Council, Frontier Enterprises, United Technologies, Texas Utilities, Oklahoma Gas & Electric, Korea Electric, Pirelli Corporation, Schlumberger/Sangamo, Several law firms as expert witness

*Research Funding and Management (partial listing)*

"Distribution Fault Anticipator/Locator", funded by Electric Power Research Institute, 1997 - 2000, $990,752

"Power Distribution Feeder Failure Prediction", funded by Keyin Systems (South Korea), 1995 - 1997, $81,000

"Detection of Arcing Faults-Algorithm Development", funded by General Electric Company, 1997- 1998, $57,418.

"Detection and Location of Incipient Faults", funded by TU Services, Inc., 1996 - 1998, $52,378.

"Acquisition of Advanced Instrumentation and Test Equipment for Research, Education and Training in Electric Power Quality", National Science Foundation, 1995- 1997, $251,743.

"Acquisition of Advanced Instrumentation and Test Equipment for Research, Education and Training in Electric Power Quality", Electric Power Research Institute, 1995

"Detection Techniques for 480 Volt Network Faults", Electric Power Research Institute, 1993, Phase I, $50,000.

"Detection Techniques for 480 Volt Network Faults", Electric Power Research Institute, 1993, Phase II, $125,000.

"An Expert Decision Maker for Feeder Protection", General Electric Co., 1993 - 1994, $50,000.

"Field Evaluation of High Impedance Fault Detection Technology", Electric Power Research Institute, 1991 - 1993, $136,000.

"Development of Detection Techniques for High Impedance Fault Detection", Electric Power Research Institute, 1990 - 1992, $285,000.

"Intelligent Power Distribution Protection System Development", David Taylor Research Center, U.S. Navy, 1990 - 1992, $325,000.

"Knowledge Based System for Improved Adaptive Relaying and Diagnostics on Distribution Feeders", Electric Power Research Institute, co-funded by Houston Lighting and Power, 1990 - 1992, $100,000.



"An Instrumentation and Data Analysis System for Monitoring Industrial and Commercial Energy Use", funded by the Energy Research in Applications Program, 1989 - 1993, $259,260.

"Methods for High Impedance Fault Detection", sponsored by Electric Power Research Institute, 1988 - 1989, $235,989.

"Characterization and Detection of Electrical Faults", sponsored by National Science Foundation, FY 1988, $91,611, FY 1989, $95,535.

"Development of High Impedance Fault Test Facility", grants from Texas Utilities and Houston Lighting and Power, 1989, $73,000.

"Advanced Power System Protection and Incipient Fault Detection", sponsored by NASA-JSC, 1986 - 1987, $60,000.

"Protection of Spaceborne Power Systems", sponsored by NASA-JSC, 1987 - 1988, $68,000.

"Development of Knowledge Based Expert Systems for the Protection of Electric Distribution Feeders", Center for Energy and Mineral Resources, 1986 - 1987.

"Assessment of the Effects of Electrical Power Disruption Upon Operations of Selected Industry Sectors in the USA", Department of Defense-Central Intelligence Agency, 1983 - 1984 with D. Bragg (classified).

"Evaluation of Electromagnetic Interference and Grounding Problems with Traffic Control Automation Equipment", Texas Highway Department, 1982 - 1984, with W. Cunningan.

"Distribution Feeder Protection Research Utilizing Microcomputer", funded by Houston Lighting and Power Co., 1982 - 1983, $29,880.

"Detection of High Impedance Faults on Distribution Circuits", funded by Electric Power Research Institute, 1978 - 1982, $252,177.

"Evaluation of Highway Luminaire Failures Due to Electrical Transients Caused by Wind Induced Vibrations", funded by Texas Department of Highways and Texas Transportation Institute, 1981 - 1983, with E. Red.

"Evaluation of the Electrical Environment in High Voltage Substations", funded by Electric Power Research Institute, 1978 - 1983, $300,950.

"Energy Management in the Food Industry", funded by Center for Energy and Mineral Resources, 1977 - 1981, $34,080.

"Microcomputer Overcurrent Relay Development", funded by DOW Chemical, 1978 - 1982, $30,000.

"Electromagnetic Field Measurements During 500 kV Fault Tests", funded by Northern States Power and Electric Power Research Institute, 1980 - 1982, $36,770.

"Test Data Acquisition Support Services", funded by Electric Power Research Institute, 1980 - 1982, $14,000.

"Distribution Substation Electromagnetic Environment Evaluation", funded by General Electric Company of New Mexico, 1980 - 1982, $18,000.

"Microprocessor-Based Distribution Feeder Protection Research", funded by Public Service Company of New Mexico, 1980 - 1982, $18,000.

Transient Recorder Utilizing Computer Control (TRUCC)", funded by TAMU Research Foundation, Texas Engineering Experiment Station and EPRI, 1979 - 1983, $199,300.

## PROFESSIONAL LICENSES:

* Registered Professional Engineer, Texas #43696
* Certified Energy Auditor, Texas

## PROFESSIONAL SOCIETY MEMBERSHIPS:

* National Academy of Engineering
* Institute of Electrical and Electronics Engineers (Fellow)
* American Academy of Forensic Sciences
* American College of Forensic Examiners (Diplomate)
* National Society of Professional Engineers
* Texas Society of Professional Engineers
* Power Engineering Society
* Instrument Society of America

## HONOR SOCIETY MEMBERSHIPS:

* Eta Kappa Nu, Electrical Engineering Honor Society
* Tau Beta Pi, National Engineering Honor Society
* Sigma Pi Sigma, National Physics Honor Society

## AWARDS, PATENTS, AND LISTINGS:

### *Special Awards/Recognition*

* Distinguished Achievement Award in Research, Association of Former Students, Texas A&M University, 1999.

* IEEE Herman Halprin Electric Transmission and Distribution Technical Field Award, 1997.

* IEEE Electrotechnology Transfer Award, 1997.

* R&D 100 Award for the Development of the Digital Feeder Monitor, 1996.

* Outstanding Professor Award, IEEE Student Branch, Texas A&M University, 1994.

* SWEMA Outstanding Instructor Award, Meter School, Texas A&M University, 1993.

* Dresser Industries Professorship (for outstanding contributions in teaching, research and service), September, 1993.

* Leadership in Student Research Supervision Service Award, IEEE/PES, 1993.

* Distinguished Service Award (for distinguished service to the Substations Committee), IEEE/PES, 1993.

* PES Executive Board Recognition (for distinguished service to the Society), 1993.

4



- Tech-Brief Award (for sponsored research on adaptive protection for space-borne power systems), NASA, 1992.

- Outstanding Technical Report, IEEE/PES, January, 1992.

- Leadership in Student Research Supervision Service Award, IEEE/PEEC, 1992.

- IEEE Fellow (for the development of high impedance fault detection techniques using digital methods), January, 1991.

- Distinguished Service Award, Power Engineering Education Committee, IEEE/PES, 1991.

- Halliburton Professorship (for outstanding achievement in education, research and service), Halliburton Education Foundation, 1989.

- Outstanding Working Group Award, PES Substations Committee, IEEE/PES, 1988.

- Distinguished Lecturer, IEEE, 1987, 1988, 1990, 1991.

- Working Group Recognition (for contribution to IEEE/ANSI standards), IEEE/PES, 1986.

- Working Group Recognition (for contribution to EE graduate curriculum development), IEEE/PEEC, 1985.

- Leadership in Student Research Supervision Service Award, IEEE/PEEC, 1985.

- Outstanding Technical Paper, Substations Committee, IEEE/PES, 1985.

- Outstanding Engineering Achievement, National Society of Professional Engineers, 1982.

- Outstanding Young Engineer, Brazos Chapter, Texas Society of Professional Engineers, 1978.

- Outstanding Patent Submission, Electric Power Research Institute, 1975.

- Baldwin Teaching Award, University of Oklahoma, 1974.

- Bolton Award, Outstanding EE Senior, Texas A&M University, 1970.

*Grants*

- General Electric Co. - Research Support Grant, 1993 - 94, $100,000.

- 3M Corp. - Research Grants, 1985, 1986, 1987, 1988, 1989, $25,000.

- TAMU International Coordination Research Grant, 1987

- Oklahoma University Research Fellowship, 1975

- Schmitt Scholar, National Engineering Consortium, 1974

- National Defense Fellowship, Texas A&M University, 1971

- Munson Foundation Scholarship, Texas A&M University, 1966 - 1970

*Listings*

- Who's Who in the South and Southwest
- Who's Who in Frontier Science and Technology

- American Men and Women of Science
- Personalities of the South, Thirteenth Edition
- Who's Who in Technology Today, 5th Edition
- Who's Who of Emerging Leaders in America
- Outstanding Young Men of America, 1976

*Patents*

"Load Analysis System for Fault Detection", U.S. Patent 5,600,526, issued 2/97.

"Arc Burst Pattern Analysis Fault Detection System, submitted to U.S. Patent and Trademark Office 12/96, awaiting issuance.

"Expert System for Detecting High Impedance Faults, U.S. Patent 5,550,751, issued 8/96.

"Arc Spectral Analysis System", U.S. Patent No. 5,578,931, issued 11/96.

"Energy Analysis Fault Detection System", U.S. Patent No. 5,512,832, issued 4/96.

"Load Extraction Fault Detection System", U.S. Patent No. 5,506,789, issued 4/96.

"Randomness Fault Detection System", U.S. Patent No. 5,485,093, issued 1/96.

"High Impedance Fault Detection Apparatus and Method", U.S. Patent No. 4,466,071, issued 8/84.

"Digital Protection System for Transmission Lines and Associated Power Equipment", U.S. Patent No. 4,161,027 issued 7/79.

## PROFESSIONAL ACTIVITIES:

*State Level*

- State Director, Texas Society of Professional Engineers, 1982 - 1985
- Chapter Director, Brazos Chapter, TSPE, 1984 - 1988
- Chairman, Southwest Electrical Exposition Conference, Houston, Texas, 1984
- Member, TAMU Relay Conference Planning Committee, 1985 - 1988
- Chairman, Southwest Electrical Exposition Conference, Houston, 1984
- President, Brazos Chapter, Texas Society of Professional Engineers, 1981 -1982
- Vice President, Brazos Chapter, TSPE, 1980 -1981
- President, Texas Society of Energy Auditors, 1979 - 1981

*National/International Level*

- International Advisor, International Advisory Committee, International Power Engineering Conference, Singapore, May 24-26, 1999.
- President, IEEE Power Engineering Society, 1998, 1999.
- International Advisor, International Conference on Advances in Power System Control, Operation and Management, Singapore, 1997
- Member, IEEE Technical Activities Board, 1998 – 1999.

6

- Member, IEEE Technical Activities Board Products Committee, 1996 – present.

- Member, IEEE Technical Activities Board Electronic Products Committee, 1998 –1999.

- Member, IEEE Power Engineering Society Editorial Board, 1996 – present.

- Chairman, Substation Automation Conference, 1995- 1998 (annually).

- Vice President, IEEE Power Engineering Society (Elected Position), 1995 - 1996

- Chairman, First International Conference on Digital Power Systems Simulators, 1995.

- Chairman, TAMU Relay Conference, 1988 – present (annually)

- Chairman, Fault Disturbance and Analysis Conference, TAMU, 1991 - 1994 (annually)

- Secretary, IEEE Power Engineering Society (Elected Position), 1994 - 1995

- Chair, PES Constitution and Bylaws Committee, 1994 - 1995

- Member, PES Plenary Session Planning Committee, 1994 - 1995

- Member, IEEE Technical Activities Board, Awards and Recognition Committee, Division 7 Representative, 1990 - 1993

- Member, IEEE Awards Planning and Policy Committee, 1990, 1991

- Chairman, PES Awards and Recognition Department, 1989 - 1993

- Member, PES Executive Board, 1989 - present

- Member, PES Technical Council, 1989 - 1993

- Chairman, IEEE/PES Substations Committee Awards Subcommittee, 1986 - 1993

- Member, Data Acquisition, Processing and Controls Subcommittee, IEEE Substations Committee, 1986 - 1993

- Member, Electric Network Control System Standards W. G., 1989 - 1992

- Chairman, PEEC Honors and Awards Committee, 1982 - 1993

- Member, Power Engineering Society Honors and Awards Committee, 1982 - 1993

- Vice Chairman, Application of New Technologies Group, IEEE/PES, 1980 - 1992

- Member, PES Power Engineering Education Committee, 1980 - present

- Member, PES Substation Committee, IEEE, 1979 - present

- Member, PES/PEEC, Graduate Curriculum Task Force, 1981 - 1984

- Vice Chairman, Digital Protection System Design Group, IEEE/PES, 1981 - 1983

- Member, Bibliography Subcommittee, IEEE/PSRC, 1980 - 1988

- Member, Relay Electrical Environment Subcommittee, PSRC/IEEE, 1980 - 1985

7

- Chairman, Substation Electromagnetic Environment Working Group, Substation Committee, IEEE/PES, 1979 - 1988

- Member, Relay Input Sources Subcommittee, IEEE/PES, 1979 - 1985

- Member, Automatic and Supervisory Systems Subcommittee, Substation Committee, IEEE, 1978 - 1986

- Member, PES Relaying Committee, IEEE, 1978 - 1985

- Chairman, Digital Input Sources and Processing Working Group, Power System Relaying

- Committee, Power Engineering Society, IEEE, 1977 - 1981

- IEEE Control of Power Systems Conference
    Member, Program Committee, 1975 - 1980
    General Chairman, 1979
    Technical Program Chairman, 1977

Member and Chair of Numerous Subcommittees and Working Groups of PES

*University Committees*

- Engineering Education Program Review Committee (EEPRC), 1990 -1993
- VISION 2020 - Engineering Education Convocation, Planning Committee, 1991
- Doctor of Engineering - External Relations Program Committee, 1989 - 1990
- Classified and Proprietary Research Subcommittee, Chairman, Faculty Senate, 1987 - 1989
- Faculty Senate Executive Committee, Member, 1986 - 1989
- Deputy Speaker, Faculty Senate, 1987 - 1988
- Engineering Caucus - Faculty Senate, Chairman, 1985 - 1987
- Faculty Senate, Senator, 1983 - 1989
- Research Committee, Faculty Senate, Chairman, 1985 - 1989
- Engineering Faculty Affairs Council, Chairman, 1983 - 1984
- Engineering Faculty Affairs Council, Member, 1981 - 1984
- TAMU Academic Council, Member,1982 - 1984
- TAMU System Patent Committee, TEES Representative, 1981 - 1987
- TEES Research Conference Committee, 1981 - 1983
- University Long Range Planning Committee, 1983 - 1984
- University Academic Affairs Committee, 1983 - 1984
- Dean of Engineering Search Committee, 1983 - 1984
- Engineering Technology Department Head Search Committee, 1985 - 1986

*Department Committees*

- Chairman, Electrical Engineering Curriculum Committee, 1990 - 1991

- Co-Chairman, Electrical Engineering/Computer Science Joint Committee on Computer Engineering, 1989, 1990

8

- Chairman and Member, Electrical Engineering Tenure and Promotion Committee, 1989 - 1991
- Chairman, Electrical Engineering Computing Resources Committee, 1986 - 1990
- Chairman, Electrical Engineering Accreditation Committee, 1985 - 1986
- Chairman, Electrical Engineering Strategic Plan Committee, 1986

*Special Activities*

- Editor-in-Chief, *Electric Power Systems Research*, 1994 - present
- Associate Editor, *Electric Power Systems Research*, 1976 - 1994
- Reviewer - IEEE *Transactions on Power Delivery*
- Reviewer - IEEE *Transactions on Power Systems*
- Reviewer - several book publishers
- Peer Reviewer, National Science Foundation

*Short Courses and Tutorials*

"High Impedance Fault Detection - Technical Evolution and State of the Art", invited tutorial, PG&E, 1992.

"Detection of Downed Conductors on Utility Distribution Systems", IEEE Tutorial, 1989, 1990.

"Distribution Substation Automation Technology - State of the Art Review", invited IEEE Tutorial, Eighth National Workshop on Electric Energy Distribution, Salvador Bahia, Brazil, September, 1984.

"Retail Energy Management Seminar: Specification of Energy Management Control Systems", invited tutorial, Houston Lighting and Power, 1982, 1983, 1984.

"Research Requirements for Implementation of the TAMU Arcing Fault Detector", invited tutorial, Mexico City Division of Mexican National Utility, Mexico City, Mexico, May, 1983.

"Principles and Applications of Energy Management Control Systems", Southwest Electrical Exposition and Conference, tutorial, 1982, 1984.

"Basics of Engineering Economics", invited tutorial, Brazos Electric Power Cooperative, 1982.

"Basic Meter Theory", Meterman Training School, TAMU Electric Power Institute, annually 1980 - present.

"Computer Relaying", IEEE tutorial, 1979, 1980.

"Industrial Energy Auditing", short course, 1977, 1978, 1979.

"Economic Evaluation of Energy Management Alternatives", TAMU Short Course, 1978.

"Economic Evaluation of Engineering Alternatives", invited short course, Dallas Power and Light, 1976, 1977.

"Digital Systems Design with Industrial Applications", short course, University of Oklahoma, 1975.

"Symmetrical Components and Fault Current Calculations", short course, Oklahoma Gas and Electric Company, 1974.

## Speeches and Lectures

"Distribution Fault Anticipation/Location," EPRI 4185-02, Distribution Business Area Council Meeting, Pasadena, California, February 17, 1999.

"High Impedance Fault Detection DFM Relay. Update on the Technology", invited lecture, 1998 IEEE/PES Winter Power Meeting, Tampa, Florida, February, 1998.

"Downed Electric Conductors, Their Characteristics, and the Potential for Public Danger". invited lecture, Southwest Electric Claims Exchange, Irving, TX, June, 1996.

"Digital Methods for Fault Detection - State of the Art", invited lectures, Third IEEE Chilean Power System Symposium, Valporaiso, Chile, 1990.

"Electric Power Engineering Education - Enhancement Through Industry, University Cooperation", Plenary Session, Power Engineering Society Summer Meeting, Minneapolis, MN, July, 1990, session organizer and speaker.

"Automation of Electric Distribution Feeders Using Advanced Technologies", invited lectures, Electropaulo International Seminar on Electric Power Distribution, Sao Paulo, Brazil, February, 1987.

"Power System Automation Research in the United States", invited presentation, Seoul National University, Korea, October, 1986.

"The Role of Research as a Linkage between Universities and Industry", invited lecture, IEEE/PES Summer Power Meeting, Mexico City, 1986.

"Substation Automation-Combining the Monitoring and Control Function", invited lecture, 1985 Fault and Disturbance Analysis Conference, Sangamo Division of Schlumberger Corp., October, 1985.

"Microprocessors in Power System Automation and Control", invited lecture, Sao Paulo Electric, Sao Paulo, Brazil, August, 1985.

"Computer Control of Power Distribution for Offshore Production Platforms", invited presentation, Petrobras Corporation, Rio De Janeiro, August, 1985.

"Microcomputer Technology in Distribution System Protection", invited lecture, Pirello Corporation, Sao Paulo, Brazil, September, 1984.

"Energy Management Systems in New Designs", invited lecture, 11th Architect and Engineers Conference, Dallas, Texas, April, 1983.

"Microcomputer Applications in the Protection of Utility Distribution Feeders", invited presentation, Tokyo Electric Co., Hitachi, and Toshiba Corp., Tokyo, Japan, May, 1982.

"Distribution High Impedance Fault Detection", IEEE Transmission and Distribution Conference, 1981.

"Using Advanced Technology in the Solution of Power System Problems", invited lecture, PEEC, Power Engineering Society, 1981.

"Energy Management in the Food Service Industry", invited address, Texas Restaurant Association Annual Convention, June, 1979.

"Microprocessors and the Power Industry", invited presentation, Power Engineering Society Relaying Committee, 1977.

"Field Experiences with Substation Automation", invited panelist, IEEE/PES Summer Power Meeting, 1977.

## PUBLICATIONS:

### *Books*

*Detection of Downed Conductors on Utility Distribution Systems*, IEEE Tutorial text, 1989
*Computer Relaying*, IEEE Tutorial Text, IEEE Power Engineering, Society, 1979, with M. Sachdev et. al.

*Power System Control and Protection*, Academic Press, Inc., New York, New York, 1978, edited with M.E. Council.

### *Significant Technical Reports*

"An Instrumentation & Data Analysis System for Monitoring Industrial and Commercial Energy Use", Final Report, Energy Research in Applications Program, March, 1993.

"Methods of High Impedance Fault Detection - Comparative Evaluation and Recommendations", Electric Power Research Institute, 1990.

"Evaluation of Algorithms for Arcing Fault Detection", Final Report, Electric Power Research Institute, December, 1989.

"The Effects of Vibration on High Pressure Sodium Lamps in Roadway Luminares", final report for Texas State Department of Highways and Public Transportation, with W. E. Red, April, 1984.

"Evaluation of the EPRI Real-Time Digital Data Acquisition System for Determining Load Characteristics", Final Report, Project 849-6, Electric Power Research Institute, March, 1983.

"Measurement and Characterization of Substation Electromagnetic Transients", final report, Project 1359-2, Electric Power Research Institute, March, 1983.

"Detection of Arcing Faults on Distribution Feeders", final report, Project 1285-3, Electric Power Research Institute, Palo Alto, CA, December, 1982.

"Evaluation of Arcing Noise Propagation from 12.5 kV High Impedance Faults:  Results of Staged Fault Tests", Electric Power Research Institute, with Mike Aucoin and Tom Talley, 1980.

"Design Criteria and Functional Specifications of an Electromagnetic Transient Capture System for Use in High Voltage Substations", Electric Power Research Institute, with Gary Gerloff, 1979.

"Analysis of the National Energy Plan:  The Effects on Electric Utilities", Center for Energy and Mineral Resources, with C. W. Brice, et. al, October, 1977.

"Techniques of Ion Implanting as Applied to the Production of Infrared Sensing Devices", Institute of Solid State Electronics, Texas A&M University, 1971 (Master's Project).

"The Influence of Ion Implantation on Both Thermally Induced Dislocations and Strain Generated Surface Patterns in Silicon", TAMU Institute for Solid State Electronics, with J.S. Linder and T. H. Bhar., 1971.

### *Refereed Papers*

Benner, Carl L., Russell, B.D., "Practical High-Impedance Fault Detection on Distribution Feeders." IEEE Transactions on Industry Applications, Vol. 33, No. 3, May/June 1997, pp. 635-640.

Short, S.X., Mamishev, A.V., Kao, T.W., Russell, B.D., "Evaluation of methods for discrimination of energized underground power cables". *Electric Power Systems Research*. Vol 37, 1996, pp. 29-38.

Mamishev, A.V., Russell, B.D., Benner, Carl L., "Analysis of High Impedance Faults Using Fractal Techniques", presented at the 1995 IEEE Power Industry Computer Applications (PICA) conference, May 7-12, 1995, Salt Lake City, Utah, to be published in *IEEE Transactions on Power Delivery*.

Mamishev, A.V., Short, S.X., Kao, T.W., Russell, B.D., "Non-Intrusive Sensing Techniques for the Discrimination of Energized Electric Cables", Instrumentation and Measurement Technology Conference, April 22-26, 1995.

Benner, Carl, Russell, B.D., "Performance of High Impedance Fault Detection Algorithms in Long Term Field Trials", *Electric Power Systems Research*, Vol. 31, No. 2, pp.71-77, November, 1994.

Mamishev, Alexander V., Russell, B.Don, "Analytical Solution for the Magnetic Field Produced by a sequence of Catenaries", October, 1994.

Benner, Carl L., Russell, B. Don, "Arcing Fault Detection for Distribution Feeders: Security Assessment in Long Term Field Trials", IEEE Transaction on Power Delivery, Vol. 10, No. 2, pp. 676-683, April, 1995.

Kim, C.J., Russell, B. Don, "Analysis of Distribution Disturbances and Arcing Faults Using Crest Factor", submitted to *Electric Power Systems Research*, July, 1994.

Kim, C.J., Russell, B. Don, "Entropy Minimization Analysis for Fuzzy Set Generation", *Third International Fuzzy Systems and Intelligent Control Conference*, Louisville, KT, March, 14-16, 1994.

Kim, C. J., Russell, B. D., "High-Impedance Fault Detection System Using an Adaptive Element Model", *IEE Proceedings-C, Vol. 140*, No. 2, pp. 153-159, March, 1993.

Jagadish, C., Russell, B. Don, "A PC Based Distribution Feeder Protection and Monitoring Device Using a Multi-tasking VRTX Operation System", submitted to *Electric Power Systems Research*.

Kim, C. J., Russell, B. Don, "A Learning Method for Use in Intelligent Computer Relays for High Impedance Faults", *IEEE Transactions on Power Delivery*, Vol. 6, No. 1, pp. 109-115, January, 1991.

Li, S., Russell, B. Don, "Optimal Arcing Fault Detection Using Signal Processing Techniques", *Electric Power Systems Research*, Vol. 21, pp. 121-128, 1991.

Kezunovic, M., Watson, K., Russell, B. D., Heller, P., Aucoin, M., "Expert System Applications to Protection, Substation Control and Related Monitoring of Feeders", *Electric Power Systems Research*, Vol. 21, pp. 71 - 1991.

Kim, C. J., Russell, B. Don, Watson, K., "A Parameter-Based Process for Selecting High Impedance Fault Detection Techniques using Decision Making Under Incomplete Knowledge", *IEEE Transactions on Power Delivery*, Vol. 5, No. 3, pp. 1314 - 1320, July, 1990.

Russell, B. D., "Computer Relaying and Expert Systems: New Tools for Detecting High Impedance Faults", *Electric Power Systems Research*, Vol. 20, No. 1, pp. 31-37, March, 1990.

Benner, C., Carswell, P., Russell, B. D., "Improved Algorithm for Detecting Arcing Faults Using Random Fault Behavior", *Electric Power Systems Research*, Vol. 17, No. 1, pp. 49-56, 1989.

Kim, C. J., Russell, B. D., "Classification of Faults and Switching Events by Inductive Reasoning and Expert System Methodology", *IEEE Transactions on Power Delivery*, Vol. 4, No. 3, pp. 1631-1637, July, 1989.

Mehta, K., Russell, B. D., "Data Compression for Digital Data from Power Systems: Requirements and Technique Evaluation", *IEEE Transactions on Power Delivery*, Vol. 4, No. 3, pp. 1683-1688, July, 1989.

Ingleson, J. W. Russell, B. Don, et.al. "Bibliography of Relay Literature, 1986 - 1987", *IEEE Transactions on Power Delivery*, Vol. 4, No. 3, pp. 1649-1658, July, 1989.

Russell, B. D., Doern, T. L., Martin, A., "Application of Microcomputer-Based Systems in Power Substations", *IEEE Transactions on Power Delivery*, Vol. 4, No. 1, pp. 201-207, January, 1989.

Russell, B. Don. Chinchali, R., "A Digital Signal Processing Algorithm for Detecting Arcing Faults on Power Distribution Feeders", *IEEE Transactions on Power Delivery*, Vol. 3, No. 1, pp. 132-140, January, 1989.

Russell, B. Don, Chinchali, R.P., Kim, C.J., "Behavior of Low Frequency Spectra During Arcing Faults and Switching Events", *IEEE Transactions on Power Delivery*, Vol. 3, No. 4, pp. 1485-1492, October, 1988.

Kezunovic, M., Russell, B. D., "Microprocessor Applications to Substation Control and Protection", *IEEE Computer Applications in Power*, Vol. 1, No. 4, pp. 16-20, October, 1988.

Kim, C. J., and Russell, B. Don, "Harmonic Behavior During Arcing Faults on Power Distribution Feeders", *Electric Power Systems Research*, Vol. 14, No. 3, pp. 219-225, June, 1988.

Russell, B. Don, K. Watson, "Power Substation Automation Using a Knowledge Based System - Justification and Preliminary Field Experiments", *IEEE Transactions on Power Delivery*, Vol. PWRD-2, No. 4, pp. 1090-1097, October, 1987.

Russell, B. Don, M. Narendorf, Aucoin, M., "Microcomputer Based Feeder Protection and Monitoring System - Utility Experience", *IEEE Transactions on Power Delivery*, Vol. PWRD-2, No. 8, pp. 1046-1052, October, 1987.

Aucoin, M., Russell, B. Don, "Detection of Distribution High Impedance Faults Using Burst Noise Signals Near 60Hz", *IEEE Transactions on Power Delivery*, 86T&D 546-6, Vol. 2, No. 2, pp. 342-348, April, 1987.

Aucoin, M., Zeigler, Russell, B. Don, "Feeder Protection and Monitoring System, Part I: Design, Implementation and Testing", *IEEE Transactions on Power Apparatus and System*, Vol. PAS-104, No. 4, pp. 873-880, April, 1985.

Aucoin, M., Zeigler, Russell, B. Don, "Feeder Protection and Monitoring System, Part II: Staged Fault Test Demonstration", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-104, No. 6, pp. 1456-1462, June, 1985.

Walker, L., Russell, B. Don, et. al., "Criteria for the Evaluation of Digital Impedance Methods of Transmission Line Protection", *IEEE Transactions on Power Apparatus and Systems*, 1984 WM105-3.

Russell, B. Don, Harvey, S., Nilsson, S. "Substation Electromagnetic Interference - Characterization & Description of the Transient EMI Problem", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-103, No. 7, pp. 1863-1870, July, 1984.

Russell, B Don, Kotheimer B. Malewsiki, R., "Substation Electromagnetic Interference - Susceptibility Testing and EMI Simulation High Voltage Laboratories", *IEEE Transactions on Power Apparatus and Systems*, PAS-103, No. 7, pp. 1871-1878, July, 1984.

Ingleson, J., Russell, B. Don, et.al. "Bibliography of Relay Literature, 1982-1983", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-104, No. 5, pp. 1189-1197, 1985, PSRC Committee Report.

Lau, K. P., Russell, B. Don, et.al., "SCADA's State-of-the-Art and Future U.S. Trends in Substation Control", *Proceedings*, 1982 CIGRE (International Conference on Large High Voltage Electric Systems), Paris, France. Russell, B. Don, "New Developments in Systems for Transmission and Distribution Substation Control and Protection", *Electric Power Systems Research*, Vol. 5, No. 1, pp. 21-34, 1982.

Russell, B. Don, "High Impedance Faults Can Now Be Detected", *Transmission and Distribution*, Vol. 34, No. 2, pp. 32-34, 60, February, 1982.

Russell, B. Don, Herrick, D., "Electromagnetic Transients in High Voltage Power Substations", *Proceedings of the 1982 IEEE International Symposium on Electromagnetic Compatibility*, (IEEE/EMC), Santa Clara, CA., September, 1982.

Stephens, J., Russell, B. Don, et.al., "Bibliography of Relay Literature, 1980-1981", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-102, No. 4, April 1983, pp. 1014-1022, PSRC Committee Report.

Aucoin, B. M., Russell, B. Don, "Distribution High Impedance Fault Detection Utilizing High Frequency Current Components", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-101, No. 6, pp. 1596-1604, June, 1982.

Stephens, J.E., Russell, B. Don, et. al., "Bibliography of Relay Literature, 1978 1979", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-100, No. 5, 1981, IEEE/PSRC Committee Report.

Russell, B. Don, "Distribution Automation Using Microcomputer Technology", *Electric Power Systems Research*, Vol. 1, No. 2, pp. 131-137, 1978.

*Conference and Professional Publications*

Russell, B.D., *"Response Characteristics of Residential Smoke Detectors under Varying Full-Scale Fire Scenarios,"* presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, Florida, February 15-20, 1999.

Benner, Carl L., Russell, B.D., *"Characteristic Behavior of Downed Electrical Lines Including Evaluation of Various Electrocution Scenarios,"* presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, Florida, February 15-20, 1999.

Benner, Carl L., Russell, B.D., *"Arcing Fault Detection - An Update on the Technology"*, presented at the IEEE/PES Winter Power Meeting, Tampa, Florida, February 2-5, 1998.

Butler, Karen, Khan, S., Russell, B. D., *"Modeling of Power Transformers for Determination of Aging and Deterioration"*, submitted for 1996 IEEE Rural Electric Power Conference, Fort Worth, Texas, April 28-30, 1996.

Khan, S., K. L. Butler, Russell, B. D., "A Predictive Maintenance Approach For Power Distribution Systems", Proceedings of the *27th Annual North American Power Symposium*, Bozeman, Montana, October 2-3, 1995.

Brzhezitsky, V.A., Il'enko, O.S., Mamishev, A.V., Russell, B. Don, Sokolovsky, S.A., "Calculation of the Critical Distance Between Power Line Conductors and Objects on the Ground", submitted to the *Seventh International Conference on Transmission and Distribution Construction, Operation, and Live-Line Maintenance*, (reviewed for IEEE *Transactions*), Columbus, OH, October, 1995.

Kim, C. J., Russell, B. D., "Identification of Distribution Disturbances by Crest Factor Analysis", submitted to the *International Conference on Electrical Engineering*, Taejon, Korea, July 19-21, 1995.

Mamishev, A.V., Nevels, R.D., Russell, B.D., "Effects of Conductor Sag on Spatial Distribution of Power Line Magnetic Field", *presented at the IEEE PES Summer Meeting*, Portland, Oregon, July, 1995.

Mamishev, A.V., Russell, B.D., "Measurement of Magnetic Fields in the Direct Proximity of Power Line Conductors", *IEEE Transactions on Power Delivery*, Vol. 10, No. 3, pp. 1211-1216, July, 1995.

Mamishev, A.V., Russell, B.D., Benner, C.L., "Analysis of High Impedance Faults Using Fractal Techniques", *1995 Power Industry Computer Applications Conference*, Salt Lake City, Utah, May, 1995.

Mamishev, A.V., Short, S.X., Kao, T.W., Russell, B.D., "Non-intrusive Sensing Techniques for the Discrimination of Energized Electric Cables", *IEEE Instrumentation and Measurements Conference*, pp. 446-449, Waltham, MA, April, 1995.

14



Mamishev, A.V., Russell, B. Don, "Measurement of Magnetic Fields in the Direct Proximity of Power Line Conductors", submitted to *IEEE Transactions on Power Delivery*, to be presented at the *IEEE-PES Winter Power Meeting*, New York, NY, January, 1995.

Mamishev, A.V., Nevels, R.D., Russell, B. Don, "Effects of the Sag of Power Line Conductors on Ambient Magnetic Fields", submitted to *IEEE Transactions on Power Delivery*, to be presented at the *IEEE-PES Winter Meeting*, New York, NY, January, 1995.

Short, S.X., Mamishev, Alex, Kao, T.W., Russell, B.D., "Evaluation of Methods for Status Identification of Underground Power Cables", submitted to Electric Power Research Journal, December, 1994

Brzhezitsky, V.A., Il'enko, O.S., Mamishev, A.V., Russell, B. D., Sokolovsky, S.A., "Partial Empirical Model of the Multifactor Aging of High Voltage Insulation", submitted to the *1994 Conference on Electrical Insulation and Dielectric Phenomena*, pp. 367-372, Arlington, TX, October, 1994.

Mamishev, A.V., Russell, B.D., "Influence of Catenary Shape of Power Line Conductors on Ambient Magnetic Fields," submitted to *1994 Universities Power Engineering Conference*, vol. 1, pp. 177-180, Galway, Ireland, September, 1994.

Williams, Stephen E., Russell, B. D., "An Integrated Approach to Power System Control and Protection for Space Platforms", Proceedings of the *29th Intersociety Energy Conversion Engineering Conference*, August 7-12, 1994, Monterey, CA.

Nevels, R.D., Mamishev, A.V., Russell, B. D., "Power Line Magnetic Field Including the Catenary Effect and Electric Field Including Absorbing Boundary Conditions", proceedings, *1994 IEEE AP-S International Symposium and URSI Radio Science Meeting*, June, 1994, Seattle, Washington.

Tyska, W.Z., Patterson, R.A., Russell, B.D., Aucoin, B.M., "A Microprocessor Based Digital Feeder Monitor with High Impedance Fault Detection", Proceedings of the *Georgia Tech Protective Relay Conference*, Atlanta, GA, May, 1994.

Benner, Carl L., Russell, B. D., Aucoin, B. Mike, "Case Histories of Distribution Feeder Faults: Field Experience with General Electric's Digital Feeder Monitor", Proceedings of the Forty-Seventh Annual Conference for Protective Relay Engineers, Texas A&M University, College Station, TX, March 21-23, 1994.

Tyska, W.Z., Patterson, R.A., Russell,  B. D., Aucoin, B.M., "A Microprocessor Based Digital Feeder Monitor with High Impedance Fault Detection", presented to the *Texas A&M University Conference for Protective Relay Engineers*, College Station, TX, March, 1994.

Kim, C. J., Russell, B. D., "Automatic Generation of Membership Function and Fuzzy Rule using Inductive Reasoning", *Proceedings of the Third International Conference on Industrial Fuzzy Control & Intelligent Systems*, December 1-3, 1993, Houston, TX.

Aucoin, B. Michael, Russell, B.D., "A Microprocessor-Based Digital Feeder Monitor with High-Impedance Fault Detection", Proceedings of the *EPRI Substation Diagnostics Conference*, November 3 - 5, 1993, New Orleans, LA.

Tyska, W.Z., Patterson, R.A., Russell, B.D., Aucoin, B.M., "A Microprocessor-Based Digital Feeder Monitor with High-Impedance Fault Detection", Proceedings of the *Western Protective Relay Conference*, October 19 - 21, 1993, Spokane, WA.

Kim, C. J., Russell, B. D., "Application of a Fuzzy Expert Model for Power System Protection: Proposal for a Synergetic Detection of Low Current Faults", *Proceedings of the Fifth International Fuzzy Systems Association* (IFSA) *World Congress*, pp. 1074-1077, July 4-9, 1993, Seoul, Korea.

Russell, B. D., Aucoin, B. M., "Field Experience with High Impedance Fault Detection", *Proceedings, High Impedance Faults on Distribution Feeders Seminar*, IEEE Vancouver Section, May 14, 1993.

Williams, S. W., Russell, B. D., "Ships Service Electric Power Enhanced Survivability Via Early Detection of Incipient Cable Faults", *Naval Engineers Journal*, pp. 78-84, May, 1993.

Benner, C. L., Russell, B. D., "Fuse Characteristics Under Non-Ideal Fault Current Conditions", *Proceedings for the Texas A&M University Conference for Protective Relay Engineers*, April, 1993.

Kim, C. J., Russell, B. D., "A Structure of Fuzzy Decision-Making System for Power System Protection", *Proceedings of the IEEE Second International Conference on Fuzzy Systems*, FUZZ-IEEE'93, March 28 - April 1, 1993, San Francisco, CA, pp. 998-1003.

Russell, B. D., "Advanced Techniques and Tools for Substation Equipment Diagnostics", Workshop on Advanced Diagnostics for Substation Equipment, Electric Power Research Institute, November, 1992.

Russell, B. D., Aucoin, B. M., Benner, C.L., "High Impedance Fault Detection in Distribution Systems", *Proceedings - Pacific Gas and Electric*, Pleasanton, CA, August, 1992.

Russell, B.D., "Performance Evaluation of the TAMU High Impedance Fault Detection System", *Conference for Protective Relay Engineers*, April, 1992.

Aucoin, M., Russell, B. D., "Fallen Conductor Faults: The Challenge to Improve Safety", *Public Utilities Fortnightly*, Vol. 129, No. 3, pp. 38-40, February, 1992.

Watson, K., Russell, B. D., Jagadish, U., "Single-Chip Microcontrollers for Switchgear Control", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Boston, MA, August, 1991.

Aucoin, M., Russell, B. D., Benner, C. L., "Characteristics of Distribution Faults", *Proceedings*, Utility Fault and Disturbance Analysis Conference, Texas A&M University, College Station, April, 1991.

Kezunovic, M., Watson, K., Russell, B. D., "Expert System Applications to Protection, Substation Control and Related Monitoring Functions", *Electric Power Systems Research*, Vol. 21, No. 1, pp 71-86, April, 1991.

Russell, B. D., Li, S., Watson, K., "Digital Methods for the Detection of Incipient Fault Conditions in Spaceborne Power Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Reno, NV, August, 1990.

Li, S., Russell, B. D., et. al., "On-Line Fault Detection in Power Systems Using Adaptive DFT", *Proceedings*, Conference on Information Sciences and Systems, Princeton, NJ, March, 1990.

Russell, B. D., Aucoin, B. M. Benner, C., "Computer Relaying Techniques for the Detection of High Impedance Faults Using Signal Processing and Pattern Recognition Methods", *Proceedings*, International Conference on Power System Protection, Singapore, September, 1989.

Aucoin, M., Russell, B. D., Benner, C., "High Impedance Fault Detection for Industrial Power Systems", *Proceedings*, IEEE Industrial Applications Society Conference, San Diego, October, 1989.

Russell, B.D., Aucoin, M. "Detection of Incipient and Low Current Faults in Electrical Distribution Systems", *Proceedings*, Intersociety Engineering Conference on Energy Conversion, Washington, D.C., August,1989.

Watson, K., Russell, B. D., McCall, K. "A Digital Protection System Incorporating Knowledge Based Learning", *Proceedings*, Intersociety Engineering Conference on Energy Conversion, Washington, D.C., August, 1989.

Russell, B. D., Watson, K. "A Digital Protection System Incorporating Real Time Expert Systems Methodology", *Proceedings*, CIGRE, Bournemouth, England, June, 1989.

Benner, C. L., Carswell, P. W., Russell, B. D., "Improved Algorithm for Detecting Arcing Faults Using Random Fault Behavior", *Proceedings*, Southern Electric Industry Application Symposium, New Orleans, November, 1988.



Russell, B. D., Watson, K., "Knowledge-Based Expert System for Improved Power System Protection and Diagnostics", *Proceedings*, Symposium on Expert Systems Applications to Power Systems, Sweden, August, 1988.

Watson, K., Russell, B. D., Hackler, I., "Expert System Structures for Fault Detection Spaceborne Power Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Denver, CO, August, 1988.

Russell, B. Don, Hackler, Irene, "Incipient Fault Detection and Power System Protection for Spaceborne Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Philadelphia, PA, August, 1987.

Kim, C.J. and Russell, B. Don, "Analysis of High Impedance Fault Detection Parameters for Digital Relays", *Proceedings*, Computer Relaying Conference, National Science Foundation and Virginia Tech, October 6, 1987.

Russell, B. Don, "Detection of High Impedance Faults on Distribution Feeders", *Proceedings*, APPA Engineering and Operations Workshop, invited paper, March, 1985.

Russell, B. Don, Heller, P., Perry, P., "Demand Control Utilizing Energy Management Systems - Report of Field Tests", *Proceedings*, Symposium on Efficient Utilization of Energy in Residential and Commercial Buildings, Texas A&M University, August, 1984.

Russell, B. Don, "Characteristics of Low Current Faults on Distribution Feeders", *Proceedings* Southwest Electrical Exposition and Conference, Houston, Texas, April, 1982.

Russell, B. Don, Perry, L. Heller, R. , "Design of a Computerized Energy Management System for Marine Applications", *Proceedings*, Industrial Energy Conservation Technology Conference & Exhibition, Houston, Texas, April, 1982.

Russell, B. Don, Willis, G., Colburn, B., "Industrial Energy Audit Training for Engineers", *Proceedings*, Industrial Energy Conservation Technology Conference & Exhibition, Houston, Texas, April, 1982.

Russell, B. Don, "High Impedance, Arcing Faults: Staged Fault Experience", *Proceedings*, 1982 Power Distribution Conference, Austin, Texas, October, 1982.

Russell, B. Don, Aucoin, M., "Development of a Low-Current Relay for High Impedance Faults on Distribution Feeders", 34th Annual Conference Protective Relay Engineers, Texas A&M University, April, 1981.

Russell, B. Don, "Energy Conservation Through the Use of a Microcomputer-Based Fuel Management System", 27th International Instrumentation Symposium, ISA, Indianapolis, Indiana, invited paper, April, 1981.

Russell, B. Don, "Energy - To Control or Not to Control - A Study in Commercial EMS Equipment", *Chuckwagon*, Texas Restaurant Association, Austin, Texas, 1981.

Russell, B. Don, "Turning On To Saving Energy", *Chuckwagon*, Texas Restaurant Association, pp. 21-23, October, 1981.

Russell, B. Don, Gerloff G., "Characteristics of the Electrical Environment in Transmission Substations", Workshop on Digital Techniques for Control and Protection of Transmission Class Substations, Electric Power Research Institute, Palo Alto, California, invited paper, August, 1980.

Russell, B. Don, Goers, Heller, P., "Microprocessor Based Data Acquisition System for Use in Energy Audits", 1979 Industrial Energy Conservation Technology Conference, Houston, Texas, April, 1979.

Russell, B. Don, et. al., "Test Techniques for SCADA and Automation Systems", 1979 IEEE Power Engineering Society Summer Meeting, A79 426-8, edited for PES Substations Committee.

Russell, B. Don, et. al., "Communication Alternatives for Distribution Metering and Load Management", 1979 IEEE Power Engineering Society Winter Meeting, edited for Application of New Technologies in Substation Control Working Group.

Russell, B. Don, Heller, R., "Microprocessor Algorithm for Overcurrent Protection of Distribution Systems", *Proceedings*, 1978 Control of Power Systems Conference, Oklahoma City, Oklahoma.

Russell, B. Don, Aucoin, M., "Algorithm for the Detection of Noise Frequencies Generated by High Impedance Faults", *Proceedings*, 1978 Control of Power Systems Conference, Oklahoma City, Oklahoma.

Russell, B. Don, et. al., "Recent Field Experiences with the Automation of Substation Control", 1978 IEEE PES Winter Meeting, A 78 102-6.

Russell, B. Don, "Microprocessor Applications and Distribution System Automation", *Proceedings*, 1977 Power Distribution Conference, University of Texas, Austin, Texas, October, 1977.

Russell, B. Don, "A Microcomputer Based Substation Control System", *Proceedings*, Control of Power Systems Conference, Oklahoma City, Oklahoma, March, 1976.

Russell, B. Don, "Present and Future Applications of Microcomputers in Power System Control", *Proceedings*, 1976 IEEE Microcomputer Conference, Oklahoma City, Oklahoma.

Russell, B. Don, "Microprocessor Applications of Interest to Substation and Protection Engineers", 1976 IEEE Summer Power Meeting, Mexico City, Mexico, A 77 746-1.

Russell, B. Don, "Use of Reliability Constraints in the Design of a Microcomputer Based Transmission Substation Control System", *Proceedings*, Midwest Power Symposium, 1975.

Russell, B. Don, "Application of Microcomputers to the Protection and Control of Power Systems Substations", *Proceedings*, IEEE Conference on Decision and Control and 14th Symposium on Adaptive Processes, Houston, Texas, December, 1975.

Russell, B. Don, Linder, J.S., Heller, R., "Electrical and Physical Measurements of Boron Ion-Implanted Layers in Silicon", TAMU Institute for Solid State Electronics, 1971.

*Panel Presentations*

Russell, B. Don, "Recent Field Experience with High Impedance Fault Detection", panelist, IEEE/PES Summer Power Meeting, Portland, Oregon, July, 1995.

Russell, B. Don, "Applications of High Impedance Fault Detectors", panelist, IEEE/PES Summer Power Meeting, Portland, Oregon, July, 1995.

Russell, B. Don, "Distribution Transformer Connections - Their Effect on Protective Relaying", Conference for Protective Relay Engineers, College Station, TX, March, 1994.

Russell, B. Don, "Trends in Integration of Control, Protection and Data Acquisition in Substations", panel organizer and chairman, PES Summer Meeting, San Diego, CA, July, 1991.

Russell, B. Don, "Integration of Load Management and Distribution Automation", invited panelist, IEEE/PES Transmission and Distribution Conference, Anaheim, CA, , September, 1986.

Russell, B. Don, "Application of Microprocessors in Feeder Control", panel chairman, IEEE/PES Summer Power Meeting, Mexico City, presentation and panel discussion, July, 1986.

Russell, B. Don, "Integrated Control and Protection of Distribution Feeders", invited panelist, PES/IEEE Summer Power Meeting, Vancouver, B. C., July, 1985.

Russell, B. Don, "Arcing Fault Protection on Multi-Grounded Distribution Systems", invited presentation, Companhia Energetica de Sao Paulo, Brazil, September, 1984.

Russell, B. Don, "Design Criteria for Computer Relay Protection of Power Distribution Systems", invited presentation, Electric Power Research Institute of Mexico and CFE, Cuernavaca, Mexico, May, 1983.

Russell, B. Don, "Facilities Monitoring and Process Control Utilizing Microcomputers", Industrial Energy Conservation Technology Conference & Exhibition, invited presentation, Houston, Texas, April, 1982.

Russell, B. Don, "Economic Aspects of Distribution Automation", invited panelist, IEEE/PES Summer Power Meeting, San Francisco, California, July, 1982.

Russell, B. Don, "Power Substation Automation Research at Texas A&M University", invited presentation, Kansai Electric and Mitsubishi Electric, Japan, 1982.

Russell, B. Don, "Application of Arcing Fault Detectors to Distribution Feeder Protection", invited tutorial, IEEE Power Systems Relaying Committee, Cincinnati, Ohio, May, 1981.

Russell, B. Don, "Power Systems Automation Laboratory: Investigation of Electromagnetic Effects on Substation Automation Equipment", Texas Engineering Experiment Station Engineering Research Conference, Texas A&M University, September, 1981.

Russell, B. Don, "Developments in Systems for Transmission and Distribution Substation Control and Protection", invited presentation, IEEE/ PES Summer Meeting, Minneapolis, Minnesota, July, 1980.

Russell, B. Don, "Electronics Science Education for Non-Science Majors", Texas Academy of Science, Science Education Section, March, 1974.

19

| Case Name | Client Name | Firm | Phone | File Number |
|---|---|---|---|---|
| Anderson v. Southeast Power Corp. | Council Woolen | Woolen, Honeywell & Kest | 407-843-7060 | 1 |
| Leicht V. Fenwal | Myles Tinilla | | 212-962-2727 | 2 |
| Max Miller v. Jimmy Davis | Richard Westein | Werstein & Associates | 214-969-0166 | 3 |
| Berryhill v. TU Electric | Estil Vance | Canley & Hanger, L.L.P. | 817-877-2838 | 4 |
| Death of Foster Bright | Alfred Martinsen | Fox, Weitzel & Howell | 713-623-8600 | 5 |
| Hatfield | Raymond Palmer | Palmer Law | 804-644-0200 | 6 |
| | | | | |
| Battse Case | Paul Brunner | Fisher, Gallagher, & Lewis | 713-400-4000 | 13 |
| Baker v. Empire District Electric | William G. McCaffree | McCaffree | 417-667-2211 | 16 |
| Javier Martinez | Richard Silvas | Richard Silvas | 512-854-7773 | 20 |
| death of Eddie Dale Holland | Paul Gilliam | Ramey & Flock | 903-597-3301 | 21 |
| Chaffin v. Tri Co. Elec. Corp. | Lonnie McGuire | | 972-756-0123 | 22 |
| Rev. Nathaniel Hayes V. BRK | Gary Strickland | Trantolo & Trantolo | 860-522-9248 | 23 |
| Yonek v. Jet Tele-comm Corp. | April Robbins | Smith & Moore | 214-740-4200 | 24 |
| Gutierrez v. Square D | Anthony Constant | Constant & Vela | 512-887-8800 | 26 |
| Dunn v. Texaco, Inc. | Les Palmer | Haley & Davis, P.C. | 817-776-3338 | 27 |
| Salverino v. Eagle Electric | Thomas J. Farmer | McCauley, Macdonald, Love & Devin | 214-744-3300 | 29 |
| Arlia Mae West v. Roselyn Apartments | Patrick Garvey | Johnson & Bell | 312-984-0203 | 30 |
| Realty v. Datt and TU | Travis Vanderpool | Worsham, Forsythe, & Wooldridge | 214-978-3000 | 31 |
| Goldsmith v. Pittway | Robert Wyatt | Wyatt & Wyatt | 562-857-2727 | 32 |
| Stevens v. Pedigo | Victor V. Corpuz | Ronquillo & DeWolf | 214-954-0076 | 37 |
| Bobbye Corley v. TU Electric | Charles D. Olsen | Haley & Davis, P.C. | 817-776-3336 | 38 |
| Emerson v. UTILX Corp. | Michael D. Lewis | Michael D. Lewis | 405-848-6608 | 39 |
| Knight v. TU Electric | David Weaver | Burford & Ryburn, LLP | 214-740-3141 | 40 |
| Aston v. Southwestern Public Services Co. | Ray Harris | Conant, Whittenberg ... | 214-999-5700 | 44 |
| | | | | |
| Lucio v. Caprock Utilities | Paul L Myers | Strasburger & Price, L.L.P. | 214-651-4536 | 46 |
| Dale Carpenter v. Univesco, Trane co. | Shari Keely | Cowles & Thompson | 214-672-2000 | 50 |
| Mercer v. Pittway | Stephen Licktelg | Fetterly & Gordon | 1-800-268-2501 | 51 |
| Marcus Wright v. Heartland Wireless | Les Palmer | Haley & Davis, P.C. | 817-776-3336 | 54 |
| Mullins v. Boyd | Paul Gilliam | Ramey & Flock | 903-510-5215 | 55 |
| Max Miller v. Trinity Contractors | Richard Westein | Werstein & Associates | 214-969-0186 | 56 |
| Rueda v. Delgado, HL&P | Judy Zimmer | Baker & Botts | 713-229-1234 | 57 |
| Jovan Sears | Charles Ward | Murray Law Firm | 504-525-8100 | 58 |






| Case | Name | Firm | Phone | # |
|---|---|---|---|---|
| Buck v. Lyda | Donald Kidd | | 713-953-9550 | 59 |
| Blanton v. HL&P | Bill Robbins III | Gallagher, Lewis, & Downey | 719-650-1200 | 60 |
| Zamora V. City of Brownsville | Anthony Constant | Constant & Vela | 512-887-8800 | 61 |
| Kennedy v. TU | Jeffrey McFall | Cantey & Hanger, L.L.P. | 817-877-2800 | 66 |
| Abercrombie v. TU Electric | Travis Vanderpool | Worsham, Forsythe, & Wooldridge L.L.P. | 214-979-3000 | 67 |
| Aleman v. Central Power & Light | James Ragan | James B. Ragan PC | 512-884-7787 | 68 |
| Gingerich | David Weaver | Burford & Ryburn, L.L.P | 214-740-3100 | 69 |
| Grand Forks Fire | James Fetterly | Fetterly & Gordon | 1-800-288-2501 | 70 |
| Bice v. Automated Controls | Chris Boyer | Crenshaw, Dupree & Milam, L.L.P. | 806-762-5281 | 71 |
| Johnson v. Coleman County | Paul L Myers | Strasburger & Price, L.L.P. | 214-651-4300 | 72 |
| Castro v. D.D.S. Aggregates | Bill Robins | Gallagher, Lewis & Downey | 713-222-8080 | 75 |
| Vallejo v. Allied Develop. & HL&P | Kevin Krist | The Krist Law Firm | 1-800-304-0404 | 76 |
| Ayala v. Cameron County Housing | Frank Costilla | Law Offices of Mark Cantu | 956-687-8181 | 77 |
| Bordelon v. Southern Pacific Railroad | Michael Wright | Calhoun & Stacy | | 78 |
| McGinnis, Rodriquez v. HL&P | Thomas J. Leibowitz | Leibowitz &Leibowitz | 281-565-6363 | 79 |
| Assembly of God v. T.U. Electric | David M. Weaver | Burford & Ryburn, L.L.P | | 80 |
| Ruiz v. Evans, Tappen | Tim Smith | Tim Smith | 210-737-1315 | 82 |
| Tasnet v. GE | Richard Petit | Foley & Lardner | 860-793-5131 | 83 |
| Claybrook v. BRK | Dennis C. Reich | Reich & Binstock | 713-622-7271 | 84 |
| Avererta v. Entergy Services Inc. | J. Robert Davis Jr. | Taylor & Cire | 409-762-6914 | 85 |
| Dunn v. HL&P | Carl D. Shaw | O'Quinn & Laminack | 713-223-1000 | 86 |
| Death of Ryan Chayse Beach | E.J.Saad | Cosby, Saad, Beebe, Crump, P.C. | 334-476-3000 | 87 |
| Fletcher v. Watson Electic et al | Gordon Asbury | Asbury & Asbury | 915-673-7141 | 88 |
| Gordon v. BRK | Anthony Bruning | Leritz, Plunkert, & Bruning | | 89 |
| Pipkin v. United Energex | Andrew N. Soule | Grau & Bassett | 214-880-0155 | 90 |
| Dampier v. Fyrenetics | Ron Stites | Stites, Hopkins & Fair | 816-842-8889 | 91 |
| Estate of Snyder | Jerry Dugan | Dugan, Brinkman, Maginnis & Pace | 215-563-3500 | 92 |
| Norton v. Texas Utilities | Estil Vance | Cantey & Hanger, L.L.P. | 817-877-2838 | 93 |
| William Klla v. Texas Exploration | Estil Vance | Cantey & Hanger, L.L.P. | 817-877-2838 | 94 |
| El Paso Electric testimony | John David Munn | Clark, Thomas & Winters | 512-472-8900 | 95 |
| Dillard v. Pittway | Richard H. Taylor | Jackson, Taylor, Martino, P.C. | 334-433-3131 | 97 |
| Brown v. BRK | Peter Perlman | Peter Perlman Law Offices, P.S.C. | 606-253-3919 | 98 |
| Noyola v. Five Trees Apartments | Paula Wyatt | Wyatt & Wyatt | 1-800-580-9928 | 99 |

| Case Name | Client Name | Firm | Phone | File Number |
|---|---|---|---|---|
| Manning v. Concho | David Weaver | | | |
| Brumbelow v. HL&P | John M. Longoria | Burford & Ryburn, L.L.P | 214-740-3117 | |
| Neal v. First Alert | Greg Allen | Roberts, Markel & Folger | 713-840-1666 | |
| Grywalski v. Kuykendall | Michael Rooney | | | |

# SMOKE DETECTOR EXAMINATION

# REPORT OF OPINIONS
# BY
# E. WAYNE MCCAIN, P.E.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT
OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, as | ) | |
| Representative of the | ) | |
| ESTATE OF MANUEL CRUZ; | ) | |
| Et al | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CASE NO. B-98-186 |
| | ) | |
| BRK BRANDS, INC. | ) | |
| Defendants. | ) | |



PLAINTIFF'S EXHIBIT

## SCOPE

This report is to disclose in accordance with the Federal Rules of Procedure Rule 26, opines which have been formed in the litigation before the Court. These opinions are with respect to information and data, which is available to me at the time this report is written.

## QUALIFICATIONS

All qualifications of the witness and compensation rate with listing of cases and expert testimony which has been given in trials is to be used in support of the qualifications of E. Wayne McCain.

1.    Yearly seminars by Alagasco including instruction and discussions relative to Codes and Standards which deal with natural gas and it's potential dangers.

2.    Continuing education courses in the field of explosions, fires, electrical and mechanical engineering, as well as, data and information developed by other experts in the field.

3.    FireEye-Electronics Corporation of America Technical School and Class dealing with photo-electric, ionization, and ultraviolet safety detections systems for flames, flame fires, and/or smoke detection systems.

4.    Lectures and consideration of Honeywell, Inc. which dealt with infrared, ionization, ultraviolet, and other photoelectric systems.

5.    Local Engineering Planning Committee - Shelby County, Alabama ± 91-93. Chaired - worked with Police Departments, Fire Departments, EPA & ADEM.

## ITEMS REVIEWED

1.    STANDARDS

    a)    NFPA 72:  National Fire Alarm Code
    b)    NFPA 101: Line Safety code
    c)    UL:  ULCVS Users' Guide and the Guide for Burglar and Fire Alarm Certificate Services
    d)    UL:  Electrical Appliance and Utilization Equipment Directory 1980 & 1979
    e)    UL 217:  Single and Multiple Station Smoke Detectors

f)    Revision for UL 217, 10-8-85
g)    Revision for UL 217, 3-21-86
h)    Revision for UL 217, 7-17-87
i)    UL 268:  Letter on Interim Allowable Smoke Detector Factory
      Sensitivity Production Window Settings

2.    ARTICLES

a)    Consumer Reports:  Smoke Detector's, Essential for Safety

3.    PRODUCT INFORMATION

a)    ESL Catalogs
b)    First Alert Smoke Detectors Box and Users Manual
c)    Recall Info on Smoke Detectors

4.    CPSC INFORMATION

a)    Smoke Detector Operability Survey-Report on Findings
b)    CPSC Info on Public Disclosure of Information
c)    News from CPSC:  Defective Alarm Prompts – Recall of Battery
      Powered Smoke Detectors
d)    CPSC-C-93-1139 Study of Deterioration of Separable Electrical
      Contacts in Smoke Detectors
e)    Fire Incident Study National Smoke Detector Project

**OPINIONS**

My opinions are as follows based on the materials and I have performed actual
tests of the SA67D Smoke Detector.

A.    The smoke detector SA67D as manufactured by BRK Brands is a
defective and unreasonably dangerous product based on the fact that the tests,
which were run by E. Wayne McCain, showed that the detector would not
function for a period of approximately two (2) hours.

B.    The smoke detector and battery markings along with the male and female
connections exhibit without doubt that the battery was installed when the fire
occurred at 190 Thomas Lane, San Benito, Texas.

C.    The smoke detector, as manufactured by Defendant BRK Brands, Inc. and its printed circuit board was inspected and an exemplar tested.

D.    I inspected the house involved in this occurrence, the smoke detector, a gas heater and other equipment.

E. WAYNE MCCAIN, P.E.

Enclosures:

1. Photographs of Smoke Detector
2. Consumer Report Articles

**BIOGRAPHICAL DATA**
**January 2002**

**B. Don Russell**

| | | |
|---|---|---|
| Associate Vice Chancellor | Associate Dean for Research | Deputy Director |
| Engineering Research Programs | Look College of Engineering | Texas Engineering Experiment Station |
| Texas A&M University System | Texas A&M University | Texas A&M University System |

Birthplace: Denison, Texas (1948)    Citizenship: U.S.    Married: Becky (Crawford) Russell
Children: Christyn (TAMU'98), John Paul
(TAMU'00), Jenny (TAMU'00), Elizabeth

Security Clearance:    DOD Secret

Professional Interests:    Electric Power Engineering; Power System Protection, Control, and Computer
Automation; Energy Systems; Fire Detection Technology; Forensic Engineering;
Engineering Economics; Engineering Ethics and Professionalism

**EDUCATION:**

Ph.D.    Electrical Engineering, University of Oklahoma, 1975
M.E.    Electrical Engineering, Texas A&M University, 1971
B.S.    Electrical Engineering, Texas A&M University, 1970
Post graduate studies, Theology and History, Abilene Christian University

**EXPERIENCE:**

*Administrative*

- Associate Vice Chancellor for Engineering Research, Texas A&M University System, 1996 - present
- Deputy Director, Texas Engineering Experiment Station, Texas A&M University System, 1996 - present
- Associate Dean for Research, College of Engineering, Texas A&M University, 1996 – present
- Associate Vice Chancellor for Academic Programs, Texas A&M University System, 1994 –1996
- Executive Associate Dean, College of Engineering, 1994 - 1996
- Assistant Agency Director, Texas Engineering Experiment Station, 1994 - 1996
- Assistant Department Head, Electrical Engineering, 1986 - 1992
- Associate Director, Institute for Ventures in New Technology (INVENT), 1982 - 1985
- Director, Electric Power Institute, 1980 - 1981

*Educational and Research*

- Regents Professor, Texas A&M University System, 2000 - present
- Professor, Electrical Engineering, Texas A&M University, 1988 – present
  - Associate Professor, 1979 – 1988
  - Assistant Professor, 1976 - 1979
- Director, Power System Automation Laboratory, 1981 - present



## BIOGRAPHICAL DATA
### January 2002

**B. Don Russell**

| | | |
|---|---|---|
| Associate Vice Chancellor | Associate Dean for Research | Deputy Director |
| Engineering Research Programs | Look College of Engineering | Texas Engineering Experiment Station |
| Texas A&M University System | Texas A&M University | Texas A&M University System |

Birthplace: Denison, Texas (1948)     Citizenship: U.S.     Married: Becky (Crawford) Russell
Children: Christyn (TAMU'98), John Paul
(TAMU'00), Jenny (TAMU'00), Elizabeth

Security Clearance:     DOD Secret

Professional Interests:     Electric Power Engineering; Power System Protection, Control, and Computer Automation; Energy Systems; Fire Detection Technology; Forensic Engineering; Engineering Economics; Engineering Ethics and Professionalism

## EDUCATION:

Ph.D.     Electrical Engineering, University of Oklahoma, 1975
M.E.     Electrical Engineering, Texas A&M University, 1971
B.S.     Electrical Engineering, Texas A&M University, 1970
Post graduate studies, Theology and History, Abilene Christian University

## EXPERIENCE:

### *Administrative*

- Associate Vice Chancellor for Engineering Research, Texas A&M University System, 1996 - present

- Deputy Director, Texas Engineering Experiment Station, Texas A&M University System, 1996 - present

- Associate Dean for Research, College of Engineering, Texas A&M University, 1996 – present

- Associate Vice Chancellor for Academic Programs, Texas A&M University System, 1994 –1996

- Executive Associate Dean, College of Engineering, 1994 - 1996

- Assistant Agency Director, Texas Engineering Experiment Station, 1994 - 1996

- Assistant Department Head, Electrical Engineering, 1986 - 1992

- Associate Director, Institute for Ventures in New Technology (INVENT), 1982 - 1985

- Director, Electric Power Institute, 1980 - 1981

### *Educational and Research*

- Regents Professor, Texas A&M University System, 2000 - present

- Professor, Electrical Engineering, Texas A&M University, 1988 – present

  - Associate Professor, 1979 – 1988

  - Assistant Professor, 1976 - 1979

- Director, Power System Automation Laboratory, 1981 - present

- Research Engineer, Electric Power and Power Electronics Institute, 1976 - present
- Member, Graduate Faculty, Texas A&M University, 1977 - present
- Visiting Instructor, Electrical Engineering, University of Oklahoma, 1973 -75
- Instructor of Physics and Member of Graduate Faculty, Abilene Christian University, 1971-73
- Graduate Teaching Assistant, Texas A&M University, 1970

*Industrial*

- President and Chief Consultant, Micon Engineering Inc., 1978 - 1990
- Consultant and Principal, Entek Associates, 1979 - 1980
- Power Systems Research Manager, Electric Power Research Institute, 1975
- Power Systems Engineer, Oklahoma Gas and Electric Company, 1974 (Summer internship)
- Assistant Government Contracts Property Administrator and Manufacturing Engineering Assistant, Texas Instruments, Inc., Dallas, Texas (co-op internship 1967-1970)
- Industrial Consultant, 1974 - present; Clients include:

  Hughes Research Laboratories, General Electric Company, 3M Corp., Westinghouse Electric, Boeing Aircraft, Rockwell International, Dow Chemical Company, Texas Energy and Natural Resources Advisory Council, Frontier Enterprises, United Technologies, Texas Utilities, Oklahoma Gas & Electric, Korea Electric, Pirelli Corporation, Schlumberger/Sangamo; several law firms as forensic engineer

*Research Funding and Management (partial listing)*

"Increased Electricity Supply through Real-Time Power System Monitoring and Control", Higher Education Coordinating Board, 2002-2003, $141,000; with Carl Benner.

"Distribution Fault Anticipator Phase II: Field Demonstration", Electric Power Research Institute, 2001 – 2004, $1,677,000; with Karen Butler and Carl Benner.

"Acquisition of Test Equipment to Advanced Research and Education in Distributed Energy Systems (DES)," funded by National Science Foundation, $150,000, 2001 – 2003, with C. Singh, et al.

"On-Line Detection of Underground Distribution Cable Failure," Texas Utilities Services, Inc., $47,357; 2001 – 2002 with Karen Butler.

"New Techniques for Maintaining Reliability in the Restructured Electric Utility Industry," funded by Texas Higher Education Coordinating Board, $156,200, 2000 – 2001; with Karen Butler.

"Distribution Fault Anticipator/Locator Phase I: Proof of Concept", funded by Electric Power Research Institute, 1997 - 2001, $1,308,411; with Karen Butler and Carl Benner.

"Power Distribution Feeder Failure Prediction", funded by Keyin Systems (South Korea), 1995 – 1997, $81,000; with Carl Benner.

"Detection of Arcing Faults-Algorithm Development", funded by General Electric Company, 1997- 1998, $57,418.

2

"Detection and Location of Incipient Faults", funded by TU Services, Inc., 1996 - 1998, $52,378; with Karen Butler.

"Acquisition of Advanced Instrumentation and Test Equipment for Research, Education and Training in Electric Power Quality", National Science Foundation, 1995- 1997, $251,743; with Prasad Enjeti, et al.

"Detection Techniques for 480 Volt Network Faults", Electric Power Research Institute, 1993, Phase I, $50,000; with Carl Benner and Michael Aucoin.

"Detection Techniques for 480 Volt Network Faults", Electric Power Research Institute, 1993, Phase II, $125,000; Carl Benner and Michael Aucoin.

"An Expert Decision Maker for Feeder Protection", General Electric Co., 1993 - 1994, $50,000.

"Field Evaluation of High Impedance Fault Detection Technology", Electric Power Research Institute,  1991 - 1993, $136,000.

"Development of Detection Techniques for High Impedance Fault Detection", Electric Power Research Institute, 1990 - 1992, $285,000.

"Intelligent Power Distribution Protection System Development", David Taylor Research Center, U.S. Navy, 1990 - 1995, $325,000.

"Knowledge Based System for Improved Adaptive Relaying and Diagnostics on Distribution Feeders", Electric Power Research Institute, co-funded by Houston Lighting and Power, 1990 - 1992, $100,000.

"An Instrumentation and Data Analysis System for Monitoring Industrial and Commercial Energy Use", funded by the Texas Energy Research in Applications Program, 1989 - 1993, $259,260.

"Methods for High Impedance Fault Detection", Electric Power Research Institute, 1988 - 1989, $235,989.

"Characterization and Detection of Electrical Faults", sponsored by National Science Foundation, FY 1988, $91,611; FY 1989, $95,535.

"Development of High Impedance Fault Test Facility", grants from Texas Utilities and Houston Lighting and Power, 1989, $73,000.

"Advanced Power System Protection and Incipient Fault Detection", sponsored by NASA-JSC,  1986 - 1987, $60,000.

"Protection of Spaceborne Power Systems", sponsored by NASA-JSC, 1987 - 1988, $68,000.

"Development of Knowledge Based Expert Systems for the Protection of Electric Distribution Feeders", Center for Energy and Mineral Resources, 1986 - 1987.

"Assessment of the Effects of Electrical Power Disruption Upon Operations of Selected Industry Sectors in the USA", Department of Defense-Central Intelligence Agency, 1983 - 1984 with D. Bragg (classified).

"Evaluation of Electromagnetic Interference and Grounding Problems with Traffic Control Automation Equipment", Texas Highway Department, 1982 - 1984, with W. Cunningham.

"Distribution Feeder Protection Research Utilizing Microcomputer", funded by Houston Lighting and Power Co., 1982 - 1983, $29,880.

"Detection of High Impedance Faults on Distribution Circuits", funded by Electric Power Research Institute, 1978 - 1982, $252,177.

"Evaluation of Highway Luminaire Failures Due to Electrical Transients Caused by Wind Induced Vibrations", funded by Texas Department of Highways and Texas Transportation Institute, 1981 - 1983, with E. Red.

"Evaluation of the Electrical Environment in High Voltage Substations", funded by Electric Power Research Institute, 1978 - 1983, $300,950.

"Energy Management in the Food Industry", funded by Center for Energy and Mineral Resources, 1977 - 1981, $34,080.

"Microcomputer Overcurrent Relay Development", funded by DOW Chemical, 1978 - 1982, $30,000.

"Electromagnetic Field Measurements During 500 kV Fault Tests", funded by Northern States Power and Electric Power Research Institute, 1980 - 1982, $36,770.

"Test Data Acquisition Support Services", funded by Electric Power Research Institute, 1980 - 1982, $114,000.

"Distribution Substation Electromagnetic Environment Evaluation", funded by General Electric Company, 1980 - 1982, $18,000.

"Microprocessor-Based Distribution Feeder Protection Research", funded by Public Service Company of New Mexico, 1980 - 1982, $18,000.

"Transient Recorder Utilizing Computer Control (TRUCC)", funded by Electric Power Research Institute, 1979 - 1983, $199,300.

## *Grants and Fellowships*

- General Electric Co. - Research Support Grant, 1993 - 94, $100,000.

- 3M Corp. - Research Grants, 1985, 1986, 1987, 1988, 1989, $25,000 each.

- TAMU International Coordination Research Grant, 1987

- Oklahoma University Research Fellowship, 1975

- Schmitt Scholar, National Engineering Consortium, 1974

- National Defense Fellowship, Texas A&M University, 1971

- Munson Foundation Scholarship, Texas A&M University, 1966 - 1970

**PROFESSIONAL LICENSES:**

- Registered Professional Engineer, Texas #43696
- Certified Energy Auditor, Texas

**PROFESSIONAL SOCIETY MEMBERSHIPS:**

- National Academy of Engineering (elected 1999)
- Institute of Electrical and Electronics Engineers (Fellow)
- Power Engineering Society
- Industry Applications Society
- American Society for Engineering Education
- National Society of Professional Engineers
- Texas Society of Professional Engineers
- International Council on Large Electric Systems (CIGRÉ)
- American Academy of Forensic Sciences
- American College of Forensic Examiners (Diplomate)
- American Board of Engineering and Technology (Diplomate)

**HONOR SOCIETY MEMBERSHIPS:**

- Phi Kappa Phi Honor Society
- Eta Kappa Nu, Electrical Engineering Honor Society
- Tau Beta Pi, National Engineering Honor Society
- Sigma Pi Sigma, National Physics Honor Society

**AWARDS, PATENTS, AND LISTINGS:**

*Special Awards/Recognition*

- Regents Professor, Texas A&M University System, 2000.

- IEEE Millennium Medal, 2000.

- Distinguished Achievement Award in Research, Association of Former Students, Texas A&M University, 1999.

- IEEE Herman Halprin Electric Transmission and Distribution Technical Field Award, 1997.

- IEEE Electrotechnology Transfer Award, 1997.

- R&D 100 Award for the Development of the Digital Feeder Monitor, 1996.

- IEEE USAB Electrotechnology Transfer Award, 1996.

- Outstanding Professor Award, IEEE Student Branch, Texas A&M University, 1994.

- SWEMA Outstanding Instructor Award, Industry Meter School, Texas A&M University, 1993.

- Dresser Industries Professorship (for outstanding contributions in teaching, research and service), 1993.

- Leadership in Student Research Supervision Service Award, IEEE/PES, 1993.

- Distinguished Service Award (for distinguished service to the Substations Committee), IEEE/PES, 1993.

- PES Executive Board Recognition (for distinguished service to the Society), 1993.

- Tech-Brief Award (for sponsored research on adaptive protection for space-borne power systems), NASA, 1992.

- Outstanding Technical Report, IEEE/PES, January, 1992.

- Leadership in Student Research Supervision Service Award, IEEE/PEEC, 1992.

- IEEE Fellow (for the development of high impedance fault detection techniques using digital methods), January, 1991.

- Distinguished Service Award, Power Engineering Education Committee, IEEE/PES, 1991.

- Halliburton Professorship (for outstanding achievement in education, research and service), Halliburton Education Foundation, 1989.

- Outstanding Working Group Award, PES Substations Committee, IEEE/PES, 1988.

- Distinguished Lecturer, IEEE, 1987, 1988, 1990, 1991.

- Working Group Recognition (for contribution to IEEE/ANSI standards), IEEE/PES, 1986.

- Working Group Recognition (for contribution to EE graduate curriculum development), IEEE/PEEC, 1985.

- Leadership in Student Research Supervision Service Award, IEEE/PEEC, 1985.

- Outstanding Technical Paper, Substations Committee, IEEE/PES, 1985.

- Outstanding Engineering Achievement, National Society of Professional Engineers, 1982.

- Outstanding Young Engineer, Brazos Chapter, Texas Society of Professional Engineers, 1978.

- Outstanding Patent Submission Award, Electric Power Research Institute, 1975.

- Baldwin Teaching Award, University of Oklahoma, 1974.

- Bolton Award, Outstanding Electrical Engineering Senior, Texas A&M University, 1970.

### *Listings*

- Who's Who in Science and Engineering
- Who's Who in Frontier Science and Technology
- Who's Who in the South and Southwest
- Who's Who of Emerging Leaders in America
- American Men and Women of Science
- Outstanding Young Men of America, 1976
- Who's Who in Technology Today

### *Patents*

"Load Analysis System for Fault Detection", U.S. Patent 5,600,526, issued 2/97.

"Arc Burst Pattern Analysis Fault Detection System, U.S. Patent 5,659,453, issued 8/97.

"Expert System for Detecting High Impedance Faults, U.S. Patent 5,550,751, issued 8/96.

"Arc Spectral Analysis System", U.S. Patent No. 5,578,931, issued 11/96.

"Energy Analysis Fault Detection System", U.S. Patent No. 5,512,832, issued 4/96.

"Load Extraction Fault Detection System", U.S. Patent No. 5,506,789, issued 4/96.

"Randomness Fault Detection System", U.S. Patent No. 5,485,093, issued 1/96.

"High Impedance Fault Detection Apparatus and Method", U.S. Patent No. 4,466,071, issued 8/84.

"Digital Protection System for Transmission Lines and Associated Power Equipment", U.S. Patent No. 4,161,027 issued 7/79.

Foreign patents granted based on the above U.S. patents.

**PROFESSIONAL ACTIVITIES:**

### *Texas Society of Professional Engineers*

- State Director, TSPE, 1982 - 1985
- Chapter Director, Brazos Chapter, TSPE, 1984 - 1988
- President, Brazos Chapter, TSPE, 1981 -1982
- Vice President, Brazos Chapter, TSPE, 1980 –1981

7

*National Academy of Engineering*
- Member, PEER Membership Committee, Section 6, 2001-2002.
- Vice Chair, PEER Membership Committee, Section 6, 2002.
- Liaison for Power and Energy (Section 6) to National Research Council, 2000. (appointed)

*Institute of Electrical and Electronics Engineers, Inc. (IEEE)*
- Division VII Director, IEEE Board of Directors, 2000, 2001 (elected position).
- Member, IEEE Assembly, 2000, 2001.
- Member, IEEE Corporate Recognitions Committee, 2001, 2002.
- Member, IEEE Overhead Allocation Recovery Committee, 2001.
- Chair, Infrastructure Finance Committee, 2000 – 2001.
- Member, IEEE Technical Activities Board Management Committee, 1999, 2000.
- Member, IEEE Technical Activities Board, 1998 – 2001.
- Member, IEEE Technical Activities Board Products Committee, 1996 – 1999.
- Member, IEEE Technical Activities Board Electronic Products Committee, 1998 –1999.
- Member, IEEE Technical Activities Board, Awards and Recognition Committee, Division VII Representative, 1990 – 1993.
- Member, IEEE Awards Planning and Policy Committee, 1990, 1991.

*Power Engineering Society*
- Member, PES Governing Board, 1989 – 2002.
- Chair, PES Executive Director Search Committee, 2001-2002.
- President, IEEE Power Engineering Society, 1998, 1999. (elected position)
- Member, IEEE Power Engineering Society Editorial Board, 1996 – 2001.
- Vice President, IEEE Power Engineering Society (elected position), 1995 – 1996.
- Secretary, IEEE Power Engineering Society (elected position), 1994 – 1995.
- Chair, PES Constitution and Bylaws Committee, 1994 – 1995.
- Member, PES Plenary Session Planning Committee, 1994 – 1995.
- Chairman, PES Awards and Recognition Department, 1989 – 1993.
- Member, PES Technical Council, 1989 – 1993.
- Chairman, IEEE/PES Substations Committee Awards Subcommittee, 1986 – 1993.
- Member, Data Acquisition, Processing and Controls Subcommittee, Substations Com., 1986– 1993.

8

- Member, Electric Network Control System Standards W. G., 1989 – 1992.
- Chairman, PEEC Honors and Awards Committee, 1982 – 1993.
- Member, Power Engineering Society Honors and Awards Committee, 1982 – 1993.
- Vice Chairman, Application of New Technologies Working Group, 1980 – 1992.
- Member, PES Power Engineering Education Committee, 1980 – present.
- Member, PES Substation Committee, IEEE, 1979 – present.
- Member, PES/PEEC, Graduate Curriculum Task Force, 1981 – 1984.
- Vice Chairman, Digital Protection System Design Group, 1981 – 1983.
- Member, Bibliography Subcommittee, Power System Relay Com., 1980 – 1988.
- Member, Relay Electrical Environment Subcommittee, PSRC, 1980 – 1985.
- Chairman, Substation Electromagnetic Environment Group, Substation Committee, 1979 – 1988.
- Member, Relay Input Sources Subcommittee, 1979 – 1985.
- Member, Automatic and Supervisory Systems Subcommittee, Substation Committee, 1978 – 1986.
- Member, PES Relaying Committee, 1978 – 1985.
- Chairman, Digital Input Sources and Processing Working Group, Power System Relaying Committee, 1977 – 1981.
- Member and Chair of additional ad hoc committees and working groups of PES.

*Conferences*
- Chairman, TAMU Relay Conference, 1988 - present (annually).
- International Advisor, International Power Engineering Conference, Singapore, 1999, 2001.
- International Advisor, International Conference on Advances in Power System Control, Operation and Management, Singapore, 1997.
- Chairman, Substation Automation Conference, 1995- 1998 (annually).
- Chairman, First International Conference on Digital Power Systems Simulators, 1995.
- Chairman, Fault Disturbance and Analysis Conference, TAMU, 1991 - 1994 (annually).
- Chairman, Southwest Electrical Exposition Conference, Houston, Texas, 1984.
- IEEE Control of Power Systems Conference
     Member, Program Committee, 1975 - 1980
     General Chairman, 1979
     Technical Program Chairman, 1977

*Other*
- President, Texas Society of Energy Auditors, 1979 – 1981

## *University Committees*

- University Research Council, 1996 – present.
- TAMUS Technology Licensing Oversight Committee, 1994-present.
- Chair, Nuclear Reactor Safety Board, 1996 – present.
- Engineering Education Program Review Committee (EEPRC), 1990 –1993.
- Member,VISION 2020 - Engineering Education Convocation Planning Committee, 1991.
- Doctor of Engineering - External Relations Program Committee, 1989 – 1990.
- Chairman, Classified and Proprietary Research Subcommittee, Faculty Senate, 1987 – 1989.
- Faculty Senate Executive Committee, Member, 1986 – 1989.
- Deputy Speaker, Faculty Senate, Charter Member, 1987 – 1988.
- Chairman, Engineering Caucus - Faculty Senate, 1985 – 1987.
- Senator, Faculty Senate, Charter Member, 1983 – 1989.
- Chairman, Research Committee, Faculty Senate, 1985 – 1989.
- Chairman, Engineering Faculty Affairs Council, 1983 – 1984.
- Engineering Faculty Affairs Council, 1981 – 1984.
- TAMU Academic Council, 1982 – 1984.
- TAMU System Patent Committee, TEES Representative, 1981 – 1987.
- TEES Research Conference Committee, 1981 – 1983.
- University Long Range Planning Committee, 1983 – 1984.
- University Academic Affairs Committee, 1983 – 1984.
- Dean of Engineering Search Committee, 1983 – 1984.
- Engineering Technology Department Head Search Committee, 1985 – 1986.

## *Department Committees*

- Chairman, Electrical Engineering Curriculum Committee, 1990 – 1991.
- Co-Chairman, Electrical Engineering/Computer Science Joint Committee on Computer Engineering, 1989 – 1990.
- Chairman, Electrical Engineering Tenure and Promotion Committee, 1989 – 1991.
- Chairman, Electrical Engineering Computing Resources Committee, 1986 – 1990.

- Chairman, Electrical Engineering Accreditation Committee, 1985 – 1986.

- Chairman, Electrical Engineering Strategic Plan Committee, 1986.

## *Special Activities*

- Editor-in-Chief, *Electric Power Systems Research Journal*, 1994 – present.

- Associate Editor, *Electric Power Systems Research Journal*, 1976 – 1994.

- Reviewer - IEEE *Transactions on Power Delivery*.

- Reviewer - IEEE *Transactions on Power Systems*.

- Reviewer - several book publishers.

- Peer Reviewer, National Science Foundation.

## *Short Courses and Tutorials*

"High Impedance Fault Detection - Technical Evolution and State of the Art", invited tutorial, PG&E, 1992.

"Detection of Downed Conductors on Utility Distribution Systems", IEEE Tutorial, 1989, 1990.

"Distribution Substation Automation Technology - State of the Art Review", invited IEEE Tutorial, Eighth National Workshop on Electric Energy Distribution, Salvador Bahia, Brazil, September, 1984.

"Retail Energy Management Seminar:  Specification of Energy Management Control Systems", invited tutorials, Houston Lighting and Power, 1982, 1983, 1984.

"Research Requirements for Implementation of the TAMU Arcing Fault Detector", invited tutorial, Mexico City Division of Mexican National Utility, Mexico City, Mexico, May, 1983.

"Principles and Applications of Energy Management Control Systems", Southwest Electrical Exposition and Conference, tutorial, 1982, 1984.

"Basics of Engineering Economics", invited tutorial, Brazos Electric Power Cooperative, 1982.

"Basic Meter Theory", Meterman Training School, TAMU Electric Power Institute, annually 1980 - 1997.

"Computer Relaying", IEEE tutorial, 1979, 1980.

"Industrial Energy Auditing", short course, 1977, 1978, 1979.

"Economic Evaluation of Energy Management Alternatives", TAMU Short Course, 1978.

"Economic Evaluation of Engineering Alternatives", invited short course, Dallas Power and Light, 1976, 1977.

"Digital Systems Design with Industrial Applications", short course, University of Oklahoma, 1975.

"Symmetrical Components and Fault Current Calculations", short course, Oklahoma Gas and Electric Company, 1974.

## *Speeches, Lectures, and Technical Presentations*

"IEEE in Review," invited keynote address, IEEE Porto Power Tech' Conference, Porto, Portugal, 2001.

"Risk Management – Successful Decisions in an Environment of Uncertainty," invited keynote address, 6th International Conference on Probabilistic Methods Applied to Power Systems, Funchal, Madeira, Portugal, September, 2000.

"The IEEE and International Collaboration in Electric Power Engineering," keynote address, PowerTech 99 Conference, Budapest, August, 1999.

"Distribution Fault Anticipation/Location," invited presentation, EPRI Distribution Business Area Council Meeting, Pasadena, California, February, 1999.

"High Impedance Fault Detection DFM Relay - Update on Technology", invited lecture, 1998 IEEE/PES Winter Power Meeting, Tampa, Florida, February, 1998.

"Downed Electric Conductors, Their Characteristics, and the Potential for Public Danger".  invited lecture, Southwest Electric Claims Exchange, Irving, TX, June, 1996.

"Recent Field Experience with High Impedance Fault Detection", invited panelist, IEEE/PES Summer Power Meeting, Portland, Oregon, July, 1995.

"Applications of High Impedance Fault Detectors", invited panelist, IEEE/PES Summer Power Meeting, Portland, Oregon, July, 1995.

"Distribution Transformer Connections - Their Effect on Protective Relaying", Conference for Protective Relay Engineers, College Station, TX, March, 1994.

"Trends in Integration of Control, Protection and Data Acquisition in Substations", panel organizer and chairman, PES Summer Meeting, San Diego, CA, July, 1991.

"Digital Methods for Fault Detection - State of the Art", invited lectures, Third IEEE Chilean Power System Symposium, Valporaiso, Chile, 1990.

"Electric Power Engineering Education - Enhancement Through Industry/University Cooperation", Plenary Session, Power Engineering Society Summer Meeting, Minneapolis, MN, July, 1990, session organizer and speaker.

"Automation of Electric Distribution Feeders Using Advanced Technologies", invited lectures, Electropaulo International Seminar on Electric Power Distribution, Sao Paulo, Brazil, February, 1987.

"Power System Automation Research in the United States", invited presentation, Seoul National University, Korea, October, 1986.

"Integration of Load Management and Distribution Automation", invited panelist, IEEE/PES Transmission and Distribution Conference, Anaheim, CA, , September, 1986.

"Application of Microprocessors in Feeder Control", panel chairman, IEEE/PES Summer Power Meeting, Mexico City, presentation and panel discussion, July, 1986.

"The Role of Research as a Linkage between Universities and Industry", invited lecture, IEEE/PES Summer Power Meeting, Mexico City, 1986.

"Substation Automation-Combining the Monitoring and Control Function", invited lecture, 1985 Fault and Disturbance Analysis Conference, Sangamo Division of Schlumberger Corp., October, 1985.

"Microprocessors in Power System Automation and Control", invited lecture, Sao Paulo Electric, Sao Paulo, Brazil, August, 1985.

"Computer Control of Power Distribution for Offshore Production Platforms", invited presentation, Petrobras Corporation, Rio De Janeiro, August, 1985.

"Integrated Control and Protection of Distribution Feeders", invited panelist, PES/IEEE Summer Power Meeting, Vancouver, B. C., July, 1985.

"Microcomputer Technology in Distribution System Protection", invited lecture, Pirello Corporation, Sao Paulo, Brazil, September, 1984.

"Arcing Fault Protection on Multi-Grounded Distribution Systems", invited presentation, Companhia Energetica de Sao Paulo, Brazil, September, 1984.

"Design Criteria for Computer Relay Protection of Power Distribution Systems", invited presentation, Electric Power Research Institute of Mexico and CFE, Cuernavaca, Mexico, May, 1983.

"Energy Management Systems in New Designs", invited lecture, 11th Architect and Engineers Conference, Dallas, Texas, April, 1983.

"Economic Aspects of Distribution Automation", invited panelist, IEEE/PES Summer Power Meeting, San Francisco, California, July, 1982.

"Microcomputer Applications in the Protection of Utility Distribution Feeders", invited presentation, Tokyo Electric Co., Hitachi, and Toshiba Corp., Tokyo, Japan, May, 1982.

"Power Substation Automation Research at Texas A&M University", invited presentation, Kansai Electric and Mitsubishi Electric, Japan, 1982.

"Facilities Monitoring and Process Control Utilizing Microcomputers", Industrial Energy Conservation Technology Conference & Exhibition, invited presentation and panelist, Houston, Texas, April, 1982.

"Distribution High Impedance Fault Detection", IEEE Transmission and Distribution Conference, 1981.

"Using Advanced Technology in the Solution of Power System Problems", invited lecture, PEEC, Power Engineering Society, 1981.

"Application of Arcing Fault Detectors to Distribution Feeder Protection", invited tutorial, IEEE Power Systems Relaying Committee, Cincinnati, Ohio, May, 1981.

"Developments in Systems for Transmission and Distribution Substation Control and Protection", invited panelist and presentation, IEEE/ PES Summer Meeting, Minneapolis, Minnesota, July, 1980.

"Energy Management in the Food Service Industry", invited address, Texas Restaurant Association Annual Convention, June, 1979.

"Microprocessors and the Power Industry", invited presentation, Power Engineering Society Relaying Committee, 1977.

"Field Experiences with Substation Automation", invited panelist, IEEE/PES Summer Power Meeting, 1977.

## PUBLICATIONS:

### Books

*Detection of Downed Conductors on Utility Distribution Systems*, Tutorial Text, IEEE Press, 1989

*Computer Relaying*, Tutorial Text, IEEE Press, 1979, with M. Sachdev et. al.

*Power System Control and Protection*, Academic Press, Inc., New York, New York, 1978, edited with M.E. Council.

### Refereed Papers

Butler, Karen L.,Russell, B.D., Benner, C., Andoh, K., "Characterization of Electrical Incipient Fault Signature Resulting from Tree Contact with Electrical Distribution Feeders," *Proceedings of IEEE Power Engineering Society*, Vol. 1, 1999, pp. 408-413.

Butler, K., Khan, S., Russell, B.D., "Analysis of Incipient Behavior of Multiple Distribution Insulators," *Proceedings of the IEEE Transmission and Distribution Conference*, New Orleans, LA, pp. 675-680, April, 1999.

Benner, Carl L., Russell, B.D., "Practical High-Impedance Fault Detection on Distribution Feeders," *IEEE Transactions on Industry Applications*, Vol. 33, No. 3, pp. 635-640, May/June 1997.

Short, S.X., Mamishev, Alex, Kao, T.W., Russell, B.D., "Evaluation of Methods for Discrimination of Energized Underground Power Cables", *Electric Power Systems Research*, Vol. 37, No. 1, pp. 29-38, April, 1996.

Mamishev, A.V., Russell, B.D., Benner, Carl L., "Analysis of High Impedance Faults Using Fractal Techniques", *IEEE Transactions on Power Systems*, Vol. 11, February 1996, pp. 435-440.

Kim, C.J., Russell, B. Don, "Analysis of Distribution Disturbances and Arcing Faults Using Crest Factor", *Electric Power Systems Research*, Vol. 35, No. 2, pp. 141-148, November, 1995.

Mamishev, A.V., Russell, B.D., "Measurement of Magnetic Fields in the Direct Proximity of Power Line Conductors", *IEEE Transactions on Power Delivery*, Vol. 10, No. 3, pp. 1211-1216, July, 1995.

14

Benner, Carl L., Russell, B. Don, "Arcing Fault Detection for Distribution Feeders: Security Assessment in Long Term Field Trials", *IEEE Transactions on Power Delivery*, Vol. 10, No. 2, pp. 676-683, April, 1995.

Benner, Carl, Russell, B.D., "Performance of High Impedance Fault Detection Algorithms in Long Term Field Trials", *Electric Power Systems Research*, Vol. 31, No. 2, pp.71-77, November, 1994.

Mamishev, Alexander V., Russell, B.Don, "Analytical Solution for the Magnetic Field Produced by a Sequence of Catenaries", October, 1994.

Kim, C. J., Russell, B. D., "High-Impedance Fault Detection System Using an Adaptive Element Model", *IEEE Proceedings-C, Vol. 140,* No. 2, pp. 153-159, March, 1993.

Kezunovic, M., Watson, K., Russell, B. D., "Expert System Applications to Protection, Substation Control and Related Monitoring Functions", *Electric Power Systems Research*, Vol. 21, No. 1, pp 71-86, April, 1991.

Kim, C. J., Russell, B. Don, "A Learning Method for Use in Intelligent Computer Relays for High Impedance Faults", *IEEE Transactions on Power Delivery*, Vol. 6, No. 1, pp. 109-115, January, 1991.

Li, S., Russell, B. Don, "Optimal Arcing Fault Detection Using Signal Processing Techniques", *Electric Power Systems Research*, Vol. 21, pp. 121-128, 1991.

Kezunovic, M., Watson, K., Russell, B. D., Heller, P., Aucoin, M., "Expert System Applications to Protection, Substation Control and Related Monitoring of Feeders", *Electric Power Systems Research*, Vol. 21, pp. 71 - 86, 1991.

Kim, C. J., Russell, B. Don, Watson, K., "A Parameter-Based Process for Selecting High Impedance Fault Detection Techniques using Decision Making Under Incomplete Knowledge", *IEEE Transactions on Power Delivery*, Vol. 5, No. 3, pp. 1314 - 1320, July, 1990.

Russell, B. D., "Computer Relaying and Expert Systems: New Tools for Detecting High Impedance Faults", *Electric Power Systems Research*, Vol. 20, No. 1, pp. 31-37, March, 1990.

Benner, C. , Carswell, P., Russell, B. D., "Improved Algorithm for Detecting Arcing Faults Using Random Fault Behavior", *Electric Power Systems Research*, Vol. 17, No. 1, pp. 49-56, 1989.

Kim, C. J., Russell, B. D., "Classification of Faults and Switching Events by Inductive Reasoning and Expert System Methodology", *IEEE Transactions on Power Delivery*, Vol. 4, No. 3, pp. 1631-1637, July, 1989.

Mehta, K., Russell, B. D., "Data Compression for Digital Data from Power Systems: Requirements and Technique Evaluation", *IEEE Transactions on Power Delivery*, Vol. 4, No. 3, pp. 1683-1688, July, 1989.

Ingleson, J. W. Russell, B. Don, et.al. "Bibliography of Relay Literature, 1986 - 1987", *IEEE Transactions on Power Delivery,* Vol. 4, No. 3, pp. 1649-1658, July, 1989.

Russell, B. D., Watson, K. "A Digital Protection System Incorporating Real Time Expert Systems Methodology", *Proceedings*, CIGRE, Bournemouth, England, June, 1989.

Russell, B. D., Doern, T. L., Martin, A., "Application of Microcomputer-Based Systems in Power Substations", *IEEE Transactions on Power Delivery*, Vol. 4, No. 1, pp. 201-207, January, 1989.

Russell, B. Don, Chinchali, R., "A Digital Signal Processing Algorithm for Detecting Arcing Faults on Power Distribution Feeders", *IEEE Transactions on Power Delivery,* Vol. 3, No. 1, pp. 132-140, January, 1989.

Russell, B. Don, Chinchali, R.P., Kim, C.J. "Behavior of Low Frequency Spectra During Arcing Faults and Switching Events", *IEEE Transactions on Power Delivery*, Vol. 3, No. 4, pp. 1485-1492, October, 1988.

Kezunovic, M., Russell, B. D., "Microprocessor Applications to Substation Control and Protection", *IEEE Computer Applications in Power*, Vol. 1, No. 4, pp. 16-20, October, 1988.

Kim, C. J., and Russell, B. Don, "Harmonic Behavior During Arcing Faults on Power Distribution Feeders", *Electric Power Systems Research,* Vol. 14, No. 3, pp. 219-225, June, 1988.

Russell, B. Don, Watson, K., "Power Substation Automation Using a Knowledge Based System - Justification and Preliminary Field Experiments", *IEEE Transactions on Power Delivery*, Vol. PWRD-2, No. 4, pp. 1090-1097, October, 1987.

Russell, B. Don, Narendorf, M., Aucoin, M., "Microcomputer Based Feeder Protection and Monitoring System - Utility Experience", *IEEE Transactions on Power Delivery*, Vol. PWRD-2, No. 8, pp. 1046-1052, October, 1987.

Aucoin, M., Russell, B. Don, "Detection of Distribution High Impedance Faults Using Burst Noise Signals Near 60Hz", *IEEE Transactions on Power Delivery*, 86T&D 546-6, Vol. 2, No. 2, pp. 342-348, April, 1987.

Aucoin, M., Zeigler, J., Russell, B. Don, "Feeder Protection and Monitoring System, Part I: Design, Implementation and Testing", *IEEE Transactions on Power Apparatus and System*, Vol. PAS-104, No. 4, pp. 873-880, April, 1985.

Aucoin, M., Zeigler, J., Russell, B. Don, "Feeder Protection and Monitoring System, Part II:  Staged Fault Test Demonstration", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-104, No. 6, pp. 1456-1462, June, 1985.

Walker, L., Russell, B. Don,  et. al., "Criteria for the Evaluation of Digital Impedance Methods of Transmission Line Protection", *IEEE Transactions on Power Apparatus and Systems,* 1984 WM105-3.

Russell, B. Don, Harvey, S., Nilsson, S. "Substation Electromagnetic Interference - Characterization & Description of the Transient EMI Problem", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-103, No. 7, pp. 1863-1870, July, 1984.

Russell, B Don, Kotheimer B. Malewsiki, R., "Substation Electromagnetic Interference - Susceptibility Testing and EMI Simulation High Voltage Laboratories", *IEEE Transactions on Power Apparatus and Systems*, PAS-103, No. 7, pp. 1871-1878, July, 1984.

Ingleson, J., Russell, B. Don, et.al. "Bibliography of Relay Literature, 1982-1983", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-104, No. 5, pp. 1189-1197, 1985, PSRC Committee Report.

Lau, K. P., Russell, B. Don, et.al., "SCADA's State-of-the-Art and Future U.S. Trends in Substation Control", *Proceedings*, 1982 CIGRE (International Conference on Large High Voltage Electric Systems), Paris, France.

Russell, B. Don, "New Developments in Systems for Transmission and Distribution Substation Control and Protection", *Electric Power Systems Research*, Vol. 5, No. 1,  pp. 21-34, 1982.

Russell, B. Don, "High Impedance Faults Can Now Be Detected", *Transmission and Distribution*, Vol. 34, No. 2, pp. 32-34, 60, February, 1982.

Russell, B. Don, Herrick, D., "Electromagnetic Transients in High Voltage Power Substations", *Proceedings* of the 1982 IEEE International Symposium on Electromagnetic Compatibility, (IEEE/EMC), Santa Clara, CA., September, 1982.

Stephens, J., Russell, B. Don, et.al., "Bibliography of Relay Literature, 1980-1981", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-102, No. 4, April 1983, pp. 1014-1022, PSRC Committee Report.

Aucoin, B. M., Russell, B. Don, "Distribution High Impedance Fault Detection Utilizing High Frequency Current Components", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-101, No. 6, pp. 1596-1604, June, 1982.

Stephens, J.E., Russell, B. Don, et. al., "Bibliography of Relay Literature, 1978 1979", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-100, No. 5, 1981, IEEE/PSRC Committee Report.

Russell, B. Don, "Distribution Automation Using Microcomputer Technology", *Electric Power Systems Research*, Vol. 1, No. 2, pp. 131-137, 1978.

## *Conference, Professional Publications and Presentations*

Richards, C., Benner, C., Butler, K., Russell, B.D., "Leakage Current Characteristics Caused by Contaminated Distribution Insulators," *Proceedings of the North American Power Symposium*, San Luis Obispo, CA, October 1999.

Russell, B.D., *"Response Characteristics of Residential Smoke Detectors under Varying Full-Scale Fire Scenarios,"* presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, Florida, February 15-20, 1999.

Benner, Carl L., Russell, B.D., *"Characteristic Behavior of Downed Electrical Lines Including Evaluation of Various Electrocution Scenarios,"* presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, Florida, February 15-20, 1999.

Benner, Carl L., Russell, B.D., *"Arcing Fault Detection - An Update on the Technology"*, presented at the IEEE/PES Winter Power Meeting, Tampa, Florida, February 2-5, 1998.

Butler, Karen, Khan, S., Russell, B. D., *"Modeling of Power Transformers for Determination of Aging and Deterioration"*, 1996 IEEE Rural Electric Power Conference, Fort Worth, Texas, April, 1996.

Khan, S., K. L. Butler, Russell, B. D., "A Predictive Maintenance Approach For Power Distribution Systems", Proceedings of the *27th Annual North American Power Symposium*, Bozeman, Montana, October 2-3, 1995.

Brzhezitsky, V.A., Il'enko, O.S., Mamishev, A.V., Russell, B. Don, Sokolovsky, S.A., "Calculation of the Critical Distance Between Power Line Conductors and Objects on the Ground", *Seventh International Conference on Transmission and Distribution Construction, Operation, and Live-Line Maintenance,* Columbus, OH, October, 1995.

Kim, C. J., Russell, B. D., "Identification of Distribution Disturbances by Crest Factor Analysis", submitted to the *International Conference on Electrical Engineering*, Taejon, Korea, July 19-21, 1995.

Mamishev, A.V., Nevels, R.D., Russell, B.D., "Effects of Conductor Sag on Spatial Distribution of Power Line Magnetic Field", *presented at the IEEE PES Summer Meeting*, Portland, Oregon, July, 1995.

Mamishev, A.V., Russell, B.D., Benner, C.L., "Analysis of High Impedance Faults Using Fractal Techniques", *1995 Power Industry Computer Applications Conference*, Salt Lake City, Utah, May, 1995.

Mamishev, A.V., Short, S.X., Kao, T.W., Russell, B.D., "Non-intrusive Sensing Techniques for the Discrimination of Energized Electric Cables", *IEEE Instrumentation and Measurements Conference*, pp. 446-449, Waltham, MA, April, 1995.

Mamishev, A.V., Russell, B. Don, "Measurement of Magnetic Fields in the Direct Proximity of Power Line Conductors", presentation, *IEEE-PES Winter Power Meeting*, New York, NY, January, 1995.

Mamishev, A.V., Nevels, R.D., Russell, B. Don, "Effects of the Sag of Power Line Conductors on Ambient Magnetic Fields", *IEEE-PES Winter Meeting*, New York, NY, January, 1995.

Brzhezitsky, V.A., Il'enko, O.S., Mamishev, A.V., Russell, B. D., Sokolovsky, S.A., "Partial Empirical Model of the Multifactor Aging of High Voltage Insulation", Proceedings, *1994 Conference on Electrical Insulation and Dielectric Phenomena,*" pp. 367-372, Arlington, TX, October, 1994.

Mamishev, A.V., Russell, B.D., "Influence of Catenary Shape of Power Line Conductors on Ambient Magnetic Fields," Proceedings, *1994 Universities Power Engineering Conference*, vol. 1, pp. 177-180, Gallway, Ireland, September, 1994.

Williams, Stephen E., Russell, B. D., "An Integrated Approach to Power System Control and Protection for Space Platforms", Proceedings, *29th Intersociety Energy Conversion Engineering Conference,* August 7-12, 1994, Monterey, CA.

Nevels, R.D., Mamishev, A.V., Russell, B. D., "Power Line Magnetic Field Including the Catenary Effect and Electric Field Including Absorbing Boundary Conditions", Proceedings, *1994 IEEE AP-S International Symposium and URSI Radio Science Meeting,* June, 1994, Seattle, Washington.

Tyska, W.Z., Patterson, R.A., Russell, B.D., Aucoin, B.M., "A Microprocessor Based Digital Feeder Monitor with High Impedance Fault Detection", Proceedings, *Georgia Tech Protective Relay Conference,* Atlanta, GA, May, 1994.

Benner, Carl L., Russell, B. D., Aucoin, B. Mike, "Case Histories of Distribution Feeder Faults: Field Experience with General Electric's Digital Feeder Monitor", Proceedings, Forty-Seventh Annual Conference for Protective Relay Engineers, Texas A&M University, College Station, TX, March 21-23, 1994.

Kim, C.J., Russell, B. Don, "Entropy Minimization Analysis for Fuzzy Set Generation", Proceedings, *Third International Fuzzy Systems and Intelligent Control Conference*, Louisville, KT, March, 14-16, 1994.

Tyska, W.Z., Patterson, R.A., Russell,  B. D., Aucoin, B.M., "A Microprocessor Based Digital Feeder Monitor with High Impedance Fault Detection", Proceedings, *Texas A&M University Conference for Protective Relay Engineers,* College Station, TX, March, 1994.

Kim, C. J., Russell, B. D., "Automatic Generation of Membership Function and Fuzzy Rule using Inductive Reasoning", *Proceedings of the Third International Conference on Industrial Fuzzy Control & Intelligent Systems*, December 1-3, 1993, Houston, TX.

Aucoin, B. Michael, Russell, B.D., "A Microprocessor-Based Digital Feeder Monitor with High-Impedance Fault Detection", Proceedings, *EPRI Substation Diagnostics Conference*, November 3 - 5, 1993, New Orleans, LA.

Tyska, W.Z., Patterson, R.A., Russell, B.D., Aucoin, B.M., "A Microprocessor-Based Digital Feeder Monitor with High-Impedance Fault Detection", Proceedings, *Western Protective Relay Conference*, October 19 - 21, 1993, Spokane, WA.

Kim, C. J., Russell, B. D., "Application of a Fuzzy Expert Model for Power System Protection: Proposal for Synergetic Detection of Low Current Faults", *Proceedings of the Fifth International Fuzzy Systems Association (IFSA) World Congress*, pp. 1074-1077, July 4-9, 1993, Seoul, Korea.

Russell, B. D., Aucoin, B. M., "Field Experience with High Impedance Fault Detection", *Proceedings, High Impedance Faults on Distribution Feeders Seminar, IEEE Vancouver Section*, May 14, 1993.

Williams, S. W., Russell, B. D., "Ships Service Electric Power Enhanced Survivability Via Early Detection of Incipient Cable Faults", *Naval Engineers Journal*, pp. 78-84, May, 1993.

Benner, C. L., Russell, B. D., "Fuse Characteristics Under Non-Ideal Fault Current Conditions", *Proceedings, Texas A&M University Conference for Protective Relay Engineers*, April, 1993.

Kim, C. J., Russell, B. D., "A Structure of Fuzzy Decision-Making System for Power System Protection", *Proceedings of the IEEE Second International Conference on Fuzzy Systems*, FUZZ-IEEE'93, March 28 - April 1, 1993, San Francisco, CA, pp. 998-1003.

Russell, B. D., "Advanced Techniques and Tools for Substation Equipment Diagnostics", Proceedings, Workshop on Advanced Diagnostics for Substation Equipment, Electric Power Research Institute, November, 1992.

Russell, B. D., Aucoin, B. M., Benner, C.L., "High Impedance Fault Detection in Distribution Systems", *Proceedings - Pacific Gas and Electric Technical Conference*, Pleasanton, CA, August, 1992.

Russell, B.D., "Performance Evaluation of the TAMU High Impedance Fault Detection System", Proceedings, *TAMU Conference for Protective Relay Engineers*, April, 1992.

Aucoin, M., Russell, B. D., "Fallen Conductor Faults: The Challenge to Improve Safety", *Public Utilities Fortnightly*, Vol. 129, No. 3, pp. 38-40, February, 1992.

Watson, K., Russell, B. D., Jagadish, U., "Single-Chip Microcontrollers for Switchgear Control", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Boston, MA, August, 1991.

Aucoin, M., Russell, B. D., Benner, C. L., "Characteristics of Distribution Faults", *Proceedings*, Utility Fault and Disturbance Analysis Conference, Texas A&M University, College Station, April, 1991.

Russell, B. D., Li, S., Watson, K., "Digital Methods for the Detection of Incipient Fault Conditions in Spaceborne Power Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Reno, NV, August, 1990.

Li, S., Russell, B. D., et. al., "On-Line Fault Detection in Power Systems Using Adaptive DFT", *Proceedings*, Conference on Information Sciences and Systems, Princeton, NJ, March, 1990.

Russell, B. D., Aucoin, B. M. Benner, C., "Computer Relaying Techniques for the Detection of High Impedance Faults Using Signal Processing and Pattern Recognition Methods", *Proceedings*, International Conference on Power System Protection, Singapore, September, 1989.

Aucoin, M., Russell, B. D., Benner, C., "High Impedance Fault Detection for Industrial Power Systems", *Proceedings*, IEEE Industrial Applications Society Conference, San Diego, October, 1989.

Russell, B.D., Aucoin, M. "Detection of Incipient and Low Current Faults in Electrical Distribution Systems", *Proceedings*, Intersociety Engineering Conference on Energy Conversion, Washington, D.C., August, 1989.

Watson, K., Russell, B. D., McCall, K. "A Digital Protection System Incorporating Knowledge Based Learning", *Proceedings*, Intersociety Engineering Conference on Energy Conversion, Washington, D.C., August, 1989.

Benner, C. L., Carswell, P. W., Russell, B. D., "Improved Algorithm for Detecting Arcing Faults Using Random Fault Behavior", *Proceedings*, Southern Electric Industry Application Symposium, New Orleans, LA, November, 1988.

Russell, B. D., Watson, K., "Knowledge-Based Expert System for Improved Power System Protection and Diagnostics", *Proceedings*, Symposium on Expert Systems Applications to Power Systems, Sweden, August, 1988.

Watson, K., Russell, B. D., Hackler, I., "Expert System Structures for Fault Detection Spaceborne Power Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Denver, CO, August, 1988.

Russell, B. Don, Hackler, Irene, "Incipient Fault Detection and Power System Protection for Spaceborne Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Philadelphia, PA, August, 1987.

Kim, C.J. and Russell, B. Don, "Analysis of High Impedance Fault Detection Parameters for Digital Relays", *Proceedings*, Computer Relaying Conference, National Science Foundation and Virginia Tech, October 6, 1987.

Russell, B. Don, "Detection of High Impedance Faults on Distribution Feeders", *Proceedings*, APPA Engineering and Operations Workshop, invited paper, March, 1985.

Russell, B. Don, Heller, P., Perry, P., "Demand Control Utilizing Energy Management Systems - Report of Field Tests", *Proceedings*, Symposium on Efficient Utilization of Energy in Residential and Commercial Buildings, Texas A&M University, August, 1984.

Russell, B. Don, "Characteristics of Low Current Faults on Distribution Feeders", *Proceedings*, Southwest Electrical Exposition and Conference, Houston, Texas, April, 1982.

Russell, B. Don, Perry, L. Heller, R. , "Design of a Computerized Energy Management System for Marine Applications", *Proceedings*, Industrial Energy Conservation Technology Conference & Exhibition, Houston, Texas, April, 1982.

Russell, B. Don, Willis, G., Colburn, B., "Industrial Energy Audit Training for Engineers", *Proceedings*, Industrial Energy Conservation Technology Conference & Exhibition, Houston, Texas, April, 1982.

Russell, B. Don, "High Impedance, Arcing Faults: Staged Fault Experience", *Proceedings*, 1982 Power Distribution Conference, Austin, Texas, October, 1982.

Russell, B. Don, "Power Systems Automation Laboratory: Investigation of Electromagnetic Effects on Substation Automation Equipment", *Proceedings,* Texas Engineering Experiment Station Engineering Research Conference, Texas A&M University, September, 1981.

Russell, B. Don, Aucoin, M., "Development of a Low-Current Relay for High Impedance Faults on Distribution Feeders", *Proceedings*, 34th Annual Conference Protective Relay Engineers, Texas A&M University, April, 1981.

Russell, B. Don, "Energy Conservation Through the Use of a Microcomputer-Based Fuel Management System", 27th International Instrumentation Symposium, ISA, Indianapolis, Indiana, invited paper, April, 1981.

Russell, B. Don, "Energy - To Control or Not to Control - A Study in Commercial EMS Equipment", *Chuckwagon*, Texas Restaurant Association, Austin, Texas, 1981.

Russell, B. Don, "Turning On To Saving Energy", *Chuckwagon*, Texas Restaurant Association, pp. 21-23, October, 1981.

Russell, B. Don, Gerloff G., "Characteristics of the Electrical Environment in Transmission Substations", Workshop on Digital Techniques for Control and Protection of Transmission Class Substations, Electric Power Research Institute, Palo Alto, California, invited paper, August, 1980.

Russell, B. Don, Goers, Heller, P., "Microprocessor Based Data Acquisition System for Use in Energy Audits", Proceedings, 1979 Industrial Energy Conservation Technology Conference, Houston, Texas, April, 1979.

Russell, B. Don, et. al., "Test Techniques for SCADA and Automation Systems", *Proceedings*, 1979 IEEE Power Engineering Society Summer Meeting, edited for PES Substations Committee.

Russell, B. Don, et. al., "Communication Alternatives for Distribution Metering and Load Management", 1979 IEEE Power Engineering Society Winter Meeting, edited for Application of New Technologies in Substation Control Working Group.

Russell, B. Don, Heller, R., "Microprocessor Algorithm for Overcurrent Protection of Distribution Systems", *Proceedings*, 1978 Control of Power Systems Conference, Oklahoma City, Oklahoma.

Russell, B. Don, Aucoin, M., "Algorithm for the Detection of Noise Frequencies Generated by High Impedance Faults", *Proceedings*, 1978 Control of Power Systems Conference, Oklahoma City, Oklahoma.

Russell, B. Don, et. al., "Recent Field Experiences with the Automation of Substation Control", *Proceedings*, 1978 IEEE PES Winter Meeting.

Russell, B. Don, "Microprocessor Applications and Distribution System Automation", *Proceedings*, 1977 Power Distribution Conference, University of Texas, Austin, Texas, October, 1977.

Russell, B. Don, "A Microcomputer Based Substation Control System", *Proceedings*, Control of Power Systems Conference, Oklahoma City, Oklahoma, March, 1976.

Russell, B. Don, "Present and Future Applications of Microcomputers in Power System Control", *Proceedings*, 1976 IEEE Microcomputer Conference, Oklahoma City, Oklahoma.

Russell, B. Don, "Microprocessor Applications of Interest to Substation and Protection Engineers", 1976 IEEE Summer Power Meeting, Mexico City, Mexico, A 77 746-1.

21

Russell, B. Don, "Use of Reliability Constraints in the Design of a Microcomputer Based Transmission Substation Control System", *Proceedings*, Midwest Power Symposium, 1975.

Russell, B. Don, "Application of Microcomputers to the Protection and Control of Power Systems Substations", *Proceedings*, IEEE Conference on Decision and Control and 14th Symposium on Adaptive Processes, Houston, Texas, December, 1975.

Russell, B. Don, "Electronics Science Education for Non-Science Majors", *Proceedings*, Texas Academy of Science, Science Education Section, March, 1974.

*Significant Technical Reports*

"Distribution Fault Anticipator, Phase I: Proof of Concept", Final Report prepared for the Electric Power Research Institute (EPRI), Palo Alto, California, EPRI Publication #1001879, December, 2001.

"A Critical Assessment and Comparison of Three Proposed Designs for C-130 Critical Load Bus Transfer", Final Report, Chrysler Technologies, with P. Enjeti, April, 1993.

"An Instrumentation & Data Analysis System for Monitoring Industrial and Commercial Energy Use", Final Report, Energy Research in Applications Program, March, 1993.

"Methods of High Impedance Fault Detection - Comparative Evaluation and Recommendations", Electric Power Research Institute, 1990.

"Evaluation of Algorithms for Arcing Fault Detection", Final Report, Electric Power Research Institute, December, 1989.

"The Effects of Vibration on High Pressure Sodium Lamps in Roadway Luminares", final report for Texas State Department of Highways and Public Transportation, with W. E. Red, April, 1984.

"Evaluation of the EPRI Real-Time Digital Data Acquisition System for Determining Load Characteristics", Final Report, Project 849-6, Electric Power Research Institute, March, 1983.

"Measurement and Characterization of Substation Electromagnetic Transients", final report, Project 1359-2, Electric Power Research Institute, March, 1983.

"Detection of Arcing Faults on Distribution Feeders", final report, Project 1285-3, Electric Power Research Institute, Palo Alto, CA, December, 1982.

"Evaluation of Arcing Noise Propagation from 12.5 kV High Impedance Faults: Results of Staged Fault Tests", Electric Power Research Institute, with Mike Aucoin and Tom Talley, 1980.

"Design Criteria and Functional Specifications of an Electromagnetic Transient Capture System for Use in High Voltage Substations", Electric Power Research Institute, with Gary Gerloff, 1979.

"Analysis of the National Energy Plan: The Effects on Electric Utilities", Center for Energy and Mineral Resources, with C. W. Brice, et. al, October, 1977.

"Techniques of Ion Implanting as Applied to the Production of Infrared Sensing Devices", Institute of Solid State Electronics, Texas A&M University, 1971 (Master 's Project).

"The Influence of Ion Implantation on Both Thermally Induced Dislocations and Strain Generated Surface Patterns in Silicon", TAMU Institute for Solid State Electronics, with J.S. Linder and T. H. Bhar., 1971.

"Electrical and Physical Measurements of Boron Ion-Implanted Layers in Silicon", TAMU Institute for Solid State Electronics, 1971, with Linder, J.S., Heller, R.

23

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Ayala v. CameronCounty Housing | Frank Costilla | Law Offices of Mark Cantu | 956-687-8181 | 77 |
| Assembly of God v. TU Electirc | David M. Weaver | Burford & Ryburn, L.L.P. 3100 Lincoln Plaza 500 N. Akard Dallas, TX 75201-3320 | 214-740-3101 | 80 |
| Death of Ryan Chayse Beach | E. J. Saad | Cosby, Saad, Beebe, Crump, P.C. | 334-476-3000 | 87 |
| Fletcher v. Watson Electric et al | Gordon Asbury | Asbury & Asbury 534 Pine Street, Suite 102 Abilene, TX 79601 | 915-673-7141 | 88 |
| Pipkin v. United Energex | Andrew N. Soule | Grau & Bassett 2311 Cedar Springs Rd., Suite 100 Dallas, TX 75201 | 214-880-0155 | 90 |
| Dampier v. Fyrenetics | Ron Stites | Stites, Hopkings & Fair | 816-842-8889 | 91 |
| Estate of Snyder | Jerry Dugan | Dugan, Brinkman, Maginnis & Pace 1880 John F. Kennedy Blvd., Suite 1400 Philadelphia, PA 19103 | 215-563-3500 | 92 |
| Norco Realty d/b/a Global Moving v.TU Electric | David M. Weaver | Burford & Ryburn, L.L.P. 3100 Lincoln Plaza, 500 N. Akard Dallas, TX 75201-3320 | 214-740-3101 | 96 |
| Brown v. BRK | Peter Perlman | Peter Perlman Law Offices, P.S.C. 388 South Broadway Lexington, KY 40508-2595 | 606-253-3919 | 98 |
| Noyola v. Five Trees Apartments | Paula Wyatt | Wyatt & Wyatt Wyatt Courtyard 4825 Everhart Rd. Corpus Christi, TX 78411 | 800-580-9928 | 99 |
| Vargas v. Wal-Mart | Paula Wyatt | Wyatt & Wyatt Wyatt Courtyard 4825 Everhart Rd. Corpus Christi, TX 78411 | 800-580-9928 | 100 |

1

4/29/2002

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Magouirk v. Texas New Mexico Power | Kight Higgins | Haynes & Boone L.L.P. | 817-347-6600 | 102 |
| Howell v. Pittway | Leo Gilberg | Leo Gilberg, Attorney @ Law<br>305 Broadway<br>New York, NY 10007 | 212-822-1440 | 104 |
| David v. Austin White Lime Co. | Michael Schumaker | Worsham, Forsythe & Wooldridge, L.L.P.<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 254-750-5217 | 106 |
| Tomecek v. TU Electric | David Poole | Worsham, Forsythe & Wooldridge, L.L.P.<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 214-979-3000 | 107 |
| Shaw v. Littlefield Real Estate | Ron Adkison | Wellborn, Houston, Adkison, Mann, Sadler & Hill    Attorneys at Law<br>P.O. Box 1109, 300 W. Main Street<br>Henderson, TX 75653-1109 | 903-657-8544 | 108 |
| Morales v. BRK | Juan C. Hernandez | Juan C. Hernandez<br>4849 Greenville, Suite 1540<br>Dallas, TX 75206 | 214-373-9700 | 109 |
| Garcia (Cox) v. BRK | Mark Cantu | Law Offices of Mark Cantu | 956-687-8181 | 110 |
| Duplechain Fire | James P. Ryan | Morrow, Morrow, Ryan & Bassett<br>324 W. Landry, P.O. Drawer 7090<br>Opelousas, LA 70571-7090 | 318-948-4483 | 112 |
| Hicks v. TU Electric | Travis Vanderpool | Hunton & Williams<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 214-979-3000 | 113 |
| Montoya v. Westinghouse Electric | Travis Vanderpool | Hunton & Williams<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 214-979-3000 | 114 |

2

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Hemphill v. FPL | Gregg Schlesinger | Sheldon J. Schlesenger, P.A.  1212 Ft. Southeast 3rd Avenue Lauderdale, FL  33316 | 954-467-8800 | 115 |
| Plunkett v. Triple - S Steel Supply | Samuel E. Dunn | Law Offices of Samual E. Dunn 10850 Richmond Avenue, Suite 200 Houston, TX 77042 | 713-787-4380 | 116 |
| Woods v. Fire X | Richard Taylor | Jackson, Taylor, Martino & Hedge Southtrust Bank Bldg. 61st Joseph St., Suite 1600 Mobile, AL  36602 | 800-256-7728 | 117 |
| Beckman v. Simpson | Ralph Modad | Reich & Binstock Chase Bank Bldg. River Oaks 4265 San Felipe, Suite 1000 Houston, TX 77027 | 512-478-2277 | 120 |
| Benningfield v. A.B. Chance | John Craven | Morris, Craven & Sulak Attorneys at Law 3307 Northland Drive, Suite 234 Austin, TX 78731-4942 | 512-458-9111 | 121 |
| Lawhorn v. Jameson Home Products | Stephen Lickteig | Robin, Kaplan, Miller & Ciresi, L.L.P. 2800 LaSalle Plaza 800 LaSalle Avenue Minneapolis, MN  55402-2015 | 612-349-8264 | 123 |
| Solvay Polymers | Doug Lang (No longe | Cozen & O'Connor 2300 Bankone Center 1717 Main Streeet Dallas, TX 75201 | 800-448-1207 | 130 |
| Ainsworth v. AMD & Dean Johnston | David Deaderick | Grove, Ehlinger & Deaderick 2525 Wallingwood Drive, Suite 800 Austin, TX 78746 | 512-499-8866 | 131 |
| Jackson/Hill v. Firex | Scott Hansbury | Dale Sprik & Associates, P.C. 933 Four Mile Road NW Grand Rapids, MI 49544 | 800-557-7745 | 132 |

3

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Robles v. Woods Industries | Dwayne R. Day | Prichard Hawkins & Young Union Square, Suite 600 10101 Renuion Place San Antonio, TX 78216 | 713-527-8800 | 133 |
| Roberts v. Honda | Grant McFarland | Prichard Hawkins & Young Union Square, Suite 600 10101 Renuion Place San Antonio, TX 78216 | 210-477-7422 | 134 |
| Sulak v. Fleetwood Travel Trailers | Steve Young | Helm, Pletcher, Bowen & Saunders, L.L.P. 2929 Allen Parkway, Suite 2700 Houston, TX 77019 | 713-522-4550 | 135 |
| Hatfield Fire | | Robin, Kaplan, Miller & Ciresi, L.L.P. 2800 LaSalle Plaza 800 LaSalle Avenue Minneapolis, MN 55402-2015 | 612-349-8436 | 136 |
| Isom v. Entergy | Christine Kibbe | Entergy Services 350 Pine Street    P.O. Box 2951 Beaumont, TX 77704 | 409-981-4498 | 137 |
| Fabela (Gonzales) v. TX Electric & Gas | Robert M. Doby III | Canley & Hanger, L.L.P. 801 Cherry Street, Suite 2100 Ft. Worth, TX 76102-6821 | 817-877-2826 | 138 |
| Kelley v. Astron Residential Inc./Comfort | Joseph Gibson IV | Quinn & Laminack 2300 Lyric Centre Bldg. 440 Louisiana Houston, TX 77002 | 800-245-0249 | 139 |
| Faust v. Lakeside Plumbing | | Fisher, Boyd, Brown, Boudreaux & Huguenard 14th Floor Riviana Bldg. 2777 Allen Parkway Houston, TX 77019 | 713-400-4000 | 140 |
| Garner, Allen v. HL&P | Anthony Griffin | Anthony P. Griffin, Inc. 1115 Moody Galveston, TX 77550 | 800-750-5034 | 141 |

4

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Dan White et al v. United Electric et al. | Steven Laird | Laird & Jones, L.L.P. One Colonial Place 2400 Scott Avenue Ft. Worth, TX 76103-2200 | 817-531-3000 | 142 |
| Bennie Pontruff v. OA Newton et al | Paul Brunner | Fisher, Boyd, Brown, Boudreaux & Huguenard 14th Floor Riviana Bldg. 2777 Allen Parkway Houston, TX 77019 | 713-400-4000 | 143 |
| Donna Holick v. David J Blasienz d/b/a Blaco Const. | Lynn A. Grisham | Waltham & Grisham 707 Texas Avenue, Suite 106D College Station, TX 77840 | 979-694-0900 | 144 |
| Salas v. Murphy | Steven Schultz | Wilcoxen, Callahan, Montgoment & Deacon 2114 K Street Sacramento, CA 95816 | 916-442-2777 | 145 |
| Hernandez/Sylvester Estate v. C&C Erection & Spaw Glass | Bret L. Walton (Asst. Donna Morales) | Werstein, Smith & Wilson 1777 N.E. Loop 410, Suite 600 San Antonio, TX 78217 | 210-820-2670 | 146 |
| St.Theresa's Church v. Slater Painting | Tim Poteet | Chamberlain, McHaney | 512-474-9124 | 147 |
| | Bennett Nolan | Nolan, Caddell & Reynolds, P.A. 404 North 7th Street P.O. Box 184 Fort Smith, AR 72902 | 501-782-5297 | 148 |
| Hardaway v. Acme Brick | Ty Gomez | Van Wey, Johnson & Judin, L.L.P. 5910 N. Central Expressway, Suite 1380 Dallas, TX 75206 | 214-265-7600 | 149 |
| Entergy Gulf States v. EPCO | Paul A. Scheurich | Entergy Services 350 Pine Street    P.O. Box 2951 Beaumont, TX 77704 | 409-981-4498 | 150 |

5

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Robert "Bob" Fristoe | Jerry Young | Gallagher, Lewis, Downey & Kim<br>Bank Of America Center<br>700 Louisiana 40th Floor<br>Houston, TX 77002-2731 | 713-222-8080 | 151 |
| H.Morin v. Brinkman Roofing Co. | Tad Rice | Ware, Snow, Fogel & Jackson<br>TX Heritage Plaza, 40th Floor<br>1111 Bagby<br>Houston, TX 77003-2545 | 713-659-6400 | 152 |
| Robert Player v. Asphlundh Tree Expert Co/TXU | Jerry Young | Gallagher, Lewis, Downey & Kim<br>Bank Of America Center<br>700 Louisiana 40th Floor<br>Houston, TX 77002-2731 | 713-222-8080 | 153 |
| All Underwriters et al v. Searock, Genmar, et al | Andy Anderson<br>David Gambach | Keller & Houck<br>200 South Biscayne Blvd., Suite 300<br>Miami, FL 33131-2332 | 305-372-9044<br>800-294-5043 | 154 |
| Jusay v. Reburiano | Mike Ney | McNamara Law Firm<br>1211 Newell Ave., P.O. Box 5288<br>Walnut Creek, CA 94596 | 925-939-5330 | 155 |
| Eric Glover v. Bradford Brothers Underground Service | Donald Kidd | Jim S. Adler, P.C.<br>Wells Fargo Tower<br>6161 Savoy, Suite 700<br>Houston, TX 77036-3323 | 713-735-2107 | 156 |
| Sottung v. PECO Energy Co., et al | Jeffrey Laffey | Saltz, Mongeluzzi, Barrett & Bendesky<br>One Liberty Place, 34th Floor<br>1650 Market Street<br>Philadelphia, PA 19103 | 215-496-8282 | 157 |
| Chapman v. Li | Jonathen Halperin | Regan, Halperin & ong, PLLC<br>The Presidential Plaza Bldg., Suite 200<br>900 Nineteenth St., NW<br>Washington, DC 20006 | 202-463-3030 | 158 |
| Lopez v. Jackson Products, Inc. | Angela Loehr | Gallop, Johnson & newman, LC<br>101 South Hanley, Suite 1600<br>St. Louis, MO 63105 | 800-330-6635 | 159 |

6

4/29/2002

| Case Name | Attorney | Firm Address | Phone # | File Number |
|-----------|----------|--------------|---------|-------------|
| Luis & Marina Estrada v. Fire X & Maple Chase | Robert Wyatt | Wyatt & Wyatt Wyatt Courtyard 4825 Everhart Rd. Corpus Christi, TX 78411 | 361-857-2727 | 169 |
| O'Campo, Molina & Hernandez v. Fire X & Maple Chase | Robert Wyatt | Wyatt & Wyatt Wyatt Courtyard 4825 Everhart Rd. Corpus Christi, TX 78411 | 361-857-2727 | 170 |
| Rodriquez v. Whirlpool Corp. | Joe Escobedo, Jr. | Hockema, Tippit & Escobedo LLP 1 Paseo Del Prado, Bldg. 101 Edinburg, TX 78539-9672 | 800-966-9112 | 171 |

4/29/2002

8

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT AT BROWNSVILLE

CIVIL ACTION NO. 98-186

JOSE GARCIA INDIVIDUALLY,            §
IDALIA GARCIA, INDIVIDUALLY,         §
AND AS REPRESENTATIVE OF THE         §
ESTATE OF MANUEL CRUZ AND            §
CYNTHIA COX AS NEXT FRIEND           §
BRITTANY COX                         §
            Plaintiffs,            §
                                    §
v.                                    §
                                    §
BRK BRANDS, INC.,                     §
            Defendants             §

## AFFIDAVIT OF B. DON RUSSELL, PHD.,P.E.

     My name is B. Don Russell. I am over the age of 21 and of sound mind and body. I am a registered professional engineer with a specialty in electrical engineering. I have over 30 years experience in electrical engineering design and forensic investigation. I hold BS, MS, and PhD degrees in electrical engineering and I am a Fellow, past society President, and division director of the Institute of Electrical and Electronics Engineers. I am a member of the National Academy of Engineering. I hereby state the following:

1. Reliance on the prior work and knowledge of other engineers and scientists is a valuable and accepted part of the scientific method. Once a scientific principle is established or a theory is proved and accepted it can be relied upon by subsequent scientists, engineers, and experts without the necessity of duplicating or repeating the experiments that led to the establishment of the scientific principle. For example, as an engineer and expert I have the right to rely on the accepted, proven theory of gravity, as documented in the literature, without the necessity of repeating gravitational experiments. This principle of reliance is widely accepted by the courts of this land. Contact corrosion is a known scientific principle taught in all engineering universities, widely published in textbooks, and widely documented in scientific literature. The interference of corrosion in electrical contacts can be relied upon as a scientific principle by electrical engineers without the necessity of repeating the foundational experiments previously run by chemists or metallurgists. In this case, I am simply stating that any electrical device, including smoke detectors, can have electrical continuity defects due to corrosion if pressure contacts are used such as those in the horn assembly of this smoke detector. This is a statement of scientific fact that would apply to any electrical apparatus with pressure contacts, including smoke detectors horns. If sufficient corrosion levels exist, electrical continuity is lost, and in the case of


PLAINTIFF'S EXHIBIT

contacts in a horn assembly, the horn may not sound when called upon by the electrical circuits of the smoke detector. This is based on fundamental electrical engineering principles for any electrical device that has pressure contacts in the electrical circuits, including smoke detectors.

2. Post event verification of electrical continuity problems in smoke detectors or any electrical device is difficult and often impossible. Only microscopic levels of corrosion are necessary to interrupt low voltage electrical signals in electrical circuits such as those in this smoke detector. However, any movement of the detector, including simply taking the detector off the wall, or any handling of the detector can disrupt the microscopic corrosion level thereby reestablishing electrical contact as if continuity had never been lost. These principles are widely established in the general literature and I refer you to references 1-3 for a general discussion of these issues. This is a known phenomena in forensic investigation of intermittent defects in electrical circuits. The inability to verify the high resistance contact due to microscopic corrosion is not evidence that the corrosion did not exist in situ, as the smoke detector existed in its original location. Residential smoke detectors that use pressure contacts in horn assemblies have previously been criticized and recalled; therefore, there is reasonable scientific linkage between horn contact corrosion and pressure contacts in any smoke detector. There is no scientific study of every make and model of AC and DC smoke detector documenting which detectors have exhibited corrosion problems. Such a study would be practically impossible, given the nature of the phenomena and the need to expose every make and model in statistically valid numbers to controlled environmental conditions and subjecting them to extensive tests. Absent such a scientific study, any engineering forensic investigator must allow for the possibility that any smoke detector with a horn assembly with pressure contacts is subject to corrosion and there exists the possibility of malfunction due to loss of electrical continuity.

3. It is alleged that the AC smoke detector drive circuitry categorically eliminates the problem of electrical contact corrosion. This conclusion is fundamental flawed based on common engineering principles. Any low voltage AC or DC signal of any voltage level or waveform shape can be interrupted by corrosion in pressure contacts in the circuit. The question of concern is only how much corrosion will be required to interrupt continuity. There are no known scientific studies that establish the exact level of corrosion required to interrupt the electrical contact in each make and model of smoke detector. I so stated in my deposition. The absence of statistically valid tests of specific models showing the minimum levels of corrosion required does not invalidate the basic scientific principle that corrosion can occur, can interrupt electrical contact, is a known problem with pressure contacts, and can occur in the smoke detector in question, as in any smoke detector or any electrical apparatus with pressure contacts. For any specific failure case, the prior knowledge of the minimum levels of corrosion required to interrupt continuity is of little value or consequence. Recall, the corrosion of the contacts is microscopic and is easily disrupted by the fire or post

fire events. Hence, post fire levels or the presence of continuity after the fire cannot be directly related to the condition of the horn contacts before the fire event.

4. As an electrical engineer I am educated and trained in all the underlying principles of electrical contact theory and the problem of corrosion in pressure contacts. Again, I rely on the foundational work of other engineers and scientists and apply their accepted principles to specific cases. My citations of previous studies in my deposition showing corrosion problems in certain smoke detectors were chosen as examples without respect to whether the smoke detector in this case was specifically used or cited in these studies. Corrosion can occur in any pressure contact in any electrical apparatus, including all smoke detectors with pressure contacts, and has been documented in certain specific smoke detectors. Because it has not been documented in every make and model that has ever been manufactured, in no way invalidates the conclusion to a reasonable degree of engineering probability that corrosion can occur in any smoke detector. Specifically, conclusions reached by investigators and reported in the document "Study of Deterioration of Separable Electrical Contacts in Smoke Detectors" include the following statements.

> "A major finding of this effort is the confirmation that the deterioration of separable contacts in smoke detector horns can cause horn malfunction during a fire situation. ...the failure mechanism that deteriorates the separable contacts is fretting corrosion, which is an accelerated atmospheric oxidation that forms at metal contact interfaces. Fretting action can promote fast changes in resistance through minute amplitude cyclic motion."
> [Ref. 3, page 58]

It should be noted that a general conclusion is reached concerning smoke detectors with pressure or separable contacts, without limitation to specific make or models.

5. Because corrosion is easily disrupted and often destroyed by a fire or the subsequent movement of the detector, it is virtually impossible, after the fact, to replicate or specifically demonstrate the loss of electrical continuity. Experts must look for indirect proof such as the presence of corrosion products, or the fact itself that an otherwise good detector did not sound, coupled with the absence of other failure mechanisms to which the failure can be attributed. By analogy, the absence of a meteor in the crater is not proof that the meteor did not fall and create the crater. The crater itself is indirect proof that the meteor did fall and create the crater. The falling of the meteor is not testable, there is no direct proof of its falling, there are no witnesses to its falling, and there may be no meteor products found years after it has fallen. Nonetheless, the crater exists and with reasonable engineering certainty a meteor did fall. Such is the case with corrosion of pressure contacts in electrical circuits where the loss of conductivity cannot be directly proved following the event, due to the disruption of the corrosion layers.

6. I have tested hundreds of smoke detectors and documented numerous failure mechanisms, including intermittent failures similar to those documented due to corrosion of horn contacts. My laboratory has tested more smoke detectors in full-scale fire tests than any laboratory in the United States in the last ten years. Therefore, I am qualified to render these opinions.

7. The presence of smoke products in the residence is indicative that the space heater produced combustion materials that should be detectable by a properly functioning smoke detector. This conclusion is supported to a high degree of engineering probability, based on photographic evidence.

8. The defendants challenge based on the matter of Werner v. Pittway Corporation is incorrect and misrepresented. The smoke detector in the Werner case was not preserved and could not be directly identified as to brand. This was due to no error or omission by myself. I relied on the testimony of the previous homeowner, who installed the detector, for identification of the detector - an action not accepted by the court. This has no relationship or analogy in this case where the smoke detector is known as to brand.

In reaching these conclusions and opinions, I relied upon my 30 years experience as an electrical engineer, my research and experimentation in smoke detector failure, my knowledge of the literature concerning failure mechanisms of smoke detectors, and my knowledge of the operation and characteristics of smoke detectors. I have further relied on studies sponsored by various groups such as the Consumer Product Safety Commission concerning smoke detector failure due to corrosion, and their subsequent criticism of certain smoke detectors with pressure contacts. I have relied on the body of literature on corrosion mechanisms and principles, as well as literature on high resistance contacts.

I am paid at $300 per hour for my services. A copy of my resume is attached showing my publications. A case list is also attached.

References

1. Bock, E. M. and Whitley, J. H., "Fretting Corrosion in Electric Contacts" AMP Inc., pages 128 - 138.
2. Malucci, R. D., "Impact of Fretting Parameters on Contact Degradation", 1996, Institute of Electrical and Electronics Engineers, pages 395 - 403.
3. "Study of Deterioration of Separable Electrical Contacts in Smoke Detectors", final report prepared for U.S. Consumer Product Safety Commission, November 1994, prepared by IIT Research Institute Rome, New York.
4. "Smoke Detector Operability Survey Report on Findings (revised)", Consumer Product Safety Commission, October 1994.

Further this affiant sayeth not.



B. Don Russell, PhD., P.E.

AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME on this the _27th_ day of _April_, 2002.

_Nicole Pottberg_

NOTARY PUBLIC AND FOR
THE STATE OF TEXAS

NICOLE POTTBERG
Notary Public, State of Texas
My Commission Expires
May 12, 2003

**BIOGRAPHICAL DATA**
**January 2002**

**B. Don Russell**

| | | |
|---|---|---|
| Associate Vice Chancellor | Associate Dean for Research | Deputy Director |
| Engineering Research Programs | Look College of Engineering | Texas Engineering Experiment Station |
| Texas A&M University  System | Texas A&M University | Texas A&M University System |

Birthplace:  Denison, Texas (1948)            Citizenship:  U.S.            Married:  Becky (Crawford) Russell
Children: Christyn (TAMU'98), John Paul
(TAMU'00), Jenny (TAMU'00), Elizabeth

Security Clearance:    DOD Secret

Professional Interests:   Electric Power Engineering; Power System Protection, Control, and Computer
Automation; Energy Systems; Fire Detection Technology; Forensic Engineering;
Engineering Economics; Engineering Ethics and Professionalism

**EDUCATION:**

Ph.D.    Electrical Engineering, University of Oklahoma, 1975
M.E.     Electrical Engineering, Texas A&M University, 1971
B.S.      Electrical Engineering, Texas A&M University, 1970
Post graduate studies, Theology and History, Abilene Christian University

**EXPERIENCE:**

*Administrative*

- Associate Vice Chancellor for Engineering Research, Texas A&M University System, 1996 - present

- Deputy Director, Texas Engineering Experiment Station, Texas A&M University System, 1996 - present

- Associate Dean for Research, College of Engineering, Texas A&M University, 1996 – present

- Associate Vice Chancellor for Academic Programs, Texas A&M University System, 1994 –1996

- Executive Associate Dean, College of Engineering, 1994 - 1996

- Assistant Agency Director, Texas Engineering Experiment Station, 1994 - 1996

- Assistant Department Head, Electrical Engineering, 1986 - 1992

- Associate Director, Institute for Ventures in New Technology (INVENT), 1982 - 1985

- Director, Electric Power Institute, 1980 - 1981

*Educational and Research*

- Regents Professor, Texas A&M University System, 2000 - present

- Professor, Electrical Engineering, Texas A&M University, 1988 – present

    - Associate Professor, 1979 – 1988

    - Assistant Professor, 1976 - 1979

- Director, Power System Automation Laboratory, 1981 - present

- Research Engineer, Electric Power and Power Electronics Institute, 1976 - present
- Member, Graduate Faculty, Texas A&M University, 1977 - present
- Visiting Instructor, Electrical Engineering, University of Oklahoma, 1973 -75
- Instructor of Physics and Member of Graduate Faculty, Abilene Christian University, 1971-73
- Graduate Teaching Assistant, Texas A&M University, 1970

## *Industrial*

- President and Chief Consultant, Micon Engineering Inc., 1978 - 1990
- Consultant and Principal, Entek Associates, 1979 - 1980
- Power Systems Research Manager, Electric Power Research Institute, 1975
- Power Systems Engineer, Oklahoma Gas and Electric Company, 1974 (Summer internship)
- Assistant Government Contracts Property Administrator and Manufacturing Engineering Assistant, Texas Instruments, Inc., Dallas, Texas (co-op internship 1967-1970)
- Industrial Consultant, 1974 - present; Clients include:

  Hughes Research Laboratories, General Electric Company, 3M Corp., Westinghouse Electric, Boeing Aircraft, Rockwell International, Dow Chemical Company, Texas Energy and Natural Resources Advisory Council, Frontier Enterprises, United Technologies, Texas Utilities, Oklahoma Gas & Electric, Korea Electric, Pirelli Corporation, Schlumberger/Sangamo; several law firms as forensic engineer

## *Research Funding and Management (partial listing)*

"Increased Electricity Supply through Real-Time Power System Monitoring and Control", Higher Education Coordinating Board, 2002-2003, $141,000; with Carl Benner.

"Distribution Fault Anticipator Phase II: Field Demonstration", Electric Power Research Institute, 2001 – 2004, $1,677,000; with Karen Butler and Carl Benner.

"Acquisition of Test Equipment to Advanced Research and Education in Distributed Energy Systems (DES)," funded by National Science Foundation, $150,000, 2001 – 2003, with C. Singh, et al.

"On-Line Detection of Underground Distribution Cable Failure," Texas Utilities Services, Inc., $47,357; 2001 – 2002 with Karen Butler.

"New Techniques for Maintaining Reliability in the Restructured Electric Utility Industry," funded by Texas Higher Education Coordinating Board, $156,200, 2000 – 2001; with Karen Butler.

"Distribution Fault Anticipator/Locator Phase I: Proof of Concept", funded by Electric Power Research Institute, 1997 - 2001, $1,308,411; with Karen Butler and Carl Benner.

"Power Distribution Feeder Failure Prediction", funded by Keyin Systems (South Korea), 1995 – 1997, $81,000; with Carl Benner.

"Detection of Arcing Faults-Algorithm Development", funded by General Electric Company, 1997- 1998, $57,418.

"Detection and Location of Incipient Faults", funded by TU Services, Inc., 1996 - 1998, $52,378; with Karen Butler.

"Acquisition of Advanced Instrumentation and Test Equipment for Research, Education and Training in Electric Power Quality", National Science Foundation, 1995- 1997, $251,743; with Prasad Enjeti, et al.

"Detection Techniques for 480 Volt Network Faults", Electric Power Research Institute, 1993, Phase I, $50,000; with Carl Benner and Michael Aucoin.

"Detection Techniques for 480 Volt Network Faults", Electric Power Research Institute, 1993, Phase II, $125,000; Carl Benner and Michael Aucoin.

"An Expert Decision Maker for Feeder Protection", General Electric Co., 1993 - 1994, $50,000.

"Field Evaluation of High Impedance Fault Detection Technology", Electric Power Research Institute, 1991 - 1993, $136,000.

"Development of Detection Techniques for High Impedance Fault Detection", Electric Power Research Institute, 1990 - 1992, $285,000.

"Intelligent Power Distribution Protection System Development", David Taylor Research Center, U.S. Navy, 1990 - 1995, $325,000.

"Knowledge Based System for Improved Adaptive Relaying and Diagnostics on Distribution Feeders", Electric Power Research Institute, co-funded by Houston Lighting and Power, 1990 - 1992, $100,000.

"An Instrumentation and Data Analysis System for Monitoring Industrial and Commercial Energy Use", funded by the Texas Energy Research in Applications Program, 1989 - 1993, $259,260.

"Methods for High Impedance Fault Detection", Electric Power Research Institute, 1988 - 1989, $235,989.

"Characterization and Detection of Electrical Faults", sponsored by National Science Foundation, FY 1988, $91,611; FY 1989, $95,535.

"Development of High Impedance Fault Test Facility", grants from Texas Utilities and Houston Lighting and Power, 1989, $73,000.

"Advanced Power System Protection and Incipient Fault Detection", sponsored by NASA-JSC, 1986 - 1987, $60,000.

"Protection of Spaceborne Power Systems", sponsored by NASA-JSC, 1987 - 1988, $68,000.

"Development of Knowledge Based Expert Systems for the Protection of Electric Distribution Feeders", Center for Energy and Mineral Resources, 1986 - 1987.

"Assessment of the Effects of Electrical Power Disruption Upon Operations of Selected Industry Sectors in the USA", Department of Defense-Central Intelligence Agency, 1983 - 1984 with D. Bragg (classified).

"Evaluation of Electromagnetic Interference and Grounding Problems with Traffic Control Automation Equipment", Texas Highway Department, 1982 - 1984, with W. Cunninghan.

"Distribution Feeder Protection Research Utilizing Microcomputer", funded by Houston Lighting and Power Co., 1982 - 1983, $29,880.

"Detection of High Impedance Faults on Distribution Circuits", funded by Electric Power Research Institute, 1978 - 1982, $252,177.

"Evaluation of Highway Luminaire Failures Due to Electrical Transients Caused by Wind Induced Vibrations", funded by Texas Department of Highways and Texas Transportation Institute, 1981 - 1983, with E. Red.

"Evaluation of the Electrical Environment in High Voltage Substations", funded by Electric Power Research Institute, 1978 - 1983, $300,950.

"Energy Management in the Food Industry", funded by Center for Energy and Mineral Resources, 1977 - 1981, $34,080.

"Microcomputer Overcurrent Relay Development", funded by DOW Chemical, 1978 - 1982, $30,000.

"Electromagnetic Field Measurements During 500 kV Fault Tests", funded by Northern States Power and Electric Power Research Institute, 1980 - 1982, $36,770.

"Test Data Acquisition Support Services", funded by Electric Power Research Institute, 1980 - 1982, $114,000.

"Distribution Substation Electromagnetic Environment Evaluation", funded by General Electric Company, 1980 - 1982, $18,000.

"Microprocessor-Based Distribution Feeder Protection Research", funded by Public Service Company of New Mexico, 1980 - 1982, $18,000.

"Transient Recorder Utilizing Computer Control (TRUCC)", funded by Electric Power Research Institute, 1979 - 1983, $199,300.

*Grants and Fellowships*

- General Electric Co. - Research Support Grant, 1993 - 94, $100,000.

- 3M Corp. - Research Grants, 1985, 1986, 1987, 1988, 1989, $25,000 each.

- TAMU International Coordination Research Grant, 1987

- Oklahoma University Research Fellowship, 1975

- Schmitt Scholar, National Engineering Consortium, 1974

- National Defense Fellowship, Texas A&M University, 1971

- Munson Foundation Scholarship, Texas A&M University, 1966 - 1970

**PROFESSIONAL LICENSES:**

- Registered Professional Engineer, Texas #43696
- Certified Energy Auditor, Texas

**PROFESSIONAL SOCIETY MEMBERSHIPS:**

- National Academy of Engineering (elected 1999)
- Institute of Electrical and Electronics Engineers (Fellow)
- Power Engineering Society
- Industry Applications Society
- American Society for Engineering Education
- National Society of Professional Engineers
- Texas Society of Professional Engineers
- International Council on Large Electric Systems (CIGRÉ)
- American Academy of Forensic Sciences
- American College of Forensic Examiners (Diplomate)
- American Board of Engineering and Technology (Diplomate)

**HONOR SOCIETY MEMBERSHIPS:**

- Phi Kappa Phi Honor Society
- Eta Kappa Nu, Electrical Engineering Honor Society
- Tau Beta Pi, National Engineering Honor Society
- Sigma Pi Sigma, National Physics Honor Society

**AWARDS, PATENTS, AND LISTINGS:**

*Special Awards/Recognition*

- Regents Professor, Texas A&M University System, 2000.

- IEEE Millennium Medal, 2000.

- Distinguished Achievement Award in Research, Association of Former Students, Texas A&M University, 1999.

- IEEE Herman Halprin Electric Transmission and Distribution Technical Field Award, 1997.

- IEEE Electrotechnology Transfer Award, 1997.

- R&D 100 Award for the Development of the Digital Feeder Monitor, 1996.

- IEEE USAB Electrotechnology Transfer Award, 1996.

- Outstanding Professor Award, IEEE Student Branch, Texas A&M University, 1994.

- SWEMA Outstanding Instructor Award, Industry Meter School, Texas A&M University, 1993.

- Dresser Industries Professorship (for outstanding contributions in teaching, research and service), 1993.

- Leadership in Student Research Supervision Service Award, IEEE/PES, 1993.

- Distinguished Service Award (for distinguished service to the Substations Committee), IEEE/PES, 1993.

- PES Executive Board Recognition (for distinguished service to the Society), 1993.

- Tech-Brief Award (for sponsored research on adaptive protection for space-borne power systems), NASA, 1992.

- Outstanding Technical Report, IEEE/PES, January, 1992.

- Leadership in Student Research Supervision Service Award, IEEE/PEEC, 1992.

- IEEE Fellow (for the development of high impedance fault detection techniques using digital methods), January, 1991.

- Distinguished Service Award, Power Engineering Education Committee, IEEE/PES, 1991.

- Halliburton Professorship (for outstanding achievement in education, research and service), Halliburton Education Foundation, 1989.

- Outstanding Working Group Award, PES Substations Committee, IEEE/PES, 1988.

- Distinguished Lecturer, IEEE, 1987, 1988, 1990, 1991.

- Working Group Recognition (for contribution to IEEE/ANSI standards), IEEE/PES, 1986.

- Working Group Recognition (for contribution to EE graduate curriculum development), IEEE/PEEC, 1985.

- Leadership in Student Research Supervision Service Award, IEEE/PEEC, 1985.

- Outstanding Technical Paper, Substations Committee, IEEE/PES, 1985.

- Outstanding Engineering Achievement, National Society of Professional Engineers, 1982.

- Outstanding Young Engineer, Brazos Chapter, Texas Society of Professional Engineers, 1978.

- Outstanding Patent Submission Award, Electric Power Research Institute, 1975.

- Baldwin Teaching Award, University of Oklahoma, 1974.

- Bolton Award, Outstanding Electrical Engineering Senior, Texas A&M University, 1970.

## *Listings*

- Who's Who in Science and Engineering
- Who's Who in Frontier Science and Technology
- Who's Who in the South and Southwest
- Who's Who of Emerging Leaders in America
- American Men and Women of Science
- Outstanding Young Men of America, 1976
- Who's Who in Technology Today

## *Patents*

"Load Analysis System for Fault Detection", U.S. Patent 5,600,526, issued 2/97.

"Arc Burst Pattern Analysis Fault Detection System, U.S. Patent 5,659,453, issued 8/97.

"Expert System for Detecting High Impedance Faults, U.S. Patent 5,550,751, issued 8/96.

"Arc Spectral Analysis System", U.S. Patent No. 5,578,931, issued 11/96.

"Energy Analysis Fault Detection System", U.S. Patent No. 5,512,832, issued 4/96.

"Load Extraction Fault Detection System", U.S. Patent No. 5,506,789, issued 4/96.

"Randomness Fault Detection System", U.S. Patent No. 5,485,093, issued 1/96.

"High Impedance Fault Detection Apparatus and Method", U.S. Patent No. 4,466,071, issued 8/84.

"Digital Protection System for Transmission Lines and Associated Power Equipment", U.S. Patent No. 4,161,027 issued 7/79.

Foreign patents granted based on the above U.S. patents.

## PROFESSIONAL ACTIVITIES:

### *Texas Society of Professional Engineers*

- State Director, TSPE, 1982 - 1985
- Chapter Director, Brazos Chapter, TSPE, 1984 - 1988
- President, Brazos Chapter, TSPE, 1981 -1982
- Vice President, Brazos Chapter, TSPE, 1980 –1981

*National Academy of Engineering*
- Member, PEER Membership Committee, Section 6, 2001-2002.
- Vice Chair, PEER Membership Committee, Section 6, 2002.
- Liaison for Power and Energy (Section 6) to National Research Council, 2000. (appointed)

*Institute of Electrical and Electronics Engineers, Inc. (IEEE)*
- Division VII Director, IEEE Board of Directors, 2000, 2001 (elected position).
- Member, IEEE Assembly, 2000, 2001.
- Member, IEEE Corporate Recognitions Committee, 2001, 2002.
- Member, IEEE Overhead Allocation Recovery Committee, 2001.
- Chair, Infrastructure Finance Committee, 2000 – 2001.
- Member, IEEE Technical Activities Board Management Committee, 1999, 2000.
- Member, IEEE Technical Activities Board, 1998 – 2001.
- Member, IEEE Technical Activities Board Products Committee, 1996 – 1999.
- Member, IEEE Technical Activities Board Electronic Products Committee, 1998 –1999.
- Member, IEEE Technical Activities Board, Awards and Recognition Committee, Division VII Representative, 1990 – 1993.
- Member, IEEE Awards Planning and Policy Committee, 1990, 1991.

*Power Engineering Society*
- Member, PES Governing Board, 1989 – 2002.
- Chair, PES Executive Director Search Committee, 2001-2002.
- President, IEEE Power Engineering Society, 1998, 1999. (elected position)
- Member, IEEE Power Engineering Society Editorial Board, 1996 – 2001.
- Vice President, IEEE Power Engineering Society (elected position), 1995 – 1996.
- Secretary, IEEE Power Engineering Society (elected position), 1994 – 1995.
- Chair, PES Constitution and Bylaws Committee, 1994 – 1995.
- Member, PES Plenary Session Planning Committee, 1994 – 1995.
- Chairman, PES Awards and Recognition Department, 1989 – 1993.
- Member, PES Technical Council, 1989 – 1993.
- Chairman, IEEE/PES Substations Committee Awards Subcommittee, 1986 – 1993.
- Member, Data Acquisition, Processing and Controls Subcommittee, Substations Com., 1986– 1993.

- Member, Electric Network Control System Standards W. G., 1989 – 1992.
- Chairman, PEEC Honors and Awards Committee, 1982 – 1993.
- Member, Power Engineering Society Honors and Awards Committee, 1982 – 1993.
- Vice Chairman, Application of New Technologies Working Group, 1980 – 1992.
- Member, PES Power Engineering Education Committee, 1980 – present.
- Member, PES Substation Committee, IEEE, 1979 – present.
- Member, PES/PEEC, Graduate Curriculum Task Force, 1981 – 1984.
- Vice Chairman, Digital Protection System Design Group, 1981 – 1983.
- Member, Bibliography Subcommittee, Power System Relay Com., 1980 – 1988.
- Member, Relay Electrical Environment Subcommittee, PSRC, 1980 – 1985.
- Chairman, Substation Electromagnetic Environment Group, Substation Committee, 1979 – 1988.
- Member, Relay Input Sources Subcommittee, 1979 – 1985.
- Member, Automatic and Supervisory Systems Subcommittee, Substation Committee, 1978 – 1986.
- Member, PES Relaying Committee, 1978 – 1985.
- Chairman, Digital Input Sources and Processing Working Group, Power System Relaying Committee, 1977 – 1981.
- Member and Chair of additional ad hoc committees and working groups of PES.

*Conferences*
- Chairman, TAMU Relay Conference, 1988 - present (annually).
- International Advisor, International Power Engineering Conference, Singapore, 1999, 2001.
- International Advisor, International Conference on Advances in Power System Control, Operation and Management, Singapore, 1997.
- Chairman, Substation Automation Conference, 1995- 1998 (annually).
- Chairman, First International Conference on Digital Power Systems Simulators, 1995.
- Chairman, Fault Disturbance and Analysis Conference, TAMU, 1991 - 1994 (annually).
- Chairman, Southwest Electrical Exposition Conference, Houston, Texas, 1984.
- IEEE Control of Power Systems Conference
    Member, Program Committee, 1975 - 1980
    General Chairman, 1979
    Technical Program Chairman, 1977

*Other*
- President, Texas Society of Energy Auditors, 1979 – 1981

9

*University Committees*

- University Research Council, 1996 – present.
- TAMUS Technology Licensing Oversight Committee, 1994-present.
- Chair, Nuclear Reactor Safety Board, 1996 – present.
- Engineering Education Program Review Committee (EEPRC), 1990 –1993.
- Member, VISION 2020 - Engineering Education Convocation Planning Committee, 1991.
- Doctor of Engineering - External Relations Program Committee, 1989 – 1990.
- Chairman, Classified and Proprietary Research Subcommittee, Faculty Senate, 1987 – 1989.
- Faculty Senate Executive Committee, Member, 1986 – 1989.
- Deputy Speaker, Faculty Senate, Charter Member, 1987 – 1988.
- Chairman, Engineering Caucus - Faculty Senate, 1985 – 1987.
- Senator, Faculty Senate, Charter Member, 1983 – 1989.
- Chairman, Research Committee, Faculty Senate, 1985 – 1989.
- Chairman, Engineering Faculty Affairs Council, 1983 – 1984.
- Engineering Faculty Affairs Council, 1981 – 1984.
- TAMU Academic Council, 1982 – 1984.
- TAMU System Patent Committee, TEES Representative, 1981 – 1987.
- TEES Research Conference Committee, 1981 – 1983.
- University Long Range Planning Committee, 1983 – 1984.
- University Academic Affairs Committee, 1983 – 1984.
- Dean of Engineering Search Committee, 1983 – 1984.
- Engineering Technology Department Head Search Committee, 1985 – 1986.

*Department Committees*

- Chairman, Electrical Engineering Curriculum Committee, 1990 – 1991.
- Co-Chairman, Electrical Engineering/Computer Science Joint Committee on Computer Engineering, 1989 – 1990.
- Chairman, Electrical Engineering Tenure and Promotion Committee, 1989 – 1991.
- Chairman, Electrical Engineering Computing Resources Committee, 1986 – 1990.

10

- Chairman, Electrical Engineering Accreditation Committee, 1985 – 1986.

- Chairman, Electrical Engineering Strategic Plan Committee, 1986.

## *Special Activities*

- Editor-in-Chief, *Electric Power Systems Research Journal*, 1994 – present.

- Associate Editor, *Electric Power Systems Research Journal*, 1976 – 1994.

- Reviewer - IEEE *Transactions on Power Delivery.*

- Reviewer - IEEE *Transactions on Power Systems.*

- Reviewer - several book publishers.

- Peer Reviewer, National Science Foundation.

## *Short Courses and Tutorials*

"High Impedance Fault Detection - Technical Evolution and State of the Art", invited tutorial, PG&E, 1992.

"Detection of Downed Conductors on Utility Distribution Systems", IEEE Tutorial, 1989, 1990.

"Distribution Substation Automation Technology - State of the Art Review", invited IEEE Tutorial, Eighth National Workshop on Electric Energy Distribution, Salvador Bahia, Brazil, September, 1984.

"Retail Energy Management Seminar:  Specification of Energy Management Control Systems", invited tutorials, Houston Lighting and Power, 1982, 1983, 1984.

"Research Requirements for Implementation of the TAMU Arcing Fault Detector", invited tutorial, Mexico City Division of Mexican National Utility, Mexico City, Mexico, May, 1983.

"Principles and Applications of Energy Management Control Systems", Southwest Electrical Exposition and Conference, tutorial, 1982, 1984.

"Basics of Engineering Economics", invited tutorial, Brazos Electric Power Cooperative, 1982.

"Basic Meter Theory", Meterman Training School, TAMU Electric Power Institute, annually 1980 - 1997.

"Computer Relaying", IEEE tutorial, 1979, 1980.

"Industrial Energy Auditing", short course, 1977, 1978, 1979.

"Economic Evaluation of Energy Management Alternatives", TAMU Short Course, 1978.

"Economic Evaluation of Engineering Alternatives", invited short course, Dallas Power and Light, 1976, 1977.

"Digital Systems Design with Industrial Applications", short course, University of Oklahoma, 1975.

"Symmetrical Components and Fault Current Calculations", short course, Oklahoma Gas and Electric Company, 1974.

## *Speeches, Lectures, and Technical Presentations*

"IEEE in Review," invited keynote address, IEEE Porto Power Tech' Conference, Porto, Portugal, 2001.

"Risk Management – Successful Decisions in an Environment of Uncertainty," invited keynote address, 6th International Conference on Probabilistic Methods Applied to Power Systems, Funchal, Madeira, Portugal, September, 2000.

"The IEEE and International Collaboration in Electric Power Engineering," keynote address, PowerTech 99 Conference, Budapest, August, 1999.

"Distribution Fault Anticipation/Location," invited presentation, EPRI Distribution Business Area Council Meeting, Pasadena, California, February, 1999.

"High Impedance Fault Detection DFM Relay - Update on Technology", invited lecture, 1998 IEEE/PES Winter Power Meeting, Tampa, Florida, February, 1998.

"Downed Electric Conductors, Their Characteristics, and the Potential for Public Danger". invited lecture, Southwest Electric Claims Exchange, Irving, TX, June, 1996.

"Recent Field Experience with High Impedance Fault Detection", invited panelist, IEEE/PES Summer Power Meeting, Portland, Oregon, July, 1995.

"Applications of High Impedance Fault Detectors", invited panelist, IEEE/PES Summer Power Meeting, Portland, Oregon, July, 1995.

"Distribution Transformer Connections - Their Effect on Protective Relaying", Conference for Protective Relay Engineers, College Station, TX, March, 1994.

"Trends in Integration of Control, Protection and Data Acquisition in Substations", panel organizer and chairman, PES Summer Meeting, San Diego, CA, July, 1991.

"Digital Methods for Fault Detection - State of the Art", invited lectures, Third IEEE Chilean Power System Symposium, Valporaiso, Chile, 1990.

"Electric Power Engineering Education - Enhancement Through Industry/University Cooperation", Plenary Session, Power Engineering Society Summer Meeting, Minneapolis, MN, July, 1990, session organizer and speaker.

"Automation of Electric Distribution Feeders Using Advanced Technologies", invited lectures, Electropaulo International Seminar on Electric Power Distribution, Sao Paulo, Brazil, February, 1987.

"Power System Automation Research in the United States", invited presentation, Seoul National University, Korea, October, 1986.

"Integration of Load Management and Distribution Automation", invited panelist, IEEE/PES Transmission and Distribution Conference, Anaheim, CA, , September, 1986.

"Application of Microprocessors in Feeder Control", panel chairman, IEEE/PES Summer Power Meeting, Mexico City, presentation and panel discussion, July, 1986.

"The Role of Research as a Linkage between Universities and Industry", invited lecture, IEEE/PES Summer Power Meeting, Mexico City, 1986.

"Substation Automation-Combining the Monitoring and Control Function", invited lecture, 1985 Fault and Disturbance Analysis Conference, Sangamo Division of Schlumberger Corp., October, 1985.

"Microprocessors in Power System Automation and Control", invited lecture, Sao Paulo Electric, Sao Paulo, Brazil, August, 1985.

"Computer Control of Power Distribution for Offshore Production Platforms", invited presentation, Petrobras Corporation, Rio De Janeiro, August, 1985.

"Integrated Control and Protection of Distribution Feeders", invited panelist, PES/IEEE Summer Power Meeting, Vancouver, B. C., July, 1985.

"Microcomputer Technology in Distribution System Protection", invited lecture, Pirello Corporation, Sao Paulo, Brazil, September, 1984.

"Arcing Fault Protection on Multi-Grounded Distribution Systems", invited presentation, Companhia Energetica de Sao Paulo, Brazil, September, 1984.

"Design Criteria for Computer Relay Protection of Power Distribution Systems", invited presentation, Electric Power Research Institute of Mexico and CFE, Cuernavaca, Mexico, May, 1983.

"Energy Management Systems in New Designs", invited lecture, 11th Architect and Engineers Conference, Dallas, Texas, April, 1983.

"Economic Aspects of Distribution Automation", invited panelist, IEEE/PES Summer Power Meeting, San Francisco, California, July, 1982.

"Microcomputer Applications in the Protection of Utility Distribution Feeders", invited presentation, Tokyo Electric Co., Hitachi, and Toshiba Corp., Tokyo, Japan, May, 1982.

"Power Substation Automation Research at Texas A&M University", invited presentation, Kansai Electric and Mitsubishi Electric, Japan, 1982.

"Facilities Monitoring and Process Control Utilizing Microcomputers", Industrial Energy Conservation Technology Conference & Exhibition, invited presentation and panelist, Houston, Texas, April, 1982.

"Distribution High Impedance Fault Detection", IEEE Transmission and Distribution Conference, 1981.

"Using Advanced Technology in the Solution of Power System Problems", invited lecture, PEEC, Power Engineering Society, 1981.

"Application of Arcing Fault Detectors to Distribution Feeder Protection", invited tutorial, IEEE Power Systems Relaying Committee, Cincinnati, Ohio, May, 1981.

"Developments in Systems for Transmission and Distribution Substation Control and Protection", invited panelist and presentation, IEEE/ PES Summer Meeting, Minneapolis, Minnesota, July, 1980.

"Energy Management in the Food Service Industry", invited address, Texas Restaurant Association Annual Convention, June, 1979.

"Microprocessors and the Power Industry", invited presentation, Power Engineering Society Relaying Committee, 1977.

"Field Experiences with Substation Automation", invited panelist, IEEE/PES Summer Power Meeting, 1977.

## PUBLICATIONS:

### Books

*Detection of Downed Conductors on Utility Distribution Systems*, Tutorial Text, IEEE Press, 1989

*Computer Relaying*, Tutorial Text, IEEE Press, 1979, with M. Sachdev et. al.

*Power System Control and Protection*, Academic Press, Inc., New York, New York, 1978, edited with M.E. Council.

### Refereed Papers

Butler, Karen L.,Russell, B.D., Benner, C., Andoh, K., "Characterization of Electrical Incipient Fault Signature Resulting from Tree Contact with Electrical Distribution Feeders," *Proceedings of IEEE Power Engineering Society*, Vol. 1, 1999, pp. 408-413.

Butler, K., Khan, S., Russell, B.D., "Analysis of Incipient Behavior of Multiple Distribution Insulators," *Proceedings of the IEEE Transmission and Distribution Conference*, New Orleans, LA, pp. 675-680, April, 1999.

Benner, Carl L., Russell, B.D., "Practical High-Impedance Fault Detection on Distribution Feeders," *IEEE Transactions on Industry Applications*, Vol. 33, No. 3, pp. 635-640, May/June 1997.

Short, S.X., Mamishev, Alex, Kao, T.W., Russell, B.D., "Evaluation of Methods for Discrimination of Energized Underground Power Cables", *Electric Power Systems Research*, Vol. 37, No. 1, pp. 29-38, April, 1996.

Mamishev, A.V., Russell, B.D., Benner, Carl L., "Analysis of High Impedance Faults Using Fractal Techniques", *IEEE Transactions on Power Systems*, Vol. 11, February 1996, pp. 435-440.

Kim, C.J., Russell, B. Don, "Analysis of  Distribution Disturbances and Arcing Faults Using Crest Factor", *Electric Power Systems Research*, Vol. 35, No. 2, pp. 141-148, November, 1995.

Mamishev, A.V., Russell, B.D., "Measurement of Magnetic Fields in the Direct Proximity of Power Line Conductors", *IEEE Transactions on Power Delivery*, Vol. 10, No. 3, pp. 1211-1216, July, 1995.

Benner, Carl L., Russell, B. Don, "Arcing Fault Detection for Distribution Feeders: Security Assessment in Long Term Field Trials", *IEEE Transactions on Power Delivery*, Vol. 10, No. 2, pp. 676-683, April, 1995.

Benner, Carl, Russell, B.D., "Performance of High Impedance Fault Detection Algorithms in Long Term Field Trials", *Electric Power Systems Research,* Vol. 31, No. 2, pp.71-77, November, 1994.

Mamishev, Alexander V., Russell, B.Don, "Analytical Solution for the Magnetic Field Produced by a Sequence of Catenaries", October, 1994.

Kim, C. J., Russell, B. D., "High-Impedance Fault Detection System Using an Adaptive Element Model", *IEEE Proceedings-C, Vol. 140,* No. 2, pp. 153-159, March, 1993.

Kezunovic, M., Watson, K., Russell, B. D., "Expert System Applications to Protection, Substation Control and Related Monitoring Functions", *Electric Power Systems Research*, Vol. 21, No. 1, pp 71-86, April, 1991.

Kim, C. J., Russell, B. Don, "A Learning Method for Use in Intelligent Computer Relays for High Impedance Faults", *IEEE Transactions on Power Delivery*, Vol. 6, No. 1, pp. 109-115, January, 1991.

Li, S., Russell, B. Don, "Optimal Arcing Fault Detection Using Signal Processing Techniques", *Electric Power Systems Research*, Vol. 21, pp. 121-128, 1991.

Kezunovic, M., Watson, K., Russell, B. D., Heller, P., Aucoin, M., "Expert System Applications to Protection, Substation Control and Related Monitoring of Feeders", *Electric Power Systems Research*, Vol. 21, pp. 71 - 86, 1991.

Kim, C. J., Russell, B. Don, Watson, K., "A Parameter-Based Process for Selecting High Impedance Fault Detection Techniques using Decision Making Under Incomplete Knowledge", *IEEE Transactions on Power Delivery*, Vol. 5, No. 3, pp. 1314 - 1320, July, 1990.

Russell, B. D., "Computer Relaying and Expert Systems: New Tools for Detecting High Impedance Faults", *Electric Power Systems Research*, Vol. 20, No. 1, pp. 31-37, March, 1990.

Benner, C. , Carswell, P., Russell, B. D., "Improved Algorithm for Detecting Arcing Faults Using Random Fault Behavior", *Electric Power Systems Research*, Vol. 17, No. 1, pp. 49-56, 1989.

Kim, C. J., Russell, B. D., "Classification of Faults and Switching Events by Inductive Reasoning and Expert System Methodology", *IEEE Transactions on Power Delivery*, Vol. 4, No. 3, pp. 1631-1637, July, 1989.

Mehta, K., Russell, B. D., "Data Compression for Digital Data from Power Systems: Requirements and Technique Evaluation", *IEEE Transactions on Power Delivery*, Vol. 4, No. 3, pp. 1683-1688, July, 1989.

Ingleson, J. W. Russell, B. Don, et.al. "Bibliography of Relay Literature, 1986 - 1987", *IEEE Transactions on Power Delivery,* Vol. 4, No. 3, pp. 1649-1658, July, 1989.

Russell, B. D., Watson, K. "A Digital Protection System Incorporating Real Time Expert Systems Methodology", *Proceedings*, CIGRE, Bournemouth, England, June, 1989.

Russell, B. D., Doern, T. L., Martin, A., "Application of Microcomputer-Based Systems in Power Substations", *IEEE Transactions on Power Delivery*, Vol. 4, No. 1, pp. 201-207, January, 1989.

Russell, B. Don, Chinchali, R., "A Digital Signal Processing Algorithm for Detecting Arcing Faults on Power Distribution Feeders", *IEEE Transactions on Power Delivery,* Vol. 3, No. 1, pp. 132-140, January, 1989.

Russell, B. Don, Chinchali, R.P., Kim, C.J. "Behavior of Low Frequency Spectra During Arcing Faults and Switching Events", *IEEE Transactions on Power Delivery,* Vol. 3, No. 4, pp. 1485-1492, October, 1988.

Kezunovic, M., Russell, B. D., "Microprocessor Applications to Substation Control and Protection", *IEEE Computer Applications in Power*, Vol. 1, No. 4, pp. 16-20, October, 1988.

Kim, C. J., and Russell, B. Don, "Harmonic Behavior During Arcing Faults on Power Distribution Feeders", *Electric Power Systems Research,* Vol. 14, No. 3, pp. 219-225, June, 1988.

Russell, B. Don, Watson, K., "Power Substation Automation Using a Knowledge Based System - Justification and Preliminary Field Experiments", *IEEE Transactions on Power Delivery*, Vol. PWRD-2, No. 4, pp. 1090-1097, October, 1987.

Russell, B. Don, Narendorf, M., Aucoin, M., "Microcomputer Based Feeder Protection and Monitoring System - Utility Experience", *IEEE Transactions on Power Delivery*, Vol. PWRD-2, No. 8, pp. 1046-1052, October, 1987.

Aucoin, M., Russell, B. Don, "Detection of Distribution High Impedance Faults Using Burst Noise Signals Near 60Hz", *IEEE Transactions on Power Delivery*, 86T&D 546-6, Vol. 2, No. 2, pp. 342-348, April, 1987.

Aucoin, M., Zeigler, J., Russell, B. Don, "Feeder Protection and Monitoring System, Part I: Design, Implementation and Testing", *IEEE Transactions on Power Apparatus and System*, Vol. PAS-104, No. 4, pp. 873-880, April, 1985.

Aucoin, M., Zeigler, J., Russell, B. Don, "Feeder Protection and Monitoring System, Part II:  Staged Fault Test Demonstration", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-104, No. 6, pp. 1456-1462, June, 1985.

Walker, L., Russell, B. Don,  et. al., "Criteria for the Evaluation of Digital Impedance Methods of Transmission Line Protection", *IEEE Transactions on Power Apparatus and Systems,* 1984 WM105-3.

Russell, B. Don, Harvey, S., Nilsson, S. "Substation Electromagnetic Interference - Characterization & Description of the Transient EMI Problem", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-103, No. 7, pp. 1863-1870, July, 1984.

Russell, B Don, Kotheimer B. Malewsiki, R., "Substation Electromagnetic Interference - Susceptibility Testing and EMI Simulation High Voltage Laboratories", *IEEE Transactions on Power Apparatus and Systems*, PAS-103, No. 7, pp. 1871-1878, July, 1984.

Ingleson, J., Russell, B. Don, et.al. "Bibliography of Relay Literature, 1982-1983", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-104, No. 5, pp. 1189-1197, 1985, PSRC Committee Report.

Lau, K. P., Russell, B. Don, et.al., "SCADA's State-of-the-Art and Future U.S. Trends in Substation Control", *Proceedings*, 1982 CIGRE (International Conference on Large High Voltage Electric Systems), Paris, France.

Russell, B. Don, "New Developments in Systems for Transmission and Distribution Substation Control and Protection", *Electric Power Systems Research,* Vol. 5, No. 1,  pp. 21-34, 1982.

Russell, B. Don, "High Impedance Faults Can Now Be Detected", *Transmission and Distribution*, Vol. 34, No. 2, pp. 32-34, 60, February, 1982.

Russell, B. Don, Herrick, D., "Electromagnetic Transients in High Voltage Power Substations", *Proceedings* of the 1982 IEEE International Symposium on Electromagnetic Compatibility, (IEEE/EMC), Santa Clara, CA., September, 1982.

Stephens, J., Russell, B. Don, et.al., "Bibliography of Relay Literature, 1980-1981", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-102, No. 4, April 1983, pp. 1014-1022, PSRC Committee Report.

Aucoin, B. M., Russell, B. Don, "Distribution High Impedance Fault Detection Utilizing High Frequency Current Components", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-101, No. 6,  pp. 1596-1604, June, 1982.

Stephens, J.E., Russell, B. Don, et. al., "Bibliography of Relay Literature, 1978 1979", *IEEE Transactions on Power Apparatus and Systems*, Vol. PAS-100, No. 5, 1981, IEEE/PSRC Committee Report.

Russell, B. Don, "Distribution Automation Using Microcomputer Technology", *Electric Power Systems Research*, Vol. 1, No. 2, pp. 131-137, 1978.


*Conference, Professional  Publications and Presentations*

Richards, C., Benner, C., Butler, K., Russell, B.D., "Leakage Current Characteristics Caused by Contaminated Distribution Insulators," *Proceedings of the North American Power Symposium*, San Luis Obispo, CA, October 1999.

Russell, B.D., *"Response Characteristics of Residential Smoke Detectors under Varying Full-Scale Fire Scenarios,"* presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, Florida, February 15-20, 1999.

Benner, Carl L., Russell, B.D., *"Characteristic Behavior of Downed Electrical Lines Including Evaluation of Various Electrocution Scenarios,"* presented at the 51st Annual Meeting of the American Academy of Forensic Sciences, Orlando, Florida, February 15-20, 1999.

Benner, Carl L., Russell, B.D., *"Arcing Fault Detection - An Update on the Technology"*, presented at the IEEE/PES Winter Power Meeting, Tampa, Florida, February 2-5, 1998.

Butler, Karen, Khan, S., Russell, B. D., *"Modeling of Power Transformers for Determination of Aging and Deterioration"*, 1996 IEEE Rural Electric Power Conference, Fort Worth, Texas, April, 1996.

Khan, S., K. L. Butler, Russell, B. D., "A Predictive Maintenance Approach For Power Distribution Systems", Proceedings of the *27th Annual North American Power Symposium*, Bozeman, Montana, October 2-3, 1995.

Brzhezitsky, V.A., Il'enko, O.S., Mamishev, A.V., Russell, B. Don, Sokolovsky, S.A., "Calculation of the Critical Distance Between Power Line Conductors and Objects on the Ground", *Seventh International Conference on Transmission and Distribution Construction, Operation, and Live-Line Maintenance,* Columbus, OH, October, 1995.

Kim, C. J., Russell, B. D., "Identification of Distribution Disturbances by Crest Factor Analysis", submitted to the *International Conference on Electrical Engineering*, Taejon, Korea, July 19-21, 1995.

Mamishev, A.V., Nevels, R.D., Russell, B.D., "Effects of Conductor Sag on Spatial Distribution of Power Line Magnetic Field", *presented at the IEEE PES Summer Meeting*, Portland, Oregon, July, 1995.

Mamishev, A.V., Russell, B.D., Benner, C.L., "Analysis of High Impedance Faults Using Fractal Techniques", *1995 Power Industry Computer Applications Conference*, Salt Lake City, Utah, May, 1995.

Mamishev, A.V., Short, S.X., Kao, T.W., Russell, B.D., "Non-intrusive Sensing Techniques for the Discrimination of Energized Electric Cables", *IEEE Instrumentation and Measurements Conference*, pp. 446-449, Waltham, MA, April, 1995.

Mamishev, A.V., Russell, B. Don, "Measurement of Magnetic Fields in the Direct Proximity of Power Line Conductors", presentation, *IEEE-PES Winter Power Meeting*, New York, NY, January, 1995.

Mamishev, A.V., Nevels, R.D., Russell, B. Don, "Effects of the Sag of Power Line Conductors on Ambient Magnetic Fields", *IEEE-PES Winter Meeting,* New York, NY, January, 1995.

Brzhezitsky, V.A., Il'enko, O.S., Mamishev, A.V., Russell, B. D., Sokolovsky, S.A., "Partial Empirical Model of the Multifactor Aging of High Voltage Insulation", Proceedings, *1994 Conference on Electrical Insulation and Dielectric Phenomena,"* pp. 367-372, Arlington, TX, October, 1994.

Mamishev, A.V., Russell, B.D., "Influence of Catenary Shape of Power Line Conductors on Ambient Magnetic Fields," Proceedings, *1994 Universities Power Engineering Conference*, vol. 1, pp. 177-180, Gallway, Ireland, September, 1994.

Williams, Stephen E., Russell, B. D., "An Integrated Approach to Power System Control and Protection for Space Platforms", Proceedings, *29th Intersociety Energy Conversion Engineering Conference,* August 7-12, 1994, Monterey, CA.

Nevels, R.D., Mamishev, A.V., Russell, B. D., "Power Line Magnetic Field Including the Catenary Effect and Electric Field Including Absorbing Boundary Conditions", Proceedings, *1994 IEEE AP-S International Symposium and URSI Radio Science Meeting,* June, 1994, Seattle, Washington.

Tyska, W.Z., Patterson, R.A., Russell, B.D., Aucoin, B.M., "A Microprocessor Based Digital Feeder Monitor with High Impedance Fault Detection", Proceedings, *Georgia Tech Protective Relay Conference,* Atlanta, GA, May, 1994.

Benner, Carl L., Russell, B. D., Aucoin, B. Mike, "Case Histories of Distribution Feeder Faults: Field Experience with General Electric's Digital Feeder Monitor", Proceedings, Forty-Seventh Annual Conference for Protective Relay Engineers, Texas A&M University, College Station, TX, March 21-23, 1994.

Kim, C.J., Russell, B. Don, "Entropy Minimization Analysis for Fuzzy Set Generation", Proceedings, *Third International Fuzzy Systems and Intelligent Control Conference*, Louisville, KT, March, 14-16, 1994.

Tyska, W.Z., Patterson, R.A., Russell, B. D., Aucoin, B.M., "A Microprocessor Based Digital Feeder Monitor with High Impedance Fault Detection", Proceedings, *Texas A&M University Conference for Protective Relay Engineers,* College Station, TX, March, 1994.

Kim, C. J., Russell, B. D., "Automatic Generation of Membership Function and Fuzzy Rule using Inductive Reasoning", *Proceedings of the Third International Conference on Industrial Fuzzy Control & Intelligent Systems*, December 1-3, 1993, Houston, TX.

18

Aucoin, B. Michael, Russell, B.D., "A Microprocessor-Based Digital Feeder Monitor with High-Impedance Fault Detection", Proceedings, *EPRI Substation Diagnostics Conference*, November 3 - 5, 1993, New Orleans, LA.

Tyska, W.Z., Patterson, R.A., Russell, B.D., Aucoin, B.M., "A Microprocessor-Based Digital Feeder Monitor with High-Impedance Fault Detection", Proceedings, *Western Protective Relay Conference*, October 19 - 21, 1993, Spokane, WA.

Kim, C. J., Russell, B. D., "Application of a Fuzzy Expert Model for Power System Protection: Proposal for Synergetic Detection of Low Current Faults", *Proceedings of the Fifth International Fuzzy Systems Association* (IFSA) *World Congress*, pp. 1074-1077, July 4-9, 1993, Seoul, Korea.

Russell, B. D., Aucoin, B. M., "Field Experience with High Impedance Fault Detection", *Proceedings, High Impedance Faults on Distribution Feeders Seminar, IEEE Vancouver Section,* May 14, 1993.

Williams, S. W., Russell, B. D., "Ships Service Electric Power Enhanced Survivability Via Early Detection of Incipient Cable Faults", *Naval Engineers Journal*, pp. 78-84, May, 1993.

Benner, C. L., Russell, B. D., "Fuse Characteristics Under Non-Ideal Fault Current Conditions", *Proceedings, Texas A&M University Conference for Protective Relay Engineer*s, April, 1993.

Kim, C. J., Russell, B. D., "A Structure of Fuzzy Decision-Making System for Power System Protection", *Proceedings of the IEEE Second International Conference on Fuzzy Systems*, FUZZ-IEEE'93, March 28 - April 1, 1993, San Francisco, CA, pp. 998-1003.

Russell, B. D., "Advanced Techniques and Tools for Substation Equipment Diagnostics", Proceedings, Workshop on Advanced Diagnostics for Substation Equipment, Electric Power Research Institute, November, 1992.

Russell, B. D., Aucoin, B. M., Benner, C.L., "High Impedance Fault Detection in Distribution Systems", *Proceedings - Pacific Gas and Electric Technical Conference,* Pleasanton, CA, August, 1992.

Russell, B.D., "Performance Evaluation of the TAMU High Impedance Fault Detection System", Proceedings, *TAMU Conference for Protective Relay Engineers,* April, 1992.

Aucoin, M., Russell, B. D., "Fallen Conductor Faults: The Challenge to Improve Safety", *Public Utilities Fortnightly,* Vol. 129, No. 3, pp. 38-40, February, 1992.

Watson, K., Russell, B. D., Jagadish, U., "Single-Chip Microcontrollers for Switchgear Control", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Boston, MA, August, 1991.

Aucoin, M., Russell, B. D., Benner, C. L., "Characteristics of Distribution Faults", *Proceedings*, Utility Fault and Disturbance Analysis Conference, Texas A&M University, College Station, April, 1991.

Russell, B. D., Li, S., Watson, K., "Digital Methods for the Detection of Incipient Fault Conditions in Spaceborne Power Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Reno, NV, August, 1990.

Li, S., Russell, B. D., et. al., "On-Line Fault Detection in Power Systems Using Adaptive DFT", *Proceedings*, Conference on Information Sciences and Systems, Princeton, NJ, March, 1990.

Russell, B. D., Aucoin, B. M. Benner, C., "Computer Relaying Techniques for the Detection of High Impedance Faults Using Signal Processing and Pattern Recognition Methods", *Proceedings*, International Conference on Power System Protection, Singapore, September, 1989.

Aucoin, M., Russell, B. D., Benner, C., "High Impedance Fault Detection for Industrial Power Systems", *Proceedings*, IEEE Industrial Applications Society Conference, San Diego, October, 1989.

Russell, B.D., Aucoin, M. "Detection of Incipient and Low Current Faults in Electrical Distribution Systems", *Proceedings*, Intersociety Engineering Conference on Energy Conversion, Washington, D.C., August,1989.

Watson, K., Russell, B. D., McCall, K. "A Digital Protection System Incorporating Knowledge Based Learning", *Proceedings*, Intersociety Engineering Conference on Energy Conversion, Washington, D.C., August, 1989.

Benner, C. L., Carswell, P. W., Russell, B. D., "Improved Algorithm for Detecting Arcing Faults Using Random Fault Behavior", *Proceedings*, Southern Electric Industry Application Symposium, New Orleans, LA, November, 1988.

Russell, B. D., Watson, K., "Knowledge-Based Expert System for Improved Power System Protection and Diagnostics", *Proceedings*, Symposium on Expert Systems Applications to Power Systems, Sweden, August, 1988.

Watson, K., Russell, B. D., Hackler, I., "Expert System Structures for Fault Detection Spaceborne Power Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Denver, CO, August, 1988.

Russell, B. Don, Hackler, Irene, "Incipient Fault Detection and Power System Protection for Spaceborne Systems", *Proceedings*, Intersociety Energy Conversion Engineering Conference, Philadelphia, PA, August, 1987.

Kim, C.J. and Russell, B. Don, "Analysis of High Impedance Fault Detection Parameters for Digital Relays", *Proceedings*, Computer Relaying Conference, National Science Foundation and Virginia Tech, October 6, 1987.

Russell, B. Don, "Detection of High Impedance Faults on Distribution Feeders", *Proceedings*, APPA Engineering and Operations Workshop, invited paper, March, 1985.

Russell, B. Don, Heller, P., Perry, P., "Demand Control Utilizing Energy Management Systems - Report of Field Tests", *Proceedings*, Symposium on Efficient Utilization of Energy in Residential and Commercial Buildings, Texas A&M University, August, 1984.

Russell, B. Don, "Characteristics of Low Current Faults on Distribution Feeders", *Proceedings*, Southwest Electrical Exposition and Conference, Houston, Texas, April, 1982.

Russell, B. Don, Perry, L. Heller, R. , "Design of a Computerized Energy Management System for Marine Applications", *Proceedings*, Industrial Energy Conservation Technology Conference & Exhibition, Houston, Texas, April, 1982.

Russell, B. Don, Willis, G., Colburn, B., "Industrial Energy Audit Training for Engineers", *Proceedings*, Industrial Energy Conservation Technology Conference & Exhibition, Houston, Texas, April, 1982.

Russell, B. Don, "High Impedance, Arcing Faults: Staged Fault Experience", *Proceedings*, 1982 Power Distribution Conference, Austin, Texas, October, 1982.

Russell, B. Don, "Power Systems Automation Laboratory: Investigation of Electromagnetic Effects on Substation Automation Equipment", *Proceedings,* Texas Engineering Experiment Station Engineering Research Conference, Texas A&M University, September, 1981.

Russell, B. Don, Aucoin, M., "Development of a Low-Current Relay for High Impedance Faults on Distribution Feeders", *Proceedings*, 34th Annual Conference Protective Relay Engineers, Texas A&M University, April, 1981.

Russell, B. Don, "Energy Conservation Through the Use of a Microcomputer-Based Fuel Management System", 27th International Instrumentation Symposium, ISA, Indianapolis, Indiana, invited paper, April, 1981.

Russell, B. Don, "Energy - To Control or Not to Control - A Study in Commercial EMS Equipment", *Chuckwagon*, Texas Restaurant Association, Austin, Texas, 1981.

Russell, B. Don, "Turning On To Saving Energy", *Chuckwagon*, Texas Restaurant Association, pp. 21-23, October, 1981.

Russell, B. Don, Gerloff G., "Characteristics of the Electrical Environment in Transmission Substations", Workshop on Digital Techniques for Control and Protection of Transmission Class Substations, Electric Power Research Institute, Palo Alto, California, invited paper, August, 1980.

Russell, B. Don, Goers, Heller, P., "Microprocessor Based Data Acquisition System for Use in Energy Audits", Proceedings, 1979 Industrial Energy Conservation Technology Conference, Houston, Texas, April, 1979.

Russell, B. Don, et. al., "Test Techniques for SCADA and Automation Systems", *Proceedings*, 1979 IEEE Power Engineering Society Summer Meeting, edited for PES Substations Committee.

Russell, B. Don, et. al., "Communication Alternatives for Distribution Metering and Load Management", 1979 IEEE Power Engineering Society Winter Meeting, edited for Application of New Technologies in Substation Control Working Group.

Russell, B. Don, Heller, R., "Microprocessor Algorithm for Overcurrent Protection of Distribution Systems", *Proceedings*, 1978 Control of Power Systems Conference, Oklahoma City, Oklahoma.

Russell, B. Don, Aucoin, M., "Algorithm for the Detection of Noise Frequencies Generated by High Impedance Faults", *Proceedings*, 1978 Control of Power Systems Conference, Oklahoma City, Oklahoma.

Russell, B. Don, et. al., "Recent Field Experiences with the Automation of Substation Control", *Proceedings*, 1978 IEEE PES Winter Meeting.

Russell, B. Don, "Microprocessor Applications and Distribution System Automation", *Proceedings*, 1977 Power Distribution Conference, University of Texas, Austin, Texas, October, 1977.

Russell, B. Don, "A Microcomputer Based Substation Control System", *Proceedings*, Control of Power Systems Conference, Oklahoma City, Oklahoma, March, 1976.

Russell, B. Don, "Present and Future Applications of Microcomputers in Power System Control", *Proceedings,* 1976 IEEE Microcomputer Conference, Oklahoma City, Oklahoma.

Russell, B. Don, "Microprocessor Applications of Interest to Substation and Protection Engineers", 1976 IEEE Summer Power Meeting, Mexico City, Mexico, A 77 746-1.

Russell, B. Don, "Use of Reliability Constraints in the Design of a Microcomputer Based Transmission Substation Control System", *Proceedings*, Midwest Power Symposium, 1975.

Russell, B. Don, "Application of Microcomputers to the Protection and Control of Power Systems Substations", *Proceedings*, IEEE Conference on Decision and Control and 14th Symposium on Adaptive Processes, Houston, Texas, December, 1975.

Russell, B. Don, "Electronics Science Education for Non-Science Majors", *Proceedings*, Texas Academy of Science, Science Education Section, March, 1974.

### *Significant Technical Reports*

. "Distribution Fault Anticipator, Phase I: Proof of Concept", Final Report prepared for the Electric Power Research Institute (EPRI), Palo Alto, California, EPRI Publication #1001879, December, 2001.

"A Critical Assessment and Comparison of Three Proposed Designs for C-130 Critical Load Bus Transfer", Final Report, Chrysler Technologies, with P. Enjeti, April, 1993.

"An Instrumentation & Data Analysis System for Monitoring Industrial and Commercial Energy Use", Final Report, Energy Research in Applications Program, March, 1993.

"Methods of High Impedance Fault Detection - Comparative Evaluation and Recommendations", Electric Power Research Institute, 1990.

"Evaluation of Algorithms for Arcing Fault Detection", Final Report, Electric Power Research Institute, December, 1989.

"The Effects of Vibration on High Pressure Sodium Lamps in Roadway Luminares", final report for Texas State Department of Highways and Public Transportation, with W. E. Red, April, 1984.

"Evaluation of the EPRI Real-Time Digital Data Acquisition System for Determining Load Characteristics", Final Report, Project 849-6, Electric Power Research Institute, March, 1983.

"Measurement and Characterization of Substation Electromagnetic Transients", final report, Project 1359-2, Electric Power Research Institute, March, 1983.

"Detection of Arcing Faults on Distribution Feeders", final report, Project 1285-3, Electric Power Research Institute, Palo Alto, CA, December, 1982.

"Evaluation of Arcing Noise Propagation from 12.5 kV High Impedance Faults: Results of Staged Fault Tests", Electric Power Research Institute, with Mike Aucoin and Tom Talley, 1980.

"Design Criteria and Functional Specifications of an Electromagnetic Transient Capture System for Use in High Voltage Substations", Electric Power Research Institute, with Gary Gerloff, 1979.

"Analysis of the National Energy Plan: The Effects on Electric Utilities", Center for Energy and Mineral Resources, with C. W. Brice, et. al, October, 1977.

"Techniques of Ion Implanting as Applied to the Production of Infrared Sensing Devices", Institute of Solid State Electronics, Texas A&M University, 1971 (Master 's Project).

"The Influence of Ion Implantation on Both Thermally Induced Dislocations and Strain Generated Surface Patterns in Silicon", TAMU Institute for Solid State Electronics, with J.S. Linder and T. H. Bhar., 1971.

"Electrical and Physical Measurements of Boron Ion-Implanted Layers in Silicon", TAMU Institute for Solid State Electronics, 1971, with Linder, J.S., Heller, R.

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Ayala v. CameronCounty Housing | Frank Costilla | Law Offices of Mark Cantu | 956-687-8181 | 77 |
| Assembly of God v. TU Electirc | David M. Weaver | Burford & Ryburn, L.L.P. 3100 Lincoln Plaza 500 N. Akard Dallas, TX 75201-3320 | 214-740-3101 | 80 |
| Death of Ryan Chayse Beach | E. J. Saad | Cosby, Saad, Beebe, Crump, P.C. | 334-476-3000 | 87 |
| Fletcher v. Watson Electric et al | Gordon Asbury | Asbury & Asbury 534 Pine Street, Suite 102 Abilene, TX 79601 | 915-673-7141 | 88 |
| Pipkin v. United Energex | Andrew N. Soule | Grau & Bassett 2311 Cedar Springs Rd., Suite 100 Dallas, TX 75201 | 214-880-0155 | 90 |
| Dampier v. Fyrenetics | Ron Stites | Stites, Hopkings & Fair | 816-842-8889 | 91 |
| Estate of Snyder | Jerry Dugan | Dugan, Brinkman, Maginnis & Pace 1880 John F. Kennedy Blvd., Suite 1400 Philadelphia, PA 19103 | 215-563-3500 | 92 |
| Norco Realty d/b/a Global Moving v.TU Electric | David M. Weaver | Burford & Ryburn, L.L.P. 3100 Lincoln Plaza, 500 N. Akard Dallas, TX 75201-3320 | 214-740-3101 | 96 |
| Brown v. BRK | Peter Periman | Peter Periman Law Offices, P.S.C. 388 South Broadway Lexington, KY 40508-2595 | 606-253-3919 | 98 |
| Noyola v. Five Trees Apartments | Paula Wyatt | Wyatt & Wyatt Wyatt Courtyard 4825 Everhart Rd. Corpus Christi, TX 78411 | 800-580-9928 | 99 |
| Vargas v. Wal-Mart | Paula Wyatt | Wyatt & Wyatt Wyatt Courtyard 4825 Everhart Rd. Corpus Christi, TX 78411 | 800-580-9928 | 100 |

1

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Magouirk v. Texas New Mexico Power | Kight Higgins | Haynes & Boone L.L.P. | 817-347-6600 | 102 |
| Howell v. Pittway | Leo Gilberg | Leo Gilberg, Attorney @ Law<br>305 Broadway<br>New York, NY 10007 | 212-822-1440 | 104 |
| David v. Austin White Lime Co. | Michael Schumaker | Worsham, Forsythe & Wooldridge, L.L.P.<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 254-750-5217 | 106 |
| Tomecek v. TU Electric | David Poole | Worsham, Forsythe & Wooldridge, L.L.P.<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 214-979-3000 | 107 |
| Shaw v. Littlefield Real Estate | Ron Adkison | Wellborn, Houston, Adkison, Mann, Sadler & Hill     Attorneys at Law<br>P.O. Box 1109, 300 W. Main Street<br>Henderson, TX 75653-1109 | 903-657-8544 | 108 |
| Morales v. BRK | Juan C. Hernandez | Juan C. Hernandez<br>4849 Greenville, Suite 1540<br>Dallas, TX 75206 | 214-373-9700 | 109 |
| Garcia (Cox) v. BRK | Mark Cantu | Law Offices of Mark Cantu | 956-687-8181 | 110 |
| Duplechain Fire | James P. Ryan | Morrow, Morrow, Ryan & Bassett<br>324 W. Landry, P.O. Drawer 7090<br>Opelousas, LA 70571-7090 | 318-948-4483 | 112 |
| Hicks v. TU Electric | Travis Vanderpool | Hunton & Williams<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 214-979-3000 | 113 |
| Montoya v. Westinghouse Electric | Travis Vanderpool | Hunton & Williams<br>Energy Plaza, 30th Floor<br>1601 Bryan Street<br>Dallas, TX 75201 | 214-979-3000 | 114 |

2

4/29/2002

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Hemphill v. FPL | Gregg Schlesinger | Sheldon J. Schlesinger, P.A.   1212 Southeast 3rd Avenue Ft. Lauderdale, FL 33316 | 954-467-8800 | 115 |
| Plunkett v. Triple - S Steel Supply | Samuel E. Dunn | Law Offices of Samuel E. Dunn 10850 Richmond Avenue, Suite 200 Houston, TX 77042 | 713-787-4380 | 116 |
| Woods v. Fire X | Richard Taylor | Jackson, Taylor, Martino & Hedge Southtrust Bank Bldg. 61st Joseph St., Suite 1600 Mobile, AL 36602 | 800-256-7728 | 117 |
| Beckman v. Simpson | Ralph Modad | Reich & Binstock Chase Bank Bldg, River Oaks 4265 San Felipe, Suite 1000 Houston, TX 77027 | 512-478-2277 | 120 |
| Benningfield v. A.B. Chance | John Craven | Morris, Craven & Sulak Attorneys at Law 3307 Northland Drive, Suite 234 Austin, TX 78731-4942 | 512-458-9111 | 121 |
| Lawhorn v. Jameson Home Products | Stephen Lickteig | Robin, Kaplan, Miller & Ciresi, L.L.P. 2800 LaSalle Plaza 800 LaSalle Avenue Minneapolis, MN 55402-2015 | 612-349-8264 | 123 |
| Solvay Polymers | Doug Lang (No longe | Cozen & O'Connor 2300 Bankone Center 1717 Main Streeet Dallas, TX 75201 | 800-448-1207 | 130 |
| Ainsworth v. AMD & Dean Johnston | David Deaderick | Grove, Ehlinger & Deaderick 2525 Wallingwood Drive, Suite 800 Austin, TX 78746 | 512-499-8866 | 131 |
| Jackson/Hill v. Firex | Scott Hansbury | Dale Sprik & Associates, P.C. 933 Four Mile Road NW Grand Rapids, MI 49544 | 800-557-7745 | 132 |

3

4/29/2002

| Case Name | Attorney | Firm Address | Phone # | File Number |
|-----------|----------|--------------|---------|-------------|
| Robles v. Woods Industries | Dwayne R. Day | Prichard Hawkins & Young<br>Union Square, Suite 600<br>10101 Renuion Place<br>San Antonio, TX 78216 | 713-527-8800 | 133 |
| Roberts v. Honda | Grant McFarland | Prichard Hawkins & Young<br>Union Square, Suite 600<br>10101 Renuion Place<br>San Antonio, TX 78216 | 210-477-7422 | 134 |
| Sulak v. Fleetwood Travel Trailers | Steve Young | Helm, Pletcher, Bowen & Saunders, L.L.P<br>2929 Allen Parkway, Suite 2700<br>Houston, TX 77019 | 713-522-4550 | 135 |
| Hatfield Fire | | Robin, Kaplan, Miller & Ciresi, L.L.P.<br>2800 LaSalle Plaza<br>800 LaSalle Avenue<br>Minneapolis, MN 55402-2015 | 612-349-8436 | 136 |
| Isom v. Entergy | Christine Kibbe | Entergy Services<br>350 Pine Street    P.O. Box 2951<br>Beaumont, TX 77704 | 409-981-4498 | 137 |
| Fabela (Gonzales) v. TX Electric & Gas | Robert M. Doby III | Canley & Hanger, L.L.P.<br>801 Cherry Street, Suite 2100<br>Ft. Worth, TX 76102-6821 | 817-877-2826 | 138 |
| Kelley v. Astron Residential Inc./Comfort | Joseph Gibson IV | Quinn & Laminack<br>2300 Lyric Centre Bldg.<br>440 Louisiana<br>Houston, TX 77002 | 800-245-0249 | 139 |
| Faust v. Lakeside Plumbing | | Fisher, Boyd, Brown, Boudreaux &<br>Huguenard<br>14th Floor Riviana Bldg.<br>2777 Allen Parkway<br>Houston, TX 77019 | 713-400-4000 | 140 |
| Garner, Allen v. HL&P | Anthony Griffin | Anthony P. Griffin, Inc.<br>1115 Moody<br>Galveston, TX 77550 | 800-750-5034 | 141 |

4

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Dan White et al v. United Electric et al. | Steven Laird | Laird & Jones, L.L.P. One Colonial Place 2400 Scott Avenue Ft. Worth, TX 76103-2200 | 817-531-3000 | 142 |
| Bennie Pontruff v. OA Newton et al | Paul Brunner | Fisher, Boyd, Brown, Boudreaux & Huguenard 14th Floor Riviana Bldg. 2777 Allen Parkway Houston, TX 77019 | 713-400-4000 | 143 |
| Donna Holick v. David J Blasienz d/b/a Blaco Const. | Lynn A. Grisham | Waltham & Grisham 707 Texas Avenue, Suite 106D College Station, TX 77840 | 979-694-0900 | 144 |
| Salas v. Murphy | Steven Schultz | Wilcoxen, Callahan,Montgoment & Deacon 2114 K Street Sacramento, CA 95816 | 916-442-2777 | 145 |
| Hernandez/Sylvester Estate v. C&C Erection & Spaw Glass | Bret L. Walton (Asst. Donna Morales) | Werstein, Smith & Wilson 1777 N.E. Loop 410, Suite 600 San Antonio, TX 78217 | 210-820-2670 | 146 |
| St. Theresa's Church v. Slater Painting | Tim Poteet | Chamberlain, McHaney | 512-474-9124 | 147 |
| | Bennett Nolan | Nolan, Caddell & Reynolds, P.A. 404 North 7th Street P.O. Box 184 Fort Smith, AR 72902 | 501-782-5297 | 148 |
| Hardaway v. Acme Brick | Ty Gomez | Van Wey Johnson & Judin, L.L.P. 5910 N. Central Expressway, Suite 1380 Dallas, TX 75206 | 214-265-7600 | 149 |
| Entergy Gulf States v. EPCO | Paul A. Scheurich | Entergy Services 350 Pine Street    P.O. Box 2951 Beaumont, TX 77704 | 409-981-4498 | 150 |

5

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Robert "Bob" Fristoe | Jerry Young | Gallagher, Lewis, Downey & Kim<br>Bank Of America Center<br>700 Louisiana 40th Floor<br>Houston, TX 77002-2731 | 713-222-8080 | 151 |
| H.Morin v. Brinkman Roofing Co. | Tad Rice | Ware, Snow, Fogel & Jackson<br>TX Heritage Plaza, 40th Floor<br>1111 Bagby<br>Houston, TX 77003-2545 | 713-659-6400 | 152 |
| Robert Player v. Asphlundh Tree Expert Co/TXU | Jerry Young | Gallagher, Lewis, Downey & Kim<br>Bank Of America Center<br>700 Louisiana 40th Floor<br>Houston, TX 77002-2731 | 713-222-8080 | 153 |
| All Underwriters et al v. Searock, Genmar, et al | Andy Anderson<br>David Gambach | Keller & Houck<br>200 South Biscayne Blvd., Suite 300<br>Miami, FL 33131-2332 | 305-372-9044<br>800-294-5043 | 154 |
| Jusay v. Reburiano | Mike Ney | McNamara Law Firm<br>1211 Newell Ave., P.O. Box 5288<br>Walnut Creek, CA 94596 | 925-939-5330 | 155 |
| Eric Glover v. Bradford Brothers Underground Service | Donald Kidd | Jim S. Adler, P.C.<br>Wells Fargo Tower<br>6161 Savoy, Suite 700<br>Houston, TX 77036-3323 | 713-735-2107 | 156 |
| Sottung v. PECO Energy Co., et al | Jeffrey Laffey | Saltz, Mongeluzzi, Barrett & Bendesky<br>One Liberty Place, 34th Floor<br>1650 Market Street<br>Philadelphia, PA 19103 | 215-496-8282 | 157 |
| Chapman v. Li | Jonathen Halperin | Regan, Halperin & ong, PLLC<br>The Presidential Plaza Bldg., Suite 200<br>900 Nineteenth St.,NW<br>Washington, DC 20006 | 202-463-3030 | 158 |
| Lopez v. Jackson Products, Inc. | Angela Loehr | Gallop, Johnson & newman, LC<br>101 South Hanley, Suite 1600<br>St. Louis, MO 63105 | 800-330-6635 | 159 |

6

| Case Name | Attorney | Firm Address | Phone # | File Number |
|---|---|---|---|---|
| Munoz, et al v. City of San Antonio et al<br>Spliman v. City of San Antonio et al | Eric Brown | Werstein, Smith & Wilson<br>106 E. 6th Street, Suite 210<br>Austin, TX 78701 | 512-472-5510 | 160 |
| Keith Hale et al v. Rusk County Coop., Inc. | Andrew Payne | Howie & Sweeney LLP<br>14th Floor, Park Place on Turtle Creek<br>2911 Turtle Creek Blvd.<br>Dallas, TX 75219 | 800-523-2339 | 161 |
| Kenneth Pridgeon et al v. Mikob Properties, Inc. | Don Kidd | Jim S. Adler, P.C.<br>3D International Tower<br>1900 West Loop South, 20th Flr<br>Houston, TX 77027-3214 | 713-341-1447 | 162 |
| Karen Grisham et al v. Lane Construction Corp. | John Payne | Payne & Blanchard, LLP<br>700 North Pearl Str., Suite 500, LB393<br>North Tower                                    Dallas,<br>TX 75201-7424 | 214-953-1313 | 163 |
| AVIVA (Yacht Fire in England) | (Nigel Thompson)<br>Andy Anderson | Keller & Houck<br>200 South Biscayne Blvd., Suite 300<br>Miami, FL 33131-2332 | 305-372-9044<br>800-294-5043 | 164 |
| Baden v. Leviton Co. et al | Denyse Clanay | Kaeske Reeves, LLP<br>6301 Gaston Avenue, Suite 735<br>Dallas, TX 75214 | 214-821-1221 | 165 |
| Yearick, Minors v. TXU Corp. | Carl Huddleston | Hunton & Williams<br>Energy Plaza, 30th Floor<br>1601 Bryan Str.<br>Dallas, TX 75201-3402 | 214-979-3000 | 166 |
| Murray v. U.S. Home Corp. | Mickey Das | Tyler, Das & Debes<br>5851 San Felipe, Suite 975<br>Houston, TX 77057 | 713-739-1900 | 167 |
| Hackert v. First Alert (other defendants pending) | Tom Buchanan | Cusick, Hacker, Murphy<br>Airport Park Blvd.<br>Latham, NY 12110 | 518-783-3843 | 168 |

7

| Case Name | Attorney | Firm Address | Phone # | File Number |
|-----------|----------|--------------|---------|-------------|
| Luis & Marina Estrada v. Fire X & Maple Chase | Robert Wyatt | Wyatt & Wyatt<br>Wyatt Courtyard<br>4825 Everhart Rd.<br>Corpus Christi, TX 78411 | 361-857-2727 | 169 |
| O'Campo, Molina & Hernandez v. Fire X & Maple Chase | Robert Wyatt | Wyatt & Wyatt<br>Wyatt Courtyard<br>4825 Everhart Rd.<br>Corpus Christi, TX 78411 | 361-857-2727 | 170 |
| Rodriquez v. Whirlpool Corp. | Joe Escobedo, Jr. | Hockema, Tippit & Escobedo LLP<br>1 Paseo Del Prado, Bldg. 101<br>Edinburg, TX 78539-9672 | 800-966-9112 | 171 |

8

4/29/2002

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE SOUTHERN DISTRICT OF TEXAS
 3                    BROWNSVILLE DIVISION
 4
 5   JOSE GARCIA, Individually )
     and as Representative of  )
 6   the ESTATE OF MANUEL       )
     CRUZ; IDALIA GARCIA,       )
 7   Individually; and CYNTHIA )
     COX, as Next Friend of     )
 8   BRITTANY COX               )
                                )
 9   VS.                        ) CIVIL ACTION NO. B-98-186
                                )
10   BRK BRANDS, INC.           )
11
12   ****************************************************
13                    ORAL DEPOSITION OF
14               B. DON RUSSELL, Ph.D., P.E.
15                      May 10, 2000
16                        Volume 1
17   ****************************************************
18
19        ORAL DEPOSITION of B. DON RUSSELL, Ph.D., P.E.,
     produced as a witness at the instance of the
20   Defendant(s), and duly sworn, was taken in the
     above-styled and numbered cause on the 10th of May,
21   2000, from 10:05 a.m. to 4:35 p.m., before Annemarie
     Hand, CSR in and for the State of Texas, reported by
22   machine shorthand, at the offices of Q & A Reporting,
     2700 Post Oak Boulevard, Suite 1750, Houston, Texas
23   77056, pursuant to the Federal Rules of Civil
     Procedure and the provisions stated on the record or
24   attached hereto.
25
```

PLAINTIFF'S
EXHIBIT
G

Page 2

```
1
2     APPEARANCES
3     FOR THE PLAINTIFF(S) CYNTHIA COX:
         Mr. Ray R. Marchan
4        HARRIS & WATTS, P.C.
         1926 E. Elizabeth
5        Brownsville, Texas 78520
6     FOR THE DEFENDANT(S):
         Mr. James Heller
7        COZEN AND O'CONNOR
         1900 Market Street
8        Philadelphia, Pennsylvania 19103
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1               INDEX
2     Appearances ................... 2
3     B. DON RUSSELL, Ph.D., P.E.
4        Examination by Mr. Heller .... 4
5     Signature and Changes ........... 245
6     Reporter's Certificate .......... 246
7
8            EXHIBITS
9     NO. DESCRIPTION              PAGE
10    1    May 2000 Curriculum Vitae of Dr. Russell
11    2 ........................... 5
         Preliminary Report of Dr. Russell, 9-28-99
12                                 21
13    3    Texas A&M Smoke Detector Test Results
14                                 21
         Technical Notes, Santa Ana Fire Department
15       Experiment, 7-14-94        21
16    5 ........................... 121
         Consumer Products Safety Commission Report
17
18    6                            121
         Tests Conducted for Canadian Television
19       Station
20    7    Report of Dr. Russell with Attachments,   148
         10-12-99
21                                 173
22    8    Three-Page Summary of Smoke Detector
         Performance Evaluation Test Procedures
23
24
25
```

Page 4

```
1        (Exhibit No. 1 marked)
2        B. DON RUSSELL, Ph.D., P.E.,
3     having been first duly sworn, testified as follows:
4               EXAMINATION
5     BY MR. HELLER:
6        Q. Dr. Russell, you and I have been together a
7     few times, so I'm pretty comfortable that you know
8     most of the rules here. If you need a break, simply
9     state it. All I ask is that you finish the -- respond
10    to the question that I'm asking before you take your
11    break and then we'll take whatever break you need.
12       A. Okay.
13       Q. If you don't understand a question I'm
14    asking, simply state it and I'll rephrase it. If you
15    answer a question, I'm going to assume you understood
16    it and you know the answer you're speaking of.
17       A. Okay.
18       Q. The only other instruction I'll give you,
19    even though I'm sure you're aware of it, is the woman
20    to your right and my left is a court reporter; if she
21    asks you any questions, she's not asking for any
22    explanation, she's simply asking for you to as best
23    you can repeat word for word what you said because for
24    some reason she missed it.
25       Do you understand all the instructions?
```

Page 5

```
1        A. I do.
2        Q. You and I have been together for two
3     depositions in a case called Ayala versus BRK and two
4     days of depositions in a case called Gordon versus
5     BRK. Is there anything that you testified to in those
6     cases at your depositions that you would like to
7     change in any way?
8        A. Not to my knowledge.
9        Q. Is there anything that you testified in those
10    depositions that you believe is inaccurate in any way?
11       A. Not to my knowledge.
12       Q. You were also in the past year deposed in a
13    case where the plaintiff's name is a Mr. Dillard, a
14    case in Alabama, and you were deposed on two separate
15    days in that case. Is there anything that you believe
16    that you testified to at the deposition in that case
17    that was inaccurate in any way?
18       A. No.
19       Q. Is there anything you'd like to change in
20    that case in any way?
21       A. No.
22       Q. When were you retained in this case, the Cruz
23    case?
24       A. I don't know the exact date. Sometime in
25    1999, as I recall.
```

Page 6

```
1        Q. Prior to the beginning of this deposition,
2     you and Mr. Marchan were gracious enough to allow me
3     to go through your documents. In those documents one
4     thing I did not see was any billings or invoices.
5        A. I haven't prepared a bill to my knowledge
6     other than asking and receiving a $3,000 retainer. So
7     I don't think I have an invoice.
8        Q. Are there any documents or anything in your
9     computer that would identify what you've done and the
10    dates that you have performed those tasks?
11       A. I could present -- I could dump a computer-
12    generated billing, yes.
13       Q. Is there any way we can get a secretary in
14    your office to fax it here today as we sit here?
15       A. No, it would have to be my accountant and
16    that -- I don't think I could get that done today.
17          MR. HELLER: I'd ask that that be
18    produced.
19       Q. (By Mr. Heller) And who were you retained
20    by?
21       A. Originally contacted as I recall by
22    Mr. Cantu.
23       Q. Mark Cantu?
24       A. Yes.
25       Q. And what did Mr. Cantu ask you to do in this
```

Page 7

```
1     case?
2        A. Asked me to review the facts of the case and
3     materials that he would send as to the performance of
4     the Ionization smoke detector in the residence.
5        Q. Did he identify a model and manufacturer of
6     the ionization type smoke detector?
7        A. I don't know if he did at that particular
8     time, but subsequently in the materials that were
9     forwarded to me it was identified as a BRK ionization
10    smoke detector.
11       Q. Do you know the model number?
12       A. SA67D, I believe. Essentially a standard 87R
13    type designed BRK smoke detector of subsequent model
14    number.
15       Q. Do you mean 83R?
16       A. What did I say.
17       Q. 87.
18       A. I meant 83.
19       Q. Is the model number or manufacturer important
20    as it relates to the opinions you expect to offer in
21    this case?
22       A. Not the model number; the manufacturer might
23    be. Model number of that manufacturer would not be
24    relevant because they are designed fundamentally the
25    same model to model of their ionization detector in
```

## Page 8

1 this generation.
2    Q. You said that the manufacturer might be. How
3 might the manufacturer might be?
4    A. Manufacturers set smoke detectors differently
5 in terms of sensitivities. They manufacture them
6 somewhat differently, their performance is somewhat
7 different. So, based on the manufacturer, you might
8 have a different performance.
9    Q. In prior depositions you've indicated that
10 you at the -- at that time could not compare the
11 design of one manufacturer versus another. Is that
12 still true, in terms of its sensitivity?
13    A. Well, you can compare the sensitivity of the
14 manufacturers simply by reading on the back where they
15 say they have set them, and they set them at different
16 levels so I certainly could do that. I don't think
17 that's what you meant.
18    Q. When I said you could, can you today compare
19 First Alert's SA67D or any of its ionization detectors
20 to another manufacturer's ionization detector
21 sensitivity setting as you sit here today?
22    A. I can tell you that -- yes, I can tell you
23 that different ionization detectors from different
24 manufacturers are set differently than this particular
25 one was set.

## Page 9

1    Q. Is that --
2    A. That's a comparison. I can't give you a list
3 of all the settings sitting here today.
4    Q. Okay. Is the sensitivity setting of the BRK
5 detector relevant to your opinion as you expect to
6 relate it in this case?
7    A. I don't think so.
8    Q. Is there a document that would identify the
9 information, photographs, records that you have
10 reviewed in this case?
11    A. Partial would be on the preliminary report
12 that I have dated September 28th. It gives a listing
13 of some of the materials that I utilized when
14 preparing that preliminary report.
15    Q. Can I see your report, please.
16    A. All of those I believe are included here in
17 this folder. There are a few subsequent additions,
18 all of which are in front of you. I have nothing that
19 I have retained or deleted from this file.
20    MR. HELLER: Let's go off the record for
21 a second.
22    (Discussion off the record)
23    (Exhibit No. 2 marked)
24    Q. (By Mr. Heller) Let me show you a document
25 that I've marked as Exhibit Russell No. 2.

## Page 10

1    MR. HELLER: For the record let it be
2 known that the May 2000 CV of Dr. Russell was marked
3 Exhibit Number 1 before the deposition.
4    Q. (By Mr. Heller) Is this the report that you
5 were referring to that identifies some of the
6 documents you reviewed in this case?
7    A. Yes. It was submitted and -- dated and
8 submitted in the last couple of days of September of
9 '99.
10    Q. In the first page of the report it has items
11 listed 1 through 8. Are those the items that you are
12 referencing that you have reviewed in this case?
13    A. Those are the ones that were reviewed at the
14 time of this report, and subsequently there were some
15 items added to my file and you have had the
16 opportunity this morning to look at that. They're all
17 here --
18    Q. Okay. What I'd --
19    A. -- with two exceptions.
20    Q. Okay. As of September 28 of 1999, you had
21 only reviewed 1 through 8 --
22    A. That's correct.
23    Q. -- of Page 1?
24    What I'd like to do is to identify --
25 for you to identify if you can the items that you have

## Page 11

1 reviewed since September 28, 1999. I guess the
2 easiest way to do it, at least for me, is you said
3 there were two items that are not here that you've
4 also reviewed. What are those two items first?
5    A. I reviewed the report, expert report that had
6 been provided by the defendants concerning analysis of
7 the smoke detector by Dr. -- let's see now, which one
8 was that.
9    Q. Custer?
10    A. No, the young lady.
11    MR. MARCHAN: Streit.
12    Q. (By Mr. Heller) Lori Streit?
13    A. Streit. And then also reviewed some pictures
14 and materials this morning that I had not seen before
15 that were taken at the scene within the month of the
16 incident by an individual I believe was an
17 investigator.
18    Q. Mr. McClintock?
19    A. That's correct, Mr. McClintock. Those two
20 items I have seen since -- that are not represented in
21 this file. Other than that, now how do you want me to
22 proceed here?
23    Q. Just make a list, if you don't mind, of what
24 you've looked at.
25    A. I'll have to go through these individually

## Page 12

1 just to compare them.
2    Q. Do you want me to do that? Would it be
3 easier?
4    A. No, I think I can do it. There is an
5 affidavit of Morris Cranmer that I do not believe was
6 on my --
7    MR. HELLER: I think Counsel and I can
8 agree that that is his affidavit and report as
9 submitted by the plaintiffs in this case?
10    MR. MARCHAN: That's correct.
11    A. There are photographs that I received
12 November of '99 which are color photographs of this
13 house, the deceased, and so forth.
14    Q. (By Mr. Heller) Does it identify who took
15 the photographs? There's an enclosure letter from
16 Mr. Custs dated November 17, 1999 to Dr. Russell,
17 Dr. McCain and Douglas Holmes identifying the
18 photographs as those obtained from the District
19 Attorney's Office.
20    A. There is a Defendant's Supplemental
21 Production of Reports to Defendants' Designation of
22 Experts that I received in February and it's the
23 report and attached graphs, resumes, et cetera, and
24 it's from Combustion Engineering.
25    Q. Thank you.

## Page 13

1    A. Plaintiffs' Designation of Expert,
2 Plaintiffs' Initial Designation of Experts by Ray
3 Marchan, copy -- let's see, and a copy of the report
4 of Wayne McCain and then another copy of my report,
5 which happened to be together because they sent it to
6 multiple people, and this was received subsequent to
7 my report being done. Then there's an interim
8 investigation report, John Kennedy & Associates. It's
9 dated October of '99 which was subsequent to my
10 report. There was -- there is a set of miscellaneous
11 materials, it includes Plaintiffs' Initial Designation
12 of Experts, McClintock & Associates' drawing that was
13 made and a memorandum dated 7-29.
14    Q. McClintock's memorandum?
15    A. Yeah, a memorandum dated 7-29. And a letter
16 report from BRI, Bob Ross Consulting.
17    Q. What's the date of that report?
18    A. August 2nd.
19    Affidavit of Morris Cranmer, I think
20 we've mentioned that. A report by Michael Shulz.
21    Q. Is that a report or a CV?
22    A. Excuse me, curriculum vitae of Michael Shulz.
23 And then on October 11th I received an extensive set
24 of 8 1/2 by 11 color photographs or copies of
25 photographs, primarily of the heater.

Page 14

```
 1   Q.  Does it identify who took the photographs?
 2   A.  I don't think so. I don't think there's any
 3  designation on them at all. It's just a transmittal
 4  letter that says here they are.
 5   Q.  Other than what we have now identified as
 6  that which you reviewed, have you reviewed any other
 7  materials in preparation for this deposition or that
 8  which you expect to review in offering your opinion?
 9   A.  Not that I'm aware of.
10   Q.  Have you talked with anyone in this case?
11   A.  I talked to Mr. McClintock, the investigator.
12   Q.  And what did Mr. McClintock tell you?
13   A.  I asked him specifically, since it was not
14  clear on his report, if he had taken his photographs
15  and had done testing of the smoke detector while the
16  unit was still at the residence and whether he had
17  done that before or after it was taken from the wall.
18  He said in his memorandum he tested it but he didn't
19  say exactly how and when, and I wanted to know whether
20  it was done that way or not.
21   Q.  What was his answer?
22   A.  Yes, he did. He tested it while it was -- he
23  took photographs first. He then opened it, he took
24  more photographs. He tested it while it was on the
25  wall. Subsequently he took it down from the wall, did
```

Page 15

```
 1  additional photographs outside the residence on the
 2  day of his inspection which was within a month of the
 3  incident. That's the total sum of the conversation.
 4   Q.  I just wanted to know how that had been done.
 5   A.  What were the results of his test while it
 6  was still on the wall?
 7   A.  He said it sounded.
 8   Q.  Okay. And I think that what you mean by
 9  test, did he push a test button?
10   A.  The only test that I'm aware he did in the
11  residence was to push the test button.
12   Q.  And what significance, if any, did it play in
13  your mind that he pushed the test button and the alarm
14  sounded?
15   A.  It said that the horn was capable of sounding
16  at the time he did that. It said that he -- it had
17  a -- it was powered with a battery that had sufficient
18  energy a month after the incident, nominal month after
19  the incident to sound the alarm and it spoke to the
20  preservation of evidence issues.
21   Q.  Are you aware that he has taken -- there is a
22  video that depicts different things that he has
23  performed in this case?
24   A.  I've not seen a video.
25   Q.  Were you aware of its existence?
```

Page 16

```
 1   A.  No.
 2   Q.  Did you talk with Mr. McClintock on any other
 3  issue?
 4   A.  No.
 5   Q.  Do you know when this conversation occurred?
 6   A.  About one hour ago.
 7   Q.  And what was the reason why you made that
 8  call today?
 9   A.  Because I had a question about that issue of
10  the battery in the unit and whether the unit was able
11  to sound. It was an assumption on my part that
12  everything he told me was true because of reading the
13  memorandum, but I had no -- because I haven't seen a
14  deposition from him if it's been taken. I had no
15  independent evidence that that -- my interpretation
16  was actually correct. I didn't want to come into the
17  deposition and make any kind of false assumptions
18  about the preservation of this evidence or the
19  performance of the smoke detector at the time, and I
20  asked Ray if it would be -- if he had that
21  information. I believe he indicated that deposition
22  hasn't been taken.
23   MR. MARCHAN:  That's correct.
24   A.  So I -- he suggested, "Let's just call him,
25  let him tell you what he did," which is exactly what I
```

Page 17

```
 1  just told you.
 2   Q.  (By Mr. Heller)  Have you spoken with anybody
 3  else?
 4   A.  No. Well, other than attorneys, excuse me.
 5   Q.  Is there anything that the attorneys told you
 6  that you're going to rely upon in offering any opinion
 7  in this case?
 8   A.  Not to my knowledge.
 9   Q.  What, if anything, other than what we've
10  already identified did you review in preparation for
11  this deposition?
12   A.  Nothing.
13   MR. MARCHAN:  Let me just take one
14  exception. I may have confirmed to him that the tank
15  was virtually empty, in a conversation. I don't know
16  if he already had that impression beforehand, but that
17  might be one other fact.
18   A.  The -- you did tell me that, but in terms of
19  actual opinion, the initial amount of gas in the tank
20  or the fact that the tank was totally empty would only
21  in a tangential sense be relevant to the opinions.
22   Q.  (By Mr. Heller)  How would it be relevant in
23  a tangential sense?
24   A.  Well, if there is an argument, a fine-pointed
25  argument that comes as to exactly when the detector
```

Page 18

```
 1  should have sounded as a function of burn time of the
 2  tank or something like that raised by someone, then it
 3  could of course become important. I haven't seen that
 4  in the materials and I also haven't seen any
 5  independent information that says how much gas was in
 6  the tank.
 7   Q.  Have you done any testing of any product in
 8  this case?
 9   A.  No.
10   Q.  Have you seen other than in photographs the
11  heater?
12   A.  No.
13   Q.  Have you seen other than in photographs the
14  smoke detector?
15   A.  No.
16   Q.  Were you aware of any testing that has been
17  performed of the heater?
18   A.  Yes, there -- in some of the materials that I
19  have seen, there is some indication that there's been
20  some testing done of the heater and some simulations,
21  both computer as well as other simulations.
22   Q.  Let me rephrase that. Are you aware of any
23  of the testing by any of the plaintiffs' experts of
24  the heater?
25   A.  I don't have any information on that, no.
```

Page 19

```
 1   Q.  Are you aware of any testing by a plaintiffs'
 2  expert of the smoke detector?
 3   A.  No.
 4   Q.  Also prior to this deposition you were
 5  gracious enough to allow me to review reports and
 6  studies that I believe you will rely upon in offering
 7  your opinions in this case?
 8   A.  Yes, I had a stack of papers with me, yeah.
 9   Q.  They're right here. What I want to do with
10  one exception is just simply identify them because I
11  think we have all talked about them before, and I may
12  mark them later but I'm not going to now.
13   The first one is Ionization Detectors --
14  How Effective Are They?, as referenced in the Fire
15  Journal of May of 1978. Is that correct?
16   A.  Yes.
17   Q.  The second one is a report that we have
18  identified previously as Dunes No. 27
19   A.  Correct.
20   Q.  Third one is Smoke Production and Properties,
21  by George Mulholland.
22   A.  Yes.
23   Q.  Next one is a Report of a Special
24  Subcommittee of the International Association of Fire
25  Chiefs as written in the late '70s.
```

4 (Pages 14 to 19)

## Page 20

```
1    A. Yes.
2    Q. Next one is a report called Ionization Smoke
3  Detector and Smoke Aging by Professor John Titus and
4  Deputy Chief -- oh, excuse me, presented to John Titus
5  and John White by Eugene Cabel and Philip Sherman.
6    A. Yes.
7    Q. Next one is a technical report prepared for
8  Factory Mutual in November of 1998.
9    A. Yes.
10   Q. Next one is a Norwegian study called
11 Detection of Smoke, Full-Scale Tests With Flaming and
12 Smoldering Fires.
13   A. Yes.
14   Q. Next one, August 21, 1995, Fire Incident
15 Study, National Smoke Detector Project, from the CPSC.
16   A. Yes.
17   Q. Next one, Characterization of Smoke From
18 Smoldering Combustion by Brian Meacham, M-E-A-C-H-A-M
19 and Vahid, V-A-H-1-D, Motevalli, M-O-T-E-V-A-L-L-I, of
20 WPI.
21   A. Yes.
22   Q. I probably just killed their names.
23   A. You did.
24   Q. Next, Fire Journal report of September '79 by
25 Elias Solomon and Martin Reese.
```

## Page 21

```
1    A. Yes.
2    Q. NFPA Journal report printed in January/
3  February of 1993 by Richard Bukalski called Studies
4  Assessed Performance of Residential Smoke Detectors.
5    A. Yes.
6    Q. Smoke Detector Operability Study, Final
7  Report, CPSC, dated August 27, 1993.
8    A. Yes.
9    Q. The only documents I'm going to mark, though,
10 Russell Exhibit 3, I believe we've talked about
11 previously, these are the results of specific tests
12 that you have performed of the response of smoke
13 detectors in Texas A&M.
14   A. Yes.
15           (Exhibit Nos. 3 and 4 marked)
16   Q. (By Mr. Heller) And No. 4, Russell Exhibit
17 No. 4 is a report called Technical Note, Santa Ana
18 Fire Department Experiment, July 14, 1994.
19   A. Yes.
20   Q. Other than the documents that we have
21 identified both in terms of the factual documents
22 related to this case and the reports and studies that
23 we have now identified, is there anything else that
24 you intend to rely upon in offering your opinions in
25 this case?
```

## Page 22

```
1    A. Not that I'm aware of sitting here today.
2    Q. What are the opinions you expect to offer in
3  this case?
4    A. The ionization smoke detector that was in the
5  residence at the time that this incident occurred
6  should have sounded a timely alarm based on the type
7  of smoke products that were coming from the fire
8  source, or heater if you please, that was in the
9  residence. There is adequate evidence of substantial
10 products emanating from that heater that should have
11 been sufficient for a properly operating and powered
12 and properly designed smoke detector to sound an
13 alarm. Failure to sound that alarm in the presence of
14 the type of smoke and smoke products, the particulate
15 matter that is indicated by that evidence, represents
16 a defective performance of that smoke detector to
17 include either design defect or some sort of
18 performance defect, which I believe was what happened
19 in this particular case.
20   Q. Let me just interrupt you. When you said "I
21 believe," you believe it was a design or performance?
22   A. I believe it was a combination of both.
23   Q. Okay.
24   A. But could have been primarily either.
25   Q. Do you know which one it was, whether it was
```

## Page 23

```
1  a design or performance?
2    A. There's no way to retroactively tell at the
3  time which was the predominant factor. Both are
4  highly probable.
5    Q. Okay. But at this point in time, you can't
6  tell us.
7    A. Cannot be done.
8    Q. Okay.
9    A. The subsequent opinions that stem from those
10 opinions are that BRK has placed into the stream of
11 commerce a smoke detector that is deficient, it is not
12 properly designed. It has been offered to the public
13 by BRK long after it was known that there were
14 deficiencies in this smoke detector and that those
15 deficiencies in the smoke detector's design and in its
16 performance were the direct cause of this smoke
17 detector not sounding a timely alarm which contributed
18 to the death of the deceased.
19   Q. What do you mean by contributed?
20   A. I am not the pathologist or the toxicologist,
21 et cetera, and I have no real opinions on that, but I
22 would -- my assumption that I am making is that a
23 timely alarm would have allowed for a timely escape.
24   Q. When you say "assumption," what do you mean?
25   A. That is my premise. I'll leave it up to the
```

## Page 24

```
1  toxicologist and pathologist to discuss issues of the
2  toxicity and the degree to which this individual was
3  overcome, et cetera, et cetera, by carbon monoxide
4  which the report indicates he was. I don't have an
5  opinion on those items that are independent of their
6  opinions.
7    Q. So you will not be offering an opinion at the
8  trial of this case that the production of smoke or
9  soot preceded incapacitating or deadly levels of
10 carbon monoxide?
11   A. I didn't say that.
12   Q. Will you be testifying to that?
13   A. I think I probably would.
14   Q. What is your basis, both in terms of your
15 experience, background and the facts of this case,
16 that lead you to the conclusion that in the Cruz
17 residence sufficient amounts of smoke and soot were
18 produced to sound an alarm before Mr. Cruz was
19 incapacitated or killed by the carbon monoxide?
20   A. Because the type of smoke products that would
21 come from this type of heater burning in an incomplete
22 fashion to produce carbon monoxide at all are
23 precisely the type of smoke products that an
24 ionization smoke detector is sensitive to, and a
25 properly designed smoke detector should have sounded a
```

## Page 25

```
1  timely alarm fairly quickly in response to those smoke
2  products.
3    Q. Let me just make sure I understand you
4  correctly. If I understood you right, you said that
5  the smoke products produced by this heater are the
6  type of smoke products that an ionization detector is
7  designed to alarm in the presence of.
8    A. The -- you have to chain the evidence
9  together. We know that the individual, the deceased,
10 was overcome by carbon monoxide. I'm taking that as a
11 fact; that if it's in dispute it will be the Cruz
12 decide, but I am taking that as a fact. That level of
13 carbon monoxide only comes from certain types of
14 combustion. You can burn propane without the
15 production of large amounts of carbon monoxide or
16 almost any carbon monoxide, but if you do burn a gas
17 like this with the production of carbon monoxide,
18 you're doing so in a type of combustion that puts off
19 a substantial amount of heat and relatively small
20 particle matter, and that small particle matter is
21 precisely the type of particle that is sensitive -- or
22 excuse me, that an ionization detector is sensitive to
23 and should sound as a result.
24   Q. In prior depositions we have gone over ad
25 nauseam the difference between small particles and
```

5 (Pages 20 to 25)

**Page 26**

1　large particles and I believe it's your opinion that
2　ionization detectors are more sensitive to small
3　particles than photoelectric detectors, and
4　photoelectric type detectors are more sensitive than
5　ionization to the larger types -- larger particles.
6　　A.　That's a matter of science, yes.
7　　Q.　Your opinion in this case is that the heater
8　in the Cruz residence put out the type of particle
9　that an ionization type detector is more sensitive to
10　than the photoelectric.
11　　A.　I think it put out both, including that type
12　of particle, yes.
13　　Q.　Okay. You believe that, correct me if I'm
14　wrong, that all sizes of smoke particles were produced
15　by this heater in the Cruz residence?
16　　A.　There's substantial residence of soot
17　deposition in the house, so we know that that
18　occurred, and there's no evidence to support that that
19　was there prior to the incident or prior to the time
20　this heater was put in place and so forth. There is
21　deposition of that same soot particles around the
22　smoke detector itself and on the housing and inside
23　the smoke detector as witnessed by your own experts.
24　So there's no reason to believe that all of that was
25　not direct result of the heater's operation.

**Page 27**

1　　　　That represents a fairly broad spectrum
2　of production of particles. You don't produce "a"
3　particle size. You produce a spectrum of particle
4　size, a distribution of particle sizes. And as a
5　result of that level of soot, you could not have had
6　that deposition of soot without a broad spectrum of
7　particle sizes being produced.
8　　Q.　Okay. And in that broad spectrum do you
9　believe there were -- do you believe there was
10　sufficient emissions of the small particle smoke that
11　an ionization detector is more sensitive to than a
12　photoelectric?
13　　A.　Yes.
14　　Q.　And, as a result, you believe that an
15　ionization detector in the Cruz residence should have
16　detected those particles.
17　　A.　Yes.
18　　Q.　Did you do as a result of your retention in
19　this case any study in any facet to determine the size
20　of particles produced in this case?
21　　A.　No.
22　　Q.　Have you done any study in your professional
23　employment dating back to when you graduated from
24　college, your master's degree and your Ph.D. degree,
25　that identifies the size or density of smoke particles

**Page 28**

1　produced from an unvented heater --
2　　A.　No.
3　　Q.　-- such as the one that was in the Cruz
4　residence?
5　　A.　No.
6　　Q.　Have you done any studies that involve an
7　unvented heater in any form?
8　　A.　No.
9　　Q.　What is your belief -- strike that.
10　　　　What is your opinion as to why this
11　detector in the Cruz residence didn't sound its alarm?
12　　A.　This detector did not sound?
13　　Q.　Yes.
14　　A.　I believe it did not sound -- the most
15　probable reason that it did not sound is that it
16　was -- had a defective Piezo electric horn in that
17　there was probability of corrosion on the contacts
18　which kept the horn from sounding an alarm even though
19　the ionization chamber did pick up the presence of
20　this particulate matter in the air.
21　　Q.　Is it true that -- rephrasing what you just
22　said, you believe the ionization chamber sensed the
23　smoke particles, triggered the electric circuitry to
24　sound the alarm, it went over to the Piezo horn and
25　the Piezo horn didn't sound because its contacts were

**Page 29**

1　corroded.
2　　A.　Yes.
3　　Q.　Okay. And that's the most probable reason?
4　　A.　I think that's the most probable.
5　　Q.　Have you done any examination of the Piezo
6　horn or the contacts in order to determine whether it
7　was corroded?
8　　A.　No. At the time that I was entered into this
9　case, it was my opinion that it would be impossible to
10　make that determination with any accuracy to try to
11　replicate what is exactly in place at the time of the
12　incident.
13　　Q.　Why?
14　　A.　Passage of time, exposure of this device to
15　substantial amounts of soot, smoke, deposition of
16　materials, some of which are caustic, some of which
17　cause corrosion, the high humidity conditions that
18　existed in the area in which this incident occurred,
19　the passage of time itself. I think it would be
20　unrealistic to assume that you could be accurate about
21　that. Also it had been handled quite a few times.
22　　Q.　You testified that you spoke with
23　Mr. McClintock an hour ago or an hour before the
24　deposition began and he told you that when he got
25　there, he pushed the test button and it sounded.

**Page 30**

1　　A.　Uh-huh.
2　　Q.　Wouldn't corrosion have prevented the
3　detector from sounding at that time?
4　　A.　No. That's an invasive test. When you push
5　that test button, you put substantial pressure on that
6　circuit board which works the board which changes the
7　contacts on the horn. The -- anything that you do to
8　touch -- this is microscopic corrosion, okay, so
9　anything you do to touch that board, anything you do
10　to disturb that in any way potentially breaks through
11　that corrosion and you've spoiled the -- you've
12　spoiled the corrosive layer and that keeps you from
13　drawing any real conclusion.
14　　　　It's a matter of record that a
15　substantial number of smoke detectors if noninvasively
16　tested won't sound, but if you then subsequently
17　handle them, push the button, warp the print circuit
18　board or otherwise disturb the microscopic corrosion
19　layer, then they will sound. And so you'd have to
20　test it in some other way.
21　　Q.　Okay. You used two words that I want to talk
22　to you about, "potentially" and "substantially." I
23　think what you testified to is that when you push the
24　test button it has the potential to change the
25　microscopic context of the corrosion and allow the

**Page 31**

1　horn to sound. Is that --
2　　A.　That is true.
3　　Q.　Do you know that that occurred here?
4　　A.　No.
5　　Q.　You testified that there were a substantial
6　number of smoke detectors, when invasively tested,
7　sound its alarm when it had previously not been able
8　to sound its alarm because of corrosion.
9　　A.　Yeah, that's a matter of reports. Consumer
10　Products Safety Commission report indicates that
11　that's the performance that they found in the field.
12　　Q.　Can you identify the Consumer Products Safety
13　Commission report?
14　　　　MR. HELLER: Let's mark it as an
15　exhibit. We're going to mark it Exhibit Russell
16　No. 5.
17　　　　(Exhibit No. 5 marked)
18　　A.　Page 17 of that report has the following
19　paragraph about midway in the page: "Among the
20　detectors that failed the aerosol smoke test in the
21　field, 25 passed all screening tests in the
22　laboratory; however, examination indicated the
23　presence of deterioration and corrosion in the horn
24　element contacts which can result in the horn becoming
25　inoperative. Function may be restored by slight

6 (Pages 26 to 31)

Page 32

1  movement of the horn element such as might occur
2  during removal from the home and subsequent transport
3  to the laboratory."
4      One of the conclusions of this report
5  was that you can't handle a smoke detector and
6  subsequently expect that the microscopic corrosion
7  will still be in place that, while on the wall,
8  prohibited it from sounding during an aerosol test
9  which is not an invasive test.
10  Q. (By Mr. Heller) Does the report say that
11  there would be no way to determine if microscopic
12  corrosion was present in the detector?
13  A. No, it doesn't say that, but these were not
14  detectors that had been through fires or had been
15  exposed to the kinds of materials we have here. These
16  were detectors that were actually just hanging on a
17  wall, and this was a survey that was done not because
18  a fire had occurred but simply because they were
19  trying to determine the percentage of detectors that
20  were operable, powered, et cetera, et cetera.
21  Q. Did it tell you whether there was a certain
22  percentage of detectors that were affected by either
23  movement or invasive testing in the manner we're
24  describing?
25  A. There were certain numbers of detectors that

Page 33

1  were cited as specifically not responding to an
2  aerosol, but subsequently after taken off the wall
3  would sound an alarm when you pushed the button.
4  Q. And what was that percentage?
5  A. I don't know the percentage. I haven't
6  looked. I'm sure it's here someplace. But the
7  problem is that they didn't have any way of
8  specifically tying that back to the microscopic
9  corrosion, but of course that was -- they were not
10  tested while they were still on the wall --
11  Q. Okay. So --
12  A. -- for microscopic corrosion.
13  Q. So the CPSC report we've marked as Exhibit 15
14  does not conclude that there was corrosion on these 25
15  detectors that was subsequently moved, jarred or
16  somehow affected and that allowed those 25 to sound
17  subsequently.
18  A. No, I think that's wrong about the 25.
19  That's exactly what was done on the 25. I'm saying
20  others -- other detectors, that may have also been the
21  case, but if they -- if they were otherwise unpowered,
22  they wouldn't have then also done the check for the
23  microscopic corrosion. So we can't say of all those
24  they found that these were the only ones that
25  exhibited that phenomena, because a large number were

Page 34

1  found without batteries. If they were found without
2  batteries, they were put into that category. Do you
3  understand what I'm saying?
4  Q. Uh-huh.
5  A. So to my knowledge those were not checked to
6  determine if they also had microscopic presence. So
7  you can't use this percentage and say that this is the
8  exact percentage of all the ones they found that had
9  microscopic corrosion, because if they weren't
10  powered, then they weren't sounding for a different
11  reason. So I'm simply saying this percentage doesn't
12  give you a statistic based on how many in the field
13  would have microscopic corrosion. All it does say is
14  that a substantial number, in this case --
15  Q. Is the term "substantial number" yours or
16  theirs?
17  A. Well, it says 114 detectors and they found 25
18  of those, so --
19  Q. So is your opinion that 25 --
20  A. That's a pretty substantial number.
21  Q. So it's your words, not theirs, the word
22  "substantial."
23  A. The word "substantial" is mine.
24  Q. And you believe that this report stands for
25  the proposition that 25 of 114 smoke detectors had

Page 35

1  this phenomenon occur?
2  A. Let me just read it. It would be easier.
3  Q. Well, no -- you can read it to yourself and I
4  have no problem with you doing that.
5  A. Okay.
6  Q. Is fact you can.
7  A. All right. Go ahead and ask.
8  Q. What I want you to do is answer my question,
9  though.
10  A. Go ahead. Ask the question again.
11  Q. Is it your belief that 25 of the 114
12  detectors were affected by this phenomenon, the
13  movement changing the corrosion, so that when it was
14  on the wall it did not sound, but when it was tested
15  in the laboratory it did sound?
16  A. The report says that their examination
17  indicated the presence of deterioration and corrosion
18  on the horn elements for 25 out of 114.
19  Q. I don't think that answers my question,
20  though.
21  A. I think it does.
22  Q. How do you think it does?
23  A. I believe the question to be what percentage,
24  which was the original question, of the ones that they
25  found exhibited this problem and did they specifically

Page 36

1  tie it to corrosion. And this says, "Examination
2  indicated the presence of deterioration and corrosion
3  on the horn element contacts for 25 passed all
4  screening tests out of 43 others that passed screening
5  tests out of 92 that were totally tested out of 114
6  that were totally sampled." So I have no other way to
7  understand that than 25 of the 114 totally sampled
8  were found with corrosion.
9  Q. And were affected by the movement of the
10  smoke detector. Is that true?
11  A. Now, that's a compound question. That's an
12  addition.
13  Q. Okay. This is my question, because I don't
14  think we've connected on the question and answer.
15  A. Let me answer it as best I can.
16  These were devices that were tested first with aerosol
17  without any movement, okay?
18  Q. How many detectors were tested totally in
19  their study --
20  A. In this --
21  Q. -- in the whole study?
22  A. Oh, I don't know in the whole study. I'd
23  have to look that up.
24  Q. Okay. So you're talking about one section of
25  this study and your belief is that 114 detectors were

Page 37

1  tested?
2  A. The study specifically says that there were
3  114 detectors found that met the study criteria in
4  their sample.
5  Q. Okay. And 114 detectors before they were
6  moved did not sound in the presence of the aerosol
7  spray.
8  A. No, I didn't say that. I said that's the
9  total sample.
10  Q. Okay.
11  A. That's the total -- that's why I was trying
12  to give you the breakdown earlier. That's the total
13  sample. 22, okay, of these could not be tested in the
14  laboratory to their test criteria.
15  Q. Why not?
16  A. We'd have -- well, damage or something. We'd
17  have to look at all the reasons. That left 92
18  detectors, okay? So there were 92 that were actually
19  tested. 43 passed what they call their screening test
20  in the laboratory.
21  Q. And when -- by passed, what do you mean?
22  A. I don't know. We'd have to ask them.
23  Q. Do you know if they meant they sounded an
24  alarm?
25  A. I think that would be one of the criteria,

Page 38

```
 1   but --
 2       Q.  Okay.
 3       A.  -- but I don't know all of their screening
 4   tests.  We'd have to go back here and look at their
 5   test protocol.
 6       Q.  Okay.
 7       A.  Of those, among the detectors that failed the
 8   aerosol smoke test in the field, 25 passed the
 9   screening tests in the laboratory subsequently,
10   meaning in the field they failed the aerosol test --
11       Q.  How many failed?
12       A.  -- and then they passed the screening test in
13   the lab.
14       Q.  How many failed in the field the aerosol
15   test?
16       A.  How many failed in the field?  I think, if I
17   understand this right, it's 49.
18       Q.  So you're saying that there were 49 detectors
19   that failed in the field and of those 49, 25 passed in
20   the lab?
21       A.  Passed the screen -- all of their screening
22   tests.  So they should have worked, is the assumption
23   that I have made.
24       Q.  Okay.
25       A.  And then they say they examined them.
```

Page 39

```
 1       Q.  The 25 or the 49?
 2       A.  The implication is the 25.  They may have
 3   done the 49, too, but the statement here only would
 4   refer back to the -- I believe the antecedent would be
 5   the 25 that's in that paragraph.  They examined them
 6   and they showed the presence, this is their quote,
 7   "presence of deterioration and corrosion on the horn
 8   element contacts which can result in the horn becoming
 9   inoperative."  So they found that as a possible
10   operative cause of why they would pass an aerosol test
11   on the wall but not subsequently --
12            MR. MARCHAN:  Wait.  Backwards.
13       A.  Excuse me, yeah.  Not pass the aerosol test
14   on the wall and subsequently would pass the screening
15   test for operability.
16       Q.  (By Mr. Heller)  Okay.  So if I understood
17   it, that's a possible cause; that wasn't determined to
18   be the cause.
19       A.  This paragraph says that they found the
20   corrosion.  It does not say that they were able to
21   make a -- that paragraph doesn't say they were able to
22   make an absolute connection.  But remember it's passed
23   all other tests.  That's the only thing that they
24   found that would be an indicative cause.
25       Q.  Okay.  But that report, at least that
```

Page 40

```
 1   paragraph of that report does not say that was the
 2   cause of the failure in the field and success in the
 3   lab.
 4       A.  My point to you is that that's why you can't
 5   do that.  They have no way of doing that.
 6       Q.  You still have to answer my question.  Did
 7   that report --
 8       A.  I already said it didn't, yeah.
 9       Q.  Okay.  Because I limited my question to that
10   paragraph.  Anywhere in that report, does it say that
11   is the cause?
12       A.  I don't know the answer to that.  I haven't
13   studied the report that carefully to say that it
14   doesn't state that someplace else.
15       Q.  Do you know what detectors were involved in
16   this test?
17       A.  It was a broad spectrum of detectors.
18       Q.  Does it identify the detectors anywhere in
19   that report by manufacturer or model number?
20       A.  I don't know if this copy of the report does
21   or not.
22       Q.  Do you know if any copy that you have seen
23   identifies the manufacturer or model number of these
24   detectors?
25       A.  I don't recall.  Sorry.
```

Page 41

```
 1       Q.  Have you seen any documents anywhere that
 2   have suggested that a 6 -- SA67D similar to the
 3   detector that was in the Cruz residence did not sound
 4   an alarm because of corrosion on the contacts?
 5       A.  Read that back for me.
 6            (Record read)
 7       A.  I don't think I can point you to a document,
 8   no.
 9       Q.  (By Mr. Heller)  Have you seen any documents
10   that suggest any of the BRK manufactured -- BRK
11   Brands, Inc. manufactured detectors failed to sound an
12   alarm because of corrosion on the contacts?
13       A.  BRK detectors have specifically been tied to
14   the issue of Piezo electric horn corrosion both based
15   on product recall in the past, as well as UL testing,
16   as well as in-house testing.
17       Q.  The product recall I think we can agree
18   occurred around 1990?
19       A.  I won't dispute that.
20       Q.  And can we agree that the product recall
21   involved detectors identified as 1839 and 2839 models?
22       A.  I think it was inclusive of those, yes.  May
23   have been limited to those.
24       Q.  Okay.  Was that what you were referring to
25   when you said BRK has been tied to recall issues?
```

Page 42

```
 1       A.  Yes, it was the specific recall of those
 2   residential smoke detectors.
 3       Q.  What were you referring to when you tied BRK
 4   to UL testing?
 5       A.  BRK has had -- there are issues that have
 6   been raised with respect to UL testing in BRK smoke
 7   detectors with respect to horn element contacts,
 8   the failure of BRK detectors to pass UL tests due to
 9   corrosion of horn contacts and the subsequent
10   modification of BRK smoke detectors by BRK employees
11   so that they would pass UL tests.
12       Q.  Are you talking about issues that occurred in
13   the 1980s?
14       A.  I won't limit it to that, but yes, that's
15   inclusive of that.
16       Q.  Are you aware of any of the contacts that you
17   just described occurring in the 1990s?
18       A.  I have no reason to believe that the issues
19   have changed in the 1990s.
20       Q.  Are you aware and can you point to any
21   evidence, testimony, documents that suggest that BRK
22   detectors other than the 1839 and 2839 have failed to
23   pass UL tests because of corrosion on the contacts?
24       A.  In the 1990s?
25       Q.  In the 1990s.
```

Page 43

```
 1       A.  No.
 2       Q.  Have you been -- do you have any evidence or
 3   documents that suggest that there have been any
 4   modifications made to smoke detectors that have failed
 5   UL tests in the 1990s?
 6       A.  No.
 7       Q.  The conduct that you're referring to and the
 8   issues that were raised, are you referring to the
 9   testimony of an ex-employee of BRK Electronics, Inc.,
10   a division of Pittway, whose name is Dave Minnis?
11       A.  That's one of the specific things I was
12   referring to.
13       Q.  What else specifically were you referring to?
14       A.  The previously produced documents of BRK with
15   respect to the prior testing of smoke detectors related to
16   corrosion of Piezo electric contacts.
17       Q.  And I did not see them here today.
18       A.  I didn't depend -- plan on depending on those
19   for my opinions because they are BRK documents and
20   I've seen them many times before, but I didn't review
21   them for this case.
22       Q.  Do you intend to use them in support of your
23   opinions in this case?
24       A.  I don't have a specific need to have that for
25   my opinion unless you have a question about it.
```

Page 44

1    Q.  And in summary form, what do those documents
2  state?
3    A.  That there were issues related to corrosion
4  of Piezo electric horns and that there were tests made
5  inside BRK's, I'll call it laboratories for lack of a
6  better phrase, related to Piezo electric horn
7  corrosion.
8    Q.  Did that discuss the 1839s and 2839s?
9    A.  And also ionization -- battery powered
10  ionization detectors as well as other detectors they
11  made, AC and battery powered.
12    Q.  And is that what you were referring to when
13  you tied BRK to its in-house testing?
14    A.  Yes.
15    Q.  Have we now discussed in at least summary
16  form all of the evidence that you have that BRK-
17  manufactured detectors are affected by corrosion on
18  the contacts?
19    A.  Well, notwithstanding of course all the
20  Consumer Products Safety Commission studies that have
21  been done on it, yeah.  I think that's probably an
22  adequate list.
23    Q.  Okay.  Are you aware of any of the design
24  differences between the 1839 and 2839 detectors and
25  the SA67D detectors?

Page 45

1    A.  They are different detectors in terms of
2  electronics because one's AC powered and the unit in
3  this case is an ionization battery powered unit.
4    Q.  Are you aware of any of the differences as it
5  affects the corrosion issue?
6    A.  There are alleged differences that the
7  electronic signal to the Piezo electric horn and the
8  AC powered units is different than the signal to the
9  horn in the DC powered units and that somehow that
10  provides compensation or the term has been used
11  "breaks through" the corrosion in the battery powered
12  units differently than the AC units and therefore they
13  are less susceptible.  I have seen no scientific
14  evidence to support that.
15    Q.  Do you have any scientific evidence to
16  contradict that?
17    A.  I don't have any evidence that I've seen of a
18  scientific study to support anything related to the
19  relationship of the electronics to the corrosion.
20    Q.  Okay.  But my question was:  Do you have any
21  scientific evidence to --
22    A.  That answered both questions.
23    Q.  So you don't have any evidence that
24  contradicts or supports that opinion.
25    A.  That's correct.  That's just postulated by

Page 46

1  BRK and I've never seen the evidence to support it.
2    Q.  And you have not done any tests to determine
3  whether that conclusion is accurate or inaccurate?
4    A.  No, I've not done any tests.
5    Q.  And you're not aware of any tests that
6  have -- that can determine whether that conclusion was
7  accurate or inaccurate?
8    A.  I've never seen a scientific test reported
9  that would do that.
10    Q.  Are you aware of any other design differences
11  of the SA67 type detectors as compared with the 1839
12  and 2839 detectors --
13    A.  Other than --
14    Q.  -- as it relates to corrosion?
15    A.  Other than the electronics and the horn, I
16  don't think there would be anything else relevant to
17  the corrosion issue.
18    Q.  If there is anything else relevant, you don't
19  know of it as you sit here today.
20    A.  No, I don't think the power, itself, other
21  than the way it affects the electronics, the way the
22  electronics is designed is not an issue, itself.  No,
23  I don't think so.
24    Q.  Other than the 1839 and 2839 models, are you
25  aware of any other BRK Brands, Inc. detector -- strike

Page 47

1  that.
2        Other than the 1839 and 2839 detectors,
3  are you aware of any detector manufactured by BRK
4  Brands, Inc., BRK Electronics, a division of Pittway,
5  or First Alert that has been scientifically determined
6  not to have sounded an alarm because of corrosion?
7    A.  I think the answer is yes in that the devices
8  that were submitted for study as I understand it to
9  the Canadian Underwriters Laboratories were inclusive
10  of not only -- well, were inclusive of DC powered or
11  battery powered devices and there were questions
12  raised about the issue of corrosion or passing those
13  tests.  I don't have that test data.
14    Q.  Anything other than the Canadian UL tests?
15    A.  I don't have any pieces of paper that would
16  answer your question affirmatively or document that.
17    Q.  So in summary, other than the Canadian tests
18  which we're now going to talk about, you don't know of
19  any BRK Electronics, BRK Brands, Inc. or First Alert
20  detector other than the 1839 and 2839s which have been
21  scientifically determined not to have sounded an alarm
22  because of corrosion.
23    A.  Emphasis on the -- me having the list and the
24  scientific determination.  That's correct.
25    Q.  Okay.  When were the Canadian UL tests

Page 48

1  conducted?
2    A.  I'm sorry, I don't have that data.  I wasn't
3  a participant in that and I haven't seen those
4  results, so I don't have a date.
5    Q.  How did you learn of those tests?
6    A.  Partially because of the testimony of
7  Mr. Minnis and subsequently in others' discussion of
8  those specific tests.
9    Q.  What do you recollect from David Minnis'
10  discussion of the Canadian tests?
11    A.  Only recollection I have would be
12  relevant to this was that there were smoke detectors
13  that had been previously submitted that had failed the
14  test, and then as a preventative measure there were
15  modifications made to smoke detectors that were
16  subsequently submitted so that they would pass the
17  test.
18    Q.  Are you of the belief that David Minnis
19  testified that the smoke detectors submitted to Canada
20  did not sound an alarm even as compared with did not
21  sound within the sensitivity requirements of Canadian
22  UL standards?
23    A.  I have no -- I have no specific information
24  that would allow me to make that distinction.
25    Q.  Okay.  And you said that you have

Page 49

1  subsequently been in discussion with others about the
2  Canadian UL tests.  Who have you been in discussions
3  with?
4    A.  The -- different attorneys concerning the
5  testimony of Mr. Minnis and the information
6  surrounding those -- the production of the documents
7  associated with the UL Canada tests.
8    Q.  And what attorneys are we talking about?
9    A.  Mr. Bruning and Mr. Fetterly.
10    Q.  When did these discussions occur?
11    A.  I couldn't tell you, but sometime over the
12  last year probably.
13    Q.  Did they occur in relation to a specific case
14  you were working on?
15    A.  Both of them would have been in cases related
16  to BRK that I had with those two gentlemen.
17    Q.  Are you currently working on any cases with
18  Mr. Bruning?
19    A.  No.
20    Q.  Are you currently working on any cases with
21  Mr. Fetterly?
22    A.  Yes.
23    Q.  What cases are they?
24    A.  The Warner case, which as I understand has
25  recently been set aside, was a case that I was most

9 (Pages 44 to 49)

Page 50

1  recently working with Mr. Fetterly on, which was
2  probably the time when I had these discussions.
3  Q. When you say "set aside," was it dismissed by
4  a court?
5  A. I don't know the legal issues involved. I
6  don't have the specifics.
7  Q. Dismissed by summary judgment?
8  A. I wouldn't -- you'd have to tell me that.
9  Q. Okay. What specifically did Mr. Bruning or
10  Mr. Fetterly tell you with regard to the Canadian UL
11  tests that led you to the conclusion that some UL
12  detectors submitted to UL Canada did not sound an
13  alarm because of corrosion?
14  A. I didn't say that. What I said was there
15  were tests -- there were smoke detectors that were
16  submitted to UL that didn't pass the test. I am not
17  here to pass judgment on why they didn't pass.
18  Q. Okay. So you --
19  A. I don't have that information.
20  Q. So you can't say that any --
21  A. Let me finish.
22  Q. I'm sorry.
23  A. And then subsequently there were actions
24  taken, ostensibly for the purpose of ensuring
25  preventatively that the units would pass the test.

Page 51

1  There's no reason to take a preventative action to
2  work on the horn contacts unless there was some mental
3  linkage made by someone that that was the reason they
4  weren't passing the test, but that is an assumption on
5  my part because I haven't seen that documentation.
6  Q. What documentation or information did you --
7  or do you have that says that the preventative action
8  taken was related to the horn contacts?
9  A. Well, putting oil on the horn contacts is
10  obviously related to them.
11  Q. What evidence do you have that suggests that
12  there was oil placed on the horn contacts in smoke
13  detectors submitted to UL Canada?
14  A. Mr. Mlanis' testimony.
15  Q. You believe Mr. Mlanis testified that there
16  was oil placed on contacts submitted to UL Canada?
17  A. No, on all paste-on contacts on smoke
18  detectors.
19  Q. Okay. You or I or both are confusing two
20  issues, so let me try to make sure we're clear.
21  A. Okay.
22  Q. The initial question on the UL Canada was do
23  you know of any smoke detectors manufactured by BRK
24  Electronics, BRK Brands, Inc. or First Alert other
25  than the 1839 and 2839 that has been scientifically

Page 52

1  determined not to have sounded an alarm because of
2  corrosion on the contacts?
3  A. Okay.
4  Q. And your answer is what?
5  A. Well, then I'm going to have to have you --
6  you want me to reanswer it, I'm going to have to hear
7  it again because you're being now very specific. I
8  was trying to answer in all candidness the evidence
9  that I had based on Mr. Mlanis' sworn testimony
10  related to his actions related to horn contacts, oil,
11  et cetera, with respect to UL. Whether that be UL
12  Canada or UL U.S., it's not a relevant issue in my
13  opinion.
14  Q. We can go back --
15  A. What I thought we earlier -- earlier I was
16  telling you that I'd had some discussions and that UL
17  Canada smoke detectors had been submitted that had
18  also failed. I don't have any evidence to support
19  that that specifically is why they failed. I've
20  already said that.
21  Q. Okay. I don't believe you said that, but
22  let's make it clear. You don't have any evidence that
23  any detectors submitted to UL Canada failed to sound
24  an alarm because of the corrosion issue on its
25  contacts.

Page 53

1  A. No, I've already said I have no evidence of
2  any of this except Mr. Mlanis' testimony.
3  Q. Okay. You keep characterizing testimony.
4  Answer my question: Do you have any evidence that any
5  detectors submitted to UL Canada by BRK Electronics,
6  BRK Brands, Inc./Pitway or First Alert failed to sound
7  an alarm because of corrosion on the contacts?
8  A. I think that's been answered. No, I don't.
9  Q. Okay.
10  A. I've already said that.
11  Q. Okay. If you did, I apologize for reasking.
12  A. That's all right.
13  Q. Do you have any evidence that any detector
14  other than the 1839 or 2839 models has ever been
15  scientifically determined to have failed to sound an
16  alarm because of corrosion on the contacts?
17  A. I think you've already asked that question.
18  I've already answered it very clearly that I --
19  emphasis on the words "scientific" and the "evidence"
20  in my possession. The answer's no, I don't have
21  anything to point you to.
22  Q. Okay. Now, when I first asked the question I
23  asked the question of BRK Brands, Inc. Do you know
24  the difference between BRK Brands, Inc. and BRK
25  Electronics, a division of Pitway?

Page 54

1  A. I'm making no distinction between any of
2  those companies with respect to this ionization -- the
3  stream of ionization smoke detector designs that have
4  occurred over the last 20 years.
5  Q. How about placing oil on the contacts, did
6  you make any distinction between the companies?
7  A. I made no distinction between any of those
8  manufacturers specifically to that unit, because with
9  respect to design I didn't see any real difference.
10  Q. Do you know what if any steps the BRK
11  Electronics, BRK Brands, Inc. or First Alert has taken
12  to avoid having corrosion on contacts stop a detector
13  from sounding its alarm?
14  A. I do know that for a while, a period which I
15  can't quantify, there was some welding of the contacts
16  on Piezo electric horns. I do not know of any other
17  specific actions that have been applied or that are
18  applied today to keep that from happening.
19  Q. Do you know if welding on -- welding the
20  contacts prevents corrosion from affecting the
21  sounding of an alarm?
22  A. Well, it certainly will keep you from having
23  the kind of microscopic corrosion in terms of contact
24  resistance between the pressure contact and the horn
25  plate, because if it's welded there's no way for

Page 55

1  microscopic corrosion to get in between those two. It
2  certainly prohibits that.
3  Q. Do you know if the SA67D's contacts were
4  welded?
5  A. I haven't seen this unit and I do not know if
6  at the time this unit was made there were welded
7  contacts or not, but it's my understanding that it was
8  not.
9  Q. What is your understanding based upon?
10  A. Based on my knowledge of the way that those
11  have been manufactured in recent years.
12  Q. Do you know when this specific detector was
13  manufactured?
14  A. No, it looks to be relative -- it looks to be
15  like a relatively new design. It is not -- with that
16  number, it is not an archaic detector.
17  Q. When you say "relatively new," can you give
18  me a time period?
19  A. Well, it's not 25 years old.
20  Q. And you believe that is or about the time
21  period that this specific detector was manufactured
22  they were not welding contacts?
23  A. To my knowledge, this -- that's correct.
24  Q. Do you know the type of contacts that are on
25  this particular detector?

10 (Pages 50 to 55)

## Page 56

```
 1    A.  I haven't seen this detector.
 2    Q.  The answer's no.
 3    A.  That's right.
 4    Q.  Do you know the type of contacts that were on
 5  any of the SA67a type smoke detectors?
 6    A.  Pressure contacts.
 7    Q.  Do you have any other information about the
 8  type of contacts, single-arm, bifurcated arm, anything
 9  to do?
10    A.  I don't have any specific information other
11  than the type of pressure contact on the Piezo
12  electric horn.
13    Q.  And you also don't --
14    A.  Made no study of that.
15    Q.  And you don't have any specific information
16  as to anything else BRK Electronics, BRK Brands,
17  Inc./Pitway or First Alert did to avoid the corrosion
18  issue other than welding its contacts, any
19  modifications?
20    A.  I'm not aware of it.  I'm not disputing they
21  may have.  I just don't know of it.
22    Q.  And therefore you wouldn't know the success
23  or failure of these modifications?
24    A.  I have no evidence to support the success or
25  failure of any proposed or implemented modifications
```

## Page 57

```
 1  they may have done.
 2    Q.  How does corrosion build upon the contacts of
 3  a smoke detector?
 4    A.  The microscopic corrosion is a complex
 5  mechanism that has to do with environment in which it
 6  is placed, the types of metals that are involved, the
 7  types of contaminants or pollutants that are in the
 8  air in combination, and it's an electrochemical
 9  process and it is -- under certain circumstances you
10  can document it with microscopic or submicroscopic
11  study.
12    Q.  SEM analysis?
13    A.  That would be a certainly adequate way to
14  look at it and see it.  You have to be extraordinarily
15  cautious because it is very fragile.  Because it is a
16  very thin and not very durable type of corrosion, it
17  is easily broken through.  So if you're going to
18  verify that, you have to do so under very careful
19  conditions.
20    Q.  What are the metals that are involved?  You
21  said it's an issue of metals.
22    A.  I'm just giving you a list of the parameters
23  that would be involved.  It can be a function of
24  the -- whatever the two surfaces are between which the
25  microscopic corrosion occurs; that's one of the
```

## Page 58

```
 1  parameters.  It is a function of heat, humidity --
 2  temperature, humidity and environment pollutants, and
 3  it is a function of time.  And these are all
 4  parameters that would affect the issue of the
 5  formation initially or the rapid growth or the
 6  sustained growth of the corrosion.
 7    Q.  With regard --
 8    A.  And I'm not, as you know, a chemist, but it's
 9  an electrochemical process.
10    Q.  So you can't identify the metals that are
11  involved in the corrosion of the contacts on the smoke
12  detector?
13    A.  I've made no study of the specific corrosion
14  mechanism that has been involved in the -- these smoke
15  detectors, no, other than to read some papers where
16  other experts have, you know, analyzed some of that.
17  But I'm not a chemist.
18    Q.  And that's not your area of expertise here.
19    A.  It's not an area that I have chosen to become
20  an expert in.
21    Q.  You said it was a function of time.  What do
22  you mean by that?
23    A.  It's an electrochemical process which means
24  time is one of the elements.  It doesn't go from no
25  corrosion to enormous amounts of corrosion in, you
```

## Page 59

```
 1  know, two seconds.  It's a process of building the
 2  corrosion and that takes some time and so it's a time
 3  function, but it's a time function in terms of the
 4  environment.  So if you change the other parameters
 5  like humidity conditions, temperature conditions and
 6  pollutant conditions which could serve as a catalyst,
 7  then you could have a longer or shorter time according
 8  to how you control those parameters.
 9    Q.  Do you know the time it would have taken for
10  the detector in the Cruz residence to have built up
11  microscopic corrosion --
12    A.  Absolutely not.
13    Q.  -- sufficient to prevent the detector from
14  sounding?
15    A.  Could be days, could be months, could be
16  longer, but I'm not -- I've made no such study and we
17  have no way of replicating the environmental
18  conditions to which this detector has been exposed and
19  we have no way of really making good assumptions about
20  what those were, so it would be difficult to.
21    Q.  Is there anything that could be done by a
22  homeowner or resident to prevent corrosion from
23  occurring?
24    A.  In general, no.
25    Q.  How about pushing the test button?
```

## Page 60

```
 1    A.  That doesn't keep it from occurring, but if
 2  you disturb the corrosion on a regular basis, of
 3  course, you could eliminate it by wiping it away.
 4  That doesn't keep it from happening, it just -- it
 5  keeps it from becoming thick enough to cause your
 6  problem.
 7    Q.  Okay.  So by pushing the test button, you can
 8  prevent corrosion from affecting the sounding of an
 9  alarm.
10    A.  Possibly.
11    Q.  Possibly.
12    A.  You don't know that, but possibly.
13    Q.  When you say "you don't know that," what do
14  you mean?
15    A.  Meaning I've never seen anybody who has done
16  a scientific study that can affirm that that is always
17  true.
18    Q.  Okay.  But you can't affirm that it is or is
19  not true.
20    A.  That's correct.
21    Q.  Do you have any evidence that the specific
22  detector that was in the Cruz residence had corrosion
23  on its contacts which prevented it from sounding an
24  alarm in the presence of the combustible products in
25  the air during the Sunday, Monday or Tuesday of
```

## Page 61

```
 1  Mr. Cruz's death?
 2    A.  Specific evidence?
 3    Q.  Yes.
 4    A.  No.
 5    Q.  Any evidence that you can say you are
 6  scientifically relying on?
 7    A.  No.
 8    Q.  That you can testify within a reasonable
 9  degree of engineering or scientific certainty about?
10    A.  I can do that.
11    Q.  Okay.  What do you say that is within a
12  reasonable degree of scientific of engineering
13  certainty that can establish that these contacts have
14  corrosion sufficient to prevent it from alarming?
15    A.  Process of elimination.
16    Q.  Okay.  What have you done to eliminate other
17  reasons?
18    A.  The device was powered with a battery
19  sufficient to sound an alarm as witnessed by both the
20  tests that Mr. McClintock we've already referred to
21  did, and his -- and the subsequent testing I believe
22  by your own experts of the battery.  The -- if you
23  eliminate the issue of properly powered, you eliminate
24  the issue of whether the electronics was working,
25  because when the test button was pushed there was
```

Page 62

1  sufficient electronic capacity to get the signal to
2  the horn because it subsequently did sound.
3        You know that smoke did reach the device
4  because there's deposition of soot and smoke particles
5  and so forth on the -- all around on the exterior
6  parts of the house around the smoke detector, on the
7  face of the smoke detector and inside the smoke
8  detector, so there's no question there was smoke
9  getting to the smoke detector. And the combination of
10 those factors lead you to very few, if not only one
11 alternative, concerning the reason why that detector
12 wouldn't sound, and that is that if smoke did reach
13 it, the smoke particles and so forth were of the type
14 of particle which I've already discussed with you that
15 would -- an ionization detector would be sensitive to,
16 and it was a properly -- it was a standard ionization
17 detector that was properly powered.
18       The only thing left is an actual failure
19 of the final terminal device which is the horn. So by
20 eliminating all the other possibilities, you are left
21 with from an engineering probability perspective only
22 one item that I can come up with, which is that the
23 horn itself did not issue the final alarm.
24    Q. But you have done no study of this particular
25 detector to verify that opinion?

Page 63

1    A. You can't do that because of the reasons I
2  already told you.
3    Q. But you have not.
4    A. Yeah, I didn't because I can't.
5    Q. Okay. Are you going to be offering the
6  opinion at the trial of this case that this detector
7  did not sound because of the differences between an
8  ionization and photoelectric type detector?
9    A. No.
10   Q. Are you going to be offering the opinion is
11 this case that this detector did not sound because of
12 the differences between an ionization and combination
13 of photoelectric and ionization detector?
14   A. No.
15   Q. Are you going to, in support of your opinion,
16 going to discuss the differences between these two
17 detectors?
18   A. None of these unless I am asked, but that's
19 not in my opinion the relevant issue. I guess if
20 somebody asked me a question about those, I'd be glad
21 to talk about it, but --
22   Q. You have testified in other cases that
23 there's been a debate between various people about the
24 effectiveness of ionization and photoelectric
25 detectors in the presence of smoke from expected

Page 64

1  residential fires.
2    A. Yes.
3    Q. It's my understanding from your testimony
4  that you don't believe that issue is relevant to this
5  case.
6    A. Okay. That's going too far. If a properly
7  designed and powered photoelectric smoke detector had
8  been present in this fire, I believe it would have
9  sounded. I believe the type of soot that was
10 deposited on this residence walls and so forth is
11 certainly indicative of the level and type of smoke
12 that would trigger a photoelectric detector and it
13 would have sounded. I also believe that had there
14 been a combination detector there or photoelectric
15 detector stand-alone by itself, that if it was
16 properly designed and installed and manufactured it
17 would have sounded a timely alarm. I believe all that
18 to be true.
19       I also believe, however, that all that
20 same evidence indicates that there was sufficient
21 smoke products for an ionization smoke detector to
22 sound an alarm in this situation and that it might
23 have even been preferentially so in that there would
24 have been a substantial amount of heat, there would
25 have been a substantial amount of small particles

Page 65

1  coming from the type of combustion indicated from the
2  studies that others did about this heater because of
3  the production of carbon monoxide. As a result of
4  that, a properly designed ionization detector should
5  also have sounded.
6        So had there been a photoelectric
7  chamber there in concert with the ionization chamber,
8  we might have had some redundancy. If the photo-
9  electric detector had a separate horn and that horn
10 wasn't corroded and it might have sounded, then we
11 might have had a timely alarm, whereas in this case we
12 seem to not have had a timely alarm. So there are
13 certainly those issues, but I believe the primary
14 issue here is why a properly powered ionization smoke
15 detector that was in the path of substantial smoke
16 products did not sound an alarm to those smoke
17 products and --
18   Q. But you don't believe that the reason it
19 didn't sound is because of the differences between an
20 ionization and photoelectric detector?
21   A. That's why I answered the questions earlier.
22 But when you start to say -- when you start to get
23 real encompassing about whether those issues are
24 relevant or not, then I will tell you that some
25 redundancy in this smoke detector design by using a

Page 66

1  photoelectric detector and a separate horn to provide
2  redundancy might well have eliminated this problem.
3    Q. But when you're talking about redundancy in
4  horns you're talking about two horns.
5    A. Absolutely.
6    Q. You're not talking about two chambers.
7    A. Yeah. One photoelectric, one ionization.
8    Q. Right. But if the same detector had a horn,
9  one horn that was corroded, whether it be a
10 photoelectric chamber or an ionization chamber, that
11 detector was not going to sound.
12   A. That's correct. I wouldn't design it that
13 way, but that's correct.
14   Q. And if we take the horn issue out, you're not
15 going to say a photoelectric detector in this case
16 would have sounded sooner than an ionization.
17   A. No, I have no reason to believe that that
18 would have happened.
19   Q. Same question for a combination detector.
20   A. That's correct.
21   Q. You won't say it's --
22   A. That's why I answered the earlier questions
23 the way I did.
24       THE WITNESS: Can we take a break?
25       MR. HELLER: Sure.

Page 67

1        (Recess from 11:22 to 11:25)
2    Q. (By Mr. Heller) What is the evidence that
3  you have that led you to the conclusion that this
4  detector did not sound an alarm?
5    A. The generic piece of evidence of course is
6  that one assumes that an individual who is sleeping in
7  a relatively small house like this was in fairly close
8  proximity to a smoke detector, which this was a matter
9  of feet, I didn't make an exact measurement, but I saw
10 a dimensional diagram of the house attached to one of
11 the documents which showed it to be a rather small
12 house, so the smoke detector's in the hallway, it's
13 just outside the bedroom areas and relatively close.
14 A properly designed smoke detector meeting UL
15 standards would have a rather shrill alarm that would
16 normally wake up an individual; it's designed for that
17 specific purpose. There's a reason to believe that an
18 alarm that sounded prior to the effects of carbon
19 monoxide taking effect on the deceased would have
20 caused the individual to wake up and to exit the house
21 and possibly even the other individual staying in the
22 house prior to the time that they left the house,
23 which I believe was -- of course was earlier than the
24 other individual probably died.
25       So there would -- I am making those --

Page 68

1  or I am understanding the situation that way that an
2  alarm, had it sounded prior to the effects of the
3  carbon monoxide on the individual, would have caused
4  the individual to wake up and to think something was
5  wrong and leave the residence.
6      Q.  Do you have any evidence that this alarm did
7  not sound after Mr. Cruz was incapacitated or killed
8  by the carbon monoxide?
9      A.  Yes.  Your own expert indicates that there is
10  no indication of any sonic deposition of smoke to
11  indicate that the alarm was sounded.  I'm not
12  validating that or invalidating that by my own
13  testing, but I'm just simply pointing out that they
14  said that in their reports.
15      Q.  Ms. Streit?
16      A.  Yes.  Plus the battery itself was found in an
17  energized condition.  This -- the tests done,
18  including the simulations by your own experts,
19  indicate that this heater burned for quite some number
20  of hours in order to create all the effects that did
21  occur, which means that had the smoke detector sounded
22  it would have depleted the battery over some period of
23  time.  It would not go ten hours or something.  So the
24  fact that the battery was found in the condition that
25  it was is an indication that this smoke detector did

Page 69

1  not sound.
2      Q.  Do you know of any test that has been
3  performed by any expert that suggests that there was
4  sufficient amount of smoke or soot products emitted by
5  this heater to have sounded the smoke detector's alarm
6  prior to when Mr. Cruz would have been incapacitated
7  by the carbon monoxide?
8      A.  Any tests?
9      Q.  Any tests, however you define tests.  Has
10  anybody used this particular heater --
11      A.  This specific heater.
12      Q.  This specific heater.
13      A.  Okay.  Go ahead now.  Ask the question again.
14      Q.  -- and concluded that there were sufficient
15  products of combustion of smoke and soot produced that
16  would have triggered this alarm prior to when Mr. Cruz
17  would have been incapacitated by carbon monoxide?
18      A.  I think that's self-evident, but no, I don't
19  have any information about somebody testing this
20  specific heater.  That wasn't provided to me.
21      Q.  Okay.  We'll get to why you believe it was
22  self-evident in a second.
23          Can you testify or are you testifying
24  that if the smoke detector sounded, it would have
25  sounded for such a period of time that the battery

Page 70

1  would have been depleted?
2      A.  There's no reason to believe that this heater
3  only ran for a short period of time because it is --
4  it had to run long enough, even based on your own
5  expert's computer simulations, to generate a
6  substantial amount of carbon monoxide that would
7  create the physical circumstances you have existed in
8  the deceased.
9      Q.  What is the evidence that you have that leads
10  you to the conclusion as to how much time this
11  detector would have had to have run -- strike that
12  question.
13          What is the evidence that you have that
14  identifies how long the heater would have had to run
15  to build up the quantities of carbon monoxide that it
16  did?
17      A.  I was simply referring to the documents from
18  your own experts which indicate that this would be
19  measured in hours.
20      Q.  Okay.  And in terms of hours, did it say how
21  many hours?
22      A.  Well, it made some assumptions in the
23  simulations that they ran and so I'm not here to try
24  to validate or invalidate those assumptions with this
25  question, but they did indicate that to create the

Page 71

1  soot that was deposited, based on their assumptions,
2  right or wrong, you would be looking at seven or eight
3  hours as I remember.
4      Q.  And is it your testimony that if the detector
5  had sounded for seven or eight hours that the battery
6  would have been depleted?
7      A.  I absolutely believe that if this detector
8  had sounded -- started to sound and sounded
9  continuously for hours, that the battery would not be
10  in the condition to show full voltage and a month
11  later be able to sound its alarm and subsequently
12  after that to be tested in the condition it was in.
13  That's correct.  It showed no depletion, is my
14  understanding, when it was tested subsequently.
15      Q.  Well, let's take my question first, then
16  we'll get to your answer.  Do you have the opinion
17  that if a detector sounds for seven or eight hours,
18  that necessarily will deplete the power to the
19  battery?
20      A.  It may not be depleted in the sense that it
21  would by that point literally have stopped sounding,
22  but there's no reason to believe that that's when this
23  heater was no longer burning either.
24      Q.  I'm just asking you seven or eight hours of
25  sounding alarm, will it deplete a 9-volt battery in

Page 72

1  this detector?
2      A.  It would be a function of that particular
3  detector's design.  I've not made that -- I've not
4  made a test of that detector.  I do not know the
5  condition of this battery and how long it had been in
6  that detector at the time that this incident occurred.
7  I do not know how much energy was left in that
8  battery, so I can't give you a specific answer to how
9  much sound it would be making six hours after it
10  started sounding.  I can't tell you that.
11      Q.  Okay.  And you --
12      A.  I can tell you that I believe it would be
13  depleted, but I can't prove that.
14      Q.  You have no scientifically verifiable tests
15  that --
16      A.  We can run a test.  It would be fairly
17  simple.  I haven't done it.
18      Q.  Okay.  You said that, and these were your
19  words, that the battery was found or determined to
20  have full voltage.  What does that mean in --
21      A.  I believe it measured 9.2 volts when it was
22  measured which indicates at least that it has a
23  substantial voltage capacity left.  It doesn't
24  necessarily indicate the energy capacity, but it
25  certainly tells us that it's not fully depleted and a

Page 73

1  damaged battery.
2      Q.  Does that indicate that the battery could not
3  have sounded for seven or eight hours -- I mean the
4  detector could not have sounded for seven or eight
5  hours using this battery?
6      A.  It is in my opinion unlikely.
7      Q.  But it's possible.
8      A.  I didn't say that.  I'm not going to guess
9  about the possibility.  I'm going to tell you that I
10  believe it is unlikely that this detector would have
11  sounded for that duration, a month later show a
12  reasonably undepleted condition so that it immediately
13  will sound the battery -- or sound the alarm, and
14  subsequently measure full voltage.  I don't believe
15  that's happened.
16      Q.  You said that the battery was measured at 9.2
17  volts.  Where do you get that from?
18      A.  I knew you were going to ask me that and I
19  think that came in the -- one of the conversations
20  that we referred to earlier that I had with respect to
21  this case that I didn't have evidence in front of me
22  for.
23      Q.  Do you know who the conversation was with?
24      A.  I believe it was with Mr. Marchan.
25          MR. MARCHAN:  And I think it was in

Page 74

```
1   Streit's report.
2       A.  Yeah, we were discussing Streit's report
3   because this morning is the first time I had seen it
4   and I haven't had a chance to read it in total detail,
5   but that's where that came from.
6       Q.  (By Mr. Heller)  Okay.  You've offered the
7   opinion a number of ways that it is self-evident that
8   this detector had enough soot or smoke before Mr. Cruz
9   was incapacitated by carbon monoxide.  What do you
10  mean by that?
11      A.  Okay.  Two pieces:  One, it is self-evident
12  that there was enough smoke products in this house at
13  some point for this smoke detector to have sounded an
14  alarm; that's the first piece.  Because you see the
15  pictures, there's deposition of smoke, soot.  The
16  smoke detector itself is sooty.  I mean, I don't think
17  there's any question it got to the smoke detector.
18  Your own expert verified that there's smoke deposition
19  inside the detector --
20      Q.  How does that --
21      A.  -- et cetera, et cetera.  So at some point it
22  should have sounded.  There's no evidence to believe
23  that it did sound at all at any point in time, so
24  that's the first piece.
25              With respect to the specific timing of
```

Page 75

```
1   the carbon monoxide content versus when it should have
2   sounded, which I believe is the other part of your
3   question?
4       Q.  Correct.
5       A.  Am I correct?
6       Q.  Correct.
7       A.  It's my belief that the type of smoke
8   products that would be given off by this type of
9   heater, which would be a broad distribution of smoke
10  products given the fact that it is producing carbon
11  monoxide, is such that this should have sounded in
12  times measured in minutes, not hours, and as a
13  consequence of that, it's my belief that it didn't
14  sound at all because it should have, and it should
15  have sounded remarkably earlier than the six or seven
16  hours of time that is indicated where this fire was
17  supposedly still burning based on the computer
18  simulations of your experts.
19      Q.  Do you know what type of heater this was?
20      A.  What type?
21      Q.  Yeah.
22      A.  I've seen the pictures and looked at the
23  nameplate and so forth, but I didn't make any specific
24  note of that.
25      Q.  Do you know the manufacturer of this heater?
```

Page 76

```
1       A.  No, I've made no study of the heater.  I mean
2   I've seen it.  I'd have to refresh my memory.
3       Q.  Do you know why carbon monoxide was emitted
4   into the residence in this particular case?
5       A.  I believe it was because of the type of
6   combustion that was occurring because of a combination
7   of -- what was said in the reports, I've made no study
8   myself, of the nozzle versus the oxygen content.
9       Q.  And how about the fact that it was not vented
10  to the outside?
11      A.  That would not necessarily be a relevant
12  issue.  The question of venting is -- for this type of
13  heater, you could have a propane heater with proper
14  design that would burn inside a residence without any
15  venting at all and we did for scores of years as we
16  all grew up with them.  So there's not necessarily a
17  relationship between the fact that there is a burning
18  of the propane in a heater without a venting.  It has
19  to do with the way it's burned, it has to with the
20  type of combustion and the type of control of the air
21  content.
22      Q.  And when you mean type of combustion, what do
23  you mean?
24      A.  Whether it is burning oxygen rich, fuel rich,
25  poor or otherwise, any combination.
```

Page 77

```
1       Q.  And why was it improperly combusting in this
2   case?
3       A.  I didn't make the study so I'm giving you
4   answers that come from only what I've seen.  I'm not
5   planning on rendering any opinions about this, but
6   it's my understanding that there are several issues
7   raised.  Whether it had the right nozzle in it for
8   burning the type of gas that was being burned or not
9   is one of the issues, and then there's the issues of
10  whether this was an oxygen-depleted atmosphere not
11  inside the residence.
12      Q.  When you say the right nozzle, you mean the
13  orifice?
14      A.  Yes, the specific orifice, nozzle or burn
15  element that was used.
16      Q.  And when you say the correct orifice, do you
17  mean the correct orifice size?
18      A.  Size for the type of gas being burned.
19      Q.  Propane versus natural gas.
20      A.  That would be the obvious comparisons.
21      Q.  Have you ever performed a study as to the
22  products of combustion, smoke, gases, et cetera, that
23  are produced when you use the improper sized orifice
24  for the gas that you are using in a space heater?
25      A.  No.  I've already answered that, I think.
```

Page 78

```
1       Q.  Have you ever read a study that discussed
2   these issues?
3       A.  No.
4       Q.  What is the basis of your opinion that the
5   use of the orifice size that was in the space heater
6   in the Cruz residence together with propane produced
7   sufficient quantities of smoke products or soot
8   products that would have sounded the alarm before
9   carbon monoxide incapacitated Mr. Cruz?
10      A.  Okay.  Good question, except I think you've
11  limited it more than I did because I told you I'm not
12  rendering an opinion on all of the combinations or
13  factors involved in the heater that created the
14  circumstances.  So I'm not speaking to that, but the
15  answer to the question that I can give based on all
16  the information I have is that in that heater as it
17  was placed right below that smoke detector or in near
18  proximity below the smoke detector, the normal types
19  of products that would come with properly burning of
20  the propane might likely have caused a properly
21  designed ionization smoke detector to go off simply
22  because of the level of heat and the type of smoke
23  products that would be rising from a properly
24  combusted fire.
25              In this case we know that at some point
```

Page 79

```
1   did not happen simply because we've got massive
2   deposition of soot that occurred which is not typical
3   of a proper combustion, okay, of a properly designed
4   propane heater designed for internal use, et cetera,
5   or one that has not been vented obviously in this
6   case.  So you've got a situation where there's lots of
7   soot that occurred.
8               At some point between those two extremes
9   of proper burning, maybe because it had enough oxygen
10  initially, maybe -- that's one of the speculations
11  that people have made -- to the point where we know
12  that it was throwing out lots of soot which could have
13  occurred sooner or later, I'm not here to tell you
14  when, at some point in that we've got virtually every
15  form of combustion represented because the issue there
16  according to the experts is a change of combustion due
17  to oxygen content.  If that occurred, you're going to
18  get a massive or broad spectrum of particles.  If
19  that's true, then this should have sounded.
20      Q.  You keep saying "if" and I want to try to see
21  if -- are you going to offer the opinion, and if you
22  are I'm going to need the basis for it, that this
23  detector should have sounded before this gentleman was
24  incapacitated by carbon monoxide?
25      A.  I believe that to be true.
```

Page 80

1  Q. What is your basis for saying in this case
2  that occurred?
3  A. I believe that a properly designed ionization
4  detector sitting above a heater of that type under
5  almost any combustion circumstances, okay, would have
6  sounded an alarm just almost due to nothing but heat
7  and proximity.
8  Q. What is your experience that leads you to
9  that conclusion?
10  A. Having tested lots of smoke detectors in
11  close proximity to fires, both burning combustion and
12  smoldering combustion.
13  Q. But you've also testified you've never tested
14  a smoke detector from the products of combustion from
15  a space heater.
16  A. You asked me my basis, I'm telling you. I've
17  already answered the question that I've not tested a
18  space heater.
19  Q. What is your bases for offering the opinion
20  that this heater put off smoke or soot products prior
21  to incapacitating levels of carbon monoxide?
22  A. I've already answered that question. Just
23  answered it a few seconds ago.
24  Q. I'm talking about the heater.
25  A. I've just answered that question. Any kind

Page 81

1  of combustion in that location with the level of heat
2  that is coming from that heater so that the products
3  are going to rise with the type of normal products,
4  relatively invisible smoke products that are going to
5  come out of normal combustion, is going to sound an
6  ionization smoke detector. That's why people
7  disconnect them in kitchens all the time is because
8  they have substantial invisible products coming with
9  high heat content by opening ovens and other kinds of
10  things that make ionization detectors go off. It
11  happens in my testing all the time where I have a fire
12  situation. It's almost impossible to keep an
13  ionization smoke detector from going off when exposed
14  to large amounts of small particles that come from
15  this kind of rapid combustion with high heat content.
16  Q. What about your experience in dealing with
17  heaters, do you —
18  A. I've already answered that. Don't ask me
19  more about heaters because I've answered it three
20  times and I've said I've not tested heaters.
21  Q. Do you have any experience with heaters?
22  Forget the testing.
23  A. I've already said that.
24  Q. None.
25  A. This has nothing to do with heaters.

Page 82

1  Q. Okay.
2  A. This has to do with just combustion, any
3  form, just combustion.
4  Q. You in previous depositions have said you are
5  not a fire expert, you are not an expert in fires,
6  fire investigations, smoke or smoke production. Is
7  that true?
8  A. I'm not going to answer that out of context.
9  I have a lot —
10  Q. I'll show you the deposition.
11  A. I'll be glad to. I have a lot of experience
12  in looking at fire situations with respect to the
13  performance of smoke detectors, but I don't do cause
14  and origin I believe has been my answer universally
15  throughout all the depositions. I don't do that. I'm
16  not doing it here.
17  Q. I'm going to quote to you and then show you
18  Page 21 and 22 of your deposition conducted
19  January 14, 1999 in Ayala versus BRK Brands, Inc., and
20  I'll read you two questions before so we get whatever
21  context is needed, and if you want me to read anything
22  else you can ask me.
23  My question: "Have you published any of
24  those papers for the peer review as I have just
25  defined it on smoke detection systems?"

Page 83

1  Answer: "No."
2  Question: "Smoke production?"
3  Answer: "No. I am not a fire expert,
4  and you're asking me about smoke questions and I've
5  already believe told you we can avoid some
6  unnecessary repetition by simply pointing out that I
7  am an electrical engineer. I do not hold myself out
8  to be an expert in fire, fire investigation, smoke and
9  smoke production, et cetera. It's not what I do."
10  I can read you more, but that's your
11  words, not mine.
12  A. I think that's accurate.
13  Q. Okay.
14  A. But I don't think that's the question.
15  Q. My question to you was did you not in prior
16  depositions say you do not hold yourself out to be an
17  expert in fires, fire investigation, smoke and/or
18  smoke production? You said —
19  A. But that's not the context of the discussion
20  you and I are having with respect to this smoke
21  detector.
22  Q. Okay. My question is: Isn't it true, you do
23  not hold yourself out to be as expert in fires, fire
24  investigation, smoke and/or smoke production?
25  A. As — it is correct that I said it correctly

Page 84

1  in that deposition. It is correct that if that is
2  your question only with respect to that deposition,
3  that is exactly what I said and I stand by it. It is
4  not a relevant issue to what we were discussing.
5  Q. But you still do not hold yourself out to be
6  an expert in those areas.
7  A. I do not.
8  Q. Okay. Now, in terms of the products of
9  combustion that are emitted by a space heater —
10  A. Right.
11  Q. — do you hold yourself out to be an expert
12  in those areas?
13  A. You're already asking the question I told you
14  not to ask anymore. I've already said I've not
15  tested, looked at or investigated the issue of the
16  smoke products coming from space heater or heaters, I
17  haven't done that. I've already answered that three
18  five times.
19  Q. How have you determined the products of
20  combustion emitted by a space heater are similar to
21  any of the tests that you have done on smoke detectors
22  in flaming or smoldering fires?
23  A. We've got pictures of soot on the walls in
24  this residence, okay? We've answered the question
25  that at some point in time there had to be sufficient

Page 85

1  smoke products for this smoke detector to have
2  sounded.
3  Q. Correct.
4  A. I've also told you that virtually any kind of
5  combustion, virtually any kind of combustion with a
6  closely proximate ionization smoke detector where
7  there is sufficient heat to cause those particles to
8  rapidly rise to that smoke detector, based on my
9  testing of smoke detectors in close proximity to any
10  kind of flaming combustion, almost always sets off an
11  ionization smoke detector in a very rapid sense.
12  That type of burning, any kind of
13  burning, I don't care if it's a heater, any kind of
14  burning creating substantial amounts of heat and
15  allowing those small particles to rise directly
16  without any significant distance to a smoke detector
17  that is in a cone of — above — a cone of influence
18  above that heater would cause that smoke detector to
19  go off in what I believe would be minutes, not seven
20  or eight hours.
21  Q. What —
22  A. And that's based on my experience with fires
23  and smoke detectors.
24  Q. Okay. And the experience you're talking
25  about is lighting smoldering and flaming fires and

15 (Pages 80 to 85)

Page 86

1  seeing when the smoke detector sounds.
2      A.  Yes.
3      Q.  What evidence do you have that there was
4  sufficient heat in the Cruz residence that pushed the
5  particles to this smoke detector before Mr. Cruz was
6  incapacitated by carbon monoxide?
7      A.  Your simulation, computer simulations of your
8  own experts show that there was substantial heat
9  production from this heater and that was a requirement
10  for them to get the oxygen reduction that they got.
11  They said that, and if I even depend on them, the
12  answer is there was plenty of heat.
13      Q.  What experience leads you to conclude that
14  there was actually soot and smoke emitted by this
15  heater prior to carbon monoxide?
16      A.  I didn't say that.
17      Q.  That's what my question is, though.
18      A.  Is that a new question?
19      Q.  Yep.
20      A.  I'm not telling you that I am pinpointing a
21  point where there was visible soot that occurred from
22  the heater at any given point.
23      Q.  But in --
24      A.  There is a simulation done by your experts,
25  which is fatally flawed I might add, but at the same

Page 87

1  time they say that they can pinpoint that at several
2  hours out.
3      Q.  What is your evidence that invisible
4  particles of smoke or soot were emitted by this heater
5  before carbon monoxide?
6      A.  There is no such thing as combustion without
7  invisible particles.
8      Q.  Sufficient to --
9      A.  Small particles, I should say, not invisible.
10  Small.  Invisible maybe to the naked eye.
11      Q.  Anything other than your tests that is in
12  your CV or that you have in your background that
13  allows you to offer a conclusion about the timing of
14  the emission of the particles versus the timing of the
15  emission of carbon monoxide?
16      A.  No.
17      Q.  And maybe I don't understand this, but how
18  can you compare the emissions of this space heater to
19  the emissions in your tests?
20      A.  I'm simply saying any kind of combustion.
21  I'm not comparing emissions to this space heater.  I'm
22  saying any kind of combustion produces particles, any
23  kind, period.  It's a mechanical process.  You
24  cannot -- you can't burn anything, okay, without there
25  being some form of residual matter produced because

Page 88

1  there is no such thing as absolute perfect combustion
2  in that sense.
3      Q.  Let me change the question to the timing of
4  the emissions of sufficient amount of smoke or soot
5  particles to trigger an alarm prior to the emission of
6  carbon monoxide in sufficient quantities to
7  incapacitate Mr. Cruz.
8      A.  I'm simply telling you that in my experience
9  ionization smoke detectors are very sensitive to the
10  small particles that come off of any kind of flaming
11  combustion of this type, meaning you've got a visible
12  flame.
13      Q.  Flame inside the heater?
14      A.  Anywhere.
15      Q.  I'm talking about the Cruz case.
16      A.  That's fine.
17      Q.  Well, I want to --
18      A.  I'm giving you the generic answer.  If you
19  want the specific answer, then this flame in this
20  heater, however that was done.  There is evidence that
21  says that it was not proper combustion, which would
22  make the situation worse.  Your own expert said that.
23  I'm relying on them for that, but they said it was not
24  proper combustion, it was oxygen depleted and fuel
25  rich and that that was initially fuel rich.  So you're

Page 89

1  going to have smoke products.  I've made no tests to
2  see what those are.  Someone may have.  I don't have
3  that information.
4      Q.  And you've done no tests as to the timing of
5  the production of smoke particles and soot particles
6  versus carbon monoxide in these type of cases?
7      A.  In these type, in this case?
8      Q.  In this case.
9      A.  I have not.
10      Q.  What's the difference between smoke and soot?
11      A.  Nothing, because smoke is not descriptive of
12  any specific kind of anything.  It's basically
13  whatever is coming off of the fire.  If you want to --
14  technically all of it is particulate matter that is
15  coming from the combustion and some of it is invisible
16  to the naked eye and some of it is black and dirty and
17  smoky like we see, and in this case there obviously at
18  some point was some black and dirty, sooty smoke
19  because it deposited itself on the walls.
20      Q.  What's the difference between a smoke
21  particle and soot particle?
22      A.  I'm confident that somebody who's an aerosol
23  expert would have a definitional difference, but I
24  don't -- I don't have one to give you.  I'm not an
25  aerosol expert.

Page 90

1      Q.  Do you know if smoke detectors are designed
2  to detect soot particles?
3      A.  Ionization smoke detector is designed to
4  detect the interruption of an ion current flow in its
5  chamber, whatever causes that.
6      Q.  Let me ask it again:  Do you know if a smoke
7  detector is designed to detect the presence of soot
8  particles?
9      A.  If soot particles interfere with that ion
10  flow, it will detect it.
11      Q.  Do you know if there's anything about a soot
12  particle that is unique to being a soot particle that
13  would prevent it from triggering an alarm of an
14  ionization detector?
15      A.  No.
16      Q.  No, you don't know or no, there is not?
17      A.  I don't think there is and I don't know of
18  anything.
19      Q.  We'll get back to all these issues, but let
20  me quickly, hopefully, go through your biographical
21  data because we've done it so many times in the past.
22      A.  Okay.
23      Q.  Looking at Russell Exhibit No. 1 which is
24  your CV dated May 2000, which I believe in
25  conversations I've had with you prior to the

Page 91

1  deposition you say there's one thing missing.
2      A.  Well, there may be more than one, but I
3  specifically -- in response to a question you asked
4  before we were on the record about what the
5  differences were in that CV and in the previous copy
6  you had, I indicated that there was at least one that
7  I'm aware of which is I recently made a speech to the
8  Fire Chiefs Association in Texas concerning the
9  performance of smoke detectors, and I don't believe --
10  I didn't see it, I don't believe it's included in that
11  resume.
12      Q.  Where did this speech occur?
13      A.  Kerrville, Texas.
14      Q.  Where is that?
15      A.  North of San Antonio.
16      Q.  Okay.
17      A.  It's northwest of San Antonio.
18      Q.  How did you get to speak at that particular
19  meeting?
20      A.  I was invited by the Fire Chiefs Association
21  to speak to their conference.
22      Q.  And what topic did you speak about?
23      A.  Performance of residential smoke detectors.
24      Q.  Did you have a handout or visual aids of any
25  kind?

## Page 92

1    A.  I used visual aids, slides and so forth.
2        MR. HELLER:  I'd ask for the production
3    of those visual aids.
4    Q.  (By Mr. Heller)  When did that speech occur?
5    A.  It was several weeks ago.  I don't have the
6    exact date.
7    Q.  Anything other than that which you believe is
8    not referenced on your CV?
9    A.  Not that I'm aware of.
10   Q.  Your CV has educational listing of a bachelor
11   of science degree at Texas A&M attained in 1970,
12   master's in electrical engineering attained at Texas
13   A&M in 1971, and a Ph.D. in electrical engineering at
14   University of Oklahoma in 1975.  Correct?
15   A.  Correct.
16   Q.  And is it also correct that in attaining
17   those degrees you did not study fire, fire detection,
18   smoke detection, smoke or smoke production?
19   A.  That's correct.
20   Q.  Your next category is experience, which we
21   have administrative and educational and research and
22   in none of those categories is there any reference to
23   work or experience in fires, fire detection, smoke
24   detection or smoke production.  Is that correct?
25   A.  As far as I know.

## Page 93

1    Q.  You're welcome to look at anything you need,
2    including your CV.
3    A.  I don't need to look at anything.
4    Q.  I didn't think so.
5    A.  I think I'm answering your question correctly
6    because of the way you're asking it.
7    Q.  Since I think there's no difference, why
8    don't -- I'll give you Exhibit 1 and I'll look at the
9    one I have here.
10   A.  I don't need this, but go ahead.  That's all
11   right.
12   Q.  I just want to make sure that we get the --
13   that you have what you need in front of you to make
14   sure I'm making accurate statements.
15       The next category is industrial
16   consulting, Page 2 of your resume, and it's true that
17   none of your industrial consulting involved fires,
18   fire detection, smoke detection or smoke production.
19   A.  Correct.
20   Q.  Under the personal consulting, excluding
21   several law firms as expert witnesses, none of your
22   personal consulting involved fires, fire detection,
23   smoke detection or smoke production.
24   A.  Correct.
25   Q.  Under your -- the category research funding

## Page 94

1    and management, none of the listings under that
2    category involved fires, fire detection, smoke
3    detection or smoke production?
4    A.  None of these listings indicate that.  That's
5    correct.
6    Q.  You do not have any licenses in fires, fire
7    detection, smoke detection or smoke production.
8    A.  That's correct.
9    Q.  You're not a member of any professional
10   societies in those areas.
11   A.  That's right.
12   Q.  You don't have any honor society memberships
13   in those areas.
14   A.  Yeah, that's correct.  I don't know of any,
15   but that's correct.
16   Q.  You do not have any awards or patents that
17   deal with smoke detectors, smoke detector research,
18   fires, fire production or fire detection.
19   A.  That's correct.
20   Q.  And that includes all the subcategories that
21   are listed on Pages 4, 5 and 6 of your CV under
22   awards, patents and listings.
23   A.  That's correct.
24   Q.  None of the references under professional
25   activities, state level or international level,

## Page 95

1    university committees, department committees, special
2    activities or short courses and tutorials involve
3    smoke detection, smoke production, fires, fire
4    detection.
5    A.  I don't know if you've mentioned the
6    categories, but other than the things you and I have
7    already mentioned, I think the answer is no.  I can't
8    remember the categories you included in that.  There
9    is listed in here --
10   Q.  Let me refer to the categories.
11   A.  Sure.
12   Q.  And I'm starting on Page 6 of your resume
13   that deals with professional activities.
14   A.  Okay.
15   Q.  The categories I mentioned were state level,
16   national/international level, university committees,
17   department committees, special activities and short
18   courses and tutorials.
19   A.  That's correct.
20   Q.  Other than the speech that you recently gave
21   to the Texas Association of Fire Chiefs, there's no
22   speeches or lectures on those areas.
23   A.  Well, they're not listed here, but there are
24   some as I've told you.  I've given speeches to places
25   like the Rotary Club of Bryan-College Station, et

## Page 96

1    cetera, about smoke detectors and their performance,
2    that kind of thing, but I -- these were -- these are
3    technical presentations that are listed here and --
4    Q.  None of them involve --
5    A.  -- and none of these listed here involve
6    that, no.
7    Q.  You're not a member of any of the committees
8    or subcommittees of the NFPA, UL or USFA.
9    A.  That is correct.
10   Q.  You have never submitted a proposal to UL or
11   NFPA relating to any of its standards concerning the
12   design, manufacture or installation of smoke
13   detectors.
14   A.  No.
15   Q.  I'm correct?
16   A.  That's correct.
17   Q.  You've never authored a publication that has
18   been peer reviewed on fires, fire detection, smoke,
19   smoke production or smoke detection.
20   A.  That's not true.
21   Q.  What have you authored that has been peer
22   reviewed on this issue?
23   A.  Well, there's one listed here specifically in
24   this resume, the one you showed me before.  I'm not
25   sure which page it's on.

## Page 97

1    (Discussion off the record)
2    A.  The first item on Page 14 under conference
3    and professional publications, Responsive
4    Characteristics of Residential Smoke Detectors Under
5    Varying Full-Scale Fire Scenarios was a written
6    document presented to the Academy of Forensic Sciences
7    for their review and they subsequently accepted it for
8    presentation at the meeting.
9    Q.  (By Mr. Heller)  Do you consider that peer
10   reviewed?
11   A.  I consider any publication that was submitted
12   to a group of qualified engineers for a publication
13   where they make a determination as to whether its
14   quality is sufficient for presentation or not to have
15   some degree of peer review, whether --
16   Q.  Do you know what type of review they
17   conducted of this?
18   A.  I don't know.
19   Q.  Do you know if they conducted any review of
20   this?
21   A.  They had to have or they wouldn't have put it
22   on the program.
23   Q.  And what do you mean by --
24   A.  They did something.
25   Q.  What do you mean by that?

**Page 98**

1  A. I submitted the paper for publication, so
2  they did some review.
3  Q. And when you say "publication," who was it
4  published to?
5  A. The proceedings of that conference.
6  Q. The attendees of that conference?
7  A. To my knowledge, the distribution of that
8  would be available to the attendees or probably if
9  somebody requested it otherwise.
10  Q. I have attended conferences where I've given
11  a presentation and submitted an article of some kind
12  and it's just been me handing it to them and them
13  putting it in a booklet and giving it out to the
14  attendees without any review whatsoever. Do you know
15  if your paper had any other review than that?
16  A. I don't know.
17  Q. So you don't know if it was reviewed in any
18  way.
19  A. I don't know what review they did.
20  Q. If any.
21  A. Since I don't know, it would have to be if
22  any because I don't know what review they did.
23  Q. Okay. Other than this particular paper, have
24  you authored any other peer reviewed publications on
25  smoke, smoke production, smoke detection, fires, fire

**Page 99**

1  production or fire detection?
2  A. Publications?
3  Q. That have been peer reviewed.
4  A. I don't think publications in that form, no.
5  Research results, yes, but not publications.
6  Q. What research results have been peer
7  reviewed?
8  A. I've submitted my research results to a
9  number of other individuals who are expert enough to
10  review those.
11  Q. Who have you submitted it to?
12  A. A list.
13  Q. Can you provide me that list?
14  A. No, probably not.
15  Q. Why not?
16  A. Just because I don't want to. I don't think
17  it's a reasonable request. It's not relevant to this
18  case.
19  Q. Have any of the people who you've submitted
20  it to been expert witnesses in a case with you?
21  A. I don't think so.
22  MR. HELLER: So I am officially asking
23  for the list of people that he has submitted that
24  to.
25  Q. (By Mr. Heller) You have to discuss it with

**Page 100**

1  counsel and --
2  A. Yeah, sure.
3  MR. HELLER: And I reserve my right to
4  discuss this at a future deposition if needed.
5  MR. MARCHAN: Sure. In other words, you
6  may need to file a motion to compel since he's
7  indicated he's not willing to turn it over.
8  MR. HELLER: What I would ask is that
9  you talk to him about it and then if that's the
10  answer, then I will file a motion, but this way
11  hopefully we can avoid that.
12  Q. (By Mr. Heller) Nothing other than the two
13  items now that you have mentioned have you had peer
14  reviewed relating to fires, fire detection, fire
15  production, smoke, smoke production or smoke
16  detection. Is that correct?
17  A. You're still talking about the publications
18  and what, our research results? The answer's no, I
19  don't know of anything else other than that.
20  Q. Anything on these issues, anything that's
21  been peer reviewed.
22  A. No. As I've told you before, most of the
23  issues you're naming are not areas in which I have
24  specifically done research. My research is
25  specifically limited to performance of residential

**Page 101**

1  smoke detectors.
2  Q. Okay. Have you, other than the two you've
3  mentioned, had papers, results on the performance of
4  smoke detectors peer reviewed?
5  A. Other than what I've already mentioned in
6  research results, no.
7  Q. Okay. Have you submitted any proposals to
8  any building code authority or NIST relating to the
9  performance of smoke detectors or fires, fire
10  production, fire detection, smoke, smoke production or
11  smoke detection?
12  A. Submitted proposals?
13  Q. Yes.
14  A. No.
15  Q. Have you tried to affect any of the code
16  requirements of any building code authority on any of
17  these issues?
18  A. Only by discussions with individuals who are
19  members of the committees of these various
20  organizations.
21  Q. Who have you discussed these issues with?
22  A. A number of people over the years.
23  Q. And I'm talking about specifically people who
24  are members of the building code authority.
25  A. I understand.

**Page 102**

1  Q. Who?
2  A. I have talked to a number of people over the
3  years who are a member of building code authorities
4  and UL over the issue of my results or conclusions
5  concerning smoke detectors.
6  Q. Who at UL have you talked to?
7  A. I can't give you the names. I don't know
8  sitting here. I've talked to several people over the
9  years.
10  Q. But you can't identify any of them?
11  A. No, I can't.
12  Q. Who have you talked to at any building code
13  authority?
14  A. I can't sit here and give you those names
15  either.
16  Q. Have you talked to anyone from BOCA?
17  A. Not to my knowledge.
18  Q. Have you talked to anyone from the Southern
19  Building Code?
20  A. Yes, I believe so.
21  Q. And who from the Southern Building Code?
22  A. I can't tell you the name, I don't know.
23  Q. If I identified the other building codes,
24  would you be able to identify people by name?
25  A. I don't think so.

**Page 103**

1  Q. Have you talked to anyone from NIST?
2  A. Yes.
3  Q. Who from NIST?
4  A. I can't sit here and give you the names.
5  Q. Have you talked to anyone from CPSC?
6  A. Yes.
7  Q. -- on these issues? Who from the CPSC?
8  A. I can't give you the names, but it's been
9  multiple people.
10  Q. When was the last time you spoke with someone
11  from the CPSC on these issues?
12  A. Probably a month ago.
13  Q. Who did you talk with a month ago?
14  A. Margaret Neely.
15  Q. What was the subject of discussion with
16  Margaret Neely?
17  A. Smoke detector performance and the actions of
18  the CPSC with respect to plans for additional testing
19  and action with respect to residential smoke
20  detectors.
21  Q. Did you call her or did she call you?
22  A. That conversation, I don't remember. I may
23  have called her, but I don't remember.
24  Q. Are you aware of any specific testing the
25  CPSC is conducting on the performance of smoke

Page 104

1  detectors?
2      A. I am aware of plans for them to conduct
3  substantial tests. I'm not going to sit here and tell
4  you that I know that they are or are not today
5  testing. I don't know the answer to that.
6      Q. Are you involved in those tests in any way?
7      A. I have been consulted by them on that, yes.
8      Q. And what issues have you been consulted by
9  them on?
10     A. How those tests should be run to demonstrate
11  the performance of residential smoke detectors.
12     Q. Did you send anything to them in writing?
13     A. Probably.
14     Q. Do you remember submitting anything to them
15  in writing?
16     A. I think I submitted some of the research
17  results that I had already alluded to.
18         MR. HELLER: I would ask that you
19  produce whatever submissions Dr. Russell has made to
20  the CPSC.
21     A. Can I point out that I think you already have
22  those.
23     Q. (By Mr. Heller) I need to know specifically
24  which ones you did submit to them. If you submitted
25  all of them and I have all of them, you don't need to

Page 105

1  do it again.
2      A. Okay.
3      Q. But if you only submitted five, let's say, I
4  need to know which ones.
5      A. Okay.
6      Q. You're not a fire protection engineer.
7  Correct?
8      A. No.
9      Q. Do you consider yourself an expert in
10  describing the quantity and/or size of smoke particles
11  produced by various materials?
12     A. I am reasonably knowledgeable of that subject
13  based on my study of the literature, but I'm not an
14  aerosol expert.
15     Q. So you don't -- although you're reasonably
16  knowledgeable, if I remember the words you just used,
17  you don't hold yourself out as an expert in that area?
18     A. I'm not an aerosol expert in that I do the
19  fundamental work, but I do depend on the literature
20  and am conversant with it on the different types of
21  size of smoke particles that are produced by the
22  burning or combustion of various types of materials.
23  In fact I have one of the papers with me here today
24  that talks about that subject.
25     Q. But the area of expertise I just identified

Page 106

1  that you think is an aerosol expert and you do not
2  hold yourself out as an expert in that area. Is that
3  correct?
4      A. I think I just answered that.
5      Q. Is that correct?
6      A. Yes.
7      Q. Okay. And you've testified in the past that
8  you do not hold yourself out as an expert in the
9  distribution of smoke or smoke particles or heat
10  produced at various stages in the combustion of a
11  fuel. Is that correct?
12     A. That's similar expertise to what we were just
13  talking about and, no, I would not do fundamental
14  studies in that. I would depend on the literature for
15  my need for that information.
16     Q. And you do not hold yourself out as an expert
17  in identifying the type or size of smoke produced by
18  certain particulate matter.
19     A. That question doesn't make sense. Say that
20  again.
21         MR. HELLER: Well, off the record.
22         (Discussion off the record)
23     A. Say it again.
24     Q. (By Mr. Heller) You do not hold yourself out
25  as an expert in identifying the type and/or size of

Page 107

1  smoke produced by certain particulate matter.
2         MR. HELLER: Off the record for a
3  second.
4         (Discussion off the record)
5      A. Rather than have you go to the trouble of
6  looking that up, I am not an aerosol expert, I'm not
7  an individual who does fundamental studies in
8  combustion. And so when you're talking about the
9  fundamental studies of what kind of particles would
10  come off of burning any given kind of material, other
11  than referring to the literature and using the studies
12  of others, I don't do fundamental studies in that.
13     Q. (By Mr. Heller) You're not an expert in fire
14  signatures. Is that correct?
15     A. I think that's an accurate statement.
16     Q. And I think this might be restating what you
17  just said and I apologize for that if it is, but it's
18  not your studied area of expertise what a given
19  material will emit in terms of size and density of
20  smoke particles when burned.
21     A. That's a correct statement.
22     Q. You're not a fire modeling expert.
23     A. That's correct.
24     Q. You're not a cause and origin expert, doctor,
25  pathologist, toxicologist, biomedical engineer, fire

Page 108

1  modeler or psychologist.
2      A. The only cause -- the answer to all that is
3  no, except the only cause and origin I do is sometimes
4  assist related to electrical causes.
5      Q. And that's not relevant to the case --
6      A. But it's not relevant to this case, in my
7  opinion.
8      Q. And you've never taught or received any
9  training in the price sensitivities of the public?
10     A. Not to my knowledge, no.
11     Q. Have you ever told anyone that you're a world
12  renowned expert on smoke detectors?
13     A. Not to my knowledge, no.
14     Q. Your more studied area of expertise relates
15  to the electric utility industry as it involves power
16  distribution. Is that correct?
17     A. That's one of many areas of expertise that I
18  have. It's one I work more extensively in, that's
19  correct.
20     Q. And you've worked more extensively on that
21  issue than in smoke detection.
22     A. I think that's a correct statement.
23     Q. Do you spend most of your time working in the
24  area of electrical engineering relevant to power
25  utilities -- public utilities rather than smoke

Page 109

1  detectors since 1975?
2      A. Since 1975, yes. Since 1995, no.
3      Q. How much money do you earn in total per year
4  working for Texas A&M?
5      A. I'm sorry, say that again.
6      Q. How much do you earn total per year from
7  Texas A&M? And that include the extension service or
8  whatever subsidiary of Texas A&M you work for.
9      A. Well, I only get one check, so it's not --
10  that's not a relevant issue. I apologize for
11  hesitating, but I have to think. I don't --
12     Q. Take your time.
13     A. I just hand my check to my wife and that's
14  what I do.
15         Just a minute. I can probably figure it
16  out. If I add $150,000 a year, it would not be far
17  off, but to be honest with you, I don't know exactly
18  what my monthly salary is.
19         MR. HELLER: What I'd like is the exact
20  figure at some point.
21     Q. (By Mr. Heller) How much money did you earn
22  in 1999 as a consulting or testifying expert on smoke
23  detectors?
24     A. I don't know the answer to that.
25         MR. HELLER: And I would like that, too.

Page 110

1  Q. (By Mr. Heller) How much money did you earn
2  last year consulting or testifying as an expert in
3  areas other than smoke detection?
4  A. I don't know the answer to that either.
5  MR. HELLER: I need that, too.
6  Q. (By Mr. Heller) What expenses do you incur
7  in acting as a consultant and testifying expert on
8  smoke detection, what types of expenses?
9  A. Expenses?
10  Q. Expenses.
11  A. Mainly travel. A little bit of copying,
12  phone, fax, clerical, whatever kind of stuff, but
13  nothing significant. Some -- occasionally I will use
14  a technician or individual to do library research or
15  something because they're cheaper than I am and it
16  saves the client money, but --
17  Q. That's fees as opposed to expenses.
18  A. Well, I put that as expenses because I only
19  list my fees as fees, so if it's an expense to me and
20  passed through with no add-ons, I put it down as an
21  expense.
22  Q. What about the testing that you engage in in
23  the performance of smoke detectors, do you incur any
24  expenses there?
25  A. Yes.

Page 111

1  Q. What type of expenses do you incur there?
2  A. Personnel, materials, detectors,
3  instrumentation, computer systems.
4  Q. Go slow, please. Okay.
5  A. Laboratory equipment of various sorts,
6  instrumentation, materials to burn.
7  Q. Is that different than the materials you
8  identified before? Because you said materials before
9  without saying materials to burn. Your list so far --
10  A. Well, it certainly would include materials to
11  burn. I didn't realize I'd said materials.
12  Q. Here's your list so far: personnel,
13  materials, smoke detectors, instrumentation, computer
14  systems and lab equipment.
15  A. And the materials would include materials to
16  burn as well as consumables of various sorts.
17  Facility related charges or construction or
18  modification or remodeling as required for the tests
19  involved. That's probably all, but I -- in general
20  categories.
21  Q. Who pays for that?
22  A. I do.
23  Q. When you say you do, what do you mean by
24  that?
25  A. I have discretionary research accounts that

Page 112

1  are to be used by me for whatever purpose I deem
2  appropriate in my research activities and I have
3  dedicated some of those monies over time to pay for
4  that kind of cost related to testing.
5  Q. So it definitely does not come out of your
6  pocket, these expenses?
7  A. Meaning out of my personal income?
8  Q. Personal income.
9  A. No, no, no.
10  Q. And it does not come from the attorneys or
11  clients that you are consulting with on smoke detector
12  issues.
13  A. Well, I mean, if they had me run a specific
14  test, they might -- then there might be. I mean, in
15  other words, if in a given -- if a given case somebody
16  said run this -- run these types of tests and give me
17  the results and that resulted in the need for those
18  kinds of materials, then of course they would pay for
19  those kinds of materials. Like, for example, Canadian
20  television asked me to run some specific tests and
21  they bought the smoke detectors and paid some of the
22  direct cost charges associated with their specific
23  tests because they asked for me to do those tests.
24  Q. What specifically did the Canadian television
25  station pay for on their tests?

Page 113

1  A. To my knowledge they paid -- they bought all
2  the smoke detectors that were tested, which was quite
3  a number, and sitting here today I'm not sure, but I'd
4  say paid for some of the direct costs like some of the
5  materials to be burned, something like that.
6  Q. How about personnel?
7  A. I don't think Canadian television paid for
8  any personnel.
9  Q. Who paid for the personnel for their tests?
10  A. Part of that personnel was paid for by me.
11  Q. Using those discretionary funds?
12  A. Using discretionary funds. I think that's --
13  it's hard to divide all this up, but I'd say that's
14  probably an accurate answer.
15  Q. How about for the lab equipment that was
16  used, the costs involved in utilizing the lab
17  equipment?
18  A. There was no billing for the lab equipment.
19  It was in place. I didn't need anything different for
20  those tests than I already had.
21  Q. How about the computer systems?
22  A. No.
23  Q. How about the remodeling or reconstruction?
24  A. There was no reconstruction.
25  Q. How about the instrumentation?

Page 114

1  A. Nothing different than I already had.
2  Q. And what personnel were involved in the
3  Canadian tests?
4  A. Myself, lab managers, assistants.
5  Q. Who are the lab managers?
6  A. Specifically in that case, Mr. Carl Benner
7  who's a lab manager for my field laboratory. A number
8  of students, quite a number actually, and I can't give
9  you the list of the names.
10  Q. Were they paid?
11  A. They're all paid, yes.
12  Q. Anybody else besides Mr. Benner and the
13  students and yourself?
14  A. I'm trying to remember in that case if there
15  was anybody else. I know there was consultation with
16  a couple of other faculty members, but I don't think
17  they were paid. This had to do with some of the
18  instrumentation used.
19  That's about the best answer I can give
20  you.
21  Q. In your prior deposition, I think it was in
22  Ayala, you testified that when you took these tests
23  over from Dr. Grosse, you developed your own protocol.
24  A. Actually I didn't take over his tests. I
25  just started testing when he left the university.

Page 115

1  Q. Okay. But at that point in time you
2  developed your own protocol.
3  A. That is correct.
4  Q. Has your protocol changed over time?
5  A. Yes.
6  Q. Okay. When did it change?
7  A. It changes continuously. Virtually every
8  time I test I modify the protocol.
9  Q. Do you have your prior protocols in any form,
10  computer or otherwise, hard copy, anything?
11  A. I have previously provided to you a general
12  protocol that I use for testing. The specific
13  protocol of any given test is not done in a fashion
14  that I could reproduce. I can go back and tell you
15  what was done on any given test which would represent
16  the protocol, but I can't hand you a stack of
17  documents that say here is protocol 1 through 20 that
18  were used on specific tests. And the reason is I just
19  don't have any reason to keep that; I just make a
20  notation about what's done in any given test, and in
21  many cases those protocols are modified based on what
22  I'm trying to study. So on any given test I can tell
23  you what the protocol was, but I can't hand you a
24  sheet that says here is the explicit protocol.
25  Q. Now, you have, and I think it was in regards

20 (Pages 110 to 115)

Page 116

1  to the Warner case, produced the results of a number
2  of tests.
3    A.  Yes.
4    Q.  Do you have a protocol for each of those
5  tests?
6    A.  The protocol or the description of the tests
7  as I recall was in the materials that were
8  produced.
9    Q.  There was one protocol and there were a
10  number of tests.  When I say a number of tests, tests
11  conducted let's say March of '97 and then another one
12  conducted June of '97 and so forth and so on.
13    A.  Right.
14    Q.  And there was one protocol associated with
15  the entire stack of tests.
16    A.  Except -- that was the general protocol,
17  that's the one I told you I have produced to you.  But
18  if you'll look at the fine print in each of those
19  tests, in some cases there are things that change;
20  number of detectors being tested, location of those
21  detectors with respect to the fire source.  Those are
22  all changes in protocol.
23    Q.  Okay.
24    A.  I'm just saying they're all under the
25  umbrella of that general protocol and that's the only

Page 117

1  one I would have to give you unless you look at the
2  specific issue of a specific test.
3    Q.  Okay.  So if I understand you correctly, if I
4  take that one three-page general protocol, that's the
5  general protocol you use for each test, and that if I
6  then take the printing on the individual test for
7  items such as location of detectors, number of
8  detectors, et cetera, that's the distinction between
9  the protocols used for the various tests.
10    A.  I think that's a fair assessment.
11    Q.  Okay.  When you began testing smoke
12  detectors, the moment that Dr. Grosse stopped and you
13  started, was the facility that is used for this
14  research already in place?
15    A.  No, I've never used Dr. Grosse's facility.
16    Q.  And I mean by that test house.
17    A.  I've never used his.
18    Q.  The facility was thereafter constructed for
19  you or purchased by you?
20    A.  No, it existed since it was a house that
21  dates probably from the '50s, but to my knowledge it
22  was never used by Dr. Grosse.
23    Q.  Was it --
24    A.  I've never tested in any of the facilities
25  that Dr. Grosse tested in, to my knowledge.

Page 118

1    Q.  Who owns that house?
2    A.  The test house that I use?
3    Q.  Yes.
4    A.  It is owned by the Texas A&M University
5  system.
6    Q.  When you took over these tests, and those are
7  my words, not your words, I understand --
8    A.  I understand.
9    Q.  -- did Texas A&M own this facility?
10    A.  Yes.
11    Q.  How did you -- how were you able to use this
12  house?
13    A.  I knew of its existence, wanted a full-scale
14  residence to do my testing in and asked for official
15  assignment of that residence to me.
16    Q.  And did you get that?
17    A.  Yes.
18    Q.  And how does that work?  How does the
19  official assignment work?
20    A.  Well, I called up the vice president, says,
21  "I want to use it," and he said, "Okay."
22    Q.  And who's the vice president?
23    A.  The individual who gave me permission to use
24  that was I think Dr. Jerry Gaston.  He's no longer in
25  that position.

Page 119

1    Q.  And I believe your position now and has been
2  for a while is associate vice chancellor?
3    A.  That's one of my positions.
4    Q.  Okay.  Who is the vice chancellor?
5    A.  Dr. Roland Haden.
6    Q.  Do you only have one facility that you use
7  for tests?
8    A.  I have had two separate residences that I
9  have used for full-scale testing.  They both still
10  exist.
11    Q.  What's the difference between the two
12  facilities?
13    A.  Very little.
14    Q.  How did you acquire the second facility?
15    A.  Same way.
16    Q.  Was it already owned by Texas A&M when you
17  began your testing?
18    A.  They're right next to each other.
19    Q.  So it was owned by Texas A&M and you got
20  assignment of this --
21    A.  Right.
22    Q.  -- by the vice president.
23    A.  Well, I mean, let me just tell you the story;
24  it's easier than you to try to figure out the right
25  questions to ask.  I wanted to do testing.  I borrowed

Page 120

1  one of these houses which was former officers housing
2  on an air base where we have an ownership and
3  where it's a research facility for us, so this is
4  ex-officers -- it's officers housing on an ex-Air
5  Force base that is now owned by the university and has
6  been for over 50 years used as a research facility.
7  These houses date from the '50s.
8    I borrowed one of those houses to do
9  initial testing in.  I decided I was going to do more
10  extensive testing, wanted a permanent installation.  I
11  requested a second, slightly larger, more accessible
12  residence for exclusive use for my testing.  I was
13  assigned that and I am currently testing in that
14  second location.
15    Q.  When did that occur, the exclusive use?
16    A.  I don't know the answer to that.  Sometime in
17  '99 or '98, late '98 maybe.  I don't really know.
18    Q.  Since you acquired use of this second
19  facility, have your tests all been conducted in this
20  second facility?
21    A.  I can't answer that.  I don't know the
22  answer.
23    Q.  Was the Canadian test conducted in that
24  facility?
25    A.  Yes.

Page 121

1    Q.  How many tests did you run for Canada?
2    A.  I can't sit here and tell you, but I believe
3  I produced that to you.
4    (Exhibit No. 6 marked)
5    Q.  (By Mr. Heller)  Let me show you a series of
6  documents we've marked Russell Exhibit No. 6.  Is that
7  what you were referring to that you have previously
8  submitted to me?
9    A.  Looks correct, yes.
10    Q.  Let me get my copy.  The question that is
11  before you is how many tests did you conduct for the
12  Canadian television station.
13    A.  And the answer is I don't know, but I can
14  maybe find out by looking here.  If my memory serves
15  me correct --
16    Q.  There are page numbers at the bottom.  If you
17  can utilize those, I'd appreciate it.
18    A.  Right.  I will.  If my memory serves me
19  correct, I'm dealing with tests that were done on
20  August 6th of 1999.  I believe that's the right date.
21  I didn't commit that date to memory, but I think it's
22  correct.  If that date's correct, then on August 6th
23  of 1999 I tested -- on that date I tested what appears
24  to be 11 different smoke detector devices in a series
25  of four recorded tests.

Page 122

```
1    Q.  What are those tests numbered?
2    A.  They're on Pages 13, 14, 15 and 16, Test
3  Nos. 1002, 1003, 1004, 1005.  I believe that to be the
4  case.
5    Q.  Where is Test 1001?
6    A.  I don't -- A, I don't know if there was a
7  Test 1001; and, B, if it -- it may have been that --
8  because I don't remember.
9    Q.  Let me help you out.
10   A.  Pardon me?
11       Yeah, I was about to say that, so I'm
12 glad you showed me.
13   Q.  You're looking at --
14   A.  It may have been that the test was aborted
15 before any results occurred, and if that's the case we
16 don't reuse test numbers.
17   Q.  Just so for the record it's clear what you're
18 looking at, there is an Appendix A that is followed by
19 first a list of abbreviations and then three pages of
20 something called test history, and you're looking at
21 Page 2 of 3, middle of the way down the page.  And
22 first, doesn't this confirm that the August 6 tests
23 were those produced for the Canadian television
24 station?
25   A.  It says CTV which is that.
```

Page 123

```
1    Q.  And therefore there are Test Nos. 1001
2  through 1005 identified?
3    A.  Right.  Same numbers I gave you before --
4    Q.  Right.
5    A.  -- with the exception of the 1001 which was
6  not really a test in that the heat source was not
7  properly lit, so it was simply aborted and started
8  over at 1002.
9    Q.  Do you know a gentleman by the name of Joseph
10 Fleming?
11   A.  Yeah, I do know Joseph Fleming.
12   Q.  And is he the Boston Fire Marshal?
13   A.  I don't know if that's his current title, but
14 that's my understanding of what he has been.
15   Q.  Was he present for all of the Canadian
16 television tests?
17   A.  He was present during that day.  I don't know
18 whether he was present for all the tests or not.
19   Q.  Do you know what his role, if any, in those
20 tests were?
21   A.  No, he did not advise me.  He was advising
22 CTV.
23   Q.  So you and he did not discuss the tests
24 before conducting them.
25   A.  No.  My tests were using my protocol.  I
```

Page 124

```
1  didn't even, frankly -- I think it's an accurate
2  statement, I didn't even know he was coming and I
3  didn't have anything to -- he didn't have anything to
4  do with my tests or my test protocol.  He was advising
5  CTV.
6    Q.  Moving off for a second the CTV tests, do you
7  consult with anyone at the university about these
8  tests that you conduct?
9    A.  No.
10   Q.  Does any --
11   A.  Well, pardon me.  If I had a computer
12 question and needed to talk to a computer expert
13 because I wanted to do something and I wasn't
14 competent to do it or one of my students, I might call
15 somebody in computer science, or if I -- you know, but
16 in terms of the tests or the test protocol, I consult
17 with no one.
18   Q.  So the procedure utilized for these tests is
19 yours and yours alone.
20   A.  That's correct.
21   Q.  No one has approved it from the university
22 perspective?
23   A.  It's had a safety analysis just so that we
24 don't do something that's going to hurt somebody, but
25 no, nobody approves it.
```

Page 125

```
1    Q.  Are you required in any way to have the
2  protocol submitted to the university?
3    A.  No.
4    Q.  When these tests -- when you first got
5  involved in these tests, did the university in any way
6  come to you and say, "We want these tests run"?
7    A.  No.
8    Q.  Was it vice versa, I want to run these
9  tests"?
10   A.  I didn't ask for permission, I just did it.
11 In my position I don't have to ask for permission.
12   Q.  So it wasn't that the university determined
13 that there was a need for these tests; you decided for
14 whatever reason you wanted to do them.
15   A.  Well, since I direct the engineering research
16 program at the university as the deputy director of
17 the Experiment Station, I would normally be one of the
18 people who would determine whether these were
19 necessary or interesting to do or not.
20   Q.  Okay.  But --
21   A.  It also just turns out that I'm also the
22 researcher.
23   Q.  But someone other than you at the university
24 did not determine there was a need for these tests.
25   A.  Absolutely not.  Other -- well, other than
```

Page 126

```
1  our prior history of doing tests on smoke detectors
2  which predates me.
3    Q.  Right.  I'm talking --
4    A.  But not my specific tests.
5    Q.  At the time that you determined -- excuse me,
6  strike that.
7        At the time that you began your tests,
8  no one other than you at Texas A&M determined that
9  there was a need for these tests.
10   A.  That's correct.
11       MR. HELLER:  Give me a second.  It might
12 be a good time to break for lunch, but let me take one
13 second.
14       (Discussion off the record)
15   Q.  (By Mr. Heller)  With regard to the
16 facilities utilized for these tests, when they were
17 acquired by you or assigned to you, however you
18 phrased it, did you have to do any remodeling?
19   A.  We did -- we did repair of sheetrock and
20 windows and doors and things to make sure that we had
21 the house in what would be considered just a normal
22 livable condition, but we didn't do any remodeling in
23 the sense that we moved walls or changed locations of
24 doors and windows or anything like that.
25   Q.  Okay.  Backing up for one quick second.  You
```

Page 127

```
1  determined that there was a need for this type of
2  facility to conduct your tests.
3    A.  I wanted a full-scale residence.
4    Q.  It wasn't that someone other than you at
5  Texas A&M determined that there was a need for a
6  facility; you determined that when you began your
7  tests.
8    A.  Correct.
9    Q.  And you knew or learned of these facilities
10 the first -- these two facilities and you determined
11 that these two facilities would be suited for your
12 tests.
13   A.  I've known of the existence of the facilities
14 for many years because I have a research lab at this
15 location, and when I wanted to have a full-scale
16 residence it was clear and obvious that these were
17 candidates.
18   Q.  Okay.  But no one other than you determined
19 that these were the two facilities that you wanted to
20 utilize.
21   A.  Absolutely.
22   Q.  And once you got these, you determined the
23 remodeling or reconstruction that was needed to run
24 your tests.
25   A.  To the extent there was any, yes.
```

22 (Pages 122 to 127)

**Page 128**

1  Q. And you determined what instrumentation was
2  needed in order to run your tests.
3  A. Yes.
4  Q. And you determined the materials that would
5  be burning in order to run your tests.
6  A. Yes.
7  Q. And you determined the procedure and
8  mechanics for running your tests.
9  A. Yes.
10  Q. Okay. And that includes you determining
11  where the origin of the fire was going to be?
12  A. Correct.
13  Q. You determining the type of origin of fire?
14  A. Correct.
15  Q. You determining the furniture that was going
16  to be in the house, if any.
17  A. Correct.
18  Q. You determining where the instrumentation was
19  going to be placed and what instrumentation was
20  needed.
21  A. Yes.
22  Q. You determining that the kitchen was to be
23  sealed as an instrumentation room.
24  A. Yes.
25  Q. You determining where the smoke detectors

**Page 129**

1  were going to be placed.
2  A. Yes.
3  Q. You determining where the obscuration
4  equipment was going to be placed.
5  A. Yes.
6  Q. And you determining what specifically you
7  were going to measure: temperature, carbon monoxide,
8  et cetera --
9  A. Oh, yes.
10  Q. -- during these tests.
11  A. Yes.
12  Q. And you determining how the response of these
13  smoke detectors was to be monitored.
14  A. Yes.
15  Q. And you determining the heat source for these
16  fires.
17  A. Yes.
18  MR. HELLER: I think it's a good time
19  for lunch.
20  (Recess from 12:43 to 1:57)
21  Q. (By Mr. Heller) One thing I didn't ask you
22  at the beginning of the deposition that I usually ask
23  witnesses, is there any medication that you're taking
24  that would affect your ability to recollect things or
25  testify accurately or honestly?

**Page 130**

1  A. Not to my knowledge.
2  Q. Okay. In the morning you testified that
3  Combustion Science's tests or the tests performed by
4  people within Combustion Science was, in your words,
5  fatally flawed.
6  A. Right.
7  Q. Can you describe what you mean by that?
8  A. Well, there are some mechanical issues with
9  respect to how the modeling was done that I would take
10  issue with and some of the assumptions and so forth,
11  but to include issues of worrying about the flow rates
12  and pressures to the gas to the particular orifice or
13  burn nozzle, et cetera, but the specific -- besides
14  those mechanical issues which could be questioned, the
15  specific issue that I'm worried about is the leap that
16  they made in their conclusions between the sounding of
17  the ionization detector based on simulated model of
18  the level of obscuration.
19  Now let me explain that. The
20  obscuration measurement that would be -- where this
21  computer model would generate that has really little
22  to do with when an ionization detector sounds.
23  Ionization detector does not sound on the basis of
24  obscuration. It sounds on the basis of an
25  interruption of an ion current flow in a chamber which

**Page 131**

1  is only indirectly related to obscuration and it's a
2  function of type of particulate matter, type of smoke
3  product, how it enters the chamber and a lot of other
4  factors. To say that you can model the level of
5  obscuration, which in this case in my opinion is also
6  a flawed model, but to say that you could even model a
7  level of obscuration and then from that predict when
8  the ionization chamber is going to sound is totally
9  flawed because there is no scientific evidence that
10  links those two things uniquely for an ionization
11  detector.
12  Q. So it's your basic opinion that any fire
13  model that includes a discussion as to when a smoke
14  detector will sound given either a fire or whatever
15  situation we're involved in that determines the timing
16  of a smoke detector's alarm based on obscuration is
17  fatally flawed.
18  A. No. It can be used in the negative to say
19  that it was not sufficient, okay, obscuration for it
20  to sound, but in the case of the ionization detector
21  as opposed to the photoelectric detector, that's not
22  the mechanism.
23  Q. Okay. So if I --
24  A. You have to be careful how you say it because
25  you could use it in the positive. You could say the

**Page 132**

1  model might show that there was not enough material of
2  any kind that had come off to allow it to sound, but
3  you can't reverse that and say you have to get to this
4  level of obscuration and therefore if I get to that
5  level I know that an ionization detector would sound.
6  You can't do that because there's no direct
7  correlation. So what it says is that this ionization
8  chamber could have been presented with invisible
9  particles, which by the way the literature for this
10  particular detector even claims to be able to detect,
11  invisible particles that have absolutely nothing to
12  do, would measure zero obscuration and it still sound.
13  Q. Okay. So if combustion --
14  A. Their conclusion is just wrong.
15  Q. If Combustion Science had phrased their
16  conclusion that there was insufficient particulate
17  matter to sound an alarm of an ionization detector up
18  to X number of minutes, that would have been okay?
19  A. Yeah, if they could do that. They couldn't
20  do it with this model, though.
21  Q. I'm just saying if that's what their
22  conclusion was.
23  A. Yes, but this model won't do that.
24  Q. Okay. That model according to your
25  interpretation will only tell the reviewer when a

**Page 133**

1  smoke -- an ionization detector or any smoke detector
2  will sound based on obscuration and you're saying
3  that's fatally flawed?
4  A. I'm not sure I caught all your language. I
5  am saying it's fatally flawed in that they've made a
6  linkage between the model predicted obscuration level
7  and the time to sound of the ionization detector under
8  these assumptions, and that's wrong. It cannot be
9  done as they did it. There is no scientific linkage.
10  Q. And that's because of the use of the linkage
11  between when it's going to alarm and obscuration.
12  A. That's right.
13  Q. Okay.
14  A. You cannot do that. This thing could have
15  sounded based on invisible smoke particles with zero
16  percent obscuration showing and it could have sounded
17  within a few minutes of this heater turning out smoke
18  products, and the model will not predict that.
19  Q. Now you, in part of your explanation you said
20  that the literature, and I assume you mean the user's
21  manual and possibly other documents put out by BRK,
22  suggests that an ionization detector will sound an
23  alarm in the presence of invisible products of
24  combustion.
25  A. BRK literature says in several places that

Page 134

1　this detector works in the -- ionization detectors,
2　and it's according to which model you're reading the
3　literature for, detect visible and invisible smoke
4　products.
5　　Q.　Okay.　And --
6　　A.　I don't have a copy with me, but I can tell
7　you they do.
8　　Q.　Do you agree that what it was saying is if
9　these visible or invisible products of combustion are
10　at the detector in sufficient quantities, it will
11　sound an alarm?
12　　A.　It has to be whatever is sufficient, you're
13　right.
14　　Q.　It can't just be the first invisible particle
15　of combustion.
16　　A.　I would not say that at all.
17　　Q.　Okay.　So you would agree that it has to be
18　in sufficient quantities, whatever that number is.
19　　A.　Right.　But sufficiency is not the same for
20　the invisible -- small invisible particles versus the
21　larger more visible particles.
22　　Q.　What do you mean by that?
23　　A.　Meaning that the variation in density
24　required, the variation in number required is a
25　function of the type of particles.　And so if you got

Page 135

1　a certain density of invisible -- I'm using this by
2　layman's kind of invisible.　It's really not
3　invisible, as you know.　It's invisible to the naked
4　eye but not technically invisible.　Scientifically
5　it's not invisible.
6　　Q.　Okay.
7　　A.　But invisible particles that caused the alarm
8　to sound, okay, that might be one density level.　You
9　might have the same density level of visible particles
10　of a much larger size and it not sound.　So you have
11　to be very careful because the function of number,
12　density, visibility, et cetera, is a function of the
13　type of particles, and the same density might not
14　sound the detector.
15　　Q.　Is an ionization detector sensitivity
16　inversely or proportionately related to the size of
17　the smoke particle?
18　　A.　It is -- the sensitivity of an ionization
19　detector is inversely related to the size in the sense
20　that the larger the particle, the less sensitive it
21　is.
22　　Q.　And what about --
23　　A.　In general.
24　　Q.　And what about the photoelectric detector?
25　　A.　Just the opposite.

Page 136

1　　Q.　So it would be proportionately related.
2　　A.　Directly proportionate.
3　　Q.　And you characterized, as I was about to
4　phrase my question about photoelectric, that the
5　inverse relationship that you just described as it
6　was -- as we were talking about ionization detector is
7　only generally true.
8　　A.　Yeah, because the curve is not a linear
9　inverse or linear directly proportional curve.　It is
10　a curve.
11　　Q.　But if --
12　　A.　And you can't claim that it is, over a total
13　length, either inverse or directly related.　It is
14　generally the case, if you did a straight line
15　approximation of the response, you'd find that one was
16　more directly related and one was more inversely
17　related.
18　　Q.　But even though the relationship is in a
19　curve form, it is inversely, in other words, the
20　relationship goes downward as the --
21　　A.　The best way to characterize it is the best
22　straight line approximation for each of those
23　performances would be, as I decided -- as I said,
24　photoelectric is more directly responsive to large
25　particles and the ionization detector is the opposite,

Page 137

1　it is more directly responsive to the smaller
2　particles.
3　　Q.　The larger the particle the less sensitive
4　the ionization chambers.
5　　A.　General terms.
6　　Q.　Can you tell me at what date and time in the
7　Cruz residence, based upon what was occurring with the
8　space heater, that there was sufficient products of
9　combustion -- smoke, either visible or invisible --
10　that should have triggered the SA67D ionization
11　detector that was within his residence?
12　　A.　A specific date and time?
13　　Q.　Yes.
14　　A.　No.
15　　Q.　Can you state a specific date and time when
16　Mr. Cruz would have been incapacitated by carbon
17　monoxide?
18　　A.　No.
19　　Q.　Getting back to the tests that we were
20　talking about which I think we had marked as
21　Exhibit 6.　Is that true?
22　　A.　Yeah.　Yes.
23　　Q.　We had discussed the CTV tests, Page 2 of 3.
24　　A.　The --
25　　Q.　On Appendix A.

Page 138

1　　A.　Yeah, the appendix, yeah.
2　　Q.　Turning to Page 1 of 3 which is the page
3　right before you're looking at, under the category
4　marked purpose, all of those lines are indicated as
5　experimental.
6　　A.　Correct.
7　　Q.　That same line that had indicated CTV for the
8　August 6 test.
9　　A.　Yes.
10　　Q.　What did you mean by experimental?
11　　A.　They were all purely for the purposes of my
12　experimentation.　There was no outside influence of
13　any kind directing or requesting or otherwise having
14　anything to do with those tests.
15　　Q.　On Page 2 of 3 all the way down to the first
16　indication of CTV, also the purpose is identified as
17　experimental and the same would be true for that.
18　　A.　Same response.
19　　Q.　Underneath the CTV there are three entries of
20　that page and the top entry of the following page that
21　says Fetterly test and the last one says Fetterly
22　follow up.
23　　A.　Yes.
24　　Q.　What does that mean?
25　　A.　Mr. Jim Fetterly had asked me to run those

Page 139

1　specific tests.
2　　Q.　And that would be four tests.
3　　A.　Yes.
4　　Q.　And then we have six experimental tests and
5　then the last four are WTVJ tests.
6　　A.　Yes.
7　　Q.　Is that for the station in Miami?
8　　A.　Yes.
9　　Q.　In prior depositions you had indicated that
10　you had been involved in testing smoke detectors since
11　approximately 1995.
12　　A.　Yes.
13　　Q.　Where -- why are the tests of '95 and '96 not
14　in this test history?
15　　A.　There are no extent records.
16　　Q.　What do you mean by that?
17　　A.　I don't have any records.　We did not keep
18　any specific records of those tests because, as I
19　said, we have been progressively modifying the
20　protocol and so forth and we just didn't have any
21　records to produce.　I produced everything that I
22　could produce that had test data and so forth.
23　　Q.　Prior to the March 7, 1997 test, did you
24　measure combustion, carbon monoxide or temperature in
25　any of those tests?

Page 140

```
 1      A.  Carbon monoxide, no; obscuration, no;
 2   temperature, maybe.  Probably, actually, in a couple
 3   of them.
 4      Q.  Prior to March 7, 1997, was the only purpose
 5   in your tests time to sound?
 6      A.  Yes.
 7      Q.  Not in any way a function of tenability as of
 8   those tests?
 9      A.  Not exactly.  We did observations at the time
10   of what we would consider tenable or not, but in terms
11   of measured parameters, there were no tenability
12   measurements made.
13      Q.  Were the March 7 tests the first tests where
14   you measured obscuration, carbon monoxide or
15   temperature?
16      A.  March 7, '97?
17      Q.  That's the first test mentioned in the test
18   history.
19      A.  Yes, but if you'll look over to the right,
20   obscuration is not checked.  Where obscuration
21   measurements existed -- and I won't say there weren't
22   others made during other tests but we don't have those
23   records.  There were a lot of obscuration measurements
24   made for instrumentation and calibration purposes and
25   other things where we just didn't keep the
```

Page 141

```
 1   measurements.  So the check is not only measured but
 2   it also implies that it's -- that we recorded it, and
 3   you'll see the check or not is the box.
 4      Q.  Is the first series of tests where you
 5   measured obscuration the August 6 test for CTV?
 6      A.  No.  That's what I was just telling you.
 7   That's the first ones I can produce because it's the
 8   only ones I've got data for.  There are a lot of
 9   obscuration measured tests in calibration of the
10   instrumentation or in prior tests to see how it was
11   going to perform and as we were designing the
12   obscuration system and so forth, but I didn't keep any
13   of those records.
14      Q.  And when you say you didn't keep them,
15   there's no way at this point you could produce them.
16      A.  They simply don't exist.  We just didn't keep
17   the computer records or they were lost in some cases.
18      Q.  The check mark is under the category
19   obscuration measure.  Was there anything else measured
20   besides obscuration?
21      A.  Yes, in each of those cases temperature was
22   measured in every case and the -- in most of those
23   cases there was also some cursory CO monitoring,
24   meaning small level CO monitoring.
25      Q.  Why didn't you measure carbon monoxide in all
```

Page 142

```
 1   those tests?
 2      A.  I started that at the same time I did the
 3   obscuration --
 4      Q.  I meant why didn't you measure carbon
 5   monoxide continuously like you were measuring
 6   obscuration in the tests that you did measure those
 7   things?
 8      A.  I'm not going to say I actually didn't, but
 9   the instrumentation we used for carbon monoxide only
10   had several hundred parts per million capability.  We
11   were just trying to see if we were getting carbon
12   monoxide production.  The purpose of the test was not
13   to directly relate carbon monoxide to the performance
14   because the issues that I was still going after were
15   relationship of obscuration to time to sound, not the
16   issue of carbon monoxide poisoning.
17      So while we -- we did use
18   instrumentation to verify that we were producing
19   carbon monoxide, it was not the kind of
20   instrumentation that would allow me to say -- to plot
21   carbon monoxide poisoning as a function of time or
22   something.  It just means that we would get to levels
23   where we were producing several hundred parts per
24   million of carbon monoxide and we noted that fact, but
25   we were not in these tests trying to relate carbon
```

Page 143

```
 1   monoxide to the other parameters.  It just wasn't a
 2   test objective at that point.
 3      Q.  Do you agree that where there is carbon
 4   monoxide being emitted by a space heater, that a smoke
 5   detector will sound an alarm too late to save a
 6   person?
 7      A.  No.
 8      Q.  You do not?
 9      A.  I won't admit that, no.
10      Q.  Do you agree with that statement?
11      A.  Say it again.
12      MR. HELLER:  Can you repeat that,
13   please.
14      (Record read)
15      A.  No, I don't agree.  That it will sound an
16   alarm too late?  No, I don't agree.
17      Q.  (By Mr. Heller)  If you -- just the opposite,
18   then.  Do you believe that if you have a fully
19   powered, fully operational, well-designed, well-
20   manufactured smoke detector, it will sound an alarm in
21   the presence of carbon monoxide and other combustible
22   products being emitted by a space heater in time to
23   save a person?
24      A.  I'd have to know the conditions,
25   circumstances.  I'd have to know what -- more
```

Page 144

```
 1   information than me willing to just give a carte
 2   blanche answer that says that either always would or
 3   always wouldn't.
 4      Q.  What more information do you need?
 5      A.  Well, for example in this case we know we had
 6   soot deposition which means we know that there was a
 7   substantial level of particulate matter coming from
 8   this heater at some point in time for that heater
 9   (sic) to sound in response to.  That's not a point of
10   your hypothetical.  I don't --
11      MR. MARCHAN:  You mean for that alarm to
12   sound?
13      THE WITNESS:  Yeah.
14      A.  In other words, the issue is you're trying to
15   relate to carbon monoxide as a specific point in time
16   to sound.  An ionization smoke detector is not
17   measuring carbon monoxide; it's measuring particulate
18   matter.  You give me a curve that shows the
19   relationship between the particulate matter and the
20   carbon monoxide, then I'll tell you for that curve
21   what the level is -- or excuse me, the time to sound
22   is for a given level of particulate matter.
23      Q.  (By Mr. Heller)  Do you have that curve in
24   this case?
25      A.  No.
```

Page 145

```
 1      Q.  Then how can you offer the opinion in this
 2   case that the ionization detector in the Cruz
 3   residence should have sounded before there are
 4   incapacitating levels of carbon monoxide?
 5      A.  Because in my experience with combustion,
 6   meaning flameless combustion of materials, I have not
 7   seen a situation where you could have that level of
 8   heat and particulate matter of any kind in that
 9   proximity to an ionization detector and not have the
10   ionization detector go off, without respect to it
11   being a heater.
12      Q.  What do you mean by "that level of heat"?
13      A.  There was a substantial KW measurement of
14   heat.  Even if you use your plaintiffs' -- or your
15   attorneys' rather -- excuse me, your experts'
16   modeling, there was a substantial level of heat being
17   given off, in fact that was the purpose of the heater,
18   which means there's plenty of thermal activity to
19   raise the particulate matter to the level of the smoke
20   detector.  This was not a benign low-heat fire where
21   the particulate matter might not have sufficient
22   energy to get raised to the level of the smoke
23   detector.
24      Q.  So you wouldn't agree with the general
25   statement that if you have a space heater you need a
```

## Page 146

1  carbon monoxide detector because a smoke detector
2  won't sound in time to save you in the emissions of
3  carbon monoxide? You won't agree to that general
4  statement?
5      A.  I don't know if I agree or not because I
6  didn't understand the statement. Repeat it again.
7          MR. HELLER:  Can you repeat that.
8      A.  It's hard for me to answer these in the
9  negative. It would be easier if you ask them in the
10  positive, but go ahead.
11          (Record read)
12      A.  I can't understand that question. It's too
13  complicated.
14      Q.  (By Mr. Heller)  Let me rephrase it.
15      A.  Yeah, let's rephrase it.
16      Q.  Would you agree with the statement that if
17  you have a space heater you need a carbon monoxide
18  detector because you will die or be incapacitated by
19  carbon monoxide poisoning before the smoke detector
20  sounds?
21      A.  You might. Can't say you will according to
22  the circumstances, because if it's burning in complete
23  combustion you're not going to produce the carbon
24  monoxide. So there are all kinds of variables that
25  are going to create the degree to which you are even

## Page 147

1  producing carbon monoxide or not in the presence of
2  these other materials. If you're producing it at
3  levels of particulate matter and it's close enough to
4  a detector, the detector is expected to sound.
5  However, if you are producing carbon monoxide under
6  circumstances where you were not getting particulate
7  matter, which is clearly not the case here, then a
8  carbon monoxide detector certainly would be a better
9  device. And I would recommend if I was giving a
10  recommendation to somebody they have both, not one or
11  the other but both in any set of circumstances,
12  because it's the only way I would think that you would
13  be completely covered.
14      Q.  Have you ever heard of a smoke detector being
15  advertised to sound as alarm in the presence of an
16  improperly vented space heater?
17      A.  I have not, no.
18      Q.  Have you ever heard of a smoke detector
19  advertised as that which can detect carbon monoxide?
20      A.  No, that would be -- no.
21      Q.  Have you ever heard of a smoke detector
22  advertised as a product that will detect the emissions
23  from a space heater that is utilizing an improper
24  orifice for the type of gas used?
25      A.  No.

## Page 148

1      Q.  Do you agree with this quote:  If you have a
2  gas furnace or a gas or butane space heater, use a
3  carbon monoxide detector along with your smoke
4  detector; carbon monoxide poisoning happens so slowly
5  that it's too late by the time a smoke detector kicks
6  in.
7      A.  Well, you're talking about two different
8  mixed mechanisms and you can't -- you'd have to know
9  and to be specific. That won't always be true
10  and it might sometimes be true. There's not enough
11  information there to decide that.
12      Q.  So in the form that I gave it to you, you
13  can't agree with it?
14      A.  No, I can't, not in a universal sense. There
15  are two different parameters involved here. You'd
16  have to know the relationship.
17          (Exhibit No. 7 marked)
18      Q.  (By Mr. Heller)  Let me show you a document
19  that we've marked Exhibit No. 7. Can you identify
20  that for me.
21      A.  It's Warner versus BRK Brands, report dated
22  October 12th, 1999.
23      Q.  That's your report. Correct?
24      A.  Yes.
25      Q.  And is that the form in which you provided it

## Page 149

1  in Warner?
2      A.  It's on my stationery and I have every reason
3  to believe it's the exact report copied.
4      Q.  I just wanted to make sure you have a chance
5  to go through it all.
6      A.  I've just looked through it. It looks like
7  mine, yes.
8      Q.  Okay. And that includes all the attachments
9  that forms Exhibit 7?
10      A.  I apologize, but I didn't look at the
11  attachments.
12      Q.  That's why I said, go through it all.
13      A.  Skipping through, it looks like it's got the
14  attachments that I submitted, yes.
15      Q.  Do you see the part of the attachments that
16  discuss your tests, your smoke detector tests,
17  specifically identifying Test 1002, 1004 and 1005?
18      A.  Are you referring to this?
19      Q.  Yes.
20      A.  Yes, I have that.
21      Q.  And do you see 1 -- you're showing me 1002.
22  Do you see also 1004, 1005?
23      A.  I see 1004. I see 1005. Yes.
24      Q.  And if I'm not mistaken, those are the tests
25  that we've previously identified as the CTV tests?

## Page 150

1      A.  The test numbers would indicate that.
2      Q.  Were you aware that those tests were
3  submitted and attached to your report in the Warner
4  case?
5      A.  I produced all of this for the Warner case.
6      Q.  Okay. So you're aware.
7      A.  Yeah.
8      Q.  Going back to Exhibit 6, Test 1002, and I'm
9  looking now specifically at the test, itself, not
10  the -- if I understand what we talked about before, in
11  terms of the protocol, the information contained on
12  this page as it relates to Test 1002 plus your three-
13  page protocol would contain the entire protocol for
14  Test 1002.
15      A.  To my knowledge, that's an accurate
16  statement.
17      Q.  And in Test 1002 you had 11 detectors:  ten
18  ionization, one photoelectric?
19      A.  That appears to be correct.
20      Q.  And in Test 1002 all of the ionization
21  detectors sounded before the photoelectric in terms of
22  time?
23      A.  Let's see, we've got -- it appears that
24  that's the case.
25      Q.  Turning the page to Test 1003, same question:

## Page 151

1  The items on this page as it relates to 1003 plus your
2  three-page protocol would identify your entire
3  protocol for Test 1003.
4      A.  To the best of my knowledge, yes.
5      Q.  And in this particular test you had again 11
6  detectors:  ten ionization, one photoelectric?
7      A.  Appears to be the case.
8      Q.  Would you agree that each detector sounded
9  within 12 seconds?
10      A.  Appears that that's the case.
11      Q.  Would you agree that they were ionizations
12  that sounded at the same time as the photoelectric?
13      A.  Within that frame of reference, yes.
14      Q.  Test 1004, if I asked you the question with
15  regard to the protocol, would the answer be the same?
16      A.  Yes.
17      Q.  And in this particular test you also had 11
18  detectors, one photoelectric, and would you agree that
19  four ions sounded before the photoelectric?
20      A.  I'd have to count. I haven't seen this in a
21  while. One, two three -- it appears that there were
22  four.
23      Q.  An additional one sounded at the same time
24  and one sounded a second later?
25      A.  That looks about right.

Page 152

```
1   Q.  And in Test 1005, if I asked you the
2   questions with regard to the protocol, the answer
3   would be the same?
4       A.  Yes.
5       Q.  And again in this particular test, 11
6   detectors, one photoelectric?
7       A.  Yes.
8       Q.  And three sounded before -- three ionization
9   detectors sounded before the photoelectric?
10      A.  That looks about right.
11      Q.  In terms of the funding for your work, your
12  tests, you've indicated that you have discretionary
13  funds.
14      A.  Yes.
15      Q.  And they come to you from where?
16      A.  Basically they're Texas Engineering
17  Experiment Station state funds.
18      Q.  Who provides the money to the engineering
19  station?
20      A.  State of Texas and/or research sponsors, but
21  in this case there is no research sponsor.
22      Q.  Research -- an example of the research
23  sponsor, would that be Vanguard who sponsored
24  Dr. Grosse's tests, the heat detector manufacturer?
25      A.  I don't know who sponsored Mr. Grosse's
```

Page 153

```
1   tests, so I --
2       Q.  Would that be an example, assuming they did
3   sponsor it?
4       A.  As an assumption on my part?
5       Q.  No.
6       A.  Yeah, if there was some external sponsor of
7   his test, whoever that was, and they paid for the
8   research funding, then that would be an example of an
9   external sponsor.
10      Q.  Is it your understanding that there's no
11  private source for any of the funds that is utilized
12  in your tests?
13      A.  Except as I have indicated to you where, in
14  the case of CTV for example, they -- the ones you've
15  already noted where they provided the smoke detectors
16  and paid for some of the direct costs associated with
17  it, yes, I have no research funding from any external
18  source:  no manufacturer, no industry, no federal
19  contracts, no state contracts, zip.
20      Q.  When you need money, how do you obtain the
21  money, how do you physically get the money you need to
22  conduct these tests?
23      A.  I just had it.  I have substantially more
24  money than I spent on this testing.
25      Q.  Let's say you want to buy a couch to use in
```

Page 154

```
1   your test it's a thousand dollars.  How do you go
2   about getting that thousand dollars to actually pay
3   for the couch?  That's my question.
4       A.  I would go buy the couch on my credit card
5   and submit an invoice and have it reimbursed.
6       Q.  Okay.  And who do you submit it to?
7       A.  Texas Engineering Experiment Station.
8       Q.  And is there a specific person at the station
9   or entity within the station that you submit it to?
10      A.  It would be general accounting, whoever
11  happened to get it and there's about a hundred people.
12  I mean, I don't know how many people would handle it.
13      Q.  Do you know whether the station accepts
14  private donations from whatever source for tests like
15  yours?
16      A.  Would they?
17      Q.  Yeah, would they?
18      A.  Yeah, they would be glad to.
19      Q.  Do you know if any private entity provides
20  any funding to the station for your testing?
21      A.  I would know explicitly because I would be
22  the one that would have that funding.  And do I know
23  of any private entity?  I mean, I have no -- I've
24  never had any private money from a manufacturer, from
25  a -- of course the federal government doesn't give
```

Page 155

```
1   those kinds of funds, the state doesn't give those
2   kind of funds.  Other than what I've already told you
3   about the direct cost reimbursement related to the
4   specific areas indicated, the -- there is -- I don't
5   think there is any.
6       Q.  Okay.  To your knowledge, have any of the
7   attorneys that have represented any of the plaintiffs
8   that you have consulted for on any of the smoke
9   detector litigation provided any funding for any of
10  your tests?
11      A.  I already answered that question, I thought,
12  when we were discussing these tests and I told you
13  that in the case of a specific group reflecting the
14  desire for testing and paying for the direct costs.
15      Q.  That would be --
16      A.  Okay?  That would be only three instances
17  that I know of:  the CTV test, the Fetterly test and
18  the WTVJ test.
19      Q.  So in regards to --
20      A.  In each of those cases they provided the --
21  some direct cost related items.
22      Q.  So in regards to my question on attorneys,
23  the only attorney you know of that has provided any
24  funding was Mr. Fetterly for the specific tests that
25  are identified as Fetterly tests.
```

Page 156

```
1       A.  I believe that to be true.
2       Q.  Did he provide any funding for the CTV tests?
3       A.  You mean to CTV?  I don't know.
4       Q.  To you or to Texas A&M?
5       A.  My funding for the CTV tests, as I said, they
6   provided the smoke detectors and some direct costs
7   related to what was burned.  I received funding from
8   Mr. Fetterly to set up instrumentation and so forth.
9   I had that instrumentation.  Some of that
10  instrumentation was used in these tests, but it's
11  been used in all these tests since it was installed.
12      Q.  What kind of funding did you obtain from
13  Mr. Fetterly with regard to instrumentation?
14      A.  He had to buy some of the -- because he
15  wanted specific documentation, he had to buy some of
16  the computer-based instrumentation because I didn't
17  have that.
18      Q.  How much money did that require him to spend?
19      A.  I don't know the answer to that question.
20      Q.  And that instrumentation was utilized in the
21  CTV tests?
22      A.  Yes.  If you will notice the August 6 date of
23  the CTV test and the August 7 date of the Fetterly
24  test and the instrumentation was in place prior to
25  those dates.  So all the instrumentation was used on
```

Page 157

```
1   all the tests.
2       Q.  Is that instrumentation still being used on
3   your tests?
4       A.  Yes.
5       Q.  He didn't take -- Mr. Fetterly didn't take it
6   back when he was finished?
7       A.  He did not own it.  This was -- the
8   conditions on which I would have accepted anything
9   like that is he can make a contribution to the
10  instrumentation if he wants a certain level of upgrade
11  of instrumentation or certain quality of
12  instrumentation.  I already had instrumentation in
13  place, but if he wants a certain quality of
14  instrumentation or something like that -- which he
15  did, he wanted documentation to certain
16  specifications -- I purchased all of that equipment, I
17  designed the instrumentation, I put it in place, I
18  said I'm not going to do this without a certain level
19  of direct cost support, which he provided, and I'm
20  going to use that from now on because it belongs to
21  me.  It just became a part of the test setup.
22          MR. MARCHAN:  Is this a different case
23  than my case?
24          MR. HELLER:  It's a case that's over.
25  We're just going over --
```

27 (Pages 152 to 157)

## Page 158

1  MR. MARCHAN: It's already over?
2  MR. HELLER: It's over.
3  MR. MARCHAN: Okay.
4  A. That does raise a question, though: Why are
5  we going into the detail of all this stuff that has
6  nothing to do with this case?
7  Q. (By Mr. Heller) We disagree on that.
8  What specifically did Mr. Fetterly want
9  identified in terms of instrumentation that you
10  were -- your instrumentation was incapable of doing?
11  A. I had an instrumentation system that
12  originally was not -- did not produce the type of
13  computer output that you have seen in these -- this
14  production that you have.
15  Q. What exhibit are we talking about?
16  A. This entire exhibit. All of this computer
17  log based instrumentation with obscuration and so
18  forth, I was doing that in a different way and we
19  agreed that it would be better if this was done in
20  this fashion so that we had highly accurate time-based
21  tied directly to the obscuration measurement tied
22  directly to the detector sounding, and I said that's
23  going to require a level of -- a step up in some
24  computer software and computer than I have and if you
25  want to pay the few thousand dollars it's going to

## Page 159

1  take to do that, I'd be glad to do it, which we did,
2  and it would be -- it is a permanent part of my
3  installation now.
4  Q. Okay. And you're talking about Exhibit 6
5  when you say the entire exhibit?
6  A. Yes, the whole thing. These are the results.
7  The results you see on the tests from 8-6-99 and
8  forward that are prepared are under that test setup
9  that I just indicated.
10  Q. Okay. Now, in your answers to some of my
11  questions concerning funding, I thought you said that
12  the funds that you used are really state funds.
13  A. They are.
14  Q. And then in another question you said
15  something about the state wouldn't provide those
16  funds. What did you mean?
17  A. The state of -- you asked -- that was a
18  separate question. You asked would the state provide
19  me development grants of any kind for smoke detector
20  testing. The answer is no. However, generic research
21  funding is made available to me for any purpose that I
22  want, not for smoke detector testing, for anything I
23  want to do. It is those funds that I have used and
24  those are just discretionary research funds at my
25  disposal. But the state has made me no grants for the

## Page 160

1  purpose of testing smoke detectors.
2  Q. Okay. But the funds that you utilize for
3  your tests come from the state?
4  A. They're all out of state accounts.
5  MR. HELLER: Can you read that last
6  answer back, the last one he said. It's just the last
7  sentence I want.
8  (Record read)
9  A. They are all spent out of state accounts.
10  Q. (By Mr. Heller) Texas state --
11  A. The money is all from State of Texas
12  accounts.
13  MR. HELLER: I want to make sure that
14  was clear on the record. That's why I --
15  MR. MARCHAN: Okay. I understand.
16  A. I didn't mean out of state meaning out of
17  Texas.
18  Q. Right. I know. But when you read a book --
19  I understand.
20  Q. -- it can be taken either way.
21  A. You're right.
22  MR. MARCHAN: We were discussing that at
23  lunch.
24  THE WITNESS: Yeah, that's right.
25  Q. (By Mr. Heller) Do you or are you required

## Page 161

1  to disclose to anyone at Texas A&M how much time you
2  spend working for private customers such as litigants?
3  A. I do in each case.
4  Q. You are required or you do it anyway?
5  A. Both.
6  Q. And how do you disclose it?
7  A. I have to have a -- I submit an outside
8  employment request which names the entity that I am
9  going to be working with or individual if it's an
10  individual. It is a form that's submitted. It is
11  reviewed for conflict of interest. It is approved.
12  It is filed and provides me permission to do
13  consulting.
14  Q. Do you disclose the fact that when you are
15  submitting data obtained by your tests to private
16  litigants?
17  A. Wait, say that again.
18  Q. Do you disclose to Texas A&M that you are
19  providing the data from these tests to litigants?
20  A. Yes.
21  Q. And --
22  A. If I do.
23  Q. And therefore when you provided the data from
24  the CTV tests and the Fetterly tests as you've
25  identified them, you have disclosed them.

## Page 162

1  A. Yes.
2  Q. And what is the nature of that disclosure?
3  A. I wrote a letter per system policy to the
4  vice chancellor of administration and informed him
5  that I was utilizing experimental data and was
6  providing that in a matter of litigation, and he
7  informed me in a phone call that that was acceptable
8  and that by system policy actually I didn't have to
9  tell him that, but I did it anyway just to make sure.
10  Q. Who owns or operates the world's leading
11  testing laboratory for smoke detectors?
12  A. The world's leading. Say that again.
13  Q. Who owns or operates the world's leading
14  testing laboratory for smoke detectors?
15  A. I don't know how -- I don't know how you
16  would answer that question. I mean, if you -- there
17  would be so many ways to measure that, you know, in
18  terms of numbers of tests or types of tests done or
19  quality of instrumentation or actually what you were
20  measuring and I'm sure there are many labs that could
21  on any one of those parameters be considered world
22  class, but I don't know the answer to that.
23  Q. Can you identify any laboratories other than
24  your own and UL laboratories that test smoke
25  detectors?

## Page 163

1  A. Well, there are Norwegian laboratories that
2  have done smoke detector testing. There are smoke
3  detec --
4  Q. Such as --
5  A. Well, the ones in this Norwegian paper for
6  example that are referenced.
7  Q. Norwegian. I thought you said "the region."
8  A. Norway.
9  Q. Okay.
10  A. Federal laboratories in a number of countries
11  that do that. England has some laboratories that have
12  done that.
13  Q. How about within the United States?
14  A. Of course NIST has run some, you know, some
15  tests themselves and have some laboratory capability.
16  I'm sure there are labs in private hands. Surely the
17  smoke detector manufacturers have some laboratories
18  where they do testing. So it's a question of what
19  kind of testing, whether it's full-scale or
20  laboratory, whether it's -- you know what I'm saying,
21  it's -- there are many different ways to measure that.
22  Q. Moving forward with your qualifications,
23  confirming things you've testified in previous cases,
24  you've never designed or been involved in the design
25  of a smoke detector's chamber?

28 (Pages 158 to 163)

## Page 164

1   A. Chamber, no.
2   Q. Have you ever analyzed the sensitivity
3 settings of a BRK smoke detector?
4   A. Meaning comparing their sensitivities to,
5 say, what their claimed sensitivity is?
6   Q. Yeah.
7   A. No.
8   Q. Would you agree that a number of features
9 within the sensing chamber of an ionization smoke
10 detector affect its performance and ability to detect
11 smoke?
12   A. Yes.
13   Q. Would you agree that one such feature is the
14 shape of the chamber?
15   A. Yes.
16   Q. Would another be the volume of the chamber?
17   A. Yes.
18   Q. Another would be the arrangement of the
19 baffles of the chamber?
20   A. Yes.
21   Q. Another would be the distance between the
22 electrodes in the chamber?
23   A. Yes.
24   Q. Another would be the location of the
25 radioactive source in the chamber?

## Page 165

1   A. Yes.
2   Q. Another would be the type of material used
3 for the electrodes in the chamber?
4   A. Yes.
5   Q. Have you done any study on any of these
6 features?
7   A. No.
8   Q. And the same would obviously be true for this
9 SA67.
10   A. For any ionization detector.
11   Q. Have you ever analyzed the calibration of the
12 electric circuitry or sensitivity settings of the
13 ionization chamber of a BRK smoke detector?
14   A. Experimentally or theoretically?
15   Q. Experimentally?
16   A. No.
17   Q. Do you agree that the timeliness of a smoke
18 detector, of an ionization detector's response is
19 related to the sensitivity setting of the chamber and
20 the calibration of the circuitry?
21   A. There is a relationship, yes.
22   Q. Have you made any attempt to analyze the
23 various components inside a chamber, an ionization
24 chamber?
25   A. No, I think you just asked that, didn't you?

## Page 166

1 I said no.
2   Q. Have you ever studied the way smoke enters an
3 ionization detector's chamber?
4   A. Other than look at the openings from the
5 chamber external to internal? Other than that, no.
6   Q. You've just looked at it?
7   A. Yeah, just the normal engineering
8 observation. I've made no study of that.
9   Q. You would agree that the construction of the
10 smoke detector's air flow exit and entrance and its
11 baffling play a role in determining how quick a
12 detector will respond to given smoke conditions?
13   A. Absolutely.
14   Q. And you've never analyzed that issue.
15   A. No, I have not.
16   Q. You would agree that not all ionization
17 chambers process smoke the same way?
18   A. To the degree they have any difference at
19 all, the answer to that would be yes. They do not.
20   Q. And you have not analyzed that issue?
21   A. No, made no comparative studies.
22   Q. And would you agree that the way it processes
23 smoke determines whether it will sound in a timely
24 manner?
25   A. That's one of the factors.

## Page 167

1   Q. Would you agree that the threshold for the
2 reduction in current, which is some preset number,
3 determines when the detector will alarm?
4   A. That is one of the factors.
5   Q. And you can affect the response time by
6 setting it higher or lower.
7   A. That is correct.
8   Q. Do you know the settings of the SA67?
9   A. Not specifically.
10   Q. Would you agree that the components utilized
11 to detect the changes of current affect a smoke
12 detector's response to smoke conditions?
13   A. Yes.
14   Q. And would you agree that all components taken
15 individually or collectively have an effect on the
16 performance and ultimately the sensitivity of a
17 detector?
18   A. Yes.
19   Q. You haven't analyzed that issue either?
20   A. No. It's not relevant to the opinions of
21 this case. In fact none of that is, the last ten
22 minutes, relevant to the opinions of this case.
23   Q. In terms of the tests that you have run, did
24 you develop a methodology and protocol which would
25 instrument chambers of different designs, in other

## Page 168

1 words, photoelectric and ionization detectors, and
2 expose them to known quantity types -- known
3 quantified types of particulate matter?
4   A. We'll have to be very specific about that.
5 Have I made comparative studies of ionization versus
6 photoelectric, yes. Have I done so under as close a
7 full-scale condition as one can get where you are
8 submitting identical smoke to the chambers, yes.
9 Could one characterize those as absolutely identical
10 in a scientific sense? Engineering sense, yes;
11 scientific sense, no, because there's no way to do
12 that, it's not possible.
13   Q. Have you quantified the types of particulate
14 matter that are involved in your tests in any fashion?
15   A. Quantified in terms of measure of let's say
16 density and size during the test? No, I do not
17 measure density and size.
18   Q. You used the word "size." I'm going to say do
19 you measure density or size?
20   A. Either or, no, yet.
21   Q. Do you measure the current flow in the
22 detector's chamber?
23   A. No. I'm doing an external noninvasive time
24 to sound measurement. I make no internal measurements
25 on any of these tests.

## Page 169

1   Q. I have a couple more just to make sure we're
2 clear.
3   A. Sure.
4   Q. Do you measure the recombination rate of ions
5 during any of these tests?
6   A. No.
7   Q. Do you determine the actual space between
8 electrodes and/or the size of particulate matter
9 entering the spaces during these tests?
10   A. No. No internal or invasive measurements are
11 made during the tests.
12   Q. And your tests are conducted without any
13 ventilation and/or operating HVAC system. Is that
14 correct?
15   A. There is always ventilation. There is no
16 intentional ventilation of the rooms, no doors open,
17 windows open type of ventilation, and there is no
18 artificial HVAC at the time of the testing for
19 anything I've shown you.
20   Q. And the kitchen portion of your tests, the
21 kitchen portion of your test facility is sealed?
22   A. Yes. It's simply used -- it's a very small
23 area and so it was -- since it was a very small part
24 of the square footage of the facility and conveniently
25 located, it was ideally suited to seal off, make

Page 170

1  essentially not part of the test scenario as far as
2  the facility is concerned and use it as the
3  instrumentation room. So that's what was done.
4        THE WITNESS: While you're looking, I'm
5  going to take a break.
6        MR. HELLER: Sure.
7        (Recess from 2:45 to 2:51)
8   Q. (By Mr. Heller) Currently how many smoke
9  detector consulting cases are you working on?
10  A. Oh, I don't know, three or four probably.
11  Q. Can you identify them for me? And obviously
12  other than this. I know about this one.
13  A. No, sitting here. I was working on the
14  Dillard case that just closed.
15  Q. Okay.
16  A. Or settled or whatever it did. I mean, I
17  just was asked to finish it out. I'm working on
18  another case for Mr. Fetterly that he has. I think
19  it's a class action kind of action.
20  Q. Schmulbach?
21  A. Yeah. I have been contacted in a couple of
22  other cases that I haven't been retained in, so I
23  won't mention those because they won't -- till I'm
24  retained I'm not part of the case. Let's see, there's
25  a case with Peter Perlman.

Page 171

1   Q. In Louisville?
2   A. Yeah, that I'm involved in. You know,
3  without going back to my file and seeing what's still
4  active and what's not, because sometimes I give a
5  report on these or I'm asked to help and then they
6  close out and I don't even remember, so --
7        MR. HELLER: I would ask for the active
8  cases.
9   A. I'd have to look it up.
10        (Exhibit No. 8 marked)
11  Q. (By Mr. Heller) Let me show you a document
12  marked Exhibit No. 8. Can you identify what that is,
13  please.
14  A. It is a three-page summary of smoke detector
15  performance evaluation test procedures.
16  Q. Would this be the protocol that we have been
17  referring to?
18  A. It certainly -- it may have a little more
19  discussion, but it is certainly inclusive of the
20  protocol in the sense that it talks about the various
21  things measured and how they're done and so forth.
22  Q. When you say --
23  A. It doesn't have such things as the layout of
24  the facility, where the locations are of the smoke,
25  fire and -- I mean the fire itself and those kinds of

Page 172

1  things. So I mean it's not the whole protocol.
2   Q. Other than the layout of the facility, the
3  layout of the placement of smoke detectors and the
4  other information that is contained on the individual
5  tests, such as Test 1002, is this the protocol for
6  your tests?
7   A. Well, it doesn't have the layout for example.
8  That's a separate sheet in there that shows the
9  facility and the physical dimensions. That's not on
10  the test sheet; that's separate from this.
11  Q. If we include the layout --
12  A. Probably has about everything else.
13  Q. Would you agree that the layout that you're
14  referring to is under Appendix C of Exhibit 6?
15  A. That's one. There's two that we produced, I
16  think. I believe you'll find there's another sheet
17  with two. That's it.
18  Q. Second page of Russell Exhibit 6.
19  A. Yeah, that's correct.
20  Q. If we include those diagrams, would we now
21  have your entire protocol marked as an exhibit?
22  A. As far as I know, all -- in everything we've
23  referenced it's all here, yeah.
24  Q. Under background and purpose which is Page 1
25  of Exhibit 8, you say, "Much anecdotal evidence exists

Page 173

1  to suggest slow operation of ionization smoke
2  detectors in the presence of smoldering nonflaming
3  fires."
4   A. Correct.
5   Q. What is the anecdotal evidence you're
6  referring to?
7   A. The anecdotal evidence refers to that
8  evidence that was not scientifically produced but was
9  produced by observation or experience, and if you look
10  at some of the literature that has been published over
11  the last 30 years you will see some of that. Now, I
12  call it anecdotal because in some cases they say they
13  test it, but then they don't produce the tests. So
14  while they may not count it as anecdotal, they might
15  count it as experimental, without benefit of their
16  exact test results and so forth, I've labeled it
17  anecdotal.
18  Q. And do these documents that you're referring
19  to talk about, and I'm using the word in quotes,
20  "slow" operation of ionization detectors?
21  A. In most cases they are referring to slow
22  operation of ionization smoke detectors to smoldering
23  fires, slow.
24  Q. Do they use the word "slow"?
25  A. Some do.

Page 174

1   Q. Okay. Which words -- which ones use the word
2  "slow"?
3   A. I apologize, but I couldn't sit here and
4  quote that. I'd have to go back to each one of those
5  documents and search through and see what their
6  language was.
7   Q. Do you consider the word "slow" an objective
8  criteria?
9   A. Slow can be very objective in the sense that
10  it can be slow when compared to other detection
11  devices, it can be slow with respect to tenability
12  parameters, it could be slow with respect to other
13  ionization detectors of similar type. And that can be
14  very objective. It can also be subjective.
15  Q. You continue on by saying that, "Presumably
16  these detectors passed UL tests but failed to perform
17  well in certain common fire scenarios." What did you
18  mean "by failed to perform well" in common fire
19  scenario?
20  A. Well, simply meant adequately in that failed
21  to provide the anticipated time to warn that would be
22  required or proper warning prior to exceeding
23  tenability criteria.
24  Q. Are you aware of a report prepared by a woman
25  named Susan Malizny of a study of ionization smoke

Page 175

1  detectors in Oklahoma?
2   A. I don't think I've seen that.
3   Q. Are you aware of a report prepared by William
4  Jurnigan of a study of ionization detectors and how
5  they performed in Dallas, Texas?
6   A. I don't think I've seen that either.
7   Q. In the second paragraph of this exhibit, it
8  starts off by saying, "In response to the potential
9  need for better performance evaluation, Texas A&M
10  University created a full-scale facility for creating
11  smoldering fires in a realistic setting in order to
12  better test smoke detectors."
13        This morning you indicated that Texas
14  A&M had nothing to do with it, that you created this
15  facility.
16  A. I'm an officer of the university and that's
17  the context in which I used this.
18  Q. Okay. Did you ever explain that to anybody
19  whom you were providing this, I'll call it a protocol,
20  to?
21  A. I don't understand what you're asking.
22  Q. Let me ask it this way: Exhibit No. 8, have
23  you provided, other than to attorneys in litigation,
24  this document to anyone?
25  A. I doubt it.

Page 176

```
1    Q. Did you --
2    A. I think it was actually produced expressly at
3  the request of BRK.
4    Q. Did you provide it to CTV?
5    A. I have no idea.
6    Q. Did you provide it to WTVJ?
7    A. I don't know.
8    Q. Do you remember if -- explaining to either of
9  those stations that any reference in any of your
10 documents to Texas A&M really meant you as it relates
11 to your tests?
12   A. I never represented to anybody that I was not
13 the researcher conducting these tests and the
14 responsible party for the university, but as deputy
15 director of the Engineering Experiment Station, I am
16 the individual who determines what is our business and
17 what isn't.
18   Q. The next sentence and every other reference
19 to it where it says Texas A&M did something, Exhibit 8
20 means B. Don Russell did it on behalf of Texas A&M.
21   A. No, that's not true. You're misleading this.
22 I have a lab manager, I have students, paid employees,
23 I have consulting faculty. There are other people
24 involved in this besides myself. All of these things
25 are inclusive of anyone and everyone at Texas A&M
```

Page 177

```
1  University who has had anything to do with this
2  activity.
3    Q. Whom other than you created the full-scale
4  facility for creating smoldering fires?
5    A. The students, my lab manager.
6    Q. What role did Mr. Benner have in this?
7    A. He took my directions and provided much of
8  the installation, the instrumentation, the management
9  of the repairs and remodeling of the facility and
10 whatever else I recommended him to.
11   Q. What about the students?
12   A. They took his direction, or mine.
13   Q. Did anyone other than Mr. Benner or the
14 students or you instrument the facility to measure
15 parameters of common interest?
16   A. Yes, we used some people from our chemical
17 engineering department as -- for consultation
18 purposes, some person from our nuclear engineering
19 department who is an expert in carbon monoxide
20 measurement and toxicity, various individuals on a
21 consultation basis as we were trying to decide how we
22 were going to do this instrumentation.
23   Q. Who from your chemical engineering
24 department?
25   A. Dr. Rock.
```

Page 178

```
1    Q. R-O-C-K?
2    A. Uh-huh.
3    Q. Anybody else?
4    A. Probably. I'm trying to remember who else I
5  talked to. I'm sorry, I don't -- sitting here today,
6  I can't remember who else I talked to. Some people
7  from our health physics area where they have expertise
8  in aerosols and measurement and so forth.
9    Q. Do you remember whom from your health physics
10 area?
11   A. He's -- that's where Dr. Rock is.
12   Q. Is health physics within the chemical
13 engineering department?
14   A. No, it's within the nuclear engineering
15 department.
16   Q. So Rock is in the nuclear engineering
17 department?
18   A. Yes, health physics is in the nuclear
19 engineering department.
20   Q. I thought you asked you about the chemical
21 engineering department. Who did you consult with
22 there?
23   A. I've consulted with one or two people related
24 to measurement of aerosols, toxicity and so forth, but
25 none of that instrumentation has been put in place.
```

Page 179

```
1    Q. So while you've consulted with them, at the
2  present you haven't utilized any of their
3  consultations for your tests.
4    A. Yeah. And actually Dr. Rock's consultation
5  was fairly minimal, just more confirming of what I
6  wanted to do and using -- utilizing some
7  instrumentation that we had in some of the
8  laboratories in nuclear engineering. Really a
9  graduate student that did that.
10   Q. Going back to the first paragraph, you
11 indicate that detectors apparently failed to perform
12 well in common fire scenario. Did you mean
13 smoldering fire? First paragraph.
14   A. Which paragraph are you in?
15   Q. The first paragraph.
16   A. Of what?
17   Q. The first paragraph of the page.
18   A. Oh, of the whole page. I thought we were
19 down on the page. I'm sorry, I thought you meant -- I
20 apologize. I thought we were under a different
21 heading already. I thought we were finished with the
22 first heading. Okay. So, failed to perform well in
23 certain fire scenarios, and what's the question?
24   Q. Did you mean smoldering fire scenarios?
25   A. Generally speaking it would be primarily
```

Page 180

```
1  smoldering fire scenarios.
2    Q. Did you ever do a study or review a study
3  that identified the percentage of residential fires
4  involving fires versus flaming fires?
5    A. I've read some literature concerning the
6  percentage of fires that are -- that start as
7  smoldering fires. For example, there's some NFPA
8  statistical data that shows in fire deaths the most
9  common form of fire is a smoldering fire condition
10 started by a cigarette. There is a lot of data along
11 those lines. I don't have any of it committed to
12 memory, but there's a lot of data in the literature
13 about that.
14   Q. Okay. Let me just make sure since your
15 sentence was a compound sentence, are you saying that
16 there are more deaths in residences from a specific
17 type of fire that is a cigarette fire in a couch that
18 smolders, or are you saying of the smoldering fires
19 that kill the most prevalent one is those which start
20 with a cigarette?
21   A. No, of all fires that kill, the most
22 prominent cause, and I don't mean that to say that in
23 all states at all times it's always the number one,
24 but in a general sense the most prevalent or one of
25 the most prevalent causes are smoldering fires due to
```

Page 181

```
1  cigarettes, of all fires that kill someone.
2    Q. And what study from the NFPA are you basing
3  that on?
4    A. It's on their Web site. You can go look up
5  causes of fires and you'll find a list of statistics
6  ad nauseam on fires that kill, fires that don't, ones
7  that cause certain damage to structure, percentages of
8  this, that and the other. Just go surf their Web site
9  and you'll see a lot of that stuff.
10   Q. Are you familiar with the report they issued
11 in June of 1999 that says just the opposite, that only
12 6 percent of all fires are smoldering fires and only
13 20 --
14   A. That's a different question than what I said.
15   Q. Hold on, because you interrupted me in the
16 middle of the question.
17   A. Okay.
18   Q. And only 20 percent of all residential fires
19 that result in deaths started in a smoldering variety?
20   A. I think that's still a different statement.
21   Q. How is that different?
22   A. Because I wasn't trying to give you a
23 percentage of what fires are smoldering fires. I said
24 of fires that kill. See, there are lots -- the
25 majority of fires, there is no death. The majority of
```

31 (Pages 176 to 181)

Page 182

1  fires are easily escaped because people are awake or,
2  you know, aware of the fire occurring. It starts in a
3  kitchen, they know it, they walk out, call the Fire
4  Department, all that stuff. You eliminate all those
5  and you go to the ones that kill people, okay? Now,
6  if you look at the ones that kill people and then you
7  look at the most common causes of those fires that
8  kill people, one of the top causes is cigarettes.
9     Q.  Let me rephrase the question. First of all,
10 are you familiar with the report that I'm talking
11 about?
12    A.  No, I don't know if I am or not. I just got
13 mine off of their Web site.
14    Q.  Okay. So you're not familiar with the report
15 that they issued in June of 1999 that said of the
16 fires in residences that kill people, smoldering fires
17 are only the cause in 20 percent of the fires.
18    A.  I've not seen that statistic. I'm not
19 disputing it. I just haven't seen it.
20    Q.  Okay. The fourth paragraph down, second
21 under corresponding Underwriters Laboratory standard,
22 starts off by saying, "TAMU tests purposely different
23 from UL test procedures in order to better simulate
24 real world scenarios."
25    A.  Right.

Page 183

1     Q.  Do real world scenarios typically have no
2  forced ventilation involved?
3     A.  They may or may not. Many times they don't
4  have any forced ventilation --
5     Q.  Do --
6     A.  -- according to the part of the country
7  you're in.
8     Q.  Do real world scenarios typically involve a
9  residence where the kitchen is sealed off from the
10 remainder of the house?
11    A.  That's an irrelevant parameter.
12    Q.  Do they typically have that situation?
13    A.  If the kitchen door was closed, yes.
14    Q.  Does your residence have a kitchen door that
15 is just closed or do you seal it off in some other
16 way?
17    A.  I also put tape around the edge because I
18 don't want the smoke inside that room inadvertently,
19 but closing the door for the most part would be
20 adequate.
21    Q.  Okay. But do real world scenarios typically
22 have a kitchen that there's tape around the door --
23    A.  No.
24    Q.  -- of the kitchen?
25    A.  They wouldn't use tape.

Page 184

1     Q.  What did you mean by the sentence in that
2  same paragraph, "TAMU procedures do not use a smoke
3  chamber or circulating fans"?
4     A.  I simply mean by that that these are full-
5  scale tests and there is no intentional use of fans to
6  circulate the smoke as is the case with some of the UL
7  tests.
8     Q.  Is it your belief that the UL fire tests
9  involve use of a smoke chamber or circulating fan?
10    A.  If you use the UL approved smoke chamber test
11 with a fan, yes.
12    Q.  Now --
13    A.  If you use the larger scale test, then the
14 answer is no. But I'm just pointing out I don't do that.
15    Q.  Okay. You're comparing TAMU procedures, at
16 least in this one sentence, to the UL smoke box test.
17 Is that correct?
18    A.  I'm simply -- no, I'm not comparing at all.
19 I'm simply saying I don't use either of those things
20 in these tests. That's all I'm saying.
21    Q.  You would agree that UL only uses these
22 things in their smoke box test?
23    A.  I never implied that they didn't.
24    Q.  But --
25    A.  Yeah, I agree. I didn't -- wasn't implying

Page 185

1  that they did.
2     Q.  Would you agree that in the UL smoldering
3  fire test, they don't use a smoke chamber or
4  circulating fan?
5     A.  In their one where they use the more open
6  room with the fur on the heating element, is that the
7  one you're referring to, fur blocks on the heating
8  element in order to --
9     Q.  I'm referring to their smoldering fire test.
10    A.  Well --
11    Q.  Are you familiar with UL's smoldering fire
12 test?
13    A.  Yes, I am. And there's -- all I'm trying
14 to -- I'm not trying to hedge your answer, I'm simply
15 trying to say all I was saying was that I don't use
16 these elements. To the degree to which you want to
17 specify their, quote, "smoldering fire test," then I
18 think it's also true because they -- that's not what
19 they're using. But I'm making no distinction between
20 their smoldering fire test and their regular smoke
21 detector test. I'm simply saying I don't use any of
22 those things in the test. It was simply a point of
23 clarification to make sure that it was clear that we
24 were not duplicating any of the UL tests. We made no
25 attempt to do that.

Page 186

1     Q.  I believe you've answered it. You agree that
2  UL in their smoldering fire tests don't use --
3     A.  I'm in full agreement and I'm saying that I'm
4  not in any way duplicating that with or without a
5  smoke detector chamber or circulating fans.
6     Q.  Your last sentence of that same paragraph
7  says, "TAMU procedures intentionally duplicate real
8  world conditions to the extent possible." What does
9  that mean?
10    A.  It means that I've made no artificial
11 modification of this residence. I'm using commonly
12 commercially purchased materials for the fire itself.
13 I'm using commonly purchased off-the-shelf smoke
14 detectors, nothing artificial about them. I have made
15 no attempt to modify the structure for any particular
16 result. It's just a full-scale residence with a fire
17 lit in one location and smoke detectors found in
18 another part of the residence.
19    Q.  When you purchase a sofa or couch to be used
20 in the smoldering fire test that you perform --
21    A.  Yes.
22    Q.  -- do you specify whether it's to be flame
23 retardant or not?
24    A.  I've used both and I don't -- I wouldn't
25 specify or not according to what I was trying to show,

Page 187

1  but I have used both.
2     Q.  Do you in any of the data that has been
3  provided identify which tests involve the flame
4  retardant couch versus couches that are not flame
5  retardant?
6     A.  I don't think any designation of any of that
7  is on these materials. You have my copy. To my
8  knowledge, it's not, no. Can it be reconstructed? It
9  possibly could.
10    Q.  You've provided us and contained in that box
11 that's over there a CD, compact disk that identifies
12 data from your tests. Would that have any of the
13 identification as to whether the couch was --
14    A.  It may. I don't know the answer, though.
15       MR. HELLER:  Let's go off the record.
16       (Discussion off the record)
17    Q.  (By Mr. Heller) The production you have
18 provided us previously included a compact disk that
19 identified other data from your tests. I've now given
20 you the opportunity to review printouts from that
21 compact disk. Does that data identify any of the
22 tests that involve flame retardant couches versus the
23 tests that didn't?
24    A.  Not to my knowledge, no.
25    Q.  Do you know of any fires that have occurred

32 (Pages 182 to 187)

Page 188

```
 1   in residences throughout the country that were started
 2   with a soldering iron on a couch other than --
 3       A.   Other than mine?
 4       Q.   Other than your test couch.
 5       A.   Not that I know of.
 6       Q.   Do you know the type of particulate produced
 7   in a soldering iron caused fire as compared with other
 8   fires?
 9       A.   By observation, not measurement, there is
10   virtually no difference in the production of smoke,
11   coloration of smoke, quantity of smoke from a well-
12   progressed burning cigarette and a soldering iron
13   which have similar temperatures on the same type of
14   fabric material.  And since I'm not controlling for
15   fire source in most of my tests, it's simply a
16   reliable way of duplicating a cigarette level of heat
17   for a smoldering type of fire because all I care about
18   is the rate of obscuration increase in many of these
19   tests.  So I -- it's simply a convenient way to do
20   that.
21       Q.   You're not concerned in any way at this point
22   with the size of the particulate matter produced?
23       A.   No, I would be concerned about that if I was
24   a manufacturer worrying about whether it was going to
25   sound or not, but if I'm strictly after the issue of
```

Page 189

```
 1   whether the obscuration measurement on the smoke
 2   detector is an indicator of the obscuration at which
 3   the unit will sound, then the actual heat source
 4   creating the smoldering fire is an irrelevant issue.
 5   Doesn't matter if it's a cigarette, a soldering iron,
 6   an electrical connection that's glowing from an
 7   extension cord or any other source that produces
 8   enough heat to cause the smoldering fabric to -- or
 9   the -- excuse me, the fabric to smolder.  That's all I
10   cared about at that point.
11       Q.   Is it your testimony, then, that the
12   soldering iron caused fire is the same in terms of the
13   smoke produced as the cigarette caused fire on a
14   couch?
15       A.   It would be essentially the same.  I'm sure
16   it's not exactly, but the issue is what does
17   smoldering polyurethane produce.  As long as the heat
18   source is roughly the same, you're going to get
19   roughly the same production out of smoldering
20   polyurethane because it's not so much a function of
21   the heat source as it is the polyurethane itself
22   smoldering.  After a few minutes the polyurethane
23   becomes its own self-sustaining heat source, so the
24   fact that there is a soldering iron or a cigarette
25   that started that becomes totally irrelevant.
```

Page 190

```
 1       Q.   Do you keep a soldering iron on the couch
 2   during a test or do you remove it at some point?
 3       A.   Generally I just let it sit there, but it
 4   ends up usually being not necessarily even in contact,
 5   I mean if it burns away from it or if it burns it up.
 6       Q.   When you say the production from a soldering
 7   iron caused fire is essentially the same as --
 8       A.   That's a --
 9       Q.   -- the production from a cigarette fire,
10   you're talking about the smoke production?
11       A.   I'm talking about the quantity of particles,
12   the type of particles and the characteristics of the
13   particles, because what's determining that primarily
14   is the smoldering polyurethane, the material itself,
15   not the original heat source that got it started,
16   because after a few moments of that, it becomes self-
17   sustaining.  The polyurethane takes over and it's
18   really the edges of the polyurethane that are in a
19   self-sustaining smoldering mode.  And by now the
20   cigarette's even gone, for example, if it started the
21   fire.  Cigarette doesn't exist anymore, so you can't
22   say that the cigarette is a material factor.
23       Q.   Do you believe that the soldering iron is
24   actually pyrolyzing the couch in order to create the
25   smoke?
```

Page 191

```
 1       A.   Good question.  I would say that -- give the
 2   same answer, that after a short period of time, once
 3   the polyurethane has ignited and become self-
 4   sustaining, it's really irrelevant.
 5            By the way, most of these fires were not
 6   started with a soldering iron.  It's a rare occurrence
 7   that I use that.  I sometimes -- I used it early on
 8   when I wanted repeatability, but in almost all of
 9   these tests that you have produced, it's a cigarette
10   that was used.
11       Q.   Moving on to the paragraphs under test
12   facility, the second paragraph, it starts off with,
13   "TAMU seals the kitchen area of the facility from the
14   rest of the structure and uses it as a control room
15   for observation and for housing monitoring equipment."
16   Do you know what effect, if any, that has on smoke
17   movement?
18       A.   I think zero.  This is a -- this kitchen
19   is -- has one door to it from the dining room area.
20   It would not be an area where it was open to the house
21   under -- in any sense it has any large normally open
22   areas.  It is a very small area that's measured
23   probably not more than I'm going to guess eight by
24   maybe six feet.  It's a very small part of the total
25   square footage of the area.  If it was a porch and not
```

Page 192

```
 1   a kitchen area and not part of the actual house proper
 2   because that was an external door, it would have
 3   absolutely nothing -- no impact on the testing; hence,
 4   from an engineering perspective, not using it as a
 5   part of the house proper is an irrelevant parameter
 6   with respect to this testing.
 7       Q.   Did you perform any tests to determine
 8   whether it had any effect or not?
 9       A.   From an engineering perspective it can't,
10   because I defined my residence as being noninclusive
11   of the kitchen.
12       Q.   But the question is did you do any tests to
13   determine whether sealing of the kitchen had any
14   effect on smoke movement?
15       A.   There's no way to do that.
16       Q.   Could you have run a test without the kitchen
17   being sealed or a series of tests without the kitchen
18   being sealed, observed and measured smoke movement and
19   then compared them to when you did it with a sealed
20   kitchen?
21       A.   No, because you can't replicate the
22   conditions of any given test close enough to have
23   repeatable conditions to which to compare to.
24       Q.   To be --
25       A.   There's more variation in the fires than
```

Page 193

```
 1   there is in the facility impact.
 2       Q.   Would you agree that to be scientifically
 3   valid, tests have to be repeatable?
 4       A.   No, sir, they do not.  They have to be
 5   statistically valid, not repeatable.
 6       Q.   And to be statistically valid, what does that
 7   mean?
 8       A.   It means that you have to do the tests enough
 9   under conditions that are either controlled enough or
10   known enough so that you can draw conclusions about
11   the validity of those tests.  But since every single
12   fire that I ever occurred is different, every one,
13   including those run by UL, even though theirs are very
14   similar but they're still different, there's no way to
15   run two fires that are like enough that you can say I
16   have exposed anything, facility or smoke detector or
17   anything else to exactly the same conditions, because
18   every fire is different, every fire develops in time
19   differently, every fire develops products differently
20   according to uncontrolled parameters and it's
21   impossible to replicate full-scale conditions exactly
22   under any given controlled conditions.
23       Q.   During UL's fire tests --
24       A.   Yes.
25       Q.   -- do you agree that they measure the buildup
```

33 (Pages 188 to 193)

Page 194

1  rate of smoke?
2    A. That's one of the things they look at.
3    Q. Do you agree they measure the obscuration
4  levels --
5    A. Yes.
6    Q. -- during the tests?
7    A. Yes.
8    Q. What other parameters are you aware that they
9  measure during their fire tests?
10   A. Well, I mean obviously they're looking to
11  determine whether the devices sound or not and I
12  assume that they have some temperature measurements
13  that they do to keep the things within controlled
14  parameters or at least they probably did that when
15  they were setting the tests up. They may or may not
16  do it on an ongoing basis. I don't think they in
17  general are studying tenability, so I'm not sure that
18  they make those kinds of measurements for that
19  purpose. I think they're basically looking for
20  performance parameters.
21   Q. Is there a specific buildup rate that is
22  involved in your tests that are not duplicated in any
23  of the UL tests?
24   A. I do not control the smoke buildup. It
25  happens as it happens.

Page 195

1    Q. So you wouldn't know the answer to that.
2    A. No, I do know the answer. I don't control
3  it, so it happens as it happens. In UL's case they
4  have controlled parameters that they try to keep the
5  specifications for how -- the rate of rise of smoke,
6  et cetera, because they have a much more specific
7  specified control over their parameters in their
8  tests. I let them happen as they naturally happen.
9    Q. Do you know if the buildup rate in your tests
10  are within the parameters utilized by UL in their fire
11  tests?
12   A. Sometimes they would be, sometimes they
13  wouldn't, because I don't control that.
14   Q. Because you don't control it, can you
15  pinpoint any of the fires in any of your tests that
16  fell outside of the parameters of the buildup rate
17  that's in the UL testing?
18   A. I've made no study to determine whether the
19  rate of rise of smoke obscuration, which would be
20  probably the measurement that you would use, would be
21  on any given test inside or outside of the parameters
22  of UL. Many would be outside I'm sure.
23   Q. How do you know? You keep saying many would
24  be outside. How have you scientifically --
25   A. Well, if someone tests the smoke --

Page 196

1    Q. Let me finish my question.
2    A. I thought you were finished. Sorry.
3    Q. That's okay. I've cut you off a couple
4  times, too.
5       How -- or what bases do you have to say
6  any of the buildup rates in your tests are outside of
7  their parameters if you have not measured it?
8    A. All you have to do is if you look at --
9  you've got any copy of the tests? I'll show you an
10  example. If you look at Test 1009 -- I just picked
11  this at random, it's the first one I came to.
12   Q. Identify the chart you're looking at, please.
13   A. I did. Test -- oh, I'm sorry. Test 1009,
14  obscuration plotted versus time. You will note that
15  at approximately between 70 and -- between 70 and 90
16  minutes there is a very rapid rise in obscuration on
17  that test.
18   Q. And it's your belief that that --
19   A. I am confident that that rate of rise is
20  probably outside of the parameters of the standard UL
21  test which they control to. Now, the rate of rise
22  between 20 minutes and 70 minutes might -- and I've
23  made no study of this, might be inside their
24  parameters. I'm just let things happen very widely in
25  these tests if you just let things happen naturally

Page 197

1  and make no attempt to control it. And I'm not saying
2  I've studied this. I'm simply giving you an example
3  of where that might be the case. Up to 78, 75 minutes
4  it might well be and then between 78 and 90 it might
5  not be, but this is what happened physically in that
6  test.
7    Q. And you're talking about the obscuration rate
8  increase between what appears to be 75 or 76 minutes
9  and 80 minutes --
10   A. Yeah.
11   Q. -- on this chart?
12   A. Yeah.
13   Q. Okay. I understand.
14   A. It's just not a parameter that I control,
15  because to do that means you have to artificially
16  control the circumstances of the test.
17   Q. Have you determined in any way whether the
18  size of the particulate matter that's produced in your
19  fires is duplicated in any of the UL tests?
20   A. Made no comparison because I don't have the
21  data from their tests that would even allow me to do
22  that.
23   Q. Okay. Your next sentence under test facility
24  says, "TAMU also closes its exterior doors and windows
25  in order to control smoke during experiments." What

Page 198

1  are you trying to control?
2    A. There's no external ventilation, meaning
3  there's no, you know, air flow, intentional air flow
4  from outside. Now, there's the normal breathability,
5  if you please, of the room, to use the more or less
6  layman's term. I mean it's -- the facility is a
7  house. I've made no attempt to seal the outside
8  windows or external doors. I've just closed them as
9  they normally would be closed. It's a relatively old
10  house. It's probably got a little air flow
11  infiltration, but there's nothing artificial about it.
12  It's what would -- it's what would be the case in any
13  1950s or early '60s vintage house in College Station
14  built about the same time with respect to the type of
15  windows and doors it has.
16   Q. Wouldn't the effect that closing the windows
17  and doors, sealing the kitchen and not having any HVAC
18  be to slow the movement of smoke in your tests?
19   A. Not necessarily.
20   Q. Why not?
21   A. Well, if I have a window open in the room of
22  fire origin, okay, or one or more windows open, it
23  might arbitrarily if not completely slow the
24  progression of fire down a hallway because it might
25  actually all go out the window and never get to the

Page 199

1  hallway. So you can't say that opening or closing a
2  window according to where it is either accelerates or
3  deprecates the pattern of flow of smoke.
4    Q. Do you mind if I come over there for a
5  second?
6    A. No.
7    Q. In Exhibit 6, Page 2 of the diagrams, we've
8  going to use that for this. If I understand
9  correctly, the sofa that you ignite, whether it be by
10  soldering iron or the cigarette, in your smoldering
11  fire tests is located in the living room area of your
12  facility. Can you put an "L" where the living room
13  is.
14   A. Where the living room is?
15   Q. Yeah.
16   A. Okay.
17   Q. And can you draw a couch with a "C" on it
18  where you place the couch.
19   A. Typically in this location.
20   Q. In any of your tests where you have measured
21  obscuration and the other parameters, were any of the
22  smoke detectors located in the living room?
23   A. Yes.
24   Q. Okay. Which tests?
25   A. I'd have to go back and look at those as to

34 (Pages 194 to 199)

Page 200

```
 1   where they were located.
 2      Q.  Why don't you look at the 1000 series tests
 3   for now.
 4      A.  Just limit myself to the 1000?
 5      Q.  Yeah, because that's the ones you have
 6   produced in litigation before.
 7      A.  Actually all of this has been produced in
 8   litigation.
 9              What -- okay, now, what's the question?
10      Q.  Were any of the smoke detectors in the living
11   room?
12      A.  I need the additional information and it's
13   not here, that shows the locations, map.  Let me see,
14   here it is.
15      Q.  You got it?
16      A.  Well, I say it is.
17      Q.  I think you might be looking for diagrams
18   that are at the end of Exhibit 7.
19      A.  I was going to say, they're not in this
20   grouping.
21      Q.  That page forward.
22      A.  This --
23      Q.  I think on the individual tests there is the
24   identity of where the detectors are.
25      A.  I know, but it's not on this other set of
```

Page 201

```
 1   sheets, that's the problem.
 2      Q.  You can use anything you need.
 3      A.  I know, I'm just trying to find it, because
 4   the sheets that you first gave me, it's not on there.
 5      Q.  Okay.
 6      A.  If I'm reading this correctly, doing it
 7   quickly, I think Tests 1002 through 1005 were all in
 8   the same room.
 9      Q.  The smoke detectors were in the living room?
10      A.  Yeah.
11      Q.  What are you looking at?
12      A.  I'm looking at --
13      Q.  Exhibit what?
14      A.  Oh.  Exhibit 7 and those specific tests'
15   statements as to where they were located.  If it goes
16   to the breakfast room or the hallway, it designates
17   breakfast room or hallway.  And if you'll look -- if
18   you continue to look, you'll see that on Test 1006 a
19   distinction is made because there is a change and
20   there is a move to have the detectors split between
21   the breakfast area and the hallway.
22      Q.  Okay.
23      A.  Whereas prior to that, they were in the room
24   of origin.
25      Q.  Okay.
```

Page 202

```
 1      A.  Does that make sense?
 2      Q.  Yes.
 3      A.  Okay.
 4      Q.  Did you ever do a controlled experiment where
 5   you looked at the difference between smoke movement
 6   with there being some form of ventilation versus when
 7   there's no ventilation?
 8      A.  Haven't yet.  Probably will, but to date I'm
 9   still exploring other parameters I want to control
10   where I don't want ventilation to be an issue.
11      Q.  Okay.  But the answer to my question is to
12   date you have not.
13      A.  That's right.
14      Q.  On the bottom of the page under monitoring
15   equipment it says, "Carbon monoxide levels are
16   occasionally measured."  How occasionally?
17      A.  Oh, maybe half the time, I guess.  It's a
18   function of what the test is.  As I said, I was not
19   trying to do every parameter characterization in every
20   test.  I test a lot, okay?  There are times when we're
21   trying to make measurements that are -- to show one
22   particular performance or parameter variation and in
23   that test I won't care what carbon monoxide's doing.
24   Similarly with temperature or obscuration.
25      Q.  Are your tests designed to determine whether
```

Page 203

```
 1   an ionization or photoelectric detector will sound in
 2   time for someone to escape a residential fire?
 3      A.  Taken as a whole, they would have something
 4   to say about that, but no given test necessarily is
 5   covering all of those parameters.
 6      Q.  Is there --
 7      A.  They may or may not.
 8      Q.  Just so I understand what you're saying.
 9      A.  Sure.
10      Q.  A person's ability to escape a fire is a
11   question of tenability at the time he learns of the
12   fire.
13      A.  That's generally the definition.
14      Q.  And carbon monoxide falls within the category
15   of tenability.
16      A.  Carbon monoxide is one of the gases that
17   would limit tenability.
18      Q.  Why don't then you measure carbon monoxide as
19   often as you measure time to alarm, obscuration and
20   temperature?
21      A.  I may, because I don't always measure those
22   things.  My point to you is this:  This is a
23   scientific set of experiments.  It's not -- none of
24   these experiments are set up and never have been to
25   model a specific case replication.  You with me?
```

Page 204

```
 1      Q.  Uh-huh.
 2      A.  This is about scientific data-gathering.  So
 3   if I go down the road and make a bunch of measurements
 4   and I discover some parameter that seems to be
 5   troublesome or some performance that seems to be
 6   unknown or unquantifiable, I may go off on the side
 7   and run a bunch of tests controlling for just certain
 8   things and study that for a while.  While I'm doing
 9   that I may abandon the other parameters because
10   they're not relevant to the question I'm trying to
11   ask.  So I go off and run these tests and get the
12   information I need to hammer down that particular
13   point and then I may return to my fundamental test
14   progression and start these rerunning tests where I may
15   be measuring multiple parameters.
16              So this is a scientific process, it's a
17   work in process, it's not something that's going to
18   be finished at any given point in time.  It's
19   something I do every few weeks just to explore
20   different alternatives or different parameters.
21      Q.  Let me ask a slightly different question.  Is
22   the purpose of your tests as they are currently
23   organized to determine whether ionization or
24   photoelectric detectors will sound an alarm in a
25   sufficient time to allow a resident to escape a
```

Page 205

```
 1   residential fire?
 2      A.  That's one of our test objectives ultimately
 3   is to be able to answer that question.
 4      Q.  The tests that you have already conducted.
 5      A.  All of them would have weight of evidence to
 6   help answer that question.  No one test, however, is
 7   designed to be the definitive answer to that question
 8   because I don't think that's possible.
 9      Q.  Have you in any way attempted to measure
10   other toxic gases such as cyanide or carbon dioxide?
11      A.  Not yet, but I have started the process.
12      Q.  What do you mean by that?
13      A.  I have started looking into instrumentation
14   for gas sampling to be used for periodically sampling
15   such gases as hydrogen cyanide and other gases given
16   off in polyurethane smoldering fires.  I will be doing
17   that shortly.
18      Q.  You have a criticism of the Dunes test.  Is
19   that correct?
20      A.  I have several criticisms of the Dunes test,
21   yes.
22      Q.  One of them relates to their measuring or
23   lack thereof of carbon monoxide.
24      A.  They draw conclusions about tenability
25   without presenting data on issues of toxic gases.
```

Page 206

1  Q. Namely, carbon monoxide.
2  A. Well, there are other toxic gases.
3  Q. Haven't you testified previously that one of
4  your biggest complaints about the Dunes test is they
5  didn't measure or present data concerning the
6  measurement of carbon monoxide?
7  A. That's a true statement, but that's not the
8  only one.
9  Q. How is that consistent with your only
10  measuring carbon monoxide levels during your tests
11  occasionally?
12  A. I promise you I will not draw conditions
13  about tenability on toxic gases without having made
14  those measurements; they did.
15  Q. Can you draw conclusions about tenability
16  generally without measuring carbon monoxide?
17  A. Only with respect to temperature and
18  obscuration, not about toxicity.
19  Q. So if obscuration is above what percent is
20  the location not tenable anymore?
21  A. There's no generally accepted number for
22  that, but some would say start getting above 10
23  percent obscuration, you're starting to get very
24  dangerous if someone wakes up in that condition. By
25  the time you get to 20 or 30 or 40 or 50 percent,

Page 207

1  you've got a major problem.
2  Q. In terms of temperature?
3  A. Temperature's even got more variation in the
4  literature on what is acceptable or not. If you look
5  at the literature, there are people who set numbers
6  like 150 degrees as being an untenable situation. To
7  sit up in bed and force your head into 150 degrees
8  stratified temperature layer, it would be
9  overwhelming, but there's a lot of variation in the
10  literature on the combined effects of obscuration,
11  temperature and other parameters as to what is and
12  isn't acceptable in terms of tenability.
13  Q. Turning to the second page of your protocol,
14  under time to alarm you indicate in one of the first
15  sentences, "TAMU spatially clusters numerous detectors
16  in order to minimize the effect of nonuniform smoke
17  distribution."
18  A. Correct.
19  Q. Did you ever do a controlled experiment to
20  determine what your clustering of detectors does to
21  the movement of smoke?
22  A. Yes, we've done tests with small numbers to
23  as many as probably a dozen smoke detectors in a
24  spatially distributed fashion to determine if there
25  was any indication of smoke pattern interference, and

Page 208

1  we did that with visual observation, as well. So it's
2  both electrically instrumented as well as visual
3  observation. There is no statistical pattern to the
4  behavior of the smoke detectors in large or small
5  groups related to smoke patterns.
6  Q. And --
7  A. No indication of any interference whatsoever.
8  Q. And when you say there's no effect on smoke
9  detectors, does that include where each specific smoke
10  detector is placed?
11  A. All of the test locations are arbitrarily
12  large distance with respect to the fire source as
13  compared with respect to their distance to each other.
14  So if you take a geometric mean of the distance
15  between each of the smoke detectors, it would be
16  measured in inches, whereas the distance to the fire
17  source would be measured in tens of feet. So since
18  it's an arbitrarily small variation in distance
19  between the two, if that was a controlling parameter,
20  then we as an industry have a much bigger problem
21  about locating smoke detectors than anybody thinks,
22  and there's no indication that that is a controlling
23  parameter.
24  Q. In the tests that you did to determine
25  whether your clustering had any effect on smoke

Page 209

1  movement and smoke detector performance, what
2  specifically did you do?
3  A. Tested the time to sound and performance of
4  individual smoke detectors in various combinations of
5  location and in numbers of smoke detectors in this
6  constricted geographic area arbitrarily long distance
7  from the fire source.
8  Q. Okay. Let's take an example. You have 12 --
9  in some of your tests I believe you have 11 detectors
10  up at one time.
11  A. Yeah, any number between probably as few as
12  two or four up to a dozen.
13  Q. Okay. But in my example we have 11.
14  A. That's fine.
15  Q. Did you at any time place your detectors up
16  in random order, test time to sound, use those same
17  11, move them around a little bit and see if those
18  same 11 sounded or when those same 11 sounded?
19  A. Yes.
20  Q. And they all --
21  A. And there's no statistical evidence that
22  shows up that relates it to position.
23  Q. How about distance between each other?
24  A. Or distances between each other.
25  Q. Did you test that?

Page 210

1  A. Yes.
2  Q. Did you move them two inches to five inches
3  apart and then five inches to ten inches apart and
4  determine what the effect was?
5  A. They've been done at different distances and
6  in each of those distances there was no performance
7  indication.
8  Q. And do you have the results with you of those
9  tests?
10  A. No, I don't have those tests. Those were
11  part of the qualifying tests for the facility I told
12  you about that we simply didn't keep the results;
13  there wasn't any reason to.
14  Q. So your quantifying and qualifying control
15  tests are no longer available.
16  A. No, I don't have that. Since there's no
17  control parameter violated, there's no reason to worry
18  about that.
19  Q. Doesn't that help if you're going to write up
20  a peer reviewed article in order to substantiate your
21  hypothesis as to your special clustering has no effect
22  on smoke movement?
23  A. No, and the reason is because the subsequent
24  tests continue to verify that very parameter. If you
25  look at the subsequent tests I have provided you data

Page 211

1  for and you look at test to test, you will show that
2  there is no spatially related parameter that is
3  dictating the time to sound. If you'll just compare
4  your data you'll see that.
5  Q. But in answer to my question, the prior data
6  is gone.
7  A. Yeah, I don't have that data. I can
8  replicate it. Anybody wants to see that, I'll be glad
9  to replicate it.
10  Q. You can replicate it by doing the tests over
11  again, not by reconstructing --
12  A. I'll be glad to replicate that for anyone
13  that wanted it.
14  Q. You've got to let me finish my question,
15  though. You can replicate that by redoing the tests,
16  not by reconstructing the data from the old tests.
17  A. I can't reconstruct the data, but I'd be glad
18  to reconstruct the tests for someone who wants to
19  challenge that. However, if they study this data,
20  they'll see that that's true.
21  Q. You describe the method by which you measure
22  obscuration in the second paragraph of Page 2.
23  A. That's correct.
24  Q. How did you determine that you would measure
25  obscuration in this manner?

36 (Pages 206 to 211)

Page 212

1    A. It has been used in the industry and by UL
2  for some time and so we simply chose to use that
3  method.
4    Q. Do you know if there's a more modern
5  technique?
6    A. There are some laser based techniques that
7  are available, but they're not markedly different in
8  performance from what I'm able to determine and
9  they -- we simply haven't spent the money to do that.
10  There's no reason to believe that would give a
11  different answer. I'll be glad to let somebody buy
12  that, though, to use it.
13    Q. You have the headlamp and the photoelectric
14  cell positioned five feet apart. It's my
15  understanding -- strike that.
16        You have the headlamp and photoelectric
17  cell positioned five feet apart and sometimes placed
18  in the hallway leading toward the breakfast area.
19    A. Yes.
20    Q. It's my understanding that the width of that
21  hallway is only three feet.
22    A. That's approximately correct.
23    Q. Therefore, am I correct in understanding that
24  you would be placing them five feet apart lengthwise
25  there in the hallway?

Page 213

1    A. That's correct.
2    Q. Did you ever than control -- do a controlled
3  experiment to determine whether the configuration of
4  the house allowed smoke to move down the hallway in
5  the same speed as it moved into the breakfast area
6  where the smoke detectors were?
7    A. I can definitively answer to you that it
8  doesn't because the breakfast area is in between the
9  fire source and the hall so it gets to the breakfast
10  area faster, and it's a much wider opening so it
11  generally migrates faster.
12    Q. Did you ever do a controlled experiment on
13  that issue?
14    A. There's no need to because common logic will
15  tell you that if you're going through a ten-foot
16  opening as opposed to a three-foot opening in terms of
17  the width of the cased opening versus the door that
18  you've got more opportunity for the smoke to progress
19  into the breakfast area than you do the hall, as would
20  be with any house. And you remember, I'm doing this
21  test in as natural a condition as I can.
22    Q. The answer to the question is no, you've not
23  done a controlled experiment.
24    A. No, I think I have. I stood there as an
25  engineer, controlled my mind and said there is no way

Page 214

1  to not violate the parameters of my tests by modifying
2  the house and have a several foot opening the same as
3  a door opening. It's a full-scale test. You can't
4  modify the structure of the house. You have to leave
5  it alone.
6    Q. But you haven't done any tests other than the
7  ones you've just described to control for this issue.
8    A. There aren't any tests to control what we're
9  describing. You can't do that.
10    Q. Can you identify the different rooms on the
11  test diagram of Exhibit 6?
12    A. Identify the rooms?
13    Q. Yeah. You've already put an "L" for living
14  room.
15    A. Living room, kitchen, breakfast area, hall,
16  bath, bedroom, bedroom, bedroom nominally.
17    Q. And the "K" for kitchen is the area that
18  you've sealed off for your instrumentation?
19    A. Yes, we simply closed one door between the
20  kitchen and the breakfast area.
21    Q. And is there a specific spot in the breakfast
22  area that you placed your smoke detectors?
23    A. Yes, it's in the -- specified and dimensioned
24  in the diagrams we gave you. Should be in those you
25  have in your hand.

Page 215

1    Q. I'm just trying to figure out where
2  everything is.
3    A. Oh, you're looking -- it's essentially right
4  here in the breakfast area and right here in the
5  hallway.
6    Q. On Exhibit 6 it would be just below where you
7  wrote "BA"?
8    A. Yeah. Without intention to be dimensionally
9  correct because it's on there dimensionally correct,
10  I'll put an "X" roughly where the smoke detectors are
11  in a box in the hall and the breakfast area.
12    Q. Okay. And the door between the breakfast
13  area and the hall, is that an open area?
14    A. This -- between the breakfast area? There is
15  a door there but it's tested open if you're making
16  measurements where you want it open.
17    Q. Your tests, are they open or are they both
18  opened and closed?
19    A. It would be a combination. Certainly you're
20  not -- I haven't done any tests where I'm measuring
21  the smoke detectors in the hall where I close the door
22  to a hall. I might sometime but I haven't yet.
23    Q. Okay. Are any of the doors leading to any of
24  the bedrooms closed?
25    A. All open.

Page 216

1    Q. They're all open?
2    A. All open.
3    Q. How about the bathroom?
4    A. To my knowledge all those doors were open
5  during all the tests.
6    Q. Did you ever measure the density of the smoke
7  produced in any of your fires?
8    A. By other than obscuration?
9    Q. Yes.
10    A. No.
11    Q. Do you know what type of equipment you would
12  need in order to measure the density?
13    A. Yeah, I could do controlled volumetric
14  sampling and get the density of smoke particles versus
15  some standard unit of volume. I mean, I could do that
16  several different ways, but I haven't done it because
17  I don't --
18    Q. But what type of equipment I guess is my
19  question.
20    A. Some sort of volumetric measuring device that
21  would allow me to sample a known volume of the smoke-
22  laden air, either continuously or in a batch sample.
23    Q. Do you know what a MIC, M-I-C, is?
24    A. Yeah, a measured ionization chamber,
25  measurement ionization chamber.

Page 217

1    Q. What does that do?
2    A. A standard ionization chamber which is
3  typically used for calibration studies related to
4  ionization chambers.
5    Q. Does it measure the density of smoke?
6    A. Not directly. It basically works just like
7  an ionization chamber does.
8    Q. What's the difference between measuring
9  obscuration and the measurement performed by a MIC?
10    A. A lot. A measurement of obscuration is a
11  basic -- as measured with this type of instrumentation
12  is basically measuring the progression of light
13  through the density of smoke.
14    Q. I'm interrupting you on purpose. You said
15  "this type" of measurement. What do you mean?
16    A. The one we are discussing under obscuration.
17  I assume we are still there. You were under this
18  paragraph on this Page 2.
19    Q. Right. But I just have to make sure the
20  record is clear.
21    A. I'm assuming all these questions are still
22  related to the measurement of obscuration I was doing
23  in my test. That's where we've been for the last 15
24  minutes.
25    Q. Then how is the -- and I'll rephrase the

37 (Pages 212 to 217)

Page 218

1  question so we're definitely sure we're talking about
2  the same thing.
3     A.  Okay.
4     Q.  How are the measurements performed by a MIC
5  different than the measurements you're performing of
6  obscuration during your test fires?
7     A.  I'm using a system that has been accepted in
8  the industry to some extent as a way to measure the
9  passage of light through the smoke products, and
10  because of the inhibiting of that light flow you can
11  calibrate it to have as its output what we call
12  obscuration, percent obscuration per foot or percent
13  obscuration per some unit of distance.  That is a
14  direct measurement of the -- something essentially
15  similar to what the human eye would see, which is how
16  thick the smoke is and how obscure that makes your
17  vision across the room full of smoke.  That is a
18  direct measurement.  An ionization chamber of any kind
19  doesn't do that specifically.  It measures that in an
20  indirect fashion --
21     Q.  What does --
22     A.  -- electrically.
23     Q.  What does a MIC measure?
24     A.  An ionization chamber of any kind measures
25  the particulate matter associated with the smoke

Page 219

1  density as opposed to the passage of light as I have
2  shown it or the failure of passage of light over some
3  distance.
4     Q.  And what do you mean by particulate matter?
5  Is it something within the particulate matter it's
6  measuring?
7     A.  Well, the obscuration measurement that we've
8  got here has absolutely nothing to do with measuring
9  any specific type of particles.  All it cares about
10  is, is the light getting to the sensor or not.  What's
11  in between could be -- I could put my hand in between
12  it and it would start saying, oop, we've got a hundred
13  percent obscuration.  So it doesn't know.  It couldn't
14  care less.  It has no way of particularly quantifying
15  or caring what's obscuring the light flow from the
16  source to the sensor.
17     Q.  On any of your tests are smoke detectors on
18  the walls?
19     A.  Not so far.
20     Q.  On any of your tests are smoke detectors
21  directly adhered to the ceiling?
22     A.  Essentially, yes, because while they are
23  mounted on a -- maybe a 3/8-inch plywood board that is
24  arbitrarily large with respect to the diameter of any
25  given smoke detector, that's essentially on the

Page 220

1  ceiling.  3/8 of an inch is not a statistically -- of
2  any statistical concern as far as I can tell.
3     Q.  On each of your tests the smoke detector is
4  mounted to a three-inch board which is mounted to the
5  ceiling?
6     A.  Yes, directly to the ceiling.  So I mean the
7  difference -- you would be talking in terms of
8  nominally a half-inch of distance between the actual
9  ceiling and the back plane location of the smoke
10  detector itself, and the smoke detectors themselves
11  vary in height much more than that.
12     Q.  Have you ever done a control test to
13  determine the effect of the use of that three-inch
14  piece of plywood?
15     A.  From an engineering perspective it is not a
16  parameter that I believe is either testable or of
17  concern.
18     Q.  So if I told you that has been tested,
19  you're not aware of it.
20     A.  I've never seen anything that would -- that
21  indicates that.
22     Q.  And if I told you that those tests showed
23  that it does have an effect on performance of smoke
24  detectors, you're not aware of it.
25     A.  I wouldn't believe it.

Page 221

1     Q.  But you're not aware of it.
2     A.  Not aware of it.  Wouldn't believe it.
3     Q.  And you haven't done any of those tests.
4     A.  And if it does, I would add, then those smoke
5  detectors have a much bigger design flaw than I think
6  with -- than I already believe with respect to their
7  sensitivity to location, and that means that they are
8  not only flawed, they are a fatally flawed product.
9     Q.  Okay.  And you -- but you offer that opinion
10  without performing any tests to determine the
11  significance or insignificance of the three-inch piece
12  of plywood.
13     A.  Engineering judgment would say that if a
14  3/8-inch difference in location of a smoke detector
15  between a ceiling and the height off the floor is a
16  material factor in the performance of a smoke detector
17  that that is an unacceptable performance.
18     Q.  Okay.  But again I'll repeat my question as
19  often as I need to:  You offered that opinion and the
20  other ones without conducting any tests to determine
21  the significance or insignificance of the effects of
22  the three-inch piece of plywood.
23     A.  No, that's not true.  I've run tests with
24  them on the ceiling and I've run tests with them on
25  boards and I will tell you that there is no

Page 222

1  performance difference in those smoke detectors, but
2  because it's impossible to create a fire that is
3  exactly identical, it is impossible then
4  scientifically to say that there is no third or fourth
5  order effect at all.
6     What you can say is with any engineering
7  probability of any kind, it is unrealistic to assume
8  that the 3/8-inch difference in the proximity of a
9  smoke detector to the ceiling or floor, according to
10  how you measure it, will make a difference in the
11  performance of that ionization chamber based on
12  several factors, one of which is that there's more
13  variation than that in make to model of the smoke
14  detectors themselves.  So if that's a varying
15  parameter, then that means that you're paying that the
16  industry better be controlling the thickness of their
17  smoke detectors and that some of the manufacturers are
18  clearly not doing it right because some of them make
19  some that are higher than others by more than that 3/8
20  inch.
21     Q.  Okay.
22     A.  That's just dumb.
23     Q.  In any of the tests that you have conducted
24  that you just identified as showing the difference
25  between the smoke detector's response when it's

Page 223

1  attached to the ceiling versus attached to the
2  plywood, do you have any of the data from that?
3     A.  No.
4     Q.  In any of the tests that you have produced in
5  Exhibit 6 or 7, were any of the smoke detectors
6  attached to the ceiling directly?
7     A.  Not to my knowledge.  None of the tests in
8  these group that you have were they attached directly,
9  not to my knowledge.
10     Q.  When you controlled for the use of plywood,
11  what if anything did you measure and where?
12     A.  All the same measurements, and you get the
13  same kind of variations in performance on the
14  individual smoke detectors in time to sound as you
15  would whether they were on the plywood or not.
16  There's more variation in the other parameters by
17  orders of magnitude than one could ever discover with
18  respect to the 3/8-inch difference in height.
19     Q.  On Page 3 under smoke material you indicate
20  that, "TAMU generally uses standard household
21  furniture components such as sofa cushions or some
22  similar common material."  What did you mean by "some
23  similar common material"?
24     A.  It might be chair cushions.  It might be sofa
25  cushions or love seat cushions or some other type of

Page 224

1  furniture like a chaise lounge, but it's all
2  basically -- for creating these types of smoldering
3  fires, it is all basically some sort of fabric-covered
4  polyurethane material and they are essentially
5  identical.
6      Q.  Under detector placement you indicate, and I
7  think we've covered this but I just want to make sure,
8  that your "placement arrangement attempts to position
9  detectors close together so that they experience the
10  same smoke while positioning them far apart enough so
11  they do not interfere with each other's smoke
12  ingress." And that is based upon the control tests
13  that you've testified to which the data is no longer
14  available for. Is that correct?
15     A.  Yes, that's basically a calculated
16  combination of parameters where you want each of the
17  detectors to see as close to the same time progression
18  of smoke as one can, while at the same time making
19  sure that no individual detector is biased in any way
20  as a function of those geometric parameters.
21     Q.  But the spatial arrangement is based upon
22  those tests we've already talked about --
23     A.  That's correct.
24     Q.  -- where you've controlled for them.
25     A.  Well, it's also these tests, too, as I

Page 225

1  indicated to you. If you look from test to test here,
2  you will notice that there is no biased performance
3  first to sound, last to sound, as a function of
4  spatial location.
5      Q.  Are you familiar with how many smoke
6  detectors are tested by UL during any one given fire
7  test?
8      A.  I don't know the answer to whether they ever
9  test more than one unit of a given model or some X
10  number of units. I'm not familiar. I probably have
11  known that at one point in time, but right now I
12  couldn't tell you.
13     Q.  Because of your answer I need to make sure I
14  ask it again, because I don't know if your answer was
15  to my question. Whether it be the same model or
16  different models, in a given fire test when they light
17  a fire in their fire room, do you know how many smoke
18  detectors are being tested at one given time?
19     A.  I may have known that in the past, but I do
20  not know the answer.
21     Q.  Do you know how far apart these smoke
22  detectors are from each other?
23     A.  I don't -- I can't answer that question
24  either because I've made no particular note of it.
25     Q.  Do you know --

Page 226

1      A.  I'm not trying to replicate the UL tests so
2  I've made no note of that.
3      MR. MARCHAN:  Let's take a break.
4      MR. HELLER:  Let me ask one more
5  question, then we'll take a five-minute break.
6          What was the last question asked?
7          (Record read)
8      A.  I've made no note of the spacing of the smoke
9  detectors, one or whether they're one or many and what
10  the spacing is in the UL test.
11     Q.  (By Mr. Heller)  Do you know in what
12  arrangement they are?
13     A.  No, made no note of that because I'm not
14  duplicating the UL test.
15     MR. HELLER:  Now we can take a break.
16          (Recess from 4:02 to 4:13)
17     Q.  (By Mr. Heller)  The tests of yours that we
18  have been talking about for the past hour or two, are
19  they basically designed to determine how a smoke
20  detector responds to given fire signatures?
21     A.  Yes, if given fire signatures means the test
22  that's occurring at the time any given test is made.
23     Q.  Looking at your August 6 test -- we're done
24  with the protocol but you can keep reading it if you'd
25  like?

Page 227

1      A.  No, that's all right. I'm waiting on you.
2      Q.  The August 6 test, can you identify any of
3  the tests that show that at 56 minutes obscuration
4  readings in the living room are 58 percent?
5      A.  You mean do any of these tests say that?
6      Q.  Yes.
7      A.  At 56 minutes?
8      Q.  Right.
9      A.  Is that what you said?
10     Q.  Right. Let me give you the entire question
11  as you're looking at it now. During the August 6,
12  1999 tests, are there any tests where at 56 minutes
13  the ionization detector first sounded and at that time
14  obscuration readings in the living room are 58
15  percent and dining room were 44 percent? That way you
16  can look for it all at one time.
17     A.  Do you have the other set of this data?
18     Q.  Yeah.
19     A.  Okay. I identified some tests where
20  that's -- those are proximate relationships. Can you
21  restate the question so I know exactly now? It took a
22  few minutes to find these plots.
23     Q.  In the August 6, 1999 test where at 56
24  minutes the ionization detector first sounded, in
25  other words, there was no ionization detector that

Page 228

1  sounded before that, and at that point --
2      A.  Wait, does that -- are you sure that's what
3  that says?
4      Q.  Uh-huh.
5      A.  Okay.
6      Q.  In fact, I'm going to quote it. Let me just
7  read it perfectly.
8      A.  That's fine. Go ahead.
9      Q.  "At 56 minutes into a smoldering fire test,
10  the first ionization detector sounded in the kitchen/
11  dining area nearest the fire source in the living
12  room. At the time of sounding the obscuration
13  readings in the living room ceiling area were 58
14  percent and the obscuration readings in the dining
15  area at the detector itself were 44 percent."
16     A.  I think they're referring to the Test 1006.
17     Q.  Hold on a second.
18     A.  Pardon me?
19     Q.  I said hold on a second. Let me just get the
20  test.
21     A.  Yeah.
22     Q.  Test 1006 occurred on August 7th. Correct?
23     A.  Yeah, it may have. Let's see. Probably did.
24  So you're saying that's not one you want?
25     Q.  No.

Page 229

1      A.  I'm just saying the data that you indicated,
2  looks like it's citing the ionization detector
3  performance at about 58 percent and 44 percent
4  obscuration at the eight-foot level in the living room
5  and the breakfast area.
6      Q.  Can we agree that the obscuration readings
7  and the other factors that identify, there's no test
8  that was conducted on August 6th that had those
9  results?
10     A.  I don't know. I'd have to go back and look
11  at all these to see.
12     Q.  I'd ask you to look at the August 6 test.
13     A.  I understand, but the August 6 -- the data
14  that identifies the test numbers is in one pile of
15  material, these others are separated in a separate
16  pile of material, and I simply happen to see that the
17  numbers you quoted for obscuration were accurate for a
18  test and it turns out you're right, it was on an
19  August 7 test.
20     Q.  Okay. Looking at Exhibit 7, the first test I
21  see is Test 1002. Is that correct?
22     A.  Okay. Let's go back. The answer -- I know
23  that to be true, yes.
24     Q.  Can we agree that that test does not meet the
25  factors, in other words, that they all sounded before

Page 230

1  obscuration anywhere was 56 percent?
2     A.   Right.  There were no measurements that high.
3     Q.   Going to Test 1004, can we agree the same
4  thing is true, all --
5     A.   That's correct.
6     Q.   Then going to Test 1005, can we agree again
7  that that's true?
8     A.   That's correct.
9     Q.   So can we agree that the tests done on
10 August 6th don't have the results that I specified?
11    A.   The tests you just mentioned do not have
12 those results.
13    Q.   Are there any other tests that you know of
14 that were performed on August 6th?
15    A.   If there were, I don't have any data for
16 them.
17    Q.   And if there were tests, I assume you would
18 have the data for them.
19    A.   We've already talked about the fact that Test
20 1001 we don't have the data for because it was
21 prematurely ended.
22    Q.   Okay.  But that wouldn't have --
23    A.   And that wouldn't have anything to do with
24 what we're discussing.
25    Q.   So other than that --

Page 231

1     A.   So I don't -- I think the answer to your
2  question is yes.
3     Q.   Okay.  Looking at Exhibit 2 which is your
4  report in this particular case -- looking at
5  Exhibit 2, that is your report in this case?
6     A.   Yes.  Well, it was the report as of
7  September 28th, 1999.
8     Q.   On Page 1, which is actually the cover
9  letter, it indicates an hourly rate of $300 per hour
10 plus expenses.  When did your rate become $300 per
11 hour?
12    A.   It's been that way for quite some time.
13    Q.   Approximately how long?
14    A.   Over a year.
15    Q.   Anywhere in your September 28th, 1999 report
16 reference corrosion being the reason this particular
17 detector did not sound?
18    A.   No.
19    Q.   As of September 28, 1999, were you of the
20 opinion that corrosion was the reason this detector
21 did not sound its alarm?
22    A.   This report did not offer an opinion about
23 why it didn't alarm.  I wasn't at that point prepared
24 to do so.
25    Q.   My question, though, is were you of the

Page 232

1  opinion at that point that corrosion was the reason
2  this detector did not sound?
3     A.   I didn't have an opinion one way or the other
4  at that time.
5     Q.   When did you first derive this opinion?
6     A.   Once I was presented with materials
7  sufficient to know that there had been substantial
8  smoke deposition generated by the heater, deposited on
9  the ceiling, et cetera, and under the assumption this
10 was a properly powered and located smoke detector,
11 there are very few alternatives and that would have
12 been one of the few.
13    Q.   What are the --
14    A.   A manufacturing defect of course would have
15 been an alternate, but given that there is testimony
16 that it sounded when the test button was pushed,
17 that's unlikely also.
18    Q.   You have no evidence of a manufacturing
19 defect?
20    A.   No.
21    Q.   What materials were you provided that led you
22 to the conclusion that corrosion was the answer?
23    A.   Particularly the pictures which showed the
24 level of smoke that reached the smoke detector.
25    Q.   So the pictures of the detector itself?

Page 233

1     A.   The detector and the area around the
2  detector.
3     Q.   Are they Mr. McClintock's pictures?
4     A.   Well, all of them.  I don't know who -- most
5  of the pictures I have weren't identified by source,
6  so I can't tell you.  I mean there's smoke shown on
7  the walls of almost every set of pictures I've got.
8  Whoever took them, I don't know.  Most of them weren't
9  identified.
10    Q.   What other than the photographs led you to
11 the conclusion that corrosion was the answer?
12    A.   That -- the information that the smoke
13 detector was a functioning, properly powered smoke
14 detector is a relevant factor.  In other words, if it
15 wasn't powered that would be a different issue, and if
16 it was not -- and if it was not demonstrated to be
17 functional, then I couldn't draw that immediate
18 conclusion.
19    Q.   And the conclusion that it was a functioning,
20 properly powered detector came to you when you learned
21 that Mr. McClintock had pushed the test button
22 while --
23    A.   No, that was a verification.  The -- over a
24 period of time, and I can't point to a specific time,
25 I have come to the conclusion this was an operable

Page 234

1  smoke detector.  I can't point to a date certain or
2  which of these materials gives me that information.  I
3  did confirm that -- when that test was done
4  specifically, though, with him today, as I told you,
5  because I wanted to make sure that he had done it with
6  the detector on the wall.
7     Q.   What other materials were you provided with
8  that led you to the conclusion that corrosion was the
9  answer?
10    A.   I don't think there are any others.  I have
11 an -- well, today of course I read the report because
12 I requested it of the -- of your expert who said that
13 there was a -- there was no indication that the device
14 had sounded, okay?  That's also additional evidence of
15 the fact that because he had a good battery and
16 because the device had not sounded and yet we then
17 pushed the button and had it sound at the time one
18 month after the test, that we did have an operable
19 potential and able to sound detector that did not
20 sound.
21    Q.   And that report is that of Lori Streit?
22    A.   That's right.  But that -- I already had the
23 opinion.  I'm just saying that confirmed it further.
24    Q.   Right.  Obviously prior to your coming to the
25 deposition today you were of the opinion that

Page 235

1  corrosion was the answer.
2     A.   That is virtually the only answer for the
3  evidence as I have it.
4     Q.   When did you come to the conclusion that
5  corrosion was the answer?
6     A.   I've had that opinion for a long time.  I
7  don't know the answer to that.
8     Q.   And whom, if anyone, did you tell that that
9  was your opinion?
10    A.   I don't know what conversations I've had with
11 anyone about that.  I've had periodic conversations
12 with the attorneys.
13    Q.   Have you -- you indicated previously that you
14 have been retained by Mark Cantu.
15    A.   Yes.
16    Q.   Prior to today, did you inform Mr. Cantu that
17 your conclusion had derived to corrosion?
18    A.   I don't think so.  I haven't talked to
19 Mr. Cantu about this case in a very long time.
20    Q.   What attorneys have you spoken with?
21    A.   Mr. Marchan and Mr. Harris.
22    Q.   Prior to today, have you advised any --
23 either Mr. Marchan or Mr. Harris that corrosion was
24 the answer?
25    A.   I don't know the answer to that because I

Page 236

```
 1   don't recall any specific conversation.
 2       Q.  Have you talked to Shiree Salinas before
 3   today?
 4           MR. MARCHAN:  She works for Mark Cantu's
 5   office.
 6       A.  I don't think so.  Not about this case, no.
 7       Q.  (By Mr. Heller)  Other than Mr. Marchan and
 8   Mr. Harris, have you talked to any other attorneys in
 9   this particular case?
10       A.  Not to my knowledge.
11       Q.  Have you written any report where corrosion
12   was identified as the reason this particular detector
13   did not sound?
14       A.  I've written no other report.  I wasn't asked
15   to.
16       Q.  Are there any statements in your
17   September 28, 1999 report which are now relevant to
18   your current opinion as to why this detector did not
19   sound its alarm?
20       A.  Well, in this report I point out that a
21   properly designed and powered ionization smoke
22   detector should have sounded an alarm under these
23   conditions.  That's still a relevant and accurate
24   statement, in my opinion.
25       Q.  Anything else?
```

Page 237

```
 1       A.  I make a general reference to the
 2   deficiencies of ionization smoke detectors but I
 3   didn't spell those out.  If I had spelled those out,
 4   they would have included such things as the lack of
 5   redundancy, the deficiencies in the horn assembly, the
 6   deficiencies in the single power supply and all the
 7   other single point failure modes that I have referred
 8   to previously in my depositions with you and others.
 9   So all those are still true.  I just accumulated those
10   into one statement that said that there were
11   deficiencies.
12       Q.  But nowhere in here --
13       A.  But I didn't say specifically in here at the
14   time which one deficiency I was pinpointing as the
15   source, no.
16       Q.  The lack of a redundant power supply in this
17   particular case, did it play a role in why this
18   detector did not sound an alarm?
19       A.  Not to the best of my knowledge because I
20   understand it had a fully powered battery.
21       Q.  You said "not to my knowledge"?
22       A.  Not to my knowledge.
23       Q.  Is there any redundancy or lack of redundancy
24   in the smoke detector which you believe did play a
25   role in this particular smoke detector not sounding an
```

Page 238

```
 1   alarm during this particular incident?
 2       A.  Yeah, if it had an extra horn that didn't
 3   have corrosion, it would have sounded.
 4       Q.  To your knowledge, if a smoke detector has
 5   two horns and the environmental conditions are which
 6   would create corrosion on one of the contacts of one
 7   of its horns, is it your opinion that it wouldn't
 8   necessarily corrode another horn?
 9       A.  Well, if you welded the contacts and/or had a
10   different type of horn, then you'd expect corrosion to
11   build up at different rates or not build up at all.
12       Q.  All right.  So if it had the same horn with
13   the same contacts --
14       A.  Then it likely might have the same problem.
15       Q.  So what you're indicating is that the two
16   horns need to be manufactured differently, one welded?
17       A.  No, no.  Weld them both would probably for a
18   better answer.  I'm just suggesting to you that if you
19   had the same horn, two of the same horn wouldn't
20   necessarily provide you the kind of comfort that you
21   would like to have.  You'd prefer to have two
22   different makes of horns or horns with different
23   characteristics like welded contact.
24       Q.  Okay.  And --
25       A.  Something that would eliminate the deficiency
```

Page 239

```
 1   or the failure mechanism that's found in the other
 2   horn.
 3       Q.  To your knowledge, has Carl Brenner acted --
 4   or Benner acted as the consultant in any fire related
 5   case in which there's an allegation that a smoke
 6   detector did not sound or did not timely sound?
 7       A.  I don't think he's ever acted as an expert in
 8   any kind of case.  He's a lab manager.
 9       Q.  Has he assisted you in any case in which you
10   were a consultant or testifying expert where there is
11   an allegation that the detector did not sound or did
12   not timely sound?
13       A.  He's never assisted me in a professional
14   manner at all.  All he does is act to implement my
15   instructions on such things as setting up a test or
16   preparing a computer or, you know, running errands or
17   doing whatever else I instruct him to do.
18       Q.  Who pays his salary?
19       A.  I do.  He is not a professional in the sense
20   of an expert in these areas.
21       Q.  When you say you do, you pay it out of the
22   discretionary funds?
23       A.  I pay it out of the state funds we've already
24   alluded to, yes.  Well, I say that.  That's true, but
25   he's also of course paid on any other contract that he
```

Page 240

```
 1   might have that would have a sponsor, but he's never
 2   been paid on a sponsored contract related to smoke
 3   detectors, to make a complete answer, because there's
 4   never been one.
 5       Q.  Do you know how many smoke detector tests you
 6   conducted or supervised in 1996?
 7       A.  No.  A lot, but I don't know how many.
 8       Q.  How about 97?
 9       A.  No, I don't have any idea.
10       Q.  How about 98?
11       A.  I don't know the numbers in any given year,
12   no.
13       Q.  Doesn't matter what year I give you?
14       A.  No, it won't matter.
15       Q.  What about the fact that we have results for
16   tests as identified in Exhibits 6 and 7?
17       A.  All of those would be inclusive, but as
18   I told you, those are only the tests which I can
19   produce specific quantified data.  They're not all the
20   tests.
21       Q.  Who determines when a specific test is going
22   to be conducted?
23       A.  I do.
24       Q.  What determines -- what factor is involved in
25   determining when you're going to conduct these tests?
```

Page 241

```
 1       A.  Generally assessment of the results of the
 2   last set of tests or some new area of investigation I
 3   wish to pursue.
 4       Q.  Are any of the tests conducted in connection
 5   with any class or curriculum?
 6       A.  No.
 7       Q.  Other than yourself, can you identify every
 8   person who contributed to what we have identified as
 9   the protocol for these tests?
10       A.  I think we've already done that.
11       Q.  You identified a Mr. -- or Dr. Rock?
12       A.  Well, he didn't have anything to do with the
13   test protocol.
14       Q.  Then I don't know if we did identify who was
15   involved in the protocol.
16       A.  I think we already answered that question,
17   because you asked me a series of questions about who
18   did that and I answered "myself" in each case.
19       Q.  So it's just you basically.
20       A.  Basically I made the determination of what
21   the test protocol would be and I made the final
22   decision on that, period.  I took inputs of various
23   kinds in discussions with various people, none of
24   which had any material effect on the final protocol
25   over my decision.
```

41 (Pages 236 to 241)

## Page 242

1  Q.  Other than what you've already testified to
2  with regard to Mr. Fetterly, has any attorney or
3  someone employed by an attorney made suggestions
4  regarding the design of a smoke detector test you've
5  conducted?
6  A.  Not to my knowledge.
7  Q.  Have you ever conducted a smoke detector test
8  and as attorney or attorney representative asked you
9  not to reveal or which resulted in having you remain a
10  consulting only expert?
11  A.  Never.
12     MR. HELLER:  I think this is a good time
13  to stop rather than go into a whole 'nother area.  Let
14  me put on the record I think we have agreed that we
15  will continue as a mutually agreeable time and place
16  rather than continue at this point.
17     MR. MARCHAN:  That's correct, so long as
18  that it's not any duplication of questions.
19     MR. HELLER:  I would agree to that.
20     MR. MARCHAN:  And the items that I noted
21  today that you requested that Dr. Russell produce
22  would be the billing to date, the visual aids used
23  during a speech at the Texas Fire Chiefs Association
24  meeting held in Kerrville, Texas, to identify the
25  specific materials supplied by him to the Consumer

## Page 243

1  Products Safety Commission, the exact income from
2  Texas A&M and from testifying -- income from
3  testifying in smoke detector cases and in other expert
4  cases and the current active smoke detector cases he's
5  involved in, and of course the record will speak to
6  those matters.
7     MR. HELLER:  I think that's complete,
8  but again, I'll have to look at the transcript.
9     THE WITNESS:  I think I wrote them all
10  down, so that sounds about right to me.
11     (Deposition adjourned at 4:35)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 244

1     CHANGES AND SIGNATURE
2  PAGE LINE   CHANGE       REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20     I, B. DON RUSSELL, Ph.D., P.E., have read the
21  foregoing deposition and hereby affix my signature
22  that same is true and correct, except as noted above.
23  _____
24
25     B. DON RUSSELL, Ph.D., P.E.

## Page 245

1  THE STATE OF TEXAS )
2  COUNTY OF      )
3
4     Before me, _____, on this day
5  personally appeared B. DON RUSSELL, Ph.D., P.E., known
6  to me (or proved to me under oath or through
7     ) (description of identity card or
8  other document) to be the person whose name is
9  subscribed to the foregoing instrument and
10  acknowledged to me that they executed the same for the
11  purposes and consideration therein expressed.
12     Given under my hand and seal of office this
13  ____ day of _____, 2000.
14
15
16     NOTARY PUBLIC IN AND FOR
     THE STATE OF TEXAS
17
18
19
20
21
22
23
24
25

## Page 246

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE SOUTHERN DISTRICT OF TEXAS
3     BROWNSVILLE DIVISION
4
5  JOSE GARCIA, Individually )
6  and as Representative of )
   the ESTATE OF MANUEL    )
7  CRUZ; IDALIA GARCIA,     )
   Individually; and CYNTHIA )
8  COX, as Next Friend of   )
   BRITTANY COX            )
                           )
9  VS.      ) CIVIL ACTION NO. B-98-186
                           )
10 BRK BRANDS, INC.    )
11
12     REPORTER'S CERTIFICATION
13  DEPOSITION OF B. DON RUSSELL, Ph.D, P.E.
14     May 10, 2000
15     Volume I
16
17     I, ANNEMARIE HAND, Certified Shorthand Reporter in
18  and for the State of Texas, hereby certify to the
19  following:
20     That the witness, B. DON RUSSELL, Ph.D., P.E., was
21  duly sworn by the officer and that the transcript of
22  the oral deposition is a true record of the testimony
23  given by the witness;
24     That $_____ is the charge for the
25  preparation of the completed deposition transcript and

## Page 247

1  any copies of exhibits and/or certified questions,
2  charged to the Defendant(s)(;
3     That the deposition transcript was submitted on
4     to the witness or to the attorney
5  for the witness for examination, signature and return
6  to me by       :
7     That the original deposition Changes and Signature
8  page was ___ /was not ___ signed and returned to the
9  deposition officer by the witness;
10     If returned, the attached Changes and Signature
11  page contains any changes and the reasons therefor;
12     If returned, the original deposition was delivered
13  to    , Custodial Attorney;
14     That pursuant to information given to the
15  deposition officer at the time said testimony was
16  taken, the following includes counsel for all parties
17  of record:
18
   Mr. Ray R. Marchan
19  Attorney for Plaintiff(s) Cynthia Cox
   Ms. Shirene Salinas
20  Attorney for Plaintiff(s) Jose Garcia and Idalia
   Garcia
21
   Mr. James Heller
22  Attorney for Defendant(s) BRK Brands, Inc.
23
24     I further certify that I am neither counsel for,
25  related to, nor employed by any of the parties or

1    attorneys in the action in which this proceeding was

2    taken, and further that I am not financially or

3    otherwise interested in the outcome of the action.

4        Certified to by me this 16th day of May, 2000.

5

6

7                    ANNEMARIE HAND, Texas CSR #4400

                     Expiration Date: 12/31/01

8                    Q & A Reporting, Inc.

                     2700 Post Oak Boulevard

9                    Suite 1750

                     Houston, Texas   77056

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE SOUTHERN DISTRICT OF TEXAS
 3                    BROWNSVILLE DIVISION
 4   JOSE GARCIA, Individually    *
     and as Representative of      *
     the ESTATE OF MANUEL CRUZ;    *
 5   IDALIA GARCIA, Individually;  *
 6   and CYNTHIA COX, as Next      *
     Friend of BRITTANY COX        *
 7                                 *
     VS.                           *  CIVIL ACTION NO. B-98-186
 8                                 *
     BRK BRANDS, INC.              *
 9
10
11                    ORAL DEPOSITION OF
12              B. DON RUSSELL, Ph.D., P.E.
13
14         On the 23rd day of January 2001, at
15   9:01 a.m., the oral deposition of the above-named
16   witness was taken at the instance of the Defendant,
17   before TIM FAILS, a Certified Shorthand Reporter in and
18   for the State of Texas, at the offices of Cozen and
19   O'Connor, 1717 Main Street, Suite 2300, Dallas, Dallas
20   County, State of Texas, pursuant to notice and the
21   agreement hereinafter set forth.
22
23
24
25
```

LEGALINK

Stanley, Rice & Associates  Tel 214-720-4567

global court reporting • legal videography • litigation support services • records production • process service

4111 N. Central Expressway, Ste. 205  Dallas  TX 75204
Tel 214-720-4567  Fax 214-720-4503  1-800-966-4567            LTR.40



PLAINTIFF'S
EXHIBIT
H

B. DON RUSSELL                                          1/23/01

---

**Page 249**

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE SOUTHERN DISTRICT OF TEXAS
3         BROWNSVILLE DIVISION
4  JOSE GARCIA, Individually  *
   and as Representative of    *
5  the ESTATE OF MANUEL CRUZ;  *
   IDALIA GARCIA, Individually;*
6  and CYNTHIA COX, as Next    *
   Friend of BRITTANY COX      *
7                              *
   VS.          * CIVIL ACTION NO. B-98-186
8                              *
   BRK BRANDS, INC.            *
9
10
11      ORAL DEPOSITION OF
12      B. DON RUSSELL, Ph.D., P.E.
13
14      On the 23rd day of January 2001, at
15 9:01 a.m., the oral deposition of the above-named
16 witness was taken at the instance of the Defendant,
17 before TIM FAILS, a Certified Shorthand Reporter in and
18 for the State of Texas, at the offices of Cozen and
19 O'Connor, 1717 Main Street, Suite 2300, Dallas, Dallas
20 County, State of Texas, pursuant to notice and the
21 agreement hereinafter set forth.
22
23
24
25

---

**Page 250**

1      A P P E A R A N C E S
2  MS. SHIREE D. SALINAS
   Law Office of Mark A. Cantu
3  The Atrium
   1300 North 10th Street
4  Suite 400
   McAllen, Texas 78501
5
      COUNSEL FOR PLAINTIFFS
6
7  MR. JAMES H. HELLER
   Cozen and O'Connor
8  The Atrium
   1900 Market Street
9  Philadelphia, Pennsylvania 19103
10    COUNSEL FOR DEFENDANT
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 251**

1               I N D E X
2                         Page
3  EXAMINATION OF B. DON RUSSELL, PH.D., P.E.
4     By Mr. James Heller . . . . . . . . . . . . 252
5
6
7  DEPOSITION EXHIBITS              PAGE
8  9  Subpoena Duces Tecum          252
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 252**

1          (WHEREUPON, Deposition Exhibit
2          9 was marked for
3          identification.)
4      B. DON RUSSEL, Ph.D., P.E.,
5  the witness hereinbefore named, being previously duly
6  cautioned and sworn to testify the truth, the whole
7  truth and nothing but the truth, testified under oath
8  as follows, to wit:
9              * * *
10      E X A M I N A T I O N
11             * * *
12 BY MR. HELLER:
13    Q.  Dr. Russell, as you know from our times in
14 the past my name is Jim Heller.  We are here hopefully
15 for a very short period of time to take the
16 continuation of your deposition, the first of which
17 occurred on May 10 of this year.
18      Some quick instructions that I know you are
19 familiar with but I'm going to say them anyway, the
20 gentleman to your left and my right is a court
21 reporter.  If he asks you anything that is not — he's
22 not asking for an explanation, he's asking you to
23 repeat as best you can word for word what you said
24 because for whatever reason he missed it.  Please keep
25 all your answers verbal.  If you don't understand my

---

**Stanley, Rice & Associates - a LegaLink Company**
global court reporting * legal videography * litigation support

B. DON RUSSELL                                    1/23/01

**Page 253**

1 question simply say so and I will rephrase it. If you
2 don't know the answer simply say I don't know and we
3 will move on. If you answer a question I'm going to
4 assume you understood it and that you know the answer
5 you are speaking of. Do you understand all the
6 instructions I have given you so far?
7    A. I understand.
8    Q. If you need a break for whatever reason just
9 simply say so. The only thing I ask is that you answer
10 the question posed to you before we take that break.
11    A. Okay.
12    Q. As I just stated we were last together in
13 this case on May 10th of this year of -- well, now we
14 are in 2001 -- May 10 of 2000. What in this case have
15 you done since May 10 of 2000?
16    A. I haven't done anything except the
17 possibility of reading additional material that we have
18 in front of us, a few items that have come in since
19 that time which you have had a chance, I think, to look
20 at this morning and then briefly glance at my own
21 record of this deposition that I only received
22 yesterday because of some mixup apparently in getting
23 all that information to me. But I haven't done any
24 more -- haven't done any more tests or any kind of --
25 of work that was specifically commissioned for this

**Page 254**

1 trial.
2    Q. Okay. In the piles of materials that I did
3 just look through that you brought with you today the
4 only thing that I saw were depositions and plaintiff's
5 and defendant's designation of experts. Was there
6 anything else that you would have read other than the
7 two type of documents I just described?
8    A. Other than my own deposition, no, I don't
9 think so.
10    Q. Okay. I notice that there is a deposition of
11 Allen Dees, D-E-E-S, and Elmer, E-L-M-E-R, McCain,
12 M-c-C-A-I-N. that you received in an undated letter
13 from Mark Cantu but it registers your receipt of
14 November 6th of this year. Is this two of the
15 depositions that you read?
16    A. Yes. I think there is another behind it if
17 you want to look somewhere, and so you might want to
18 look through that stack.
19    Q. I did just before I identified it. Going
20 back to the question, though --
21    A. But yes, the answer is those are two of the
22 things that I have glanced at but I really haven't even
23 read those depositions yet.
24    Q. Okay. So you haven't read those?
25    A. No.

**Page 255**

1    Q. I also notice another undated letter from
2 Mark Cantu's office enclosing a deposition of Jesse
3 Aronstein dated June 14, 2000. Have you read this
4 deposition?
5    A. No, my response is the same.
6    Q. Do you know that recently -- and I don't have
7 the date with me -- that Jesse was deposed for a second
8 time in this case? Have you received or read that
9 transcript?
10    A. I have not received that.
11    Q. I also notice a September 20th, 2000 letter
12 from Ray Marchan, which is actually addressed to me and
13 Ms. Neely, but behind it encloses exhibits at Jesse
14 Aronstein's June deposition. Did you review these
15 documents?
16    A. I looked at it when I got it but I haven't
17 done much with it. The -- one of the main documents in
18 here, the study of separable contacts, is actually a
19 part of my file. I'm familiar with the document so I
20 didn't read it, and the -- the other were papers on
21 fretting corrosion, which I'm generally familiar with
22 so I didn't read them.
23    Q. I noticed in the file materials that there is
24 also a December deposition of Michael Schultz. Did you
25 review that deposition?

**Page 256**

1    A. No, I haven't had a chance to review that
2 either.
3    Q. Okay. Have you engaged in any discussions
4 with anybody whatsoever on this case since May 10 of
5 2000?
6    A. Other than attempting on multiple occasions
7 to arrange for deposition I don't think I have had a
8 single conversation with anybody about this case.
9    Q. Then I'm going to ask a series of really
10 quick redundant questions to make sure the record is
11 clear.
12    A. No problem.
13    Q. I understand from that that you have not
14 talked to any of the other plaintiff experts since May
15 10 of 2000?
16    A. No, I have not.
17    Q. You have not talked to any of the fact
18 witnesses relating to this case since May 10 of 2000?
19    A. I have never talked to any of them.
20    Q. You didn't talk to any of the plaintiffs
21 since May 10 of 2000?
22    A. No, I haven't.
23    Q. And you have not talked to anybody else in
24 this case upon which any of your opinions we'll rely
25 upon since May 10 of 2000?

Page 257

1   A.   Yes.
2   Q.   And other than the items that we just
3 identified you have not received or reviewed any other
4 document relating to this case since May 10 of 2000?
5   A.   If it is not here I haven't, no.
6   Q.   Have you had any meetings other than with
7 attorneys since May 10 of 2000 relating to this case?
8   A.   No.
9   Q.   Have you done any inspections of any of the
10 physical evidence in this case since May 10 of 2000?
11   A.   No.
12   Q.   And that is inclusive of the heater that was
13 in Mr. Cruz's residence and the smoke detector that was
14 in Mr. Cruz's case?
15   A.   No in either case.
16   Q.   Have you performed any inspections of any
17 exemplar detectors relative to this particular case
18 since May 10 of 2000?
19   A.   No.
20   Q.   Have you performed any tests that are in any
21 way related to this particular case since May 10 of
22 2000?
23   A.   Yes.
24   Q.   What tests?
25   A.   It's a generic answer but any tests that I do

Page 259

1   Q.   Yes.
2   A.   No, I don't think so.
3   Q.   Look at the third page of this document which
4 is Exhibit A, specifically Paragraph 3. It calls for
5 the production of a generic type of document, basically
6 any document that you have not produced to date, that
7 you will rely upon in support of your opinion.
8   A.   Yes. And like I said, the -- the tests that
9 you already have been given prior to my other
10 deposition supports the opinions that I have concerning
11 ionization smoke detectors. We have an ongoing testing
12 process as you know at the university. We test every
13 few weeks. I would characterize -- with respect to
14 this case I would characterize the tests we have done
15 since May as more of the same. I can give you a
16 computer log of that, be glad to provide that but it --
17 it -- it does not change any opinions; it did not
18 provide any information that would change my opinion
19 in this case in any way; it is not something I would
20 rely on. I don't need to rely on any data since May
21 that would provide any different feel for me than what
22 I have before me.
23   Q.   I appreciate the fact that you say you are
24 not going to rely upon it. If it wouldn't be any
25 trouble I would like you to produce it for me.

Page 258

1 of an ionization smoke detector's performance would be
2 a relevant issue to this case. If you are asking me is
3 it or more less relevant or have I learned something
4 different that changes my opinions that would be
5 different than the tests I have already revealed to you
6 previously the answer is no, no new information.
7   Q.   Are the results of these tests in any written
8 form?
9   A.   They would be in computer form but I can't
10 tell you that I reduced them to any written form, no.
11 I don't think I have. I am thinking --
12   Q.   Take your time.
13   A.   -- is the reason I'm pausing. I'm just
14 trying to remember if we have reduced any of those to
15 any kind of written form in that time frame other than
16 just the computer logs. I can't sit here and tell you
17 that I have or haven't.
18   Q.   I want to show you a document that I had
19 premarked at the beginning of this deposition as
20 Russell Exhibit 9 which takes over the numbering from
21 your prior deposition. It is the subpoena duces tecum
22 and notice of deposition together with Exhibit A to the
23 subpoena duces tecum for today's deposition. Have you
24 seen this document before?
25   A.   I don't think so. This is about today?

Page 260

1   A.   We can try to dump a computer disk for that.
2   Q.   Okay. You indicated that you read a portion
3 of the May 10 deposition. In reviewing that deposition
4 or in the knowledge that you have acquired since May 10
5 is there any answer to any question that you would like
6 to change for whatever reason, not that it is
7 inaccurate but that you have learned something since
8 that date that would suggest to you that you would like
9 to change your answer in any form?
10   A.   As I think I mentioned to you before we went
11 on the record I only got a copy of my deposition
12 yesterday so I have only had a chance to briefly go
13 through it. I don't sit here today and know of
14 anything that I would want to change but I did not have
15 any detailed time with that or lengthy time with that
16 deposition to study it well.
17   Q.   Okay.
18   A.   I just didn't get it. Somehow there was a
19 mix-up and it never got back to me.
20   Q.   Let me just quickly go over your opinions
21 that you are going to be rendering in this case. Do
22 you have an opinion within a reasonable degree of
23 scientific or engineering certainty as to whether the
24 detector in the Cruz residence alarmed at any time
25 during the night, morning of his death?

Page 261

1   A.  I don't have any specific information because
2 I was not there that -- to say that the -- that the
3 device did or did not alarm at all at any time; I'm not
4 here to say that.  My opinion is that -- that a timely
5 alarm likely did not occur as a consequence of the
6 things we talked about in the first half of this
7 deposition, but no, I'm not here to sit and say that
8 very late, for example, in the -- in the -- in the
9 process of that particular incident that it did or did
10 not sound at some point.  The issue to me was a timely
11 alarm and whether it was a likely event, not whether it
12 ever did sound at all.  I have no opinion on that.
13   Q.  Do you have an opinion on whether there was a
14 battery connected to the detector during the night,
15 morning of Mr. Cruz's death?
16   A.  I have an opinion that -- that there was a
17 battery based on the testimony we discussed in the
18 first half of this deposition where the device was
19 actually tested and -- and the battery was tested and
20 the battery was found to be good and the device was
21 found to be sound, and it was my understanding from the
22 testimony that the battery was sound in the detector.
23 Other than that I have no separate opinion, have done
24 no testing to try to determine separately in any way
25 whether the battery was connected or not.

Page 262

1   Q.  Just so we can --
2   A.  So basically it is an assumption from the
3 testimony for me that it was connected.
4   Q.  And just so the record is clear, your
5 testimony that you are citing is that of Mat
6 McClintock --
7   A.  Yes.
8   Q.  -- who tested the detector approximately one
9 month after Mr. Cruz's death and it sounded its alarm?
10   A.  To my knowledge that is all I have.
11   Q.  You didn't separately inspect the battery or
12 the detector or do any task to confirm or reject the
13 fact that a battery was or was not in the detector
14 during the night or morning of his death?
15   A.  No, I did not.
16   Q.  Are you to offer an opinion within a
17 reasonable degree of scientific or engineering
18 certainty why the detector did not sound a timely alarm
19 in your opinion?
20   A.  Yes, I think so.  We -- we discussed that
21 extensively in my first deposition I believe there
22 are at least two compounding reasons why the detector
23 might not have sounded a timely alarm or an alarm at
24 all.
25   Q.  And what are those two compounding reasons?

Page 263

1   A.  They have to do with the response of an
2 ionization chamber to certain smoke particles, or I
3 might better say, the lack of response in time, the
4 lack of sensitivity; and then, two, the possibility and
5 probability of corrosive contacts -- corroded contacts
6 on the horn that even if the detector chamber and
7 electronics had sounded an alarm might well have
8 prevented the horn from actually sounding.  And those
9 are two known failure modes or defects of this
10 particular type of detector and each or -- taken
11 together or separately could explain why there would
12 not be a timely alarm.
13   Q.  Correct me --
14   A.  I believe we discussed both of those at some
15 length.
16   Q.  Do you know which of those two compounding
17 reasons, to use your phrase, is the reason why this
18 detector did not timely alarm?
19   A.  I think there is a -- with -- with a high
20 level of engineering certainty there is a good
21 probability that both of them could have been in place.
22 The -- the responsiveness or the lack of
23 nonresponsiveness to the -- of the ionization chamber
24 to certain types of smoke particles, the delayed
25 response that can occur is something that is inherent,

Page 264

1 and so that is likely -- that likely was the case.
2     With respect to the -- the failure of the
3 device to sound at all at any time during this process,
4 of all the reasons that could occur many of them are
5 eliminated by the fact that a month later it was tested
6 to work with a -- with an operable battery so the
7 electronics was working, et cetera.  By then the device
8 had been exercised; just a pushing of the button itself
9 exercises the -- the smoke detector.  So that would
10 destroy the evidence, if you please, of any microscopic
11 corrosion that might have caused a high contact
12 resistance that resulted in the horn not sounding.  So
13 it is not testable but if -- if everything works after
14 the fact with a properly powered device and the
15 electronics works and so forth when you pushed the
16 button, one of the few things left that would explain
17 why the device did not sound would be corrosion of the
18 contact.
19   Q.  The first of the compounding reasons was the
20 response or lack of response of the ionization chamber
21 as you described it?
22   A.  Yes.
23   Q.  And you said -- if I -- and if I'm not
24 correct tell me -- that it is the ionization chamber's
25 inherent lack of response to certain types of smoke?

Stanley, Rice & Associates - a LegaLink Company                     214-720-4567
global court reporting * legal videography * litigation support                legalink.com

4 (Pages 261 to 264)

B. DON RUSSELL                                           1/23/01

**Page 265**

1    A.   That's correct.
2    Q.   And if I remember testimony that you have
3 given previously it is the type of smoke that can be
4 characterized as large particulate, low density smoke;
5 is that fair?
6    A.   Certainly it is not very sensitive to that
7 type of smoke, that's correct.
8    Q.   If I remember your testimony in the May
9 deposition correctly, and again correct me if I'm
10 wrong, you offered the testimony that in this
11 particular case, the heater put out just the opposite
12 type of smoke, that is, large quantities of small
13 particulate smoke.
14    A.   I think that is absolutely true at some
15 point. If you recall there was an issue of timeliness
16 in that. What -- the type of smoke that a heater of
17 that type would put out in an oxygen rich environment
18 might well be different than the type of smoke it would
19 put out as it became oxygen starved.
20    Q.   Let's start with the oxygen rich environment.
21 What type of type of smoke would be produced in an
22 oxygen rich environment?
23    A.   If it was this type of heater, all things
24 being equal, working properly, oxygen rich and so
25 forth, you would get a lot of small particles

**Page 266**

1 invisible -- invisible in the semi technical context,
2 if this art uses that term; I don't mean literally
3 invisible -- of particles and -- and often those are --
4 those are particles that are fairly sensitive for an
5 ionization detector to detect.
6    Q.   Now, you -- I'm sorry.
7    A.   That is all right. I was just going to
8 continue to say that it is clear, however, from the
9 photographs that we had a lot of deposition of -- of
10 soot and smoke in this -- in this residence in the
11 location around the heater and by the smoke detector.
12 So at some point we had a lot of dark, black
13 particulate matter that was getting to or in and around
14 this detector at some point.
15    Q.   Would that have occurred after the
16 environment became oxygen depleted?
17    A.   I think I have already told you that it is --
18 it is not my specific intent to testify for you exactly
19 how this heater is going to behave under varying
20 conditions. I wasn't asked to do that; I have made no
21 particular study of this particular heater. It is the
22 case that that can be true under certain types of
23 conditions but I'm not here to tell you I'm testifying
24 about that.
25    Q.   But in on oxygen rich environment it is your

**Page 267**

1 belief that if the heater was working appropriately it
2 would put out the type of particles that an ionization
3 detector is most sensitive to?
4    A.   Generally speaking you will find that
5 ionization detectors will often sound to just the
6 superheated small particulate matter that comes off of
7 a well functioning device if it is a heater or similar
8 device if it's too close to it when there is no visible
9 smoke at all.
10    Q.   All right. I understand from your testimony
11 that you have done no study and do not have an opinion
12 at this point in time as to when during the events
13 which led to Mr. Cruz's death the heater would have put
14 out this type of particulate?
15    A.   I don't, that's right.
16    Q.   However, my question is, whenever that
17 occurred why in your opinion at that time did the
18 ionization detector that was in the Cruz residence not
19 alarm?
20    A.   If it put -- if it was -- let me make sure I
21 understand the question. At what point in time it
22 starts putting out this black smoke? Is that the point
23 in time?
24    Q.   No. Let me rephrase the question.
25    A.   Okay.

**Page 268**

1    Q.   At the time that it was putting out the type
2 of smoke that you testified is the type that an
3 ionization detector is most sensitive to --
4    A.   Oh, most sensitive to. I misunderstood.
5    Q.   -- most sensitive to -- why at that time did
6 the ionization detector that was in the Cruz residence
7 not alarm?
8    A.   The most probable reason given all the
9 possible failure modes and knowing that the device one
10 month later behaved as it did and under the premise
11 that it was properly powered would be corrosion of the
12 horn contacts.
13    Q.   Which would have been the second of the
14 compounding reasons that you previously mentioned?
15    A.   That's correct.
16    Q.   Do you have an opinion in this particular
17 case as to what came first, the production of the type
18 of smoke that an ionization detector is most sensitive
19 to, in other words, the small particulate as compared
20 with when the heater produced the large particulate
21 smoke which you have had testified that an ionization
22 detector is less sensitive to?
23    A.   Again, I'm not one that is going to I think
24 provide testimony on this but if you are asking my
25 opinion I think immediately upon lighting you would

---

Page 269

1 have gotten some of the invisible small particle
2 production from the -- from this -- from this heater.
3     Q.   And then from how long thereafter it remained
4 that way you don't know?
5     A.   I'm not going to say that. I don't know.
6     Q.   Did you do any study to determine the path or
7 speed of the smoke produced by this heater?
8     A.   I have done no fire modeling. That is not my
9 area.
10     Q.   You deemed two conditions, oxygen rich and
11 oxygen depleted. Is there a certain percentage of
12 oxygen in the air that goes with those two terms?
13     A.   I was using those in a very delayed sense. I
14 would leave that to the fire modeling experts and the
15 people who tested this heater to make a decision.
16 Could it be device specific? Some devices would work
17 properly much longer as the oxygen is just depleted
18 than other devices might and I have made no study of
19 this heater. I don't know.
20     Q.   Moving on to the second of your possible
21 reasons -- back up; let me strike that question.
22         To the extent that this wasn't asked in the
23 least two or three previous questions you have not done
24 any study to determine in any way the size or density
25 of particulate put out by this heater on the night,

Page 270

1 morning of Mr. Cruz's death?
2     A.   I have done no tests, if that is what you are
3 asking, no.
4     Q.   Have any of the tests that you have done at
5 Texas A&M, the generic tests that you have been engaged
6 in, involved the production of smoke by a heater?
7     A.   No, I have never tested a heater. I think
8 that question was asked in my first deposition.
9     Q.   Have you done it since May of 2000?
10     A.   No.
11     Q.   Moving on, then, to the second opinion,
12 you -- and I forget the words you used but you said
13 that when somebody pushes the test button of the
14 detector I think it exercises the interior of the
15 detector? Is that the word used?
16     A.   Yes. The mechanism is fairly simple. You
17 have pressure contacts that are attached to the printed
18 circuit board. You also have the test button that
19 is -- that has to have some pressure applied to it to
20 make the contact that is also attached to the printed
21 circuit board. That flexes the fiberglass printed
22 circuit board which also tends to move the contacts
23 across the face of the plate in the ionization --
24 excuse me -- in the piezoelectric form. That's
25 P-I-E-Z-O. The -- the very act of doing that can

Page 271

1 disrupt microscopic corrosion. So the problem you have
2 is that it is difficult to test or -- or to -- to show
3 or replicate the exact condition of the corrosion on a
4 piezoelectric horn at the time of a given incident if
5 there has been any significant disruption, pushing of
6 the test button or handling of the smoke detector,
7 which of course in this case there was.
8     Q.   Have you done any study that was aimed at
9 identifying the specific response of particulate or
10 microscopic corrosion within the detector that occurs
11 when a test button is pushed?
12     A.   No. I have -- I'm relying on the reports and
13 the literature which describe the very issue of
14 detectors that do not work on the wall but subsequently
15 are tested to find that there is absolutely nothing
16 wrong with them except the presence of microscopic
17 corrosion on the piezoelectric horn.
18     Q.   What studies are you talking about?
19     A.   I think you and I actually discussed this in
20 the first deposition. We discussed the studies that
21 were made by -- where detectors that were found in the
22 field were found not to work when stimulated without
23 touching them, were brought back and subsequently
24 tested, and -- and there is a -- I don't know where --
25     Q.   If I can short circuit this, two reports were

Page 272

1 marked as Exhibit 5 --
2     A.   That's right.
3     Q.   -- during your first deposition. This was an
4 August 21, 1995 report called The National Smoke
5 Detector Project --
6     A.   That was one of the ones that I don't have
7 yet back.
8     Q.   -- and a January 1995 report put out by the
9 CPFC called Fire Incident Study Sample Analysis.
10     A.   Yes.
11     Q.   Are those the two studies you are referring
12 to?
13     A.   Those are two of the studies, yes.
14     Q.   Is there any other one?
15     A.   I would have to go back and look and see if
16 there are other references. I know there are some
17 papers that referenced this issue of frettable contact
18 corrosion.
19     Q.   In those studies, the two that you just
20 identified or I just identified, and in any others that
21 you may have read, did they discuss the manner in which
22 they determined that the corrosive -- the microscopic
23 corrosion was found during their tests? In other
24 words, you described the process of the detector not
25 working in the field but working in the lab and the

B. DON RUSSELL                                    1/23/01

Page 273

1 only difference being the presence of microscopic
2 corrosion.
3     A.  Well, the report was that a statistical
4 number, significant number, of the detectors would --
5 would not sound in the field to external stimuli but
6 when brought back they could find no specific reason
7 why that would be the case except for the horn itself
8 not being able to sound.
9     Q.  Do you know what number of horns in those
10 studies didn't alarm because of this microscopic
11 corrosion?
12     A.  No, I'm sorry. I -- I think we may have had
13 some discussion about that earlier, but frankly, I
14 haven't looked at those reports in quite some time and
15 I wouldn't be able to quote any specific numbers.
16     Q.  Did you know what percentage of horns didn't
17 alarm because of microscopic corrosion?
18     A.  I haven't committed that to memory also.
19     Q.  If you looked at the report would you be able
20 to identify --
21     A.  If I studied the report I would be able to
22 say whatever the report said but I think that would
23 also be a matter of record; whatever it says is
24 whatever it says.
25     Q.  And other than these reports you have not

Page 274

1 done any analysis on the cause or effect of microscopic
2 corrosion?
3     A.  I don't know what cause or effect means. I
4 know -- I know the cause; in other words, I have
5 studied a little bit of the chemistry just by reading
6 papers of why it happens.  That is not specifically my
7 expertise but I am an electrical engineer and I do deal
8 with corrosion issues on contacts on a regular basis in
9 all of our business.  I'm -- I'm conversant with the
10 literature about why you are concerned about the loss
11 of electrical continuity due to corrosion of pressure
12 contacts; it is a standard science for us.
13         The chemistry of that for -- for
14 piezoelectric horns is very specific because they use
15 certain types of materials.  The type of silver or
16 stainless materials that they use and the presence of
17 the type of corrosive factors that are normal to a
18 residence and in the air, you know, the sulphurs and
19 the chlorides that you normally get in residential air,
20 create a certain chemistry and that creates a certain
21 level of microscopic corrosion.  I know all -- I have
22 read all that; I know all about that, and I also know
23 that it can build up to be substantial enough to have
24 the contact resistance increase such that you cannot
25 initiate the sound of the horn.

Page 275

1         It is also the case because it is microscopic
2 corrosion that it is very easily disrupted.  You just
3 push a little hard on that contact and punch through it
4 or you move it around and then you can certainly easily
5 disengage from the corrosion and -- and/or disrupt it
6 and cause the horn to sound.  Those are just a matter
7 of science.
8     Q.  Does the length of time that corrosion has
9 been adhered to the contact materials have any relation
10 to how hard it would be to move them by the exercising
11 of the test button?
12     A.  Possibly.
13     Q.  Have you done any tests to determine that
14 relationship?
15     A.  No, I have not done any tests on these things
16 at all.  I'm relying on the literature reported in --
17 in the literature.
18     Q.  Did -- does the literature that you have
19 reviewed identify the length of time and quantity of
20 corrosive material that relate to its ability to be
21 moved by the exercise of a test button?
22     A.  I do know that some of the literature does
23 discuss time sensitive issues about how long it takes
24 to develop the corrosion. I can't sit here and recall
25 a piece of literature to cite where it then takes that

Page 276

1 and relates it specifically to any kind of pressure
2 that would be required from the contacts to break
3 through. No, I don't know of any.
4     Q.  Does the buildup of corrosion depend upon the
5 material that is used, in this case on the pressure
6 contacts?
7     A.  Yes and no.  The -- you can have corrosion
8 buildup that -- that is unrelated to the specific
9 material issues in terms of the -- of the, say, two
10 dissimilar metals or something that might be used
11 between the contact, the spring contact itself, if you
12 will allow me that, and the plate.  But then you can
13 also have that corrosion and those issues exacerbated
14 by and added to by the nature of those -- of that
15 bimetallic connection that is made.  So it is not a
16 simple answer.  I'm told by the people I have talked to
17 that are expert on this in the past or read their
18 papers that this is a very complex set of chemistry.
19     Q.  Let's take the materials that were in this
20 particular detector on the horn contacts.  Can you tell
21 me what they are?
22     A.  No.  I have not made a study of the specific
23 materials because there are two functions here.  You
24 can have -- you can have the generic buildup of the
25 microscopic corrosion that is independent of the

Page 277

1 materials of the contacts. And then you can have
2 separate corrosion issues related to the nature of the
3 types of metals if they are dissimilar. And that --
4 that art and that science, as I said, is fairly
5 complex. I have made no study of this specific set of
6 contacts and which type of chemistry and process would
7 be set up at those contacts. I just know that there is
8 no such thing as a set of any kind of pressure contacts
9 that are metal to metal, no matter what the materials
10 are, where corrosion is not a possibility.
11    Q.   Does the materials -- strike that.
12         Are the materials relevant to the amount of
13 resistance required to effect the -- in this case the
14 horn's operation?
15    A.   That can be but it is a secondary effect.
16 Generally speaking, you have a very small amount of the
17 material involved so the actual resistance of the
18 material is not a significant part of the circuit, if
19 that's the question.
20    Q.   Does whether the circuitry is characterized
21 as high or low impedence have a relationship to the
22 amount of resistance required to affect its operation?
23    A.   It can because the issue is, is there enough
24 contact impedence to cause a disruption of the
25 electronic circuit? In other words, as a matter of

Page 279

1    A.   No.
2    Q.   Dr. Aronstein, I believe, testified that
3 there is a requirement that resistance levels attain
4 approximately 10,000 ohms to affect the horn's
5 operation. Do you know have dispute with that
6 testimony?
7    A.   I have every reason to believe that a contact
8 resistance of 10,000 ohms would clearly disrupt this
9 circuit. If that is being stated as a minimum I
10 wouldn't have any comment. I don't know the answer to
11 that. It sounds -- it sounds much higher than I
12 believe would be necessary but I -- but I'm not -- I'm
13 not here to say I have done the test.
14    Q.   You will leave that to others?
15    A.   Yes.
16    Q.   Do you have any physical evidence that in
17 this case corrosion built on the contacts that led to
18 resistance levels high enough to effect the horn's
19 operation, actual physical evidence?
20    A.   I don't, no. I haven't done -- I think we
21 already answered the question that I did not do the
22 examination of the smoke detector.
23    Q.   When the microscopic corrosion is moved by
24 the exercising of the test button where does the
25 microscopic corrosion go?

Page 278

1 electrical circuit theory, the -- the relative
2 impedence and drive capability of the electronics
3 itself is -- is going to drive that horn and the
4 contact resistance that becomes a part of that circuit
5 and the magnitude of that resistance then becomes a
6 matter of calculation as to whether the actual
7 electronics and so forth can break through that
8 resistance, if you please, or can overcome that
9 resistance level, whatever it is, and cause the horn to
10 sound.
11    So there is a whole -- there is a whole set
12 of circuit theory there. The problem about modeling
13 that, however, is you have got to have some knowledge
14 specifically about the conditions that existed at the
15 time, which we cannot replicate. We could replicate it
16 if we knew what it was, we just don't know what it was.
17 And it has been disrupted so there is no way to go back
18 and say exactly what the conditions were at the time of
19 the incident. Therefore, it is not possible to exactly
20 replicate the circumstances for some sort of separate
21 test.
22    Q.   Have you done any study to determine the
23 quantity of resistance at any of the contact points
24 required for the detector that was in the Cruz residence
25 to effects its horn operation?

Page 280

1    A.   Actually it probably stays right in place.
2 The issue is generally that when you push on one of
3 these contacts, you physically move it, you can
4 actually have a pitting effect on the piezoelectric
5 horn itself at the point of contact due to the erosion
6 of the face of the plate due to the electrical chemical
7 processes that are going on, but literally, it is -- it
8 is microscopic and a very small point, and so any
9 movement of the -- any movement of the horn contact at
10 all with respect to the plate physically moves it to a
11 different location. So actually the corrosion could
12 stay in place but you could move the point of contact.
13    Q.   What are the materials that the corrosion
14 that is in the horn contact made of?
15    A.   The nature of the horn corrosion -- excuse
16 me. The corrosion elements themselves?
17    Q.   Yes.
18    A.   Sulfides and chlorides are typically what you
19 find, and I am sure there are other things but, again,
20 I'm not a chemist. Although I have had some chemistry
21 I'm not the person probably to talk to about the actual
22 chemical composition of the corrosion itself. The
23 literature is pretty complete on that.
24    Q.   Regardless of which of the chemicals forms
25 the corrosive element or elements do you know of any

**Page 281**

1 tests that could later detect their presence, albeit
2 either at or near the contact?
3    A.    According to the level of -- or to the
4 handling of the -- of the evidence and according to the
5 preservation of the evidence, et cetera, a scanning
6 electron microscope or something equivalent could often
7 detect the presence of those contact points, any -- I
8 think any erosion of the surface and/or the presence of
9 the -- of scrapes or scratches that were caused by the
10 contact itself and also the presence of any of those
11 corrosive elements.
12    Q.    Do you know if an SEM analysis was done on
13 this particular circuit?
14    A.    I have no knowledge of one.
15    Q.    Therefore, if one was performed you haven't
16 looked at or heard about the results?
17    A.    That is a correct statement.
18    Q.    In your file was an August 22, 2000 letter
19 from Leticia Garza of Ray Marchan's office dated -- I
20 think I already gave it -- but October 22 to yourself,
21 Michael Schultz, Morris Cranmer, and Dr. Aronstein
22 inquiring as to your availability for an inspection and
23 testing of December 15th, 2000. Do you remember
24 receiving that letter?
25    A.    I'm not going to sit here and say that I

**Page 282**

1 remember. I get so much correspondence I won't say I
2 remember seeing it or not. Most likely, my assistant
3 saw it and then discussed it with me.
4    Q.    Did you attend any testing or inspecting on
5 December 15 of 2000 of this detector?
6    A.    No.
7    Q.    Have you ever been involved in an SEM
8 analysis of a smoke detector?
9    A.    Yes.
10    Q.    Was it for litigation or in a separate test?
11    A.    Litigation.
12    Q.    And were you involved in the analysis of the
13 SEM test?
14    A.    I was physically present when it was being
15 done and I subsequently saw the analysis, yes.
16    Q.    But were you the --
17    A.    Both I mean.
18    Q.    Let me rephrase the question. Were you the
19 expert called upon to look at the charts and graphs
20 prepared by the SEM and asked to interpret them?
21    A.    No, I was not. I would not -- I would not
22 myself interpret SEM data. I would use someone skilled
23 in that and then I would work with them.
24    Q.    What type of person, expert would be the type
25 of person that you believe is skilled at reading SEM's?

**Page 283**

1    A.    Well, that is complicated question. I can
2 read -- I can read the results that are generally
3 provided by someone who has done an SEM analysis. I
4 mean, it is not that -- you know, it is hard to answer
5 that question. I mean, as an electrical engineer I'm
6 familiar with the nature of the machine and I can look
7 at somebody who -- the results of someone who had done
8 that and -- and, you know -- and see what had happened
9 I mean. The results you get are often things like here
10 are the elements that are present and here is -- you
11 know, we are looking at this -- here is a -- here is a
12 scan of the area of this particular scratch and here is
13 how deep it looks compared to the surface area. I
14 mean, there is all kinds of information there, most of
15 which I can interpret once it is shown to me, but I
16 would not -- but I'm not a person who runs an SEM
17 machine so, therefore, I would not be one that would
18 originate that data.
19    Q.    You indicated previously that you have
20 reviewed, I believe, reports or studies talking about
21 the time necessary to create the corrosion that
22 ultimately affects the horn operation. Did I state
23 that accurately?
24    A.    I have read expert discussion of that issue,
25 which is a very complex function of things like the

**Page 284**

1 level of the contaminants in the environment,
2 temperature, time, nature of the materials, whether
3 they have been coated or not, presence of other
4 contaminants, types of metals involved. I mean, it is
5 a fairly complex set of chemistry.
6    Q.    Have you done any analysis as to how those
7 issues and those reports relate to this particular
8 case?
9    A.    No.
10    Q.    You said coatings. What did you mean?
11    A.    You can take metals and coat them with
12 materials that might inhibit the process of -- of
13 corrosion.
14    Q.    Is coatings also referred to as platings?
15    A.    Platings is one of the things that you could
16 do. You could take a material like stainless steel and
17 plate it with another material.
18    Q.    Tin, silver, or gold?
19    A.    Silver, tin, gold certainly, all those are
20 used.
21    Q.    And they inhibit the formation of corrosion?
22    A.    They change the chemistry, and according to
23 the circumstances most definitely could inhibit. They
24 also, under certain circumstances, could exacerbate it
25 according to what the contaminants are.

**Page 285**

1 Q. What circumstances inhibit it and what
2 circumstances exacerbate it?
3 A. I'm -- I'm not here to do that. I'm not your
4 chemistry expert on the actual corrosion mechanisms.
5 I'm not going to testify on that.
6 Q. Can you identify the reports that do discuss
7 this issue?
8 A. I would have to go back and look at my files
9 and -- and find you the -- the reference. I'm not
10 prepared to do that today.
11 Q. If a corrosive element was present in this
12 detector are you familiar with the quantity of
13 corrosion that would have been required in this
14 particular detector to effect its horn operation?
15 A. No.
16 Q. Are you familiar with -- in any way with the
17 testimony in this case as to when, if at all, the
18 detector last alarmed prior to Mr. Cruz's death?
19 A. To be honest, I don't remember. I think -- I
20 think I have a vague recollection in this case of there
21 having been some testimony on that issue of whether it
22 had been tested or sounded but I can't sit here and
23 tell you. Whatever it is it is. I don't know.
24 Q. If the -- the last time the detector alarmed
25 was from the presence of particulate, whether it be

**Page 286**

1 smoke particulate, water vapor particulate, whatever as
2 compared with the testing of the detector by pushing
3 the test button would that be relevant as to whether
4 there was sufficient time from that date, whenever it
5 was, to the date of Mr. Cruz's death as to the
6 likelihood that corrosion prevented this detector from
7 alarming?
8 A. I think I understand that long question. It
9 does make a difference because when you push the test
10 button, if you did it with some pressure, and you
11 physically scrape the contact from the printed circuit
12 across the plate of the horn it is a different
13 mechanism than if without any physical motion the horn
14 is called on to sound. There is corrosion there but
15 not enough corrosion to keep it from sounding. The
16 horn contact stays in the same place but we are able to
17 actually get the horn to move. Those are two different
18 mechanisms. I'm confident that they would have some
19 material effect on the re-buildup of the corrosion. I
20 have made no specific study of that myself.
21 Q. So you don't know the effect of the horn
22 alarming from smoke particulate as opposed to the test
23 button on microscopic corrosion?
24 A. I have made no study of that.
25 Q. Do you have an opinion as to the amount of

**Page 287**

1 time necessary for corrosion to build after the horn
2 had sounded from a nontesting for it to later affect
3 the horn's operation through corrosion?
4 A. I have no opinion about that because it is a
5 matter of quite a number of parameters that would have
6 to be modeled in this case and I have made no study of
7 that.
8 Q. What type of parameters would have to be
9 modeled in order to offer that opinion?
10 A. How advanced the corrosion had become at the
11 point of initialization, at the point where we say it
12 was sounding, and then the amount of time thereafter
13 that it was sitting still, the types of corrosive, the
14 environment type of corrosive, the environment that it
15 was in, the level of environment as a function, then,
16 of all the physical parameters of the nature of the
17 materials that were involved, the temperature that this
18 process was taking place at, the humidity, for example,
19 of the circumstances because a lot of these corrosive
20 processes are humidity sensitive; the chlorides and so
21 forth are water soluble in some cases, and so that
22 makes a big difference. So all these parameters would
23 have to be modeled and studied and I certainly have not
24 done that.
25 Q. If the horn contacts had suffered some level

**Page 288**

1 of corrosive -- corrosion to it are there any other
2 locations in the detector itself that would also have
3 sustained some form of microscopic corrosion?
4 THE WITNESS: Can you repeat that?
5 (WHEREUPON, the requested portion
6 of the record was read by
7 reporter.)
8 THE WITNESS: Possibly but not the same.
9 There is the -- there is the normal corrosion or -- or
10 placement of contaminant materials, deposition of
11 contaminants materials from the atmosphere on any kind
12 of metal surfaces and electronics that are in this
13 device, and that can occur on the horn plate or
14 anyplace else. But the corrosion mechanism of this
15 fretting corrosion issue that is discussed in the
16 literature is a mechanism that is discussed in the --
17 in the geographic location of the point of contact
18 between the plate and the actual contact itself and
19 that chemistry is different. Because of that
20 bimetallic contact and the -- and the nature of the --
21 of the surface pressure and the -- and the mechanisms
22 that are going on there are different than just saying
23 a general deposition of contaminants on any metal,
24 which is also occurring. So no, I would not say that
25 you would get the same mechanism anyplace else that you

Page 289

1 were going to get at the point of contact.
2    Q.   Describe the process of fretting corrosion.
3    A.   You are asking me to describe something that
4 I probably can struggle through but I'm not testifying
5 about this.  This is not part of my opinions.  I don't
6 know that this is something that I really ought to be
7 trying to do on the fly here when I have not offered a
8 specific opinion about that.  The -- I'm not your
9 chemist, okay?  I'm not the person who is going to try
10 to draw the equations and describe for you the -- the
11 process of creating and sustaining a buildup of that
12 corrosion at that point.  I draw my information on that
13 from fundamental literature about the occurrence of
14 this corrosion.  Then I draw my conclusions.
15   Q.   Did you say occurrence?
16   A.   Occurrence of this corrosion.  I'm really not
17 comfortable sitting here and trying to give you a
18 scientific explanation of fretting corrosion.
19   Q.   Then tell me your basis for concluding that
20 corrosion is a possible cause of this detector not
21 alarming.
22   A.   Okay.  I can do that; that I can do.
23   Q.   We will go back and forth between what you
24 can and can't do.
25   A.   Sure.  If I take a properly powered, properly

Page 291

1 determined that this detector was properly functioning?
2    A.   At least at that point -- and I think it is
3 reasonable to extrapolate backwards -- we know the
4 electronics was working sufficiently; we know that the
5 horn had mechanical integrity; we know that the push
6 button worked; and we know there was enough power for
7 it to sound.
8    Q.   And because during this test the horn did
9 sound you believe that the only possible cause of it
10 not sounding during the night, morning of Mr. Cruz's
11 death was corrosion of the contacts?
12   A.   Yes, because if you study the literature with
13 that set of parameters the only thing I have ever seen
14 reported in the literature as to a reason why a horn
15 would not sound under that set of circumstances is
16 corrosion of the contacts or lack of contact at the
17 contacts.
18   Q.   But you made no study as to whether or not it
19 was properly powered at the time of his death?
20   A.   I have no way to do that.
21   Q.   And you did no study to determine whether it
22 did sound during the night, morning of his death?
23   A.   I wasn't there.
24   Q.   But you did nothing affirmative to study
25 whether it did or didn't?

Page 290

1 functioning smoke detector and I provided a stimulus of
2 an external smoke product to which it is sensitive such
3 that the chamber initiates the electronics to sound or
4 to activate and the horn doesn't sound I'm left with
5 only one possibility and that is the horn's failed,
6 okay?  If the horn fails the question is on what basis
7 would that horn fail?  What mechanism would cause that
8 horn not to sound?  If separately later I proved that
9 the horn is capable of sounding; in other words, later
10 I determined it is mechanically okay and it is able
11 vibrate and sound, which in this case we did determine,
12 I don't know anything else to point to except the
13 corrosion of those contacts.
14   Q.   Okay.  So in this particular case you believe
15 from the literature that you have read the heater
16 at some point would have produced smoke that this
17 detector should have been sensitive to?
18   A.   I do believe that.
19   Q.   And from Mr. McClintock pushing the test
20 button a month after the incident you believe that the
21 detector was properly powered?
22   A.   Well, that is the only evidence I have, but
23 my assumption is that, yes, we did have a powered
24 detector.
25   Q.   Because it sounded at that time you have

Page 292

1    A.   I don't know how I would separately do that.
2    Q.   Did you study in any way the production of
3 carbon monoxide by this heater during the night,
4 morning of Mr. Cruz's death?
5    A.   I made no study of the heater at all.
6    Q.   And that would include all of the byproducts
7 of its production, including smoke, soot?
8    A.   I wasn't asked to study the heater; I have
9 not even seen the heater.
10   Q.   How many contacts are in this detector as it
11 relates to the horn?
12   A.   Three, if it's a standard piezoelectric horn.
13   Q.   Assume -- and you said that caveat because
14 you haven't seen this detector?
15   A.   I haven't seen this particular detector but I
16 know this model of detector and I expect it to have
17 three contacts on the piezoelectric horn.
18   Q.   Assuming it does have these three contacts
19 how many, if any, of the horn contacts have to be
20 interrupted through higher resistance in order to
21 effect the horn's operation?
22   A.   The horn would be affected in some way by any
23 corrosion on any one of the contacts.  It would
24 probably be fully inhibited from sounding by corrosion
25 on maybe two of the contacts.

**Page 293**

1   Q.  Which of the two?
2   A.  Well, there is a feedback horn mechanism that
3 causes a resonance condition on the piezoelectric horn,
4 and you will sound without that. There will be a
5 muffled sound; it won't be up to standard strength, but
6 it would be barely -- it would be audible, anything
7 from barely audible to, you know, fairly audible.
8   Q.  So let me stop you right there.
9   A.  Sure.
10   Q.  If the feedback contact was completely open
11 the horn would sound in some capacity?
12   A.  Likely, yes --
13   Q.  Okay.
14   A.  -- the typical piezoelectric horn would, but
15 it would not be the 85 plus decibel kind of sound we
16 are used to from the piezoelectric horn because it
17 doesn't go into a resonance condition because of the
18 loss of the feedback loop but you -- if you disrupt
19 the -- the two fundamental contacts that have to do
20 with the basic vibration sequence of the horn, I mean,
21 it doesn't sound.
22   Q.  Have you done any study to determine the
23 decibel level of the horn if the feedback contact has
24 been interrupted?
25   A.  No, I'm not -- I mean, I -- I have -- I have

**Page 295**

1 have a serious set of problems with the whole art or
2 science of sonic deposition with respect to deposition
3 of smoke products on piezoelectric horns. I think it
4 is not as scientifically sound as some have made it out
5 to be or used it to be, but clearly the level of
6 vibration, the speed of vibration, and the magnitude of
7 vibration are going to be very material factors on
8 anything that is going to be deposited on the surface
9 of the plate.
10   Q.  And is it possible, therefore, that without
11 the resonance there wouldn't be any pattern to detect
12 sonic deposition?
13   A.  Without making any commentary on my belief
14 about the whole issue of sonic deposition clearly I
15 think it would be make a difference.
16   Q.  Since the May 10 deposition have you done any
17 analysis on the differences between the drive
18 circuitries of the 1839 detector and the 2839 detector
19 as compared with the type of detector that was in the
20 Cruz residence on the night, morning of his death?
21   A.  I have done no such thing.
22   Q.  Do you have any evidence from whatever source
23 that a BRK detector or a detector made by any of its
24 predecessor companies other than the 1839 or 2839 ever
25 failed to alarm because of corrosion of the horn

**Page 294**

1 physically disrupted the feedback loop on piezoelectric
2 horns before and I have heard the sound that it makes
3 when you don't have the feedback loop, and it's audible
4 in some cases or barely audible in others but you can
5 hear it generally speaking. I have not actually
6 measured the output. It is markedly less. It would
7 not be a very effective alarm. It certainly wouldn't
8 pass any UL standard.
9   Q.  Have you done any study to determine --
10 strike that question.
11        Are you familiar with the term "sonic
12 deposition"?
13   A.  I am.
14   Q.  Have you done any study to determine the
15 effect of the lack of resonance or the lack the
16 feedback contact has on the sonic deposition?
17   A.  I have made no such study; I don't know of
18 such a study.
19   Q.  Do you have an opinion from whatever basis as
20 to whether the lack of a resonance or lack of a
21 feedback would have on sonic deposition?
22   A.  It would have an effect, in my opinion, a
23 substantial effect in that it would be a far less
24 energetic vibration which is a material factor in the
25 whole issue of what is called sonic deposition. Now, I

**Page 296**

1 contacts?
2        THE WITNESS:  Can you read that
3 question back? The first part of it I lost.
4        MR. HELLER:  Can you read it?
5        (WHEREUPON, the requested portion
6        of the record was read by
7        reporter.)
8        THE WITNESS:  I don't think the things
9 that I have seen specifically identified model numbers
10 sufficiently for me to -- to give you an answer to that
11 question. I may have seen it because I have seen the
12 statistical evidence of numbers of detectors not
13 sounding and so forth, but without the model numbers I
14 won't have a way of knowing if it is a certain model of
15 BRK detector so I guess the answer is no.
16   Q.  (By Mr. Heller)  Have you seen from whatever
17 source a detector with the type of materials that this
18 detector had on its horn contacts ever be determined
19 that it did not alarm because of corrosion?
20   A.  I think the answer would be the same because
21 that is even a more specific question. No, I don't
22 have that information.
23   Q.  Are there different types of horn assemblies
24 in detectors?
25   A.  Yes.

Page 297

1    Q.  Have you ever seen a report or study issued
2 that suggests that the type of horn assembly that was
3 in this particular detector ever failed to alarm
4 because of corrosion?
5    A.  I think it has got to be the same answer.
6 Unless I could do a specific model number check of the
7 folks who have done this work and had done statistical
8 sampling of detectors that didn't sound and then
9 subsequently did sound with the presence of corrosion I
10 couldn't answer that question and I haven't done that,
11 so no, I can't answer that question.  I don't have an
12 answer to that question.
13    Q.  Based upon the tasks that you did and did not
14 perform in this case, which you testified to both today
15 and last time, it is my belief you cannot establish the
16 amount of soot or smoke that was in the Cruz residence
17 at any time during the event which produced his death?
18    A.  I have done no fire modeling, no.
19    Q.  Same question with respect to carbon dioxide?
20    A.  That is correct.
21    Q.  Are you aware of anyone who has done any fire
22 modeling -- strike that question.
23       Are you aware of any of the plaintiff's
24 experts that have done any fire modeling in this
25 particular case?

Page 298

1    A.  I think I already mentioned to you that I
2 have not read the depositions of the -- of the
3 plaintiff's experts in this case so I can't tell you
4 what they have done specifically.
5    Q.  Based upon whatever knowledge you have to
6 date are you aware of any of the plaintiff's experts
7 that have done any fire modeling?
8    A.  I'm not saying whether they have or not.  I'm
9 just not aware of any.
10    Q.  Have you been asked to, have you recommended,
11 do you have any plans to conduct any tasks from this
12 date forward in this particular case?
13    A.  I have not been asked to and I have no
14 separate plans.  I only do what I'm asked to do.
15    Q.  Have you made any recommendations for any
16 tests or tasks that you should do in this case
17 further support your opinion?
18    A.  No.
19    Q.  In support of the first part of your opinion,
20 and that is that an ionization detector is not
21 sensitive to certain types of smoke, you cited the fact
22 that there was soot and particulate smoke found within
23 the resident after Mr. Cruz's death, correct?
24    A.  Yes, there is pictorial evidence of the
25 presence of those components.

Page 299

1    Q.  And based upon the testimony you have given
2 it is my understanding that you cannot testify as to
3 when the smoke and soot particulate that was found on
4 the walls was created by this heater?
5    A.  I can't do that.
6    Q.  It is my understanding that your testimony is
7 that when this heater was first powered, and the
8 environment that Cruz was living in at the time was
9 oxygen rich, that the heater was producing the type of
10 particulate that the ionization detector is most
11 sensitive to?
12    A.  I think that is a correct statement.  When I
13 say oxygen rich I just simply mean normal oxygenation
14 of the air in what you would expect in a residence.
15    Q.  22 or 23 percent?
16    A.  Yeah, just the normal -- I didn't mean by
17 that it had been enhanced in any way and probably
18 oxygen rich is probably the wrong comment, but just
19 normal oxygenation.  When you light off some sort of
20 gas combustion you tend to get from that a substantial
21 amount, particularly initially, of invisible high
22 energy particulate matter which turns out ionization
23 detectors are very sensitive to.
24       Now, there are a whole set of issues in this
25 particular case because of the orifice that was in this

Page 300

1 heater versus the type of material being burned and I
2 have made no study about all that.  I'm not here to
3 represent anything about the combustion of that heater.
4 I'm just saying a normal heater, proper oxygen, proper
5 fuel, everything -- everything working functionally,
6 you would tend to get early on actually some
7 particulate matter off of that heater that a very close
8 and proximate ionization detector might well detect.
9    Q.  And based upon the fact that you have not
10 studied the production of soot and smoke and carbon
11 monoxide by this particular heater during the night,
12 morning of his death is my understanding correct that
13 your testimony is that if the heater during Mr. Cruz's
14 death or prior to Mr. Cruz's death was producing the
15 type of smoke that an ionization type detector was most
16 sensitive to, that the reason it didn't sound was most
17 likely the corrosion issue that you have talked about?
18    A.  Yes.  If the detector chamber detected the
19 smoke, given everything we know about how this worked
20 later, the most probable -- with the highest degree of
21 engineering certainty or probability, the most probable
22 failure mechanism for why the detector would not sound
23 an alarm would be a failure of the horn contact simply
24 due to corrosion or a mechanical failure, but -- which
25 could be corrected by pushing the horn also, but most

Page 301

1 likely corrosion.
2    Q.  And if the heater was producing the large
3 particulate smoke, the type of smoke that you have
4 testified an ionization detector is less sensitive to,
5 absent the horn corrosion issue is it your testimony
6 that at some point the alarm would have sounded?
7    A.  If that is the only kind of particulate
8 matter then the horn might not have sounded simply
9 because the ionization chamber was not sensitive to
10 that particulate matter.  However, given the amount of
11 deposition of soot that I saw in the pictures, given
12 the amount of smoke and so forth that was there, I
13 think we had a broad spectrum of smoke products over
14 the course of this fire, so there that is no question
15 in my mind that at some point in time we definitely had
16 the right type of particulate matter in sufficient
17 quantities for a properly designed, powered, and
18 functioning smoke detector to sound.
19    Q.  And you have made no study as to the timing
20 of when the correct quantity and size of particulate
21 was produced by this heater to make an ionization
22 detector alarm?
23    A.  I have made no such study.
24    Q.  And therefore, you can't testify as to
25 whether that did or did not occur before Mr. Cruz was

Page 302

1 either incapacitated or killed by the carbon monoxide?
2    A.  I can't specifically do that in terms of
3 relating it to the toxicology issues involved which
4 would require, of course, a toxicologist or someone to
5 speak to the time durations and other issues related to
6 how fast it would take for someone to become
7 incapacitated due to the carbon monoxide and I'm not a
8 toxicologist.
9    Q.  Have you done any analysis, either by
10 pictures or otherwise, of the interior of the smoke
11 detector?
12    A.  No, I have not.
13    Q.  Have you seen any pictures of the inside of
14 the smoke detector?
15    A.  Not in any detail, no.
16    Q.  Based upon what you have seen of pictures of
17 the Cruz residence do you have an expectation as to
18 what the interior of the smoke detector would look like
19 as a result of this event?
20    A.  My problem is that I don't -- I don't know
21 that I have pictorial evidence to look at that would be
22 representative of what happened -- let's call it -- the
23 day after the fire, what condition it was in the day
24 after the fire before any handling, before any
25 movement, before anything was done.  If I had that then

Page 303

1 I would -- I would expect to see some evidence that --
2 that was consistent with what was happening on the
3 outside of the detector in terms of deposition of smoke
4 particles moderated by the fact that, of course, it has
5 got to moderate inside, and you would see probably some
6 evidence of smoke and deposition of smoke products.
7 The degree to which that would occur, no, I'm not
8 prepared to argue.  And it might be minor.
9    Q.  First thing, you mentioned a fire?
10    A.  I didn't mean a fire.  I mean -- I'm sorry.
11 There was a fire, of course, in the heater itself; it
12 was burning but I didn't mean a separate fire.
13    Q.  Are you aware of, have you seen any
14 photographs taken by any of the public officials, the
15 sheriff's office, police department, anyone?
16    A.  I did some see of those photographs, yes.
17    Q.  Wouldn't those photographs have been taken
18 before any handling of the detector?
19    A.  I don't know when a lot of those photographs
20 were taken.
21    Q.  Have you done any study as to the materials
22 of the inside of the detector and their relation to how
23 much smoke adhere to them during an event such as what
24 occurred in the Cruz residence?
25    A.  I have not done a study.  I have seen lots of

Page 304

1 smoke detectors that have gone through fires and I'm
2 generally familiar with the wide range of deposition of
3 smoke products that you can get inside a smoke
4 detector.  It can range from very little to a lot.
5    Q.  Did any of these reports or studies identify
6 whether one would expect to see more smoke adhere to
7 the plastic parts of the interior of the detector as
8 compared to the battery?
9    A.  Which studies are you referring to?
10    Q.  The ones you just mentioned.
11    A.  I didn't mention studies.  I said I have
12 physically looked at lots of studies.
13    Q.  Let me rephrase the question.  Based upon the
14 detectors you have seen can you state whether smoke
15 particles are more likely and in more quantity to
16 adhere to the plastic parts of the interior of the
17 detector as compared to the battery?
18    A.  As opposed to the battery?
19    Q.  As compared with it.
20    A.  Compared with the battery.  I have seen
21 probably every combination.  I have seen smoke
22 detectors that have gone through extensive fires but
23 were not damaged where there was virtually no smoke
24 deposition inside the smoke detector even though there
25 was substantial deposition of smoke outside.  I have

## Page 305

1 seen smoke detectors who have gone through particularly
2 smoky kinds of fires that -- where there was heavy
3 deposition of -- of smoke on all surfaces inside, metal
4 and plastic alike. You know, there is a wide
5 combination of -- of -- from my observation a very wide
6 combination of -- of -- excuse me, not combination -- a
7 very wide spectrum of possibilities about the
8 deposition of smoke on the surfaces inside, a thin
9 deposition layer of grayish smoke over the whole
10 plastic and metal surfaces inside that shows up often
11 more on the plastic than the metal simply because of
12 the coloration difference being the batteries are
13 typically dark and plastic is often white, so you tend
14 to see it a little more in contrast, which is very
15 common, and I have seen that many times.
16    Q.   You have described the smoke in this
17 particular incident to be thick and black?
18    A.   Well, I'm -- I'm just not describing the
19 smoke, I'm simply describing some of the pictures where
20 the deposits on the outside of the walls appear to be
21 very sooty deposits but I have made no analysis so far
22 of those and I don't know that one was done.
23    Q.   Would you have an opinion, then, as to
24 whether the type of smoke that you have seen in the
25 pictures would be the type of smoke that based upon

## Page 306

1 your observation of smoke detectors in the past would
2 more likely adhere to the plastic as opposed to the
3 battery?
4    A.   I think that would be speculation on my part.
5    Q.   Are there any photographs that you are
6 relying on in support of your opinion or just the
7 testimony that we cited before?
8    A.   No specific photographs, no. Can we take a
9 break while you are looking at that?
10        MR. HELLER: Yes.
11        (WHEREUPON, a break was taken.)
12    Q.   (By Mr. Heller) Have you ever seen from
13 whatever source whatsoever any report that a detector
14 with the type of drive circuitry that the detector in
15 the Cruz resident had ever failed to alarm because of
16 corrosion?
17    A.   I don't think I have any specific reports
18 that relate reported failures due to contact corrosion
19 to a specific model number that would allow me to do
20 that, so the answer is no.
21    Q.   So no to the drive circuit?
22    A.   Right.
23        MR. HELLER: That is all I have. Thank
24 you very much.
25        THE WITNESS: Very good.

## Page 307

1        MS. SALINAS: We will reserve our
2 questions until the time of trial.
3        THE REPORTER: Ms. Salinas, do you use
4 the condensed and ASCII versions of the deposition?
5        MS. SALINAS: Yes.
6        MR. HELLER: Yes. What I would like is
7 a full, mini, and ASCII.
8        MS. SALINAS: Yes.
9        MR. HELLER: All right.
10       (At the hour of 10:24 a.m. the
         deposition was concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 308

1        C O R R E C T I O N S  T O  T H E
2        D E P O S I T I O N  O F
3        B. DON RUSSELL, Ph.D., P.E.
   PAGE/LINE ** READS ** SHOULD READ ** REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
         _____
         B. DON RUSSELL, Ph.D., P.E.
24
25

B. DON RUSSELL                                    1/23/01

Page 309

```
1      SIGNATURE OF WITNESS
2      I, B. DON RUSSELL, Ph.D., P.E., solemnly swear or
3  affirm under the pains and penalties of perjury that
4  the foregoing pages contain a true and correct
5  transcript of the testimony given by me at the time and
6  place stated within the corrections, if any, and the
7  reasons therefor noted on a separate sheet of paper and
8  attached hereto, and that I am signing this before a
9  Notary Public.
10
11     _____
               B. DON RUSSELL, Ph.D., P.E.
12
13
14 STATE OF TEXAS          .
15 COUNTY OF _____ .
16     SUBSCRIBED AND SWORN TO BEFORE ME by
17 _____ on this, the _____ day of
18 _____, A.D., 2001.
19
20     _____
               Notary Public, State of Texas
21
22 My Commission Expires: _____
23
24
25
```

Page 310

```
1  STATE OF TEXAS
2  COUNTY OF DALLAS
3      This is to certify that I, TIM FAILS, a Certified
4  Shorthand Reporter in and for the State of Texas,
5  reported in shorthand the proceedings conducted at the
6  time and place set forth in the caption hereof and that
7  the above and foregoing pages contain a full, true, and
8  correct transcript of said proceedings.
9      Further certification requirements pursuant to
10 Rules 205 and 206 will be complied with after they have
11 occurred.
12     CERTIFIED TO BY me in Dallas, Dallas County,
13 Texas, on this, the _____ day of
14 _____, A.D., 2001.
15
16
17     _____
               TIM FAILS, Texas CSR No. 2931
18         Expiration Date: 12/31/02
               STANLEY, RICE & ASSOCIATES, INC.
19         4111 North Central Expressway, Suite 205
               Dallas, Texas 75204
20         (214)720-4567
21
22
23
24
25
```

**A**

ability 275:20
able 273:8,15,19,21
  286:16 290:10
about 256:8 258:25
  261:6 266:24
  271:18 273:13
  274:10,10,22
  275:23 278:12,14
  280:21 281:16
  283:20 287:4
  289:5,8,13 295:14
  300:2,3,17,19
  305:7
above 310:7
above-named
  249:15
absent 301:5
absolutely 265:14
  271:15
according 281:3,4
  284:22,25
accurately 283:23
acquired 260:4
across 270:23
  286:12
act 270:25
ACTION 249:7
activate 290:4
actual 277:17 278:6
  279:19 280:21
  285:4 288:18
actually 255:12,18
  261:19 263:8
  271:19 280:1,4,11
  286:17 294:5
  300:6
added 276:14
additional 253:17
addressed 255:12
adhere 303:23
  304:6,16 306:2
adhered 275:9
advanced 287:10
affect 277:22 279:4
  287:2
affected 292:22
affects 283:22
affirm 309:3
affirmative 291:24
after 262:9 264:13
  266:15 287:1
  290:20 298:23
  302:23,24 310:10
again 265:9 268:23
  280:19

agreement 249:21
aimed 271:8
air 269:12 274:18
  274:19 299:14
alarm 261:3,5,11
  262:9,18,23,23
  263:7,12,18
  267:19 268:7
  273:10,17 294:7
  295:25 296:19
  297:3 300:23
  301:6,22 306:15
alarmed 260:24
  285:18,24
alarming 286:7,22
  289:21
albeit 281:1
alike 305:4
Allen 254:11
allow 276:12 306:19
already 258:5 259:9
  266:17 279:21
  281:20 298:1
Although 280:20
amount 277:12,16
  277:22 286:25
  287:12 297:16
  299:21 301:10,12
analysis 272:9
  274:1 281:12
  282:8,12,15 283:3
  284:6 295:17
  302:9 305:21
and/or 275:5 281:8
another 254:16
  255:1 284:17
answer 253:2,3,4,9
  254:21 257:25
  258:6 260:5,9
  276:16 279:10
  283:4 296:10,15
  296:20 297:5,10
  297:11,12 306:20
answered 279:21
answers 252:25
anybody 256:4,8,23
anyone 297:21
  303:15
anyplace 288:14,25
anything 252:21
  253:16 254:6
  260:14 290:12
  293:6 295:8 300:3
  302:25
anyway 252:19
apparently 253:22
appear

305:20
applied 270:19
appreciate 259:23
appropriately 267:1
approximately
  262:8 279:4
area 269:9 283:12
  283:13
argue 303:8
Aronstein 255:3
  279:2 281:21
Aronstein's 255:11
around 266:11,13
  275:4
arrange 256:7
art 266:2 277:4
  295:1
ASCII 307:4,7
asked 266:20
  269:22 270:8
  282:20 292:8
  298:10,13,14
asking 252:22,22
  258:2 268:24
  270:3 289:3
asks 252:21
assemblies 296:23
assembly 297:2
assistant 282:2
ASSOCIATES
  310:18
assume 253:4
  292:13
Assuming 292:18
assumption 262:2
  290:23
atmosphere 288:11
Atrium 250:3,8
attached 270:17,20
  309:8
attain 279:3
attempting 256:6
attend 282:4
attorneys 257:7
audible 293:6,7,7
  294:3,4
August 272:4
  281:18
availability 281:22
aware 297:21,23
  298:6,9 303:13
A&M 270:5
A.D 309:18 310:14
a.m 249:15 307:10

**B**

B 249:12 251:3

252:4 308:2,23
309:2,11
back 254:20 260:19
  269:21 271:23
  272:7,15 273:6
  278:17 285:8
  289:23 296:3
backwards 291:3
barely 293:6,7
  294:4
based 261:17
  297:13 298:5
  299:1 300:9
  302:16 304:13
  305:25
basic 293:20
basically 259:5
  262:2
basis 274:8 289:19
  290:6 294:19
batteries 305:12
battery 261:14,17
  261:19,20,22,25
  262:11,13 264:6
  304:8,17,18,20
  306:3
became 265:19
  266:16
become 287:10
  302:6
becomes 278:4,5
before 249:17
  253:10 254:19
  258:24 259:22
  260:10 294:2
  301:25 302:24,24
  302:25 303:18
  306:7 309:8,16
beginning 258:19
behave 266:19
behaved 268:10
behind 254:16
  255:13
being 252:5 265:24
  273:1,8 279:9
  282:14 300:1
  305:12
belief 267:1 295:13
  297:15
believe 262:21
  263:14 279:2,7,12
  282:25 283:20
  290:14,18,20
  291:9
best 252:23
better 263:3
between

276:11
  288:18 289:23
  295:17
big 287:22
bimetallic 276:15
  288:20
bit 274:5
black 266:12 267:22
  305:17
board 270:18,21,22
both 263:14,21
  282:17 297:14
BRANDS 249:8
break 253:8,10
  276:2 278:7 306:9
  306:11
briefly 253:20
  260:12
BRITTANY 249:6
BRK 249:8 295:23
  296:15
broad 301:13
brought 254:3
  271:23 273:6
BROWNSVILLE
  249:3
build 274:23 287:1
buildup 276:4,8,24
  289:11
built 279:17
burned 300:1
burning 303:12
business 274:9
button 264:8,16
  270:13,18 271:6
  271:11 275:11,21
  279:24 286:3,10
  286:23 290:20
  291:6
byproducts 292:6
B-98-186 249:7

**C**

C 250:1 308:1,1
calculation 278:6
call 302:22
called 272:4,9
  282:19 286:14
  294:25
calls 259:4
came 268:17
Cantu 250:2 254:13
Cantu's 255:2
capability 278:2
capable 290:9
capacity 293:11
caption 310:6

Page 2

carbon 292:3
  297:19 300:10
  302:1,7
case 253:13,14
  255:8 256:4,8,18
  256:24 257:4,7,10
  257:14,15,17,21
  258:2 259:14,19
  260:21 264:1
  265:11 266:22
  268:17 271:7
  273:7 275:1 276:5
  277:13 279:17
  284:8 285:17,20
  287:6 290:11,14
  297:14,25 298:3
  298:12,16 299:25
cases 287:21 294:4
cause 274:1,3,4
  275:6 277:24
  278:9 289:20
  290:7 291:9
caused 264:11
  281:9
causes 293:3
cautioned 252:6
caveat 292:13
Central 310:19
certain 263:2,24
  264:25 266:22
  269:11 274:15,20
  274:20 284:24
  296:14 298:21
certainly 265:6
  275:4 284:19
  287:23 294:7
certainty 260:23
  262:18 263:20
  300:21
certification 310:9
certified 249:17
  310:3,12
certify 310:3
cetera 264:7 281:5
chamber 263:2,6,23
  264:20 290:3
  300:18 301:9
chamber's 264:24
chance 253:19
  256:1 260:12
change 259:17,18
  260:6,9,14 284:22
changes 258:4
characterize 259:13
  259:14
characterized 265:4

277:20
charts 282:19
check 297:6
chemical 280:6,22
chemicals 280:24
chemist 280:20
  289:9
chemistry 274:5,13
  274:20 276:18
  277:6 280:20
  284:5,22 285:4
  288:19
chlorides 274:9
  280:18 287:20
circuit 270:18,21,22
  271:25 277:18,25
  278:1,4,12 279:9
  281:13 286:11
  306:21
circuitries 295:18
circuitry 277:20
  306:14
circumstances
  278:20 284:23,24
  285:1,2 287:19
  291:15
cite 275:25
cited 298:21 306:7
citing 262:5
CIVIL 249:7
clear 256:11 262:4
  266:8
clearly 279:8 295:5
  295:14
close 267:8 300:7
coat 284:11
coated 284:3
coatings 284:10,14
coloration 305:12
combination 304:21
  305:5,6,6
combustion 299:20
  300:3
come 253:18
comes 267:6
comfortable 289:17
comment 279:10
  299:18
commentary 295:13
Commission 309:22
commissioned
  253:25
committed 273:18
common 305:15
companies 295:24
compared 268:19

283:13 286:2
  295:19 304:8,17
  304:19,20
complete 280:23
completely 293:10
complex 276:18
  277:5 283:25
  284:5
complicated 283:1
complied 310:10
components 298:25
composition 280:22
compounding
  262:22,25 263:16
  264:19 268:14
computer 258:9,16
  259:16 260:1
concerned 274:10
concerning 259:10
concluded 307:10
concluding 289:19
conclusions 289:14
condensed 307:4
condition 271:3
  293:3,17 302:23
conditions 266:20
  266:23 269:10
  278:14,18
conduct 298:11
conducted 310:5
confident 286:18
confirm 262:12
connected 261:14
  261:25 262:3
connection 276:15
consequence 261:5
consistent 303:2
contact 264:11,18
  270:20 272:17
  274:24 275:3,9
  276:11,11 277:24
  278:4,23 279:7
  280:5,9,12,14
  281:2,7,10 286:11
  286:16 288:17,18
  288:20 289:1
  291:16 293:10,23
  294:16 300:23
  306:18
contacts 255:18
  263:5,5 268:12
  270:17,22 274:8
  274:12 276:2,6,20
  277:1,6,7,8
  279:17 280:3
  287:25 290:13

291:11,16,17
  292:10,17,18,19
  292:23,25 293:19
  296:1,18
contain 309:4 310:7
contaminant 288:10
contaminants 284:1
  284:4,25 288:11
  288:23
context 266:1
continuation 252:16
continue 266:8
continuity 274:1
contrast 305:14
conversant 274:9
conversation 256:8
copy 260:11
correct 263:13
  264:24 265:1,7,9
  268:15 281:17
  297:20 298:23
  299:12 300:12
  301:20 309:4
  310:8
corrected 300:25
corrections 309:6
correctly 265:9
correspondence
  282:1
corroded 263:5
corrosion 255:21
  264:11,17 268:11
  271:1,3,10,17
  272:18,23 273:2
  273:11,17 274:2,8
  274:11,21 275:2,5
  275:8,24 276:4,7
  276:13,25 277:2
  277:10 279:17,23
  279:25 280:11,13
  280:15,16,22
  283:21 284:13,21
  285:4,13 286:6,14
  286:15,19,23
  287:1,3,10 288:1
  288:3,9,14,15
  289:20 290:13
  291:11,16 292:23
  292:24 295:25
  296:19 297:4,9
  300:17,24 301:1,5
  306:16,18
corrosive 263:5
  272:22 274:17
  275:20 280:25

281:11 285:11
  287:13,14,19
  288:1
COUNSEL 250:5
  250:10
county 249:20
  309:15 310:2,12
course 271:7 301:14
  302:4 303:4,11
court 249:1 252:20
COX 249:6,6
Cozen 249:18 250:7
CPFC 272:9
Cramner 281:21
create 274:20
  283:21
created 299:4
creates 274:20
creating 289:11
cruz 249:5 260:24
  267:18 268:6
  278:24 295:20
  297:16 299:8
  301:25 302:17
  303:24 306:15
Cruz's 257:13,14
  261:15 262:9
  267:13 270:1
  285:18 286:5
  291:10 292:4
  298:23 300:13,14
CSR 310:17
CYNTHIA 249:6

        D
D 250:2 251:1 308:1
dallas 249:19,19
  310:2,12,12,19
damaged 304:23
dark 266:12 305:13
data 259:20 282:22
  283:18
date 255:7 259:6
  260:8 286:4,5
  298:6,12 310:18
dated 255:3 281:19
day 249:14 302:23
  302:23 309:17
  310:13
deal 274:7
death 260:25
  261:15 262:9,14
  267:13 270:1
  285:18 286:5
  291:11,19,22
  292:4 295:20
  297:17 298:23

300:12,14,14
December 255:24
  281:23 282:5
decibel 293:15,23
decision 269:15
deemed 269:10
deep 283:13
Dees 254:11
defects 263:9
defendant 249:16
  250:10
defendant's 254:5
definitely 284:23
  301:15
degree 260:22
  262:17 300:20
  303:7
delayed 263:24
  269:13
density 265:4
  269:24
department 303:15
depend 276:4
depleted 266:16
  269:11,17
deposed 255:7
deposited 295:8
deposition 249:11
  249:15 251:7
  252:1,16 253:21
  254:8,10 255:2,4
  255:14,24,25
  256:7 258:19,21
  258:22,23 259:10
  260:3,3,11,16
  261:7,18 262:21
  265:9 266:9 270:8
  271:20 272:3
  288:10,23 294:12
  294:16,21,25
  295:2,2,12,14,16
  301:11 303:3,6
  304:2,24,25 305:3
  305:8,9 307:4,10
depositions 254:4
  254:15,23 298:2
deposits 305:20,21
describe 271:13
  289:2,3,10
described 254:7
  264:21 272:24
  305:16
describing 305:18
  305:19
designation 254:5
designed 301:17
destroy

264:10
detail 302:15
detailed 260:15
detect 266:5 281:1,7
  295:11 300:8
detected 300:18
detector 257:13
  260:24 261:14,22
  262:8,12,13,18,22
  263:6,10,18 264:9
  266:5,11,14 267:3
  267:18 268:3,6,18
  268:22 270:14,15
  271:6,10 272:5,24
  276:20 278:24
  279:22 282:5,8
  285:12,14,18,24
  286:2,6 288:2
  289:20 290:1,17
  290:21,24 291:1
  292:10,14,15,16
  295:18,18,19,23
  295:23 296:15,17
  296:18 297:3
  298:20 299:10
  300:8,15,18,22
  301:4,18,22
  302:11,14,18
  303:3,18,22 304:4
  304:7,17,24
  306:13,14
detectors 257:17
  259:11 267:5
  271:14,21 273:4
  296:12,24 297:8
  299:23 304:1,14
  304:22 305:1
  306:1
detector's 258:1
determine 261:24
  269:6,24 275:13
  278:22 290:11
  291:21 293:22
  294:9,14
determined 272:22
  290:10 291:1
  296:18
develop 275:24
device 261:3,18,20
  264:3,7,14,17
  267:7,8 268:9
  269:16 288:13
devices 269:16,18
difference 273:1
  286:9 287:22
  295:15 305:12
differences

295:17
different 258:4,5
  259:21 265:18
  280:11 286:12,17
  288:19,22 296:23
difficult 271:2
dioxide 297:19
discuss 272:21
  275:23 285:6
discussed 261:17
  262:20 263:14
  271:19,20 282:3
  288:15,16
discussion 273:13
  283:24
discussions 256:3
disengage 275:5
disk 260:1
dispute 279:5
disrupt 271:1 275:5
  279:8 293:18
disrupted 275:2
  278:17 294:1
disruption 271:5
  277:24
dissimilar 276:10
  277:3
DISTRICT 249:1,2
DIVISION 249:3
document 255:19
  257:4 258:18,24
  259:3,5,6
documents 254:7
  255:15,17
doing 270:25
DON 249:12 251:3
  252:4 308:2,23
  309:2,11
done 253:15,16,23
  253:24 255:17
  257:9 259:14
  261:23 267:11
  269:8,23 270:2,4
  270:9 271:8 274:1
  275:13,15 278:22
  279:13,20 281:12
  282:15 283:3,7
  284:6 287:24
  293:22 294:9,14
  295:16,21 297:7,7
  297:10,18,21,24
  298:4,7 302:9,25
  303:21,25 305:22
Dr 252:13 279:2
  281:21
draw 289:10,12,14
drive

278:2,3
295:17 306:14,21
duces 251:8 258:21
  258:23
due 274:11 280:5,6
  300:24 302:7
  306:18
duly 252:5
dump 260:1
durations 302:5
during 260:25
  261:14 262:14
  264:3 267:12
  272:3,23 291:8,10
  291:22 292:3
  297:17 300:11,13
  303:23
D-E-E-S 254:11

E

E 250:1,1 251:1
  252:10 308:1,1,1
  309:1,1
each 263:10
earlier 273:13
early 300:6
easily 275:2,4
effect 274:1,3
  277:13,15 279:18
  280:4 285:14
  286:19,21 292:21
  294:15,22,23
effective 294:7
effects 278:25
either 256:2 257:15
  281:2 302:1,9
electrical 274:7,11
  278:1 280:6 283:5
electron 281:6
electronic 277:25
electronics 263:7
  264:7,15 278:2,7
  288:12 290:3
  291:4
element 280:25
  285:11
elements 280:16,25
  281:11 283:10
eliminated 264:5
Elmer 254:11
encloses 255:13
enclosing 255:2
energetic 294:24
energy 299:22
engaged 256:3
  270:5
engineer 274:7

283:5
engineering 260:23
  262:17 263:20
  300:21
enhanced 299:17
enough 274:23
  277:23 279:18
  286:15 291:6
environment
  265:17,20,22
  266:16,25 284:1
  287:14,14,15
  299:8
equal 265:24
equations 289:10
equivalent 281:6
erosion 280:5 281:8
establish 297:15
ESTATE 249:5
et 264:7 281:5
even 254:22 263:6
  292:9 296:21
  304:24
event 261:11 297:17
  302:19 303:23
events 267:12
ever 261:12 282:7
  291:13 295:24
  296:18 297:1,3
  306:12,15
every 259:12 279:7
  304:21
everything 264:13
  300:5,5,19
evidence 257:10
  264:10 279:16,19
  281:4,5 290:22
  295:22 296:12
  298:24 302:21
  303:1,6
exacerbate 284:24
  285:2
exacerbated 276:13
exact 271:3
exactly 266:18
  278:18,19
examination 251:3
  279:22
example 261:8
  287:18
except 253:16
  271:16 273:7
  290:12
excuse 270:24
  280:15 305:6
exemplar 257:17
exercise

Page 4

275:21
exercised 264:8
exercises 264:9
  270:14
exercising 275:10
  279:24
Exhibit 252:1
  258:20,22 259:4
  272:1
exhibits 251:7
  255:13
existed 278:14
expect 292:10
  299:14 303:1
  304:6
expectation 302:17
expert 276:17
  282:19,24 283:24
  285:4
expertise 274:7
experts 254:5
  256:14 269:14
  297:24 298:3,6
Expiration 310:18
Expires 309:22
explain 263:11
  264:16
explanation 252:22
  289:18
Expressway 310:19
extensive 304:22
extensively 262:21
extent 269:22
external 273:5
  290:2
extrapolate 291:3
E-L-M-E-R 254:11

**F**
F 308:1 309:1
face 270:23 280:6
fact 256:17 259:23
  262:13 264:5,14
  298:21 300:9
  303:4
factor 294:24
factors 274:17
  295:7
fail 290:7
failed 290:5 295:25
  297:3 306:15
fails 249:17 290:6
  310:3,17
failure 263:9 264:2
  268:9 300:22,23
  300:24
failures 306:18

fair 265:5
fairly 266:4 270:16
  277:4 284:5 293:7
familiar 252:19
  255:19,21 283:6
  285:12,16 294:11
  304:2
far 253:6 294:23
  305:21
fast 302:6
feedback 293:2,10
  293:18,23 294:1,3
  294:16,21
feel 259:21
few 253:18 259:13
  264:16
fiberglass 270:21
field 271:22 272:25
  273:5
file 255:19,23
  281:18
files 285:8
find 267:4 271:15
  273:6 280:19
  285:9
fire 269:8,14 272:9
  297:18,21,24
  298:7 301:14
  302:23,24 303:9
  303:10,11,12
fires 304:1,22 305:2
first 252:16 261:6
  261:18 262:21
  264:19 268:17
  270:8 271:20
  272:3 296:3
  298:19 299:7
  303:9
flexes 270:21
fly 289:7
folks 297:7
follows 252:8
foregoing 309:4
  310:7
forget 270:12
form 258:8,9,10,15
  260:9 270:24
  288:3
formation 284:21
forms 280:24
forth 249:21 264:15
  265:25 278:7
  287:21 289:23
  296:13 301:12
  310:6
forward 298:12
found

261:20,21
271:21,22 272:23
298:22 299:3
frame 258:15
frankly 273:13
frettable 272:17
fretting 255:21
  288:15 289:2,18
Friend 249:6
from 252:13 254:13
  255:1,12 256:13
  258:20 261:21
  262:2 263:8 266:8
  267:10 269:2,2,2
  269:3 275:5 276:2
  281:19 285:25
  286:4,6,11,15,22
  287:2 288:11
  289:13 290:15,19
  292:24 293:7,16
  294:19 295:22
  296:16 298:11
  299:20 304:4
  305:5 306:12
front 253:18
fuel 300:5
full 307:7 310:7
fully 292:24
function 283:25
  287:15
functionally 300:5
functioning 267:7
  290:1 291:1
  301:18
functions 276:23
fundamental
  289:13 293:19
further 298:17
  310:9

**G**
G 309:1
GARCIA 249:4,5
Garza 281:19
gas 299:20
gave 281:20
general 288:23
generally 255:21
  267:4 277:16
  280:2 283:2 294:5
  304:2
generic 257:25
  259:5 270:5
  276:24
gentleman 252:20
geographic 288:17
getting 253:22

266:13
give 259:15 289:17
  296:10
given 253:6 259:9
  265:3 268:8 271:4
  299:1 300:19
  301:10,11 309:5
glad 259:16
glance 253:20
glanced 254:22
go 260:12,20 277:15
  278:17 279:25
  285:8 289:23
  293:17
goes 269:12
going 252:19 253:3
  254:19 256:9
  259:24 260:21
  266:7,19 268:23
  269:5 278:3 280:7
  281:25 285:5
  288:22 289:1,9
  295:7,8
gold 284:18,19
gone 304:1,22 305:1
good 261:20 263:20
  306:25
gotten 269:1
graphs 282:19
grayish 305:9
guess 296:15

**H**
H 250:7 308:1
half 261:6,18
handling 271:6
  281:4 302:24
  303:18
happened 283:8
  302:22
happening 303:2
happens 274:6
hard 275:3,10 283:4
having 285:21
hear 294:5
heard 281:16 294:2
heater 257:12
  265:11,16,23
  266:11,19,21
  267:1,7,13 268:20
  269:2,7,15,19,25
  270:6,7 290:15
  292:3,5,8,9 299:4
  299:7,9 300:1,3,4
  300:7,11,13 301:2
  301:21 303:11
heavy 305:2

heller 250:7 251:4
  252:12,14 296:4
  296:16 306:10,12
  306:23 307:6,9
hereinafter 249:21
hereinbefore 252:5
hereof 310:6
hereto 309:8
high 263:19 264:11
  277:21 279:18
  299:21
higher 279:11
  292:20
highest 300:20
honest 285:19
hopefully 252:14
horn 263:6,8 264:12
  268:12 271:4,17
  273:7 274:25
  275:6 276:20
  278:3,9,25 280:5
  280:9,14,15
  283:22 285:14
  286:12,13,16,17
  286:21 287:1,25
  288:13 290:4,6,7
  290:8,9 291:5,8
  291:14 292:11,12
  292:17,19,22
  293:2,3,11,14,16
  293:20,23 295:25
  296:18,23 297:2
  300:23,25 301:5,8
borns 273:9,16
  274:14 294:2
  295:3
horn's 277:14 279:4
  279:18 287:3
  290:5 292:21
hour 307:10
humidity 287:18,20

**I**
IDALIA 249:5
identification 252:3
identified 254:19
  257:3 272:20,20
  296:9
identify 273:20
  275:19 285:6
  304:5
identifying 271:9
immediately 268:25
impedence 277:21
  277:24 278:2
inaccurate 260:7
INC 249:8 310:18

incapacitated 302:1
302:7
incident 261:9
271:4 272:9
278:19 290:20
305:17
include 292:6
including 292:7
inclusive 257:12
increase 274:24
independent 276:25
indicated 260:2
283:19
Individually 249:4
249:5
information 253:23
258:6 259:18
261:1 283:14
289:12 296:22
inherent 263:25
264:25
inhibit 284:12,21,23
285:1
inhibited 292:24
initialization 287:11
initially 299:21
initiate 274:25
initiates 290:3
inquiring 281:22
inside 302:13 303:5
303:22 304:3,24
305:3,8,10
inspect 262:11
inspecting 282:4
inspection 281:22
inspections 257:9
257:16
instance 249:16
instructions 252:18
253:6
integrity 291:5
intent 266:18
interior 270:14
302:10,18 304:7
304:16
interpret 282:20,22
283:15
interrupted 292:20
293:24
invisible 266:1,1,3
269:1 299:21
involved 270:6
277:17 282:7,12
284:4 287:17
302:3
ionization 258:1

259:11 263:2,23
264:20,24 266:5
267:2,5,18 268:3
268:6,18,21
270:23 298:20
299:10,22 300:8
300:15 301:4,9,21
issue 258:2 261:10
265:15 271:13
272:17 277:23
280:2 283:24
285:7,21 288:15
294:25 295:14
300:17 301:5
issued 297:1
issues 274:8 275:23
276:9,13 277:2
284:7 299:24
302:3,5
items 253:18 257:2

_____
J
james 250:7 251:4
January 249:14
272:8
Jesse 255:2,7,13
Jim 252:14
JOSE 249:4
June 265:3,14
just 253:8,12 254:3
254:7,19 257:2
258:13,16 260:18
260:20 262:1,4
264:8 265:11
266:7 267:5
269:17 272:19,20
274:5 275:2,6
277:7 278:16
288:22 298:9
299:13,16,18
300:4 304:10
305:18 306:6

_____
K
keep 252:24 286:15
killed 302:1
kind 253:24 258:15
276:1 277:8
288:11 293:15
301:7
kinds 283:14 305:2
knew 278:16
know 252:13,18
253:2,2,4 255:6
259:12 260:13
263:16 269:4,5,19
271:24 272:16

273:9,16 274:3,4
274:4,18,21,22,22
275:22 276:3
277:7 278:16
279:5,10 280:25
281:12 283:4,8,11
285:23 286:21
289:6 290:12
291:3,4,5,6 292:1
292:16 293:7
294:17 300:19
302:20 303:19
305:4,22
knowing 268:9
296:14
knowledge 260:4
262:10 278:13
281:14 298:5
known 263:9

_____
L
lab 272:25
lack 263:3,4,22
264:20,25 291:16
294:15,15,20,20
large 265:4,12
268:20 301:2
last 253:12 285:18
285:24 297:15
late 261:8
later 264:5 268:10
281:1 287:2 290:8
290:9 300:20
Law 250:2
layer 305:9
learned 258:3 260:7
least 262:22 269:23
291:2
leave 269:14 279:14
led 267:13 279:17
left 252:20 264:16
290:4
length 263:15 275:8
275:19
lengthy 260:15
less 258:3 268:22
294:6,23 301:4
let 260:20 267:20,24
269:21 282:18
293:8 304:13
Leticia 281:19
letter 254:12 255:1
255:11 281:18,24
let's 265:20 276:19
302:22
level 263:20 274:21
278:9 281:3 284:1

287:15,25 293:23
295:5
levels 279:3,18
light 299:19
lighting 268:25
like 259:8,25 260:5
260:8 283:9,25
284:16 302:18
307:6
likelihood 286:6
likely 261:5,11
264:1,1 282:2
293:12 300:17
301:1 304:15
306:2
literally 266:2 280:7
literature 271:13
274:10 275:16,17
275:18,22,25
280:23 288:16
289:13 290:15
291:12,14
litigation 282:10,11
little 274:5 275:3
304:4 305:14
living 299:8
location 266:11
280:11 288:17
locations 288:2
log 259:16
logs 258:16
long 269:3 275:23
286:8
longer 269:17
look 253:19 254:3
254:17,18 259:3
272:15 282:19
283:6 285:8
302:18,21
looked 255:16
273:14,19 281:16
304:12
looking 283:11
306:9
looks 283:13
loop 293:18 294:1,3
loss 274:10 293:18
lost 296:3
lot 265:25 266:9,12
287:19 303:19
304:4
lots 303:25 304:12
low 265:4 277:21

_____
M
M 252:10
machine 283:6,17

made 266:20 269:18
271:21 276:15,22
277:5 280:14
286:20,24 287:6
291:18 292:5
294:17 295:4,23
298:15 300:2
301:19,23 305:21
magnitude 278:5
295:6
main 249:19 255:17
make 256:10 267:20
269:15 270:20
286:9 295:15
301:21
makes 287:22 294:2
making 295:13
manner 272:21
MANUEL 249:5
many 264:4 292:10
292:19 305:15
Marchan 255:12
Marchan's 281:19
Mark 250:2 254:13
255:2
marked 252:2 272:1
markedly 294:6
Market 250:8
Mat 265:3
material 253:17
275:20 276:5,9
277:17,18 284:16
284:17 286:19
294:24 295:7
300:1
materials 254:2
255:23 274:15,16
275:9 276:19,23
277:1,9,11,12
280:13 284:2,12
287:17 288:10,11
294:17 303:21
matter 266:13
267:6 273:23
275:6 277:9,25
278:6 287:5
299:22 300:7
301:8,10,16
may 252:17 253:13
253:14,15 256:4
256:14,18,21,25
257:4,7,10,18,21
259:15,20 260:3,4
265:8 270:9
272:21 273:12
295:16 296:11
maybe

Page 6

292:25
McAllen 250:4
McCain 254:11
McClintock 262:6
  290:19
mean 266:2 282:17
  283:4,5,9,14
  284:4,10 293:20
  293:25 299:13,16
  303:10,10,12
means 274:3
measured 294:6
mechanical 291:5
  300:24
mechanically
  290:10
mechanism 270:16
  286:13 288:14,16
  288:25 290:7
  293:2 300:22
mechanisms 285:4
  286:18 288:21
meetings 257:6
memory 273:18
mention 304:11
mentioned 260:10
  268:14 298:1
  303:9 304:10
metal 277:9,9
  288:12,23 305:3
  305:10,11
metals 276:10 277:3
  284:4,11
Michael 255:24
  281:21
microscope 281:6
microscopic 264:10
  271:1,10,16
  272:22 273:1,10
  273:17 274:1,21
  275:1 276:25
  279:23,25 280:8
  286:23 288:3
might 254:17
  262:23 263:3,7
  264:11 265:18
  269:18 276:10
  284:12 300:8
  301:8 303:8
mind 301:15
mini 307:7
minimum 279:9
minor 303:8
missed 252:24
misunderstood
  268:4
mixup

253:22
mix-up 260:19
model 292:16 296:9
  296:13,14 297:6
  306:19
modeled 287:6,9,23
modeling 269:8,14
  278:12 297:18,22
  297:24 298:7
moderate 303:5
moderated 303:4
modes 263:9 268:9
monoxide 292:3
  300:11 302:1,7
month 262:9 264:5
  268:10 290:20
more 253:24,24
  258:3 259:15
  296:21 304:6,15
  304:15 305:11,14
  306:2
morning 253:20
  260:25 261:15
  262:14 270:1
  291:10,22 292:4
  295:20 300:12
Morris 281:21
most 267:3 268:3,4
  268:5,8,18 282:2
  283:14 284:23
  299:10 300:15,16
  300:20,21,25
motion 286:13
move 253:3 270:22
  275:4,10 280:3,12
  286:17
moved 275:21
  279:23
movement 280:9,9
  302:25
moves 280:10
Moving 269:20
  270:11
much 255:17 269:17
  279:11 282:1
  303:23 306:24
muffled 293:5
multiple 256:6
myself 282:22
  286:20
M-c-C-A-I-N
  254:12

_____
N
_____

N 250:1 251:1
  252:10,10 308:1,1
  309:1,1

name 252:14
named 252:5
National 272:4
nature 276:14 277:2
  280:15 283:6
  284:2 287:16
  288:20
near 281:2
necessary 279:12
  283:21 287:1
need 253:8 259:20
Neely 255:13
never 256:19
  260:19 270:7
new 258:6
Next 249:6
night 260:25 261:14
  262:14 269:25
  291:10,22 292:3
  295:20 300:11
nonresponsiveness
  263:23
nontesting 287:2
normal 274:17
  288:9 299:13,16
  299:19 300:4
normally 274:19
North 250:3 310:19
Notary 309:9,20
noted 309:7
nothing 252:7
  271:15 291:24
notice 249:20
  254:10 255:1,11
  258:22
noticed 255:23
November 254:14
number 273:4,4,9
  287:5 297:6
  306:19
numbering 258:20
numbers 273:15
  296:9,12,13

_____
O
_____

O 252:10 308:1,1,1
  308:1,1,1 309:1
oath 252:7
observation 305:5
  306:1
occasions 256:6
occur 261:5 263:25
  264:4 288:13
  301:25 303:7
occurred 252:17
  266:15 267:17
  303:24 310:11

occurrence 289:13
  289:15,16
occurring 288:24
occurs 271:10
October 281:20
off 267:6 299:19
  300:7
offer 262:16 287:9
offered 265:10
  289:7
office 250:2 255:2
  281:19 303:15
offices 249:18
officials 303:14
often 266:3 267:5
  281:6 283:9
  305:10,13
Oh 268:4
ohms 279:4,8
okay 253:11 254:2
  254:10,24 256:3
  260:2,17 267:25
  289:9,22 290:6,10
  290:14 293:13
once 283:15
one 255:17 262:8
  264:16 268:9,23
  272:6,14 280:2
  281:14,15 283:17
  284:15 290:5
  292:23 304:6
  305:22
ones 272:6 304:10
ongoing 259:11
only 253:9,21 254:4
  260:11,12 273:1
  290:5,22 291:9,13
  298:14 301:7
open 293:10
operable 264:6
operation 277:14,22
  278:25 279:5,19
  283:22 285:14
  287:3 292:21
opinion 259:7,18
  260:22 261:4,12
  261:13,16,23
  262:16,19 267:11
  267:17 268:16,25
  270:11 286:25
  287:4,9 289:8
  294:19,22 298:17
  298:19 305:23
  306:6
opinions 256:24
  258:4 259:10,17

260:20 289:5
opposed 286:22
  304:18 306:2
opposite 265:11
oral 249:11,15
order 287:9 292:20
orifice 299:25
originate 283:18
other 254:6,8
  255:20 256:6,14
  257:2,3,6 258:15
  259:9 261:23
  268:19 269:18
  272:14,16,23
  273:25 274:4
  277:25 280:19
  284:3 288:1 290:9
  295:24 302:5
others 272:20
  279:14 294:4
otherwise 302:10
ought 289:6
out 265:11,17,19
  267:2,14,22 268:1
  269:25 272:8
  295:4 299:22
output 294:6
outside 303:3
  304:25 305:20
over 258:20 260:20
  301:13 305:9
overcome 278:8
own 253:20 254:8
oxygen 265:19
  265:20,22,24
  266:16,25 269:10
  269:11,12,17
  299:9,13,18 300:4
oxygenation 299:13
  299:19
O'Connor 249:19
  250:7

_____
P
_____

P 250:1,1 308:1
page 251:2,7 259:3
pages 309:4 310:7
PAGE/LINE 308:3
pains 309:3
paper 309:7
papers 255:20
  272:17 274:6
  276:18
Paragraph 259:4
parameters 287:5,8
  287:16,22 291:13
part 255:19 277:18

278:4 289:5 296:3
298:19 306:4
particle 269:1
particles 263:2,24
265:25 266:3,4
267:2 303:4
304:15
particular 257:17
257:21 261:9
263:10 265:11
266:21,21 268:16
276:20 281:13
283:12 284:7
285:14 290:14
292:15 297:3,25
298:12 299:25
300:11 305:17
particularly 299:21
305:1
particulate 265:4
265:13 266:13
267:6,14 268:19
268:20 269:25
271:9 285:25
286:1,1,22 298:22
299:3,10,22 300:7
301:3,7,10,16,20
parts 304:7,16
pass 294:8
past 252:14 276:17
306:1
path 269:6
pattern 295:11
pausing 258:13
penalties 309:3
Pennsylvania 250:9
people 269:15
276:16
percent 299:15
percentage 269:11
273:16
perform 297:14
performance 258:1
performed 257:16
257:20 281:15
period 252:15
perjury 309:3
person 280:21
282:24,25 283:16
289:9
Philadelphia 250:9
photographs 266:9
303:14,16,17,19
306:5,8
phrase 263:17
physical 257:10

279:16,19 286:13
287:16
physically 280:3,10
282:14 286:11
294:1 304:12
ph.d 249:12 251:3
252:4 308:2,23
309:2,11
pictorial 298:24
302:21
pictures 301:11
302:10,13,16
305:19,25
piece 275:25
piezoelectric 270:24
271:4,17 274:14
280:4 292:12,17
293:3,14,16 294:1
295:3
piles 254:2
pitting 280:4
place 263:21 280:1
280:12 286:16
287:18 309:6
310:6
placement 288:10
plaintiff 256:14
plaintiffs 250:5
256:20
plaintiff's 254:4
297:23 298:3,6
plans 283:3
plastic 304:7,16
305:4,10,11,13
306:2
plate 270:23 276:12
280:6,10 284:17
286:12 288:13,18
295:9
platings 284:14,15
please 252:24
264:10 278:8
plus 293:15
point 261:10 265:15
266:12,14 267:12
267:21,22 280:5,8
280:12 287:11,11
288:17 289:1,12
290:12,16 291:2
301:6,15
points 278:23 281:7
police 303:15
portion 260:2 288:5
296:5
posed 253:10
possibilities 305:7
possibility

253:17
263:4 277:10
290:5
possible 268:9
269:20 278:19
289:20 291:9
295:10
Possibly 275:12
288:8
power 291:6
powered 264:14
268:11 289:25
290:21,23 291:19
299:7 301:17
predecessor 295:24
premarked 297:14
premise 268:10
prepared 282:20
285:10 303:8
presence 271:16
273:1 274:16
281:1,7,8,10
284:3 285:25
297:9 298:25
present 282:14
283:10 285:11
preservation 281:5
pressure 270:17,19
274:11 276:1,5
277:8 286:10
288:21
pretty 280:23
prevented 263:8
286:6
previous 269:23
previously 252:5
258:6 265:3
268:14 283:19
printed 270:17,20
270:21 286:11
prior 258:21 259:9
285:18 300:14
probability 263:5
263:21 300:21
probable 268:8
300:20,21
probably 280:1,21
289:4 292:24
299:17,18 303:5
304:21
problem 256:12
271:1 278:12
302:20
problems 295:1
proceedings 310:5,8
process 259:12

261:9 264:3
272:24 277:6
284:12 287:18
289:2,11
processes 280:7
287:20
produce 259:25
produced 259:6
265:21 268:20
269:7 290:16
297:17 301:21
producing 299:9
300:14 301:2
product 290:2
production 259:5
268:17 269:2
270:6 292:2,7
300:10
products 295:3
301:13 303:6
304:3
Project 272:5
proper 300:4,4
properly 264:14
265:24 268:11
269:17 289:25,25
290:21 291:1,19
301:1
proved 290:8
provide 259:16,18
259:21 268:24
provided 283:3
290:1
proximate 300:8
public 303:14 309:9
309:20
punch 275:3
pursuant 249:20
310:9
push 275:3 280:2
286:9 291:5
pushed 264:15
271:11
pushes 270:13
pushing 264:8
271:5 286:2
290:19 300:25
put 265:11,17,19
267:2,13,20
269:25 272:8
putting 267:22
268:1
P-I-E-Z-O 270:25
P.E 249:12 251:3
252:4 308:2,23
309:2,11

Q
quantities 265:12
301:17
quantity 275:19
278:23 285:12
301:20 304:15
question 253:1,3,10
254:20 260:5
267:16,21,24
269:21 270:8
277:19 279:21
282:18 283:1,5
286:8 290:6
294:10 296:3,11
296:21 297:10,11
297:12,19,22
301:14 304:13
questions 256:10
269:23 307:2
quick 252:18
256:10
quickly 260:20
quite 273:14 287:5
quote 273:15

R
R 250:1 308:1,1
309:1
range 304:2,4
Ray 255:12 281:19
read 254:6,15,23,24
255:3,8,20,22
260:2 272:21
274:22 276:17
283:2,2,4 288:6
290:15 296:2,4,6
298:2 308:3
reading 253:17
274:5 282:25
READS 308:3
really 254:22 256:9
289:6,16
reason 252:24 253:8
258:13 260:6
263:17 268:8
273:6 279:7
291:14 300:16
308:3
reasonable 260:22
262:17 291:3
reasons 262:22,25
263:17 264:4,19
268:14 269:21
309:7
recall 265:15
275:24

Page 8

receipt 254:13
received 253:21
    254:12 255:8,10
    257:3
receiving 281:24
recently 255:6
recollection 285:20
recommendations
    298:15
recommended
    298:10
record 253:21
    256:10 260:11
    262:4 273:23
    288:6 296:6
reduced 258:10,14
redundant 256:10
reference 285:9
referenced 272:17
references 272:16
referred 284:14
referring 272:11
    304:9
Regardless 280:24
registers 254:13
regular 274:8
reject 262:12
relate 275:20 284:7
    306:18
related 257:21
    277:2 302:5
relates 276:1 292:11
relating 256:18
    257:4,7 302:3
relation 275:9
    303:22
relationship 275:14
    277:21
relative 257:17
    278:1
relevant 258:2,3
    277:12 286:3
rely 256:24 259:7
    259:20,20,24
relying 271:12
    275:16 306:6
remained 269:3
remember 258:14
    265:2,8 281:23
    282:1,2 285:19
rendering 260:21
repeat 252:23 288:4
rephrase 253:1
    267:24 282:18
    304:13
replicate 271:3

278:15,15,20
report 272:4,8
    273:3,19,21,22
    297:1 306:13
reported 275:16
    291:14 306:18
    310:5
reporter 249:17
    252:21 288:7
    296:7 307:3 310:4
reports 271:12,25
    273:14,25 283:20
    284:7 285:6 304:5
    306:17
represent 300:3
representative
    249:4 302:22
requested 288:5
    296:5
require 302:4
required 276:2
    277:13,22 278:24
    285:13
requirement 279:3
requirements 310:9
reserve 307:1
residence 257:13
    260:24 266:10
    267:18 268:6
    274:18 278:24
    295:20 297:16
    299:14 302:17
    303:24
resident 298:23
    306:15
residential 274:19
resistance 264:12
    274:24 277:13,17
    277:22 278:4,5,8
    278:9,23 279:3,8
    279:18 292:20
resonance 293:3,17
    294:15,20 295:11
respect 259:13
    264:2 280:10
    295:2 297:19
response 255:5
    263:1,3,25 264:20
    264:20,25 271:9
responsiveness
    263:22
result 302:19
resulted 264:12
results 258:7 281:16
    283:2,7,9
revealed 258:5
review

255:14,25
    256:1
reviewed 257:3
    275:19 283:20
reviewing 260:3
re-buildup 286:19
RICE 310:18
rich 265:17,20,22
    265:24 266:25
    269:10 299:9,13
    299:18
right 252:20 266:7
    267:10,15 272:2
    301:16 306:22
    307:9
Rules 310:10
runs 283:16
RUSSEL 252:4
russell 249:12 251:3
    252:13 258:20
    308:2,23 309:2,11

S
S 250:1 308:1,1
    309:1,1,1
salinas 250:2 307:1
    307:3,5,8
same 255:5 259:15
    286:16 288:8,25
    296:20 297:5,19
Sample 272:9
sampling 297:8
saw 254:4 282:3,15
    301:11
saying 288:22 298:8
    300:4
says 273:23,24
scan 283:12
scanning 281:5
Schultz 255:24
    281:21
science 274:12
    275:7 277:4 295:2
scientific 260:23
    262:17 289:18
scientifically 295:4
scrape 286:11
scrapes 281:9
scratch 283:12
scratches 281:9
second 255:7
    268:13 269:20
    270:11
secondary 277:15
see 272:15 283:8
    303:1,5,16 304:6

305:14
seeing 282:2
seen 258:24 291:13
    292:9,14,15 296:9
    296:11,11,16
    297:1 302:13,16
    303:13,25 304:14
    304:20,21 305:1
    305:15,24 306:13
SEM 281:12 282:7
    282:13,20,22
    283:3,16
semi 266:1
SEM's 282:25
sense 269:13
sensitive 265:6
    266:4 267:3 268:3
    268:4,5,18,22
    275:23 287:20
    290:2,17 298:21
    299:11,23 300:16
    301:4,9
sensitivity 263:4
separable 255:18
separate 261:23
    277:2 278:20
    282:10 298:14
    303:12 309:7
separately 261:24
    262:11 263:11
    290:8 292:1
September 255:11
sequence 293:20
series 256:9
serious 295:1
set 249:21 276:18
    277:5,7,8 278:11
    284:5 291:13,15
    295:1 299:24
    310:6
sheet 309:7
sheriff's 303:15
SHIREE 250:2
short 252:15 271:25
shorthand 249:17
    310:4,5
show 258:18 271:2
shown 283:15
shows 305:10
significant 271:5
    273:4 277:18
signing 309:8
silver 274:15 284:18
    284:19
similar 267:7
simple 270:16

276:16
simply 253:1,2,9
    299:13 300:23
    301:8 305:11,19
since 253:15,18
    256:4,14,18,21,25
    257:4,7,10,18,21
    259:15,20 260:4,7
    270:9 295:16
single 256:8
sit 258:16 260:13
    261:7 275:24
    281:25 285:22
sitting 287:13
    289:17
size 269:24 301:20
skilled 282:22,25
small 265:12,25
    267:6 268:19
    269:1 277:16
    280:8
smoke 257:13 258:1
    259:11 263:2,24
    264:9,25 265:3,4
    265:7,12,13,16,18
    265:21 266:10,11
    267:9,22 268:2,18
    268:21 269:7
    270:6 271:6 272:4
    279:22 282:8
    286:1,22 290:1,2
    290:16 292:7
    295:3 297:16
    298:21,22 299:3
    300:10,15,19
    301:3,3,12,13,18
    302:10,14,18
    303:3,6,6,23
    304:1,3,3,6,14,21
    304:23,24,25
    305:1,3,8,9,16,19
    305:24,25 306:1
smoky 305:2
solemnly 309:2
soluble 287:21
some 252:18 253:22
    261:10 263:14
    265:14 266:12,14
    269:1,16 270:19
    272:16 273:13,14
    275:22 278:13,20
    280:20 285:21
    286:10,18 287:21
    287:25 288:3
    290:16 292:22
    293:11 294:4

295:4 299:19
300:6 301:6,15
303:1,5,16 305:19
**somebody** 270:13
283:7
**Somehow** 260:18
**someone** 282:22
283:3,7 302:4,6
**something** 258:3
259:19 260:7
263:25 276:10
281:6 289:3,6
**somewhere** 254:17
**sonic** 294:11,16,21
294:25 295:2,12
295:14
**soot** 266:10 292:7
297:16 298:22
299:3 300:10
301:11
**sooty** 305:21
**sorry** 266:6 273:12
303:10
**sort** 278:20 299:19
**sound** 261:10,12,21
261:22 262:18
264:3,17 267:5
273:5,8 274:25
275:6 278:10
286:14 290:3,4,8
290:11 291:7,9,15
291:22 293:4,5,11
293:15,21 294:2
295:4 297:8,9
300:16,22 301:18
**sounded** 262:9,23
263:7 285:22
287:2 290:25
301:6,8
**sounding** 263:8
264:12 286:15
287:12 290:9
291:10 292:24
296:13
**sounds** 279:11,11
**source** 295:22
296:17 306:13
**SOUTHERN** 249:2
**speak** 302:5
**speaking** 253:5
267:4 277:16
294:5
**specific** 261:1
266:18 269:16
271:9 273:6,15
274:14 276:8,22

**277:5** 286:20
289:8 296:21
297:6 306:8,17,19
**specifically** 253:25
259:4 274:6 276:1
278:14 296:9
298:4 302:2
**spectrum** 301:13
305:7
**speculation** 306:4
**speed** 269:7 295:6
**spring** 276:11
**stack** 254:18
**stainless** 274:16
284:16
**standard** 274:12
292:12 293:5
294:8
**STANLEY** 310:18
**start** 265:20
**starts** 267:22
**starved** 265:19
**state** 249:18,20
283:22 304:14
309:14,20 310:1,4
309:6
**stated** 253:12 279:9
309:6
**statement** 281:17
299:12
**STATES** 249:1
**statistical** 273:3
296:12 297:7
**stay** 280:12
**stays** 280:1 286:16
**steel** 284:16
**still** 287:13
**stimulated** 271:22
**stimuli** 273:5
**stimulus** 290:1
**stop** 293:8
**Street** 249:19 250:3
250:8
**strength** 293:5
**strike** 269:21
277:11 294:10
297:22
**struggle** 289:4
**studied** 273:21
274:5 287:23
300:10
**studies** 271:18,20
272:11,13,19
273:10 283:20,
304:5,9,11,12
**study** 255:18 260:16
266:21 267:11

**269:**6,18,24 271:8
272:9 276:22
277:5 278:22
286:20,24 287:6
291:12,18,21,24
292:2,5,8 293:22
294:9,14,17,18
297:1 300:2
301:19,23 303:21
303:25
**subpoena** 251:8
**SUBSCRIBED**
309:16
**subsequently**
271:14,23 282:15
297:9
**substantial** 274:23
294:23 299:20
304:25
**suffered** 287:25
**sufficient** 286:4
301:16
**sufficiently** 291:4
296:10
**suggest** 260:8
**suggests** 297:2
**Suite** 249:19 250:4
310:19
**Sulfides** 280:18
**sulphurs** 274:18
**superheated** 267:6
**support** 259:7
298:17,19 306:6
**supports** 259:10
**sure** 256:10 267:20
280:19 289:25
293:9
**surface** 281:8
283:13 288:21
295:8
**surfaces** 288:12
305:3,8,10
**sustained** 288:3
**sustaining** 289:11
**swear** 309:2
**sworn** 252:6 309:16

_____

**T**

**T** 252:10 308:1,1,1
308:1 309:1,1
**take** 252:15 253:10
258:12 276:19
284:11,16 289:25
302:6 306:8
**taken** 249:16
263:10 303:14,17

**303:20** 306:11
**takes** 258:20 275:23
275:25
**taking** 287:18
**talk** 256:20 280:21
**talked** 256:14,17,19
256:23 261:6
276:16 300:17
**talking** 271:18
283:20
**task** 262:12
**tasks** 297:13 298:11
298:16
**technical** 266:1
**tecum** 251:8 258:21
258:23
**tell** 258:10,16
264:24 266:23
276:20 285:23
289:19 298:3
**temperature** 284:2
287:17
**tend** 299:20 300:6
305:13
**tends** 270:22
**term** 266:2 294:11
**terms** 269:12 276:9
302:2 303:3
**test** 259:12 270:13
270:18 271:2,6,11
275:11,21 278:21
279:13,24 282:10
282:13 286:3,9,22
290:19 291:8
**testable** 264:13
**tested** 261:19,19
262:8 264:5
269:15 270:7
271:15,24 285:22
**testified** 252:7
268:2,21 279:2
297:14 301:4
**testify** 252:6 266:18
285:5 299:2
301:24
**testifying** 266:23
289:4
**testimony** 261:17,22
262:3,5 265:2,8
265:10 267:10
268:24 279:6
285:17,21 299:1,6
300:13 301:5
306:7 309:5
**testing** 259:11
261:24 281:23

**282:**4 286:2
**tests** 253:24 257:20
257:24,25 258:5,7
259:8,14 270:2,4
270:5 272:23
275:13,15 281:1
298:16
**texas** 249:2,18,20
250:4 270:5
309:14,20 310:1,4
310:13,17,19
**Thank** 306:23
**their** 272:23 276:17
281:1 303:21
**themselves** 280:16
**theory** 278:1,12
**therefor** 309:7
**thick** 305:17
**thin** 305:8
**thing** 253:9 254:4
277:8 291:13
295:21 303:9
**things** 254:22 261:6
264:16 265:23
275:15 280:19
283:9,25 284:15
296:8
**think** 253:19 254:9
254:16 256:7
258:11,25 259:2
260:10 262:20
263:19 265:14
266:17 268:23,25
270:7,14 271:19
273:12,22 279:20
281:8,20 285:19
285:20 286:8
291:2 295:3,15
296:8,20 297:5
298:1 299:12
301:13 306:4,17
**thinking** 258:11
**third** 259:3
**though** 254:20
304:24
**three** 269:23 292:12
292:17,18
**through** 254:3,18
260:13 275:3
276:3 278:7 287:3
289:4 292:20
304:1,22 305:1
**TIM** 249:17 310:3
310:17
**time** 252:15 253:19
255:8 258:12,15

B. DON RUSSELL

Page 10

260:15,15,24
261:3 263:3 264:3
267:12,17,21,23
268:1,5 271:4
273:14 275:8,19
275:23 278:15,18
283:21 284:2
285:24 286:4
287:1,12 290:25
291:19 297:15,17
299:8 301:15
302:5 307:2 309:5
310:6
timeliness 265:15
timely 261:4,10
262:18,23 263:12
263:18
times 252:13 305:15
timing 301:19
tin 284:18,19
today 254:3 258:25
260:13 285:10
297:14
today's 258:23
together 253:12
258:22 263:11
told 266:17 276:16
touching 271:23
toxicologist 302:4,8
toxicology 302:3
transcript 255:9
309:5 310:8
trial 254:1 307:2
trouble 259:25
true 265:14 266:22
309:4 310:7
truth 252:6,7,7
try 260:1 261:24
289:9
trying 258:14 289:7
289:17
turns 299:22
two 254:7,14,21
262:22,25 263:4,9
263:16 269:10,12
269:23 271:25
272:11,13,19
276:9,23 286:17
292:25 293:1,19
type 254:7 259:5
263:10 265:3,7,12
265:16,17,18,21
265:21,23 267:2
267:14 268:1,2,17
274:15,17 277:6
282:24,24 287:8

287:14 295:19
296:17 297:2
299:9 300:1,15,15
301:3,16 305:24
305:25 306:14
types 263:24 264:25
266:22 274:15
277:3 284:4
287:13 296:23
298:21
typical 293:14
typically 280:18
305:13

**U**

U 309:1
UL 294:8
ultimately 283:22
undated 254:12
255:1
under 252:7 266:19
266:22 268:10
284:24 291:15
309:3
understand 252:25
253:5,7 256:13
267:10,21 286:8
understanding
261:21 299:2,6
300:12
understood 253:4
UNITED 249:1
university 259:12
Unless 297:6
unrelated 276:8
until 307:2
use 263:17 274:14
274:16 282:22
307:3
used 270:12,15
276:5,10 284:20
293:16 295:5
uses 266:2
using 269:13

**V**

vague 285:20
vapor 286:1
varying 266:19
verbal 252:25
versions 307:4
versus 300:1
very 252:15 261:8
265:6 269:13
270:25 271:13
274:14 275:2
276:18 277:16

280:8 283:25
294:7 295:7
299:23 300:7
304:4 305:5,7,14
305:21 306:24,25
vibrate 290:11
vibration 293:20
294:24 295:6,6,7
virtually 304:23
visible 267:8
VS 249:7

**W**

W 309:1
wall 271:14
walls 299:4 305:20
want 254:17,17
258:18 260:14
wasn't 266:20
269:22 291:23
292:8
water 286:1 287:21
way 257:21 259:19
261:24 269:4,24
278:17 285:16
291:20 292:2,22
296:14 299:17
weeks 259:13
well 253:13 260:16
263:7 265:18
267:7 273:3 283:1
290:22 293:2
300:8 305:18
went 260:10
were 253:12 254:4
255:20 271:21,21
271:22,23,25
276:19 278:18
281:9 282:12,16
282:18 287:17
289:1 303:20
304:23
we'll 256:24
whatsoever 256:4
306:13
while 306:9
white 305:13
whole 252:6 278:11
278:11 294:25
295:1,14 299:24
305:9
wide 304:2 305:4,5
305:7
wit 252:8
witness 249:16
252:5 288:4,8
296:2,8 306:25

witnesses 256:18
word 252:23,23
270:15
words 268:19
270:12 272:24
274:4 277:25
290:9
work 253:25 264:6
269:16 271:14,22
282:23 297:7
worked 291:6
300:19
working 264:7
265:24 267:1
272:25,25 291:4
300:5
works 264:13,15
wouldn't 259:24
273:15 279:10
294:7 295:11
303:17
written 258:7,10,15
wrong 265:10
271:16 299:18

**X**

X 251:1 252:10

**Y**

Yeah 299:16
year 252:17 253:13
254:14
yesterday 253:22
260:12

**1**

10 252:17 253:14,15
256:4,15,18,21,25
257:4,7,10,18,21
260:3,4 295:16
10th 250:3 253:13
10,000 279:4,8
10:24 307:10
12/31/02 310:18
1300 250:3
14 255:3
15 282:5
15th 281:23
1717 249:19
1839 295:18,24
1900 250:8
19103 250:9
1995 272:4,8

**2**

20th 255:11
2000 253:14,15

255:3,11 256:5,15
256:18,21,25
257:4,7,10,18,23
270:9 281:18,23
282:5
2001 249:14 253:14
309:18 310:14
205 310:10,19
206 310:10
21 272:4
214)720-4567
310:20
22 281:18,20 299:15
23 299:15
23rd 249:14
2300 249:19
252 251:4,8
2839 295:18,24
2931 310:17

**3**

3 259:4

**4**

400 250:4
4111 310:19

**5**

5 272:1

**6**

6th 254:14

**7**

75204 310:19
78501 250:4

**8**

85 293:15

**9**

9 251:8 252:2
258:20
9:01 249:15

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOSE GARCIA, INDIVIDUALLY AND §
IDALIA GARCIA, INDIVIDUALLY AND AS §
REPRESENTATIVE OF THE ESTATE §
OF MANUEL CRUZ, DECEASED, §
§
PLAINTIFFS §
§
CYNTHIA COX AS NEXT FRIEND §
OF BRITTANY COX, §
§
PLAINTIFF §
§    CIVIL ACTION NO.
§
v. §    B98-186
§
BRK BRANDS, INC., §
§
DEFENDANT §

## ORDER DENYING
## DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS

Came on this the _____ day of _____, 2002, Plaintiffs and Intervenor's

Opposition to Defendant's Motion to Exclude Plaintiffs Experts for consideration and after

considering the evidence and argument of counsel the Court denies Defendant's motion.

SIGNED FOR ENTRY on this the _____ day of _____, 2002.


_____
JUDGE PRESIDING

cc:   Rene Oliveira & Elizabeth Neally, **Roerig, Oliveira & Fisher**, 855 West Price Rd, Suite 9,
      Brownsville, Texas 78520.
      Ray R. Marchan, **Watts & Heard, L.L.P.**, 1926 East Elizabeth Street, Brownsville, Texas
      78520.
      James Heller and Terry M. Henry, **Cozen O'Connor**, 1900 Market Street, Philadelphia, PA
      19103.