# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### -BROWNSVILLE DIVISION-

United States District Court
Southern District of Texas
ENTERED

**JUN 1 8 2002**

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| JOSE GARCIA, INDIVIDUALLY | § | |
| AND IDALIA GARCIA, | § | |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE | § | |
| ESTATE OF MANUEL CRUZ, | § | |
| DECEASED, | § | |
| Plaintiffs, | § | CIVIL ACTION NO. B-98-186 |
| | § | |
| VS. | § | |
| | § | |
| BRK BRANDS, INC., | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's BRK Brands, Inc., ("BRK") Motion to Exclude Plaintiffs' Experts (Docket No. 151). BRK filed a Corrected Brief in support of their motion (Docket No. 153), as well as an appendix to their brief in support (Docket No. 164). The plaintiffs filed responses in opposition to BRK's motion (Docket Nos. 154, 155, 157, 158). After careful consideration of this matter, the Court grants in part and denies in part BRK's Motion to Exclude Plaintiffs' Experts (Docket No. 151).

## I.

### FACTUAL BACKGROUND

On Sunday, December 14, 1997, Manuel Cruz ("Cruz") met his friend Jose Garcia ("Garcia') to prepare for a double date they had that evening at Cruz's home. Cruz did not have a heating, ventilating, and air conditioning system (HVAC) in his house, so he used a large space heater to warm the home. The heater was designed to burn natural gas; however, Cruz improperly supplied

1

it with liquid propane gas. He compounded this error by failing to provide exterior venting for the products of combustion emitted while the heater operated.

On the night of their double date, Cruz used the space heater. That night Cruz and Garcia drank nearly a case of beer and shared a bottle of wine with their dates. In the early hours of Monday morning, after their guests departed, Garcia felt too drunk to drive home, so he decided to stay the night. At about 4:00 a.m., Cruz and Garcia fell asleep. Cruz slept on his bed, and Garcia slept in the living room on a couch that was beneath a window that was opened about an inch. Between 6:00 and 6:30 a.m., Garcia awoke with a headache that he attributed to a hangover. He decided to go home, and he called out to Cruz that he was leaving as he walked out of the house, but Cruz did not respond. Garcia did not detect any soot in the rooms or on his clothes when he left.

That Monday Cruz was supposed to meet his daughter Brittany Cox and her mother Cynthia at the zoo around 9:00 a.m., but he never arrived. Between 10:00 a.m. and 12:00 p.m., Cynthia Cox called Cruz at home to find out whether he would be joining them. There was no answer, and Cox assumed that Cruz had forgotten about the visit. The following day, Tuesday, December 16, Kenya Sosa, Cruz's date from Sunday night, became worried because she had not heard from Cruz for two days. Around 11:30 p.m., she visited Cruz's home and discovered him dead on his bed where he was last seen by Garcia. An autopsy revealed that Cruz died sometime before Tuesday morning as a result of carbon monoxide poisoning and before he inhaled any soot or smoke.

The plaintiffs in this case filed suit against BRK Brands, Inc., a manufacturer of smoke detectors, alleging that a BRK model SA67D smoke detector, which was installed on the wall of the hallway leading from Cruz's living room, approximately seven to ten feet above the space heater,

2

"failed to warn [Cruz] of the smoke in his house."[1] The plaintiffs contend that soot emitted from the space heater would have caused a properly functioning smoke detector to alarm, and the space heater in this instance produced soot in sufficient volume to have been able to cause the detector to alarm before Cruz became incapacitated. According to the plaintiffs, the BRK smoke detector in Cruz's home was defective because its piezo-horn contacts, the contacts through which the alarm signal is transmitted to the horn, were corroded. The plaintiffs claim that the peizo-horn contacts on Cruz's detector became corroded through a "fretting" motion. Fretting is a specific deterioration process, involving microscopic motions at a contact interface. According to the plaintiffs, this corrosion developed to such an extent that it blocked the transmission of the alarm signal to the horn. To support their theory of liability, the plaintiffs have offered the opinions of various experts to explain why, in the absence of any evidence of smoke inhalation, BRK should be held liable for Cruz's carbon monoxide poisoning. In their motion to exclude the plaintiffs' experts, BRK challenges the qualifications and the opinions of the experts, asserting that the plaintiffs have failed to satisfy the standard for admitting expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court held a *Daubert* hearing in which the arguments of the parties were heard and several of the plaintiffs' experts testified.

## II.

### THE STANDARD FOR ADMITTING EXPERT TESTIMONY

Under the Federal Rules of Evidence Rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify .

---

[1] Plaintiffs' First Amended Complaint, Docket No. 27.

. . in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The district court acts as a "gate-keeper" when determining the admissibility of expert testimony. *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony. *Pipotone v. Biomatrix, Inc.*, 2002 WL 500290, *3 (5th Cir. Apr. 18, 2002). The district court must ensure that any proffered expert testimony or evidence is not only relevant, but reliable. *See Daubert*, 509 U.S. at 589.

As an initial matter, the court must determine whether the witness tendered is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). A court may exclude an expert who does not have the appropriate experience, education, or training to offer a helpful opinion with regard to the issues in controversy. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995). The opinion must be informed by the witness's expertise rather than merely be an opinion broached by a purported expert. *Jones v. Lincoln Electric Co.*, 188 F.3d 709, 723 (7th Cir. 1999) (relying on *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). Whether a witness is qualified as an expert is determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony. *Carroll v. Otis Elevator*, 896 F.2d 210, 212 (7th Cir. 1990).

After a court considers whether a witness possesses the necessary training, education, or experience to offer expert testimony, it must then engage in a rigorous two-part analysis. The first

inquiry requires that the court satisfy itself that the principles, reasoning, and methods underlying the proposed testimony are reliable. *Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999). Reliability requires some objective, independent validation of the expert's methodology. The expert's assurances that he has applied generally accepted scientific methodology is insufficient. *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). Ultimately, the court must determine nothing less than whether the expert's testimony reflects "scientific knowledge," whether his findings are "derived by scientific method," and whether his work product amounts to "good science." *Daubert*, 509 U.S. at 590-94. The purpose of the examination "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Seatrax*, 200 F.3d at 372 (quoting *Kumho Tire*, 526 U.S. at 152).

Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *Daubert*, 509 U.S. at 590. The court must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data. *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994). Among the factors that a court may consider are (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether there is widespread acceptance of the theory or technique. These factors are illustrative rather than exhaustive, and they are not equally applicable in every case. *Daubert*, 43 F.3d at 1316-17.

The second inquiry requires that the court ensure that the expert testimony is relevant, that

is, that the testimony will assist the trier of fact to understand or determine a fact in issue. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). Accordingly, the court must determine whether the reasoning or methodology underlying the testimony can be applied to the facts at issue. *Seatrax*, 200 F.3d at 372 (relying on *Daubert*, 509 U.S. at 592-93). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. The proponent need not prove to the judge that the expert's testimony is correct, but he must prove by a preponderance of the evidence that the testimony is admissible. *Moore*, 151 F.3d at 276.

## III.

### ADMISSIBILITY OF PLAINTIFFS' EXPERT TESTIMONY

#### A. Plaintiffs' Expert Michael Schulz

Plaintiffs designated Michael Schulz as a fire origins and investigation expert. According to the plaintiffs, Schulz will testify "that a properly designed and operating smoke detector would detect the by-products of combustion from a propane fueled space heater."[2] While Schulz has an impressive resume and may very well be qualified to investigate and analyze fires and fire explosions, this Court believes he is not qualified to answer the specific questions in this case. Schulz based his testimony upon a demonstrative test he performed at the Cruz residence on April 18, 2000. Schulz testified that the purpose of his experiment was to demonstrate that soot or smoke particulate do not have to be of a visible size in order to sound an alarm.[3] In his experiment, Schulz placed a dual, photoelectric/ionization, smoke detector, First Alert/BRK Brands Model No. SA301B, in what he believed had been the location of Cruz's smoke detector at the time Cruz died. Schulz

---

[2]Plaintiffs' Response to Motion to Exclude Plaintiffs' Experts, Docket No. 154.
[3]Schulz Deposition, Vol. I, pp. 70-71.

measured the level of carbon monoxide and oxygen within the living room and the bedroom of the Cruz residence while operating the propane-fueled heater.  Schulz testified that the smoke detector alarmed five minutes and twenty-four seconds after the heater was turned on.  He maintained that this test showed that the Cruz smoke detector should have alarmed from the flue gases, *i.e.*, water vapor, carbon monoxide, carbon dioxide, and propane, that the heater released prior to the emission of soot and smoke and before lethal concentrations of carbon monoxide were produced within the Cruz residence.

According to Schulz, his methodology complied with the guidelines of the National Fire Code, and he was merely trying to demonstrate the general principle that a heater in close proximity to a smoke detector will cause the detector to alarm because it will detect the by-products of combustion.  Schulz's test is not reliable because it is deficient in its methodology and provides insufficient support for the proposition that an ionization smoke detector will sound when a propane-fueled heater emits by-products of combustion.  Schulz did not measure the production of soot, smoke, carbon dioxide, or hydrogen cyanide to determine the cause of the alarm.[4]  He conceded that he is not familiar with the speed by which smoke must move into the smoke detector in order to trigger the smoke alarm.[5]  He further does not know whether the by-products of the heater triggered the photoelectric sensor or the ionization sensor of the detector he used.  Moreover, no error may be conferred from Schulz's test because he performed the test only once, and there are no other tests or studies to which his results might be compared.  Schulz failed to utilize a scientifically valid method of determining when the space heater emissions would have reached a significant volume

---

[4]Schulz Deposition, Vol. I, pp. 26-27.
[5]Schulz Deposition, Vol. I, p. 71.

to cause the detector to alarm and falls short of a valid method in which one can conclude to a reasonable scientific degree that the Cruz detector should have alarmed in sufficient time to allow Cruz to escape the residence before he was incapacitated by carbon monoxide.

Plaintiffs argue that it is not necessary for Schulz to testify regarding the numerical quantitative rates in which products of combustion are produced from the propane-fueled heater. However, without this type of testimony, plaintiffs cannot make the leap that a properly-functioning smoke detector will generally detect the by-products of combustion of a propane-fueled heater. In order to make that assertion, Schulz would have to know the emission rate of the by-products of combustion from the heater in order to determine at what point in time the smoke detector should have triggered.

Moreover, Schulz's experiment is not relevant because it did not attempt to replicate the conditions that existed at the time of Cruz's death. Schulz testified that the following elements of his demonstrative test were not similar to the conditions to which Cruz was exposed on the night of his death: the external temperature during his test was approximately fifty degrees warmer;[6] the ventilation of the house was different;[7] the doors to all the bedrooms and the bathroom were open during his test;[8] no measurements of the temperature of the plume of the products of combustion were taken;[9] no measurements were taken of soot, smoke, and other products of combustion that were inside the heater or released into the testing atmosphere;[10] the position of the heater was not for a certainty placed in the same location vis-a-vis the smoke detector;[11] the orifice of the heater

---

[6]Schulz Deposition, Vol. I, pp. 39-40.
[7]Schulz Deposition, Vol. I, pp. 36-37.
[8]Schulz Deposition, Vol. I, pp. 36-37.
[9]Schulz Deposition, Vol. I, pp. 162-63; Schulz Deposition, Vol. II, p. 251.
[10]Schulz Deposition, Vol. I, pp. 27, 62, 68; Schulz Deposition, Vol. II, p. 258.
[11]Schulz Deposition, Vol. I, pp. 18-19, 149-50.

8

opening was not measured;[12] and the smoke detector was a completely different type than the Cruz detector.[13]   If Schulz intended to demonstrate that there are some circumstances under which an ionization detector will respond to the fumes that a malfunctioning space heater generates, his test provides no basis to conclude that a smoke detector should have alarmed in response to the conditions existing at any time before Cruz's death.   Because this Court concludes that Schulz's testimony is neither reliable nor relevant, he  is not allowed to testify as to the opinions he proffers.

### B.  Plaintiffs' Expert E. Wayne McCain

E. Wayne McCain was designated to testify regarding the allegedly defective smoke detector and the accumulation of smoke and soot to such an extent that the smoke detector should have alarmed hours earlier than at the time of Cruz's death.   McCain's curriculum vitae shows that he is an expert in designing systems that burn fuels and gases and the operation of fuel-burning appliances.   While McCain has had experience with industrial type detector systems that are used for regulating or monitoring the products of industrial combustion, he has no experience in residential smoke detectors other than through litigation.[14]   He further conceded that he has no independent experience in the design, manufacture, or sale of residential smoke detectors, and he has never done any investigation or study observing the effects of soot and smoke on a smoke detector.[15] Moreover, he has never testified either at a deposition or at trial regarding the effects of smoke or soot on residential smoke detectors other than in one lawsuit in which he simulated a slow smoldering fire on a couch.[16]   Accordingly, while McCain may have the expertise to address issues

---

[12]Schulz Deposition, Vol. I, pp. 32-33.
[13]Schulz Deposition, Vol. I, pp. 25-26.
[14]McCain Deposition, pp. 45, 52-55.
[15]McCain Deposition, p. 83.
[16]McCain Deposition, pp. 62-64.

relating to the operation of the space heater, this Court concludes that he is not qualified to offer any opinion as to the effect that the soot or other particles emitted by the space heater had or should have had on the smoke detector.

Additionally, this Court deems any testimony proffered by McCain regarding the allegedly defective operation of the smoke detector unreliable. McCain visually observed the Cruz detector twice but did not test or examine it.[17]   He observed the ignition and operation of the heater on propane and only measured the heater and performed a visual examination of it.[18]   Nevertheless, McCain drew the conclusion that the BRK model SA67D smoke detector as manufactured is a defective product based on tests he ran in previous litigation in which the smoke detector in that case would not function for a period of approximately two hours after he initiated a slow, smoldering fire on a couch.[19]   He contended that his opinion is further substantiated by the amount of soot he discovered on the ceilings and within the detector in the Cruz residence.[20]   Yet McCain's conclusion that the smoke detector was defective because it did not alarm prior to Cruz's death lacks scientific validity. He has no evidence that the space heater was properly vented, that it was operating when Cruz's body was found, that it was still producing soot when Cruz's body was found, that it was producing soot before fatal levels of carbon monoxide were produced, and that the soot was produced in sufficient quantities to cause the detector to alarm before incapacitating levels of carbon monoxide were produced. McCain also can offer no opinion with regard to the rate of production of carbon monoxide, soot, and smoke.[21]   Furthermore, because McCain does not know the gas

---

[17]McCain Deposition, pp. 99-100.
[18]McCain Deposition, pp. 100-101.
[19]McCain Deposition, pp. 174-75.
[20]McCain Deposition, pp. 9, 175.
[21]McCain Deposition, pp. 193-195.

10

pressure that was on the valve on the night of the incident, he cannot estimate the amount of carbon monoxide produced in relation to the amount of soot produced.[22] Finally, McCain's "smoldering couch" test, moreover, is not reproducible using a valid scientific methodology, and McCain conceded that it was difficult to reproduce the smoldering fire conditions on the upholstery.[23] According to McCain, his test was a "real-world demonstration" and not an attempt to meet any standards with respect to his scientific methodology.[24] Further, his demonstrative test is not relevant as it does not fit the facts of this case. The test area was almost twice the size of Cruz's residence, and he did not measure the obscuration level, carbon monoxide production, and soot or smoke production.[25]

### C. Plaintiffs' Expert Dr. Morris Cranmer

The plaintiffs retained Dr. Morris Cranmer, a toxicologist, to offer a variety of opinions. As a toxicologist, Cranmer is qualified to determine Cruz's cause of death and the effect that the increasing levels of carbon monoxide accumulating in the residence had on Cruz. Despite his qualifications, however, his testimony regarding Cruz's time of death is unreliable. Cranmer's underlying calculations fail to account for certain factors and do not follow a scientifically recognized procedure.

Cranmer estimated that Cruz died between 10 a.m. and 2 p.m. on Monday, December 16. To estimate the BTUs required to maintain a comfortable atmosphere within Cruz's home, Cranmer relied upon an estimated heat loss rate prepared for him by an HVAC consultant.[26] He admitted,

---

[22]McCain Deposition, p. 116.
[23]McCain Deposition, pp. 73-74.
[24]McCain Deposition, p. 65.
[25]McCain Deposition, pp. 67-69.
[26]Cranmer Deposition, Vol. II, p. 27.

11

however, that the heat exchange rate could be off by ten to fifteen percent.[27]  Furthermore, while Cranmer conceded that the operation of the space heater would increase the air pressure within Cruz's house, thus affecting the air exchange, he did not consider the pressurization in his calculations, and he did not perform any tests to determine the actual pressurization.[28]  Significantly, Cranmer did not actually calculate Cruz's carbon monoxide uptake; instead, he estimated Cruz's rate of uptake on a chart based on a constant exposure to a fixed rate of carbon monoxide.[29]  Cranmer admitted, however, that Cruz was not exposed to a constant rate of carbon monoxide and may not fit the standard man depicted in his chart.[30]  Additionally, Cranmer did not calculate the rate of production of carbon dioxide, which would have the effect of increasing Cruz's respiration, and consequently, his carbon monoxide uptake.[31]

Other factors suggest that Cranmer's findings are not scientifically reliable such as the severity of Garcia's headache when he awoke in the morning and whether the heater began producing large quantities of carbon monoxide at some point in time.[32]  Dr. Cranmer also conceded that Cruz's failure to respond to Ms. Cox's 10:00 a.m. phone call would change his opinion concerning the estimated time of Cruz's death.[33]  Cranmer failed to consider Cruz's drinking history, and he used a female's volume of distribution for alcohol instead of a male's volume of distribution for alcohol.  Consequently, Cruz's rate of alcohol metabolism may have been higher than Cranmer estimated.  Cranmer also suggested that the inhalation of carbon monoxide slows down the rate of

---

[27]Cranmer Deposition, Vol. II, p. 28.
[28]Cranmer Deposition, Vol. II, p. 44.
[29]Cranmer Deposition, Vol. II, pp. 64-67.
[30]Cranmer Deposition, Vol. II, p. 67.
[31]Cranmer Deposition, Vol. II, pp. 98-99.
[32]Cranmer Deposition, Vol. II, p. 50, 54.
[33]Cranmer Deposition, Vol. II, p. 72.

alcohol metabolism, but no medical literature supports this proposition. Additionally, Cranmer did not consider the Blood Alcohol Content ("BAC") measurement taken by the Baptist Valley Medical Center during Cruz's autopsy. If he had considered Baptist Valley's BAC result, he agreed that Cruz would have become incapacitated and died much earlier than he originally concluded.[34] When considering both Cruz's BAC reading in combination with the likely increase in carbon dioxide, which would have increased Cruz's carbon monoxide uptake, Cranmer believed that Cruz may have died even before 9:00 a.m. on Monday, December 16. The impact of these additional factors on Dr. Cranmer's opinion demonstrate that his proposed testimony is not scientifically based and inherently unreliable.

Cranmer also provided testimony regarding the operation of the smoke detector. Cranmer interpreted the results of a report written by one of BRK's experts and concluded that the heater produced sufficient quantities of smoke and smoke particulate that should have triggered the detector prior to Cruz's death.[35] According to Cranmer, "the alarm should have sounded . . . hours before Mr. Cruz's death."[36] This theory is "based on the . . . high concentrations of carbon monoxide in the air . . . and that would have been sufficient to produce visible and invisible particles that should have been detected by the smoke alarm."[37] Cranmer is not qualified to provide this kind of determination because he is not a smoke detector expert, smoke particulate expert, soot formation expert, or fire signature expert.[38] He testified that his knowledge regarding the time at which a detector should alarm is based on articles in Consumer Reports, the expert opinions of Michael Schulz and E. Wayne

---

[34]Cranmer Deposition, Vol. II, pp. 86-88.
[35]Cranmer Deposition, Vol. I, p. 29.
[36]Cranmer Deposition, Vol. I, p. 71.
[37]Cranmer Deposition, Vol. I, pp. 71-72.
[38]Cranmer Deposition, Vol. II, pp. 78-79.

McCain, BRK literature regarding smoke detectors, and his own personal experience.[39] He has never inspected the Cruz detector or been designated as an expert on smoke detectors,[40] and he lacks an understanding of how smoke detectors respond under various environmental conditions. While Cranmer should be permitted to testify as to Cruz's carbon monoxide poisoning, his testimony concerning the operation of the smoke detector and concerning the production of soot and smoke that purportedly should have triggered the smoke detector's alarm should be considered unreliable because it is outside his area of expertise.

Cranmer's testimony also demonstrates a lack of understanding of the scientific principles behind the combustion process. In order to approximate the rate of production of soot the night that Cruz died, Cranmer performed a regression analysis of an experiment conducted by one of BRK's experts. In that experiment, a heater was ignited inside a structure that was about 470 cubic feet, and probes were inserted to sample the gases within the structure.[41] Cranmer did not examine the concentration of oxygen in the structure over time,[42] and he ignored the first three data points and then assumed a linear accumulation of soot over time.[43] Had he taken these data points into consideration, the graph would have more closely resembled a hockey stick, consequently undermining his testimony that soot accumulated in a straight linear pattern.[44]

Cranmer also seeks to support his opinion based upon an impromptu experiment he conducted using the space heater. To conduct the test, Cranmer placed a smoke detector on the wall near the space heater, then ignited the space heater. However, Cranmer's exercise is unreliable

---

[39]Cranmer Deposition, Vol. I, pp. 73-77.
[40]Cranmer Deposition, Vol. I, p. 12.
[41]Cranmer Deposition, Vol. I, pp. 102-103.
[42]Cranmer Deposition, Vol. II, p. 182.
[43]Cranmer Deposition, Vol. II, pp. 160-162.
[44]Cranmer Deposition, Vol. II, p. 181-82.

14

because (1) he did not measure the velocity of the soot at the smoke detector;[45] (2) he did not measure the temperature at the smoke detector;[46] he used a different smoke detector model;[47] (3) he took no measurements of carbon monoxide, carbon dioxide, or any other products of combustion;[48] (4) the smoke detector was placed in a different location vis-à-vis the heater;[49] and (5) ventilation during his tests permitted an infinite dilution of gases. Cranmer failed to follow any recognized protocol in performing his heater exercise; thus, it does not provide a reasonable basis upon which to form a reliable expert opinion. Furthermore, Cranmer's exercise is not relevant because his test conditions differed from the facts of this case in the following respects: (1) the smoke detector used in his impromptu test was a different model from the Cruz detector; (2) the smoke detector was placed in a different location vis-à-vis the heater; and (3) the ventilation during Cranmer's test allowed for an indefinite dilution of the gases.[50] Accordingly, Cranmer's testimony relating to the operation of the Cruz detector and space heater must be excluded because it is beyond his expertise, and the results of his impromptu exercise are neither relevant nor reliable.

### D. Plaintiffs' Expert Dr. Don Russell

Plaintiffs designated Dr. Don Russell as an expert on smoke detectors and fretting corrosion of the piezo-horn contacts. Russell holds a B.S., an M.E., and a Ph.D. in electrical engineering. He has been a member of the electrical engineering faculty at Texas A&M University since 1977. Russell opined that the detector in the Cruz residence should have sounded a timely alarm (that is, prior to Cruz's incapacitation or death) because evidence exists that the detector was powered, and

---

[45]Cranmer Deposition, Vol. II, p. 135.
[46]Cranmer Deposition, Vol. II, p. 135.
[47]Cranmer Deposition, Vol. II, p. 134.
[48]Cranmer Deposition, Vol. II, p. 144.
[49]Cranmer Deposition, Vol. II, p. 138.
[50]Cranmer Deposition, Vol. II, pp. 134, 138, 144.

he has reason to believe that the heater emitted by-products that were of sufficient size and quantity to trigger the alarm.[51] He concluded that the smoke detector failed to alarm as a result of corrosion of the contacts.[52] He also determined that the smoke and soot produced by the heater preceded the production of carbon monoxide.[53]

BRK challenges Russell's testimony as unreliable and irrelevant. BRK points out that Russell has not tested any of the products in this case, including the smoke detector.[54] He has not seen, other than in photographs, the heater or the smoke detector.[55] Moreover, he is not aware of any testing of the smoke detector conducted by any of the plaintiffs' experts. He acknowledged that fretting corrosion may be detected through scanning electron microscope (SEM) analysis, and although he has conducted SEM analysis in prior litigation, he performed no SEM analysis in this case.[56] Furthermore, he is not aware of any SEM analysis conducted by other experts in this case, and he has not looked at the results of any SEM analysis that other experts may have indeed conducted.[57]

While Russell cannot point to specific evidence or tests demonstrating that fretting corrosion caused the detector's failure to alarm, Russell asserts that the engineering literature supports the proposition that corrosion occurred in this case.[58] At his deposition, he testified:

> If I take a properly powered, properly functioning smoke detector and I provided a stimulus of an external smoke product to which it is sensitive such that the chamber initiates the electronics to sound . . . and the horn doesn't sound I'm left with only

---

[51]Russell Deposition, Vol. I, p. 22.
[52]Russell Deposition, Vol. I, p. 28.
[53]Russell Deposition, Vol. I, p. 24.
[54]Russell Deposition, Vol. I, pp. 18, 29.
[55]Russell Deposition, Vol. I, p. 18.
[56]Russell Deposition, Vol. I, p. 57; Russell Deposition, Vol. II, p. 282.
[57]Russell Deposition, Vol. II, p. 281.
[58]Russell Deposition, Vol. I, p. 60-61; Russell Deposition, Vol. II, p. 291.

16

one possibility and that is the horn's failed[.] If the horn fails the question is . . . [w]hat mechanism would cause that horn not to sound? If . . . later I proved that the horn is capable of sounding . . . and it is able to vibrate and sound, which in this case we did determine, . . . the only thing I have ever seen reported in the literature as to a reason why a horn would not sound under that set of circumstances is corrosion of the contacts or lack of contact at the contacts.[59]

Russell's theory is a testable hypothesis, and one that can be proven (or disproven) using sophisticated microscopic analysis. Even though he admitted that he does not know the particular metals that made up the contacts in the Cruz detector, he testified that "there is no such thing as a set of any kind of pressure contacts that are metal to metal . . . where corrosion is not a possibility."[60] The Court believes that based on his electrical engineering background, Russell is qualified to make such a statement, and it is reliable. Furthermore, he relied on the report of one of the plaintiffs' experts which concluded that the battery in the Cruz detector was properly attached and had power.[61] He also relied on the reports from experts on both sides, showing that the heater operated for some time, and the smoke detector did not alarm.[62] Having investigated smoke detector failures for over a decade and relying on literature regarding ionization smoke detectors as well as his own testing of ionization smoke detectors, Russell asserted that the heater emitted a broad distribution of particle sizes sufficient to have triggered the smoke detector.[63] While this Court observes that Russell's method of arriving to his conclusions are imperfect — alternative (and more accurate) methods to test his theory were indeed available at the time he arrived at his conclusions — this Court believes that Russell nonetheless has good grounds for his theory. *See Brown v. Southeastern Pennsylvania Transportation Authority (In re Paoli Railroad Yard PCB Litigation)*, 35 F.3d 717, 746 (3rd Cir.

---

[59]Russell Deposition, Vol. II, p. 289-291.
[60]Russell Deposition, Vol. II, p. 276-277.
[61]Russell Deposition, Vol. I, p. 61-62.
[62]Russell Deposition, Vol. I, p. 68.
[63]Russell Deposition, Vol. I, p. 26-28.

17

1994) (holding that the Court "should not exclude evidence simply because . . . there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his . . . conclusions"). He eliminated all other possibilities and reasonably deduced that corrosion occurred in this case.[64]

Russell has sufficient expertise to testify that the smoke detector should have sounded based on the amount of smoke and soot particles that collected on the detector, and that a probable cause of the detector's failure to alarm is fretting corrosion; however, to the extent that Russell wishes to testify that the Cruz detector should have sounded a "timely alarm" (that is, an alarm prior to Cruz's incapacitation or death), this Court prohibits such testimony as unreliable and irrelevant. Russell is not a toxicologist and may not testify regarding the effect of Cruz's exposure to carbon monoxide over time.[65] Furthermore, he has performed no tests regarding the space heater and cannot testify as to the emission rate of the by-products of combustion from the heater.[66]

### E. Plaintiffs' Expert Dr. Jesse Aronstein

Plaintiffs have designated Dr. Jesse Aronstein to testify regarding fretting corrosion. While BRK did not directly challenge Aronstein's qualifications in its motion, this Court finds that Aronstein possesses the qualifications to testify concerning fretting. He has a Ph.D. in Materials Science, and his specialty is electrical contact technology, including the analysis of materials used in electrical contact and connections. He is qualified in every respect to testify as to the scientific and technical aspects of the piezo-horn contacts and the evidence that demonstrates their failure.

---

[64]Russell Deposition, Vol. I, p. 68.
[65]Russell Deposition, Vol. II, pp. 301-302.
[66]Russell Deposition, Vol. I, p. 24.

Aronstein has specifically investigated environmental factors such as temperature and humidity for electrical contacts in connection with residential wiring systems, and his research on this topic has been accepted by peer review and published.

For the purposes of this *Daubert* motion, this Court is concerned with the scientific validity and relevance of the theory that Aronstein presents. The fretting phenomena applies to all metal in contact, including electrical contacts such as the piezo-horn contact, and is well established in engineering literature and practice. The theory has been tested and is generally accepted among the scientific community. The identification of fretting damage can be done unambiguously with electron microscope techniques, such as those employed by Aronstein in the examination of the contacts from the piezo-horn in the Cruz detector.

BRK identifies several weaknesses in Aronstein's testimony. BRK argues that Aronstein's opinion is neither relevant nor reliable because he improperly assumes that the battery was properly powered and that the separate elements of tin and oxygen that were found on the detector's horn assembly constituted tin oxide, which is evidence of fretting. BRK further points out that there is no evidence that sufficient oxidation existed to increase the resistance beyond the capability of the horn circuit. BRK makes other arguments regarding the relevance of certain literature relied upon by Aronstein as well as arguments contesting whether fretting occurred in this case. The Court dismisses these arguments because they address the credibility and weight of the testimony rather than its admissibility.

### F.  Plaintiffs' Expert Douglas Holmes

Douglas Holmes has been designated as an expert in the cause and origins of fire and the accumulation of smoke and soot on the smoke detector. Holmes is a licensed fire investigator and

19

fire consultant specializing in the cause and origin of fires. BRK contends that Holmes lacks the expertise to address any of the issues in this case and challenges Holmes's qualifications to testify regarding the design and operation of the smoke detector and of the space heater in the Cruz residence.

Holmes opined that the detector should have sounded before Cruz was incapacitated by carbon monoxide.[67] According to Holmes, this assertion is based on the position of Cruz's head in relation to the position of the smoke detector and the heater.[68] Holmes also testified that the production of soot preceded the production of fatal levels of carbon monoxide.[69] When asked why Garcia saw no visible soot the night preceding Cruz's death, Holmes explains that "if [Cruz] used it before, he used it at a lower setting and then . . . the science would support that he turned the heater up to a higher — probably a higher position, but that he modified the position of the fuel being supplied."[70] The plaintiffs point out that Holmes will not testify regarding the design and operation of the smoke detector and that he will not testify that the quantity of soot produced should have caused the Cruz detector to alarm prior to the production of lethal concentrations of carbon monoxide. The Court is satisfied with the plaintiffs' position because in any event Holmes is not qualified to provide such testimony. Holmes did not use a valid scientific methodology to arrive to his conclusions, and he did not consider other alternative reasons to explain why no visible soot was present the night preceding Cruz's death, such as the gas pressure setting of the heater's gas valve or the decreasing amount of oxygen within the Cruz residence over time. Holmes also assumes,

---

[67]Holmes Deposition, pp. 215-216.
[68]Holmes Deposition, p. 216.
[69]Holmes Deposition, p. 219.
[70]Holmes Deposition, pp. 220-221.

without offering any scientific basis, that soot reached the detector in sufficient quantities to cause it to alarm before Cruz became incapacitated. Because Holmes's conclusions are merely speculation and not scientifically reliable explanations, they constitute inadmissible expert testimony.

Holmes also conducted a series of tests identified as the "Holmes-Hardin" tests, for a case captioned *Ayala v. BRK*.[71] These tests attempted to simulate a fire that occurred in a home that resulted from a lit cigarette on a sofa and purported to evaluate whether a specific model of BRK detectors would alarm in time to alert a sleeping resident of the fire before he was incapacitated. The videotape of the Holmes-Hardin tests indicated that the detectors alarmed before the premises became untenable. According to Holmes, the results showed that the Cruz detector itself is defective merely because the Cruz detector did not alarm.[72] Nonetheless, the Holmes-Hardin tests are not relevant because there are substantial differences between the circumstances of the Ayala fire and the circumstances in this case; consequently, no scientifically valid conclusions may be drawn and applied here. First, the Ayala fire involved an uncontrolled fire resulting from a lit cigarette.[73] The Ayala smoke detector was also installed in a different location in the house than the Cruz detector and was located differently with reference to the smoke.[74] Moreover, Ayala's home was larger than Cruz's residence, and the windows in the replica of the Ayala home were all closed unlike in the Cruz residence in which the living room window was slightly opened.[75] Finally, the Ayala home had an HVAC system, which the Cruz home did not.[76]

Holmes further relied upon an experiment conducted by his assistant Terry Dees. This test

---

[71]Holmes Deposition, pp. 95-96.
[72]Holmes Deposition, p. 201.
[73]Holmes Deposition, pp. 99-100.
[74]Holmes Deposition, pp. 100, 107.
[75]Holmes Deposition, p. 106.
[76]Holmes Deposition, p. 108.

was a six-and-a-half minute exercise in which Dees placed four battery-operated smoke detectors inside the flue vent located on the roof of his house in Dickinson, Texas, and waited to see whether the smoke detectors would alarm. Two of the detectors sounded an intermittent alarm while the other two did not alarm whatsoever.[77] Holmes stated that the purpose of the Terry Dees Flue Test was to recreate the effect of flue gases on an ionization smoke detector.[78] The test, however, is neither reliable nor relevant. Dees did not follow any known testing protocol other than to videotape the demonstration, and no measurements of smoke particulate or of obscuration levels were taken.[79] Dees also testified at his deposition that he did not know what caused the intermittent alarm, and he had no reason to believe that it was something other than the heat from the vent cap.[80] Lastly, this experiment is irrelevant because it did not involve soot emitted from a propane-fueled heater or soot produced as a result of the burning of liquid propane gas. It was also not conducted for the specific purpose of testing and evaluating the response time of smoke detectors.[81]

Finally, Holmes provided testimony that the detector failed to alarm. His conclusion is derived from investigating the scene, interviewing witnesses, and physically inspecting the battery and the detector.[82] While the testimony may be objectionable on other grounds, this Court considers Holmes to have sufficient experience and expertise to offer such testimony.

**IV.**

In summary, the Court makes the following determinations: (1) The expert testimony proffered by Michael Schulz is not admissible; (2) E. Wayne McCain may only testify as to the

---

[77]Dees Deposition, p. 35, 37, 43; Holmes Deposition, pp. 115-116, 119.
[78]Holmes Deposition, p. 111.
[79]Holmes Deposition, p. 112, 114-115.
[80]Dees Deposition, pp. 35-38.
[81]Holmes Deposition, pp. 45, 89-90, 94.
[82]Holmes Deposition, p. 214.

operation of the space heater and his observations of the heater arising from his visual examination of it; (3) Dr. Morris Cranmer's testimony is limited to testimony related to the effect that the increasing levels of carbon monoxide had on Cruz over time; he may not provide testimony regarding Cruz's time of death; (4) Dr. Don Russell may testify as to the theory of fretting corrosion and his basis for that opinion; however, any testimony regarding the time at which the Cruz detector should have alarmed is beyond his province; (5) Dr. Jesse Aronstein may also testify as to the theory of fretting corrosion and his basis for that opinion; and (6) Douglas Holmes is solely permitted to testify that the detector failed to alarm; he may not testify regarding the Terry Dees Flue Test or the Holmes-Hardin tests; the design, operation, or defects of the Cruz detector; or the time at which the Cruz detector should have sounded.

IT IS therefore **ORDERED** that Defendant's BRK Brands, Inc., Motion to Exclude Plaintiffs' Experts (Docket No. 151) is **GRANTED IN PART** and **DENIED IN PART**.

DONE at Brownsville, Texas, this 17th day of June, 2002.

John Wm. Black
United States Magistrate Judge