IN THE U.S. DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 2 8 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE GARCIA, Individually and | : | |
| as Representative of the Estate | : | CIVIL ACTION |
| of MANUEL CRUZ, IDALIA GARCIA, | : | |
| Individually; and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

**THE OBJECTIONS OF BRK BRANDS, INC.
TO THE JUNE 17, 2002 ORDER AND OPINION OF
MAGISTRATE JUDGE JOHN BLACK**

TO THE HONORABLE JUDGE OF SAID COURT:

Defendant, BRK Brands, Inc. by and through its undersigned counsel, hereby objects, in part, to the June 17, 2002 Order of Magistrate Judge John Black setting forth this Court's determination on BRK's Motion to Exclude Plaintiffs' Experts.

**I.**

**Statement of Facts and Procedural History**

1. On December 16, 1997, Manual Cruz was discovered dead in his home at 190 Thomas Lane, San Benito, Texas. Mr. Cruz had previously installed a large, gas-fueled space heater with a supply of LP-Gas (liquid propane gas) and without venting. The heater, however, was designed to burn natural gas and to be connected to a flue. His improper fueling and installation caused the gases from the combustion process, including carbon monoxide, to be vented directly into

- 1 -

the living space of his house. An autopsy revealed that Mr. Cruz died as a result of carbon monoxide poisoning and before he inhaled any soot or smoke.

2.    The plaintiffs in this case filed suit against BRK, a manufacturer of smoke detectors, alleging that a BRK model SA67D smoke detector, installed in the Cruz residence at the time of the incident, "failed to warn [Cruz] of the smoke in his house." (See Plaintiffs' First Amended Complaint, Docket No. 27). Plaintiffs contend that soot emitted from the space heater would have caused a properly functioning smoke detector to alarm, and that the space heater in this instance produced soot in sufficient quantities to cause the detector to alarm before Mr. Cruz became incapacitated by carbon monoxide. (See Plaintiffs' First Amended Complaint, Docket No. 27). Specifically, plaintiffs allege that the BRK smoke detector in Mr. Cruz's home was defective because its piezo-horn contacts, the contacts through which the alarm signal is transmitted to the horn, were corroded to such an extent that it blocked the transmission of the alarm signal to the horn. To support their theory of liability, plaintiffs will seek to offer at trial the opinions of various experts to explain why, in the absence of any evidence of smoke inhalation, BRK should be held liable for Cruz's carbon monoxide poisoning.

3.    On April 16, 2002, BRK Brands, Inc. filed and served an extensive motion to preclude plaintiffs' experts from testifying at trial pursuant to Federal Rule of Civil Procedure 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). On May 15 and 16, 2002, a hearing was held before Magistrate Judge John Black to hear additional evidence and to take testimony from witnesses, including, but not limited to, plaintiffs' experts, Drs. B. Don Russell and Jesse Aronstein on the issues presented in BRK's motion.

4.      On June 17, 2002, Judge Black issued his Memorandum Opinion and Order, granting in part, and denying in part BRK's motion.  For the reasons detailed below, BRK opposes only that portion of Judge Black's ruling that would allow the admission of the opinion testimony of Drs. Don Russell and Jesse Aronstein as being clearly erroneous and contrary to law.  Specifically, BRK challenges the Court's ruling permitting Drs. Russell and Aronstein to testify as to the theory of fretting corrosion and the basis for their opinions on this issue.  (See Memorandum Opinion and Order of Magistrate Judge John Black, dated June 17, 2002 [and entered on June 18, 2002], p. 23, attached hereto as Exhibit "A").

## II.

## ARGUMENT

### A.    Standard Of Review

5.      Pursuant to Federal Rule of Civil Procedure 72(a), a party has ten days after being served with a copy of the magistrate judge's order to serve and file objections to the order.  See F.R.C.P. 72(a).  BRK was served with a copy of Magistrate Judge Black's Memorandum Opinion and Order on June 18, 2002.  Accordingly, BRK's objections are timely made.

6.      Further under Rule 72(a), a district court is required to modify or set aside any factual or legal ruling of a magistrate judge found to be clearly erroneous or contrary to law.  See Young v. Conductron Corp., 899 F. Supp. 39, 40 (D.N.H. 1995); Castano v. American Tobacco Co., 896 F. Supp. 590, 594 (E.D. La. 1995); OPNAD Fund, Inc. v. Watson, 863 F. Supp. 328, 330 (S.D. Miss. 1994).  The "clearly erroneous" standard applies only to factual findings made by the magistrate judge, whereas conclusions of law are reviewed under the more lenient "contrary to law" standard. See Jochims v. Isuzu Motors, Ltd., 151 F.R.D. 338, 340 (S.D. Iowa 1993).

7.    A magistrate judge's factual finding is considered clearly erroneous when: (a) although there is evidence to support the finding, the reviewing court, based upon the entire evidence, is left with a definite and firm conviction that a mistake has been committed; or (2) in situations where the finding is contrary to the clear weight of the evidence. Young, 899 F. Supp. at 40; Jochims, 151 F.R.D. at 340. Conversely, when a dissatisfied litigant objects to a magistrate judge's legal ruling, the district court is to consider whether the ruling was contrary to law. Young, 899 F. Supp. at 40.

**B.    The Magistrate Judge Clearly Erred And/Or Committed An Error Of Law By Failing To Preclude The Testimony Of B. Don Russell And Jesse Aronstein At Trial In This Matter.**

8.    Faced with a proffer of expert testimony, the trial judge must determine at the outset whether the expert is qualified and his testimony is admissible. Significantly, the burden of proof is on the party proffering an expert witness to establish by a preponderance of the evidence the admissibility of his/her testimony. Daubert, 509 U.S. at n.10 (quoting Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)); Rothfos Corporation v. M/V Neuvo Leon, 123 F.Supp.2d 362, 371 (S.D. Tex. 2000); Bennett v. PRC Public Sector, Inc., 931 F.Supp. 484, 490 (S.D. Tex. 1996).

9.    For brevity and judicial economy, with respect to a detailed analysis of the standard for the admission of expert testimony, BRK relies upon and incorporates herein by reference its Memorandum Of Law In Support Of Its Motion To Preclude Plaintiffs' Experts, including, but not limited to, pages 17-22, 27-32 and 56-58.

10.    However, there have been several cases published since BRK filed its Motion to Preclude that apply the teachings of Daubert. Specifically, these recent decisions stress that an

- 4 -

expert witness must review all of the facts and information related to the case in order to form a

reliable opinion. See e.g., Hollander v. Sandoz Pharmaceutical Corp., No. 00-6135, 2002 U.S. App.

Lexis 9066 (10th Cir. May 10, 2002); Paoline v. Kilgo Trucking, Inc., No. 00-CV-956 ( E.D. Pa.

April 30, 2002); Lassiegne v. Taco Bell Corp., No. CIV.00-3259, 2002 U.S. Dist. Lexis 6808 (E.D.

La. April 11, 2002); and Knotts v. Black & Decker, Inc., No. 3:00 CV 7734 (N.D. Ohio), attached

hereto for the Court's ease of reference as Exhibit "B." Indeed, expert opinions failing to take all

material facts into consideration are based upon weak foundations, and are inherently unreliable.

See Lassiegne, 2002 U.S. Dist. Lexis 6808, at *19.

11.    More importantly, these recent decisions have also clarified that, to be admissible,

the proffered testimony of an expert must be able to link the plaintiffs' "theory" to the facts of the

specific case in which the expert intends to testify. See generally, Hollander, 2002 U.S. App. Lexis

9066; Paoline, No. 00-CV-956 ( E.D. Pa. April 30, 2002); Lassiegne, 2002 U.S. Dist. Lexis 6808;

Knotts, No. 3:00 CV 7734 (N.D. Ohio), attached as Exhibit "B." Where the expert contends that

there is a substantial amount of literature that supports his theory, the expert is still required to bridge

the theoretical cause of plaintiff's injury to what actually occurred in the specific matter. See

Hollander, 2002 U.S. App. LEXIS 9066, at *45; Knotts, No. 3:00 CV 7734 (N.D. Ohio), p. 24. To

accomplish this, the expert may make no speculative leaps, and must close all analytical gaps

between the existing data and the proffered opinion. See Hollander, 2002 U.S. App. LEXIS 9066,

at *33; Knotts, No. 3:00 CV 7734 (N.D. Ohio), pp. 15 and 24.

12.    Notably, in the recent case of Knotts v. Black & Decker, these principles were applied

by the District Court for the Northern District of Ohio to exclude unreliable expert testimony. See

Knotts, No. 3:00 CV 7734 (N.D. Ohio), p. 24. The Knotts case arises out of a fire which occurred

in a house, killing two of its residents. See id. at 4. Plaintiffs in that case brought claims for

wrongful death and product liability against Black & Decker alleging that a defective Black &

Decker VP130 electrical battery charger was the cause of the fire. See id. at 5. To support their

theory, plaintiffs offered the testimony of Dr. Kramerich to show the functional capacity of Black

& Decker's product to overheat and potentially cause a fire due to a lack of thermal protection in its

design. Id. at 15. In response, Black & Decker filed a motion challenging the admissibility of Dr.

Kramerich's opinions under Daubert. See Id. Consequently, Black & Decker's motion was granted

based on the court's finding that Dr. Kramerich's opinions were speculative, unreliable, and at best

showed the possibility of a failure mode on the part of all battery chargers, **but failed to establish**

**a probability as to the specific battery charger at issue.** See Id. at 24 (emphasis supplied).

Significantly, in coming to this conclusion, the court noted that there had been no independent

testing of the product at issue to validate Dr. Kramerich's opinion that Black & Decker's product

could cause the battery to overheat and the plastic charger case to ignite. Id. at 24. Rather, Dr.

Kramerich's opinions were based solely upon literature which involved various types of battery

chargers made by a variety of manufacturers, all for the proposition that the "same technology" was

applicable to the Black & Decker VP130 for the purpose of asserting this possible scenario with the

alleged offending product. Id. at 24. Accordingly, the court outright rejected Dr. Kramerich's

methodology as unreliable and speculative, stating:

> [T]his extrapolation theory when coupled with the lack of any independent
> testing qualifies Dr. Kramerich's opinion as tenuous at best because there is
> simply too great an analytical gap between the data and the opinion offered.

Id. at 24.

13.     As set forth below, the magistrate judge's rulings with respect to Drs. Russell and Aronstein are clearly erroneous and/or contrary to law, and must be reversed, in light of <u>Daubert</u>, the recently published case law, the evidence submitted in BRK's original motion and the overwhelming evidence presented at the May hearing, all of which demonstrate that the opinions of Drs. Russell and Aronstein regarding fretting corrosion are neither reliable nor relevant.

**(1)     <u>The Magistrate Judge Clearly Erred When He Found That Dr. Russell's Opinions Regarding Fretting Corrosion Were Reliable And Relevant</u>**

14.     In this case, plaintiffs offer Dr. Russell's opinion testimony about the general theory that corrosion can accumulate on electrical contacts.  Similar to Dr. Kramerich in Knotts, supra, Dr. Russell's opinion must be precluded because he is unable to connect his theory to the facts of this case and, therefore, his proffered testimony provides nothing of value to the fact finder in determining the issues in this case.  Remarkably, even the magistrate judge noted that "Russell cannot point to specific evidence or tests demonstrating that fretting corrosion caused the detector's failure to alarm." (See Memorandum Opinion and Order of Magistrate Judge Black, p. 16, Exhibit "A.")

15.     Regardless of his "theory" of possible failure mechanisms in this case, Dr. Russell has never seen the specific smoke detector at issue in this case, yet baldly seeks to offer his testimony about possible "failure mechanisms."  Among the many things he did not do to determine if his "theory" is applicable in this case, Dr. Russell testified at the <u>Daubert</u> hearing to the following:

- He has never seen nor inspected the smoke detector that was in the Cruz residence;

- He has never seen pictures of the inside of the Cruz smoke detector;

- He has not examined nor inspected exemplars of smoke detectors for his work in this case;

- He has no specific evidence that the smoke detector in the Cruz residence had corrosion on its p-horn contacts that prevented it from alarming;

- He has no information that an SEM of the Cruz smoke detector occurred;

- He has no physical evidence in this case that corrosion lead to resistance levels that were high enough to effect the smoke detectors operation;

- He is unfamiliar with the quantity of corrosion needed to effect a particular smoke detector's horn;

- He has never studied the amount of resistance required at the horn contact of the smoke detector in the Cruz residence to affect its operation;

- He has made no study of the corrosion mechanism in Mr. Cruz's smoke detector;

- He does not know the time required for the smoke detector in Mr. Cruz's house to build up sufficient corrosion in order to effect its ability to alarm;

- He does not know of any smoke detector with the type of contact materials as the one in this case that has failed to alarm because of corrosion; and

- He does not know of any model SA67D smoke detectors that ever failed to alarm because of corrosion.

16.     Perhaps most importantly, he knows that the formation of sufficient corrosion on the horn contacts to effect its operation is dependent upon a number of factors, including but not limited to, the level of contaminants in the environment, the temperature and humidity, the nature of the

contact materials and whether the contact terminals were coated or not. However, Dr. Russell admitted at the Daubert hearing that he has never studied these factors as they relate to smoke detector piezo-horns generally, or as they relate to the detector in Mr. Cruz's house. (See also, pages 45-48 and 64-65 of BRK's Motion to Preclude). Therefore, he cannot opine as to how it effected the Cruz case.

17.    Because Dr. Russell has failed to tie his general "theory" to the facts of this case and because he has wholly failed to do any examination or inspection of the specific smoke detector at issue in this case to determine if his theory applies, his proffered testimony is neither reliable nor relevant and the Magistrate Judge clearly erred in finding Dr. Russell could testify at trial.

**(2)    The Magistrate Judge Clearly Erred When He Found That Dr. Aronstein's Opinions Regarding Fretting Corrosion Were Relevant And Reliable**

18.    Similarly, the Magistrate Judge clearly erred in finding that Dr. Aronstein could testify concerning his theory that fretting corrosion occurred between the electrical contacts and disk of the piezo-horn inside Mr. Cruz's detector sufficient to create 10,000 ohms resistance and prevent the horn from sounding an alarm. (See, pages 48-54 of BRK's Motion to Preclude).

19.    At the Daubert hearing, Dr. Aronstein testified that he principally relied upon four studies to support his theory of product defect. These are: (1) "Fretting Corrosion and Electrical Contacts" by Bock & Whitley; (2) "The Impact of Fretting Parameters on Contact Degradation" by Robert Malucci; (3) "When Smoke Detectors Don't Work" by Julie Ayers; and (4) "Study of Deterioration of Separable Electrical Contacts in Smoke Detectors" prepared by IIT Research Institute ("IITRI"). However none of these studies support, and some actually contradict his theory regarding corrosion.

20.     Bock & Whitley's article does not support Dr. Aronstein's theory that fretting action can cause an increase in the resistance of the contacts in the piezo-horn of Mr. Cruz's smoke detector to increase above 10,000 ohms. Rather, as Dr. Aronstein admitted at the hearing, Bock & Whitley determined that with fretting corrosion conditions more severe than that to which Mr. Cruz's detector was exposed, they could only induce electrical resistance at the contacts to .2 ohms.

21.     Similarly, Dr. Aronstein admitted at the hearing that the Malucci study of fretting corrosion could only generate single digit ohms of resistance. As a result, neither Malucci nor Bock & Whitley support Dr. Aronstein's theory that fretting corrosion can cause resistances in the piezo-horn's tin/silver contacts to reach the 10,000 ohms he believes is necessary to cause the smoke detector in this case to fail to sound.

22.     With regard to the only other study cited by Dr. Aronstein in support of his opinion and as discussed in great detail in BRK's original motion and explained at the May hearing by Tom Eagar, BRK's materials expert, the Consumer Product Safety Commission commissioned IIT Research Institute to determine the validity of its hypothesis that fretting corrosion could prevent a piezo-horn in a smoke detector from sounding.[1] Following extensive laboratory and statistical analysis involving several types of tests, materials analysis, evaluations and attempts to deliberately induce the type of fretting corrosion thought to occur in piezo-electric horn contacts, the IITRI study concluded that no "life limiting mechanisms exist" and that "overall smoke detector reliability is considered good." Further, the study specifically commented that the type of horn used in BRK smoke detectors was "ruggedly constructed."

---

[1]     The CPSC's survey was summarized by Julie Ayers in her article "When Smoke Detectors Don't Work," which concluded that the majority of detectors that fail to work did not have a power source.

- 10 -

23.    In that none of the articles relied upon by Dr. Aronstein support his theory that fretting corrosion can cause sufficient resistance to develop to prevent a smoke detector horn from sounding, his opinion concerning a potential defect is not reliable and he should be precluded from testifying at trial.  It was clear error for the Magistrate Judge to permit Dr. Aronstein to testify concerning his theory of product defect and the basis therefor.

### III.

### CONCLUSION

24.    As set forth above, in its original motion and at the hearing before this Court, BRK Brands, Inc. respectfully request this Court overrule that portion of Magistrate Judge Black's Memorandum Order and Opinion related to the proffered opinion testimony of Drs. Russell and Aronstein and preclude Drs. Russell and Aronstein from testifying at the trial of this matter.

Respectfully submitted,

**COZEN O'CONNOR**

BY:

JAMES HELLER
TERRY M. HENRY
1900  Market Street
Philadelphia, PA  19103
Tel: 215/665-2000
Fax: 215/665-2013

**ROERIG, OLIVEIRA & FISHER**

Rene O. Oliveira
State Bar No. 15254700
Cameron County I.D. No. 3507
Elizabeth G. Neally
State Bar No. 14840400
Cameron County I.D. No. 3506

- 11 -

855 West Price Road, Suite 9
Brownsville, TX 78520
Tel: 956/542-5666
Fax: 956/542-0016

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and correct copy of **THE OBJECTIONS OF BRK BRANDS, INC. TO THE JUNE 17, 2002 ORDER AND OPINION OF MAGISTRATE JUDGE JOHN BLACK** has been forwarded via certified mail, return receipt requested to the attorneys for Plaintiffs, as follows:

Juan Gonzalez, Esq.
The Atrium, Suite 400
1300 North Tenth Street
McAllen, TX 78501
[CM/R.R. # 7160 3901 9844 5410-6802]

Ray Marchan, Esq.
**EDDINGTON & ASSOCIATES, L.L.P.**
1926 E. Elizabeth
Brownsville, TX 78520
[CM/R.R. # 7160 3901 9844 5410 6802]

on this 28th day of June, 2002.

Elizabeth G. Neally

- 12 -

*165*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
## -BROWNSVILLE DIVISION-

United States District Court
Southern District of Texas
ENTERED

JUN 1 8 2002

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| JOSE GARCIA, INDIVIDUALLY | § | |
| AND IDALIA GARCIA, | § | |
| INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE | § | |
| ESTATE OF MANUEL CRUZ, | § | |
| DECEASED, | § | |
|     Plaintiffs, | § | CIVIL ACTION NO. B-98-186 |
| | § | |
| VS. | § | |
| | § | |
| BRK BRANDS, INC., | § | |
|     Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's BRK Brands, Inc., ("BRK") Motion to Exclude

Plaintiffs' Experts (Docket No. 151). BRK filed a Corrected Brief in support of their motion

(Docket No. 153), as well as an appendix to their brief in support (Docket No. 164). The plaintiffs

filed responses in opposition to BRK's motion (Docket Nos. 154, 155, 157, 158). After careful

consideration of this matter, the Court grants in part and denies in part BRK's Motion to Exclude

Plaintiffs' Experts (Docket No. 151).

## I.

### FACTUAL BACKGROUND

On Sunday, December 14, 1997, Manuel Cruz ("Cruz") met his friend Jose Garcia ("Garcia")

to prepare for a double date they had that evening at Cruz's home. Cruz did not have a heating,

ventilating, and air conditioning system (HVAC) in his house, so he used a large space heater to

warm the home. The heater was designed to burn natural gas; however, Cruz improperly supplied

1



it with liquid propane gas. He compounded this error by failing to provide exterior venting for the products of combustion emitted while the heater operated.

On the night of their double date, Cruz used the space heater. That night Cruz and Garcia drank nearly a case of beer and shared a bottle of wine with their dates. In the early hours of Monday morning, after their guests departed, Garcia felt too drunk to drive home, so he decided to stay the night. At about 4:00 a.m., Cruz and Garcia fell asleep. Cruz slept on his bed, and Garcia slept in the living room on a couch that was beneath a window that was opened about an inch. Between 6:00 and 6:30 a.m., Garcia awoke with a headache that he attributed to a hangover. He decided to go home, and he called out to Cruz that he was leaving as he walked out of the house, but Cruz did not respond. Garcia did not detect any soot in the rooms or on his clothes when he left.

That Monday Cruz was supposed to meet his daughter Brittany Cox and her mother Cynthia at the zoo around 9:00 a.m., but he never arrived. Between 10:00 a.m. and 12:00 p.m., Cynthia Cox called Cruz at home to find out whether he would be joining them. There was no answer, and Cox assumed that Cruz had forgotten about the visit. The following day, Tuesday, December 16, Kenya Sosa, Cruz's date from Sunday night, became worried because she had not heard from Cruz for two days. Around 11:30 p.m., she visited Cruz's home and discovered him dead on his bed where he was last seen by Garcia. An autopsy revealed that Cruz died sometime before Tuesday morning as a result of carbon monoxide poisoning and before he inhaled any soot or smoke.

The plaintiffs in this case filed suit against BRK Brands, Inc., a manufacturer of smoke detectors, alleging that a BRK model SA67D smoke detector, which was installed on the wall of the hallway leading from Cruz's living room, approximately seven to ten feet above the space heater,

"failed to warn [Cruz] of the smoke in his house."[1]  The plaintiffs contend that soot emitted from the space heater would have caused a properly functioning smoke detector to alarm, and the space heater in this instance produced soot in sufficient volume to have been able to cause the detector to alarm before Cruz became incapacitated.  According to the plaintiffs, the BRK smoke detector in Cruz's home was defective because its piezo-horn contacts, the contacts through which the alarm signal is transmitted to the horn, were corroded.  The plaintiffs claim that the peizo-horn contacts on Cruz's detector became corroded through a "fretting" motion.  Fretting is a specific deterioration process, involving microscopic motions at a contact interface.  According to the plaintiffs, this corrosion developed to such an extent that it blocked the transmission of the alarm signal to the horn.  To support their theory of liability, the plaintiffs have offered the opinions of various experts to explain why, in the absence of any evidence of smoke inhalation, BRK should be held liable for Cruz's carbon monoxide poisoning.  In their motion to exclude the plaintiffs' experts, BRK challenges the qualifications and the opinions of the experts, asserting that the plaintiffs have failed to satisfy the standard for admitting expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The Court held a *Daubert* hearing in which the arguments of the parties were heard and several of the plaintiffs' experts testified.

## II.

### THE STANDARD FOR ADMITTING EXPERT TESTIMONY

Under the Federal Rules of Evidence Rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify .

---

[1]Plaintiffs' First Amended Complaint, Docket No. 27.

3

. . in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The district court acts as a "gate-keeper" when determining the admissibility of expert testimony. *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000). This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony. *Pipotone v. Biomatrix, Inc.*, 2002 WL 500290, *3 (5th Cir. Apr. 18, 2002). The district court must ensure that any proffered expert testimony or evidence is not only relevant, but reliable. *See Daubert*, 509 U.S. at 589.

As an initial matter, the court must determine whether the witness tendered is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). A court may exclude an expert who does not have the appropriate experience, education, or training to offer a helpful opinion with regard to the issues in controversy. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995). The opinion must be informed by the witness's expertise rather than merely be an opinion broached by a purported expert. *Jones v. Lincoln Electric Co.*, 188 F.3d 709, 723 (7th Cir. 1999) (relying on *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). Whether a witness is qualified as an expert is determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony. *Carroll v. Otis Elevator*, 896 F.2d 210, 212 (7th Cir. 1990).

After a court considers whether a witness possesses the necessary training, education, or experience to offer expert testimony, it must then engage in a rigorous two-part analysis. The first

inquiry requires that the court satisfy itself that the principles, reasoning, and methods underlying the proposed testimony are reliable. *Tanner v. Westbrook*, 174 F.3d 542, 546 (5th Cir. 1999). Reliability requires some objective, independent validation of the expert's methodology. The expert's assurances that he has applied generally accepted scientific methodology is insufficient. *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). Ultimately, the court must determine nothing less than whether the expert's testimony reflects "scientific knowledge," whether his findings are "derived by scientific method," and whether his work product amounts to "good science." *Daubert*, 509 U.S. at 590-94. The purpose of the examination "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Seatrax*, 200 F.3d at 372 (quoting *Kumho Tire*, 526 U.S. at 152).

Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *Daubert*, 509 U.S. at 590. The court must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data. *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994). Among the factors that a court may consider are (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether there is widespread acceptance of the theory or technique. These factors are illustrative rather than exhaustive, and they are not equally applicable in every case. *Daubert*, 43 F.3d at 1316-17.

The second inquiry requires that the court ensure that the expert testimony is relevant, that

5

is, that the testimony will assist the trier of fact to understand or determine a fact in issue. *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). Accordingly, the court must determine whether the reasoning or methodology underlying the testimony can be applied to the facts at issue. *Seatrax*, 200 F.3d at 372 (relying on *Daubert*, 509 U.S. at 592-93). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. The proponent need not prove to the judge that the expert's testimony is correct, but he must prove by a preponderance of the evidence that the testimony is admissible. *Moore*, 151 F.3d at 276.

### III.

#### ADMISSIBILITY OF PLAINTIFFS' EXPERT TESTIMONY

##### A. *Plaintiffs' Expert Michael Schulz*

Plaintiffs designated Michael Schulz as a fire origins and investigation expert. According to the plaintiffs, Schulz will testify "that a properly designed and operating smoke detector would detect the by-products of combustion from a propane fueled space heater."[2] While Schulz has an impressive resume and may very well be qualified to investigate and analyze fires and fire explosions, this Court believes he is not qualified to answer the specific questions in this case. Schulz based his testimony upon a demonstrative test he performed at the Cruz residence on April 18, 2000. Schulz testified that the purpose of his experiment was to demonstrate that soot or smoke particulate do not have to be of a visible size in order to sound an alarm.[3] In his experiment, Schulz placed a dual, photoelectric/ionization, smoke detector, First Alert/BRK Brands Model No. SA301B, in what he believed had been the location of Cruz's smoke detector at the time Cruz died. Schulz

---

[2] Plaintiffs' Response to Motion to Exclude Plaintiffs' Experts, Docket No. 154.
[3] Schulz Deposition, Vol. I, pp. 70-71.

6

measured the level of carbon monoxide and oxygen within the living room and the bedroom of the Cruz residence while operating the propane-fueled heater. Schulz testified that the smoke detector alarmed five minutes and twenty-four seconds after the heater was turned on. He maintained that this test showed that the Cruz smoke detector should have alarmed from the flue gases, *i.e.*, water vapor, carbon monoxide, carbon dioxide, and propane, that the heater released prior to the emission of soot and smoke and before lethal concentrations of carbon monoxide were produced within the Cruz residence.

According to Schulz, his methodology complied with the guidelines of the National Fire Code, and he was merely trying to demonstrate the general principle that a heater in close proximity to a smoke detector will cause the detector to alarm because it will detect the by-products of combustion. Schulz's test is not reliable because it is deficient in its methodology and provides insufficient support for the proposition that an ionization smoke detector will sound when a propane-fueled heater emits by-products of combustion. Schulz did not measure the production of soot, smoke, carbon dioxide, or hydrogen cyanide to determine the cause of the alarm.[4] He conceded that he is not familiar with the speed by which smoke must move into the smoke detector in order to trigger the smoke alarm.[5] He further does not know whether the by-products of the heater triggered the photoelectric sensor or the ionization sensor of the detector he used. Moreover, no error may be conferred from Schulz's test because he performed the test only once, and there are no other tests or studies to which his results might be compared. Schulz failed to utilize a scientifically valid method of determining when the space heater emissions would have reached a significant volume

---

[4]Schulz Deposition, Vol. I, pp. 26-27.
[5]Schulz Deposition, Vol. I, p. 71.

7

to cause the detector to alarm and falls short of a valid method in which one can conclude to a reasonable scientific degree that the Cruz detector should have alarmed in sufficient time to allow Cruz to escape the residence before he was incapacitated by carbon monoxide.

Plaintiffs argue that it is not necessary for Schulz to testify regarding the numerical quantitative rates in which products of combustion are produced from the propane-fueled heater. However, without this type of testimony, plaintiffs cannot make the leap that a properly-functioning smoke detector will generally detect the by-products of combustion of a propane-fueled heater. In order to make that assertion, Schulz would have to know the emission rate of the by-products of combustion from the heater in order to determine at what point in time the smoke detector should have triggered.

Moreover, Schulz's experiment is not relevant because it did not attempt to replicate the conditions that existed at the time of Cruz's death. Schulz testified that the following elements of his demonstrative test were not similar to the conditions to which Cruz was exposed on the night of his death: the external temperature during his test was approximately fifty degrees warmer;[6] the ventilation of the house was different;[7] the doors to all the bedrooms and the bathroom were open during his test;[8] no measurements of the temperature of the plume of the products of combustion were taken;[9] no measurements were taken of soot, smoke, and other products of combustion that were inside the heater or released into the testing atmosphere;[10] the position of the heater was not for a certainty placed in the same location vis-a-vis the smoke detector;[11] the orifice of the heater

---

[6]Schulz Deposition, Vol. I, pp. 39-40.
[7]Schulz Deposition, Vol. I, pp. 36-37.
[8]Schulz Deposition, Vol. I, pp. 36-37.
[9]Schulz Deposition, Vol. I, pp. 162-63; Schulz Deposition, Vol. II, p. 251.
[10]Schulz Deposition, Vol. I, pp. 27, 62, 68; Schulz Deposition, Vol. II, p. 258.
[11]Schulz Deposition, Vol. I, pp. 18-19, 149-50.

opening was not measured;[12] and the smoke detector was a completely different type than the Cruz detector.[13]  If Schulz intended to demonstrate that there are some circumstances under which an ionization detector will respond to the fumes that a malfunctioning space heater generates, his test provides no basis to conclude that a smoke detector should have alarmed in response to the conditions existing at any time before Cruz's death.  Because this Court concludes that Schulz's testimony is neither reliable nor relevant, he is not allowed to testify as to the opinions he proffers.

### B.  Plaintiffs' Expert E. Wayne McCain

E. Wayne McCain was designated to testify regarding the allegedly defective smoke detector and the accumulation of smoke and soot to such an extent that the smoke detector should have alarmed hours earlier than at the time of Cruz's death.  McCain's curriculum vitae shows that he is an expert in designing systems that burn fuels and gases and the operation of fuel-burning appliances.  While McCain has had experience with industrial type detector systems that are used for regulating or monitoring the products of industrial combustion, he has no experience in residential smoke detectors other than through litigation.[14]  He further conceded that he has no independent experience in the design, manufacture, or sale of residential smoke detectors, and he has never done any investigation or study observing the effects of soot and smoke on a smoke detector.[15]  Moreover, he has never testified either at a deposition or at trial regarding the effects of smoke or soot on residential smoke detectors other than in one lawsuit in which he simulated a slow smoldering fire on a couch.[16]  Accordingly, while McCain may have the expertise to address issues

---

[12]Schulz Deposition, Vol. I, pp. 32-33.
[13]Schulz Deposition, Vol. I, pp. 25-26.
[14]McCain Deposition, pp. 45, 52-55.
[15]McCain Deposition, p. 83.
[16]McCain Deposition, pp. 62-64.

9

relating to the operation of the space heater, this Court concludes that he is not qualified to offer any opinion as to the effect that the soot or other particles emitted by the space heater had or should have had on the smoke detector.

Additionally, this Court deems any testimony proffered by McCain regarding the allegedly defective operation of the smoke detector unreliable. McCain visually observed the Cruz detector twice but did not test or examine it.[17] He observed the ignition and operation of the heater on propane and only measured the heater and performed a visual examination of it.[18] Nevertheless, McCain drew the conclusion that the BRK model SA67D smoke detector as manufactured is a defective product based on tests he ran in previous litigation in which the smoke detector in that case would not function for a period of approximately two hours after he initiated a slow, smoldering fire on a couch.[19] He contended that his opinion is further substantiated by the amount of soot he discovered on the ceilings and within the detector in the Cruz residence.[20] Yet McCain's conclusion that the smoke detector was defective because it did not alarm prior to Cruz's death lacks scientific validity. He has no evidence that the space heater was properly vented, that it was operating when Cruz's body was found, that it was still producing soot when Cruz's body was found, that it was producing soot before fatal levels of carbon monoxide were produced, and that the soot was produced in sufficient quantities to cause the detector to alarm before incapacitating levels of carbon monoxide were produced. McCain also can offer no opinion with regard to the rate of production of carbon monoxide, soot, and smoke.[21] Furthermore, because McCain does not know the gas

---

[17]McCain Deposition, pp. 99-100.
[18]McCain Deposition, pp. 100-101.
[19]McCain Deposition, pp. 174-75.
[20]McCain Deposition, pp. 9, 175.
[21]McCain Deposition, pp. 193-195.

10

pressure that was on the valve on the night of the incident, he cannot estimate the amount of carbon monoxide produced in relation to the amount of soot produced.[22]   Finally, McCain's "smoldering couch" test, moreover, is not reproducible using a valid scientific methodology, and McCain conceded that it was difficult to reproduce the smoldering fire conditions on the upholstery.[23] According to McCain, his test was a "real-world demonstration" and not an attempt to meet any standards with respect to his scientific methodology.[24] Further, his demonstrative test is not relevant as it does not fit the facts of this case.  The test area was almost twice the size of Cruz's residence, and he did not measure the obscuration level, carbon monoxide production, and soot or smoke production.[25]

### C.  Plaintiffs' Expert Dr. Morris Cranmer

The plaintiffs retained Dr. Morris Cranmer, a toxicologist, to offer a variety of opinions.  As a toxicologist, Cranmer is qualified to determine Cruz's cause of death and the effect that the increasing levels of carbon monoxide accumulating in the residence had on Cruz.  Despite his qualifications, however, his testimony regarding Cruz's time of death is unreliable.  Cranmer's underlying calculations fail to account for certain factors and do not follow a scientifically recognized procedure.

Cranmer estimated that Cruz died between 10 a.m. and 2 p.m. on Monday, December 16. To estimate the BTUs required to maintain a comfortable atmosphere within Cruz's home, Cranmer relied upon an estimated heat loss rate prepared for him by an HVAC consultant.[26]  He admitted,

---

[22]McCain Deposition, p. 116.
[23]McCain Deposition, pp. 73-74.
[24]McCain Deposition, p. 65.
[25]McCain Deposition, pp. 67-69.
[26]Cranmer Deposition, Vol. II, p. 27.

however, that the heat exchange rate could be off by ten to fifteen percent.[27] Furthermore, while Cranmer conceded that the operation of the space heater would increase the air pressure within Cruz's house, thus affecting the air exchange, he did not consider the pressurization in his calculations, and he did not perform any tests to determine the actual pressurization.[28] Significantly, Cranmer did not actually calculate Cruz's carbon monoxide uptake; instead, he estimated Cruz's rate of uptake on a chart based on a constant exposure to a fixed rate of carbon monoxide.[29] Cranmer admitted, however, that Cruz was not exposed to a constant rate of carbon monoxide and may not fit the standard man depicted in his chart.[30] Additionally, Cranmer did not calculate the rate of production of carbon dioxide, which would have the effect of increasing Cruz's respiration, and consequently, his carbon monoxide uptake.[31]

Other factors suggest that Cranmer's findings are not scientifically reliable such as the severity of Garcia's headache when he awoke in the morning and whether the heater began producing large quantities of carbon monoxide at some point in time.[32] Dr. Cranmer also conceded that Cruz's failure to respond to Ms. Cox's 10:00 a.m. phone call would change his opinion concerning the estimated time of Cruz's death.[33] Cranmer failed to consider Cruz's drinking history, and he used a female's volume of distribution for alcohol instead of a male's volume of distribution for alcohol. Consequently, Cruz's rate of alcohol metabolism may have been higher than Cranmer estimated. Cranmer also suggested that the inhalation of carbon monoxide slows down the rate of

---

[27]Cranmer Deposition, Vol. II, p. 28.
[28]Cranmer Deposition, Vol. II, p. 44.
[29]Cranmer Deposition, Vol. II, pp. 64-67.
[30]Cranmer Deposition, Vol. II, p. 67.
[31]Cranmer Deposition, Vol. II, pp. 98-99.
[32]Cranmer Deposition, Vol. II, p. 50, 54.
[33]Cranmer Deposition, Vol. II, p. 72.

12

alcohol metabolism, but no medical literature supports this proposition. Additionally, Cranmer did not consider the Blood Alcohol Content ("BAC") measurement taken by the Baptist Valley Medical Center during Cruz's autopsy. If he had considered Baptist Valley's BAC result, he agreed that Cruz would have become incapacitated and died much earlier than he originally concluded.[34]  When considering both Cruz's BAC reading in combination with the likely increase in carbon dioxide, which would have increased Cruz's carbon monoxide uptake, Cranmer believed that Cruz may have died even before 9:00 a.m. on Monday, December 16. The impact of these additional factors on Dr. Cranmer's opinion demonstrate that his proposed testimony is not scientifically based and inherently unreliable.

Cranmer also provided testimony regarding the operation of the smoke detector. Cranmer interpreted the results of a report written by one of BRK's experts and concluded that the heater produced sufficient quantities of smoke and smoke particulate that should have triggered the detector prior to Cruz's death.[35] According to Cranmer, "the alarm should have sounded . . . hours before Mr. Cruz's death."[36] This theory is "based on the . . . high concentrations of carbon monoxide in the air . . . and that would have been sufficient to produce visible and invisible particles that should have been detected by the smoke alarm."[37] Cranmer is not qualified to provide this kind of determination because he is not a smoke detector expert, smoke particulate expert, soot formation expert, or fire signature expert.[38] He testified that his knowledge regarding the time at which a detector should alarm is based on articles in Consumer Reports, the expert opinions of Michael Schulz and E. Wayne

---

[34]Cranmer Deposition, Vol. II, pp. 86-88.
[35]Cranmer Deposition, Vol. I, p. 29.
[36]Cranmer Deposition, Vol. I, p. 71.
[37]Cranmer Deposition, Vol. I, pp. 71-72.
[38]Cranmer Deposition, Vol. II, pp. 78-79.

13

McCain, BRK literature regarding smoke detectors, and his own personal experience.[39] He has never inspected the Cruz detector or been designated as an expert on smoke detectors,[40] and he lacks an understanding of how smoke detectors respond under various environmental conditions. While Cranmer should be permitted to testify as to Cruz's carbon monoxide poisoning, his testimony concerning the operation of the smoke detector and concerning the production of soot and smoke that purportedly should have triggered the smoke detector's alarm should be considered unreliable because it is outside his area of expertise.

Cranmer's testimony also demonstrates a lack of understanding of the scientific principles behind the combustion process. In order to approximate the rate of production of soot the night that Cruz died, Cranmer performed a regression analysis of an experiment conducted by one of BRK's experts. In that experiment, a heater was ignited inside a structure that was about 470 cubic feet, and probes were inserted to sample the gases within the structure.[41] Cranmer did not examine the concentration of oxygen in the structure over time,[42] and he ignored the first three data points and then assumed a linear accumulation of soot over time.[43] Had he taken these data points into consideration, the graph would have more closely resembled a hockey stick, consequently undermining his testimony that soot accumulated in a straight linear pattern.[44]

Cranmer also seeks to support his opinion based upon an impromptu experiment he conducted using the space heater. To conduct the test, Cranmer placed a smoke detector on the wall near the space heater, then ignited the space heater. However, Cranmer's exercise is unreliable

---

[39] Cranmer Deposition, Vol. I, pp. 73-77.
[40] Cranmer Deposition, Vol. I, p. 12.
[41] Cranmer Deposition, Vol. I, pp. 102-103.
[42] Cranmer Deposition, Vol. II, p. 182.
[43] Cranmer Deposition, Vol. II, pp. 160-162.
[44] Cranmer Deposition, Vol. II, p. 181-82.

14

because (1) he did not measure the velocity of the soot at the smoke detector;[45] (2) he did not measure the temperature at the smoke detector;[46] he used a different smoke detector model;[47] (3) he took no measurements of carbon monoxide, carbon dioxide, or any other products of combustion;[48] (4) the smoke detector was placed in a different location vis-à-vis the heater;[49] and (5) ventilation during his tests permitted an infinite dilution of gases. Cranmer failed to follow any recognized protocol in performing his heater exercise; thus, it does not provide a reasonable basis upon which to form a reliable expert opinion. Furthermore, Cranmer's exercise is not relevant because his test conditions differed from the facts of this case in the following respects: (1) the smoke detector used in his impromptu test was a different model from the Cruz detector; (2) the smoke detector was placed in a different location vis-à-vis the heater; and (3) the ventilation during Cranmer's test allowed for an indefinite dilution of the gases.[50] Accordingly, Cranmer's testimony relating to the operation of the Cruz detector and space heater must be excluded because it is beyond his expertise, and the results of his impromptu exercise are neither relevant nor reliable.

### D. Plaintiffs' Expert Dr. Don Russell

Plaintiffs designated Dr. Don Russell as an expert on smoke detectors and fretting corrosion of the piezo-horn contacts. Russell holds a B.S., an M.E., and a Ph.D. in electrical engineering. He has been a member of the electrical engineering faculty at Texas A&M University since 1977. Russell opined that the detector in the Cruz residence should have sounded a timely alarm (that is, prior to Cruz's incapacitation or death) because evidence exists that the detector was powered, and

---

[45]Cranmer Deposition, Vol. II, p. 135.
[46]Cranmer Deposition, Vol. II, p. 135.
[47]Cranmer Deposition, Vol. II, p. 134.
[48]Cranmer Deposition, Vol. II, p. 144.
[49]Cranmer Deposition, Vol. II, p. 138.
[50]Cranmer Deposition, Vol. II, pp. 134, 138, 144.

15

he has reason to believe that the heater emitted by-products that were of sufficient size and quantity to trigger the alarm.[51] He concluded that the smoke detector failed to alarm as a result of corrosion of the contacts.[52] He also determined that the smoke and soot produced by the heater preceded the production of carbon monoxide.[53]

BRK challenges Russell's testimony as unreliable and irrelevant. BRK points out that Russell has not tested any of the products in this case, including the smoke detector.[54] He has not seen, other than in photographs, the heater or the smoke detector.[55] Moreover, he is not aware of any testing of the smoke detector conducted by any of the plaintiffs' experts. He acknowledged that fretting corrosion may be detected through scanning electron microscope (SEM) analysis, and although he has conducted SEM analysis in prior litigation, he performed no SEM analysis in this case.[56] Furthermore, he is not aware of any SEM analysis conducted by other experts in this case, and he has not looked at the results of any SEM analysis that other experts may have indeed conducted.[57]

While Russell cannot point to specific evidence or tests demonstrating that fretting corrosion caused the detector's failure to alarm, Russell asserts that the engineering literature supports the proposition that corrosion occurred in this case.[58] At his deposition, he testified:

> If I take a properly powered, properly functioning smoke detector and I provided a stimulus of an external smoke product to which it is sensitive such that the chamber initiates the electronics to sound . . . and the horn doesn't sound I'm left with only

---

[51]Russell Deposition, Vol. I, p. 22.
[52]Russell Deposition, Vol. I, p. 28.
[53]Russell Deposition, Vol. I, p. 24.
[54]Russell Deposition, Vol. I, pp. 18, 29.
[55]Russell Deposition, Vol. I, p. 18.
[56]Russell Deposition, Vol. I, p. 57; Russell Deposition, Vol. II, p. 282.
[57]Russell Deposition, Vol. II, p. 281.
[58]Russell Deposition, Vol. I, p. 60-61; Russell Deposition, Vol. II, p. 291.

one possibility and that is the horn's failed[.] If the horn fails the question is . . . [w]hat mechanism would cause that horn not to sound? If . . . later I proved that the horn is capable of sounding . . . and it is able to vibrate and sound, which in this case we did determine, . . . the only thing I have ever seen reported in the literature as to a reason why a horn would not sound under that set of circumstances is corrosion of the contacts or lack of contact at the contacts.[59]

Russell's theory is a testable hypothesis, and one that can be proven (or disproven) using sophisticated microscopic analysis. Even though he admitted that he does not know the particular metals that made up the contacts in the Cruz detector, he testified that "there is no such thing as a set of any kind of pressure contacts that are metal to metal . . . where corrosion is not a possibility."[60] The Court believes that based on his electrical engineering background, Russell is qualified to make such a statement, and it is reliable. Furthermore, he relied on the report of one of the plaintiffs' experts which concluded that the battery in the Cruz detector was properly attached and had power.[61] He also relied on the reports from experts on both sides, showing that the heater operated for some time, and the smoke detector did not alarm.[62] Having investigated smoke detector failures for over a decade and relying on literature regarding ionization smoke detectors as well as his own testing of ionization smoke detectors, Russell asserted that the heater emitted a broad distribution of particle sizes sufficient to have triggered the smoke detector.[63] While this Court observes that Russell's method of arriving to his conclusions are imperfect — alternative (and more accurate) methods to test his theory were indeed available at the time he arrived at his conclusions — this Court believes that Russell nonetheless has good grounds for his theory. *See Brown v. Southeastern Pennsylvania Transportation Authority (In re Paoli Railroad Yard PCB Litigation)*, 35 F.3d 717, 746 (3rd Cir.

---

[59]Russell Deposition, Vol. II, p. 289-291.
[60]Russell Deposition, Vol. II, p. 276-277.
[61]Russell Deposition, Vol. I, p. 61-62.
[62]Russell Deposition, Vol. I, p. 68.
[63]Russell Deposition, Vol. I, p. 26-28.

1994) (holding that the Court "should not exclude evidence simply because . . . there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his . . . conclusions"). He eliminated all other possibilities and reasonably deduced that corrosion occurred in this case.[64]

Russell has sufficient expertise to testify that the smoke detector should have sounded based on the amount of smoke and soot particles that collected on the detector, and that a probable cause of the detector's failure to alarm is fretting corrosion; however, to the extent that Russell wishes to testify that the Cruz detector should have sounded a "timely alarm" (that is, an alarm prior to Cruz's incapacitation or death), this Court prohibits such testimony as unreliable and irrelevant. Russell is not a toxicologist and may not testify regarding the effect of Cruz's exposure to carbon monoxide over time.[65] Furthermore, he has performed no tests regarding the space heater and cannot testify as to the emission rate of the by-products of combustion from the heater.[66]

### E. Plaintiffs' Expert Dr. Jesse Aronstein

Plaintiffs have designated Dr. Jesse Aronstein to testify regarding fretting corrosion. While BRK did not directly challenge Aronstein's qualifications in its motion, this Court finds that Aronstein possesses the qualifications to testify concerning fretting. He has a Ph.D. in Materials Science, and his specialty is electrical contact technology, including the analysis of materials used in electrical contact and connections. He is qualified in every respect to testify as to the scientific and technical aspects of the piezo-horn contacts and the evidence that demonstrates their failure.

---

[64]Russell Deposition, Vol. I, p. 68.
[65]Russell Deposition, Vol. II, pp. 301-302.
[66]Russell Deposition, Vol. I, p. 24.

18

Aronstein has specifically investigated environmental factors such as temperature and humidity for electrical contacts in connection with residential wiring systems, and his research on this topic has been accepted by peer review and published.

For the purposes of this *Daubert* motion, this Court is concerned with the scientific validity and relevance of the theory that Aronstein presents. The fretting phenomena applies to all metal in contact, including electrical contacts such as the piezo-horn contact, and is well established in engineering literature and practice. The theory has been tested and is generally accepted among the scientific community. The identification of fretting damage can be done unambiguously with electron microscope techniques, such as those employed by Aronstein in the examination of the contacts from the piezo-horn in the Cruz detector.

BRK identifies several weaknesses in Aronstein's testimony. BRK argues that Aronstein's opinion is neither relevant nor reliable because he improperly assumes that the battery was properly powered and that the separate elements of tin and oxygen that were found on the detector's horn assembly constituted tin oxide, which is evidence of fretting. BRK further points out that there is no evidence that sufficient oxidation existed to increase the resistance beyond the capability of the horn circuit. BRK makes other arguments regarding the relevance of certain literature relied upon by Aronstein as well as arguments contesting whether fretting occurred in this case. The Court dismisses these arguments because they address the credibility and weight of the testimony rather than its admissibility.

### F. *Plaintiffs' Expert Douglas Holmes*

Douglas Holmes has been designated as an expert in the cause and origins of fire and the accumulation of smoke and soot on the smoke detector. Holmes is a licensed fire investigator and

19

fire consultant specializing in the cause and origin of fires. BRK contends that Holmes lacks the expertise to address any of the issues in this case and challenges Holmes's qualifications to testify regarding the design and operation of the smoke detector and of the space heater in the Cruz residence.

Holmes opined that the detector should have sounded before Cruz was incapacitated by carbon monoxide.[67] According to Holmes, this assertion is based on the position of Cruz's head in relation to the position of the smoke detector and the heater.[68] Holmes also testified that the production of soot preceded the production of fatal levels of carbon monoxide.[69] When asked why Garcia saw no visible soot the night preceding Cruz's death, Holmes explains that "if [Cruz] used it before, he used it at a lower setting and then . . . the science would support that he turned the heater up to a higher — probably a higher position, but that he modified the position of the fuel being supplied."[70] The plaintiffs point out that Holmes will not testify regarding the design and operation of the smoke detector and that he will not testify that the quantity of soot produced should have caused the Cruz detector to alarm prior to the production of lethal concentrations of carbon monoxide. The Court is satisfied with the plaintiffs' position because in any event Holmes is not qualified to provide such testimony. Holmes did not use a valid scientific methodology to arrive to his conclusions, and he did not consider other alternative reasons to explain why no visible soot was present the night preceding Cruz's death, such as the gas pressure setting of the heater's gas valve or the decreasing amount of oxygen within the Cruz residence over time. Holmes also assumes,

---

[67]Holmes Deposition, pp. 215-216.
[68]Holmes Deposition, p. 216.
[69]Holmes Deposition, p. 219.
[70]Holmes Deposition, pp. 220-221.

without offering any scientific basis, that soot reached the detector in sufficient quantities to cause it to alarm before Cruz became incapacitated.  Because Holmes's conclusions are merely speculation and not scientifically reliable explanations, they constitute inadmissible expert testimony.

Holmes also conducted a series of tests identified as the "Holmes-Hardin" tests, for a case captioned *Ayala v. BRK*.[71]  These tests attempted to simulate a fire that occurred in a home that resulted from a lit cigarette on a sofa and purported to evaluate whether a specific model of BRK detectors would alarm in time to alert a sleeping resident of the fire before he was incapacitated.  The videotape of the Holmes-Hardin tests indicated that the detectors alarmed before the premises became untenable.  According to Holmes, the results showed that the Cruz detector itself is defective merely because the Cruz detector did not alarm.[72]  Nonetheless, the Holmes-Hardin tests are not relevant because there are substantial differences between the circumstances of the Ayala fire and the circumstances in this case; consequently, no scientifically valid conclusions may be drawn and applied here.  First, the Ayala fire involved an uncontrolled fire resulting from a lit cigarette.[73]  The Ayala smoke detector was also installed in a different location in the house than the Cruz detector and was located differently with reference to the smoke.[74]  Moreover, Ayala's home was larger than Cruz's residence, and the windows in the replica of the Ayala home were all closed unlike in the Cruz residence in which the living room window was slightly opened.[75]  Finally, the Ayala home had an HVAC system, which the Cruz home did not.[76]

Holmes further relied upon an experiment conducted by his assistant Terry Dees.  This test

---

[71]Holmes Deposition, pp. 95-96.
[72]Holmes Deposition, p. 201.
[73]Holmes Deposition, pp. 99-100.
[74]Holmes Deposition, pp. 100, 107.
[75]Holmes Deposition, p. 106.
[76]Holmes Deposition, p. 108.

was a six-and-a-half minute exercise in which Dees placed four battery-operated smoke detectors inside the flue vent located on the roof of his house in Dickinson, Texas, and waited to see whether the smoke detectors would alarm. Two of the detectors sounded an intermittent alarm while the other two did not alarm whatsoever.[77] Holmes stated that the purpose of the Terry Dees Flue Test was to recreate the effect of flue gases on an ionization smoke detector.[78] The test, however, is neither reliable nor relevant. Dees did not follow any known testing protocol other than to videotape the demonstration, and no measurements of smoke particulate or of obscuration levels were taken.[79] Dees also testified at his deposition that he did not know what caused the intermittent alarm, and he had no reason to believe that it was something other than the heat from the vent cap.[80] Lastly, this experiment is irrelevant because it did not involve soot emitted from a propane-fueled heater or soot produced as a result of the burning of liquid propane gas. It was also not conducted for the specific purpose of testing and evaluating the response time of smoke detectors.[81]

Finally, Holmes provided testimony that the detector failed to alarm. His conclusion is derived from investigating the scene, interviewing witnesses, and physically inspecting the battery and the detector.[82] While the testimony may be objectionable on other grounds, this Court considers Holmes to have sufficient experience and expertise to offer such testimony.

## IV.

In summary, the Court makes the following determinations: (1) The expert testimony proffered by Michael Schulz is not admissible; (2) E. Wayne McCain may only testify as to the

---

[77] Dees Deposition, p. 35, 37, 43; Holmes Deposition, pp. 115-116, 119.
[78] Holmes Deposition, p. 111.
[79] Holmes Deposition, p. 112, 114-115.
[80] Dees Deposition, pp. 35-38.
[81] Holmes Deposition, pp. 45, 89-90, 94.
[82] Holmes Deposition, p. 214.

22

operation of the space heater and his observations of the heater arising from his visual examination of it; (3) Dr. Morris Cranmer's testimony is limited to testimony related to the effect that the increasing levels of carbon monoxide had on Cruz over time; he may not provide testimony regarding Cruz's time of death; (4) Dr. Don Russell may testify as to the theory of fretting corrosion and his basis for that opinion; however, any testimony regarding the time at which the Cruz detector should have alarmed is beyond his province; (5) Dr. Jesse Aronstein may also testify as to the theory of fretting corrosion and his basis for that opinion; and (6) Douglas Holmes is solely permitted to testify that the detector failed to alarm; he may not testify regarding the Terry Dees Flue Test or the Holmes-Hardin tests; the design, operation, or defects of the Cruz detector; or the time at which the Cruz detector should have sounded.

IT IS therefore **ORDERED** that Defendant's BRK Brands, Inc., Motion to Exclude Plaintiffs' Experts (Docket No. 151) is **GRANTED IN PART** and **DENIED IN PART.**

DONE at Brownsville, Texas, this 17th day of June, 2002.

John Wm. Black
United States Magistrate Judge

Source: All Sources > / . . . / > $ US Court of Appeals Cases - 10th Circuit ⓘ
Terms: name(hollander and sandoz) (Edit Search)

*289 F.3d 1193; 2002 U.S. App. LEXIS 9066, \*;*
*CCH Prod. Liab. Rep. P16,324*

DEE **HOLLANDER** and DON **HOLLANDER,** Plaintiffs-Appellants, v. **SANDOZ**
PHARMACEUTICALS CORPORATION, a New Jersey corporation; **SANDOZ,** LTD., a foreign
corporation; and HCA HEALTH SERVICES OF OKLAHOMA, INC., an Oklahoma corporation,
d/b/a/ Presbyterian Hospital, Defendants-Appellees.

No. 00-6135

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

289 F.3d 1193; 2002 U.S. App. LEXIS 9066; CCH Prod. Liab. Rep. P16,324

May 10, 2002, Filed

**PRIOR HISTORY:  [\*1]**  APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA. (D.C. NO. 96-CV-756-T).

Hollander v. Sandoz Pharms. Corp., 95 F. Supp. 2d 1230, 2000 U.S. Dist. LEXIS 8776 (W.D.
Okla. 2000).

**DISPOSITION:** Affirmed in part and remanded.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, husband and wife, appealed from an order of the
United States District Court for the Western District of Oklahoma dismissing their
products liability action against defendants drug manufacturer and distributor which
alleged that a drug manufactured and distributed by the defendants caused the wife to
suffer an interacerebral hemorrage.

**OVERVIEW:** Plaintiffs challenged, inter alia, the district court's assessment of their
evidence that the drug (active ingredient, bromocriptine mesylate) caused the wife's
stroke. In particular, they challenged both the district court's application of Daubert to
exclude their expert opinion testimony and the district court's assessment of the record
absent that testimony, alleging that whether or not the experts were allowed to give
their ultimate opinion, there was sufficient evidence that a jury could find in plaintiffs'
favor on the issue of causation. The court of appeals disagreed and noted, inter alia, that
the district court did not exercise manifestly unreasonable judgment in concluding that
the plaintiffs' experts' opinions did not meet Daubert's scientific reliability standard as
those opinions were based on, inter alia, studies of the pharmacology of bromocriptine,
in which the plaintiffs' expert provided no details on the methodology or conclusions of
his studies. However, the court of appeals agreed that the claim against the drug's
Switzerland-based manufacturer should have been dismissed without prejudice to allow
the plaintiffs to pursue their claim in an appropriate forum.

**OUTCOME:** The district court's judgment against the plaintiffs was affirmed in all
respects except that the plaintiffs' claim against the defendant manufacturer based in
Switzerland was remanded with instructions to dismiss that claim without prejudice.

**CORE TERMS:** bromocriptine, stroke, hypertension, causation, reliability, reliable, animal,
scientific, ergot, postpartum, lactation, vasoconstriction, patient, differential diagnosis,

disease, blood pressure, alkaloid, methodology, federal district, scientific evidence, dopamine, seizures, incidence, dose, post-partum, unreliable, suppressant, summary judgment, differential, diagnoses

## CORE CONCEPTS - ◆ Show Concepts

**COUNSEL:** Steven R. Hickman (James E. Frasier with him on the briefs), of Frasier, Frasier & Hickman, LLP, Tulsa, Oklahoma, for the Plaintiffs-Appellants.

Grant J. Espisito of Mayer, Brown & Platt, New York, New York, for Defendant-Appellee Sandoz Limited; Joe G. Hollingsworth (Katherine R. Latimer and Kirby T. Griffis of Spriggs & Hollingsworth, Washington, D.C., for Defendant-Appellee Sandoz Pharmaceuticals Corporation; Richard M. Eldridge and Thomas E. Steichen of Eldridge Cooper Steichen & Leach, P.L.L.C., Tulsa, Oklahoma, for Defendants-Appellees Sandoz Pharmaceuticals Corporation and Sandoz Limited, with them on the brief).

David A. Branscum (Glenn D. Huff with him on the brief) of Foliart, Huff, Ottaway & Bottom, Oklahoma City, Oklahoma for the Defendant-Appellee HCA Health Services of Oklahoma, Inc.

**JUDGES:** Before EBEL and HENRY, Circuit Judges, and ROGERS, District Judge. *


* The Honorable Richard D. Rogers, United States District Judge for the District of Kansas, sitting by designation.

**OPINIONBY:** HENRY

**OPINION:**

**HENRY**, Circuit Judge.

Dee and Don Hollander filed this products liability action in the District Court for Oklahoma County alleging that Parlodel, **[*2]** a drug manufactured by Sandoz Pharmaceuticals Corporation ("Sandoz"), now known as Novartis Pharmaceuticals Corporation, and distributed by HCA Health Services of Oklahoma, Inc., doing business as Presbyterian Hospital ("Presbyterian Hospital"), caused Ms. Hollander to suffer an intracerebral hemorrhage shortly after she gave birth to the Hollanders' second child. After the Oklahoma County District Court dismissed the Hollanders' claim against Presbyterian Hospital, the remaining defendants removed the case to the federal district court.

The federal district court denied the Hollanders' motion to remand the case to state court. It rejected the Hollanders' arguments that it lacked jurisdiction over the remaining claims and that the defendants' removal petition was untimely. Subsequently, the federal district court dismissed the defendant Sandoz, Ltd. with prejudice, reasoning that the holding company had its principal place of business in Switzerland and that the court lacked personal jurisdiction over it.

Finally, applying Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), the federal district court ruled that **[*3]** the Hollanders' expert testimony regarding the causal connection between Parlodel and intracerebral hemorrhages lacked the necessary reliability and was therefore inadmissible. See Hollander v. Sandoz Pharms. Corp., 95 F. Supp. 2d 1230, 1238-39 (W.D. Okla. 2000). As a result, the court granted summary judgment to Sandoz.

The Hollanders now appeal those rulings, arguing that: (1) the federal district court lacked subject matter jurisdiction and therefore erred in denying their motion to remand the case to

the Oklahoma state court; (2) the court erred in dismissing their claim against the defendant Presbyterian Hospital; (3) the court abused its discretion in ruling that the testimony of their experts was not sufficiently reliable to be admissible; (4) the court erred in granting summary judgment to Sandoz; and (5) the district court erred in dismissing their claim against Sandoz, Ltd., with prejudice.

For the reasons set forth below, we conclude that the federal district court had subject matter jurisdiction. We further hold that the court did not abuse its discretion in finding that the Hollanders' expert testimony was not sufficiently reliable and that the court **[*4]** did not err in granting summary judgment to Sandoz. However, we agree with the Hollanders that the federal district court should have dismissed their claim against Sandoz, Ltd., without prejudice. In light of these conclusions, we do not address the Hollanders' challenge to the dismissal of their claim against Presbyterian Hospital.

Accordingly, we affirm the district court's judgment against the Hollanders and in favor of Presbyterian Hospital and Sandoz. We remand the Hollanders' claim against Sandoz, Ltd., so that it may be dismissed without prejudice.

## I. BACKGROUND

On July 23, 1990, Ms. Hollander gave birth by cesarean section to a healthy baby boy at Presbyterian Hospital in Oklahoma City. Because Ms. Hollander did not want to breast feed her son, her obstetrician prescribed a fifteen day course of Parlodel, to be taken in two 2.5 mg doses per day.

Parlodel is manufactured by Sandoz. The drug's active ingredient is bromocriptine mesylate, a compound derived from ergot (a naturally occurring substance made from a fungus that attacks cereal grains). The compound blocks the production of prolactin, a hormone that triggers the secretion of milk in postpartum women. **[*5]** The Federal Drug Administration (FDA) approved Parlodel for the suppression of post-partum lactation in 1980, and approximately 9 million women in the United States have taken it for that purpose. See Siharath v. Sandoz Pharms. Corp., 131 F. Supp. 2d 1347, 1349 (N.D. Ga. 2001) (discussing the history of Parlodel). Parlodel is also prescribed for several other disorders, including acromegaly (a disease caused by hypersecretion of the pituitary growth hormone), Parkinson's disease, and various diseases involving the excessive production of prolactin.

Ms. Hollander received her first dose of Parlodel at 6:00 p.m. on July 23, 1990. About two hours later, her blood pressure increased sharply to 180/90. On the following day, she received her second and third doses of Parlodel, and her blood pressure returned to the normal range. She continued to take two 2.5 mg doses of the drug each day. Presbyterian Hospital discharged her on July 27, 1990.

On the evening of July 28, 1990, Ms. Hollander complained of a severe headache. By the following morning, she could neither speak nor move her right side. At Presbyterian Hospital, a CT scan revealed that Ms. Hollander had suffered **[*6]** an intracerebral hemorrhage in the left basal ganglia area of her brain. Ms. Hollander's treating physicians were puzzled as to the cause. One of them noted that her stroke resembled those caused by hypertension but added that Ms. Hollander had no history of the disorder. Clinical information revealed no pregnancy-related disorders involving hypertension, such as eclampsia or preeclampsia. n1

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n1 Preeclampsia involves the "development of hypertension with albuminuria or edema between the 20th week of pregnancy and the end of the 1st week postpartum." The Merck Manual, § 18 at 2057 (17th ed. 1999). "Albuminuria" refers to "the presence in the urine of serum albumin." Dorland's Illustrated Medical Dictionary at 42 (28th ed. 1994). Eclampsia involves "convulsive seizures or coma without other etiology occurring in the same time

period." The Merck Manual, § 18 at 2057.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

On August 1, 1990, Ms. Hollander's condition deteriorated. As a result, her physicians performed an emergency left frontal craniotomy **[*7]** and removed an intracerebral hematoma. Ms. Hollander slowly improved. She remained in the hospital for over three weeks and then transferred to a rehabilitation center.

The Hollanders filed this action against Sandoz, Sandoz, Ltd., and Presbyterian Hospital in May 1995 in the District Court for Oklahoma County. They alleged that Ms. Hollander's stroke was caused by Parlodel, that the drug was unreasonably dangerous to the ordinary consumer when used as a lactation suppressant, and that Sandoz, Sandoz, Ltd., and Presbyterian Hospital had failed to warn of the dangers of the drug. They further alleged that Ms. Hollander had suffered permanent injuries.

Presbyterian Hospital filed a motion to dismiss the Hollanders' claims, arguing that a hospital could not be held strictly liable for providing a drug prescribed by a doctor. The Oklahoma County District Court granted Presbyterian Hospital's motion to dismiss in an oral ruling at an August 25, 1995 hearing. It issued a written ruling on May 10, 1996.

Sandoz filed a notice of removal on May 10, 1996. The Hollanders then filed a motion to remand the case to the Oklahoma state court, which the district court denied. See Aplt's App. **[*8]** vol. I, at 116-17 (District Court Order, filed June 12, 1996). Subsequently, the court dismissed the Hollanders' claims against Sandoz, Ltd., reasoning that it was a holding company incorporated in Switzerland with its principal place of business there, that it had no office, manufacturing, distribution, or sales facilities in the United States, and that it did not advertise here. As a result, the court concluded that it lacked personal jurisdiction over Sandoz, Ltd., and it dismissed with prejudice the claims against the company. See id. at 354 (District Court Order, filed Dec. 17, 1996).

The dispute between the Hollanders and Sandoz involves issues that have been raised in other litigation as well as in regulatory proceedings. See Kuhn v. Sandoz Pharms. Corp., 270 Kan. 443, 14 P.3d 1170, 1174 (Kan. 2001) (describing a "decade-long disagreement between Sandoz and the [FDA] concerning the use of Parlodel for the prevention of physiologic lactation"). In 1984 (four years after first approving the drug as a lactation suppressant), the FDA reported that "the labeling of Parlodel (bromocriptine) is being revised to reflect reports of postpartum hypertension, seizures, **[*9]** and cerebrovascular accidents." Aplt's App. vol. IV-B, at 2401-02 (FDA Drug Bulletin, vol. 14, no. 1, at 3-4). The FDA explained that it had received seven reports of hypertension alone, seven reports of seizures, and three cases of cerebrovascular accidents (including one fatality). Because approximately 500,000 women had used Parlodel to suppress postpartum lactation, however, the significance of those reports was difficult to assess. The FDA expressly acknowledged that "[a] cause and effect relationship has not been established." Id.

Sandoz eventually modified the Parlodel package insert to include information about these cases. However, the company noted that hypertension, seizures, strokes, and myocardial infarctions regularly occur in postpartum women who are not treated with bromocriptine. Thus, it maintained, "the number of cases reported to Sandoz is less that one would expect even in the absence of any drug effect." Id. at 2448 (Letter from Sandoz's Executive Director of Sales, Aug. 20, 1987).

Over the next few years, the FDA continued to receive reports of adverse reactions to Parlodel. Sandoz commissioned a study by Epidemiologic Resources, Inc., regarding **[*10]** the relationship between Parlodel and strokes and seizures (the "ERI study"). See Aplt's App. vol. II-D, at 1361-1532 (Kenneth Rothman, et al., "An Epidemiologic Evaluation of the Possible Relation Between Bromocriptine, Puerperal Seizures and Strokes," (Sept. 30,

1988)); n2 Siharath, 131 F. Supp. 2d at 1356-57 (discussing the ERI study). Although the
ERI study did not find a causal connection between strokes and seizures, the FDA concluded
that the study failed to allay concerns regarding the drug's association with seizures and
involved too few individuals to adequately characterize the risk of stroke.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 The purpureum is "the period from the end of the third stage of labor until the involution
of the uterus is complete, usually lasting 3 to 6 weeks." Dorland's Illustrated Medical
Dictionary at 1386.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

The FDA further concluded that the possibility that Parlodel might cause serious adverse
reactions in some patients outweighed the limited benefits associated with its use. As a
result, **[*11]** it requested all manufacturers to remove the indication for lactation
suppression from the Parlodel label. Initially, Sandoz refused to comply with the FDA's
request, arguing that Parlodel should not be used routinely but should be available in specific
circumstances recommended by physicians. Not satisfied with this position, the FDA initiated
formal procedures for withdrawing its prior approval for the labeling of Parlodel. The FDA
explained its position as follows:

> FDA now has new information suggesting that therapeutic use of bromocriptine
> for the prevention of physiological lactation may lead to serious adverse
> experiences, including death and paralysis, in a small but significant number of
> patients. Patients at high risk of experiencing these serious adverse experiences
> cannot be adequately predetermined. In light of the limited benefit of using
> bromocriptine for the prevention of lactation, and the effectiveness and lack of
> serious adverse effects of conservative treatments such as breast binding with or
> without mild analgesics, the risk that bromocriptine may cause a serious adverse
> effect in a postpartum woman is unacceptable.

> Accordingly, the Director concludes that **[*12]** the potential risks associated
> with the use of bromocriptine for the prevention of physiological lactation
> outweigh its limited benefits and bromocriptine is no longer shown to be safe for
> use in preventing physiological lactation.

59 Fed. Reg. 43347, 43351 (Aug. 24, 1994). Sandoz then agreed to FDA's proposal to
withdraw the indication for the suppression of postpartum lactation.

Following the FDA's approval of Parlodel as a lactation suppressant, professional medical
journals began to publish reports regarding women who had suffered heart attacks and
strokes after taking the drug. For example, one of the Hollanders' expert witnesses described
two patients who had suffered from cardiac dysfunction, seizures, and cerebral vasospasm.
See Kenneth Kulig, "Bromocriptine Associated Headache: Possible Life Threatening
Sympathomimetic Intersection," Obstetrics and Gynecology, 72: 941 (1991) (Aplt's App. vol.
IV-B, at 2444-46). Another expert published case histories concerning women who had
suffered from heart attacks. See, e.g., Leslie Iffy, et al., "Acute Myocardial Infarction in the
Puerperium in Patients Receiving Bromocriptine," American Journal of **[*13]** Obstetrics and
Gynecology, vol. 155, No. 2, at 371-72 (1986) (Aplt's App. vol. IV-D, at 2976-77). Medical
researchers also published numerous articles reporting the effects of bromocriptine in
animals. See Siharath, 131 F. Supp. 2d at 1366-69 (discussing animal studies), Glastetter v.
Novartis Pharms. Corp., 107 F. Supp. 2d 1015, 1037-1041 (E.D. Mo. 2000) (same), aff'd,
252 F.3d 986, 991 (8th Cir. 2001). Some of the studies involved dogs, rats, and pithed

animals. See id.; see also Aplt's App. vol. I-A, at 369-376 (Sandoz's statement of material facts, filed July 15, 1999) (discussing animal studies). Some researchers concluded that, contrary to the Hollanders' allegations regarding the effect of bromocriptine on Ms. Hollander, the drug actually decreases blood pressure. See, e.g, Saad Lahlou & Pierre Demenge, "Contribution of Spinal Dopamine Receptors to the Hypotensive Action of Bromocriptine in Rats," Journal of Cardiovascular Pharmacology, vol. 18, 317-323 (1991) (Aplt's App. vol. II-E, at 1646-54).

As the discussion in the scientific literature continued, the controversy over Parlodel made its way to the courts. **[*14]** In 1994, a Kentucky jury awarded $968,512 in compensatory damages and $1,000,000 in punitive damages to a woman who alleged that Parlodel had caused her stroke. See Aplt's App. vol. IV-A, at 2171 (Judgment in Roberts v. Betts, no. 89-CI-653-V, 25th Judicial Dist., Pulaski Cir. Ct., July 20, 1994). A Kentucky appellate court affirmed that judgment in an unpublished opinion. See id. at 2175-78. In contrast to the Roberts case, several recent decisions have rejected claims that Parlodel has caused strokes and heart attacks when prescribed as a post-partum lactation suppressant, concluding that the scientific evidence supporting these claims was not sufficiently reliable under Daubert. n3 However, several other decisions have reached the opposite conclusion. n4 See generally Mark Hansen, "When Expert Testimony Fails the Test: District Courts Disagree on what Defines Causation Evidence in Drug Disability Cases," 88 ABA Journal 22 (Jan. 2002) (stating that "[an] Alabama magistrate's decision brought to eight the number of products liability suits over Parlodel that have survived a so-called Daubert challenge to the admissibility of the plaintiffs' **[*15]** causation evidence but [an] Illinois judge's ruling--tantamount to an order of summary judgment for the defense--marked the seventh trial or appellate decision to exclude such evidence").

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 See Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 989 (8th Cir. 2001); Caraker v. Sandoz Pharms. Corp., 172 F. Supp. 2d 1046 (S.D. Ill. 2001); Siharath, 131 F. Supp. 2d 1347 (N.D. Ga. 2001); Brumbaugh v. Sandoz Pharms. Corp., 77 F. Supp. 2d 1153, 1155, (D. Mont. 1999).

n4 See Brasher v. Sandoz Pharms. Corp., 160 F. Supp. 2d 1291 (N.D. Ala. 2001); Globetti v. Sandoz Pharms. Corp., 111 F. Supp. 2d 1174 (N.D. Ala. 2000); Aplt's App. vol. V, at 3184-3213 (Tr. of unpublished ruling in Kittelson v. Sandoz Pharms. Corp., No. 98-2277 (D. Minn. March 2, 2000) (denying motion to exclude scientific testimony as unreliable); Kuhn, 270 Kan. 443, 14 P.3d 1179-85 (applying the test for admissibility set forth in Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C. Cir. 1923) and concluding that there were genuine issues of material fact as to whether Parlodel caused a patient's death).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*16]**

In support of their contention that Parlodel caused Ms. Hollander's stroke, the Hollanders relied primarily on the testimony of three experts: (1) Dr. Kenneth Kulig, a physician who is board-certified in toxicology and emergency medicine and who has served as the Chairman of the Pharmacy and Therapeutics Committee and Director of the Porter Regional Toxicology Center at Porter Adventist Hospital in Denver, Colorado, and as an associate clinical professor in the Division of Emergency Medicine and Trauma in the Department of Surgery at the University of Colorado Health Sciences Center; (2) Dr. Leslie Iffy, M.D., a professor in the Department of Obstetrics and Gynecology of the University of Medicine and Dentistry of New Jersey; and (3) Dr. Pedro A. Jose, M.D., Ph.D., a Professor of Pediatrics, Physiology, and Biophysics at Georgetown University and an expert on the role of dopamine and dopaminergic drugs on the development of hypertension.

The parties offered deposition testimony, affidavits, expert reports, and transcripts of testimony from other cases involving Parlodel. In general, the experts' theory was that in

certain women, Parlodel causes vasoconstriction (a narrowing of the **[\*17]** blood vessels) and hypertension (high blood pressure). Vasoconstriction and hypertension, the experts reasoned, can then cause strokes, as they did in the case of Ms. Hollander.

In his written report, Dr. Kulig explained that he had reviewed Ms. Hollander's medical records, medical literature regarding bromocriptine and other ergot alkaloids, FDA documents, and marketing, promotional and research material complied by Sandoz. He concluded that Ms. Hollander suffered "an intracerebral hemorrhage secondary to ergot induced vasospasm resulting in blood vessel rupture in her brain." Aplt's App. vol. II-A, at 652 (Dr. Kulig's Sept. 22, 1998 report, at 3). He added, "It is my opinion with a reasonable degree of medical certainty that Mrs. Hollander's stroke was caused by the drug bromocriptine, and had the patient not been taking the drug, she would not have had a stroke." Id. at 653. According to Dr. Kulig, the fact that bromocriptine could cause strokes was well know to Sandoz at the time that Ms. Hollander began taking the drug. Id. at 652.

In an affidavit in another case involving Parlodel, Dr. Kulig provided a more detailed explanation as to how he had reached his conclusions. **[\*18]** See Aplt's App. vol. II-E, at 1742-59 (Dr. Kulig's affidavit in Railey v. Novartis Pharmaceuticals Corp., 94-1440 (C.D. Ill.)). He noted that bromocriptine is an ergot, "a class of drugs with known molecular structures and many common properties," including the tendency to cause vasoconstriction. See id. at 1745 (stating that "one needs only to look at the package inserts from Sandoz regarding other ergot alkaloids it manufactures to understand that vasoconstriction is indeed the core property of ergot alkaloids"). Bromocriptine differs from the naturally occurring ergot alkaloid alpha ergocriptine only in that the molecule has an additional bromine atom attached to the second carbon atom of the basic ergot ring. See id.

Dr. Kulig explained the significance of the structural differences between bromocriptine and other ergot alkaloids as follows:

> Although the adding of a bromine atom to the core nucleus makes the drug in some patients a vasodilator (the first dose may cause a precipitous fall in blood pressure, another fact that makes the drug unsafe in the post-partum period), it is misleading and inaccurate to suggest that the drug can never cause vasoconstriction **[\*19]** or hypertension in any person. While the addition of a bromine atom to a very large organic molecule may change the pharmacokinetics and pharmacological dynamics of a drug, it would be unlikely to change the core properties of an ergot alkaloid from being a vasoconstrictor to a vasodilator in all cases. Clinical studies, epidemiologic evidence and adverse drug reaction experience with this drug indicates that vasoconstriction with bromocriptine unquestionably occurs, as would be expected based on the fact that it is an ergot that can cause ergotism.

Id. at 1745-46.

Dr. Kulig also discussed several other categories of evidence on which he had relied in forming his opinion. These included the pharmacological and toxicological properties of bromocriptine, studies of the relationship between bromocriptine and hypertension, and case reports concerning adverse reactions.

As to pharmacology, Dr. Kulig explained that bromocriptine is "a dopamine agonist." Id. In other words, the drug stimulates the release of dopamine, a neurotransmitter. Dr. Kulig added that bromocriptine is also a "dopamine-1 antagonist," inhibiting the effects of dopamine at specific "D-1" receptors. **[\*20]** Id. According to Dr. Kulig, dopamine is a well known vasoconstrictor. However, activation of the "D-1" dopamine receptors results in

vasodilation. Thus, the fact that bromocriptine stimulates the release of dopamine and that it inhibits the D-1 dopamine receptors is consistent with the drug causing vasoconstriction.

Moreover, Dr. Kulig reported that bromocriptine "has a very long beta elimination half-life of about 50 hours." Id. at 1747. That means that a steady state is not achieved in someone taking the drug twice a day until about ten days after leaving the hospital. As a result, one would not expect women who have taken the drug to suppress post-partum lactation to develop hypertension and vasospasm until after their discharge from the hospital.

With regard to hypertension, Dr. Kulig referred to three studies. In the first, commissioned by Sandoz, nineteen percent of patients demonstrated increases in blood pressure after taking bromocriptine. In the second study, published by the FDA in 1984, six out of seven patients who developed hypertension while on bromocriptine regained normal blood pressure after they stopped taking the drug. Finally, a study by Dr. Dorothy Watson **[\*21]** n5 found that women with pregnancy-induced hypertension had a higher incidence of post-partum hypertension after taking the drug than those women not receiving bromocriptine. See id. at 1748-49 (stating that "this case control study provides important evidence that bromocriptine causes post-partum hypertension in women who had pregnancy-induced hypertension prior to delivery").

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 Watson, D.I., et al., "Bromocriptine Mesylate for Lactation Suppression: A Risk for Postpartum Hypertension?" Obstetrics and Gynecology, 74(4): 573-576 (1989) (Aplt's App. vol. II-D, at 1596-97).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Finally, Dr. Kulig discussed the adverse reactions to bromocriptine that had been spontaneously reported to the FDA and Sandoz. These reactions included hypertension, seizures, strokes, and myocardial infarction. Although he acknowledged that these reports did not establish causation, he presented them as an important factor to be considered along with the other scientific evidence.

In addition to Dr. Kulig, the Hollanders also relied **[\*22]** on the opinion of Dr. Leslie Iffy. See Aplt's App. vol. II-A, at 733-739 (Dr. Iffy's written report, July 25, 1997). Dr. Iffy concluded that there was "an overwhelming probability" that Ms. Hollander's stroke was caused by bromocriptine. Id. at 738. He listed five factors that supported his opinion: (1) Ms. Hollander had normal blood pressure during a prior pregnancy but displayed an episode of hypertension when she took Parlodel during her first childbirth; (2) she suffered episodes of hypertension during her second pregnancy and immediately after the birth of her second child; "this being the case, she was predisposed for the hypertensive effect of bromocriptine"; (3) when she took Parlodel after the second pregnancy, her blood pressure increased, "in all probability a bromocriptine effect"; (4) "the time of occurrence of the cerebral hemorrhage (sixth day postpartum) was highly characteristic of bromocriptine related catastrophic side effects"; and (5) "apart from her moderate smoking habit, the patient had no identifiable predisposing factors for cerebral hemorrhage[;] the absence of evidence of congenital defect at the site of the hemorrhage further emphasizes the lack **[\*23]** of predisposing factors on the part of the patient." Id. Dr. Iffy added that, in his view, Sandoz was aware of the dangers of Parlodel at the time that Ms. Hollander suffered her stroke. See id. at 739.

The third expert on whom the Hollanders relied--Dr. Pedro Jose--set forth a more specific theory of causation. In his written report, Dr. Jose stated, "I think that the hypertension (which caused the stroke) is probably due to Parlodel; the hypertension would not have happened if Parlodel was not prescribed." Aplt's App. vol. II-A, at 842 (Dr. Jose's report, Jan. 23, 1998). Dr. Jose acknowledged that bromocriptine often decreases blood pressure. However, in deposition testimony he explained that in instances in which extra-cellular fluid

volume is increased--as is the case in pregnancy--and in which the activity of the sympathetic nervous system is decreased, bromocriptine has the "paradoxical effect of increasing blood pressure." Id. at 801.

After conducting discovery, Sandoz filed a motion to exclude the opinion testimony offered by the Hollanders' experts on the grounds that the testimony was insufficiently reliable under Daubert. In the same motion, Sandoz requested **[*24]** the court to grant summary judgment in its favor. It argued that, in the absence of the unreliable opinion testimony, the Hollanders could not demonstrate that there were controverted issues of material fact on the issue of whether Parlodel caused Ms. Hollander's stroke.

The federal district court granted Sandoz's motion to exclude the Hollanders' expert testimony as well as its motion for summary judgment. See Hollander, 95 F. Supp. 2d at 1235-39. The court set forth four reasons in support of its evidentiary ruling.

First, the court observed that the Hollanders' experts were unable to explain the physiological mechanism by which Parlodel caused vasoconstriction and ensuing hypertension and strokes. The court explained that "Dr. Kulig could only list possible mechanisms for Parlodel causing hypertension," that "Dr. Jose could not cite any studies or tests that proved his hypothesis that bromocriptine might cause high blood pressure," and that "Dr. Iffy also classified his opinion that Parlodel caused Mrs. Hollander's stroke as being a hypothesis, which is not held by a medical degree of certainty." See id. at 1235-36 (internal quotation marks omitted). **[*25]**

Second, the court reasoned that the kinds of case reports on which the Hollanders relied have been repeatedly rejected as a scientific basis for establishing causation. It stated: "The problems with case reports and adverse drug experience reports were acknowledged by Dr. Iffy--because they are not controlled studies and do not eliminate confounding variables, the reported effect or injury could be due to some other cause than Parlodel." See id. at 1237.

Third, the court found that the fact that bromocriptine belongs to a class of compounds (ergot alkaloids) that have been shown to cause hypertension did not constitute reliable causation evidence. The court observed that the Hollanders had failed to refute Sandoz's evidence that "the chemical diversity of ergot alkaloids corresponds to the diversity of the biological activities of these compounds." Id. at 1238 (internal quotation marks and emphasis omitted).

Fourth, the animal studies on which the Hollanders' experts relied were too dissimilar to the facts of this case. "The studies relied upon involved different drugs, did not test the systemic effect of the drug, some of the animals were anaesthetized, **[*26]** and they were neither pregnant nor post-partum. . . . Doctors Jose and Kulig were unaware of any controlled animal studies in which bromocriptine caused an increase in blood pressure." Id. at 1238 (internal citations omitted).

In light of its conclusion that the Hollanders' opinion testimony was insufficiently reliable under Daubert, the district court briefly assessed the state of the record absent that testimony. It concluded that, without expert opinion testimony, the Hollanders could not demonstrate that Parlodel caused Ms. Hollander's stroke. The court therefore granted Sandoz's motion for summary judgment.

## II. DISCUSSION

In this appeal, the Hollanders primarily challenge the district court's assessment of their evidence that Parlodel caused Ms. Hollander's stroke. In particular, they challenge both the district court's application of Daubert to exclude their expert opinion testimony and the district court's assessment of the record absent that testimony. They maintain that "whether or not the experts are allowed to give their ultimate opinion, there is sufficient evidence that

a jury could find in [their] favor on the issue of causation." Aplt's **[*27]** Br. at 28. The Hollanders also present several other challenges to the district court's rulings.

We begin our analysis by addressing the Hollanders' argument that the district court lacked subject matter jurisdiction and therefore erred in denying their motion to remand the case to the Oklahoma state court. Because we conclude that the federal district court had subject matter jurisdiction, we then turn to the Hollander's arguments regarding scientific evidence. Finally, we address their argument that the district court erred in dismissing their claims against Sandoz, Ltd., with prejudice.

A. Jurisdiction

Focusing on several alleged defects in the removal procedure, the Hollanders argue that the federal district court erred in denying their motion to remand. As a result, they contend, that court lacked jurisdiction to adjudicate the case, and the judgment in favor of the defendants should be vacated so that the case may be heard in the Oklahoma state court.

In light of the Supreme Court's decision in Caterpillar, Inc. v. Lewis, 519 U.S. 61, 136 L. Ed. 2d 437, 117 S. Ct. 467 (1996), we need not address the Hollanders' specific arguments. In Caterpillar **[*28]** , the Court held that "a district court's error in failing to remand a case improperly removed is not fatal to the ensuing adjudication if federal jurisdictional requirements are met at the time judgment is entered." 519 U.S. at 64; see also Feichko v. Denver & Rio Grande W. R.R. Co., 213 F.3d 586, 590-91 (10th Cir. 2000) (discussing Caterpillar). The Court reasoned that, despite deficiencies in the removal process, "[to] wipe out the adjudication postjudgment, and return to state court a case now satisfying the federal jurisdictional requirements, would impose an exorbitant cost on our dual court system, a cost incompatible with the fair and unprotracted administration of justice." Caterpillar, 519 U.S. at 77.

Here, as the defendants observe, complete diversity existed between the remaining parties at the time that the federal district court entered judgment: the Hollanders resided in Arkansas and the defendant Sandoz was a Delaware corporation with its principal place of business in New Jersey. Thus, the alleged deficiencies in the removal procedure do not divest the district court of subject matter jurisdiction. We therefore proceed **[*29]** to the merits.

B. Admissibility of the Hollanders' Experts' Testimony Under Daubert

Rule 702 of the Federal Rules of Evidence provides:

> if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In Daubert, the Supreme Court concluded that Rule 702 superseded the "general acceptance" standard for the admissibility of scientific evidence first set forth in Frye, 293 F. at 1014. n6 Under Daubert, when faced with a proffer of expert scientific testimony, a district court "must determine at the outset, pursuant to [Fed. R. Evid.] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or



determine **[*30]** a fact in issue." Daubert, 509 U.S. at 592. Thus, under Daubert, the district court performs an important gatekeeping role in assessing scientific evidence. See Macsenti v. Becker, 237 F.3d 1223, 1230-34 (10th Cir. 2001) (discussing the district court's gatekeeping function under Daubert).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 The Frye test required district courts to exclude evidence when the underlying scientific principles were not "sufficiently established to have gained general acceptance in the particular field in which [they belong]." Frye, 293 F. at 1014.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The Daubert standard ensures that the proffered evidence is both "reliable" and "relevant." See Daubert, 509 U.S. at 589. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592-93. Relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." Id. at 593. **[*31]**

We review the district court's application of Daubert to exclude expert opinion evidence for an abuse of discretion. See General Electric v. Joiner, 522 U.S. 136, 143, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997); Mitchell v. Gencorp Inc., 165 F.3d 778, 780 (10th Cir. 1999). Thus, we must afford substantial deference to the district court's application of Daubert. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999) ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"); Joiner, 522 U.S. at 143 (noting that the court of appeals "failed to give the trial court the deference that is the hallmark of abuse-of-discretion review"). Under the abuse of discretion standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." McEwen v. City of Norman, Okla., 926 F.2d 1539, 1553-54 (10th Cir. 1991); **[*32]** see also Summers v. Missouri Pacific R.R. System, 132 F.3d 599, 603 (10th Cir. 1997) (stating that, under the abuse of discretion standard, "we will not disturb the trial court's determination "absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment").

Here, the Hollanders focus on the district court's application of the "reliability" prong of the Daubert inquiry. They invoke two methods of causation analysis: one promulgated by Sandoz's Drug Monitoring Center and the other set forth by a professor of medical statistics, Sir Austin Bradford Hill. See Aplt's App. vol. IV-B, at 2378-79 (Sandoz's classifications of evidence of causation); vol. IV-D, at 2949-52 (Bradford Hill, "The Environment and Disease: Association or Causation?," Proceedings of the Royal Society of Medicine, vol. 58 no. 5 (May 1965)). n7

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 Under the Sandoz scheme, there are four main categories of causation: (a) not related; (b) remote; (c) probable; and (d) definite. The Hollanders focus on the standard for "probable" causation.

An adverse reaction is considered to be "probably related to a drug" if the reaction: (1) "occurs within a reasonable time interval following the administration of the drug"; (2) "could not readily be attributed to the patient's clinical condition/underlying disease, concomitant therapy, or to environmental or toxic factors"; (3) "follows a known pattern of response to the drug"; and (4) "disappears or improves following cessation of treatment or dose reduction." See Aplt's App. vol. IV-B, at 2378-79.

Sir Bradford Hill sets forth nine factors that should be considered "before deciding that the most likely interpretation [of the association] is causation." These factors are: strength, consistency, specificity, temporality, dose response, biological plausibility, coherence, experimental evidence and analogy. See Aplt's App. vol. IV-D, at 2949-52 (Bradford Hill paper); vol. II-E, at 1751-55 (Dr. Kulig's affidavit). Dr. Kulig applies the Bradford Hill criteria in reaching his opinion that Parlodel caused Ms. Hollander's stroke.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*33]**

Relying primarily on Dr. Kulig's testimony, the Hollanders maintain that his opinion that Parlodel caused Ms. Hollander's stroke comports with these general standards of causation analysis. Accordingly, they reason, Dr. Kulig's testimony is sufficiently scientific to be admissible under Daubert. See Aplt's Br. at 24 ("It cannot be gainsaid that Dr. Kulig's methodology--how he takes the information available and analyzes it in a scientific manner-- is good science and would be helpful to a jury of laymen.").

Additionally, the Hollanders note that Dr. Kulig criticized some of Sandoz's own evidence on scientific grounds. They point to his testimony that the studies invoked by Sandoz do not demonstrate that there is an increased risk of stroke in the post-partum period generally. As a result, they maintain, the evidence is disputed as to whether Ms. Hollander's stroke may be explained by this generally increased risk during the post-partum period, as Sandoz contends, rather than by her taking Parlodel.

Finally, the Hollanders contend that Drs. Kulig, Iffy, and Jose applied the methodology generally employed by experts in the relevant fields. Thus, by relying on scientific principles, **[*34]** professional publications, animal studies, differential diagnoses, and case reports, these experts did what Daubert requires: they grounded their conclusions in "the methods and procedures of science" rather than "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590.

In order to assess the Hollanders' argument, we begin with an overview of the standards for reliability under Daubert and its progeny. Then we turn to an examination of the scientific opinion evidence at issue here.

1. Scientific Reliability Under Daubert

Under Daubert's reliability prong, "an inference or assertion must be derived by the scientific method . . . [and] must be supported by appropriate validation--i.e. 'good grounds,' based on what is known." Id. The Supreme Court listed four nonexclusive factors that the trial court may consider in assessing reliability: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling **[*35]** the technique's operation; and (4) whether the theory has been accepted in the scientific community. See id.

The list is not exclusive, and district courts applying Daubert have broad discretion to consider a variety of other factors. See Kumho Tire, 526 U.S at 150 ("We can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue."). Generally, the district court should focus on the experts' methodology rather than the conclusions that they generate. See Daubert, 509 U.S. at 595. However, the experts' conclusions are not immune from scrutiny: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Joiner, 522 U.S. at 147 ("Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Regardless **[*36]** of the specific factors at issue, the purpose of the Daubert inquiry is always the same: "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." n8 Kumho Tire, 526 U.S. at 152. n9

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 As Justice Breyer has observed, the requirement that the district court assess reliability and relevance under Daubert "will sometimes ask judges to make subtle and sophisticated determinations about scientific methodology and its relation to the conclusions an expert witness seeks to offer--particularly when a case arises in an area where the science itself is tentative or uncertain, or where testimony about general risk levels in human beings or animals is offered to prove individual causation." Joiner, 522 U.S. at 147-48 (Breyer, J., concurring). Even though judges usually do not have the formal scientific training to assist them in making these decisions, there are Rules of Evidence and Civil Procedure that may assist them in making the necessary determinations. "Among these techniques are an increased use of pretrial conference authority [pursuant to Fed. R. Civ. P. 16] to narrow the scientific issues in dispute, pretrial hearings where potential experts are subject to examination by the court, and the appointment of special masters and specially trained law clerks." Id. at 149 (citations omitted). **[*37]**

n9 Judge Posner has expressed a similar view. "When the Supreme Court in Daubert told judges to distinguish between real and courtroom science, it was not with the object of discovering the essence of "science," if there is such an essence. The object . . . was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." Rosen v. C-G Corp., 78 F.3d 316, 318 (7th Cir 1996).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -


2. The Hollanders' Scientific Evidence

We assess the Hollanders' challenge to the district court's Daubert ruling by examining the opinions of their three primary experts: Drs. Kulig, Iffy, and Jose. As to each expert, we must assess the grounds that they provide for their opinion that Parlodel causes stroke, asking whether those grounds involve "the methods and procedures of science," Daubert, 509 U.S. at 590, and "the level of intellectual rigor of the expert in the field." Kumho Tire, 526 U.S. at 152.

In doing so, we note that the scope of our review is quite narrow: **[*38]** we may reverse the district court's ruling only if we conclude that it abused its discretion in applying Daubert to exclude opinions of the Hollanders' experts. Because the district court has discretion to consider a variety of factors is assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. See McEwen, 926 F.2d at 1553-54 (discussing appellate review for an abuse of discretion). Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results. See generally Federal Judicial Center, Reference Manual on Scientific Evidence 27 (2d ed. 2000) (observing that, in light of the abuse of discretion standard of review for Daubert determinations **[*39]** of reliability, "in theory judges are free to select different procedures and apply different factors to a particular expert or type of

expertise than their colleagues do in the same district or circuit" and that "as a consequence, similar cases could be resolved differently on the basis of inconsistent determinations about admissibility"); see also Brasher, 160 F. Supp. 2d at 1298 n.17 (observing that the Eighth Circuit's decision in Glastetter, 252 F.3d at 989-92, affirming the exclusion of Parlodel evidence as unreliable "does not necessarily [establish] that an inconsistent holding by this court would constitute an abuse of discretion"). n10

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 Conflicting decisions in the district courts regarding the reliability of opinion testimony about Parlodel further illustrate this point. Compare Siharath, 131 F. Supp. 2d 1347 (evidence regarding Parlodel's adverse effects unreliable); and Brumbaugh, 77 F. Supp. 2d 1153 (same); with Brasher, 160 F. Supp. 2d 1291 (Parlodel evidence reliable); and Globetti v. Sandoz Pharms., Corp., 111 F. Supp. 2d 1174 (N.D. Ala. 2000) (same).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*40]**

a. Similarity to other ergot alkaloids

We begin our analysis with Dr. Kulig's testimony that bromocriptine is an ergot alkaloid. According to Dr. Kulig, this fact supports his theory that bromocriptine causes vasoconstriction.

As the district court observed, neither Dr. Kulig nor the Hollanders' other experts disputed the fact that bromocriptine has a different chemical structure than ergot alkaloids known to cause vasoconstriction. Moreover, neither Dr. Kulig nor the Hollanders' other experts disputed the scientific literature stating that small differences in chemical structure may produce substantial differences in physiological effects.

In light of these considerations, several courts have agreed with the district court's conclusion that the fact that bromocriptine is an ergot alkaloid does not constitute reliable scientific evidence that it causes vasoconstriction and associated adverse reactions like heart attacks and strokes. See Glastetter, 252 F.3d at 990 ("This generic assumption that bromocriptine behaves like other ergot alkaloids carries little scientific value. Even minor deviations in molecular structure can radically change a particular substance's **[*41]** properties and propensities."); n11 Brumbaugh, 77 F. Supp. 2d at 1156 ("Testimony extending general conclusions about similar drugs does not meet Daubert's requirement of reliability."); Siharath, 131 F. Supp. 2d at 1363-65 (finding a lack of reliable evidence that bromocriptine acts like other ergot alkaloids). Moreover, in a similar case, this circuit has rejected the argument that one chemical's resemblance to another known to have deleterious effects constituted reliable causation evidence. See Mitchell, 165 F.3d at 782 ("Missing from [the plaintiff's evidence] is additional testimony explaining what these similarities are and how the similarities cause the human body to respond to Defendant's chemicals in a manner similar to benzene.").

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n11 The Eighth Circuit also noted that "one leading treatise on medical toxicology concludes that bromocriptine has *no* vasoconstrictive properties." Glastetter, 252 F.3d at 990 (emphasis in original) (citing Matthew J. Ellenhorn, Ellenhorn's Medical Toxicology: Diagnosis and Treatment of Human Poisoning 1879, table 74-23 (2d ed. 1997)).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*42]**

These decisions support the district court's analysis. Accordingly, the district court did not abuse its discretion in finding that bromocriptine's similarity to other ergot alkaloids constituted an unreliable basis on which to conclude that the drug causes vasoconstriction

and ensuing adverse effects like Ms. Hollander's stroke.

b. Pharmacology of bromocriptine

In important respects, the Hollanders' experts' discussion of the specific pharmacological properties of bromocriptine is similarly speculative. For example, Dr. Kulig's affidavit refers to the drug's known effects on dopamine and serotonin, and notes that these neurotransmitters are known to trigger vasoconstriction and vasospasm. However, although he states that the effect of Parlodel on serotonin receptors "has been demonstrated in company studies," Aplt's App. vol. II-E, at 1747, Dr. Kulig provides no details on the methodology or conclusions of these studies. Moreover, the mere fact that Parlodel acts on serotonin and dopamine receptors does not establish that Parlodel itself, as opposed to some other agent that triggers either the release of these neurotransmitters or some other physiological mechanism, causes **[*43]** vasoconstriction, hypertension, and stroke.

The testimony of Dr. Jose (the expert on peripheral dopamine receptors) reveals similar deficiencies. Although he presented an elegant theory of the way in which bromocriptine might have the paradoxical effect of causing vasoconstriction and increased blood pressure, he acknowledged that there were a number of animal studies that concluded that bromocriptine decreases blood pressure. Dr. Jose attempted to distinguish these studies by observing that the specific conditions that he had posited as necessary to trigger the paradoxical effects of bromocriptine were not present. However, he acknowledged that his thesis had not been tested. See Aplt's App. vol. II-A, at 802 ("I have bits and pieces proving that bromocriptine can increase sodium reabsorption, bits and pieces that can show that bromocriptine can decrease blood flow; but to put all of them together [to demonstrate that bromocriptine can cause high blood pressure] no, that has not been tested."). Accordingly, the district court did not exercise manifestly unreasonable judgment in concluding that the opinions of the Hollanders' experts did not meet the Daubert reliability **[*44]** standard insofar as those opinions were based on the pharmacology of bromocriptine.

c. Studies of hypertension

Both Dr. Kulig and Dr. Iffy relied on studies regarding the relationship between bromocriptine and hypertension. Dr. Kulig referred to a 1981 study commissioned by Sandoz in which women received the drug to treat amennorrhea-galactorrhea syndrome. n12 Dr. Kulig states that nineteen percent of those women reported increases in blood pressure. Both experts invoke a study by D.I. Watson, which concluded that women with pregnancy-induced hypertension who then took bromocriptine after giving birth had a higher incidence of postpartum hypertension than women who did not receive the drug. n13



- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n12 Amenorrhea refers to an "absence or abnormal stoppage of the menses." See Dorland's Illustrated Medical Dictionary 55. Galactorrhea is the "excessive or spontaneous flow of milk" or the "persistent secretion of milk irrespective of nursing." Id. at 672.

n13 D.I. Watson, et al., supra, Obstetrics and Gynecology, 74(4): 573-576 (Aplt's App. vol. II-D, at 1596-97).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*45]**

Again, it is not an abuse of discretion to conclude that there is "simply too great an analytical gap" between these studies and the experts' conclusion that Parlodel caused Ms. Hollander's stroke. See Joiner, 522 U.S. at 146. The studies in question do not directly address the relationship between Parlodel and stroke. Moreover, the Hollanders presented no expert analysis as to how one might extrapolate from bromocriptine's effect on a small group of women with amennorrhea-galactorrhea syndrome to determine the effect that the drug would

have on women like Ms. Hollander who took the drug as a postpartum lactation suppressant.

As to the Watson study, Dr. Iffy admitted that it did not claim a "high degree of reliability." Aplt's App. vol. II-A, at 698. Dr. Iffy acknowledged that, under the study's criteria for determining which women had pregnancy-induced hypertension, Ms. Hollander herself would not qualify. Id. Thus, she was not in the class of patients whose blood pressure increased after taking Parlodel.

d. Animal Studies

According to the Hollanders' experts, there are certain animal studies that also provide evidence that bromocriptine may cause vasoconstriction, **[\*46]** hypertension, and stroke. These studies included those performed on isolated veins, on animals that were unconscious, and on pithed animals. Many involved large doses of bromocriptine, relatively much greater than the doses taken by Ms. Hollander.

Several recent decisions considering these studies have agreed with the district court's analysis. The studies suggest only that bromocriptine may act as a vasoconstrictor in very specific circumstances in certain kinds of animals; the studies do not constitute reliable evidence that bromocriptine causes strokes. See Glastetter, 252 F.3d at 991 (noting that one of the plaintiff's experts concluded that "not a single animal study had ever concluded that [intracerbral hemorrhage] was associated with bromocriptine"); Caraker v. Sandoz Pharms. Corp., 172 F. Supp. 2d 1046, 1050-51 (S.D. Ill. 2001) (noting that "some [studies] involved animals that had a steel rod injected down their spinal cord to destroy it so the animal has no intact nervous system, some involved bromocriptine's reaction locally (e.g., in a single isolated vein of an animal) as opposed to a systemic administration; and some were poorly **[\*47]** documented"); Siharath, 131 F. Supp. 2d at 1367-69 (discussing three animal studies in detail and concluding that they did not constitute a reliable basis for experts' opinions that Parlodel caused the plaintiff's stroke).

In light of these characteristics of the animal studies, the district court's conclusion that they were unreliable does not "exceed[] the bounds of permissible choice in the circumstances." McEwen, 926 F.2d at 1553-54. We therefore discern no abuse of discretion in the court's analysis.

e. Case studies and differential diagnosis

The next methodologies employed by the Hollanders' experts present a closer question. "Differential diagnosis" refers to the process by which a physician "'rules in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." Glastetter, 252 F.3d at 989 (8th Cir. 2001). The remaining cause is the expert's conclusion. Id. In conducting a differential diagnosis, physicians often use case reports--"a doctor's account of a particular patients' reaction to a drug or other **[\*48]** stimulus, accompanied by a description of the relevant surrounding circumstances." Id.

Here, Drs. Kulig, Iffy, and Jose performed a differential diagnosis, reviewing Ms. Hollander's medical history and medical records, excluding other causes of her stroke, and then attributing the stroke to Parlodel. They relied in part on case reports, both those filed with the FDA and those published in the professional literature. Dr. Kulig expressed the view that the onset of Ms. Hollander's initial symptom (i.e., developing a headache several days after giving birth) and the timing of her stroke (several days after her discharge from the hospital) fit a general pattern seen in patients suffering adverse reactions to Parlodel and was also consistent with the pharmokinetics of the drug.

With regard to differential diagnoses, courts have reached contrasting conclusions as to reliability under Daubert. Compare Westberry v. Gislaved Gummi GB, 178 F.3d 257, 262-66

(4th Cir. 1999) (holding that "[a] reliable differential diagnosis provides a valid basis for an expert opinion on causation" and concluding that the district court did not abuse its discretion in admitting a physician's **[\*49]** opinion testimony based on differential diagnosis) with Glastetter, 252 F.3d at 989 (holding that a district court did not abuse of discretion in excluding a differential diagnosis that was "scientifically invalid"); see also Federal Judicial Center, Reference Manual on Scientific Evidence 34 (2d. ed. 2000) (noting that "judges disagree on whether a physician relying on the methodology of clinical medicine can provide adequate proof of causation in a toxic tort action"). Courts have also reached contrasting conclusions as to the reliability of case reports. Compare Glaser v. Thompson Med. Co., 32 F.3d 969, 975 (6th Cir. 1994) (holding that the district court abused its discretion in excluding physician's opinion testimony based in part on case reports) with Casey v. Ohio Med. Prods., 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) (stating that "case reports are not reliable scientific evidence of causation, because they simply described reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and **[\*50]** do not investigate or explain the mechanism of causation"); see generally Federal Judicial Center, Reference Manual on Scientific Evidence 475 (noting that "causal attribution based on case studies must be regarded with caution" but that "such studies may be carefully considered in light of other information available, including toxicological data," and citing cases reaching contrasting conclusions on their admissibility under Daubert). n14 Our circuit does not appear to have addressed the reliability of differential diagnosis and case reports under Daubert.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n14 The conflicting views of the reliability of differential diagnosis are apparent in the Parlodel cases too. Compare Brasher, 160 F. Supp. 2d at 1296 (concluding that differential diagnosis constitutes a reliable methodology under Daubert) and Globetti, 111 F. Supp. 2d at 1178 (characterizing differential diagnosis as "a well-recognized and widely-used technique relied on by medical clinicians worldwide to identify and isolate the causes of disease") with Glastetter, 252 F.3d at 989 (concluding that differential diagnosis and case reports did not establish reliable proof of causation), and Siharath, 131 F. Supp. 2d at 1361-63 (same).

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[\*51]**

In the instant case, the district court made short shrift of the Hollanders' experts' differential diagnoses and reliance on case reports. The court stated that "because of their limitations, case reports have been repeatedly rejected as a scientific basis for a conclusion regarding causation." Hollander, 95 F. Supp. 2d at 1237.

Because the Daubert reliability inquiry is case-specific, we need not address, in general terms, the reliability of differential diagnoses and case reports. See Kumho Tire, 526 U.S. at 150. Instead, we must only decide whether the district court abused its discretion by characterizing the specific diagnoses and case reports at issue here as unreliable under Daubert.

Again, we conclude that the district court did not abuse its discretion. In many of the decisions in which a differential diagnosis has been deemed reliable, the party relying on the diagnosis has offered independently reliable evidence that the allegedly dangerous drug or substance had harmful effects. See, e.g., Zuchowicz v. United States, 140 F.3d 381, 385-87 (2d Cir. 1998) (affirming admission of differential diagnosis based in **[\*52]** part on scientific articles regarding the effects of a drug); Kennedy v. Collagen Corp., 161 F.3d 1226, 1228-30 (9th Cir. 1998) (holding that the district court abused its discretion in excluding expert opinion based on differential diagnosis when the diagnosis was supported by scientific and clinical studies regarding the connection between collagen and autoimmune disorders). That is not the case here. In order to "rule in" Parlodel as a scientifically plausible cause of Ms. Hollander's stroke, the Hollanders' experts would need to present reliable evidence that

the drug can cause strokes, and for the reasons we have discussed, the district court did not abuse its discretion in concluding that the experts did not do so. See Glastetter, 252 F.3d at 989 (affirming the district court's exclusion of a differential diagnosis); cf. Siharath, 131 F. Supp. 2d at 1362-63 ("[A] fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must actually be capable of causing the injury. That is, the expert must 'rule in' the other suspected cause as well as 'rule out' other possible **[*53]** causes. And, of course, expert opinion on this issue of general causation must be derived from scientifically valid methodology.") (internal quotation marks omitted).

We take a similar view of the case reports regarding other women suffering various injuries after taking Parlodel. Many of these case reports contain only limited information regarding the medical histories of the patients and the nature of the injuries they suffered. In addition, given the large number of women who took Parlodel and the variety of possible causes for many of these injuries, it was not unreasonable for the district court to characterize the reports as unreliable evidence of causation. See Siharath, 131 F. Supp. 2d at 1361 (noting that "case reports . . . do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation" and that, as to Parlodel, "the modest number of case reports associating the drug with stroke or even postpartum hypertension is not what would be expected if there was a significant increased risk ") (internal quotation marks omitted).

In holding that the district court did not abuse its discretion in excluding the **[*54]** particular differential diagnoses and case reports submitted by the Hollanders, we emphasize that, in other litigation, there may well be differential diagnoses and case reports that do not suffer from the same deficiencies noted by the district court here. For example, if the case reports in this record contained more detailed information about other women who suffered strokes and heart attacks after taking Parlodel, and if there were a substantially larger number of such detailed reports, that information might have provided support for the theories of Drs. Kulig, Iffy, and Jose. In that instance, a district court might well be justified in finding opinion testimony like that of Drs. Kulig, Iffy, and Jose reliable under Daubert. See Caraker, 172 F. Supp. 2d at 1050 (stating that "an overwhelming amount of case reports of a temporal proximity between a very specific drug and a very specific adverse event might . . . be enough to make a general causation conclusion sufficiently reliable" but adding that "in this case, however, we have a scant number of case reports").

Moreover, as the Eighth Circuit has written:

> We do not believe that a medical expert **[*55]** must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness. The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed. If a properly qualified medical expert performs a reliable differential diagnosis through which, to a reasonable degree of medical certainty, all other possible causes of the victims' condition can be eliminated, leaving only the toxic substance as the cause, a causation opinion based on that differential diagnosis should be admitted.

Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1209 (8th Cir. 2000) (internal quotation marks omitted); see also Westberry, 178 F.3d at 262 (holding that a reliable differential diagnosis alone may provide a valid foundation for a causation opinion, even when no epidemiological studies, peer-reviewed published studies, animal studies, or laboratory data are offered in support of the opinion). However, in light of the **[*56]** deficiencies of the

particular differential diagnoses and case reports in this record, the district court's analysis was not unreasonable.

f. Rechallenge and dechallenge reports

Ms. Hollanders' experts also presented several accounts of rechallenge and dechallenge. Rechallenge occurs when a patient is exposed to the same drug thought to have previously caused an adverse reaction. Dechallenge occurs when the drug is removed. As the Eighth Circuit has noted, rechallenge and dechallenge resemble controlled experiments in some ways, and thus may be more valuable than typical case reports. Glastetter, 252 F.3d at 990-91. Occasionally the results may appear quite dramatic. For example, one Sandoz employee described a rechallenge-dechallenge report as "'the smoking gun' we have looked for so diligently." Aplt's App. vol. IV-B, at 2364. n15

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 A physician reported to Sandoz that he had induced vasoconstriction of the cerebral blood vessels by administering small doses of Parlodel to a woman who had previously suffered a stroke after taking the drug. See Aplt's App. vol. IV-B, at 2364-65 (memorandum from Dr. William F. Westin, dated Sept 17, 1987). There appears to be no further discussion of this report in the record.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*57]**

Nevertheless, by the Hollanders' account, there were only three such reports. See Aplt's Br. at 31. Of these three, only one involved vasoconstriction of the cerebral blood vessels. n16 Moreover, as to that incident, the only information to which the Hollanders' have directed us is a second-hand account by a Sandoz physician. Thus, the district court conclusion here -- that there were too few of these reports for them to constitute reliable evidence of causation under Daubert--was not unreasonable. Cf. Glastetter, 252 F.3d at 990 (finding rechallenge and dechallenge data to be more potent proof of causation than did the district court but further concluding that the district court did not abuse its discretion in excluding it).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n16 One of the incidents involved the vasoconstriction of a coronary artery and another involved hypertension.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

g. The Risks of Stroke in the Postpartum period

A linchpin of Sandoz's defense was that there is an increased risk of stroke in the postpartum period **[*58]** generally. Sandoz relied heavily on a study concluding that there is a 28.3 relative risk of stroke for women in the postpartum period, as compared with non-pregnant women. See Steven J. Kittner, et al., Pregnancy and the Risk of Stroke, New Eng. J. Med. 768-74 (1996) (Aplt's App. vol. II-C, at 1335-41). n17 Thus, according to Sandoz, Ms. Hollander's stroke could well have been the result of the increased risk to which all women are exposed during the postpartum period rather than an adverse reaction to Parlodel.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n17 One authority explains the concept of "relative risk" as follows:

[Relative risk] is defined as the ratio of the incidence rate (often referred to as

incidence) of disease in exposed individuals to the incidence rate in unexposed individuals.

. . . .

The incidence rate of disease reflects the number of cases of disease that develop during a specified period of time divided by the number of persons in the cohort under study. Thus, the incidence rate expresses the risk that a member of the population will develop the disease within a specified period of time.

For example, a researcher studies 100 individuals who are exposed to an agent and 200 who are not exposed. After one year, 40 of the exposed individuals are diagnosed as having a disease, and 20 of the unexposed individuals are also diagnosed as having the disease. The relative risk of contracting the disease is calculated as follows:

-The incidence rate of disease in the exposed individuals is 40 cases per year per 100 persons (40/100), or 0.4

-The incidence rate of disease in the unexposed individuals is 20 cases per year per 200 persons (20/200), or 0.1.

A relative risk of 4.0 indicates that the risk of disease in the exposed group is four times as high as the risk of disease in the unexposed group.

. . . .

Although a relative risk is a straightforward concept, care must be taken in interpreting it. Researchers should scrutinize their results for error. Error in the design of the study could yield an incorrect relative risk. Sources of bias and confounding should be examined. Whenever an association is uncovered, further analysis should be conducted to determine if the association is real or due to an error or bias. Similarly, a study that does not find an association between an agent and disease may be erroneous because of bias or random error.

Federal Judicial Center, Reference Manual on Scientific Evidence 348-49.

Thus, in the instant case, the study cited by Sandoz concluded that women in the postpartum period were 28.3 times more likely than non-pregnant women to have suffered a stroke.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -  **[*59]**

In the district court proceedings, the Hollanders challenged this argument primarily through the testimony of Dr. Kulig, who stated that the Kittner study (and others reaching similar conclusions about the risks of the postpartum period) did not control for bromocriptine use or for specific conditions that increase the risk of stroke, such as eclampsia. According to Dr. Kulig, when these factors are excluded, the Kittner study does not establish that there is an increased risk of stroke in the postpartum period.

The district court acknowledged Dr. Kulig's criticisms of the study. However, the court found that "the postpartum incidence of stroke is a factor that should be considered." See Hollander, 95 F. Supp. 2d at 1238 n.21.

The Hollanders now argue that the district court erred in its qualified affirmation of the Kittner study in the face of Dr. Kulig's critique of it. If this case required Sandoz to prove that there was an increased risk of stroke during pregnancy, we might agree. However, no such

burden is imposed on Sandoz here. Instead, it is the Hollanders who have the burden of demonstrating the harmful effect of Parlodel. Accordingly, it was not unreasonable **[*60]** for the district court to conclude that Dr. Kulig's attack on the Kittner study did not constitute reliable evidence that Parlodel caused Ms. Hollander's stroke.

In summary, we agree with the court's assessment in Siharath: the Hollanders have done the best they could with the available data and the scientific literature. See 131 F. Supp. 2d at 1373. The data on which they rely might well raise serious concerns in conscientious clinicians seeking to decide whether the benefits of the drug outweigh its risks. However, in deriving their opinions that Parlodel caused Ms. Hollander's stroke from the various sources we have outlined, Drs. Kulig, Iffy, and Jose all made several speculative leaps. As a result, the district court did not abuse its discretion in excluding their testimony under Daubert.

C. Grant of Summary Judgment to Sandoz

In a related argument, the Hollanders maintain that, even if the district court did not abuse its discretion in excluding their experts' testimony, the court nevertheless erred in granting summary judgment to Sandoz.

According to the Hollanders, the following evidence demonstrates that there are controverted issues of material **[*61]** fact as to whether Parlodel caused her stroke: (1) the FDA's determination that Parlodel had not been shown to be safe when prescribed as a postpartum lactation suppressant; (2) the judgment entered against Sandoz in a case in Kentucky involving Parlodel; (3) incidents of dechallenge and rechallenge; (4) case reports; (5) studies of hypertension; (6) the fact that bromocriptine is an ergot; (7) animal studies; and (8) epidemiological studies.

We engage in de novo review of the district court's summary judgment ruling, applying the same standard as the district court under Fed. R. Civ. P. 56(c). See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). We view the facts and the reasonable inferences to be drawn from them in the light most favorable to the nonmoving party. Adler, 144 F.3d at 670.

Under Oklahoma law, which we apply in this diversity **[*62]** case, see Wood v. Eli Lilly & Co., 38 F.3d 510, 512 (10th Cir. 1994), "[a] plaintiff seeking recovery for an injurious side effect from a properly manufactured prescription drug must prove that the drug caused the injury and that the manufacturer breached a duty to warn of possible detrimental reactions." McKee v. Moore, 648 P.2d 21, 23 (Okla. 1982). Causation is established if "in a natural and continuous sequence, unbroken by an independent cause" the drug produces an injury that would not have occurred if it had not been administered. See Gaines v. Providence Apartments, 750 P.2d 125, 126-27 (Okla. 1987) (defining proximate cause).

We need not address the Hollanders' argument in detail. We have already ruled that five of the eight categories of evidence on which they rely did not constitute sufficiently reliable grounds under Daubert for their experts' opinions. n18 As a result, these categories of evidence do not raise questions of fact on issues of causation.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n18 These categories of evidence are as follows: incidents of dechallenge and rechallenge; case reports; studies of hypertension; the fact that bromocriptine is an ergot; and animal studies.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*63]**

Moreover, under Oklahoma law, a plaintiff must introduce expert testimony if "the fact in issue is not within the realm of ordinary experience of mankind." Strubhart v. Perry Mem'l Hosp. Trust Auth., 903 P.2d 263, 274 (Okla. 1995). Here, the alleged effect of Parlodel is not within the realm of ordinary experience: in order to assess the arguments regarding the alleged effects of the drug, the factfinder would be required to assess the wide variety of scientific evidence that we have discussed here. As a result, the Hollanders cannot prove their claim without expert testimony.

Finally, we consider briefly the three categories of evidence that we have not yet addressed-- the FDA determination, the judgment in the Roberts case, and the epidemiological studies. None of this evidence provides sufficient support for the Hollanders' claims.

As to the FDA determination, this circuit has noted that differing standards militate against applying regulatory actions to the elements of tort law. See Mitchell, 165 F.3d at 783 n.3 (10th Cir. 1999). In assessing a district court's application of Daubert, we discounted a state agency's classification of a **[*64]** substance as a carcinogen, stating that the methodology employed by the agency "results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances," and that "the agencies' threshold of proof is reasonably lower than that appropriate in tort law." Id. (internal quotation marks omitted).

Moreover, several courts have concluded that this specific FDA ruling about Parlodel is not relevant to the causation question. See Glastetter, 252 F.3d at 991 (noting that the FDA ruling is not reliable evidence of causation for two reasons: (1) because the FDA "balanced Parlodel's possible harm against its limited beneficial use," an irrelevant consideration in the Daubert inquiry; and (2) because "the FDA will remove drugs from the marketplace upon a lesser showing of harm to the public than the standards used to assess tort liability"); Siharath, 131 F. Supp. 2d at 1366 (rejecting the plaintiff's reliance on the FDA ruling). Moreover, the language used in the FDA ruling regarding the withdrawal of Parlodel indicates that the agency did not make a determination that Parlodel causes seizures and strokes. **[*65]** n19 Accordingly, we conclude that the FDA ruling does not establish that there are controverted factual issues as to whether Parlodel caused Ms. Hollanders' stroke. n20

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n19 The FDA ruling states that the evidence received by the FDA "calls into question bromocriptine's safety," that bromocriptine "may be an additional risk factor in patients who are already at risk for seizures and stroke," and that the FDA had obtained new evidence "suggesting that therapeutic use of bromocriptine for the prevention of physiological lactation may lead to serious adverse experiences . . . ." 59 Fed. Reg. 43348, 43351 (Aug. 24, 1994) (emphasis added).

n20 Our conclusion about the FDA's decision to withdraw the indication for Parlodel as a lactation suppressant should not be read to suggest that, as a general rule, regulatory decisions lack the intellectual rigor necessary under the Daubert reliability inquiry. Indeed, some authorities view the review process in the regulatory area as typically "far more careful and systematic" than the peer review process employed by scientific journals. See Kenneth R. Foster & Peter W. Huber, Judging Science: Scientific Knowledge in the Federal Courts 174 (1997). "Regulators require that documents submitted to them contain far more detail than is typically found in papers submitted to professional journals . . . . [and] administrative reports--not peer reviewed journals--may provide parties with the solidest available data." Id. at 174-75.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*66]**

As to the judgment in the Roberts case, the Hollanders fail to explain its relevance. The case

was decided under Kentucky law, and our decision is governed by different law and different facts. Moreover, in light of the district court's broad discretion in these matters, the fact that different courts reach difference conclusions as to reliability under Daubert does not establish that a legal error has been made by one or the other. See Brasher, 160 F. Supp. 2d at 1299 n.17 (noting that inconsistent rulings Daubert rulings do not necessarily establish an abuse of discretion).

Finally, the epidemiological studies in question do not support the Hollanders' claim. The district court accurately observed that the Hollanders' own experts did not rely on these studies. Moreover, as the district court further noted, "although several studies have been conducted regarding Parlodel and stroke, none has shown a statistically significant link between them." Hollander, 95 F. Supp. 2d at 1236. See also Siharath, 131 F. Supp. 2d at 1356-59 (discussing four studies finding no statistically significant association). n21

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n21 The Hollanders also suggest that a totality of the circumstances approach establishes that there are controverted issues of material fact. In essence they maintain that even though each individual category of evidence may be insufficient, all of the evidence considered as a whole raises factual questions as to whether Parlodel caused her stroke. The Hollanders cite no legal authority in support of this approach, and in our view, this argument is inconsistent with Daubert. To suggest that those individual categories of evidence deemed unreliable by the district court may be added to form a reliable theory would be to abandon "the level of intellectual rigor" of the expert in the field. Kumho Tire, 526 U.S. at 152.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - **[*67]**

Accordingly, we conclude that the district court properly granted Sandoz's motion for summary judgment.

D. Dismissal of Sandoz, Ltd.

Prior to ruling on the Daubert and summary judgment motions, the district court dismissed the Hollanders' claims against the defendant Sandoz, Ltd., a company incorporated in Switzerland with its principal place of business there. Prior to January 1, 1990, Sandoz, Ltd. sold Parlodel in bulk to the defendant Sandoz Corporation. However, after that date, Sandoz, Ltd. became a holding company, conducting no advertising in the United States and owing no manufacturing, distribution, or sales facilities here. In granting Sandoz's motion to dismiss, the district court reasoned that Sandoz, Ltd. "does not have a bank account, a telephone number or any employees, officers or directors in this country; and that it does not actively advertise in the United States." Aplt's. App. vol. I, at 344 (Dist. Ct. Order, filed Dec. 10, 1996, at 1). Accordingly, the court concluded that it lacked personal jurisdiction over Sandoz, Ltd., and it dismissed the claims against Sandoz, Ltd. with prejudice.

On appeal, the Hollanders argue that, because Sandoz, Ltd. sold **[*68]** Parlodel to its United States subsidiary (Sandoz) prior to January 1, 1990, Sandoz, Ltd. should be deemed to have continued to do business in the United States through July 1990, when Ms. Hollander suffered her stroke. They contend that it is unlikely that Sandoz, Ltd. would have completely ceased doing business in the United States in the seven month period beginning in January 1990 (when it became a holding company) and July 1990 (when Ms. Hollander took Parlodel). Additionally, the Hollanders argue that the district court erred in dismissing the claims against Sandoz, Ltd. with prejudice.

The Hollanders' challenge to the court's jurisdictional ruling raises a legal question that we review de novo. See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995). Their argument is undermined by precedent that imposes the burden of proof on the party asserting jurisdiction. See id. Because they have offered no evidence to rebut Sandoz, Ltd.'s

evidence that it did not do business in the United States after January 1, 1990, we conclude that the district court properly held that it lacked jurisdiction over the company.

However, we further conclude that the district **[*69]** court should not have dismissed the Hollanders' claim against Sandoz, Ltd. with prejudice. Its jurisdictional ruling did not address the merits of the Hollanders' allegations as to Sandoz, Ltd., and, as a result, the claim against Sandoz, Ltd. should have been dismissed without prejudice to filing in an appropriate forum. See Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1221 (11th Cir. 1999) (concluding that the district court erred in dismissing claims against a party with prejudice on jurisdictional grounds and instructing the district court to dismiss the claims without prejudice); Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) ("A dismissal for lack of jurisdiction . . . does not preclude a subsequent action in an appropriate forum.").

## III. CONCLUSION

This case illustrates the continuing importance of the Supreme Court's observation in Daubert:

> There are . . . differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project **[*70]** is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment--often of great consequence--about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

Daubert, 509 U.S. at 596-97. Thus, in Judge Posner's words, "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." Rosen, 78 F.3d at 319.

Here, the district court characterized the Hollanders' evidence as such guesswork, and that characterization was not unreasonable. The Hollanders' evidence provided support for the **[*71]** FDA's decision to withdraw the indication for Parlodel as a postpartum lactation suppressant, as well as for the decisions of experienced clinicians that the apparent risks of Parlodel outweighed the limited benefits of prescribing the drug as a lactation suppressant. However, the district court did not abuse its discretion in ruling that the Hollanders' evidence did not satisfy the Daubert standard of reliability.

Additionally, the district court did not err in denying the Hollanders' motion to remand the case to the Oklahoma state courts or in dismissing the claim against Sandoz, Ltd. However, the court did err in dismissing the claim against Sandoz, Ltd. with prejudice.

Accordingly, we AFFIRM the judgment of the district court in all respects EXCEPT that we REMAND the Hollanders' claim against Sandoz, Ltd. with instructions to dismiss that claim without prejudice. n22

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n22 In light of our conclusion that the federal district court did not abuse its discretion in concluding that Hollanders' expert testimony was unreliable under Daubert, as well as our conclusion that the court did not err in granting summary judgment to Sandoz, we need not address the Hollanders' challenge to the dismissal of their products liability claim against Presbyterian Hospital. Even assuming that the dismissal was improper, the Hollanders have failed to explain why the same reliability problems noted by the federal district court do not defeat the Hollanders' products liability claim against Presbyterian Hospital.

We do note, as Presbyterian Hospital observes in its response brief, that an overwhelming majority of jurisdictions have refused to apply strict liability principles to claims against hospitals and physicians involving the distribution of allegedly dangerous drugs or medical devices. See, e.g., Royer v. Catholic Med. Ctr., 144 N.H. 330, 741 A.2d 74 (N.H. 1999) (affirming the dismissal of a products liability claim based on an allegedly defective prosthesis and reasoning that where "a health care provider in the course of rendering health care services supplies a prosthetic device to be implanted into a patient, the health care provider is 'not engaged in the business of selling' prostheses for purposes of strict products liability"); Cafazzo v. Central Med. Health Servs., Inc., 542 Pa. 526, 668 A.2d 521, 525 (Pa. 1995) (rejecting products liability claim based on a prosthesis and reasoning that "hospitals and physicians are not sellers, providers, suppliers, or distributors of products such as to activate 402A" and that the policy reasons for strict liability are not present); Ayyash v. Henry Ford Health Sys., 210 Mich. App. 142, 533 N.W.2d 353, 354 (Mich. Ct. App. 1995) (rejecting products liability claim against a hospital based on an allegedly defective temporomandibular joint implant and reasoning that when "a putative defendant uses a defective product in the course of providing a service, the courts must decide whether the 'transaction' is primarily a sale or a service" and concluding that "in the case of a physician or hospital rendering medical care courts typically have characterized the 'transaction' as a service" and adopting that characterization for policy reasons); see generally Linda A. Sharp, Annotation, Liability of Hospital or Medical Practitioner under Doctrine of Strict Liability in Tort or Breach of Warranty, for Harm Caused by Drug, Medical Instrument, or Similar Device Used in Treating Patient, 65 ALR 5th 357, 371 § 2(b) (1999) (noting "the continued reluctance by most courts to apply no-fault products liability principles in actions against medical defendants for injuries caused by medical products). But see Thomas v. St. Joseph Hosp., 618 S.W.2d 791 (Tex. Civ. App. 1981) (hospital held strictly liable where hospital gown ignited when lighted match fell on it); Silverhart v. Mount Zion Hosp., 20 Cal. App. 3d 1022, 98 Cal. Rptr. 187 (Cal. App. 1st Dist. 1971) (hospital would be found liable where not engaged in activities integrally related to primary function of providing medical services-- selling a defective product in its gift shop).

Although Oklahoma courts do not appear to have answered this particular question, we have no reason to believe that those courts would disagree with the majority rule and extend products liability to hospitals in circumstances like those in the case at bar. Cf. Allenberg v. Bentley Hedges Travel Serv., Inc., 2001 OK 22, 22 P.3d 223, 230-31 (Okla. 2001) (holding that commercial sellers of used products may not be held strictly liable, "at least if the alleged defect was not created by the seller, and the product is sold in essentially the same condition as when it was acquired for resale"). For that reason, and because the Hollanders did not seek certification in the district court proceedings, we DENY their motion for certification to the Oklahoma Supreme Court. See Boyd Rosene & Assocs., Inc. v. Kansas Municipal Gas Agency, 178 F.3d 1363, 1365 (10th Cir. 1999) (observing that "certification is never compelled, even when there is no state law governing an issue"); Massengale v. Oklahoma Bd. of Examiners in Optometry, 30 F.3d 1325, 1331 (10th Cir. 1994) (stating that "we generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court").

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[*72]

Source: <u>All Sources</u> > / . . . / > **$ US Court of Appeals Cases - 10th Circuit** 🄸
Terms: **name(hollander and sandoz)**  (<u>Edit Search</u>)
View: **Full**
Date/Time: Friday, June 28, 2002 - 11:09 AM EDT

<u>About LexisNexis</u> | <u>Terms and Conditions</u>

<u>Copyright ©</u> 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

burden is imposed on Sandoz here. Instead, it is the Hollanders who have the burden of demonstrating the harmful effect of Parlodel. Accordingly, it was not unreasonable **[*60]** for the district court to conclude that Dr. Kulig's attack on the Kittner study did not constitute reliable evidence that Parlodel caused Ms. Hollander's stroke.

In summary, we agree with the court's assessment in Siharath: the Hollanders have done the best they could with the available data and the scientific literature. See 131 F. Supp. 2d at 1373. The data on which they rely might well raise serious concerns in conscientious clinicians seeking to decide whether the benefits of the drug outweigh its risks. However, in deriving their opinions that Parlodel caused Ms. Hollander's stroke from the various sources we have outlined, Drs. Kulig, Iffy, and Jose all made several speculative leaps. As a result, the district court did not abuse its discretion in excluding their testimony under Daubert.

## C. Grant of Summary Judgment to Sandoz

In a related argument, the Hollanders maintain that, even if the district court did not abuse its discretion in excluding their experts' testimony, the court nevertheless erred in granting summary judgment to Sandoz.

According to the Hollanders, the following evidence demonstrates that there are controverted issues of material **[*61]** fact as to whether Parlodel caused her stroke: (1) the FDA's determination that Parlodel had not been shown to be safe when prescribed as a postpartum lactation suppressant; (2) the judgment entered against Sandoz in a case in Kentucky involving Parlodel; (3) incidents of dechallenge and rechallenge; (4) case reports; (5) studies of hypertension; (6) the fact that bromocriptine is an ergot; (7) animal studies; and (8) epidemiological studies.

We engage in de novo review of the district court's summary judgment ruling, applying the same standard as the district court under Fed. R. Civ. P. 56(c). See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). We view the facts and the reasonable inferences to be drawn from them in the light most favorable to the nonmoving party. Adler, 144 F.3d at 670.

Under Oklahoma law, which we apply in this diversity **[*62]** case, see Wood v. Eli Lilly & Co., 38 F.3d 510, 512 (10th Cir. 1994), "[a] plaintiff seeking recovery for an injurious side effect from a properly manufactured prescription drug must prove that the drug caused the injury and that the manufacturer breached a duty to warn of possible detrimental reactions." McKee v. Moore, 648 P.2d 21, 23 (Okla. 1982). Causation is established if "in a natural and continuous sequence, unbroken by an independent cause" the drug produces an injury that would not have occurred if it had not been administered. See Gaines v. Providence Apartments, 750 P.2d 125, 126-27 (Okla. 1987) (defining proximate cause).

We need not address the Hollanders' argument in detail. We have already ruled that five of the eight categories of evidence on which they rely did not constitute sufficiently reliable grounds under Daubert for their experts' opinions. n18 As a result, these categories of evidence do not raise questions of fact on issues of causation.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n18 These categories of evidence are as follows: incidents of dechallenge and rechallenge; case reports; studies of hypertension; the fact that bromocriptine is an ergot; and animal studies.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - **[*63]**

Moreover, under Oklahoma law, a plaintiff must introduce expert testimony if "the fact in issue is not within the realm of ordinary experience of mankind." Strubhart v. Perry Mem'l Hosp. Trust Auth., 903 P.2d 263, 274 (Okla. 1995). Here, the alleged effect of Parlodel is not within the realm of ordinary experience: in order to assess the arguments regarding the alleged effects of the drug, the factfinder would be required to assess the wide variety of scientific evidence that we have discussed here. As a result, the Hollanders cannot prove their claim without expert testimony.

Finally, we consider briefly the three categories of evidence that we have not yet addressed-- the FDA determination, the judgment in the Roberts case, and the epidemiological studies. None of this evidence provides sufficient support for the Hollanders' claims.

As to the FDA determination, this circuit has noted that differing standards militate against applying regulatory actions to the elements of tort law. See Mitchell, 165 F.3d at 783 n.3 (10th Cir. 1999). In assessing a district court's application of Daubert, we discounted a state agency's classification of a [*64] substance as a carcinogen, stating that the methodology employed by the agency "results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances," and that "the agencies' threshold of proof is reasonably lower than that appropriate in tort law." Id. (internal quotation marks omitted).

Moreover, several courts have concluded that this specific FDA ruling about Parlodel is not relevant to the causation question. See Glastetter, 252 F.3d at 991 (noting that the FDA ruling is not reliable evidence of causation for two reasons: (1) because the FDA "balanced Parlodel's possible harm against its limited beneficial use," an irrelevant consideration in the Daubert inquiry; and (2) because "the FDA will remove drugs from the marketplace upon a lesser showing of harm to the public than the standards used to assess tort liability"); Siharath, 131 F. Supp. 2d at 1366 (rejecting the plaintiff's reliance on the FDA ruling). Moreover, the language used in the FDA ruling regarding the withdrawal of Parlodel indicates that the agency did not make a determination that Parlodel causes seizures and strokes. [*65] n19 Accordingly, we conclude that the FDA ruling does not establish that there are controverted factual issues as to whether Parlodel caused Ms. Hollanders' stroke. n20

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n19 The FDA ruling states that the evidence received by the FDA "calls into question bromocriptine's safety," that bromocriptine "may be an additional risk factor in patients who are already at risk for seizures and stroke," and that the FDA had obtained new evidence "suggesting that therapeutic use of bromocriptine for the prevention of physiological lactation may lead to serious adverse experiences . . . ." 59 Fed. Reg. 43348, 43351 (Aug. 24, 1994) (emphasis added).

n20 Our conclusion about the FDA's decision to withdraw the indication for Parlodel as a lactation suppressant should not be read to suggest that, as a general rule, regulatory decisions lack the intellectual rigor necessary under the Daubert reliability inquiry. Indeed, some authorities view the review process in the regulatory area as typically "far more careful and systematic" than the peer review process employed by scientific journals. See Kenneth R. Foster & Peter W. Huber, Judging Science: Scientific Knowledge in the Federal Courts 174 (1997). "Regulators require that documents submitted to them contain far more detail than is typically found in papers submitted to professional journals . . . . [and] administrative reports--not peer reviewed journals--may provide parties with the solidest available data." Id. at 174-75.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - - [*66]

As to the judgment in the Roberts case, the Hollanders fail to explain its relevance. The case

was decided under Kentucky law, and our decision is governed by different law and different facts. Moreover, in light of the district court's broad discretion in these matters, the fact that different courts reach difference conclusions as to reliability under Daubert does not establish that a legal error has been made by one or the other. See Brasher, 160 F. Supp. 2d at 1299 n.17 (noting that inconsistent rulings Daubert rulings do not necessarily establish an abuse of discretion).

Finally, the epidemiological studies in question do not support the Hollanders' claim. The district court accurately observed that the Hollanders' own experts did not rely on these studies. Moreover, as the district court further noted, "although several studies have been conducted regarding Parlodel and stroke, none has shown a statistically significant link between them." Hollander, 95 F. Supp. 2d at 1236. See also Siharath, 131 F. Supp. 2d at 1356-59 (discussing four studies finding no statistically significant association). n21

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n21 The Hollanders also suggest that a totality of the circumstances approach establishes that there are controverted issues of material fact. In essence they maintain that even though each individual category of evidence may be insufficient, all of the evidence considered as a whole raises factual questions as to whether Parlodel caused her stroke. The Hollanders cite no legal authority in support of this approach, and in our view, this argument is inconsistent with Daubert. To suggest that those individual categories of evidence deemed unreliable by the district court may be added to form a reliable theory would be to abandon "the level of intellectual rigor" of the expert in the field. Kumho Tire, 526 U.S. at 152.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - [*67]

Accordingly, we conclude that the district court properly granted Sandoz's motion for summary judgment.

D. Dismissal of Sandoz, Ltd.

Prior to ruling on the Daubert and summary judgment motions, the district court dismissed the Hollanders' claims against the defendant Sandoz, Ltd., a company incorporated in Switzerland with its principal place of business there. Prior to January 1, 1990, Sandoz, Ltd. sold Parlodel in bulk to the defendant Sandoz Corporation. However, after that date, Sandoz, Ltd. became a holding company, conducting no advertising in the United States and owing no manufacturing, distribution, or sales facilities here. In granting Sandoz's motion to dismiss, the district court reasoned that Sandoz, Ltd. "does not have a bank account, a telephone number or any employees, officers or directors in this country; and that it does not actively advertise in the United States." Aplt's. App. vol. I, at 344 (Dist. Ct. Order, filed Dec. 10, 1996, at 1). Accordingly, the court concluded that it lacked personal jurisdiction over Sandoz, Ltd., and it dismissed the claims against Sandoz, Ltd. with prejudice.

On appeal, the Hollanders argue that, because Sandoz, Ltd. sold [*68] Parlodel to its United States subsidiary (Sandoz) prior to January 1, 1990, Sandoz, Ltd. should be deemed to have continued to do business in the United States through July 1990, when Ms. Hollander suffered her stroke. They contend that it is unlikely that Sandoz, Ltd. would have completely ceased doing business in the United States in the seven month period beginning in January 1990 (when it became a holding company) and July 1990 (when Ms. Hollander took Parlodel). Additionally, the Hollanders argue that the district court erred in dismissing the claims against Sandoz, Ltd. with prejudice.

The Hollanders' challenge to the court's jurisdictional ruling raises a legal question that we review de novo. See Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995). Their argument is undermined by precedent that imposes the burden of proof on the party asserting jurisdiction. See id. Because they have offered no evidence to rebut Sandoz, Ltd.'s

evidence that it did not do business in the United States after January 1, 1990, we conclude that the district court properly held that it lacked jurisdiction over the company.

However, we further conclude that the district **[*69]** court should not have dismissed the Hollanders' claim against Sandoz, Ltd. with prejudice. Its jurisdictional ruling did not address the merits of the Hollanders' allegations as to Sandoz, Ltd., and, as a result, the claim against Sandoz, Ltd. should have been dismissed without prejudice to filing in an appropriate forum. See Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1221 (11th Cir. 1999) (concluding that the district court erred in dismissing claims against a party with prejudice on jurisdictional grounds and instructing the district court to dismiss the claims without prejudice); Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963) ("A dismissal for lack of jurisdiction . . . does not preclude a subsequent action in an appropriate forum.").

## III. CONCLUSION

This case illustrates the continuing importance of the Supreme Court's observation in Daubert:

> There are . . . differences between the quest for truth in the courtroom and the quest for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project **[*70]** is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment--often of great consequence--about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

Daubert, 509 U.S. at 596-97. Thus, in Judge Posner's words, "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." Rosen, 78 F.3d at 319.

Here, the district court characterized the Hollanders' evidence as such guesswork, and that characterization was not unreasonable. The Hollanders' evidence provided support for the **[*71]** FDA's decision to withdraw the indication for Parlodel as a postpartum lactation suppressant, as well as for the decisions of experienced clinicians that the apparent risks of Parlodel outweighed the limited benefits of prescribing the drug as a lactation suppressant. However, the district court did not abuse its discretion in ruling that the Hollanders' evidence did not satisfy the Daubert standard of reliability.

Additionally, the district court did not err in denying the Hollanders' motion to remand the case to the Oklahoma state courts or in dismissing the claim against Sandoz, Ltd. However, the court did err in dismissing the claim against Sandoz, Ltd. with prejudice.

Accordingly, we AFFIRM the judgment of the district court in all respects EXCEPT that we REMAND the Hollanders' claim against Sandoz, Ltd. with instructions to dismiss that claim without prejudice. n22

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n22 In light of our conclusion that the federal district court did not abuse its discretion in concluding that Hollanders' expert testimony was unreliable under Daubert, as well as our conclusion that the court did not err in granting summary judgment to Sandoz, we need not address the Hollanders' challenge to the dismissal of their products liability claim against Presbyterian Hospital. Even assuming that the dismissal was improper, the Hollanders have failed to explain why the same reliability problems noted by the federal district court do not defeat the Hollanders' products liability claim against Presbyterian Hospital.

We do note, as Presbyterian Hospital observes in its response brief, that an overwhelming majority of jurisdictions have refused to apply strict liability principles to claims against hospitals and physicians involving the distribution of allegedly dangerous drugs or medical devices. See, e.g, Royer v. Catholic Med. Ctr., 144 N.H. 330, 741 A.2d 74 (N.H. 1999) (affirming the dismissal of a products liability claim based on an allegedly defective prosthesis and reasoning that where "a health care provider in the course of rendering health care services supplies a prosthetic device to be implanted into a patient, the health care provider is 'not engaged in the business of selling' prostheses for purposes of strict products liability"); Cafazzo v. Central Med. Health Servs., Inc., 542 Pa. 526, 668 A.2d 521, 525 (Pa. 1995) (rejecting products liability claim based on a prosthesis and reasoning that "hospitals and physicians are not sellers, providers, suppliers, or distributors of products such as to activate 402A" and that the policy reasons for strict liability are not present); Ayyash v. Henry Ford Health Sys., 210 Mich. App. 142, 533 N.W.2d 353, 354 (Mich. Ct. App. 1995) (rejecting products liability claim against a hospital based on an allegedly defective temporomandibular joint implant and reasoning that when "a putative defendant uses a defective product in the course of providing a service, the courts must decide whether the 'transaction' is primarily a sale or a service" and concluding that "in the case of a physician or hospital rendering medical care courts typically have characterized the 'transaction' as a service" and adopting that characterization for policy reasons); see generally Linda A. Sharp, Annotation, Liability of Hospital or Medical Practitioner under Doctrine of Strict Liability in Tort or Breach of Warranty, for Harm Caused by Drug, Medical Instrument, or Similar Device Used in Treating Patient, 65 ALR 5th 357, 371 § 2(b) (1999) (noting "the continued reluctance by most courts to apply no-fault products liability principles in actions against medical defendants for injuries caused by medical products). But see Thomas v. St. Joseph Hosp., 618 S.W.2d 791 (Tex. Civ. App. 1981) (hospital held strictly liable where hospital gown ignited when lighted match fell on it); Silverhart v. Mount Zion Hosp., 20 Cal. App. 3d 1022, 98 Cal. Rptr. 187 (Cal. App. 1st Dist. 1971) (hospital would be found liable where not engaged in activities integrally related to primary function of providing medical services-- selling a defective product in its gift shop).

Although Oklahoma courts do not appear to have answered this particular question, we have no reason to believe that those courts would disagree with the majority rule and extend products liability to hospitals in circumstances like those in the case at bar. Cf. Allenberg v. Bentley Hedges Travel Serv., Inc., 2001 OK 22, 22 P.3d 223, 230-31 (Okla. 2001) (holding that commercial sellers of used products may not be held strictly liable, "at least if the alleged defect was not created by the seller, and the product is sold in essentially the same condition as when it was acquired for resale"). For that reason, and because the Hollanders did not seek certification in the district court proceedings, we DENY their motion for certification to the Oklahoma Supreme Court. See Boyd Rosene & Assocs., Inc. v. Kansas Municipal Gas Agency, 178 F.3d 1363, 1365 (10th Cir. 1999) (observing that "certification is never compelled, even when there is no state law governing an issue"); Massengale v. Oklahoma Bd. of Examiners in Optometry, 30 F.3d 1325, 1331 (10th Cir. 1994) (stating that "we generally will not certify questions to a state supreme court when the requesting party seeks certification only after having received an adverse decision from the district court").

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

**[*72]**

Source: <u>All Sources</u> > / . . . / > **$ US Court of Appeals Cases - 10th Circuit** ⓘ
Terms: **name(hollander and sandoz)** (<u>Edit Search</u>)
View: Full
Date/Time: Friday, June 28, 2002 - 11:09 AM EDT

<u>About LexisNexis</u> | <u>Terms and Conditions</u>

<u>Copyright ©</u> 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

VINCENT J. and BEVERLY PAOLINE      :            CIVIL ACTION **ENTERED**

v.                        **FILED APR 3 0 2002**          APR 3 0 2002

KILGO TRUCKING, INC., et al.        :            NO. 00-956 **CLERK OF COURT**

## MEMORANDUM AND ORDER

THOMAS J. RUETER                              April 30, 2002
United States Magistrate Judge

       Presently before the court is a motion for summary judgment ("Motion") filed by defendant Lufkin Industries, Inc., individually and d/b/a Lukfin Trailers ("defendant" or "Lufkin") (Document No. 20). The Motion was referred to the undersigned for decision by the Honorable J. Curtis Joyner. By stipulation approved by Judge Joyner on March 19, 2002, Lufkin[1] and the plaintiffs agreed that the undersigned may decide the Motion without a hearing, that such decision will be binding upon the parties, and that neither party will seek reconsideration nor file an appeal. (Document No. 32.) For the reasons stated below, the Motion is **GRANTED**.

       Plaintiff Vincent Paoline suffered injuries when the car he was driving collided with the rear of a parked tractor trailer manufactured by Lufkin. In the present litigation, he and his wife raise a crashworthiness claim. The law is clear that

> [t]o establish a cause of action on a theory of crashworthiness, a plaintiff must
> show: (1) the design of the product was defective; (2) an alternative, safer design
> that was practical existed; (3) what injuries, if any, the plaintiff would have

---

[1]    Pursuant to various agreements, the other named defendants need not be party to the stipulation.

received had the alternative design been used; and (4) the defective design caused or exacerbated specific injuries.

Oddi v. Ford Motor Co., 234 F.3d 136, 143 (3d Cir. 2000) (footnote omitted); Rapp v. Singh, 152 F. Supp. 2d 694, 698 (E.D. Pa. 2001) (quoting Oddi). Lufkin argues that plaintiff's proposed experts cannot offer any "admissible, reliable answers" to the following three questions: (1) How strong was the guard?; (2) How strong should the guard have been?; and (3) What would have happened to Mr. Paoline if a different design, one approved by plaintiffs' experts, had been used?. (Def.'s Reply Br. at 1.) Consequently, Lufkin contends that plaintiffs have failed to make a prima facie case because their proposed expert testimony fails to satisfy the standards set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

The Third Circuit Court of Appeals, considering Daubert, concluded that eight factors are relevant in assessing the admissibility of expert scientific[2] evidence:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established as reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Oddi, 234 F.3d at 145 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994)). See also Rapp, 152 F. Supp. 2d at 699 (same). A proponent of expert testimony need not prove to the court that the expert opinions are correct, but must demonstrate by a preponderance of the evidence that they are reliable, which is to say that the "particular opinion is

---

[2]    The parties do not dispute that the expert evidence at issue is "scientific" as opposed to "technical."

based on valid reasoning and reliable methodology." Oddi, 234 F.3d at 146 (quoting

Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)).

This court will focus on the third issue raised by Lufkin, that is, the plaintiffs have

not offered admissible evidence through expert testimony to prove what injuries Mr. Paoline

would have suffered if a different design of rear bumper guard had been used. Plaintiffs concede

that Steven C. Batterman, Ph.D. will be the only expert to testify with respect to biomechanics.

(Def.'s Reply Br. at 16; Pls.' Reply Br. to Def.'s Reply Br. at 14-15.) Dr. Batterman, therefore,

will be the only expert to testify regarding causation and plaintiff's injuries. As stated above, in

order to succeed on a crashworthiness claim, Dr. Batterman would have to be able to testify as to

what injuries, if any, Mr. Paoline would have received had the alternative design been used. In

relevant part, Dr. Batterman's testimony from his deposition is as follows:

Q.    Have you undertaken any calculations or any type of analysis as to what would
      have happened with any of these [proposed alternative] guards if Mr. Paoline
      struck it with a Cavalier going 25 miles an hour?

A.    Well, my opinion, the underride would have been prevented, meaning his vehicle
      would not have gone underneath the trailer as far as it did.

Q.    Can you be more specific? What would have happened with any of these guards
      to his vehicle? Have you undertaken any analysis to give me some precise
      measurements or precise calculations as to what would have happened to his
      vehicle if it had contacted any of these guards?

A.    No, I haven't undertaken that at this stage.

Q.    Can you tell me if any of these guards would have been too rigid for this collision
      in terms of Mr. Paoline's deceleration at that speed?

A.    They're all capable of yielding, of absorbing some energy. The energy-absorbing
      guards, which are known to be energy-absorbing guards like the Quinton-Hazell
      and the Hope Safe-T bumper, certainly would not have been too rigid. The
      Insurance Institute for Highway Safety guard and the TTI guards would have

3

decelerated his vehicle faster than others. There would have been obvious front-end crush to his vehicle. But there wouldn't have been any invasion, . . ., with any of those guards. So he would not have impacted [sic] hard, unyielding structure with his face and head, which he did, in my opinion, in this case.

Q.  Other than simply telling me that, have you done any analysis or calculations that I can look at so you can show me why it is what you're saying what you're saying?

A.  Well, the reports that I have for you have all that done. That's all in the reports. You know, I'm not Lufkin Industries, I'm Steve Batterman. I don't have zillions of dollars to spend on building something and running a test, nor do you have to do it when the tests are out there.

Q.  Can you tell me . . . if you made a determination as to what injuries Mr. Paoline would have suffered had he contacted any one of the five guards that you mentioned?

A.  Do you mean had his vehicle contacted the guards?

Q.  Correct.

A.  Well, in my opinion, there would have been a substantial reduction in the probability, if not a complete mitigation, in the probability of his total brain injury and his zygomatic fractures.

Q.  Could he still had [sic] the zygomatic fractures –

A.  Could he have? I would say certainly he could have, but don't forget his head and face would have been impacting an energy-absorbing windshield with nothing behind it.

Q.  So he still would have hit the windshield?

A.  Oh, I think so.

Q.  Could he have sustained the closed-head injury as a result of hitting the windshield?

A.  Could he? Is it possible? Certainly it's possible. Is it probable knowing that he sustained the TBI by impacting hard structure? I'd say it is not probable. There was a substantial risk – minimization of risk of the injuries he sustained in this accident if his vehicle had impacted a properly designed guard.

4

Q.      Would he still with one of these properly designed guards have struck the windshield at or about 25 miles an hour?

A.      Yes.

Q.      Have you undertaken any studies in connection with this case to determine what happens if someone of his size and stature strikes a windshield at 25 miles per hour?

A.      You can be injured. I have plenty of cases of people striking windshields at 25 miles an hour that sustained facial lacerations. Sometimes they sustained neck injuries. I don't know of a single case that I have been involved in where anybody has sustained a total brain injury. I can't recall about facial fractures. But the probability of that is substantially increased by hitting rigid material like the back of a trailer like he did in this case.

Q.      Could you point to any body of literature other than the cases you have worked on, but a body of literature that can be consulted – that you consulted for this case that would talk about head injuries from striking a windshield at about 25 miles per hour?

A.      There's an enormous body of literature. I did not consult any specifically for the purposes of this case. But there are tens of thousands of pages in the Strapp . . . Car Crash Conferences; in the SAE literature in general. The sources are enormous. There are treatises on that. There is the Handbook of Human Tolerance . . . .

Q.      What portion of his head would strike the windshield with your proposed alternative designed bumper?

A.      I think his face would.

Q.      What part of his face would strike it?

A.      The frontal part of his face. And don't forget he's going to be stopped in part because before he strikes the windshield, in my opinion, his upper torso is going to strike the energy-absorbing steering column and that's going to slow him down and absorb some of the energy of the impact. Plus again we're talking about an unrestrained occupant, is that correct?

Q.      I'm assuming you're going to use the same facts that you've been assuming all along, that he was unrestrained.

A.    Well, I'm assuming he's unrestrained, that's correct. And I'm saying that his upper torso, his abdominal area, et cetera, strikes the steering wheel, slows him down a bit, and his head and face strike the windshield. And it may be with a delta-v of less than 25 miles an hour.

Q.    Can you point to me where on this little drawing that I made where you would expect his face to strike the windshield?

A.    I can't because that depends very much on his actions on whether he throws his hands up in front of his face, whether he turns his head and neck. But all things being equal if he holds onto the steering wheel, I think it's going to be a frontal striking of his face. I'm just going to say frontal. You drew a very nice Halloween-type picture. And I would say frontal facial contact with the windshield.

Q.    Just put a big X. Just anywhere on the front of his face, anywhere?

A     I'm just saying frontal contact. I can't tell you. It depends too much on what he's done, what he will do in anticipation of the accident. But, in general, I expect him to strike it full frontal contact. He may strike it with the top of his forehead first and his head and neck then go up into the windshield into what we call a rake angle to the windshield. But I would say I can't omit full frontal contact.

Q.    What kind of injuries would he suffer if he struck with his top of his forehead first and then did that same motion that you just described going somewhere along the lines of something less than 25 miles per hour?

A.    I think he can have facial lacerations. I think he can have flexion injuries, or flexion/extension injuries in general in his cervical column.

Q.    Could he become a paraplegic as a result of that? In other words, could he fracture a vertebrae and render himself a paraplegic?

A.    Can you? Yes. I have never yet been involved in a case where somebody has fractured a vertebrae that way. But can you? Sure, it's possible.

(Batterman Dep. at 137-145.)

In forming his conclusions, Dr. Batterman admits that he did not test any of the components of the rear guard or the rear sub-assembly on the Lufkin trailer (Batterman Dep. at 15, 30). Dr. Batterman stated that he has reviewed crash tests for Chevrolet Cavaliers (Mr.

Paoline was driving a 1986 Cavalier at the time of the accident), but did not review them specifically for this case, and did not specify whether he reviewed crash tests for a 1986 Cavalier. Id. at 41. Dr. Batterman did not have the opportunity to inspect either the vehicle or the trailer immediately after the accident. Id. at 41-43. Mr. Paoline's Cavalier was left at the accident site, and subsequently disappeared. Dr. Batterman testified that he would have liked to inspect both the vehicle and the trailer immediately after the accident to obtain some of the following information: overall crush measurements as far as the impact concerned the axle and the trailer wheels, id. at 43; witness marks on the trailer to see where the Cavalier impacted the trailer, id., at 44; location of hair, teeth marks, and body tissue on both the trailer and inside the Cavalier, id.; deformation of the steering wheel, id. at 46; the distance the hood of the vehicle was peeled back, id.; the seating position in the vehicle, id. at 46-47; and the energy absorbing elements of the steering column and the deformity, if any, of the slip bolts holding the steering column, id. at 127. Dr. Batterman further stated that, if the Cavalier had been available to him, he "would have done as thorough a forensic investigation as I could to see if I could find any head strikes, body strikes, in general, in various parts of the vehicle." Id. at 46. Dr. Batterman testified that his investigation into the cause of Mr. Paoline's injuries was affected by not having the Cavalier to inspect. Id. at 45.

Dr. Batterman did inspect the trailer approximately three to four years after the accident, and long after the trailer had been repaired. At the inspection, Dr. Batterman did no testing of the trailer other than to take measurements. He did not take any samples of steel from the trailer, id. at 61, nor did he do any speed tests at the scene, id. Dr. Batterman performed no tests or calculations to determine what it would take to bend or deform the gussets or slide rail on

the trailer, id. at 81, whether the macadam was the same as at the time of the accident, id., the strength of the trailer bumper at the time of the accident, id. at 82, how much energy the bumper absorbed during the accident, id., or what it would take to deform the steering wheel as revealed in post-accident photographs, id. at 127. Dr. Batterman performed no drag tests on the road, nor did he perform any G-analysis. Id. at 81. Dr. Batterman testified that he relied upon testing performed by the Insurance Institute for Highway Safety to determine the speed of the Cavalier at the time of the accident, but admitted that those tests involved two different vehicles, neither of which was a Cavalier, one of which was heavier than the Cavalier, and the other Dr. Batterman didn't "believe" was heavier. Id. at 85-86. The Insurance Institute tests were performed using a Freuhauf trailer with a bumper that was not identical to the Lufkin bumper at issue in this litigation, and with a trailer that was not attached to a tractor as in the instant case. Id. at 86. Importantly, the Insurance Institute tests involved crash test dummies in a belted position. Id. at 86-87. Relying upon these tests, Dr. Batterman concluded that with a properly designed guard, these were "survivable" accidents. Id. at 87. However, Dr. Batterman relied upon no tests involving unbelted dummies in reaching his conclusions.[3] Id. at 88, 125.

After carefully examining the deposition testimony of Dr. Batterman, this court concludes that he cannot offer admissible evidence as to the injuries Mr. Paoline would have suffered if an alternative design had been used. Dr. Batterman is unaware of the various forces that were at work in the accident. While he hypothesizes that Mr. Paoline would have suffered less traumatic injuries, he is unable to point to any tests or studies upon which he bases that

---

[3]    It appears to be undisputed that Mr. Paoline was not wearing a seat belt at the time of the accident. (Batterman Dep. at 50.)

conclusion. Even with a different guard on the trailer, Dr. Batterman testified that Mr. Paoline's face and head would have struck the windshield. However, Dr. Batterman did not undertake any studies to determine what would happen if someone of Mr. Paoline's size and stature struck a windshield at 25 miles per hour. Id. at 141. He stated that Mr. Paoline "certainly ... could have" suffered zygomatic fractures and "certainly it's possible" that Mr. Paoline would have suffered a closed head injury. Id. at 139-40. While Dr. Batterman testified that he personally has never been involved in a case where such an individual suffered traumatic brain injury, that does not mean that it could not occur. Id. When asked what part of Mr. Paoline's face would have impacted the windshield, Dr. Batterman stated, "I can't tell you." Id. at 144. Dr. Batterman first stated that frontal facial contact would have been made, but then stated that the top of the forehead might have struck the windshield first, followed by the head and neck. Id. Dr. Batterman was unable to state with any certainty what injuries Mr. Paoline would have suffered if his vehicle struck one of the alternative guards, noting that too many variables, such as the driver's actions in anticipation of impact, existed. Id.

As to the rigidity of the proposed guards, Dr. Batterman stated that some of the proposed alternative guards would not have been too rigid upon impact, but admits that others would have been more rigid causing a faster deceleration of the vehicle. Dr. Batterman, however, did not explain whether Mr. Paoline would have suffered deceleration injuries associated with striking an overly rigid guard. Dr. Batterman admitted that there was a trade-off between a rear guard being too rigid and too flimsy, because "you don't want to increase the deceleration of the vehicle to the point where the occupant is exposed to injury-producing threshold levels just due to the fact that the vehicle is decelerating very rapidly." Id. at 171-72.

9

When asked if he had any analysis or calculations to support his conclusions, Dr. Batterman stated "[t]hat's all in the reports," "I don't have zillions of dollars to spend building something and running a test, nor do you have to do it when the tests are out there." Id. at 139. While Dr. Batterman alludes to the existence of reports supporting his conclusions, he identifies none. Further, Dr. Batterman referred to what he called "an enormous body of literature" regarding human tolerance, however, he testified that he did not consult it for the purposes of this case. Id. at 141-42.

It is clear to this court that Dr. Batterman's proposed testimony regarding Mr. Paoline's hypothetical injuries does not satisfy the requirements of Daubert, as applied by the Third Circuit, and therefore is not admissible. Plaintiffs have not proven by a preponderance of the evidence that Dr. Batterman's opinion regarding injuries Mr. Paoline would have suffered with an alternative rear guard is "based on valid reasoning and reliable methodology." Oddi, 234 F.3d at 146 (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. (1997)). As detailed above, Dr. Batterman cannot state with any certainty what would have happened to Mr. Paoline's car if it had struck one of the proposed alternative guards. (Batterman Dep. at 137-38.) All the above leads this court to the conclusion that Dr. Batterman has failed to prove that he applied: (1) a method consisting of a testable hypothesis (Oddi factor number 1); (2) a method subjected to peer review (Oddi factor number 2); and (3) a generally accepted method (Oddi factor number 5). Moreover, without this information, the known or potential rate of error in Dr. Batterman's conclusions in limitless (Oddi factor number 3). Without knowing what method or techniques Dr. Batterman applied in order to reach his conclusions, it is impossible to assess "the existence and maintenance of standards controlling the technique's operation" (Oddi factor

number 4), or the "relationship of the technique to methods which have been established as reliable" (Oddi factor number 6).   Without evidence to prove what injuries Mr. Paoline would have suffered if an alternative design was used, plaintiffs cannot succeed on their crashworthiness claim and judgment must be entered in favor of Lufkin.[4]

For the reasons stated above, it is hereby

**ORDERED**

that defendant Lufkin's motion for summary judgment (Document No. 20) is **GRANTED**.

BY THE COURT:

THOMAS J. RUEHER
United States Magistrate Judge

---

[4]        Pursuant to Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   The Supreme Court has stated that Fed. R. Civ. P. 56(c) requires "the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Source: All Sources > / . . . / > US District Court Cases - 5th Circuit ⓘ
Terms: name(lassiegne and taco bell)  (Edit Search)

↙ Select for FOCUS™ or Delivery
☐

*2002 U.S. Dist. LEXIS 6808, \**

RAYMOND J. **LASSIEGNE** VERSUS **TACO BELL** CORP., ET. AL.

CIVIL ACTION NO: 00-3259 SECTION: "R"(3)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2002 U.S. Dist. LEXIS 6808

April 11, 2002, Decided
April 11, 2002, Filed, Entered

**DISPOSITION: [\*1]** Defendants' motion in limine granted. Defendants' motion for summary judgment granted and plaintiff's claims for damages dismissed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff individual sued defendant restaurant alleging personal injuries due to choking on a chicken bone from a taco purchased at the restaurant. The individual sought damages for an esophageal abrasion, impotency, migraine headaches, and post-traumatic stress disorder (PTSD). The restaurant moved in limine to exclude the testimony of the individual's experts and moved for summary judgment.

**OVERVIEW:** The individual worked as a police officer. While on duty, he purchased a chicken soft taco from the restaurant. The individual alleged that a chicken bone became lodged in his throat and he choked. The individual reported the incident to the restaurant's manager. Later that day the individual went to the emergency room and was diagnosed with an esophageal abrasion. The court held that the urologist presented no scientific basis for her ultimate conclusion that the choking incident caused a brain injury that caused the individual's erectile dysfunction and she admitted that her conclusion was speculative. The neurologist's testimony as to causation for the individual's migraine headaches was not based on a factual basis sufficient to support a conclusion regarding causation and was excluded as unreliable. It was undisputed that the individual's clinical interviews with the social worker were rife with omissions and inconsistencies with regard to information relevant to a diagnosis of PTSD. The presumption of causation did not apply because the medical evidence did not show a reasonable possibility that the choking incident caused the individual's injury.

**OUTCOME:** The motion in limine to exclude the causation testimony of the individual's experts was granted. The motion for summary judgment was granted and the individual's claims for damages for impotency, migraine headaches, and post-traumatic stress disorder were dismissed.

**CORE TERMS:** choking, dysfunction, erectile, causation, migraine, headaches, diagnosis, disorder, oxygen, depression, brain, expert testimony, patient, reliability, impotency, reliable, stress, doctor, methodology, symptoms, summary judgment, brain damage, post-traumatic, malingering, self-reported, scientific, deprived, erections, medical evidence, nonmoving party

## CORE CONCEPTS – ◆ Hide Concepts

▤ Evidence : Witnesses : Expert Testimony

⚓A district court has considerable discretion to admit or exclude expert testimony under Fed. R. Evid. 702.

▤ Evidence : Witnesses : Expert Testimony

⚓Fed. R. Evid. 702, which governs the admissibility of expert witness testimony, provides that an expert witness qualified by knowledge, skill, experience, training or education, may testify when scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.

▤ Evidence : Witnesses : Expert Testimony

⚓      See Fed. R. Evid. 702.

▤ Evidence : Witnesses : Expert Testimony

⚓Fed. R. Evid. 702 requires a district court to act as a "gatekeeper" to ensure that any and all scientific evidence admitted is not only relevant, but reliable. The Daubert gatekeeping function applies to all forms of expert testimony. A court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

▤ Evidence : Witnesses : Expert Testimony

⚓With regard to the gatekeeping function of Fed. R. Evid. 702, first, a court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation.

▤ Evidence : Witnesses : Expert Testimony

⚓With regard to Fed. R. Evid. 702, Daubert identified a number of factors that are useful in analyzing reliability of an expert's testimony, including testing, peer review and publication, evaluation of known rates of error, and general acceptance within the scientific community. The test of reliability is "flexible" and Daubert's list of specific factors does not necessarily nor exclusively apply to every expert in every case. Reliability is fact-specific inquiry and application of Daubert factors depends on nature of the issue at hand, the witness's particular expertise and the subject of the testimony. Nevertheless, in the vast majority of cases, a district court should first consider the Daubert factors before addressing whether other factors are relevant to the case. The overarching goal is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. The proponent of the expert testimony must prove by a preponderance of the evidence that the testimony is reliable.

▤ Evidence : Witnesses : Expert Testimony

⚓With regard to Fed. R. Evid. 702, a court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other words, whether it is relevant.

▤ Evidence : Relevance : Relevant Evidence

⚓The federal rules of evidence define "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401.

🖹 Evidence : Procedural Considerations : Burdens of Proof, Presumptions & Inferences
🖹 Evidence : Witnesses : Expert Testimony

⚓With regard to Fed. R. Evid. 702, a court's role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

🖹 Evidence : Procedural Considerations : Burdens of Proof, Presumptions & Inferences
🖹 Evidence : Witnesses : Expert Testimony

⚓The United States Court of Appeals for the Fifth Circuit holds that, in determining the admissibility of expert testimony, a district court must defer to the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.

🖹 Evidence : Witnesses : Expert Testimony

⚓Expert testimony is not admissible when it is based merely on subjective belief or unsupported speculation.

🖹 Civil Procedure : Summary Judgment : Summary Judgment Standard

⚓Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor. The moving party bears the burden of establishing that there are no genuine issues of material fact. A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.

🖹 Civil Procedure : Summary Judgment : Burdens of Production & Proof

⚓With regard to a motion for summary judgment, if the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exits.

🖹 Evidence : Procedural Considerations : Burdens of Proof, Presumptions & Inferences

⚓Under Louisiana law, a presumption of causation in favor of the plaintiff applies in cases where a plaintiff shows that (1) he was in good health before the accident, and (2) the medical testimony showed a reasonable possibility that the accident caused the injury. A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

🖹 Evidence : Witnesses : Expert Testimony

📄 Torts : Causation : Cause in Fact

⚓Under Louisiana law, when the conclusion regarding medical causation is not one
within common knowledge, expert medical testimony is required to prove causation.

**COUNSEL:** For RAYMOND J LASSIEGNE, plaintiff: Ronald Adams Johnson, Michael W.
Mallory, Johnson, Johnson, Barrios & Yacoubian, New Orleans, LA.

For TACO BELL CORP, defendant: John Tilghman Culotta, Lorie Guarisco DeMarcay, Hailey,
McNamara, Hall, Larmann & Papale, Metairie, LA.

For KEYSTONE FOOD LLC, defendant: Michael Mossy Christovich, Nicole Songy Loeb,
Deutsch, Kerrigan & Stiles, New Orleans, LA.

**JUDGES:** SARAH S. VANCE, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** SARAH S. VANCE

**OPINION: ORDER AND REASONS**

Before the Court are defendants' motions in limine to exclude plaintiff's proffered expert
medical testimony. Defendants also move for summary judgment on plaintiff's claims for
damages for impotency, migraine headaches and post-traumatic stress disorder. For the
following reasons, defendants' motions are granted.

## I. BACKGROUND

On November 30, 1999 plaintiff Raymond Lassiegne, a police officer, purchased a chicken soft
taco **[*2]** from a Taco Bell store number 2738 located in Harvey, Louisiana. He was eating
in his car, when on his third or fourth bite, he bit down into a hard substance, which
apparently was a chicken bone. He swallowed the chicken and the bone, and they became
lodged in his throat. Lassiegne asserts that while he choked on the chicken and bone, he felt
as though he would pass out. He did not pass out, however, and he admits that the choking
incident lasted only a matter of seconds. (Defs.' Mot. in Limine, Ex. A, Dep. Lassiegne, at
201.) Plaintiff drove back to the Taco Bell and reported the incident to the manager. He then
went back to work. Later that day, plaintiff went to the emergency room at West Jefferson
hospital and was diagnosed with an esophageal abrasion. Plaintiff claims that he was
deprived of oxygen during the choking incident and that as a result, he now suffers from
migraine headaches, impotency and post-traumatic stress disorder. He seeks damages.

Lassiegne relies on the testimony of expert witnesses to prove medical causation. Defendants
assert that there is no admissible scientific evidence that plaintiff's choking incident led to
migraine headaches, impotency or post-traumatic **[*3]** stress disorder, and asks the Court
to exclude the testimony of plaintiff's three medical experts. In addition, defendants ask that
the Court grant summary judgment on those claims if the opinion testimony is excluded.
Defendants contend that without the expert testimony, plaintiff cannot prove medical
causation.

## II. DISCUSSION: MOTIONS IN LIMINE

### A. Legal Standard

⚓The district court has considerable discretion to admit or exclude expert testimony under
Federal Rule of Evidence 702. See General Electric Co. v. Joiner, 522 U.S. 136, 138-39, 118
S. Ct. 512, 515, 139 L. Ed. 2d 508 (1997); Seatrax, Inc. v. Sonbeck Int'l, Inc., 200 F.3d 358,
371 (5th Cir. 2000) (citations omitted). ⚓Rule 702, which governs the admissibility of expert

witness testimony, provides that an expert witness "qualified ... by knowledge, skill, experience, training or education," may testify when scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. FED. R. EVID. 702. *See also Daubert, 509 U.S. 579, 587, 113 S. Ct. 2786, 2794, 125 L. Ed. 2d 469.* For the testimony to be admissible, Rule ⊼702  **[*4]**  establishes the following requirements:

> (1) the testimony [must be] based upon sufficient facts or data,
> (2) the testimony [must be] the product of reliable principles and methods, and
> (3) the witness [must apply] the principles and methods reliably to the facts of the case.

FED. R. EVID. 702.

In *Daubert*, the Supreme Court held that ⊼Rule 702 requires the district court to act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S. Ct. at 2795. *See also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999)* (clarifying that *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

⊼First, the court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chemical Inc., 151 F.3d 269, 276 (5th Cir. 1998)* (citing *In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3rd Cir. 1994)).*  **[*5]** The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert, 509 U.S. at 589, 113 S. Ct. at 2795.* The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See Daubert 509 U.S. at 590, 113 S. Ct. at 2795.*

⊼*Daubert* identified a number of factors that are useful in analyzing reliability of an expert's testimony, including testing, peer review and publication, evaluation of known rates of error, and general acceptance within the scientific community. *See Daubert 509 U.S. at 592-94, 113 S. Ct. at 2796-97.* In *Kumho Tire*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert's* list of specific factors does not necessarily nor exclusively apply to every expert in every case. 526 U.S. 137, 119 S. Ct. at 1175. *See also Seatrax, 200 F.3d at 372* (reliability is fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony"). Nevertheless, in the vast majority  **[*6]**  of cases, the district court should first consider the *Daubert* factors before addressing whether other factors are relevant to the case. *See Black v. Food Lion, Inc., 171 F.3d 308, 311-12 (5th Cir. 1999). See also Watkins v. Telsmith, 121 F.3d 984, 991 (5th Cir. 1997)* (regardless of basis of expert's opinion, *Daubert's* non-exclusive factors are relevant to initial reliability assessment). The overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176.* The proponent of the expert testimony must prove by a preponderance of the evidence that the testimony is reliable. *Tanner v. Westbrook, 174 F.3d 542, 547 (5th Cir. 1999)* (citing *Moore, 151 F.3d at 276*).

⊼The Court must also must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence, in other  **[*7]**  words, whether it is relevant. *See Daubert, 509 U.S. at 591, 113 S. Ct. at 2795-96;* FED. R. EVID. 702. ⊼The Federal Rules of Evidence define "relevant

evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.

☀The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. *See Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798. As the Supreme Court noted in *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas, 483 U.S. 44, 61, 107 S. Ct. 2704, 2714, 97 L. Ed. 2d 37 (1987)*). ☀The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "the jury's role as the proper arbiter of disputes between conflicting opinions." As a general rule, questions relating to **[*8]** the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More or Less Sit. in Lefore County, Miss., 80 F.3d 1074, 1077 (5th Cir. 1996)* (quoting *Viterbo v. Dow Chemical Co., 826 F.2d 420, 422 (5th Cir. 1987)*).

**B. Testimony of Dr. Susan McSherry**

Plaintiff asserts that after the choking incident, he reported to his doctor a decrease in libido with a simultaneous decrease in morning erections and erections upon attempting intercourse. He also said that his erections had decreased in terms of rigidity. He consulted with Dr. McSherry, a urologist, who had performed a vasectomy and follow-up treatment on Lassiegne in 1994-95. Dr. McSherry is a urologist certified by the American Board of Urology and trained in neural urology.

While defendants do not dispute that Dr. McSherry is properly qualified as an expert, they argue that her testimony should be excluded because it is not reliable. In this case, after taking Lassiegne's self-reported medical history and performing objective tests, Dr. McSherry **[*9]** diagnosed Lassiegne with erectile dysfunction, apparently caused by an ischemic event such as a loss of oxygen. Dr. McSherry identified four possible causes of erectile dysfunction: psychogenic, hormonal, vascular and neurogenic. Dr. McSherry ruled out psychogenic erectile dysfunction because Lassiegne apparently stopped having normal morning erections. (Defs.' Mot. in Limine, Ex. B, Dep. McSherry, at 27.) She determined that his erectile dysfunction did not have a hormonal cause because his PSA, testosterone and chemistry panel levels were normal. (*Id.*, at 28.) Further, based on the results of a Penile Doppler Blood Flow Study, she determined that Lassiegne's erectile dysfunction was not vasculogenic. (*Id.*, at 31.)

After running these tests and ruling out the other causes of erectile dysfunction, Dr. McSherry concluded that Lassiegne's erectile dysfunction was neurogenic, in that it was caused by "any kind of disruption of the nerve control of the erections, whether it be in the brain, the spinal cord or peripheral nerves." (*Id.* at 35.) Dr. McSherry hypothesized that Lassiegne suffered a "neurological event" as a result of the choking incident, which left a "neural lesion" **[*10]** in his brain. (*Id.*, at 24.) She conceded that such a lesion had to be "microscopic" because Lassiegne's "x-rays didn't show any specific damage." (*Id.*) Dr. McSherry admits that she ran no tests to determine if Lassiegne had suffered any brain damage. (*Id.* at 35-46.)

Dr. McSherry testified that there is "no test" to directly test for neurologic lesions associated with erectile dysfunction. She stated that she was not aware of "any tests you can run to locate the actual site [of the nerve damage]" and that such a diagnosis is "based a lot on the patient's history." (*Id.* at 36.) Further, Dr. McSherry testified that the "process of elimination" methodology to determine whether the cause of erectile dysfunction is neurogenic is a theory that has been generally accepted by the urological scientific community. (*Id.*, at 98-99.) She testified that the theory has been subjected to peer review and publication. (*Id.* at 98.) Specifically, she pointed out that the methodology was discussed in Campbell's Textbook of Urology. (*Id.* at 98-99.)

The Court finds that although Dr. McSherry may have followed an accepted methodology in diagnosing Lassiegne with erectile **[*11]** dysfunction, her ultimate conclusion that the choking incident caused erectile dysfunction is unreliable. Dr. McSherry presents no scientific basis, no "specific train of medical evidence," to link Mr. Lassiegne's choking incident to his erectile dysfunction. *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999). In *Food Lion*, the Fifth Circuit emphasized that *Daubert* and its progeny require that an expert's opinion be applied "fact-specifically" in each case. *Id.* Indeed, the Fifth Circuit stated that the "use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support." *Id.*

Here, Dr. McSherry presented no scientific basis for her ultimate conclusion that the choking incident caused a brain injury that caused plaintiff's erectile dysfunction. By her own testimony, Dr. McSherry admitted that her conclusion was speculative.

> I'm assuming in his case, since it was an abrupt onset [of erectile dysfunction] and he gives a history of completely normal erections and then an accident of some sort, which the way he describes it to me was possibly an anoxic or ischemic event, that something happened **[*12]** in his brain that could cause this.

(*Id.*, at 23)(emphasis added.) Further, it is clear from her testimony that Dr. McSherry determined that the choking incident was responsible for the brain damage based on temporal proximity alone.

> Q. And your theory that it's the choking incident that caused this erectile dysfunction is based on the chronology of events as given to you by Mr. Lassiegne; is that correct?
> A. Yes.

(*Id.*, at 119.) In *Moore v. Ashland Chemical Inc.*, the Fifth Circuit upheld the district court's exclusion of expert testimony when the expert relied "substantially on the temporal proximity between exposure and symptoms." 151 F.3d 269, 278 (5th Cir. 1998)(en banc).

In fact, Dr. McSherry arrived at her opinion without any information regarding how much time plaintiff was deprived of oxygen or whether plaintiff was deprived of oxygen at all.

> Q. But you have no knowledge about how long he was deprived of oxygen?
> A. No.
> Q. You don't even know if he was deprived of oxygen?
> A. No.

(*Id.*, at 120.) Dr. McSherry offers no scientific support for a general theory that loss of oxygen for any amount of time would **[*13]** cause a neurological event sufficient to result in erectile dysfunction. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999) ("If [the doctor's] causation opinion was not based on sufficient information of the level of benzene to which Plaintiffs were exposed, his methodology would not be reliable, rendering his causation opinion inadmissible."); *Moore*, 151 F.3d at 278 ("Because he had no accurate information on the level of Moore's exposure to the fumes, Dr. Jenkins necessarily had no

support for the theory that the level of chemicals to which Moore was exposed causes RADS.").

Finally, the Court finds that Dr. McSherry lacked the kind of specialized knowledge required to testify about causation. See _Tanner v. Westbrook_, 174 F.3d 542, 548 (5th Cir. 1999). What is in dispute in this case is whether plaintiff's choking incident caused his erectile dysfunction, not whether an anoxic event can cause erectile dysfunction generally. As the Supreme Court observed in Kumho, "the question before the trial court was specific, not general. The trial court had to decide whether this particular expert had sufficient specified **[*14]** knowledge to assist the jurors in deciding the particular issues in this case." _Kumho Tire_, 526 U.S. 137, 119 S. Ct. at 1178 (internal quotation marks and citations omitted).

In this case, Dr. McSherry admitted that she was not qualified to opine on the existence of a neural lesion or on the amount of oxygen deprivation that is necessary to cause anoxic brain damage. She testified that she was only qualified to state that Lassiegne fell "into the neurological etiology of erectile dysfunction." (_Id._ at 25.) Indeed, when pressed to discuss the specifics of the type of brain trauma needed to cause erectile dysfunction, she deferred to a neurologist. (_Id._, at 22.)

Based on the deposition testimony, the Court finds that Dr. McSherry's opinion that the choking incident caused plaintiff's erectile dysfunction has no scientific basis and is not sufficiently reliable under Rule 702 of the Federal Rules. The Court therefore excludes this causation opinion.

## C. Testimony of Dr. Steven Atkins

The Court finds that the testimony of Dr. Steven Atkins that the choking incident caused plaintiff's migraines suffers from the same deficiencies as Dr. McSherry's testimony. **[*15]** It is not disputed that Dr. Atkins, a board certified neurologist, is qualified to testify as a witness. Dr. Atkins testified that he arrived at the conclusion that plaintiff suffered from migraine headaches based on plaintiff's history and his own knowledge of other cases in clinical medicine. (Defs.' Mot. in Limine, Ex. D, Dep. Atkins, at 65-66.) He testified that there is no diagnostic "test" for headaches. (_Id._) Dr. Atkins did observe that plaintiff's EEG, a test of brain physiologic activity, as well as his CT scan and his SPECT scan were normal. (_Id._, at 54-55.)

To be helpful on the issue of medical causation, Dr. Atkins must do more than diagnose plaintiff with migraine headaches or establish that deprivation of oxygen to the brain can cause migraine headaches. Rather, he must provide a reliable causative link between this choking incident and plaintiff's migraines. Dr. Atkins gives the following explanation for his conclusion that the choking incident was in fact the cause of plaintiff's migraines:

> Q. Can you please explain to me how a choking incident could cause Mr. Lassiegne to suffer from migraine headaches?
>
> A. Because during a choking incident, people **[*16]** [are] not breathing efficiently, correct, and by definition, if you're choking, you're not breathing properly. That means there's decreased oxygen to the brain. Decreased oxygen to the brain can cause injury to the brain. Injury to the brain such as that can cause headaches, and can also cause chronic headaches.

(Defs.' Mot. in Limine, Ex. D., Dep. Atkins, at 58.) Dr. Atkins explained that in the context of a cardiac arrest, "within several minutes to six minutes is about when the brain will begin suffering irreversible ischemic or anoxic damage." (_Id._ at 58-59.) Dr. Atkins admits, however,

that he arrived at his conclusion that plaintiff's choking incident caused migraine headaches without considering how long plaintiff was deprived of oxygen.

> Q. Did Mr. Lassiegne tell you how long he allegedly choked?
> A. He did not specify the time to me.

(*Id.*, at 62.)

> Q. Do you have any information as to how long that near choking incident lasted?
>
> A. No, I do not.

(*Id.*, at 95.)

Dr. Atkins offers no scientific support for a general theory that loss of oxygen for any amount of time would cause brain damage sufficient to result in migraine **[\*17]** headaches. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999); *Moore*, 151 F.3d at 278. Indeed, Dr. Atkins admits that he is aware of no scientific literature supporting a theory that a minimal amount of oxygen loss causes brain damage. (*Id.*, at 101-102.) As with Dr. McSherry's testimony, the Court finds that Dr. Atkins furnishes no "specific train of medical evidence" tying Mr. Lassiegne's choking incident to his migraine headaches. *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999).

Since Dr. Atkins' testimony as to causation is not based on a factual basis sufficient to support a conclusion regarding causation, the Court excludes it as unreliable.

### D. Testimony of Randell L. Hess

Randell L. Hess is a licensed clinical social worker, with training in biofeedback, and an expertise in stress, anxiety, depression and post-traumatic stress disorders (Defs.' Mot. in Limine, Ex. G, Dep. Hess, at 12, 73-75, 77-79.) It is undisputed that Hess is qualified to testify as an expert as to post-traumatic stress disorder ("PTSD"). Hess met with Lassiegne on May 3, 2000, May 27, 2000, July 20, 2000 and March 14, 2001. **[\*18]**

In his deposition testimony, Hess stated that he diagnosed PTSD based on the criteria established by the Diagnostic and Statistical Manual, Fourth Edition ("DSM-IV"), the "authoritative text in treating mental disorders." (*Id.* at 17, 83-84, 102-106). He stated the following about this methodology:

> Basically from the clinical interview, looking at the criteria, at the DSM-IV, what it states, [PTSD] was the diagnosis I arrived at.

(*Id.*, at 35.) Hess identified the following facts as asserted by Lassiegne as the basis for his diagnosis:

> That [Lassiegne] had experienced an actual or threatened event of death which was the choking. A sense of helplessness. That he had recurring and intrusive distressing recollections of the event, recurring stressing dreams of the event.

That he had efforts to avoid those thoughts or feelings. That he avoided places that brought back those feelings. And he had some sense of, I guess you'd call it, doom and gloom, about the uncertainties of the future. He had difficulty falling asleep. He was irritable and had behavior outbursts, difficulty concentrating, and that those had lasted more than a month.

(*Id.*, **[*19]** at 35-36.) Hess testified that any kind of near-death experience can cause PTSD, including a "chicken bone or a pretzel or something else." (*Id.* at 38.) Hess also testified that he considered a differential diagnosis for plaintiff, including "strictly depression, acute stress disorder, generalized anxiety disorder," but ruled those diagnoses out based on the criteria listed in the DSM-IV. (*Id.*, at 41.)

Defendants argue that Hess's diagnosis was unreliable because plaintiff failed to inform Hess of certain essential facts, such as that his brother suffered from depression, delusions and cocaine dependence, that he was engaged in litigation, and that his mother committed suicide with his gun in July of 2000 and that he discovered her body. Defendants assert that since plaintiff withheld key facts and provided inconsistent answers, Hess' testimony was not based upon sufficient facts or data and accordingly, not admissible under Rule 702. The Court agrees.

In *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 (5th Cir. 1987), the Fifth Circuit upheld the district court's decision to exclude expert testimony that plaintiff had been injured by his exposure to a chemical **[*20]** because the doctor's opinion was based on a "weak foundation." In that case, the doctor relied on plaintiff's self-reported history, which was "incomplete in a critical area." *Id.* at 423. The doctor had not been informed that plaintiff had a family history of depression and hypertension. The doctor admitted that plaintiff's symptoms were characteristic of depression and hypertension. *Id.* at 423. The Fifth Circuit found that the doctor's "failure to take into account this family history seriously weakens this source as a foundation for Dr. Johnson's expert opinion" and held that the district court had correctly excluded the evidence. *Id.*, at 423. In this case, it is undisputed that Lassiegne failed to disclose to Hess certain relevant facts and, in fact, provided different accounts of his symptoms to different doctors. Under these circumstances, the Court finds that Lassiegne's porous account of his history is too flimsy a foundation to support Hess' conclusion.

In his deposition, Hess acknowledged that when he diagnosed psychological disorders, he relied on the accuracy and completeness of his patient's self-reported history.

> Q. **[*21]** In diagnosing your patients and treating them, you really have to rely on your patient as a historian, correct?
> A. In most cases.

(*Id.*, at 45). Hess also stated that he ruled out possible alternative diagnoses, like depression, based on the factual information given to him by plaintiff.

> Q. Is it fair to say that you ruled out the possibility of depression as being Mr. Lassiegne's main problem based on what he's telling you, his reporting of his symptoms to you?
> A. Correct.

(*Id.*, at 45-46.) Based on Hess' testimony, it is clear that the reliability of a diagnosis using the DSM-IV depends on the reliability of the underlying factual basis for the diagnosis.

In this case, it is undisputed that Lassiegne's clinical interviews with Hess were rife with omissions and inconsistencies with regard to information relevant to a diagnosis of PTSD. Most importantly, Lassiegne never told Hess that his brother, who drowned in 1998, had experienced depression, delusions and had a cocaine dependency problems. (*Id.*, at 58; Ex. A, Dep. Lassiegne, at 235.) Hess stated that this information indicated that Lassiegne may have had a family history of depression and such **[*22]** a family history would have had an impact on his diagnosis.

> Q. Would any of those factors regarding his brother having experienced depression, delusions or cocaine addiction indicate that there was a family history or possible family history of depression?
> A. It would have.
> Q. Would a patient's family history with respect to mental disorders or illness have any effect on your opinion as to either the cause of the problem or the nature of their problem?
> A. Hypothetically, yes. In this case, the things that have been indicating that I was not aware of, still impacts, I think, his ability to deal with things, but it doesn't necessarily cause the PTSD. People have a lot of experiences that they go through and deal with or don't deal with, but having - again, based on the symptoms that he indicated and so forth, they - what he was - the PTSD was resulting from the choking incident.

(*Id.*, at 58-59)(emphasis added.) Although Hess stated that the information Lassiegne withheld did not "necessarily cause" PTSD, it is clear that the undisclosed information could have impacted Hess' diagnosis, particularly since he had to rule out depression as the source of **[*23]** plaintiff's problems in making a differential diagnosis. (*Id.*)

Further, Hess acknowledged that malingering needed to be "ruled out" when the patient has a financial interest in a diagnosis, but that he did not "actively" consider whether Lassiegne was malingering.

> Q. Would you agree that malingering should be ruled out in a situation in which financial remuneration, benefit, eligibility and forensic determinations play a role?
>
> A. Sure.
>
> . . .
> Q. Did you consider whether Mr. Lassiegne was malingering?
> A. Not actively, no.

(*Id.*, at 42.) Hess stated that Lassiegne never told him that he was involved in litigation, even though Hess generally asked during the clinical interview whether there were any legal issues that he needed to consider. Hess stated that he did not have this information when he made the "initial diagnosis" of PTSD.

> A. . . . . When I made the initial diagnosis, there was no discussion of a lawsuit. It was strictly on a clinical basis.
> Q. When, if ever, did Mr. Lassiegne mention that he was involved in a lawsuit?
> A. I don't believe he ever did. I think I just go something in the mail from the attorneys.

Q. Do you ask your patients **[*24]** normally if they're involved in any litigation or anything like that?
A. I usually ask if there are any legal concerns that they have.

(*Id.*, at 43.) When asked about whether this information would have changed his diagnosis, Hess stated that he "informally ruled [malingering] out." (*Id.*, at 44.) Hess failed to explain, however, how he "informally" rules out malingering. Further, he conceded that a neuropsychological evaluation to rule out the possibility of malingering would have been helpful "from a treatment standpoint." (*Id.*, at 44.)

In addition, Lassiegne never told Hess that his mother committed suicide, with his gun, and that he discovered the body in July 2000. n1 (*Id.*, at 46, 62.) Hess testified that it was important in dealing with psychological disorders for patients to tell him about any traumatic events in their lives.



Q. And, in particular, in dealing with psychological disorders, it's important, would you agree, for your patients to tell you about any traumatic events that occur in their life while you're treating them.
A. Correct.
Q. Because it's possible that these events could have quite an effect on their well-being; correct? **[*25]**
A. Possible, yes.

(*Id.*, Ex. G, Dep. Hess, at 45-46.) Here, it is undisputed that Lassiegne had an appointment with Hess two weeks after his mother's suicide, on July 20, 2000. (*Id.*, at 62.) Hess stated the suicide was a "significant event" and that it "would have" been helpful in diagnosing Lassiegne. (*Id.*, at 46.) Hess also found it "significant" that Lassiegne did not inform Hess of the suicide. (*Id.*, at 62.)

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 The Court notes that Lassiegne also reported at his October 30, 2001 deposition that both his parents were in good health, when his mother had in fact committed suicide in July 2000. (Defs.' Mot. in Limine, Ex. A, Dep. Lassiegne, at 10.)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Hess also confirmed that Lassiegne provided descriptions of his symptoms to other doctors that were inconsistent with the symptoms Lassiegne self-reported to him. (*Id.*, at 65.) Hess confirmed that one of the factors in diagnosing PTSD is that the traumatic experience is persistently reexperienced in one of the following ways: recurrent and **[*26]** intrusive distressing recollections of the event, recurrent distressing dreams of the events, intense distress at the exposure to internal and external cues or flashbacks (*Id.*, at 103-04, 109). Consistent with those criteria, Lassiegne told Hess that he had flashbacks and nightmares. (*Id.*, at 104-105.) Lassiegne, however, told Dr. Desselle that he did not have flashbacks. (*Id.*, at 113-114.) Hess acknowledged that such contradictory reports could impact his diagnosis of PTSD.

Q. When we were talking earlier about the diagnosis of post-traumatic stress disorder . . . that one of the critical factors in making that diagnosis as opposed to some other disorder was the recurrent thought or flashbacks; is that a correct understanding.

A. Yes, that's a significant part.
. . .
Q. If you learned that he was not, in fact, experiencing flashbacks?
A. At what point in time?
Q. Ever.
A. If he's say, not experiencing it now?
Q. Well, say, if he had never experienced them?
A. If he had never experienced them, yes, that would be significant.

*Id.*, at 109-110.) Further, Lassiegne denied having PTSD to Dr. McSherry. (*Id.*, 91-92, 114; Ex. 4.) Hess stated that **[*27]** he would have like to have known "why Lassiegne would say that." (*Id.*, at 92.)

Moreover, there are indications that Hess uncritically accepted plaintiff's account and failed to interpose much in the way of independent professional judgment in arriving at his conclusion. Hess concluded that plaintiff suffered from PTSD as a result of choking on a chicken taco, even though plaintiff admits that he still eats at the same Taco Bell and eats chicken from fast food restaurants. (Defs.' Mot. in Limine, Ex. A, Dep. Lassiegne, at 155-56, 177.) In addition, plaintiff is a police officer who carries a gun and who apparently risks his life on a daily basis. (*Id.*, at 109, 172-73.) He has weathered the deaths of his brother and mother in a two and a half year period. Yet, when plaintiff asserted that he has been traumatized for over a year from choking on a chicken bone that did not even cause him to pass out, Hess had no qualms about diagnosing him with PTSD. (*Id.*, at 194.) Further, Hess clings to this conclusion in the face of mounting evidence of significant omissions from Lassiegne's self-reported history, and he fails to give an adequate explanation of why his opinion is still **[*28]** valid.

Based on the cumulative effect of the foregoing inconsistencies and omissions in Lassiegne's self-reported oral history -- the accuracy and completeness of which Hess relied upon in making his diagnosis -- the Court finds that Lassiegne did not provide Hess with a sufficient factual basis for Hess to arrive at a reliable diagnosis. Accordingly, the Court excludes Hess' opinion testimony as to medical causation.

### E. Testimony as to the Possibility of Causation

The Court rejects the plaintiff's suggestion that Dr. McSherry, Dr. Atkins and Mr. Hess be allowed to testify as to the "possibility of causation." ⚑Expert testimony is not admissible when it is based merely on subjective belief or unsupported speculation. *See Daubert*, 509 U.S. at 590, 113 S. Ct. at 2795. Plaintiff has not submitted any post-Daubert case law that contradicts that position.

### III. DISCUSSION: SUMMARY JUDGMENT

### A. Legal Standard

⚑Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2551, 91 L. Ed. 2d 265 (1986). **[*29]** The court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The moving party bears the burden of establishing that there are no genuine issues of material fact. *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993). A factual dispute precludes a

grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. See *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 2001 WL 1650961 (5th Cir. 2001)(citations omitted).

⧫If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *Celotex*, 477 U.S. at 325, 106 SCt. at 2552; **[*30]** *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exits. *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553.

## B. Analysis

Defendants have moved for summary judgment on plaintiff's claims for damages for impotency, migraine headaches and PTSD, arguing that under Louisiana law, plaintiff cannot meet his burden of proof on causation without medical expert testimony. Plaintiff argues that his own testimony is sufficient to establish a causal link between the choking incident and impotency, migraine headaches and post-traumatic stress disorder and asserts that under *Housley v. Cerise*, 579 So. 2d 973 (La. 1991), he is entitled to the presumption of causation. The Court disagrees.

In *Housley*, the ⧫Louisiana Supreme Court held that a presumption of causation in favor of the plaintiff applied in cases where plaintiff showed that (1) he was in good health before the accident, and (2) the medical testimony showed a reasonable possibility that the accident caused the injury. 579 So. 2d adt 980 ("[a] **[*31]** claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.") The Court finds that the *Housley* presumption does not apply in this case because the medical evidence does not show a reasonable possibility that the choking incident caused the injury. The Court has already excluded the expert medical testimony as to causation as unreliable. In addition, Dr. Atkins admitted that he knew of no other case in which an individual sustained brain damage following a choking incident in which there was only a partial obstruction of the airway. (Defs.' Mot. in Limine, Ex. D, Dep. Atkins, at 126-27.) Dr. McSherry testified that in her fifteen years of practice, she had never had a patient who developed erectile dysfunction from a choking incident. (*Id.*, Ex. B, Dep. McSherry, at 101-02.) Mr. Hess stated that he was not familiar with any literature **[*32]** or case studies in which choking on something caused PTSD. (*Id.*, Ex. G, Dep. Hess, 37-38.) All of the objective medical tests showed that Lassiegne had no brain damage. (*Id.* Ex. D, Dep. Atkins, at 54-55.) In stark contrast, in *Housley*, all of the experts agreed that a fall can cause the premature rupture of a pregnant woman's water bag. 579 So. 2d at 979. The Court finds that since plaintiff has not met his burden of showing that the medical evidence established a "reasonable possibility" of a causal connection, the *Housley* presumption does not apply.

Plaintiff also argues that the Court should allow his experts to testify as fact witnesses, and that plaintiff's medical testimony plus the experts' fact testimony is sufficient to prove medical causation. n2 The Court rejects this argument. The Louisiana Supreme Court has held that ⧫when the conclusion regarding medical causation is not one within common knowledge, expert medical testimony is required to prove causation. See *Pfiffner v. Correa*, 643 So. 2d 1228, * 10 (La. 1994). It is not disputed that the causes of impotency, migraine headaches and PTSD are not matters within the common knowledge **[*33]** of a layperson. Accordingly, plaintiff must present admissible expert testimony regarding causation to meet his burden, and he cannot do that in this case.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

Case 1:98-cv-00186    Document 167    Filed in TXSD on 06/28/2002    Page 93 of 122
Get a Document - by Party Na^    - lassiegne AND taco bell
Page 15 of 15

n2 In support, plaintiff cites *Arceneaux v. Howard, 633 So.2d 207,* (La. 5 Cir. 1993), which the Court finds to be inapplicable. In *Arceneaux,* the state appellate court found that the *Housley* presumption applied, and in this case, the Court has found that the *Housley* presumption does not apply.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The Court therefore grants defendants' motion for summary judgment on plaintiff's claims for damages for impotency, migraine headaches and PTSD. See *Black v. Food Lion, 171 F.3d 308, 314 (5th Cir. 1999)*("Without Dr. Reyna's testimony, Black cannot hold Food Lion liable for medical expenses, lost wages, or pain and suffering attributable to her fibromyalgia.") The Court, however, rejects defendant Keystone's argument that this case should be dismissed in its entirety. Lassiegne may still be compensated for any damages and **[\*34]** medical expense incurred for the treatment of his esophageal abrasion caused by the alleged choking incident. *See id.* The Court also excludes any testimony regarding impotency, migraine headaches or PTSD at trial as irrelevant, since plaintiff cannot prove that there is a causal connection between the choking incident and those ailments.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to limine to exclude the causation testimony of Drs. McSherry and Atkins, and Mr. Hess. In addition, the Court finds that without expert testimony, plaintiff can not meet his burden of proof in showing causation. The Court therefore grants defendants' motion for summary judgment and dismisses plaintiff's claims for damages for impotency, migraine headaches and PTSD.

New Orleans, Louisiana, this 11th day of April, 2002.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

Source: All Sources > / . . . / > US District Court Cases - 5th Circuit ⓘ
Terms: name(lassiegne and taco bell)  (Edit Search)
View: Full
Date/Time: Friday, June 28, 2002 - 10:13 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MELVIN KNOTTS, etc., et al.,

                       Plaintiff,                    Case No. 3:00 CV 7734

        -vs-

                                                    __MEMORANDUM OPINION__

BLACK & DECKER, INC., et al.,

                       Defendant.

KATZ, J.

This matter is before the Court on Defendant's Motion for Summary Judgment and multiple Motions in Limine. The parties have fully briefed the issue rendering these matters ripe for disposition. This Court has jurisdiction under 28 U.S.C. § 1332.

### BACKGROUND

This action arises out of a fire which occurred at 528 Buckeye Street in Toledo, Ohio on November 14, 1998. Residents of the home included Mrs. Ladean Knotts, age 60[1], as well as her son Martin and his wife who lived in the upstairs portion of the home. A second son, Melvin, lived nearby with his children, Michael, age 3, and Harley, age 1. Ladean's daughter, Lisa Amerson, also lived

---

[1] At the time of the incident, Mrs. Knotts was confined to bed for health related reasons.

nearby with her children Milisa Knotts, age 14, Samuel Amerson, age 5, Nathaniel Amerson, age 3, and Chelsea Amerson, age 14 months.  Mr. Larry Pringle, Ladean's significant other, was presently living with Lisa Amerson during renovations[2] to the 528 Buckeye Street address.  During a regular day, Lisa and Melvin brought their children to Mrs. Knotts' home while they worked and Milisa Amerson[3] babysat.

The front of the Buckeye Street residence faced south and the house had a front porch with a front entrance.  On entering the home, there was a small alcove.  To the left of the alcove there was a stairway leading to the second story where Mrs. Knotts' son Martin lived.  To the right of the alcove was a doorway leading to the living room which was functioning as Mrs. Knotts' bedroom.  Behind or to the north of the living room/bedroom was a dining room which was under renovation.  Melvin Knotts and Mr. Pringle had installed new wiring, breaker boxes and outlets several weeks before the fire.  According to Melvin Knotts, the local utility company had approved and inspected all new wiring for the renovation before the power was activated.  At the time of the fire, drywall had been installed on the north and east walls of the dining room and there was drywall leaning in the northeast corner of the dining room while plywood was leaning against the east wall.

On the south wall of the dining room, a space heater was plugged into an electrical outlet.  That space heater was hooked up to a gas tank located in the basement.  On the day of the fire, Melvin

---

[2]

Upon completion of the renovations to the Buckeye Street home, Mr. Pringle and John Knotts would move in to live with Ladean, Melvin Knotts and his wife.

[3]

Although Milisa was of school age, she was being home-schooled by her mother.

2

Knotts observed that the space heater in the kitchen was not turned on, but Milisa Amerson testified that the heater was on. A second space heater was located near the north wall of the living room/bedroom and, according to Martin Knotts, it was activated.

Just shortly before the fire, Melvin Knotts purchased two Black & Decker Versapak battery chargers at a Meijer Store. The battery charger consisted of (1) a transformer which was plugged into an electrical outlet and (2) a charger base capable of charging two batteries at one time. According to Melvin Knotts, the charger base had an opening on the back of its plastic housing which allowed it to be hung from a nail on a wall. At the time of the fire, the battery charger was plugged into the top outlet of a duplex receptacle on the northeast wall of the dining room. The outlet was approximately one foot above the floor. The lower outlet was covered by a childproof plastic cap. The battery charger hung from a nail approximately five and a half feet above the floor. The transformer and the receptacle into which it was plugged were obscured by the drywall leaning against the wall; however, Melvin Knotts stated that the drywall was not leaning on the power cord of the battery charger.

On the morning of November 14, 1998, Martin Knotts rose before 5:00 a.m. to prepare to go to work. Before leaving the house, he walked through the downstairs living room/bedroom and into the dining room to make coffee. After chatting with his mother, Martin unplugged a utility light which was plugged into an outlet in the dining room located behind the space heater. Mrs. Knotts had complained that the light, which was hanging from the rafters in the dining room, was bothering her. Martin also testified that he may have unplugged the dining room space heater and turned off its gas valve (located on the floor), but he is unsure.

3

At approximately 5:30 a.m. Melvin Knotts came by the home to drop off insulation and picked up a set of batteries located in the battery charger. Melvin then placed another set of batteries into the charger. He left the home about thirty minutes later.

Lisa Amerson arrived around 8:15 a.m. with her and Melvin's children. Fourteen year old Milisa Amerson was to babysit Samuel, Nathaniel, Chelsea, Michael and Harley. According to Milisa, the children stayed in the living room of the Knotts home and were not permitted in the dining or any back rooms due to the ongoing renovations.

At around 10:00 a.m., Milisa's friend, Kristy Williams, arrived with her baby to visit. Shortly thereafter, both girls heard a buzzing noise but could not determine its source or origin. Milisa then fed the children lunch and thereafter, she, Kristy and Kristy's baby went outside to take out the garbage. When Milisa went outside, Nathaniel was napping on the bed with Mrs. Knotts.

Minutes after Milisa was outside, Samuel ran outside to alert Milisa as to the fire. Milisa went into the house and saw a wall on fire. She then attempted to get all of the children out of the home and then went back to rescue her grandmother. During that rescue attempt, one year old Harley wandered back into the house and up the stairs. Milisa was unable to get her grandmother out of the house and two neighbors actually dragged Milisa to safety just prior to firefighters arriving on the scene. Both Harley and Mrs. Knotts died in the fire.

A subsequent investigation was conducted by the Toledo Fire Department. The origin of the fire was determined to have been located at the east wall of the dining room. The investigation initially ruled the cause of fire as undetermined. However, after interviewing family members, including two of the

4

children, a supplemental report found the fire "was accidental and all indications point[ed] to a [sic] electrical battery charger used for charging cordless tools."

Plaintiffs Melvin Knotts and Lisa Amerson as administrators of the decedents' estates initiated this action against Black & Decker asserting wrongful death and product liability claims. Black & Decker effected a timely removal from state court to the present venue and now seeks summary judgment on the basis that the Defendant's battery charger was not defective and there is no evidence that the battery charger caused the fire. Contemporaneous with its motion for summary judgment, the Defendant moves to preclude the statements of Samuel and Nathaniel Amerson as well as the testimony of the Plaintiffs' experts. As the motions in limine are central to dispositive motion pending, the Court addresses those issues first.

### MOTION IN LIMINE[4] REGARDING STATEMENTS OF CHILDREN

---

[4]

Motions in limine are generally used to ensure evenhanded and expeditious management of trials by eliminating evidence that is clearly inadmissible for any purpose. *See Jonasson v. Lutheran Child and Family Serv.*, 115 F.3d 436, 440 (7th Cir.1997). The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds. *Cf. Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984) (federal district courts have authority to make in limine rulings pursuant to their authority to manage trials). Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. (citations omitted). Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine. *See United States v. Connelly*, 874 F.2d 412, 416 (7th Cir.1989) (citing *Luce*, 469 U.S. at 41, 105 S.Ct. at 463) ("Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). *Hawthorne Partners v. AT & T Technologies, Inc.*, 831 F.Supp. 1398, 1400- 1401 (N.D.Ill.1993).

In anticipation of the issues which would be presented, on March 2, 2001, the Court conducted a voir dire of each minor child in the presence of counsel. Following the individual interviews by the Court, counsel were requested to brief the issue of admissibility of the proffered statements. Thereafter, the depositions of each child took place on April 3, 2001, with the undersigned judicial officer present. At issue is the competency of Samuel and Nathaniel Amerson as well as the admissibility of their statements to fire inspectors.

### A. Competency to Testify

Under Fed. R. Evid. 601, a court is directed to the applicable state law to determine the competency of a witness. In Ohio the trial judge is vested with the duty to conduct a voir dire of the child to determine competency. *State v. Wilson*, 156 Ohio St. 525, 532, 103 N.E.2d 552, 556 (1952). The purpose of such an examination is to allow the judge to observe first-hand the child's demeanor, his way of responding to questions, to determine the child's ability to convey facts with accuracy and truthfulness. Considerations which a trial court takes into account include:

> (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.

*State v. Frazier*, 61 Ohio St.3d 247, 251, 574 N.E.2d 483, 487 (1991).

At the time of the voir dire by the Court, Samuel was seven years old and Nathaniel six years of age. Upon questioning each separately, both Samuel and Nathaniel were responsive to short-term memory questions such as where they attended school, who their teachers were and their respective ages. Additionally, both children were able to identify their family members who had accompanied them

6

to the courthouse. Both children were also able to discern the difference between the truth and a falsity. Their demeanor also indicated that they appreciated the need to be truthful in response to questions.

Having attended the depositions of the children taken just a month after the voir dire, this Court concludes that Samuel and Nathaniel, at the time of their examination on voir dire and on deposition, were capable of receiving just impressions of facts observed and could accurately relate them to recent events. More problematic, in this Court's view, is the depth of the children's memory relative to this incident. The Court observed the children's demeanor during the depositions and it appeared that their response to counsel's questions were not contrived and appeared to be based upon their best recollection. However, the inability of the children to accurately recount the events they experienced at ages three and five, respectively, raises serious concerns as to their competency. At times during their depositions they were unable to remember details previously given to the fire investigators and gave inconsistent answers. It is this inability to recount those impressions and details which renders them incompetent to testify as to those events. Although this is admittedly a close issue, the Court finds that the relevant factors weigh against a finding of competency; therefore, Samuel and Nathaniel Amerson are not deemed competent to testify as to the events of November 14, 1998.

## B. Admissibility of Out of Court Statements

Next, the Court considers the admissibility of statements made days after the incident to Fire Investigator Sbrocchi which were included in his report of November 18, 1999. The Plaintiffs argue that these statements, even if the children are deemed incompetent to testify, should be admitted as they fall within two exceptions to the hearsay rule, namely, an excited utterance and as part of a public records report. For the reasons that follow, this Court finds these statements inadmissible.

7

Under Fed. R. Evid. 803(2), an excited utterance reflects "[a] statement relating to a startling event or condition while the declarant was under the stress of excitement, caused by the event or condition." The Ohio Supreme Court has applied a four part test to determine what constitutes a spontaneous exclamation:

> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,

> (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

> (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and

> (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

*State v. Wallace,* 37 Ohio St.3d 87, 89, 524 N.E.2d 466, 469 (1988). As noted by the Court in *Wallace,* the lapse of time between the event and the statement does not preclude admissibility. *Id.* In that case the declarant was unconscious for a fifteen hour period between the time she was assaulted and her unelicited statement, which in the Supreme Court's view indicated that the effect of the assault continued to dominate her thought process. Moreover, an out of court statement is not prohibited when it is the result of questioning that: "(1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the

8

domination of the nervous excitement over the declarant's reflective faculties." *Id.* at 93, 524 N.E.2d at 472.

In the present action, both sides correctly identify the pivotal issue as whether at the time of the questioning the children were still under the influence of the startling event. The interview by Investigator Sbrocchi took place four days after the fire. Present during the interview in addition to Sbrocchi were Investigator Darrell Bonnough, Samuel Amerson, Nathaniel Amerson, Milisa Knotts, and their mother Lisa Amerson. Although Plaintiffs advocate that Samuel and Nathaniel were still under the influence of the startling event, there is nothing in the record to support that contention. The deposition testimony of Investigator Sbrocchi does not indicate, for example, that the boys were visibly distraught when asked about the incident, which could have indicated that they were still under the stress of the event. It is not even clear exactly what questions were posed to Samuel and Nathaniel. Thus, on the record before the Court are the childrens' statements in response to some sort of questioning by the investigator. Taking into account that situation, coupled with the passage of four days and the unknown influences of intervening circumstances which effects on the reflective thought process are unknown, it is unclear that the young boys were still under the stress of nervous excitement. It is a combination of all these factors which leads this Court to conclude that the statements made by Samuel and Nathaniel Amerson to Investigator Sbrocchi do not qualify as excited utterances under Fed. R. Evid. 803(2).

Alternatively, the Plaintiffs argue that the statements are admissible under the public records exception under Fed. R. Evid. 803(8). However, both the Sixth Circuit and Ohio courts have held that witness statements contained in an investigative report are not admissible under 803(8). *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994); *Nelson v. Ford Motor Co.*, 145 Ohio App.3d 58, 68,

9

761 N.E.2d 1099, 1107 (2001). Under this rule, such factual findings of an investigation are excluded where "the sources of information or other circumstances indicate lack of trustworthiness." In light of the childrens' statements not being qualified as excited utterances, the Defendant has met its burden of establishing a lack of trustworthiness. *See United States v. Garland*, 991 F.2d 328, 335-336 (6th Cir. 1993).

Accordingly, the statements of Samuel and Nathaniel Amerson made to the investigators four days after the incident are inadmissible.

### MOTION IN LIMINE REGARDING PLAINTIFFS' EXPERTS

#### A. *Expert Testimony Considerations*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court directed the trial courts to act as gatekeepers in excluding unreliable expert testimony. Under this gatekeeping function, the trial courts were charged with assessing the reliability and relevancy of expert testimony before admissibility. Six years later, the Supreme Court expanded its application in *Daubert* to all expert testimony not just testimony which was grounded in science. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). As a result of these directives, Fed. R. Evid. 702 was amended as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Although the Court in *Daubert* identified several factors, they also noted that the inquiry was flexible, setting forth a non-exclusive checklist including:

> (1)whether a theory or technique can be or has been tested--that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

FED. R. EVID. 702 advisory committee note, 2000 Amendments.

Regarding the reliability factor, a trial court "must focus on the soundness of the expert's methodology." *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 303 (6th Cir.), *cert. denied*, 118 S.Ct. 67 (1997). "An expert opinion that is based on scientifically valid principles will satisfy Fed. R. Evid. 702; an expert's subjective belief or unsupported speculation will not." *Id.*, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, (on Remand), 43 F.3d 1311, 1319 (9th Cir.) *cert. denied*, 516 U.S. 869, 116 S. Ct. 189, 133 L.Ed2d 126 (1995). Finally, the party offering the expert testimony bears the burden of proof in establishing its admissibility. *Daubert*, 509 U.S. at 592 n.10, 113 S.Ct. at 2796.

With these principles in mind, the Court now turns to the parties' contentions.

*B. Ralph Dolence*

Ralph Dolence ("Dolence") is Plaintiffs' expert on the issue of fire origin and cause. He is a licensed electrician and veteran firefighter. He has opined "that the origin and cause of the fire was an unidentified failure in the Black and Decker Versa Pack Battery Charger." (Dolence Aff.) He is not offered for the purpose of the alleged defectiveness of the product. Due to the destruction of the home

11

and the lack of physical evidence in this case, Dolence based his opinion on review of photographs, x-ray analysis of an exemplar battery charger, analysis of the components of an exemplar battery charger, the Toledo Fire Inspection Reports and Supplemental Reports, and witness testimony.

The Plaintiffs submit that Dolence's testimony will assist the jury in understanding how an origin of a fire is determined and will provide a forensic analysis to establish this fire's origin. In his report of October 1, 2001[5], Dolence based his conclusion on a number of facts, all of which were gleaned from the investigative report. A review of Dolence's deposition also reveals that he did no independent investigation save for an x-ray analysis of an exemplar and taking it apart to see its components. (Dolence Dep., pp. 117, 121-122.) He did not, for example, conduct a burn test as Plaintiffs' other expert was charged with determining the product's failure. Although a fire origin expert, Dolence was unable to utilize the photographs taken at the scene as a basis for his conclusions due to the alleged poor quality of those photographs. This excerpt from his deposition reveals to a large extent the basis for his conclusions:

---

[5]
      We base our conclusion on a number of facts. The Black & Decker battery charger was plugged in and in operation at the point of fire origin. The battery charger was witnessed on fire. The City of Toledo Electrical Inspector examined the duplex receptacle and wiring remains of the battery charger was plugged into at the time of the fire and ruled out electrical failure or malfunction. This, in turn, rules out the duplex receptacle and associated wiring as a cause of the fire, leaving the Black & Decker battery charger as the heat source that ignited combustibles and caused the resultant fire.
      Based on the facts, statements, reports and photographs, other accidental causes have been considered and have been ruled out. The cause of the fire was an unidentified failure within the Black & Decker battery charger.

(Dolence Report at p. 2.)

Q:     There's nothing that you've seen that rules out - - and I want you to let me start over again.  Obviously, you've relied heavily on the witness statements in formulating your conclusions?

A:     That's correct.

Q:     Putting those witness statements aside for the moment, there's nothing that you have seen that rules out other potential causes of fire, is that correct?

A:     That's not correct.

Q:     All right.  Let me try and ask another question.  There are no - - there's no evidence of burn pattern that are inconsistent with something else starting this fire, correct?

A:     That are inconsistent?

Q:     Correct.

A:     Well, its not just burn pattern.  It's the nature of the fire, what's inconsistent with those.  The careless smoking fire is a long slow smoldering fire.  You don't have - -

Q:     Let me try - - let me try a different question.  Because I know exactly where you're coming from and think I - - you're going to agree with me in the end.
       Well, let me ask this.  There is nothing that you have evaluated in terms of photographic evidence or burn pattern evidence or smoke pattern evidence that is inconsistent with these children starting the fire, correct?

A:     No.  I think it still has to come back to - - and the only way I can answer this is to come back to what they initially saw.

Q:     Okay.  But other than what they saw you don't really have anything else to tell you what did start this fire, correct?

A:     And a lot of things that said - - tell me what did not set the - - start the fire.

(Id. at pp. 101-102.)  Ultimately, Dolence conceded that the pictures were not useful in determining the

fire's point of origin.  (Id. at p. 104.)

13

At other times during his deposition, Dolence conceded that he ruled out electrical failures or malfunctions based upon the conclusions of the City of Toledo's Electrical Inspector. (Id. at p. 132.) Dolence also acknowledged that if the witness statements were removed he could not opine upon the origin of the fire. (Id. at p. 141.) Dolence relied upon the fire investigators' report as supporting his opinion that the battery charger was the source of origin, yet he disagreed that the point of origin was on the east wall, as determined by the fire investigators, and opined it was on the north wall, where the battery charger was located. (Id. at pp. 147-149.)

On the issue of juvenile firesetting, he ruled out this possibility because, despite the fact that the fire investigators may not have considered this issue, there was nothing to indicate to Dolence that juvenile firesetting played a role in this incident. (Id. at pp. 97-98.) According to Investigator Sbrocchi's deposition, if it had been determined that the children had set the fire while playing, it would still have been classified as an accidental fire. (Sbrocchi Dep., p. 34.) However, the report did not indicate that the children had placed paper on the fire because he "felt the family had already had enough." (Id. at p. 54.)

A similar situation was presented in *Michigan Millers Mutual Insurance Corp. v. Benfield,* 140 F.3d 915 (11th Cir. 1998), where an expert's testimony was disallowed on the issue of the fire's origin. There, the expert opined that the cause of the fire was intentional as all accidental causes were eliminated and he could not identify the ignition source. *Id.* at p. 921. The expert was also unable to explain his methodology for eliminating a potential source of origin and the district court determined that his opinion on the incendiary cause was without a rational explanation and insufficient to assist the jury. *Id.*

14

Having carefully viewed the factors upon which Dolence premises his opinion, the Court finds that his opinion is not grounded on anything other than the fire investigation report and the witness statements contained therein. There is no independent basis or analysis grounded either in scientific methodology or reliable procedures to support his theory as to the origin of the fire. Moreover, this Court is mindful of the Supreme Court's cautionary language in *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L. Ed.2d 508 (1997) which states that:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.

In this instance, it is the view of this Court that Dolence's opinion is incapable of bridging the analytical gap sufficient to establish an admissible opinion on the origin of the fire. Accordingly, Defendant's Motion in Limine regarding Ralph Dolence is well taken.

## C. George Kramerich, Ph.D.

Dr. Kramerich's ("Kramerich") opinion is being offered on the functional capacity of the Defendant's product to overheat and potentially cause a fire due to a lack of thermal protection in its design. (Pltf's Opp. at p.9.) The Defendant challenges Dr. Kramerich's opinions as being inadmissible as they fail to comport with *Daubert's* requirements of reliability and assistance to the jury. *See also* Fed. R. Evid. 702.

The Court has carefully reviewed Dr. Kramerich's deposition testimony of November 13, 2001, his subsequent affidavit of March 24, 2002, as well as multiple exhibits submitted by Plaintiffs in support of their opposition. After review of the memoranda submitted and review of the relevant case law, the

15

Court concludes that Dr. Kramerich's testimony fails to meet the requirements under *Daubert* and is also inadmissible.

### 1. *Items Relied Upon by Dr. Kramerich*

In coming to his conclusions, Dr. Kramerich reviewed documents from the Consumer Product Safety Commission ("CPSC") involving reports relative to battery chargers, an exemplar, the fire origin, witness observations and elimination of other potential heat sources.   It is the Defendant's contention that the CPSC documents are inadmissible on the basis that they have not been authenticated and that they contain hearsay.

Although the Defendants are correct that the documents have not been formally authenticated, there is a letter dated November 5, 2001, from the CPSC to Plaintiff's counsel responding to a request for information relative to selected battery chargers and drills which   references "four Epidemiologic Investigation Reports with the underlying and supporting documentation." (Kramerich Dep., Ex.S, p.1.) While the formal requirements of Fed. R. Evid 901(b) have not been technically complied with, it is clear that if allowed to proceed to trial, Plaintiffs would be able to authenticate these CSPC reports in compliance with Fed. R. Evid. 901.

Assuming for the moment that the documents are authenticated, the inquiry turns to whether these documents would be admissible at trial or fall within any exception to the hearsay rule.   The November 5, 2001 letter from the CPSC offers the following insight upon the proffered documents:

16

> While conducting the interviews for the investigation reports, Commission staff or
> contractors *have spoken with the individuals involved or with others who witnessed
> or are familiar with the incidents.* Where possible, Commission staff examined the
> products reportedly involved in the incidents. Although the Commission has investigated
> the incidents described in the investigation reports, the Commission has not necessarily
> determined the cause of the incidents.

*Id.* (Emphasis added.)

The admissibility of CPSC reports has been addressed by both this Circuit and others. In

*Morales v American Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998), for example, the district

court admitted a CPSC publication entitled "Hazard Analysis of Mini-Bike Related Injuries." Plaintiff's

expert relied upon this information in "determin[ing] the basic cognitive skills required to operate a basic

minibike or motorcycle in order to assess at what age children could safely operate such a vehicle." *Id.*

at 512. As this evidence was used to establish the age appropriateness of such vehicles, its admission for

that narrow purpose was deemed appropriate.

The Court in *Shelton v. Consumer Products Safety Com'n*, 277 F.3d 998 (8th Cir. 2002),

affirmed the admission of laboratory test reports generated by the CPSC under the business records

exception to the hearsay rule. There was no challenge by the opposing party as to trustworthiness of the

information. Thus, where those reports were created in the course of regularly conducted activity, they

complied with the dictates of Fed. R. Evid. 803(6) and were properly admitted.

In this instance, the CSPS documents are offered as factual reports to support Dr. Kramerich's

opinion as to the functional capability of the product to cause a fire. The problem with these reports is

that unlike the above examples, these documents are not merely statistics but contain witness or

eyewitness statements by someone not an employee of the CPSC as to an incident and do reflect CPSC conducted experiments. As noted by the appellate Court in *McKinnon v. Skil Corp.*:

> The CPSC reports are untrustworthy because they contain double hearsay in many instances, the CPSC investigator at one level, and the accident victim interviewee at yet another level removed. Most of the data contained in the reports is simply a paraphrasing of versions of accidents given by the victims themselves who surely cannot be regarded as disinterested observers.

638 F.2d 270, 278 (1st Cir. 1981).

Similar to the statements made by the young Amerson children above, these observations recorded by the CPSC are not admissible for the truth of the matter asserted. Therefore, to the extent that Dr. Kramerich relies upon these witness observations, the Defendant correctly observes that the trustworthiness of these statements/observations relative to product at issue has not been established and they are deemed inadmissible. *See, Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994); *Nelson v. Ford Motor Co.*, 145 Ohio App.3d 58, 68, 761 N.E.2d 1099, 1107 (2001).

2. *Kramerich's Testimony*

As noted by the Defendant, during his deposition Dr. Kramerich conceded that he did not rely upon all of the CSPS documents as many of them did not contain incidents related to this case. Rather he relied upon those reports involving "a portable battery type device *that in all probability* used the same type of technology for recharging the battery that we were talking about in this case." (Kramerich Dep., p. 26.) (Emphasis added.)

Other documents which Dr. Kramerich relied upon were articles from various publications such as the following:

18

Q:     Okay.  I've next marked as Defendants' Exhibit M Page 5 from a document consisting of one page, Page 5 from the Fall 2001 issue of Fire Findings, and that contains an article which I assume you're including because it says, "Scorched charger leads to testing," correct?

A:     Correct.

Q:     What is it about that particular document that led to its inclusion in your file?

A:     It's just an issue involving battery chargers.

Q:     Do you know whether - - other than the information contained in this article, do you know anything about the similarity or dissimilarity of this battery charger to the one that we're talking about here?

A:     Other than my opinion that they're probably made from similar materials and use essentially the same technology, *they're totally different devices*.  This was for rechargeable AA batteries.     And the purpose of this test was to see if putting in regular alkaline batteries that were not rechargeable batteries would set this thing on fire. And they ran a test and it didn't set it on fire.

Q:     Okay.  And, in fact, they did not reach a conclusion in that article that it was probable that it could catch on fire, correct?

A:     For this particular type of device, yes.

(Kramerich Dep., p. 45-46.) (Emphasis added.)  Dr. Kramerich also relied upon an April 2001 Fire & Arson Investigator article despite the fact that the size of batteries at issue was different in the devices. (Id. at p. 43.)

Dr. Kramerich also hinged his opinion of the Black & Decker VP130 being susceptible to catching fire based upon other similar items:

Q:     So is it accurate to say that you can't tell to a reasonable degree of engineering probability in this particular case with this particular charger that any of these failure modes that you posited would lead to ignition of that battery charger?

       Mr. George: Objection

19

A:    I have difficulty answering that question. It's my opinion, absent the scientific method evidence, that there is supporting factual documentation that this technology produces fires. And there's no reason to exclude Black & Decker's products from that body of evidence that says these kind of things do catch on fire.

Q:    All right.

A:    Do I have specific information that this thing made by Black & Decker caused a fire, no.

Q:    That's what I'm really trying to hone in on. I understand -- I think I do understand how the evidence you've looked at and how you've interpreted it. And I also understand that you simply do not have enough data about this case and about some of these other incidents to say to a reasonable degree of engineering probability that any of the failure modes that you posited in this particular battery charger can cause an ignition; isn't that right?

A:    That's correct, but I need to extrapolate on that a little bit.

Q:    Okay.

A:    The failure modes I have hypothesized in this case are the same failure modes that would be required to occur in the battery chargers that have been reported to have caught fire and started fires.
If you take the battery chargers where we have evidence of recalls and firesetting being the result of failure and overheating in the battery charger, those battery chargers have the same type of NiCad batteries not made by Black & Decker, they use the same type of -- they use the same concept of rectification using LEDs and diodes and resistors, and those failures I've hypothesized here have caused fires in those other devices, which leads me to conclude that they should cause fire in these devices.

Q:    I understand that, I understand the methodology, but I guess in order for you to form an opinion to a reasonable degree of probability, you would have to do some testing, correct?

A:    I would have to take the one that Dolence has, which there's testimony is a clone, and ignite it.

(Id. at pp. 115-117.)

20

Dr. Kramerich's opinion focused on a failure mode which would cause overheating of the battery of the charger case itself. When queried, Dr. Kramerich agreed that different color plastics might have different levels of ignition, but when asked about comparison to the product at issue, he stated: "It would be my opinion it would be highly unlikely that the materials would be significantly different in thermal characteristics, but, again, I haven't investigated it, so I don't know." (Id. at p. 45.)

Dr. Kramerich was also unable to indicate the temperature necessary to cause overheating of the battery sufficient to ignite the charger relative to the Defendant's product:

Q:   If you apply that full voltage to that battery with the failure of [diode] D3, how hot does -- what gets hot?

A:   The battery.

Q:   How hot does it get?

A:   I don't know.

Q:   So you can't say to a reasonable degree of engineering probability that a failure of component D3 would get the battery in the battery charger hot enough to ignite the components of the charger base, correct?

A:   It's my opinion that it does with the specifics of the NiCad in that battery and with the actual current flow. I haven't conducted any tests, so I can't tell you.

Q:   You could do that, right?

A:   Yeah.

(Id. at pp. 95-96.) Nor was the witness able to testify as to the temperature necessary to ignite the plastic charger case:

Q:   We've already -- you've already said that you don't know what the plastic charger base is made of, correct?

21

A:    Correct

Q:    And I thought we agreed early on in the deposition that in order to figure out whether something can ignite, you need to know how hot something gets and how hot whatever its going to ignite needs to be in order to catch fire, correct?

A:    Un-huh.

Q:    You don't know how hot this battery gets if there's this failure, correct?

A:    You're taking me to the same scenario that I went through in order not to do this test. I have a general understanding of - - without the specific details of quantitative information with regards to plastic and plastic burning.
I've investigated enough fires involving plastic things that I know they burn. And I know there's no remarkable difference between what Black & Decker puts in its stuff or Bell & Howell or Sears or Craftsman or anybody else, nobody has a unique plastic that's noncombustible, that's been on television half a dozen times on 20/20, showing all these plastic things burn, so I know they burn. I don't need the specific quantitative thermal capacity in degrees Fahrenheit or Centigrade, it's going to burn. And we have factual evidence that these things made from this stuff does burn.

Q:    Okay. I just want to make sure I understand this. You don't have any factual evidence that a Black & Decker battery charger base has overheated and ignited, correct?

A:    No.

Q:    Your factual evidence relates to other manufacturers, correct?

A:    Yes.

Q:    And you don't know how hot the batteries get in the event - - the Black & Decker batteries get on a VP130 if we fail component [diode] D3, correct?

A:    At this time, that's correct.

(Id. at pp. 96-98.)

22

On the issue of the failure rate, considering "the whole universe of similar battery chargers" Dr.

Kramerich agreed that "chance of a failure of any type leading to ignition" was "low" or "remote" but did

not want to "extrapolate [] beyond that." (Id. at pp. 110-111.)

While Kramerich's testimony is not offered on the issue of cause and origin, his opinion on

defective design subverts the Plaintiffs' case.

Q:     Okay.  Have you designed - - do you have a design that cures the defects that you posit
       in either the circuit on Page 1 of the T or the circuit on Page 2 of the T?

A:     I don't want to go too far with this.  We're not talking about a defect, and I'm not
       alleging either of these designs is a defective design.  What I'm saying is that there is a
       *potential* for component failure in the design which *can* lead to a problem.  And it's the
       design - - it's the consideration given to what happens if there is a failure that leads me to
       conclude that either of these designs would have worked with a thermal cutout, because
       in either case you would have shut off the electricity.
       So if you bought a 29-cent part and it failed, you got a 29-cent thermal cutout that shuts
       everything off and it doesn't work anymore and the consumer is safe.  So I'm not alleging
       this is a stupid design or it's a defective design, what I'm saying is that there are failure
       modes in this design that can lead to problems.

Q:     All right.

A:     And you can't put enough parts in there to eliminate that.

Q:     Okay.  Well, then I misunderstood your testimony.  Let me just go back and ask you a
       question, maybe it will clear it up.  Do you have an opinion to a reasonable degree of
       engineering probability that the design of the Black & Decker VP 130 as reflected either
       in Exhibit T, Page 1 or Exhibit T, Page 2, is defective?

A:     Yes.

Q:     And what's your opinion?

A:     It's not.

(Id. at pp. 103-104.)  (Emphasis added.)

23

Considering Dr. Kramerich's testimony as a whole, the Court concludes that this testimony shows at best the possibility of a failure mode on the part of all battery chargers but does not establish a probability as to the Black & Decker VP130 sufficient within the dictates of *Daubert*. As acknowledged in his deposition, there was no independent testing of the product in order to validate Dr. Kramerich's assertions that the Defendant's product could cause the battery to overheat and the plastic charger case to ignite. Rather, the expert's theory was based upon articles and documents which involved battery chargers of several types, made by varying manufacturers, all for the proposition that the "same technology" was applicable to the Black & Decker VP130 for the purpose of asserting this possible scenario with the alleged offending product. This extrapolation theory when coupled with the lack of any independent testing qualifies Dr. Kramerich's opinion as tenuous at best because "there is simply too great an analytical gap between the data and the opinion offered." *Joiner v. General Electric Co.*, 522 U.S. at 146, 118 S.Ct. at 519.

The Sixth Circuit has also upheld exclusion of expert testimony where there was a lack of a reliable testing to validate the hypothesis. *Pride v. Bic Corp*, 218 F.3d 56, 577, 578 (6th Cir. 2000). Although that case involved expert testimony aimed at the cause and origin of the fire purportedly caused by a lighter, the Circuit affirmed the district court's decision to exclude the expert testimony for the following reasons:

> The failure of [plaintiff's] experts to test their hypothesis in a timely and reliable manner or to validate their hypothesis by reference to generally accepted scientific principles as applied to the facts of this case renders their testimony on the cause and origin of the fire inadmissible under *Daubert* and Federal Rules of Evidence 702 and 104.

24

*Id.* The same reasoning is applicable here and despite Dr. Kramerich's best attempts[6] to bridge the gap between his opinion and the data, his opinion is speculative, unreliable and cannot be deemed admissible in this instance.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). See e.g., *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th

---

[6]

Plaintiffs' proffer of Dr. Kramerich's affidavit of March 2002 cannot be considered by the Court to the extent his opinion contradicts his deposition testimony. Conflicts between affidavits and other evidentiary materials do not preclude summary judgment and the court may disregard the subsequent affidavit unless a legitimate reason is given for the discrepancy. See *Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1977)(party cannot create a genuine issue of material fact by filing an affidavit after summary judgment has been made, that contradicts the earlier deposition testimony); *Dotson v. U.S. Postal Service*, 977 F.2d 976, 978 (6th Cir.), *cert. denied*, 506 U.S. 892 (1992) (party cannot rely upon an affidavit contradicting prior sworn testimony); *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Generally, however, a deposition is given more weight as it affords the opposing side an opportunity for cross-examination not available in an affidavit. To the extent that the subsequent affidavit contradicts the prior sworn testimony without explanation, the Court disregards these averments. See also 11 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 56.14[1][f] (3d ed. 2001).

Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of his responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusional allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. See Lujan v. National Wildlife Federation, 497 U.S. 871, 888-89, 110 S.Ct. 3177, 3188-89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and nonexpert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." See Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 968-69 (6th Cir.1991) (quoting *State Mut. Life Assurance Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir.1979) and citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1609 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has

26

been made, which contradicts [ ] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. Nonmaterial facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Id. (citations omitted).

Where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2552 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. at 2510-11 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam ) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). " The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512).

27

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact  because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511.

## B.  Products Liability Claims

Although codified in the Ohio Products Liability Act[7], in order to establish a product liability claim it must be shown that:

> (1) there was a defect in the product manufactured and sold by the defendant, (2) the defect existed at the time the product left the defendant's control, and (3) the defect was the direct and proximate cause of the plaintiff's injuries or losses

*Atkins v. General Motors Corp.*, 132 Ohio App.3d 556, 562, 725 N.E.2d 727, 731 (1999), citing *State Farm Fire & Casualty Co.*, 37 Ohio St.3d 1, 5-6, 523 N.E.2d 489, 493 (1988).  It is the Defendant's position that the absence of evidence to establish a causal link warrants summary judgment on all claims.

The trier of fact must be presented with the probability as to the cause of the plaintiff's injuries and not a mere possibility. *See Shumaker v. OliverB. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, n.3, 504 N.E.2d 44, 46 (1986), citing, *Drew v. Indus. Comm'n*, 136 Ohio St. 499, 501, 26 N.E. 2d 793 (1940).  Without the expert testimony of either Dolence or Kramerich, coupled with the inadmissibility of the children's statements, the evidence which is admissible merely points to a possible cause.  The evidence that the battery charger was plugged in, the buzzing noise heard by Milisa Knotts and seeing a

---

[7] *See* OHIO REV. CODE § 2307 et seq.

28

wall in the dining room on fire do not establish causation. Even when coupled with the fire investigators'

report, causation is tenuous because the fire investigators did not conclusively rule out juvenile firesetting

but declined to list that possibility in their report out of respect for the family. They testified that even if

such a determination had been further investigated it would not have altered their conclusion that the fire

was accidental. Therefore, the conclusion of the fire investigation was not conclusive as to the cause.

Additionally, there was no admissible testimony by Dr. Kramerich to support the contention that

the VP130 was defective or prone to igniting as he did not conduct tests to bolster his opinion but based

it upon the technology generally utilized in all battery chargers.

In sum, the Plaintiffs have not met their burden of establishing proof of causation or a defect

which is necessary in order to place this matter before the trier of fact. Having considered all of the

competent evidence presented in this action, the Court finds that Defendant is entitled to summary

judgment on all claims.

### CONCLUSION

For the reasons stated above, Defendant's Motion in Limine to Exclude Hearsay Statements of

Children (Doc. No. 46) is granted. Defendant's Motion in Limine to Exclude Testimony of Plaintiffs'

Experts (Doc. No. 47) is granted. Defendant's Motion for Summary Judgment (Doc. No. 45) is

granted.

IT IS SO ORDERED.

_s/ David A. Katz_
DAVID A. KATZ
U. S. DISTRICT JUDGE

29