*168*

United States District Court
Southern District of Texas
FILED

JUN 2 8 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CYTHIA COX AS NEXT FRIEND | § | |
| OF BRITTANY COX, ET AL | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO. B-98-186 |
| BRK BRANDS, INC. | § | |

## PLAINTIFFS' AND INTERVENOR'S OBJECTION TO MAGISTRATE JUDGE'S OPINION AND ORDER

TO THE HONORABLE COURT:

NOW COMES, CYNTHIA COX, AS NEXT FRIEND OF BRITTANY MARIE COX, JOSE GARCIA INDIVIDUALLY AND IDALIA GARCIA INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF MANUEL CRUZ, plaintiffs in the above styled and numbered cause, by and through their attorney of record, WATTS & HEARD, L.L.P., and asks the court to consider the Magistrate Judge's recommendation and files these its objections under F.R.C.P. 72(b).

Plaintiffs and Intervenors object to the order entered by the Magistrate Judge granting in part Defendant BRK Brands, Inc. Motion to Exclude Plaintiffs' Experts and in support thereof would respectfully show the court as follows.

The court should permit the testimony of Michael Schulz because the witness is qualified, his opinions are reliable, and there is no question that they are relevant and helpful to the jury.

## II. BACKGROUND

Plaintiffs and Intervenors seek to impose liability upon BRK because its detector, a product intended to alarm in the presence of sufficient quantities of by-products of combustion,



failed to perform its intended function of timely alarming Manuel Cruz, decedent. This claim is legally sufficient in imposing liability upon BRK for the failure of its product to properly alarm and is supported by the facts because there is scientifically valid methodology to prove that the smoke detector should have alarmed before Mr. Cruz became incapacitated by the carbon monoxide produced by the space heater.

As has been disclosed to the court and relied upon by the experts, Defendant broke its promise to the consumers of this country by the fraudulent acts in getting their detectors listed by Underwriter's Laboratory. This affront to honesty has created a risk of severe injury and death to those consumers who rely on the claimed safety of the BRK detector. Additionally, the defendant has used design processes which are affected by humidity and/or fretting to such an extent that the separable contacts upon the sounding mechanism will be affected. Additionally, plaintiffs/intervenors have submitted through their experts design alternatives that would have prevented such a failure by the use of soldered contacts on the warning horn.

Mr. Cruz, a former police officer, was wary for his safety and took adequate precautions in attempting to ventilate his residence as well as placing the space heater in a position directly underneath the BRK detector. In fact, he unfortunately relied upon the detector's alarm based on the representations by defendant of its product safety.

BRK admits that there is a large body of research that provides information to determine where a smoke detector should be installed. However, BRK does not dispute that the use of the smoke detector at the distance determined to exist around the space heater was in any way improper. BRK also sets forth that the body of research available allows experts to "better" understand what volume of smoke is necessary to cause a detector to "alarm."

The plaintiffs/intervenors in this case filed suit against BRK Brands, Inc., a manufacturer of smoke detectors, alleging that a BRK model SA67D smoke detector, which was installed on the wall of the hallway leading from Cruz's living room, approximately seven to ten feel above the space heater, "failed to warn [Cruz] of the smoke in his house." The plaintiffs contend that the products of combustion emitted from the space heater would have caused a properly functioning smoke detector to alarm, and the space heater in this instance emitted products of combustion in sufficient volume to have been able to cause the detector to alarm before Cruz became incapacitated. According to the plaintiffs, the BRK smoke detector in Cruz's home was defective because its piezo-horn contacts, the contacts through which the alarm signal is transmitted to the horn, were corroded. The plaintiffs claim that the piezo-horn contacts on Cruz's detector became corroded through a "fretting" motion. Fretting is a specific deterioration process, involving microscopic motions at a contact interface. According to the plaintiffs, this corrosion developed to such an extent that it blocked the transmission of the alarm signal to the horn. To support their theory of liability, the plaintiffs have offered the opinions of various experts to explain why, in the absence of any evidence of smoke inhalation, BRK should be held liable for Cruz's carbon monoxide poisoning.

Plaintiffs designated Michael Schulz as a fire origins and investigations expert. According to the plaintiffs, Schulz will testify "that a properly designed and operating smoke detector would detect the by-products of combustion from a propane fueled space heater." Schulz has an impressive resume and may very well be qualified to investigate and analyze fires and fire explosions, he is qualified to answer the specific questions in this case. Schulz used a demonstration he performed at the Cruz residence on April 18, 2000 to support his opinions but his opinions were based on available

information out in the field including BRK's own instructions.  His opinions were actually based on the available literature and the recognized and accepted knowledge in the field apart from the demonstration.  The demonstration illicitated that information which already generally known.  Even BRK admits that this propane heater will set the detector alarm off.  Schulz testified that the purpose of his demonstration was to show that the products of combustion and smoke particulate do not have to be of a visible size in order to sound an alarm.  In his demonstration, Schulz placed a dual, photoelectric/ionization, smoke detector, First Alert/BRK Brands Model No. SA301B, in the location of Cruz's smoke detector at the time Cruz died.  Schulz measured the level of carbon monoxide and oxygen within the living room and the bedroom of the Cruz residence while operating the propane-fueled heater.  Schulz testified that the smoke detector alarmed five minutes and twenty-four seconds after the heater was turned on.  He maintained that this test showed that the Cruz smoke detector should have alarmed from the flue gases, i.e., water vapor, carbon monoxide, carbon dioxide, and propane, that the heater released prior to the emission of soot and smoke before lethal concentrations of carbon monoxide were produced within the Cruz residence.

Michael Schulz's methodology complied with the guidelines of the National Fire Code, and he was demonstrating the general principle that a heater in close proximity to a smoke detector will cause the detector to alarm because it will detect the by-products of combustion.  Schulz's demonstration is reliable because its methodology provides support for the proposition that an ionization smoke detector will sound when a propane-fueled heater emits by-products of combustion.

### III. SUMMARY OF THE ARGUMENT

Because plaintiffs believe that BRK's misleading characterizations of Plaintiffs' expert's opinions are not helpful to the court's analysis, Plaintiffs' suggest that the court

read plaintiffs' expert's report and deposition testimony before proceeding through this lengthy response brief. *See* Exhibit "1" and "2". Also see the authoritative sources and defendant's information attached as exhibit 3, Study of Deterioratio0n of Seperable Electtircal Contacts in Smoke Detectors; Exhibit "4", Studies Assess Performance of Residential Detectors; Exhibit "5" Standard for Safety; Exhiobit "6" Smoke Detector Operability Survey Repot of Findings; Exhibit "7", fire Incident Study National Smoke Detector Project; and Exhibit "8" NFPA 921 Guide for Fire & Explosion Investigations. The level of qualification of the expert Mike Schulz and the intellectual rigor and reliability of the proffered opinions is self-evident from the affidavit and report. Plaintiffs hope that the affidavit and report will considerably streamline the court's consideration of the issues.

Generally, expert testimony that is reliable and will assist the trier of fact in determining facts in issue is admissible. Although reliability is determined by reference to the three requirements of Federal Rule of Evidence 702, which incorporate the factors set out in *Daubert* and its progeny. The trial court has wide latitude in determining how it will assess reliability, including which factors it deems relevant and whether it believes that reliability of the opinions can be assumed. In this case, Plaintiffs' expert Mike Schulz will offer opinions regarding well-known areas of expertise and he is not testifying about a controversial subject. Furthermore, he has based his opinions on reliable facts and data and has reliably applied his methodologies and techniques to those facts. There is no basis to question the reliability of any of the opinions because they are not novel, do not make unwarranted analytical leaps, and comport with generally accepted scientific knowledge within the detector and product warning industries. See attached deposition testimony of Michael Schulz attached hereto as Exhibit "2."

## IV. FEDERAL RULE OF EVIDENCE 702 PROVIDES THE GOVERNING STANDARD

In 2000, amendments to Federal Rule of Evidence 702 codified certain changes that *Daubert* and its progeny had on the application of the old rule 702. The amended rule now requires the court to find each of the following factors as a predicate to admissibility:

> (1) the testimony is based upon sufficient facts or data;
> (2) the testimony is the product of reliable principles and methods;
> (3) the witness has applied the principles and methods reliably to the facts of the case.

In applying the second and third prongs, the court evaluates the nonexclusive factors mentioned in *Daubert* and expanded in subsequent cases, only if it deems such factors helpful to determining reliability in a particular case. FRE 702 (Advisory Committee Notes). The Advisory Committee Notes recognize that neither *Daubert* nor the amendment of rule 702 is intended to permit a party to force expensive, time consuming challenges to the opinion of every single expert and that the trial court has broad discretion to avoid unnecessary "reliability" proceedings in "ordinary cases where the reliability of an expert's methods is properly taken for granted." FRE 702 (Advisory Committee Notes) (citing *Kumho Tire vs. Carmichael,* 119 S. Ct. 1167, 1176 (1999)).

> *Daubert* requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case."

*Watkins v. Telsmith, Inc.,* 121 F.3d 984, 988-89 (5th Cir.1997).

The court should approach the admissibility (or "reliability") inquiry from the premise that "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." *United States vs. 14.38 Acres of Land Situated in LeFlore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir. 1996). In addition, it is critical to

recognize that there are neither "bright-line exclusionary" rules, nor bright-line rules of inclusion. *Heller vs. Shaw Industries*, 167 F.3d 1167, 1176. Therefore, no single factor among those described below is necessarily dispositive of reliability, nor even necessarily relevant to it. Rather, the court should make its ruling based on a totality of the circumstances.

The "trial court should consider the specific factors identified in *Daubert* [and other cases] where they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co. vs. Carmichael*, 119 S. Ct. 1167, 1175 (1999). The common sense corollary to this is that the trial court should simply disregard those factors that do not lend themselves to examining the reliability of testimony offered in a particular case. In this regard, it is appropriate to examine the realities of detector litigation and the detector industry in general.

FRE 702 provides that a person becomes qualified to render expert opinions "by knowledge, skill, experience, training *or* education." FRE 702 (emphasis supplied). This inquiry involves a routine, common sense evaluation of whether the person has sufficient background and knowledge to really understand the subject. There are no magic formulae for qualification and any one – or combination of more than one – of the factors may be sufficient. For example, the Advisory Committee Notes specifically acknowledge that FRE 702 provides for qualification on the basis of experience, standing alone. FRE 702 (Advisory Committee Notes, 2000 Amendment).

BRK goes to great pains to repeat reliability "buzzwords," such as publication, general acceptance and peer-review instead of focusing on the proper qualification factors. This is an effort to confuse the issues, not to educate the court about the proper inquiries required of it.

In any event, qualification of an expert has taken a back seat to reliability under *Daubert* and after the amendment to rule 702, qualification is less of an issue:

> Of course, qualifications remain important; rule 702 requires a qualified expert. A completely unqualified expert using the most reliable of tests should not be allowed to testify. But the heart of *Daubert* is relevance and reliability. **As long as some reasonable indication of quali1fications is adduced, the court may admit the evidence without abdicating its gate-keeping function.** After that, qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity.

*Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496 (5th 1999) (emphasis added). Certainly, Michael S. Schulz has decades of experience that show much more than a "reasonable indication of qualifications." See exhibit 1.

The qualification of a person to render expert opinions and the ultimate admissibility of those opinions are completely distinct inquiries under rule 702.  FRE 702; *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496 (5th 1999).  Therefore, the court should decline BRK's invitation to confuse possible qualification issues, such as whether a particular expert has been employed in the detector industry, with the proper reliability factors set out in the portions of the brief that follow.

A.  EXPLANATION OF RULE 702 ANALYSIS

1.  SUFFICIENT FACTS OR DATA

This factor essentially requires that the court examine the evidentiary context surrounding the opinion to determine whether there is enough information available for the expert to draw a reliable conclusion.  This can perhaps be better characterized as a requirement that there be sufficient evidence, including in some cases reliable opinions of other experts, to ensure that the opinions are not speculative.  Nevertheless, "the language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."  FRE 702 (Advisory Committee Notes, 2000 amendment).

## 2. OPINIONS PRODUCT OF RELIABLE PRINCIPLES AND METHODS

This clause incorporates *Daubert* indicia of reliability. Under this clause, the court considers examining such things as: (1) whether the technique or theory is subject to testing, that is whether it is subject to objective challenge or is merely subjective and conclusory; (2) whether the particular technique or theory has been subject to peer review or publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence or maintenance of standards or controls and (5) whether the technique or theory has been generally accepted in the scientific community. FRE 702 (Advisory Committee Notes, 2000 amendment). Although every kind of expert testimony must be reliable, not all of these factors are applicable to every kind of expert testimony. *See Kumho Tire v. Carmichael*, 119 S. Ct. 1167, 1175 (1999). There are additional considerations, which although they do not have to be applied to every situation, may be helpful or even dispositive of the reliability determination in a particular case. Many of these factors are also reviewed in the Advisory Committee's Notes.

For example, in a particular case, it may be significant that: (1) the subject of expert testimony arises from research that is not litigation related; (2) whether there is an "analytical gap" in the testimony as a result of an unjustified extrapolation from an accepted premise to a conclusion that does not follow logically; (3) whether the expert has excluded obvious alternative explanations; (4) whether the expert has applied less rigor than he would outside of litigation and (5) whether the field of expertise is junk science, such as astrology. FRE 702 (Advisory Committee Notes, 2000 amendment) (citations omitted).

One critical point to keep in mind is that *Daubert* does not require that a technique or theory *be* tested, only that it be verifiable by objective challenge, such as

testing. This is the fundamental tenet of *Daubert*: That an expert cannot proffer opinions that are not based in science and that cannot be controverted by competing scientific information. This precludes a party from introducing opinions that have no basis except an expert's *ipse dixit* that cannot be attacked.

Detector design and testing are proprietary processes. This is demonstrated by the fact that BRK always asserts trade secret privilege and seeks protective orders prior to producing documents in litigation. Just as BRK produced performance-related detector information in this case only after obtaining a protective order, other manufacturers generally do not disclose this information. The manufacturers' engineers, therefore, do not publicly share design or performance information that could tend to give their company a competitive safety advantage.

These realities also affect the application of other traditional *Daubert* factors, especially with respect to design and manufacturing data and information. A lack of peer-review publications or of a relevant scientific community are not significant in a detector design and manufacture case. Detector design and manufacturing research is typically conducted in-house by company engineers and scientists or, alternatively, by industry lobbying organizations. For example, although many of the techniques and theories can readily be tested, the vast majority of testing that is performed is performed in-house by large companies. Therefore, even if testing exists, it is extremely difficult to identify and access the studies. Second, techniques and theories are not usually subject to traditional peer-review because they are proprietary. Even if they were, the results are again unlikely to be publicly available. Therefore, the court should not place too much weight on the fact that conclusions and opinions are not supported by long laundry lists of scholarly works. Finally, the fifth *Daubert* factor, whether the theory or technique has been generally accepted in the scientific community, is difficult

to apply because the relevant scientific community, at least on an industry-wide basis, does not share information. However, to the extent that there is industry-wide common knowledge or perhaps company-wide common knowledge, this factor can be relevant.

The fact that expert opinions do not neatly fit within the *Daubert* framework is no cause for concern. Detector failure analysis is a subject in which there is decades of experience. The discipline does not necessitate a "subjective, conclusory approach that cannot reasonably be assessed for reliability." *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Rather, it applies physics, chemistry and mechanical engineering principles to evaluate the cause of detector failure.

To the extent that BRK argues about plaintiffs' experts' consulting involvement in litigation, the Advisory Committee Notes have specifically adopted the language of *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317 n.5, recognizing that some areas of expertise have developed around courtrooms and litigation and that in these cases the fact that a technique was developed for litigation is insignificant. FRE 702 (Advisory Committee Notes, 2000 Amendment). While such a factor may present a convincing bias argument for the jury, it is irrelevant to reliability. Although *Daubert* and its progeny focus on nonlitigation uses for the *methodology* employed by the expert, there is nothing in those cases to indicate that an expert's expertise cannot be gained entirely through work in litigation, whether for or against the industry.

3.    PRINCIPLES AND METHODS APPLIED RELIABLY TO THE FACTS OF THE CASE

This portion of the rule provides the court with flexibility to address situations that arise when a witness purports to apply the correct principles and methodology, but there is nevertheless a disconnect between the principles and methods and the conclusion that they generate. Although *Daubert* made clear that the court is to focus on

principles and methodology, not the conclusions generated, this particular clause deals with the exceptional case in which "there is simply too great an analytical gap between the data and the opinion offered." *General Electric v. Joiner*, 522 U.S. 136 (1997); *see also* FRE 702 (Advisory Committee Notes, 2000 amendment) (applies in situations in which expert purports to apply correct principles, but reaches a conclusion from which "the trial may fairly suspect that the principles and methods have not been faithfully applied."). Alternatively, it applies to the situation faced by the Supreme Court in *Kumho Tire*, in which the expert purported to follow a reliable methodology, but the conclusions do not flow logically from the methodology. Because this clause has the potential to operate as a credibility determination dispositive of an entire case and therefore to operate in a manner that deprives a party of its right to a trial by jury, it should be applied sparingly to the very exceptional case. FRE 702 (Advisory Committee Note, 2000 amendment) ("amendment is not intended to limit the right to a trial by jury...").

B.    ARGUMENT

### MICHAEL SCHULZ IS QUALIFIED TO TESTIFY ABOUT THE DETECTOR.

Plaintiffs designated Michael Schulz as an expert witness to demonstrate that a properly designed and operating smoke detector would detect the by-products of combustion from a propane fueled space heater. This is a principle that is clearly within his areas of expertise. Michael J. Schulz is a member of the National Fire Protection Association's (NFPA) Technical Committee on Fire Investigations having been appointed to the committee at the time of its formation by the Standards Council. The NFPA Technical Committee on Fire Investigations is responsible for those National Fire Codes that address the investigation and analysis of fire and explosion incidents.

Since his appointment, he has made significant contributions to both National Fire Code 907M, entitled *Manual for the Determination of Electrical Fire Cause*, and national Fire Code 921, entitled *Guide for Fire and Explosion Investigations.*

He previously served as Chairman of the NFPA 921 Task Group on Collection and analysis of Physical Evidence. He now currently serves on the Task Group on Fire-Related Human Behavior and the Task Group on Origin Determination.

Mr. Schulz is a graduate of the National Fire Academy, a college instructor, a consultant to the United States Fire Administration, a Certified Fire and Explosion Investigator, a Certified Protection Specialist, a Certified Fire Investigation Instructor Level I and Level II, and a Forensic Fire Science and Laboratory Manager. Please see Curriculum Vitae attached as Exhibit "1".

In further support that Michael Schulz's testimony is reliable, he provides a compilation of First Alert (BRK) User's Manuals for the company's line of single station detectors.   He also provides an informational brochure that was downloaded from Firstalert.com. See attached Exhibit "3." Each manual specifically instructs the end user not to place the detector in specific locations that will result in its activation under conditions that do not involve actual hostile fire incidents. As such manuals provide, in order to avoid "nuisance alarms", the units should not be installed:

"Where combustion particles are produced. Combustion particles form when something burns. Areas to avoid include poorly ventilated kitchens, garages, and furnace rooms. Keep units at least 20 feet (6 meters) from the sources of combustion particles (stove, furnace, water heater, space heater) if possible. Ventilate these areas as much as possible;

In air streams near kitchens.  Air currents can draw cooking smoke into the sensing chamber of a smoke alarm near the kitchen; and,

In very damp, humid or steamy areas, or directly near bathrooms with showers.  Keep units at least 10 feet (3 meters) away from showers, saunas, dishwashers, etc."

In further support that Michael Schulz's testimony is reliable, he provides excerpts from the "National Fire Protection Association's Fire Protection Handbook."  See attached Exhibit "9." He also provides Appendix A in its entirety and the title pages from National Fire Protection Association 72, entitled "National Fire Alarm Code."  See attached Exhibit "10."  Both of these sources address the installation of the detector in specific locations that will result in activation under conditions that do not involve actual hostile fire incidents.

Appendix A to NFPA 72 provides on page 72-116 and 72-117 the following information:

**"A-2-3.6.1.2**  Smoke detectors can be affected by electrical and mechanical influences and by aerosols and particulate matter found in protected spaces.  The location of detectors should be such that in the influences of aerosols and particulate matters from sources such as those in Table A-2-3. 1.2(a) are minimized.  Similarly, the influences of electrical and mechanical factors shown in Table A-2-3.6.1.2(b) should be minimized. While it might not be possible to isolate environmental factors totally, an awareness of these factors during system layout and design favorably affects detector performance."

**Table A-2-3.6.1.2(a)  Common Sources of Aerosols and Particulate Matter Moisture**

**Moisture**

Humid outside air
Humidifiers
Live stream

Showers
Slop sink
Stream tables
Water spray

**Combustion Products and Fumes**

Chemical fumes
Cleaning fluids
Cooking equipment
Curing
Cutting, welding, and brazing
Dryers
Exhaust hoods
Fireplaces
Machining
Ovens
Paint Spray

**Atmospheric Contaminants**

Corrosive atmospheres
Dust or lint
Excessive tobacco smoke
Heat treating
Linen and bedding handling

**Table A-2-3.6.1.2(a) Common Sources of Aerosols and
Particulate Matter Moisture (*continued*)**

Pneumatic transport
Sawing, drilling, and grinding
Textile and agricultural processing

**Engine Exhaust**

Diesel trucks and locomotives
Engines not vented to the outside
Gasoline forklift trucks

**Heating Element with Abnormal Conditions**
Dusting accumulations
Improper exhaust

Incomplete combustion

---

This is also confirmed from the excerpts of 72-155 and 72-157, and 72-158 as follows:

72-155:

"The installation of smoke detectors in kitchens, attics (finished or unfinished), or garages is not normally recommended, as these locations occasionally experience conditions that can results in improper operation."

72-157:

"Locating smoke alarms away from sources of nuisance alarms can minimize these problems. Photoelectric-type smoke alarms are less likely to alarm from normal cooking than are the ionization type and should be considered for installation on the floor containing the cooking facilities. Some smoke alarms have a temporary silencing means that can be activated during cooking to reduce nuisance alarms. The two types of smoke alarms are equally susceptible to stream from bathrooms but locating them at least 3 ft from the bathroom door should minimize such problems. Having both types of smoke alarms in a home is a good idea from the view-point of response to different types of fires, but where interconnected it is important to make sure that the interconnect circuits are compatible."

72-158:

**A-8-1.4.2**  One of the common problems associated with residential smoke detectors is the nuisance alarms that are usually triggered by products of combustion from cooking, smoking, or other household particulates. While an alarm for such a condition is anticipated and tolerated by the occupant of a dwelling unit through routine living experience, the alarm is not permitted where it also sounds alarms in other dwelling units or in common use spaces. Nuisance alarms caused by cooking are a very

common occurrence, and inspection authorities should be aware of the possible ramifications where the coverage is extended beyond the limits of the dwelling unit."

If a party timely objects to the Magistrate's Judge's recommendation, the district court must make a de novo determination of the objectionable portions of the Magistrate Judge's recommendation or findings. F.R.C.P. 72(b); 28 U.S.C. Section 636(b)(1). The district court may then accept, reject, or modify, in whole or in part, the recommendation or finding. F.R.C.P. 72(b); 28 U.S.C. Section 636(b)(1).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully pray that BRK's Motion to Exclude Plaintiffs' designated expert Michael Schulz be in all things denied, and for all other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

Ray R. Marchan
Attorney-in-Charge
State Bar No. 12969050
Federal Id No. 9522
WATTS & HEARD, L.L.P.
1926 E. Elizabeth
Brownsville, Texas 78520
Phone:        (956) 544-0500
Fax:          (956) 541-0255

## CERTIFICATE OF SERVICE

On the _27_ day of June, 2002, a true and correct copy of the foregoing response was served, via fax, by hand-delivery or by certified mail, return receipt requested to all opposing counsel of record.

## **AFFIDAVIT OF AUTHENTICITY**

STATE OF TEXAS       )
                               )
COUNTY OF CAMERON  )

BEFORE ME, the undersigned Notary Public, on this day personally appeared RAY R. MARCHAN, known to me, and first being by me duly sworn according to law upon his oath deposed and stated as follows:

"My name is RAY R. MARCHAN, I am a licensed attorney engaged in the general practice of law in Brownsville, Cameron County, Texas. I am attorney with Watts & Heard, L.L.P., 1926 E. Elizabeth, Brownsville, Texas. The law firm of Watts & Heard, L.L.P., has been retained by Plaintiffs Cynthia Cox as next friend of Brittany Cox in connection with the above-referenced lawsuit.

I am of sound mind, capable of making this affidavit, and I have personal knowledge of each and every statement stated below.

I hereby certify that the copies attached hereto as exhibits 1 to 8 are authentic true and correct copies of the originals."

Further affiant sayeth not.

_____
RAY R. MARCHAN

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said RAY R. MARCHAN, on the _27_ day of June, 2002, to certify which witness my hand and seal of office.

_____
NOTARY PUBLIC, STATE OF TEXAS

Leticia Fierros Garza
Notary Public
State of Texas
My Commission Expires
July 26, 2004

STATE OF TEXAS       )
                              )

COUNTY OF CAMERON  )

On this the 27 day of June, 2002, came before me, the undersigned authority, appeared RAY R. MARCHAN, who after being duly sworn upon his oath stated and deposed as follows:

"My name is Ray R. Marchan. I am over the age of 18 years and am fully competent and not disqualified by law to make this affidavit. I am the attorney for the Plaintiffs Cynthia Cox as next friend of Brittany Cox . I hereby certify that all of the facts stated in the foregoing Objection to Magistrate's Opinion and Order are true and correct to my knowledge."

Signed this the 27 day of June, 2002.



RAY R. MARCHAN

SWORN TO AND SUBSCRIBED on this the 27 day of June, 2002.

NOTARY PUBLIC, STATE OF TEXAS

Leticia Fierros Garza
Notary Public
State of Texas
My Commission Expires
July 26, 2004

# JOHN A. KENNEDY & ASSOCIATES

## PROFESSIONAL RESUME

## CURRICULUM VITAE

# MICHAEL J. SCHULZ

## SENIOR STAFF EXPERT
## FIRE AND EXPLOSION ANALYST
## FIRE & SAFETY ENGINEERING TECHNOLOGIST



**JOHN A. KENNEDY & ASSOCIATES, INCORPORATED**

**CORPORATE OFFICES
AND
FORENSIC FIRE SCIENCE AND TECHNOLOGY LABORATORY**

2155 STONINGTON AVENUE – SUITE 118
HOFFMAN ESTATES, ILLINOIS 60195
TELEPHONE (847) 885 – 9010
FACSIMILE (847) 885 – 8304
EMAIL schulzmj@msn.com

10/99



# JOHN A. KENNEDY & ASSOCIATES, INC.

## ACADEMIC ACHIEVEMENTS

Michael J. Schulz holds a Bachelor of Science degree in Fire & Safety Engineering Technology, Magna Cum Laude, from the University of Cincinnati's OMI College of Applied Science.

He also successfully completed the Certificate Program in Fire Science Technology taken at the University of Cincinnati's OMI College of Applied Science and co-sponsored by the United States Fire Administration's National Fire Academy.

He has participated in fire science programs of study and educational activities involving many institutions of higher education and post-secondary training including the following:

- Eastern Kentucky University

- University of Southern Mississippi

- Cape Cod Community College

- Milwaukee Area Technical College

- University of Cincinnati

- University of Wisconsin

- Texas A & M University

- Oklahoma State University

- William Rainey Harper Community College

- United States Fire Administration's National Fire Academy

- Federal Bureau of Investigation's FBI National Academy

- National Bureau of Standards' Center For Fire Research

- National Institute of Standards and Technology's Building and Fire Research Laboratory

# JOHN A. KENNEDY & ASSOCIATES, INC.

He is also a regular lecturer at Eastern Kentucky University's Fire Safety and Engineering Technology program. His lectures there focus on fire and explosion investigation and analysis. Eastern Kentucky University was the first university in the United States to offer a four-year Baccalaureate degree in fire investigation.

He has also been a lecturer at the Cape Cod Community College's Fire Science program. His lectures there also focused on fire and explosion investigation and analysis.

He has also been a lecturer at the University of Southern Mississippi. His lectures there also focused on fire and explosion investigation and analysis.

He has also served as an instructor for Texas A & M University. He served as the Chief Instructor for the Texas Fire and Explosion Investigation Symposium.

## CONSULTANT TO THE UNITED STATES FIRE ADMINISTRATION

Michael J. Schulz has served as a consultant to the Federal Emergency Management Agency's, United States Fire Administration's National Fire Academy.

He was contracted to serve as a training course Content Expert directing and overseeing the revision of current federal fire investigation training programs administered by the United States Fire Administration's National Fire Academy, as well as the development of a new federal fire investigation training program as part of the mandates by the United States Congress under the Arson Prevention Act of 1994. In that capacity, he was selected to serve as a chairman of one of the two working task groups.

He was also selected as one of only sixty delegates from across the nation to the United States Fire Administration and National Fire Academy's National Symposium For Arson Prevention and Control, held in Emmitsburg, Maryland in July 1995. The symposium serves to advise the United States Fire Administration and its National Fire Academy on the goals and objectives of their respective arson prevention and control programs.

## CONSULTANT TO MAJOR NEWS ORGANIZATIONS

Michael J. Schulz regularly serves as a consultant with major news organizations in the United States including ABC News, NBC News, CBS News and King World Productions. In that capacity, he has assisted in the research and development of a variety of network affiliate and national news segments and programs all of which have focused on timely fire safety issues.





# JOHN A. KENNEDY & ASSOCIATES, INC.

(NAFI).

This certification is achieved by an evaluation of qualifications, training and experience, participation in a specialized training program and successful completion of a comprehensive written examination administered by the National Certification Board.

Since his original certification, he was later appointed to serve as a member of the National Certification Board. In that capacity, he is responsible for the certification of fire investigation instructors from around the world.

## CERTIFIED FIRE SERVICE INSTRUCTOR II

Michael J. Schulz also holds registration as a Certified Fire Service Instructor II from the State of Wisconsin's Board of Vocational, Technical and Adult Education. This certification is consistent with the standards recognized nationally for this certification.

This certification is achieved by completion of specialized instruction and by successful completion of a comprehensive certification program project. The prerequisite for this level II certification is prior successful attainment of level I certification which is achieved by completion of specialized instruction, successful completion of a practical instructional project and successful completion of a comprehensive written examination administered by the Board.

As a Certified Fire Service Instructor II, he is certified to instruct the United States Fire Administration's National Fire Academy's Field Program entitled "Fire/Arson Detection." He has presented this program of instruction to hundreds of fire service and law enforcement personnel.

## MEMBER OF NFPA TECHNICAL COMMITTEE ON FIRE INVESTIGATIONS

Michael J. Schulz is a member of the National Fire Protection Association's (NFPA) Technical Committee on Fire Investigations having been appointed to the committee at the time of its formation by the Standards Council. The NFPA Technical Committee on Fire Investigations is responsible for those National Fire Codes that address the investigation and analysis of fire and explosion incidents.

Since his appointment, he has made significant contributions to both National Fire Code 907M, entitled *Manual For The Determination Of Electrical Fire Causes*, and National Fire Code 921, entitled *Guide For Fire and Explosion Investigations*.




# JOHN A. KENNEDY & ASSOCIATES, INC.

## PARTICIPANT IN THE CODES AND STANDARDS MAKING PROCESS

Michael J. Schulz is a member of the National Fire Protection Association's Technical Committee on Fire Investigations.  This committee has the responsibility for the development of the National Fire Codes that focus on fire and explosion investigation and analysis.

As such, he is a co-author of the National Fire Protection Association's National Fire Code NFPA 907M, entitled *Manual For The Determination of Electrical Fire Causes*, and National Fire Code NFPA 921, entitled *Guide For Fire and Explosion Investigations*.

He is also a co-author of standards approved by the American National Standards Institute (ANSI) as that organization has approved both NFPA 907M and NFPA 921 as ANSI standards.

Michael J. Schulz has also addressed the general membership of the National Fire Protection Association (NFPA) at annual meetings, fall meetings, membership section meetings and technical committee reporting sessions on issues involving the development and adoption of various National Fire Codes including NFPA 907M and NFPA 921.

## CODES AND STANDARDS INTERPRETATION

Michael J. Schulz has extensive knowledge in the development, interpretation and application of laws, codes, standards, and recommended practices that focus on issues arising from the investigation and analysis of fires and explosions.

During his tenure with the fire service, he was responsible for supervising a municipal fire department's code development, fire inspection and code enforcement activities. He was also assigned to a mayoral task group that developed and implemented a revised municipal fire prevention code.  During that assignment, he authored many portions of that new fire prevention code.

His involvement in the codes and standards making process provides him with a unique and specialized insight into the development, interpretation and application of such laws, codes, standards and recommended practices.

His professional training, education and experience includes the interpretation and application of such codes and standards as the following:

- □ National Fire Protection Association (NFPA)
- □ American National Standards Institute (ANSI)

**Page 9**

# JOHN A. KENNEDY & ASSOCIATES, INC.

- Floor coverings.
- Plastics.
- Foams and other types of rubbers.
- Residential construction materials and interior furnishings.
- Commercial construction materials and interior furnishings.
- Concrete and masonry.
- Metals and alloys.
- Glass.
- Household and other appliances.
- Furnaces and heating equipment.
- Televisions.
- Gas utilization equipment and appliances.
- Disposable lighters.
- Spray finish application equipment.
- Motor vehicle construction materials and interior furnishings.
- Manufactured home construction materials and interior furnishings.
- Electrical wiring and components.
- Smoke and heat detection devices.

He regularly tests materials and products and evaluates them against applicable codes and standards including the following:

- ASTM D 56, entitled *Test Method For Flash Point By Tag Closed Tester.*
- ASTM D 92, entitled *Test Method For Flash And Fire Points By Cleveland Open Cup.*
- ASTM D 568, entitled *Test Method For Rate Of Burning and/or Extent And Time Of Burning Of Flexible Plastics In A Vertical Position.*
- ASTM D 635, entitled *Test Method For Rate Of Burning and/or Extent And Time Of Burning Of Flexible Plastics In A Horizontal Position.*
- ASTM D 1230, entitled *Test Method For Flammability Of Apparel Textiles.*
- ASTM D 1310, entitled *Test Method For Flash Point Of And Fire Point Of Liquids By Tag Open-Cup Apparatus.*
- ASTM D 1929, entitled *Test Method For Ignition Properties Of Plastics.*
- ASTM D 2859, entitled *Test Method For Flammability Of Finished Textile Floor Covering Materials.*
- ASTM D 3065, entitled *Test Methods For Flammability Of Aerosol Products.*
- ASTM D 3278, entitled *Test Methods For Flash Point Of Liquids By SetaFlash Closed-Cup Apparatus.*
- ASTM D 3828, entitled *Test Methods For Flash Point By SetaFlash Closed Tester.*
- ASTM D 3874, entitled *Test Method For Ignition Of Materials By Hot Wire Sources.*
- ASTM D 3934, entitled *Test Method For Flash/No Flash Test - Equilibrium Method By A Closed-Cup Apparatus.*

# JOHN A. KENNEDY & ASSOCIATES, INC.

- Fire Science and Technology Educators Section of the National Fire Protection Association
  Member, Board of Directors

- Fire Marshal's Association of North America (FMANA)
  Associate Member

- National Fire Academy Alumni Association (NFAAA)
  Active Member

- American Society For Testing and Materials (ASTM)
  Active Member

- Human Factors and Ergonomics Society (HFES)
  Active Member

- Society Of Automotive Engineers (SAE)
  Member

- Chicago Chapter of the Society of Automotive Engineers
  Member

- Building Officials and Code Administrators, International (BOCA)
  Active Member

- Southern Building Code Congress International (SBCCI)
  Active Member

- International Building Code Officials (ICBO)
  Active Member

- National Association of Fire Investigators (NAFI)
  Member, Board of Directors
  Member, National Certification Board
  Representative, NFPA Technical Committee on Fire Investigations (1992 to Present)
  Chairman, Education Committee
  Editor, The National Fire Investigator
  Systems Operator, NAFI On-Line

- International Association Of Arson Investigators (IAAI)
  Active Member



Page 13



# JOHN A. KENNEDY & ASSOCIATES, INC.

In 1989, he was the recipient of one of the first Official Citations presented by the Chief of Police and the Police and Fire Commission of the City of Cedarburg Police Department.

In 1991, he was named a Kentucky Colonel by Governor Wallace G. Wilkinson of the State of Kentucky for his contributions to the training of Kentucky law enforcement and fire service personnel in fire and explosion investigation and analysis.

In 1991, he was the recipient of the 1991 Man of the Year Award presented by the National Association of Fire Investigators for his achievements and continuing work on the National Fire Protection Association's Technical Committee on Fire Investigations.

In 1995, he was selected for inclusion in the Marquis Who's Who in Science and Engineering.

In 1995, he was selected for inclusion in the Marquis Who's Who in the Midwest.

In 1996, he was selected for inclusion in the Marquis Who's Who in America.

In 1996, he was selected for inclusion in the Marquis Who's Who in the World.

In 1997, he was selected for inclusion in the Marquis Who's Who in Finance and Industry.

## PROFESSIONAL KNOWLEDGE

Michael J. Schulz has extensive knowledge in fire and explosion investigation and analysis and related fields. This extensive knowledge includes the following subjects:

- Determining the origin of fire and explosion incidents.
- Determining the ignition factor (cause) of fire and explosion incidents.
- Determining responsibility and liability for fire and explosion incidents.
- Subrogation investigation of fire and explosion incidents.
- Products liability issues arising from fire and explosion incidents.
- Mathematical computer fire modeling.
- Chemistry, physics, dynamics and behavior of fires and explosions.
- Application of recognized methods of fire and explosion investigation and analysis.
- Evaluating and tracing the development and spread of fire.
- Searching the fire and explosion incident scene.
- Collection and analysis of physical evidence.
- Fire and explosion investigation photography.

# JOHN A. KENNEDY & ASSOCIATES, INC.

His professional experience includes both the evaluation of and revision of existing warnings, instructions and labels and the development of new ones in accordance with applicable laws, codes, standards, industry standards and standards of good practice.

He has also instructed for both the National Association of Fire Investigators and the National Fire Protection Association on the role of labels and warnings in fire and explosion incidents.

He also serves on the National Fire Protection Association's Technical Committee on Fire Investigations' Task Group on Fire-Related Human Behavior which is responsible for the develop of new portions of the National Fire Code which will address the role of warnings, instructions and labels in fire and explosion incidents.

## KNOWLEDGE OF HAZARD ANALYSIS TECHNIQUES IN EVALUATING PRODUCT SAFETY

Michael J. Schulz has extensive knowledge in the recognized and accepted techniques and methodologies of evaluating product safety with respect to fire safety and life safety.

His professional education includes courses that specifically focused on both the foundational theories and the practical application of product hazard analyses. He employs the recognized and accepted techniques and methodologies when evaluating consumer and commercial products for fire safety and life safety hazards, as well as proper and effective hazard mitigation strategies.

His professional experience includes the performance of fire safety and life product hazard analyses on a wide spectrum of both consumer and commercial products.

He has also instructed for both the National Association of Fire Investigators and the National Fire Protection Association on the role of product hazard analyses as an integral part of investigating and analyzing fire and explosion incidents involving consumer or commercial products.

## FORENSIC FIRE SCIENCE AND TECHNOLOGY LABORATORY

John A. Kennedy & Associates, Incorporated, maintains and operates a fully equipped Forensic Fire Science and Technology Laboratory located in Hoffman Estates, Illinois. This laboratory utilizes the most modern and up-to-date equipment and techniques to

# JOHN A. KENNEDY & ASSOCIATES, INC.

❑ National Fire Protection Association's NFPA 921, 1998 Edition, entitled *Guide for Fire and Explosion Investigations*.

He was also a contributor to one of the most recognized and accepted textbooks in the field of fire and explosion investigation and analysis:

❑ *Explosion Investigation And Analysis - Kennedy On Explosions*, published by Investigations Institute, Chicago, Illinois, 1990.

He is also a contributor to a new textbook in the field of fire and explosion investigation and analysis:

❑ *Fire Investigation And Analysis - Kennedy On Fire Investigation*, to be published by Investigations Institute, Chicago, Illinois.

He has also been a regular contributor to numerous publications that focus on the field of fire and explosion investigation and analysis. These publications include the following:

❑ *The Dispatcher*, a monthly publication for the Wisconsin fire service.

❑ *The National Fire Investigator*, the Journal of the National Association of Fire Investigators.

He is also the systems operator (SYSOP) for NAFI On-Line which is a computerized, electronic bulletin board system and the electronic forum of the National Association of Fire Investigators.

NAFI On-Line boasts professional membership and utilization by fire and explosion investigators and analysts from throughout the world. It is the world's only electronic bulletin board system dedicated to the field of fire and explosion investigation and analysis.

## PROFESSIONAL EDUCATION AND TRAINING

Michael J. Schulz has an extensive academic foundation in the field of fire and explosion investigation and analysis and related education and training. This professional education and training includes the following:

❑ Wisconsin Certified Law Enforcement Officer Training, State of Wisconsin, Department of Justice, Training and Standards Board, March, 1979.

# JOHN A. KENNEDY & ASSOCIATES, INC.

- Arson Investigation, Milwaukee Area Technical College, Oak Creek, Wisconsin, February, 1984.

- 35th Annual I.A.A.I. Training Conference, International Association of Arson Investigators, Clearwater Beach, Florida, April, 1984.

- Arson Investigation, Hillsborough Community College, Tampa Bay, Florida, April, 1984.

- Fire/Arson Detection, Wisconsin Board of Vocational, Technical and Adult Education, Madison, Wisconsin, May, 1984.

- 19th Annual Wisconsin Arson Training Seminar, State of Wisconsin, Department of Justice, Division of Criminal Investigation and the Wisconsin Chapter of the International Association of Arson Investigators, June, 1985.

- Fire Investigation, Milwaukee Area Technical College, Mequon, Wisconsin, September, 1984.

- Effective Use of Photography As Legal Evidence, University of Wisconsin, Department of Engineering and Applied Science, Milwaukee, Wisconsin, May, 1985.

- 20th Annual Wisconsin Arson Training Seminar, State of Wisconsin, Department of Justice, Division of Criminal Investigation and the Wisconsin Chapter of the International Association of Arson Investigators, June, 1985.

- Determining the Cause and Origin of Fires and Explosions, National Association of Fire Investigators, Chicago, Illinois, August, 1985.

- Certified Fire Inspector Training, State of Wisconsin, Department of Industry, Labor and Human Relations, Grafton, Wisconsin, March, 1986.

- Fire and Arson Investigation, United States Fire Administration's National Fire Academy, Emmitsburg, Maryland, June, 1986.

- 21st Annual Wisconsin Arson Training Seminar, State of Wisconsin, Department of Justice, Division of Criminal Investigation and the Wisconsin Chapter of the International Association of Arson Investigators, June, 1986.

- Determining the Cause and Origin of Fires and Explosions, National Association of Fire Investigators, Chicago, Illinois, August, 1986.

# JOHN A. KENNEDY & ASSOCIATES, INC.

- National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators, Schaumburg, Illinois, August, 1991.

- Flammable Gases Seminar, National Fire Protection Association, Montreal, Quebec, Canada, November, 1991.

- Fire Case Studies Symposium: Office High-Rise Firesafety, National Fire Protection Association, Montreal, Quebec, Canada, November, 1991.

- Fire Codes and Standards Forum, Fire Marshal's Association of North America, Montreal, Quebec, Canada, November, 1991.

- Fire Science and Technology Educators Section Program, National Fire Protection Association, Montreal, Quebec, Canada, November, 1991.

- Advanced Fire Scene Analysis, National Fire Protection Association, St. Louis, Missouri, February, 1992.

- Fire Investigation Course for Professional Development, Eastern Kentucky University, Richmond, Kentucky, March, 1992.

- Fire Department Instructors Conference, International Society of Fire Service Instructors, Cincinnati, Ohio, April, 1992.

- Human Behavior Task Group Meeting, National Fire Protection Association, FBI Academy, Quantico, Virginia, April, 1992.

- Mathematical Computer Fire Modeling, Special Tutoring Program, National Institute of Standards and Technology, Gaithersburg, Maryland, June, 1992.

- National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators, Schaumburg, Illinois, August, 1992.

- Fire Determination Strategies, University of Cincinnati, Cincinnati, Ohio, October, 1992.

- FPETool and Hazard I User's Conference, National Institute of Standards and Technology, Gaithersburg, Maryland, October, 1992.

- Fire Investigation and Analysis, National Fire Protection Association, Fire Science and Technology Educator's Section Program, Dallas, Texas, November, 1992.



# JOHN A. KENNEDY & ASSOCIATES, INC.

- Canadian National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators, Toronto, Canada, October, 1995.

- National Fire Protection Association, Fire Science and Technology Educators' Section Program, Chicago, Illinois, November, 1995.

- Communicating With Power and Clarity, University of Cincinnati, Cincinnati, Ohio, November, 1995.

- Fire Related Human Behavior, University of Cincinnati, Cincinnati, Ohio, December, 1995.

- Eastern Kentucky University's National Advanced Fire, Arson and Explosion Investigation Training Program, Richmond, Kentucky, March, 1996.

- National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators, Schaumburg, Illinois, August, 1996.

- Eastern Kentucky University's National Advanced Fire, Arson and Explosion Investigation Training Program, Richmond, Kentucky, March, 1997.

- National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators, Schaumburg, Illinois, July, 1997.

- Texas Fire, Arson and Explosion Investigation Training Symposium, Missouri City Fire Department, Texas A & M University, Missouri City, Texas, September, 1997.

- The Role of Hazard Analysis Techniques in Evaluating Product Safety, College of Engineering, Department of Professional Engineering Development, University of Wisconsin, Madison, Wisconsin, April, 1998.

- National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators, Schaumburg, Illinois, July, 1998.

- Texas Fire, Arson and Explosion Investigation Training Symposium, Missouri City Fire Department, Texas A & M University, Missouri City, Texas, August, 1998.

- Investigation of Motor Vehicle Fires, Chicago, Illinois, Lee S. Cole & Associates, Incorporated, November, 1998.

- Canadian National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators, Toronto, Canada, November, 1998.

Page 25

# JOHN A. KENNEDY & ASSOCIATES, INC.

- United States Fire Administration's National Fire Academy Field Program Fire/Arson Detection as the chief instructor, Cedarburg, Wisconsin, March, 1985.

- Milwaukee Area Technical College's Arson Investigation course as the chief instructor, Oak Creek, Wisconsin, March, 1986.

- United States Fire Administration's National Fire Academy Field Program Fire/Arson Detection as the chief instructor, Cedarburg, Wisconsin, May, 1986.

- International Society of Fire Service Instructors' 5th Annual Midwest Conference on the topic of Fire Investigation Training Resources, Eau Claire, Wisconsin, September, 1986.

- Wisconsin Society of Fire Service Instructors' 25th Annual Conference on the topic of Fire Investigation Training Resources, Wisconsin Rapids, Wisconsin, February, 1987.

- Milwaukee Area Technical College's Arson Investigation course as the sole instructor, Oak Creek, Wisconsin, March, 1987.

- United States Fire Administration's National Fire Academy Field Program Fire/Arson Detection as the chief instructor, Cedarburg, Wisconsin, March, 1987.

- Milwaukee Area Technical College's Textiles For Interiors course as a guest instructor on the topic of fire safety considerations in interior design, Mequon, Wisconsin, March, 1987.

- Milwaukee Area Technical College's Arson Investigation course as the sole instructor, Oak Creek, Wisconsin, March, 1988.

- Milwaukee Area Technical College's Arson Investigation course as the sole instructor, Oak Creek, Wisconsin, April, 1988.

- Wood County Fire Investigation Task Force Training Seminar on the topic of Incendiary Fire Devices, Wisconsin Rapids, Wisconsin, April, 1988.

- Marquette County Firemen's Association Annual Training Seminar on the topic of Incendiary Fire Devices, Wisconsin Rapids, Wisconsin, April, 1988.

- Grand Rapids Fire Department Training Seminar on the topic of Firefighter's Role in Fire Investigation, Grand Rapids, Wisconsin, October, 1988.



# JOHN A. KENNEDY & ASSOCIATES, INC.

☐ Eastern Kentucky University's Fire Investigation Course For Professional Development as a primary instructor, Richmond, Kentucky, March, 1992.

☐ National Association of Fire Investigators' National Fire, Arson and Explosion Investigation Training Program as a primary instructor, Schaumburg, Illinois, August, 1992.

☐ State of Wisconsin's Public Defender's Conference on the topic of Fire Investigation, Oconomowoc, Wisconsin, October, 1992.

☐ National Fire Protection Association, Fire Science and Technology Educator's Section Program on the topic of NFPA 921 - Guide For Fire and Explosion Investigations, Dallas, Texas, November, 1992.

☐ National Institute of Standards and Technology's FPETool and Hazard I User's Conference on the subject of Mathematical Computer Fire Modeling,  Gaithersburg, Maryland, October, 1992.

☐ Eastern Kentucky University's Fire Investigation Course For Professional Development as a primary instructor, Richmond, Kentucky, March, 1993.

☐ Northern Illinois Arson Task Force Training Program on the topic of NFPA 921 - Guide For Fire and Explosion Investigations, Elk Grove Village, Illinois, April, 1993.

☐ National Association of Fire Investigators' National Fire, Arson and Explosion Investigation Training Program as a primary instructor, Schaumburg, Illinois, August, 1993.

☐ Conference on Community College Fire Science and Technology Core Curriculum on the topic of NFPA 921 - Guide For Fire and Explosion Investigations, National Fire Protection Association, Palatine, Illinois, September, 1993.

☐ Denver Fire Department Arson Squad's Advanced Arson Investigation Seminar on the topic of Explosion Investigation and Analysis, Denver, Colorado, March, 1994.

☐ Eastern Kentucky University's Fire Investigation Course For Professional Development as a primary instructor, Richmond, Kentucky, March, 1994.

☐ National Association of Fire Investigators' National Fire, Arson and Explosion Investigation Training Program as a primary instructor, Schaumburg, Illinois, August, 1994.



**Page 29**

# JOHN A. KENNEDY & ASSOCIATES, INC.

- Burlington County, New Jersey Annual Fire Investigation Task Force Training Program on the topics of compartment fire development, fire pattern analysis, heat and flame vector analysis, and origin determination, Mount Holly, New Jersey, January, 1997.

- National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators as the chief instructor, Schaumburg, Illinois, July, 1998.

- Crawford Company Special Investigation Unit, Annual National Training Program on the topics of compartment fire development, fire pattern analysis and heat and flame vector analysis, Atlanta, Georgia, August, 1998.

- Texas Fire, Arson and Explosion Investigation Training Symposium as the chief instructor, Missouri City Fire Department, Texas A & M University, Missouri City, Texas, August, 1998.

- Canadian National Fire, Arson and Explosion Investigation Training Program as the chief instructor, National Association of Fire Investigators, Toronto, Canada, November, 1998.

- National Seminar on Fire Analysis Litigation on the topics of fire pattern analysis and mathematical computer fire modeling, National Association of Fire Investigators, Sarasota, Florida, January, 1999.

- Eastern Kentucky University's National Advanced Fire, Arson and Explosion Investigation Training Program on the topics of advanced fire pattern analysis and mathematical computer fire modeling, Richmond, Kentucky, April, 1999.

- Florida Fire & Explosion Investigation Symposium on the topics of compartment fire development, fire pattern analysis and origin determination through heat and flame vector analysis, National Association of Fire Investigators, Fort Lauderdale, Florida, July, 1999.

- National Fire, Arson and Explosion Investigation Training Program, National Association of Fire Investigators as the chief instructor, Schaumburg, Illinois, August, 1999.

**PROFESSIONAL REFERENCES AVAILABLE UPON REQUEST** 

# JOHN A. KENNEDY & ASSOCIATES, INC.

☐ Professional Resume and Curriculum Vitae of John A. Kennedy & Associates, Incorporated, Senior Staff Expert, Fire and Explosion Analyst, Fire and Safety Engineering Technologist Michael J. Schulz.

☐ Listing of expert deposition and trial testimony of John A. Kennedy & Associates, Incorporated, Senior Staff Expert, Fire and Explosion Analyst, Fire and Safety Engineering Technologist Michael J. Schulz from 1995 to present.

**John A. Kennedy & Associates, Incorporated**

*Michael J. Schulz*

**Michael J. Schulz**
**Senior Staff Expert**
**Fire and Explosion Analyst**
**Fire and Safety Engineering Technologist**

Page 12

STUDY OF DETERIORATION OF SEPARABLE ELECTRICAL CONTACTS IN SMOKE DETECTORS

## GLOSSARY

**Auger Electron Spectroscopy (AES)** - The energy analysis of low energy Auger electrons produced when an excited atom relaxes in a radiationless process after ionization by a high energy electron, ion or x-ray. AES is used to determine the elemental composition of very thin surface layers.

**Cross-Section** - A procedure to illustrate the downward projection of a surficial geology along a vertical plane.

**Depth Profiling** - The use of AES spectral data collected from a film exposed to ion beam sputtering, which continually exposes fresh surface, to identify film chemical composition.

**Energy Dispersive Analysis by X-Ray (EDAX)** - A tool which is used in conjunction with a SEM to analyze x-rays generated by the SEM electronic beam scanning of the material to be evaluated. The impingement of the x-rays on the EDAX detector allows the spectral analysis of surface elements.

**Fourier Transform Spectroscopy** - A spectroscopic technique in which all pertinent wavelengths simultaneously irradiate the sample for a short period of time, and the absorption spectrum is found by mathematical manipulation of the Fourier transform so obtained.

**Fretting Corrosion** - Surface damage usually in an air environment between two surfaces, one or both of which are metals, in close contact under pressure and subject to a slight relative motion.

**Interface Resistance.** Resistance caused by the imperfect contact between two materials at an interface.

**Sputtering** - The ejection of atoms or groups of atoms from the surface of a material as the result of heavy-ion impact.

**Scanning Electron Microscope (SEM)** - A type of electron microscope in which a beam of electrons sweeps over the specimen. The specimen secondary electrons which are generated by the beam are measured and used to trigger a cathode-ray-display. The SEM yields high resolution surface topography photographs at magnifications up to 200,000x.

**Surface Analysis** - A procedure in which analytical data is used to determine the physical characteristics of a medium.

**Thermionic Emission** - The liberation of electrons or ions from a substance as a result of heat.

**Tunneling (Current)** - Electron flow in a two terminal electronic device having an extremely thin potential barrier to electron flow explained by quantum and wave mechanics that allows electrons to pass through the barrier from one contact to the other.

# STUDIES ASSESS PERFORMANCE OF RESIDENTIAL DETECTORS

By

**Richard W. Bukowski**
**Building and Fire Research Laboratory**
**National Institute of Standards and Technology**
**Gaithersburg, MD 20899**

Reprinted from NFPA JOURNAL, Vol. 87, No. 1, 48-54, January/February 1993.

**NOTE:**     This paper is a contribution of the National Institute of Standards and Technology and is not subject to copyright.



sensing chamber and because the typical 90° scattering angle was inefficient for the dark smoke particles that flaming combustion produced.

At that time, federal regulations required that installations of ionization-type detectors be individually licensed and that detectors be tested annually for leakage of the radioactive source material. After about 10 years of testing data indicated that no leakage ever occurred, these regulations were withdrawn in the late 1960s.

When the first edition of NFPA 74, *Household Fire Warning Equipment*, was published in 1967, the minimum requirement for a residential fire alarm system was a heat detector in every room and a smoke detector outside the bedrooms, all connected to a control panel. It is estimated that such systems were installed in fewer than 1 percent of U.S. homes because of the cost—about $1,500 for a small house.

### Studies conducted during the 1960s

The earliest direct comparison of the performance of smoke and heat detectors in a residential setting was a study published by John McGuire and Brian Ruscoe of the National Research Council of Canada in 1962.[3] They examined reports of fatal fires in residential dwellings, classified as "unshared separate dwellings," that occurred between 1956 and 1960, resulting in 342 deaths.

*Based on their judgment*, (italics mine), they estimated the lifesaving potential if detectors had been installed in the dwellings in two configurations:
• a fixed-temperature heat detector activating at 150°F (66°C) in the area of fire origin—in effect, a heat detector in every



*This review of the literature presents a comprehensive picture of the performance of residential detectors in fire tests.*

# DETECTORS

ment were reported to be "quite noxious."

Test 2 involved an overheating electric motor in the kitchen. Five smoke detectors operated during the test, but no heat detectors activated. No comments were recorded on conditions in the home at the time the detectors activated.

Test 3 involved an overloaded electric cord under an upholstered chair in the living room. Four smoke detectors operated at times ranging from 1 minute 15 seconds to 12 minutes, and five heat detectors activated—four at 13 minutes and one at 15 minutes.

The report states that "Observers noted that when the first (smoke) detector operated, the living room was still tenable, but during the next 10 minutes (before the first temperature-sensitive detector operated), the smoke became unbearable."

Of special interest is the comment that "Besides the detectors shown in the diagrams, a spring-wound fixed-temperature device had been placed in the living room for test 3. That device operated 14 minutes after the arc." (The time that the cord began arcing was taken as the time of fire ignition.) Thus, the spring-wound heat detector located in the room of fire origin did not respond until several minutes after smoke conditions in the living room were considered "unbearable."

The fourth test involved a grease fire in the kitchen. The smoke detector in the front hall operated first. It was followed 1 minute later by the rate-of-rise heat detector adjacent to the stove in the kitchen, and then by the smoke detector in the rear hall 15 seconds later.

The final test involved a fire in a plastic wastebasket filled with trash in the kitchen, below the draperies. A smoke detector in the rear hall operated first, at 1 minute. It was followed by the smoke detector in the front hall at 3 minutes and by the rate-of-rise detector in the kitchen, the room of fire origin, at 3¼ minutes.

These tests were the first to demonstrate that smoke detectors *remotely located* from the room of origin consistently operated *before* heat detectors—in these tests, the more sensitive rate-of-rise type detectors—that were *in the room of fire origin.* (Italics mine.)

### Detector technology and standards during the 1970s

By the start of the 1970s, the technology of residential fire detection was changing rapidly. About 1965, the single-station, ac-powered, photoelectric smoke detector was developed, but it was not effectively marketed until the appearance of battery-powered ionization-type devices in 1969 and 1970. Problems with the response of the early smoke detectors were being recognized and corrected.

Mechanically powered heat detectors similarly were improved to increase their sensitivity and reaction time; spacing was increased to 30 feet, 50 feet, and eventually to 70 feet.

By the time the experiments discussed in this section were conducted, at mid-decade, the performance of the heat detectors and smoke detectors used in the tests was significantly improved over those used in prior tests and was essentially equal to that of current devices.

The 1974 edition of NFPA 74 was the first to recognize the potential benefits of having fewer than one device in every room. This standard contained a controversial system of "levels of protection."

In this system, the minimum level—level 4—required a single smoke detector outside bedrooms and one at the top of a basement stairway, following the earlier recommendations of McGuire and Ruscoe. The maximum level—level 1—required a traditional heat or smoke detector in every room and a smoke detector outside bedrooms. The controversy related to the fact that levels 2 through 4 were based solely on the judgment of the committee and no verifying tests were performed.

To resolve these concerns, the National Bureau of Standards (now the National Institute of Standards and Technology) contracted with the IIT Research Institute (IITRI) and Underwriters Laboratories to conduct a thorough study. This became known as the Indiana Dunes Study, which will be discussed in the next section.

### Studies conducted during the 1970s

In 1974, the Japan Housing Corporation (JHC) sponsored a study of fire detector performance in residences.[6] Tests were carried out in two typical Japanese dwellings: a three-room, single-story struc-

ture with a 350-square-foot (32.4-square-meter) floor area, and a five-room, single-story house with a 485-square-foot (45-square-meter) floor area.

As in most Japanese houses, each room was closed off from the rest by doors because of the lack of central heating. The same situation is present in older houses in the United Kingdom, for the same reason. Fixed-temperature (140°F, 60°C), heat detectors, rate-of-rise thermal detectors, and smoke detectors were provided in every room.

Ten experiments were conducted and the following conclusions were made:

"1. The difference in operation times between a heat detector and a smoke detector is mainly dependent upon the time lag in smoke production and temperature-rise. For example, in...detecting a fire due to an oil stove, there is no time lag in operation time between a smoke detector and a rate-of-rise type/ Class 2 spot detector, while a fixed-temperature type detector takes much time to respond.

"2. It is desirable to provide detectors [on] a room-to-room basis in [a] Japanese dwelling house, because the movement of [the] fire stream from the fire room to another [room] may be largely delayed due to many partitions such as sliding doors and transoms particular to the Japanese dwellings.

"3. From the viewpoint of safety for human life, smoke detectors are naturally desirable. However, [because of] the possibilities of false alarm, it is recommendable to avoid the use of smoke detectors [in] kitchens and bathrooms. Since there are many, but relatively narrow, rooms in a Japanese dwelling house and it is impractical to provide every room with smoke detectors on account of economy, it is also recommendable to provide the rate-of-rise type/Class 2 spot detector primarily and the fixed-temperature type/

**NFPA Journal** January/February 1993

## TABLE 1 — Test Results

| Test | Building | Test Fire | Smoke Detector Activation Time | Heat Detector Activation Time |
|---|---|---|---|---|
| 1 | 3 room, 1 story | Chair | None present | 119 min. |
| 2 | 3 room, 1 story | Mattress | None present | Did not activate |
| 3 | 3 room, 1 story | Chair | None present | 84 min. |
| 4 | 3 room, 1 story | Mattress | None present | 95 min. |
| 5 | 6 room, 1 story | Chair | 38 min., 45 sec. | Did not activate |
| 6 | 6 room, 1 story | Sofa | 5 min., 40 sec. | 64 min., 40 sec. |
| 7 | 5 room, 1 story | Chair | 25 min. | 2 hours, 9 min. |
| 8 | 5 room, 1 story | Fiber drum/trash | 6 min. | 5 min. |
| 9 | 10 room, 2 story | Chair | 21 min. | 1 hour, 40 min. |
| 10 | 10 room, 2 story | Chair | 49 min. | Did not activate |
| 11 | 10 room, 2 story | Box/trash | Did not activate | 1 minute |
| 12 | 10 room, 2 story | Box/trash | Did not activate | 3 minutes |
| 13 | 10 room, 2 story | Chair | 1 hour, 40 min. | Did not activate |



# Automatic Sprinklers Are Needed, Too

*Russell P. Fleming, P.E.*

Automatic sprinklers are heat detectors and are recognized as alarm-initiating devices in numerous building and fire codes. But by no means should automatic sprinkler protection be equated to heat detection in terms of their overall impact on fire safety.

Like a heat detector, a sprinkler usually can be expected to respond at a later point of fire growth than a smoke detector. Once it has responded, however, an automatic sprinkler begins to fight the fire. Water from the sprinkler is expected to suppress or control the fire, reducing the rate of heat release and preventing the rapid development of untenable conditions.

In most studies comparing the relative effectiveness of smoke and heat detectors, success is measured by the ability of the detector to provide several minutes of warning before untenable conditions develop. While heat detection alone might fail in many of these instances, heat detection combined with automatic suppression generally would succeed, since the development of untenable conditions is precluded.

It is not surprising that in the past, some studies concluded that heat detectors alone might provide almost no escape time, especially in

fast-developing fires. During the residential sprinkler development program in the late 1970s, it was found that sprinklers protecting typical residential furnishings often activated just as the heat-release rate of the fire was beginning a dramatic exponential increase.

In freeburn testing of the upholstered-furniture corner scenario, used as the basis for the residential sprinkler program, the convective heat-release rate of the fire was about 10,000 Btu (175 kW) per minute 2 minutes after ignition, but it increased to 200,000 Btu (3,500 kW) per minute within 1 additional minute.[1] This is basically the difference between the burning rate of a trash-basket fire capable of activating a fast response sprinkler and the burning rate of fully involved upholstered furniture capable of causing flashover in a small room.

The difference between detection alone versus combined automatic detection and suppression is clearly demonstrated in NFPA 550, *The Firesafety Concepts Tree*, in which the box labeled "detect fire" and the box labeled "apply sufficient suppressant" must connect through an "AND" gate to reach the box labeled "automatically suppress fire." Automatic sprinklers combine those two

elements successfully and achieve automatic fire suppression. From that point, the route to the fire safety objective consists solely of "OR" gates. When you "automatically suppress fire," you proceed to "suppress fire," "manage fire," and "manage fire impact," and reach the "fire safety objective" at the top of the tree.

Without automatic suppression, the "detect fire" box must be linked through an "AND" gate with "communicate signal," "decide action," "respond to site," and "apply sufficient suppressant" in order to reach the "manually suppress fire" box. Each of these additional steps takes time, and during these crucial minutes the fire can easily grow to deadly proportions.

With a properly designed, installed, and maintained automatic sprinkler system, the fire is quickly controlled or suppressed, achieving the fire safety objective of protecting life and property.

1. B.G. Vincent, *Heat Release Properties for Three Selected Large-Scale Fuel Packages*, Factory Mutual Research Corporation, December 1985.

*Russell P. Fleming is vice president of engineering at the National Fire Sprinkler Association.*

---

sory board found that a smoke detector on every level provided the desired 3 minutes of escape time in 80 percent of the experiments, compared to 11 percent for a heat detector in the fire room—in effect, a detector in every room.

The clear and decisive results of the Indiana Dunes tests and the analysis of the Massachusetts report resulted in changes to NFPA 74; the 1978 edition required smoke detectors on every level as the minimum requirement. Similar requirements subsequently were adopted in nearly every state and in many cities and counties in the United States, as well as in other countries.

After the first Dunes report was published, the experimental design and the test results were questioned in a *Fire Journal* article by E.L. Gallagher,[9] who represented the heat detector industry through a trade association, the Fire Equipment Manufacturers Association. A rebuttal by the National Bureau of Standards appeared in a subsequent issue of *Fire Journal*.[10]

In 1974, Factory Mutual Research Cor-

poration performed another set of experiments that examined the performance of detectors in apartments.[11] The apartments were in high-rise buildings, although the height of the buildings had no impact on the results.

The test geometry consisted of a one-bedroom, 763-square-foot (70-square-meter) apartment that opened onto a 58-foot (17.7-meter) corridor. Ionization- and photoelectric-type smoke detectors and fixed-temperature (135°F, 57°C) and rate-of-rise heat detectors were used. The performance of the detectors was judged in 19 experiments on their ability to provide 2 minutes of warning before tenability criteria in the apartment were exceeded.

Pertinent conclusions reached in this study include the following:

"2. The ionization detector performed adequately in the protectable flaming fire starts and, in general, inadequately in the smoldering fire starts.[12]

"3. The photoelectric smoke detector did not perform adequately anywhere in the protectable flaming fire starts, but

was adequate almost everywhere in the apartment in the smoldering fire starts of long duration.

"4. Both detector types performed adequately, by a wide margin, in the kitchen fires when located close to the fire. However, those detectors located at remote locations from the kitchen fires did not respond adequately.

"5. Neither of the heat detectors performed adequately, regardless of the fire and detector location."

In 1978, the Minneapolis Fire Department conducted a series of experiments to examine the performance of smoke and heat detectors in residences.[13] The test house was a four-bedroom, two-story dwelling with a basement. Smoke detectors and heat detectors (135°F, 57°C) were located on each floor level, near the central stairway. Eight tests were conducted with fires in various rooms on each floor.

The conclusions of the investigators included the following:

"Heat detectors alone should not be relied upon for early life safety warning



# Standard for Safety

# UL 217

## Single and Multiple Station Smoke Detectors



(UL) Underwriters Laboratories Inc.®

# Standard





**Underwriters Laboratories Inc.**®
An independent, not-for-profit organization testing for public safety

**May 10, 1993**

**Standard for**

**Single and Multiple Station Smoke Detectors**

**UL 217, Fourth Edition**

Accompanying this transmittal notice is a copy of the fourth edition of UL 217.

THIS EDITION OF THE STANDARD IS NOW IN EFFECT.

Revised and/or additional pages may be issued from time to time.

Subscribers to UL's services in the area covered by this standard will receive these revised and/or additional pages automatically. Others may receive such pages by subscribing to UL's subscription service for revisions. See UL's CATALOG OF STANDARDS FOR SAFETY for a description of the revision subscription service, the cost of the service for this standard, and ordering information.







# CONTENTS

**FOREWORD**

**INTRODUCTION**

1  Scope ......................................................................... 7
2  General ...................................................................... 7
3  Glossary ..................................................................... 8
4  Detector Reliability Prediction .............................................. 9
5  Installation and Operating Instructions ...................................... 9
6  Nonfire Alarm Feature ....................................................... 10
7  Alarm Silencing Means (Optional) ............................................ 10
8  Battery Removal Indicator ................................................... 10

**CONSTRUCTION**

**ASSEMBLY**

9  General ..................................................................... 10
10  Servicing and Maintenance Protection ....................................... 11
11  Enclosure .................................................................. 12
12  Corrosion Protection ....................................................... 16

**POWER SUPPLY**



13  Primary Power Supply ....................................................... 17
14  Secondary Power Supply ..................................................... 17
15  Batteries .................................................................. 18
16  Supplementary Signaling Circuits ........................................... 19

**FIELD WIRING**

17  Permanent Connection ....................................................... 19
18  Power Supply Cord .......................................................... 20
19  Equipment Grounding ........................................................ 21
20  Remote Power Supply ........................................................ 21

**INTERNAL WIRING**

21  General .................................................................... 22
22  Bonding for Grounding ...................................................... 23

67  Paint Loading Test  ................................................  91
68  Replacement Test, Head and Cover ..................................  91
69  Battery Replacement Test  .........................................  91
70  Polarity Reversal Test  ...........................................  92
71  Strain Relief Test  ...............................................  92
72  Power Supply Tests  ...............................................  92
73  Fire Test (Optional Heat Detector)  ...............................  93
74  Optional Fire and Smoldering Smoke Tests  .........................  93
75  Accelerated Aging Test (Optional Long-Term Stability Test) ........  94
76  Drop Test ........................................................  94

**SMOKE DETECTORS FOR USE IN RECREATIONAL VEHICLES**

77  General  ..........................................................  95
78  Variable Ambient Temperature and Humidity Test ...................  95
79  Corrosion (Salt Spray) Test ......................................  95
80  Vibration Test  ..................................................  95
81  Contamination Test (Cooking By-Products)  ........................  96

**MANUFACTURING AND PRODUCTION TESTS**

82  General  ..........................................................  98
83  Sensitivity Calibration Tests  ....................................  98
84  Photocell Illuminating Lamp Test (Photoelectric Detectors)  .......  98
85  Production Line Dielectric Voltage-Withstand Tests ................  98
86  Production Line Grounding Continuity Tests ........................  99
87  Detector Shipment  ................................................  99

**MARKING**

88  General  ..........................................................  100
89  Packaging Marking ................................................  102

**INSTRUCTIONS**

90  General  ..........................................................  102

**SUPPLEMENT SA — SMOKE DETECTOR RELIABILITY PREDICTION**

**GENERAL**

SA1  Instructions for Determining a Reliability Prediction for Smoke Detectors ...........  SA1
SA2  Methods of Determining Failure Rate ..............................  SA1
SA3  Maximum Detector Failure Rates ...................................  SA13



## FOREWORD

A.  This Standard contains basic requirements for products covered by Underwriters Laboratories Inc. (UL) under its Follow-Up Service for this category within the limitations given below and in the Scope section of this Standard. These requirements are based upon sound engineering principles, research, records of tests and field experience, and an appreciation of the problems of manufacture, installation, and use derived from consultation with and information obtained from manufacturers, users, inspection authorities, and others having specialized experience. They are subject to revision as further experience and investigation may show is necessary or desirable.

B.  The observance of the requirements of this Standard by a manufacturer is one of the conditions of the continued coverage of the manufacturer's product.

C.  A product which complies with the text of this Standard will not necessarily be judged to comply with the Standard if, when examined and tested, it is found to have other features which impair the level of safety contemplated by these requirements.

D.  A product employing materials or having forms of construction differing from those detailed in the requirements of this Standard may be examined and tested according to the intent of the requirements and, if found to be substantially equivalent, may be judged to comply with the Standard.

E.  UL, in performing its functions in accordance with its objectives, does not assume or undertake to discharge any responsibility of the manufacturer or any other party. The opinions and findings of UL represent its professional judgment given with due consideration to the necessary limitations of practical operation and state of the art at the time the Standard is processed. UL shall not be responsible to anyone for the use of or reliance upon this Standard by anyone. UL shall not incur any obligation or liability for damages, including consequential damages, arising out of or in connection with the use, interpretation of, or reliance upon this Standard.

F.  Many tests required by the Standards of UL are inherently hazardous and adequate safeguards for personnel and property shall be employed in conducting such tests.



2.1.2    A component need not comply with a specific requirement that:

a)    Involves a feature or characteristic not needed in the application of the component in the product covered by this standard, or

b)    Is superseded by a requirement in this standard.

2.1.3    A component shall be used in accordance with its recognized rating established for the intended conditions of use.

2.1.4    Specific components are recognized as being incomplete in construction features or restricted in performance capabilities. Such components are intended for use only under limited conditions, such as certain temperatures not exceeding specified limits, and shall be used only under those specific conditions for which they have been recognized.

## 2.2    Units of measurement

2.2.1    If a value for measurement as given in these requirements is followed by an equivalent value in other units in parentheses, the second value may be only approximate. The first stated value is the requirement.

## 2.3    Undated references

2.3.1    Any undated reference to a code or standard appearing in the requirements of this standard shall be interpreted as referring to the latest edition of that code or standard.



## 3  Glossary

3.1    For the purpose of this standard the following definitions apply.

3.2    ALARM SIGNAL — An audible signal intended to indicate an emergency fire condition.

3.3    ALARM VERIFICATION — The process that confirms the presence of an abnormal concentration of smoke particles in a detector for a predetermined period before an alarm signal is indicated.

3.4    COMBINATION SMOKE DETECTOR — A detector that employs more than one smoke detecting principle in one unit. To qualify as a combination smoke detector it is required that each principle contributes in response, either wholly or partially, to at least one of the Fire Tests (Section 45), or the Smoldering Smoke Test (Section 46).

3.5    COMPONENT, LIMITED LIFE — A component that is expected to fail and be periodically replaced and whose failure is supervised, if failure of the component affects normal operation or sensitivity. Typical examples of such components include incandescent lamps, electronic tube heaters, functional heating elements, and batteries. See also 37.4.2.

3.6    COMPONENT, RELIABLE — A component that is not expected to fail or be periodically replaced and is not supervised. A reliable component shall have a predicted failure rate of 2.5 or less failures per million hours.

3.7    SENSITIVITY — Relative degree of response of a detector. A high sensitivity denotes response to a lower concentration of smoke than a low sensitivity under identical smoke build-up conditions.

3.8    STORY — That portion of a building included between the upper surface of a floor and upper surface of the floor or roof next above.



5.2    The instructions and drawings shall include such directions and information as deemed by the manufacturer to be necessary for proper and safe installation, testing, maintenance, operation, and use of the detector.

## 6  Nonfire Alarm Feature

6.1    A nonfire alarm feature, such as a burglar alarm, may be used in common with a single and/or multiple station smoke detector or accessory, provided it does not degrade or interfere with operation of the smoke detector or accessory and complies with all the requirements of this standard (see 4.3 and 35.1.9).

## 7  Alarm Silencing Means (Optional)

7.1    Each single and multiple station smoke detector may be provided with an automatically resettable alarm silencing means that has a fixed or variable time setting and that silences the detector alarm for a maximum of 15 minutes.  Following the silenced period, the detector shall restore automatically to its intended operation.  Silencing of one detector of a multiple station system shall not prevent an alarm operation from the other detectors in the system.  See 35.2.1 and 35.2.2.

7.2    A variable adjustment may be provided on a detector to vary the silenced period.  If included, the adjustment means shall be provided with a mechanical stop or the equivalent, so that the maximum 15-minute limitation cannot be exceeded.

## 8  Battery Removal Indicator



8.1    Removal of a battery from a battery-operated smoke detector shall result in a readily apparent and prominent visual indication.  The visual indication shall consist of:

    a)    A warning flag that will be exposed with the battery removed and the cover closed;

    b)    A hinged cover that cannot be closed with the battery removed; or

    c)    An equivalent arrangement.

8.2    If a warning flag, or equivalent, is employed to comply with the requirement of 8.1, it shall be marked as required in 88.6.

## CONSTRUCTION

## ASSEMBLY

## 9  General

### 9.1    Accessories

9.1.1    Unless specifically indicated otherwise, the construction requirements specified for a detector shall apply also for any remote accessories with which it is to be employed.

### 9.2    Sensitivity adjustment

9.2.1    If a field sensitivity adjustment is provided, it shall be accessible with the detector installed as intended, marked to indicate the direction of sensitivity (high or low), and shall employ a mechanical stop at both extremes.  The sensitivity at the low sensitivity end shall be within the limits indicated in 38.1.1.  Removal of a snap-on cover to gain access to the sensitivity control is permissible, if no high-voltage parts can be contacted by the user.

10.1.2    An electrical component which may require examination, replacement, adjustment, servicing, or maintenance with the detector energized shall be located and mounted with respect to other components and with respect to grounded metal so that it is accessible for such service without subjecting the user to an electric shock from adjacent uninsulated high-voltage live parts.

10.1.3    The following are not considered to be uninsulated live parts:

    a)    Coils of relays, solenoids, and transformer windings, if the coils and windings are provided with insulating overwraps;

    b)    Terminals and splices with insulation rated for the intended application; and

    c)    Insulated wire.

## 10.2    Sharp edges

10.2.1    An edge, projection, or corner of an enclosure, opening, frame, guard, knob, handle, or the like, of a smoke detector shall be smooth and rounded, so as not to cause a cut-type injury when contacted during use or user maintenance.

## 11 Enclosure

## 11.1    General

11.1.1    The enclosure of a detector shall be constructed to resist the abuses likely to be encountered in service. The degree of resistance to abuse inherent in the detector shall preclude total or partial collapse with the attendant reduction of spacings, loosening or displacement of parts, and other defects that, alone or in combination, may result in a risk of fire, electric shock, or injury to persons.

11.1.2    Enclosures for individual electrical components, outer enclosures, and combinations of the two are to be considered in determining compliance with the requirement of 11.1.1.

11.1.3    All electrical parts of a detector, including a separate power supply, except for plug-in blades, shall be enclosed to provide protection against contact with uninsulated live parts. A separate enclosure for field-wiring terminals that will be enclosed by a back box is not required.

11.1.4    There shall be no nonfunctional rear openings in a smoke detector intended for permanent wiring connection through which debris or air currents can pass that could affect detector response from smoke after the detector is installed as intended. A nonfunctional opening is one that is not required for operation or installation of a detector.

11.1.5    There shall be no openings between the mounting surface to which a detector is intended to be installed and the rear of the detector through which air can pass that could affect detector response from test smoke after the detector is installed as intended.

11.1.6    To comply with 11.1.4 and 11.1.5, one of the following methods, or its equivalent, may be used:

    a)    An elastomeric rubber or neoprene gasket, or the equivalent, may be interposed between the rear of the detector and the mounting surface to seal the rear openings and preclude the escape of air from around the edge of the detector; or

    b)    Instructions in the installation manual may be provided to describe the location and method(s) of applying a sealing compound that has been found acceptable for the intended use.

## 11.3   Sheet metal enclosures

**11.3.1**   The thickness of sheet metal employed for the enclosure of a detector shall not be less than that indicated in Table 11.2, except that sheet metal of two gage sizes lesser thickness may be employed if the surface under consideration is curved, ribbed, or otherwise reinforced, or if the shape and/or size of the surface is such that equivalent mechanical strength is provided.

**Table 11.2**
**Sheet metal enclosures**

| Maximum dimensions of enclosure | | | | Minimum thickness of sheet metal | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Steel | | | | | | Brass or aluminum | | |
| Length or width | | Area | | Zinc-coated | | | Uncoated | | | | | |
| inches | mm | inches$^2$ | cm$^2$ | inch | (mm) | GSG | inch | (mm) | MSG | inch | (mm) | AWG |
| 12 | 305 | 90 | 581 | 0.034 | (0.86) | 20 | 0.032 | (0.81) | 20 | 0.045 | (1.14) | 16 |
| 24 | 610 | 360 | 2322 | 0.045 | (1.14) | 18 | 0.042 | (1.07) | 18 | 0.058 | (1.47) | 14 |
| 48 | 1219 | 1200 | 7742 | 0.056 | (1.42) | 16 | 0.053 | (1.35) | 16 | 0.075 | (1.91) | 12 |
| 60 | 1524 | 1500 | 9678 | 0.070 | (1.78) | 14 | 0.067 | (1.70) | 14 | 0.095 | (2.41) | 10 |
| Over 60 | 1524 | Over 1500 | 9678 | 0.097 | (2.46) | 12 | 0.093 | (2.36) | 12 | 0.122 | (3.10) | 8 |



**11.3.2**   At any point where conduit or metal-clad cable is to be attached, sheet metal shall have a thickness of not less than 0.032 inch (0.81 mm) if of uncoated steel, not less than 0.034 inch (0.86 mm) if of galvanized steel, and not less than 0.045 inch (1.14 mm) if of nonferrous metal.

**11.3.3**   A ferrous plate or plug closure for an unused conduit opening or other hole in the enclosure shall have a thickness not less than 0.027 or 0.032 inch (0.69 or 0.81 mm) nonferrous metal for a hole having a 1-3/8 inch (34.9 mm) diameter maximum dimension.

**11.3.4**   A closure for a hole larger than 1-3/8 inch (34.9 mm) diameter shall have a thickness equal to that required for the enclosure of the device or a standard knockout seal shall be used.

**11.3.5**   A knockout in a sheet metal enclosure shall be secured but shall be capable of being removed without undue deformation of the enclosure.

**11.3.6**   A knockout shall be provided with a surrounding surface for seating of a conduit bushing, and shall be so located that installation of a bushing at any knockout likely to be used during installation will not result in spacings between uninsulated live parts and the bushing of less than those indicated in Spacings, General, Section 33.

## 11.4   Nonmetallic enclosures

**11.4.1**   An enclosure or parts of an enclosure of nonmetallic material shall have the mechanical strength and durability and be formed so that operating parts will be protected against damage. The mechanical strength of the enclosure shall be at least equivalent to a sheet metal enclosure of the minimum thickness specified in Table 11.2. See also Tests of Thermoplastic Materials, Section 66.

**11.4.2**   The continuity of any grounding system to which a detector can be connected shall not rely on the dimensional integrity of the nonmetallic material.

**11.6.4**    A hinged cover is not required where the only fuse(s) enclosed is intended to provide protection to portions of internal circuits, such as may be employed on a separate printed wiring board or circuit subassembly, to prevent circuit damage resulting from a fault. The use of such a fuse(s) is acceptable if the word "CAUTION" and the following or equivalent marking is located on the cover of a detector employing high-voltage circuits: "Circuit Fuse(s) Inside — Disconnect Power Prior To Servicing."

**11.6.5**    A hinged cover shall be provided with a latch, screw, or catch to hold it closed.  An unhinged cover shall be securely held in place by screws or the equivalent.

**11.7    Glass panels**

**11.7.1**    Glass covering an enclosure opening shall be held securely in place so that it cannot be displaced in service and shall provide mechanical protection of the enclosed parts.  The thickness of a glass cover shall not be less than that indicated in Table 11.3.

**Table 11.3**
**Thickness of glass covers**

| Maximum size of opening | | | | Minimum thickness | |
|---|---|---|---|---|---|
| Length or width | | Area | | | |
| inches | (mm) | inches$^2$ | (cm$^2$) | inch | (mm) |
| 4 | (102) | 16 | (103) | 1/16 | (1.6) |
| 12 | (305) | 144 | (929) | 1/8 | (3.2) |
| Over 12 | (305) | Over 144 | (929) | a | |

a 1/8 inch (3.2 mm) or more, depending upon the size, shape, and mounting of the glass panel.  A glass panel for an opening having an area of more than 144 square inches (929 cm$^2$), or having any dimension greater than 12 inches (305 mm), shall be supported by a continuous groove not less than 3/16 inch (4.8 mm) deep along all four edges of the panel.

**11.7.2**    A transparent material other than glass employed as a cover over an opening in an enclosure shall:

a)    Be mechanically equivalent to that of glass,

b)    Not distort, or

c)    Not become less transparent at the temperature to which it may be subjected under normal or abnormal service conditions.

**11.7.3**    A lens, light filter, or similar part of a smoke detector shall be constructed of a material whose transparency will not be diminished by the conditions to which it will be exposed in service, as represented by the Performance Tests (see Sections 35 — 76) of this standard.

**12  Corrosion Protection**

**12.1**    Iron and steel parts shall be protected against corrosion by enameling, galvanizing, plating, or other equivalent means.



14.3   If a nonrechargeable or rechargeable type battery is employed as a secondary power supply, the marking on the unit shall include recommended periodic battery replacement instructions.

14.4   If the discharge condition of a nonrechargeable type battery cannot be discerned visually, some form of test means, or equivalent, shall be provided to determine battery capacity.  Any of the following would be an acceptable means:

   a)   Battery test switch with related meter or equivalent means to indicate battery capacity.

   b)   Prominent marking on front of unit which has the following or equivalent wording: "Shut off A-C power.  Push test switch.  If sound of alarm has decreased below the level when AC was applied, replace battery."

   c)   Monitored battery where a trouble indication, as described in 37.1.3, is obtained.

## 15  Batteries

### 15.1   General

15.1.1   If a battery or set of batteries is employed as the main source of power of a single or multiple station smoke detector, it shall meet the requirements of the Battery Tests, Section 64.

15.1.2   Batteries included as part of a detector shall be so located and mounted that terminals of cells will be prevented from coming in contact with uninsulated live parts, terminals or adjacent cells, or metal parts of the enclosure as a result of shifting.

15.1.3   A battery compartment intended for use with rechargeable batteries which emit gases during charging shall be provided with vent holes.

15.1.4   Ready access shall be available to the battery compartment to facilitate battery replacement, without damage to the detector components or disassembly of any part of the detector, except for a cover or the equivalent.

15.1.5   Connections of external wiring to a battery-operated single- or multiple-station smoke detector, or to a portable accessory, shall not be subjected to stress or motion during battery replacement and/or servicing.  Removal of the detector or accessory from the mounting support to replace a battery or to service the unit is permitted, provided the connected wiring is not subjected to flexing or stress.

### 15.2   Battery connections

15.2.1   Lead or terminal connections to batteries shall be identified with the proper polarity, (plus or minus signs), and provided with strain relief. The polarity may be indicated on the unit adjacent to the battery terminals or leads.

15.2.2   Connections to battery terminals shall be either by a lead terminating in a positive snap action type of clip, or a fixed butt type connection which applies a minimum of 1.5 pounds (6.6 N) force to each battery contact, or equivalent.  The connection shall consist of an unplated or plated metal which is resistant to the corrosive action of the electrolyte.

15.2.3   Each lead of a clip-lead assembly employed as part of a battery operated detector shall be a minimum of No. 26 AWG (0.21 mm$^2$) stranded wire with a minimum 1/64-inch (0.4-mm) insulation.



17.4.2   Leads provided for field connection to power limited fire protective signaling circuits, such as may be employed for multiple station interconnection or for connection to remote signaling devices, shall not be smaller than No. 16 AWG (1.3 mm$^2$), for a single conductor, No. 19 AWG (0.65 mm$^2$) for two or more conductors, and No. 22 AWG (0.32 mm$^2$) for four or more conductors of a multiconductor cable.  The conductor shall be solid, bunch tinned stranded, or stranded copper.  Stranded copper wire, consisting of not more than seven strands, may be employed only for No. 18 AWG (0.82 mm$^2$) and larger conductors.

## 17.5   Grounded supply terminals and leads

17.5.1   A field-wiring terminal for the connection of a grounded supply conductor shall be identified by means of a metallic plated coating substantially white in color and shall be readily distinguishable from the other terminals, or proper identification of the terminal for the connection of the grounded conductor shall be clearly shown in some other manner, such as on an attached wiring diagram.

17.5.2   A field-wiring lead provided for connection of a grounded supply conductor shall be finished to show a white or natural gray color and shall be readily distinguishable from other leads.  No other leads, other than grounded conductors, shall be so identified.

17.5.3   A terminal or lead identified for the connection of the grounded supply conductor shall not be electrically connected to a single-pole manual switching device that has an OFF position or to a single-pole overcurrent (not thermal) protective device.

## 18   Power Supply Cord



18.1   A cord-connected single station smoke detector shall be provided with not less than 6 feet (1.83 m) nor more than 20 feet (6.10 m) of flexible cord and a two or three prong attachment plug of the type and rating for connection to the supply circuit.

18.2   The flexible cord shall be of Type SP-1, SPT-1, SP-2, SPT-2, SV, SVT, SJ, SJT, SPE, SVE, or equivalent, minimum No. 18 AWG (0.82 mm$^2$).  It shall be rated for use at the voltage and ampacity rating of the detector, in accordance with the National Electrical Code, ANSI/NFPA 70.

18.3   Means shall be provided to prevent the flexible cord from being pushed into the enclosure through the cord-entry hole if such displacement can:

   a)   Subject the cord to mechanical damage or to exposure to a temperature higher than that for which the cord is rated,

   b)   Reduce spacings below the minimum acceptable values, or

   c)   Result in damage in internal components.

18.4   A smoothly rounded restraining means shall be provided for securing the attachment plug to the receptacle.  The means shall withstand for 1 minute a pull of 5 pounds force (22.25 N) while installed as intended in service without any evidence of damage to the connection.



20.2    Where longer runs of interconnecting wiring would be used in an installation, such as in a multiple station configuration, or where several detectors are supplied by a common power supply, the wiring need not be provided by the manufacturer. However, the installation wiring diagram or instructions shall be marked to specify that the wiring to be used shall be in accordance with the provisions of Article 760 of the National Electrical Code, ANSI/NFPA 70. In addition, the resistance of the interconnecting wiring shall be a maximum of 10 ohms, unless otherwise specified by the manufacturer.

## INTERNAL WIRING

## 21 General

21.1    The internal wiring of a detector shall consist of conductors having insulation rated for the potential involved and the temperatures to which it may be subjected, and shall have the mechanical strength and current-carrying capacity for the service. The wiring shall be routed away from moving parts and sharp projections and held in place with clamps, string, ties, or equivalent, unless of sufficient rigidity to retain a shaped form.

21.2    Leads, or a cable assembly, connected to parts mounted on a hinged cover shall be of sufficient length to permit the full opening of the cover without applying stress to the leads or their connections. The leads shall be secured or equivalently arranged to prevent abrasion of insulation and jamming between parts of the enclosure.

21.3    If the use of a short length of insulated conductor is not feasible, such as for a short coil lead or the like, electrical insulating tubing may be employed. The tubing shall not be subjected to sharp bends, tension, compression, or repeated flexing, and shall not contact sharp edges, projections, or corners. The wall thickness of the tubing shall conform to the requirements for such tubing, except that the wall thickness at any point for polyvinyl chloride tubing of 3/8 inch (9.5 mm) diameter or less, shall not be less than 0.017 inch (0.43 mm). For insulating tubing of other types the wall thickness shall not be less than that required to at least equal the mechanical strength, dielectric properties, and heat and moisture resistance characteristics of polyvinyl chloride tubing having a wall thickness of 0.017 inch.

21.4    Internal wiring of circuits operating at different potentials shall be separated by barriers or shall be segregated, unless the conductors of the circuits of lower voltage are provided with insulation equivalent to that required for the highest voltage involved. Segregation of insulated conductors may be accomplished by clamping, routing, or equivalent means that provides permanent separation.

21.5    Stranded conductors clamped under wire-binding screws, or similar parts, shall have the individual strands soldered together or be equivalently arranged, to provide reliable connections.

21.6    Wireways shall be smooth and free from sharp edges, burrs, fins, and moving parts that may cause abrasion of the conductor insulation.

21.7    All splices and connections shall be mechanically secured to preclude shorting to adjacent uninsulated current carrying parts in the event that an improper connection, such as a cold solder joint, is made. Tack soldering is permitted where the design precludes mechanical security provided that five samples resist a pull force of 2 pounds (8.9 N) applied for 3 seconds and the connection is subjected to 100 percent inspection and testing with the same pull force by the manufacturer.

21.8    A splice shall be provided with insulation equivalent to that of the wires involved, if permanence of electrical spacing between the splice and uninsulated metal parts is not assured.

21.9    Splices shall be located, enclosed, and supported so that flexing, movement, or vibration will not damage the insulation or affect the integrity of the splice.



## ELECTRICAL COMPONENTS

## 23 General

### 23.1 Mounting of components

23.1.1    A switch, lampholder, attachment-plug receptacle, plug connector, or similar electrical component, and uninsulated live parts shall be mounted securely and shall be prevented from turning.

*Exception No. 1:    The requirement that a switch be prevented from turning may be waived if all four of the following conditions are met:*

*a)    The switch is to be of a plunger or other type that does not tend to rotate when operated. A toggle switch is considered to be subject to forces that tend to turn the switch during operation of the switch.*

*b)    The means for mounting the switch makes it unlikely that the operation of the switch will loosen it.*

*c)    The spacings are not to be reduced below the minimum required values if the switch rotates.*

*d)    The operation of the switch is to be by mechanical means rather than by direct contact by persons.*

*Exception No. 2:    A lampholder of the type in which the lamp cannot be replaced, such as a neon pilot or indicator light in which the lamp is sealed in a nonremovable jewel, need not be prevented from turning if rotation cannot reduce spacings below the minimum values required.  See Spacings, Section 33.*

23.1.2    Uninsulated live parts shall be so secured to the base or mounting surface that they will be prevented from turning or shifting in position, if such motion may result in a reduction of spacings.  Friction between surfaces is not acceptable as a means to prevent shifting or turning of live parts, but a properly applied lock washer may be accepted.

23.1.3    Uninsulated live parts, for example, field-wiring terminals, shall be secured to their supporting surfaces by methods other than friction between surfaces so that they will be prevented from turning or shifting in position if such motion may result in reduction of spacings below the minimum values required. This may be accomplished by two screws or rivets; by square shoulders or mortises; by a dowel pin, lug, or offset; by a connecting strap or clip fitted into an adjacent part; or by some other equivalent method.

### 23.2 Operating components

23.2.1    Operating components and assemblies, such as switches, relays, and similar devices, shall be protected by individual dust covers or dust tight cabinets, against fouling by dust or by other material which may impair their operation.

23.2.2    Adjusting screws and similar adjustable parts shall be prevented from loosening under the conditions of actual use.  The use of a properly applied lock washer to prevent loosening may be accepted.

### 23.3 Current-carrying parts

23.3.1    A current-carrying part shall be of metal such as silver, copper or copper alloy, or equivalent material.



24.5    If a soft-rubber bushing or similar material that may deteriorate with age is employed in a hole in metal, the hole shall be free from sharp edges, burrs, projections, and the like, which would be likely to cut into the bushing and wire insulation.

24.6    An insulating metal grommet may be considered acceptable in lieu of an insulating bushing, provided that the insulating material used is not less than 1/32 inch (0.8 mm) in thickness and fills completely the space between the grommet and the metal in which it is mounted.

## 25  Lampholders and Lamps

25.1    A single station smoke detector intended to be connected to a commercial alternating current (ac) power source shall be provided with a "power-on" lamp to indicate energization of the unit.

25.2    If more than one lamp is provided on the detector, the "power-on" lamp shall be white or green, an alarm indicating lamp shall be red, and a trouble lamp shall be amber or yellow. The "power-on" lamp may be of a different color if marked to identify the function.

25.3    At least one spare lamp shall be provided in a single station smoke detector that employs photocell illuminating lamps that are likely to burn out during the service life of a detector.

25.4    A lampholder and lamp shall be rated for the circuit in which they are employed.

25.5    A lampholder in a high-voltage circuit shall be wired so that the screw shell will be connected to an identified (grounded circuit) conductor.

25.6    A lampholder shall be installed so that uninsulated high-voltage live parts will not be exposed to contact by persons removing or replacing lamps in service.

25.7    A lamp or equivalent means, such as a distinctive audible signal indication, shall be provided on a detector intended for multiple-station interconnection to identify the unit from which the alarm was initiated.

## 26  Light Emitting Diode (LED) Source Lamps

### 26.1    General

26.1.1    A LED used as a light source of a single station smoke detector employing a photocell light assembly shall comply with electrical supervision requirements specified in 37.5.1 — 37.5.5, operating condition requirements specified in 26.2.1 — 26.2.4, and the reliability prediction specified in 4.1.

### 26.2.  Operating conditions

26.2.1    For direct current operation, the drive current shall not exceed 75 percent of the dc forward current rating.

26.2.2    For pulsed operation, the average current shall not exceed 75 percent of the dc forward current rating.

26.2.3    For pulsed operation, where the pulse duration exceeds 1 millisecond or the duty factor is greater than 50 percent, the peak current shall not exceed 75 percent of the dc forward current rating.

26.2.4    For all applications, the LED shall be electrically protected from negative voltages, from transients or pulse undershoot exceeding 70 percent of the rated reverse voltage.





33.2    The spacings between an uninsulated live part and:

    a)    A wall or cover of a metal enclosure;

    b)    A fitting for conduit or metal-clad cable; and

    c)    Any dead metal part

shall not be less than that indicated in Table 33.1.

33.3    The "Through Air" and "Over Surface" spacings of Table 33.1 measured at an individual component part are to be judged on the basis of the volt-amperes used and controlled by the individual component. However, the spacings from one component to another, and from any component to the enclosure or to other uninsulated dead metal parts, excluding the component mounting surface, shall be judged on the basis of the maximum voltage and total volt-amperes rating of all components in the enclosure.

33.4    The spacing requirements in Table 33.1 do not apply to the inherent spacings inside motors, except at wiring terminals, or to the inherent spacings of a component provided as part of the detector. Such spacings are judged on the basis of the requirements for the component. The electrical clearance resulting from the assembly of a component into the complete device, including clearances to dead metal or enclosures, shall be those indicated in Table 33.1.

33.5    The "To Wall of Enclosure" spacings of Table 33.1 are not to be applied to an individual enclosure of a component part within an outer enclosure.



33.6    Enameled or equivalently insulated wire is to be considered an uninsulated live part, but enamel is acceptable as turn-to-turn insulation in coils.

# PERFORMANCE

## 34 General

### 34.1 Test units and data

34.1.1 Detectors that are fully representative of production units are to be used for each of the following tests, unless otherwise specified. THE SENSITIVITY SETTING OR RANGE OF SENSITIVITIES PROVIDED ON THE SAMPLES FOR TEST WILL DEFINE THE PRODUCTION SENSITIVITY.

34.1.2 The devices employed for testing are to be those specified by the wiring diagram of the detector, except that substitute devices may be used if they produce functions and load conditions equivalent to those obtained with the devices intended to be used with the detector in service.

### 34.2 Accessories

34.2.1 Accessories for use with single and multiple station smoke detectors are to be subjected to the following tests as applicable:

    a) Normal Operation, Section 35
    b) Circuit Measurement, Section 36
    c) Temperature, Section 48
    d) Overload, Section 49
    e) Endurance, Section 50
    f) Variable Ambient Temperature, Section 51
    g) Humidity, Section 52
    h) Leakage Current, Section 53
    i) Transient, Section 54
    j) Dielectric Voltage-Withstand, Section 55
    k) Overvoltage and Undervoltage, Section 57
    l) Jarring, Section 61
    m) Audibility, Section 65
    n) Tests of Thermoplastic Materials, Section 66
    o) Drop Test, Section 76 (portable appliance only)

### 34.3 Test voltages

34.3.1 Unless otherwise specified, the test voltage for each test shall be as follows, at rated frequency:

| Detector rated voltage, nameplate | Test voltage |
|---|---|
| 110 to 120 | 120 |
| 220 to 240 | 240 |
| Other | Marked rating |



e)    Maximum vendor's ratings for each component as well as the actual maximum operating values (voltage and current) in the detectors.

f)    A description of component screening and burn-in test data for solid-state devices or integrated circuits which operate at greater than the limits described in note b of Table 48.1.

g)    For a detector using a reliable LED as the photocell illuminating light source, the data specified in 26.2.1 — 26.2.4.

h)    General calibration procedure of test instruments employed by the manufacturer in the calibration of a detector.

i)    A general description of the circuit operation under standby, alarm, and trouble conditions.

j)    A description of the smoke test chamber, including drawings and operation procedure, to be used by a manufacturer in conducting the factory smoke tests.

## 35  Normal Operation Test

### 35.1  General

35.1.1    A detector shall operate for all conditions of its intended performance, at all sensitivity settings, when energized from a source of rated voltage, under all conditions covered both in the installation instructions and in any supplementary information provided by the manufacturer.

35.1.2    The test voltage is to be in accordance with 34.3.1. The detector is to be in the standby condition and prepared for its intended signaling operation when it is connected to related devices and circuits.

35.1.3    The introduction of smoke into the detector chamber, such as from a smoldering cotton lamp wick, rope, or equivalent, shall result in the operation of the detector in its intended manner. See 38.1.1. The alarm signal shall persist for at least 4 minutes under an abnormal level of smoke.

35.1.4    A single station smoke detector that employs a secondary power supply shall operate for alarm signals with the main power de-energized.

35.1.5    If single station smoke detectors are also intended for multiple station connection, the operation for alarm of one detector shall result in the alarm signal of all connected detectors being energized and the detector that initiated the alarm signal shall be identified. See 25.7.

35.1.6    If a heat detector is provided integral with a single station smoke detector, or is intended to be connected to a remote initiating device circuit of a multiple station smoke detector, actuation of the heat detector shall result in the same type of alarm signal as when actuated by smoke.

35.1.7    Neither principle of operation of a combination smoke detector shall be rendered inoperative by any of the Performance Tests (Sections 35 — 76) of this standard. A circuit analysis shall be made, supplemented by electrical measurements if necessary, to determine that both principles of operation contribute to detector actuation.



## 36.2    Battery trouble voltage determination

36.2.1    An increase in the internal resistance, or a decrease in terminal voltage, of a battery employed as the primary source of power to a detector shall not impair operation for an alarm signal before a trouble signal is obtained.  In addition, any combination of voltage and resistance at which a trouble signal is obtained shall be greater than the battery voltage and resistance combination measured over a 1 year period in the room ambient condition of the Battery Test, Section 64.

36.2.2    The trouble level of a battery operated smoke detector shall be determined (using the test circuit in Figure 36.1 and the voltage-resistance curves of Figure 36.2) for each of the following voltages:

    a)    Rated battery voltage.

    b)    Trouble level voltage (assuming minimal or no series resistance).

    c)    Voltages between rated and trouble level voltage.

<div align="center">

**Figure 36.1**
**Test circuit**

</div>



S2478

36.2.4    To determine that a battery is capable of supplying alarm and trouble signal power to the detector for at least 1 year under the room ambient condition described in Battery Tests, Section 64, Curve A of Figure 36.2 is to be plotted from the data obtained in the measurements described in 36.2.3 and compared to Curve B of Figure 36.2, which is plotted from data generated in the 1 year battery test. The intersection of Curves A and B shall not occur before 1 year and all points of Curve B to the right of point F (extended to the base line), shall be below Curve A.

## 37  Electrical Supervision Test

### 37.1  General

37.1.1    A single station smoke detector shall be electrically supervised so that failure of a limited life component, open in an externally connected detector circuit, or ground fault on any externally connected wiring which prevents operation for an alarm signal from the detector shall result in an audible trouble signal.

37.1.2    The wiring extending between detectors wired in a multiple station configuration shall be electrically supervised so that a short or multiple ground fault, which would prevent operation for an alarm signal, shall result in an audible trouble signal or result in an alarm signal. An "open" in any of the wiring between detectors is not required to be indicated by a trouble signal if the operation as a single station detector is not prevented. This requirement does not apply to the interconnected wiring of detectors intended to be connected by a Class 1 wiring method.

37.1.3    If an audible trouble signal is required to indicate a fault condition, it shall be produced at least once every minute for a minimum of seven consecutive days. The trouble signal shall be distinctive from the alarm signal.

37.1.4    To determine if a detector unit complies with the requirements for electrical supervision, the detector is to be energized in the standby condition, and the type of fault to be detected is then to be introduced. Each fault shall be applied separately, the results noted and the fault removed. The detector is then to be restored to the standby condition prior to establishing the next fault.

37.1.5    A fault condition (open, ground, or short), of other than the smoke detector circuit of a smoke detector with a nonfire-alarm feature shall not prevent alarm signal operation as a smoke detector. For this test the detector is to be energized from a rated source of supply in the normal standby condition and the fault is to be applied. With the fault applied the detector is then to be subjected to an abnormal smoke condition which shall result in an audible smoke alarm.

### 37.2  AC powered units

37.2.1    Failure of the main power supply to a detector other than those powered from a primary battery shall be indicated by de-energization of a "power-on" lamp.

37.2.2    Neither loss nor restoration of power shall cause an alarm signal under either momentary or extended (at least 1/2 hour) power outage conditions. Momentary energization of the alarm circuit (maximum of 1 second), and energization of the trouble circuit (maximum of 2 minutes), is acceptable. A gradual increase to 110 percent of rated voltage or reduction to 0 volts from rated voltage at a rate of not greater than 5 volts per minute shall not result in energization of the alarm signal for more than 1 second.

37.2.3    Loss of power to a single unit of a multiple station detector configuration, while energized in the standby condition, shall not result in a false alarm and shall not prevent the operation of the remaining units for alarm.



37.5.3   An audible trouble signal for greater than 50 percent light degradation of a limited life LED is not required if light degradation data is supplied by the LED manufacturer to show that, for the conditions under which it is to be operated, the LED will not reach 50 percent light output at the end of the reliability prediction period. See 3.6.

37.5.4   When the light output of an LED source lamp is reduced to the 50 percent level, or the light level anticipated at the end of the reliability prediction is less than 50 percent, the sensitivity of the detector shall not be reduced by more than 50 percent of the value at full output, and in no case shall it exceed 4 percent per foot (12.5 percent/m) for gray smoke and 10 percent per foot (29.2 percent/m) for black smoke. (See Reduction in Light Output Test, Section 63.)

37.5.5   An LED employed as the light source of a photoelectric detector is not required to be electrically supervised by means of an audible trouble signal if it is considered to be reliable based on its use in the detector and supporting reliability data provided by the component manufacturer. Failure of the reliable LED at the end of the failure rate prediction described in 3.6, may result in an alarm signal.

## 37.6   External wiring

37.6.1   An open or ground fault in the loop wiring connected from a single station smoke detector to additional remote heat detectors that prevent operation for alarm signals from any of the interconnected detectors, shall not cause an alarm signal but shall result in an audible trouble signal. A short or double ground fault in the leads may result in an alarm.

37.6.2   An open, ground fault, or short in any power limited fire protective circuit wiring among multiple station interconnected detectors or any wiring extending to a remote signaling device is not required to be indicated by a trouble signal if the fault does not prevent operation of any of the interconnected units as a single station detector. A ground fault is permitted to prevent operation for alarm if the interconnected wiring is to be made in accordance with Class 1 requirements of the National Electrical Code, ANSI/NFPA 70. The installation wiring diagram shall indicate the type of connections to be employed.

37.6.3   An open, ground fault, or short in the power limited fire protection circuit conductors extending between the output of a separate power supply and a detector, which prevents operation of the detector, shall result in de-energization of the detector "power-on" light.

## 38   Sensitivity Test

### 38.1   General

38.1.1   A smoke detector when calibrated to each end of its production window shall operate within the limits specified below when subjected to a smoldering smoke condition using the test equipment described in 38.3.1 — 38.3.3, and when subjected to a range of air velocities. If the detector employs a variable sensitivity setting, test measurements are to be made at maximum and minimum settings. The sensitivity measurement is to be made with the detector located in the air stream in the least and most favorable horizontal positions for smoke entry as determined in the Directionality Test, Section 40. If a detector employs alarm verification [see 88.1(m)], the sensitivity measurements are to be made with and without the alarm verification bypass applied.



**Figure 38.1**
**Sensitivity test limits – gray smoke – cotton wick – 30 fpm**



S2212

**Figure 38.2**
**Smoke build-up rate – sensitivity test – gray smoke – cotton wick – 30 fpm**



S2213

## 38.3    Test equipment

38.3.1    The visible smoke obscuration (optical density) in the test compartment is to be measured by means of a dc type microammeter having a maximum internal resistance of 100 ohms and full scale reading of 100 $\mu$A used with a barrier type selenium photovoltaic cell, enclosed in a hermetically sealed case.[a] An equivalent meter consists of a digital voltmeter having a minimum input impedance of 10 megohms in parallel with a 100 ohms resistance, and a 500 ohms potentiometer. The meter and cell are to be used in conjunction with the light produced by a tungsten filament automotive type lamp (such as a prefocused spotlight bulb) energized from a constant current source at approximately half rated voltage to provide a light beam of uniform flux density. The photoelectric cell and lamp are to be spaced 5 feet (1.5 m) apart. The following equations are to be used:

[a] A meter acceptable for this purpose is Weston Instrument Model 622 in conjunction with a Weston Instrument Model 594 RR Photronic Cell.

a)    At any distance, the percent obscuration per foot (or per meter) will be:

$$O_u = \left[ 1 - \left( \frac{T_s}{T_c} \right)^{\frac{1}{d}} \right] 100$$

In which:

$O_u$ is the percent obscuration per foot (or per meter).

$T_s$ is the smoke density meter reading with smoke.

$T_c$ is the smoke density meter reading with clear air.

d is the distance in feet (or meters).

b)    The percent obscuration of light for the full length beam at any distance will be:

$$O_d = \left[ 1 - \frac{T_s}{T_c} \right] 100$$

In which:

$O_d$ is the percent obscuration at distance d.

$T_s$ is the smoke density meter reading with smoke.

$T_c$ is the smoke density meter reading with clear air.



f)   At any distance, the optical density per foot (or per meter) will be:

$$OD = \frac{Log_{10}\left(\dfrac{T_e}{T_s}\right)}{d}$$

In which:

OD is the Optical Density per foot (or per meter).

$T_e$ is the smoke density meter reading with clear air.

$T_s$ is the smoke density meter reading with smoke.

d is the distance in feet (or meters).

**38.3.2**   A Measuring Ionization Chamber (MIC)[b] is to be used to measure the relative buildup of particles of combustion during each trial. The MIC utilizes the ionization principle with air drawn through the chamber at a rate of 25 ±5 liters per minute by a regulated vacuum pump.

[b] Electronikcentralen, Horsholm Denmark, Measuring Ionization Chamber (MIC), Type EC 23095.

**38.3.3**   A typical test chamber consists of the following items. Different chamber configurations may be used as long as they provide a homogeneous smoke mix and a laminar air flow across the detector, adjustable from 30 to 150 feet per minute (0.16 to 0.76 m/s).

a)   Outer Cabinet — Constructed of 3/4 inch (19.1 mm) exterior grade plywood, has overall inside dimensions of approximately 65-3/4 inches (1.67 m) long by 19-1/4 inches (490 mm) deep by 18-1/8 inches (460 mm) wide. Has a centrally located gasketed hinged top door approximately 33-7/8 inches (860 mm) wide in the top with a 12 by 24 inch (305 by 610 mm) clear plastic window. A 1/4 inch (6.4 mm) diameter hole is located in the window center for air flow measurement. Box is provided with a 7 inch (178 mm) diameter exhaust port in the right end centered 4-1/2 inches (114 mm) above the bottom and employed with a sliding or hinged wooden cover.

b)   Inner Compartment — Constructed of 3/4 inch exterior grade plywood, approximately inside dimension 41-3/4 inches (1.06 m) long by 11-1/2 inches (292 mm) high covering the entire width of the inside of the outer cabinet. The left end has a 5-3/4 inch (146 mm) diameter hole for the circulating fan centered 3-7/8 inches (98.1 mm) above the bottom and a 4 inch (102 mm) diameter hole for the light beam centered 3 inches (76.2 mm) in either direction from the top back corner. The right end is the same as the left end except it has one additional 4 inch diameter hole centered 3 inches in either direction from the top front corner. Molding strips nominal 5/8 inch (15.9 mm) are used to secure the end pieces and the top. All interior surfaces are painted with a flat black paint.

c)   Circulating Fan[c] — 250 cubic feet per minute (cfm) (0.12 m³/s) rated 115 volts, 60 hertz, 5-3/4-inch (146-mm) diameter. The fan may be located on either side of the opening. The fan is connected to a motor controller (r) for variable speed adjustment.

Alternate Fan[d] — 550 cfm (0.26 m³/s), rated 115 volts, 50/60 hertz, 10-inch (254-mm) diameter.

[c] A fan acceptable for this purpose is a Model 7600 rated 115 volts, 60 hertz by Pamoter, Inc. or equivalent.

[d] E. G. & G. Rotron, Model CL2L2, or equivalent.



l)    Lamp — Low-voltage automotive spot-light type 4515 or equivalent rated at 6 volts dc, and mounted on 3/4 inch (19.1 mm) plywood bracket approximately 4 inches (102 mm) from the side wall in-line with the photocell. The distance from the lamp (lens face) to photocell is to be exactly 5 feet (1.52 m). The lamp is to be operated from a regulated voltage supply at 2.40 volts which yields a lamp color temperature of 2373 ±50°K. At that level, the photocell current is to be 100 ±25 microamperes into 100 ohms. The lamp is not to cause random meter fluctuations.

m)    Smoke Generator Access Assembly — Constructed of 3/4 inch (19.1 mm) plywood approximately 9 inches (229 mm) high by 7 inches (178 mm) wide with a 4-7/8 by 6-3/4 inch (124 by 172 mm) panel on the inside so as to be flush on the inside of the compartment when closed. Has a semicircular shaped shelf of approximately 3-5/8 inch (92.1 mm) radius mounted 2-5/8 inches (66.7 mm) above the bottom to support the combustible holder and screen.

n)    Wick Igniter — Cone resistor, rated 1000 watts, wire guard. Energized through output of variable autotransformer to provide dull red head (approximately 75 — 80 volts).

o)    Kerosene Lamp — Employed to generate black smoke. Approximately 4 inches (102 mm) high, 1/2 inch (12.7 mm) cotton wick, perforated metal shroud used as shield for wick, approximately 3-1/2 inches (88.9 mm) high, 2-3/4 inches (70 mm) diameter.

p)    Combustible Holder and Screen (32 FPM Velocity) — Steel cylinder open on both ends, approximately 3 inches (76.2 mm) diameter by 6 inches (152 mm) long with 1/8 inch (3.2 mm) diameter holes on 9/32 inch (7.1 mm) centers. Smaller, 1/32 inch (0.8 mm) diameter holes spaced 3/32 inch (2.4 mm) on centers are arranged in 9/32 inch squares around each larger hole. Combustible is cotton lamp wick 1/8 inch in diameter with the smoldering end pointing downward so as to extend approximately 5 inches (127 mm) into screen. Wick is held vertically by a wire in the center of and supported by the screen.

Combustible Holder and Screen (150 FPM Velocity) — Same overall dimensions as holder for 32 fpm velocity except 5-3/4 inches high, fabricated from solid sheet metal with a 1/2- by 1-7/8 inch (13- by 48-mm) rectangular opening at top for insertion of wick and a 3/16 inch (5 mm) diameter hole on side approximately 1 inch (25 mm) from bottom. See Figure 38.5.

q)    METER ASSEMBLY — Digital microammeter assembly consisting of a voltmeter having a minimum impedance of 10 megohms (clear air condition is indicated as 10 millivolts), and a trim potentiometer for adjustment of the meter. Connected directly to photocell (item 5). An analog direct current microammeter, having a maximum impedance of 100 ohms and a linearity of 1 percent or better over a range of 50 — 100 microamperes, may also be used.

r)    CONTROL CABINET — Cabinet for mounting timers, switches, variable autotransformer for varying supply voltage to outlets (k), and potentiometer for speed control of circulating fan (item 3).

s)    MONITOR HEAD METER[h] — High impedance meter 100 picoamperes full scale. Employed with (l) and (u).

[h] Fluke Model 8022A multimeter, or equivalent.

t)    AIR DIFFUSER — Same type of screening material as described in (h). To be wedged between the underside of the air stream straightener and the deflector at approximately a 45 degree angle with the horizontal.

u)    CONTROL EQUIPMENT (MONITORING HEAD) — Consists of a suction control unit employed with a vacuum pump and an amplifier with power supply. Employed with (l) and (s).



**38.4.3**   The air velocity in the test compartment is to be maintained at 32 ±2 fpm (0.16 ±0.001 m/s), as measured 1 inch (25.4 mm) in front (upstream) of the middle section of the detector with a hot wire anemometer, or equivalent air velocity measuring instrument. The velocity measurement is to be made with the detector removed.

**38.4.4**   The combustible is to be inserted into the test chamber and operation is to be continued until the detector is actuated in a continuous (steady or pulsing) alarm condition. For detectors whose alarm is nonpulsing but which emit alarm pulses with the initial entry of smoke, a continuous alarm condition is one that is continuous (nonpulsing) for not less than 5 seconds. The MIC/light relationship and the visible smoke build-up rate is to remain within the limits represented by the curves illustrated in Figures 38.1 and 38.2. If the trial-to-trial variation in percent light transmission at alarm is ±0.2 or less, only three trials need be conducted on each sample. If the variation is greater than ±0.2, five trials are to be performed. The test chamber is to be exhausted between each trial until the MIC and light beam indicate a clear condition. The airflow is to be allowed to stabilize for at least 30 seconds before each test trial.

**38.4.5**   The final value used for the sensitivity shall be the average of the total number of readings. The following readings are to be recorded for each trial at the moment of actuation:

   a)   Visible Smoke Obscuration (percent light transmission),

   b)   Measuring Ionization Chamber (MIC) Meter Reading, and

   c)   Time of test trial.

For combination smoke detectors, the sensitivity of each principle of operation is to be recorded. If a detector has a variable sensitivity setting, test trials are to be made at the maximum and minimum sensitivity settings.

**38.5   Uniformity of operation**

**38.5.1**   The detector shall be uniform in operation so that the readings of the smoke density and monitoring head meter of one detector shall be within 50 percent of the overall average of all 12 detectors tested in 38.4.2. If a detector has a variable sensitivity setting, the requirement applies to each setting tested.

**38.6   Alarm verification**

**38.6.1**   This test is to be conducted only on detectors that employ an alarm verification circuit that is bypassed in order to comply with the Fire Tests, Section 45, and the Smoldering Smoke Test, Section 46. To determine the delay time of an alarm verification circuit, sensitivity measurements are to be made on each of 10 samples; 5 preset to the maximum anticipated production sensitivity and 5 preset to the minimum anticipated production sensitivity. With the alarm verification bypassed, each detector is to be subjected to an increase in smoke until the alarm sounder is energized at which point the bypass is immediately removed (the unit is now out of alarm) and the test continued until the detector realarms. The sensitivity measurement is to be recorded at each alarm point and the time differential noted between the two alarm points. The measured time differential shall be between 10 and 30 seconds. If the alarm verification delay time cannot be obtained using the method described, an equivalent procedure is to be employed.

**39   Velocity-Sensitivity Test**

**39.1**   The sensitivity of a detector shall not vary more than 1 percent per foot obscuration outside of the production window limits, using gray smoke, when tested in accordance with the sensitivity test at air velocities of 32 and 150 fpm (0.16 and 0.76 m/s) ±10 percent. In no case shall the sensitivity exceed the limits specified in 38.1.1 for gray smoke.



**39.3**   For this test the detectors are to be oriented, in turn, in the least favorable and then the most favorable position for smoke entry.

## 40   Directionality Test

**40.1**   The sensitivity of the detector shall comply with the requirements of 38.1.1 for gray smoke, in any orientation with the air flow in the chamber. The detector shall be tested at a 30 — 35 fpm (0.15 — 0.18 m/s) air velocity in its least favorable position and at each 90 degree angle from the position. The positions would include all four compass points with the detector in a horizontal position with the oncoming air directed to each of four sides and with the detector positioned on edge with the detector front facing the oncoming air. The locations of the least and most favorable smoke entry positions are to be marked on all detectors to be used in subsequent Sensitivity Tests, see 38.1.1, the Fire Test, Section 45, and the Smoldering Smoke Test, Section 46.

**40.2**   Two samples, one employing a maximum sensitivity, and one employing a minimum sensitivity, are to be employed for this test. A detector positioned on edge is to be mounted on a wooden board so that the edge of the detector rests on the mounting platform. The mounting board is to extend a maximum of 2 inches (50.8 mm) beyond the vertical sides of a detector and no extension beyond the top edge.

**40.3**   If the height of a detector is too great to be accommodated in the platform test area, it is to be located adjacent to the left edge of the mounting platform with the top edge touching the roof of the test compartment and corresponding adjustments made in the location of the velocity measurement. See 38.4.3.

## 41   Sensitivity Test Feature

**41.1**   A sensitivity test feature shall be provided on a smoke detector, to simulate either mechanically or electrically a specified level of smoke in the sensing chamber. The test feature shall be accessible from outside the detector, with the detector installed as intended. The maximum permissible measured level shall not exceed 6 percent per foot [0.027 OD/foot (0.088 OD/m)] obscuration using gray smoke.

**41.2**   Four samples, two at maximum and two at minimum sensitivity, shall be subjected to this test. Each sample is to be connected to a rated supply voltage, except that a detector employing a battery as the main supply shall be tested at the test voltage level (rated or trouble level voltage) that results in the lowest sensitivity measurement. The sensitivity is to be determined by conducting a curve plot of smoke obscuration versus an instrument (meter) reading, or equivalent.

## 42   Smoke Entry (Stack Effect) Test

**42.1**   A smoke detector shall alarm within 2 minutes under the test conditions described in 42.2 — 42.4, which simulate air passing through an electrical conduit system that is connected to a smoke detector.

**42.2**   The test box shown in Figure 42.1 is to be employed. Fan operation is to be adjusted so that the free flow air velocity at the center of the hole in the base is 300 feet per minute and with the hole covered, the fan shall produce a back pressure measuring between 0.012 — 0.015 inches of water. The fan is then to be turned off. A smoke detector is to be installed in accordance with the manufacturer's installation instructions, facing downward and covering the hole in the base of the test box, to simulate installation in a ceiling.

**42.3**   The upper, smoldering end of 1/8 inch (3.2 mm) diameter vertical cotton wick is to be positioned 3 inches (76 mm) below the lowest surface of the detector, in turn, below the center of the detector, and below the detector at four equally spaced locations about the outer rim of the detector. The time until the detector alarms is to be recorded at each of the five wick positions, beginning when the wick is first positioned. Two detectors are to be tested.



## 44 Stability Tests

44.1    There shall be no false alarms of a detector set at the maximum sensitivity setting when two representative samples are subjected to the following test conditions. Different detectors are to be employed for each test. A test need not be conducted if the principle of operation is such that conducting the test would have no possible effect. Detectors whose sensitivity may be affected by air velocity are to be tested in the horizontal position in which a false alarm is most likely to occur. Momentary energization of the alarm (maximum of 1 second) is permitted during this test.

a)    Operation for 90 days in an ambient room temperature of approximately 23 ±2°C (73.4 ±3°F) 30 to 50 percent relative humidity, and having a relatively clean atmosphere with air movement of 0 — 10 fpm (0 — 0.05 m/s).

b)    Operation for 90 days in a relatively clean atmosphere in an air stream having a velocity of 300 ±25 fpm (1.5 ±0.13 m/s) in an ambient as specified in (a).

c)    Three plunges from an ambient humidity of 20 ±5 percent relative humidity to an ambient of 90 ±5 percent relative humidity at 23 ±2°C (73.4 ±3°F).

d)    Ten cycles of temperature variation between 0 and 49°C (32 and 120°F).

e)    Ten cycles of change of air velocity from 0 to 300 ±25 fpm (0 to 1.5 ±0.13 m/s).

f)    Ten cycles of a 2 inch (50.8 mm) change of air pressure starting from 31 to 29 ±0.5 inches (787 to 737 ±12.7 mm) of mercury.

g)    Fifty cycles of momentary (approximately 1/2 second) interruption of the detector power supply at a rate of not more than 6 cycles per minute followed by 10 cycles of very rapid OFF-ON switching (each consisting of 3 OFF-3 ON sequences in 1-1/2 seconds) to simulate a loose wire connection in the home or an automatic reclosing circuit in the distribution line, at not more than 1 cycle per minute. Battery operated detectors may be tested in conjunction with the Battery Replacement Test, Section 69.

h)    Twenty cycles subjected to high light intensity from a distance of 1 foot (0.3 m), 10 cycles using a 150 watt incandescent lamp, 10 cycles using a 4 light fluorescent fixture with 40 watt daylight lamps at a rate of 4 cycles per minute. Each cycle is to consist of 10 seconds ON and 5 seconds OFF.

i)    Ten cycles exposed to direct sunlight at a rate of 4 cycles per minute. Each cycle is to consist of 10 seconds of exposure and 5 seconds not exposed.

44.2    Two detectors, employing a maximum sensitivity setting, are to be mounted in a position of normal use, energized from a source of supply in accordance with 34.3.1 and subjected to each of the above test conditions.

44.3    For 44.1(a) the detectors are to be mounted on wooden supports simulating normal installation and are to be connected to indicating lamps or equivalent means to indicate a false alarm.

44.4    For 44.1(c), the detector is to be plunged from one humidity level to the other in not more than 3 seconds per plunge and maintained at each humidity level for not less than 1/2 hour between plunges.



b)    Receptacle — To be formed of 1/32 inch (0.79 mm) thick sheet metal, 4 inches in diameter and 12 inches (0.3 m) high and seamed together, with no air gap at the seam, with support rods at the bottom.

c)    Point of Ignition — The probe tips of the igniter are to be placed at the bottom center of the receptacle touching the paper and arcing sustained for up to 5 seconds.

d)    Smoke Profile — For this test the following conditions apply:

1)    Flame breakthrough shall occur between 1 and 3 minutes.

2)    The first principal peak of light obscuration shall occur between 1 and 3 minutes.

3)    Smoke shall peak between 27 and 37 percent per foot obscuration [0.137 and 0.2 OD/foot (0.45 and 0.66 OD/m)] at the ceiling detector location; and between 21.5 and 37 percent per foot [0.105 and 0.2 OD/foot (0.345 and 0.66 OD/m)] at each sidewall detector location.

4)    There shall be between 20 and 40 seconds of 4 percent per foot [0.018 OD/foot (0.058 OD/m)] or higher obscuration at the ceiling detector location; and between 10 and 30 seconds of 10 percent per foot [0.045 OD/foot (0.15 OD/m)] or higher obscuration at the sidewall detector locations.

5)    The secondary peak shall not exceed 13 percent per foot obscuration [0.061 OD/foot (0.2 OD/m)] at any detector location.

6)    Length of test shall be 4 minutes.

## 45.3    Wood fire — Test B

45.3.1    The following materials and procedures shall be used for the wood fire test.

a)    Combustible[k] — A wood brand formed of three layers of kiln dried fir strips, each strip 3/4 inch (19.1 mm) square in cross section, 6 inches (152 mm) long with six strips in each layer, is to be used. Wood strips are to be nailed or stapled together with adjacent layers at right angles to each other. Overall dimensions of the wood brand are to be approximately 6 by 6 by 2-1/2 inches (152 by 152 by 64 mm). The brand is to be supported on a 5 inch (127 mm) diameter ring support 3 feet (0.9 m) above the test room floor.

[k] Douglas Fir, S4 (smooth on all sides), clear of knots and holes, weight — 1.05 — 1.32 pounds per 10 foot length.

b)    Promoter — The wood brand is to be ignited by burning 4 milliliters of denatured alcohol consisting of 190 proof (95 percent) ethanol to which 5 percent methanol is added as a denaturant. The alcohol is to be placed in a 1-1/2 inch (38 mm) diameter, 1 inch (25.4 mm) deep metal container, the bottom of which is to be 3-1/2 inches (89 mm) below the bottom of the wood brand and centered so that the flame will not break through the top of the wood brand. The container is to be supported by a 1/4 inch (6.4 mm) hardware cloth. The alcohol is to be placed in the container no earlier than 30 seconds prior to ignition.

c)    Point of Ignition — Ignition is to be by probes in alcohol. Probe tips of the igniter are to be placed as near the container lip as possible without arcing to the sides.



## 45.5    Polystyrene fire — Test D

45.5.1    The following materials and procedures shall be used for the polystyrene fire test.

a)    Combustible — Consists of 1 ounce (28.4 g) of foam polystyrene type packing material, density between 1.5 — 2.0 lb/ft³ (24 — 32 kg/m³), with no flame inhibitor, each piece being a truncated prism approximately 1 inch (25.4 mm) on each side and 1/2 inch (12.7 mm) high.

b)    Receptacle — To be formed of 1/4 inch (6.4 mm) mesh hardware cloth, approximately 18 inches (457 mm) high by 6 inches (152 mm) in diameter with a hardware cloth bottom, centered on a ring support. The combustible is to be poured into the receptacle and leveled out.

c)    Promotor — The combustible is to be ignited with 5 milliliters denatured alcohol placed in a 4 inch (102 mm) diameter 1-1/2 inch (38.1 mm) deep metal container under the wire basket. The 4 inch container shall be placed in a larger, approximately 9 inch (230 mm) diameter container. The containers are to be centered on the support ring upon which the wire mesh basket rests and placed as close to the bottom of the wire mesh basket as possible allowing for probe placement.

d)    Point of ignition — Alcohol is to be poured over one piece of polystyrene and placed between the probe tips of the igniter in the smaller container approximately 30 seconds prior to ignition. Ignition is to be by a 2 second arc.

e)    Smoke Profile — For this test the following conditions apply:

1)    Smoke buildup shall occur between 35 and 45 seconds at the ceiling detector location; and between 25 and 35 seconds at each sidewall detector location.

2)    Ten percent per foot obscuration [0.046 OD/foot (0.15 OD mm)] shall occur between 70 and 90 seconds at the ceiling detector location; and between 60 and 80 seconds at each sidewall detector location.

3)    After obtaining the 10 percent obscuration, and buildup shall remain between 10 and 13 percent per foot [0.046 and 0.061 OD/foot (0.15 and 0.2 OD/m)] at the ceiling detector location; and between 10 and 17 percent per foot [0.026 and 0.08 OD/foot (0.15 and 0.265 OD/m)] at each sidewall detector location.

4)    Length of test shall be 2 minutes.

## 45.6    Igniter Assembly

45.6.1    The igniter assembly is to consist of the following or equivalent components:

a)    Igniter Probes — The metal probes, approximately 1/4 inch (6.4 mm) diameter and tapered at the ends to form a point and maintained approximately 1/2 inch (12.7 mm) apart, are to be connected to the high-voltage insulated output leads of an oil burner ignition transformer, see (c). Adjustment and support for the probes is to be provided by metal clamps affixed to a vertical steel bar integral with the igniter assembly.

b)    Support — A ring clamp, approximately 5 inches (127 mm) in diameter is clamped to a ring stand to support the container holding the combustible.



five feet from the nuisance source. Nine more were placed between five and ten feet from the source. Nuisance alarms can often be reduced by relocating the unit. In two interviews, consumers explained to the field interviewers that they solved previous nuisance alarms by relocating the detector away from the source.

Broken or missing covers can increase the sensitivity by allowing smoke to enter the sensing chamber with greater ease. Three detectors collected for nuisance alarms had broken or missing covers. An increase in sensitivity can cause the detector to be more prone to nuisance alarms.

Excessive dirt, dust and insect infestation can also alter the sensitivity of the detector, causing an unusual number of nuisance alarms. Almost one-third of the samples collected for nuisance alarms were noted to have significant accumulations of debris. Figure 7 shows a detector with extreme insect infestation. Small insects were able to enter the sensing chamber of the ionization detector and alter the ionization current thus triggering an alarm. Cleaning and proper maintenance is vital for proper functioning of smoke detectors.



Figure 7.  Insect infestation resulting in nuisance alarms.

In two detectors, the Engineering Laboratory was unable to determine the cause of nuisance alarming. One unit did not respond to the Gross Smoke Test or the Test Button Test, and the other operated erratically. Further testing on these detectors was not performed.

In the remaining three detectors, the high occurrence of nuisance alarms could not be determined by examinations of the detectors or analysis of the Survey questionnaire.

The detectors collected in the Survey were placed in the UL 217 Sensitivity Test Chamber to determine at what smoke obscuration level the detector responded. Three units collected for excessive nuisance alarming could not be tested in the UL 217 Sensitivity Test Chamber because of various malfunctions in the detector. The remaining 30 smoke detectors' sensitivity values are displayed in Figure 8. Further discussion on the sensitivity issue appears in the "Discussion" section of this report.





- Five additional detectors passed all tests satisfactorily, but excessive dirt, improper battery installation and defective test button may have caused malfunction in the field.

  Dirt and insects in the sensing chamber can cause the detector to produce continuous alarms. Three detectors that sounded continuously in the field did not sound continuously when powered at the laboratory. Excessive dirt and insects were present in the detectors.

  The field interviewer reported that in one detector collected, the battery did not "fit tightly" into the detector. Improper battery installation caused the detector to sound continuously during the field assessment. The detector worked appropriately in the laboratory when the battery was correctly installed.

  One detector's test button remains depressed when the Test Button Test is performed. This detector was collected for continuously alarming because of this flaw.

- Six detectors that sounded continuously in the field also sounded continuously when initially powered in the laboratory.

  After being cleaned, one functioned properly and passed all tests.

  Three detectors sounded continuously for no apparent reason and could not be repaired or restored to proper operation.

  In the remaining two detectors, tests were possible, but the smoke detectors alarmed intermittently at times for no apparent cause.

- Four detectors chirped at one-minute intervals when proper power was restored to the unit. Three of these smoke detectors were collected because of chirping in the field, the fourth detector was collected because of continuous alarming in the field.

  In one unit, the A/C power terminals had been broken off the detector and the unit was being powered only by the back-up battery. The consumer was unaware of this situation.

  In the other three units, the reason for the periodic chirps could not be determined. The periodic chirps are very similar to a low-battery signal but each detector was powered with a new battery.

- Two units collected because the consumer complained of chirps exhibited malfunctions in the laboratory.

  Both detectors sounded continuously when power was restored to the units

broken off. After replacing the terminal at the laboratory, both units functioned properly, except one failure of the Low-Battery Alarm Test. In another sample, the battery was reported loose by the field interviewer when he attempted to install the battery into the detector. At the Laboratory, it was found that the battery had not been properly installed in the consumer's home by field interviewers.

Two detectors were collected because the consumer claimed the battery ran down quickly. In the Laboratory, batteries were placed in the detectors, and battery voltage has been checked monthly. Neither of these detectors show any signs of unusual battery decay rate.

In addition to those listed above, several other battery related problems surfaced during testing of samples collected for other reasons. None of these involved the actual battery, but rather the battery terminal on the smoke detector.

In three detectors, battery terminal contacts were loose. Two of these detectors failed the Low-Battery Alarm Test, but otherwise they functioned properly. In two additional detectors, corrosion was found on the battery terminals. One of these detectors failed the Low-Battery Alarm Test. The other functioned properly. Another detector did not originally respond because the negative battery terminal (see Figure 9) had a cold solder joint to the battery connector that came loose. The unit functioned properly after repair.



**Figure 9. Cold solder joint.**

The final class of problems related to the battery is a large number of Low-Battery Alarm Test failures. The Low-Battery Alarm Test was conducted by placing a 300 ohm resistor in series with the battery to simulate the internal resistance of a partially discharged battery. With this resistance, the detector should go into a low-battery alarm. Twenty-three of the collected detectors failed the Low-Battery Alarm Test. Nineteen of the 23 detectors had an electromagnetic horn element. The electromagnetic horn element is no longer used in the design of smoke detectors; the piezoelectric horn element has replaced the electromagnetic horn element. The Engineering Laboratory could not determine the reason for failure in the other four detectors that failed the Low-Battery Alarm Test.

The electromagnetic horn element does not respond to this test because of the internal resistance of the smoke detector. Appropriate adjustments were made to the Low Battery Test for these horns by directly decreasing the voltage from a power supply. With the modified test, the electromagnetic horn generated a low battery alarm.



One possible reason other than excessive debris in the detector and the uncertainty of the power state of the detector is horn corrosion. Horn corrosion accounted for six of the 73 smoke detector's failure of the Gross Smoke Test. Each of these detectors uses the current horn technology of a piezoelectric disk with three plated areas, typically made of silver. Twenty-four smoke detectors that failed the Simulated Smoke Tests in the field and arrived at the Laboratory in working order are suspected of failing because of horn corrosion. Each of these units uses the current horn technology. Furthermore, during the Laboratory examination, deterioration and corrosion was visible on each of the horn contacts. Over time, the detector may become inoperative because the plated area in the horn element corrodes in the household environment. With corrosion and deterioration, the normally low electrical resistance of the pressure contact becomes higher until the horn can not sound an alarm signal.

Continuity can be restored to the deteriorated electrical contacts by slight movement of the horn element. Removing the malfunctioning detector from the consumer's home, packing the unit and transporting it to the Laboratory can have a significant consequence. During transportation and handling, the contact continuity can be restored with the result that the previously malfunctioning sample will pass the Gross Smoke Test and Test Button Test upon arrival at the Laboratory.

Manufacturers claim [5] that testing the detector on a regular basis performs a "self-wiping" action on the plated contact areas in the horn element, which will keep the horn element in working order. In the Survey questionnaire, consumers were asked how often they tested their smoke detectors. Consumers' responses for the detectors with failed horn elements range from testing in the past month (1 response), to in the last six months (3 responses), to testing within the last year (1 response), to never testing the detector (1 response). This varied response cannot confirm or refute the "self-wiping" claim since at least one detector was tested in the manufacturer-recommended time frame.

Since corrosion is partly a function of time, it is helpful to know when the units with horn failures were manufactured. Information was obtained from Underwriters Laboratories Inc. (UL) concerning the age of the detector. The UL Release Date is the time in which the labels were given to the manufacturers to use on their product. Depending on the production schedule, the actual manufacturing date can vary up to one year. The six units with horn corrosion that failed the Gross Smoke Test and the Test Button Test during field testing all had UL Release Dates prior to 1986. Four of the six units' UL Release Dates were more than 10 years old, the recommended replacement interval by the major manufacturers. The other units suspected of possible horn failure all had UL Release Dates earlier than 1987.

The Engineering Laboratory is not certain how big a role time plays in the



19

smoke detectors would meet all the performance requirements imposed by UL 217. By desensitizing the smoke detectors, nuisance alarms decreased 80% when compared to the nine months prior, and 69% when compared to the same calendar months after the alteration.

By decreasing the sensitivity of smoke detectors, nuisance alarms can be reduced. However, we do not know the effectiveness of the altered smoke detector in protecting against the dangers of fire.

## Location

Another potential solution to nuisance alarming is using the appropriate detector in the proper location. In the Survey, 11 out of 33 of the detectors collected for nuisance alarming were placed less than five feet from the source of the smoke, steam, or moisture. All of these were ionization type detectors.

Ionization detectors use a small amount of radioactive material (Americium 241) which makes the air in the sensing chamber between two electrodes conductive [7]. When particles enter the chamber, it reduces the current in the sensing chamber, thus triggering a control circuit and sounding the alarm. The ionization detector reacts to particle sizes less than one micron. Particles of this size can occur from cooking in kitchens where fast burning fires are created, exhaust gases from automobiles, and cigarette smoking. Placing an ionization detector close to these sources may result in nuisance alarms [8].

An alternative to ionization detectors used near particulate sources of less than one micron, is the photoelectric detector. The photoelectric detector utilizes a light scattering design that incorporates a light source and a photocell. Smoke particles greater than one micron enter the detector and deflect the light source to the photocell, which sounds the alarm. Photoelectric smoke detectors accounted for only one of the samples collected for nuisance alarms.

The most common cause of nuisance alarm, over 50% of the samples, resulted from cooking, which typically produces particles less than one micron. Photoelectric detectors require larger particles to scatter light and are typically insensitive to particle sizes less than one micron. Sub-micron particles from cooking may prematurely trigger the ionization detector.

The photoelectric smoke detector has a lower sensitivity (usually above 2.0% ob/ft or 6.6% ob/m) than the ionization smoke detector. However, dust and dirt in the unit may contribute to the obscuration, effectively increasing sensitivity and causing a higher number of alarms. The one photoelectric smoke detector collected for nuisance alarms had extensive dirt and dust. Cleaning the unit in the Laboratory changed the



21

in progress to develop a proper fire scenario profile.

## Age of Smoke Detectors

UL provided the release date for the issue numbers on each of the detectors collected in the Survey.  Depending on the production schedule of the individual manufacturer, discrepancies between release date and the actual manufacturing date can exist up to a few years.  For the purpose of this Survey, the age of the smoke detectors was only obtained in this manner.  An alternative method to acquire age information would have been to use the date code on each detector.  Although this second method can give an exact day of production, the method was not chosen because of the large number of manufacturer's detectors collected in the Survey.  Many of these manufacturers do not currently produce smoke detectors, and obtaining date code information was not possible.

Figure 10 shows that detectors collected in the Survey have UL Release Dates prior to 1987.  This information suggests that newly manufactured smoke detectors are much less likely to malfunction or have excessive nuisance alarms.  Over time the detector's components can malfunction and their sensitivity can be altered by the household environment.

## UL Release Date for Detectors



Figure 10.  UL Release Date of Detectors Collected as Inoperable (n=155).



# References

[1]     UL Standard 217, "Single and multiple station smoke detectors," fourth edition, May 1993.

[2]     National Fire Protection Association estimates for 1991.

[3]     Jernigan, William, "Keeping the smoke detectors operational:  The Dallas experience," *Fire Journal,* vol. 81, pp. 57-63, 1987.

[4]     Smith, Charles, "Smoke detector operability survey:  Report on findings", October 1994 (Revised).

[5]     Smoke Detector Manufacturer, National Smoke Detector Project — Joint Technology and Investigations Committee, May 11, 1993.

[6]     Breen, David E., "Toward more reliable residential smoke detection systems," *Journal of Fire Protection Engineers,* vol. 2,  pp. 1-10, 1990.

[7]     Bernigau, Norbert, Luck, Heinz, "The principle of the ionization chamber in aerosol measurement techniques - A Review," *Journal of Aerosol Science,* vol.17, pp. 511-515, 1986.

[8]     Kitchenham, Christopher, "Controlling nuisance alarms," *Consulting/Specifying Engineer,* vol. sup, pp. 11-14, 1990.

[9]     Dubivsky, P.M., Bukowski, R.W., "False alarm study of smoke detectors in Department of Veterans Affairs Medical Center," US Department of Commerce, May 1989.

[10]    National Electrical Manufacturers Association, "Guide for proper use of system smoke detectors," April 1992.

[11]    Wong, Jacob, United States Patent Number 5,053,754, Oct. 1991.





# FIRE INCIDENT STUDY

# NATIONAL SMOKE DETECTOR

# PROJECT

JANUARY 1995

LINDA E. SMITH, EPHA
DIRECTORATE FOR EPIDEMIOLOGY
U.S. CONSUMER PRODUCT SAFETY COMMISSION
4330 EAST WEST HIGHWAY
BETHESDA, MD 20814



CPSA 6 (b)(1) Cleared
No Mfrs/Prvt.blrs or      1-31-95
Products Identified
Excepted by_____

## EXECUTIVE SUMMARY

The Consumer Product Safety Commission conducted the Fire Incident Study to identify why smoke detectors fail to alarm in residential fires.  Data were collected from 263 fires in 15 U.S. cities between April 1992 and February 1993.  Fourteen deaths, 33 injuries, and $2.7 million in property loss occurred in these fires.

The study results indicated that about 60 percent of the detectors failed to alarm because they were disconnected from their power sources.  Among those that were disconnected because occupants experienced problems with them, the reasons most often cited by occupants were that it "alarms too often" or that there were unwanted alarms related to cooking activities.

Detectors that did not operate correctly after power was restored were collected for evaluation at the CPSC laboratory. In addition, some detectors that were connected but still failed to alarm in the fire were collected  for laboratory testing. Laboratory tests found detectors with horns that did not operate, faulty wiring connections, excessive dirt or insects inside the detectors, and corroded or disconnected components.

The results of this study confirm the findings of a companion CPSC survey of smoke detectors in households without fires.[1] In that survey, 60 percent of detectors that did not alarm to testing were found disconnected.  Both studies found that most detectors were disconnected for reasons other than problems with the detector itself.  These studies indicate that in order to reduce deaths and injuries from residential fires, the number of working smoke detectors must be increased.

---

[1]*Smoke Detector Operability Survey: Report on Findings,* Charles L. Smith, U.S. Consumer Product Safety Commission, as Revised, October 1994.

## I.   BACKGROUND

### A. Earlier Studies

Residential structure fires continue to cause almost 4,000 deaths and over 21,000 injuries annually.  Although the presence of smoke detectors in households has climbed steadily since their introduction in the early 1970's, a variety of local studies have indicated that an unacceptably large proportion of installed detectors are unpowered.  "Three local studies in the 1980's showed that on the order of one-fourth to one-third of detectors were non-operational."[2]  Moreover, anecdotal information indicated that detectors were being disconnected from their power sources in response to nuisance alarms.  A landmark study of detector operation when a fire occurred was completed in 1983 by the International Association of Fire Chiefs Foundation.[3]  This was the first large-scale study of detector operation that included multiple localities and measured sensitivity of the detectors in the field.  That study documented power-related problems as a major cause of failure to alarm in a fire, and included an effort to test detector sensitivity.

### B. U.S. Fire Loss Estimates

Fire department incident data commonly report detector performance in attended fires.  These data are captured by the U.S. Fire Administration's National Fire Incident Reporting System (NFIRS).[4]

CPSC staff estimated detector operation in U.S. fires based on NFIRS data applied to National Fire Protection Association (NFPA) aggregate estimates of residential fire losses over the 3-year period 1989-1991, using a method developed by Hall and

---

[2] Hall, John R. Jr., *U.S. Experience with Smoke Detectors and Other Fire Detectors, Who Has Them? How Well Do they Work? When Don't They Work?*,  National Fire Protection Association, Boston, MA , 1990.

[3] Hawkins, Raymond E., *An Evaluation of Residential Smoke Detectors Under Actual Field Conditions, Final Report,* International Association of Fire Chiefs Foundation, March 1983.

[4] NFIRS does not capture data from all U.S. fire departments, nor all states.  Nevertheless, it is a very large data base consisting of more than 200,000 residential structure fire reports annually.  It is the most comprehensive data available and is thought to reasonably represent U.S. fire losses.

into account, estimation of detector performance included only the smaller number of home fires where a detector was present and the smoke damage appeared to have extended sufficiently that it may have reached the detector.[6]  Among this group of fires, the detector did not alarm in an estimated 32 percent, that resulted in 45 percent of the deaths and 35 percent of the injuries (Table 1b).  This performance distribution was the same for one- or two-family dwellings as for multiple-unit housing such as apartments and condominiums.  Although a greater proportion of the deaths occurred in fires in which detectors operated, the death rate in fires where they operated was nearly half that of the rate in fires where they did not operate (0.8 versus 1.5 deaths per 100 fires).

NFIRS data do not distinguish between smoke and heat detectors.  However, since relatively few heat detectors are present in homes, detector performance data probably reflect smoke detectors rather than heat detectors.

### C. National Smoke Detector Project

In response to continuing reports of detectors failing to operate in fires, the U.S. Consumer Product Safety Commission (CPSC) initiated a National Smoke Detector Project in 1991.  The project was jointly sponsored with the U.S. Fire Administration, the Congressional Fire Services Institute, and the National Fire Protection Association.  Operating committees were formed to concentrate on four areas: Field Investigations, Technology, Codes and Standards, and Consumer Awareness.

The activities of the Field Investigations Committee were directed to completing two studies of smoke detector operability. One was to determine the status of smoke detector operability in households generally.  The other was to determine the reasons why detectors failed to operate in fires.  While different populations were surveyed, both studies used the same testing procedures to determine operability and the reasons for lack of operability.

The survey of detector operation in non-fire households was conducted over the period October - December, 1992.  The final report on that survey was completed in October 1994, entitled *Smoke Detector Operability Survey, Report on Findings* by Charles L. Smith, Directorate for Economic Analysis, U.S. Consumer Product Safety Commission, as Revised.  The study of smoke

---

[6] If the smoke detector was in the room of origin, only incidents with smoke damage beyond part of the room were included.  If the detector was outside the room of origin, only incidents with smoke damage beyond the room of origin were included.  This adjustment had the effect of reducing the estimated percent of fires in which the detector did not operate, from 35 percent based solely on detector performance coding, to 32 percent adjusted for extent of smoke damage.

2) Investigation Procedure: The fire service was instructed to complete the project questionnaire as soon after the fire as possible, testing up to three detectors per household.

3) On-site Detector Testing: The test procedure included spraying each detector with aerosol smoke to initiate an alarm and pressing the detector's test button (when available). Depending on the circumstances, a detector could have been sprayed with the aerosol smoke either once or twice.  The test procedure generally was as follows:  First the detector was sprayed with aerosol smoke.  If the detector did not alarm, the detector cover was removed and power was restored, if possible. The detector then was sprayed a second time with aerosol smoke and the test button was pushed.

4) Collection of Detectors: Project guidelines called for sample collection under the following conditions:  1) a detector that did not respond to aerosol smoke when powered, 2) a detector that did not respond to the test button when powered, 3) a detector that was found disconnected from the power source and the occupant reported a problem with it, 4) a detector that was found to have a dead battery and the occupant reportedly did not hear a low-battery signal, and 5) an AC-powered detector that could not be tested but had failed to sound during the fire. Collected detectors were sent to CPSC for laboratory analysis. When a detector was removed, it was replaced with a new detector.

C. Comparison of Study Cities with National Data

An additional aspect of the study involved collection of fire incident data on all residential structure fires that occurred in each city during the study period.[8]  These data were compared to 1991 NFIRS data (the most recent year available) to evaluate how well these cities reflected the larger data base.

These comparisons are presented in Figures 1 - 3.  Very little difference in distribution was found among types of residential property, detector performance and extent of smoke damage.  Among the grouped forms of heat, the relative proportions of fires that involved smoking materials (often resulting in smoldering fires) versus open flame were similar in the study cities and NFIRS. There were some differences: 1) a smaller proportion of fires in the study cities than in NFIRS involved fuel-fired heating equipment,[9] and 2) a larger

---

[8]Ten fire departments provided data for the study period. Four departments reported data to NFIRS but could not provide data for the study period in the format requested.  As a surrogate, this analysis includes their 1991 data from NFIRS.  No overall fire data were available for one department.

[9]It is noted that a large proportion of fires coded "Other" in the Equipment Involved in Ignition section were fires coded "No Equipment Involved."

**Figure 2:**  COMPARISON OF FIRE DATA FROM CITIES IN THE
1992 SMOKE DETECTOR FIRE INCIDENT STUDY WITH NATIONAL FIRE DATA





Note:  Includes residential structure fires only
    Cities  :  11 cities, 5/92 - 2/93
          4 cities, 1/91 - 2/91 and 5/91 - 12/91
    NFIRS  :  1/91 - 3/91 and 5/91 - 12/91



Source:   U.S. Consumer Product Safety Commission/EPHA

proportion of fires in the study cities involved soft goods such as mattresses/bedding as the form of material first ignited. The effect of these differences on the study findings is not clear. However, for the most part, it appears that residential structure fires in these cities are reasonably representative of fires nationally, as characterized by NFIRS.

### D. Smoke Detector Legislation

It is noted that smoke detector legislation varied by city, which could affect the proportion of dwellings that had detectors, as well as the type of detectors in use. The details of the smoke detector legislation operable in the sample cities are summarized in Appendix C. A few general statements may be made. All of the sample cities required detectors for at least some subset of housing. Legislation in most cities became effective in the early 1980's. Few cities required detectors for all existing housing. Detectors were more often required for multiple-unit housing than one- or two-family homes. Some cities required detectors for rental housing only, particularly for housing existing when the regulations became effective (as opposed to new construction).

## III. RESULTS

### A. Population of Detectors and Type of Housing

#### 1. Number of Detectors

This study included a total of 263 reports on residential structure fires in which a smoke detector failed to alarm when it should have. These fires resulted in 14 deaths, 33 injuries and $2.7 million in property loss. These 263 households contained a total of 324 detectors, a mean of 1.2 detectors per household. Most households, 81 percent, contained only one detector; 16 percent contained two (See Table 2). Thus, 97 percent of these households contained no more than two detectors. The largest number of detectors reported in a household was six.

Compared to the findings of the Smoke Detector Operability Survey, these fire households contained a smaller average number of detectors than did non-fire households. In the Smoke Detector Operability Study (of non-fire households), among households with detectors, the general population contained 1.6 detectors per household; the low income population contained 1.5 detectors per household. Also, 59 percent of the general population of households with detectors and 71 percent of the low income households with detectors contained only one detector.[10]

---

[10]*Smoke Detector Operability Survey: Report on Findings*, Charles L. Smith, U.S. Consumer Product Safety Commission, as Revised, October 1994, p. 4.

remainder, about 2 percent, were thought to be a combination of ionization and photoelectric (had two test buttons).

Most detectors in these households, 81 percent, were solely battery-powered. About 18 percent were AC-powered; 16 percent hard-wired, and 2 percent cord-connected plug-in units. One percent were hard-wired with a battery back-up.

The most common detector was battery-operated ionization, accounting for 78 percent (191 of 245) of detectors where both type and power source were known.

Compared to the Smoke Detector Operability Survey, the Fire Incident Study included a greater proportion of ionization-type, battery-powered detectors. The Smoke Detector Operability Survey indicated that 78 percent of detectors in U.S. households were ionization type and 72 percent were solely battery-powered.

### 3. Type of Housing

Of the 253 fires in which renter/owner status was reported, 70 percent of the households involved were rental units, the remainder were owner-occupied. While 56 percent of the rental units were apartments, 43 percent were one- or two-family dwellings. The remainder included rooming houses or hotels.

This preponderance of rental units was not evident among the inoperable detectors identified in the Smoke Detector Operability Survey, the subset most equivalent to the fire study where failure to operate was a prerequisite for inclusion. Among detectors that failed to alarm to testing in the Operability Survey, 29 percent were in rental housing, the same percent of rental housing as in the total survey population. There is no indication, then, that rental housing is a contributing factor to detector inoperability.

### B. Detectors That Should Have Alarmed

#### 1. Characteristics

Of the 314 detectors for which information was collected, 273 detectors were believed to be in situations where the detector should have alarmed, the focal point of the study. This included all detectors for which the fire department or occupant believed that there was enough smoke at the detector that the detector should have alarmed, and the fire was not arson-related.[11] Subsequent analysis will be confined to these 273

---

[11] A total of 26 fires involved arson or suspected arson. The 37 detectors in these fires have been excluded from the remainder of this analysis, due to the possibility that they may have been tampered with by the arsonist.

## 2. Initial Condition Found

After the fire was extinguished, the fire department investigator sprayed the detector with aerosol smoke and pushed the test button, with some exceptions for special conditions as noted in the protocol. Following those steps, the investigator described the condition of the detector as it was found (Table 4). Among the 273 detectors in the study that ought to have alarmed but did not, 162 (59 percent) were found to be disconnected from the power source. A battery was missing in 102 detectors, and disconnected in 41 detectors. The AC power to 19 detectors was disconnected. The remaining 111 (41 percent) detectors were found to be connected to a power source.[12] We note that this does not necessarily mean that in all cases the

### Table 4.

Initial Condition of the Detector
Found by the Investigator
(n=273)

| Condition | No. | Percent of Detectors |
|---|---|---|
| Power Disconnected | 162 | 59 |
| Missing Battery | 102 | 37 |
| Disconnected Battery | 41 | 15 |
| Disconnected AC | 19 | 7 |
| Other | 180 | |
| Heat Deformed | 41 | 15 |
| Missing Cover | 36 | 13 |
| Clogged with dust/dirt | 23 | 8 |
| Insect Infestation | 14 | 5 |
| Failure of AC Power Supply | 6 | 2 |
| Located in dead air space | 5 | 2 |
| Other | 55 | 20 |

Note:    It was possible to specify multiple conditions for a detector. Therefore, number of conditions is greater than 273 and the percent of detectors adds to more than 100. The conditions cited under "Power Disconnected" do not overlap each other, but could overlap conditions in the "Other" section.

Source:    U.S. Consumer Product Safety Commission/EPHA
           Data from 15 fire departments

---

[12]This includes four detectors collected as samples that were too damaged to be sure that power was connected.



Figure 4
Fire Incident Study
Smoke Test Results
Detectors That Should Have Alarmed

A total of 114 detectors met the study criteria for sample collection and were evaluated by the CPSC Engineering Laboratory. Some detectors met multiple criteria for collection.

The number of detectors collected for specific reasons follow.

| | |
|---|---|
| Failed to Alarm to Aerosol Smoke While Powered | 49 |
| Disconnected with Reported Problem | 33 |
| Dead Battery with No Low Battery Signal | 7 |
| Alarmed to Aerosol Smoke but Not to Test Button | 3 |
| Could Not Be Tested | 42 |

Of the 114 detectors collected for laboratory analysis, 22 could not be subjected to testing due to extensive fire damage. Among the remaining 92 detectors that were tested, 43 passed all screening tests in the laboratory.

Among the detectors that failed the aerosol smoke test in the field, 25 passed all screening tests in the laboratory. However, examination indicated the presence of deterioration and corrosion on the horn element contacts, which can result in the horn becoming inoperative. Function may be restored by slight movement of the horn element, such as might occur during removal from the home and subsequent transport to the laboratory.

Of the 33 detectors for which problems were reported by the occupant, 22 involved nuisance alarms (alarmed to non-fire situations). Testing indicated that, on average, these 22 were more sensitive than detectors without nuisance problems that were tested in the Smoke Detector Operability Survey.

Additional findings included a variety of component failures, corroded battery clips, presence of excessive debris in the detector, and fire damage that prevented evaluation of their pre-fire condition. Additional details of sample analysis are included in Appendix D.

C.    Comparison of Detectors Found With and Without an Initially Connected Power Source

1.    Characteristics

As indicated earlier, 59 percent of the detectors were found disconnected from their power sources, and 41 percent were still connected. The characteristics of these two groups of detectors are included in Table 3, columns 3 and 5. The percentage of hard-wired detectors (27 percent) was significantly greater among connected detectors than among those disconnected (9 percent), $p < .005$. Put another way, solely battery-operated detectors were more often disconnected, compared to solely hard-wired

Most of the detectors that failed to respond to aerosol smoke were collected for testing; 19 of the 20 in the disconnected group, and 30 of the 33 in the connected group. Among the 43 initially disconnected detectors that were not tested under power, 10 alarmed continuously when powered which prevented testing. Seven were collected as samples. Among the detectors in the initially connected group that were not tested, it is noted that 8 were AC detectors in dwellings in which the electrical power was not functioning at the time of the investigation.

## D.  Possible Malfunctions

### 1.  Detectors with Reported Problems

For the 162 detectors found without a connected power source, when occupants were available they were asked additional questions. They were asked, "Did you have any problems with this detector?"  If they said "yes," the investigator was to say "Please describe the problem." Among the 115 detectors for which the occupant was available to be questioned, occupants reported that 40 detectors (35 percent) caused them problems.  The detector characteristics (Table 3, column 4) were not significantly different from the disconnected detectors without problems (p > .05).  Of these 40 detectors with problems, 33 were collected for analysis in the laboratory.   Detectors with problems accounted for an estimated 21 percent of the detectors in the study, allocating incidents involving disconnected detectors for which an occupant was not available to ask about a problem.

When occupants stated that there was a problem, they were asked to describe it. Most often (16 detectors), they cited "too frequent alarms" without specifying any circumstances connected with the alarms (Table 6). Alarms to cooking were cited for 12 detectors, followed by alarms to tobacco smoke and batteries running down (4 detectors each).  An alarm to steam or humidity was reported for one detector. Other situations cited as problems included continuous alarms, intermittent alarms, and low battery-associated chirps.  Some occupants cited multiple problems for a detector.  When a specific source of a problem was cited, investigators were asked to provide the distance of the detector from the source.  A distance was provided for only 8 detectors, ranging from 6 feet to 20 feet.  Results of laboratory sensitivity are discussed in Appendix D, but may not indicate the detector's prefire condition, due to smoke and water contamination suffered in the fire.  It is noted that the

## IV. DISCUSSION

The purpose of this study was to identify the reasons why some smoke detectors failed to alarm in residential structure fires. To do this, it was necessary to work within the confines of the fire scene and the difficulties it entailed.

It is important to recognize a number of vital features to put the study results into proper perspective. First, the primary goal of the fire service is suppression of the fire. Although the fire service recognizes the importance of prevention and the activities needed to achieve it, those activities are usually "add-ons" to their already busy schedule. This has the effect of limiting the number of questions they realistically will be able to answer. Second, the event of the fire itself and ensuing suppression may have affected the condition of the detector as it was found. This means that its condition before the fire must be estimated to some extent, taking the effect of the fire, suppression, and clean-up into consideration. Third, questions asked of the occupant must take into account the possibility of potential liability on the part of the occupant, e.g., some jurisdictions have taken occupants to court because they allegedly removed the battery from the detector.

These factors all affected the questions asked during the study. Primarily, they had the effect of limiting the number of questions. The companion study, the Smoke Detector Operability Survey, included exploration of some issues that the Field Investigations Committee believed could not be accurately assessed after a fire. One example of this was further exploration of why detectors had been disconnected. In the Operability Survey, when a detector was found to have a disconnected power source, the respondent was asked why the battery was removed or power disconnected. While 32 percent of those respondents reported removal of power due to nuisance alarms, about 40 percent forgot to replace the batteries or did not check to see that they had power, with an additional variety of explanations such as "no batteries in the house" or "removed for other purposes."[15] Both studies indicated that while removal of power to address unwanted alarms was a major reason for disconnection, absence of power for other reasons also was common.

The finding that battery-powered detectors were more likely to be disconnected is consistent with the finding that relatively large numbers of detectors were disconnected for reasons apparently unrelated to unwanted alarms. Together, these findings lend further support to the current trend toward requiring hard-wired detectors in new construction. For the majority of households that do not have hard-wired AC detectors, .

_____

[15]_Smoke Detector Operability Survey: Report on Findings_, Charles L. Smith, U.S. Consumer Product Safety Commission, as Revised, October 1994, p.12.

## V. Conclusions

U.S. fire loss data indicated that operating smoke detectors have the ability to reduce fire death rates, but also indicated that detectors did not operate in a large proportion of the fires where they should have. The results of the Fire Incident Study of detector operability indicated that the most common reason for failure to alarm in fires was that the detector was not connected to a power source at the time, 59 percent of all detectors. For detectors without a power source, an unacceptably large proportion of consumers, 35 percent, stated that there were problems with the detector, predominantly alarms to cooking activities. Results also indicated that some detectors were incapable of alarming to the aerosol smoke test when powered. Although fire damage and fire contamination limited the conclusions that could be drawn from laboratory sample analysis, laboratory findings included horns that did not sound, failure to respond in the sensitivity testing chamber, and a variety of conditions that included corroded battery clips and component failures. These results are consistent with the reasons for detector inoperability identified in the Smoke Detector Operability Survey of non-fire households.

**APPENDIX B**

February 1992

## NATIONAL SMOKE DETECTOR PROJECT

## SUPPLEMENTAL REPORT FOR RESIDENTIAL FIRE INCIDENTS

**INSTRUCTIONS:**

Complete this report for every residential structural fire in which the detector nearest the fire failed to alarm when it should have. Attach your Fire Incident Report, and Casualty Report when applicable.

Circle appropriate responses or fill in the blanks as appropriate.

Date of Fire _____     FD Incident No._____

Address _____

**Suggested Wording to Explain the Project:**

(SAID TO OCCUPANT) I would appreciate your permission to test your smoke detectors as part of a national project that our fire department is supporting. This project could lead to better, more effective, smoke detectors for everyone. Our testing will not hurt your home or your detectors. In fact, if we find any dead or missing batteries, we will replace them free of charge. And if we find problems with a detector that we can't solve here, we want to collect it for further testing. We will leave battery-powered detectors free of charge to replace any that we collect. If your detectors are not battery operated, we will leave a battery-powered detector for your protection until you can arrange for proper replacement. Is it okay for us to collect this information?

_____ Yes          _____ No (If No, then stop.)

(SAID TO OCCUPANT) It would help us if you would accompany us as we go through your home, so we can ask you questions about each detector as we test it.

IF **ALL** DETECTORS IN THE UNIT ARE TOO SEVERELY DAMAGED TO TEST, CHECK HERE ☐ , ANSWER Q. 1-2 FOR EACH DETECTOR, THEN SKIP TO Q. 14.

IF OCCUPANT VOLUNTEERS INFORMATION THAT THIS DETECTOR DOES NOT HAVE A BATTERY IN IT, SKIP TO Q. 5.

3.  Conduct an initial smoke test.  Using the designated aerosol spray, <u>point the tube at the detector and release a two-second burst of aerosol</u>.  (Count "one one thousand" to estimate one second.)  If there is no response, wait 10 seconds (in case there is a time-delay feature in the detector), then spray again for one second with the tube positioned right against the detector's smoke inlets.  If there is still no response, wait 10 more seconds and repeat the test a third time with a one-second spray.

Did the detector sound in response to this test?

|  | Detector # | | |
|---|---|---|---|
|  | 1 | 2 | 3 |
| Yes...................................... | Y | Y | Y |
| No (If No, skip to Q. 5) | N | N | N |
| Not tested due to severe damage (Return to Q. 1 for next detector or Q. 14 if last detector)........ | U | U | U |

4.  If detector alarmed in response to smoke test, press and hold the test button(s), one at a time.  Did the detector sound in response to the test button(s)?

|  | Detector # | | |
|---|---|---|---|
|  | 1 | 2 | 3 |
| Yes (all available buttons)........... | Y | Y | Y |
| One alarmed, the other didn't (Collect detector & continue)...... | M | M | M |
| No (Collect detector and continue)........................... | N | N | N |
| No test button........................ | U | U | U |

5.  What type of power supply does the detector have? (Remove detector cover, or remove from ceiling as necessary.)

|  | Detector # | | |
|---|---|---|---|
|  | 1 | 2 | 3 |
| a. Battery only................... | a | a | a |
| b. Hard wire only (AC).......... | b | b | b |
| c. Plug-in....................... | c | c | c |
| d. Hard-wired with battery back-up.............. | d | d | d |
| e. Other (specify)_____ | e | e | e |
| f. Unknown....................... | f | f | f |

B-3

13. **Was this detector found without a battery, battery disconnected, or AC disconnected (9a, 9b or 9c circled)?**

```
Yes (Ask Q. 13a)......................Y....Y....Y
No  (Skip to instructions
        following Q. 13c)................N....N....N
```

a. Ask the occupant, "HAVE YOU HAD ANY PROBLEMS WITH THIS DETECTOR?"

| | Detector # | |
|---|---|---|
| | **1    2    3** | |

```
Yes (Collect detector).............Y....Y....Y
No.................................N....N....N
Occupant not available.............Z....Z....Z
```

b. If "yes" to Q. 13a, say "PLEASE DESCRIBE THE PROBLEM." Don't suggest possible answers.  Circle as many as apply.

| | Detector # | |
|---|---|---|
| | **1    2    3** | |

```
a)  Alarms too often,
        unspecified...................a....a....a
b)  Alarms to steam/humidity.........b....b....b
c)  Alarms to cooking................c....c....c
d)  Alarms to tobacco smoke..........d....d....d
e)  Alarms to fireplace..............e....e....e
f)  Battery runs down too often......f....f....f
g)  Other (specify below)............g....g....g
```

Detector#___Problem_____

Detector#___Problem_____

Detector#___Problem_____

c. For any detector referred to in Q. 13b whose problem may be related to location, cite detector number, source reported by occupant to have caused the problem (such as stove), and distance between the detector and source, in feet.

Detector #_____ Source_____ Distance_____

Detector #_____ Source_____ Distance_____

Detector #_____ Source_____ Distance_____

UNITED STATES GOVERNMENT

**MEMORANDUM**

U.S. CONSUMER PRODUCT
SAFETY COMMISSION
WASHINGTON, D.C. 20207

TO      : Linda Smith, EPHA                        January 14, 1993
THROUGH: James I. Price, Director, ESME
         Margaret L. Neily, Project Manager, Smoke Detectors
FROM    : Eleanor Perry, ESME

SUBJECT: Summary of City Code Requirements to Support the Fire
         Incident Study Report (EP)


     The attached summary, "Provisions of City Smoke Detector
Codes" was prepared from the city code information you provided.
Code provisions have been separated into those for new and
existing residential property for either one and two family
dwellings or multiple family dwellings since these categories
were treated separately in many of the codes.  Under the heading
for multiple family dwellings, the provisions apply to apartment
houses, rooming houses, dormitories, hotels, motels and lodging
houses.

C-1

C-3

| CITY | STATE | EFFECTIVE DATE | 1 & 2 FAMILY DWELLING — NEW CONSTRUCTION | | 1 & 2 FAMILY DWELLING — EXISTING CONSTRUCTION | | MULTIPLE FAMILY DWELLINGS — NEW CONSTRUCTION | | MULTIPLE FAMILY DWELLINGS — EXISTING CONSTRUCTION | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | TYPE | LOCATION/PROVISION | TYPE | LOCATION/PROVISION | TYPE | LOCATION/PROVISION | TYPE | LOCATION/PROVISION |
| Buffalo | New York | 1/1/84 | Hard wired | There shall be one detector in each sleeping area with an alarm clearly audible in adjoining sleeping spaces with intervening doors closed. There shall be one detector at the head of each stairway on an unrelated living area placed on ceiling needed to not off excited level off net floor less than 4 feet that the smoke is interrupted before it reaches the adjoining area. Section 1216 BOCA Basic Building Code 1975. | Hard wired, battery, simple with maintenance | There shall be one detector in each sleeping area with an alarm clearly audible in adjoining sleeping spaces with intervening doors closed. There shall be one detector at the head of each stairway on an unrelated living area placed on ceiling needed to not off excited off net floor less than 4 feet that the smoke is interrupted before it reaches the adjoining area. | Hard wired | There shall be one detector in each sleeping area with an alarm clearly audible in adjoining sleeping spaces with intervening doors closed. There shall be one detector at the head of each stairway or at the entrance to public halls & stairways and be installed in the alarm system and be connected to an alarm clearly audible through out the building. | Hard wired, battery, simple with maintenance | There shall be one detector in each sleeping area with an alarm clearly audible in adjoining sleeping spaces with intervening doors closed. There shall be one detector at the head of each stairway or at the entrance to public halls & stairways and be installed in the alarm system and be connected to an alarm clearly audible through out the building. |
| Oklahoma City | Oklahoma | 6/29/92 | Hard wired | All occupied structures comply BOCA defined 11 & 2 family dwellings residential & shall be equipped per (BOCA) BOCA required electrical in installed with smoke detectors according to manufacturer's specifications. They shall be located and in sufficient number to insure that the alarm is audible in all parts of the structure. | | Smoke detectors installed in a manner at location to qualify for a new construction building installed when substantial improvement to building permit are wished in excess of $1000 or more value area of more sleeping rooms are added. | Hard wired | All occupied structures comply BOCA defined 11 & 2 family dwellings residential & shall be equipped per (BOCA) BOCA required electrical in installed with smoke detectors according to manufacturer's specifications. They shall be located and in sufficient number to insure that the alarm is audible in all parts of the structure. All installed smoke detectors in occupied structures commercial in installed residential shall have at least 1 operated detector installed in a area and location the total quality & for a current building permit for new construction. |
| Tulsa | Oklahoma | 2/2/82 | | | | | | | Hard wired | At least 1 single or multiple station detector shall be installed in each person, room or sleeping area in the building of groups R-1 & I-1 Detectors shall be installed according to the Minor 74. When installed, the alarm shall be audible to occupants in the room or dwelling unit. |
| Portland | Oregon | 1977 | | | | At least 1 single or multiple station detector shall be installed in the immediate vicinity of the bedroom & on each floor including basements. A detector on the upper level of a split level and more than 1 full level above the lower level without an intervening door is sufficient. Detectors shall be installed according to NFPA 74. When installed the alarm shall be audible to each the occupants in the dwelling unit. Every dwelling unit occupied by a tenant shall have an approved & properly functioning detector installed according to the State Fire Marshall. The owner of a rental dwelling unit in to supply & install the detector & provide instructions for testing. The tenant is responsible for testing the detector & notifying the owner of deficiencies in writing. Dwelling units shall not be transferred without having a properly installed, approved detector. | | At least 1 single or multiple station detector shall be installed in each person, room or sleeping area in the building of groups R-1 & I-1 Detectors shall be installed according to Minor 74. When installed, the alarm shall be audible to occupants in the room or dwelling unit. Every lodging house & hotel guest room shall have an approved & properly working detector installed according to the State Fire Marshall. A hotel shall provide 1 detector for having installed at 1 door knock device for each 75 rooms of fraction of rooms. These shall be provided when requested. They may be portable or permanently installed. Dwelling units shall not be transferred without having a properly installed, approved detector. | Hard wired | At least 1 single or multiple station detector shall be installed in each person, room or sleeping area in buildings of groups R-1 & I-1 Detectors shall be installed according to Minor 74. When installed, the alarm shall be audible to occupants in the room or dwelling unit. Every lodging house & hotel guest room shall have an approved & properly working detector installed according to the State Fire Marshall. A hotel shall provide 1 detector for having installed at 1 door knock device for each 75 rooms or fraction of rooms. These shall be provided when requested. They may be portable or permanently installed. Dwelling units shall not be transferred without having a properly installed, approved detector. |

| CITY | STATE | EFFECTIVE DATE | 1 & 2 FAMILY DWELLING | | | | MULTIPLE FAMILY DWELLINGS | | | |
| | | | NEW CONSTRUCTION | | EXISTING CONSTRUCTION | | NEW CONSTRUCTION | | EXISTING CONSTRUCTION | |
| | | | LOCATION/PROVISION | TYPE | LOCATION/PROVISION | TYPE | LOCATION/PROVISION | TYPE | LOCATION/PROVISION | TYPE |
| Fort Worth | Texas | 2/10/83 | | Hard wired | | | Buildings 3 or more stories high having 15 dwelling units in an apt, house or dormitory or 20 or more hotel guest rooms... Approved single station smoke detectors shall be installed in accordance with the provisions... Group R occupancies shall have smoke detectors installed... | Hard wired or battery | | |
| Seattle | Washington | 12/21/80, 12/21/81 | Group R residences shall have single station detectors to protect each sleeping area. System detectors connected to an approved automatic fire alarm system, capable of starting all components shall be installed to protect each sleeping area if the occupancy is used by more than 6 persons, 3 of which are under 15 years old and not related by blood or marriage.<br><br>Smoke detectors shall be installed in all dwelling units built or manufactured after 12/21/81. Smoke detectors shall be installed by persons other than the owner. The detector shall be designed, manufactured & installed to conform with Nationally adopted standards & the administrative procedure set, chapter 34.05 RCW promulgated by the director of community development through the director of fire protection. The owner shall ensure that the detector is operating properly before a new tenant moves in. The tenant is responsible for maintaining the detector. | Hard wired or battery | Group R residences shall have single station detectors to protect each sleeping area. System detectors connected to an approved automatic fire alarm system, capable of starting all components shall be installed to protect each sleeping area if the occupancy is used by more than 6 persons, 3 of which are under 15 years old and not related by blood or marriage.<br><br>Smoke detectors shall be installed in all dwelling units occupied by persons other than the owner. The detector shall be designed, manufactured & installed to conform with Nationally adopted standards & the administrative procedure set, chapter 34.05 RCW promulgated by the director of community development through the director of fire protection. The owner shall ensure that the detector is operating properly before a new tenant moves in. The tenant is responsible for maintaining the detector. | Hard wired or battery | Buildings 3 or more stories high having 15 dwelling units in an apt, house or dormitory... Approved single station smoke detectors shall be installed... Group R occupancies shall have smoke detectors installed... Smoke detectors shall be installed in all dwelling units built or manufactured after 12/21/81. Smoke detectors shall be installed by persons other than the owner. The detector shall be designed, manufactured & installed to conform with Nationally adopted standards & the administrative procedure set, chapter 34.05 RCW promulgated by the director of community development through the director of fire protection. The owner shall ensure that the detector is operating properly before a new tenant moves in. The tenant is responsible for maintaining the detector. | Hard wired or battery | Smoke detectors shall be installed in all dwelling units occupied by persons other than the owner. The detector shall be designed, manufactured & installed to conform with Nationally adopted standards & the administrative procedure set, chapter 34.05 RCW promulgated by the director of community development through the director of fire protection. The owner shall ensure that the detector is operating properly before a new tenant moves in. The tenant is responsible for maintaining the detector. |

# Fire Incident Study
# Sample Analysis



**January 1995**

**Julie I. Shapiro**
**U.S. Consumer Product Safety Commission**
**Directorate for Engineering Sciences**
**Division of Engineering Laboratory**

# Table of Contents

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LABORATORY TEST PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

POWER STATE OF DETECTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

LABORATORY ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    UNITS FOUND DISCONNECTED AFTER THE FIRE . . . . . . . . . . . . . . . . . 5

    UNITS FOUND CONNECTED AFTER THE FIRE . . . . . . . . . . . . . . . . . . . 7

    UNKNOWN IF POWERED AT TIME OF FIRE . . . . . . . . . . . . . . . . . . . . . . 8

SMOKE DETECTORS COLLECTED FOR FAILING FIELD TESTING . . . . . . . . . 9

SMOKE DETECTORS COLLECTED FOR COMPLAINTS . . . . . . . . . . . . . . . . . 11

    NUISANCE ALARMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        SENSITIVITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        LOCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        TECHNOLOGY USED IN THE SMOKE DETECTOR . . . . . . . . . . . 14

    CONTINUOUS ALARMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    BATTERY RELATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    REPETITIVE CHIRP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    OTHER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    NO LOW BATTERY ALARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# Introduction

The Engineering Laboratory, as part of the National Smoke Detector Project, performed a preliminary evaluation of the smoke detectors collected in the Fire Incident Study.  The primary goal of the study was to determine the reason for malfunction.

This report describes the visual observations and test data recorded by the Engineering Laboratory personnel during the preliminary analysis of samples collected in the study.  Based upon this report and the results of the Smoke Detector Operability Survey [1], recommendations will be made to increase the reliability of smoke detectors in consumers' homes.

Smoke detectors that residents stated did not respond in an actual fire were collected from homes in 15 mid-size cities across the United States.   In most situations, fire department personnel tested the units and answered survey questions concerning the condition of the smoke detector.  One-hundred fourteen samples were collected as "in scope" samples, and were sent to the Engineering Laboratory to be analyzed for any of the following conditions:

- "Smoke" generated by UL Listed aerosol smoke detector test spray failed to activate the alarm.
- Pressing and holding the test button failed to activate the alarm.
- Unit sounded continuously when powered.
- Consumer reported that the smoke detector had problems and the power to the detector was found disconnected.
- Unit had a dead battery and consumer did not hear the low battery alarm.
- Unit could not be tested in the field due to fire damage.

Each smoke detector was present during a fire.  This makes analysis of the units more difficult because some aspects of the condition before the fire are unknown. Evaluating the inoperable and troublesome detectors in the laboratory can be misleading since some aspects of the fire and the fire fighting mission have an adverse effect on the units.

## Power State of Detectors

Smoke detectors that did not respond in a fire situation were collected by the participating fire departments.  If possible, the fire department tested the smoke detector and collected units that conformed with specific collection criteria.  The Engineering Laboratory received 114 samples from 15 selected cities.

There were 92 battery powered smoke detectors and 22 AC powered smoke detectors collected in the study.  These 114 samples were sent to the Engineering Laboratory for investigation of the failure.

The results of the laboratory testing are divided by the detector's power state: units that were found disconnected after the fire, units that were found still connected after the fire, and units for which the power state at the time of the fire could not be determined.  These categories are displayed in Figure 1.



Figure 1.  Power state of smoke detectors.

4

Thirty-three of the units passed all screening tests satisfactorily in the Engineering Laboratory. An additional 11 units were repaired in the laboratory and passed all retests satisfactorily. These repairs included:

- Seven of these units required that the piezo-electric horn be replaced in the detector. In four of the units, excessive heat caused damage to the horn housings causing them to be non-functional. Horns in the other three units did not operate and there were no signs of damage.
- Two smoke detectors failed only the Test Button Test. Cleaning the contact area of the test button switch restored the unit.
- Two other units required that wires be reconnected. In one unit, the AC input wires were purposely cut; in the second unit, the battery terminal wire was damaged in the fire and required replacement.

After power was restored to the smoke detectors in the laboratory, eight detectors sounded continuously and one chirped at one-minute intervals. All of the detectors were thoroughly cleaned, and five functioned properly following the procedure. Three detectors continued to sound and one chirped at repetitive intervals, but could respond to other tests. No further testing was performed on the continuous sounding samples.

Eight additional units failed only the Low Battery Test. Each of these smoke detectors uses older horn technology consisting of an electromagnetic horn. The test used to simulate a low battery in the laboratory placed a 300 ohm resistor in series with a 9-volt battery. The electromagnetic horn does not respond to this test because of the internal resistance of the smoke detector. Appropriate adjustments were made to the Low Battery Test for these horns by directly decreasing the voltage from a power supply. With the modified test, the electromagnetic horn generated a low battery alarm signal.

A variety of problems encompass the five detectors classified in the "Other" category. These included:

- A heat damaged unit that could not be repaired because replacement parts were not available at the laboratory;
- Two smoke detectors responded intermittently during testing;
- One unit that failed the Test Button Test depending on the orientation of the detector; and
- One detector that did not respond during the Sensitivity Test with smoke obscuration over 4.0% obscuration/foot.

An additional two detectors failed the Sound Level Test in the laboratory. Both detectors' sound level was intermittent, at times dropping below 70 dB. The detectors passed all other tests in the laboratory.

6



Ten smoke detectors passed all the tests outlined in Table 1 in the laboratory; an additional unit passed the testing protocol after handling. Handling the smoke detector in the laboratory may have restored continuity to a contact in the unit, resulting in a functional detector.

In five other units, repairs could not be successfully made. The exact reason for the detector malfunction could not be determined.

Repairs were successful in four units. Each detector passed the testing protocol after the following repairs:

- reconnecting a 'plug-in' horn in the smoke detector;
- re-soldering a cold solder joint on one connection of the horn;
- replacing a corroded battery clip on the smoke detector; and
- replacing the entire horn housing, which was damaged in the fire.

In two units, there was not a response during the sensitivity tests with smoke obscuration levels over 4% obscuration of smoke per foot. In two additional units the smoke detector sounded intermittently for unknown reasons.

Among the 32 units for which the fire department reported that no one heard the alarm, laboratory analysis revealed that three of these units responded at some point during the fire. Soot patterns on the smoke detector [2] suggest that the detector alarmed during the fire.

### Unknown if Powered at Time of Fire

The power state of four detectors at the time of the fire could not be determined. Each of these detectors had extensive fire damage. No testing of these units was performed in the laboratory because of the damage.

8



laboratory without any repairs. One possible reason other than excessive debris in the detector and the uncertainty of the power state of the detector is horn corrosion. Horn corrosion has been shown to account for detector failure [1]. The suspected detectors use a piezoelectric disk with three plated areas, typically made of silver, for the horn. Laboratory examination showed visible deterioration and corrosion on each of the horn contacts. Over time, the detector may become inoperative because the plated area in the horn element corrodes in the household environment. With corrosion and deterioration, the normally low electrical resistance of the pressure contact becomes higher until the horn can not sound an alarm signal.

Continuity can be restored to the deteriorated electrical contacts by slight movement of the horn element. Removing the malfunctioning detector from the consumer's home, packing the unit and transporting it to the Laboratory can have a significant consequence. During transportation and handling, the contact continuity can be restored with the result that the previously malfunctioning sample will pass the Gross Smoke Test and Test Button Test upon arrival at the Laboratory.

Twelve additional detectors could pass the testing protocol after repairs were made to the detector. These repairs included replacing components deformed in the fire, corroded components, and others.

The reason for failure could not be determined for four detectors collected. Three other detectors did not respond to the sensitivity test, and an additional three detectors could not be tested due to extensive fire damage. Two detectors sounded continuously when powered and could not be tested.

10

D-13

## Nuisance Alarms

Consumers reported nuisance alarm problems with 22 smoke detectors. Three major reasons can cause nuisance alarms: the sensitivity of the unit, the location of the unit, and the technology the smoke detector uses to detect smoke.

<u>Sensitivity</u>

The sensitivity of the smoke detector determines at what concentration of smoke the detector will respond. Smoke concentration is measured by its "obscuration rate," which relates the percentage of light beam intensity lost per foot (or meter) of smoke that it passes through. A smoke detector with a higher sensitivity will respond to a lower smoke concentration.

Sixteen smoke detectors were tested in the sensitivity chamber at the Engineering Laboratory. The values of sensitivity ranged from 0.5% to 1.7% obscuration of smoke/foot. A lower value signifies a higher sensitivity. In the Smoke Detector Operability Survey [1], the sensitivity values for detectors collected because of nuisance alarms ranged from 0.6% to 2.0% obscuration of smoke/foot. The sensitivity values from both studies are shown in Figure 6.

On average, the smoke detectors collected because of nuisance alarms have a greater sensitivity when compared to units collected without complaints of nuisance alarms. The average sensitivity of detectors collected because of nuisance alarms in the Smoke Detector Operability Survey is 1.16% obscuration of smoke/foot, compared to the Fire Incident Study of 1.03% obscuration of smoke/foot. Smoke Detector Operability Survey detectors that did not have nuisance alarm complaints had sensitivity averaging 1.32% obscuration of smoke/foot.

Excessive dirt, dust and insect infestation can alter the sensitivity of the detector, causing an unusual number of nuisance alarms. The additional elements from the fire (e.g. soot, heat, and water) can adversely affect the detector's sensitivity. Thus, limited conclusions can be drawn from the information. An accurate assessment of the sensitivity values for detectors collected in the Fire Incident Study cannot be made since the condition of the unit before the fire is unknown.

12

## Location

Poor location of the detector can contribute to nuisance alarms. In the Smoke Detector Operability Survey, more than one-third of the detectors collected for nuisance alarms were placed less than five feet from the source of smoke. This information was not collected adequately in the Fire Incident Study to make a statement. Out of the 22 complaints of nuisance alarms, distance from the source was reported in less than half of the cases.

## Technology Used in the Smoke Detector

Currently, two types of technology are used in residential smoke detectors, ionization and photoelectric. However, the nuisance complaints from consumers in the Fire Incident Study were from only ionization type smoke detectors.

Ionization detectors use a small amount of radioactive material (Americium 241) which makes the air in the sensing chamber between two electrodes conductive [4]. When particles enter the chamber, the current is reduced, thus triggering a control circuit and sounding the alarm. The ionization detector reacts to particle sizes less than one micron. Particles of this size can occur from cooking in kitchens where fast burning fires are created, exhaust gases from automobiles, and cigarette smoking. Placing an ionization detector close to these sources may result in nuisance alarms [5].

The photoelectric detector utilizes a light scattering design that incorporates a light source and a photocell. Smoke particles greater than one micron enter the detector and deflect the light source to the photocell, which sounds the alarm. No photoelectric smoke detectors were collected with complaints of nuisance alarms. However, the Smoke Detector Operability Survey [1] indicated that photoelectric detectors account for approximately 11% of detectors in residences, and the ionization detector accounts for 76 % of detectors in use (13% of detector types undetermined).

### Continuous Alarms

Four consumers complained of continuous alarms when asked if they had experienced any problems with their detector. In the laboratory, cleaning the ionization chamber with compressed air stopped the alarming in one sample, but did not correct the problem in a second sample. In another sample, the battery supplied with the smoke detector caused the unit to sound continuously. In some smoke detectors, an extremely low voltage will cause the unit to go into continuous alarm; the battery voltage measured 5.5-volts for this particular sample. Connecting a new battery,measuring 9 volts, to the unit did not produce a continuous alarm, and the unit was able to pass all tests satisfactorily. For the last unit, the circuit board was not properly attached in the detector, which forced the test button contact closed causing a

14



# Conclusion

The Engineering Laboratory performed limited testing on the 114 smoke detector samples received to determine why they did not respond in a fire. In 68% of the units collected, the detector was found with a disconnected power source after the fire.

Nuisance alarms and other problems were reported in 42% of the cases with removed power. These detectors were more sensitive (lower sensitivity values) when compared to smoke detectors collected that did not have nuisance alarm problems. However, the fire-related debris in the detector can alter the sensitivity. Location of the detectors may contribute to nuisance alarms. Unfortunately, the distance from the detector to the sources of smoke were not collected by the fire department personnel in most cases.

Twenty eight percent of the detectors were found with power connected after the fire. In the laboratory, a variety of problems were found with the units that inhibited them from sounding. Two detectors did not respond in the sensitivity chamber even with high levels of smoke. Additional problems were found with internal components of the detectors .

Twenty percent of the units collected could not be tested in the laboratory because of damage from the fire. Additional units required repairs because of the excessive heat during the fire. Smoke detectors are placed on the ceiling or the upper part of the wall in a home. Heat rises creating high temperatures at the ceiling. Critical elements in the smoke detector can be damaged with levels of heat in the excess of 150 degree Celsius. Additional recommendations to the voluntary standard may include a survivability test to insure detectors can properly function for an extended period of time in a fire.

16



# NFPA 921

## Guide for
## Fire and Explosion
## Investigations

## 2001 Edition



NFPA, 1 Batterymarch Park, PO Box 9101, Quincy, MA 02269-9101
An International Codes and Standards Organization

NFPA License Agreement

This document is copyrighted by the National Fire Protection Association (NFPA), 1 Batterymarch Park, Quincy, MA 02269-9101 USA.
All rights reserved.

NFPA grants you a license as follows: The right to download an electronic file of this NFPA document for temporary storage on one computer
for purposes of viewing and/or printing one copy of the NFPA document for individual use. Neither the electronic file nor the hard copy print
may be reproduced in any way. In addition, the electronic file may not be distributed elsewhere over computer networks or otherwise. The
hard copy print may only be used personally or distributed to other employees for their internal use within your organization.



Copyright ©
NFPA
One Batterymarch Park
Quincy, Massachusetts 02269

## IMPORTANT NOTICE ABOUT THIS DOCUMENT

NFPA codes, standards, recommended practices, and guides, of which the document contained herein is one, are developed through a consensus standards development process approved by the American National Standards Institute. This process brings together volunteers representing varied viewpoints and interests to achieve consensus on fire and other safety issues. While the NFPA administers the process and establishes rules to promote fairness in the development of consensus, it does not independently test, evaluate, or verify the accuracy of any information or the soundness of any judgments contained in its codes and standards.

The NFPA disclaims liability for any personal injury, property or other damages of any nature whatsoever, whether special, indirect, consequential or compensatory, directly or indirectly resulting from the publication, use of, or reliance on this document. The NFPA also makes no guaranty or warranty as to the accuracy or completeness of any information published herein.

In issuing and making this document available, the NFPA is not undertaking to render professional or other services for or on behalf of any person or entity. Nor is the NFPA undertaking to perform any duty owed by any person or entity to someone else. Anyone using this document should rely on his or her own independent judgment or, as appropriate, seek the advice of a competent professional in determining the exercise of reasonable care in any given circumstances.

The NFPA has no power, nor does it undertake, to police or enforce compliance with the contents of this document. Nor does the NFPA list, certify, test or inspect products, designs, or installations for compliance with this document. Any certification or other statement of compliance with the requirements of this document shall not be attributable to the NFPA and is solely the responsibility of the certifier or maker of the statement.

*See inside back cover for additional important notices and information.*

## NOTICES

All questions or other communications relating to this document and all requests for information on NFPA procedures governing its codes and standards development process, including information on the procedures for requesting Formal Interpretations, for proposing Tentative Interim Amendments, and for proposing revisions to NFPA documents during regular revision cycles, should be sent to NFPA headquarters, addressed to the attention of the Secretary, Standards Council, National Fire Protection Association, 1 Batterymarch Park, P.O. Box 9101, Quincy, MA 02269-9101.

Users of this document should be aware that this document may be amended from time to time through the issuance of Tentative Interim Amendments, and that an official NFPA document at any point in time consists of the current edition of the document together with any Tentative Interim Amendments then in effect. In order to determine whether this document is the current edition and whether it has been amended through the issuance of Tentative Interim Amendments, consult appropriate NFPA publications such as the *National Fire Codes®* Subscription Service, visit the NFPA website at www.nfpa.org, or contact the NFPA at the address listed above.

A statement, written or oral, that is not processed in accordance with Section 6 of the Regulations Governing Committee Projects shall not be considered the official position of NFPA or any of its Committees and shall not be considered to be, nor be relied upon as, a Formal Interpretation.

The NFPA does not take any position with respect to the validity of any patent rights asserted in connection with any items which are mentioned in or are the subject of this document, and the NFPA disclaims liability for the infringement of any patent resulting from the use of or reliance on this document. Users of this document are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, is entirely their own responsibility.

Users of this document should consult applicable federal, state, and local laws and regulations. NFPA does not, by the publication of this document, intend to urge action that is not in compliance with applicable laws, and this document may not be construed as doing so.

### Licensing Policy

This document is copyrighted by the National Fire Protection Association (NFPA). By making this document available for use and adoption by public authorities and others, the NFPA does not waive any rights in copyright to this document.

1. **Adoption by Reference**—Public authorities and others are urged to reference this document in laws, ordinances, regulations, administrative orders, or similar instruments. Any deletions, additions, and changes desired by the adopting authority must be noted separately. Those using this method are requested to notify the NFPA (Attention: Secretary, Standards Council) in writing of such use. The term "adoption by reference" means the citing of title and publishing information only.

2. **Adoption by Transcription**—A. Public authorities with lawmaking or rule-making powers only, upon written notice to the NFPA (Attention: Secretary, Standards Council), will be granted a royalty-free license to print and republish this document in whole or in part, with changes and additions, if any, noted separately, in laws, ordinances, regulations, administrative orders, or similar instruments having the force of law, provided that: (1) due notice of NFPA's copyright is contained in each law and in each copy thereof; and (2) that such printing and republication is limited to numbers sufficient to satisfy the jurisdiction's lawmaking or rule-making process. B. Once this NFPA Code or Standard has been adopted into law, all printings of this document by public authorities with lawmaking or rule-making powers or any other persons desiring to reproduce this document or its contents as adopted by the jurisdiction in whole or in part, in any form, upon written request to NFPA (Attention: Secretary, Standards Council), will be granted a nonexclusive license to print, republish, and vend this document in whole or in part, with changes and additions, if any, noted separately, provided that due notice of NFPA's copyright is contained in each copy. Such license shall be granted only upon agreement to pay NFPA a royalty. This royalty is required to provide funds for the research and development necessary to continue the work of NFPA and its volunteers in continually updating and revising NFPA standards. Under certain circumstances, public authorities with lawmaking or rule-making powers may apply for and may receive a special royalty where the public interest will be served thereby.

3. **Scope of License Grant**—The terms and conditions set forth above do not extend to the index of this document.

(For further explanation, see the Policy Concerning the Adoption, Printing, and Publication of NFPA Documents, which is available upon request from the NFPA.)

Copyright © 2001 NFPA, All Rights Reserved

**NFPA 921**

Guide for

# Fire and Explosion Investigations

**2001 Edition**

This edition of NFPA 921, *Guide for Fire and Explosion Investigations*, was prepared by the Technical Committee on Fire Investigations and acted on by the National Fire Protection Association, Inc., at its November Meeting held November 12–15, 2000, in Orlando, FL. It was issued by the Standards Council on January 13, 2001, with an effective date of February 9, 2001, and supersedes all previous editions.

This edition of NFPA 921 was approved as an American National Standard on February 9, 2001.

## Origin and Development of NFPA 921

NFPA 921, *Guide for Fire and Explosion Investigations*, was developed by the Technical Committee on Fire Investigations to assist in improving the fire investigation process and the quality of information on fires resulting from the investigative process. The guide is intended for use by both public sector employees who have statutory responsibility for fire investigation and private sector persons conducting investigations for insurance companies or litigation purposes. The goal of the committee is to provide guidance to investigators that is based on accepted scientific principles or scientific research.

The first edition of the document, issued by NFPA in 1992, focused largely on the determination of origin and cause of fires and explosions involving structures. The second edition of the document included revised chapters on the collection and handling of physical evidence, safety, and explosions. NFPA 907M, *Manual for the Determination of Electrical Fire Causes*, was withdrawn as an individual document and was integrated with revisions into this document as a separate chapter. Elements of NFPA 907M that relate to other chapters of this document were relocated appropriately. New chapters dealing with the investigation of motor vehicle fires, management of major investigations, incendiary fires, and appliances were added.

The third edition of the document included a new chapter on fuel gas systems in buildings and the impact of fuel gases on fire and explosion investigations. The chapter on electricity and fire was rewritten to improve organization, clarify terminology, and add references. In the chapter on fire patterns, several sections were revised. Other revisions were made in the chapter on physical evidence on the subject of preservation of the fire scene and of physical evidence. The edition also included new text regarding ignitable liquid detection canine/handler teams.

The fourth edition of this document includes new chapters on building systems, fire-related human behavior, failure analysis and analytical tools, fire and explosion deaths and injuries, and wildfire investigations. An updated chapter on motor vehicle fires has been written. The document has been organized to group chapters into subjects that will make the document more usable.



**Table 15.4.6 Design and Construction Drawing That May Be Available**

| Type | Information | Discipline |
|------|-------------|------------|
| Topographical | Shows the varying grade of the land | Surveyor |
| Site plan | Shows the structure on the property with sewer, water, electrical distributions to the structure | Civil engineer |
| Floor plan | Shows the walls and rooms of structure as if you were looking down on it | Architect |
| Plumbing | Layout and size of piping for fresh and waste water | Mechanical engineer |
| Electrical | Size and arrangement of service entrance, switches and outlets, fixed electrical appliances | Electrical engineer |
| Mechanical | HVAC system | Mechanical engineer |
| Sprinkler/fire alarm | Self-explanatory | Fire protection engineer |
| Structural | Frame of building | Structural engineer |
| Elevations | Shows interior/exterior walls | Architect |
| Cross section | Shows what the inside of components look like if cut through | Architect |
| Details | Show close-ups of complex areas | All disciplines |

**15.6* Specifications.** Architects and engineers prepare specifications to accompany their drawings. While the drawings show the geometry of the project, the specifications detail the quality of the materials, responsibilities of various contractors, and the general administration of the project. Specifications are usually divided into sections for the various components of the building. For the fire investigator, the properties of materials can be identified through a specification review and may assist in the analysis.

## Chapter 14 Physical Evidence

**14.1* General.** During the course of any fire investigation, the fire investigator is likely to be responsible for locating, collecting, identifying, storing, examining, and arranging for testing of physical evidence. The fire investigator should be thoroughly familiar with the recommended and accepted methods of processing such physical evidence.

**14.2 Physical Evidence.** Physical evidence, defined generally, is any physical or tangible item that tends to prove or disprove a particular fact or issue. Physical evidence at the fire scene may be relevant to the issues of the origin, cause, spread, or the responsibility for the fire.

The decision on what physical evidence to collect at the incident scene for submission to a laboratory or other testing facility for examination and testing, or for support of a fact or opinion, rests with the fire investigator. This decision may be based on a variety of considerations, such as the scope of the investigation, legal requirements, or prohibition. (*See Section 2.2.*) Additional evidence may also be collected by others, including other investigators, insurance company representatives, manufacturer's representatives, owners, and occupants. The investigator should also be aware of issues related to spoliation of evidence.

**14.3* Preservation of the Fire Scene and Physical Evidence.** Every attempt should be made to protect and preserve the fire scene as intact and undisturbed as possible, with the structure, contents, fixtures, and furnishings remaining in their pre-fire locations. (*See Figure 14.3.*)

**FIGURE 14.3** Physical evidence at a fire scene. Evidence such as this small paper match could easily be destroyed or lost in an improperly preserved fire scene.



Generally, the cause of a fire or explosion is not known until near the end of the investigation. Therefore, the evidentiary or interpretative value of various pieces of physical evidence observed at the scene may not be known until, at, or near the end of the fire scene examination, or until the end of the complete investigation. As a result, the entire fire scene should be considered physical evidence and should be protected and preserved.

The responsibility for the preservation of the fire scene and physical evidence does not lie solely with the fire investigator, but should begin with arriving fire-fighting units or police authorities. Lack of preservation may result in the destruction, contamination, loss, or unnecessary movement of physical evidence. Initially, the incident commander and, later, the fire investigator should secure or ensure the security of the fire scene from unnecessary and unauthorized intrusions and should limit fire suppression activities to those that are necessary.

Evidence at the fire scene should be considered not only in a criminal context, such as in traditional forensic evidence (e.g., weapons, bodily fluids, footprints), nor should it be lim-



ized to arson-related evidence, items, or artifacts, such as incendiary devices or containers. Potential evidence at the fire scene and surrounding areas can include the physical structure, the contents, the artifacts, and any materials ignited or any material on which fire patterns appear.

**14.3.1 Fire Patterns as Physical Evidence.** The evidentiary and interpretative use of fire patterns may be valuable in the identification of a potential ignition source, such as an incendiary device in an arson fire or an appliance in an accidental fire. Fire patterns are the visible or measurable physical effects that remain after a fire. These include thermal effects on materials, such as charring, oxidation, consumption of combustibles, smoke and soot deposits, distortion, melting, color changes, changes in the character of materials, structural collapse, and other effects. *(See Section 4.3.)*

**14.3.2 Artifact Evidence.** Artifacts can be the remains of the material first ignited, the ignition source, or other items or components in some way related to the fire ignition, development, or spread. An artifact may also be an item on which fire patterns are present, in which case the preservation of the artifact is not for the item itself but for the fire pattern that is contained thereon.

**14.3.3 Protecting Evidence.** There are a number of methods that can be utilized to protect evidence from destruction. Some methods include posting a fire fighter or police officer as a sentry to prevent or limit access to a building, a room, or an area; use of traffic cones or numerical markers to identify evidence or areas that warrant further examination; covering the area or evidence with tarpaulins prior to overhaul; or isolating the room or area with rope, caution tape, or police line tape. The investigator may benefit from supervising overhaul and salvage operations.

Items found at the fire scene, such as empty boxes or buckets, may be placed over an artifact. However, these items may not clearly identify the artifact as evidence that should be preserved by fire fighters or others at the fire scene. If evidence is not clearly identified, it may be susceptible to movement or destruction at the scene.

**14.3.4 Role and Responsibilities of Fire Suppression Personnel in Preserving the Fire Scene.** Generally, fire officers and fire fighters have been instructed during basic fire training that they have a responsibility on the fire scene regarding fire investigation. In most cases, this responsibility is identified as recognizing the indicators of incendiarism, such as multiple fires, the presence of incendiary devices or trailers, and the presence of ignitable liquids at the area of origin *(see Chapter 19)*. While this is an important aspect of their responsibilities in the investigation of the fire cause, it is only a small part.

Prompt control and extinguishment of the fire protects evidence. The ability to preserve the fire scene is often an important element in the investigation. Even when fire officers and fire fighters are not responsible for actually determining the origin or cause of the fire, they play an integral part in the investigation by preserving the fire scene and physical evidence.

**14.3.4.1 Preservation.** Once an artifact or other evidence has been discovered, preliminary steps should be taken to preserve and protect the item from loss, destruction, or movement. The person making the discovery should notify the incident commander as soon as practical. The incident commander should notify the fire investigator or other appropriate individual or agency with the authority and responsibility for the documentation and collection of the evidence.

**14.3.4.2 Caution in Fire Suppression Operations.** Fire crews should avoid causing unnecessary damage to evidence when using straight-stream hoselines, pulling ceilings, breaking windows, collapsing walls, and performing overhaul and salvage.

**14.3.4.2.1 Use of Water Lines and Hose Streams.** When possible, fire fighters should use caution with straight-stream applications, particularly at the base of the fire, because the base of the fire may be the area of origin. Evidence of the ignition source can sometimes be found at the area of origin. The use of hoselines, particularly straight-stream applications, can move, damage, or destroy physical evidence that may be present.

The use of water hoselines for overhaul operations like washing down, or for opening up walls or ceilings, should also be restricted to areas away from possible areas of origin.

The use of water should be controlled in areas where the investigator may wish to look at the floor for possible fire patterns. When draining the floor of standing water, the drain hole should be located so as to have the least impact on the fire scene and fire patterns.

**14.3.4.2.2 Overhaul.** It is during overhaul that any remaining evidence not damaged by the fire is susceptible to being destroyed or displaced. Excessive overhaul of the fire scene prior to the documentation and analysis of fire patterns can affect the investigation, including failure to determine the area of origin.

While the fire fighters have a responsibility to control and extinguish the fire and then check for fire extension, they are also responsible for the preservation of evidence. These two responsibilities may appear to be in conflict and, as a result, it is usually the evidence that is affected during the search for hidden fire. However, if overhaul operations are performed in a systematic manner, both responsibilities can be met successfully.

**14.3.4.2.3 Salvage.** The movement or removal of artifacts from a fire scene can make the reconstruction difficult for the investigator. If the investigator cannot determine the pre-fire location of the evidence, the analytical or interpretative value of the evidence may be lost. Moving, and particularly removing, contents and furnishings or other evidences at the fire scene should be avoided until the documentation, reconstruction, and analysis is completed.

**14.3.4.2.4 Movement of Knobs and Switches.** Fire fighters should refrain from turning knobs and operating switches on any equipment, appliances, or utility services at the fire scene. The position of components, such as the knobs and switches, may be a necessary element in the investigation, particularly in developing fire ignition scenarios or hypotheses. These components, which are often constructed of plastics, can become very brittle when subjected to heating. Their movement may alter the original post-fire state and may cause the switch to break or to become impossible to relocate in its original post-fire position. *(See 21.5.5.)*

**14.3.4.2.5 Use of Power Tools.** The use of gasoline- or diesel-powered tools and equipment should be controlled carefully in certain locations. The refueling of any fuel-powered equipment or tools should be done outside the perimeter of the fire scene. Whenever fuel-powered equipment is used on the fire scene, its use and location should be documented and the investigator advised.

**14.3.4.2.5 Limiting Access of Fire Fighters and Other Emergency Personnel.** Access to the fire scene should be limited to those persons who need to be there. This precaution includes limiting fire fighters and other emergency or rescue personnel to those necessary for the task at hand. When possible, the activity or operation should be postponed until the evidence has been documented, protected, evaluated, and collected.

**14.3.5 Role and Responsibilities of the Fire Investigator.** If the fire fighters have not taken the preliminary steps to preserve or protect the fire scene, then the fire investigator should assume the responsibility for doing so. Then, depending on the individual's authority and responsibility, the investigator should document, analyze, and collect the evidence.

**14.3.6 Practical Considerations.** The precautions in this section should not be interpreted as requiring the unsafe or infinite preservation of the fire scene. It may be necessary to repair or demolish the scene for safety or for other practical reasons. Once the scene has been documented by interested parties and the relevant evidence removed, there is no reason to continue to preserve the scene. The decision as to when sufficient steps have been taken to allow the resumption of normal activities should be made by all interested parties known at that time.

**14.4 Contamination of Physical Evidence.** Contamination of physical evidence can occur from improper methods of collection, storage, or shipment. Like improper preservation of the fire scene, any contamination of physical evidence may reduce the evidentiary value of the physical evidence.

**14.4.1 Contamination of Evidence Containers.** Unless care is taken, physical evidence may become contaminated through the use of contaminated evidence containers. For this reason, the fire investigator should take every reasonable precaution to ensure that new and uncontaminated evidence containers are stored separately from used containers or contaminated areas.

One practice that may help to limit a possible source of cross contamination of evidence collection containers, including steel paint cans or glass jars, is to seal them immediately after receipt from the supplier. The containers should remain sealed during storage and transportation to the evidence collection site. An evidence collection container should be opened only to receive evidence at the collection point, at which time it should be resealed pending laboratory examination.

**14.4.2* Contamination During Collection.** Most contamination of physical evidence occurs during its collection. This is especially true during the collection of liquid and solid accelerant evidence. The liquid and solid accelerant may be absorbed by the fire investigator's gloves or may be transferred onto the collection tools and instruments.

Avoiding cross-contamination of any subsequent physical evidence, therefore, becomes critical to the fire investigator. To prevent such cross-contamination, the fire investigator can wear disposable plastic gloves or place his or her hands into plastic bags during the collection of the liquid or solid accelerant evidence. New gloves or bags should always be used during the collection of each subsequent item of liquid or solid accelerant evidence.

An alternative method to limit contamination during collection is to utilize the evidence container itself as the collection tool. For example, the lid of a metal can may be used to scoop the physical evidence into the can, thereby eliminating

any cross-contamination from the fire investigator's hands, gloves, or tools.

Similarly, any collection tools or overhaul equipment such as brooms, shovels, or squeegees utilized by the fire investigator need to be cleaned thoroughly between the collection of each item of liquid or solid accelerant evidence to prevent similar cross-contamination. The fire investigator should be careful, however, not to use waterless or other types of cleaners that may contain volatile solvents.

**14.4.3 Contamination by Fire Fighters.** Contamination is possible when fire fighters are using or refilling fuel-powered tools and equipment in an area where an investigator later tests for the presence or omission of an ignitable liquid. Fire fighters should take the necessary precautions to ensure that the possibility of contamination is kept to a minimum, and the investigator should be informed when the possibility of contamination exists.

**14.5 Methods of Collection.** The collection of physical evidence is an integral part of a properly conducted fire investigation. The method of collection of the physical evidence is determined by many factors including the following.

(a) *Physical State.* Whether the physical evidence is a solid, liquid, or gas

(b) *Physical Characteristics.* The size, shape, and weight of the physical evidence

(c) *Fragility.* How easily the physical evidence may be broken, damaged, or altered

(d) *Volatility.* How easily the physical evidence may evaporate

Regardless of which method of collection is employed, the fire investigator should be guided by the policies and procedures of the laboratory that will examine or test the physical evidence.

**14.5.1* Documenting the Collection of Physical Evidence.** Physical evidence should be thoroughly documented before it is moved. This documentation can be best accomplished through field notes, written reports, sketches, and diagrams, with accurate measurements and photography. The diagramming and photography should always be accomplished before the physical evidence is moved or disturbed. The investigator should strive to maintain a list of all evidence removed and of who removed it.

The purpose of such documentation is twofold. First, the documentation should assist the fire investigator in establishing the origin of the physical evidence, including not only its location at the time of discovery, but also its condition and relationship to the fire investigation. Second, the documentation should assist the fire investigator in establishing that the physical evidence has not been contaminated or altered.

**14.5.2 Collection of Traditional Forensic Physical Evidence.** Traditional forensic physical evidence includes, but is not limited to, finger and palm prints, bodily fluids such as blood and saliva, hair and fibers, footwear impressions, tool marks, soils and sand, woods and sawdust, glass, paint, metals, handwriting, questioned documents, and general types of trace evidence. Although usually associated with other types of investigations, these types of physical evidence may also become part of a fire investigation. The recommended methods of collection of such traditional forensic physical evidence vary greatly. As such, the fire investigator should consult with the forensic laboratory that will examine or test the physical evidence.

**14.5.3 Collection of Evidence for Accelerant Testing.** An accelerant is any agent, often an ignitable liquid, used to initiate or speed the spread of fire. Accelerant may be found in any state: gas, liquid, or solid. Evidence for accelerant testing should be collected and tested in accordance with ASTM E 1387, *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris Samples by Gas Chromatography*, or with ASTM E 1618, *Standard Test Method for Ignitable Liquid Residues in Extracts from Fire Debris by Gas Chromatography–Mass Spectrometry.*

Liquid accelerants have unique characteristics that are directly related to their collection as physical evidence. These characteristics include the following:

(1) Liquid accelerants are readily absorbed by most structural components, interior furnishings, and other fire debris.

(2) Generally, liquid accelerants float when in contact with water (alcohol is a noted exception).

(3) Liquid accelerants have remarkable persistence (survivability) when trapped within porous material.

When a canine/handler team is used to detect possible evidence of accelerant use, the handler should be allowed to decide what areas (if any) of a building or site to examine. Prior to any search, the handler should carefully evaluate the site for safety and health risks such as collapse, falling, toxic materials, residual heat, and vapors and should be the final arbiter of whether the canine is allowed to search. It should also be the handler's decision whether to search all of a building or site, even areas not involved in the fire.

The canine/handler team can assist with the examination of debris (loose or packaged) removed from the immediate scene as a screening step to confirm whether the appropriate debris has been recovered for laboratory analysis.

**14.5.3.1 Collection of Liquid Samples for Accelerant Testing.** When a possible liquid accelerant is found in a liquid state, it can easily be collected using any one of a variety of methods. Whichever method is employed, however, the fire investigator should be certain that the evidence does not become contaminated.

If readily accessible, the liquid accelerant may be collected with a new syringe, eye dropper, pipette, siphoning device, or the evidence container itself. Sterile cotton balls or gauze pads may also be used to absorb the liquid. This method of collection results in the liquid accelerant's becoming absorbed by the cotton balls or gauze pads. The cotton balls or gauze pads and their absorbed contents then become the physical evidence that should be sealed in an airtight container and submitted to the laboratory for examination and testing.

**14.5.3.2 Collection of Liquid Evidence Absorbed by Solid Materials.** Often, liquid accelerant evidence may be found only where the liquid accelerant has been absorbed by solid materials, including soils and sands. This method of collection merely involves the collection of these solid materials with their absorbed contents. The collection of these solid materials may be accomplished by scooping them with the evidence container itself or by cutting, sawing, or scraping. Raw, unsealed, or sawed edges, ends, nail holes, cracks, knot holes, and other similar areas of wood, plaster, sheet rock, mortar, or even concrete are particularly good areas to sample. If deep penetration is suspected, the entire cross section of material should be removed and preserved for laboratory evaluation. In some solid material, such as soil or sand, the liquid accelerant may

absorb deeply into the material. The investigator should therefore remove samples from a greater depth.

In those situations where liquid accelerants are believed to have become trapped in porous material, such as a concrete floor, the fire investigator may use absorbent materials such as lime, diatomaceous earth, or non-self-rising flour. This method of collection involves spreading the absorbent onto the concrete surface, allowing it to stand for 20 to 30 minutes, and securing it in a clean, airtight container. The absorbent is then extracted in the laboratory. The investigator should be careful to use clean tools and containers for the recovery step since the absorbent is easily contaminated. A sample of the unused absorbent should be preserved separately for analysis as a comparison sample.

**14.5.3.3 Collection of Solid Samples for Accelerant Testing.** Solid accelerant may be common household materials and compounds or dangerous chemicals. Since some incendiary materials remain corrosive or reactive, care should be taken in packaging to ensure that the corrosive residues do not attack the packaging container. In addition, such materials should be handled carefully by personnel for their own safety.

**14.5.3.4* Comparison Samples.** When physical evidence is collected for examination and testing, it is often necessary to also collect comparison samples.

The collection of comparison samples is especially important in the collection of materials that are believed to contain liquid or solid accelerant. For example, the comparison sample for physical evidence consisting of a piece of carpeting believed to contain a liquid accelerant would be a piece of the same carpeting that does not contain any of the liquid accelerant. Comparison samples allow the laboratory to evaluate the possible contributions of volatile pyrolysis products to the analysis and also to estimate the flammability properties of the normal fuel present.

It is recognized that comparison samples may be unavailable due to the condition of the fire scene. It is also recognized that comparison samples are frequently unnecessary for the valid identification of ignitable liquid residue. The determination of whether comparison samples are necessary is made by the laboratory analyst, but because it is usually impossible for an investigator to return to a scene to collect comparison samples, they should be collected at the time of the initial investigation.

If mechanical or electrical equipment is suspected in the fire ignition, exemplar equipment may be identified and collected or purchased as a comparison sample.

**14.5.3.5* Canine Teams.** Properly trained and validated ignitable liquid detection canine/handler teams have proven their ability to improve fire investigations by assisting in the location and collection of samples for laboratory analysis for the presence of ignitable liquids. The proper use of detection canines is to assist with the location and selection of samples.

In order for the presence or absence of an ignitable liquid to be scientifically confirmed in a sample, that sample should be analyzed by a laboratory in accordance with 14.5.3. Any canine alert not confirmed by laboratory analysis should not be considered validated.

Research has shown that canines have responded or have been alerted to pyrolysis products that are not produced by an ignitable liquid and have not always responded when an ignitable liquid accelerant was known to be present. If an investigator feels that there are indicators of an accelerant, samples should be taken even in the absence of a canine alert.

The canine olfactory system is believed capable of detecting gasoline at concentrations below those normally cited for laboratory methods. The detection limit, however, is not the sole criterion or even the most important criterion for any forensic technique. Specificity, the ability to distinguish between ignitable liquids and background materials, is even more important than sensitivity for detection of any ignitable liquid residues. Unlike explosive- or drug-detecting dogs, these canines are trained to detect substances that are common to our everyday environment. The techniques exist today for forensic laboratories to detect submicroliter quantities of ignitable liquids, but because these substances are intrinsic to our mechanized world, merely detecting such quantities is of limited evidential value.

Current research does not indicate which individual chemical compounds or classes of chemical compounds are the key "triggers" for canine alerts. Research reveals that most classes of compounds contained in ignitable liquids may be produced from the burning of common synthetic materials. Laboratories that use ASTM guidelines (*see Section 14.10*) have minimum standards that define those chemical compounds that must be present in order to make a positive determination. The sheer variety of pyrolysis products present in fire scenes suggests possible reasons for some unconfirmed alerts by canines. The discriminatory ability of the canine to distinguish between pyrolysis products and ignitable liquids *is* remarkable but not infallible.

The proper objective of the use of canine/handler teams is to assist with the selection of samples that have a higher probability of laboratory confirmation than samples selected without the canine's assistance.

Canine ignitable liquid detection should be used in conjunction with, and not in place of, the other fire investigation and analysis methods described in this guide.

**14.5.4 Collection of Gaseous Samples.** During certain types of fire and explosion investigations, especially those involving fuel gases, it may become necessary for the fire investigator to collect a gaseous sample. The collection of gaseous samples may be accomplished by several methods, one of which is shown in Figure 14.5.4.

**FIGURE 14.5.4  Gathering a gaseous sample.**



The first method involves the use of commercially available mechanical sampling devices. These devices merely draw a sample of the gaseous atmosphere and contain it in a sample chamber or draw it through a trap of charcoal- or polymer-adsorbing material for later analysis.

Another method is the utilization of evacuated air-sampling cans. These cans are specifically designed for taking gaseous samples.

**14.5.5 Collection of Electrical Equipment and Components.** Before attempting to collect electrical equipment or components, the fire investigator should verify that all sources of electricity are off or disconnected. All safety procedures described in Chapter 10 should be followed. Electrical equipment and components may be collected as physical evidence to assist the fire investigator in determining whether the component was related to the cause of the fire.

Electrical components, after being involved in a fire, may become brittle and subject to damage if mishandled. Therefore, methods and procedures used in collection should preserve, as far as practical, the condition in which the physical evidence was found. Before any electrical component is collected as physical evidence, it should be thoroughly documented, including being photographed and diagrammed. Electrical wiring can usually be cut easily and removed. This type of evidence may consist of a short piece, a severed or melted end, or it might be a much longer piece, including an unburned section where the wiring's insulation is still intact. The fire investigator should collect the longest section of wiring practicable so that any remaining insulation can also be examined. Before wires are cut, a photograph should be taken of the wire(s), and then both ends of the wire should be tagged and cut so that they can be identified as one of the following:

(1) The device or appliance to which it was attached or from which it was severed

(2) The circuit breaker or fuse number or location to which the wire was attached or from which it was severed

(3) The wire's path or the route it took between the device and the circuit protector

Electrical switches, receptacles, thermostats, relays, junction boxes, electrical distribution panels, and similar equipment and components are often collected as physical evidence. It is recommended that these types of electrical evidence be removed intact, in the condition in which they were found.

When practical, it is recommended that any fixtures housing such equipment and components be removed without disturbing the components within them. Electrical distribution panels, for example, should be removed intact. An alternative method, however, would be the removal of individual fuse holders or circuit breakers from the panel. If the removal of individual components becomes necessary, the fire investigator should be careful not to operate or manipulate them while being careful to document their position and their function in the overall electrical distribution system.

If the investigator is unfamiliar with the equipment, he or she should obtain assistance from someone knowledgeable regarding the equipment, prior to disassembly or on-scene testing, to prevent damage to the equipment or components.

**14.5.6 Collection of Appliances or Small Electrical Equipment.** Whenever an appliance or other type of equipment is believed to be part of the ignition scenario, it is recommended that the fire investigator have it examined or tested. Appliances may be collected as physical evidence to support the fire

**Figure 45.1**
**Fire test room**



S2300



A. **Fire Test Room Dimensions**
  1. **Length — 36 feet (11 m)**
  2. **Width — 22 feet (6.7 m)**
  3. **Ceiling — height 10 feet (3.0 m) suspended type. Consists of 2 by 4 feet (0.6 by 1.2 m) by 5/8 inch (15.9 mm) thick incombustible fissured mineral fiber layer in panels.**
B. **Test Fire**
  1. **3 feet (0.91 m) above floor for Fire Tests**
  2. **8 inches (203 mm) above floor for Smoldering Smoke Test**
C. **Lamp Assembly — 4 inches (102 mm) below ceiling, 7 inches (178 mm) from each side wall.**
D. **Photocell Assembly — Spaced 5 feet (1.5 m) from lamp, photocell center 4 inches (102 mm) below ceiling, 7 inches (178 mm) from each side wall.**
E. **Measuring Ionization Chamber (MIC) — See 46.9.**
F. **Test Panel, ceiling mounted detectors — see Figures 45.2 and 45.4.**
G. **Test Panel, sidewall mounted detectors — see Figures 45.3 and 45.4.**
S. **Air Supply**
V. **Exhaust Vents**

**Figure 45.4**
**Panel mounting for fire tests**



S2484



**45.7.9**   To determine the acceptability of the test trial for each combustible and each detector location, the relationship between the MIC output (ordinate) and the percent light obscuration (abscissa) is to be plotted. The data generated shall remain within the limits represented by the curves illustrated in Figures 45.9 — 45.16.

**Figure 45.9
Paper fire — ceiling location**



S2218

**Figure 45.12**
**Wood fire — wall location**



S2221

**Figure 45.13**
**Gasoline fire — ceiling location**



S2222

**Figure 45.14**
**Gasoline fire — wall location**



S2223

**Figure 45.15**
**Polystyrene fire — ceiling location**



S2224



46.5    The heat source is to be a 240 volt, 1550 watt hotplate[1], having a steel plate 8-1/2 inch (216 mm) diameter by 1/4 inch (6.4 mm) thick, the topmost portion of which is approximately 8 inches (200 mm) above the floor. The temperature of the hotplate is to be monitored by an iron-constantan No. 30 AWG (0.05 mm²) (Type J) thermocouple attached to the edge of the steel plate by placing its junction in a hole 0.015 inch (0.38 mm) in diameter and 1/4 inch deep and peening over the opening to secure it. The thermocouple is to be connected to a proportioning temperature controller which can be precisely set for the desired hotplate temperature. The controller sensitivity is adjusted so that all conditions for this test are met. Once set for a specific temperature, the hotplate shall be maintained at that temperature (as monitored by a temperature measuring meter). Prior to the start of the test, the hotplate temperature is to be 23 ± 2°C (73 ± 4°F). The initial proportioning controller temperature setting is to be 205°C (401°F). The hotplate and controller then are to be energized and the test time started (T=0). The proportioning controller setting is to be increased to obtain the temperature sequence included in Table 46.1 and Figure 46.1. (The hotplate temperature normally lags the controller setting by approximately 2 minutes during incremental increases.)

[1] A hotplate acceptable for this purpose is Emerson Electric Co. Series PH-400 Chromalox.



**Figure 46.1**
**Hotplate temperature profile**



S2901

46.6    The smoldering smoke test is to be conducted in the same room and ambient conditions and under the same mounting conditions as employed for the Fire Tests. See 45.7.1 — 45.7.3 and 45.7.5. The detector samples are to be energized from a source of supply in accordance with 34.3.1 except that detectors powered from a battery shall be energized by batteries that are depleted to their trouble signal voltage levels unless the minimum sensitivity is measured at rated battery voltage.



**46.9**    A Measuring Ionization Chamber (MIC)[m] is to be used to measure the relative buildup of particles of combustion during the test. The MIC utilizes the ionization principle with air drawn through the chamber at a rate of 25 ± 5 liters per minute by a regulated vacuum pump. The monitoring head is to be located as shown in Figure 45.1.

[m] Cerberus Ltd., Mannedorf, Switzerland, or Electronikcentralen, Horsholm, Denmark, Measuring Ionization Chamber (MIC), Type EC 23095.

**46.10**    Prior to the test, the MIC shall be calibrated in clean air for a value of 100 picoamperes. As the smoke level increases during the test, the meter reading will decrease.

**46.11**    To determine the acceptability of the test trial, the relationship between the MIC output (ordinate) and the percent light transmission (abscissa) shall be plotted at 1 minute intervals during the test. The points generated shall remain within the curves illustrated in Figure 46.3.

**Figure 46.3**
**Smoldering smoke test measuring ionization chamber/light beam limits**



S2909

Note — Limits are based on a Measuring Ionization Chamber resistance of 20 x 10¹⁰ ohms measured at 21°C, 77 percent RH, and 760 mm Hg.

### Table 48.1
### Maximum temperature rises

| Device or material | Normal standby Degrees C | Normal standby Degrees F | Alarm condition Degrees C | Alarm condition Degrees F |
|---|---|---|---|---|
| **A. COMPONENTS** | | | | |
| 1. Capacitors | 25 | 45 | 40 | 72 |
|  | 25 | 45 | 65 | 117 |
| 2. Fuses | 25 | 45 | 65 | 117 |
| 3. Rectifiers – At any point | 25 | 45 | 50 | 90 |
| a. Germanium | 25 | 45 | 50 | 90 |
| b. Selenium | 50 | 75 | 75 | 135 |
| c. Silicon (1) Maximum 60 percent of rated volts | 25 | 45 | 75 | 135 |
| (2) 60 percent > rated volts | | | | |
| 4. Relays and other coils with: | | | | |
| a. Class 105 insulated windings | | | | |
| Thermocouple method | 25 | 45 | 65 | 117 |
| Resistance method | 35 | 63 | 75 | 135 |
| b. Class 103 insulated windings | | | | |
| Thermocouple method | 45 | 81 | 85 | 153 |
| Resistance method | 55 | 99 | 95 | 171 |
| 5. Resistors[a] | | | | |
| a. Carbon | 25 | 45 | 50 | 90 |
| b. Wire wound | 50 | 90 | 125 | 225 |
| c. Other | 25 | 45 | 50 | 90 |
| 6. Sealing compounds | 15°C (27°F) less than its melting point | | | |
| 7. Solid state devices | See Note[b] | | | |
| **B. INSULATED CONDUCTORS[c]** | | | | |
| 1. Appliance wiring material | 25°C (45°F) less than the temperature limit of the wire | | | |
| 2. Flexible cord | 35 | 63 | 35 | 63 |
| **C. ELECTRICAL INSULATION – GENERAL** | | | | |
| 1. Fiber used as electrical insulation or cord bushings | 25 | 45 | 65 | 117 |
| 2. Phenolic composition used as electric insulation or as parts where deterioration will result in a risk of fire or electric shock | 25 | 45 | 125 | 225 |
| 3. Varnished cloth | 25 | 45 | 60 | 108 |

(Continued)




48.9    The temperature of a copper coil winding is determined by the change-in-resistance method by comparing the resistance of the winding at the temperature to be determined with the resistance at a known temperature by means of the equation:

$$T = \frac{R}{r} \; ( \; 234.5 + t \; ) \; - 234.5$$

In which:

      T is the temperature to be determined in degrees C.

      t is the known temperature in degrees C.

      R is the resistance in ohms at the temperature to be determined.

      r is the resistance in ohms at the known temperature.

48.10    As it is generally necessary to de-energize the winding before measuring R, the value of R at shutdown may be determined by taking several resistance measurements at short intervals, beginning as quickly as possible after the instant of shutdown. A curve of the resistance values and the time may be plotted and extrapolated to give the value of R at shutdown.

48.11    To determine compliance with this test, a detector is to be connected to a source of supply in accordance with 34.3.1 and operated under the following conditions:

    a)    Standby — (16 hours minimum). Constant temperatures.

    b)    Alarm — (1 hour).

    c)    Alarm — (7 hours or to battery depletion).  Abnormal test.

48.12    For 48.11(c), the temperature limits may be exceeded but there shall be no manifestation of a fire or approaching failure, and the detector shall operate as intended following the test.

48.13    The detector is to be subjected to the Dielectric Voltage-Withstand Test, Section 55, following 48.11 (b) or (c).

## 49  Overload Test

### 49.1   Detector

49.1.1    A detector other than that operating from a primary battery shall be capable of operating as intended after being subjected to 50 cycles of alarm signal operation at a rate of not more than 6 cycles per minute with the supply circuit to the detector at 115 percent of the rated test voltage. Each cycle shall consist of starting with the detector energized in the standby condition, initiation of an alarm by smoke or equivalent means, and restoration of the detector to standby.



Case 1:98-cv-00186    Document 168    Filed in TXSD on 06/28/2002    Page 126 of 206

**50.3    Audible signaling appliance**

**50.3.1**    The audible signaling appliance of each of two detectors shall operate as intended when the detector is operated for 8 hours of alternate 5-minute periods of energization and de-energization in the standby and alarm conditions, followed by 72 hours of continuous energization in an alarm condition. For this test, the detectors are to be connected to a source of rated voltage and frequency. For a battery operated detector, a filtered dc supply is to be employed that has an output voltage equivalent to the fresh battery voltage.

**50.4    Test means**

**50.4.1**    A sensitivity adjustment switch, test means, alarm silencing means, or reset switch provided on a detector shall operate as intended after being operated for 1500 cycles at the rate of not more than 10 cycles per minute. The time of actuation of a test means is to be sufficient to obtain at least 1 second of alarm. For this test one detector is to be connected to a rated source of supply voltage and frequency. This test may be conducted in conjunction with the Endurance Test of the detector.

**51    Variable Ambient Temperature Test**

**51.1    Operation in high and low ambient**

**51.1.1**    A detector shall operate for its intended signaling performance when tested in an ambient temperature of 0 and 49°C (32 and 120°F) at a relative humidity of 30 to 50 percent. Two detectors, one at maximum and one at minimum sensitivity, are to be maintained at each ambient temperature for at least 3 hours so that thermal equilibrium is reached. The units then are to be tested for sensitivity while connected to a source of supply in accordance with 34.3.1.

**51.1.2**    Sensitivity measurements shall be recorded before and during exposure to each ambient temperature in accordance with the Sensitivity Test, Section 38, except that the smoldering rate of the wick is to be such that the relationship between the MIC output and the percent light transmission remains within the limits represented by the curves illustrated in Figures 51.1 and 51.3 for the 0°C (32°F) and 49°C (120°F) ambients, respectively. The visible smoke buildup rates are to be maintained within the limits illustrated in Figures 51.2 and 51.4 for the 0 and 49°C ambients, respectively.

**51.1.3**    Each unit shall operate as intended in each ambient. The sensitivity readings using gray smoke measured in each ambient temperature shall vary not more than 1 percent per foot obscuration (0.014 optical density per meter) from the value recorded prior to the Variable Ambient Temperature Test, and shall not, in any case, exceed the limits specified in 38.1.1.

**51.1.4**    Prior to each test, the wick is to be conditioned for each ambient as shown in Table 51.1.

**Table 51.1**
**Variable ambient wick conditioning**

| Ambient | Wick conditioning | Number of wicks used |
|---|---|---|
| 0°C (32°F) | At least 24 hours at 0°C, 30 – 50 percent RH | 1 |
| 49°C (120°F) | At least 24 hours at 49°C, 40 – 50 percent RH | 2 |



**Figure 51.3**
**Sensitivity test limits – 49°C ambient – gray smoke – cotton wick – 30 fpm**



S2229    MEASURING IONIZATION CHAMBER OUTPUT – PICOAMPERES

**Figure 51.4**
**Smoke build-up rate – sensitivity test – 40°C ambient – gray smoke – cotton wick – 30 fpm**



S2230



    b)    Between any interior parts of a detector that may be contacted by a person during servicing, and earth ground.

53.2    For this test the detector is to be de-energized, removed from the humidity environment, placed on a dry insulating surface, and immediately reenergized from a rated source of supply.  The leakage measurement then is to be made within 5 minutes of energization while in the standby and alarm conditions. The leakage current value is to be rms values for essentially dc (nonfiltered rectified ac) and sinusoidal waveforms up to 1 kilohertz.  For frequencies above 1 kilohertz the leakage current limit is to be the value given multiplied by the frequency in kilohertz up to a maximum multiplier of 100.

53.3    The test meter employed to measure the leakage current is to be an average responding ac milliammeter that indicates the rms value of a pure sine wave, having an error of not greater than 5 percent, and a maximum input impedance of 1000 ohms.  For ac measurements, a dc milliammeter, with a maximum impedance of 1000 ohms in the test circuit, is to be employed.

53.4    If a conductive surface other than metal is used for the enclosure or part of the enclosure, the leakage current is to be measured using a metal foil with an area of 10 by 20 centimeters (4 by 8 inches) placed in contact with the surface.  Where the surface is less than 10 by 20 centimeters (4 by 8 inches), the metal foil is to be the same size as the surface.  The metal foil is not to be pressed into openings and is not to remain in place long enough to affect the temperature of the sample.

53.5    If a detector is intended for multiple station connection, leakage currents are to be measured with the maximum number of detectors intended to be interconnected, unless it is established by circuit analysis that the leakage current is independent of interconnection.

**Figure 53.1**
**Leakage current measurement circuit**



S2489



### Figure 54.1
### Surge generator circuit



S2490



| | | | |
|---|---|---|---|
| C1 — | Capacitor, 0.025 μF, 10 kV | R1 — | Resistor, 22 Ohms, 1 W, composition |
| C2 — | Capacitor, 0.06 μF, 10 kV | | |
| C3 — | Capacitor, 10 μF, 400 V | R2 — | Resistor, 12 Ohms, 1 W, composition |
| | | R3 — | Resistor, 1.3 Megohms (12 in series, 110K Ohms each, 1/2 W) |
| CR1 — | Relay, coil 24 V, DC. Contacts, 3-pole, single throw, each contact rated 25 A, 600 V, AC maximum: All three poles wired in series. | R4 — | Resistor, 47K Ohms (10 in series, 4.7K Ohms each, 1/2 W) |
| CR2 — | Relay, coil 120 V, AC. Contacts DPDT. Provides either 120 V or 240 V test circuit. | R5 — | Resistor, 470 Ohms, 1/2 W |
| | | R6 — | Resistor, 200 Megohms, 2 W, 10 kV |
| | | R7 — | Resistor, 0.2 Megohms (2 in series, 100K Ohms each, 2 W, carbon) |
| D1 — D4 — | Diodes, 25 kV PIV each | | |
| | | S1 — | Switch, SPST |
| L1 — | Inductor 15 μH [33 turns, No. 22 AWG wire, wound on 0.835 inch (21.2 mm) diameter PVC tubing] | S2 — | Switch, SPST, key-operated, 120 V, AC, 1A |
| L2 — | Inductor, 70 μH [45 turns, No. 14 AWG wire, wound on 2.375 inch (60.33 mm) diameter PVC tubing] | T1 — | Transformer, 2 kVA, 120 V primary, 1:1 (120 V or 240 V output) |
| | | T2 — | Transformer, 90 VA, 120/15,000 V |
| | | T3 — | Variable autotransformer, 2.5 A |
| M1 — | Meter, 0 — 20 V, DC | | |

54.5.2 For this test, each circuit is to be subjected to five different transient waveforms having peak voltage levels in the range of 100 to 2400 volts, as delivered into a 200 ohm load. A transient waveform at 2400 volts shall have a pulse rise time of 100 volts per microsecond, a pulse duration of approximately 80 microseconds, and an energy level of approximately 1.2 joules. Other applied transients shall have peak voltages representative of the entire range of 100 to 2400 volts, with pulse durations from 80 to 110 microseconds, and energy levels not less than 0.3 joule or greater than 1.2 joules.

54.5.3 The detector is to be subjected to 60 transient pulses induced at the rate of six pulses per minute as follows:

a) Twenty pulses (two at each transient voltage level specified in 54.5.2) between each circuit lead or terminal and earth ground, consisting of ten pulses of one polarity, and ten of the opposite polarity (total of 40 pulses), and

b) Twenty pulses (two at each transient voltage level specified in 54.5.2) between any two circuit leads or terminals consisting of ten pulses of one polarity and ten of the opposite polarity.

54.5.4 At the conclusion of the test, the detector shall comply with the requirements of the Normal Operation Test, Section 35, and Sensitivity Test, Section 38.

## 55 Dielectric Voltage-Withstand Test

55.1 A detector shall withstand for 1 minute, without breakdown, the application of an essentially sinusoidal ac potential of a frequency within the range of 40 — 70 hertz, or a dc potential, between high-voltage live parts and exposed dead metal parts, and live parts of high- and low-voltage circuits. The test potential is to be:

a) For a detector rated 30 volts ac rms (42.4 volts dc or ac peak) or less — 500 volts (707 volts, if a dc potential is used).

b) For a detector rated between 31 and 250 volts ac rms — 1000 volts (1414 volts, if a dc potential is used).

c) For a detector rated more than 250 volts ac rms — 1000 volts plus twice the rated voltage (1414 volts plus 2.828 times the rated ac rms voltage, if a dc potential is used).

55.2 Any reference grounds are to be disconnected prior to the test applications.

55.3 If the charging current through a capacitor or capacitor-type filter connected across the line, or from line to earth ground, is sufficient to prevent maintenance of the specified ac test potential, the capacitors and capacitor-type filters may be tested using a dc potential in accordance with 55.1.

55.4 The test potential may be obtained from any convenient source having sufficient capacity to maintain the specified voltage. The output voltage of the test apparatus is to be monitored. Starting at zero, the applied potential is to be increased at a rate of approximately 200 volts per minute until the required test value is reached and is to be held at that value for 1 minute.

55.5 A printed-wiring assembly or other electronic-circuit component that would short circuit or would be damaged by application of the test potential, is to be removed, disconnected, or otherwise rendered inoperative before the test. A representative subassembly may be tested instead of an entire unit.

57.2.2    For detectors intended for connection in a multiple station configuration, the maximum number of detectors specified by the installation instructions are to be interconnected with either 10 ohms resistance between detectors, or the maximum resistance specified in the installation instructions, and tested for intended operation.

57.2.3    If the detector is provided with a standby battery the test is to be conducted at 85 percent of the charged battery voltage. If the standby battery provides a trouble signal requiring replacement at higher than 85 percent of the charged battery voltage, the test is to be conducted at the battery trouble signal voltage level.

57.2.4    For operation at the reduced voltage, three detectors are to be energized from a source of supply in accordance with 34.3.1, following which the voltage is to be reduced to 85 percent of the test voltage specified in 34.3.1 for ac operated detectors, or the battery trouble level voltage for battery operated detectors, and then tested for signaling operation and sensitivity.

## 58  Dust Test

58.1    The sensitivity of a detector shall not be reduced abnormally by an accumulation of dust, without an alarm or audible trouble signal being produced.

58.2    To determine compliance with 58.1, a sample in its intended mounting position, is to be placed, de-energized, in an air tight chamber having an internal volume of at least 3 cubic feet (0.09 m³).

58.3    Approximately 2 ounces (0.06 kg) of cement dust, maintained in an ambient room temperature of approximately $23 \pm 2°C$ ($73.4 \pm 3°F$) at 20 — 50 percent relative humidity and capable of passing through a 200 mesh screen, is to be circulated for 15 minutes by means of compressed air or a blower so as to completely envelop the sample in the chamber. The air flow is to be maintained at an air velocity of approximately 50 fpm (0.25 m/s).

58.4    Following the exposure to dust, the detector is to be removed carefully, mounted in its intended position, energized from a source of supply in accordance with 34.3.1, and tested for sensitivity using gray smoke, unless a trouble signal or a false alarm is obtained. Sensitivity measurements following this test may vary by more than 1 percent obscuration (0.014 optical density per meter) in the direction of high sensitivity, but they shall not vary by more than 1 percent per foot obscuration (0.014 optical density per meter) in the direction of low sensitivity and shall not, in any case, exceed the limits specified in 38.1.1.

## 59  Static Discharge Test

59.1    The components of a detector shall be shielded so that its operation is not adversely affected when subjected to static electric discharges. Operation of the trouble circuit during this test is not considered a failure if the subsequent operation of the detector is not impaired. Operation of the alarm shall terminate in less than 5 seconds. The test is to be conducted in an ambient temperature of $23 \pm 3°C$ ($73 \pm 5°F$), at a relative humidity of 10 ±5 percent, and a barometric pressure of not less than 700 mm of mercury (194 kPa).

59.2    Each of two detectors is to be mounted in its intended mounting position and connected to a source of supply in accordance with 34.3.1. If a detector is intended to be installed on a metal back box, the box is to be connected to earth ground. A 250 picofarad low leakage capacitor, rated 10,000 volts dc, is to be connected to two high-voltage insulated leads, 3 feet (0.9 m) long. A 1500 ohm resistor is to be inserted in series with one lead. The end of each lead is to be attached to a 1/2 inch (12.7 mm) diameter metal test probe with a spherical end mounted on an insulating rod. The capacitors are to be charged by touching the ends of the test leads to a source of 10,000 volts dc for at least 2 seconds for each discharge. One probe is to be touched to the detector and the other probe is then to be touched to earth ground.





**Figure 61.1
Jarring test**



(1)
Test Method for Unit
Intended to be Mounted
Vertically

(2)
Test Method for Unit
Intended to be Mounted
Horizontally

IP110

## 62 Corrosion Test

### 62.1 General

62.1.1   A detector shall operate as intended after being subjected to the corrosive atmosphere tests described in 62.1.2 — 62.2.1. The samples are to be placed in the test chambers that are located in an ambient room temperature of approximately 23 ±2°C (73.4 ±3°F), maintained at 20 — 50 percent relative humidity, and are to be mounted in the intended position of use on a platform approximately 2 inches (50.8 mm) above the bottom of the exposure chamber. The relative humidity inside the chamber during the test is to be approximately 95 percent.

62.1.2   Moist Hydrogen Sulfide-Air Mixture Exposure — Two samples, one at maximum and one at minimum sensitivity setting, are to be exposed to a moist hydrogen sulfide-air mixture in a closed glass chamber for a period of 10 days. On the first through fourth and seventh through tenth days, an amount of hydrogen sulfide equivalent to 0.1 percent of the volume of the chamber is to be introduced into the chamber from a commercial gas cylinder, the volume required being measured with a flowmeter and stopwatch. Prior to each introduction of gas, the remaining gas-air mixture from the previous day is thoroughly purged from the chamber. On the fifth and sixth day of the exposure, the chamber is to remain closed and no purging or introduction of gas is to be provided. During the exposure, the gas-air mixture is gently stirred by means of a small motor driven fan located in the upper middle portion of the chamber. A small amount of water (10 ml/0.003 $m^3$ of chamber volume) is to be maintained at the bottom of the chamber for humidity.

62.1.3   Moist Carbon Dioxide-Sulfur Dioxide-Air Mixture Exposure — Two samples, one at maximum and one at minimum sensitivity setting, are to be exposed to a moist carbon dioxide-sulfur dioxide-air mixture in a closed glass chamber for a period of 10 days. On the first through fourth and seventh through tenth days, an amount of carbon dioxide equivalent to 1.0 percent of the volume of the chamber, plus an amount of sulfur dioxide equivalent to 0.5 percent of the volume of the chamber, is to be introduced. On the fifth and sixth day of the exposure period, the chamber is to remain closed and no purging or introduction of gas is to be provided. A small amount of water (10 ml/0.003 $m^3$ of chamber volume) is to be maintained at the bottom of the chamber for humidity.

supply voltage to the detector, or an equivalent method. (The level of reduction of light is to be determined initially by means of an acceptable light meter, review of curve sheets, or the equivalent.) Sensitivity measurements at the reduced light output level shall not vary more than 1 percent per foot obscuration (0.014 optical density per meter) for gray smoke and not more than 4 percent per foot obscuration (0.058 optical density per meter) for black smoke toward the low sensitivity region from the value of rated light output. In no case shall they exceed the limits specified by 38.1.1 for both gray and black smoke.

63.3    For a detector that employs a battery as the main source of supply, the test is to be conducted at the trouble signal level of the battery.

## 64 Battery Tests

64.1    If a battery is employed as the main source of power of a single station smoke detector, it shall provide power to the unit under intended ambient conditions for at least 1 year in the standby condition, including novelty and weekly alarm testing, and then operate the detector for a minimum of 4 minutes of alarm, followed by 7 days of trouble signal. See 37.3.1.

64.2    Six samples of the battery or sets of batteries, if more than one is used for primary power, are to be tested under each of the following ambient conditions for a minimum of 1 year while connected to the detector or a simulated load to which the battery is to supply power.

a)    Room Ambient — 23 ±3°C (73.4 ±5°F), 30 — 50 percent relative humidity, 760 mm Hg.

b)    High Temperature — 45°C (113°F).

c)    Low Temperature — 0°C (32°F).

d)    Humidity — 30 ±2°C (86 ±3°F), 85 ±5 percent relative humidity.

64.3    For the test, either detector samples or test loads simulating a maximum standby current drain are to be employed. The alarm load is to be the audible appliance intended to be used in the detector or an appropriate load simulating maximum alarm conditions. The batteries are to be tested in the mounting clips employed in the detector.

64.4    Terminals or jacks are to be provided on each test means to facilitate measurement of battery voltage, standby, and alarm currents. The measuring means is to be separated from the battery test means by a wiring harness or equivalent at least 3 feet (0.9 m) long.

64.5    Prior to placing the battery test setups in the various ambient conditions, each battery is to be subjected to 25 cycles of alarm representing novelty testing. Each cycle is to consist of 5 seconds of alarm and at least 5 minutes between each application.

64.6    During the course of the test, the battery voltage and current in standby and alarm condition are to be recorded periodically. The alarm voltage is to be recorded 3 seconds after energization. The standby voltage and current are to be recorded prior to the alarm measurements. The detector is to be placed into an alarm condition weekly. The duration of the weekly alarm test signal is to be 3 seconds.

64.7    At the end of the year all batteries shall have sufficient capacity to operate the alarm signal for a minimum of 4 minutes followed by 7 days of trouble signal. To obtain the trouble signal level, it may be necessary to continue the test with the standby current drain for longer than 1 year. The length of time that the batteries subjected to conditions of 64.2 (b), (c), and (d) to operate the alarm signal may be less than 1 year, but not less than 6 months, provided that the detector is marked to indicate the battery limitations for the ambient condition involved.



### 65.3 Alarm duration test

65.3.1   An alarm sounding appliance of a detector powered by a primary battery that has been discharged to the trouble level condition shall provide the equivalent of 85 db at 10 feet (3.05 m) after 1 minute of continuous alarm operation and shall provide at least 82 db after 4 minutes.

65.3.2   To determine compliance with 61.3.1, a measurement shall be made under the following conditions. The ambient noise level is to be at least 10 db below the measured level produced by the signaling appliance. The detector is to be mounted 1 foot (302 mm) from the microphone placed in a direct line with the detector. The detector is then to be energized in the alarm condition and the sound output is to be measured at 1 minute intervals, using a sound level meter° employing the A-weighting network. A maximum of 3 db decrease from the original 1 minute reading, after 4 minutes shall determine compliance for a battery operated detector that is providing a trouble signal.

° A suitable meter for the purpose is a General Radio Type 1551 sound level meter (Type II).

### 65.4 Supplementary remote sounding appliances

65.4.1   The sound output of a supplementary remote sounding appliance, intended to be installed in the same room as a user, such as a bedroom, shall be not less than 85 db. The sound output may be less than 85 db but not less than 75 db provided the appliance is marked with the following, or equivalent, text to indicate the specific use:

"THIS UNIT IS TO BE INSTALLED IN A ROOM OCCUPIED FOR SLEEPING."

### 66 Tests of Thermoplastic Materials

### 66.1 General

66.1.1   Thermoplastic materials intended for the sole support of current-carrying parts or as an enclosure of a detector shall be subjected to the following tests. If possible, a complete detector shall be used.

### 66.2 Accelerated air-oven aging test

66.2.1   There shall be no excessive warping or exposure of high-voltage uninsulated current-carrying parts so as to impair operation or provide access to uninsulated high-voltage parts when representative samples of a plastic material are aged for 7 days in a circulating-air oven maintained at 90°C (194°F), or for 28 days at a temperature of 70°C (158°F), and in both cases at a relative humidity of 0 — 10 percent.

66.2.2   At least three representative samples are to be mounted on supports as intended in service and placed in the oven. At the end of the aging period indicated in 66.2.1, the samples are to be removed, permitted to cool, and then examined for adverse distortion. Falling off of a detector cover is acceptable during the test provided no high-voltage parts are exposed, operation for smoke is not affected, and the cover can be replaced as intended.

### 66.3 Flame test

66.3.1   An insulating material employed as part of a detector for the sole support of current-carrying parts which may be ignited during a fault condition from adjacent current-carrying parts, or as an enclosure shall comply with the requirements for Type 94-5V when tested in accordance with the requirement for Tests for Flammability of Plastic Materials for Parts in Devices and Appliances, UL 94.

*Exception:   For battery-powered units, the thermoplastic material may comply with the requirements for Type 94-HB.*



## 70  Polarity Reversal Test

70.1    A smoke detector shall operate as intended after being connected in each polarity. This includes high-voltage cord connected and fixed wiring (splice lead) types, battery types (main or standby), and multiple station interconnection leads. Each polarity is to be applied for at least 24 hours on all units unless a trouble signal or alarm signal is obtained.  For battery operated detectors intended to be connected by a polarized clip assembly the reverse polarity is to be applied for a minimum of 1 second.  A trouble or alarm signal is to be permitted under any incorrect polarity applied.  A maximum 1-second alarm is permitted when the correct polarity is connected.

70.2    Two samples are to be subjected to this test. Sensitivity measurements using gray smoke prior to and following the test are to be made in accordance with the Sensitivity Test, Section 38.  Measurements following the polarity reversal shall vary not more than 1 percent per foot obscuration (0.014 optical density per meter) from the value recorded prior to the test and shall not, in any case, exceed the limits in 38.1.1.

## 71  Strain Relief Test

### 71.1    General

71.1.1    A cord or lead that depends upon a thermoplastic enclosure or part for strain relief is to be subjected to the applicable tests specified in 71.2.1 — 71.3.1 following exposure to either temperature conditioning test described in 56.2.

### 71.2    Power-supply cord

71.2.1    When tested in accordance with 16.2, the strain relief means provided on the flexible cord shall withstand for 1 minute, without displacement, a pull of 35 pounds-force (156 N) applied to the cord with the connections within the detector disconnected.

71.2.2    A 35 pound-mass (15.9 kg) weight is to be suspended on the cord and supported by the detector so that the strain relief means will be stressed from any angle that the construction of the detector permits. The strain relief is not acceptable if, at the point of disconnection of the conductors, there is such movement of the cord as to indicate that stress would have resulted on the connections.

### 71.3    Field-wiring leads

71.3.1    Each lead employed for field connections, including a battery clip lead assembly, shall withstand for 1 minute a pull of 10 pounds-force (44.5 N) without any evidence of damage or of transmittal of stress to internal connections.

## 72  Power Supply Tests

### 72.1    General

72.1.1    If a separate power supply is used to provide energy to one or more detectors, it is to be subjected to the test in 72.2.1 — 72.3.2.

### 72.2    Volt-amperes capacity

72.2.1    The volt-amperes capacity of the output circuit of a power supply that is separate from the detectors shall not be more than 100 volt-amperes and not more than 30 volts, 60 hertz rms, 42.4 volts peak or dc.

**74.2**  For 74.1 (a) and (b), the supply voltage to the detectors in the Fire Test and Smoldering Smoke Test shall be at the voltage indicated for the applicable test.  For detectors employing a battery as the main power supply, the test voltage shall be at the trouble signal level, unless the minimum sensitivity is measured at rated battery voltage.

## 75  Accelerated Aging Test (Optional Long-Term Stability Test)

**75.1**  This test is an alternate test method to the 90-day stability test requirements of 44.1 (a) and (b).

**75.2**  A detector shall operate for its intended signaling performance after being subjected for 14 days to an ambient temperature of 66 ±3°C (150 ±6°F) 0 — 10 percent relative humidity, followed by 10 cycles of change of air velocity from 0 to 300 ±25 fpm (0 to 1.5 ±0.13 m/s).  No false alarms shall occur during or following the aging or during exposure to the changes in air velocity.

**75.3**  Sensitivity measurements using gray smoke, recorded before and after the exposures shall be in compliance with the Sensitivity Test, Section 38, and shall not vary more than 1 percent per foot obscuration (0.014 optical density per meter) from the value recorded prior to the aging.

**75.4**  Two samples, one at maximum and one at minimum sensitivity, or both at the sensitivity that is most likely to be affected by the test temperature (as determined during the Variable Ambient Temperature Test, Section 51) are to be placed in a circulating air oven and energized for a period of 14 days from a source of rated voltage and frequency.  Following removal, the energized samples are to be permitted to cool to room temperature for at least 24 hours and subjected, in turn, to 10 cycles of the change of air velocity test described in 44.1(e) and then to the Sensitivity Test, Section 38. Batteries need not be subjected to the elevated ambient temperature.

## 76  Drop Test

**76.1**  This test is to be conducted only on detectors intended for transient use, such as a travel alarm, and is not to be conducted on detectors intended for stationary installation.

**76.2**  A detector shall withstand five drops from a height of 7 feet (2.1 m) onto a tiled concrete floor without exposure of internal high-voltage parts or affecting its intended operation and sensitivity.  The sample is to be held so that each impact with the floor is at a different location on the detector. Dislodgement of parts is permitted if:

a)  The dislodged part does not affect operation or sensitivity of the unit,

b)  The dislodged part can be replaced (such as a cover),

c)  There are no high-voltage parts exposed, and

d)  The condition is visually obvious.

**76.3**  Each of two detectors is to be raised to a height of 7 feet (2.1 m) and permitted to drop five times onto a concrete floor covered with a 1/8 inch (3.2 mm) thick uncushioned vinyl tile. Following the drops, the unit is to be examined for damage and tested for sensitivity. Sensitivity measurements, recorded after the drop test, shall vary not more than 1 percent per foot obscuration (0.014 optical density per meter) from the value recorded prior to the test, and shall not, in any case exceed the limits specified in 38.1.1.





80.2  Two detectors, one at maximum and one at minimum sensitivity, are to be subjected to vibration for 120 hours in accordance with the Vibration Test, Section 60. Sensitivity measurements are to be recorded before and after the test.

## 81 Contamination Test (Cooking By-Products)

81.1  After exposure in accordance with 81.2 — 81.5, a detector shall not false alarm or otherwise be adversely affected. Sensitivity measurements following the exposure shall not be greater than 1 percent per foot in the direction of low sensitivity, may be greater than 1 percent per foot in the direction of high sensitivity, but in no case shall exceed the limits of the Sensitivity Test, Section 38.

81.2  Two samples are to be subjected to the vaporization of a mixture of 50 grams of animal fat (lard), 50 grams of vegetable fat (Crisco), and 100 grams of beef gravy (Franco-American). The mixture is to be placed in an 8 inch (203 mm) diameter aluminum plate that is heated on an 8-1/2 inch (216 mm) diameter hotplate located on the bottom center of a galvanized sheet metal enclosure.

81.3  The enclosure is to measure approximately 3 feet (914 mm) high, 16 inches (406 mm) square and have an open top and a 16 inch square opening at the bottom of one side. A sheet metal cover, approximately 18 inches (457 mm) square, with 1 inch (25 mm) flanges, is to be supported at the enclosure top by 7/8 inch (20 mm) high standoffs. See Figure 81.1.

81.4  The detector under test is to be supported on the end of a threaded (1/4 inch (61 mm) steel rod positioned so that the exposed face of the detector is approximately 12 inches (304 mm) below the enclosure cover and 16 inches (406 mm) above the aluminum plate. The detector is not to be energized during the test.

81.5  Each sample is to be subjected to five complete vaporization exposures. Following the fifth exposure, each sample is to be removed, permitted to cool for at least 3 hours, and then tested for sensitivity as specified in the Sensitivity Test, Section 38.



## MANUFACTURING AND PRODUCTION TESTS

### 82  General

82.1   To verify compliance with these requirements in production, the manufacturer shall provide the necessary production control, inspection and tests.  The program shall include at least the Sensitivity Calibration Tests, Section 83, and the Photocell Illuminating Lamp Test (Photoelectric Detectors), Section 84, conducted on 100 percent of the production.

### 83  Sensitivity Calibration Tests

83.1   The sensitivity of each detector shall be checked, following the warm-up period recommended by the manufacturer, using appropriate instruments to determine that the sensitivity levels are within the marked rating including tolerance, which is within the specified limits of the detector.  The test equipment shall verify the value or range of sensitivities marked on the detector.  The value of indication shall be in the form of percent per foot obscuration.

83.2   For the warm-up period, the detectors are to be energized from a source of supply in accordance with 34.3.1.  If the detector sensitivity is not within the manufacturer's specifications, the unit is to be corrected and retested.  If a retested sample is still outside the specification, it is to be rejected.

83.3   A warm-up period is required for those detectors employing components whose characteristics are likely to vary during initial warm-up, such as solid-state devices operating at greater than 25 percent of rating, lamp filaments, resistors, and other components that affect sensitivity.

83.4   A warm-up period is not required if the detector components are operated at not more than 25 percent of rating in the standby condition or if the individual components are burned-in prior to assembly.

### 84  Photocell Illuminating Lamp Test (Photoelectric Detectors)

84.1   The manufacturer shall provide facilities for measurement of all the photocell illuminating lamps, including any replacement lamps which may be provided, to determine that the illumination output is uniform and within the specifications for the intended use.

### 85  Production Line Dielectric Voltage-Withstand Tests

85.1   Each detector rated at more than 30 volts ac rms (42.4 volts dc or ac peak) shall withstand, without breakdown, as a routine production-line test, the application of an essentially sinusoidal ac potential of a frequency within the range of 40 — 70 hertz, or a dc potential, between high-voltage live parts and the enclosure, high-voltage live parts and exposed dead metal parts, and live parts of circuits operating at different potentials or frequencies.  The test potential is to be:

   a)   For a detector rated at 250 volts ac rms or less — either 1000 volts (1414 volts, if a dc potential is used) applied for 60 seconds or 1200 volts (1697 volts, if a dc potential is used) applied for 1 second.

   b)   For a detector rated at more than 250 volts — either 1000 volts plus twice the rated voltage (1414 volts plus 2.828 times the rated ac rms voltage, if a dc potential is used) applied for 60 seconds or 1200 volts plus 2.4 times the rated voltage (1697 volts plus 3.394 times the rated ac rms voltage, if a dc potential is used) applied for 1 second.

   *Exception:   A product, the housing of which is entirely comprised of polymeric materials, need not be subjected to this test if there are no exposed dead metal parts that may become energized under fault conditions.*



# MARKING

## 88 General

88.1   A detector shall be permanently marked with the following information unless specifically indicated that it may appear on the installation wiring diagram.  The marking shall be in a contrasting color, finish, or equivalent.  Unless the letter height is specified, all markings shall be at least 3/64 inch (1.2 mm) high.

a)   Name or identifying symbol and address of the manufacturer or private labeler.

b)   Model number and date of manufacture, or equivalent.

c)   Electrical rating; in volts, amperes, or watts, and frequency.  Not required for battery operated detectors.

d)   Correct mounting position if a unit is intended to be mounted in a definite position.  (May appear in the installation instructions.)

e)   Identification of lights, switches, meters, and the like regarding their function unless their function is obvious.

f)   Maximum rating of fuse in each fuseholder and temperature rating of supplementary heat detector, if provided, in degrees Fahrenheit and Celsius.

g)   Identification of spare lamps and batteries by part number, manufacturer's model number or equivalent. Located adjacent to the component.

h)   Reference to an installation diagram and/or owner's manual.

i)   For a detector that employs a radioactive material, the following information shall be indicated directly on the exterior (back of detector acceptable) of the unit:

1)   The statement "CONTAINS RADIOACTIVE MATERIAL,"

2)   Name or Radionuclide and quantity (no abbreviations), and

3)   The statement, "U.S. NRC License No. XXX." (XXX — No. of License) or the name of the Licensee.

j)   A detector not intended to be painted in use shall be marked on the outer surface of the enclosure with the following or equivalent notice: "Do Not Paint." The letters shall not be less than 1/8 inch (3.2 mm) high and shall be located so as to be readily visible after the detector is mounted in its intended manner.  See 67.1.

k)   The following or equivalent qualifying statement on a battery-operated detector where battery operation, under other than normal room temperature conditions during the long term (minimum 1 year) battery tests, is less than 1 year:

"CONSTANT EXPOSURES TO HIGH OR LOW TEMPERATURES OR HIGH HUMIDITY MAY REDUCE BATTERY LIFE."

Applicable wording shall be used.

88.5   If a manufacturer produces detectors at more than one factory, each such assembly shall have a distinctive marking to identify it as the product of a particular factory.

88.6   With regard to the requirement in 8.2, a warning flag, hinged cover as described in 8.1 (inside or outside), or equivalent, shall be marked with the word "WARNING" and the following or equivalent text: "Risk of Fire — Battery Has Been Removed." The letter height shall be a minimum of 3/8 inch (9.5 mm).

## 89  Packaging Marking

89.1   The point-of-sale carton, in which a detector employing a radionuclide is packaged, shall be permanently marked on the exterior with the following information.  The letter height shall be at least 3/64 inch (1.2 mm) high and shall be in contrasting color, finish, or equivalent.

    a)   Name of radionuclide and amount (no abbreviations).

    b)   The statement, "U.S. NRC License No. XXX" (XXX — No. of License) or the name of the Licensee.

    c)   The following or equivalent statement:

       "THIS DETECTOR CONTAINS RADIOACTIVE MATERIAL AND HAS BEEN MANUFACTURED IN COMPLIANCE WITH U.S. NRC SAFETY CRITERIA IN 10 CFR 32.27. THE PURCHASER IS EXEMPT FROM ANY REGULATORY REQUIREMENTS."

# INSTRUCTIONS



## 90  General

90.1   Each single and multiple station smoke detector shall be provided with installation instructions which shall include the following information.

    a)   Typical installation drawing layouts for the unit(s) indicating recommended locations and wiring methods which shall be in accordance with Household Fire Warning Equipment, ANSI/NFPA 74. Locations where detector installations are not recommended shall also be included.

    b)  -  Description of the operation, testing, and proper maintenance procedures for the unit(s). The frequency of testing shall be in accordance with NFPA 74.

    c)   Replacement parts, such as lamps or batteries, shall be identified in the instructions by a part number, manufacturer's model number, or the equivalent, and information included as to where a homeowner can obtain the part.



7)    Name and address of firm to whom detector is to be sent for servicing.

8)    The following notice: THIS EQUIPMENT SHOULD BE INSTALLED IN ACCORDANCE WITH THE NATIONAL FIRE PROTECTION ASSOCIATION'S STANDARD 74 (National Fire Protection Association, Batterymarch Park, Quincy, MA 02269).

l)    For detector-transmitters intended to be installed with compatible audible signal receiver units, instructions shall include the limitations of use in typical single level and multilevel dwelling units as well as in apartment buildings where adjacent apartments may have similar systems.

m)    For detectors also acceptable for installation in recreational vehicles, the word "WARNING," and the following or equivalent text: "TEST SMOKE DETECTOR OPERATION AFTER VEHICLE HAS BEEN IN STORAGE, BEFORE EACH TRIP, AND AT LEAST ONCE PER WEEK DURING USE.  An identical marking is to be provided by the recreational vehicle manufacturer that shall be permanent and located, visibly, within 24 inches (610 mm) of the smoke detector."

90.2    The instructions may be incorporated on the outside of the unit, on a separate sheet, or as part of a manual.  If not included directly on the device, the instructions or manual shall be referenced in the marking information on the unit.

90.3    The material shipped with the detector, including the package, instructions, or user's manual, shall not include information other than that specified in 90.1, such as manufacturer's claims on the operation of the detector which have not been substantiated by the performance tests included in this standard, or that are not covered in Household Fire Warning Equipment, ANSI/NFPA 74 or other applicable NFPA standards.




  d)   Add all individual failure rates of critical and conditionally critical components to obtain the overall failure rate for the detector.

Note:    Mil-specification numbers in Tables SA2.4 and SA2.5 are provided for reference only to determine general component type.

### Table SA2.1
### Generic failure rate for standard bipolar digital devices
### (TTL and DTL) in failures per million hours

| Circuit complexity | Failure rate |
|---|---|
| 1 to 20 Gates[a] | 0.029 |
| 21 to 50 Gates | 0.062 |
| 51 to 100 Gates | 0.094 |
| 101 to 500 Gates | 0.38 |
| Greater than 500 Gates | 6.0 |
| Memories, less than or equal to 1000 Bits | 0.30 |
| Memories 1001 to 4000 Bits | 0.70 |
| Memories 4001 to 8000 Bits | 1.2 |
| [a] Assume 1 Gate is equivalent to four transistors. | |

### Table SA2.2
### Generic failure rate for standard bipolar beam lead and ECL, bipolar and MOS linear,
### and all other MOS devices in failures per million hours

| Circuit complexity | Failure rate |
|---|---|
| 1 to 20 Gates[a] | 0.048 |
| 21 to 50 Gates | 0.19 |
| 51 to 100 Gates | 0.31 |
| 101 to 500 Gates | 1.4 |
| Greater than 500 Gates | 23 |
| Linear, less than or equal to 32 transistors | 0.052 |
| Linear, 33 to 100 transistors | 0.12 |
| Memories, less than or equal to 1000 Bits | 1.2 |
| Memories 1001 to 4000 Bits | 2.7 |
| Memories 4001 to 8000 Bits | 4.5 |
| [a] Assume 1 Gate is equivalent to four transistors. | |



### Table SA2.4
### Generic failure rate for resistors in failures per million hours

| Resistors, fixed | | | |
|---|---|---|---|
| Construction | Style | Mil–R–Spec. (ref. only) | Failure rate |
| Composition | RCR | 39008 | 0.002 |
| Composition | RC | 11 | 0.01 |
| Film | RLR | 39017 | 0.015 |
| Film | RL | 22684 | 0.075 |
| Film | RNR | 55182 | 0.017 |
| Film | RN | 10509 | 0.017 |
| Film, power | RD | 11804 | 0.96 |
| Wire wound, accurate | RBR | 39005 | 0.056 |
| Wire wound, accurate | RB | 93 | 0.28 |
| Wire wound, power | RWR | 39007 | 0.033 |
| Wire wound, power | RW | 26 | 0.17 |
| Wire wound, chassis mount | RER | 39009 | 0.062 |
| Wire wound, chassis mount | RE | 18546 | 0.31 |
| | | | |
| **Resistors, variable** | | | |
| | | | |
| Wire wound, trimmer | RTR | 39015 | 0.066 |
| Wire wound, trimmer | RT | 27208 | 0.33 |
| Wire wound, precision | RR | 12934 | 2.7 |
| Wire wound, semi-precision | RA | 19 | 2.3 |
| Wire wound, semi-precision | RK | 39002 | 2.3 |
| Wire wound, power | RP | 22 | 2.3 |
| Non-wire wound, trimmer | RJ | 22097 | 4.6 |
| Composition (common pot) | RV | 94 | |
|   factory preset and sealed | | | 0.46 |
|   field variable | | | 3.7 |



### Table SA2.6
### Generic failure rate for miscellaneous parts in failures per million hours

| Part type | Failure rate |
|---|---|
| Pulse transformer | 0.0027 |
| Audio transformer | 0.0066 |
| Power transformer and filters | 0.021 |
| RF transformers and coils | 0.022 |
| Connectors | 0.45 |
| Connections | |
| solder, reflow lap to printed circuit boards | 0.00012 |
| solder, wave to printed circuit boards | 0.00044 |
| other hand solder connections (e.g., wire to terminal board) | 0.0044 |
| crimp | 0.0073 |
| weld | 0.002 |
| wirewrap | 0.0000037 |
| Coaxial connectors | 0.63 |
| Toggle switches | 0.57 |
| Push button switches | 0.38 |
| Sensitive switches | 0.90 |
| Rotary switches | 1.4 |
| General purpose relays | 0.30 |
| High current relay | 1.0 |
| Latching relays | 0.29 |
| Reed relays | 0.26 |
| Meters and bimetal | 5.7 |
| Two sided printed wiring boards | 0.0024 |
| Multilayer printed wiring board | 0.30 |
| Quartz crystals | 0.20 |
| Thermistor | |
| bead | 0.10 |
| disc | 0.31 |
| Fuses | 0.10 |
| Neon lamps | 0.20 |
| Photocells | 0.02 |
| Light emitting diodes (LED) | |
| General use (indicator light) | 0.20 |
| Light source of photoelectric detectors | 2.50[a] |

[a] This is the maximum value permitted and is based on the failure rate of half light output. Selected LED's having projected lower failure rates at half light output are usually employed. The reliability is to be evaluated on data supplied by LED manufacturer.



**Table SA2.10**
**Detector reliability prediction – parts count method sample calculation**

| Component | Generic failure rate (A) | Quality factor multiplier (B) | Failure rate failures/$10^6$ hrs A times B |
|---|---|---|---|
| Composition resistor | 0.01 | 1 | 0.01 |
| Composition resistor | 0.01 | 1 | 0.01 |
| Composition resistor | 0.01 | 1 | 0.01 |
| Film resistor | 0.075 | 1 | 0.075 |
| Film resistor | 0.075 | 1 | 0.075 |
| Wire wound resistor, power | 0.17 | 1 | 0.17 |
| Capacitor, plastic | 0.006 | 1 | 0.006 |
| Capacitor, plastic | 0.006 | 1 | 0.006 |
| Capacitor, tantalum, solid | 0.026 | 1 | 0.026 |
| Capacitor, dry electrolyte | 0.41 | 1 | 0.41 |
| Transistor, silicon NPN | 0.18 | 0.3 | 0.05 |
| Transistor, silicon NPN | 0.18 | 0.3 | 0.05 |
| Thyrister (SCR) | 0.16 | 1 | 0.16 |
| Diode, silicon | 0.12 | 1 | 0.12 |
| Diode, silicon | 0.12 | 1 | 0.12 |
| Relay, reed | 0.26 | 1 | 0.26 |
| Relay, general purpose | 0.30 | 1 | 0.30 |
| Connector | 0.45 | 1 | 0.45 |
| Printed wiring board | 0.0024 | 1 | 0.0024 |
| Switch, push button | 0.38 | 1 | 0.38 |
| Potentiometer, factory preset | 0.46 | 1 | 0.46 |
| LED (indicator lamp) | 0.20 | 1 | 0.20 |
| TOTAL DETECTOR FAILURE RATE | | | 3.371 |

### Table SA2.11 (Cont'd)
### Parts stress analysis method references

| Type device | Applicable equation | MIL-HDBK-217B 9/20/74 page reference |
|---|---|---|
| RV Composition Potentiometers | $\lambda_p = \lambda_b \times \pi_{TAPS}(\pi_R \times \pi_V \times \pi_Q \times \pi_E)$ | 2.5.6-5 |
| CPV Paper and Plastic Film, Est. Rel. CHR Metalized Paper, Est. Rel. CQ & CQR Paper and Plastic Film, ER & NON-ER | $\lambda_p = \lambda_b(\pi_E \times \pi_Q)$ | 2.6.1-1 |
| CM Mica Molded, CMR Mica Dipped, Est. Rel. | $\lambda_p = \lambda_b(\pi_E \times \pi_Q)$ | 2.6.2-1 |
| CB Button Mica | $\lambda_p = \lambda_b \ (\pi_E) \ (\pi_Q)$ | 2.6.2-3 |
| CYR Glass Capacitors, Est. Rel. | $\lambda_p = \lambda_b(\pi_E \times \pi_{CV} \times \pi_Q)$ | 2.6.3-1 |
| CK Ceramic, General Purpose, CKR Ceramic, General Purpose, Est. Rel. | $\lambda_p = \lambda_b(\pi_E \times \pi_Q)$ | 2.6.4-1 |
| CC Ceramic, Temperature Compensating | $\lambda_p = \lambda_b \ (\pi_E) \ (\pi_Q)$ | 2.6.4-5 |
| CSR Solid Tantalum Electrolytic, Est. Rel. | $\lambda_p = \lambda_b(\pi_E \times \pi_{SR} \times \pi_Q)$ | 2.6.5-1 |
| CLR Nonsolid Tantalum, Est. Rel., CL Nonsolid Tantalum, NON Est. Rel. | $\lambda_p = \lambda_b(\pi_E \times \pi_Q)$ | 2.6.5-3 |
| CU Aluminum Oxide Electrolytic | $\lambda_p = \lambda_b(\pi_E) \times \pi_Q$ | 2.6.6-1 |
| CE Aluminum, Dry Electrolyte | $\lambda_p = \lambda_b(\pi_E) \times \pi_Q$ | 2.6.6-3 |
| CV Variable Ceramic Capacitors | $\lambda_p = \lambda_b(\pi_E) \times \pi_Q$ | 2.6.7-1 |
| PC Variable, Piston Type Tubular Trimmer | $\lambda_p = \lambda_b(\pi_E) \times \pi_Q$ | 2.6.8-1 |
| Transformers | $\lambda_p = \lambda_b(\pi_E \times \pi_F)$ | 2.7-1 |
| Motors High Speed | $\lambda_p = (\lambda_E + \lambda_W) \pi_E$ | 2.8.1-1 |
| Blowers | $\lambda_p = \lambda_E + \lambda_W$ | 2.8.2-1 |
| Relays | $\lambda_p = \lambda_b(\pi_E \times \pi_C \times \pi_{CYC} \times \pi_F)$ | 2.9-1 |
| Switches, Snap-Action Toggle or Pushbutton | $\lambda_p = \lambda_b(\pi_E \times \pi_C \times \pi_{CYC})$ | 2.10-1 |
| Basic Sensitive Switches | $\lambda_p = \lambda_b(\pi_E \times \pi_{CYC})$ | 2.10-2 |
| Rotary, Ceramic or Glass Wafer Silver Alloy Contacts | $\lambda_p = \lambda_b(\pi_E \times \pi_{CYC})$ | 2.10-3 |
| Connectors | $\lambda_p = \lambda_b(\pi_E \times \pi_p) + N\lambda_{CYC}$ | 2.11-1 |

Note: $\pi_Q$ multiplier same as for JAN Class C if Table SA5.1 screening is conducted



SA2.2    PARTS STRESS ANALYSIS METHOD[b] — The failure rate is calculated using the procedure in MIL-HBK-217B, Section 2. Calculations and supporting data on rating of components for the determination will be required for review. See also Table SA2.11 and Figure SA2.1 for equations and tabulation sheets.

[b] If a Mil-Spec component is required in a detector but does not employ a specific marking to that effect, it will be necessary for the detector manufacturer to provide documentation to verify that the component is Mil-Spec graded. The documentation may be in the form of a shipping order, invoice, or equivalent, provided by the component vendor.

SA2.3    SCREENING BURN-IN METHOD — This method is required for the evaluation of custom integrated circuit "chips" although it may also be applied to any other component of a detector, including generic "chips." The evaluation shall consist of a burn-in test program to determine the numerical failure rate coupled with a minimum quality assurance screening program for all production units. Refer to Sections SA4 — SA6.

SA2.4    ALTERNATE METHOD (GENERIC DEVICES ONLY) — An alternate for generic components only shall consist of the burn-in test program to determine the numerical failure rate coupled with the component manufacturer's standard screening program which is employed for the device family[c] of the component. The condition of acceptance of the limited screening shall include the following:

a)    A test sample lot shall be screened in accordance with the component manufacturer's standard program and then subjected to the burn-in test described in Sections SA4 — SA6.

b)    The component manufacturer shall provide failure rate data on the particular device being tested or the device family[c] from a second source, such as field failure rate data or a separate burn-in test.

c)    A comparison of the burn-in test data from (a) and (b) shall be made and results from (a) shall not be worse than those in (b) by one order of magnitude (10:1).

[c] Similar devices manufactured under same process and design rules.

SA2.5    PUBLISHED RELIABILITY DATA — This method may be employed for the evaluation of generic integrated circuit "chips" as well as any other component of a detector, except for a custom "chip." The evaluation is derived by the use of generic failure rate data from industry and military recognized publications on component reliability based on field accumulated data. Examples of such publications include "Micro-Circuit Device Reliability," "Linear/Interface Data and Micro-Circuit Device Reliability," "Digital Generic Data." Devices evaluated by this method shall conform to the identification program in SA4.3, and minimum screening program of Table SA5.1.

SA2.6    The overall failure rate of the components of a detector may be evaluated by any combination of two or more of the failure rate determination methods described in SA2.1, SA2.2, SA2.3, SA2.4, and SA2.5.

### Table SA5.1
### Minimum screening program

| Hermetic Packages | |
|---|---|
| 1.  Internal visual (Method 2010.1, condition B modified) | 100 percent[a] |
| 2.  Bond strength (Method 2011) | Sample basis[a] |
| 3.  Stabilization bake (Method 1008C, 150°C, 24 hours) | 100 percent[b] |
| 4.  Temperature cycling (Method 1010C, -55°C to 150°C, 10 cycles) | 100 percent[c] |
| 5.  Seal (Fine leak, Method 1014B, $5 \times 10^{-8}$ CC/sec) | 100 percent[d] |
| 6.  Seal (Gross leak – 1014B fluorocarbon) | 100 percent |
| 7.  Functional electrical, 25°C | 100 percent |
| 8.  External visual, Method 2009 | 100 percent |
| 9.  Quality conformance | AQL 1.5% per MIL-STD 105 Level II |
|     a)  Functional electrical, 25°C | |
|     b)  Temperature cycling (Method 1010C, -55°C to 150°C, 10 cycles) | |
|     c)  Seal (Fine leak, Method 1040B, $5 \times 10^{-8}$ CC/sec)[c] | |
|     d)  External visual, Method 2009 | |
| **Plastic packages** | |
| 1.  Internal visual (Method 2010.1, condition B modified) | 100 percent[a] |
| 2.  Bond strength (Method 2011) | Sample basis[a] |
| 3.  Temperature cycling (Method 1010C, -55°C to 150°C, 10 cycles) | 100 percent[e,f] |
| 4.  Functional electrical test, 25°C | 100 percent |
| 5.  External visual, Method 2009 | 100 percent |
| 6.  Quality conformance | AQL 1.5% per MIL-STD 105 Level II |
|     a)  Functional electrical test, 25°C | |
|     b)  Temperature cycling (Method 1010C, -55°C to 150°C, 10 cycles) | |
|     c)  External visual, Method 2009 | |



(Continued)



**Figure SA6.1**
**Time-temperature regression and allowable time limits for test condition**



S2486

## SA6.3    Test calculations and procedures

SA6.3.1    Figure SA6.1 illustrates basic curves which represent burn-in test conditions of a device of 1000 hours for initial conditional acceptance and is continued to 3000 hours for final acceptance when tested at an elevated temperature of 125°C (251°F).

SA6.3.2    The elevated test temperature and related time periods (using the illustrated curves) may be increased or decreased except the minimum selected temperature for the burn-in test shall be not less than 100°C (212°F).

SA6.3.3    The following examples illustrate the use of the curves in Figure SA6.1 for calculations of final and initial conditional acceptance at temperatures other than 125°C (251°F).

    a)    Example 1 — Assuming a test temperature of 150°C (302°F):

        1)    Time for Initial Conditional Acceptance — 167 hours (using Curve A).

        2)    Time for Final Acceptance — 650 hours (using Curve B).

    b)    Example 2 — Assuming a test temperature of 100°C (212°F):

        1)    Time for Initial Conditional Acceptance — 5700 hours (using Curve A).

        2)    Time for Final Acceptance — 25,000 hours (using Curve B).



## SA6.4   Test conditions

SA6.4.1    Suitable sockets or other mounting means shall be provided to make firm electrical contact to the terminals of devices under test in the specified circuit configuration. The mounting means shall be so designed that they will not remove internally dissipated heat from the device by conduction, other than that removed through the device terminals and the necessary electrical contacts, which shall be maintained at or above the specified ambient temperature. The apparatus shall provide for maintaining the specified biases at the terminal of the device under test and, when specified, monitoring of the input excitation. If the device incorporates on board elements which directly drive such things as the detector horn, battery pulse test or beacon LED of a photoelectric smoke detector, these shall be pulsed during the test for a number of cycles equivalent to the operation life of the intersection of curve B, Figure SA6.1, with the 38°C (100°F) line.

SA6.4.2    Power supplies and current-setting resistors shall be capable of maintaining the specified operating conditions, as minimal throughout the testing period with normal variations in their source voltages, ambient temperatures, and the like. The test equipment shall preferably be so arranged that only natural convection cooling of the devices occurs. When test conditions result in significant power dissipation, the test apparatus shall be arranged so as to result in the approximate average power dissipation for each device whether devices are tested individually or in a group. The test circuits need not compensate for normal variations in individual device characteristics but shall be arranged so that the existence of failed or abnormal (that is, open, short, or the like) devices in a group does not negate the effect of the test for other devices in the group.

## SA6.5   Failure rate number calculation

SA6.5.1    The following equation is to be used in determining the initial conditional and final failure rates for the device in concert with the burn-in test. Extrapolations are made from the selected elevated test temperature to the 38°C smoke detector operating condition by use of the Arrehenius Equation.

$$\lambda = \lambda_o^{\left(\frac{-E}{KT}\right)}$$

In which:

A is the failure rate per million hours

A is the constant

E is the activation energy in electron volts (ev) (varies between 0.65 ev to 1.1 ev for a large number of integrated circuits). Documentation shall be provided to support value employed. If documentation is not provided, value of 0.65 ev is to be used.

K is Boltzman's constant (8.62 X $10^{-5}$ ev/°K).

T is the absolute temperature in degrees Kelvin.



**Then**

$$\lambda_1 = \lambda_2 \; \ln^{-1}\left[\frac{-0.65}{8.62 \; x \; 10^{-5}}\left(\frac{1}{398} - \frac{1}{311}\right)\right]$$

In which:

$\lambda_1$ is 20 X $10^{-6}$ failures/hour.

$\lambda_1$ is 20 failures/$10^6$ hour.

$\lambda_1$ is 0.02 failure/1000 hour.

$\lambda_1$ is 2.0 percent/1000 hour.

e)   Referring to Table SA6.1, the following sample lot size for the appropriate accept number (C — the number of failures or less) can be used at the conditional acceptance point (1000 hours).  For 2.0%/1000 hours:

C = 0  N = 47
C = 1  N = 109
C = 2  N = 155, and the like.

From the equation and Table SA6.1, with no failures from a sample lot size of 47 at a test ambient of 125°C, the failure rate is 0.1 Failure/$10^6$ hours at the conditional acceptance point of 1000 hours.  The failure rate may be less at the final acceptance point of 3000 hours.



A2        SINGLE AND MULTIPLE STATION SMOKE DETECTORS — UL 217        MAY 10, 1993

## Obscuration – optical density chart (Cont'd)
### Based on a 5 foot (1.52 m) light beam

| Light transmission (meter reading) (microamperes) | Obscuration (Ou) | | Total obscuration Od | Optical density (OD) | | Total optical density ODt |
|---|---|---|---|---|---|---|
| | Percent per foot | Percent per meter | | Per foot | Per meter | |
| 78.5 | 4.73 | 14.64 | 21.5 | 0.0210 | 0.0690 | 0.1051 |
| 78.0 | 4.85 | 15.04 | 22.0 | 0.0215 | 0.0708 | 0.1079 |
| 77.5 | 4.97 | 15.40 | 22.5 | 0.0221 | 0.0726 | 0.1107 |
| 77.0 | 5.09 | 15.76 | 23.0 | 0.0227 | 0.0745 | 0.1135 |
| 76.5 | 5.22 | 16.12 | 23.5 | 0.0232 | 0.0763 | 0.1163 |
| 76.0 | 5.34 | 16.48 | 24.0 | 0.0238 | 0.0782 | 0.1191 |
| 75.5 | 5.47 | 16.84 | 24.5 | 0.0244 | 0.0801 | 0.1220 |
| 75.0 | 5.59 | 17.20 | 25.0 | 0.0249 | 0.0820 | 0.1249 |
| 74.5 | 5.72 | 17.56 | 25.5 | 0.0255 | 0.0839 | 0.1278 |
| 74.0 | 5.84 | 17.93 | 26.0 | 0.0261 | 0.0858 | 0.1307 |
| 73.5 | 5.97 | 18.29 | 26.5 | 0.0267 | 0.0877 | 0.1337 |
| 73.0 | 6.10 | 18.66 | 27.0 | 0.0273 | 0.0897 | 0.1366 |
| 72.5 | 6.23 | 19.02 | 27.5 | 0.0279 | 0.0916 | 0.1396 |
| 72.0 | 6.36 | 19.39 | 28.0 | 0.0285 | 0.0936 | 0.1426 |
| 71.5 | 6.49 | 19.76 | 28.5 | 0.0291 | 0.0956 | 0.1456 |
| 71.0 | 6.62 | 20.13 | 29.0 | 0.0297 | 0.0976 | 0.1487 |
| 70.5 | 6.75 | 20.50 | 29.5 | 0.0303 | 0.0996 | 0.1518 |
| 70.0 | 6.89 | 20.87 | 30.0 | 0.0309 | 0.1016 | 0.1549 |
| 69.5 | 7.02 | 21.24 | 30.5 | 0.0316 | 0.1037 | 0.1580 |
| 69.0 | 7.15 | 21.61 | 31.0 | 0.0322 | 0.1057 | 0.1611 |
| 68.5 | 7.29 | 21.98 | 31.5 | 0.0328 | 0.1078 | 0.1643 |
| 68.0 | 7.42 | 22.36 | 32.0 | 0.0335 | 0.1099 | 0.1674 |
| 67.5 | 7.56 | 22.73 | 32.5 | 0.0341 | 0.1120 | 0.1707 |
| 67.0 | 7.70 | 23.11 | 33.0 | 0.0347 | 0.1141 | 0.1739 |
| 66.5 | 7.84 | 23.49 | 33.5 | 0.0354 | 0.1163 | 0.1771 |
| 66.0 | 7.97 | 23.86 | 34.0 | 0.0360 | 0.1184 | 0.1804 |
| 65.5 | 8.11 | 24.24 | 34.5 | 0.0367 | 0.1206 | 0.1837 |
| 65.0 | 8.25 | 24.62 | 35.0 | 0.0374 | 0.1228 | 0.1870 |
| 64.5 | 8.40 | 25.00 | 35.5 | 0.0380 | 0.1250 | 0.1904 |
| 64.0 | 8.54 | 25.39 | 36.0 | 0.0387 | 0.1272 | 0.1938 |
| 63.5 | 8.68 | 25.77 | 36.5 | 0.0394 | 0.1294 | 0.1972 |
| 63.0 | 8.83 | 26.15 | 37.0 | 0.0401 | 0.1317 | 0.2006 |
| 62.5 | 8.97 | 26.54 | 37.5 | 0.0408 | 0.1339 | 0.2041 |
| 62.0 | 9.12 | 26.92 | 38.0 | 0.0415 | 0.1362 | 0.2076 |
| 61.5 | 9.26 | 27.31 | 38.5 | 0.0422 | 0.1385 | 0.2111 |
| 61.0 | 9.41 | 27.70 | 39.0 | 0.0429 | 0.1409 | 0.2146 |
| 60.5 | 9.56 | 28.09 | 39.5 | 0.0436 | 0.1432 | 0.2182 |
| 60.0 | 9.71 | 28.48 | 40.0 | 0.0443 | 0.1456 | 0.2218 |
| 59.5 | 9.86 | 28.87 | 40.5 | 0.0451 | 0.1480 | 0.2254 |
| 59.0 | 10.01 | 29.26 | 41.0 | 0.0458 | 0.1504 | 0.2291 |

NOTE – See 38.3.1.



# UL's Product Safety Publications and Standards Binders



## Catalog of Standards for Safety

Keep up to date on each one of more than 600 published UL Standards for Safety by requesting a copy of the catalog. Proposed standards, outlines, and Standards-on-Diskette are also included.

## Standards-on-Diskette

Play it Safe! Be able to access on your PC the most current UL Standards for Safety in print. Available in WordPerfect 5.1 on 3-1/2" and 5-1/4" diskettes, you can quickly and easily reference data including tables, drawings, and formulas. UL Standards-on-Diskette is fast, allows its user to review and research current requirements in seconds, and save time by eliminating manual searching methods. When ordering a diskette, you will also receive UL's Standard Subscription Service which provides a new diskette with updated requirements each time the Standard is revised, and each time a proposal bulletin is issued.



## Publications Catalog

The variety of publications and product services described in this catalog may surprise some people who only think of UL as a symbol on the back of a television or electric coffee maker. Gas appliances, roofing materials, industrial trucks, boats, burglar alarms, computers, lightning protection components, fire extinguishers — these are just a handful of the thousands of products that fall within the scope of UL's testing for public safety. Brochures for international services, consumer information and films, product directories, and inspection guides are among the 70-plus publications described in the catalog.



## Standards Update

Published quarterly, the UL Standards Update contains the latest information on UL's Standards for Safety, proposed standards, outlines of investigation, and Standards-on-Diskette. The Update also includes information on revisions, bulletins, UL test equipment, upcoming effective dates, and UL/CSA and international harmonization activities. The cost of the Update is $75 which includes shipping by regular First Class mail.

## Regular Binder

Heat-sealed blue vinyl with 2¼ inch rings will hold approximately 25 standards. The cost of Standards for Safety regular binders is $7 and includes shipping by regular First Class mail.

## Deluxe Binder

Stiff-finished, heavily-sized blue fabric cover with 2 full-length metal piano-type hinges is made to last. Swing-hinge construction takes less shelf space than conventional ring binder yet holds 33% more standards. Standards for Safety Deluxe Binders are sold for $30 and includes shipping by regular First Class mail.



To order any or all of these publications and binders, contact Publications Stock, Underwriters Laboratories Inc., 333 Pfingsten Road, Northbrook, IL 60062-2096. Phone (708) 272-8800, Ext. 42612 or 42622.



# Smoke Detector Operability Survey
# Report on Findings
### *(revised)*

## *October 1994*

**Charles L. Smith**
**Directorate for Economic Analysis**
**Consumer Product Safety Commission**





# I. Executive Summary

The Smoke Detector Operability Survey was done to fill a need for new field data on the numbers and types of smoke detectors installed in households, the proportion of installed smoke detectors that are working, the ways in which smoke detectors are failing, factors leading to non-working detectors, and types of households or housing that are more likely to have non-working smoke detectors. A total of 1,012 in-person interviews were conducted from October 1 through December 23, 1992: 811 from the main sample and an additional 201 field interviews of lower socioeconomic status (lower SES) households. All aspects of the full survey were conducted by Market Facts, Inc., under contract to the CPSC.

The results of the survey will provide support for the major elements of the National Smoke Detector Project, which are intended to increase the presence of working smoke detectors in U.S. households. The National Smoke Detector Project is a joint project among the Consumer Product Safety Commission (CPSC), the Congressional Fire Services Institute, the U.S. Fire Administration (USFA), and the National Fire Protection Association (NFPA). The Department of Housing and Urban Development and many other organizations are also project participants and have a strong interest in the results of the survey.

The survey found that an estimated 88 percent of households (84.5 million) have at least one installed smoke detector. Of these, about 5 million had detectors connected to a central alarm system. The remaining 79.5 million households (or about 83 percent of all households) had non-central system detectors, and were the subject of the Smoke Detector Operability Survey. Some major findings of the survey are:

★ About 71 percent of the smoke detectors tested in the study operated by battery power only, and about 26 percent operated by AC power; most of these (91 percent) were hard-wired, rather than plug-in. About 2 percent of detectors were operated by a combination of AC power with backup battery power. The power source of 1 percent of the detectors could not be determined.



★ CPSC Engineering Laboratory evaluation of smoke detectors collected from the survey because of problems with nuisance alarms found three factors associated with nuisance alarms: 1) detector type -- 32 of 33 detectors collected for nuisance alarms were ionization detectors; 2) location -- 34 percent of the detectors collected for nuisance alarms were placed within 5 feet of the source of smoke, steam, or moisture; and 3) maintenance -- unless detectors are cleaned by vacuuming (recommended by many manufacturers), contaminants such as dirt, insects and spiders can increase their sensitivity, leading to an increase in nuisance alarms.

★ It appears that the significance of the low-battery warning "chirp" is widely misinterpreted as a nuisance alarm.

★ Households with incomes of less than $15,000 comprised an estimated 23 percent of all households with detectors; however, they accounted for 33 percent of those without at least one working detector ("inoperative households").



- ▸ renewed efforts to convince consumers to install detectors properly;

- ▸ additional efforts to expand adoption of smoke detector requirements by all jurisdictions;

- ▸ educational efforts to encourage consumers to maintain installed detectors and instruct them on how to avoid alarms when there is no fire ("nuisance alarms");

- ▸ efforts to stimulate development of new technology by industry; and,

- ▸ efforts to incorporate the new technology into standards and codes.

## III.  Description of the Survey and Sample

The survey sample was drawn using a clustered sample approach.  A sample of 40 ZIP Codes was used for interviewing respondents in a primary sample and in a sample of lower socioeconomic status (lower SES) households.  The sample locations were separated into urban and rural categories, with urban ZIP Codes defined as those residential ZIP Codes falling within a Metropolitan Statistical Area (MSA), and all others being categorized as rural ZIP Codes.  Of the 40 ZIP Codes that comprised the sampling locations, 30 were urban and 10 were rural, a stratification that reflects census estimates.

A total of 1,012 in-person interviews were conducted from October 1 through December 23, 1992:  811 from the main sample and an additional 201 lower SES field interviews.  The cooperation rate for the survey (completed interviews divided by completes plus refusals) was 74 percent.  All aspects of the full survey were conducted by Market Facts, Inc., under contract to the CPSC (OMB Clearance No. 3041-0111).  The survey questionnaire used by the field interviewers is attached as Appendix A.  A more detailed description of the survey, including the sample design and sampling procedures, is provided in a report prepared by Market Facts, *Smoke Detector Operability Study - Final Report* (September 23, 1993), which is available from the Office of the Secretary of the CPSC.

Forty-one percent of households with smoke detectors reported having more than one detector; only 13 percent reported having more than two detectors. The mean number of smoke detectors in households was 1.6. Table 1 below shows survey findings on the number of households with smoke detectors, by the number of detectors in the household. Fifty-five percent of households with smoke detectors had the same number of detectors as floors in their residence (including basements); 26 percent had fewer detectors than floors; and 19 percent had more detectors than floors. This means that at least 26 percent of households with smoke detectors did not have enough detectors to meet the requirement of every-level-protection endorsed by fire services. Some of the other 74 percent may not have had enough detectors to protect separated sleeping areas on the same floor.

The mean number of smoke detectors in lower SES households was 1.5, essentially the same as for households in the main survey sample. One-third (33 percent) of households in the lower SES sample had fewer smoke detectors than floors. However, the difference between this percentage and that found for the main sample (26 percent) was not statistically significant at a confidence level of 90 percent.

## Table 1.
# Households with Detectors
### (Millions of Households)

| Number of Detectors in Household | Households | % |
|---|---|---|
| One | 47.3 | 59 |
| More than One | 32.2 | 41 |
| Two | 22.2 | 28 |
| Three | 6.1 | 8 |
| Four or more | 3.9 | 5 |
| Total | 79.5 | |
| *Mean Number* | *1.6* | |

4

Table 2 shows the results of smoke detector power sources cross-tabulated with the presence of warnings or labels concerning radioactive materials in detectors (which, as noted above, signifies the likelihood that the detectors are ionization type, rather than photoelectric). As may be seen in Table 2, of those smoke detectors with radioactive material labels (probable ionization-type) for which the type of power source was known (comprising about 78 percent of detectors for which the type of power source was determined), an estimated 77 percent were powered by battery power only vs. only 54 percent of detectors without the labels (probable photoelectric detectors).

## Table 2.
## SMOKE DETECTOR POWER SOURCE
### BY THE PRESENCE OF A RADIOACTIVE MATERIAL LABEL

| POWER SOURCE | TOTAL | % OF TOTAL | % OF KNOWN POWER | RADIOACTIVE LABEL OR WARNING (SIGNIFYING PROBABLE IONIZATION-TYP | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | YES | % OF KNOWN POWER | NO | % OF KNOWN POWER | DON'T KNOW | % OF KNOWN POWER |
| BATTERY ONLY | 1,123 | 70% | 72% | 946 | 77% | 88 | 54% | 84 | 50% |
| AC - HARDWIRED | 366 | 23% | 23% | 222 | 18% | 65 | 40% | 76 | 45% |
| AC - PLUG-IN | 39 | 2% | 2% | 34 | 3% | 4 | 3% | 1 | 0% |
| COMBINATION, AC & BATTERY | 37 | 2% | 2% | 24 | 2% | 4 | 3% | 9 | 5% |
| UNDETERMINED | 18 | 1% | -- | 3 | | 0 | | 15 | |
| NO ANSWER | 25 | 2% | -- | 0 | | 0 | | 0 | |
| TOTAL (detectors) | 1,608 | | | 1,229 | | 161 | | 184 | |
| WITH KNOWN POWER | 1,565 | 97% | | 1,226 | 78% | 161 | 10% | 169 | 11% |
| PERCENT OF TOTAL | | | | 76% | | 10% | | 11% | |

Note: Based on detectors observed by survey field interviewers. Data from the lower SES sample have been combined with those from the main sample. Results have been weighted to account for over-sampling of low-income households.



6

Table 4 shows detector power sources depending on whether dwellings were owned or rented. An estimated 77 percent of detectors in owned dwellings were powered by battery-power only, compared to just 59 percent of detectors in rented dwellings. Conversely, although some form of AC-power was the power source of about 28 percent of the detectors surveyed for which the power type was determined, about 41 percent of detectors in rented dwellings were powered by AC. These findings, statistically significant at confidence levels greater than 95 percent, are linked to those discussed above for power source by dwelling type, since a much higher percentage of apartments and condominiums are rental units (85 percent) than is true for single family site-built homes (about 17 percent).

## Table 4.

## SMOKE DETECTOR POWER SOURCE, BY OWNED OR RENTED DWELLINGS

| POWER SOURCE | OWNED DWELLINGS | | RENTED DWELLINGS | | TOTAL | |
|---|---|---|---|---|---|---|
| | NUMBER OF DETECTORS | % OF KNOWN POWER | NUMBER OF DETECTORS | % OF KNOWN POWER | NUMBER OF DETECTORS | % OF KNOWN POWER |
| BATTERY ONLY | 858 | 77% | 264 | 59% | 1,123 | 72% |
| AC/HARD WIRE | 220 | 20% | 146 | 33% | 366 | 23% |
| AC/PLUG-IN | 24 | 2% | 14 | 3% | 39 | 2% |
| AC/BATTERY BACKUP | 17 | 2% | 20 | 5% | 37 | 2% |
| UNDETERMINED | 8 | -- | 10 | -- | 18 | -- |
| NO ANSWER | 21 | -- | 5 | -- | 25 | -- |
| TOTAL | 1,147 | | 459 | | 1,608 | |
| WITH KNOWN POWER SOURCE | 1,119 | 72% | 444 | 28% | 1,565 | |
| PERCENT OF TOTAL | 71% | | 29% | | | |

Note: Based on detectors observed by survey field interviewers. Data from the lower SES sample have been combined with those from the main sample. Results have been weighted to account for over-sampling of low-income households.



## C. Respondents' Observations and Actions Concerning Smoke Detectors

### 1. Perceptions of Smoke Detector Operability

Before smoke detectors were tested by the interviewers, respondents were asked questions about whether their detectors were working. Respondents were asked to give reasons for believing that all of their detectors were working, or why they thought that one or more were not working. Information on these perceptions is summarized in Tables 6 through 8.

### Table 6.
### Perceptions of Operability
#### (Millions of Households)

|  | Households | % |
|---|---|---|
| All Detectors Work | 62.0 | 78 |
| At Least One Doesn't Work | 8.6 | 11 |
| Don't Know | 8.8 | 11 |
|  | 79.5 | 100 |

### Table 7.
#### How Do You Know Detector(s) Work(s)?

|  | % |
|---|---|
| It Was Tested | 58.2 |
| Assume It Works/Unsure | 16.3 |
| Light Is On | 16.2 |
| Went Off With Smoke/Fire | 14.3 |
| Went Off While Cooking | 1.9 |
| New Detector/Batteries | 1.8 |
| Isn't Beeping/Battery Not Low | 1.0 |
| Other Reason | 0.9 |
| Steam/Bathroom Sets Off | 0.7 |
| Went Off (Not Specified) | 0.4 |
| Blew Smoke At It | 0.2 |
| No Answer | 0.1 |

Totals > 100% because of multiple answers
(of those believing all detectors were working)

### Table 8.
#### Why Do You Think Detector(s) Doesn't (Don't) Work?

|  | % |
|---|---|
| Battery Removed/Disconnected | 43.7 |
| Dead Battery | 29.0 |
| Beeps Continuously/Randomly | 5.9 |
| Defective/Tested & It Didn't Work | 5.3 |
| Non-working/Had Fire & It Didn't Work | 3.8 |
| AC Power Disconnected | 2.3 |
| Light Not On/Cover Missing | 0.6 |
| Other Reason | 5.5 |
| Don't Know | 16.5 |

Totals > 100% because of multiple answers
(of those thinking at least 1 detector wasn't working)

10

interviewers found that, for all households surveyed, nearly 20 percent of detectors did not have functioning power sources; about 5 percent of detectors had dead batteries, and the other 15 percent had missing or disconnected batteries or were disconnected from AC power. Owners of units with missing or disconnected batteries or units which were disconnected from AC power were asked why the detectors were not connected to a power source. Their responses are summarized in Figure 2.

## Figure 2.
## Reasons for Missing or Disconnected Batteries or Disconnected AC Power
(for 15 percent of detectors with missing or disconnected power sources)



As seen in Figure 2, just over 80 percent of respondents having detectors that were disconnected from power supplies provided reasons why this was the case. Among respondents who provided reasons, about 40 percent forgot to replace the batteries or did not check the detectors to see that they had power; somewhat less than 10 percent stated that detectors were not installed, installed

12

not allow the field interviewer to test their units.

Figure 3 shows the results of the field testing done by the survey interviewers.

## Figure 3.
## The Results of the Field Operability Testing
### (Percent of Detectors Surveyed)



Worked when Power was Restored 15%

Did Not Work 10%

Unable to Test 2%

Worked 73%

Based on the results of the field operability testing, the percentage of households with one or more functioning smoke detectors is less than indicated by the perceptions of smoke detector owners. An estimated 63.5 million households had at least one working non-central system detector in 1992 (based on the results of the first series of smoke and button tests); this was 66 percent of all households and 80 percent of all households with smoke detectors. (The difference between the estimated 80 percent of households with a working detector ("operative households") and 73 percent of detectors working in response to the first series of tests reflects homes with more than one detector, not all of which were operational.) An estimated 16.0 million households with installed smoke detectors had no working detectors (20 percent of households with smoke detectors). An estimated 7.3 million (or 46 percent) of these "inoperative" households had been thought by the survey respondents to have all their detectors in working condition. Table 9 shows the results of operability testing related to respondents' perceptions of operability.

14

all dwelling types), and single family detached houses were somewhat more likely to be operative households (81 percent vs. 80 percent for all dwelling types).

As discussed previously, 55 percent of households had the same number of detectors as floors in the residence, and 26 percent had fewer detectors than floors. Because of the presence of non-working detectors, a higher percentage of households had fewer working detectors than the number of floors. An estimated 43 percent of households in the main sample had fewer working detectors than floors. The estimated percentage of households in the lower SES sample with fewer working detectors than floors was 53 percent. (However, the calculated difference between the main and lower SES samples was not statistically significant at a 90 percent confidence level.)

Of detectors whose types of power supplies were determined, about 72 percent operated by battery power only and about 28 percent operated by hard-wired AC, plug-in AC, or combinations of AC power with a battery backup. Battery powered smoke detectors were less likely to alarm when subjected to the first smoke and button tests than those powered by AC; about 69 percent of these units alarmed in response to the first series of tests, compared to about 84 percent of AC-powered detectors.

About 76 percent of detectors were determined to have radioactive material labels (signifying they are ionization-type detectors, although a small but undetermined number could be ionization/photoelectric combination units). About 72 percent of such detectors alarmed when subjected to the first series of tests. This was somewhat lower than detectors without such labels (presumed to be photoelectric models), 79 percent of which alarmed (although the difference was not statistically significant at a 90 percent confidence level). Much of the difference in percentages found to be working may be attributable to the fact that probable ionization-type detectors were more likely to be battery powered; 77 percent were powered by batteries, compared to about 55 percent of detectors without radioactive material labels.

Households in more recently-constructed dwellings, those built in the 1980's and 1990's (and, to a lesser degree, those built in the 1970's), were found to be more likely to have one or more working smoke detectors. About 92 percent of households in dwellings built from 1980 through 1992 and about

As reported previously, about 20 percent of smoke detectors were found to be without functioning power sources. Table 10 shows that detectors with radioactive material labels, that is, those presumed to be ionization-type, comprised about 85 percent of detectors found to have dead batteries, or missing or disconnected power sources. This is greater than the percentage of detectors in the survey found to have such labels, 76 percent.

Most observations of non-functioning power sources involved detectors powered by batteries only. Such detectors comprised almost 93 percent of detectors observed to have problems with power sources. Of detectors for which the power supplies were determined, 72 percent were battery-powered.

## Table 10.

## CONDITIONS OF DETECTORS OBSERVED

### FOR ALL DETECTORS, AND BY THE PRESENCE OF RADIOACTIVE LABELS AND POWER SOURCES

| CONDITION OBSERVED | TOTAL | % OF ALL DETECTORS | RADIOACTIVE LABEL | | | | | | POWER SOURCE | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | YES | % | NO | % | UNCERTAIN | % | BATTERY | % | AC | % | COMBO | % |
| MISSING BATTERY | 184 | 11.4% | 154 | 84% | 17 | 9% | 13 | 7% | 181 | 98% | | | 2 | 1% |
| DISCONNECTED BATTERY | 48 | 3.0% | 46 | 96% | 2 | 4% | | | 48 | 100% | | | | |
| DEAD BATTERY | 84 | 5.2% | 71 | 85% | 6 | 7% | 7 | 8% | 84 | 100% | | | | |
| DISCONNECTED FROM AC | 22 | 1.4% | 17 | 77% | 3 | 14% | 2 | 9% | | | 21 | 95% | 1 | 5% |
| COVER HANGING OPEN | 12 | 0.7% | 9 | 75% | | | 3 | 25% | 9 | 75% | | | 2 | 17% |
| MISSING COVER | 23 | 1.4% | 16 | 70% | 4 | 17% | 3 | 13% | 13 | 57% | 8 | 35% | 1 | 4% |
| INSECTS / COBWEBS | 15 | 0.9% | 9 | 60% | 1 | 7% | 5 | 33% | 11 | 73% | 4 | 27% | | |
| CLOGGED w/ DIRT / DUST | 45 | 2.8% | 38 | 84% | 5 | 11% | 2 | 4% | 28 | 62% | 17 | 38% | 1 | 2% |
| < 1' OF WALL-CEILING MEETING | 80 | 5.0% | 63 | 79% | 11 | 14% | 6 | 8% | 58 | 73% | 21 | 26% | 1 | 1% |
| < 8' OF AIR DUCT/VENT | 13 | 0.8% | 12 | 92% | | | 1 | 8% | 6 | 46% | 7 | 54% | | |
| CATHEDRAL CEILING-COULDN'T REACH | 3 | 0.2% | 2 | 67% | | | 1 | 33% | 1 | 33% | 2 | 67% | | |
| IN STORAGE / NOT YET INSTALLED | 16 | 1.0% | 14 | 88% | | | 2 | 13% | 14 | 88% | 2 | 13% | | |
| ALARMS CONTINUOUSLY | 4 | 0.2% | 4 | 100% | | | | | 4 | 100% | | | | |
| REMOVED / DISCONNECTED-NOT WORKING | 5 | 0.3% | 5 | 100% | | | | | 5 | 100% | | | | |
| PARTS GLUED / BROKEN OFF | 7 | 0.4% | 4 | 57% | 1 | 14% | 2 | 29% | 5 | 71% | 1 | 14% | | |
| NOT MOUNTED / IN VIEW | 4 | 0.2% | 4 | 100% | | | | | 4 | 100% | | | | |
| BATTERY DOESN'T FIT PROPERLY | 3 | 0.2% | 3 | 100% | | | | | 3 | 100% | | | | |
| NOT WORKING (UNSPECIFIED) | 2 | 0.1% | 1 | 50% | | | 1 | 50% | | | 2 | 100% | | |
| HANGING FROM WIRES | 1 | 0.1% | 1 | 100% | | | | | | | 1 | 100% | | |
| CONTACT POOR | 1 | 0.1% | 1 | 100% | | | | | | | 1 | 100% | | |

Note:  Observed detectors were those which did not pass the first series of smoke and button tests, and which did not alarm continuously when restored to power. Data from the lower SES sample have been combined with those from the main sample. Results have been weighted to account for over-sampling of low-income households.

18

horn that has been replaced by piezoelectric horn elements in the manufacture of smoke detectors. Other results of the analysis of the Engineering Laboratory are summarized in Section V., and the report on the analysis is attached as Appendix B, (*Smoke Detector Operability Survey - Engineering Laboratory Analysis*, October 1994, by Julie I. Shapiro, Directorate for Engineering Sciences).

## Table 11.

## CONDITIONS OF DETECTORS OBSERVED
### BY REPORTED ANNUAL HOUSEHOLD INCOME

| CONDITION OBSERVED | HOUSEHOLD INCOME | | | |
|---|---|---|---|---|
| | < $15,000 | | $15,000 OR MORE | |
| MISSING BATTERY | 48 | 28% | 123 | 72% |
| DISCONNECTED BATTERY | 12 | 26% | 35 | 74% |
| DEAD BATTERY | 23 | 28% | 60 | 72% |
| DISCONNECTED FROM AC POWER | 5 | 22% | 18 | 78% |
| COVER HANGING OPEN | 3 | 27% | 8 | 73% |
| MISSING COVER | 6 | 30% | 14 | 70% |
| INSECTS / COBWEBS | 10 | 63% | 6 | 38% |
| CLOGGED w/ DIRT / DUST | 17 | 39% | 27 | 61% |
| < 1' OF WALL-CEILING MEETING | 25 | 32% | 53 | 68% |
| < 5' OF AIR DUCT/VENT | 3 | 25% | 9 | 75% |
| CATHEDRAL CEILING-COULDN'T REACH | 1 | 33% | 2 | 67% |
| IN STORAGE / NOT YET INSTALLED | 3 | 19% | 13 | 81% |
| ALARMS CONTINUOUSLY | 3 | 75% | 1 | 25% |
| REMOVED / DISCONNECTED - NOT WORKING | 1 | 25% | 3 | 75% |
| PARTS GLUED / BROKEN OFF | 2 | 33% | 4 | 67% |
| NOT MOUNTED / IN VIEW | 1 | 25% | 3 | 75% |
| BATTERY DOESN'T FIT PROPERLY | 1 | 50% | 1 | 50% |
| NOT WORKING (UNSPECIFIED) | | | 2 | 100% |
| CONTACT POOR | | | 1 | 100% |
| NUMBER OF DETECTORS OBSERVED | 105 | 28% | 274 | 72% |

Note: Observed detectors were those which did not pass the first series of smoke and button tests, and which did not alarm continuously when restored to power. Data from the lower SES sample have been combined with those from the main sample. Results have been weighted to account for over-sampling of low-income households.

## Figure 4.
# Problems Reported For Detectors
### (% of Detectors with Dead Batteries or Missing/Disconnected Power Sources & which were Reported to Have Problems)



## V.  Sample Collection and Engineering Analysis

An important component of the project was to identify reasons for smoke detector inoperability.  Detectors that were non-working (following installation of new batteries or connection of AC power) or exhibited other possible malfunctions were collected and sent to the CPSC's Engineering Laboratory for analysis.  Respondents were provided with a replacement detector and $25 towards installation.  A total of 159 detectors from the survey were sent to the laboratory.  Four detectors were determined to have been improperly collected, bringing the total number of samples for evaluation to 155.

22

_. Further research addressing these problem areas will be done with the goal of increasing the reliability of smoke detectors installed in households. Detailed findings of the engineering analysis are given in a separate report by the Directorate for Engineering Sciences, which is attached as Appendix B.

## VI. Conclusion

The Smoke Detector Operability Survey provided a great deal of information on conditions related to non-working detectors. The related demographic and housing data, and the laboratory analysis of detectors collected during the survey will be instrumental in focusing activities of public and private agencies and industry aimed at reducing the national fire hazard through the use of working smoke detectors.

The findings that a high percentage of U.S. households now have smoke detectors installed is encouraging, and indicates that efforts by government agencies and private groups to convince consumers of the increased safety afforded by smoke detectors have achieved some success. Lower smoke detector prices also may have led to more detectors being purchased by consumers. Nearly 90 percent of households now have either central system or single-station smoke detectors installed.

Although some of the findings are encouraging, the survey also points to areas in which additional efforts are required. More than an estimated 11 million households in 1992 had no smoke detectors installed, and an even greater number, about 16 million households, had detectors, but none were working. Also, 26 percent of households had fewer detectors than floors, and, because of the presence of non-working detectors, an estimated 43 percent of households had fewer working detectors than floors. These findings indicate that in future efforts to improve the safety of household residents, actions to address reasons for the failure of detectors to function may be at least as important as those seeking to increase the presence of detectors in homes.

A high percentage of inoperative smoke detectors in households had dead batteries, or missing or disconnected batteries or AC power sources. Many respondents forgot to replace batteries, or were unaware that batteries were missing or disconnected. A significantly higher percentage of battery-powered detectors was inoperative than was found for those powered by AC. Over half

# Appendix A.

# Survey Questionnaire



We are asking people in your community a few questions about their smoke detectors, and doing some simple tests to make sure the detectors work properly. If the batteries in your detector need to be replaced, we have new batteries to give out, free of charge. Also, if any of your smoke detectors do not work, we have new ones to replace them, again free of charge. As you probably know, properly operating smoke detectors can help protect you and your family in the event of a fire. We would like to collect any detectors that don't work and send them to the Consumer Product Safety Commission's lab to find out why they don't work. In addition, even if all of your detectors work I will give you a free smoke detector (SHOW DETECTOR) in appreciation for your participation in the survey.

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

2.    How many smoke detectors do you have in your home?

One ............. [ ]1          Five ............. [ ]5
Two ............. [ ]2          More than Five .... [ ]6
Three ............ [ ]3         Don't know ....... [ ]9
Four ............ [ ]4                                          (16)

3.    Do you or another member of your household own your home or do you rent?

Own ..................................... [ ]1
Rent .................................... [ ]2
Don't know .............................. [ ]9          (17)

3a.    How long have you and your family lived in this (apartment/house)? Would that be... (READ LIST, CHECK ONLY ONE)

Less than 6 months, . [ ]1          6 to 10 years, or .... [ ]5
6 to 11 months,  ... [ ]2           11 years or more? .. [ ]6
1 to 5 years, ....... [ ]3          Don't know ....... [ ]9          (18)

4.    How many floors are there in your home? Include the basement if you have one, but don't include an unfinished attic.

One ............. [ ]1          Five ............. [ ]5
Two ............. [ ]2          More than Five ..... [ ]6
Three ............ [ ]3         Don't know . ....... [ ]9
Four ............ [ ]4                                          (19)

5.    When was this (house/building) built? Was it ...(READ LIST, CHECK ONLY ONE)

1990 or later ...... [ ]1          1950's ............ [ ]6
1985 to 1989 ...... [ ]2           1940's or .......... [ ]7
1980 to 1984 ...... [ ]3           before 1940 ........ [ ]8
1970's ........... [ ]4            (DO NOT
1960's ........... [ ]5            READ)-►Don't know . [ ]9
                                                               (20)

10.   Why do you think the detector went off when there was no fire?  (DO NOT READ LIST, CHECK ALL THAT APPLY)

        Cooking .......................... [ ]1
        Fireplace ......................... [ ]2
        Tobacco .......................... [ ]3
        Steam from Bathroom ............... [ ]4
        Low Battery ....................... [ ]5
        Other (Specify:) _____ ....... [ ]6
        Don't know/no apparent reason ........... [ ]9        (36-42)

11.   When was the last time you or someone else tested the smoke detector(s) in your current home? (READ LIST, CHECK ONLY ONE)

        within the last week, .................. [ ]1
        within the last month, ................. [ ]2
        within the last 6 months, .............. [ ]3
        within the last year,  ................. [ ]4
        more than one year, or ................. [ ]5
(DO NOT  never? ................................ [ ]6
READ)-►  don't know ......................... [ ]9        (43)

      Now I'd like to test your smoke detector(s) to make sure that they are working properly.  Would you show me the first smoke detector?

      Perform tests, record observations for/ask respondent questions 12 - 28.  Use questionnaire for each household, ask questions 12 - 28 for detector #1 before going to detector #2, continue for all detectors.  If more than 5 detectors in the household, ask questions and test each one and note answers/observations in margins.

      If respondent volunteers that the detector has no batteries or power,

      DO NOT TEST DETECTOR - (SKIP TO Q17)

      Detector #    1 [ ]    2 [ ]    3 [ ]    4 [ ]    5 [ ]        (44-48)

14. (OBSERVE) Is this detector wall-mounted or ceiling mounted?

| Detector # | 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|---|
| Wall-mounted .......... | 1 | 1 | 1 | 1 | 1. | |
| Ceiling-mounted ....... | 2 | 2 | 2 | 2 | 2 | |
| Other/Unknown/don't know | 9 | 9 | 9 | 9 | 9 | (59-63) |

15. (OBSERVE) What type of power supply does the detector have? (REMOVE COVER OR REMOVE FROM WALL/CEILING AS NECESSARY)

| Detector # | 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|---|
| Battery-only ........... | 1 | 1 | 1 | 1 | 1 | |
| AC/ Hard wire ........ | 2 | 2 | 2 | 2 | 2 | |
| AC/ Plug-in (with cord) .. | 3 | 3 | 3 | 3 | 3 | |
| Combo AC/battery backup ............ | 4 | 4 | 4 | 4 | 4 | |
| Undetermined .......... | 9 | 9 | 9 | 9 | 9 | (64-68) |

16. (OBSERVE) Does the detector have a radioactive material label or marking, either on the enclosure or inside?

| Detector # | 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|---|
| Yes ................ | 1 | 1 | 1 | 1 | 1 | |
| No ................ | 2 | 2 | 2 | 2 | 2 | |
| Don't know .......... | 9 | 9 | 9 | 9 | 9 | (69-73) |

17. (OBSERVE) Does the detector have 2 test buttons?

| Detector # | 1 | 2 | 3 | 4 | 5 | |
|---|---|---|---|---|---|---|
| Yes ................ | 1 | 1 | 1 | 1 | 1 | |
| No ................ | 2 | 2 | 2 | 2 | 2 | |
| No test buttons ....... | 3 | 3 | 3 | 3 | 3 | (73-77) |

(78 Open)

18. (OBSERVE) Note all identifying information:                          1-80

| Detector # | Brand Name | Model # | UL Issue # | UL Control # |
|---|---|---|---|---|
| # 1 | | | | |
| # 2 | | | | |
| # 3 | | | | |
| # 4 | | | | |
| # 5 | | | | |

-77-

IF YES OR NO IN (OF 20)
  Press and hold test button(s) one at a time.  Only press test buttons.

  – If button is marked 'Push to Test' (or contains radioactive materials) hold
    the test button for a maximum of 10 seconds to test operability.

  – If button is marked 'Push and hold to test' (or does not contain radioactive
    materials) hold the button a maximum of 30 seconds to test operability.

**21.    (OBSERVE) Did the detector sound in response to the test button?**

| Detector # | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Yes (all buttons) ............ | 1 | 1 | 1 | 1 | 1 |
| No (all buttons) (Label) ....... | 2 | 2 | 2 | 2 | 2 |
| 2 buttons, only 1 worked (Label) | 3 | 3 | 3 | 3 | 3 |
| No test button on unit ....... | 4 | 4 | 4 | 4 | 4 |

**21a.    (OBSERVE) Note condition of detector as you found it.  (CIRCLE AS MANY AS APPLY)**

| Detector # ................ | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Missing Battery ................... | 1 | 1 | 1 | 1 | 1 |
| Battery in Detector but Disconnected .. | 2 | 2 | 2 | 2 | 2 |
| Dead Battery ..................... | 3 | 3 | 3 | 3 | 3 |
| Disconnected from AC Power ....... | 4 | 4 | 4 | 4 | 4 |
| Missing Cover .................... | 5 | 5 | 5 | 5 | 5 |
| Insects/Cobwebs ................. | 6 | 6 | 6 | 6 | 6 |
| Clogged with Dust/Dirt ............ | 7 | 7 | 7 | 7 | 7 |
| Located within 1 foot of wall/ceiling meeting, or inside corner of 2 walls .. | 8 | 8 | 8 | 8 | 8 |
| Located within 5 feet of air duct or vent (ignore doors & windows) ...... | 9 | 9 | 9 | 9 | 9 |
| Located on cathedral ceiling ........ | 0 | 0 | 0 | 0 | 0 |
| None of the above ................ | X | X | X | X | X |
| Other ( Specify:) ................. | R | R | R | R | R |

Detector # _1_  Specify _____

Detector # _2_  Specify _____

Detector # _3_  Specify _____

Detector # _4_  Specify _____

Detector # _5_  Specify _____

(5-59)
(5-9)

**24a.** (READ) Why do you think: (IF BATTERY OPERATED: SAY "the battery was (missing/disconnected)?" OR IF AC POWERED:    SAY "the power was disconnected?" (DO NOT READ LIST.  CIRCLE ALL THAT APPLY.)

| Detector # | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Forgot to replace . . . . . . . . . . . . . | 1 | 1 | 1 | 1 | 1 |
| Removed, nuisance . . . . . . . . . . . | 2 | 2 | 2 | 2 | 2 |
| Alarmed continuously with power . | 3 | 3 | 3 | 3 | 3 |
| Removed, needed elsewhere  . . . . | 4 | 4 | 4 | 4 | 4 |
| Never looked . . . . . . . . . . . . . . . | 5 | 5 | 5 | 5 | 5 |
| Don't know . . . . . . . . . . . . . . . . | 6 | 6 | 6 | 6 | 6 |
| Other (specify)  . . . . . . . . . . . . . | 7 | 7 | 7 | 7 | 7 |

(25-59)

Detector # _1_  Specify _____

Detector # _2_  Specify _____

Detector # _3_  Specify _____

Detector # _4_  Specify _____

Detector # _5_  Specify _____

> If battery was dead in Q. 23 and no chirp was heard in Q. 22, LABEL FOR COLLECTION.
>
> If YES in Q. 24 and "Removed, nuisance" in Q. 24a, LABEL FOR COLLECTION.

**25.** (READ) Have you had any problems with this detector?

| Detector # | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Yes (LABEL FOR COLLECTION) . . . | 1 | 1 | 1 | 1 | 1 |
| No →(SKIP TO BOX BEFORE Q. 27) | 2 | 2 | 2 | 2 | 2 |

(65-69)
(70-78 Open)
7-80

**27.** (READ) It is important that we determine why smoke detectors don't work.

| IF BATTERY: I would like to collect this smoke detector and . . . | IF AC POWER: I would like to give you this box so you can . . . |
|---|---|

. . . send it to the U.S. Consumer Product Safety Commission's lab for analysis to find out why it does not work properly. I am able to offer $25 to reimburse you for this smoke detector and to install a replacement detector. We will provide you with a free replacement detector. (May I collect this detector/Would you send this detector to the Consumer Product Safety Commission)?

| Detector # | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Yes (REMOVE DETECTOR/GIVE BOX THEN CONTINUE) . . . . . . . . . . . . . . . . . | 1 | 1 | 1 | 1 | 1 |
| No (GIVE REPLACEMENT DETECTOR AND SKIP TO Q. 28) . . . . . . . . . . . . . . . | 2 | 2 | 2 | 2 | 2 |
| | | | | | (10-14) |



CAREFULLY PACKAGE DETECTOR

**27a.** (AFTER SMOKE DETECTOR HAS BEEN REMOVED/BOX GIVEN; SAY:) Here is a replacement smoke detector. I'm going to test it now to be sure it works.

PERFORM BUTTON TEST
 – If detector alarms, give respondent replacement detector
 – If detector does not alarm, select & test another detector

Here is $25 to reimburse you for your old detector and for any costs you might encounter in installing this new detector. Please read and sign the following statement to acknowledge that you received the $25. **HAND RESPONDENT ACKNOWLEDGEMENT A.**

(15-69)

**28.** NOTE ACTION TAKEN: (CIRCLE ALL THAT APPLY)

(70-78 Open)
8-80

| Detector # | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| No action required . . . . . . . . . . . . . . . | 1 | 1 | 1 | 1 | 1 |
| Replaced Battery/Restored Power . . . | 2 | 2 | 2 | 2 | 2 |
| Refused Battery replacement . . . . . . . . | 3 | 3 | 3 | 3 | 3 |
| Collected Detector (Left Replacement) | 4 | 4 | 4 | 4 | 4 |
| Advised Replacement (AC/hard wired) | 5 | 5 | 5 | 5 | 5 |
| Replacement refused/could not replace (battery models) . . . . . . . . . . . . . . . | 6 | 6 | 6 | 6 | 6 |
| | | | | | (5-34) |



> **Be sure each detector collected is labeled with detector number and Sample ID.**
> **Make sure all replacement detectors have been tested and are working properly**

**SAY:** And may I have your telephone number for validation purposes?

Phone # (      ) _____                                    (43-52)

**SAY:** Thank you, here is your free smoke detector for your time and cooperation in this study.

**IF SAMPLE COLLECTED, SAY:** "Someone from the U.S. Consumer Product Safety Commission may wish to contact you to follow-up for more information, in which case you would be told about laboratory analysis results for collected samples. Could I have your name and address in case CPSC needs to contact you for more information?"

[ ]      CHECK HERE IF PERMISSION GIVEN FOR FOLLOW-UP CONTACT
                                                                           (53)

Name _____

Address _____

_____



# Appendix B.

# Engineering Analysis Report

## ACKNOWLEDGEMENTS

The author acknowledges Ms. Soma Sao who made significant contributions to the Engineering Laboratory Analysis of the samples collected in the Smoke Detector Operability Survey.  Her technical and analytical capability assisted during the evaluation of samples and writing of the draft report.  In addition, much appreciation is expressed to Mr. Ronald T. Reichel who offered his technical expertise and continued support and guidance throughout the examinations of smoke detectors.

Gratitude is expressed to Underwriters Laboratories Inc. (UL) for their cooperation and support in developing a proper testing chamber by allowing Consumer Product Safety Commission (CPSC) laboratory personnel to visit their smoke detector testing laboratory in Northbrook, Illinois.  UL also provided information  concerning the approximate age of smoke detectors collected in the Survey.

In addition, appreciation is expressed for the peer review of the draft report by all members who attended the Technology Committee Meeting in May, 1993 and by the CPSC engineering staff.  Reviewers made extremely helpful recommendations for enhancing the paper.

# Executive Summary

The Smoke Detector Operability Survey collected 155 smoke detector samples from the field for at least one of the following reasons: failing a simulated smoke test (73 Units), failing the test button test (63 Units), complaints of nuisance alarms (33 Units), complaints of continuous alarms (32 Units), and battery related problems (17 Units). The Division of Engineering Laboratory evaluated the detectors to determine the reason for malfunction. The Engineering Laboratory discovered four major reasons that detectors were inoperable in residences.

Horn corrosion and deterioration caused at least six of the 73 units collected for failing a simulated smoke test to fail in the Laboratory. It is suspected that an additional 24 of these smoke detectors failed to respond to the smoke test in the field because of horn deterioration, although they functioned properly when received by the Laboratory. Each of these smoke detectors have similarities in horn design and have visible deterioration on each of the horn contacts. Shipping and handling of the smoke detectors may have restored temporary continuity to the smoke detector's horn and resulted in a functional unit.

The second problem is that frequent nuisance alarms cause homeowners to disable their detector. Various reasons for the excessive alarms include location, type of detector, lack of maintenance causing excessive debris and insects to accumulate in the detector, and high sensitivity levels. Dust, cooking contaminants, high humidity, debris, and insects in the sensing chamber can increase the sensitivity level of the detector, which leads to excessive nuisance alarms. Educating consumers on how smoke detectors work and how to keep them in proper condition may solve some of these problems.

The third major problem discovered during the Engineering Laboratory evaluation is that some smoke detectors sound continuously or chirp at periodic intervals. The Engineering Laboratory was unable to determine the exact defects in the smoke detector. Members of the Technology Committee have agreed to examine selected samples to help determine the exact causes of malfunction.

The fourth problem encompasses a variety of complications with batteries and defective mechanical and electrical elements.

Laboratory analysis of inoperable and troublesome detectors collected by the Survey provided invaluable information regarding the technical reasons for smoke detector failures and operating problems. Effectively addressing each of these areas has the potential to increase the number of working smoke detectors in residences.

1

## Reason for Sample Collection



**Figure 1. The Reasons for Sample Collection by the Field Interviewer (n=155).**
**(Smoke Detectors were collected for multiple reasons causing the total to be greater than 155.)**

The most prevalent reason for sample collection is failure of a properly powered smoke detector to respond to smoke. This report will determine the cause of this and other potentially hazardous conditions with smoke detectors. The Laboratory Analysis Section will evaluate each of the five categories in Figure 1.



3

# Laboratory Analysis

The Laboratory Analysis Section examines each smoke detector collected in the survey by determining the reason for malfunction during field testing. Each of the five reasons, which include Simulated Smoke Test Failure, Test Button Test Failure, Nuisance Alarming, Continuous Alarming, and Low-Battery Alarm Failure (shown in Figure 1) are discussed below.

## Failed Simulated Smoke Tests

In consumers' homes, interviewers used an aerosol spray with a three-foot wand extension to spray a two second burst of artificial smoke into the detector. If there was no response, additional bursts followed. If there was still no response, the process was repeated after the batteries were replaced, or AC power was restored. A total of 73 units (51 battery-powered and 22 AC-powered) were collected for failing the Simulated Smoke Test.

### Battery Powered Detectors

Twenty-two battery-powered detectors that failed the Simulated Smoke Test in the field, arrived at the Engineering Laboratory in working order and were able to pass the testing program listed in Table 1 with satisfactory results. It is noted that an additional 13 smoke detectors passed all tests in the Laboratory, but excessive dirt, dust or insects were present in the unit. The possible reasons for the malfunction in the field, and the smoke detector's functionality after arriving at the Engineering Laboratory are discussed in the "Discussion" section of this report. The remaining 16 samples had three principal reasons for failing the Simulated Smoke Test during field testing and the Laboratory Gross Smoke Test, which included:

- deteriorated electrical horn contacts,
- component problems, or
- defective units.

Six nonfunctional units arrived at the laboratory because of horn contact corrosion. In these detectors, the horn element is a piezoelectric disk with three plated surface pads, typically made of silver, incased in a plastic housing. Three flexible metal arms create a pressure contact onto each plated pad. The horn element's housing allows the low-energy, low-voltage electrical pressure contacts to be exposed to the normal household environment, making them susceptible to contaminants from cooking such as hydrogen sulfide from eggs, and cleaning fumes such as ammonium hydroxide. These contaminants and many others in the residential environment may result in corrosion and deterioration of the contact surfaces.



The reasons for Gross Smoke Test failure (see Figure 2) discovered by the Engineering Laboratory are:

- Three units were missing covers, which made them inoperative because of an interlock switch that activated the detector when its cover was in place.
  In the laboratory, using the appropriate covers, one detector was operable and two sounded continuously. After a thorough cleaning of the detectors that sound continuously, one behaved appropriately, and one continued to alarm. Further investigation of the latter sample is required.

- Two units' AC input terminals were intentionally detached from the circuit board.
  Both detectors functioned properly and passed all tests satisfactorily after reconnecting the input wires.



Figure 2. Laboratory Results for AC Powered Detectors Collected for Simulated Smoke Test Failure (n=22).



## Failed Test Button Test in Field

Sixty-three smoke detectors were collected for failing the Test Button Test in field testing. Three detectors did not have a test button and were improperly collected for failing the Test Button Test. Twenty-nine of the 60 smoke detectors evaluated for failing the Test Button Test functioned properly when tested in the Engineering Laboratory. Ten smoke detectors that functioned properly in the Laboratory had insects and debris in the unit and the sensing chamber of the smoke detector that may have caused failure during field testing. Debris, which may have caused failure in the field, could have been dislodged during shipment, resulting in a fully functional test button.

# Laboratory Results
## Failed Test Button Test



Figure 4.  Laboratory Results for Detectors Collected for Test Button Test Failure (n=60).

The remaining 31 cases divide into eight categories involving horn contact deterioration, electrical component failure, physical flaws, test button contact difficulty, and other complications. The reasons for failure of the Test Button Test are summarized in Figure 4 and described below.

9

Six detectors did not function properly and could not be tested.

Four of these detectors sounded continuously or sporadically when power was restored to the units in the Laboratory. Members of the Technology Committee agreed to examine the units to determine the exact cause of failure at some time in the future.

Testing was not possible in two additional units that did not respond to any tests. Further examination of these units is required to determine the source of failure.

## Nuisance Alarms

The Smoke Detector Operability Survey showed that many of the detectors in consumers' homes sounded due to cooking smoke, bathroom water vapors, tobacco smoke and other non-threatening sources of air-suspended particulate. Thirty-three detectors were collected and sent to the Laboratory for examination because the consumer believed there was a problem with the detector. In 32 of the detectors collected, the power had been disconnected by the consumer because of nuisance alarms. Figure 5 shows a breakdown of the sources of nuisance in the respondents' homes.



### Nuisance Alarms
#### Sources

Unspecified in Survey (20.0%)
Bathroom Water Vapor (14.3%)
Other (2.9%)
Cigarette Smoke (8.6%)
Cooking (54.3%)

Figure 5. Sources of Nuisance Alarms from Collected Samples (n=33).



**FIGURE 4:  CONCEPTUAL CROSS-SECTION OF HORN DISK AND CONTACTS**



**FIGURE 5:  BIFURCATED CONTACT F ON OLDER HORNS (12X)**



FIGURE 8:  BIRFURCATED CONTACT SEPARATED FROM HORN (50X)



FIGURE 9:  DIMPLED CONTACT SEPARATED FROM HORN (50X)



FIGURE 12:  TEMPERATURE CYCLE PROFILE FOR ACCELERATED SMOKE DETECTOR HORN TESTS



**FIGURE 14a:  TOP VIEW TYPE B HORN**



**FIGURE 14b.  BOTTOM VIEW TYPE B HORN**



FIGURE 16: BEFORE CORR    N TEST - H₂S



FIGURE 18:  AFTER CORROSION TEST – SO₂



FIGURE 20: AFTER CORROSION TEST – $H_2S/SO_2$



FIGURE 22

-34-



FIGURE 4



Auger depth profile of Sample X, Terminal B

**FIGURE 26**



**FIGURE 28**



Auger elemental survey after profile of Sample Y, Terminal S

FIGURE 30



Auger depth profile of Sample Z, Terminal S

**FIGURE 32**



**FIGURE 34: HORN CONTACTS ON SMOKE DETECTOR Z**



**FIGURE 35: HORN ELEMENT IN SMOKE DETECTOR Z**

STUDY OF DETERIORATION OF SEPARABLE ELECTRICAL CONTACT: 'N SMOKE DETECTORS

# APPENDIX B

# TASK III & IV REPORT

# TABLE OF CONTENTS

**Page**

1.0  INTRODUCTION ...................................................................................1
2.0  CORROSION TESTING..........................................................................2
3.0  SEPARATE QUALIFICATION PROCEDURE/STANDARD FOR HORNS ......6
4.0  HORN DAMAGE DURING ROUTINE HANDLING ..............................10
5.0  RELIABILITY PREDICTION...................................................................11
6.0  SELF WIPING CONTACTS, CONTACT LUBRICANTS, AND
     SOLDERED CONTACTS ......................................................................13
7.0  SUMMARY...........................................................................................15

APPENDIX A:  COMMENTS ON UL217................................................A-1

# LIST OF FIGURES

**Page**

FIGURE 1:  CONCEPTUAL CROSS-SECTION OF HORN DISK
           AND CONTACTS............................................................................2

# LIST OF TABLES

**Page**

TABLE 1:   FMG ENVIRONMENTS BY COMPOSITION ...............................4
TABLE IX:  COMPATIBLE COUPLES........................................................9
TABLE 2:   AVERAGE FAILURE RATES FOR MISCELLANEOUS PARTS..........12

## 2.0   CORROSION TESTING

Six new smoke detectors were supplied to IITRI by CPSC for standard corrosion testing specified in UL217 (para. 62.1.2 and 62.1.3). The detailed results of this testing are discussed in the March 1994 monthly report number 6 and the Task II report.

Three corrosion tests using two horns in each test were run. These corrosion tests were:

1 - Standard 10 day $SO_2$ test
2 - Standard 10 day $H_2S$ test
3 - 10 day combined $H_2S$ and $SO_2$ test

After completion of the corrosion testing all six smoke detectors functioned properly. Surface analyses and depth profiles were then run on the contacts and contact pads. The horn configuration includes separable contacts B, F and S identified in a conceptual cross section drawing (Figure 1). Only the silver plated contact pads of terminals F&S showed any signs of sulfur. The depth of the sulfur layer ranged from 80Å (angstroms) on the units exposed to $SO_2$ to 400Å on units exposed to the combined gases. Units tested with $H_2S$ only had a sulfur level of 180Å. On the basis of the above the $SO_2$ test is not needed. The $H_2S$ or the combined testing would only be marginally useful for the silver plated contacts and useless for the non-silver contact pair (Terminal B).



FIGURE 1:  CONCEPTUAL CROSS-SECTION OF HORN DISK AND CONTACTS

TABLE 1:  FMG ENVIRONMENTS BY COMPOSITION

| Test/Class | Gas Concentration, ppb | | | % RH | T, °C |
|---|---|---|---|---|---|
| | $H_2S$ | $Cl_2$ | $NO_2$ | | |
| I | - | - | - | - | - |
| II | 10 | 10 | 200 | 70 | 30 |
| III | 100 | 20 | 200 | 70 | 30 |
| IV | 200 | 50 | 200 | 75 | 50 |

More recently[3] it has been demonstrated that amorphous $SiO_2$ can be formed on contact interfaces in the presence of silicone vapors causing the growth of a glass non-conductive film.  Since silicone vapors are common by-products of the decomposition of oils, rubbers, etc., and since silicon and oxygen were present in many of the surface analyses this mechanism cannot be ruled out at this time.

It is further recommended that a test program be defined to evaluate new coating and contact technologies and the effect of using temperature cycling during FMG testing.  This testing would further refine the mixed flowing gas testing recommended for inclusion in UL217 while also evaluating new technologies.  A suggested test approach is as follows:

- Prepare test plan similar to test protocol plan of this effort

- Test units
  - 70 horns or detectors/environment
  - 20/vendor w/o stabilant
  - 10/vendor w/stabilant
  - 5/vendor control

- Perform testing per selected gaseous environments with temperature cycling

- Correlate data with existing program data
  - Smoke detector field data
  - Battelle data
  - UL217 test data

-4-

## 3.0   SEPARATE QUALIFICATION PROCEDURE/STANDARD FOR HORNS

Horns (referred to as an alarm sounding appliance in UL217) have been the only cause of smoke detector failures noted in this study. The high resistance observed at the horn separable contact interfaces was the only horn failure mechanism.

The horn (piezoelectric disk, separable contacts) is not only a vital component of a smoke detector, it has potential for other uses (e.g., carbon monoxide detectors). Therefore, consideration should be given to develop a procedure to require demonstration of an acceptable level of horn quality and reliability before inclusion in smoke detectors. Also the fact that the horns failure rate contribution is not included in smoke detector reliability predictions means that the reliability of horns could vary by vendor depending on his procurement/test procedures. Standard reliability testing is already required by UL217 for other components (e.g., microcircuits). The procedure could be as simple as assessing a vendor's quality practices and performing horn contact resistance measurements and corrosion testing on a periodic basis.

It is recommended that a horn qualification procedure that would be performed on a sample basis be developed in accordance with the following procedure:

1. Determine what horn vendor qualification procedures/testing presently exist.

2. Survey horn vendors to determine what testing and quality controls are used.

3. Survey manufacturers of smoke detectors to determine what testing/quality controls they require from horn vendors and testing/quality controls they perform in-house (e.g., incoming inspection through out-going product).

4. Develop and coordinate a sound cost effective horn qualification procedure.

silver-solder, and low brass (all members of Group 5) are inherently nonsusceptible when coupled together.

6.6.2 <u>Compatibility graphs.</u> Permissible couple series are shown in table IX by the graphs at the right. Members of groups connected by lines will form permissible couples. A 0 indicates the most cathodic member of each series, a 0 an anodic member, and the arrow indicates the anodic direction.

6.6.3 <u>Selection of compatible couples.</u> Proper selection of metals in the design of equipment will result in fewer intermetallic contact problems. For example, for sheltered exposure, neither silver nor tin require protective finishes. However, since silver has an anodic index of 15 and tin 65, the EMF generated as a couple is 0.50 volt, which is not allowable by table IX. In this case, other metals or plates will be required. It should be noted that, in intermetallic couples, the member with the higher anodic index is anodic to the member with the lower anodic index and will be susceptible to corrosion in the presence of an electrolytic medium. If the surface are of the cathodic part is significantly greater than that of the anodic part, the corrosive attack on the contact area of the anodic part may be greatly intensified. Material selection for intermetallic contact parts, therefore, should establish the smaller part as the cathodic member of the couple, whenever practicable.

6.6.4 <u>Plating.</u> When base metals intended for intermetallic contact form couples not allowed by table IX, they are to be plated with those metals which will reduce the potential difference to that allowed by table IX.

## 4.0   HORN DAMAGE DURING ROUTINE HANDLING

During IITRI's engineering evaluation of horn construction techniques it was observed that routine maintenance/disassembly of smoke detectors could destroy critical elements.   This is described in the Task II Test Protocol Implementation Report, para. 3.4 Horn Construction.   The following recommendation is offered to preclude horn element damage (i.e., piezoelectric disk, separable contacts).

- **Provide precautions and instructions on the smoke detector housing concerning disassembly of the horn.**

TABLE 2: AVERAGE FAILURE RATES FOR MISCELLANEOUS PARTS 1/

| Part Type | Average Failure Rate (Failures/$10^6$ hrs.) |
|---|---|
| Horns | |
|    Electromechanical | 0.25 |
|    Electronic (on-board oscillator) | 0.084 |
|    Electronic (no on-board oscillator) | 0.011 |

1/ Values are based upon the assumption that the parts will be replaced
before their respective wear-out periods are reached.

IITRI personnel are presently analyzing the separable contact resistance data
that resulted from the accelerated testing performed during this effort. The results,
if appropriate, could be used in lieu of Table 2 failure rates. Weibull analysis is being
utilized in conjunction with chi-square confidence levels to estimate lower bound
characteristic contact life. Estimation of the number of temperature cycles to failure
is also being accomplished based on resistance data but may be of limited value due
to the large extrapolation distances. This analysis will be included in the final report
for this contract.

Additional discussion on aspects of UL217 prediction philosophy are included
in Appendix A, page A-1 (comments on page 8, para. 3.6, page     ara. 4.1 and para.
4.2.6).