IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

CYTHIA COX AS NEXT FRIEND §
OF BRITTANY COX, ET AL §
§ CIVIL ACTION
VS. §
§ NO. B-98-186
BRK BRANDS, INC. §

United States District Court
Southern District of Texas
FILED

JUL 0 1 2002

Michael N. Milby
Clerk of Court

## PLAINTIFFS' AND INTERVENOR'S AMENDED OBJECTION TO MAGISTRATE JUDGE'S OPINION AND ORDER

TO THE HONORABLE COURT:

NOW COMES, CYNTHIA COX, AS NEXT FRIEND OF BRITTANY MARIE COX, JOSE GARCIA INDIVIDUALLY AND IDALIA GARCIA INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF MANUEL CRUZ, plaintiffs in the above styled and numbered cause, by and through their attorney of record, WATTS & HEARD, L.L.P., and asks the court to consider the Magistrate Judge's recommendation and files these its objections under F.R.C.P. 72(b).

Plaintiffs and Intervenors object to the order entered by the Magistrate Judge granting in part Defendant BRK Brands, Inc. Motion to Exclude Plaintiffs' Experts and in support thereof would respectfully show the court as follows.

The court should permit the testimony of Michael Schulz because the witness is qualified, his opinions are reliable, and there is no question that they are relevant and helpful to the jury.

## II. BACKGROUND

Plaintiffs and Intervenors seek to impose liability upon BRK because its detector, a product intended to alarm in the presence of sufficient quantities of by-products of combustion,

failed to perform its intended function of timely alarming Manuel Cruz, decedent. This claim is legally sufficient in imposing liability upon BRK for the failure of its product to properly alarm and is supported by the facts because there is scientifically valid methodology to prove that the smoke detector should have alarmed before Mr. Cruz became incapacitated by the carbon monoxide produced by the space heater.

As has been disclosed to the court and relied upon by the experts, Defendant broke its promise to the consumers of this country by the fraudulent acts in getting their detectors listed by Underwriter's Laboratory. This affront to honesty has created a risk of severe injury and death to those consumers who rely on the claimed safety of the BRK detector. Additionally, the defendant has used design processes which are affected by humidity and/or fretting to such an extent that the separable contacts upon the sounding mechanism will be affected. Additionally, plaintiffs/intervenors have submitted through their experts design alternatives that would have prevented such a failure by the use of soldered contacts on the warning horn.

Mr. Cruz, a former police officer, was wary for his safety and took adequate precautions in attempting to ventilate his residence as well as placing the space heater in a position directly underneath the BRK detector. In fact, he unfortunately relied upon the detector's alarm based on the representations by defendant of its product safety.

BRK admits that there is a large body of research that provides information to determine where a smoke detector should be installed. However, BRK does not dispute that the use of the smoke detector at the distance determined to exist around the space heater was in any way improper. BRK also sets forth that the body of research available allows experts to "better" understand what volume of smoke is necessary to cause a detector to "alarm."

The plaintiffs/intervenors in this case filed suit against BRK Brands, Inc., a manufacturer of smoke detectors, alleging that a BRK model SA67D smoke detector, which was installed on the wall of the hallway leading from Cruz's living room, approximately seven to ten feel above the space heater, "failed to warn [Cruz] of the smoke in his house." The plaintiffs contend that the products of combustion emitted from the space heater would have caused a properly functioning smoke detector to alarm, and the space heater in this instance emitted products of combustion in sufficient volume to have been able to cause the detector to alarm before Cruz became incapacitated. According to the plaintiffs, the BRK smoke detector in Cruz's home was defective because its piezo-horn contacts, the contacts through which the alarm signal is transmitted to the horn, were corroded. The plaintiffs claim that the piezo-horn contacts on Cruz's detector became corroded through a "fretting" motion. Fretting is a specific deterioration process, involving microscopic motions at a contact interface. According to the plaintiffs, this corrosion developed to such an extent that it blocked the transmission of the alarm signal to the horn. To support their theory of liability, the plaintiffs have offered the opinions of various experts to explain why, in the absence of any evidence of smoke inhalation, BRK should be held liable for Cruz's carbon monoxide poisoning.

Plaintiffs designated Michael Schulz as a fire origins and investigations expert. According to the plaintiffs, Schulz will testify "that a properly designed and operating smoke detector would detect the by-products of combustion from a propane fueled space heater." Schulz has an impressive resume and may very well be qualified to investigate and analyze fires and fire explosions, he is qualified to answer the specific questions in this case. Schulz used a demonstration he performed at the Cruz residence on April 18, 2000 to support his opinions but his opinions were based on available

information out in the field including BRK's own instructions. His opinions were actually based on the available literature and the recognized and accepted knowledge in the field apart from the demonstration. The demonstration illicitated that information which already generally known. Even BRK admits that this propane heater will set the detector alarm off. Schulz testified that the purpose of his demonstration was to show that the products of combustion and smoke particulate do not have to be of a visible size in order to sound an alarm. In his demonstration, Schulz placed a dual, photoelectric/ionization, smoke detector, First Alert/BRK Brands Model No. SA301B, in the location of Cruz's smoke detector at the time Cruz died. Schulz measured the level of carbon monoxide and oxygen within the living room and the bedroom of the Cruz residence while operating the propane-fueled heater. Schulz testified that the smoke detector alarmed five minutes and twenty-four seconds after the heater was turned on. He maintained that this test showed that the Cruz smoke detector should have alarmed from the flue gases, i.e., water vapor, carbon monoxide, carbon dioxide, and propane, that the heater released prior to the emission of soot and smoke before lethal concentrations of carbon monoxide were produced within the Cruz residence.

Michael Schulz's methodology complied with the guidelines of the National Fire Code, and he was demonstrating the general principle that a heater in close proximity to a smoke detector will cause the detector to alarm because it will detect the by-products of combustion. Schulz's demonstration is reliable because its methodology provides support for the proposition that an ionization smoke detector will sound when a propane-fueled heater emits by-products of combustion.

### III. SUMMARY OF THE ARGUMENT

Because plaintiffs believe that BRK's misleading characterizations of Plaintiffs' expert's opinions are not helpful to the court's analysis, Plaintiffs' suggest that the court

read plaintiffs' expert's report and deposition testimony before proceeding through this lengthy response brief. *See* Exhibit "1" and "2". Also see the authoritative sources and defendant's information attached as exhibit 3, Study of Deterioration of Seperable Electrical Contacts in Smoke Detectors; Exhibit "4", Studies Assess Performance of Residential Detectors; Exhibit "5" Standard for Safety; Exhibit "6" Smoke Detector Operability Survey Repot of Findings; Exhibit "7", fire Incident Study National Smoke Detector Project; and Exhibit "8" NFPA 921 Guide for Fire & Explosion Investigations. The level of qualification of the expert Mike Schulz and the intellectual rigor and reliability of the proffered opinions is self-evident from the affidavit and report. Plaintiffs hope that the affidavit and report will considerably streamline the court's consideration of the issues.

    Generally, expert testimony that is reliable and will assist the trier of fact in determining facts in issue is admissible. Although reliability is determined by reference to the three requirements of Federal Rule of Evidence 702, which incorporate the factors set out in *Daubert* and its progeny. The trial court has wide latitude in determining how it will assess reliability, including which factors it deems relevant and whether it believes that reliability of the opinions can be assumed. In this case, Plaintiffs' expert Mike Schulz will offer opinions regarding well-known areas of expertise and he is not testifying about a controversial subject. Furthermore, he has based his opinions on reliable facts and data and has reliably applied his methodologies and techniques to those facts. There is no basis to question the reliability of any of the opinions because they are not novel, do not make unwarranted analytical leaps, and comport with generally accepted scientific knowledge within the detector and product warning industries. See attached deposition testimony of Michael Schulz attached hereto as Exhibit "2."

## IV. FEDERAL RULE OF EVIDENCE 702 PROVIDES THE GOVERNING STANDARD

In 2000, amendments to Federal Rule of Evidence 702 codified certain changes that *Daubert* and its progeny had on the application of the old rule 702. The amended rule now requires the court to find each of the following factors as a predicate to admissibility:

> (1) the testimony is based upon sufficient facts or data;
> (2) the testimony is the product of reliable principles and methods;
> (3) the witness has applied the principles and methods reliably to the facts of the case.

In applying the second and third prongs, the court evaluates the nonexclusive factors mentioned in *Daubert* and expanded in subsequent cases, only if it deems such factors helpful to determining reliability in a particular case. FRE 702 (Advisory Committee Notes). The Advisory Committee Notes recognize that neither *Daubert* nor the amendment of rule 702 is intended to permit a party to force expensive, time consuming challenges to the opinion of every single expert and that the trial court has broad discretion to avoid unnecessary "reliability" proceedings in "ordinary cases where the reliability of an expert's methods is properly taken for granted." FRE 702 (Advisory Committee Notes) (citing *Kumho Tire vs. Carmichael*, 119 S. Ct. 1167, 1176 (1999)).

> *Daubert* requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case."

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir.1997).

The court should approach the admissibility (or "reliability") inquiry from the premise that "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." *United States vs. 14.38 Acres of Land Situated in LeFlore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). In addition, it is critical to

recognize that there are neither "bright-line exclusionary" rules, nor bright-line rules of inclusion. *Heller vs. Shaw Industries,* 167 F.3d 1167, 1176. Therefore, no single factor among those described below is necessarily dispositive of reliability, nor even necessarily relevant to it. Rather, the court should make its ruling based on a totality of the circumstances.

The "trial court should consider the specific factors identified in *Daubert* [and other cases] where they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co. vs. Carmichael,* 119 S. Ct. 1167, 1175 (1999). The common sense corollary to this is that the trial court should simply disregard those factors that do not lend themselves to examining the reliability of testimony offered in a particular case. In this regard, it is appropriate to examine the realities of detector litigation and the detector industry in general.

FRE 702 provides that a person becomes qualified to render expert opinions "by knowledge, skill, experience, training *or* education." FRE 702 (emphasis supplied). This inquiry involves a routine, common sense evaluation of whether the person has sufficient background and knowledge to really understand the subject. There are no magic formulae for qualification and any one – or combination of more than one – of the factors may be sufficient. For example, the Advisory Committee Notes specifically acknowledge that FRE 702 provides for qualification on the basis of experience, standing alone. FRE 702 (Advisory Committee Notes, 2000 Amendment).

BRK goes to great pains to repeat reliability "buzzwords," such as publication, general acceptance and peer-review instead of focusing on the proper qualification factors. This is an effort to confuse the issues, not to educate the court about the proper inquiries required of it.

In any event, qualification of an expert has taken a back seat to reliability under *Daubert* and after the amendment to rule 702, qualification is less of an issue:

> Of course, qualifications remain important; rule 702 requires a qualified expert. A completely unqualified expert using the most reliable of tests should not be allowed to testify. But the heart of *Daubert* is relevance and reliability. **As long as some reasonable indication of qualilfications is adduced, the court may admit the evidence without abdicating its gate-keeping function.** After that, qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity.

*Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496 (5th 1999) (emphasis added). Certainly, Michael S. Schulz has decades of experience that show much more than a "reasonable indication of qualifications." See exhibit 1.

The qualification of a person to render expert opinions and the ultimate admissibility of those opinions are completely distinct inquiries under rule 702. FRE 702; *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496 (5th 1999). Therefore, the court should decline BRK's invitation to confuse possible qualification issues, such as whether a particular expert has been employed in the detector industry, with the proper reliability factors set out in the portions of the brief that follow.

A. EXPLANATION OF RULE 702 ANALYSIS

    1. SUFFICIENT FACTS OR DATA

This factor essentially requires that the court examine the evidentiary context surrounding the opinion to determine whether there is enough information available for the expert to draw a reliable conclusion. This can perhaps be better characterized as a requirement that there be sufficient evidence, including in some cases reliable opinions of other experts, to ensure that the opinions are not speculative. Nevertheless, "the language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence." FRE 702 (Advisory Committee Notes, 2000 amendment).

## 2. OPINIONS PRODUCT OF RELIABLE PRINCIPLES AND METHODS

This clause incorporates *Daubert* indicia of reliability. Under this clause, the court considers examining such things as: (1) whether the technique or theory is subject to testing, that is whether it is subject to objective challenge or is merely subjective and conclusory; (2) whether the particular technique or theory has been subject to peer review or publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence or maintenance of standards or controls and (5) whether the technique or theory has been generally accepted in the scientific community. FRE 702 (Advisory Committee Notes, 2000 amendment). Although every kind of expert testimony must be reliable, not all of these factors are applicable to every kind of expert testimony. *See Kumho Tire v. Carmichael*, 119 S. Ct. 1167, 1175 (1999). There are additional considerations, which although they do not have to be applied to every situation, may be helpful or even dispositive of the reliability determination in a particular case. Many of these factors are also reviewed in the Advisory Committee's Notes.

For example, in a particular case, it may be significant that: (1) the subject of expert testimony arises from research that is not litigation related; (2) whether there is an "analytical gap" in the testimony as a result of an unjustified extrapolation from an accepted premise to a conclusion that does not follow logically; (3) whether the expert has excluded obvious alternative explanations; (4) whether the expert has applied less rigor than he would outside of litigation and (5) whether the field of expertise is junk science, such as astrology. FRE 702 (Advisory Committee Notes, 2000 amendment) (citations omitted).

One critical point to keep in mind is that *Daubert* does not require that a technique or theory *be* tested, only that it be verifiable by objective challenge, such as

testing. This is the fundamental tenet of *Daubert*: That an expert cannot proffer opinions that are not based in science and that cannot be controverted by competing scientific information. This precludes a party from introducing opinions that have no basis except an expert's *ipse dixit* that cannot be attacked.

Detector design and testing are proprietary processes. This is demonstrated by the fact that BRK always asserts trade secret privilege and seeks protective orders prior to producing documents in litigation. Just as BRK produced performance-related detector information in this case only after obtaining a protective order, other manufacturers generally do not disclose this information. The manufacturers' engineers, therefore, do not publicly share design or performance information that could tend to give their company a competitive safety advantage.

These realities also affect the application of other traditional *Daubert* factors, especially with respect to design and manufacturing data and information. A lack of peer-review publications or of a relevant scientific community are not significant in a detector design and manufacture case. Detector design and manufacturing research is typically conducted in-house by company engineers and scientists or, alternatively, by industry lobbying organizations. For example, although many of the techniques and theories can readily be tested, the vast majority of testing that is performed is performed in-house by large companies. Therefore, even if testing exists, it is extremely difficult to identify and access the studies. Second, techniques and theories are not usually subject to traditional peer-review because they are proprietary. Even if they were, the results are again unlikely to be publicly available. Therefore, the court should not place too much weight on the fact that conclusions and opinions are not supported by long laundry lists of scholarly works. Finally, the fifth *Daubert* factor, whether the theory or technique has been generally accepted in the scientific community, is difficult

to apply because the relevant scientific community, at least on an industry-wide basis, does not share information. However, to the extent that there is industry-wide common knowledge or perhaps company-wide common knowledge, this factor can be relevant. The fact that expert opinions do not neatly fit within the *Daubert* framework is no cause for concern. Detector failure analysis is a subject in which there is decades of experience. The discipline does not necessitate a "subjective, conclusory approach that cannot reasonably be assessed for reliability." *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Rather, it applies physics, chemistry and mechanical engineering principles to evaluate the cause of detector failure.

To the extent that BRK argues about plaintiffs' experts' consulting involvement in litigation, the Advisory Committee Notes have specifically adopted the language of *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317 n.5, recognizing that some areas of expertise have developed around courtrooms and litigation and that in these cases the fact that a technique was developed for litigation is insignificant. FRE 702 (Advisory Committee Notes, 2000 Amendment). While such a factor may present a convincing bias argument for the jury, it is irrelevant to reliability. Although *Daubert* and its progeny focus on nonlitigation uses for the *methodology* employed by the expert, there is nothing in those cases to indicate that an expert's expertise cannot be gained entirely through work in litigation, whether for or against the industry.

    3.    PRINCIPLES AND METHODS APPLIED RELIABLY TO THE FACTS OF THE CASE

This portion of the rule provides the court with flexibility to address situations that arise when a witness purports to apply the correct principles and methodology, but there is nevertheless a disconnect between the principles and methods and the conclusion that they generate. Although *Daubert* made clear that the court is to focus on

principles and methodology, not the conclusions generated, this particular clause deals with the exceptional case in which "there is simply too great an analytical gap between the data and the opinion offered." *General Electric v. Joiner*, 522 U.S. 136 (1997); *see also* FRE 702 (Advisory Committee Notes, 2000 amendment) (applies in situations in which expert purports to apply correct principles, but reaches a conclusion from which "the trial may fairly suspect that the principles and methods have not been faithfully applied."). Alternatively, it applies to the situation faced by the Supreme Court in *Kumho Tire*, in which the expert purported to follow a reliable methodology, but the conclusions do not flow logically from the methodology. Because this clause has the potential to operate as a credibility determination dispositive of an entire case and therefore to operate in a manner that deprives a party of its right to a trial by jury, it should be applied sparingly to the very exceptional case. FRE 702 (Advisory Committee Note, 2000 amendment) ("amendment is not intended to limit the right to a trial by jury...").

B.   ARGUMENT

### MICHAEL SCHULZ IS QUALIFIED TO TESTIFY ABOUT THE DETECTOR.

Plaintiffs designated Michael Schulz as an expert witness to demonstrate that a properly designed and operating smoke detector would detect the by-products of combustion from a propane fueled space heater. This is a principle that is clearly within his areas of expertise. Michael J. Schulz is a member of the National Fire Protection Association's (NFPA) Technical Committee on Fire Investigations having been appointed to the committee at the time of its formation by the Standards Council. The NFPA Technical Committee on Fire Investigations is responsible for those National Fire Codes that address the investigation and analysis of fire and explosion incidents.

Since his appointment, he has made significant contributions to both National Fire Code 907M, entitled *Manual for the Determination of Electrical Fire Cause*, and national Fire Code 921, entitled *Guide for Fire and Explosion Investigations*.

He previously served as Chairman of the NFPA 921 Task Group on Collection and analysis of Physical Evidence. He now currently serves on the Task Group on Fire-Related Human Behavior and the Task Group on Origin Determination.

Mr. Schulz is a graduate of the National Fire Academy, a college instructor, a consultant to the United States Fire Administration, a Certified Fire and Explosion Investigator, a Certified Protection Specialist, a Certified Fire Investigation Instructor Level I and Level II, and a Forensic Fire Science and Laboratory Manager. <u>Please see</u> Curriculum Vitae attached as Exhibit "1".

In further support that Michael Schulz's testimony is reliable, he provides a compilation of First Alert (BRK) User's Manuals for the company's line of single station detectors. He also provides an informational brochure that was downloaded from Firstalert.com. See attached Exhibit "9." Each manual specifically instructs the end user not to place the detector in specific locations that will result in its activation under conditions that do not involve actual hostile fire incidents. As such manuals provide, in order to avoid "nuisance alarms", the units should not be installed:

> "Where combustion particles are produced. Combustion particles form when something burns. Areas to avoid include poorly ventilated kitchens, garages, and furnace rooms. Keep units at least 20 feet (6 meters) from the sources of combustion particles (stove, furnace, water heater, space heater) if possible. Ventilate these areas as much as possible;

In air streams near kitchens. Air currents can draw cooking smoke into the sensing chamber of a smoke alarm near the kitchen; and,

In very damp, humid or steamy areas, or directly near bathrooms with showers. Keep units at least 10 feet (3 meters) away from showers, saunas, dishwashers, etc."

In further support that Michael Schulz's testimony is reliable, he provides excerpts from the "National Fire Protection Association's Fire Protection Handbook." See attached Exhibit "10." He also provides Appendix A in its entirety and the title pages from National Fire Protection Association 72, entitled "National Fire Alarm Code." See attached Exhibit "11" Both of these sources address the installation of the detector in specific locations that will result in activation under conditions that do not involve actual hostile fire incidents.

Appendix A to NFPA 72 provides on page 72-116 and 72-117 the following information:

"A-2-3.6.1.2   Smoke detectors can be affected by electrical and mechanical influences and by aerosols and particulate matter found in protected spaces. The location of detectors should be such that in the influences of aerosols and particulate matters from sources such as those in Table A-2-3. 1.2(a) are minimized. Similarly, the influences of electrical and mechanical factors shown in Table A-2-3.6.1.2(b) should be minimized. While it might not be possible to isolate environmental factors totally, an awareness of these factors during system layout and design favorably affects detector performance."

**Table A-2-3.6.1.2(a)  Common Sources of Aerosols and Particulate Matter Moisture**

**Moisture**

   Humid outside air
   Humidifiers
   Live stream

Showers
Slop sink
Stream tables
Water spray

**Combustion Products and Fumes**

Chemical fumes
Cleaning fluids
Cooking equipment
Curing
Cutting, welding, and brazing
Dryers
Exhaust hoods
Fireplaces
Machining
Ovens
Paint Spray

**Atmospheric Contaminants**

Corrosive atmospheres
Dust or lint
Excessive tobacco smoke
Heat treating
Linen and bedding handling


**Table A-2-3.6.1.2(a) Common Sources of Aerosols and Particulate Matter Moisture (*continued*)**

Pneumatic transport
Sawing, drilling, and grinding
Textile and agricultural processing

**Engine Exhaust**

Diesel trucks and locomotives
Engines not vented to the outside
Gasoline forklift trucks

**Heating Element with Abnormal Conditions**
Dusting accumulations
Improper exhaust

Incomplete combustion

This is also confirmed from the excerpts of 72-155 and 72-157, and 72-158 as follows:

72-155:

"The installation of smoke detectors in kitchens, attics (finished or unfinished), or garages is not normally recommended, as these locations occasionally experience conditions that can results in improper operation."

72-157:

"Locating smoke alarms away from sources of nuisance alarms can minimize these problems. Photoelectric-type smoke alarms are less likely to alarm from normal cooking than are the ionization type and should be considered for installation on the floor containing the cooking facilities. Some smoke alarms have a temporary silencing means that can be activated during cooking to reduce nuisance alarms. The two types of smoke alarms are equally susceptible to stream from bathrooms but locating them at least 3 ft from the bathroom door should minimize such problems. Having both types of smoke alarms in a home is a good idea from the view-point of response to different types of fires, but where interconnected it is important to make sure that the interconnect circuits are compatible."

72-158:

A-8-1.4.2 One of the common problems associated with residential smoke detectors is the nuisance alarms that are usually triggered by products of combustion from cooking, smoking, or other household particulates. While an alarm for such a condition is anticipated and tolerated by the occupant of a dwelling unit through routine living experience, the alarm is not permitted where it also sounds alarms in other dwelling units or in common use spaces. Nuisance alarms caused by cooking are a very

common occurrence, and inspection authorities should be aware of the possible ramifications where the coverage is extended beyond the limits of the dwelling unit."

If a party timely objects to the Magistrate's Judge's recommendation, the district court must make a de novo determination of the objectionable portions of the Magistrate Judge's recommendation or findings. F.R.C.P. 72(b); 28 U.S.C. Section 636(b)(1). The district court may then accept, reject, or modify, in whole or in part, the recommendation or finding. F.R.C.P. 72(b); 28 U.S.C. Section 636(b)(1).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully pray that BRK's Motion to Exclude Plaintiffs' designated expert Michael Schulz be in all things denied, and for all other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

_____
Ray R. Marchan
Attorney-in-Charge
State Bar No. 12969050
Federal Id No. 9522
WATTS & HEARD, L.L.P.
1926 E. Elizabeth
Brownsville, Texas 78520
Phone:    (956) 544-0500
Fax:      (956) 541-0255

## CERTIFICATE OF SERVICE

On the ___1___ day of July 2002, a true and correct copy of the foregoing response was served, via fax, by hand-delivery or by certified mail, return receipt requested to all opposing counsel of record.

_____

## AFFIDAVIT OF AUTHENTICITY

STATE OF TEXAS )
)
COUNTY OF CAMERON )

BEFORE ME, the undersigned Notary Public, on this day personally appeared RAY R. MARCHAN, known to me, and first being by me duly sworn according to law upon his oath deposed and stated as follows:

"My name is RAY R. MARCHAN, I am a licensed attorney engaged in the general practice of law in Brownsville, Cameron County, Texas. I am attorney with Watts & Heard, L.L.P., 1926 E. Elizabeth, Brownsville, Texas. The law firm of Watts & Heard, L.L.P., has been retained by Plaintiffs Cynthia Cox as next friend of Brittany Cox in connection with the above-referenced lawsuit.

I am of sound mind, capable of making this affidavit, and I have personal knowledge of each and every statement stated below.

I hereby certify that the copies attached hereto as exhibits 1 to 11 are authentic true and correct copies of the originals."

Further affiant sayeth not.

_____
RAY R. MARCHAN

SWORN TO AND SUBSCRIBED before me, the undersigned authority, by the said RAY R. MARCHAN, on the ___/___ day of June, 2002, to certify which witness my hand and seal of office.

_____
NOTARY PUBLIC, STATE OF TEXAS

Leticia Fierros Garza
Notary Public
State of Texas
My Commission Expires
July 26, 2004

STATE OF TEXAS )
)
COUNTY OF CAMERON )

On this the __1__ day of July, 2002, came before me, the undersigned authority, appeared RAY R. MARCHAN, who after being duly sworn upon his oath stated and deposed as follows:

"My name is Ray R. Marchan. I am over the age of 18 years and am fully competent and not disqualified by law to make this affidavit. I am the attorney for the Plaintiffs Cynthia Cox as next friend of Brittany Cox . I hereby certify that all of the facts stated in the foregoing Objection to Magistrate's Opinion and Order are true and correct to my knowledge."

Signed this the __1__ day of July, 2002.

_____
RAY R. MARCHAN

SWORN TO AND SUBSCRIBED on this the __1__ day of July, 2002.

_____
NOTARY PUBLIC, STATE OF TEXAS