*185*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

**DEC 2 0 2002**

| | | |
|---|---|---|
| CYNTHIA COX AS NEXT FRIEND | § | |
| OF BRITTANY COX, ET AL | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO. B-98-186 |
| BRK BRANDS, INC. | § | |

Michael N. Milby
Clerk of Court

<u>**PLAINTIFF COX'S BRIEF IN SUPPORT OF RESPONSE TO**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

Now comes, Plaintiff Cynthia Cox as Next Friend of Brittany Cox and files this

Brief in Support of Response to Defendant's Motion for Summary Judgment:

### SUMMARY RESPONSE

Although BRK moves for summary judgment on several different grounds, the

heart of its motion lies in two contentions: (1) Plaintiffs have no evidence that the failure

of the smoke detector was a cause in fact of Mr. Cruz's death; and (2) the manufacturer

of a defective smoke detector cannot be held liable in tort unless the smoke detector

itself actually causes the injury.  BRK is not entitled to summary judgment with regard

to either of these issues.

Cause in fact normally is not an issue decided on summary judgment.  BRK,

nevertheless, claims causation cannot be proven because Mr. Cruz died of carbon

monoxide poisoning before there was enough soot to trigger the alarm and even if the

alarm had sounded before Mr. Cruz died, Mr. Cruz would have ignored its warning.

Several of Plaintiffs' expert witnesses have opined that there was enough soot in

contact with the smoke detector before Mr. Cruz's death to trigger the alarm.  This

Court has previously ruled, however, that the experts cannot provide opinions on this

ultimate issue of causation. Assuming this Court does not revisit its decision regarding the admissibility of expert's opinions, the issue for this summary judgment is whether Plaintiffs can prove cause in fact through circumstantial evidence. They can. Although nobody can determine the exact timing, quantity, and flow of soot and carbon monoxide produced by the heater, there is enough evidence for a jury to reasonably infer that enough soot reached the smoke detector to sound the alarm before Mr. Cruz became unconscious.

BRK also claims it is entitled to summary judgment on causation because Plaintiffs cannot conclusively prove that if the alarm had sounded before Mr. Cruz lost consciousness that he would have heeded its warning. Because the alarm did not sound and Mr. Cruz died, there is no way to absolutely prove what he would have done had the alarm sounded. Again, however, there is enough circumstantial evidence for a jury to make the reasonable inference that Mr. Cruz would have heeded the warning.

BRK's second primary basis for summary judgment is its claim that the manufacturer of a defective product cannot be held liable in tort unless its product actually causes the accident or injury. In support of this proposition, BRK cites several cases involve buglary alarm systems that failed. In those cases, the parties had entered into a contract that included liquidated damages in the event the system failed. BRK and Plaintiffs do not have such a contract. Further, this is a personal injury action, which is substantially different from the loss of property cases cited by BRK. Several courts, including the Fifth Circuit, have held that a manufacturer can be held liable for injuries caused by the failure of its product, even if the product was not the precipitating cause of the incident.

Plaintiff Cox requests this Court deny BRK's Motion for Summary Judgment.

## STATEMENT OF FACTS

This wrongful death action arises out of the untimely death of Manuel Cruz. Plaintiff Cox was Mr. Cruz's minor daughter.

Manuel Cruz lived by himself in a house in San Benito, Texas. He had a gas-fueled space heater in his house. [Russell, Tab "9", Ex. 2; Tab "1", Exs. 7 and 44; Tabs "5" and "6", generally][1] The heater was installed improperly in two respects: (1) although it was designed to burn natural gas, it was hooked to a propane gas tank; and (2) the heater was not properly vented, so that the byproducts of the combustion process (i.e., soot and carbon monoxide) remained in the house. [*Id.*] Because of the different properties between natural gas (for which the heater was designed) and liquid propane (which the heater was receiving), too much gas was going to the heater. [*Id.*] Because the heater was not designed to burn that quantity of gas, it had a larger than expected amount of incomplete combustion. [*Id.*] The incomplete combustion is the unwanted byproduct, such as soot and carbon monoxide. [*Id.*] Thus, these two problems with the installation of the heater exacerbated the eventual problem – a greater amount of incomplete combustion byproduct than intended and the failure to vent that byproduct outside the house.

Mr. Cruz lived in a small, one-story, house. [Garcia Aff., Exhibit "E," layout of the house] One section of the house was the living room and kitchen. [*Id.*] These were connected by a hallway to three bedrooms and a bath on the other side of the house. [*Id.*] The heater was installed in the living room, near the hallway. [*Id.*] At the time the

---

[1]    References to BRK's Appendix are referred to as "Exhibit [corresponding letter]." References to Plaintiff Cox's Appendix are referred to as "Tab [corresponding number]."

heater was installed, Mr. Cruz already had a smoke detector installed on the wall of the hallway, very close to the heater. [Sosa Aff., Exhibit "A"; Garcia, Exhibit "O", p. 35]

About two weeks after the heater was installed, on Sunday, December 14, 1997, Manuel Cruz and Jose Garcia went on a double date. [Garcia Aff., Exhibit "E"] They came back to Mr. Cruz's house at approximately 10:30 p.m. [*Id.*] When they got to the house, Mr. Cruz turned the heater on. [*Id.*] Mr. Cruz and Mr. Garcia stayed up late drinking beer and smoking cigarettes. [*Id.*] At approximately 4:00 a.m., they decided to go to sleep. [*Id.*] Mr. Cruz went to his bedroom and shut his door, and Mr. Garcia (who *felt too drunk to drive home*) slept on the couch in the living room. [*Id.*] Between 6:00 a.m. and 6:30 a.m., Mr. Garcia woke up and went home. [*Id.*] When he awoke, Mr. Garcia had a headache. [*Id.*] He called out "good-bye" to Mr. Cruz as he left, but did not attempt to go into his room. [*Id.*]

Between 10:00 a.m. and noon on Monday, December 15, 1997, Cynthia Cox called Mr. Cruz at home to see if he would be joining her and their daughter Brittany. Cox Exhibit "G" p. 59] Mr. Cruz did not answer the phone. [*Id.*]

On Tuesday, December 16, 1997, Kenya Sosa, Mr. Cruz's girlfriend, went to the house to check on Mr. Cruz. [Sosa Aff., Exhibit "A"] When she went into his bedroom, she discovered him dead, on his bed. [*Id.*]

The pathologist at Valley Baptist Medical Center performed an autopsy of Manuel Cruz at approximately 10:30 a.m., on Wednesday, December 17, 1997. [Autopsy Report, Exhibit "H"] He determined Mr. Cruz had a carboxyhemoglobin level of 49.1% (which means Mr. Cruz died of carbon monoxide poisoning). [*Id.*] The

pathologist found a blood alcohol level of 0.055 g/dl.[2]   [Id.]   He also rendered a diagnosis that the body was "approximately 24 hours of post mortem interval." [Id.]

The pathologist signed an affidavit on March 19, 2000 (more than two years after his examination), in which he stated, "[t]he conclusion I formed based on the findings of Mr. Cruz' autopsy was that he died of carbon monoxide poisoning before he inhaled any smoke or soot and more than 24 hours before his autopsy." [Id.] The pathologist provided no reason, in his affidavit, for changing his opinion about the time of death from "approximately 24 hours" to "more than 24 hours." [Id.] Further, he provided no basis for his conclusion about a lack of inhaled soot and smoke other than the initial finding that the larynx, trachea, bronchi, and lungs were unremarkable. [Id.]

When Mr. Cruz's body was found on December 17, 1997, there was a large amount of soot in the house. [Garcia, Exhibit "O", pp. 28, 44] It was on the wall, the ceiling, and even on the smoke detector. [Id.; McClintock, Tab "4", Exs. 2-21] The heater was no longer running because it was out of fuel. When the smoke detector was still on the wall, somebody pushed its test button and the alarm sounded. [McClintock, Tab "4", Ex. 2; Russell, Exhibit "L", p. 14] It was determined that the batter in the smoke detector had a charge of more than 9 volts. [Tab "6", p. 127] It was also determined that the smoke detector never sounded from the time Mr. Cruz turned the heater on at 10:30 p.m. Sunday evening, until after Mr. Cruz's body was found on Tuesday evening. [Holmes Exhibit "C", Ex. 3; Russell, Exhibit "L" pp. 26-28, 67-70; Tab "9"; Tab "5", pp. 87-157; Tab "6", pp. 67-94]

Plaintiff Cox, Mr. Cruz's minor daughter, brought this wrongful death claim against BRK Brand, Inc., the manufacturer of the smoke detector in Mr. Cruz's house.

---

[2]       There is evidence that Mr. Cruz's blood alcohol level was between 0.03 and 0.055. [Tab 6, pp. 50-52]

She has asserted causes of action for strict products liability (design, manufacturing, and marketing defects), breach of warranty under 402B of the Restatement, negligence, breach of implied warranties, civil conspiracy, and gross negligence. BRK filed a 12(b)(6) motion to dismiss that was denied. It has now filed a motion for summary judgment seeking dismissal of all claims against it.

## ARGUMENTS AND AUTHORITIES

### I.    Cause in Fact

In diversity cases, such as this, Texas law determines the quality and quantum of evidence required to establish a cause of action. *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 986 (5th Cir. 1989); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817 (1938). To prove her causes of action for strict products liability, breach of warranty, and negligence under Texas law, Plaintiff Cox is required to present some evidence that the failure of the smoke detector was a cause in fact of Mr. Cruz's death. BRK claims it is entitled to summary judgment as to all claims because Plaintiffs have no evidence to establish cause in fact.[3]

The Texas Supreme Court addressed cause in fact in *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 458-59 (Tex. 1992). The Court held that cause in fact "means that an act or omission was a substantial factor in bring about the injury and without which no harm would have occurred." *Id.* "The act or omission need not be the sole cause." *Id.* at 459. The Court summed up the issue before it as "whether there is any evidence from which reasonable minds could draw an inference that the failure to provide a safe

---

[3]    Although Plaintiffs' cause of action for negligence requires proof of both cause in fact and foreseeability (i.e., proximate cause), BRK has not moved for summary judgment based on a lack of evidence of foreseeability.

place to work was a cause in fact of Havner's death. . . . Whether other possible inferences may be drawn from the evidence is not the relevant inquiry." *Id.*

As BRK notes, cause in fact cannot be established by mere conjecture, guess, or speculation. [BRK Brief at 16] Plaintiffs are not required, however, to present direct and positive proof, because the jury is allowed to infer cause in fact "from the circumstances surrounding the event." *Mosley v. Excel Corp.,* 109 F.3d 1006, 1009 (5th Cir. 1997); *Bartley v. Euclid, Inc.,* 158 F.3d 261, 272 (5th Cir. 1998). In fact, because the determination of cause in fact is based so heavily on the particular facts of the case, the Texas Supreme Court has stated that cause in fact is "a particularly apt question for jury determination." *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 756 (Tex. 1975).

Despite the fact that the issue of cause in fact in this case should be determined by a jury, BRK requests this Court grant it summary judgment, claiming (1) there is no evidence the smoke detector alarm should have sounded before Mr. Cruz became incapacitated by carbon monoxide; and (2) there is no evidence Mr. Cruz would have heard the alarm and either shut off the space heater or vacated the premises.

## A.    The Timing Issue

There is unquestionably evidence of three important facts: (1) the heater produced both carbon monoxide and soot as a byproduct; (2) there was enough carbon monoxide in the house to cause the death of Mr. Cruz; and (3) there was enough soot in the house to trigger the smoke detector. The dispute is whether there was enough soot to trigger the alarm before Mr. Cruz became incapacitated. Nobody will ever know the exact time Mr. Cruz became incapacitated or when there was enough soot to trigger the alarm. It is not unusual, however, for a jury to be presented with only estimates or opinions as to what happened. That is why we have a jury – to determine what is mre likely than not the truth. Figuring out the unknown facts (forensics) can be done by

experts who design a similar situation and attempt to recreate the scenario. It can be done by experts who have enough technical knowledge and experience that they can piece together the puzzle with certain key facts. Finally, the truth can be determined by the jury's common sense of inferring from the evidence presented.

### 1.    *Expert Testimony*

Several of Plaintiffs' expert witnesses have testified that in their professional opinions, the smoke detector should have sounded its alarm before Mr. Cruz became incapacitated by carbon monoxide. [Russell, Exhibit "L" pp. 22-29, 68-89, 133-145; Tab "9"; Cramner, Tab "1" pp. 70-73, 128-152, Ex. 7; Cramner Aff., Tab "8"; McCain, Exhibit "D", pp. 7-11, 62, 119, 130-31, 182; McCain, Tab "3" Ex. 6; Schulz, Tab "2", pp. 44-49, 70-71, 143-44, 173-74; Schulz Aff., Tab "7"; Tab "5", pp. 52-96, 175-211; Tab "6", pp. 68-95; Tab "10"] Based on this expert testimony, there is at the least a disputed issue of material fact as to whether the alarm should have sounded before Mr. Cruz lost consciousness. After a *Daubert* challenge, however, this Court determined that none of those witnesses can give an opinion on this ultimate issue of whether the alarm should have sounded before Mr. Cruz became incapacitated.

Plaintiff resubmits this expert testimony in support of this summary judgment response for two reasons. First, Plaintiff requests this Court reconsider its ruling and accept the testimony of some or all of these experts with regard to the opinion that the smoke detector should have sounded its alarm before Mr. Cruz became incapacitated by carbon monoxide. Second, Plaintiffs offer the evidence in order to preserve the issue.

As discussed below, even after this Court's *Daubert* rulings, there is still enough expert testimony, along with other evidence, for a jury to reach a reasonable inference that the alarm should have sounded before the carbon monoxide made Mr. Cruz lose consciousness.

### 2. *BRK's contention of no soot in the lungs*

BRK claims that Mr. Cruz did not have any amount of smoke or soot in his lungs at the time of his death. It claims this proves there was no smoke or soot in Mr. Cruz's house at the time of his death, so that the smoke detector would not have sounded before Mr. Cruz's death. BRK's contention, however, is subject to disputed material facts.

First, it is disputed that Mr. Cruz did not have any amounts of smoke or soot in his lungs at the time of his death. The soot that was produced from the heater was in varying sizes. [Russell, Exhibit "L" pp. 24-26] Some of the soot that should have triggered the alarm would have been invisible to the naked eye. [Russell, Exhibit "L" pp. 24-26, 87-90, 134-37; McCain, Exhibit "D" pp. 7-11, 182] Consequently, it is possible that Mr. Cruz had trace amounts of these microscopic soot particles in his lungs at the time he died. [Davenport Aff. & Pathology Report, not addressing microscopic particles of soot] Based on the fact that Mr. Cruz and Mr. Garcia smoked a pack of cigarettes during the evening, it is not clear whether a trace amount of soot from the heater could have been detected in Mr. Cruz's lungs. [Garcia Aff., Exhibit "E"]

Second, even if Mr. Cruz did not have any amount of soot in his lungs, that does not prove there was no soot in the house. Mr. Cruz died in his bedroom, with the door shut. [Garcia Aff., Exhibit "E"; Perez Aff., Exhibit "F"] The heater that was producing carbon monoxide and soot was in the living room (which is down the hall from the bedroom). [*Id.*, layout of the house] The smoke detector that should have detected the soot was in the living room, a few feet from the heater. [*Id.*] The alarm could have (and in fact should have) sounded before the soot got to the bedroom. This is consistent with the fact that there was a large amount of soot found in the living room and not the bedroom. [Holmes, Tab "10"; McClintock, Tab "4", Exs. 2-21]

BRK has not conclusively proven that there was no soot to sound the alarm before Mr. Cruz became incapacitated. To the contrary, there is evidence from which a jury could reasonably infer the alarm should have sounded first. Consequently, this Court should not grant summary judgment based on this argument.

### 3. Failure to quantify the amount of soot and amount of carbon monoxide

BRK alternatively contends that Plaintiffs cannot prove the alarm should have sounded before Mr. Cruz became incapacitated because they cannot quantify the amount of soot particles coming from the heater. BRK improperly assumes that the exact quantity of soot and a soot-to-carbon monoxide ratio must be calculated before there can be any proof that the alarm should have sounded before Mr. Cruz's death. In other words, BRK believes the only way Plaintiffs can prove this case is if they have experts determine the exact amount of soot being produced by the heater and the exact number of minutes that soot would have triggered the smoke detector and then have experts determine the exact amount of carbon monoxide being produced by the heater and the exact number of minutes (or hours) that carbon monoxide would have incapacitated and killed Mr. Cruz. This is not, however, the only means of producing evidence that the detector should have sounded before Mr. Cruz was incapacitated.

There are several facts from which a jury can infer that the smoke detector should have sounded before Mr. Cruz's death:

- the heater was in the living room, a few feet away from the smoke detector [Garcia Aff., Exhibit "E"];

- Mr. Cruz's bedroom is down the hall from room where the heater and smoke detector are located [*Id.*];

- The smoke detector was on the wall, between the heater and Mr. Cruz's bedroom, so that coming from the heater you would pass the detector before getting to the bedroom [*Id.*];

- the smoke detector is an ionization type, which is sensitive to small soot particles [Russell, Exhibit "L", p. 135; Tab "6", pp. 68-95];

- there was a charged battery in the detector [Tab "6", p. 127; McClintock, Tab "4", p. 103];

- the heater was producing both soot and carbon monoxide at the same time [Tab "6", pp. 68-95; Russell, Exhibit "L", pp. 87-90; McCain, Exhibit "D", pp. 7-11, 182];

- even microscopic particles of soot would trigger the smoke detector's alarm [*Id.*];

- it would take several hours for the carbon monoxide to cause Mr. Cruz to lose consciousness [Cramner, Tab "1", Ex. 44; Russell, Exhibit "L", pp. 70-74];

- when an ionization type smoke detector is that close to a space heater it will trigger an alarm within minutes, not hours [*Id.*; Tabs 5 and 6, generally];

- BRK states in its user manual for ionization smoke detectors that the detector should not be within 20 feet of a space heater or it will be triggered by the heater [Tab "5", pp. 55, 57, 95-96; Exhibit "J"];

- an ionization detector is sensitive, so that it triggers an alarm when it encounters small amounts of soot particles [Tab 6, pp. 68-95; Russell, Exhibit "L", pp. 87-90]; and

- the smoke detector never sounded despite the fact there were large quantities of soot found in Mr. Cruz's living room, around the detector, and on the detector [Tab 6, generally].

"[C]ircumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it. If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable. . . ." *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001). In this case, it is reasonable to infer that when the heater produced both carbon monoxide and soot at the same time, these byproducts would pass through the detector before they got to the bedroom, setting off the alarm before incapacitating Mr. Cruz. Although it might also be reasonable to infer that fatal levels of carbon monoxide got to Mr. Cruz's bedroom for a sustained length of time to incapacitate him without a sufficient amount of soot

reaching the smoke detector to sound the alarm, it is for the jury to decide which inference is more reasonable. *Lozano*, 52 S.W.3d at 148.

Because there is evidence (separate and apart from the evidence prohibited by the Court's *Daubert* ruling) that would allow the jury to reasonably infer the alarm should have sounded before Mr. Cruz became unconscious, Plaintiff Cox requests this Court deny BRK's motion for summary judgment.

### B.    Reacting to the Alarm

BRK also contends that Plaintiffs cannot prove cause in fact because there is no evidence Mr. Cruz would have heard the alarm and either shut off the heater or vacated the premises. We can never be sure what Mr. Cruz would have done, because the alarm never sounded and he died. Again, however, there is circumstantial evidence that Mr. Cruz would have heard and heeded the warning.

BRK is incorrect in assuming that the only way for a jury to determine whether Mr. Cruz would have heard the alarm is to have expert calculations. The purpose of a smoke detector is to warn people of a dangerous situation. As we all know, when triggered, a smoke detector makes a loud, shrill, annoying sound. [Sosa Aff., Exhibit "A", describing the noise when Mr. Cruz's smoke detector went off previously; Garcia, Exhibit "N"] The only feasible reason given by BRK as to why Mr. Cruz would not have heard the alarm is that he was too drunk to physically respond.

According to the pathologist, Mr. Cruz had a blood alcohol content of 0.055 g/dl at the time of his death. [Davenport Aff., Exhibit "H"] There is other evidence that his blood alcohol content was 0.03 g/dl. [Tab "6", pp. 50-52] Either reading was well below the legal limit to drive in Texas, 0.08. Tex. Penal Code §49.01. If Mr. Cruz was not too drunk to drive a vehicle on Texas roadways, a jury could reasonably find he was not so drunk that he would not hear the smoke detector's shrill alarm.

Further, Mr. Garcia, who was drinking with Mr. Cruz the previous night, was not too intoxicated to get up at 6:00 a.m. and leave the house. [Garcia Aff., Exhibit "E"] If a jury is told that Mr. Cruz was below the "legal limit," sleeping down the hallway from a normal sounding smoke detector (approximately 85 decible), it has enough evidence to make a reasonable inference whether Mr. Cruz would have been able to respond to the alarm. Consequently, summary judgment is not proper.

BRK also suggest that if the alarm had sounded, Mr. Cruz would have probably just taken the battery out and gone back to sleep. According to Ms. Sosa, when the smoke detector went off another time, Mr. Cruz did not take the battery out, but rather, fanned the smoke away. [Sosa Aff., Exhibit "A"] Also, Cynthia Cox testified that Mr. Cruz was "safety cautious" and would have reacted prudently to an alarm. [Cox, Exhibit "G", p. 67] This shows Mr. Cruz was not in the habit of taking the battery out to stop the alarm. Rather, he would attempt to remedy the source of the smoke.

Further, BRK's suggestion that a consumer would fail to heed the warning of the smoke detector is contrary to the very purpose of the product. If Mr. Cruz was conscientious enough to purchase and maintain a smoke detector, a jury can reasonably infer that he has the item for his protection and will heed its warning of a hazardous situation.

Plaintiff Cox requests this Court deny BRK's motion for summary judgment based on causation.

## II.    Tort Recovery for Defective Product

BRK contends it is entitled to summary judgment with regard to all tort claims against it because it can never held liable in tort for an injury caused by its product

failing to perform. BRK claims that it can be held liable in tort only if its product physically causes the injury (e.g., a short circuit in the alarm causes a fire).

The cases BRK relies on to support its argument are not dispositive of the issue it raises. None of the cases holds that a product manufacturer cannot be held liable when its product failed to perform as designed and, consequently, was a cause of personal injury.

Before addressing the cases upon which BRK relies, it is appropriate to briefly discuss BRK's theory in general. BRK claims that a product manufacturer can never be held liable for a defect in its product if the product itself did not physically cause the injury. By way of analogy, if an occupant of a vehicle is killed because her seatbelt breaks and fails to restrain her, the seatbelt manufacturer cannot be held liable because the fatal injury is caused by the person's body colliding with the vehicle. Just as the smoke detector did not produce the carbon monoxide that killed Mr. Cruz, the seatbelt did not cause the accident and the forces that resulted in the occupant's death. We know this is not the law. *Hyundai Motor Co. v. Alvarado,* 974 S.W.2d 1 (Tex. 1998) (recognizing a product liability claim for seatbelt failure).

Again, the cases BRK cites in support of its argument do not stand for the proposition that the manufacturer of a product that fails to perform cannot be held liable for personal injuries in tort. The cases relied upon by BRK are:

- *Kelley v. American Heyer-Schutle Corp.,* 957 F.Supp. 873 (W.D. Tex. 1997). *Kelley* merely states that the plaintiff must show a causal connection between the product and the medical condition of which the plaintiff complains. It does not address the issue of a product having to directly cause the harm or injury as opposed to not preventing it. The product in *Kelley* was not designed to prevent the condition of which the plaintiff complained.

- *Vallance & Co. v. De Anda,* 595 S.W.2d 587 (Tex.App.—San Antonio 1980, no writ). *Vallance* involved a burglar alarm system. The parties contractually agreed to a liquidated damage clause to fix the amount of liability on the part of the company. The court found the liquidated damage clause was enforceable.

- *Schepps v. American District Telegraph Co. of Texas,* 286 S.W.2d 684 (Tex.Civ.App.—Dallas 1955, no writ). The product at issue in Schepps was also a burglar alarm system. Like *Vallance,* the parties had a contractual agreement to limit the company's liability in the event the burglar alarm system failed. Schepps is a fraud case, not a tort case.

- *Fireman's Fund American Ins. Co. v. Burns Electronic Security Services, Inc.,* 417 N.E.2d 131 (Ill.App. 1980). Fireman's Fund is also a burglar alarm case. The parties had contracted to determine who would pay damages arising from the product failure. The plaintiff asserted a product liability claim in an attempt to circumvent the contractual agreement it had reached with the company. The court found there was no need for the law of torts to define the rights of the parties when they had already done so in their contract. The court noted that the case might be different if the failure of the alarm had caused personal injury. *Id.* at 134.

- *Aronson's Men's Stores, Inc. v. Potter Electric Signal Co., Inc.,* 632 S.W.2d 472 (Mo. 1982). *Aronson's* is also a burglar alarm case. The Court determined that the burglar alarm system was not unreasonably dangerous for purposes of strict liability. A burglar alarm at a clothing store, of course, is designed to protect property when nobody is in the premises. A smoke detector, on the other hand, is designed to prevent personal injury. Consequently, the harm that could reasonably be anticipated with the failure of a smoke detector is substantially greater than with the failure of a burglar alarm. The Court held that the burglar alarm company could be held liable in negligence, because negligence is based on a foreseeable or reasonably anticipated harm or injury. Based on the current state of product liability (design defect) law in Texas, the product liability claim is based on the foreseeable risks of harm posed by the product. Restatement (Third) of Torts: Products Liability, §2. Consequently, under the Missouri Supreme Court's rationale in *Aronson's,* the manufacturer of a defective burglar alarm could be held strictly liable for the defective design of the system.

- *Linegar v. Armour of America, Inc.,* 909 F.2d 1150 (8th Cir. 1990). *Linegar* involves the performance of a bullet proof vest. The court noted that the vest performed as it was intended and stopped all of the bullets that struck it. The court rejected the theory that the manufacturer should have been liable because the vest did not protect additional portions of the body. Unlike *Linegar,* the Plaintiffs in this case do not claim that the smoke detector failed because it was not designed to detect the soot in Mr. Cruz's house. This is a case where the product failed to perform – it failed to detect the smoke and soot in Mr. Cruz's house, which it was designed to detect. *Linegar* is not relevant because that product performed as it was designed to do.

BRK failed to cite this Court any of the considerable authority that has recognized that the manufacturer of a smoke detector can be held liable for personal

injuries caused by the failure of the alarm to properly function. Most of these cases actually involved BRK and its predecessor Pittway Corporation.

The Second Circuit addressed this issue in *Butler v. Pittway Corp.*, 770 F.2d 7 (2nd Cir. 1985). In *Butler*, the plaintiffs claimed their house sustained additional fire and smoke damage because the smoke detector failed to timely sound an alarm. Pittway claimed that because the smoke detector was not the cause of the fire, it could not be held responsible in tort for aggravated damages caused by its product's failure to properly perform. The Second Circuit rejected this argument. It held the manufacturer's tort liability "should not be limited to [situations] in which the defect causes the accident, but should extend to situations in which the defect caused injuries over and above that which would have occurred from the accident, but for the defective design." *Id.* at 10 (quoting *Caiazzo v. Vokswagenwerk*, 647 F.2d 241, 245 (2nd Cir. 1981)). The court held Pittway could be held strictly liable for the property damage caused by its defective product's failure to perform.

Courts have consistently held that the manufacturer of a smoke detector can be held liable in tort for personal injuries that were caused by the detector's failure to properly sound an alarm. *See e.g., Laaperi v. Sears, Roebuck & Co., Inc.*, 787 F.2d 726, 730 (1st Cir. 1986) (failure to warn purchasers of the Pittway smoke detector of non-obvious limitations of the detector, when it will not function, gave rise to potential liability for injuries caused in the fire when the alarm did not timely sound); *Carruth v. Pittway Corp.*, 643 So.2d 1340, 1346 (Ala. 1994) (recognizing a failure to warn cause of action against manufacturer of smoke detector, where detector failed to timely warn of danger and was a cause of the deaths); *Pearsall v. Emhart Industries*, 599 F.Supp. 207, 215 (E.D. Penn. 1984) ("[t]he purpose of a smoke or heat detector is to alert persons to life threatening danger thereby allowing them to escape. . . . As a matter of social policy the

risk of death due to defective heat and smoke detectors should be placed upon their manufacturer.").

Although it appears the Fifth Circuit has not published an opinion involving smoke detectors, it has addressed the general issue raised by BRK. In *Koonce v. Quaker Safety Products & Manufacturing Co.*, 798 F.2d 700 (5th Cir. 1986), the court analyzed the liability of the manufacturer of a safety suit. The court held that the manufacturer's failure to warn of the suit's limitations was a producing cause of the plaintiff's injuries and death. *Id.* at 718. Consequently, the court affirmed the judgment against the manufacturer.

BRK has not shown that Texas law prohibits a tort claim against a product manufaturer whose product causes or exacerbates an injury even though it does not cause the precipitating event. Plainitff Cox, therefore, requests this Court deny its motion for summary judgment on this issue.

## III.   DTPA/Breach of Implied Warranty of Merchantability

BRK argues that Plaintiffs cannot prevail, as a matter of law, on their DTPA (breach of implied warranty of merchantability) claims. BRK claims that Plaintiffs cannot present evidence that the smoke detector was unfit for the ordinary purposes for which it was to used.

BRK's argument about the smoke detector not being unfit for its ordinary purpose is based on the improper assumption that the only purpose of a smoke detector is to warn of a fire. As its name implies, a smoke detector is designed to signal an alarm if it detects smoke and soot.[4] *Pearsall*, 599 F.Supp. at 215 (noting that the purpose of a smoke detector is to alert persons of life threatening danger). Plaintiffs do not contend

---

[4]   Although heat detectors signal an alarm if they detect as certain level of heat, that is not relevant to this case.

the smoke detector should have been triggered by the carbon monoxide. The smoke detector should, however, have sounded an alarm when it encountered an unusual amount of smoke and soot, which (as in this case) signals that something is wrong.

Further, BRK is incorrect in claiming there was no fire. Although the fire in this case was controlled and did not directly cause the harm, it did cause the output of the soot and carbon monoxide. Consequently, the smoke detector's failure to warn Mr. Cruz that the fire was producing hazardous byproducts – soot and carbon monoxide – was a failure to perform as it was designed.

Plaintiff Cox requests this Court deny BRK's motion for summary judgment on this issue.

## IV.    Civil Conspiracy

BRK claims that its conduct in influencing public officials is not an unlawful and cannot be the basis of a claim for civil conspiracy. Plaintiffs are not asserting a cause of action against BRK for civil conspiracy. The evidence of conspiracy goes to the issue of gross negligence and punitive damages.

## V.    Violations of the Consumer Product Safety Act

Plaintiffs are not asserting a cause of action arising out of BRK's violations of the Consumer Product Safety Act (CPSA). Plaintiffs agree that they do not have a private cause of action under the CPSA. The CPSA does, however, serve as a point of evidence to show the applicable standard of care for manufacturers of safety products.

## VI.    Punitive Damages

BRK contends it cannot be held liable for punitive damages because: (1) the smoke detector it designed, manufactured, and distributed is not defective; and (2) even

if it is defective, this is nothing more than negligence on the part of BRK (i.e., BRK did not create an extreme risk of harm and proceed in conscious indifference to the rights, safety, and welfare of others).

The issues regarding the defective product have been discussed above. There is evidence the smoke detector in Mr. Cruz's house failed to sound its alarm even though it encountered large quantities of soot. [Garcia, Exhibit "O", pp. 24, 28; McClintock, Tab "4"] Thus, BRK's first point must fail.

The gross negligence standard in Texas, as set forth Texas Civil Practice and Remedies Code §41.001(7), is a high standard. There is evidence, however, that BRK knew it had a problem with its ionization type smoke detectors not timely signaling when they encountered sufficient amounts of smoke or soot to indicate a hazardous situation. [Russell, Exhibit "L", pp. 42-54]

BRK finally argues that it cannot be held liable for punitive damages if it complies with the applicable governmental and industry standards. Although compliance with the standards is evidence that the manufacturer did not commit gross negligence, it is possible for a manufacturer to know its product poses a substantial risk of harm despite its compliance with the standards. Based on Plaintiffs' research, no Texas court has adopted a rule that prohibits a finding of malice or gross negligence if the manufacturer complied with the government and industry standards. This is an evidentiary issue for trial, not a legal issue for summary judgment.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Cynthia Cox as Next Friend of Brittany Cox prays that this Honorable Court deny Defendant's Motion for Summary Judgment and grant her such other and further relief, at law or in equity, to which she may show herself to be justly entitled to receive.

Respectfully submitted this 20th day of December, 2002.

WATTS LAW FIRM, L.L.P.
1926 E. Elizabeth
Brownsville, Texas  78520
(956) 544-0500
(956) 541-0255  FAX


Ray R. Marchan
Attorney for Plaintiff Cynthia Cox,
ANF of Brittany Cox
State Bar No. 12969050
Federal I.D. No. 9522

## CERTIFICATE OF SERVICE

On this 20th day of December, 2002, a true and correct copy of the foregoing instrument was forwarded to opposing counsel via fax, by hand-delivery or by certified mail, return receipt requested.

RAY R. MARCHAN