*186*

United States District Court
Southern District of Texas
FILED

DEC 2 0 2002

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE, DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, INDIVIDUALLY | § | |
| AND AS REPRESENTATIVE OF THE | § | |
| ESTATE OF MANUEL CRUZ; IDALIA | § | |
| GARCIA, INDIVIDUALLY; AND CYNTHIA | § | |
| COX, INDIVIDUALLY AND AS NEXT | § | CIVIL ACTION NO. B-98-186 |
| FRIEND OF BRITTANY COX | § | |
| | § | |
| v. | § | JURY DEMANDED |
| | § | |
| BRK BRANDS, INC. | § | |

### PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM THERETO

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs JOSE GARCIA, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF MANUEL CRUZ and IDALIA GARCIA INDIVIDUALLY, ask the court to deny Defendant's Motion for Summary Judgment.

### A. Introduction

1.    Plaintiffs are JOSE GARCIA, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF MANUEL CRUZ and IDALIA GARCIA INDIVIDUALLY; Defendant is BRK BRANDS, INC.

2.    Plaintiffs sued Defendant based upon negligence, negligence pro se, gross negligence, strict product liability, breach of warranties, and various causes of action as detailed in their petitions, complaints and amended complaints seeking actual and punitive damages, on file with the court which are incorporated herewith by reference as if set forth at length.

3.    On November 27, 2002, Defendant filed their Motion for Summary Judgment on all of

1

Plaintiffs' cause of action.

4.      Summary judgment is improper in this case because there are genuine issues of material fact one each element of each of Plaintiffs' causes of action and Plaintiffs would show unto the court as follows:

### B. Background Facts

5.      Manuel Cruz was discovered dead in his home in San Benito, Texas on December 16, 1997. Manuel Cruz's home was equipped with a BRK Model SA67D smoke detector which was installed in an appropriate place on the wall of the hallway leading from Mr. Cruz's living room, approximately 7 to 10 feet from a space heater he was using to heat his home. Mr. Cruz died of carbon monoxide poisoning in a situation where the BRK smoke detector failed to alarm although there were products of combustion being produced by the space heater in question.

### C. Standard of Review

6.      The purpose of the summary judgment is to pierce the pleadings and to assess the proof to determine whether there is a genuine need for trial. Although summary judgment is proper in any case where there is no genuine issue of material fact, this is not a case where the court should grant summary judgment. (emphasis added) Fed. R. Civ. P. 56(c ); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348 (1986)

7.      A defendant who seeks summary judgment on a Plaintiffs' cause of action must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of Plaintiffs' claim or (2) showing there is no evidence to support an essential element of Plaintiff's claim. *Celotex Corp.,* 477 U.S. at 322-25, 106 S. Ct. at 2552-54; *J. Geils Band Employee Benefit Plan v. Smith Barney*

2

*Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir. 1996). A genuine issue is one that can be resolved only by a trier of fact because it may be resolved in favor of either party. *Anderson,* 477 U.S. at 248-49, 106 S.Ct. at 2510. A genuine issue exists when a reasonable jury could resolve the disputed fact in favor of, or in the manner described by, the nonmovant. *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir.1996); A material fact is one that can affect the outcome of the suit under the governing substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

8.    If (but only if ) the defendant makes the requisite showing, the burden shifts to the plaintiff to prove there is a fact issue that is trial worthy. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Defendant cannot rely on conclusory statements to establish that Plaintiffs have not presented evidence on an essential element of their claim. Rather, Defendant must demonstrate an absence of a genuine factual dispute. *See Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555. Only if Defendant meets its burden are Plaintiffs required to respond by summary judgment proof to show a genuine issue of material fact. Fed. R. Civ. 56(e).

9.    "The purpose of the procedure has sometimes been misunderstood, perhaps in part because the motion for summary judgment has often been used improperly: as a discovery device; to educate the trial judge: in the hope, however faint, of quick victory; and in the expectation, frequently realized of retarding the progress of a suit and making litigation more expensive." *Professional Managers,* 799 F.2d at 221-22. Most important, the court should not resolve disputed issues of fact at the summary judgment stage. *Estiverne v. Louisiana State Bar Ass'n,* 863 F.2d 371, 374 (5th Cir. 1989).

10.    Summary judgment will not lie if the dispute about a fact is genuine; that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 106 S. Ct. at 2510; Stults, 76 F.3d at 654. Summary judgment is inappropriate if the

3

evidence before the court, <u>viewed as a whole</u>, could lead to different factual findings and conclusions. (emphasis added) *Honore*, 833 F.2d at 567. Summary judgment is inappropriate where there is a genuine disagreement as to the <u>reasonable inferences</u> to be drawn from undisputed facts. *Fischbach*, 799 F.2d at 196; *Winters v. Highlands Insurance Co.*, 569 F.2d 297, 299 (5th Cir. 1978); see *Stephen R. Ward, Inc.*, 681 F. Supp. At 392; EEOC, 657 F. Supp. At 743. "Appellee argues that this circumstantial proof is insufficient to withstand its motion for summary judgment because appellants failed to absolutely negate the possibility that an intermediate act or agency produced the defective condition." *Ridgwayt v. Ford Motor Co.*, 82 S.W.3d 26 (Tex. App. 2002)

8.      Furthermore, United States Court of Appeals for the Fifth Circuit in a case styled ***Trevino s. Yamaha Motor Corporation, U.S. A.*** 882 F.2d 182 (5th Cir. 1989) stated that the use of summary judgment is **<u>rarely appropriate in negligence for product liability cases even where material facts are disputed</u>**. (emphasis added)

9.      Defendant claims that Plaintiffs cannot prevail without specific evidence concerning how much soot or byproduct of combustion would cause the detector to alarm and whether the alarm would have sounded before carbon monoxide reached lethal levels. Defendant not only ignores all of the evidence cited herein but also that it is entirely appropriate for a jury to consider circumstantial evidence. Simply because Plaintiffs may not absolutely negate all possibilities does not mean that there is no material issue of fact. *See Ridgeway v. Ford Motor. Id.* The standard of review guides the court to resolve all inferences and doubts in favor of Plaintiffs at this stage of the process. Evidence may be either direct or circumstantial. It is direct evidence if it proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact. It is circumstantial evidence if it proves a fact from which an inference of the existence of

another fact may be drawn. *Dutton v. Southern Pacific Trans. Co.* 561 S.W.2d 892 (Tex. App –

El Paso, 1978).

10.    Merely because it appears to the court that the nonmovant is unlikely to prevail at trial or

that the movant's version of the facts is more plausible than the nonmovant's version is no

reason to grant summary judgment. *EEOC v. AFGE Local* 1617, 657 F. Supp. 742, 743 (W.D.

Tex. 1987) (citing *Jones v. Western Geophysical Co. of America*, 669 F.2d 280, 283 (5th Cir.

1982); *Johnson v. Sawyer*, 640 F. Supp. 1126, 1130 (S.D. Tex. 1986).

11..    At the summary judgment stage the judge's function is not to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial.  The

judge is not to make credibility determinations, weigh evidence, or draw  from the facts

legitimate inferences for the movant. *Anderson*, 106 S. Ct. at 2513.  Stated differently, the

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his

favor. *Anderson,* 106 S. Ct. at 2513; Ragas, 136 F. 3d at 458; *Willis*, 61 F.3d at 315; *Stults*, 76

F.3d at 654; *Karr*, 950 F. Supp. At 1321.  All reasonable doubt as to the existence of a genuine

issue of material fact must be resolved against the movant and in the light most favorable to the

nonmoving party. *Doe v. Taylor Independent School District*, 15 F.3d 443, 456 n.11 (5th Cir.

1994), cert. Denied, 513 U.S. 815 (1994); APG3, 32 F.Supp. 2d at 483; *EEOC*, 657 F. Supp. at

743.

12.    In determining whether there is a disputed issue of material fact that precludes summary

judgment, the court must consider <u>all evidence</u> in the light most favorable to Plaintiffs as the

nonmovant. (emphasis added) *Hom v. Squire*, 81 F3d 969, 973 (10th Cir. 1996).

13.    With respect to the claim that a product manufacturer cannot be held liable in tort where the

product has not caused physical injury or direct physical injury as claimed on Page 2, Paragraph 6

of Defendant's Brief in Support of Motion for Summary Judgment, the better reasoned policy is that

stated in *Stephen W. Butler and Rebekah O. Butler v. Pittway Corporation*, 770 F2d 7 (U.S. App.

1985)

" .... 'neither sound policy nor reason can be found to justify a distinction between the liability of the manufacturer whose defective item causes the initial accident and that of the manufacturer whose defective product aggravates or enhances the injuries after an intervening impact.' *Id. at 159, 350 N.Y.S.2d at 650-51, 305 N.E.2d at 773;*"

". . . . Although the smoke detectors in the Butler home did not cause the fire, had they sounded a timely alarm the fire may have been detected earlier and the alleged resulting [**8] damages and injuries may have been less severe."

". . . . In our view, the appellants should have an opportunity to offer evidence in an attempt to show that their injuries were enhanced as a result of the failure of the smoke detectors. *See Caiazzo, 647 F.2d at 249-50*"

". . . . Similarly , a malfunctioning smoke detector can create an unreasonable risk of harm in that the inhabitants of a structure who rely on such an alarm may be lulled into an unjustified sense of safety and fail to be forewarned of the existence of a fire. *See Pennsylvania Glass, 652, F.2d at 1174-75.* In our view, <u>if appellants can show that the smoke detector herein did not function properly, this defect may be shown to have exposed them to an unreasonably dangerous condition.</u>" (Emphasis added)

Further, where a defendant in a civil case moves for summary judgment based on the lack of proof of a material fact, the judge must ask the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonably jurors could[*15] find by a preponderance of the evidence that the plaintiff is entitled to a verdict-whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).

14.    Further, "in the Texas case of Salazar v. Wolo Manufacturing Group 983 SW 2d 87 (Tex.

App. [14[th] Dist. Houston] 1998) in a product liability case in which victims were injured when

they were struck by a car in which the driver was prevented from stopping because a Club, an

antitheft product manufactured by Wolo, became lodged behind the break of the driver's car after it slipped out from under the seat where it was stored. Defendants claimed that because the Club was not in use that a product liability cause of action should be thrown out on summary judgment. In that case, the Court of Appeals noted that it was not the use or nonuse of the club that was at issue, but whether the Club was unreasonably dangerous as designed or marketed, and whether the use was intended or foreseeable. The Court could not say as a matter of law that Appellants could not maintained a restatement of torts Section 402(a)1 action for a design in marketing defect simply because the Club was not being used at the time of Appellant's injuries for its intended purpose. This reasoning applies here with respect to the claims of Plaintiffs' as noted on Page 2 of Defendant's Brief in Support of their Motion for Summary Judgment. Item 6.

### D. Argument

15.    BRK has claimed that smoke detectors will not alarm in response to carbon monoxide. Plaintiffs do not contest that assertion. However, it should alarm in response to byproducts of combustion such as are what occurred in this case. These products of the combustion include water particles. Defendant's counsel concedes that water particles will not be distinguished by a smoke detector. (See Page 15 of the May 15 Daubert hearing, Exhibit "A") Mr. Heller there states ". . . . the plaintiffs have submitted user manual after user manual confirming , that water particles will not be distinguished by a smoke detector from smoke particles. Particles get in the detector, changes the electric flow within the chamber, smoke detector alarms."

16.    Thus, contrary to what is claimed on Page 8 of the May 15 Daubert Hearing Transcript, attached as Exhibit "A") in support that "all of the plaintiffs' experts in this case have agreed that it's not a smoke detector's intended function to detect the particles of combustion that's

emitted from a space heater. That would be a carbon monoxide job." Such is not accurate. The evidence here shows that a smoke detector should alarm in response to the particles of combustion other than the production of carbon monoxide. What Plaintiffs have urged and have presented in evidence is to the effect a BRK smoke detector that is properly operating and probably powered should alarm in response to the presence of the byproducts of combustion including soot, smoke and water particles.

17.     Defendants' positions as stated in their Brief in Support of their Motion for Summary judgment and as held throughout the course of this litigation have exhibited clear signs of extremely partisan advocacy that go beyond reality, the facts of the case or acceptable methods of representation of their client's interest.

The Defendant's positions in this litigation have been to deny everything. It has been a "scorched earth" policy of deny, demean, diminish, denigrate, derogate, and derail. Apparently, Defendant even suggests that the smoke detector present in Mr. Cruz's residence is not theirs. Specifically, on Page 5 of their Brief in Support Defendants state at number 14 "Plaintiffs have produced a BRK Brands model SA67D smoke detector that they claim was installed in Mr. Cruz's home at the time of his death." (emphasis added). Defendant's position throughout has been to deny everything with or without justification. Here, they apparently denied that the smoke detectors is even theirs. They have also taken the position that if it is theirs, that it did not have a battery. If it did have a battery, it was not properly in place. If it was properly in place, it was not the actual battery in place in the smoke detector. These positions of Defendant's counsel and through their conduct throughout this case have demonstrated their strategy of demeaning, ridiculing and dismissing the facts, evidence and in effect denying all responsibility and culpability which flies in the face of the facts and circumstances at issue. This case concerns

8

death, pain, misery and loss. Regardless of Defendants advocacy some respect and tact would be in order.

Plaintiffs Jose Garcia and Idalia Garcia expressly adopt any additional evidence or authority offered by Cynthia Cox Individually and as Next Friend of Brittany Cox

## THE SMOKE DETECTOR SHOULD HAVE ALARMED

18.    Plaintiffs dispute and disagree with Defendant's analysis of what is required for Plaintiffs to prevail in this case. The fact of the matter is that there are disputed issues of fact sufficient to require that this case be submitted to a jury and that a reasonable jury based on the evidence available and to be presented could legitimately find in favor of the Plaintiffs.

There is sufficient evidence to establish that a properly operating ionization smoke detector should alarm in response to the emissions of the  byproducts of  combustion from a malfunctioning space heater.

There is sufficient evidence that the smoke detector at issue was adequately powered at the time it should have alarmed.

There is sufficient evidence that the smoke detector did not alarm when it should have and in fact the smoke alarm did not ever alarm at the time at issue. The question and emphasis of Defendants on the "timing issues" it is submitted by plaintiffs, is not as crucial or necessary as they claim. In fact not even the pathologist, Dewitt Davenport could give any precise time of death.   With the testimony available as detailed hereinabove and hereinafter, a reasonable jury could infer that because  the detector did not alarm and it should have and Mr. Cruz died as a result, that the detector's failure was a substantial factor in his death.

## THE FAILURE TO ALARM WAS DUE TO A DEFECT

Dr. Aronstein testifies that the detector "was powered and that there was a detectible

effluent of the flames in the heater, that smoke alarm should have sounded . . ." " . . . and that in fact it did not sound" and that the most probable cause of it not sounding is "that there was most likely high resistance at the contacts. The cause of the high resistance at the contacts was most likely to be fretting". See Page 127 of May 15 Daubert Hearing (Exhibit "A")

## DR. ARONSTEIN RAISES GENUINE ISSUES OF MATERIAL FACT

19.    Plaintiffs' expert Dr. Jesse Aronstein (whom Magistrate Black ruled was fully qualified and could express opinions concerning all aspects of fretting corrosion as related to the issues in this case) provides evidence and testimony that raise genuine issues of material fact such that the jury as the trier of fact should be allowed to evaluate the evidence in this case.

## EVIDENCE OF DESIGN DEFECT

20.    Dr. Aronstein establishes that the selection of materials in the contacts constitute a design defect and that such defect in design caused the smoke detector to fail to alarm. Plaintiffs refer counsel and the court to  Dr. Jesse Aronstein's deposition dated June 14, 2002, (Exhibit "C")

Page 46        Lines 2 – 25

> Q.    Have you, based upon this work, derived opinions that you intend to express at the trial of this case?
>
> A.    Yes.
>
> Q.    What are those opinions?
>
> A.    Opinion as expressed in my report on page two, and that is on the basis of information that I have that the smoke detector was properly powered, and that it would have been sensitive, sufficiently sensitive to detect the products of combustion coming from the space heater located below it, and should have sounded, that the most likely cause of its non-sounding was high resistance from electrical contacts between the horn, and the spring contacts connecting it to the circuit board.
>
> Q.    Any other opinions?
>
> A.    And I believe that the selection of materials used for those contacts

constitutes a defective design.  That's I believe the essence of my opinion.

Page 51          Lines 11 - 25

Q.    one of the opinions that you had referenced was that the selection of materials that were used for the contacts constituted a design defect.

A.    Yes.

Q.    What were the materials that you believe that were used that constitutes a design defect?

A.    It's stainless steel.

Q.    Anything else?

A.    At one point, and possibly still, they are plating the stainless steel, tin plating has been noted on some samples.  And from a standpoint of a process called fretting, tin is a very poor

Page 52          Lines 2-25

choice.

Q.    So whether this was stainless steel contact or a tin-plated stainless steel contact, it is your opinion that either material constitutes a design defect?

A.    That is correct.

Q.    Do you have any reports or studies that suggest that tin plating a contact is either, in your words, a poor choice or a design defect?

A.    Yes.  There is  substantial body of material on the process of fretting, in which different materials  are compared, and tin is one of the worst.

## ARONSTEIN ESTABLISHES SAFER FEASIBLE ALTERNATIVE DESIGN

21.    Dr. Aronstein's testimony provides sufficient evidence concerning whether a safer feasible alternative design is available.

Page 52 continued

11

Q.    In your opinion what materials should have been used?

A.    There are many alternatives.  I think I have previously mentioned that gold-plated contacts and lubricated gold-plated contacts represent the best case, and perhaps should have been used in a device that is primarily a safety device, is what we are dealing with here.  I also

Page 53          Lines 2-4

indicated that it is simple enough to eliminate the contact problem all together by soldering the connection.

Page 151          Lines 5-10

Q.    The photographs that we marked s Exhibit 5, do you know who took them?

A.    My understanding, or my recollection is that these are McClintock's photographs.

Q.    Do you know when they were taken?

Page 154          Lines 7-25

Q.    are you relying on anything he did in deriving your opinion?

A.    Part of the basis for my opinion was that this smoke detector was properly powered.  And that is Mr. McClintock's observation.  He was the first man, person, apparently, to take note of the detector, of the smoke alarm.

## ARONSTEIN ESTABLISHES THE DETECTOR DID NOT ALARM

22.    Dr. Jesse Aronstein in his  deposition dated November 14, 2002,  (Exhibit "D") testified the detector did not alarm.

Page 25          Lines 23 – 24

Q.    Do you have an opinion today as to whether this smoke detector alarmed in December of

Page 26          Lines 2 - 20

12

1997 during the day or days when Mr. Garcia died?

A.    Yes.

Q.    What is that opinion?

A.    My opinion is that it did not.

Q.    Do you have an opinion as you sit here today as to why the detector did not sound during the day or days in December when Mr. Garcia died?

A.    Yes.

Q.    What are those opinions?

A.    Defective contacts.

Q.    Anything else?

A.    To the Piezo Horn.

Q.    What is the defect in the contact to the Piezo Horn to this detector not sounding in December when Mr. Garcia died?

A.    I believe the contacts on one or more of the contacts was high resistance due to fretting corrosion.

Page 60        Lines 8-24

Q.    Your opinion of it, if I can restate it, and tell me if I'm wrong, is tat the concept of fretting corrosion prevented at the contact points, prevented this detector from sounding it's alarm?

A.    My opinion?

Q.    Yes.

A.    Is that this detector did not alarm, did not work properly in the event and a probable cause, under the assumption that as we talked previously it was properly powered, and had the sensitivity to detect the soot that was emitted by the heater, that the most likely cause of it not operating was high resistance at a contact.

Q.    Due to fretting corrosion?

13

A.    High resistance at a contact. The most probable cause of the high resistance is

Page 61    Line 2

fretting.

Page 99    Lines 17-24

Q.    What is your opinion as to what caused the movement of the horn assembly through the detector which caused the fretting to occur in the Garcia detector?

B.    Two factors that I believe were discussed previously. One is thermo expansion and contraction due to fluctuations in normal temperature in that residence.

Page 100    Lines 2-4

The second is vibration due to activation of the horn, such as in testing the horn.

Page 113    Lines 20-24

Q.    Your opinion in this case is based on certain assumptions. One of which ask that the detector be properly powered; is that correct?

A.    That is correct.

Q.    Have you done anything to confirm

Page 114    Lines 2-24

that the detector in the Garcia residence was properly powered at the time of his death?

A.    Yes.0

Q.    What have you done?

A.    I believe the first thing was to observe when measurement was made of the voltage of the battery that was in the detector and, I forget the exact voltage, but it was high enough to --for me to conclude that the detector would operate with that battery.

14

Q.    What did you do to confirm that the battery that you observed the testing of was the battery that was in the detector at the time Mr. Garcia died?

A.    I believe the documentation that I received, included Mr. McClintock's report, indicate that there is no reason to believe that it was not the same batter.

Q.    For the record, I stand corrected, I thing every time I referred to the person who died as Mr. Garcia it should be Mr. Cruz.

Let the record reflect any time I referred a death to Mr. Garcia, that he is still

Page 115    Lines 2-5

Alive and kicking and it's Mr. Cruz that is deceased.  Are you aware that recently there was a deposition of Mr. Alva taken?

A.    No.

This evidence and the depositions of Dr. Aronstein as a whole establish that there are genuine issues of material fact concerning Plaintiffs' legal theories in this case that should be put to an impartial jury for a final determination.

## DOUGLAS HOLMES RAISES GENUINE ISSUES OF MATRIAL FACTS

23.    Plaintiffs have proffered the Douglas Holmes testimony in this case.  Mr. Holmes has testified that Mr. Cruz would have been able to hear the smoke detector if it had alarmed and that he believes it failed to alarm.  Mr. Holmes testified at his deposition taken on June 16, 2000 (Exhibit "E") in pertinent part;

Page 192    Lines 17 – 25

Q.    What makes you believe that Mr. Cruz, sleeping, would have been able to hear the smoke detector through his closed bedroom door at the end of the hallway?

A.    Because I have performed tests in the past of going behind closed doors in bedrooms and sounding alarms.  The detectors are meant to be loud enough to

15

give you warning of the fire. If it wouldn't go through a door, then they would have little value over

Page 193        Lines 1-16, 25

the last 20 years where they were installing one, maybe two detectors in front of the bedroom door or outside the bedroom door. I mean to code, you could still do that. So if you can't get that alarm to go down the hall, whatever foot that is, 15 foot and be heard through a closed hollow core door, then I suspect it would not be a very good smoke detector, period.

Q.      Do you know that Mr. Cruz's doors were hollow core?

A.      That is my opinion based on my examination of the scene and the assumption that the doors were not changed or altered significantly and also the fact that when you build that house, those are normally hollow core doors. It would be very unusual to catch a solid core door in a house such as this

Q.      Practically, do you know why it's set at the

Page 194        Lines 1-12

Level it's set? Do you know the reason why it's set at X decibels?

A.      So it will wake people up and it's made to be at a certain level and to be louder than certain other things, which is what I'm trying to remember which is which because they compare it to other events and then there's decibels in other areas.

Q.      It's supposed to sound so you can hear it over background noise. Is that right?

A.      Over background noise and it's supposed to warn you at a distance. You're not supposed to have to be sitting in the same room with a detector.

Page 196        Lines 11-16

Q. .... Did you consider that he may have disabled his own smoke detector because of nuisance alarms from his space heater?

Page 214        Lines 17-25

Q.      What evidence do you have that it didn't detect it, that it didn't sound an alarm?

16

C.  The individual is dead, no witnesses reported hearing it and the batter is still holding near its brand-new level of battery. The 9-volt runs a little bit over. One of the reports, when it was – by the time I measured it, it's down to 8.6, 8.7. It was previously reported to have been higher, and then if somebody was putting a battery on it or trying to test

Page 215    Lines 1-3

it, they'll send that detector down. So based on the power or the energy remaining in the battery, it would suggest that it never worked.

Page 218    Lines 23-25

Do you have any facts or evidence that the smoke detector sounded its alarm but stopped at some point once the smoke or soot had cleared?

Page 219    Lines 1-7

A.  No
Q.  What evidence do you have that the smoke detector failed to sound its alarm between Monday morning at 6:30 a.m and Tuesday night at 11:30 p.m.?

A.  The remaining available energy of the battery and the fact that Mr. Cruz is dead.

Thus to the extent Defendant's claim that even if the alarm would have sounded there is no evidence Mr. Cruz could or would have heard there is a material dispute on that item.

## REED McCLINTOCK RAISES GENUINE ISUES OF MATERIAL FACT

24.  Reed McClintock inspected the premises and the detector while it was still in place. His testimony places evidence before the trier of fact that the battery was in place and that it had sufficient charge for the detector to alarm. His testimony is further evidence that the alarm was sufficiently loud that had it alarmed Mr. Cruz would have heard it. See Exhibit "F" excepts of deposition of Reed McCain)

Page 103    Lines 7 – 19

17

Q.    …  when you first saw the smoke detector, the first thing you did was press the test button?

A.    Yeah.

Q.    Okay.

A.    Yes. As a matter of fact, I didn't put my gloves on. I had it without my gloves on and I pushed the button.

Q.    Okay. Do you recall how long it took before the alarm sounded?

A.    No, I don't recall.

Q.    Okay.

A.    All I remember is that the guy that was with me said, "What's that?" I said, "That's the smoke detector."

Page 104    Lines 17 – 25

Q.    All right. How many times did you test the detector while it was still on the wall?

A.    I believe they did it twice.

Q.    Okay.

A.    First time was kind of like a startle, you know. It has got that piercing sound. Touched it, I touched it, it went off. Turned around Willie – Willie came out – he came in and said, "What's that" because he was outside at the time. I said, "That's the smoke detector." I said, "I

Page 107    Lines 5 - 17

Q.    And before you opened up the detector, how many times had you tested it?

A.    Twice.

Q.    You had already tested it twice?

A.    Right.

Q.    Okay. And why did you open up the detector?

18

A.    Because I wanted to make sure that I could take a look inside and just photograph the inside.  Normal thing to do.

Q.    Okay.  Is the batter in?  In other words, is the battery connected to the terminal contacts in this photograph?

A.    Yeah.

Page 108    Lines 12-21

Q.    Okay.  And the battery is connected to the terminals of the detector in this photograph as well?

D.    Well, I can't tell if it is because what I did is I took a screwdriver and before packing, let loose of the battery from the contacts.

Q.    Okay.

A.    Primarily because I didn't want the battery to drain while it was being packed if it went off in shipping or anything else.  So, I needed to just break it off a little bit.

Page 246    Lines 22-25

Q.    Okay.  If I was to tell you that the autopsy report said – Forget it.  I won't even go there.

It is your testimony when you saw that detector the battery was properly installed; is that right?

Page 246    Lines 1-5

A.    Yes.

Q.    And the battery that you found with that smoke detector has accompanied that smoke detector the entire time it was in your possession?

A.    Yes.

## DR. RUSSELL RAISES GENUINE ISSUE OF MATERIAL FACT

25.    Although at Page 19 of the May 15 Daubert hearing (Exhibit "A") Mr. Heller told the

court the detector did not alarm but claimed that the battery wasn't connected. Counsel for Defendant conceded at Page 18 of the May 15 Daubert hearing (Exhibit "A") that there is a question about "why the smoke detector did not alarm" and as stated is in the context of being a fact not disputed. The great weight of the evidence, if not all the evidence clearly establishes that the detector did not alarm. In fact, defense counsel's extreme position is that it's essentially impossible for fretting corrosion to cause a problem that is going to affect the switch and not only that counsel goes a step further not only is it impossible for it to cause it, but the facts in this case prove that it is impossible for this detector to have had that happen as stated on Page 30 of the May 15 Daubert hearing transcript (Exhibit "A"). Clearly, that is a fact issue in dispute.

Dr. Russell testified on Page 65 of the May 16 Daubert hearing attached hereto as Exhibit "B" and will testify at trial that "Fretting corrosion, in and of itself, is science. It's well documented. I don't think that any legitimate expert would argue that fretting corrosion doesn't occur; it does occur; it's well documented, and that is can occur in smoke detectors that have pressure or separable contacts." Thus, this is further support for the position that although multiple significant fact issues exist in this case, that the Defendant's counsel's approach of deny, diminish, demean and derail is a failed strategy that is not supported by reality and the facts of this case and is further support that a fair jury taking into account not only the evidence but the positions put forward and the demeanor of the witnesses would find for Plaintiffs.

In his deposition taken on January 23, 2001, Russell's testimony puts in issue that the smoke detector should have sounded based on the amount of smoke and soot particles on the detector and that a probable cause of the failure to alarm is fretting corrosion.

<u>Page</u>          <u>Line</u>

| | | |
|---|---|---|
| 276 | 7-18 | Yes and no. The - - you can have corrosion buildup that - - that is unrelated to the specific material issues in terms of the - - of the, say, two dissimilar metals or something that might be used between the contact, the spring contact itself, if you will allow me that, and the plate. But then you can also have that corrosion and those issues exacerbated by and added to by the nature of those - - of that bimetallic connection that is made. So it is not a simple answer. I'm told by the people I have talked to that are expert on this in the past or read their papers that this is a very complex set of chemistry. |
| | 19-21 | Let's take the materials that were in this particular detector on the horn contacts. Can you tell me what they are? |
| | 22-25 | No. I have not made a study of the specific materials because there are two functions here. You can have - - you can have the generic buildup of the microscopic corrosion that is independent of the |
| 277 | 1-10 | materials of the contacts. And then you can have separate corrosion issues related to the nature of the types of metals if they are dissimilar. And that - - that art and that science, as I said, is fairly complex. I have made no study of this specific set of contacts and which type of chemistry and process would be set up at those contacts. I just know that there is no such thing as a set of any kind of pressure contacts that are metal to metal, no matter what the materials are, where corrosion is not a possibility. |
| | 11-14 | Does the materials - - strike that.<br>　　　Are the materials relevant to the amount of resistance required to effect the - - in this case the horn's operation? |
| | 15-19 | That can be but it is a secondary effect. Generally speaking, you have a very small amount of the material involved so the actual resistance of the material is not a significant part of the circuit, if that's the question. |
| 289 | 19-21 | Then tell me your basis for concluding that corrosion is a possible cause of this detector not alarming. |
| | 22 | Okay. I can do that; that I can do. |
| | 23-24 | We will go back and forth between what you can and can't do. |
| | 25 | Sure. If I take a properly powered, properly |
| 290 | 1-13 | functioning smoke detector and I provided a stimulus of an |

21

external smoke product to which it is sensitive such that the chamber initiates the electronics to sound or to activate and the horn doesn't sound I'm left with only one possibility and that is the horn's failed, okay. If the horn fails the question is on what basis would that horn fail? What mechanism would cause that horn not to sound? If separately later I proved that the horn is capable of sounding; in other words, later determined it is mechanically okay and it is able vibrate and sound, which in this case we did determine, I don't know anything else to point to except the corrosion of those contacts.

14-17    Okay. So in this particular case you believe from the literature that you have read that the heater at some point would have produced smoke that this detector should have been sensitive to?

18    I believe that.

19-21    And from Mr. McClintock pushing the test button a month after the incident you believe that the detector was properly powered?

22-24    Well, that is the only evidence I have, but my assumption is that, yes, we did have a powered detector.

291    2-7    At least at that point - - and I think it is reasonable to extrapolate backwards - - we know the electronics was working sufficiently; we know that the horn had mechanical integrity; we know that the push button worked; and we know there was enough power for it to sound.

8-11    And because during this test the horn did sound you believe that the only possible cause of it not sounding during the night, morning of Mr. Cruz' death was corrosion of the contact?

12-17    Yes, because if you study the literature with that set of parameters the only thing I have ever seen reported in the literature as to a reason why a horn would not sound under that set of circumstances is corrosion of the contacts or lack of contact at the contact.

Dr. Russell further testified at his deposition dated January 23, 2001 and May 10, 2000.

(Exhibits 7 and 8 respectively

Page    Line

15    5-6    What were the results of this test while it was still o the wall?

22

| | | |
|---|---|---|
| | 7 | He said it sounded. |
| | 8-9 | Okay. And I think that what you mean by test, did he push a test button? |
| | 10-11 | The only test that I'm aware he did in the residence was to push the test button. |
| | 12-14 | And what significance, if any, did it play in your mind that he pushed the test button and the alarm sounded? |
| | 15-20 | It said that the horn was capable of sounding at the time he did that. It said that he - - it had a - - it was powered with a battery that had sufficient energy a month after the incident, nominal month after the incident to sound the alarm and it spoke to the preservation of evidence issues. |
| 22 | 2-3 | What were the opinions you expect to offer in this case? |
| | 4-19 | The ionization smoke detector that was in the residence at the time that this incident occurred should have sounded a timely alarm based on the type of smoke products that were coming from the fire source, or heater if you please, that was in the residence. There is adequate evidence of substantial products emanating from that heater that should have been sufficient for a properly operating and powered and properly designed smoke detector to sound an alarm. Failure to sound that alarm in the presence of type of smoke and smoke products, the particulate matter that is indicated by that evidence, represents a defective performance of that smoke detector to include design defect or some sort of performance defect, which I believe was what happened in this particular case. |
| 28 | 6-7 | Have you done any studies that involve an unvented heater in any form? |
| | 8 | No. |
| | 9-11 | What is your belief - - strike that. What is your opinion as to why this detector in the Cruz residence didn't sound its alarm? |
| | 12 | This detector did not sound? |

23

| | | |
|---|---|---|
| | 13 | Yes. |
| | 14-20 | I believe it did not sound - - the most probable reason that it did not sound is that it was - - had a defective Piezo electric horn in that there was probability of corrosion on the contacts which kept the horn from sounding an alarm even though the ionization chamber did pick up the presence of this particulate matter in the air. |
| 61 | 11-14 | Okay. What do you say that is within a reasonable degree of scientific or engineering certainty that can establish that these contacts have corrosion sufficient to prevent it from alarming? |
| | 15 | Process of elimination. |
| | 16-17 | Okay. What have you done to eliminate other reasons? |
| | 18-25 | The device was powered with a battery sufficient to sound an alarm as witnessed by both the tests that Mr. McClintock we've already referred to did, and his - - and the subsequent testing I believe by your own experts of the battery. The - - if you eliminate the issue of properly powered, you eliminate the issue of whether the electronics was working, because when the test button was pushed there was sufficient |
| 62 | 1-2 | electronic capacity to get the signal to the horn because it subsequently did sound. |
| | 3-17 | You know that smoke did reach the device because there's deposition of soot and smoke particles and so forth on the - - all around on the exterior parts of the house around the smoke detector, on the face of the smoke detector and inside the smoke detector, so there's no question there was smoke getting the smoke detector. And the combination of those factors lead you to very few, if not only one alternative, concerning the reason why that detector wouldn't sound, and that is that if smoke did reach it, the smoke particles and so forth were of the type of particle which I've already discussed with you that would - - an ionization detector would be sensitive to, and it was a properly - - it was a standard ionization detector that was properly powered. |
| | 18-23 | The only thing left is an actual failure of the final terminal device which is the horn. So by eliminating all the other possibilities, you are left with from an engineering probability perspective only one item that I can come up with, which is that the horn itself did not issue the final alarm. |

| 68 | 6-8 | Do you have any evidence that his alarm did not sound after Mr. Cruz was incapacitated or killed by the carbon monoxide? |
| | 9-14 | Yes. Your own expert indicates that there is no indication of any sonic deposition of smoke to indicate that the alarm was sounded. I'm not validating that or invalidating that by my own testing, but I'm just simply pointing out that they said that in their reports. |
| | 15 | Ms. Streit? |
| | 16-25 | Yes. Plus the battery itself was found in an energized condition. This - - the tests done, including the simulations by your own experts, indicate that this heater burned for quite some number of hours in order to create all the effects that did occur, which means that had the smoke detector sounded it would have depleted the battery over some period of time. It would not go ten hours or something. So the fact that the battery was found in the condition that it was is an indication that this smoke detector did not sound |

## DEFENDANTS' OWN EXPERTS RAISE GENUINE ISSUES OF MATERIAL FACTS

26.    In analyzing the evidence and witnesses presented, not only is the jury entitled to consider and rely upon plaintiffs' experts, but likewise they are entitled to consider and rely upon, if they choose, or to dismiss or make negative inferences from the testimony of Defendant's experts. Plaintiffs believe that Mr. Eagar in his testimony when considered by a impartial jury in South Texas will take into account his demeanor and the positions that he is taking in his testimony which taken in combination clearly indicate that his testimony is nothing more than paid advocacy for BRK's position in this case. The undersigned was present at this deposition taken on June 20, 2002 in Philadelphia, Pennsylvania (See Exhibit "G") and found Mr. Eagar to be the single most uncooperative and combative expert in any case he has been involved in twelve years of litigation practice. Plaintiffs would hope that this same type of conduct of Eagar be exhibited before the jury and a fair jury will take into account the witnesses demeanor in evaluating evidence.

Further, Dr. Robe another of Defendant's experts in his deposition exposes Defendant did not do any testing which actually involved the use of a BRK smoke detector. Also at Page 24 of day two, May 16th of the Daubert hearing (Exhibit "B") he clearly indicates that Dr. Armstrong did not use a BRK detector to see when it would activate. Page 24, Lines 13 – 14 and Page 25 Lines 1-2 No smoke detector by BRK was not used.

Page 24    Lines 13-14

Q.    Now, did Dr. Armstrong use a BRK detector to see when it would activate in his room, 8 by 8 by 8 test?

Page 25    Lines 1-2

A.    No, a smoke detector by BRK was not used. We detected soot by scientifically accepted techniques.

Plaintiffs believe this is evidence that would persuade a jury to infer that such was so because of fear on BRK's part that the alarm would sound. He also testifies that they were not able to figure out how many water particles were coming out of that soot production for how long a period of time and that they did not measure the water vapor.

The BRK smoke detector not alarming although properly powered and the skewed nature of the testing done taken in context with the combative, uncooperative and clearly biased testimony of Mr. Eagar is additional support for plaintiffs' position that there are facts in issue not only from the testimony of plaintiffs' experts, but also from examination and cross examination of Defendant's experts which would support a fair minded jury to be able to make a finding in favor of plaintiffs' position which is what the standard that this court is required to apply consist of.

"the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence

presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonably jurors could[*15] find by a preponderance of the evidence that the plaintiff is entitled to a verdict-whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.

Anderson v. Liberty Lobby, Inc., Id at 202

Dr. Robe at Page 28 concedes that under some circumstances, this space heater would cause a properly functioning smoke detector to sound.

Although the subject smoke detector is not designed to alarm due to the presence of carbon monoxide, Defendant's own expert, Richard L. P. Custer (who was retained to render opinions concerning the smoke detector and its operational characteristics. See Page 7 of his deposition taken June 20, 2002) (Exhibit "H") concedes that smoke detectors can be alarmed by smoke aerosols and the products of combustion including water vapor. See deposition of Richard L.P. Custer.

Page 11        Lines 19 – 24

        Q.    Are you familiar or have knowledge that oftentimes accompanying these detectors, there are instructions about placing them, or trying not to place them too close to, for example, showers and baths?

        A.    Yes.

Page 12        Lines 1 – 14, 17-20

        Q.    Okay. What's your understanding of why that's the case?

        A.    In – in some instances, it can result in the water vapor, the fog, so to speak, when you open the shower door – or bathroom door after a shower, can result in an unwanted alarm.

        Q.    Okay. And in your conclusion one, you indicate that these detectors are designed to provide the early warning in the presence of smoke aerosol from a range of fuel – fire fuels and types.

And you just confirmed that steam from the shower can also cause it to sound; is that correct?

A.    It will – it will respond – the detectors will respond to a variety of – of things that are generated from sources other than hostile fires.

Page 16        Lines 18-24

Q.    Do you have a working knowledge that the products of combustion from the propane fuel space heater located in the Cruz home did produce water vapor.

A.    That's a – that's a product of the combustion of propane, methane and other things.

Page 17        Lines 1-15

R.    So it's yes?

E.    There could be some humidity or water produced.

R.    Do you believe that was the case here?

A.    As a function of complete combustion, some could be produced, yes.

Q.    And you did not evaluate what effect the humidity, as well as the products of combustion which are the specific products of combustion of water vapor, whether that would have caused a properly functioning energized smoke detector to activate?

            MR. HENRY:  In this case?
            MR. MARCHAN: Yes.

A.    Not directly, no.

Mr. Custer concedes that water vapor was produced by the subject space heater in the Cruz residence and that a properly functioning and energized smoke detector should have sounded in this case.  See deposition of Mr. Custer.

Page 57          Lines 21-24

                 Q.      If properly functioning and energized, with the evidence of the products of
                 combustion that you're aware of in this case, should it have sounded, the detector,
                 I mean?

Page 58          Lines 1-2

                 A.      At some point in time, if it were energized.

## SUMMARY JUDGMENT EVIDENCE

27.      In support of their response, Plaintiffs includes the following evidence in the attached
appendix:

A.       Documentary evidence. The exhibits, which are verified as authentic, establish the
following facts:

Exhibit "A"      May 15, 2002 Daubert Hearing

Exhibit "B"      May 16, 2002 Daubert Hearing

B.       Depositions excerpts.

Exhibit "C"      Deposition of Jesse Aronstein – June 14, 2000

Exhibit "D"      Deposition of Jesse Aronstein – December 14, 2000

Exhibit "E"      Deposition of Douglas Holmes – June 16, 2000

Exhibit "F"      Deposition Excerpts of Reed McClintock – May 17, 2000

Exhibit "G"      Deposition of Thomas Eagar – June 20, 2002

Exhibit "H"      Deposition of  Don Russell – May 10, 2000

Exhibit "I"      Deposition of Don Russell – January 23, 2001

Exhibit "J"      Deposition of  Richard Custer – June 20, 2002

## CONCLUSION

28.      As detailed hereinabove and also by any evidence or authority offered by Brittany Cox

there is evidence of genuine issues of material fact that when considered in light of the applicable standard of review preclude the granting of summary judgment Plaintiffs ask the Court to deny Defendant's motion.

Dated:  December 20, 2002

Respectfully submitted,

By: _____
JUAN A. GONZALEZ
Attorney in Charge
Federal No. 3472
State Bar No. 08129310

OF COUNSEL:  GLENN D. ROMERO
Federal No.  7734

**LAW OFFICE OF MARK A CANTU**
The Atrium
1300 N. 10th Street, Ste. 400
McAllen, Texas 78501
Telephone: (956) 687-8181
Fax: (956) 687-8868

ATTORNEYS FOR PLAINTIFF
JOSE GARCIA, INDIVIDUALLY
AND AS REPRESENTATIVE OF
THE ESTATE OF MANUEL CRUZ
AND IDALIA GARCIA,
INDIVIDUALLY

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing instrument was delivered via hand delivery, telefax, certified mail return receipt requested and/or regular mail to the following counsel of record on this the _____ day December 2002.

Rene Oliveira/Elizabeth Neally
**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 West Price Rd, Suite 9
Brownsville, Texas 78520

Terry M. Henry
James Heller
**COZEN O'CONNOR**
1900 Market Street
Philadelphia, PA 19103

Ray R. Marchan
**WATTS & HEARD, L.L.P.**
1926 East Elizabeth
Brownsville, Texas  78520

Juan A. Gonzalez