*196*

## IN THE U.S. DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 2 1 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

## DEFENDANT'S PORTION OF JOINT PRETRIAL ORDER

Pursuant to the Court's Procedures, Defendant BRK Brands, Inc. files this it's portion of the Joint Pretrial Order. Plaintiffs were contacted and presented with Defendant's portion on Feburary 18, 2003, by email, but failed to provide their portion to Defendant's for incorporation by the deadline set by the Court.

1. **APPEARANCES OF COUNSEL**

   A. **Attorneys for Plaintiffs Jose Garcia, Individually and Idalia Garcia Individually and as Next Friend and as Representative of the Estate of Manuel Cruz**

   Juan Gonzalez
   Law Offices of Mark Cantu
   The Atrium, Suite 400
   1300 North Tenth Street
   McAllen, Texas 78501

   B. **Attorneys for Plaintiff Cynthia Cox as Next Friend of Brittany Cox**

   Ray Marchan
   Watts Law Firm, L.L.P.
   1926 E. Elizabeth
   Brownsville, Texas 78520

**C.    Attorneys for Defendant BRK Brands, Inc.:**

James H. Heller
Terry M. Henry
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
Telephone: (215) 665-2000
Facsimile: (215) 665-2013

Rene O. Oliveira
Elizabeth G. Neally
Roerig, Oliveira & Fisher, L.L.P.
855 W. Price Road, Suite 9
Brownsville, Texas 78520
Telephone: (956) 542-5666
Facsimile: (956) 542-0016

## 2.    STATEMENT OF THE CASE

In the early morning hours of December 15, 1997, Manuel Cruz died when a propane space heater in his home located at 190 Thomas Lane, San Benito, Texas produced fatal levels of carbon monoxide. Mr. Cruz had purchased a large gas fueled space heater approximately two weeks before his death. He fueled the space heater with LP Gas (liquid propane gas). However, the heater was designed to burn natural gas. Further, Mr. Cruz failed to provide exterior venting for the heater as it was designed for in order to have safe operation. As a result of his improper fueling and installation, the gasses from the combustion process, including carbon monoxide were vented directly into the living space of his home.

Mr. Cruz's body was found on December 16, 1997 by Kenya Sosa. At approximately 11:00 p.m. she returned to his home to see if he was there. When she entered his home, she discovered him dead on the bed where he had last been seen.

The medical examiner, Dwight S. Davenport, stated in his autopsy report that there was no soot in Mr. Cruz's lung and concluded that Mr. Cruz died of carbon monoxide poisoning before he inhaled any smoke or soot. There is no dispute that Mr. Cruz' carbon monoxide

poisoning death was caused by the continuing operation of an un-vented and improperly fueled space heater in his home.

Plaintiffs, representatives and heirs of Mr. Cruz, seek to impose liability upon Defendant BRK Brands, Inc. for Mr. Cruz's death based upon allegations that a BRK Brands' smoke detector failed to alarm, even though this detector did not directly inflict physical harm or start in motion a series of events that resulted in Mr. Cruz's death and was not intended to serve as carbon monoxide detector. Nothing the smoke detector did or failed to do resulted in physical harm to Mr. Cruz, or could have prevented the harm Mr. Cruz suffered.

## 3. JURISDICTION

This case is brought to Federal Court under the diversity jurisdiction of the court. State law controls on all substantive issues, including products liability laws.

## 4. MOTIONS

The only motions pending before the Court of which BRK Brands is aware, are BRK Brands' Motion for Summary Judgment and Motions in Limine.

## 5. CONTENTIONS OF THE PARTIES

### A. Plaintiffs' Contentions

Plaintiffs contend that BRK Brands should be held liable for the carbon monoxide poisoning death of Manual Cruz because a BRK Brands' smoke detector he placed in his home should have alarmed to the soot produced by the improperly fueled and vented space heater Mr. Cruz installed in his home.

### B. BRK Brands' Contentions

Plaintiffs have no evidence demonstrating that the smoke detector is responsible for Mr. Cruz' death. To do so, plaintiffs would have to show that the space heater produced sufficient quantities of soot or smoke that the smoke detector should have alarmed before Mr. Cruz was

incapacitated or killed by carbon monoxide. However, pursuant to the Court's Order on BRK Brands' *Daubert* motion, plaintiffs are unable to present evidence as to:

1.  how much smoke and/or carbon monoxide was produced by the space heater at anytime;

2.  when the space heater began producing smoke in relation to the carbon monoxide;

3.  when smoke reached the smoke detector in sufficient quantities to cause it to alarm; and

4.  when Mr. Cruz became incapacitated or died.

Therefore, it is impossible for plaintiffs to prove that the smoke detector should have alarmed before Mr. Cruz became incapacitated from the carbon monoxide the heater was producing.

Plaintiffs seek to impose liability upon Defendant BRK Brands, Inc. for Mr. Cruz' death based upon allegations that a BRK smoke detector failed to alarm, even though the detector did not directly inflict physical harm or start in motion of serious of events that resulted in Mr. Cruz's death and was not intended to serve as a carbon monoxide detector. Nothing the BRK smoke detector did or failed to do resulted in physical harm to Mr. Cruz or could have prevented the harm Mr. Cruz suffered.

A product manufacturer cannot be held liable for injury resulting from an incident against which the product was not intended to protect and BRK Brands has never claimed that smoke detectors will alarm in response to carbon monoxide. Industry and government standards to which smoke detectors are manufacture do not require that they provide early warnings of carbon monoxide poisoning hazards.

To the extent that plaintiffs are pursuing causes of action for violation of the Texas Deceptive Trade Practices Act, civil conspiracy and violation of the Consumer Product safety Act, or seek punitive damages, plaintiffs have no evidence to support their allegations and plaintiffs cannot prove one or more elements to these purported causes of action.

4

## C.    AFFIRMATIVE DEFENSES:

In addition to the affirmative defenses encompassed in the above defenses, BRK Brands contends that the following affirmative defenses apply to this case.

1.    The product described in Plaintiffs' First Amended Original Complaints was misused, improperly applied, or improperly installed by a party other than BRK Brands, and therefore, plaintiffs may not recover against BRK Brands.

2.    Plaintiffs are barred from recovering damages for breach of implied warranties that were part of a valid disclaimer by BRK Brands.

3.    In the unlikely event that any issue on exemplary damages against BRK Brands may be submitted to the jury and/or to be awarded, BRK Brands invokes the definitions, requirements and limitations on exemplary damages provided by §41.001 et seq. Of the Texas Civil Practice & Remedies Code.

4.    If it is proven that BRK Brands manufactured any products installed in Mr. Cruz's home, plaintiffs cannot recover any consequential damages because they are expressly excluded by a written limited warranty.

5.    Plaintiffs' claims for punitive damages are barred in a strict liability defect case involving a mass-produced, widely marketed product.

6.    Plaintiffs' causes of action are barred in whole or in party by the Doctrines of Latches, Waiver and Estoppel.

7.    Plaintiffs' First Amended Complaints is defective in that they have failed to join indispensable parties, among whom is Martin Industries, manufacturer of the space heater that produced fatal levels of carbon monoxide in Mr. Cruz' home.

8.    BRK Brands relies upon the Doctrine of Comparative Fault as a bar to, or mitigate, any recovery by any plaintiff in this action.

5

9.    The Plaintiffs' alleged damages resulted from independent, superseding and/or intervening causes unrelated to any conduct of BRK Brands.

10.    BRK Brands, Inc. relies upon the Doctrine of Comparative Fault, and avers that plaintiffs' injuries and damages were directly and proximately caused by Manuel Cruz' negligence. Mr. Cruz's negligence, upon information and belief, includes but is not limited to causing his own death, which resulted in the injuries and damages, if any, plaintiffs claim to have suffered as a result of his death.

11.    Mr. Cruz's failure to exercise reasonable care by installing a space heater in his home, or by having a space heater installed in his house, without proper or adequate ventilation for the reasonably foreseeable flue gases, such as carbon monoxide, that would be produced by the space heater was the direct and proximate cause of his death.

12.    Mr. Cruz's failure to exercise reasonable care by installing a space heater in his home, or by having a space heater installed in his home, supplied with an improper fuel that resulted in a deficient fuel mixture was the direct and proximate cause of his death.

13.    Mr. Cruz's failure to exercise reasonable care by installing a device to provide early warning of carbon monoxide poisoning danger was the direct and proximate cause of his death.

14.    The product plaintiffs claim was defective, a smoke detector, was not designed, manufactured, marketed, or sold for the intended purpose of providing early warning or carbon monoxide poisoning hazards.

15.    It was not reasonably foreseeable that Mr. Cruz would rely upon a smoke detector to provide early warning of carbon monoxide poisoning hazards.

16.    BRK Brands relies upon the Doctrine of Comparative Fault and avers, upon information and belief, that a non-party manufactured the space heater that caused, along with

6

Manuel Cruz's own negligence, the death of Manuel Cruz, which resulted in the injuries and damages, if any, plaintiffs claim to have suffered as a result of his death.

17.    Plaintiffs' alleged injuries and damages were not directly and proximately caused by any act or omission of BRK Brands.

18.    BRK Brands denies that it is guilty of any negligence or wrong doing of any nature whatsoever, denies that it manufactured or sold any product that was in a defective condition or unreasonably dangerous in any regard and specifically denies that it is liable to plaintiffs under any theory of law alleged in the First Amended Original Petition.

19.    To the extent Plaintiffs allege fraud, those allegations are not pled with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure.

20.    Mr. Cruz' smoke detector alarmed two or three months before his death.

21.    BRK Brands did not breach any warranties, express or implied.

22.    BRK Brands, Inc. denies that it was guilty of any fraudulent conduct.

23.    Due to spoliation, BRK Brands has been prejudiced in that it has been unable to make an appropriate investigation in order to prepare defenses on its own behalf.

24.    Plaintiffs have failed to state a claim for which relief can be granted for breach of warranty.

25.    Plaintiffs have failed to state a claim for which relief can be granted for violation of the Texas Deceptive Trade Practices Act.

26.    Plaintiffs have failed to state a claim for which relief can be granted under a civil conspiracy theory.

27.    Plaintiffs have failed to state a claim for which relief can be granted for violation of the Consumer Product Safety Act.

28.    Plaintiffs' claims are barred, in whole or in part, because conditions precedent to Plaintiffs' recovery have not occurred.  For example, and without limitation, Plaintiffs failed to provide written notice prior to suit as required by §17.05(a) of the Texas Business and Commerce Code (Texas DTPA).

29.    Plaintiffs' claims are barred, in whole or in part, because the injuries, damages, and losses alleged in Plaintiffs' pleadings, none being admitted, were proximately caused in whole or in part by the fault or negligence of Plaintiffs or others.  Accordingly, Plaintiffs' claims are barred or must be reduced under the doctrine of contributory or comparative fault.

## 6.    ADMISSION OF FACT

1.    Plaintiff Jose Garcia is not Manuel Cruz' natural or adoptive parent, but is his step-father.

2.    Manuel Cruz lived at 190 Thomas Lane, San Benito, Texas.

3.    His house had no central heating or air conditioning system.

4.    To provide heat, Mr. Cruz installed a large, gas-fueled space heater, which he fueled with a supply of LP-Gas (liquid propane gas).

5.    The heater he installed, however, was designed to burn natural gas.

6.    The heater was designed for safe operation only when vented, but Mr. Cruz failed to provide exterior venting for the products of combustion from the heater.

7.    His improper fueling and installation caused the gases from the combustion process, including carbon monoxide, to be vented directly into the living space of his house.

8.    On Sunday, December 14, 1997, the day before he died, Manuel Cruz spent time with his friend Jose Garcia.

9.    At approximately 10:30 p.m., the heater was turned on and continued to run throughout the night.

8

10.    At about 4:00 a.m., Mr. Cruz and Mr. Garcia went to bed, with Mr. Garcia sleeping on a couch in the living room beneath a window opened about an inch.

11.    Between 6:00 and 6:30 a.m., with the heater still running, Mr. Garcia woke with a headache and went home.

12.    Before leaving, Mr. Garcia shouted good-bye to Mr. Cruz, but received no response.

13.    Mr. Garcia did not observe any smoke and/or soot in the house or on his clothes when he left.

14.    At 9:00 a.m. on Monday, about three hours after Mr. Garcia left, Mr. Cruz was to have met his daughter, Brittany Cox, and her mother Cynthia at the Zoo, but he never appeared.

15.    Between 10:00 a.m. and 12:00 noon, Cynthia Cox called Mr. Cruz at home to see if he would be joining them.

16.    No one answered the phone and she assumed that he had simply forgotten about the visit.

17.    On Tuesday night, December 16, 1997, Kenya Sosa, went to Mr. Cruz' house to see if he was home.

18.    When she entered his house she discovered him dead on his bed.

19.    The medical examiner observed no soot in Mr. Cruz's lungs and concluded that Mr. Cruz died of carbon monoxide poisoning before he inhaled any smoke or soot.

20.    Mr. Cruz's asphyxiation was the result of carbon monoxide poisoning caused by the continuous operation of an un-vented and improperly fueled space heater in his home.

21.    The BRK Brands smoke detector model SA67D was listed by Underwriters Laboratories and met or exceeded all standards applicable to residential smoke detectors.

22.    Mr. Cruz' smoke detector alarmed two or three months before his death.

9

23. A smoke detector, regardless of its type, cannot and will not alarm immediately upon the ignition of a fire.

24. Rather, a smoke detector will only alarm when smoke reaches the detection chamber in sufficient quantities to trigger the detection device.

25. The quantity of smoke necessary to trigger the alarm will be partly a function of the sensitivity at which the particular detector is set.

26. The setting of the smoke detector is crucial because smoke from a hostile fire is no different than smoke from a friendly (intended) fire, such as cooking and space heaters, and, as of the date of the fire, there were no devices capable of distinguishing between smoke from a friendly fire and from a hostile fire.

27. The only way to limit the number of times a smoke detector may alarm in the presence of smoke from a friendly fire (sometimes referred to as a nuisance alarm) is to distinguish between the amount of smoke being generated on the assumption that a friendly fire will generally be a small, contained fire and generate little smoke.

28. Although there are many potentially dangerous conditions that may exist in a home, smoke detectors are designed to protect against only one such hazard, hostile fires.

29. Carbon monoxide is a colorless, odorless, tasteless gas that is produced by the incomplete burning of fuel, usually from gas-fueled appliances or a wood burning fire place in the home.

30. Carbon monoxide poisoning can render a person unresponsive before incapacitating or fatal levels are reached.

31. Smoke detectors are not designed to detect, nor do they claim to be able to detect, carbon monoxide from any source.

10

## 7.    CONTESTED ISSUES OF FACT

1.    Whether the smoke detector was properly powered at the time of Mr. Cruz' death (was the battery properly installed).

2.    Is the battery that plaintiffs produced with the smoke detector the battery that was installed in the smoke detector at the time of Mr. Cruz' death?

3.    The time of Mr. Cruz' of incapacitation.

4.    The time of Mr. Cruz' death.

5.    Whether the smoke detector alarmed.

6.    Whether plaintiffs' investigator, Mac McClintock, pushed the test button when he discovered the smoke detector in Mr. Cruz' house.

7.    Whether the space heater generated sufficient smoke or soot to cause a properly operating smoke detector to alarm.

8.    When, if at all, the space heater generated a sufficient amount of smoke or soot to cause a properly operating smoke detector to alarm.

9.    Whether the space heater generated a sufficient amount of smoke or soot to cause a properly operating smoke detector to alarm before Mr. Cruz' became incapacitated.

10.    If not otherwise incapacitated by alcohol or carbon monoxide, whether Mr. Cruz would have been able to or respond to a smoke detector alarm.

11.    What Mr. Cruz would have done if alerted by a smoke detector.

## 8.    AGREED PROPOSITIONS OF LAW

1.    An action to recover damages under the Texas wrongful death statute is for the exclusive benefit of the surviving spouse, children and parents of the deceased. Texas Civ. Prac. & Rem. Code §71.004(a).

2.     Although Texas law governs the elements of plaintiffs' causes of action, the sufficiency of evidence is a matter of federal law. See Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, 850 (5th Cir. 1967).

3.     To recover for injuries under either a strict products liability, negligence, negligence per se or breach of warranty theory, the plaintiffs must prove, among other things, causation. See Ambrosio v. Carter's Shooting Center, 20 S.W.3d 262, 265 (Tex. App. – Houston [14 Dist.] 2000); Minnesota Mining and Manufacturing Co. v. Atterbury, 978 S.W.2d 183, 197 (Tex. App. 1998).

4.     To succeed on their negligence, negligence per se and/or breach of warranty theories, the plaintiffs must prove that BRK's conduct and/or the product defect was the proximate cause of their injuries. See General Motors Corp. v. Saenz, 873 S.W.2d 353, 357 (Tex. 1993); Ambrosio, 20 S.W.3d at 265 (discussing negligence and negligence per se); Minnesota Mining and Manufacturing Co. v. Atterbury, 978 S.W.2d 183, 197 (Tex. App. 1998) (discussing breach of warranty).

5.     However, to recover for strict products liability, the plaintiffs need only establish that the defect at issue was a producing cause of their injuries. See Amstadt v. United States Brass Co., 919 S.W.2d 644, 648 (Tex. 1996); Minnesota Mining and Manufacturing, 978 S.W.2d at 197.

6.     A producing cause has been defined as "an efficient, exciting or contributing cause that, in a natural sequence, produces the injuries or damages complained of and but for which, such injuries or damages would not have occurred." Minnesota Mining and Manufacturing, 978 S.W.2d at 197; see also Haynes & Boone v. Bowser Boulden Ltd., 896 S.W.2d 179 (Tex. 1995).

7.    The difference between proximate and producing cause is that proof of proximate cause entails a showing of foreseeability, while proof of producing cause does not. See Saenz, 873 S.W.2d at 357; Roberts v. Healey, 991 S.W.2d 873, 878 (Tex. App. – Houston [14th Div.] 1999).

8.    Although a producing cause need not be foreseeable, both producing and proximate cause require that the defendant's conduct be a "cause-in-fact" of plaintiffs' injuries. See Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775 (Tex. 1995); Minnesota Mining and Manufacturing, 978 S.W.2d at 197; Dinkelman v. Toyota Motor Sales, U.S.A., No. 3:98-CV-0400-H, 1999 U.S. Dist. LEXIS 1448, *6 (Feb. 4, 1999 N.D. Tex.).

9.    In other words, the defendant's act or omission must be a substantial factor in bringing about the plaintiffs' injury, and that without that act or omission, no harm would have occurred. See Ambrosio, 20 S.W.3d at 266; Roberts, 991 S.W.2d at 878.

10.    Cause-in-fact, commonly referred to as factual causation, must be proven by evidence of probative force, and cannot be established by mere conjecture, guess or speculation. See Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995); Ambrosio, 20 S.W.3d at 266; Roberts, 991 S.W.2d at 878.

11.    Cause-in-fact is not shown if the defendant's act or omission did no more than furnish a condition that made the injury possible. Ambrosio, 20 S.W.3d at 266; Roberts, 991 S.W.2d at 878.

12.    In other words, cause-in-fact does not exist as a matter of law when the defendant's conduct was too attenuated or remotely connected to plaintiffs' injury. See Ambrosio, 20 S.W.3d at 267; Wheaton Van Lines, Inc. v. Mason, 925 S.W.2d 722, 728 (Tex. App. – Fort Worth 1996).

13.    To prevail on their claim for breach of implied warranty of merchantability under the Texas Deceptive Trade Practice Act, plaintiffs must prove that the smoke detector at issue: (a) was defective when it left BRK's possession; and (b) was unfit for the ordinary purposes for which it is used because of a lack of something necessary for adequacy.  See Sipes v. General Motors Corp., 946 S.W.2d 143, 158 (Tex. App. 1997).

14.    The defect in an implied warranty of merchantability case means the condition of the goods that, because of a lack of something necessary for adequacy, renders them unfit for the ordinary purpose for which they are used. Id.; see also Hyundai Motor Co. v. Rodriguez, 995 S.W.2d 661, 665 (Tex. 1999); Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442 (Tex. 1989).

15.    However, in a case involving a claim for personal injuries, strict liability and breach of warranty, concepts of "defect" are functionally identical. Hyundai, supra.

16.    More than mere commission of a tort is required for the imposition of punitive damages. Guilbeau v. Anderson, 841 S.W.2d 517, 520 (Tex. App. – Houston [14th Dist.] 1992); Transportation Insurance Co. v. Moriel, 879 S.W.2d 10, 16 (Tex. 1994).

17.    Under Texas law, punitive damages may be awarded only if the claimant proves by clear and convincing evidence that the defendant acted with gross negligence, malice or otherwise morally culpable conduct. See Celanese LTD. v. Chemical Waste Management, Inc., 75 S.W.3d 593, 599 (Tex. App. – Texarkana 2002); Wicker v. City of Galveston, 944 F. Supp. 553, 560 (S.D. Tex. 1996); see also Tex. Civ. Prac. & Rem. Code § 41.003(a) (Vernon 1997).

18.    Specifically, punitive damages may not be imposed, absent clear and convincing proof of the following:

    (A)    a specific intent by the defendant to cause substantial injury to the claimant [this element demonstrates malice]; or

    (B)    an act or omission:

        (i)    which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme

14

degree of risk, considering the probability and magnitude of the potential harm to others; **and**

(ii)    of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others [prongs (B)(i) and (ii), taken together, demonstrate both malice and gross negligence].

Tex. Civ. Prac. & Rem. Code § 41.001(7) (Vernon 1997) (emphasis added); Celanese, 75 S.W.3d at 599; see also Tex. Civ. Prac. & Rem. Code § 41.003(a) (Vernon 1997).

19.    The objective component of malice and gross negligence is a function of the magnitude and probability of the potential injury, and can never be satisfied by conduct creating a remote possibility of injury or even a high probability of minor harm; rather the alleged conduct must have created the likelihood of serious injury. See Celanese, 75 S.W.3d at 599-600; General Motors Corp. v. Sanchez, 997 S.W.2d 584, 596 (Tex. 1999); Universal Servs. Co. v. Ung, 904 S.W.2d 638, 641 (Tex. 1995).

20.    Plaintiffs must prove that the defendant had "actual subjective awareness of the risk involved, but nevertheless proceed[ed] in conscious indifference to the rights, safety or welfare of others." Moriel, 879 S.W.2d at 23; Celanese, 75 S.W.3d at 599.

21.    An act or omission that is merely thoughtless, careless or inordinately risky cannot be grossly negligent or malicious, and does not support a claim for punitive damages. See Wicker, 944 F. Supp. at 560.

22.    Evidence of simple negligence is not enough to prove either the objective or subjective elements required to establish a claim for punitive damages. Moriel, 879 S.W.2d at 22; Celanese, 75 S.W.3d at 599-600.

23.    Further, punitive damages may not be assessed against a defendant as a result of harm caused by a product which complies with all government and industry standards and requirements. See e.g. Barger v. Garden Way, Inc., 499 S.E.2d 737, 743 (Ga. App. 1998) (compliance with government regulations "does tend to show that there is no clear and

15

convincing evidence of willful misconduct"); Satcher v. Honda Motor Corp., 52 F.3d 1311, 1317 (5th Cir. 1995); Mercer v. Pittway Corp., 616 N.W.2d 602, 618 (Iowa 2000) (compliance with the UL 217 standard shows there can be a reasonable disagreement over the relative risks in the manufacture and production of ionization smoke detectors, thereby precluding an award of punitive damages).

## 9.    CONTESTED ISSUES OF LAW

1.    Material facts may not be proved through unreasonable inferences drawn from the evidence. See Fenner v. General Motors Corp., 657 F.2d 647, 651 (5th Cir. 1981).

2.    An inference as to an ultimate issue of fact is deemed unreasonable, and without probative force, if it would allow a jury to rest its verdict on mere speculation and conjecture. See Bridges v. Groendyke Transport, Inc., 553 F.2d 877, 878-79 (5th Cir. 1977).

3.    Ultimate inferences are too speculative and conjectural to support a judgment if they are at war with uncontradicted or unimpeached facts. See Fenner, 657 F.2d at 651; Helene Curtis Industries, 385 F.2d at 851.

4.    A jury may not reasonably infer causation from meager circumstantial evidence that could give rise to any number of inferences, none more probable than the other. See Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1388 (5th Cir. 1996); Dreijer v. Girod Motor Co., 294 F.2d 549, 555-556 (5th Cir. 1961); Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001); Wright v. Wal-Mart Stores, Inc., 73 S.W.3d 552, 555 (Tex. App. – Houston 2002).

5.    Thus, when circumstances are consistent with any possibility, and nothing shows that one is more probable than the other, no fact can be inferred. See Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1388 (5th Cir. 1996); Dreijer v. Girod Motor Co., 294 F.2d 549, 555-556 (5th Cir. 1961); Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001); Wright v. Wal-Mart Stores, Inc., 73 S.W.3d 552, 555 (Tex. App. – Houston 2002).

10.    **EXHIBITS**

    A.    **Plaintiffs' Exhibits.**

    B.    **BRK Brands' Exhibits**

See Exhibit "1", for the list of exhibits BRK Brands expects to offer into evidence during trial. In accordance with Appendix B of the Local Rules of the United States District Court for the Southern District of Texas, a party requiring authentication of an exhibit must notify the offering counsel in writing within five days after the exhibit is listed and made available; failure to object in advance of the trial in writing concedes authenticity. BRK Brands hereby notifies plaintiffs to authenticate any and all medical records.

11.    **WITNESSES**

    A.    **Plaintiffs' Witnesses**

    B.    **BRK Brands' Witnesses**

See Exhibit "2" for the list of witnesses who BRK Brands may call at trial to offer testimony in support of its case in chief. If BRK Brands determines that it will call other witnesses at trial, their names, addresses and subject of their testimony will be reported to opposing counsel in writing as soon as they are known; this does not apply to rebuttal or impeachment witnesses.

12.    **SETTLEMENTS**

The parties attempted to resolve the present dispute through mediation on April 25, 2000, and February 6, 2003, but were unsuccessful. All settlement efforts have been exhausted and will have to be tried.

13.    **TRIAL.**

    A.    **Plaintiffs**

Plaintiffs anticipate _____ hours of testimony.

**B.      BRK Brands**

Defendant anticipates 24 hours of testimony.  Defendant will provide monitors and other devices, if necessary, to view exhibits and other exhibits.  However, BRK Brands requests that the Court make available an interface device so that images stored on a lap-top computer may be used during trial.

BRK Brands also respectfully request the Court's flexibility in scheduling this matter for trial or in calling witnesses out of turn.  This defendant, its counsel and many of its expert witnesses are set to begin trial on or about March 3, 2003 in the U.S. District Court for the Northern District of Texas, Amarillo before the Honorable Mary Lou Robinson.

14. **ATTACHMENTS**

    A. **Plaintiffs**

    B. **BRK Brands**

Proposed questions for the voir dire examination attached as Exhibit "3"

Proposed charge, including instructions, definitions, and special interrogatories, with authority attached as Exhibit "4"

Omnibus Motion and Order of Defendant BRK Brands, Inc/Motion in Limine is attached as Exhibit "5"

Brief in Support of the Omnibus Motion of Defendant BRK Brands, Inc. to Exclude Plaintiffs' Evidence is attached as Exhibit "6"

Appendix to the Omnibus Motion of Defendant BRK Brands, Inc. to Exclude Plaintiffs' Evidence is attached as Exhibit "7"

_____    _____
United States District Judge                      Date

APPROVED:

_____    _____
Juan Gonzalez                           Date
Attorney for Jose Garcia Individually and
Idalia Garcia, Individually and as Representative
of the Estate of Manuel Cruz, deceased

_____    _____
Ray R. Marchan                          Date
Attorney for Cynthia Cox as
Next Friend of Brittany Cox

_____    _____
Rene O. Oliveira                         Date
Attorney for BRK Brands, Inc.

19

# IN THE U.S. DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| JOSE GARCIA, Individually, | : |  |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : |  |
| MANUEL CRUZ and CYNTHIA COX as | : |  |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
|  | : |  |
| vs. | : |  |
|  | : |  |
| BRK BRANDS, INC. | : |  |

## EXHIBIT LIST OF DEFENDANT BRK BRANDS, INC.

GARNER, STEIN  & DEAN, LLP
Robert E. Garner, Esquire
State Bar No.
1212 Amarillo National Plaza/Two, 500 South
Taylor, LB #233
Amarillo, Texas  79101-2446
(P) 806-373-0505
(F) 806-379-8056

and

COZEN O'CONNOR
James H. Heller, Esquire
Pennsylvania Attorney ID No. 44980
Terry M. Henry, Esquire
Pennsylvania Attorney ID No. 77455
The Atrium
1900 Market Street
Philadelphia, PA  19103
(P) (215) 665-2000
(F) (215) 665-2013

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|---|---|---|---|---|---|
| 1. | Smoke detector taken from the Cruz residence | | | | |
| 2. | Space heater taken from the Cruz residence | | | | |
| 3. | Certificate of Death for Manuel Cruz | | | | |
| 4. | Affidavit of Bennie Ochoa dated March 23, 1999 | | | | |
| 5. | Letter dated December 12, 1997 from Bennie Ochoa III to Valley Baptist Hospital authorizing the hospital to conduct an autopsy on Manuel Cruz | | | | |
| 6. | Final Anatomic Diagnoses of Manuel Cruz dated January 6, 1998, and accompanying Affidavit of Dewitt S. Davenport dated March 19, 2000 | | | | |
| 7. | Final Anatomic Diagnoses of Manuel Cruz dated January 6, 1998, including but not limited to an earlier draft of the diagnoses and various laboratory test results. | | | | |
| 8. | Cameron County Sheriff's Department Case Report dated December 16, 1997 re: the death of Manuel Cruz, including the Final Anatomic Diagnoses of Manuel Cruz dated January 8, 1998 | | | | |
| 9. | Criminal Investigator's Report dated March 16, 1999 re: the death of Manuel Cruz | | | | |

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| 10. | Affidavit of Aaron Garcia dated March 27, 1999 | | | | |
| 11. | Idalia Garcia's and William Faulk's Application for Administration and Declaration of Heirship for Manuel Cruz dated February 12, 1998 | | | | |
| 12. | Affidavits of Rosalinda Perez and accompanying diagrams of the Cruz residence | | | | |
| 13. | Affidavit of Jose Garcia and accompanying diagrams of the Cruz residence | | | | |
| 14. | Affidavit, Kenya Elizabeth Sosa, and accompanying diagrams of the Cruz residence | | | | |
| 15. | Transcript of Interview of Kenya E. Sosa dated February 5, 1999 re: the death of Manuel Cruz | | | | |
| 16. | Transcript of Interview with Kenya E. Sosa dated February 16, 1999 | | | | |
| 17. | Interview Synopses of Jose Luis Barreda. | | | | |
| 18. | Interview Synopses of  Mike Martinez. | | | | |
| 19. | Interview Synopses of Jose Carlos Garza. | | | | |
| 20. | Interview Synopses of Danny Martinez Posada | | | | |
| 21. | Interview Synopses of Geroge Delgado | | | | |

2

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|---|---|---|---|---|---|
| 22. | Owners Manual and Operating Instructions for the VR30 and VR 40 Vented Room Heaters | | | | |
| 23. | Article entitled, "Predicting Smoke Detector Activation using the Fire Dynamics Simulator," written by Vijay T. D'Souza, Jason A. Sutula, Stephen M. Olenick, and Wei Zhang, and Richard J. Roby | | | | |
| 24. | Article entitled, "The Role of Soot Particle Formation in the Production of Carbon Monoxide," written by Rahul Puri and Robert J. Santoro, published in Fire Safety Science-Proceedings of the Third International Symposium | | | | |
| 25. | Article entitled "Characteristics of Large Diffusion Flames Burning in a Vitiated Atmosphere," written by J.H. Morehart , E.E. Zukoski, and T. Kubota published in Fire Safety Science-Proceedings of the Third International Symposium | | | | |
| 26. | Article entitled, "Pollutant Emission Rates from Indoor Combustion Appliances and Sidestream Cigarette Smoke," written by J. Girman, M.G. Apte, G.W. Traynor, J.R. Allen, and C.D. Hollowell in Environment International, dated 1982. | | | | |
| 27. | Article entitled, "The Effect of Oxygen Concentration on CO and Smoke Produced by Flames," written by G. Mulholland, M. Janssens, S. Yusa, W. Twilley, and V. Babrauskas published in | | | | |

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| | Fire Safety Science-Proceedings of the Third International Symposium | | | | |
| 28. | Article entitled, "The effect of vitiation in trace pollutants from domestic gas appliances," written by J.H. Bromly, F.J. Barnes, R.C.R. Johnston, and L.H. Little, in the December 1985 ed. of The Journal of the Institute of Energy | | | | |
| 29. | Chart tracking carbon monoxide concentration versus time, dated October 29, 1996 | | | | |
| 30. | Article entitled, "Studies Assess Performance of Residential Detectors," by Richard W. Bukowski in the January/February 1993 ed. of the NFPA Journal | | | | |
| 31. | Article entitled, "Fretting Corrosion in Electric Contacts," written by E.H. Bock and J.H. Whitley | | | | |
| 32. | Abstract entitled, "Impact of Fretting Parameters on Contact Degradation," written by Robert D. Malucci, dated 1996 | | | | |
| 33. | Report entitled, "Smoke Detector Operability Survey: Report on Findings," written by Charles L. Smith, dated October 1994 | | | | |
| 34. | Report entitled, "Study of Deterioration of Separable Electrical Contacts in Smoke Detectors," prepared by John P. Farrell and George Ebel, dated November 16, 1994 | | | | |

4

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|---|---|---|---|---|---|
| 35. | Literature entitled, "Standard for Safety: Single and Multiple Station Smoke Detectors," written by Underwriters Laboratories, dated May 10, 1993 | | | | |
| 36. | Fire Protection Handbook, prepared by the NFPA, 18th ed. | | | | |
| 37. | NFPA 72 National Fire Alarm Code, 1999 ed. | | | | |
| 38. | Literature entitled, "The U.S. Fire Problem & What We Can Learn from the New NFIRS," prepared by the NFPA | | | | |
| 39. | Study entitled, "Data Analysis and Evaluation Task Group: Smoke Detector Project," prepared by the Consumer Product Safety Commission, dated June 8, 1999 | | | | |
| 40. | Charts relating to smoke detector operability, dated August 10, 1999 | | | | |
| 41. | Article entitled, "Keeping the Smoke Detectors Operational: The Dallas Experience," by William Jernigan, in the July/August 1987 ed. of Fire Journal | | | | |
| 42. | Various BRK Electronics Design and Computation Books, dated from 1982 through 1983 | | | | |
| 43. | Memorandum dated January 26, 1984 re: 83R Test Program Report | | | | |

5

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| 44. | Undated Chart describing product defects and actions taken | | | | |
| 45. | Document entitled, "Quality Control Procedure: New Product Sequential Life Testing," dated May 21, 1993 | | | | |
| 46. | BRK Inspection Instructions | | | | |
| 47. | First Alert Reliability Engineering Testing Procedures dated 1992 and 1993 | | | | |
| 48. | First Alert Product Specifications dated August 11, 1999 | | | | |
| 49. | Memorandum Opinion Order in Garcia v. BRK Brands, Inc. dated July 18, 2002 | | | | |
| 50. | Daubert Hearing charts dated May 15, 2002 re: the combustion of propane and the Plaintiff's expert's data | | | | |
| 51. | Daubert Hearing Charts dated May 15, 2002, containing photographs of exemplars and the Cruz smoke detector | | | | |
| 52. | American Board of Forensic Examiners Petition Form for Waiver of Examination, and Membership Application | | | | |
| 53. | Chronology of circumstances relating to Manuel | | | | |

6

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| | Cruz's death | | | | |
| 54. | Graph tracking the total amount of soot over a particular period of time | | | | |
| 55. | Mathematical equations and BAC calculations | | | | |
| 56. | Photographs of Manuel Cruz's smoke alarm and residence | | | | |
| 57. | Diagram of Manuel Cruz's residence | | | | |
| 58. | Summary of Dr. Russell's test data. | | | | |
| 59. | American Board of Forensic Examiners Petition Form for Waiver of Examination completed by James Heller | | | | |
| 60. | Analysis of Smoke Detector Activation due to soot from a Misfueled Gas-fired Space Heater, written by Richard J. Roby and Michael S. Klassen, dated January 14, 2000 | | | | |
| 61. | Diagrams of Manuel Cruz's residence | | | | |
| 62. | Graphs detailing the upper oxygen and carbon monoxide levels in Manuel Cruz's residence | | | | |
| 63. | Letter dated December 29, 1999 from Robert C. Bux re: the cause of Manuel Cruz's death, and accompanying curriculum vitae | | | | |

7

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| 64. | Letter dated January 14, 2000 from Richard L.P. Custer re: the appropriateness of a smoke detector to alert Manuel Cruz to a carbon monoxide poisoning hazard, and accompanying references, testimony list, and qualification highlights | | | | |
| 65. | Report detailing Manuel Cruz's projected economic damages writen by Carlos H. Cascos, dated December 28, 1999, and accompanying testimony list, hourly rates and curriculum vitae | | | | |
| 66. | Letter dated December 30, 1999 from Lori A. Streit re: the functionality of Manuel Cruz's smoke detector, including her curriculum vitae, testimony list, and rate sheet | | | | |
| 67. | Close up photographs of a battery | | | | |
| 68. | Photographs of a battery | | | | |
| 69. | Photographs of a battery | | | | |
| 70. | Photographs of battery placed in a smoke detector | | | | |
| 71. | Photographs of a battery placed in a smoke detector | | | | |
| 72. | Photograph of a warning within a smoke detector, and a close up photograph of a p-horn | | | | |
| 73. | Photographs of Manuel Cruz's smoke detector | | | | |

8

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| 74. | Photographs of Manuel Cruz's smoke detector | | | | |
| 75. | Photographs of various warnings inside Manuel Cruz's smoke detector | | | | |
| 76. | Photographs in which a battery is being measured | | | | |
| 77. | Photographs of Manuel Cruz's smoke detector | | | | |
| 78. | Photographs of Manuel Cruz's smoke detector and of the battery dated December 14, 1999, and April 20, 1999, September 15, 2000 | | | | |
| 79. | Laboratory report dated December 22, 1999 prepared by Andrew T. Armstrong and Scott Jamieson Riley | | | | |
| 80. | Graphs detailing the level of carbon dioxide and carbon monoxide | | | | |
| 81. | Photographs of Manuel Cruz's space heater | | | | |
| 82. | Letter dated November 10, 2000 from Thomas W. Eager re: the functionality of the p-horn in the Cruz smoke detector and accompanying curriculum vitae and litigation identification list | | | | |
| 83. | Videotape | | | | |
| 84. | SEM photographs of the PH dated September 15, 2000 | | | | |

9

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| 85. | SEM Photographs and EDS of the f and b contact arms. | | | | |
| 86. | Photographs of aluminum particles on the exemplar smoke detector dated November 9, 2000 | | | | |
| 87. | Photographs of the salt fog sample dated September 27, 2000. | | | | |
| 88. | Photographs indicating the daily temperature in Brownsville, TX. | | | | |
| 89. | Photographs dated September 15, 2000 | | | | |
| 90. | Photographs of the salt fog test on the Cruz smoke detector that occurred on August 5, 2000 (the photographs are dated August 7, 2000) | | | | |
| 91. | Photographs of the Cruz smoke detector examination that occurred on September 15, 2000 (the photographs are dated September 16, 2000) | | | | |
| 92. | Photographs of the salt fog unit test on the Cruz detector and accompanying graphs | | | | |
| 93. | Document entitled, "Codes & Standards Background: NFPA Codes and Standards Definition," created by the NFPA, dated November 24, 1999 | | | | |
| 94. | Book entitled, This Inventive Century: The Incredible Journey of Underwriters Laboratories (1894-1994), | | | | |

10

| EX # | DESCRIPTION | STIP | WITNESS | OBJ | ADMITTED |
|------|-------------|------|---------|-----|----------|
| 95. | written by Norman Beene Literature entitled, "More than a Mark," created by the Underwriters National Laboratories Inc. | | | | |
| 96. | Report entitled, "Detector Sensitivity and Siting Requirements for Dwellings (a report of the NBS "Indiana Dunes Tests"), by R.W. Bukowski, T.E. Waterman, and W.J. Christian, dated August 1975 | | | | |
| 97. | Report entitled, "Director Sensitivity and Siting Requirements for Dwellings, Phase 2 (Part 2 of a report on the NBS "Indiana Dunes Tests"), by S.W. Harpe, T.E. Waterman, and W.J. Christian, issued February 1977 | | | | |
| 98. | NFPA 72 National Fire Alarm Code, 1996 ed. | | | | |
| 99. | Various Press Releases from the Consumer Product Safety Commission re: fire safety and prevention | | | | |
| 100. | Report entitled, "U.S. Experience with Smoke Detectors and other Fire Detectors: Who has them? How do they work? When won't they work?" prepared by John R. Hall, dated August 1996 | | | | |
| 101. | Article entitled, "Surveillance and Prevention of Residential-Fire Injuries," in July 1996 ed. of The New England Journal of Medicine | | | | |

BRK Brands reserves the right to supplement, correct and move discretely or define the exhibits on this list.

## IN THE U.S. DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

JOSE GARCIA, Individually,          :
IDALIA GARCIA, Individually and     :       CIVIL ACTION
as Representative of the Estate of  :
MANUEL CRUZ and CYNTHIA COX as      :
Next Best Friend of Brittany Cox,   :       NO. B-98-186
                                    :
              vs.                   :
                                    :
BRK BRANDS, INC.                    :

## WITNESS LIST OF BRK BRANDS

1.      Kenya Elizabeth Sosa
        11070 Mead Road, Apt. 1403
        Baton Rouge, Louisiana
        (225) 293-3189
        Ms. Sosa was with Manuel Cruz the evening prior to his death and who had discovered
        his body.

2.      Rosalinda Perez
        250 South McCullough
        San Benito, Texas 78586
        (956) 361-2772
        Ms. Perez was another fried of Manuel Cruz who was with him in the hours before his
        death.

3.      Jose Garcia
        3651 F.M. 802
        Brownsville, TX 78520
        Telephone: 544-1048
        Mr. Garcia was at Manuel Cruz' home until approximately 6:30 a.m. on Monday,
        December 15, 1997, and has knowledge of the activities of Manuel Cruz up until that
        time.

4.    Officer Jose Luis Barreda
      Cameron County Sheriff's Department
      954 E. Harrison
      Brownsville, Texas 78520
      (956) 544-9860
      Officer Barreda responded to the call by Kenya Sosa of the death of Manuel Cruz on
      December 16, 1997 and has knowledge of the condition of Manuel Cruz' home upon
      their arrival.

5.    Deputy Delgado
      Cameron County Sheriff's Department
      954 E. Harrison
      Brownsville, Texas 78520
      (956) 544-9860
      Deputy Delgado responded to the call by Kenya Sosa of the death of Manuel Cruz on
      December 16, 1997 and has knowledge of the condition of Manuel Cruz' home upon
      their arrival.

6.    Investigator Vasquez
      Cameron County Sheriff's Department
      954 E. Harrison
      Brownsville, Texas 78520
      (956) 544-9860
      Investigator Vasquez  responded to the call by Kenya Sosa of the death of Manuel Cruz
      on December 16, 1997 and has knowledge of the condition of Manuel Cruz' home upon
      their arrival.

7.    Jose Carlos Garza
      Criminal Investigator
      Cameron County Sheriff , s Department
      Brownsville, Texas 78520
      Investigator Garcia responded to the call by Kenya Sosa of Manuel Cruz' death and was
      first at the scene with CPL Delgado and has knowledge of the condition of Manuel Cruz'
      home.

8.    Officer Gracie Paredes
      Cameron County Sheriff , s Department
      954 E. Harrison
      Brownsville, Texas 78520
      (956) 544-9860
      Entered the report of the incident and has knowledge of the same.

DEFENDANT , S WITNESS LIST                                           **Page 2**

9.    Mike Martinez
      Harlingen EMS
      1705 Vermont
      Harlingen, Texas 78550
      (956) 428-3087
      Responded to a call to the residence of Manuel Cruz and has knowledge of the conditions
      at Manuel Cruz' home.


10.   Aaron Garcia
      Harlingen EMS
      1705 Vermont
      Harlingen, Texas 78550
      (956) 428-3087
      Responded to a call to the residence of Manuel Cruz, and has knowledge of the
      conditions at Manuel Cruz' home.


11.   Danny Pozada
      Harlingen EMS
      1705 Vermont
      Harlingen, Texas 78550
      (956) 428-3087
      Responded to a call to the residence of Manuel Cruz, and has knowledge of the
      conditions at Manuel Cruz' home.


12.   Bennie Ochoa, III
      Justice of the Peace
      Pct. 1, Place 1
      302 Queen Isabella Boulevard
      P. O. Box 1563
      Port Isabel, Texas 78578
      (956) 943-2520
      Has knowledge of examining Manuel Cruz' body and pronouncing him dead.


13.   Dr. DeWitt S. Davenport
      Pathology
      P. O. Drawer 2588
      Harlingen, Texas 78551
      Dr. Davenport performed an autopsy on Manuel Cruz and determined the cause of death
      was from carbon monoxide poisoning, and also that he had a blood alcohol level of .055

g/dl.

14.  Desi G. Nagera
     Cameron County Fire Marshall
     964 E. Harrison Street
     Brownsville, Texas 78520
     Fire Marshall in charge of the investigation.

15.  Joseph Hernandez
     City of Los Fresnos EMS
     200 N. Brazil
     Los Fresnos, Texas 78566
     (956) 233-5768
     Person in charge of paramedics who responded to the scene.

16.  Armando Lucio
     Fire Chief
     San Benito Fire Department
     143 S. Reagan
     San Benito, Texas 78586
     (956) 361-3857
     Fire Chief involved in the investigation.

17.  Andrew T. Armstrong, Ph.D.
     Armstrong Forensic Laboratory, Inc.
     330 Loch _ n Green Trail
     Arlington,, Texas 7612
     Telephone: (817) 275-2691
     Dr. Armstrong will provide testimony about the general properties, installation, use and
     operation of the space heater.

18.  Lori A. Streit, PhD.
     Unified Engineering Inc.
     78 Eisenhower Lane North
     Lombard, Illinois 60148
     Telephone: (630) 261-3031
     Dr. Streit will provide testimony about the properties, installation, use, operation and
     analyses of the smoke detector and battery in question.

19.    Dr. Robert C. Bux
       Bexar County
       Forensic Science Center
       7337 Louis Pasteur
       San Antonio, Texas 78229-4565
       Telephone: (210) 335-4054
       Dr. Bux will provide testimony regarding the cause and origin of Manuel Cruz' death,
       analysis of the autopsy, and the properties and effect of carbon monoxide/alcohol and
       their manifestations on the human body.

20.    Richard J. Roby, P.E., Ph.D.
       Combustion Science & Engineering, Inc.
       9160 Rumsey Road, suite 81
       Columbia, Maryland 21045-1997
       Telephone: (410) 884-3266
       Dr. Roby will provide testimony about the operation of the space heater, the products of
       combustion produced by the space heater, and the impact on the atmosphere within Mr.
       Cruz' home.

21.    Michael Klassen Ph.D., P.E.
       Combustion Science & Engineering, Inc.
       9160 Rumsey Road, suite 81
       Columbia, Maryland 21045-1997
       Telephone: (410) 884-3266
       Dr. Klassen will provide testimony about the operation of the space heater, the products
       of combustion produced by the space heater, and the impact on the atmosphere within
       Mr. Cruz' home.

22.    Carlos H. Cascos
       Pattilló, Brown & Hill, L.L.P.
       765 E. Seventh Street
       Brownsville, Texas 78520
       Telephone: (956) 544-7778
       Mr. Cascos will provide testimony about Manuel Cruz' economical damages.

23.    Richard Custer
       Custer Powell, Inc.
       160 East Main Street
       P. O. Box 1432
       Westborough, Massachusetts 01581
       Telephone: (508) 616-9990

Mr. Custer will provide testimony regarding the operations of the ionization of the smoke detector.

24.     Mark Devine
        BRK Brands, Inc.
        3901 Liberty Street Road
        Aurora, ILL 60504-8122
        Mr. Devine may testify about the design, manufacture quality control, users manual, properties, installation, use, operation and UL listing of the SA67D and/or other smoke detectors;

25.     James Woodburn
        502 Roberts Lane
        Batavia, Ill.
        Mr. Woodburn will be used, if needed, to rebut testimony and evidence produced by plaintiffs concerning BRK's design, manufacture and UL listing of smoke detectors;

26.     Paul Patty
        333 Pfingsten Road
        Northbrook, Ill 60062
        Mr. Patty will be used, if needed, to rebut testimony and evidence produced by plaintiffs concerning BRK's design, manufacture and UL listing of smoke detectors;

27.     Edward Duran
        BRK Brands Inc.
        3901 Liberty Street Road
        Aurora, IL 60504
        Mr. Duran may testify about the design, manufacture quality control, users manual, properties, installation, use, operation and UL listing of the SA67D and/or other smoke detectors;

28.     Richard Bukowski
        NIST
        Mr. Bukowski may testify about the design, manufacture, properties, installation, use, operation, analyses and UL listing of the SA67D and/or other smoke detectors;

29.     Vince Mori
        BRK Brands Inc
        3901 Liberty Street Road
        Aurora, IL 60504
        Mr. Mori may testify about the design, manufacture quality control, users manual, properties, installation, use, operation and UL listing of the SA67D and/or other smoke detectors;

30.  John Hall
     NFPA
     Mr. Hall may testify about the properties, installation, use, operation and analyses of
     smoke detectors in real world fires;

31.  Robert Malucci
     Molex, Inc.
     2222 Wellington Ct.
     Lisle, IL 60532
     Mr. Malucci will testify about is analyses of fretting corrosion;

32.  John P. Farrell and George Ebel
     ITT Research Institute
     201 Mill Street
     Rome, NY 13440
     Misters Farrell and Ebel will testify about their analyses of smoke detectors;

33.  Representatives from CPSC, FEMA, USFA, UL and CDC will testify concerning their
     analyses and investigations of smoke detectors how smoke detectors prevent deaths and
     injuries to thousands of people each year.  They may also testify, in rebuttal to allegations of
     wrongdoing;

34.  Susan Mallonee
     Oklahoma City, OK
     Ms. Mallonee will testify to the operation of ionization smoke detectors in real world
     fires;

35.  William Jernigan
     Dallas, TX
     Mr. Jernigan will testify to the operation of ionization smoke detectors in real world fires;

36.  Sofia Castillo
     Unknown Address
     Wife of Manuel Cruz, Deceased

IN THE U.S. DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

PROPOSED VOIR DIRE
OF DEFENDANT BRK BRANDS, INC.

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW BRK BRANDS, INC., Defendant in the above-styled and numbered

cause and respectfully requests the Court to present the following questions to the jury during

voir dire examination:

1.  Does any prospective juror know Idalia Garcia, Jose Garcia, Cynthia Cox, or Brittany
    Cox?

    1)  How do you know them and how would you describe your relationship with
        them?

    2)  Would such familiarity, if any, affect your ability to be fair and impartial?

2.  Does any member of the panel know any of the following attorneys or their law firms; or
    have you or any member of your family ever been connected with, employed by or
    represented by any of these lawyers and/or their firms:

    1)  Ray R. Marchan or the Watts Law Firm?

    2)  Juan Gonzalez, Mark Cantu, or the Law Offices of Mark Cantu?

        a)  If yes, in what capacity and type of lawsuit?

      b)     If yes, is there anything in that relationship that would bias or prejudice the juror?

3.    Is there any prospective juror who believes that just because we are here at trial that the Plaintiffs are automatically entitled to money?

4.    Is there any juror  who believes that just because an attorney or the Plaintiffs ask for a specific amount of money that they are automatically entitled to it?

5.    Is there anyone who believes that just because an attorney or the Plaintiffs file a lawsuit that all or part of their claims must be true?

6.    Will all the prospective jurors agree to make the Plaintiffs prove their case upon a preponderance of the credible evidence on both liability and damages?

7.    Does any prospective juror have any specialized engineering, legal, or insurance training, education or experience?

8.    Has any prospective juror, or a member of the prospective juror's immediate family, ever been exposed to carbon monoxide poisoning?

    If yes:

    1)    What was (were) the substance(s), and where did the exposure happen?

    2)    Do you believe that the exposure had any impact on your health, or the health of your family member?

    3)    Are you concerned that the exposure may affect your health, or the health of your family member, in the future?

9.    Has any prospective juror, or a member of the prospective juror's immediate family, ever been exposed to a fire?

    If yes:

    1)    What was (were) the substance(s), and where did the exposure happen?

    2)    Do you believe that the exposure had any impact on your health, or the health of your family member?

    3)    Are you concerned that the exposure may affect your health, or the health of your family member, in the future?

10.    In this case, is there any prospective juror who would start off favoring the Plaintiffs because they are individuals suing a corporation for damages?

11.   Is there any prospective juror who does not believe that a homeowner has an obligation to maintain their home in a safe manner?

12.   Is there any member of the panel who has any quarrel with the rule of law that the Plaintiffs have the burden of proof in a civil lawsuit?

13.   Is there any member of the panel who has any prejudice or feeling for or against civil lawsuits, or who has had any experience which would cause him to have a feeling, bias, prejudice, or opinion on civil lawsuits before hearing any of the evidence in this case?

14.   Does any prospective juror believe that because of any past experience or personal feelings, they cannot fairly decide this case?

15.   Is there any prospective juror who cannot follow the court's instruction and not let sympathy or bias play any part in this case?

16.   Will all the prospective jurors agree to treat BRK Brands, Inc. just like any other defendant?

17.   Do you have any beliefs or opinions for or against punitive damages?

18.   Does the jury agree that should Plaintiffs be unable to prove their case by a preponderance of the evidence, regardless of whether they feel sorry for or are sympathetic to Manuel Cruz's family that they will find in favor of BRK Brands, Inc.?

19.   Does the jury agree with the statement that consumers have an obligation to read warning and safety information regarding a product?

20.   Does the jury agree that a homeowner has a duty to insure that he is heating his house in a safe manner?

21.   Does the jury agree that a smoke detector is not designed to alarm when there is carbon monoxide is in the area?

22.   Does everyone understand the difference between a smoke detector and a carbon monoxide detector?

23.   Do the jurors understand that a smoke detector is not designed or manufactured for the detection of carbon monoxide?

24.   How many jurors understand what carbon monoxide gas is?

25.   Do the juror all agree that they will abide by the standard of care in the State of Texas for products manufacturers?

26.   Does any juror believe that all products sold should be held to a standard of perfection or require a product manufacturer to cover every single safety risk?

3

27.   Has any of the jurors ever lost a family member or close friend to death as a result of a defective product?

28.   Has any of the jury ever lost a loved one or close friend to death as a result of a fire?

29.   Has any of the jury ever used natural gas or propane fueled space heater in their home or office?

30.   Do the jury members know that they are to properly vent the space heater?

31.   Do the jury members know how to properly fuel a space heater?

32.   Have the jury members ever had a space heater cause damage, injury or death within their residence or the residence or a family member or close friend?

      If yes,

            a)      Please explain the circumstances of the event;

            b)      Please identify the damages, injuries or death that resulted from the problems with the space heater; and

            c)      Will that experience affect your ability to be a fair and impartial juror during the trial of this matter;

33.   Have the jury members ever had a smoke detector not sound an alarm when they think it should have?

            a)      If yes, please explain the circumstances under which you believe the smoke detector should have alarmed?

34.   Do the jury members have a smoke detector?

      If yes,

            a)      How many do you have in your home?

            b)      What type/brand of smoke detector is it?

            c)      How often do you test it?

35.   Do any of the jurors have knowledge as to how a smoke detector sensing smoke particles from a fire?

      If yes,

            a)      Please explain source of your knowledge; and

4

b)      (At side bar) Identify how the witness believes smoke from fire is detected by the smoke detector;

36.   Has any juror had their smoke detector alarm when they were cooking or from any other cause other than smoke from an unwanted fire?

If yes,

a)      Identify what caused the detector to alarm.

b)      Please explain the circumstances upon which the smoke detector alarmed and how you stopped the alarm?

c)      Would that incident affect your ability to be fair to either the plaintiffs or defendant in the trial of this matter

37.   Do the jury members believe that a homeowner who does not properly vent a space heater to the outside of the home assumes the risks associated with the gases emitted within the home?

38.   Do the jury members believe that a homeowner who does not burn the proper fuel in a space heater assumes the risk associated with burning the wrong fuel?

39.   Have you or a family member or close friend ever been involved in a lawsuit?

If yes:

a)      Who filed the lawsuit?

b)      What was the suit about?

c)      How was it resolved?

. d)     What were your feelings about the process at the conclusion of the case?

40.   Have the jurors, a family member, or any close friend or co-worker lived or owned property near 190 Thomae Lane, San Benito, Texas?

(a)     If yes, please identify the name and relationship to you of each person who has ever lived near that address

41.   Do the jurors  think that they can wait until the defendant has had an opportunity to present evidence in this case before making a decision?

If no, please explain

42.   Can any of the jurors think that you will be able to listen to the judge's explanation of the law and apply it to the facts of this case as he instructs? Please explain if answered no.

43.   Can you think of anything that might affect his ability to fairly and impartially decide the issues in this case?   Please explain.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER**
855 West Price Road, Suite 9
Brownsville, TX  78520
Telephone: (956) 542-5666
Facsimile: (956)542-0016

By:_____
        Rene O. Oliveira
        State Bar No. 15254700
        Federal Bar No. 4033
        Elizabeth G. Neally
        State Bar No. 14840400
        Federal Bar  No.8044

**COZEN O'CONNOR**
        James H. Heller
        Terry M. Henry
        1900  Market Street
        Philadelphia, PA   19103
        Tel: 215/665-2000
        Fax: 215/665-2013

PHILA1\1789164\1 077262.000

6

**IN THE U.S. DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

## THE PROPOSED JURY INSTRUCTIONS OF
## DEFENDANT BRK BRANDS, INC.

By and through its undersigned counsel, defendant, BRK Brands, Inc. ("BRK"),

hereby submits the following proposed jury instructions and respectfully reserves the right to

amend or supplement them at any time at or before the close of the presentation of the evidence.

In submitting these jury instructions, BRK does not concede that any of plaintiffs' claims (or any

of the requested damages) should be submitted to the jury, for the reasons set forth in BRK's

Motion for Summary Judgment and Reply In Support of Summary Judgment.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER**

BY: _____
     Rene O. Oliveira
     Elizabeth G. Neally
     855 West Price Road, Suite 9
     Brownsville, TX  78520
     Tel: 956/542-5666
     Fax: 956/542-0016

**COZEN O'CONNOR**
     James Heller
     Terry M. Henry
     1900  Market Street
     Philadelphia, PA  19103
     Tel: 215/665-2000
     Fax: 215/665-2013

## TABLE OF BRK BRANDS, INC.'S PROPOSED JURY INSTRUCTIONS

Jury Instruction No. 1 – Nature of the Case,
General Instructions ........................................................................................1

Jury Instruction No. 2 - Trial Procedure.............................................................3

Jury Instruction No. 3 -  Extrinsic Influences .................................................5

Jury Instruction No. 4 - Objections....................................................................6

Jury Instruction No. 5 - Burden Of Proof .........................................................7

Jury Instruction No. 6 - Credibility Of Lay Witnesses.....................................9

Jury Instruction No. 7 - Credibility Of Expert Witnesses .............................11

Jury Instruction No. 8 – Direct and Indirect or Circumstantial Evidence .............................13

Jury Instruction No. 9 – Inferences From Evidence........................................14

Jury Instruction No. 10 - Speculation ..............................................................15

Jury Instruction No. 11 - Sympathy..................................................................16

Jury Instruction No. 12 – Negligent Products Liability ..................................17

Jury Instruction No. 13 – Negligence ...............................................................18

Jury Instruction No. 14 – Strict Products Liability .........................................19

Jury Instruction No. 15 – Design Defect – Strict Products Liability...............20

Jury Instruction No. 16 – Design Defect – Strict Products Liability...............21

Jury Instruction No. 17 – Safer Alternative Design.........................................22

Jury Instruction No. 18 – State Of The Art Defense ......................................23

Jury Instruction No. 19 – Marketing Defect –
Strict Products Liability ...................................................................................24

Jury Instruction No. 20 – Marketing Defect –
Strict Products Liability ...................................................................................25

Jury Instruction No. 21 – Adequate Warnings ...............................................26

Jury Instruction No. 22 – Unreasonably Dangerous Product........................27

Jury Instruction No. 23 – Substantial Change In Condition or
Subsequent Alteration by Affirmative Conduct ..............................................28

Jury Instruction No. 24 – Negligent Products Liability ..................................29

Jury Instruction No. 25 – Breach of Implied Warranty of Merchantability
Under The Texas Deceptive Trade Practices Act ........................................................30

Jury Instruction No. 26 – Causation ........................................................31

Jury Instruction No. 27 – Proximate Cause ........................................................32

Jury Instruction No. 28 – Producing Cause – Strict Products Liability ........................33

Jury Instruction No. 29 – Sole Cause ........................................................34

Jury Instruction No. 30 - Causation ........................................................35

Jury Instruction No. 31 - Substantial Factor ........................................................36

Jury Instruction No. 32 – Cause-In-Fact ........................................................37

Jury Instruction No. 33 – Foreseeability
(Requirement To Establish Proximate Cause) ........................................................38

Jury Instruction No. 34 – Superceding Cause ........................................................39

Jury Instruction No. 35 – "Modified" Comparative Negligence ...................................40

Jury Instruction No. 36 - Damages ........................................................41

Jury Instruction No. 37 - Damages ........................................................42

Jury Instruction No. 38 - Compensatory Damages ........................................................43

Jury Instruction No. 39 – Proof of Damages ........................................................44

Jury Instruction No. 40 - Punitive Damages ........................................................45

Jury Instruction No. 41 – Punitive Damages ........................................................46

Jury Instruction No. 42 – Punitive Damages ........................................................47

Jury Instruction No. 43 – Clear and Convincing
Evidence – Punitive Damages ........................................................48

Jury Instruction No. 44 – Limitation On The  Recovery of Punitive Damages .................49

Jury Instruction No. 45 - Deliberations ........................................................50

**BRK's Proposed**
**Jury Instruction No. 1 – Nature of the Case,**
**General Instructions**

Members of the jury, we are about to begin the trial of the case about which you have heard some details during the process of jury selection. Before the trial begins, however, there are certain instructions you should have in order to better understand what will be presented before you and how you should conduct yourself during the trial.

The parties who bring a lawsuit are called the Plaintiffs. In this action, the Plaintiffs are Jose Garcia, Idalia Garcia, and Cynthia Cox who is here on behalf of Brittany Cox. The party against whom this suit is brought is called the Defendant. In this action, the Defendant is BRK Brands, Inc. ("BRK"). The Plaintiffs in this case seek to hold BRK liable for the death Manual Cruz based upon allegations that Mr. Cruz died of asphyxiation when a BRK smoke detector in his home allegedly failed to warn him of a carbon monoxide poisoning hazard in his house.

By your verdict, you will decide disputed issues of fact. I will decide all questions of law that arise during the trial, and before you retire to deliberate at the close of the case, I will instruct you on the law that you must follow and apply in deciding upon your verdict.

Since you will be called upon to decide the facts of this case, you should give careful attention to the testimony and evidence presented for your consideration, bearing in mind that I will instruct you at the end of the trial concerning the manner in which you should determine the credibility or "believability" of each witness and the weight to be given to testimony. During the trial, however, you should keep an open mind and should not form or express any opinion about the case one way or the other until you have heard all of the testimony and evidence, the closing arguments of the lawyers, and my instructions to you on the applicable law.

While the trial is in process, you must not discuss the case in any manner among yourselves or with anyone else, nor should you permit anyone to discuss it in your presence.

From time to time during the trial, I may be called upon to make rulings of law on objections or motions made by the lawyers. It is the duty of the attorneys on each side of a case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible. You should not show prejudice against an attorney or his client because the attorney has made objections. You should not infer or conclude from any ruling or other comment I may make that I have any opinions on the merits of the case favoring one side or the other. And, if I sustain an objection to a question that goes unanswered by the witness, you should not draw any inferences or conclusions from the question itself.

During the trial it may be necessary for me to confer with the lawyers out of your hearing with regard to questions of law or procedure that require consideration by the Court alone. On some occasions, you may be excused from the courtroom for the same reason. I will try to limit these interruptions as much as possible, but you should remember the importance of the matter you are here to determine and should be patient even though the case may seem to go slowly.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 70.01 (4th ed. 1987).

**BRK's Proposed**
**Jury Instruction No. 2 - Trial Procedure**

After I finish these preliminary instructions, the plaintiffs' attorneys will make an opening statement outlining their cases. Then, the attorneys for the defendant have the right, but not the obligation, to make an opening statement. Plaintiffs will then present their evidence. While the defendant does not have to present any evidence, it will be given an opportunity to do so after the plaintiffs have finished presenting their evidence.

Evidence is presented to you through a process called direct examination -- the asking of questions of a witness. The direct examination of a witness will be conducted by the attorney calling the witness, and any witness may be cross-examined by opposing counsel. Cross-examination has two purposes. First, it allows an attorney to bring out additional facts which were not mentioned or developed during direct examination. Second, it allows an attorney to develop facts which may help you decide whether you should believe what the witness is telling you. It is doubtful that the cross-examination in this case will resemble what happens on Perry Mason. No one is going to jump up and say "I confess, I did it" or "I confess, I didn't do it." Rather, the role of cross-examination is to bring out additional evidence, and to help you judge the credibility of the witness.

I may ask questions of a witness in order to obtain information or bring out some facts not fully developed by the testimony.

At the end of all the evidence, the attorneys will make their closing arguments in which they will give you their views of what the evidence means. While the opening statements and closing arguments should be given due consideration, they are not evidence. Only the answers given by witnesses and the documents or other materials I have admitted into evidence can be considered by you in determining the facts.

-3-

Following the closing arguments, I will give you instructions on the law, which are sometimes referred to as the jury charge. In these instructions, I will tell you the law which you must apply to the facts which you will find as a result of your deliberations.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 70.02 (4th ed. 1987).

**BRK's Proposed**
**Jury Instruction No. 3 - Extrinsic Influences**

You are not to discuss this case, or anything connected with it, among yourselves until all of the evidence is in and you have received the final instructions from me and have retired to the jury room for deliberations to reach your verdict. Do not permit others to discuss this case with you, or in your presence. If such a thing should occur, you should advise me promptly. Additionally, do not talk to counsel, the parties or any witnesses. If you do so, even though innocently, it could create serious problems.

Finally, counsel and I are required by law to take up certain matters out of your hearing. We may do this at the bench, or in my chambers, or I may ask you to leave the courtroom. You should not concern yourself with any such proceedings.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:    Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 70.15 (4th ed. 1987).

**BRK's Proposed**
**Jury Instruction No. 4 - Objections**

The admission of evidence in court is governed by rules of law. During the trial, the attorneys may make objections, and it will be my duty to rule on those objections and decide whether certain evidence can be admitted for your consideration. You must not concern yourself with the objections or the reasons for my rulings. The attorneys have the right and duty to make objections in order to make sure that only legally sufficient and relevant evidence is presented to you. You should not penalize any of the litigants (or their attorneys) because an attorney makes objections. Similarly, you must not consider testimony or exhibits to which I have sustained an objection, or which I have ordered stricken from the record.

None of my rulings should be regarded as an indication of my opinion as to what your findings should be. Likewise, you should not take any questions I may ask witnesses as any indication of my opinion as to how you should determine the issues of fact, since you and you alone are the sole finders of the facts.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

Authority:   Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 70.13 (4th ed. 1987); Fifth Circuit Pattern Jury Instruction 3B.

**BRK's Proposed**
**Jury Instruction No. 5 - Burden Of Proof**

This is a civil case and as such, with the exception of plaintiffs' claim for punitive damages, the plaintiffs have the burden of proving their material allegations by a preponderance of the evidence. If the proof should fail to establish any essential element of the plaintiffs' claim by a preponderance of the evidence, you should find for BRK as to that claim.

To "establish by a preponderance of the evidence" means to prove that something is more likely so than not so. In other words, a preponderance of the evidence in the case means such evidence as, when considered and compared with that opposed to it, has more convincing force, and produces in your minds belief that what is sought to be proved is more likely true than not true. This rule does not, of course, require proof to an absolute certainty, since proof to an absolute certainty is seldom possible in any case.

To illustrate what I mean by the phrase "preponderance of evidence," think, if you will, of an ordinary balance scale, with a pan on each side. Onto one side of the scale, place all of the evidence favorable to the Plaintiffs; onto the other, place all of the evidence favorable to the Defendant. If, after considering the comparable weight of the evidence, you feel that the scales tip, ever so slightly or to the slightest degree, in favor of the Plaintiffs, your verdict must be for the Plaintiffs. If the scales tip in favor of the Defendant, or are equally balanced, the Plaintiffs have not met their burden of proof and your verdict must be for the Defendant and against the Plaintiffs.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits admitted into evidence, regardless of who may have produced them.

-7-

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

Authority: Adapted from Modern Jury Instructions ¶ 73.01, Instruction 73-1; 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 72.01 (4th ed. 1987).

## BRK's Proposed
## Jury Instruction No. 6 - Credibility Of Lay Witnesses

You are the sole judges of the credibility or "believability" of each witness and the weight to be given to his/her testimony. You must consider and weigh the testimony of each witness and give it such weight as you deem appropriate.

In weighing the testimony of a witness you should consider his/her relationship to the Plaintiffs or to the Defendant; his/her interest, if any, in the outcome of the case; his/her manner of testifying; his/her opportunity to observe or acquire knowledge concerning the facts about which he/she testified; his/her candor, fairness and intelligence; and the extent to which he/she has been supported or contradicted by other credible evidence. You may, in short, accept or reject the testimony of any witness in whole or in part.

You may find that some of the witnesses testified inconsistently, or contradicted each other. Even actual contradictions in the testimony of witnesses do not necessarily mean that any witness has been willfully false. Poor memory is not uncommon. Sometimes a witness forgets, or remembers incorrectly. It is also true that two persons witnessing an incident may see or hear it differently.

If different parts of the testimony of any witness or witnesses appear to be inconsistent, you should try to reconcile the conflicting statements if you can do so fairly and satisfactorily. If, however, you decide that there is a genuine and irreconcilable conflict of testimony, it is your function and duty to determine which, if any, of the contradictory statements you will believe.

If you decide that a witness has deliberately falsified his or her testimony on a significant point, you should take this into consideration in deciding whether or not to believe the rest of that witness' testimony. While you are allowed to refuse to believe the rest of the testimony of a witness you believe has testified falsely on one point, you are not required to do so.

The number of witnesses offered by one side or the other does not, in itself, determine the weight of the evidence. It is a factor, but only one of many factors which you should consider. Whether the witnesses appear to be biased or unbiased, and whether they are interested or disinterested persons, are among the important factors which go to the reliability of their testimony. The important thing is the quality of the testimony of each witness. In short, the test is not which side brings the greater number of witnesses or presents the greater quantity of evidence, but which witness or witnesses, and which evidence, you consider most worthy of belief. Even the testimony of one witness may outweigh that of many, if you have reason to believe the testimony of the one rather than the testimony of the many. Obviously, however, where the testimony of the witnesses appears to you to be of the same quality, the weight of numbers becomes significant.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Adapted from Fifth Circuit Pattern Jury Instructions 4 and 5A.

**BRK's Proposed**
**Jury Instruction No. 7 - Credibility Of Expert Witnesses**

During the trial of this matter you have heard the testimony of people who have been labeled as "expert" witnesses. While everyone talks about these witnesses as being experts, perhaps a better name for them would be "technical witnesses" because these witnesses are presented because they have certain technical training or experience which may be able to help you understand certain aspects of this case. There are only two differences between these expert witnesses and every other witness you have heard. The first is that expert witnesses have specific training or experience which may be relevant to the dispute which you have been asked to decide. The second is that these witnesses are allowed to give their opinion as to what happened, even though they were not physically present to observe the events which gave rise to this lawsuit.

Because expert witnesses were not present to personally observe the events which gave rise to this lawsuit, they must rely on others to give them the information they need to form their opinions. In deciding whether you believe what an expert witness said, you should take into consideration both the type of information the expert relied upon, and the source of that information. You should also consider the method the expert used to reach the opinions the expert gave while on the witness stand, and the experience or training which the expert brought to bear on this case. If either the expert's method, or the information from which the expert formed an opinion does not seem to you to be true or reliable, you may discount it. Similarly, you may discount an expert's testimony if you do not believe that the expert had sufficient training or experience. Your job with respect to an expert witness is no different than your job with respect to any other witness you have heard. You must determine whether to credit the expert witness' testimony. If you do not find the expert's testimony to be credible, you can, and

must, reject it.  In making this decision, you should not be influenced by the fact that other people in the courtroom have referred to the witness as an expert.


Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  4 Leonard B. Sand, et al, Modern Federal Jury Instructions Instruction 76-9 (1994); 3 Hon. Edward J. Devitt, et al, Federal Jury Practice and Instructions § 72.08 (1992).

**BRK's Proposed**
**Jury Instruction No. 8 – Direct and Indirect or Circumstantial Evidence**

Evidence may be direct or indirect.  Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.  Indirect evidence (sometimes called circumstantial or inferences) consists of a chain of circumstances pointing to the existence or non-existence of certain facts.  Circumstantial evidence is based upon deductions or logical conclusions that you reach from the direct evidence.

Let me give you an example of direct and circumstantial evidence.  If a witness testified that he/she observed snow falling last night, that would be an example of direct evidence.  On the other hand, if a witness testified that there was no snow on the ground before going to sleep and that when he/she arose in the morning the ground was snow covered, you could *infer* from these facts that it snowed during the night.  That would be an example of circumstantial evidence.

You may consider both direct and circumstantial evidence in deciding this case.  The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:   Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 72.03 (4th ed. 1987).

-13-

**BRK's Proposed**
**Jury Instruction No. 9 – Inferences From Evidence**

When deciding this case, you are permitted to draw only those inferences from the evidence which are reasonable and logical in light of the facts, testimony and/or surrounding circumstances.

An inference as to an ultimate issue of fact is unreasonable, if it rests on mere speculation and conjecture. Ultimate inferences are too speculative and conjectural to support a judgment if they are at war with uncontradicted or unimpeached facts. What this means is that you may not infer something if the evidence presented by the parties demonstrates that the opposite is true.

Also, you may not reasonably infer that a thing may have happened from meager circumstantial evidence where that evidence shows that a number of things may have occurred, none more probable than the other. For instance, when evidence shows that many different results may have happened, but the evidence does not make one more probable than another, you are not permitted to infer one specific result that did occur. That would be speculation.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: See Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1388 (5th Cir. 1996); Fenner v. General Motors Corp., 657 F.2d 647, 651 (5th Cir. 1981); Bridges v. Groendyke Transport, Inc., 553 F.2d 877, 878-79 (5th Cir. 1977); Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, 850-51 (5th Cir. 1967); Dreijer v. Girod Motor Co., 294 F.2d 549, 555-556 (5th Cir. 1961); Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001); Wright v. Wal-Mart Stores, Inc., 73 S.W.3d 552, 555 (Tex. App. – Houston 2002).

**BRK's Proposed**
**Jury Instruction No. 10 - Speculation**

Likewise, you are not to reach a verdict based on speculation or conjecture. If you find

that you are unable to reach a decision as to the facts of the case without guessing or speculating,

then your verdict must be in favor of the defendant.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

Authority: <u>Seven-Up Co. v. Coca-Cola Co.</u>, 86 F.3d 1379, 1388 (5th Cir. 1996); <u>Fenner v. General Motors Corp.</u>, 657 F.2d 647, 651 (5th Cir. 1981); <u>Bridges v. Groendyke Transport, Inc.</u>, 553 F.2d 877, 878-79 (5th Cir. 1977); <u>Helene Curtis Industries, Inc. v. Pruitt</u>, 385 F.2d 841, 850-51 (5th Cir. 1967); <u>Dreijer v. Girod Motor Co.</u>, 294 F.2d 549, 555-556 (5th Cir. 1961); <u>Lozano v. Lozano</u>, 52 S.W.3d 141, 148 (Tex. 2001).

**BRK's Proposed**
**Jury Instruction No. 11 - Sympathy**

It is plaintiffs' duty to come forward and prove their case. You may not permit sympathy for or against any of the parties in this case to influence your decision even in the slightest degree.


Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: 3 E. Devitt, C. Blackmar & M. Wolff, <u>Federal Jury Practice and Instructions (Civil)</u> § 701.01 (4th ed. 1987).

**BRK's Proposed**
**Jury Instruction No. 12 – Negligent Products Liability**

Plaintiffs in this case claim that BRK was negligent in its design, manufacture and sale of the smoke detector at issue, due to BRK's alleged failure to ensure that the smoke detector installed in Manual Cruz's residence at the time of the incident would provide an audible warning in response to by-products of combustion emitted from an improperly vented and fueled space heater, and BRK's failure to provide adequate instructions and warnings regarding the smoke detector and its components. BRK disputes these claims.

While strict liability focuses on the condition of the smoke detector, negligence looks at the acts of BRK and determines if BRK exercised ordinary care in the design, production and marketing of the smoke detector at issue. Thus, to recover under a theory of negligent products liability, the plaintiffs must prove, by a preponderance of the evidence, **all** of the following:

(1) the duty owed by BRK to Manual Cruz;

(2) a breach of that duty;

(3) Manual Cruz suffered an injury as a result of the breach of that duty; and

(4) the breach of duty proximately caused the death of Manual Cruz.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  American Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 427 (Tex. 1997); Garrett v. Hamilton Standard Controls, 850 F.2d 253, 256 (5th Cir. 1988); Nobles v. Sofamor, 81 F.Supp.2d 735, 740 (S.D. Tex. 1999).

-17-

**BRK's Proposed**
**Jury Instruction No. 13 – Negligence**

The legal term "negligence," otherwise known as carelessness, means the failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. In this case, you must consider whether BRK acted reasonably under the circumstances in its design, manufacture and/or marketing of the smoke detector at issue.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Texas Pattern Jury Charge § 2.1; see also Colvin v. Red Steel Co., 682 S.W.2d 243, 245 (Tex. 1984); Great Atlantic & Pacific Tea Co. v. Evans, 175 S.W.2d 249, 250-51 (Tex. 1943).

**BRK's Proposed**
**Jury Instruction No. 14 – Strict Products Liability**

Plaintiffs in this case also seek to hold BRK strictly liable for Manual Cruz's carbon monoxide poisoning death based upon allegations that Mr. Cruz died of asphyxiation when a BRK smoke detector installed in his home failed to warn him of the smoke in his house.

To recover under a theory of strict products liability, the plaintiffs must show that: (1) the smoke detector possessed a defect that rendered it unreasonably dangerous at the time it left the hands of BRK; and (2) the smoke detector's dangerous condition caused Manual Cruz's death.

In other words, the difference between negligence and strict products liability claims is that a strict products liability claim focuses on the condition of the product, here a smoke detector, while a negligence claim focuses on the defendant's conduct in designing that product.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

Authority:  American Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 427 (Tex. 1997); Lucas v. Texas Industries, Inc., 696 S.W.2d 372, 377 (Tex. 1984); Turner v. General Motors Corp., 584 S.W.2d 844, 847 n.1 (Tex. 1979); Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374 (Tex. 1978); Garrett v. Hamilton Standard Controls, Inc., 850 F.2d 253, 256-57 (5th Cir. 1988); Oser v. Wal-Mart Stores, Inc., 951 F.Supp. 115, 118 (S.D. Tex. 1996); RESTATEMENT (SECOND) OF TORTS § 402A cmt. G. (1965).

**BRK's Proposed**
**Jury Instruction No. 15 – Design Defect – Strict Products Liability**

To recover on their products liability claim alleging a design defect, the plaintiffs must prove by a preponderance of the evidence that: (1) there was a safer alternative design; and (2) a defect in the smoke detector was a producing cause of the death of Manual Cruz. If there are no safer alternatives, the smoke detector at issue is not unreasonably dangerous as a matter of law.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a)-(b) (Vernon 1997) (Texas Products Liability Act of 1993); Rodriguez v. Riddell Sports, Inc., 242 F.3d 567, 574 (5th Cir. 2001); Huffine v. Kawasaki Motors Corp., No. 1:00-CV-294-C, 2002 U.S. Dist. LEXIS 1493 (N.D. Tex. Jan. 31, 2002).

**BRK's Proposed**
**Jury Instruction No. 16 – Design Defect – Strict Products Liability**

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist there must have been a safer alternative design.


Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Texas Pattern Jury Charge § 71.05B.

**BRK's Proposed**
**Jury Instruction No. 17 – Safer Alternative Design**

"Safer alternative design" means a product design other than the one actually used that in reasonable probability --

> 1. would have prevented or significantly reduced the risk of the occurrence or injury that happened in this case without substantially impairing the smoke detector's utility; and

> 2. was economically and technologically feasible at the time the smoke detector left the control of BRK by the application of existing or reasonably achievable scientific knowledge.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____
_____

Authority:  Texas Pattern Jury Charge § 71.05B.

-22-

**BRK's Proposed**
**Jury Instruction No. 18 – State Of The Art Defense**


Texas law does not require that a manufacturer supply only state-of-the-art products to avoid later liability under product liabilities theories.    Industry and governmental standards should be considered as evidence of whether or not a product is defectively designed.

The evidence you have heard demonstrates that Manual Cruz's smoke detector met or exceeded the standard for smoke detectors set by Underwriters Laboratories.



Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Bennett v. PRC Public Sector, Inc., 931 F.Supp. 484, 501 (S.D. Tex. 1996).

**BRK's Proposed**
**Jury Instruction No. 19 – Marketing Defect –**
**Strict Products Liability**

A "marketing defect" with respect to smoke detector means that BRK failed to give adequate warnings of the smoke detector's dangers that were known or by the application of reasonably developed human skill and foresight should have been known or failed to give adequate instructions to avoid such dangers, which failure rendered the smoke detector unreasonably dangerous as marketed.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Texas Pattern Jury Charge § 71.06; American Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 426 (Tex. 1997); Smith v. Aqua-Flo, Inc., 23 S.W.3d 473, 480 (Tex. App. 2000).

**BRK's Proposed
Jury Instruction No. 20 – Marketing Defect –
Strict Products Liability**

To recover on their products liability claim alleging a marketing defect, plaintiffs must

prove, by a preponderance of evidence, **all** of the following:

     (1) there was an inherent risk associated with Manual Cruz's use of the smoke detector, or that a risk might arise from the intended or reasonably anticipated use of the smoke detector;

     (2) BRK should have foreseen the risk of harm;

     (3) BRK failed to give an adequate warning of the danger;

     (4) BRK's failure to warn made the smoke detector at issue unreasonably dangerous; and

     (5) BRK's failure to warn caused the death of Manual Cruz.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  McLennan v. Am. Eurocopter Corp., 245 F.3d 403, 427 (5th Cir. 2001); Reberger v. The Bic Corp., No. CIV.A.700CV005-R, 2001 U.S. Dist. LEXIS 15190, at *20 (N.D. Tex. Sept. 25, 2001).

**BRK's Proposed**
**Jury Instruction No. 21 – Adequate Warnings**

"Adequate" warnings and instructions mean warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average user and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent person.

BRK, however, has no duty to warn consumers concerning risks associated with the relevant smoke detector that are matters within the ordinary knowledge common to the community. Whether information about a risk is common knowledge is an objective inquiry and the user's, in this case Manual Cruz's, knowledge is not dispositive on the issue. The consumer's perspective is that of an ordinary user of the product; not necessarily that of an ordinary person unfamiliar with a product.


Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

---

Authority: Texas Pattern Jury Charge § 71.06; Bituminous Cas. Corp. v. Black & Decker Mfg. Co., 518 S.W.2d 868, 872-73 (Tex. Civ. App. 1974); McLennan v. Am. Eurocopter Corp., Inc., 245 F.3d 403, 428-29 (5th Cir. 2001); Huffine v. Kawasaki Motors Corp., No. 1:00-CV-294-C, 2002 U.S. Dist. LEXIS 1493, at *11-12 (N.D. Tex. Jan. 31, 2002).

**BRK's Proposed**
**Jury Instruction No. 22 – Unreasonably Dangerous Product**

An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with the ordinary knowledge common to the community as to the product's characteristics.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Texas Pattern Jury Charge § 71.06.

**BRK's Proposed**
**Jury Instruction No. 23 – Substantial Change In Condition or**
**Subsequent Alteration by Affirmative Conduct**

A product is not in a defective condition, thus not unreasonably dangerous when sold, if the unreasonably dangerous condition is solely caused by a substantial change or alteration of the product after it is sold, and but for which unreasonably dangerous condition the event would not have occurred. "Substantial change or alteration" means that the configuration or operational characteristics of the product are changed or altered by affirmative conduct of some person in a manner that BRK could not have reasonably foreseen would occur in the intended or foreseeable use of the product. Substantial change or alteration does not include reasonably foreseeable wear and tear or deterioration.

An example of substantial change or alteration in this case would be that the battery was disconnected. If you find such a fact, then the operational characteristics of the smoke detector have been changed, or substantially altered, and your verdict must be in favor of BRK.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Texas Pattern Jury Charge § 70.05;  Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374 (Tex. 1978); Miller v. Bock Laundry Machine Co., 568 S.W.2d 648 (Tex. 1977); Ford Motor Co. v. Russell & Smith Ford Co., 474 S.W.2d 549 (Tex. Civ. App. – Houston [14th Dist.] 1971; RESTATEMENT SECOND OF TORTS § 402A(1)(b) (1965).

**BRK's Proposed**
**Jury Instruction No. 24 – Negligent Products Liability**

If you should find that the plaintiffs have not presented sufficient evidence to establish the smoke detector at issue was defective, then plaintiffs cannot recover against BRK under a strict products liability theory. Under these circumstances, you must also find that plaintiffs cannot recover against BRK under a negligent products liability theory. This is because BRK cannot be held liable for failing to exercise ordinary care when producing a smoke detector that is not defective because: (1) if the smoke detector was not unreasonably dangerous because of the way it was manufactured, it was not negligent for BRK to manufacture it that way; and (2) even if BRK was somehow negligent in the design or production of the smoke detector, that negligence cannot have caused Manual Cruz's death because the negligence did not render the smoke detector unreasonably dangerous.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Garrett v. Hamilton Standard Control, Inc., 850 F.2d 253, 257 (5th Cir. 1988); Nobles v. Sofamor, 81 F.Supp.2d 735, 740 (S.D. Tex. 1999).

**BRK's Proposed**
**Jury Instruction No. 25 – Breach of Implied Warranty of Merchantability**
**Under The Texas Deceptive Trade Practices Act**

To prevail on their claim for breach of implied warranty of merchantability under the Texas Deceptive Trade Practice Act, the plaintiffs must prove that:

(1) the smoke detector at issue was defective meaning that it was unfit for the ordinary purposes for which it was used because of a lack of something necessary for adequacy;

(2) the smoke detector at issue was defective when it left BRK's possession; <u>and</u>

(3) the smoke detector's unfit condition caused Manual Cruz's death.

The defect in an implied warranty of merchantability case means the condition of the goods that, because of a lack of something necessary for adequacy, renders them unfit for the ordinary purpose for which they are used.

Where as here, a case involves a claim for personal injuries, strict products liability and breach of warranty concepts of "defect" are functionally identical.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:   <u>Hyundai Motor Co. v. Rodriguez</u>, 995 S.W.2d 661, 665 (Tex. 1999); <u>Sipes v. General Motors Corp.</u>, 946 S.W.2d 143, 158 (Tex. App. 1997).

-30-

**BRK's Proposed
Jury Instruction No. 26 – Causation**

To recover on their claims, the plaintiffs must prove causation. This means that on their negligence claim, plaintiffs must prove that BRK's conduct was the proximate cause of the death of Manual Cruz.

To recover under their breach of warranty claim, plaintiffs must prove that a defect in the smoke detector was the proximate cause of the death of Manual Cruz.

On the other hand, to recover under their strict products liability claims, plaintiffs need to establish that a defect in the smoke detector was a producing cause of the death of Manual Cruz.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

---

Authority: Hyundai Motor Co. v. Rodriguez, 995 S.W.2d 661, 665 (Tex. 1999); Amstadt v. U.S. Brass Co., 919 S.W.2d 644, 648 (Tex. 1996); General Motors Corp. v. Saenz, 873 S.W.2d 353, 357 (Tex. 1993); Baxter Healthcare Corp. v. Grimes, No. 05-95-01682-CV, 1998 Tex. App. LEXIS 5505, *4 (Tex. Civ. App. – Dallas Aug. 31, 1998) (not designated for publication); Dinkelman v. Toyota Motor Sales, U.S.A., No. 3:98-CV-0400-H, 1999 U.S. Dist. LEXIS 1448, *6 (N.D. Tex. Feb. 4, 1999).

**BRK's Proposed**
**Jury Instruction No. 27 – Proximate Cause**

"Proximate cause" means a cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Texas Pattern Jury Charge § 70.02; Rudes v. Gottschalk, 324 S.W.2d 201, 207 (Tex. 1959).

**BRK's Proposed**
**Jury Instruction No. 28 – Producing Cause – Strict Products Liability**

"Producing cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produced the injuries or damages complained of and but for which, such injuries or damages would not have occurred.  There may be more than one producing cause.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Minnesota Mining and Manufacturing Co. v. Atterbury, 978 S.W.2d 183, 197 (Tex. App. 1998); Hartzell Propeller Co. v. Alexander, 485 S.W.2d 943, 946 (Tex. Civ. App. – Waco 1972); see also Haynes & Boone v. Bowser Boulden Ltd., 896 S.W.2d 179 (Tex. 1995).

**BRK's Proposed**
**Jury Instruction No. 29 – Sole Cause**

There may be more than one cause of an occurrence or injury, but if an act or omission of any person or entity not a party to the lawsuit was the sole cause of the occurrence or injury, then no act, omission, or product of BRK could have been a cause of the occurrence or injury.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Texas Pattern Jury Charge § 70.03.

-34-

**BRK's Proposed**
**Jury Instruction No. 30 - Causation**

The difference between proximate and producing cause is that proof of proximate cause entails a showing of foreseeability, while proof of producing cause does not. Thus, the plaintiffs bear a less demanding causation burden in strict liability cases.

Although a producing cause need not be foreseeable, both producing and proximate cause require that BRK's conduct be a "cause-in-fact" of the death of Manual Cruz. In other words, "cause in fact" requires that BRK's conduct or the allegedly defective smoke detector be a substantial factor in bringing about the death of Manual Cruz, and that without said conduct, no harm would have occurred to Mr. Cruz.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775 (Tex. 1995); General Motors Corp. v. Saenz, 873 S.W.2d 353, 357 (Tex. 1993); Ambrosio v. Carter's Shooting Center, 20 S.W.3d 262, 266 (Tex. App. – Houston [14 Dist.] 2000); Roberts v. Healey, 991 S.W.2d 873, 878 (Tex. App. – Houston [14th Div.] 1999); Minnesota Mining and Manufacturing Co. v. Atterbury, 978 S.W.2d 183, 197 (Tex. App. 1998); Garrett v. Hamilton Standard Control, Inc., 850 F.2d 253, 257 n. 6 (5th Cir. 1988); Dinkelman v. Toyota Motor Sales, U.S.A., No. 3:98-CV-0400-H, 1999 U.S. Dist. LEXIS 1448, *6 (N.D. Tex. Feb. 4, 1999).

**BRK's Proposed**
**Jury Instruction No. 31 - Substantial Factor**

A defendant's conduct is not a substantial factor in bringing about harm if that harm would have been sustained even in the absence of the defendant's conduct. Thus, if you find that Manual Cruz would have been harmed in the absence of any conduct by BRK or in the absence of a smoke detector, then you must find that neither BRK nor the smoke detector was a substantial factor in bringing about the harm.

Within the context of this case, plaintiffs must prove that sufficient smoke or soot got to the smoke detector to cause it to alarm before Manual Cruz was incapacitated by the carbon monoxide. If you find that plaintiffs have failed to present this evidence, then neither the conduct of BRK nor the smoke detector was a substantial factor in Manual Cruz's death, and your verdict must be in favor of BRK.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Hall v. Atchison, T. & S. Ry. Co., 504 F.2d 380, 385 (5th Cir. 1974) (applying Texas law); RESTATEMENT (SECOND) OF TORTS § 432 (1965).

**BRK's Proposed**
**Jury Instruction No. 32 – Cause-In-Fact**

Cause-in-fact, commonly referred to as factual causation, must be proven by evidence of

probative force, and cannot be established by mere conjecture, guess or speculation. Cause-in-

fact is not shown if BRK's acts or omissions did no more than furnish a condition that made the

death of Manual Cruz possible. In other words, cause-in-fact does not exist as a matter of law

when BRK's conduct was too attenuated or remotely connected to the death of Manual Cruz.


Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:   Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995);
Ambrosio v. Carter's Shooting Center, 20 S.W.3d 262, 266-67 (Tex. App. – Houston [14 Dist.]
2000); Roberts v. Healey, 991 S.W.2d 873, 878 (Tex. App. – Houston [14[th] Div.] 1999);
Wheaton Van Lines, Inc. v. Mason, 925 S.W.2d 722, 728 (Tex. App. – Fort Worth 1996).

**BRK's Proposed**
**Jury Instruction No. 33 – Foreseeability**
**(Requirement To Establish Proximate Cause)**

Should you find that BRK's conduct was a substantial factor in bringing about the death of Manual Cruz, BRK cannot be held liable under plaintiffs' negligent liability claim unless the death of Manual Cruz was foreseeable.

"Foreseeability" does not require a person to anticipate precise manner in which injury will occur once he/she has created dangerous situation through his/her negligence. Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable.

Thus, to establish foreseeability, plaintiffs must show that BRK should have anticipated others, like Manual Cruz, would expose themselves to carbon monoxide poisoning hazards they created as a result of BRK's negligent act or omission.


Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Ambrosio v. Carter's Shooting Center, 20 S.W.3d 262, 266-67 (Tex. App. – Houston [14 Dist.] 2000).

**BRK's Proposed**
**Jury Instruction No. 34 – Superceding Cause**

The intervening negligence of a person, other than the defendant, will excuse defendant's liability for plaintiffs' injuries if such act is a superceding cause, and one which the defendant should not have foreseen as the natural or ordinary result of its acts.

"Superceding cause" sometimes referred to as a "new and independent cause" is defined as an act or omission of a person, separate and apart from the defendant, which breaks the chain of causation between the negligent act or omission of the defendant and the injuries plaintiffs complain of, and thereby becomes the immediate cause of the plaintiffs' injuries.

If you find that BRK was negligent but that the carbon monoxide poisoning death of Manual Cruz was caused by the act of a party separate and apart from BRK, BRK may be liable for plaintiffs' injuries, only if you further find that a reasonably prudent person, situated as BRK was prior to the circumstances surrounding the death of Manual Cruz, would have foreseen an act of the kind committed by this other party as a probable consequence of BRK's negligence.

If your finding is that a reasonably prudent person would not have foreseen an act of the kind committed by a party separate and apart from BRK as a probable consequence of BRK's negligence, then BRK is not responsible for the plaintiffs' injuries, and your verdict should be for the defendant.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

---

Authority:    Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 80.20 (4th ed. 1987); Clark v. Waggoner, 452 S.W.2d 437, 440 (Tex. 1970); Benitz v. Gould Group, 27 S.W.3d 109, 116-17 (Tex. App. – San Antonio 2000).

**BRK's Proposed**
**Jury Instruction No. 35 – "Modified" Comparative Negligence**

You have heard evidence that Manual Cruz improperly fueled and failed to properly vent the space he used in his home and that led to the production of fatal levels of carbon monoxide.

Notwithstanding this evidence, if you find that Manual Cruz's carbon monoxide poisoning death was proximately caused by negligence on the part of BRK, and not by negligence on the part of Manual Cruz, then plaintiffs are entitled to recover the full amount of any damages you may find they have sustained as a result of the death of Manual Cruz.

However, if you should find that Manual Cruz's carbon monoxide poisoning death was proximately caused by the negligence of both Manual Cruz and BRK, then you must compare the percentages of their negligence.

If the negligence of Manual Cruz is of less degree than the negligence of BRK, then plaintiffs are entitled to recover any damages which you may find they have sustained as a result of the death of Manual Cruz after you have reduced them in proportion to the degree of Manual Cruz's own negligence.

If on the other hand, BRK was not negligent or if the negligence of Manual Cruz is greater in degree than the negligence of BRK, then plaintiffs are not entitled to recover any damages.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 80.28 (4th ed. 1987); Tex. Civ. Prac. & Rem. Code §§ 33.001, 33.002 and 33.003 (Vernon 2001).

**BRK's Proposed**
**Jury Instruction No. 36 - Damages**

You should not consider the question of plaintiffs' damages until you have first determined whether or not BRK is liable for the damages claimed by the plaintiffs. If you find, based upon the evidence and under the instructions of the Court, that BRK is not liable to the plaintiffs, then you should not consider the question of damages at all. The fact that the Court has given you instructions on damages is not to be taken by you as any indication that plaintiffs are entitled to damages.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

**Authority:** Adapted from Fifth Circuit Pattern Jury Instruction 8A.

### BRK's Proposed
### Jury Instruction No. 37 - Damages

If you find that BRK acted wrongfully, and that its actions were a substantial cause the death of Manual Cruz, you must then find an amount of money you believe will fairly and adequately compensate plaintiffs for any financial injury they have proven, by a preponderance of the evidence. The amount you award today must compensate plaintiffs completely for any damages they have sustained.

Plaintiffs have the burden of proving their damages to a reasonable degree of certainty. You are not permitted to award damages which are uncertain, contingent, speculative, conjectural, or based on mere fanciful conceptions.

If the plaintiffs have met their burden of presenting sufficient evidence to convince you that you can fairly estimate the damages, if any, you believe plaintiffs suffered as a result of the actions of any of BRK, you should award plaintiffs that amount. If you believe that plaintiffs were damaged by BRK's actions, but you do not believe that you have been presented with sufficient evidence to fairly estimate the damages, or if you do not believe you can distinguish between damages which were caused by the actions BRK and damages which you do not believe were caused by BRK, you should not award plaintiffs any damages.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 85.01 (4th ed. 1987).

**BRK's Proposed**
**Jury Instruction No. 38 - Compensatory Damages**

Damages are to be compensatory to the extent of the losses sustained, and the award must be limited to compensation and compensation alone. Moreover, the loss sustained should be compensated with the least burden to the party found liable consistent with the idea of fair compensation to the injured.


Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____
_____

**Authority:**   Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, <u>Federal Jury Practice and Instructions (Civil)</u> § 85.01 (4th ed. 1987).

### BRK's Proposed
### Jury Instruction No. 39 – Proof of Damages

Damages are not to be presumed. The Plaintiffs must prove their damages, if any, with a reasonable degree of certainty. More importantly, the mere fact that I charge you on the measure of damages should not indicate to you that I think damages should be awarded.

Damages must be reasonable. If you should find that plaintiffs are entitled to a verdict, you may award only such damages as will reasonably compensate them for such injury and damage as you find, from a preponderance of the evidence in the case, that they have sustained as a proximate result of the accident.

You are not permitted to award speculative damages. Thus, you are not to include in any verdict compensation for any prospective loss which, although possible, is not reasonably certain to occur in the future.

Damages which are uncertain, contingent, or speculative are not recoverable.

All claimed losses need not be accepted by you. Only those that are fair, reasonable, and necessary are compensable. Those that are not believed, doubtful, speculative, or which may never be incurred must be rejected.

Therefore, if you find BRK liable for Manual Cruz's death and award plaintiffs damages, your award cannot exceed $185,272.00.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Adapted from 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) § 85.14 (4th ed. 1987); see also Ciba-Geigy Corporation v. Stephens, 871 S.W.2d 317, 322 (Tex. App.- Eastland 1994, writ denied).

**BRK's Proposed**
**Jury Instruction No. 40 - Punitive Damages**

Plaintiffs allege that they are entitled to an award of punitive damages, as a consequence of BRK's conduct in connection with the design, testing, distribution, manufacture and sale of the smoke detector at issue. The purpose of punitive damages is not to compensate the plaintiffs, but rather to punish the defendant, and to deter the defendant and others from committing certain acts in the future.

In assessing whether punitive damages are appropriate, the motive for the defendant's acts must be taken into account, not just the nature of the act itself or relationship of the parties. *The state of mind of the actor is vital.* The act or failure to act, must be intentional, reckless or malicious. An act or omission that is merely thoughtless, careless or inordinately risky cannot be grossly negligent or malicious, and does not support a claim for punitive damages. In other words, evidence of simple negligence is not enough to establish a claim for punitive damages.

Accordingly, punitive damages may not be awarded against BRK in this case, unless you are convinced that BRK's conduct was a substantial factor in bringing about the death of Manual Cruz, as plaintiffs have alleged, and that plaintiffs have proven by clear and convincing evidence that BRK acted with gross negligence, malice or otherwise morally culpable conduct.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

Authority: Transportation Insurance Co. v. Moriel, 879 S.W.2d 10, 16 and 22 (Tex. 1994); Burk Royalty Co. v. Walls, 616 S.W.2d 911, 920 (Tex. 1981); Celanese LTD. v. Chemical Waste Management, Inc., 75 S.W.3d 593, 599-600 (Tex. App. – Texarkana 2002); Guilbeau v. Anderson, 841 S.W.2d 517, 520 (Tex. App. – Houston [14th Dist.] 1992); Wicker v. City of Galveston, 944 F. Supp. 553, 560 (S.D. Tex. 1996); see also Tex. Civ. Prac. & Rem. Code § 41.003(a) (Vernon 1997).

-45-

**BRK's Proposed**
**Jury Instruction No. 41 – Punitive Damages**

In determining whether BRK acted maliciously or with gross negligence toward Manual Cruz, plaintiffs are required to prove by clear and convincing evidence that:

<ol>
<li>(1)   BRK specifically intended to cause substantial injury to Manual Cruz; <u>or</u></li>
<li>(2) Objectively, BRK's conduct with respect to the designing, testing, distributing, manufacturing and selling of the smoke detector at issue created an extreme degree of risk; <u>and</u></li>
</ol>

Subjectively, BRK had actual subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety or welfare of others.

The objective component of malice and gross negligence is a function of the magnitude and probability of the potential injury, and can never be satisfied by conduct creating a remote possibility of injury or even a high probability of minor harm; rather to be entitled to punitive damages, BRK's conduct must have created the likelihood of serious injury to Manual Cruz.

"Actual subjective awareness" means that BRK knew about the peril, but its act or omissions demonstrated that it did not care.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority: Tex. Civ. Prac. & Rem. Code § 41.001(7) (Vernon 1997); <u>General Motors Corp. v. Sanchez</u>, 997 S.W.2d 584, 596 (Tex. 1999); <u>Mobil Oil Corp. v. Ellender</u>, 968 S.W.2d 917, 921 (Tex. 1998); <u>Universal Servs. Co. v. Ung</u>, 904 S.W.2d 638, 641 (Tex. 1995); <u>Transportation Insurance Co. v. Moriel</u>, 879 S.W.2d 10, 16 and 22-23 (Tex. 1994); <u>Celanese LTD. v. Chemical Waste Management, Inc.</u>, 75 S.W.3d 593, 599-600 (Tex. App. – Texarkana 2002); <u>see also</u> Tex. Civ. Prac. & Rem. Code § 41.003(a) (Vernon 1997).

**BRK's Proposed**
**Jury Instruction No. 42 – Punitive Damages**

Plaintiffs are not entitled to an award of punitive damages in this case should you find that, at all relevant times, the smoke detector at issue was in compliance with all governmental and industry standards and requirements.

The evidence you have heard demonstrates that Manual Cruz's smoke detector met or exceeded the standard for smoke detectors set by Underwriters Laboratories.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____
_____

Authority:  See, e.g., Satcher v. Honda Motor Corp., 52 F.3d 1311, 1317 (5th Cir. 1995); Mercer v. Pittway Corp., 616 N.W.2d 602, 618 (Iowa 2000); Barger v. Garden Way, Inc., 499 S.E.2d 737, 743 (Ga. App. 1998).

**BRK's Proposed
Jury Instruction No. 43 – Clear and Convincing
Evidence – Punitive Damages**

"Clear and convincing evidence" means the measure or degree of proof that will produce in your mind a firm belief or conviction as to the truth of the allegation sought to be established.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Tex. Civ. Prac. & Rem. Code § 41.001(2) (Vernon 2001).

**BRK's Proposed**
**Jury Instruction No. 44 – Limitation On The**
**Recovery of Punitive Damages**

Although the determination of whether to award punitive damages, and the amount of punitive damages to be awarded, is within your discretion, punitive damages, if any, awarded against BRK may not exceed an amount equal to the greater of:

(1)  two times the amount of economic damages;  plus

an amount equal to any noneconomic damages you may find, not to exceed $750,000;

**or**

(2) $200,000.

"Economic damages" means compensatory damages for pecuniary loss;  the term does not include exemplary damages or damages for physical pain and mental anguish, loss of consortium, disfigurement, physical impairment, or loss of companionship and society.

"Exemplary damages" means any damages awarded as a penalty or by way of punishment.  Exemplary damages includes punitive damages.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

_____

Authority:  Tex. Civ. Prac. & Rem. Code §§ 41.001(4)-(5) and 41.008(b) (Vernon 2001).

**BRK's Proposed**
**Jury Instruction No. 45 - Deliberations**

I have now outlined for you the rules of law applicable to this case and the need for you to apply that law to the facts as you find them from the evidence in the case. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. Neither of you to be concerned with the wisdom of any rule of law stated by me.

Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any view of law other than that given in the instructions of the Court, just as it would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence in the case.

In deciding the facts of this case you must not be swayed by bias or prejudice or favor as to any party. Our system of law does not permit the parties and the public expect that you will carefully and impartially consider all the evidence of the case, follow the law as stated by the Court, and reach a just verdict regardless of the consequences.

This case should be considered and decided by you as an action between persons of equal standing in the community, and holding the same or similar stations in life. A corporation is entitled to the same fair trial at your hands as is a private individual. The law is no respecter of persons, and all persons, including corporations, stand equal before the law and are to be dealt with as equals in a court of justice.

Upon retiring to the jury room you should first select one of your number to act as your foreman or forewoman who will preside over your deliberations and will be your spokesman here in Court. A form of verdict has been prepared for your convenience.

Your verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to

-50-

reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-reexamine your own views, and change your opinions, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times you are not partisans. You are judges – judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

You will take the verdict form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreman fill it in, date and sign it, and then return to the courtroom.

If, during your deliberations, you should desire to communicate with the Court, please reduce your message or question to writing signed by the foreman or forewoman, and pass the note to the marshal who will bring it to my attention. I will then respond as promptly as possible, either in writing or by having you returned to the courtroom so that I can address you orally. I caution you, however, with regard to any message or question you might send, that you should never state or specify your numerical division at the time.

Accepted:_____

Rejected: _____

Modified:_____

Covered in another instruction: _____

Authority: 3 E. Devitt, C. Blackmar & M. Wolff, Federal Jury Practice and Instructions (Civil) (4th ed. 1987), pp. 112-13 and 117-18; Fifth Circuit Pattern Jury Instruction 1, 2B, 8A and 9.

## IN THE U.S. DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

## OMNIBUS MOTION OF DEFENDANT BRK BRANDS, INC.
## TO EXCLUDE PLAINTIFFS' EVIDENCE

**NOW COMES**, DEFENDANT, BRK BRANDS, INC., and files this Omnibus Motion to Exclude Plaintiffs' Evidence at the trial of this matter, pursuant to Federal Rules of Evidence 402, 403 and 802, and in support of said Omnibus Motion incorporates by reference, as though fully set forth herein, the Brief Of Defendant BRK Brands, Inc. In Support Of Its Omnibus Motion To Exclude Plaintiff's Evidence.

1.      Plaintiffs should be prohibited from instructing the jury, or presenting circumstantial evidence for the purpose of inferring causation because:

a)      An inference as to an ultimate issue of fact is deemed unreasonable, and without probative force, if it would allow a jury to rest its verdict on mere speculation and conjecture. See Bridges v. Groendyke Transport, Inc., 553 F.2d 877, 878-79 (5th Cir. 1977);

b)      Where plaintiffs' own expert states that it is impossible to determine the rate of soot and carbon monoxide production during the relevant time period, a jury should not be permitted to speculate on the issue; and

c)      The ultimate inference proposed by plaintiffs is too speculative and conjectural because it is at odds with the undisputed facts.

2.      The deposition testimony of David Minnis should be precluded because:

a)      The deposition plaintiffs seek to offer as evidence is not admissible because, among other things, BRK did not have sufficient opportunity to cross-examine and confront Mr. Minnis with information showing the inaccuracy of his claims, his personal biases, motives and psychological/emotional state.  See Minnesota Mining & Manufacturing Co. v. Nishika Ltd., 885 S.W.2d 603, 631 (Tex. App. 1994), rev'd on other grounds, 953 S.W.2d 733 (Tex. 1997) (recognizing that the opportunity to cross-examine is crucial to determine the credibility of the declarant for accuracy, bias, motive, self-interest, prejudice, recall, and ability to remember);

b)      David Minnis' allegations are not relevant to the SA67D model smoke detector in that his anticipated testimony does not address the specific issues involved in this case and Mr. Minnis has never said that the SA67D smoke detector, the model at issue here, was modified or altered in any way for Underwriters Laboratories' ("UL") tests; and

c)      Mr. Minnis' allegations are not supported by any independent evidence.

3.      Evidence of consumers communications with BRK, including the testimony of Beth Weber, are not relevant and should be precluded because:

a)      For evidence of consumer communications to be admissible, the proffering party must show that the event complained of by the consumer occurred under "substantially similar" circumstances as the incident alleged in the plaintiffs' Complaint and plaintiffs cannot meet this burden.  Mills v. Beech Aircraft Corp., Inc., 886 F.2d 758 (5th Cir. 1989); Hardy v. Chemetron Corp., 870 F.2d 1007, 1009 (5th Cir. 1989); Magic Chef, Inc., v.

2

Anita Sibley, 546 S.W.2d 851, 855 (Tex. Ct. App. 1977); Mercer v. Pittway Corp., 616 N.W.2d 602 (Iowa, 2000);

       b)     Consumer complaints and other claims, and the testimony of Beth Weber, are irrelevant; and

       c)     The consumer communications constitute inadmissible hearsay.

4.    Any evidence related to the design, development and/or recall of other models of smoke detectors should be precluded because:

       a)     Plaintiffs are not entitled to present evidence of the design, development and marketing of other models of smoke detectors;

       b)     The SA67D is not substantially similar to previous models;

       c)     All piezo-electric horns are not the same; and

       d)     Plaintiffs are not entitled to present evidence of recalls of other models of smoke detectors.

5.    The plaintiffs should be precluded from using, mentioning and/or presenting the videotape interview of Emma Lumbreros because:

       a)     The videotape interview of Emma Lumbreros constitutes inadmissible hearsay;

       b)     The videotape interview of Emma Lumbreros is irrelevant and unduly prejudicial; and

       c)     Plaintiffs' disclosure of the videotape interview of Emma Lumbreros is untimely and should be excluded.

6.    The plaintiffs should be precluded from using, mentioning and/or presenting the videotape and/or transcript of the "20/20" news program because:

a)    The statements and claims made in the "20/20" news program have no relevance to this case; and

b)    The 20/20 news program should be excluded as it renders unqualified expert opinion and constitutes inadmissible hearsay.

**WHEREFORE, PREMISES CONSIDERED, BRK BRANDS, INC.** respectfully prays that this Omnibus Motion be set for a hearing commencing on _____ 2003, and that, upon final hearing of its Omnibus Motion to Exclude Plaintiffs' Evidence at the trial of this matter, this Honorable Court will exclude plaintiffs from offering certain evidence at the trial of this matter, and for such other relief, at law or in equity, to which Defendant may show itself justly entitled to receive.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER**

BY: _____

Rene O. Oliveira
State Bar No. 15254700 / USDC Adm No. 4033
Cameron County I.D. No. 3507
Elizabeth G. Neally
State Bar No. 14840400 / USDC Adm. No. 8044
Cameron County I.D. No. 3506
855 West Price Road, Suite 9
Brownsville, TX 78520
Tel: 956/542-5666
Fax: 956/542-0016

and

4

**COZEN O'CONNOR**
James Heller
Terry M. Henry
1900 Market Street
Philadelphia, PA 19103
Tel: 215/665-2000
Fax: 215/665-2013

Attorneys for Defendant
BRK Brands, Inc.

Dated: February 21, 2003

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certifies that a true and correct copy of the foregoing **Omnibus Motion of Defendant BRK BRANDS, Inc. to Exclude Plaintiffs' Evidence,** has been served upon counsel of record by Certified Mail, Return Receipt Requested, on this 21st day of February, 2003, to wit:

Mr. Juan Gonzalez, Esq.
The Atrium, Suite 400
1300 North Tenth Street
McAllen, Texas 78501

Mr. Ray R. Marchan
**Eddington & Associates, L.L.P.**
1926 E. Elizabeth
Brownsville, Texas 78520

Elizabeth G. Neally

IN THE U.S. DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

ORDER GRANTING OMNIBUS MOTION OF DEFENDANT
BRK BRANDS, INC. TO EXCLUDE
PLAINTIFFS' EVIDENCE

On this the ___ day of _____, 2003, there came to be considered the

Omnibus Motion of Defendant, BRK Brands, Inc., to Exclude Plaintiffs' Evidence at trial, and it

appearing to the Court that the Omnibus Motion should be **GRANTED**;

**IT IS, THEREFORE, ORDERED,** that Plaintiffs' are prohibited, at trial, from:

(1)    Instructing the jury, or presenting any evidence for the purpose of inviting

the jury, to infer when the smoke detector at issue should have alarmed, when Manual Cruz

became incapacitated or died from the carbon monoxide and/or whether the smoke detector at

issue should have alarmed before Manual Cruz was incapacitated or died;

(2)    Presenting the testimony of David Minnis whether live or from the matter

of Gordon v. BRK Brands, Inc., Circuit Court of the City of St. Louis, Missouri, No. 992-0771,

or any other matter;

(3)    Presenting any evidence of consumer communications with BRK Brands,

Inc., including any testimony from Beth Weber;

(4)    Presenting any evidence related to the design, development, marketing and/or recall of the 1839I model smoke detector, or any other model detector, other than the SA67D model detector;

(5)    Using, mentioning and/or presenting the videotape interview of Emma Lumbreros; and

(6)    Using, mentioning and/or presenting the videotape, or transcript, of the "20/20" News Program that aired on ABC television on or about March 17, 1996, and again on December 20, 1996, or the videotape or transcript from any other news program.

**SO ORDERED** in Brownsville, Texas, on this ___ day of _____, 2003.

_____
PRESIDING JUDGE

2

## IN THE U.S. DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

## BRIEF IN SUPPORT OF THE OMNIBUS
## MOTION OF DEFENDANT BRK BRANDS, INC.
## TO EXCLUDE PLAINTIFFS' EVIDENCE

**ROERIG, OLIVEIRA & FISHER**
Rene O. Oliveira
State Bar No. 15254700 / USDC Adm No. 4033
Cameron County I.D. No. 3507
Elizabeth G. Neally
State Bar No. 14840400 / USDC Adm. No. 8044
Cameron County I.D. No. 3506
855 West Price Road, Suite 9
Brownsville, TX 78520
Tel: 956/542-5666
Fax: 956/542-0016

**COZEN O'CONNOR**
James Heller
Terry M. Henry
1900 Market Street
Philadelphia, PA 19103
Tel: 215/665-2000
Fax: 215/665-2013

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ............................................................. 1

II.   BACKGROUND FACTS ...................................................................... 1

III.  PROCEDURAL HISTORY ................................................................. 2

IV.  STANDARD OF REVIEW .................................................................. 3

V.   SPECIFIC MOTIONS TO EXCLUDE EVIDENCE ......................................... 4

    A.   PLAINTIFFS SHOULD BE PROHIBITED FROM INSTRUCTING THE JURY,
        OR PRESENTING ANY EVIDENCE, TO INFER CAUSATION THROUGH
        CIRCUMSTANTIAL EVIDENCE ........................................................ 4

    B.   THE DEPOSITION TESTIMONY OF DAVID MINNIS IS NOT RELEVANT AND
        SHOULD BE PRECLUDED .............................................................. 6

        1.   DAVID MINNIS' ALLEGATIONS ARE NOT RELEVANT TO THE SA67D
             MODEL SMOKE DETECTOR. ..................................................... 8

        2.   DAVID MINNIS' ALLEGATIONS ARE NOT SUPPORTED BY ANY
             INDEPENDENT EVIDENCE. ...................................................... 9

    C.   EVIDENCE OF CONSUMERS COMMUNICATIONS WITH BRK, INCLUDING
        THE TESTIMONY OF BETH WEBER, ARE NOT RELEVANT AND SHOULD
        BE PRECLUDED ........................................................................ 11

        1.   BRK'S COMMUNICATIONS WITH CONSUMERS. ............................. 11

        2.   THE CONSUMER COMMUNICATIONS ARE NOT SUBSTANTIALLY SIMILAR. .......... 11

        3.   CONSUMER COMPLAINTS AND CLAIMS, AND THE TESTIMONY
             OF BETH WEBER, ARE IRRELEVANT. ...................................... 15

        4.   THE CONSUMER COMMUNICATIONS CONSTITUTE INADMISSIBLE HEARSAY. ......... 17

    D.   ANY EVIDENCE RELATED TO THE DESIGN, DEVELOPMENT, MARKETING
        AND/OR RECALL OF OTHER MODELS OF SMOKE DETECTORS SHOULD
        BE PRECLUDED ........................................................................ 19

        1.   PLAINTIFFS ARE NOT ENTITLED TO PRESENT EVIDENCE CONCERNING
             OTHER MODELS OF SMOKE DETECTORS. ..................................... 19

        2.   THE SA67D IS NOT SUBSTANTIALLY SIMILAR TO PREVIOUS MODELS. ......... 20

        3.   ALL PIEZO-ELECTRIC HORNS ARE NOT THE SAME. ........................ 21

4.    PLAINTIFFS ARE NOT ENTITLED TO PRESENT EVIDENCE OF RECALLS
OF OTHER MODELS OF SMOKE DETECTORS. .................................................... 22

E.    THE PLAINTIFFS SHOULD BE PRECLUDED FROM USING, MENTIONING
AND/OR PRESENTING THE VIDEOTAPE INTERVIEW OF EMMA LUMBREROS .............. 24

1.    THE VIDEOTAPE INTERVIEW OF EMMA LUMBREROS IS IRRELEVANT
AND UNDULY PREJUDICIAL AND SHOULD BE PRECLUDED. .......................... 25

2.    THE VIDEOTAPE INTERVIEW OF EMMA LUMBREROS CONSTITUTES
INADMISSIBLE HEARSAY.......................................................................... 26

3.    PLAINTIFFS' DISCLOSURE OF THE VIDEOTAPE INTERVIEW OF EMMA LUMBREROS
IS UNTIMELY AND SHOULD BE EXCLUDED. ................................................ 28

F.    THE PLAINTIFFS SHOULD BE PRECLUDED FROM USING, MENTIONING
AND/OR PRESENTING THE VIDEOTAPE AND/OR TRANSCRIPT OF THE
"20/20" NEWS PROGRAM THAT AIRED ON ABC TELEVISION ON OR
ABOUT MAY 17, 1996 AND AGAIN ON DECEMBER 20, 1996.......................... 30

1.    THE STATEMENTS AND CLAIMS MADE IN THE "20/20" NEWS PROGRAM
HAVE NO RELEVANCE TO THIS CASE.......................................................... 31

2.    THE 20/20 PROGRAM SHOULD BE EXCLUDED AS IT RENDERS UNQUALIFIED
EXPERT OPINION AND CONSTITUTES INADMISSIBLE HEARSAY. .................... 31

VI. CONCLUSION ................................................................................................ 33

## TABLE OF AUTHORITIES

Aerotech Resources Inc., v. Dodson Aviation Inc.,
   191 F. Supp. 2d 1209 (D. Kan. 2002)...........................................................28

Aetna Casualty & Surety Co. v. Cooper,
   485 So. 2d 1364 (Fla. Ct. App. 1986)...........................................................27

Babb v. Ford Motor Co., Inc.,
   535 N.E.2d 676 (Ohio Ct. App. 1987)...........................................................19

Bolstridge v. Central Maine Power Co.,
   621 F. Supp. 1202 (D.C. Me. 1985)..............................................................27

Borroto v. Campbell,
   No. CIV.A.3:92CV2102-H, 2002 WL 655523, *1
   (N.D. Tex. April 18, 2002) ...........................................................................32

Bridges v. Groendyke Transport, Inc.,
   553 F.2d 877 (5th Cir. 1977) .........................................................................4

Brooks v. Chrysler Corp.,
   786 F.2d 1191 (D.C. Cir.), cert. denied 479 U.S. 853 (1986)................................12, 16

Cameron v. Otto Bock Orthopedic Industry, Inc.,
   43 F.3d 14 (1st Cir. 1994).............................................................................18

Cooper v. Firestone Tire & Rubber Co.,
   945 F.2d 1103 (9th Cir. 1991) .......................................................................22

Drabik v. Bostich,
   997 F.2d 496 (8th Cir. 1993) .........................................................................18

Dreijer v. Girod Motor Co.,
   294 F.2d 549 (5th Cir. 1961) .........................................................................5

Farner v. Paccar, Inc.,
   562 F.2d 518 (8th Cir. 1977) .........................................................................22

Fenner v. General Motors Corp.,
   657 F.2d 647 (5th Cir. 1981) .........................................................................4

Ford Motor Co. v. Phelps,
    389 S.E.2d 454 (Va. 1990)........................................................................18

Giglio v. Saab-Scania of America, Inc.,
    No. 90-2465, 1992 WL 329557 (E.D. La. Nov. 2, 1992),
    aff'd 14 F.3d 55 (5th Cir. 1994) ...........................................................4, 22

Gumbs v. International Harvester, Inc.,
    718 F.2d 88 (3d Cir. 1983)..........................................................................3

Hardy v. Chemetron Corp.,
    870 F.2d 1007 (5th Cir. 1989) ..................................................................12

Helene Curtis Industries, Inc. v. Pruitt,
    385 F.2d 841 (5th Cir. 1967) ......................................................................4

Jackson v. Firestone Tire & Rubber Co.,
    788 F.2d 1070 (5th Cir. 1986) ..................................................................22

Kallstom v. City of Columbus,
    165 F. Supp. 2d 686 (S.D. Ohio 2001) .....................................................33

Lozano v. Lozano,
    52 S.W.3d 141 (Tex. 2001)..........................................................................5

Magic Chef, Inc., v. Anita Sibley,
    546 S.W.2d 851 (Tex. Ct. App. 1977) ......................................................12

Magnivision, Inc. v. Bonneau Co.,
    115 F.3d 956 (Fed. Cir. 1997)......................................................................4

McGonigal v. Gearhart Industries,
    851 F.2d 774 (5th Cir. 1988) ...............................................................12, 15

Mercer v. Pittway Corp.,
    616 N.W.2d 602 (Iowa 2000) .............................................................14, 15

Mills v. Beech Aircraft Corp., Inc.,
    886 F.2d 758 (5th Cir. 1989) ....................................................................12

Minnesota Mining & Manufacturing Co. v. Nishika Ltd.,
    885 S.W.2d 603 (Tex. App. 1994), rev'd on other grounds,
    953 S.W.2d 733 (Tex. 1997)........................................................7, 8, 17, 18

Pesce v. General Motors Corp.,
    939 F. Supp. 160 (N.D.N.Y. 1996) ................................................................22

Reed v. Iowa Marine & Repair Corp.,
    16 F.3d 82 (5th Cir. 1994) .............................................................................28

Seven-Up  Co. v. Coca-Cola Co.,
    86 F.3d 1379 (5th Cir. 1996) .......................................................................4, 5

Sprynczynatyk v. General Motors Corp.,
    771 F.2d 1112 (8th Cir. 1985) .......................................................................27

Texas Instruments, Inc. v. Hyundai Electronics,
    50 F. Supp. 2d 619 (E.D. Tex. 1999) ............................................................29

Tompkins v. Medtronic, Inc.,
    17 F.3d 396 (9th Cir. 1994) ...........................................................................22

U.S. v. Blackstone,
    56 F.3d 1143 (9th Cir. 1995) ...........................................................................4

U.S. v. Carter,
    491 F.2d 625 (5th Cir. 1974) ....................................................................17, 27

U.S. v. Wright,
    799 F.2d 423 (8th Cir. 1986) .........................................................................26

United States v. Hall,
    653 F.2d 1002 (5th Cir. 1981) .........................................................................3

United States v. Hatchett,
    918 F.2d 631 (6th Cir. 1990) .........................................................................32

United States v. McCormick,
    565 F.2d 286 (4th Cir. 1977) .........................................................................10

Verzwyvelt v. St. Paul Fire and Marine Insurance Co.,
    175 F. Supp. 2d 881 (W.D. La. 2001) .........................................................3, 24

Wilson v. Zapata Off-Shore Co.,
    939 F.2d 260 (5th Cir. 1991) .........................................................................18

Wolf v. The Proctor & Gamble Co.,
    555 F. Supp. 613 (D.N.J. 1982) .....................................................................18

- v -

Wright v. Wal-Mart Stores, Inc.,
    73 S.W.3d 552, 555 90 F. Supp. 2d 1018 (W.D. Wis. 2000) .....................................5, 9

## **OTHER**

Fed. R. Civ. P. 26(e)(2) ...........................................................................................28

Fed. R. Civ. P. 37 (c)(1) ..........................................................................................28

Fed. R. Evid. 401 .......................................................................................................3

Fed. R. Evid. 402 .......................................................................................................3

Fed. R. Evid. 403 .......................................................................................................3

Fed. R. Evid. 801(c) ................................................................................................17

Fed. R. Evid. 802 ...............................................................................................3, 17

## I.   PRELIMINARY STATEMENT

1.    At trial, BRK Brands, Inc. ("BRK") anticipates that plaintiffs will try to present all manner of testimony, documents or argument to draw the jury's attention away from the facts surrounding Mr. Cruz's carbon monoxide poisoning death.   Based on plaintiffs' Rule 26, discovery and Pre-Trial disclosures, it is clear that plaintiffs will try to taint the jury by seeking to present irrelevant testimony and documents and unsubstantiated argument.   Therefore, BRK is submitting this memorandum of law in support of its Omnibus Motion in Limine to exclude the following from trial:

- ◆   any argument that causation can be inferred from the circumstantial evidence;

- ◆   the testimony of David Minnis;

- ◆   consumer communications with BRK, and the testimony of Beth Weber;

- ◆   evidence related to other smoked detector models;

- ◆   evidence of recalls of other smoke detector models;

- ◆   the videotape interview of Emma Lumbreros; and

- ◆   the videotape or transcript of ABC news program "20/20."

## II.   BACKGROUND FACTS

2.    On December 16, 1997, Manual Cruz was discovered dead in his home at 190 Thomas Lane, San Benito, Texas. Manuel Cruz's house was of relatively simple construction.   It had no central heating or air conditioning system.   To provide heat, Mr. Cruz installed a large, gas-fueled space heater with a supply of LP-Gas (liquid propane gas).   The heater he installed, however, was designed to burn natural gas.   To compound his error, the heater was designed for safe operation only when vented, but Mr. Cruz failed to provide exterior venting for the products of combustion from the heater.   His improper fueling and installation caused the gases from the

fuel rich combustion process, including carbon monoxide, to be vented directly into the living space of his house.

3.      On Sunday, December 14, 1997,  Manuel Cruz and Jose Garcia drank nearly a case of beer and shared a bottle of wine with their dates.  By the early hours of Monday morning, Mr. Garcia felt too drunk to drive home, so he decided to stay the night.  At about 4:00 a.m., the two turned in for the evening, with Mr. Garcia sleeping on a couch in the living room beneath a window opened about an inch.  Between 6:00 and 6:30 a.m., Mr. Garcia woke with a headache and went home to sleep off what he thought was a hangover.  Interestingly, Mr. Garcia did not detect any soot in the house when he left, or on his clothes.

4.      On Tuesday night December 17, 1997, around 11:30 p.m., Kenya Sosa, discovered Mr. Cruz's body in the bedroom of his house.  The medical examiner concluded that Mr. Cruz died of carbon monoxide poisoning before he inhaled any smoke or soot.  Plaintiffs do not dispute that Mr. Cruz's asphyxiation was the result of carbon monoxide poisoning caused by the continuous operation of an un-vented and improperly fueled space heater in his home.

5.      Plaintiffs contend that a BRK model SA67D smoke detector was installed in Mr. Cruz's house and that the smoke detector should have alarmed before Mr. Cruz became incapacitated from the carbon monoxide.

## III.   **PROCEDURAL HISTORY**

6.      The basis of all of plaintiffs' claims against BRK rest upon the simple factual allegation that Mr. Cruz died of asphyxiation, "when the smoke detector in his home failed to warn him of the smoke in his house."  However, plaintiffs do not dispute that there was no fire, that the smoke detector did not kill Mr. Cruz by asphyxiation and that there was no other source of the carbon monoxide but the heater.

2

7.    Plaintiffs contend that Mr. Cruz's smoke detector was defective and failed to alarm because its piezo-horn was susceptible to corrosion.  Essentially, plaintiffs allege that the piezo-horn contacts on the BRK detector – the contacts through which the alarm signal is transmitted to the horn - became corroded through a "fretting" motion and this corrosion developed to the extent it blocked the transmission of the alarm signal to the horn.

## IV.    STANDARD OF REVIEW

8.    Pursuant to Federal Rule of Evidence 402, "evidence which is not relevant is not admissible." Fed. R. Evid. 402.  Relevant evidence is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.  Implicit in that definition are two distinct requirements:  (1) the evidence must be probative of the proposition it is offered to prove; and (2) the proposition to be proved must be one that is of consequence to the action.  United States v. Hall, 653 F.2d 1002, 1005 (5th Cir. 1981) (quoting McCormick on Evidence § 185 (2d ed. 1973); 1 Weinstein's Evidence P 401(03) (1980); 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5162 (1978)).  Thus, for evidence to be relevant there must be some logical relationship between the proffered evidence and plaintiffs' theory of the case.  See Gumbs v. International Harvester, Inc., 718 F.2d 88, 97 (3d Cir. 1983).

9.    The determination of admissibility does not stop with relevance.  Indeed, under Federal Rules of Evidence, admissibility is predicated on more than just logical relevance; rather, legal relevance is paramount.  See Verzwyvelt v. St. Paul Fire and Marine Ins. Co., 175 F. Supp.2d 881 (W.D. La. 2001).  Although relevant, evidence is not deemed admissible if it constitutes inadmissible hearsay or if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Fed. R. Evid. 402,

3

403 and 802; see also Giglio v. Saab-Scania of Am., Inc. No. 90-2465, 1992 WL 329557 (E.D. La. Nov. 2, 1992), aff'd 14 F.3d 55 (5th Cir. 1994); Magnivision, Inc. v. Bonneau Co., 115 F.3d 956, 961 (Fed. Cir. 1997) ("The purposes of the Federal Rules of Evidence include assuring that relevant evidence does not unfairly prejudice the jury."); U.S. v. Blackstone, 56 F.3d 1143, 1146 (9th Cir. 1995) (unfair prejudice means the tendency to suggest a decision on an improper basis, such as emotion or instinct).

## V.   SPECIFIC MOTIONS TO EXCLUDE EVIDENCE

10.   BRK submits the following matters are irrelevant, constitute inadmissible hearsay, are unduly prejudicial and/or are likely to confuse the jury and, therefore, are not admissible for any purpose in the trial of this case.

### A.   Plaintiffs Should Be Prohibited From Instructing The Jury, Or Presenting Any Evidence, To Infer Causation Through Circumstantial Evidence

11.   BRK anticipates that the plaintiffs will present certain evidence at trial for the exclusive purpose of inviting the jury to speculate about when the smoke detector should have alarmed, when Mr. Cruz became incapacitated from the carbon monoxide and/or whether the smoke detector should have alarmed before Mr. Cruz was incapacitated or died. These questions are ultimate issues of fact as they relate to whether BRK may be held liable for Mr. Cruz's death.

12.   An inference as to an ultimate issue of fact is deemed unreasonable, and without probative force, if it would allow a jury to rest its verdict on mere speculation and conjecture. See Bridges v. Groendyke Transport, Inc., 553 F.2d 877, 878-79 (5th Cir. 1977).   Ultimate inferences are too speculative and conjectural to support a judgment if they are at war with uncontradicted or unimpeached facts.  See Fenner v. General Motors Corp., 657 F.2d 647, 651 (5th Cir. 1981); Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, 851 (5th Cir. 1967). Further, a jury may not reasonably infer causation from meager circumstantial evidence that could give rise to any number of inferences, none more probable than the other.  See Seven-Up

Co. v. Coca-Cola Co., 86 F.3d 1379, 1388 (5th Cir. 1996); Dreijer v. Girod Motor Co., 294 F.2d 549, 555-556 (5th Cir. 1961); Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001); Wright v. Wal-Mart Stores, Inc., 73 S.W.3d 552, 555 (Tex. App. – Houston 2002). Thus, when circumstances are consistent with any possibility, and nothing shows that one is more probable than the other, no fact can be inferred. Id.

13.    At trial, BRK expects that the plaintiffs' strategy will be to suggest to the jury that it may infer, from the evidence presented by plaintiffs, that the smoke detector should have sounded before Mr. Cruz became incapacitated. The evidence upon which plaintiffs will rely (as set forth in BRK's Reply In Support Of Its Motion For Summary Judgment), however, is legally insufficient to support such an inference.

14.    Plaintiffs' suggested inference is no more plausible, nor supported by the circumstantial evidence, than any number of equally opposite inferences, such as that Mr. Cruz became incapacitated by carbon monoxide before the smoke detector should have alarmed from the emission of soot from the space heater. Thus, because the circumstances are consistent with numerous other possibilities, and nothing shows that one is more probable than the other, this ultimate fact cannot be reasonably inferred. See Seven-Up Co., 86 F.3d at 1388; Dreijer, 294 F.2d at 555-556; Lozano, 52 S.W.3d at 148; Wright, 73 S.W.3d at 555.

15.    The circumstantial evidence that plaintiffs intend to introduce at trial, could never lead to an inference that the smoke detector should have alarmed before Mr. Cruz became incapacitated. Such an inference would be worse than speculation and is patently unreasonable in light of the admission of plaintiffs' expert that there are insufficient facts available to determine whether a sufficient amount of soot was produced to trigger the alarm before Mr. Cruz became incapacitated by carbon monoxide. (Deposition Testimony of E. Wayne McCain ("McCain"), pp. 116 and 186, attached hereto as Exhibit "A".) Where plaintiffs' own expert

states that it is impossible to determine the rate of soot and carbon monoxide production during the relevant time period, a jury should not be permitted to speculate on the issue. Simply put, the jury cannot infer the existence of a scientific fact circumstantially, where plaintiffs' own expert admits no such inference could be properly reached from the available facts.

16.     Additionally, the ultimate inference proposed by plaintiffs is too speculative and conjectural to support a judgment against BRK, because it is at odds with the undisputed facts that the space heater operated throughout the night, producing carbon monoxide and other products of combustion, but no perceptible soot, (Affidavit of Jose Garcia ("Garcia Aff."), p. 3, attached hereto as Exhibit "B"; Affidavit of Rosalinda Perez ("Perez Aff."), pp. 2-3, attached hereto as Exhibit "C"), and that Mr. Cruz died of carbon monoxide poisoning before he inhaled any soot or smoke.  (Affidavit and Autopsy Report of Dewitt S. Davenport, M.D. ("Davenport"), attached hereto as Exhibit "D".)

17.     Accordingly, plaintiffs should be precluded from introducing any evidence at trial that is presented specifically to invite the jury to infer when the smoke detector should have alarmed, when Mr. Cruz became incapacitated from the carbon monoxide and/or whether the detector should have alarmed before Mr. Cruz was incapacitated or died, and from arguing to the jury or instructing the jury to infer the same, on the ground that the probative value of such evidence, argument or instruction is substantially outweighed by its prejudicial effect.  Should the Court permit such evidence, argument or instruction, the jury would be allowed to rest its verdict on mere speculation and conjecture.

**B.     The Deposition Testimony of David Minnis Is Not Relevant And Should Be Precluded**

18.     Plaintiffs' Rule 26 disclosures, and February 7, 2003 correspondence to defense counsel, reveal their intention to introduce at trial the deposition testimony of David Minnis, a

former Pittway employee.[1] (See Letter from Juan A. Gonzalez to Elizabeth G. Neally and James Heller, dated 2/7/03 (hereinafter "Gonzalez Letter"), attached hereto as Exhibit "E".) Plaintiffs did not seek to depose Mr. Minnis in this case and counsel's letter, dated February 7, 2003, fails to identify the case from which this deposition was taken. However, BRK's defense counsel assumes that plaintiffs mean to rely on the deposition testimony provided by Mr. Minnis in the matter of Gordon v. BRK Brands, Inc., Circuit Court of the City of St. Louis, Missouri, No. 992-0771.

19.    The Gordon deposition, however, is not admissible because, among other things, the circumstances under which it was taken. In Gordon, the plaintiffs identified Mr. Minnis as a witness, and noticed his deposition, during trial. BRK knew nothing about Mr. Minnis, a former Pittway employee, and believed that he was being deposed simply for informational purposes. With no notice of the issues to which Mr. Minnis would testify and only hours to prepare, BRK did not have sufficient opportunity in the Gordon case to cross-examine and confront Mr. Minnis with information showing the inaccuracy of his claims, his personal biases, motives and psychological/emotional state.

20.    Curiously, plaintiffs have never tried to depose Mr. Minnis in this case. To the extent plaintiffs contend Mr. Minnis' testimony to be relevant to their claims, it was their obligation to depose Mr. Minnis to develop sufficient facts for this Court to make that determination. Likewise, plaintiffs should have deposed Mr. Minnis in this case to afford BRK an opportunity to cross-examine Mr. Minnis on his specious allegations. See Minnesota Mining & Manufacturing Co. v. Nishika Ltd., 885 S.W.2d 603, 631 (Tex. App. 1994), rev'd on other

---

[1]    BRK Electronics, a division of Pittway was purchased from Pittway Corporation on July 21, 1992 by THL-FA Operating Corp. and subsequently became known as BRK Brands. Following the Pittway asset sale, Mr. Minnis continued his employment with BRK until his termination in June 1994. However, Mr. Minnis' allegations arise out of his period of employment with Pittway.

grounds, 953 S.W.2d 733 (Tex. 1997) (recognizing that the opportunity to cross-examine is crucial to determine the credibility of the declarant for accuracy, bias, motive, self-interest, prejudice, recall, and ability to remember). Having failed to take his deposition, plaintiffs are now barred from admitting as evidence his testimony from another, unrelated case.

### 1.   David Minnis' Allegations Are Not Relevant To The SA67D Model Smoke Detector.

21.     Whether presented as a live witness or through his deposition testimony, the evidence Mr. Minnis would offer is irrelevant. Mr. Minnis alleged in the Gordon case that in early 1986, while employed by Pittway, he placed a lubricant on the electrical horn contacts of sample model 1201 smoke detectors to ensure they would pass Underwriters Laboratories' ("UL") corrosion testing. He also alleged that he thought that another Pittway employee similarly modified a model 86RAC smoke detector for the same reason in 1987.

22.     Mr. Minnis' Gordon testimony does not address the specific issues involved in this case. In Gordon, although given the opportunity to make as many wild allegations as he could, Mr. Minnis never said that the SA67D smoke detector, the model at issue here, was modified or altered in any way for UL tests. This is particularly important, because Mr. Minnis worked closely with the project engineer in developing an earlier version of the SA67D model smoke detector.

23.     Moreover, the events about which he has previously testified took place in 1986 and 1987, years before BRK developed the design used in the SA67D detector at issue here, and his alleged activities involved a model smoke detector other than the SA67D. The piezo-horn used in Pittway smoke detectors during the time of Mr. Minnis' allegations were made from different materials, were of a different design and made to different specifications.

24.     Additionally, Mr. Minnis' testimony cannot relate to the SA67D smoke detector because he ended his employment with BRK in 1994, two years before the SA67D model

detector in this case was manufactured. In fact, the events about which Mr. Minnis would seek to testify relate only to the 1201 and 86RAC models, not the SA67D.

### 2. Minnis' Allegations Are Not Supported By Any Independent Evidence.

25. Mr. Minnis' testimony is not only unsupported and uncorroborated, but it has also been directly rebutted under oath by Frederick J. Conforti in this matter and James Woodburn in the case of Werner v. Pittway Corp., BRK Brands, Inc., et al., U.S.D.C. Western District of Wisconsin, No. 99-C-0109.[2] Mr. Woodburn is a former employee of Pittway Corporation who Mr. Minnis claimed participated in the alleged conspiracy to modify the horn contacts to secure Underwriters Laboratories' approval.

26. Mr. Woodburn was the in-house corrosion-testing engineer at Pittway. (Deposition Testimony of James H. Woodburn in the matter of Werner v. Pittway Corp., et al. ("Woodburn"), pp. 68-69, attached hereto as Exhibit "F".) Mr. Woodburn explained that, although he experimented with using lubricant on the horn contacts, it only had a marginal affect on the operation of the horn and was abandoned. (*Woodburn*, pp. 148-49, Exhibit F.) Mr. Woodburn is not aware of any reason for placing lubricant on the horn contacts of samples sent to UL and never put oil on the horn contacts of samples he sent to UL. (*Woodburn*, p. 146, Exhibit F.) Mr. Woodburn also testified that problems which were found with the model 1839 detector were not experienced by battery-operated detectors, because the 1839 used a different driver mechanism than did the battery-operated detectors, such as the SA67D. (*Woodburn*, pp. 113 and 115, Exhibit F.)

27. Likewise, Frederick J. Conforti, the President of BRK during the relevant period, does not support Mr. Minnis' contentions. In fact, Mr. Conforti testified that Pittway conducted

---

[2]    The claims in Werner v. BRK were dismissed on BRK's motion for summary judgment at 90 F.Supp. 2d 1018 (W.D. Wis. 2000).

a comprehensive internal investigation into the allegations of Mr. Minnis and found no truth or anything to substantiate his claims. (Deposition Testimony of Frederick J. Conforti ("Conforti Dep."), pp. 45-47, attached hereto as Exhibit "G.") Mr. Conforti further testified that the Consumer Product Safety Commission ("CPSC") also conducted its own investigation of Mr. Minnis' allegations and found "no conclusive evidence that anybody did anything at BRK that was improper." (*Conforti Dep.*, p. 48, Exhibit G.)

28.    Mr. Conforti testified that, although BRK's engineering department experimented by applying oil on the horn contacts, "it didn't help the situation." (*Conforti Dep.*, p. 49, Exhibit G.) Mr. Conforti explained that "had it helped the situation, that would have been the solution on the end version of the AC-operated detector," given that it is much simpler to put a drop of oil on the contacts as opposed to soldering the units. (*Conforti Dep.*, p. 49, Exhibit G.)

29.    Thus, Mr. Minnis' uncorroborated testimony regarding an alleged "conspiracy" to conceal defects or to defraud Underwriters Laboratories more than fifteen years ago is nothing more than inflammatory rhetoric.[3] It is uncontested that Mr. Minnis is a classic "disgruntled former employee." After leaving his job, he filed a claim against BRK in federal court to

---

[3]    BRK anticipates that in desperation, plaintiffs may argue that the statements of Mr. Minnis are admissible under Federal Rule of Evidence 801(d)(2)(E) as an admission by an alleged co-conspirator. Mr. Minnis' testimony, however, is not admissible as an admission by an alleged co-conspirator for two independent reasons. First, Rule 801(d)(2)(E) dictates that a statement may be offered into evidence as an admission by party-opponent if it is a "statement of a co-conspirator of a party during the course and in furtherance of the conspiracy." The events about which Mr. Minnis testified all allegedly occurred while Mr. Minnis was employed by Pittway, a non-party to this litigation. In addition, Mr. Minnis made no statement "during the course" of his alleged conspiracy. The statements which plaintiffs wish to admit into evidence were made by Mr. Minnis more than 8 years after the alleged "conspiracy" had been completed. Secondly, any such "admission" may be used as evidence only where the record contains "independent evidence [of the conspirators'] participation in, and the conspiracy itself." United States v. McCormick, 565 F.2d 286 (4th Cir. 1977). In other words, the uncorroborated allegations of Mr. Minnis are not sufficient to establish the conspiracy about which he has made his claims and are, therefore, not admissible against BRK. As previously discussed, plaintiffs have failed to provide any evidence whatsoever that corroborates Mr. Minnis' allegations.

recover a "bonus" to which he claimed he was entitled. His claim was judicially rejected and he has admittedly suffered from serious psychological problems for several years.

30. Every individual named by Mr. Minnis who allegedly knew of or participated in the alleged "conspiracy" to falsify tests for Underwriters Laboratories, even those who no longer have any connection with BRK or Pittway, have denied his outrageous claims. Even if Mr. Minnis' claims are to be believed, which BRK strenuously rejects, then it must be recognized that they are limited to events occurring in 1986 and 1987, while Mr. Minnis was employed by Pittway, a non-party to this litigation. Significantly, the events about which Mr. Minnis testified allegedly took place more than ten years before the SA67D in this case was manufactured, and involve smoke detector models other than the SA67D. Therefore, Mr. Minnis' anticipated testimony should be excluded.

### C. Evidence Of Consumers Communications With BRK, Including The Testimony Of Beth Weber, Are Not Relevant And Should Be Precluded

#### 1. BRK's Communications With Consumers.

31. In an attempt to assert innuendo and speculation in support of their otherwise baseless accusations concerning product defect, plaintiffs stated that they will seek to present BRK's records related to communications with consumers as evidence that BRK had "notice" of a defect. Specifically, plaintiffs have already indicated in their Rule 26(a) disclosure that they intend to rely upon "consumer complaints." However, as the Court might expect, these "consumer complaints" typically consist of little more than a consumer advising BRK that they are disappointed with the performance of a smoke detector in relation to a fire or other smoke related event.

#### 2. The Consumer Communications Are Not Substantially Similar.

32. For evidence of consumer communications to be admissible, the proffering party must show that the event complained of by the consumer occurred under "substantially similar"

11

circumstances as the incident alleged in the plaintiffs' Complaint. <u>Mills v. Beech Aircraft Corp., Inc.</u>, 886 F.2d 758 (5th Cir. 1989); <u>Hardy v. Chemetron Corp.</u>, 870 F.2d 1007, 1009 (5th Cir. 1989); <u>Magic Chef, Inc., v. Anita Sibley</u>, 546 S.W.2d 851, 855 (Tex. Ct. App. 1977). It is the plaintiff's burden to establish sufficient similarity between the customer communications and the plaintiff's own theory of defect so that the admission of the customer communications will make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. <u>McGonigal v. Gearhart Industries</u>, 851 F.2d 774, 778 (5th Cir. 1988). As discussed below, plaintiffs cannot meet their burden to establish the admissibility of BRK's consumer communications.

33. Plaintiffs will likely contend that BRK's communications with its consumers provided BRK with some vague "notice" that the piezo-horns in its smoke detectors were defective. To establish notice, however, the information would have to demonstrate that a smoke detector failed to alarm because the piezo-horn failed to operate due to fretting. If the information does not suggest that the defect alleged by the plaintiffs exists or that any of the incidents were caused by that defect, then the information is not particularly probative. <u>Brooks v. Chrysler Corp.</u>, 786 F.2d 1191, 1198 (D.C. Cir.), <u>cert. denied</u> 479 U.S. 853 (1986).

34. Plaintiffs' purported smoke detector expert, B. Don Russell, admits that he does not know of any model battery-powered smoke detector that ever failed to alarm because of corrosion. (Deposition Testimony of Dr. B. Don Russell, Volume I, dated May 10, 2000 ("Russell Vol. I"), pp. 41 and 53, attached hereto as Exhibit "I".) The smoke detector in this case then would be BRK's first battery-powered detector to have failed because of fretting corrosion. More importantly, although many of BRK's smoke detectors have piezo-horns, those horns are not necessarily the same. Over the years, the BRK's piezo-horns have been manufactured from various materials, in different configurations, applied at different contact

12

pressures and driven by different electronic circuitry.[4]  Plaintiffs' expert agrees that all of these factors, and more, are interrelated and affect the operation of the piezo-horn.  (Deposition Testimony of B. Don Russell in the matter of <u>Morales v. BRK Brands, Inc., et al.</u>, pending in the Northern District of Texas, ("Russell Dep."), pp. 43-47, attached hereto as Exhibit "H"; *Russell Vol.* I, pp. 44-45 and 164-67, Exhibit I).  For the consumer communications to be probative of the issue of notice, the information related to other smoke detector models would have to include a piezo-horn of the same materials and construction, with the same electronic circuitry and found to have failed due to corrosion of the contacts, which plaintiffs concede there are none.

35.    Dr. Russell agrees that, simply because a smoke detector did not alarm, one cannot conclude anything about the reason for the alleged failure.  Claiming to have tested numerous photoelectric and ionization smoke detectors, Dr. Russell has experienced cases where photoelectric and ionization smoke detectors fail to alarm under both smoldering and flaming fire conditions.  Even from the results of his own tests, Dr. Russell agrees that from the fact that a smoke detector fails to alarm, no conclusions can be drawn as to why there was a failure. (*Russell Dep.*, pp. 121-123, Exhibit H).  Dr. Russell has acknowledged that there may be many reasons for these alleged failures described in the consumer communications, including lack of an adequate power source, component failure, horn failure, battery wiring failure or integrated circuit failure. (*Russell Dep.*, pp. 188-89, Exhibit H).  Dr. Russell also concedes that he cannot determine from such documents the mechanism of the alleged failure.  (<u>Id.</u>)  Because it is impossible to determine from the consumer complaints the probable cause of a smoke detector failure, such information cannot establish notice to BRK of any defect.

---

[4]    This information was set forth in the deposition of BRK's representative Mark Devine, in the pending matter of <u>Morales v. BRK Brands, Inc., et al.</u>, taken on November 20, 2002, but subject to a confidentiality agreement between the parties.

36.    In <u>Mercer v. Pittway Corp.</u>, 616 N.W.2d 602 (Iowa 2000),[5] a case cited by

plaintiffs, the Supreme Court of Iowa relied on the same consumer complaints sought herein by

plaintiffs to   reverse the improperly reached jury verdict.   The <u>Mercer</u> case involved a

determination as to the admissibility of the consumer complaints.   Therefore, the Iowa Supreme

Court's holding is relevant to the issue BRK places before this Honorable Court.   This is

especially true in light of the fact that plaintiffs' expert acknowledges that he cannot state that the

consumer complaints are substantially similar to each other or any other fire, including the

circumstances of Mr. Cruz's carbon monoxide poisoning death.   In reviewing the same consumer

complaints plaintiffs seek herein, the Iowa Supreme Court made the following findings:

> Plaintiffs [have] the burden of showing that the facts and
> circumstances of each consumer complaint were substantially
> similar to the Mercer fire....Accordingly, this means that plaintiff
> had to do more than just show that each consumer complaint
> involved a model 83R that did not alarm to smoke.   Rather,
> plaintiffs had to show that there was a sufficient similarity between
> the reason why the particular consumer's detector failed to alarm
> and why the Mercers' detector failed to alarm....Thus, the fact that
> BRK categorized the complaints as NRS [no response to smoke] or
> that BRK sent out the same form letter to the consumer does not
> prove the reason the particular consumer's detector allegedly failed
> is sufficiently similar to the reason the Mercers' detector allegedly
> did not alarm

616 N.W.2d at 616.  Importantly, the Iowa Supreme Court also held, after a thorough review of

these consumer complaints as follows:

> The consumer complaints reveal that some of the smoke detectors
> referenced in the complaints failed to alarm for reasons unrelated
> to those advanced by plaintiffs in this case.  For example, in some
> of the consumer complaints, there was no battery in the detector or

---

[5]    The verdict in <u>Mercer</u> was overturned in part because the trial court admitted as evidence
consumer complaints absent a showing by plaintiff that there existed a substantial likelihood of
similarity to the model and factual situation at hand.  <u>Mercer v. Pittway Corp.</u>, 616 N.W.2d 602
(Iowa 2000) (plaintiff had to do more than just show that each consumer complaint involved the
same model that did not alarm to smoke).

14

the battery or the smoke detector was started on fire in an attempt to test it...with respect to the ... consumer complaints received by BRK prior to the [Mercer] fire, it would be necessary for the court to examine each prior incident to determine if it truly is substantially similar to the incident in the subject case. The court simply could not rely on BRK's classification system of processing consumer complaints for its conclusion that the complaints were substantially similar to the Mercer fire. Rather, it was plaintiffs' burden to establish a threshold foundation that in each consumer complaint the smoke detector was fully operable, that the detector was installed properly as to location in the home and on the wall/ceiling, and that a sufficient amount of smoke reached the detector to trigger the alarm.

Id.

37.     This Honorable Court should note that the Iowa Supreme Court was asked to consider those consumer complaints that involved the same smoke detector model that was in the Mercer home at the time of their fire. Here, this Honorable Court is being asked to consider admitting communications related to all ionization detector models BRK produces. This should not be allowed, especially in light of Dr. Russell's testimony that he cannot say whether any of the consumer complaints are substantially similar to each other or any other fire, which would have to include the circumstances of Mr. Cruz's carbon monoxide poisoning death. It is plaintiffs' burden to demonstrate a sufficient similarity between the reason why a particular consumer's detector failed to alarm and why the detector in their case failed to alarm. McGonigal, 851 F.2d at 778. To do so, plaintiffs must do more than show that the consumer complaint involved the same model smoke detector and that it did not alarm. Mercer, supra. Because they cannot meet this burden, BRK consumer communications are inadmissible.

### 3.     Consumer Complaints And Claims, And The Testimony Of Beth Weber, Are Irrelevant.

38.     As we all know, many people have fires in their homes, which do not require a detector to alarm, such as from smoking cigarettes or lighting candles. Therefore, smoke detectors must be set so that they will not regularly alarm in response to so-called friendly fires.

15

The only way this can be accomplished is by distinguishing between the amount of smoke generated, on the basis that a friendly fire will generally be a small, contained fire and generate less smoke than a hostile fire. Consequently, the sensitivity of smoke detectors is set so that they will not usually alarm in response to small quantities of smoke. Indeed, many regulatory agencies worldwide recognize this fact and mandate a level of smoke at which the detector must not alarm. For the above reasons, smoke detectors will not immediately alarm in response to a smoke producing situation, which may lead a consumer to believe that it is not properly operating.

39.    Plaintiffs will likely contend that BRK's communications with its consumers provided BRK with some vague "notice" that the piezo-horns in its smoke detectors were defective. To establish notice, however, the information would have to demonstrate that a smoke detector failed to alarm because the piezo-horn's failed to operate because of fretting. If the information does not suggest that the defect alleged by the plaintiffs exists or that any of the incidents were caused by that defect, then the information is not particularly probative. Brooks v. Chrysler Corp., 786 F.2d 1191, 1198 (D.C. Cir.), cert. denied 479 U.S. 853 (1986).

40.    Beth Weber is a former employee of Pittway Corporation and BRK who had responsibility for communicating with those consumers who alleged that their smoke detector failed to perform as they expected. BRK anticipates that plaintiffs will seek to offer the testimony of Beth Weber through deposition testimony to describe how those consumers' allegations were handled and how it was that Pittway Corporation and BRK responded.

41.    Like David Minnis, plaintiffs have failed to take Ms. Weber's deposition within the context of this case and have failed to identify which deposition testimony they will seek to admit into evidence.

16

42.    More importantly, just as the consumer complaints themselves are not relevant to this case, Ms. Weber's testimony about how she managed communications with customers is equally irrelevant. Therefore, plaintiffs should be precluded from entering into evidence any evidence about consumer communications or any testimony from Beth Weber.

### 4.    The Consumer Communications Constitute Inadmissible Hearsay.

43.    Hearsay is an out of court statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c). The Federal Rules of Evidence provide that hearsay evidence, whether written or oral, is not admissible. Fed. R. Evid. 802.

44.    Notwithstanding the lack of any similarity between the claimed defect and BRK's prior customer complaints, by offering BRK's records related to communications with consumers who had complained about detectors allegedly failing to alarm in the presence of smoke, plaintiffs invite the jury to infer that some defect must exist in the design of the model SA67D. As such, plaintiffs intend to offer the customer complaints for the truth of the matter asserted; that the detector fails to alarm in the presence of smoke. Accordingly, correspondence between BRK and its customers is inadmissible hearsay.

45.    The two fundamental reasons for excluding hearsay evidence are that it violates rules that all testimony must be given under oath and that the opposing party must be given an opportunity to cross-examine persons making the statement. See U.S. v. Carter, 491 F.2d 625, 628 (5th Cir. 1974). Presently, plaintiffs have no intention to call each customer as a witness to testify regarding the facts of their individual claim. The evidence of the customer claims, then, is not under oath and BRK is deprived of the opportunity to cross–examine the declarants. Cross-examination is crucial to determine the credibility of the declarant for accuracy, bias, motive, self-interest, prejudice, recall, and ability to remember. See Minnesota Mining & Manufacturing

Co. v. Nishika Ltd., 885 S.W.2d 603, 631 (Tex. App. 1994), rev'd on other grounds, 953 S.W.2d 733 (Tex. 1997).

46.    There is ample precedent that such complaint letters should not be permitted under any exception to the hearsay rule, including the business record exception, as they lack the necessary trustworthiness to qualify under the exceptions.  See, e.g., Wilson v. Zapata Off-Shore Co., 939 F.2d 260, 271 (5th Cir. 1991) (stating general proposition that outsider's statement contained in business record does not have presumption of accuracy); Cameron v. Otto Bock Orthopedic Industry, Inc., 43 F.3d 14, 16 (1st Cir. 1994) (upholding exclusion on hearsay grounds of post-accident reports which had "no bearing" on notice; where offered "to show defect, the truth of the reports is critical," and inclusion in company business records is immaterial where source is a non-party to business and is not acting in the course of its business); Drabik v. Bostich, 997 F.2d 496, 504 (8th Cir. 1993) (noting that the trial judge sustained hearsay objection to exhibits which plaintiff sought to introduce to show other "nailer" accidents); Wolf v. The Proctor & Gamble Co., 555 F. Supp. 613, 620-21 (D.N.J. 1982) (consumer complaints made over telephone and incorporated into company records, or furnished in letters, deemed inadmissible hearsay; complaints unlikely to have been made immediately and present sense hearsay exception otherwise inapplicable); Minnesota Mining & Manufacturing Co. v. Nishika, Ltd., 885 S.W.2d 603, 631 (Tex. App. 1994), rev'd on other grounds, 953 S.W. 2d 733 (Tex. 1997) (complaint letters not trustworthy because accusatory and self-serving; cross-examination of complainants "crucial and paramount;" business records exception does not apply); Ford Motor Co. v. Phelps, 389 S.E.2d 454 (Va. 1990) (hearsay statements by consumers acting for personal reasons not an exception to Virginia's hearsay rule; failure to limit the use of these exhibits was reversible error although "a number" of complainants testified; exhibits were "tainted with hearsay, opinions, conclusions, and other non-probative matter prejudicial to

defendant"); <u>Babb v. Ford Motor Co., Inc.</u>, 535 N.E.2d 676, 679-80 (Ohio Ct. App. 1987) (upholding court's refusal to allow use of letter complaints to show incidents occurred as discussed; they were inadmissible hearsay offered to prove truth of facts asserted and not admissible under business records exception; live testimony or other valid exception to hearsay rule was required for admission).

### D.    Any Evidence Related To The Design, Development, Marketing And/Or Recall Of Other Models Of Smoke Detectors Should Be Precluded

#### 1.    Plaintiffs Are Not Entitled To Present Evidence Concerning Other Models Of Smoke Detectors.

47.    Plaintiffs contend that the smoke detector in the Cruz residence was a SA67D, a battery-powered smoke detector.    Nevertheless, it is anticipated that plaintiffs will seek to present evidence regarding the design, development and marketing of other, unrelated models of smoke detectors, including smoke detectors manufactured in the 1980s, long before the smoke detector at issue in this case was manufactured.

48.    However, information relating to the design, development and marketing of other models of smoke detectors is irrelevant to the facts and circumstances alleged in the Complaint. Plaintiffs concede that the smoke detector at issue is a SA67D model detector.    To permit plaintiffs to present testimony or other evidence regarding the design, development and marketing of smoke detectors other than the SA67D would be truly oppressive and would thwart any attempt at a just, speedy, or inexpensive determination of this action.

49.    Moreover, because the design, development and marketing of other models is irrelevant to the model at issue, the only conceivable use for such information would be to mislead the court or jury.    This type of abuse of the discovery rules should not be countenanced by this Honorable Court.

## 2.   The SA67D Is Not Substantially Similar To Previous Models.

50.   The way in which smoke particulate is directed through the molded plastic housing of a smoke detector is important because the openings and "fins" of the cover affect the number, size and speed of smoke particles entering the ion detection chamber and will determine the rate at which the detector will "sense" smoke.

51.   As discussed above, Dr. Russell agrees that the construction of the smoke detector's airflow plays a role in determining how quickly a detector will respond to given smoke conditions. (*Russell Vol. I*, pp. 44-45 and 164-67, Exhibit I). Dr. Russell admits he has not analyzed this issue and can not comment or identify the similarities (if any) between the BRK ionization smoke detectors. All of the components of a smoke detector collectively have an affect on the performance and ultimate sensitivity of a smoke detector.

52.   While their expert agrees that all of the components of a smoke detector collectively have an affect on the performance and ultimate sensitivity of a smoke detector, plaintiffs conveniently ignore the obvious differences between the molded plastic housings of the SA67D and BRK's other smoke detector models, which dramatically affect the flow of smoke to the SA67D's ionization chamber, and the manner in which it detects smoke. In responding to this motion, plaintiffs will likely ignore Dr. Russell's testimony when they argue that all ionization smoke detectors are substantially similar. Dr. Russell, however, has already testified under oath that he cannot support that argument.

53.   The SA67D's differences (from other ionization smoke detectors), in the way it processes and responds to smoke, is further evidenced by the examination conducted by Underwriters Laboratories. BRK sells no smoke detector until it has been listed by Underwriters Laboratories as having met the requirements of Standard for Safety 217.[6] When reviewing

---

[6]   Underwriters Laboratories, which is an independent, not for profit testing laboratory and the leading developer of U.S. product safety standards, has for over thirty years developed

smoke detector submissions, whether for new or redesigned models, UL decides the scope of testing. If it deems a smoke detector to be substantially similar, in any characteristic, to another smoke detector model, UL does not repeat its tests related to that similar characteristic. For the SA67D, UL determined it was sufficiently different from other BRK ionization smoke detectors in the manner in which it processed and responded to smoke, including previous SA67 models, so it subjected the SA67D detector to fire and smoldering smoke tests, in addition to many others. That decision, made in light of UL's decades of experience in testing and evaluating thousands of varieties of smoke detectors, must carry greater weight than plaintiffs' argument.

### 3.   All Piezo-Electric Horns Are Not The Same.

54.   Plaintiffs claim that the Cruz smoke detector was defective because its piezo-horn (the signaling device) was susceptible to corrosion. However, plaintiffs' experts, Dr. Aronstein, Dr. Russell and Douglas Holmes, all agree that they know of no battery powered smoke detector of the type manufactured by BRK that has ever failed to operate because of corrosion of the piezo-horn contacts. (*Russell Vol. I*, pp. 41 and 53, Exhibit I; Deposition Testimony of Jesse Aronstein, Volume I, dated June 14, 2000 ("Aronstein Vol. I"), pp. 57-60, attached hereto as Exhibit "J"; Deposition Testimony of Jesse Aronstein, Volume II, dated Nov. 14, 2000 ("Aronstein Vol. II"), pp. 190-91, attached hereto as Exhibit "K"; Deposition Testimony of Douglas Lee Holmes ("Holmes"), pp. 210-12, attached hereto as Exhibit "L".)

55.   As discussed above, the design parameters and materials used in the manufacture of a piezo-horn can affect its operation, and BRK has varied its design, construction and materials of the horn contacts over the time it has used piezo-horns in its smoke detectors. BRK has also used different circuits to drive the horn and has changed the design of the horn's

---

performance tests and standards that establish the minimum amount of smoke below which a detector may not sound and the maximum amount of smoke at which a detector must sound.

housing and the material on the piezo disk, all of which affect the operation of the piezo horn. Plaintiffs' purported expert on the piezo horn, Dr. Russell, concedes these obvious points. Consequently, plaintiffs' claim that all piezo-horns in BRK smoke detectors are identical is incorrect and cannot form the basis for plaintiffs' contention that the SA67D is substantially similar to previous models.

### 4. Plaintiffs Are Not Entitled To Present Evidence Of Recalls Of Other Models Of Smoke Detectors.

56.     Plaintiffs contend that the smoke detector in the Cruz residence was a SA67D, a battery-powered smoke detector. Nevertheless, BRK anticipates that plaintiffs will attempt to prove that the Cruz detector was defective by introducing evidence of Pittway Corporation's ("Pittway") recall of its 1839I model smoke detector in September 1992, more than a decade ago. Courts, however, have been hesitant to admit evidence of a product recall at trial.

57.     As a preliminary matter, before evidence of a recall can even be considered for admission into evidence, "the plaintiff must lay a proper foundation, independent of the recall itself, establishing that a defect existed in the [product]." Pesce v. General Motors Corp., 939 F. Supp. 160, 165 (N.D.N.Y. 1996) (citing Calhoun v. Honda Motor Co., 738 F.2d 126, 133 (6th Cir. 1994)); see also, Farner v. Paccar, Inc., 562 F.2d 518, 525-26 (8th Cir. 1977).

58.     Under no circumstances will a court even consider submitting evidence of a recall to prove a design defect, or notice of a defect, unless the plaintiff can demonstrate that there is a substantial similarity between the products in question. See Tompkins v. Medtronic, Inc., 17 F.3d 396 (9th Cir. 1994); Cooper v. Firestone Tire & Rubber Co., 945 F.2d 1103, 1105 (9th Cir. 1991); see also Giglio v. Saab-Scania of Am., Inc., No. 90-2465, 1992 WL 329557 (E.D. La. Nov. 2, 1992), aff'd 14 F.3d 55 (5th Cir. 1994) (holding that evidence of a product recall must be excluded where it is more prejudicial than probative); Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1082-83 (5th Cir. 1986) (recognizing that "a showing of substantial similarity is

required when a plaintiff attempts to introduce evidence of other accidents as direct proof of negligence, a design defect or notice of the defect); <u>Verzwyvelt v. St. Paul Fire & Marine Ins. Co.</u>, 175 F. Supp.2d 881 (W.D. La. 2001) (evidence of a recall is inadmissible as being unduly prejudicial when the recall involved an entirely different product, manufactured at an entirely different facility).

59.    In this matter, the allegations of plaintiffs' Complaint are only that the contacts between the circuitry and the horn of the SA67D were defectively designed and susceptible to corrosion. Plaintiffs are not relieved of their burden to identify a defect in the SA67D model smoke detector simply because they believe that other model detectors had corrosion problems or because they believe that a former Pittway employee may have modified some other model of smoke detector to pass UL's corrosion test. Plaintiffs must be able to demonstrate some relevant similarities between these other models of detectors and the SA67D.

60.    Significantly, plaintiffs' experts, Dr. Aronstein, Dr. Russell and Mr. Holmes, all agree that they know of no battery powered smoke detector of the type manufactured by BRK that has ever failed to operate because of corrosion of the piezo-horn contacts. (*Russell Vol. I*, pp. 41 and 53, Exhibit I; *Aronstein Vol. I*, pp. 57-60, Exhibit J; *Aronstein Vol. II*, pp. 190-91, Exhibit K; *Holmes*, pp. 210-212, Exhibit L.) In fact, Dr. Russell has admitted that the only model of smoke detector that he knows of that allegedly did not alarm because of corrosion was manufactured by Pittway, not BRK. (*Russell Vol. I*, pp. 42-45, Exhibit I.) The smoke detector that Dr. Russell was referring to is the model 1839I, a hard-wired detector manufactured by Pittway, not BRK, between the years 1985 through 1990.

61.    Significantly, Dr. Russell acknowledges that the model 1839I detectors were AC powered (hard-wired), not battery-powered detectors. (*Russell Vol. I*, pp. 44-45, Exhibit I.) Dr. Russell also admits that the circuitry of the 1839I detector is different than battery-powered

smoke detectors and that studies have concluded that the differences in the drive circuitry make battery-operated detectors more resilient to the affects of corrosion.[7] (*Russell Vol. I*, pp. 44-46, Exhibit I.) Dr. Russell further admits that he has not performed any research on this issue and cannot contradict the conclusions reached by Pittway's research. (*Russell Vol. I*, p. 58, Exhibit I.)

62.    Consequently, plaintiffs' own expert admits that he is not aware of any evidence connecting battery-powered detectors, such as the SA67D, to the corrosion issue. Without any evidence that the SA67D model detector is substantially similar to the model 1839I detector, or any suggestion that the detector at issue in this case was or could be affected by corrosion, plaintiffs should not be permitted to reference Pittway's 1992 recall of the 1839I model smoke detector at trial.

63.    Otherwise, BRK will be unfairly prejudiced, and the jury confused or mislead, if plaintiffs are permitted to parade evidence of a recall involving an entirely different product in front of the jury at trial. See, e.g., Verzwyvelt v. St. Paul Fire & Marine Ins. Co., 175 F. Supp.2d 881 (W.D. La. 2001). Such evidence may carry great weight and may be viewed by the jury as convincing proof that the product was defective. Accordingly, BRK respectfully requests that such evidence be excluded.

**E.    The Plaintiffs Should Be Precluded From Using, Mentioning And/Or Presenting The Videotape Interview Of Emma Lumbreros**

64.    Plaintiffs' counsel has recently revealed, by letter dated February 7, 2003, his intention to introduce into evidence at the trial of this matter and play for the jury a videotape interview of former Pittway employee, Emma Lumbreros, in support of plaintiffs' allegations that the smoke detector at issue was defective, and BRK engaged in gross negligence with regard

---

[7]    The electrical circuitry of the 1839I was unique to those detectors because they were designed for hard-wired applications, not battery powered applications.

to the design and marketing of its ionization smoke detectors (sometimes referred to as "the Videotape"). (See Gonzalez Letter, Exhibit E.) Evidence of this interview, however, should be precluded given that plaintiffs never disclosed the content of the Videotape to BRK. Nevertheless, within the last month, BRK obtained a copy of the videotape in other litigation and, therefore, asserts that the out-of-court statements expressed by Ms. Lumbreros in the Videotape are not admissible, because they are irrelevant, unduly prejudicial and constitute nothing more than improper hearsay.

### 1. The Videotape Interview Of Emma Lumbreros Is Irrelevant And Unduly Prejudicial And Should Be Precluded.

65.    Ms. Lumbreros, a former Pittway quality control technician, was the Pittway employee who first discovered in the late eighties the problems associated with the 1839I model smoke detector, detailed above. Ms. Lumbreros' videotape testimony -- apparently detailing how she learned of the problem with the 1839I model smoke detector, and the steps that Pittway undertook to remedy the problem -- may all be true; however, her testimony has no relevance to this case, which concerns a model SA67D smoke detector manufactured years after the problems with the 1839I surfaced and were remedied. Even if presented live, such testimony must be excluded for the same reasons (as set forth above) that plaintiffs should not be permitted to reference at trial Pittway's recall of the 1839I model smoke detector, which occurred more than a decade ago. Simply stated, Ms. Lumbreros's testimony must be excluded because the model 1839I detector is entirely distinguishable in its internal design, external appearance and method of operation from the SA67D model detector at issue in this case.

66.    Additionally, Ms. Lumbreros alleges generally in the Videotape that at some unknown point in time, she discovered an unidentified problem with BRK's 83R smoke

detector.[8]  Curiously, Ms. Lumbreros was unable to describe the nature of the problem, or for that matter, identify when this problem allegedly occurred.  Accordingly, this Court should prohibit the admission of Ms. Lumbreros' speculative and conjectural statements concerning unidentified problems associated with the 83R model smoke detector at the trial, on the grounds that the probative value of such generalized testimony is substantially outweighed by its prejudicial effect, and if admissible would allow a verdict based on mere speculation and conjecture.  See, e.g., U.S. v. Wright, 799 F.2d 423 (8th Cir. 1986) (holding that the exclusion of witness' testimony that informant had told him that he had given defendant some kind of "content" to hold for him was not abuse of discretion; statement was ambiguous in that it would require jury to speculate on what type of "content" was involved and statement did not bear directly on issue of whether defendant knew what he was holding and could have misled jury with regard to that issue).

### 2.    The Videotape Interview Of Emma Lumbreros Constitutes Inadmissible Hearsay.

67.    Assuming the videotape interview of Emma Lumbreros is relevant, which it is not, this interview should be excluded, as it constitutes inadmissible hearsay.  By offering the unverified and unqualified statements of Ms. Lumbreros into evidence, plaintiffs are encouraging the jury to infer that BRK engaged in gross negligence with regard to the design and marketing of the SA67D model detector.  They are also encouraging the jury to conclude that BRK had notice that the Cruz detector would not provide a timely alarm in this case, based on the problems that Pittway may or may not have experienced with 1839I model smoke detectors.

---

[8]    Ms. Lumbreros' interview also references an alleged problem that BRK had with appliance timers in the late eighties, which clearly has no bearing whatsoever on the issues presented in this case.  Accordingly, the needless presentation of such testimony would serve only to mislead the jury and waste precious judicial resources.

68.    Accordingly, plaintiffs plainly and improperly intend to offer the obviously edited, out-of-court statements expressed by Ms. Lumbreros in the videotape interview for the truth of the matters asserted. See, e.g., Sprynczynatyk v. General Motors Corp., 771 F.2d 1112, 1117 (8th Cir. 1985) (recognizing that words recorded on a videotape are inadmissible hearsay if offered for their truth); Aetna Casualty & Sur. Co. v. Cooper, 485 So.2d 1364, 1366 (Fla. Ct. App. 1986) (generally, a videotape offered to prove the truth of the matter asserted constitutes inadmissible hearsay).

69.    Thus, this Court should not allow the admission of the edited out-of-court statements of Ms. Lumbreros expressed in her videotape interview, as Ms. Lumbreros was not under oath at the time of the interview, and BRK was deprived of the opportunity to cross-examine Ms. Lumbreros regarding her claims. See Carter, 491 F.2d at 628. More significantly, BRK has never deposed or cross-examined Ms. Lumbreros in this case or any other case. Accordingly, the videotape interview of Ms. Lumbreros is nothing more than inadmissible hearsay. See, e.g., Bolstridge v. Central Maine Power Co., 621 F. Supp. 1202, 1204 (D.C. Me. 1985) (holding that videotapes should be admitted as demonstrative evidence only when the tapes convey the observations of a witness to the jury more fully or accurately than for some specific, articulable reason the witness can convey them through the medium of conventional, in-court examination).

70.    It is also clear, after viewing the video, that Ms. Lumbreros was interviewed before the video was shot, ensuring only information beneficial to plaintiffs' case was recorded. To the extent Ms. Lumbreros slipped-up and stated something that may not have helped plaintiffs, those statements were deleted from the videotape which was obviously heavily edited. Such a ham-handed approach to offering hearsay evidence becomes even more unduly prejudicial to BRK where plaintiffs have quite obviously tapered with the videotape.

27

71.     Accordingly, BRK respectfully requests that Plaintiffs be prohibited from introducing and/or making any use or reference to the Videotape Interview of Emma Lumbreros at the trial of this matter.

**3.     Plaintiffs' Disclosure Of The Videotape Interview Of Emma Lumbreros Is Untimely And Should Be Excluded.**

72.     Plaintiffs should not be permitted to present the Videotape at trial on account of their failure to timely disclose this prejudicial piece of evidence during the discovery process. The Federal Rules of Civil Procedure require that a party comply with discovery rules in good faith. Absent a party's good faith effort to abide by the rules, a court is well within its discretion to impose sanctions, including barring certain pieces of evidence.

73.     Pursuant to Federal Rule of Civil Procedure 37(c)(1), a party that without substantial justification, fails to comply with Rule 26(e)(2), which imposes a duty to supplement a prior production seasonably, "is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." See Fed. R. Civ. P. 37 (c)(1). A party has an absolute duty to supplement or correct any disclosure or response to include information thereafter acquired if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not been made known to the other parties during the discovery process or in writing. See Fed. R. Civ. P. 26(e)(2); Reed v. Iowa Marine & Repair Corp., 16 F.3d 82, 84-85 (5th Cir. 1994). Therefore, a party is duty bound until the close of discovery, to produce all documents responsive to any request made previously. The basic purpose behind this principle is to prevent prejudice and unfair surprise. See id. at 85.

74.     Significantly, the failure to produce or disclose information without substantial justification may result in the exclusion of the proffered evidence. See, e.g., Aerotech Resources Inc., v. Dodson Aviation Inc., 191 F. Supp.2d 1209,1230 (D. Kan. 2002) (finding an audiotape

inadmissible due to defendant's failure to previously produce the tape in response to plaintiff's request for information); Texas Instruments, Inc. v. Hyundai Electronics, 50 F. Supp.2d 619 (E.D. Tex. 1999) (finding that defendant's failure to timely disclose prior art information warranted exclusion of that evidence at trial).

75.     As part of its discovery, BRK, through properly propounded discovery requests, sought all documents and things, including videotapes, that plaintiffs believed were relevant to their claims.  Although some responsive documents were produced during discovery, the videotape interview of Emma Lumbreros was never identified nor produced during the discovery period.

76.     It was not until well after the close of discovery in this action that plaintiffs' counsel, by letter dated February 7, 2003, first disclosed the existence of the Videotape to BRK, and indicated plaintiffs' intention to present the Videotape to the jury at trial in this matter. Plaintiffs' counsel, however, has never to this day divulged the content of the recently identified Videotape to BRK.

77.     In fact, plaintiffs have not produced a copy, or transcript, of the Videotape to BRK.  BRK rather fortuitously obtained the Videotape through an unrelated case.  Nevertheless, it is clear that the Videotape has been in plaintiffs' possession for quite some time.  Although undated, the videotape interview of Emma Lumbreros was purportedly taken in the mid-1990s by Attorney Bryan Harris, the former colleague of Attorney Ray Marchan, counsel for plaintiff Cynthia Cox in this case.  There is no justifiable excuse for plaintiffs' failure to produce the Videotape during the discovery process.

78.     Further, plaintiffs' last-minute disclosure of the Videotape would severely prejudice BRK, because it would inevitably force BRK to sacrifice valuable trial preparation time in order to investigate, locate and depose Ms. Lumbreros.  Absent plaintiffs' dilatory

conduct, such discovery would have been completed much earlier. Therefore, plaintiffs should not be permitted to use, mention and/or present the videotape interview of Emma Lumbreros at trial.

**F.   The Plaintiffs Should Be Precluded From Using, Mentioning And/Or Presenting The Videotape And/Or Transcript Of The "20/20" News Program That Aired On ABC Television On Or About May 17, 1996 And Again On December 20, 1996**

79.     BRK anticipates that plaintiffs will attempt to introduce into evidence at the trial of this matter and play for the jury a tape of a "20/20" television news program, reporting on the deficiencies of ionization smoke detectors, that aired on or about May 17, 1996 (and again on December 20, 1996), to show that ionization smoke detectors are unreasonably dangerous and defective, BRK had notice that the detector at issue would not provide a timely alarm when exposed to soot emitted from a space heater, and BRK engaged in gross negligence with regard to the design and marketing of its ionization smoke detectors.

80.     In the 20/20 news program, several reporters assert that ionization detectors do not give maximum time to escape from smoldering fires, and that the warnings provided with these types of detectors are inadequate. Further, several individuals identified only as "fire victims," claim that an ionization detector failed to alarm in a timely manner in the presence of smoke at their residences. Gary Lederer, a former BRK executive, is also quoted as stating that a photoelectric detector will go into alarm 15 minutes prior to an ionization detector in a slow, smoldering smoke fire.

81.     Plaintiff's expert, Dr. Russell was also interviewed on the program. Dr. Russell stated that the ionization type detectors are inadequate in detecting slow, smoldering smoke fires, and that the manufacturers should either warn of their limitations, or take them off the market.

82.     Evidence of the 20/20 news program is inadmissible. This evidence should be precluded because it is irrelevant, purports to render expert opinion testimony without the

30

necessary qualifications or foundation and constitutes nothing more than improper hearsay on the ultimate issue of this case.

### 1. The Statements And Claims Made In The "20/20" News Program Have No Relevance To This Case.

83.    The statements and claims made in the "20/20" news program aired in May, 1996, and repeated in December, 1996, have no possible relevance to this case. These news magazine reports focus exclusively on the performance of ionization smoke detectors when exposed to slow, smoldering fires. However, as plaintiffs' expert, Dr. Russell, candidly admitted in his deposition in this case, soot from Mr. Cruz's space heater, if it would trigger a smoke detector, would not have the characteristics of a slow, smoldering fire (i.e., the type of fire ionization detectors are supposedly unable to detect adequately). In light of this, the opinions and statements expressed in this program are simply irrelevant, and have no bearing upon whether the detector at issue in this case was defective or contributed to the death of Mr. Cruz.

84.    Further, to the extent that the "20/20" news program includes claims that ionization detectors failed to sound during the course of a fire, such hearsay statements should be excluded for the same reason that BRK's records of the consumer complaints are not admissible. There is simply no evidence that any of these incidents were substantially similar to the circumstances of Mr. Cruz's carbon monoxide poisoning death.

85.    Thus, the only purpose of the foregoing evidence is to unfairly portray BRK as an uncaring corporation so as to inflame the jury and generate a massive punitive damages award.

### 2. The 20/20 Program Should Be Excluded As It Renders Unqualified Expert Opinion And Constitutes Inadmissible Hearsay.

86.    Assuming the "20/20" news programs is relevant, which it is not, this news program should be excluded, as it purports to render expert opinion without the necessary qualifications, and constitutes inadmissible hearsay. Specifically, the statements and opinions

that Hugh Downs, Arnold Diaz and others express in the program regarding the design, warnings, and operation of ionization smoke detectors are nothing more than inadmissible lay witness testimony as to an area properly reserved for experts, i.e. the adequacy of ionization detectors or the warnings that are provided with these detectors when they are sold.

87.    Messrs. Downs and Diaz, as well as other reporters, have not and cannot be qualified as experts if they were appear in court, and their unqualified views of fire protection devices should not be presented to the jury through the guise of playing a tape of the "20/20" program, or other news magazine stories.

88.    Additionally, the unverified and unqualified statements of the reporters, as well as those interviewed, in the "20/20" and other news programs constitute classic hearsay.  By offering news reports into evidence, plaintiffs are encouraging the jury to infer that all ionization smoke detectors are unreasonably dangerous and defective.  Thus, plaintiffs intend to offer the out-of-court statements expressed in the news reports for the truth of the matter asserted, i.e. that ionization smoke detectors fail to alarm in the presence of smoke.

89.    This Court should not permit the jury to hear the edited statements of the reporters, and other individuals, expressed in news reports as none of the persons appearing on the programs were under oath, and BRK was deprived of the opportunity to cross-examine them. Accordingly, news programs constitute inadmissible hearsay.    See, e.g., United States v. Hatchett, 918 F.2d 631, 641-42 (6th Cir. 1990) (holding that the district court properly excluded videotaped segment from a "60 Minutes" television broadcast that focused on the collection techniques of a local IRS office as hearsay where such evidence was being offered to show that IRS agents used oppressive collections tactics); Borroto v. Campbell, No. CIV.A.3:92CV2102-H, 2002 WL 655523, at *1 (N.D. Tex. April 18, 2002) (prohibiting plaintiff from relying on statements made during a television news segment on the ground that such evidence constitutes

32

hearsay); <u>Kallstom v. City of Columbus</u>, 165 F. Supp.2d 686, 692-93 (S.D. Ohio 2001) (striking plaintiff's quotes from various news stories, including quotes from an ABC News 20/20 transcript, as hearsay where used to prove the truth of the matter asserted).

90.     Accordingly, BRK respectfully requests that plaintiffs be prohibited from introducing and/or making any use or reference to the "20/20" television program, or any other news program, at the trial of this matter.

## VI.   CONCLUSION

91.     In light of the above, defendant, BRK Brands, Inc., respectfully requests this Honorable Court preclude plaintiffs' evidence as set forth above in the form of the attached order.

Dated this 21st day of February, 2003.

Respectfully Submitted

**ROERIG, OLIVEIRA & FISHER**

BY:

Rene O. Oliveira
State Bar No. 15254700   / USDC Adm. No. 4033
Cameron County I.D. No. 3507
Elizabeth G. Neally
State Bar No. 14840400   / USDC Adm. No. 8044
Cameron County I.D. No. 3506
855 West Price Road, Suite 9
Brownsville, TX  78520
Tel:  956/542-5666
Fax:  956/542-0016

**COZEN O'CONNOR**
James Heller
Terry M. Henry
1900  Market Street
Philadelphia, PA  19103
Tel:  215/665-2000
Fax:  215/665-2013

33

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certifies that a true and correct copy of the foregoing **Brief in Support of the Omnibus Motion of Defendant BRK BRANDS, Inc. to Exclude Plaintiffs' Evidence,** has been served upon counsel of record by Certified Mail, Return Receipt Requested, on this 21st day of February, 2003, to wit:

Mr. Juan Gonzalez, Esq.
The Atrium, Suite 400
1300 North Tenth Street
McAllen, Texas 78501

Mr. Ray R. Marchan
**Eddington & Associates, L.L.P.**
1926 E. Elizabeth
Brownsville, Texas 78520

Elizabeth G. Neally

# IN THE U.S. DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

United States District Court
Southern District of Texas
FILED

FEB 2 1 2003

Michael N. Milby
Clerk of Court

## APPENDIX TO THE OMNIBUS MOTION OF DEFENDANT
## BRK BRANDS, INC. TO EXCLUDE PLAINTIFFS' EVIDENCE

**ROERIG, OLIVEIRA & FISHER**
  Rene O. Oliveira
  State Bar No. 15254700
  Cameron County I.D. No. 3507
  Elizabeth G. Neally
  State Bar No. 14840400
  Cameron County I.D. No. 3506
  855 West Price Road, Suite 9
  Brownsville, TX  78520
  Tel: 956/542-5666
  Fax: 956/542-0016

**COZEN O'CONNOR**
  James Heller
  Terry M. Henry
  1900  Market Street
  Philadelphia, PA  19103
  Tel: 215/665-2000
  Fax: 215/665-2013

# TABLE OF CONTENTS

Deposition Testimony of E. Wayne McCain.................................................Exhibit A

Affidavit of Jose Garcia ....................................................................Exhibit B

Affidavit of Rosalinda Perez ...............................................................Exhibit C

Affidavit and Autopsy Report of Dewitt S. Davenport, M.D. ...........................Exhibit D

Letter from Juan A. Gonzalez to Elizabeth G. Neally and
James Heller, dated 2/7/03 ................................................................Exhibit E

Deposition Testimony of James H. Woodburn,
in the matter of Werner v. Pittway Corp., et al. .......................................Exhibit F

Deposition Testimony of Frederick J. Conforti ..........................................Exhibit G

Deposition Testimony of B. Don Russell,
in the matter of Morales v. BRK Brands, Inc., et al., .................................Exhibit H

Deposition Testimony of Dr. B. Don Russell, Volume I
(dated May 10, 2000) .....................................................................Exhibit I

Deposition Testimony of Jesse Aronstein, Volume I
(dated June 14, 2000) ....................................................................Exhibit J

Deposition Testimony of Jesse Aronstein, Volume II
(dated November 14, 2000) ................................................................Exhibit K

Deposition Testimony of Douglas Lee Holmes.............................................Exhibit L

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  BROWNSVILLE DIVISION
 3
    JOSE GARCIA, Individually,            *
 4  and as Representative               *
    of the ESTATE OF MANUEL            *
 5  CRUZ; IDALIA GARCIA,               *
    Individually; and                   *
 6  CYNTHIA COX, as Next               *
    Friend of BRITTANY COX             *   CIVIL ACTION NO. B-98-186
 7                                        *
    VS.                                 *
 8                                        *
    BRK BRANDS, INC.                    *
 9
10  ********************************************
11              ORAL DEPOSITION OF
12             ELMER WAYNE McCAIN, P.E.
13                OCTOBER 24, 2000
14                    VOLUME 1
15  ********************************************
16      ORAL DEPOSITION OF ELMER WAYNE McCAIN, P.E.,
17  produced as a witness at the instance of the
18  Defendant, and duly sworn, was taken in the
19  above-styled and numbered cause on the 24th day of
20  October, 2000, from 9:27 a.m. to 3:48 p.m., before
21  Stacie M. Conner, CSR in and for the State of Texas,
22  reported by stenographic method, at the offices of
23  Q & A Reporting, Inc., 2700 Post Oak Boulevard,
24  Suite 1750, Houston, Texas, pursuant to the Federal
25  Rules of Civil Procedure.
```

Page 2

```
 1              A P P E A R A N C E S
 2
 3  FOR PLAINTIFFS JOSE GARCIA, INDIVIDUALLY AND AS
    REPRESENTATIVE OF THE ESTATE OF MANUEL CRUZ; AND
 4  IDALIA GARCIA, INDIVIDUALLY:
 5      Ms. Shiree D. Salinas
        LAW OFFICE OF MARK A. CANTU
 6      The Atrium
        1300 North 10th Street, Suite 400
 7      McAllen, Texas 78501
 8
 9  FOR THE PLAINTIFF CYNTHIA COX, AS NEXT FRIEND OF
    BRITTANY COX:
10
11      Mr. Ray R. Marchan
        MARTIS & WATTS, P.C.
12      1926 East Elizabeth Street
        Brownsville, Texas 78520
13
14  FOR THE DEFENDANT:
15      Mr. Terry M. Henry
        COZEN & O'CONNOR
16      The Atrium
        1900 Market Street
17      Philadelphia, Pennsylvania 19103
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    INDEX
 2  Appearances.................................  2
 3  ELMER WAYNE McCAIN, P.E.
 4      Examination by Mr. Henry................  4
 5  Changes and Signature.......................  198
    Reporter's certificate......................  200
 6
                    EXHIBITS
 7  NO.    DESCRIPTION                         PAGE
 8  1      Notice of Deposition.               18
 9  2      E. Wayne McCain, P.E., Curriculum Vitae. 29
10  3      Report by E. Wayne McCain, P.E.      29
11  4      Three pages of handwritten notes
           by Mr. McCain.                      102
12  5      Martin Industries Installation and
           Operating Instructions.             104
13  6      16 pages of photographs taken by
           Mr. McCain.                         107
14
15  6A     Photograph taken by Mr. McCain of
           the data plate.                     177
16
17  7      Page 921-139 from NFPA 921, 1998
           edition, which has Section 19-1.3,
18         "Pressure Regulation."              137
19  8      Photograph.                         149
20  9      Photograph.                         149
    10     Photograph.                         150
21
22  11     One page of handwritten notes by
           Mr. McCain.                         174
23  12     "Smoke Detector Operability Survey
           Report on Findings"                 159
24
25  13     "Fire Incident Study, National
           Smoke Detector Project."            166
```

Page 4

```
 1           ELMER WAYNE McCAIN, P.E.,
 2  having been first duly sworn, testified as follows:
 3                  EXAMINATION
 4  BY MR. HENRY:
 5      Q. Good morning, Mr. McCain. My name is Terry
 6  Henry. We've met already this morning.
 7      A. Good morning, sir.
 8      Q. As you know, we represent BRK Brands in a
 9  case that was brought in the U.S. District Court for
10  the Southern District of Texas styled Garcia vs. BRK
11  Brands.
12      A. Yes, sir.
13      Q. I'd like to ask you a few questions,
14  preliminary ones.
15          Do you know personally or did you know
16  personally Manuel Cruz?
17      A. Who?
18      Q. Manuel Cruz.
19      A. No.
20      Q. What about plaintiffs Jose and Idalia
21  Garcia?
22      A. No.
23      Q. Cynthia Cox or Brittany Cox?
24      A. No.
25      Q. Now I'm going to talk about some of the
```

Page 5

```
 1  defense experts, and I wonder if you've met them
 2  either personally or professionally outside this
 3  case. Dr. Rick Roby?
 4      A. No. I've heard of him but don't know him,
 5  never met him.
 6      Q. Michael Classen?
 7      A. No. Well, Classen, I think I may have
 8  met. Is he with Armstrong?
 9      Q. Well, I think you met him at
10  Dr. Armstrong's facility.
11      A. So I've met him, but I wouldn't know him if
12  he walked in the door.
13      Q. Dr. Armstrong, Andrew Armstrong, did you --
14      A. I've met him.
15      Q. You met him at his facility during this
16  case?
17      A. Yes.
18      Q. Outside this case, do you know him?
19      A. No.
20      Q. Dr. Roy Striet?
21      A. No.
22      Q. Richard Custer?
23      A. No.
24      Q. Alton Patton?
25      A. No.
```

Page 6

```
 1      Q. Thomas Eagar?
 2      A. Thomas who?
 3      Q. Eagar.
 4      A. No.
 5      Q. Okay. As you know, this is a
 6  question-and-answer format. Please wait until I'm
 7  done asking a question before you give me an
 8  answer. That makes sure that you hear the complete
 9  question and understand it. The court reporter has
10  an easier time taking down the transcript of our
11  discussion today.
12          Please answer verbally. Shakes of the
13  heads or "uh-huh's" and "huh-uh's" don't translate
14  well in the transcript, and it's impossible to
15  determine what an answer is.
16      A. I understand.
17      Q. Also, if you don't understand a question,
18  please ask me to rephrase it or state it again; and
19  I'll do so. It's important that you understand the
20  question completely before answering so we can get a
21  fair and accurate understanding of your answers.
22      A. Yes, sir.
23      Q. Now, you've been retained as an expert in
24  this case; is that right?
25      A. Yes, sir.
```

GARCIA VS BRK BRANDS INC        CondenseIt™        ELMER W McCAIN PE VOL I 10-24-00

Page 115

1  Now, what pressure is that? I don't
2  know. Nobody knows what pressure that was. It was
3  high enough to create a lot of soot, we know that.
4  That's one thing we do know.
5  Now -- but that pressure in inches
6  water column we don't know because -- and you
7  wouldn't probably measure it in inches water column,
8  frankly. You'd probably get above a half pound of
9  LP gas pressure, but I can't tell you that until I
10 looked at the orifice size used by Martin.
11 Q. What's the conversion between what you just
12 said, the half pound -- is that right, half pound
13 pressure?
14 A. Uh-huh.
15 Q. -- and inches water column? Do you know?
16 A. I think -- and I could stand corrected
17 because engineers know a lot of numbers, but they
18 usually have to look them up. I think it's
19 35 approximate inches water column to 1 pound per
20 square inch, but that's to the best of my
21 recollection.
22 Q. So a half a pound would be roughly --
23 A. 17.
24 Q. There you go. Inches water column?
25 A. Yes.

Page 116

1  Q. Okay. But you don't know that?
2  A. That's pretty close. I've dealt with a lot
3  of LP gas. You know, I --
4  Q. And because you don't know the pressure,
5  it's impossible for you to predict how much carbon
6  monoxide was produced versus how much soot?
7  A. That's correct, because you don't know how
8  much gas you're putting in.
9  Q. And you don't know whether large amounts of
10 carbon monoxide preceded the soot production?
11 A. That's correct. But you know -- you know
12 how far open you can open the vanes, the air shutter
13 opening. You know how much air you can get in
14 there, but how much gas can you get through it?
15 Because all this blue and red flame stuff is a bunch
16 of mess; but when you get red, supposedly you're
17 creating more soot. That's not necessarily the
18 case. You might have a blue flame. I can create a
19 lot of soot with blue flame.
20 Now, if you could open that to just
21 infinity, that hole, that vane that you're opening
22 for air, primary air, then you could burn all the
23 gas. You could burn it out the front of the heater
24 and probably not create any soot, but you'd create a
25 lot of heat.

Page 117

1  Q. Right.
2  A. So you don't use all 2500 BTU's per gallon
3  that you have of LP gas ability to produce heat.
4  Q. But the BTU's that you have written here,
5  the 30,000 BTU's input max, that's based on natural
6  gas; is that right?
7  A. That's what the catalog said. That's
8  correct.
9  Q. And in fact, it would be higher for
10 propane?
11 A. You'd put more -- if you put the same
12 amount of gas through the same hole, you'd create
13 two and a half times as much. You'd use two and a
14 half times as much gas as you would natural gas.
15 Q. Okay.
16 A. It's 1,000 BTU's and 2500 BTU's. That's
17 the --
18 MR. MARCHAN: Ms. Court Reporter, on
19 the spelling of "vane," it's v-a-n-e.
20 THE REPORTER: Thanks.
21 (Discussion off the record)
22 Q. (BY MR. HENRY) Earlier in your deposition
23 when you were talking about the amount of soot
24 produced, you referred to it in pounds. You said
25 pounds of soot were produced; is that right? Do you

Page 118

1  recall that?
2  A. I recall that, but that was just a broad
3  statement. How many pounds, I don't know. I don't
4  know that a pound was produced. Soot is light.
5  Q. I'm not going to ask you how many --
6  A. Don't ask me how many pounds. Lord, we'd
7  be here all day. I could calculate it, but it would
8  be wrong because it would be a theoretical number.
9  Q. That's not where I was going.
10 You used that reference to say there
11 was a heck of a lot of soot produced?
12 A. That's what I meant.
13 Q. I understand.
14 A. Yes.
15 Q. Take a look at Page 2 of your notes, either
16 the exhibit here or your originals.
17 A. Yeah, uh-huh. All right, sir.
18 Q. Now, down there, there's something written
19 there that says "Normal soot inside heater"; is that
20 right?
21 A. Yes, on the burner. That's what I'm
22 referring to.
23 Q. On the burner?
24 A. Yes.
25 Q. Why do you think that there was normal soot

Page 119

1  on the burner, yet you had this impression that
2  there was lots of soot that was produced?
3  A. Because you blow it off. As you increase
4  pressure and increase capacity through the orifices
5  or the raised portions of the burner, you will blow
6  off -- that's where the soot comes from. You blow
7  it off and it comes out the back and goes up on the
8  ceiling because it's extremely light and it will
9  adhere to the walls or the ceiling or whatever or
10 you if you're standing there.
11 Q. Sticky stuff?
12 A. Yeah. So that's what I was referring to
13 there. I was looking at the burners particularly
14 because if the burner had been just clean as a
15 whistle and there had been no soot on the back at
16 the vent, I would have said, "Well, the soot didn't
17 come from this heater."
18 But when I saw that it was normal soot
19 in here but there was soot on the outlet inside the
20 heater that was knocked off at Armstrong's as well
21 as prior to that, I mean, on the floor, a pile of
22 it, I knew where it came from, from the heater.
23 Q. Is that a pretty clear sign that this was a
24 ventilation-controlled burn -- not enough oxygen,
25 too much fuel?

Page 120

1  A. Yes.
2  Q. Do you have any direct knowledge of how
3  this space heater was installed, the one in
4  Mr. Cruz's house?
5  A. No. It had probably or possibly been moved
6  before I ever saw it. It was sitting with the
7  outlet, the vent, in toward the bedroom and the
8  smoke detector, I was told, was mounted in the hall
9  on the right-hand side and the bedroom is in the
10 back past the bathroom.
11 That's the only thing that I know
12 about it. Directly, I have no direct knowledge.
13 Someone else had been there. As a matter of fact,
14 I probably a number of people had been there.
15 Q. Okay. It's your understanding, though,
16 that this space heater was connected to propane gas
17 as opposed to natural gas?
18 A. Yes.
19 Q. And that there was no vent connected to --
20 or flue connected to the 4-inch vent in the back?
21 A. Yes.
22 Q. As part of your work in this case, did you
23 take a look at any regulations that might apply in
24 this case, such as NFPA 58 or 54 or the Texas
25 Railroad Commission regulations for distribution of

**Page 181**

1  somewhere along there.
2    Q.  Well, the trial testimony that we have is
3  December, 1996.
4    A.  So that was '97 it went to trial.  The
5  trial testimony you is --
6    Q.  The trial testimony is December, 1996.
7    A.  What was your question?
8    Q.  That was -- that's the first question.
9    A.  That's when it was.
10    Q.  My next question is going to be:  You've
11  testified that you bought the 83R before the Neal
12  case.
13    A.  Yeah.
14    Q.  It's fair to say it was before 1996?
15    A.  Yes.
16    Q.  Was it before 1995?
17    A.  No.  It would have been within a couple of
18  months prior to the test that we did in the Neal
19  case, whatever the date is on that.
20    Q.  Oh, so it would be prior to the test you
21  did in the Neal case?
22    A.  Yes.
23    Q.  Okay.  All right.
24    A.  Do you have the transcript of my trial
25  testimony?

**Page 182**

1    Q.  I do, sir, and I just kind of glanced
2  through it now to see if I could find the date and I
3  couldn't.
4        You testified earlier in this case
5  that you would expect that the smoke detector would
6  have went off shortly after Mr. Cruz ignited or
7  started up his space heater.  Do you remember that?
8    A.  Yes.
9    Q.  And that's because you believe, in addition
10  to carbon monoxide being produced, that there was
11  most likely -- at least invisible products of
12  combustion, soot, being produced?
13    A.  And probably heavy soot was being produced
14  based on what you see in the photographs on the
15  ceiling and so forth and the walls.
16        So I would expect it to go off
17  relatively quick, based on the amount of soot that
18  was being produced and the amount of LP gas that we
19  know was going into it because it had an orifice,
20  according to Mr. Armstrong, or Dr. Armstrong, for
21  natural gas when they were applying LP gas.  So
22  that's why I surmise that.
23    Q.  Do you have any evidence that it didn't go
24  off -- excuse me.
25        Do you have any evidence that, in

**Page 183**

1  fact, it did go off when he lit it on the night of
2  December 14 but he pulled the battery out so that it
3  wouldn't alarm when he ran the heater?
4    A.  No, I have no evidence at all.
5    Q.  You said earlier that you reviewed the
6  statement and affidavits of Rosalinda Perez and
7  Jose Garcia; is that right?
8    A.  Yes.
9    Q.  And they're two of the people that spent --
10  or were the last two people that saw Mr. Cruz alive;
11  is that right?
12    A.  That's what they said, yes, sir.
13    Q.  Okay.  And you understand that the night of
14  December 13 and 14, they were with Mr. Cruz until
15  the early hours of the morning?
16    A.  Yes.
17    Q.  And they also had testimony that Mr. Cruz
18  had the front door open, people were in and out of
19  the house up until perhaps 2:00, 2:30 in the
20  morning?
21    A.  Sure.
22    Q.  Okay.  Would that have an effect on the
23  operation of that space heater in this house?
24    A.  Yes.  It would give you more oxygen,
25  decrease the amount of carbon monoxide, decrease the

**Page 184**

1  amount of sooting.  It's air infiltration.
2    Q.  Okay.  And you also -- you'd also agree
3  that Mr. Garcia has said in his affidavit that he
4  left Mr. Cruz's house between 6:00 and 6:30 in the
5  morning of December 14 and still didn't see any soot
6  being produced by the space heater?
7    A.  That's correct, and that he had a headache
8  and was nauseous.
9    Q.  Okay.  So that's a pretty clear indication
10  that carbon monoxide was being produced before any
11  visible soot?
12        MR. MARCHAN:  Objection, form.
13        MS. SALINAS:  Join the objection.
14    A.  That's an indication.  However -- yes,
15  that's an indication, he felt -- he had a headache
16  and felt dizzy and nauseous --
17    Q.  (BY MR. HENRY)  Okay.
18    A.  -- at 6:00, 6:30 a.m.
19    Q.  What evidence do you have that -- based on
20  the testimony of Rosalinda Perez and Mr. Garcia
21  there, what evidence do you have that the smoke
22  detector should have sounded an alarm before fatal
23  levels of carbon monoxide were produced?
24    A.  As I said earlier, the amount of gas being
25  put into the heater, the amount of carbon monoxide

**Page 185**

1  and where the couch was located, he would receive
2  less carbon monoxide than he would if he were back
3  in the bedroom, in my opinion, because they've got
4  the exit going toward the bedroom in which the
5  gentleman who was killed is located.
6        But the only thing that I have that
7  tells me that it should have alarmed is the fact
8  that you had so much soot, he had -- he was
9  nauseous, et cetera, and where I have the couch
10  marked.  And you don't have this drawing, Page 4 or
11  5 of Jose Garcia's affidavit.  There's not a date on
12  it.  It was for Armstrong Forensic Laboratories this
13  was done.
14        But you would expect, based on the
15  fact that the exit is going toward Manny's room, an
16  exit is going toward the hall where the smoke
17  detector is located -- I would, without question,
18  expect it, the smoke detector, to alarm within 30 or
19  45 minutes at the outside, particularly with a man
20  that's 20 feet away not having anything but nauseous
21  headaches; and a man in the direction of the
22  velocity of the heat and the carbon monoxide and
23  soot, the heavy loading of it, is in the direction
24  of the heater -- of where the heater is blowing
25  these products and the smoke detector is closer than

**Page 186**

1  that as to probably a foot and a half, 2 feet.  It
2  would go off first, in my opinion.
3    Q.  But in order to determine when the smoke
4  detector would alarm, you'd have to know the amount
5  of products being produced by the space heater?  And
6  by the --
7    A.  That's correct.
8    Q.  -- I mean carbon, carbon dioxide,
9  particulate matter, right?
10    A.  That's correct.
11    Q.  And the only way you'd know that is if you
12  know how much fuel is going into the burner element
13  of the heater, right?
14    A.  That's right.
15    Q.  You've already testified that you don't
16  know that, and you can't know that.
17    A.  You don't know that, Armstrong doesn't know
18  it, nobody knows that because nobody knows what the
19  regulator was set at, nobody knows how much gas was
20  going into it.  Therefore, with the sooting and so
21  forth, you'd know there was a lot going in.  What's
22  "a lot"?  Nobody knows, but that "lot" put enough
23  soot in there to cause enough smoke to cause the
24  alarm to go off.  It should have gone off, in my
25  opinion.

## AFFIDAVIT OF JOSE GARCIA

STATE OF TEXAS      :
                        :    S.S.
COUNTY OF CAMERON   :

BEFORE ME, the undersigned authority, on this day personally appeared Jose Garcia, known to me to be the person whose name is subscribed hereto. Being first duly sworn, upon oath as stated as follows:

My name is Jose Garcia. I am over the age of 18 (eighteen) years, of sound mind and I am competent to make this Affidavit. The facts contained in this Affidavit are based upon my personal knowledge and are true and correct. I make this Affidavit freely, voluntarily and without coercion.

I first met Manuel Cruz in 1991 or 1992, after which we became friends. Manny lived at 190 Thomae Lane, San Benito, Texas.

In December, 1997 Manny arranged for a double date between himself and Kenya Sosa, and me and a women named Marrisa. He arranged the date for Sunday, December 14, 1997.

On Sunday December 14th I picked up a hamburger and a coke for Manny and arrived at his house around 12:00 noon. When I arrived, Manny ate his hamburger and then we began to clean his place up and prepare for our double date.

That afternoon we went to H.E.B. and bought things we needed to cook dinner and a twelve pack of beer. We drank some beer while we prepared dinner, chicken alfredo, for our double date. It began to get cold in the afternoon, so Manny

turned on the space heater that was in the living room of his house.

Kenya and Marrisa arrived between 4:30 p.m. and 5:00 p.m. on December 14th. During dinner, Manny and I drank wine, but Kenya and Marrisa did not. After dinner, Manny and I took Kenya and Marrisa for a walk in a park in Harlingen, then we all went to a movie. However, before leaving the house, Kenya told Manny to turn the heater off, and he did.

When the movie let out, we went to an arcade, then stopped by H.E.B. to get cold medicine for Kenya. We got back to Manny's house after 11:00 p.m. and Kenya and Marrisa left. After Kenya and Marrisa left, we went into the house and Manny turned on the heater. We then made a quick trip to H.E.B. for another 12 pack of beer.

When we got back from H.E.B., Manny got a call from a girl named Rose who wanted to come to Manny's house. While we waited for Rose, we drank more beer, smoked cigarettes and watched T.V. However, we only smoked cigarettes outside because Manny did not want us to smoke in his house. We smoked at least a pack of cigarettes over the course of the evening.

Rose arrived at Manny's house with her son and we laughed, joked and listened to music during her visit. Rose and her son left Manny's house between 2 a.m. and 3 a.m. and Manny helped carry her son to the car. After Rose and her son left, Manny and I talked and we planned another date with Kenya and Marrisa. I don't remember how much beer we drank, but I am sure we were both legally intoxicated and not able to drive. Both my sister, Belen, and Rose told us not to drive anywhere.

2

Manny went to bed about 4 a.m. and I laid on the couch, sometimes sleeping, sometimes watching TV. But the more I tried to sleep, I began to get a headache. During the day and into the evening, Manny had left a window above the couch open about 2 inches to 3 inches, but when I laid down on the couch around 4 a.m., I closed the window to about 1 inch because it was cold.

Eventually I fully woke up between 6:00 a.m. and 6:30 a.m. and went to the bathroom. When I woke up, I had a headache and I felt dizzy and nauseous. After going to the bathroom, I yelled a good-bye to Manny as I left, but he did not respond. Because I was tired, had a headache and felt nauseous and dizzy, when I got home I went back to sleep and slept until the afternoon. However, when I awoke, my headache was better but I still felt nauseous.

Attached to this, my Affidavit, is a diagram of Manny's house as it appeared on December 14-15, 1997.

On Monday morning, December 15, 1997, when I left Manny's house, there was no soot or smoke in Manny's house. I was in the living room, kitchen and bathroom and did not see any soot or smoke. The space heater appeared to be operating normally.

I learned of Manny's death on December 17, 1997.

Further Affiant Sayeth not.

_Jose Garcia_
Jose Garcia

SWORN TO AND SUBSCRIBED before Me JOSE GARCIA, on this 1 day of April, 2000, to certify which witness my hand and seal of office.



_Will C. Bodd_
Notary Public, Sate of Texas,
Print Name _William L. Bodden_
My Commission Expires: _11 / 06 / 00_

WILLIAM L. BODDEN
Notary Public
State of Texas
My Commission Expires 11-06-2000

Armstrong Forensic Laboratory, Inc.
Report No: 99GA1585
Page 4 of 5



## AFFIDAVIT OF ROSALINDA PEREZ

STATE OF TEXAS          :
                        :          S.S.
COUNTY OF CAMERON       :

BEFORE ME, the undersigned authority, on this day personally appeared Rosalinda Perez, known to me to be the person whose name is subscribed hereto. Being first duly sworn, upon oath as stated as follows:

My name is Rosalinda Perez. I am over the age of 18 (eighteen) years, of sound mind and I am competent to make this Affidavit. The facts contained in this Affidavit are based upon my personal knowledge and are true and correct. I make this Affidavit freely, voluntarily and without coercion.

I met Manuel Cruz in August 1997, after which we became close friends.

I slept at Manuel Cruz' house at 190 Thomae Lane, San Benito, Texas on Saturday night - Sunday morning, December 13-14, 1997. When I left Manny's house on Sunday morning, December 14, I forgot my contact lenses. I returned to Manny's house at approximately 11:30 p.m. on Sunday evening to pick up my contacts. At the time, I had my son Grant with me. When I arrived at Manny's house, Manny and Jose Garcia were standing outside of his house.

Manny had a space heater in the living room of his house. The space heater was turned "on" during the entire time I was at Manny's Sunday night. During my

visit, I thought it was stuffy in Manny's house and asked him to open the door.

Manny opened the door to the living room and kept it open for awhile to let some

fresh air into the house. While at Manny's house that Sunday night, I did not notice

that the heater produced any noticeable order or smell. While I was at Manny's, the

heater did not produce any soot or smoke.

While visiting with Manny and Mr. Garcia, they drank beer and smoked

cigarettes. I did not drink any alcohol.

I left Manny's house around 2 a.m. on the morning of December 15th.

Because Grant was sleeping, Manny helped carry him down to my car. I arrived

home around 2:30 a.m. and called Manny to let him know that Grant and I got home

safely. I also told Manny that neither he nor Joe Garcia should drive because they

had drank too much beer.

Attached to this, my Affidavit, is a diagram of Manny's house as it appeared

on the weekend of December 13-15, 1997.

A friend notified me on December 17, 1997 that Manny had died.

Further Affiant Sayeth Not.

_____
Rosalinda Perez

SWORN TO AND SUBSCRIBED before Me ROSA LINDA PEREZ, on this _1_ day of
April , 2000, to certify which witness my hand and seal of office.

_____
Notary Public, Sate of Texas

JOEL W. BROTZMAN
Notary Public
State of Texas
Comm. Exp. 04-17-2001

_____

Joel W Brotzman
Printed Name of Notary Public

My Commission Expires: 04-17-2001

PHILA1\1206882\1 077262.000

Armstrong Forensic Laboratory, Inc.
Report No: 99GA1585
Page 4 of 5



Rosalinda Perez   03-02-00

## AFFIDAVIT OF DEWITT S. DAVENPORT, M.D.

STATE OF TEXAS      :
                      : S.S.
COUNTY OF CAMERON  :

      **BEFORE ME,** the undersigned authority, on this day personally appeared Dewitt S. Davenport, M.D., known to me to be the person whose name is subscribed hereto. Being first duly sworn, upon oath as stated as follows:

      My name is Dewitt S. Davenport. I am over the age of 18 (eighteen) years, of sound mind and I am competent to make this Affidavit. The facts contained in this Affidavit are based upon my personal knowledge and are true and correct. I make this Affidavit freely, voluntarily and without coercion.

      I am a pathologist employed by the Valley Baptist Medical Center.

      On December 17, 1997 at 10:30 a.m. I performed an autopsy on Manuel Cruz. My findings were that, at the time of his death, Mr. Cruz had a carboxyhemoglobin level of 49.1% and a blood alcohol of 0.055g/dl. There was no evidence of foul play and no evidence of significant natural disease. Mr. Cruz' larynx, trachia, bronchi and lungs were unremarkable, showing no evidence of soot or smoke inhalation.

      The conclusion I formed based upon the findings of Mr. Cruz' autopsy was that he died of carbon monoxide poisoning before he inhaled any smoke or soot and more than 24 hours before his autopsy.

"As a pathologist with Valley Baptist Medical Center, I am the records custodian for Pathology Department, Valley Baptist Medical Center.

"Attached hereto are three (3) pages of the pathology records at Valley Baptist Medical Center. These documents were prepared at my direction and signed by me.

"These said three (3) pages of records pertaining to Manuel Cruz, deceased, are kept by the Valley Baptist Medical Center, and it was in the regular course of business at Valley Baptist Medical Center, for an employee thereof, with personal knowledge of the act, event or condition recorded to make the memorandum or record or to transmit information thereof to be included in such record and the memorandum was made at or near the time of the act or event recorded or reasonably soon thereafter.

"The autopsy records of Manuel Cruz, deceased, attached hereto are exact duplicates of the originals.

Further Affiant Sayeth Not."

_Dewitt S. Davenport, M.D._

Dewitt S. Davenport, M.D.

SWORN TO AND SUBSCRIBED before Me DEWITT S. DAVENPORT, M.D., on this _17TH_ day of March, 2000, to certify which witness my hand and seal of office.

Notary Public, State of Texas
Printed Name: _ANDREA CHAVEZ_
My Commission Expires: _02-04-2003_

**PATHOLOGY**
P.O. Drawer 2588
Harlingen, Texas 78551

Lawrence J. Dahm, M.D.                    DeWitt S. Davenport, M.D.
Margie W. Cornwell, M.D.                  Wm. Eddy,HT,CT(ASCP)CT(IAC)

January 6, 1998

OA-97-0234                               Date of Autopsy: 12/17/97
CRUZ,MANUEL                              Time of Autopsy: 10:30 a.m.
Authorized by: Justice of the Peace      Performed by: Dr. Davenport
               Bennie Ochoa, III         Assisted by: Argullin/Picacio
                                         Witnessed by: None

====================================================================

FINAL ANATOMIC DIAGNOSES:

   1.  Early decompositional changes (approximately 24 hours of post
       mortem interval).

   2.  Chemical findings of carbon monoxide poisoning (49.1%).


FINAL SUMMARY:

       This man died of carbon monoxide poisoning.  The level was 49.1%.
   The blood alcohol was 0.055 g/dl.  No other evidence of foul play was seen
   and no significant natural disease was identified.


DSD/bpc                          DeWitt S. Davenport, M.D.
01/06/98                                 Pathologist


(continued on next page)

PROPERTY:

The decedent is wearing plaid underwear. No other property is seen.

GROSS DESCRIPTION:

EXTERNAL EXAMINATION:

The body is of a man who is approximately 5 feet, 10 inches and approximately 200 pounds. Livor mortis and rigor mortis are absent. He has short brown hair with male-pattern baldness. The eyes are brown and the mouth is unremarkable. He has skin slip on his back and extensive greenish discoloration from the groin up. The scrotum is edematous. Unidentifiable tattoos are present on the left forearm and left index finger. The right shoulder contains a tattoo of an eagle. No additional abnormalities are seen.

INTERNAL EXAMINATION:

The body is opened in the standard fashion. Organ position is normal. The cavities are dry and the membranes are smooth and glistening. Soft tissue, especially muscle, are bright pink.

CARDIOVASCULAR:

The heart weights 290 gm. The coronary arteries are patent and the chambers and valves are normal.

RESPIRATORY TRACT:

The larynx, trachea, and bronchi are unremarkable. The right and left lungs weigh 530 and 580 gm, respectively, and they are unremarkable.

GASTROINTESTINAL TRACT:

The esophagus is normal. The stomach is empty. The small and large bowel, gallbladder, vermiform appendix, pancreas, and biliary tree of normal. The liver weighs 1120 gm and it is normal.

ENDOCRINE:

No abnormalities are seen in the thyroid or adrenal glands.

HEMIC-LYMPHATIC:

The lymph nodes are normal. The thymus is atrophied, and the bone marrow is dark brown. The spleen weighs 150 gm and is normal.

(continued on next page)

## GENITOURINARY TRACT:

Each kidney weighs 105 gm. The capsule strips with ease revealing a smooth shiny cortical surface. Cortices are normal thickness. The medullae, collecting systems, and urinary bladder are normal.

## MUSCULOSKELETAL/INTEGUMENTARY:

No additional lesions seen.

## CENTRAL NERVOUS SYSTEM:

Not examined.

## MICROSCOPIC EXAMINATION:

Sections of skeletal muscle, lungs, spleen, heart, liver, and kidney were examined microscopically. All show marked autolytic effect. Toxicology, please see attached results.

DSD:bpc

**PATHOLOGY**
P.O. Drawer 2588
Harlingen, Texas 78551


Lawrence J. Dahm, M.D.                    DeWitt S. Davenport, M.D.
Margie W. Cornwell, M.D.                  Wm. Eddy,HT,CT(ASCP)CT(IAC)

January 6, 1998


OA-97-0234                               Date of Autopsy: 12/17/97
CRUZ,MANUEL                              Time of Autopsy: 10:30 a.m.
Authorized by:  Justice of the Peace    Performed by: Dr. Davenport
                Bennie Ochoa, III       Assisted by: Argullin/Picacio
                                        Witnessed by:  None

========================================================================

**FINAL ANATOMIC DIAGNOSES:**

   1.   Early decompositional changes (approximately 24 hours of post
        mortem interval).

   2.   Chemical findings of carbon monoxide poisoning (49.1%).


**FINAL SUMMARY:**

     This man died of carbon monoxide poisoning.  The level was 49.1%.
The blood alcohol was 0.055 g/dl.  No other evidence of foul play was seen
and no significant natural disease was identified.



DSD/bpc                       DeWitt S. Davenport, M.D.
01/06/98                              Pathologist








(continued on next page)

PROPERTY:

The decedent is wearing plaid underwear.  No other property is seen.

GROSS DESCRIPTION:

EXTERNAL EXAMINATION:

The body is of a man who is approximately 5 feet, 10 inches and approximately 200 pounds.  Livor mortis and rigor mortis are absent.  He has short brown hair with male-pattern baldness.  The eyes are brown and the mouth is unremarkable.  He has skin slip on his back and extensive greenish discoloration from the groin up.  The scrotum is edematous. Unidentifiable tattoos are present on the left forearm and left index finger.  The right shoulder contains a tattoo of an eagle.  No additional abnormalities are seen.

INTERNAL EXAMINATION:

The body is opened in the standard fashion.  Organ position is normal.  The cavities are dry and the membranes are smooth and glistening. Soft tissue, especially muscle, are bright pink.

CARDIOVASCULAR:

The heart weights 290 gm.  The coronary arteries are patent and the chambers and valves are normal.

RESPIRATORY TRACT:

The larynx, trachea, and bronchi are unremarkable.  The right and left lungs weigh 530 and 580 gm, respectively, and they are unremarkable.

GASTROINTESTINAL TRACT:

The esophagus is normal.  The stomach is empty.  The small and large bowel, gallbladder, vermiform appendix, pancreas, and biliary tree of normal.  The liver weighs 1120 gm and it is normal.

ENDOCRINE:

No abnormalities are seen in the thyroid or adrenal glands.

HEMIC-LYMPHATIC:

The lymph nodes are normal.  The thymus is atrophied, and the bone marrow is dark brown.  The spleen weighs 150 gm and is normal.

(continued on next page)

## GENITOURINARY TRACT:

Each kidney weighs 105 gm.  The capsule strips with ease revealing a smooth shiny cortical surface.  Cortices are normal thickness.  The medullae, collecting systems, and urinary bladder are normal.

## MUSCULOSKELETAL/INTEGUMENTARY:

No additional lesions seen.

## CENTRAL NERVOUS SYSTEM:

Not examined.

## MICROSCOPIC EXAMINATION:

Sections of skeletal muscle, lungs, spleen, heart, liver, and kidney were examined microscopically.  All show marked autolytic effect.  Toxicology, please see attached results.

DSD:bpc



**JUSTICE OF THE PEACE**

**BENNIE OCHOA III**
P.O. BOX 1563
302 QUEEN ISABELLA BLVD.
IBC BANK BLDG. 2ND FLOOR
PORT ISABEL, TEXAS 78578
(210) 943 2520

*U30683   0820*
*MORGUE-2785*
*CRUZ, MANUEL*
*AID*

*CA-97-0234*

12-17-97
_____
Date

To: *Valley Baptist Hospital*
*Harlingen Texas*
_____

Subject:        Request for Autopsy

     I, Bennie Ochoa III, Justice of the Peace, Pct. 1, Place 1, Cameron County,
Texas, do hereby authorize the Representative of said hospital to make a
complete examination of the body of the following named deceased with removal
of such tissues or organs as may be necessary to determine the cause of death.

Name of deceased *Manuel Cruz*
Age *09*  Race *Hispanic White Male*
Address *Tomae Lane*     *Green Valley Farms*
Location where body found *bedroom*

_____

Other Information *possible cause of death (Carbon*
*Monoxide poisoning)*
*pronounced dead at 1240 AM  12-17-97*

_____
Bennie Ochoa III, Justice of the Peace
Pct. 1,   Place 1
Port Isabel, Texas 78578

Not printed or mailed at State or County Expense

Fax copy
to
Investigator
Jimmy Vasquez
Sheriff's Dept
544-0878

OA-97-0234
Manuel Cruz

`DEC. -26'97(FRI) 09:54    PA1 .OGY                          9563891173                    P. 001`

```
┌─────────────────────────────────────────────────────────────────────────────┐
│                                                                               │
│  TRANSACTION REPORT                                                           │
│                                                                               │
│  Transmission                                                                 │
│  Transaction(s) completed                                                     │
│                                                                               │
│                                                                               │
│  NO.  TX DATE/TIME    DESTINATION              DURATION  PGS.   RESULT  MODE   │
│                                                                               │
│  293 DEC. 26 09:53   9565440878               0' 00' 47'  002    OK     N  ECM │
│                                                                               │
└─────────────────────────────────────────────────────────────────────────────┘
```



**Valley Baptist Medical Center**

2101 Pease Street  P.O. Drawer 2588  Harlingen, Texas 78550  (512) 421-1100

## FAX (956) 389-1173

### FACSIMILE COVER PAGE

### CONFIDENTIAL

### IMPORTANT NOTICE

This message is intended only for the use of the individual or
entity to which it is addressed.  It may contain information that is
privileged, confidential and exempt from disclosure under law.  If
the reader of this message is not the intended recipient, or the
employee or agent responsible for delivering the message to the
intended recipient, you are notified that any dissemination,
distribution or copying of this communication is strictly prohibited.
If you have received this communication in error, please notify us
immediately by telephone, and return the original message to us at
the above address via the United States Postal Service.  Thank you.

TO:    _Investigator Jimmy Vasquez_

FROM:  _Pathology_

DATE:  _12/26_

TIME:  _9:30    am_

NUMBER OF PAGES (Including this page):    _2_

JAN. -06'98 (TUE) 14:53      P    )LOGY                    ᴗ:9563891173                  P. 001



TRANSACTION REPORT

Transmission
Transaction(s) completed

| NO. | TX DATE/TIME | DESTINATION | DURATION | PGS. | RESULT | MODE |
|---|---|---|---|---|---|---|
| 348 | JAN. 6 14:51 | 9565440878 | 0° 01' 50" | 006 | OK | N ECM |

## Valley Baptist Medical Center

2101 Pease Street  P.O. Drawer 2588  Harlingen, Texas 78550  (512) 421-1100

FAX (956) 389-1173

### FACSIMILE COVER PAGE

#### CONFIDENTIAL

#### IMPORTANT NOTICE

This message is intended only for the use of the individual or
entity to which it is addressed.  It may contain information that is
privileged, confidential and exempt from disclosure under law.  If
the reader of this message is not the intended recipient, or the
employee or agent responsible for delivering the message to the
intended recipient, you are notified that any dissemination,
distribution or copying of this communication is strictly prohibited.
If you have received this communication in error, please notify us
immediately by telephone, and return the original message to us at
the above address via the United States Postal Service.  Thank you.

TO: _Investigator Jimmy Vasquez_
_Cameron County Sheriff's Dept_

FROM: _Pathology_

DATE: _1/6/98_

TIME: _2:20 pm_

NUMBER OF PAGES (Including this page): _6_

FAX Report
(prelim & Final)
to Major Reyna
FAX # 544-0878

PATHOLOGY
P.O. Drawer 2588
Harlingen, Texas 78551


Lawrence J. Dahm, M.D.                     DeWitt S. Davenport, M.D.
Margie W. Cornwell, M.D.                   Wm. Eddy,HT,CT(ASCP)CT(IAC)


December 23, 1997


OA-97-0234                          Date of Autopsy: 12/17/97
CRUZ,MANUEL                         Time of Autopsy: 10:30 a.m.
Authorized by:  Justice of the Peace    Performed by: Dr. Davenport
                Bennie Ochoa, III       Assisted by: Argullin/Picacio
                                        Witnessed by:  None


===========================================================================

**PRELIMINARY ANATOMIC DIAGNOSES:**

1. Early decompositional changes (approximately 24 hours of post
   mortem interval).

2. Chemical findings of carbon monoxide poisoning (49.1%).


**PRELIMINARY SUMMARY:**

This man died of carbon monoxide poisoning.  The level was 49.1%.
The blood alcohol was 0.055 g/dl.  No other evidence of foul play was seen
and no significant natural disease was identified.


DSD/bpc                        DeWitt S. Davenport, M.D.
12/23/97                            Pathologist


(continued on next page)

```
12/19/19        VALLEY BAPTIST MEDICAL CENTER          AUTO RESULT REPORT
   18:10        DEPARTMENT OF LABORATORY MEDICINE               PAGE      1
NAME: CRUZ,MANUEL
H#  : MORGUE-2785         LOC: MORGUE              AGE: 29Y    SEX: M
ACCT: 000000000


 W30684    COLL: 12/17/97 08:52   REC: 12/17/97 08:53 PHYS: CORNWELL,MARGIE

   ALCOHOL SERUM          H 0.055  [0-0]          G/DL
```

```
12/17/19          VALLEY BAPTIST MEDICAL CENTER              AUTO RESULT REPORT
   09:14          DEPARTMENT OF LABORATORY MEDICINE                   PAGE     1
NAME: CRUZ,MANUEL
H#  : MORGUE-2785          LOC: MORGUE              AGE: 29Y    SEX: M
ACCT: 000000000


   W30684    COLL: 12/17/97 08:52  REC: 12/17/97 08:53 PHYS: CORNWELL,MARGIE

   CARBON MONOXIDE          * 49.1   [0.5-5]          %
                            RESULT CHECKED
```

PATHOLOGY
P.O. Drawer 2588
Harlingen, Texas 78551


Lawrence J. Dahm, M.D.                    DeWitt S. Davenport, M.D.
Margie W. Cornwell, M.D.                  Wm. Eddy,HT,CT(ASCP)CT(IAC)

                        December 23, 1997


OA-97-0234                        Date of Autopsy:  12/17/97
CRUZ,MANUEL                       Time of Autopsy: 10:30 a.m.
Authorized by:  Justice of the Peace    Performed by: Dr. Davenport
                Bennie Ochoa, III        Assisted by: Argullin/Picacio
                                  Witnessed by:  None

====================================================================

PRELIMINARY ANATOMIC DIAGNOSES:

    1.  Early decompositional changes (approximately 24 hours of post
        mortem interval).

    2.  Chemical findings of carbon monoxide poisoning (49.1%).


PRELIMINARY SUMMARY:

    This man died of carbon monoxide poisoning.  The level was 49.1%.
The blood alcohol was 0.055 g/dl.  No other evidence of foul play was seen
and no significant natural disease was identified.


DSD/bpc                        DeWitt S. Davenport, M.D.
12/23/97                             Pathologist

(continued on next page)

OA-97-0234  CRUZ,MANU.  (continued)                          PAGE 2

PROPERTY:

     The decedent is wearing plaid underwear.  No other property is seen.

GROSS DESCRIPTION:

EXTERNAL EXAMINATION:

     The body is of a man who is approximately 5 feet, 10 inches and
approximately 200 pounds.  Livor mortis and rigor mortis are absent.  He
has short brown hair with male-pattern baldness.  The eyes are brown and
the mouth is unremarkable.  He has skin slip on his back and extensive
greenish discoloration from the groin up.  The scrotum is edematous.
Unidentifiable tattoos are present on the left forearm and left index
finger.  The right shoulder contains a tattoo of an eagle.  No additional
abnormalities are seen.

INTERNAL EXAMINATION:

     The body is opened in the standard fashion.  Organ position is
normal.  The cavities are dry and the membranes are smooth and glistening.
Soft tissue, especially muscle, are bright pink.

CARDIOVASCULAR:

     The heart weights 290 gm.  The coronary arteries are patent and the
chambers and valves are normal.

RESPIRATORY TRACT:

     The larynx, trachea, and bronchi are unremarkable.  The right and
left lungs weigh 530 and 580 gm, respectively, and they are unremarkable.

GASTROINTESTINAL TRACT:

     The esophagus is normal.  The stomach is empty.  The small and large
bowel, gallbladder, vermiform appendix, pancreas, and biliary tree of
normal.  The liver weighs 1120 gm and it is normal.

ENDOCRINE:

     No abnormalities are seen in the thyroid or adrenal glands.

HEMIC-LYMPHATIC:

     The lymph nodes are normal.  The thymus is atrophied, and the bone
marrow is dark brown.  The spleen weighs 150 gm and is normal.

(continued on next page)

OA-97-0234   CRUZ,MANU.   (continued)                              PAGE 3

### GENITOURINARY TRACT:

Each kidney weighs 105 gm.  The capsule strips with ease revealing a smooth shiny cortical surface.  Cortices are normal thickness.  The medullae, collecting systems, and urinary bladder are normal.

### MUSCULOSKELETAL/INTEGUMENTARY:

No additional lesions seen.

### CENTRAL NERVOUS SYSTEM:

Not examined.

```
12/19/19          VALLEY bᴀPTIST MEDICAL CENTER          AUTO RESULT REPORT
 .18:10        DEPARTMENT OF LABORATORY MEDICINE                    PAGE    1
NAME: CRUZ,MANUEL
H#  : MORGUE-2785          LOC: MORGUE              AGE: 29Y   SEX: M
ACCT: 000000000


   W30684    COLL: 12/17/97 08:52  REC: 12/17/97 08:53 PHYS: CORNWELL,MARGIE

    ALCOHOL SERUM          H 0.055  [0-0]          G/DL
```

```
12/17/19        VALLEY bаᴘTIST MEDICAL CENTER        AUTO RESULT REPORT
.09:14          DEPARTMENT OF LABORATORY MEDICINE               PAGE    1
NAME: CRUZ,MANUEL
H#  : MORGUE-2785        LOC: MORGUE          AGE: 29Y   SEX: M
ACCT: 000000000
```

```
W30684    COLL: 12/17/97 08:52  REC: 12/17/97 08:53 PHYS: CORNWELL,MARGIE

   CARBON MONOXIDE          *  49.1   [0.5-5]        %
                               RESULT CHECKED
```

O234

```
12/26/19        VALLEY BAPTIST MEDICAL CENTER              AUTO RESULT REPORT
· ·10:17        DEPARTMENT OF LABORATORY MEDICINE                    PAGE    1
NAME: CRUZ,MANUEL
H#  : MORGUE-2785          LOC: MORGUE              AGE: 29Y    SEX: M
ACCT: 000000000


 W30866    COLL: 12/17/97 11:30  REC: 12/17/97 11:55 PHYS:·DAVENPORT, DEWITT S

   MISC. SENDOUTS
      TEST NAME              DRUG SCREEN NMS TEST CODE 8102
      TEST RESULTS           PENDING
      REFERENCE LAB          PENDING
```

O A- 92 0231

Thursday, December 11, 1997

# Ex-Port Isabel officer's death probed

Valley Morning Star

SAN BENITO — Cameron County sheriff's deputies Wednesday were investigating the death of a former Port Isabel police officer.

The former officer, Manuel Cruz, 29, of San Benito, appeared to have died of carbon monoxide poisoning, sheriff's spokesman Mary Guy Reyna said.

Cruz was found at 11:25 p.m. Tuesday in the bedroom of his home at 190 Thomae St. in the Green Valley Farms colonia.

Reyna said Cruz was found by his girlfriend, who then called the sheriff's department.

Authorities estimate Cruz had been dead for about a day.

Reyna said preliminary autopsy results indicated that Cruz had a high volume of carbon monoxide in his system.

Authorities said they believe the carbon monoxide was emitted from a gas heater in the home.

PATHOLOGY
P.O. Drawer 2588
Harlingen, Texas 78551


Lawrence J. Dahm, M.D.                    DeWitt S. Davenport, M.D.
Margie W. Cornwell, M.D.                  Wm. Eddy,HT,CT(ASCP)CT(IAC)

December 23, 1997


OA-97-0234                           Date of Autopsy:  12/17/97
CRUZ,MANUEL                          Time of Autopsy: 10:30 a.m.
Authorized by:  Justice of the Peace   Performed by: Dr. Davenport
                Bennie Ochoa, III      Assisted by: Argullin/Picacio
                                       Witnessed by:  None

=============================================================================

## PRELIMINARY ANATOMIC DIAGNOSES:

1. Early decompositional changes (approximately 24 hours of post mortem interval).

2. Chemical findings of carbon monoxide poisoning (49.1%).


## PRELIMINARY SUMMARY:

This man died of carbon monoxide poisoning.  The level was 49.1%. The blood alcohol was 0.055 g/dl.  No other evidence of foul play was seen and no significant natural disease was identified.


DSD/bpc                       DeWitt S. Davenport, M.D.
12/23/97                              Pathologist


(continued on next page)

Name _Maurer Cerey_    Autopsy no. _0497-034_

Age _____ Race _____ Sex _____ Date _ / / _    Diener: _Ted_
Time _____                                              _AA_

Hair: _Mousdant balde_

Eyes: _brow_

Mouth: _OK_

Height: _5'10"_

Weight: _200_

Livor  (NO)  Y

Rigor  (NO)  Y

Skin SF on Arell

tatoos "n hu eagle

tatoo

Groin

Distended

Circumcised: No Y

Cm Fat: _____

Smell of alcohol:
    No  Y

X-ray:  No  Y

Blood:
    Femoral
    Heart
    No .

Urine:  No  Y

Bile: No  Y

Tissue for Toxicology: No  Y

Gross Photos: No  Y

Clothing:  _underwear plaid_

*Int soft tissues pial*

**H ORY:**

**Witness:** No Y    **Name:**

**Chain of custody:** No Y    **Items:**

**HEART:** 290

**RT LUNG:** 430

**LT LUNG:** 580

**LIVER:** 1/70

**SPLEEN:** (50)

**RT KIDNEY:** 105

**LT KIDNEY:** 105

**BRAIN:**

*Stomach empty*

*A × ⊕*

*GB⊕*

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

NAME : RUIZ,MANUEL
ADDR: MERCURR-1735        LOC  KREENE                    AGE   M  R  AL       PT       B
MR/RG: 00000010

W30684  COLL. 12 17 97  SPEC RECV  2 17 97  SUFF PHYS: JOHNSON    MTL

ALCOHOL SERUM          H 0.055  00-02      G DL

CARBON MONOXIDE        H 48.0   00.5-52    %
                       RESULT CHECKED

SPECimeN IN Frig Door
12-19-97  [symbol]
        6:10 PM

MAYO
MEDICAL LABORATORIES

200 ___ Street Southwest          800-533-1710
Roc ___ r, Minnesota 55905

| PATIENT NAME | PATIENT NUMBER | AGE | SEX | LAB. CONTROL NO. |
|---|---|---|---|---|
| CRUZ, MANUEL | MORGUE-2785 | 29 | M | J900791 |

| REFERRING PHYSICIAN | PURCHASE NUMBER | ACCOUNT NUMBER |
|---|---|---|
| 288, DAVENPORT, DEWITT S. | W30866 | C7016993 |

| COLLECTION | | RECEIVED | | REPORT PRINTED | | SPECIMEN INFORMATION |
|---|---|---|---|---|---|---|
| 12/17/97  1130 | | 12/19/97  12:19PM | | 01/28/98  7:21AM | | DATE OF BIRTH: 01/01/1968 |
| DATE TIME | | DATE TIME | | DATE TIME | | |

Valley Baptist Hospital
Attn: Lab
P O Drawer 2588
2101 Pease St
Harlingen, TX 78550
Tel : 956-389-4500

| TEST REQUESTED | HI LO | RESULTS | UNITS | EXPECTED VALUES |
|---|---|---|---|---|

DRUG SCREEN NMS TEST CODE 8102
        RESULTS FAXED AND MAILED 1/23/98

                TEST PERFORMED BY
                NATIONAL MEDICAL SERVICES, INC.
                3701 WELSH ROAD
                PO BOX 433A
                WILLOWGROVE, PA 19090-0437

LABORATORY DIRECTOR: LESTER E. WOLD, M.D.

LABORATORY SERVICE REPORT  MC 1359-01/R896

| PATIENT NAME | TEST NAME | COLLECTION DATE AND TIME |
|---|---|---|
| CRUZ, MANUEL | DRUG SCREEN NMS TEST CODE 8102 | 12/17/97  1130 |



# National Medical Services, Inc.

*Toxicology Specialists Worldwide Since 1970*

3701 Welsh Road
Willow Grove, PA 19090
Phone: (215) 657-4900
1-800-522-6671
Fax: (215) 657-2972

January 22, 1998

TO:   Mayo Medical Laboratories
      200 1st Street S.W.
      Referrals - 252 Hilton Bldg.
      Rochester, MN  55905

**TOXICOLOGY REPORT OF:   CRUZ, Manuel   (J900791) 29/M**
      NMS Control No.:       127897
      NMS Accession No.:     97-211025

**SPECIMENS:**         Two gray top tubes each containing ~5 mL blood were received on 12/23/97.

**EXAMINATION:**       Analysis Requested - Panel 8102 - Autopsy Toxicology Therapeutic and Abused Drug Screen.

**FINDINGS:**

**Blood**

        ETHYL ALCOHOL                                        31 mg/dL (BAC=0.03% w/v)
        (by Enzyme Immunoassay & Headspace GC)

        Other than the above findings, examination of the specimens submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

**COMMENTS:**

        Ethyl alcohol is a CNS-depressant and has effects so-related, e.g., impaired judgment, alertness and coordination.

        If the determined blood alcohol concentration (BAC) is representative of the circulating BAC at the time of the fatal incident, then it represents as absorbed body burden of approximately 1 to 2 "drinks" of an alcoholic beverage in an adult of average size weighing approximately 155 lbs.

        Note: a "drink" = 1 oz. of distilled spirits
                           4 oz. of wine
                          12 oz. of beer

        Each of the drinks listed above contains about the same amount of ethyl alcohol.

                                                    Respectfully,

                                                    Lee M. Blum, Ph.D., DABFT
                                                    Forensic Toxicologist

LMB/seh

This analysis was performed under chain of custody. The chain of custody documentation is on file at National Medical Services, Inc.

The data generated in the determination of the results contained in this report are scheduled to be discarded eighteen (18) months from the date of the original report, unless alternate arrangements are made by you prior thereto.

The remainder of the submitted specimens are scheduled to be discarded six (6) weeks from the date of this report unless alternate arrangements are made by you prior thereto.

**\*\*\*\* \*\*\*\* ANALYSIS SUMMARY \*\*\*\* \*\*\*\***

**8102 - Therapeutic and Abused Drug Screen**

Test No. 8102 - Drug Screen by Enzyme Immunoassay on Blood for: AMPHETAMINES, BARBITURATES, BENZODIAZEPINES, BENZOYLECGONINE (COCAINE), CANNABINOIDS (MARIHUANA), METHADONE, METHAQUALONE, OPIATES, PHENCYCLIDINE (PCP) and PROPOXYPHENE; Enzymatic Assay for: ALCOHOL.

Test No. 0170- Alcohol Panel - Headspace Gas Chromatography on Blood for: ALCOHOLS, ACETONE, ACETALDEHYDE AND ISOPROPYL ALCOHOL.

Test No. 8102 – Drug Screen Panel II – Gas Chromatography of Extracts on Blood for: BELLADONNA-, CINCHONA-, ERGOT-, METHYLXANTHINE- AND STRYCHNOS-ALKALOIDS, AMPHETAMINE AND AMPHETAMINE-LIKE SYMPATHOMIMETICS, ANTIEPILEPTICS, ANTIHISTAMINES, ANTIPSYCHOTICS (INCLUDING PHENOTHIAZINES, TRI-AND TETRACYCLICS), BARBITURATE AND NON-BARBITURATE HYPNOSEDATIVES, LOCAL ANESTHETICS, NON-DIGITALIS CARDIOREGULATORIES, NON-LSD HALLUCINOGENS, ORAL HYPOGLYCEMICS (TOLBUTAMIDE, CHLORPROPAMIDE), SYNTHETIC ANTICHLORINERGICS, AND SYNTHETIC MORPHINE SUBSTITUTE NARCOTIC ANALGESICS.

Test No. 8102 - Colorimetric Analysis on Blood for: SALICYLATES, ACETAMINOPHEN and ETHCHLORVYNOL.

**\* \* \* \* \* END OF REPORT \* \* \* \* \***

Dr. Davenport

 **National Medical Services, Inc.**

*Toxicology Specialists Worldwide Since 1970*

3701 Welsh Road
Willow Grove, PA 19090
Phone (215) 657-4900 —
1-800-522-667
Fax (215) 657-2972

January 22, 1998

TO:     Mayo Medical Laboratories
        200 1st Street S.W.
        Referrals - 252 Hilton Bldg.
        Rochester, MN 55905

TOXICOLOGY REPORT OF:   CRUZ, Manuel   (J900791)  29/M
        NMS Control No.:        127897
        NMS Accession No.:      97-211025

SPECIMENS:      Two gray top tubes each containing ~5 mL blood were received on 12/23/97.

EXAMINATION:    Analysis Requested - Panel 8102 - Autopsy Toxicology Therapeutic and Abused Drug Screen.

FINDINGS:

Blood

        ETHYL ALCOHOL                                       31 mg/dL (BAC=0.03% w/v)
        (by Enzyme Immunoassay & Headspace GC)

        Other than the above findings, examination of the specimens submitted did not reveal any positive findings of toxicological
        significance by procedures outlined in the accompanying Analysis Summary.

COMMENTS:

        Ethyl alcohol is a CNS-depressant and has effects so-related, e.g., impaired judgment, alertness and coordination.

        If the determined blood alcohol concentration (BAC) is representative of the circulating BAC at the time of the fatal incident,
        then it represents an absorbed body burden of approximately 1 to 2 "drinks" of an alcoholic beverage in an adult of average
        size weighing approximately 153 lbs.

        Note: a "drink" = 1 oz. of distilled spirits
                           4 oz. of wine
                           12 oz. of beer

        Each of the drinks listed above contains about the same amount of ethyl alcohol.

                                                        Respectfully,

                                                        Lee M. Blum, Ph.D., DABFT
                                                        Forensic Toxicologist

LMB/seh

NMS Control No.: 127897
Page 2

This analysis was performed under chain of custody.  The chain of custody documentation is on file at National Medical Services, Inc.

The data generated in the determination of the results contained in this report are scheduled to be discarded eighteen (18) months from the date of the original report, unless alternate arrangements are made by you prior thereto.

The remainder of the submitted specimens are scheduled to be discarded six (6) weeks from the date of this report unless alternate arrangements are made by you prior thereto.

**** ****    ANALYSIS SUMMARY    **** ****

8102 - Therapeutic and Abused Drug Screen

Test No. 8102 - Drug Screen by Enzyme Immunoassay on Blood for: AMPHETAMINES, BARBITURATES, BENZODIAZEPINES, BENZOYLECGONINE (COCAINE), CANNABINOIDS (MARIHUANA), METHADONE, METHAQUALONE, OPIATES, PHENCYCLIDINE (PCP) and PROPOXYPHENE; Enzymatic Assay for: ALCOHOL.

Test No. 0170- Alcohol Panel - Headspace Gas Chromatography on Blood for: ALCOHOLS, ACETONE, ACETALDEHYDE AND ISOPROPYL ALCOHOL.

Test No. 8102 – Drug Screen Panel II – Gas Chromatography of Extracts on Blood for: BELLADONNA-, CINCHONA-, ERGOT-, METHYLXANTHINE- AND STRYCHNOS-ALKALOIDS, AMPHETAMINE AND AMPHETAMINE-LIKE SYMPATHOMIMETICS, ANTIEPILEPTICS, ANTIHISTAMINES, ANTIPSYCHOTICS (INCLUDING PHENOTHIAZINES, TRI-AND TETRACYCLICS), BARBITURATE AND NON-BARBITURATE HYPNOSEDATIVES, LOCAL ANESTHETICS, NON-DIGITALIS CARDIOREGULATORIES, NON-LSD HALLUCINOGENS, ORAL HYPOGLYCEMICS (TOLBUTAMIDE, CHLORPROPAMIDE), SYNTHETIC ANTICHLORINERGICS, AND SYNTHETIC MORPHINE SUBSTITUTE NARCOTIC ANALGESICS.

Test No. 8102 - Colorimetric Analysis on Blood for: SALICYLATES, ACETAMINOPHEN and ETHCHLORVYNOL.

* * * * *    END OF REPORT    * * * * *

# MARK A. CANTU
## ATTORNEY AT LAW

**ASSOCIATES**

**GLENN D. ROMERO**

**JUAN A. GONZALEZ**

February 7, 2003

Elizabeth G. Neally
**ROERIG, OLIVEIRA & FISHER, L.L.P.**
855 West Price Road, Suite 9
Brownsville, Texas 78520

Via Facsimile (956) 542-0016
and First Class Mail

Mr. James Heller
**COZEN & O'CONNOR**
1900 Market Street
Philadelphia, PA 19103

Via Facsimile (215) 665-2013
and First Class Mail

RE:     Civil Action No. B98-186; Jose Garcia, et al, Cynthia Cox vs. BRK Brands, Inc.;
        Southern District of Texas, Brownsville Division

Dear Ms. Neally and Mr. Heller:

Please be advised that this letter is intended to advise you that Plaintiffs will be using the deposition of David Minnis and the videotaped interview, and transcription thereof, of Emma Lomberos pursuant to Rule 32(a)(4). Please let me know if you need to re-depose the said witnesses for this case.

Should you have any questions, please do not hesitate to call me.

Sincerely,

**LAW OFFICE OF MARK A. CANTU**

Juan A. Gonzalez
Attorney at Law

*Signed for Mr. Gonzalez in his absence
to prevent delay.*

JAG/ac

cc:     Mr. Ray R. Marchan
        **WATTS LAW FIRM**
        1926 East Elizabeth
        Brownsville, Texas  78520



**1**

```
1
2
3        UNITED STATES DISTRICT COURT
4        WESTERN DISTRICT OF WISCONSIN
5    SHAWN D. WERNER, Individually,
     and as surviving spouse of TERYL L. WERNER,
6    and as Personal Representative of the
     ESTATE OF DREW T. WERNER and        )
7    ESTATE OF KAEDYN M. WERNER,
     Plaintiffs,
8
9        vs.
10   PITTWAY CORPORATION, BRK BRANDS, INC.
     COLE, DEF INSURANCE COMPANY, DEF INSURANCE
11   COMPANY,
         Defendants,
12
     and                    )Case
13   GOLDEN RULE INSURANCE COMPANY and    )98
14   NATIONAL GUARDIAN LIFE INSURANCE
     COMPANY
15       Defendants-
16       Subrogees.
17       The Evidence Deposition of JAMES H.
18   WOODBURN, taken in the above-entitled cause before
19   Diane Hromek, Certified Shorthand Reporter and
20   videographed by Craig Sinnott; in the State of
21   Illinois and Notary Public within the County of
22   DuPage, at DuPage County Airport, 2700
23   International Drive, West Chicago, Illinois, on the
24   2nd day of August, 1998, at 1:00 o'clock p.m.
```

**2**

```
1    PRESENT:
2        FETTERLY & GORDON, P.A.
         BY: MR. STEVEN LICKTEIG
3        880 First Bank Place
         330 Third Avenue South
4        Minneapolis, Minnesota 55402
         Phone: 612-335-5411
5        Fax: 612-335-4411
         E-mail: slickteig@fetterly.com
6        Appeared on behalf of the plaintiffs.
7        COZEN AND O'CONNOR
         BY: MR. ROBERT V. HAYES
8        The Atrium
         1900 Market Street
9        Philadelphia, PA 19103
         Phone: 215-665-2093
10       Fax: 215-665-2013
         E-mail: rhayes@cozen.com
11       Appeared on behalf of the defendant,
         Pittway Corporation, and BRK Brands, Inc.
12   ALSO PRESENT:
13       TRIALVIDEO/DEPOVISION, LTD.
         20 N. Clark Street, Suite 707
14       Chicago, Illinois 60602
         Phone: 312-263-4001
15       Fax: 312-263-4019
16
17
18
19
20
21
22
23
24
```

**3**

```
1            I N D E X
2    JAMES H. WOODBURN                PAGE
3    Direct Examination
     By: Mr. Lickteig                   5
4    Cross-Examination
     By: Mr. Hayes                    120
5    Re-Direct Examination
     By: Mr. Lickteig                 155
6    Re-Cross Examination
     By: Mr. Hayes                    173
7    Re-Direct Examination
     By: Mr. Lickteig                 175
8    Re-Cross Examination
     By: Mr. Hayes                    177
9
10
11
12   EXHIBITS                        PAGE
         57
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
1        THE VIDEOGRAPHER:  We are going on the
2    record.
3        My name is Craig Sinnott, I'm a
4    video technician for Depovision located at 20 North
5    Clark Street Chicago, Illinois.
6        The date is August 2nd, 1998,
7    and the time is 1:14 p.m.
8        We are present here today at
9    2700 International Drive, West Chicago, Illinois
10   with reference to the case entitled Shawn D. Werner
11   et al, versus Pittway Corporation, et al; pending
12   in the United States District Court of Wisconsin,
13   case No. 98 C0186 C.
14       The witness is James H.
15   Woodburn.
16       An audio-visual recording of
17   this deposition is at the request of plaintiff.
18       If the court reporter could
19   please identify herself and swear in the witness
20   please.
21       (Whereupon, the court reporter
22       introduced herself.)
23       JAMES H. WOODBURN,
24   after having first been duly sworn, deposeth and
```

**5**

```
1    saith as follows:
2        DIRECT EXAMINATION
3        BY: MR. LICKTEIG
4        Q.  Mr. Woodburn, I will introduce myself,
5    briefly. My name is Steven Lickteig, I'm a lawyer
6    with Fetterly & Gordon in Minneapolis, and I'm
7    representing the Shawn D. Werner family in
8    connection with some litigation lawsuit, if you
9    will, against the Pittway Corporation and BRK
10   Brands, Inc., related to a fire and related to
11   allegations of the malfunction of a smoke detector
12   and a carbon monoxide detector.
13       During today's deposition, I
14   will be proceeding first.  I will be asking you
15   some questions.
16       Present, also, and he will
17   introduce himself as the record proceeds, is a Mr.
18   Robert Hayes, who represents Pittway Corporation
19   and BRK Brands, Incorporated.
20       Does that give you a brief
21   introduction of who I am and what my purpose is
22   here, Mr. Woodburn?
23       A.  Yes, sir?
24       MR. HAYES:  Objection, move to destroy
```

**6**

```
1    counsel's testimony.
2        BY MR. LICKTEIG:
3        Q.  Let me first of all ask you to give
4    your full name, for the record, please?
5        A.  James H. Woodburn.
6        Q.  Where do you live, Mr. Woodburn?
7        A.  562 Roberts Lane, in Batavia,
8    Illinois.
9        Q.  And where do you currently work?
10       A.  I work with Pro Tech Plastics,
11   Incorporated, in West Chicago.
12       Q.  And what is your position there?
13       A.  I'm the Director of Engineering.
14       Q.  Briefly, what is that business about?
15   What is your job as Director of Engineering?
16       A.  We're a custom injection molder of
17   plastic parts.
18       Our business is primarily
19   automatic motive related, but auto and decorative
20   bezels.
21       My job involves advising my
22   customers as to design improvements for injection
23   molding, to make things more manufacturable, their
24   designs.
```

## 67

1  manufactured by BRK from beginning of the 1990's
2  through the time you left in September of 1993?
3  Did they utilize this pressure contact type of
4  design?
5     A.  What was the starting date --
6     Q.  Back to --
7     A.  -- referred to?
8     Q.  -- the beginning of 1990, the early
9  1990's?
10    A.  No, they were not always pressure
11 contacts.
12    Q.  Were they from 1985 forward?
13    A.  I'm not sure the exact date we altered
14 the design.
15    Q.  Okay.
16       Was it in that general time
17 period?
18    MR. HAYES: Objection, vague and ambiguous
19 as to what is meant by that "general time frame?"
20    THE WITNESS: I would -- I would say early
21 80's.
22 BY MR. LICKTEIG:
23    Q.  That's when the pressure contacts
24 design began or was utilized in the -- in the

## 68

1  detector line. I wanted to make sure -- we have --
2  I understand what you're saying.
3     A.  This? Approximately that time frame.
4     Q.  Okay, and that pressure contact design
5  feature was utilized, then, up through the time
6  period in which you left, September of '93?
7     MR. HAYES: Objection, vague and ambiguous.
8  What is meant by that pressure contact feature.
9     THE WITNESS: Pressure contacts were used,
10 yes.
11    MR. LICKTEIG: Okay.
12 BY MR. LICKTEIG:
13    Q.  Did you have design responsibilities
14 relative to the P-Horn?
15    MR. HAYES: Objection, vague and ambiguous.
16    THE WITNESS: Yes, I had some design
17 responsibilities.
18 BY MR. LICKTEIG:
19    Q.  Did you have design responsibility
20 relative to the pressure contact design at any
21 period of time?
22    A.  Yes, I did.
23    Q.  Describe that for us.
24    A.  I tested various configurations and

## 69

1  materials.
2       I had responsibility for the
3  documentation of these designs based on the input I
4  had from my supervisors.
5       I did the corrosion testing
6  in-house to evaluate designs.
7     Q.  Did you ever talk with the -- to
8  anyone about this incident that you have told us
9  about involving Mr. Minnis and lubricating the --
10 the contacts -- other than what you have told us
11 about with the conversations with Mr. Reagan and
12 Hayes and the lawyers from DC.
13    MR. HAYES: Objection, vague and ambiguous.
14       Misstates the witness'
15 testimony.
16    THE WITNESS: Since I left BRK, I've talked
17 to Dave Minnis about it.
18 BY MR. LICKTEIG:
19    Q.  And on how many occasions is?
20    A.  No more than twice.
21    Q.  Okay, when was that first occasion?
22    A.  I can't remember, exactly.
23    Q.  Last year?
24    A.  No.

## 70

1     Q.  More than a year ago?
2     A.  Yes.
3     Q.  Both of them occurred more than a year
4  ago?
5     A.  Yes.
6     Q.  More than two years ago?
7     A.  Yes. It would be the first year after
8  I left BRK.
9     Q.  Okay, so approximately in 1994
10 sometime, is that --
11    A.  Yes.
12    Q.  Okay.
13       On that first occasion, where
14 was it, by the way?
15    A.  He called me at my home.
16    Q.  Okay, tell us about that discussion.
17    A.  He attempted to remind me of the
18 incident with the oil on the horn.
19       I told him all I could remember
20 was telling him how to do it.
21       He wanted me to back him up
22 with statements he was making to the CPSC
23    Q.  What did you tell him?
24    A.  I told him, you know, I can talk to

## 71

1  the CPSC about what I remember, and --
2     Q.  And it was -- was it essentially what
3  you told us about here today?
4     A.  Yes, sir.
5     Q.  And did you talk -- any more to that
6  conversation than what you generally described
7  here?
8     A.  I can't remember any more to it.
9     Q.  Okay.
10       And you mentioned you talked
11 with him a second time, is that correct?
12    A.  It was right around that -- he called
13 me a couple times in that period to try to discuss
14 this issue.
15    Q.  Was there anything different about
16 this second conversation that you told us?
17    A.  Not that I remember.
18    Q.  Were you ever contacted by any
19 representative of CPSC on the subject of
20 lubricating horn contact?
21    A.  Yes, sir.
22    Q.  And when was that?
23    A.  About that time period.
24    Q.  Okay, and who contacted you?

## 72

1     A.  I can't remember his name for certain.
2       A name that has been mentioned
3  to me sounds familiar.
4     Q.  Okay.
5       Where -- how was that contact
6  made?
7     A.  He called -- oh, go ahead.
8     Q.  He called you?
9     A.  He called me.
10    Q.  And did you meet with him or simply
11 talk to him?
12    A.  I met with him.
13    Q.  And where was that?
14    A.  At my home.
15    Q.  And tell us about that conversation.
16    A.  I explained to him basically what I
17 have told you gentlemen.
18       He asked me some things about
19 Dave Minnis, in particular.
20       I explained what I felt about
21 the situation.
22    Q.  Did you tell him, essentially, the
23 same thing that you told us here today about the
24 information you provided Mr. Minnis about

## 109

1  A. 1978.
2  Q. What type of failure was involved in
3  that testing, if you can describe it with
4  particularity?
5  A. The smoke detector that had the horns
6  in it did not operate properly after the test.
7  Q. Meaning that it was supposed to sound
8  and didn't sound? Is that the type of failure you
9  are referring to?
10  A. Yes.
11  Q. And was that condition that caused
12  that failure, evaluated?
13  A. Yes.
14  Q. And what was that failure, or that --
15  what did the evaluation disclose?
16  A. It, at this time, disclosed many
17  things.
18  Q. For example?
19  A. In relationship to the horn?
20  Q. Yes, the horn and its failure to sound
21  because of corrosion?
22  A. The materials the horn was made out of
23  were improper for that test.
24  Q. Did any of those failures involve the

## 110

1  contacts that -- contacts similar to the ones that
2  you eventually discussed with Mr. Minnis?
3  MR. HAYES: Objection, vague and ambiguous.
4  THE WITNESS: It involved previous versions
5  of those contacts.
6  BY MR. LICKTEIG:
7  Q. And was there corrosion, on the
8  contacts, preventing the horn from sounding in that
9  -- in the context of those failures, I believe you
10  said?
11  A. Yes.
12  Q. In '78 time frame?
13  A. Yes.
14  Q. And what type of change, if any, was
15  made to the contacts -- at either point, to address
16  that issue?
17  A. The materials were changed.
18  Q. From what to what?
19  A. They were changed from an unplated
20  brass disk and phosphor bronze terminals to
21  stainless steel.
22  Q. And was that change made generally in
23  the time frame of 1978 or '79?
24  A. In that time period.

## 111

1  Q. And again, I assume that's an
2  approximation?
3  A. Yes, I'm --
4  Q. And did that material then, as to the
5  contacts, was that as it was changed, did that
6  material stay in place throughout the time frame
7  that you worked for BRK and First Alert as to
8  P-Horns?
9  MR. HAYES: Objection, vague and ambiguous.
10  THE WITNESS: It basically, yes.
11  BY MR. LICKTEIG:
12  Q. That stainless steel type of material
13  used in the contact points in the P-Horn?
14  A. Yes.
15  Q. Were you ever aware of any other
16  corrosion problems with P-Horn contacts other than
17  the ones that were addressed in '78 or '79 when
18  materials changed through the time that you left
19  BRK?
20  A. Only the issue with the 1838 smoke
21  detector.
22  Q. There was a recall on that detector
23  because of?
24  A. I can't remember if it was recalled or

## 112

1  not.
2  Q. What was the specific corrosion
3  problem on the P-Horn contacts of the 1838's as you
4  recall, if you do?
5  A. It necessarily was not a corrosion
6  problem, it was a contact resistance issue in
7  relationship to the driver on the smoke detector.
8  Q. You are certainly going to go way
9  above my head in making that description, but would
10  you describe what that driver problem was, as you
11  understood it?
12  A. The 1838 was a self-oscillating
13  circuit that involved the horn as a integral
14  component of the driver.
15  In other words, the horn, the
16  electrical characteristics of the Piezo disk were
17  active components in the driver in all the battery
18  operated units. The horn was a passive component
19  in the dried circuit, and the horn was literally
20  driven.
21  Q. And would that characteristic of the
22  1838 be more conducive to the development of
23  corrosion? Was that the explanation?
24  A. It had nothing to do with the

## 113

1  development of corrosion.
2  Q. What change was made, then, to the
3  1838 P-Horn to address? Was there a concern or a
4  problem, then, with that difference or that future
5  in the 18?
6  A. It's a big problem.
7  Q. The problem being?
8  A. The horn didn't start.
9  Q. Wouldn't alarm, on occasion, when it
10  should?
11  A. Yes.
12  Q. And did the battery-operated
13  detectors, the full line of them, utilize or have
14  the same horn, albeit with a different driver
15  mechanism passive?
16  A. Same horn, different driver.
17  Q. Is that the only difference between
18  the horns and the battery-operated line compared
19  with the 1838's you have described?
20  A. Yes.
21  Q. Did you participate in any type of
22  study or evaluation to determine that, indeed, the
23  battery-operated detectors would not be susceptible
24  to the problems that you, BRK, was experiencing

## 114

1  with the failures in the horns on the 1838 line?
2  A. No, I did not.
3  Q. Did anyone, if you know?
4  A. Yes.
5  I was told that a study was
6  being conducted.
7  Q. Okay.
8  Do you know who was in charge
9  of that?
10  A. I don't recall.
11  Q. Was that in-house or?
12  A. It was in-house.
13  Q. Would that be the electrical
14  engineering group?
15  A. Yes, I believe so.
16  Q. But you don't have any first-hand
17  knowledge of that study or anything from it?
18  A. No.
19  Q. We will leave the preliminary to that
20  topic. We were discussing whether or not you were
21  aware of any contact corrosion problems with the
22  BRK detectors after the change in materials. You
23  told me about back in the '78 or '79 time period.
24  And I have asked that same question, but limiting

## 115

```
1    it to the -- the battery-operated lines of the
2    smoke detector.
3        A.  I don't recall any problems.
4        Q.  Was there ever any attempt by BRK that
5    you are aware, to evaluate any of the units
6    returned to BRK for whatever reason -- warranty,
7    returned units -- any sort of complaints involving
8    the battery-operated line of detectors where
9    attempts to evaluate whether or not there were
10   corrosion problems on the P-Horn contacts?
11       MR. HAYES:  Objection, vague and ambiguous.
12       THE WITNESS:  I -- my understanding was --
13   is that that was the main avenue of study on all
14   smoke detectors.
15           We always evaluated customer
16   returns.
17   BY MR. LICKTEIG:
18       Q.  Did you ever participate in the
19   evaluation of customer returns on battery operated
20   smoke detectors for the purpose of determining
21   whether or not there was corrosion or corrosion
22   indications on P-Horn contacts?
23       A.  No.
24       Q.  Do you know of anyone, first of all,
```

## 116

```
1    within your mechanical engineering group, that did
2    that?
3        A.  No.
4        Q.  Do you know of anyone in BRK that --
5    that did that?
6        A.  Specifically, no.
7        Q.  Do you know a group or --
8        A.  The design group handled all customer
9    returns, evaluation of them.
10       Q.  So we would have to go to the design
11   group and its records to determine whether or not
12   there was ever any type of specific study as to
13   returned units relative to perform horn contact
14   corrosion evaluation.
15       MR. HAYES:  Object to the question as vague
16   and ambiguous.
17           Assumes facts not in evidence.
18       THE WITNESS:  That's where I would go.
19   BY MR. LICKTEIG:
20       Q.  And no one has ever told you that they
21   did, one way or the other?
22       A.  No problems ever came to me.
23       Q.  Who headed the design group during the
24   time periods that you were employment by BRK?
```

## 117

```
1        MR. HAYES:  Objection, over broad as to
2    time.
3        THE WITNESS:  Many people.
4    BY MR. LICKTEIG:
5        Q.  For instance?
6        A.  You want me to start a list?
7        Q.  Yes, if you could.
8        A.  Okay.
9            We would start with Rich
10   Schwarzbox.
11           Steve Seigle.
12           George Schoenfelder.
13           Nick Bellavia.
14           I believe there were others,
15   but I can't remember all the names.
16       Q.  Sure.
17           Why was it that the matter of
18   evaluating warranty returns was placed with Design
19   Group?
20           And, if you don't know the
21   answer to the question, simply so indicate.
22       MR. HAYES:  Objection.
23       THE WITNESS:  I don't know a specific
24   reason.
```

## 118

```
1    BY MR. LICKTEIG:
2        Q.  But that's how it was done -- is that
3    correct?
4        A.  Uh-huh.
5        Q.  That's a yes?
6        A.  Yes.
7        Q.  What involvement did you have relative
8    to the design and development of carbon monoxide
9    detectors while you were still with BRK or First
10   Alert?
11       MR. HAYES:  Object to the form of the
12   question.  It's vague and ambiguous.
13       THE WITNESS:  We, the mechanical group, was
14   involved with the design of the housings, the
15   layout of the printed circuit board per the circuit
16   designs, the general mechanical assembly of the
17   unit.
18   BY MR. LICKTEIG:
19       Q.  The initial carbon monoxide detector
20   marketed by BRK was a Facco unit.
21           Was that on stream being sold
22   to the public when you left in September of 1993?
23       MR. HAYES:  Objection, move to strike, move
24   to strike counsel's testimony.
```

## 119

```
1        THE WITNESS:  Facco?
2        MR. HAYES:  Being ambiguous.
3        THE WITNESS:  "Facco?"  What do you mean by
4    "Facco"?
5    BY MR. LICKTEIG:
6        Q.  That, as best I can tell you, is -- is
7    the marketing designation of the first carbon
8    monoxide detector marketed by First Alert in the
9    time frame, I believe, of 1993, initially.
10           Counsel can correct me if I'm
11   wrong.
12           And I'm wondering if you --
13       THE WITNESS:  What was the original question
14   again?
15       MR. HAYES:  Just objection.  Move to strike
16   counsel's testimony.
17   BY MR. LICKTEIG:
18       Q.  Did you have any -- was that first
19   carbon monoxide detector on the market when you
20   left BRK in September of '93?
21       MR. HAYES:  Objection -- assumption facts
22   not in evidence.
23       THE WITNESS:  I believe it was.
24   BY MR. LICKTEIG:
```

## 120

```
1        Q.  How long had your mechanical
2    engineering group been active in the design of the
3    carbon monoxide detector housing, I believe you
4    said printed circuit board design?
5        A.  I can't remember.
6            I think -- a year or two years.
7        Q.  What type of horn was utilized in the
8    carbon monoxide detector that you were familiar
9    with?
10       A.  A Piezo Horn.
11       Q.  Would that be the same type horn that
12   we were discussing earlier in the context of your
13   -- the incident that you described with Mr. Minnis?
14       A.  Whatever the current construction was
15   at that time.
16       Q.  But a pressure contact design feature
17   as to the contacts in that P-Horn?
18       MR. HAYES:  Objection, vague and ambiguous.
19       THE WITNESS:  I can't recall exactly if -- a
20   change had been made after the 1838.
21   BY MR. LICKTEIG:
22       Q.  Okay.
23           Well, was it -- whatever was
24   being used in the battery -- the battery operated
```

145

1  corrosion tests when you tested them?
2     A.  As I remember, yes.
3     Q.  Have there been any need to put
4  lubricants on the contacts of an 83-R detector for
5  it to pass the UL corrosion test?
6     A.  I don't —
7     MR. LICKTEIG:  Objection to form.
8  BY MR. HAYES:
9     Q.  Do you know of any.
10    A.  I don't know of any.
11    Q.  In your experience — strike that.
12       When you ran the 83-R through
13 corrosion tests, did you — withdraw that question.
14       When you were testing the 83-R
15 for UL corrosion tests, did you ever place
16 lubricants on the contacts?
17    A.  No.
18    MR. LICKTEIG:  I will object to the form of
19 the question in that I believe the witness says
20 that he had no recollection of those tests.  That
21 — his corrosion tests on 83-R.
22    MR. HAYES:  That is not what the witness'
23 testimony was.
24    THE WITNESS:  I never placed oil on horns in

146

1  83-R smoke detector test.
2  BY MR. HAYES:
3     Q.  As you sit here today, do you have
4  recollection of doing 83-R smoke detector test,
5  corrosion tests?
6     A.  Some, yes.
7     MR. LICKTEIG:  Objection.
8       And —
9  BY MR. HAYES:
10    Q.  The ones that you can recall, when
11 they passed, you didn't need lubricant on the
12 contacts, is that right?
13    A.  Yes, as far as I know, yes.
14       I never put oil on a horn or
15 knew of it being put on a horn on the tests that I
16 ran.
17    Q.  Now, did you ever take, undertake,
18 excuse me, evaluations to try to improve the
19 contacts, even after the development of the
20 stainless steel terminals with the stainless steel
21 disk?
22    A.  Yes.
23    Q.  For — at whose direction did you do
24 that?

147

1     A.  Vice President of Engineering named
2  Ron Cigarski.
3     Q.  What did Mr. Cigarski tell you when he
4  directed you to undertake that evaluation?
5     A.  He wanted to — he wanted to test
6  every contact that we made in the corrosion test
7  with No. 1 torque, evaluated electrical
8  characteristics of the contact individually, and
9  with a goal of establishing a no greater than ten
10 percent resistance rise in any contact in the smoke
11 detector.
12       It wasn't specific to P-Horns.
13    Q.  Was there — is there some thought
14 that there was a problem with the detector or were
15 you just trying to improve it?
16    A.  We had learned about contacts, and we
17 were passing the corrosion test.
18       We were looking at contacts
19 and, specifically based on some, what we had
20 learned in some prototypes in trying to develop a
21 new detector, we learned some things.  We wanted to
22 go in back and look at all the contacts that we
23 had.
24    Q.  Okay.

148

1       During the course of this
2  evaluation, did you evaluate putting lubricants on
3  the contacts?
4     A.  Yes.
5     Q.  And — what was the purpose — when
6  you were evaluating putting lubricants on the
7  contacts, what were you doing that for?
8     A.  I wanted to evaluate whether it would
9  help meet that goal of a ten percent contact
10 resistance rise, no greater than.
11    Q.  When you were evaluating the
12 lubricants, was it with the intent that it, in
13 fact, this was panned ought to be useful, that it
14 would be done for all the manufacturing products?
15    A.  That was the idea.
16    Q.  What — what if any were the results
17 — strike that.
18       What if anything were the
19 results of your evaluation of the usefulness of
20 putting the lubricants on the contacts?
21    A.  I don't remember the exact results of
22 the test.
23    Q.  Do you recall, generally?
24    A.  It didn't meet the ten percent goal.

149

1     Q.  Did it improve at all the performance
2  of the detector in the UL corrosion test?
3     A.  I remember that it helped a little
4  bit.
5     Q.  And when you say it "helped a little
6  bit," what do you mean by that?
7     A.  That the contact resistance, after the
8  corrosion test, was a little lower in those horns
9  than with a horn without oil.
10    Q.  But regardless of the lubricant, the
11 detector was still performing after it came out of
12 the UL corrosion test?
13    A.  They passed the corrosion tests.
14    Q.  When you say they "passed," does that
15 mean they worked after they went through it?
16    A.  Yes, sir — well —
17    Q.  Okay, you can — the answer is yes?
18    A.  Yes.
19    Q.  Now, there were times when both you
20 and Mr. Minnie worked at either BRK Electronics or
21 BRK Brands, Inc., you were both employed together
22 there?
23    A.  Yes.
24    Q.  Okay.

150

1       Did you have an understanding
2  of what Mr. Minnie's responsibilities were at those
3  companies?
4     A.  I believe I did at the time.
5       I can't remember exactly
6  everything he did.
7     Q.  Well, regardless of what exactly he
8  was doing, did you have a general understanding of
9  what his positions were?
10    A.  Yes.
11       He was — engineering, he ran
12 tests — basically —
13    Q.  Was he in the design group at any
14 point in time?
15    A.  Yes, I'm not sure exactly what his
16 title was.
17    Q.  Okay.
18       To your knowledge or
19 information, was it at or about the time that you
20 recall him approaching you, asking you about
21 lubricants, was he in an engineering group that was
22 either doing design or development work?
23    A.  I believe so, yes.
24    Q.  Would it be unusual for someone in

FREDERICK J. CONFORTI, JUNE 06, 2002

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF TEXAS

3             BROWNSVILLE DIVISION

4

5    JOSE GARCIA, individually and    )

6    as representative of the Estate  )

7    of Manuel Cruz, IDALIA GARCIA,   )

8    individually, and CYNTHIA COX as )

9    next friend of BRITTANY COX,     )

10                        Plaintiffs, )

11            -vs-                     ) No. B-98-186

12   BRK BRANDS, INC.,                )

13                        Defendant.  )

14           The videotaped deposition of

15   FREDERICK J. CONFORTI, called for examination,

16   taken pursuant to the Federal Rules of Civil

17   Procedure of the United States District Courts

18   pertaining to the taking of depositions, taken

19   before SUSAN K. TODAY, a Notary Public within and

20   for the County of DuPage, State of Illinois, and a

21   Certified Shorthand Reporter of said state, C.S.R.

22   No. 84-2212, at Suite 220, 3051 Oak Grove Drive,

23   Downers Grove, Illinois, on the 6th day of June,

24   A.D. 2002, at 11:15  a.m.

FREDERICK J. CONFORTI, JUNE 06, 2002

Page 2

```
1    PRESENT:
2        MR. JUAN A. GONZALEZ,
3        (The Atrium,
4        1300 North 10th Street, Suite 400,
5        McAllen, Texas 78501,
6        956-687-8868),
7            appeared on behalf of Plaintiffs
8            Jose Garcia and Idalia Garcia;
9        WATTS & HEARD,
10       (1926 East Elizabeth Street,
11       Brownsville, Texas 78520-4933,
12       956-544-0500), by:
13       MR. RAY R. MARCHAN,
14           appeared on behalf of Plaintiff
15           Cynthia Cox;
16       COZEN O'CONNOR,
17       (1900 Market Street,
18       Philadelphia, Pennsylvania 19103-3508,
19       215-665-4653), by:
20       MR. TERRY M. HENRY,
21           appeared on behalf of the Defendant.
22
23
24
```

Page 3

```
1    PRESENT:  (Continued)
2
3    ALSO PRESENT:
4        MR. BRENNEN BEHIMER, Legal Videographer,
5        Esquire Video Services.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20   REPORTED BY:  SUSAN K. TODAY, C.S.R., R.P.R.
21            License No. 84-2212.
22
23
24
```

Page 4

```
1        THE VIDEOGRAPHER:  Good morning.  We are going
2    on the video record at 11:15 a.m.
3        My name is Brennen Behimer, and I am a
4    legal videographer in association with Esquire
5    Video Services.  My address is 155 North Wacker
6    Drive, Chicago, Illinois.
7        The court reporter is Susan Today of
8    Esquire Deposition Services.
9        Here begins the videotaped deposition of
10   Fred J. Conforti taking place at 3051 Oak Grove
11   Drive, Suite 220, Downers Grove, Illinois.  Today's
12   date is June 6th, 2002.
13       This deposition is being taken in the
14   matter of Jose Garcia, et al. versus BRK Brands,
15   Inc. in the United States District Court, Southern
16   District of Texas, Brownsville Division, case
17   No. B-98-186.
18       This deposition is being taken on behalf
19   of the plaintiffs.  The party at whose instance
20   this deposition is being recorded on an audiovisual
21   recording device are the plaintiffs.
22       Will counsel, please, state their names
23   for the record?
24   MR. MARCHAN:  Ray Marchan for Cynthia Cox as
```

Page 5

```
1    next friend of Brittany Cox.
2        MR. HENRY:  Juan Gonzalez for the Garcia
3    plaintiffs.
4        MR. HENRY:  Terry Henry for defendant BRK
5    Brands, Inc.
6        THE VIDEOGRAPHER:  Will the reporter now swear
7    in the witness, please?
8            (WHEREUPON, the witness was duly
9            sworn.)
10           FREDERICK J. CONFORTI,
11   called as a witness herein, having been first duly
12   sworn, was examined and testified as follows:
13           EXAMINATION
14   BY MR. MARCHAN:
15       Q.   Good morning, sir.
16       A.   Good morning.
17       Q.   Would you, please, be so kind as to give
18   us your full legal name and your current business
19   address for the record?
20       A.   Frederick J. Conforti.  My current
21   business address is 3820 Stern, St. Charles,
22   Illinois.
23       Q.   What do you do for a living now,
24   Mr. Conforti?
```

2 (Pages 2 to 5)

FREDERICK J. CONFORTI, JUNE 06, 2002

Page 42

1    Q.   I would like to kind of translate this
2  subject of failure rate into cycles of use. Do you
3  know at what time as far as cycles of use the smoke
4  detector lasted before it started having an
5  unacceptable failure rate?
6    A.   That is not a question.
7    Q.   Okay. It's not a question?
8    A.   That is not a question that -- you have
9  to rephrase that question.
10   Q.   All right. Are these separable contact
11 smoke detectors, is their life expectancy
12 calculated on the number of cycles of use?
13   A.   It's not done that way.
14   Q.   How is it done?
15   A.   Every component has a known life based
16 on testing of that type of component. You then can
17 calculate your failure rates one of two ways. You
18 could make the product go through -- a number of
19 units go through a number of period of time through
20 a number of exercises of whatever it does and see
21 when it fails and determine the failure rate for
22 that particular product and that particular design.
23 Or because it's a true and tried and true method
24 acceptable by everybody that's in quality control,

Page 43

1  the government, Underwriters Laboratories, any
2  testing agency in the world we ever went to, you
3  can use standard tables for standard types of
4  components, of which a smoke detector is made up of
5  standard types of components. Each of these
6  components has a failure rate.
7        You can then go through a calculation
8  putting all the components that you are using
9  together into an assembly and doing a calculation
10 based on each of those components what the total
11 failure rate is for that entire assembly.
12       So we had a choice of doing it one of
13 two ways.
14   Q.   The testing way or the calculation way?
15   A.   Right.
16   Q.   And in the testing way, what did you
17 understand the useful life expectancy of the smoke
18 detectors would be?
19   MR. HENRY: Objection. Which model? Each
20 model has different components.
21   MR. MARCHAN: The models that would use the
22 separable contacts on the piezohorn.
23   MR. HENRY: Same objection.
24 BY THE WITNESS:

Page 44

1    A.   Answer you in general.
2  BY MR. MARCHAN:
3    Q.   Yes.
4    A.   Every detector basically had a 3-1/2
5  percent failure rate as the criteria set by
6  National Bureau of Standards and Underwriters
7  Laboratories. Every product that we ever sold met
8  that criteria and exceeded that criteria.
9    Q.   So a 15-percent failure rate would be
10 totally unacceptable?
11   A.   Never get off the ground.
12   Q.   I understand. How many depositions have
13 you given in regards to claims that there was
14 defects in the BRK Electronics smoke detector?
15   A.   Half a dozen.
16   Q.   Is that it? Not more than that?
17   A.   Maybe a dozen, but not more than that.
18   Q.   Not 20?
19   A.   No.
20   Q.   I hope at least in this instance you
21 found me to be courteous toward you in my tone and
22 questioning.
23   A.   Absolutely.
24   MR. MARCHAN: And I will go ahead and pass the

Page 45

1  witness.
2    THE WITNESS: Okay. Thank you.
3          EXAMINATION
4  BY MR. GONZALEZ:
5    Q.   I have got a couple of questions for you
6  also. I am the attorney for the Garcia plaintiffs
7  in this case.
8        You mentioned that with respect to the
9  allegations of David Minnis that Pittway undertook
10 a complete investigation.
11       What knowledge or information do you
12 have of what that investigation consisted of? What
13 did Pittway do?
14   A.   Pittway -- this is all secondhand
15 information because I was kept out of the loop
16 because I was one of the people under suspicion, if
17 you will. So therefore, I was not on the side of
18 those doing the investigation. I was on the side
19 of those being investigated.
20   Q.   Understood.
21   A.   So I think to answer your question,
22 you'd probably be better off to ask other people.
23       But to my understanding what I heard
24 through the grapevine, they interviewed many, many

12 (Pages 42 to 45)

FREDERICK J. CONFORTI, JUNE 06, 2002

Page 46

1 people and did as thorough an investigation as they
2 possibly could do of everybody that was involved in
3 any way, either that could give collaborating
4 information, give background information that was a
5 suspect in the situation as someone who might have
6 done something improper. And all of that was
7 evaluated by Pittway management as well as a law
8 firm. I believe the law firm that they used was
9 Kirkland & Ellis.
10    Q.   And who would these people be that would
11 know more detail of this information?
12    A.   Former head of Pittway, King Harris, and
13 whoever he worked with at the law firm of
14 Kirkland & Ellis.
15    Q.   The suspect of someone that might have
16 done something improper, without putting you on the
17 spot as to whether he did or not, would you know
18 the identity of that person?
19    A.   Anybody in the corporation was suspect,
20 from me, the president, down to the lowest person
21 in the company.
22    Q.   To your knowledge, did it ever get
23 narrowed down to —
24    A.   No. My knowledge is that after the

Page 47

1 investigation was done, that everybody was
2 exonerated, that they found no truth or anything to
3 substantiate Mr. Minnis' claims.
4    Q.   And at whose instance was the
5 investigation undertaken?
6    A.   Mr. Harris, the president of Pittway.
7    Q.   And was it required by any outside
8 agency or —
9    A.   No.
10    Q.   — was it solely an internal
11 investigation?
12    A.   Internal.
13    Q.   Do you know if this investigation was
14 undertaken in anticipation of litigation?
15    A.   I don't know that.
16    MR. GONZALEZ: I am going to go ahead and pass
17 the witness. Thank you.
18        FURTHER EXAMINATION
19 BY MR. MARCHAN:
20    Q.   Just a quick follow-up.
21        King Harris is not an attorney?
22    A.   No.
23    Q.   Is that correct?
24    A.   That's correct.

Page 48

1    MR. HENRY: He is a king.
2    MR. MARCHAN: Thanks for your time.
3        EXAMINATION
4 BY MR. HENRY:
5    Q.   I only have a couple of questions to
6 follow up. Typically I don't do this.
7        Concerning the investigations into the
8 Minnis allegations, do you know if the CPSC and
9 Underwriters Laboratories undertook their own
10 separate investigations of those allegations?
11    A.   I believe that CPSC did. I don't know
12 if Underwriters Laboratories did anything formal or
13 informal or did it in conjunction with the CPSC.
14    Q.   Do you know the results of the CPSC, if
15 anecdotally?
16    A.   Basically my understanding of the result
17 of the CPSC investigation was basically that there
18 was nothing more for them to act on than they
19 already acted on, that the problem did not extend
20 to any products other than the AC-operated
21 detectors that were recalled, and that there was no
22 conclusive evidence that anybody did anything at
23 BRK that was improper.
24        Because, to give you an example, when we

Page 49

1 first came up with the problem, one of the
2 solutions that was tried within the engineering
3 department was to add oil to the contacts. Guess
4 what? It didn't help the situation, because had it
5 helped the situation, that would have been the
6 solution on the end version of the AC-operated
7 detector.
8    Q.   Much simpler to —
9    A.   Much simpler than soldering the units is
10 to put a drop of oil on it.
11    Q.   And you wouldn't impact the ceramic disk
12 like you —
13    A.   That's correct.
14    Q.   Let me ask you a couple questions about
15 the 1839-I problem. Do you recall how that arose,
16 how you discovered that?
17    A.   Yes. We discovered that in our own life
18 tests that we were doing as part of our ongoing
19 quality control for the product.
20    Q.   BRK's own quality assurance program?
21    A.   That's correct.
22    Q.   And you voluntarily told the CPSC about
23 it?
24    A.   That's correct.

13 (Pages 46 to 49)

Page 1

```
 1              UNITED STATES DISTRICT COURT FOR THE
 2                 NORTHERN DISTRICT OF TEXAS
 3                      AMARILLO DIVISION
 4
    JENNIFER MORALES, Individually    *
 5  and Representatives of the Estate*
    of ISIAH MORALES, Deceased, and   *
 6  as Next Friend of MARCY MORALES,  *
    and PEDRO MORALES,                *
 7                                    *
                                      *
 8           Plaintiffs,              *     Civil Action
                                      *  No. 2:01-CV-425-J
 9           vs.                      *
                                      *
10  BRK BRANDS, INC., d/b/a FIRST     *
    ALERT CORP., SUNBEAM,             *
11  PRODUCTS, INC., SUNBEAM,          *
    CORPORATION FIRST ALERT, INC.,    *
12  and PITTWAY CORPORATION,          *
                                      *
13           Defendants.             *
14
15
16      ****************************************
                  ORAL DEPOSITION OF
17                  B. DON RUSSELL
        ****************************************
18
19
20
21
22
23
24
25
```

B. DON RUSSELL                                    1/14/2003

**Page 2**

1     On the 14th day of January, 2003, at 11:00 a.m.,
2  the oral deposition of the above-named witness was
3  taken at the instance of the Defendants before
4  Lezley Cull, Certified Shorthand Reporter in and for
5  the State of Texas, at the offices of
6  Cozen & O'Connor, 2300 Bank One Center, 1717 Main
7  Street, in the City of Dallas, County of Dallas,
8  State of Texas, pursuant to Notice and the agreement
9  hereinafter set forth.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1                I N D E X
   WITNESS:                           PAGE:
2  B. DON RUSSELL
3  Examination By: Mr. Henry . . . . . . . . . . . . 5
4  INFORMATION OR DOCUMENTS TO BE PROVIDED
5  1 - 197/8
6
   DEPOSITION EXHIBITS              IDENTIFIED
7
      1 - Fourth Amended Notice   . . . .   7
8
      2 - Curriculum vitae. . . .   . . 9
9
      3 - Disclosure of Preliminary Opinions,
10        6-10-02  . . . . . . . . . . . . . . 10
11     4 - Affidavit of B. Don Russell. .   . . . 12
12     5 - Documents entitled, "Timeline,"
         "Fire Model Input Timeline," and
13        "Smoke Detector Analysis". . . . . . . . 57
14     6 - Seven-page timeline. . . . . . . . . . . 63
15     7 - Summary of smoke detector testing. . . . . 64
16     7a - Summary of smoke detector testing. . . . . 64
17
18
19
20
21
22
23
24
25

**Page 3**

1            A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
      Mr. Juan C. Hernandez
4  JUAN C. HERNANDEZ & ASSOCIATES, P.C.
      4849 Greenville Avenue
5     Suite 1670
      Dallas, Texas 75206
6
7
   FOR THE DEFENDANTS:
8     Mr. Terry M. Henry
      COZEN & O'CONNOR
9     1900 Market Street
      Philadelphia, Pennsylvania 19103-3508
10
11
12
13
14
15
16
17
18
19
20  ALSO PRESENT: Cecil Hastings
21
22
23
24
25

**Page 5**

1            P R O C E E D I N G S
2              B. DON RUSSELL,
3  having been first duly sworn, testified as follows:
4       (Exhibit Nos. 1-4 marked before
5        going on the record.)
6              EXAMINATION
7  BY MR. HENRY:
8     Q.  Good morning, Dr. Russell.  As you know, I'm
9  Terry Henry and I'm an attorney that represents BRK
10  Brands, a defendant in this case, brought by the
11  Morales family, which arises out of a fire that
12  occurred on February 3rd, 1999.
13          You've been deposed a number of times
14  before in the smoke detector cases; is that right?
15     A.  Correct.
16     Q.  Do you think it's necessary for me to go
17  through the rules of engagement?
18     A.  I don't think so.
19     Q.  Okay.  The one rule that I would like to
20  reemphasize, though, is if you don't understand a
21  question that I ask or it just doesn't make sense to
22  you, feel free to have me rephrase the question.
23     A.  I will do that.
24     Q.  Can you tell me, how many cases are you
25  currently working on involving smoke detectors?

2 (Pages 2 to 5)

B. DON RUSSELL                                     1/14/2003

Page 38

1  the sense that you mean the question, yes, there has
2  to be sufficient density and quantity of smoke, and
3  it is generally what you associate with what you
4  referred to as a hostile fire.
5      Q.  (BY MR. HENRY)  Well, and that's my point.
6  A smoke detector won't respond immediately upon the
7  first smoke particle that reaches it?
8      A.  We've already agreed to that.
9      Q.  I mean, it's got to be a sufficient amount?
10     A.  That is correct.
11     Q.  Would you agree that there are some
12 standards that impose a minimum and maximum
13 sensitivity on smoke detectors?
14     A.  I know of no maximum, meaning in any real
15 context.  I know there are minimum requirements based
16 on, of course, the UL standards in terms of the tests
17 that are run such that a smoke detector that
18 detected, only once obscuration got to 90 percent,
19 would not pass those UL standards tests.  I know of
20 no such thing as a maximum.  I'm not sure what you
21 would even mean by a "maximum."
22     Q.  A level under which a smoke detector
23 shouldn't alarm.  In other words --
24     A.  Well, that's a different question.
25     Q.  I meant -- well, by maximum sensitivity, is

Page 39

1  there -- is there -- on the low scale of smoke
2  production --
3      A.  That's really a security issue, not a
4  sensitivity issue.  Security issue means a security
5  against false alarming.  That's what I assumed you
6  were referring to.
7      Q.  And that's where I'm going.  You'll agree
8  that there are some standards that provide that
9  security against nuisance alarms?
10     A.  I would agree that security against false
11 alarms is one of the design issues in commercial
12 residential smoke detectors.
13     Q.  In talking about ionization smoke detectors,
14 you'd agree that there are a number of factors that
15 affect how quickly a smoke detector will respond to a
16 smoke or -- a smoke event or a fire?
17     A.  Yes.
18     Q.  The size of the ionization chamber is one of
19 those factors?
20     A.  The size of the ionization chamber?  By
21 definition, yes, if you varied the size of the
22 ionization chamber and held everything else constant,
23 that would affect that.
24     Q.  By the same token, the volume within the
25 ionization chamber would affect --

Page 40

1      A.  I assumed volume when you said "size."
2      Q.  Okay.  The arrangement of the baffles of the
3  ionization chamber?
4      A.  Certainly.
5      Q.  The distance between the electrodes within
6  the ionization chamber would affect it?
7      A.  Yes.
8      Q.  The location of the radioactive source?
9      A.  Yes.
10     Q.  The type of radioactive source within the
11 ionization chamber?
12     A.  Type and strength, yes.
13     Q.  And the sensitivity setting of the
14 ionization -- or, I'm sorry, the sensitivity of the
15 smoke detector as a whole?
16     A.  Yes.
17     Q.  What about the design of the smoke
18 detector's cover and how it allows smoke to enter and
19 exit?
20     A.  Absolutely.
21     Q.  In fact, the response time of a smoke
22 detector can be changed based on the sensitivity
23 setting?
24     A.  Yes, it can, externally.
25     Q.  And some brands, that's done at the factory

Page 41

1  and you can't change it when it hits the market; is
2  that right?
3      A.  I know of nobody who produces a residential
4  smoke detector that has a variable sensitivity.
5  There may be one.  I'm just not aware of it.
6      Q.  And when I talk about the sensitivity
7  setting for an ionization chamber, do you understand
8  that to be the threshold, I guess the Delta T, in the
9  change of current of the ionization chamber?
10     A.  I understand it to be the -- the use of the
11 outboard or exterior electronics to set a level of
12 the current flow in the ionization chamber, which
13 will be, then, assumed to be a detection of smoke.
14 And that would be an interruption of the current.  So
15 you'd have a certain level of interruption which you
16 would then declare to be detection, which is binary.
17 You're either detecting or you're not detecting.  So
18 you have to come to the decision about whether you
19 have detection or not.  But the chamber itself is an
20 analog output device.  It's a continuous device.  So
21 you have to decide and set some threshold of current
22 interference where you believe that to mean, we have
23 detected smoke, and that's a setable parameter.
24     Q.  I guess that's my question.  Where you set
25 that threshold is the sensitivity setting?

B. DON RUSSELL                                                    1/14/2003

Page 42

1    A.  That would be generally the sensitivity
2  setting.  It's not independent of all the other
3  factors you mentioned, but it is generally the
4  setable parameter.  Because once the ionization
5  chamber is made and all those other factors are
6  fixed, it is now up to the external electronics to
7  determine what that threshold will be.
8    Q.  So if you change the cover of the smoke
9  detector, that's going to alter the flow of smoke --
10  that could alter the flow of smoke into or out of the
11  detector and you may need to change the sensitivity
12  level or setting of that smoke detector?
13    A.  If you changed the design of the cover?
14    Q.  Correct.
15    A.  Certainly, you could -- in the extreme, you
16  could put a cover on it that has no holes in it.
17  Obviously, that's going to affect smoke getting into
18  it.
19    Q.  But even a -- for example, a new cover that
20  has holes in it could alter -- depending on where
21  those holes are located and the size and shape of
22  those holes -- could alter how the smoke enters and
23  exits the smoke detector and the ionization chamber?
24    A.  It would alter it to some extent.  The
25  question is, would it be a material change or not,

Page 43

1  and that would be subject to some experimentation.
2    Q.  And you would agree that it's all these
3  factors that we've just discussed, collectively, that
4  determine how quickly a smoke detector will respond
5  in a fire or smoke event?
6    A.  All of those will affect the speed of
7  response.
8    Q.  I mean, there's not one that you could pull
9  out and say, this is the factor?
10    A.  No.
11    Q.  And you'd agree that the signaling devices,
12  the horn, the thing that alarms itself, is not the
13  same on all smoke detectors?
14    A.  Most modern smoke detectors use a
15  piezo-electric horn device, but those might well be
16  different based on the design of the smoke detector
17  itself.
18    Q.  Do you know of any smoke detector today that
19  uses a mechanical horn?
20    A.  There are some old ones still in use, but I
21  don't know of any modern design that still specifies
22  a mechanical horn.
23    Q.  In residential use?
24    A.  Correct.
25    Q.  And you'd agree that there are some piezo

Page 44

1  horns that are of a solid unit construction and then
2  there are others where part of the cover makes up a
3  component of the piezo horn?
4    A.  That is correct.
5    Q.  Piezo horns can also be made out of a
6  variety of different materials?
7    A.  Yes.  The plating materials can be
8  different, for example, or the contact materials
9  could be different.
10    Q.  And the size and shapes of the contacts
11  themselves can be different?
12    A.  Correct.
13    Q.  And the contacts can be applied at different
14  contact pressures?
15    A.  Correct.
16    Q.  Piezo horns, depending on the manufacturer,
17  can operate at different frequencies?
18    A.  Correct.
19    Q.  The horn driver can operate at a different
20  voltage?
21    A.  Correct.
22    Q.  The operating environment itself, where the
23  smoke detector is, could have an impact on the
24  operation of the smoke detector?
25    A.  If you mean by that, the temperature of the

Page 45

1  environment or the exposure of the smoke detector to
2  a harsh environment such as, say, a chemical
3  environment or an extremely high humidity
4  environment, all of those can affect that.
5    Q.  Would you agree that together, all of those
6  factors affect how the piezo horn may or may not
7  operate when given a signal to alarm by the
8  electronic components of the smoke detector?
9    A.  Only in the extreme.  I mean, the
10  piezo-electric horns are -- if properly designed,
11  should operate over a wide variety of environmental
12  and temperature conditions or they're not going to be
13  an effective design.  Anyone that would design a
14  smoke detector with a piezo-electric horn that had a
15  narrow environmental constraint as to its operation
16  would have a bad design.  So the design parameters
17  should be broad enough to fit a wide range of
18  operational circumstances in a residence, and are, to
19  my knowledge.
20    Q.  And I guess that's my question.  The factors
21  that we just discussed, would you agree that those
22  are the design parameters?
23    A.  Well, they certainly are design parameters.
24  I'm not going to say they're the only design
25  parameters.  They are certainly inclusive.

12 (Pages 42 to 45)

B. DON RUSSELL                                        1/14/2003

**Page 46**

1    Q.   Are there any other design parameters that
2  one might ought to consider that might affect the
3  operation of the piezo horn?
4    A.   I'm sure there are.  But to recap, some of
5  the primary ones are the temperature range at which
6  you are expecting the operation, the environmental
7  conditions to include any type of chemical
8  environments, obviously, humidity and how that might
9  interact with, say, a chemical environment.  The
10  presence of some chemicals would only be problematic
11  in a high humidity environment, for example, where
12  water condensation became a problem.  And then there
13  are all these mechanical issues that we talked about,
14  because it makes a big difference whether you're
15  talking about a -- whether you're talking about a
16  type of metal used, for example, in the contacts or
17  surfaces of the piezo-electric horn that might be
18  more or less sensitive to certain environmental
19  factors.  I mean, all of those are issues and they're
20  interrelated.
21    Q.   You can't pull one issue out, for example,
22  the materials used, without also considering whether
23  it's the appropriate contact force or size and shape
24  of the contacts themselves?
25    A.   All of those are interrelated.  They cannot

**Page 48**

1          MR. HENRY:  I'm on Page 11 already.
2  We're really zipping through.
3          MR. HERNANDEZ:  Great.
4    Q.   (BY MR. HENRY)  We discussed briefly some of
5  the tests you performed on smoke detectors, correct?
6    A.   Yes.
7    Q.   And all of those tests so far have been
8  performed at Texas A&M?
9    A.   All of the tests I performed have been
10  performed at Texas A&M.
11    Q.   The last tests -- the last series of tests,
12  as I said, that I have seen data on, are the ones
13  that were performed in January of 2000 for WLTV.
14    A.   Okay.
15    Q.   Now, you said you've continued to do tests
16  since that time; is that right?
17    A.   Yes.
18    Q.   Have those tests been directly related to
19  any litigation?
20    A.   No.
21    Q.   Have they been directly related to any, for
22  example, TV network news reports?
23    A.   No.
24    Q.   They have been done solely as part of your
25  own experiment and research at Texas A&M?

**Page 47**

1  be separately independently treated.
2    Q.   Are you going to offer an opinion in this
3  case concerning whether the smoke detector in the
4  Morales case was properly installed or maintained?
5    A.   Properly installed or maintained?  I saw
6  nothing to indicate to me that it was installed in an
7  inappropriate location.  So in that context, if you
8  ask my opinion of whether that location was an
9  appropriate place to have a smoke detector, I would
10  say yes.
11          I have no separate information or
12  opinion concerning maintenance.  I understand it was
13  relatively new, so it probably did not require any
14  maintenance.  I'm not sure I have any other opinion
15  with respect to that.
16    Q.   Are you going to provide any opinion in this
17  case concerning what Isiah Morales did or could have
18  done during the course of the fire?
19    A.   My -- no, I have no opinion about that,
20  other than as it might relate to escape time issues,
21  which would be separately discussed.
22          MR. HENRY:  When did you want to break
23  for your --
24          MR. HERNANDEZ:  12:30 -- well, 12:25 is
25  actually okay with me.  12:30 is the hearing.

**Page 49**

1    A.   Correct.
2    Q.   And they also have been conducted in the
3  TEES facility?
4    A.   Yes.
5    Q.   And in the same house, what is that, 7800 or
6  7802 --
7    A.   The answer is yes.
8    Q.   And what about the protocol for those tests,
9  do you have a written protocol that you use?
10    A.   The answer is yes.  Although, of course,
11  that varies based on the individual objectives of the
12  individual tests.  But the general protocol has not
13  changed from the one that was produced to you with
14  the previous data and has been discussed in previous
15  depositions.  There's no change in approach to my
16  testing of -- since the last time that matter was
17  discussed with you and your colleagues.
18    Q.   I guess that was almost three years ago, of
19  the last set of data that we have.  Sitting here
20  today, can you tell me -- or do you know how many
21  tests you've run since that time?
22    A.   I can't tell you, but it's a lot.  I mean,
23  we have tested a lot of detectors in that time frame.
24    Q.   And have they run generally the same where
25  you have a couch in the living area, smoke detectors

13 (Pages 46 to 49)

B. DON RUSSELL                                    1/14/2003

**Page 118**

1  fire test, once we have a significant flame, we just
2  truncate the test.
3      Q.   It's best to put out the fire when you can,
4  as opposed to burn the house down?
5      A.   That's generally the case unless we were
6  prepared to let it burn, which, in these cases, we
7  were not doing that.
8      Q.   Was there any attempt made to determine why
9  either the photoelectric or the ionization detectors
10  in the hallway failed to sound before the fire
11  transitioned to a flaming condition?
12      A.   Other than we had not reached the
13  sufficiently high levels of smoke density to cause
14  them to sound.  Because they do require -- some of
15  these detectors require, for a smouldering fire, a
16  very high level of obscuration to sound.  If you're
17  asking other than that, no other determination.
18      Q.   If I could have you take a look at
19  Test 2004.
20      A.   Okay.
21      Q.   And the only question there is,
22  Detector 2009, which was a photoelectric detector,
23  you have indicated there that it never sounded; is
24  that right?
25      A.   Yes.

**Page 119**

1      Q.   Again, was there any attempt to make -- was
2  there any attempt made to try and determine why it
3  didn't sound when all the other photoelectrics did in
4  that test?
5      A.   I can comment on that.  If you'll look at
6  the footnote on No. 5, you'll see it first sounded at
7  15 minutes and 57 seconds.  So it actually did beep.
8  But we do not consider a burp, as we refer to it
9  often, meaning a simple sounding of the alarm which
10  immediately does not lock in and stay, but goes away,
11  as an effective sounding.  Meaning, here's the
12  detector and we get a beep and it stops, just as a
13  frame of reference.  This one actually did that.  But
14  it never locked into a sounding mode where it
15  continued to sound.
16      So early -- relatively early in the
17  fire, it actually did detect and it did burp, but it
18  didn't lock in the alarm.  It went away and never
19  came back.  And I can't tell you why.  We did not
20  dissect it.  That is not an infrequent thing to have
21  happen.  It happens fairly frequently with some types
22  of certain detectors.  They will detect, they will
23  sound the alarm, but it will last for a very short period
24  of time, it will go away and it will not come back,
25  which is not a very effective alarm.

**Page 120**

1      Q.   Well, what about Detectors 3015 and 3002,
2  those are two ionization detectors that you have
3  noted that did not alarm --
4      A.   At all.
5      Q.   -- at all?
6      A.   Never burped, never alarmed.  I can't tell
7  you why.
8      Q.   Well, other ionization detectors in your
9  test did alarm, though?
10      A.   Yes.  It's not uncommon that same make, same
11  model, detectors right beside each other, same smoke,
12  one will alarm, one won't.  The variation in
13  performance, same make, same model, between
14  manufacturers of smoke detectors is notoriously bad,
15  as has already been seen by some of the data you saw
16  from the American Sensors detectors.
17      Q.   How is it you can conclude why a detector
18  will not alarm?
19      A.   It just didn't go off.  That's all this test
20  shows, it didn't go off.  I never concluded why.  I
21  didn't attempt to conclude why.  The purpose of my
22  test here was not to tell you why it didn't go off.
23  The purpose of these tests was to show performance of
24  elapsed time of the detection, as opposed to
25  obscuration measurements.  In this case, these two

**Page 121**

1  detectors right beside each other didn't go off.
2      Q.   And right beside other detectors --
3      A.   Right beside detectors that did, I mean.
4  Didn't go off.  That is not uncommon.  I have
5  detectors that I've taken from the box, put in the
6  battery, pushed the alarm, had the alarm button go
7  off, put on the wall, exposed to high levels of
8  smoke, high obscuration levels, they never went off
9  in the test.  We truncate the test.  We walk back and
10  we push the alarm button and it sounds.  No
11  externally perceivable reason of why it would not
12  have sounded versus its companion that did sound next
13  to it.  It tested fine, it just didn't sound in the
14  presence of smoke.
15      Q.   But your results demonstrate that that
16  happens for both ionization and photoelectric?
17      A.   Absolutely.  I told you, you can make a bad
18  photoelectric detector if you try.  Actually, you
19  don't have to try, you just have to be bad at it.
20      Q.   So --
21      A.   A bad photoelectric detector is no better
22  than a bad ionization detector, if you're asking that
23  question.
24      Q.   Exactly.
25      So from the fact that a smoke detector

31 (Pages 118 to 121)

B. DON RUSSELL                                    1/14/2003

**Page 122**

1  didn't alarm, you can't draw any conclusion as to why
2  it didn't alarm?
3      A.  I didn't try to.  You will not see any
4  conclusions drawn there.
5      Q.  But, in any case, you can't?
6      A.  Not without additional effort, which I'm not
7  suggesting I did here.  I made no attempt -- the
8  purpose of these tests was not to take a specific
9  make of smoke detector and prove up what its
10  sensitivity setting was, what it's failure mode was,
11  if it did fail, or anything else.  The purpose of
12  these tests was to say, straight out of the box,
13  UL-approved, same make, same model, or variations in
14  make and model detectors, under same conditions as
15  near as one can do it scientifically, instrumented,
16  how did they sound as compared to obscuration
17  measurements.  That's this data.  Don't make more of
18  the data than is there.  I am not drawing any
19  conclusions that are not supported by the data.
20      Q.  I'm not suggesting you are.
21          But my question is, based on not just
22  your tests, but based solely on the fact that a
23  detector fails to alarm, whether it's you saying it
24  failed to alarm or anybody, you can't draw any
25  conclusions as to why it didn't alarm just from the

**Page 123**

1  fact that it didn't?
2      A.  And I don't believe I ever have.
3      Q.  Okay.
4      A.  I don't believe I -- I certainly haven't
5  here and I don't believe I have.  I can tell you that
6  often, from these tests, I can tell other things.  I
7  can say it should have alarmed because its same make,
8  same model, companions did, and may have done so in
9  fairly close concert with one another.  But why
10  didn't it?  Well, obviously it has some defect of
11  some sort, assuming it was exposed to the same smoke
12  products in the same way at the same time with any
13  kind of statistical significant sameness, if you
14  please -- pardon the expression -- why didn't it?
15  Well, it may have had a too high sensitivity setting
16  or it may have a component break or it may have had
17  something else.
18          I will tell you this, all of these
19  detectors were tested good by pushing the button
20  before and after the tests.  So it was not that it
21  wasn't powered and it was not that it didn't test
22  good externally.  Okay?  I can tell you that.
23      Q.  Okay.
24      A.  But the only thing I can tell you is, it was
25  not any apparent or obvious failure such as no

**Page 124**

1  battery, bad battery connection or bad horn,
2  sufficient that it wouldn't sound at all, because you
3  punch the test button and you got sound before and
4  after the test.  Okay?  So that is the only frame of
5  reference I would give you because I did no intrusive
6  analysis.
7      Q.  The tests for WTVJ, the summary data here
8  has some obscuration data, and some of the columns
9  have asterisks.
10      A.  Where are we looking?
11      Q.  Here on Exhibit 7.  It's towards the back.
12  It's the next set of tests.
13      A.  All right.
14      Q.  Now, on each of these sets of summary, you
15  have the asterisks and then you have a note that the
16  obscuration levels are not available for a certain
17  period of time because of the camera lights being
18  switched on?
19      A.  Yes.
20      Q.  And my question is, once the camera lights
21  were switched off and you were able to resume taking
22  obscuration levels, was there any effort to reset or
23  revalidate your photocell to make sure it was
24  calibrated correctly?
25      A.  Yeah.  We do check the calibration.  And the

**Page 125**

1  issue is not a matter of calibration, it's a matter
2  of interference.  The calibration doesn't change.  In
3  fact, it's -- it's arguable that we actually could
4  have used those measurements.  But to be fair, I did
5  not think that that was a reasonable thing to do,
6  absent substantial effort to prove that up, which I
7  had no real reason to do.
8          I don't believe the camera lights
9  actually did interfere with the measurements.  But to
10  be fair, what we did when we turned the camera lights
11  on, is we just did not report those measurements
12  because I did not want to have them biased or have
13  them be subject to a conclusion that they were
14  biased, so we left them off.  In truth, we have
15  subsequently determined it probably wouldn't make any
16  difference because they were aimed in a different
17  direction than the photoelectric cell, which are
18  beams that are around the corner and very specific to
19  the detector.
20          THE WITNESS:  Let's take a break, if we
21  could.
22          MR. HENRY:  Absolutely.
23          THE WITNESS:  Is that all right?
24          MR. HENRY:  Yeah, that's fine.
25          (Break was taken from 2:42 to 2:49 p.m.)

32 (Pages 122 to 125)

B. DON RUSSELL                                        1/14/2003

**Page 186**

1  considerations, and we should test to determine if
2  that's the case.
3         By BRK's own admission, they have never
4  run full-scale tests under varying fire conditions in
5  order to determine what those performance gaps were
6  in their detectors.  They have simply relied on the
7  UL test to say that they have a decent product.  That
8  is an error in judgement.  And that has led, in my
9  opinion, to the fact that they have never entered
10 into an exhaustive design of a competent smoke
11 detector product that addresses the performance gaps
12 and differences between ionization and photoelectric
13 detectors.
14    Q.  Are you aware that in response to a consumer
15 complaint, BRK did attempt to follow up with the
16 consumer concerning the circumstances of the
17 complaint?
18    A.  I'm well aware of the testimony in previous
19 litigation of the individuals who handle those
20 reports.  And some of the testimony indicates that,
21 on many of the cases, they simply threw the detector
22 in the box, sent another detector with a generic
23 letter that was reproduced in the same format and
24 form for each of the individual responses, and sent
25 it to the -- to the individual who had sent them the

**Page 187**

1  alleged defective detector, and said, here is one of
2  our good detectors and go and do well.  And no
3  response was followed up, no contact was made, and no
4  attempt was made to interrogate the individuals or to
5  follow up on what was done with the detectors that
6  were thrown into the box.
7         I am also aware of testimony that says,
8  in some cases, some of the detectors were tested to
9  determine if they could -- why they had not sounded,
10 many of which were inconclusive and could not
11 determine why it would not have sounded, which, by
12 the way, has supported evidence that the reason they
13 didn't sound, since they were otherwise found
14 functional, was because of the defects in the
15 ionization chambers to detect certain types of smoke
16 under certain fire conditions, which otherwise is not
17 a measurable parameter in a detector in any way that
18 BRK would normally test.  And I have read testimony
19 for both of those from BRK's staff over the years in
20 various litigation.
21    Q.  Does that mean you're not aware of the
22 information they try to obtain from consumers
23 concerning the circumstances under which --
24    A.  I just told you that, in the second half of
25 that, that I was aware that they had in some limited

**Page 188**

1  cases.  Many, they did not.  Some, they did.
2     Q.  Are you aware of the circumstances where in
3  the cases they did, but the consumer didn't respond?
4     A.  I'm confident there would be a statistical
5  sampling of all kinds of responses, some responses,
6  some no responses, et cetera.  I would not expect
7  anything different than that.  I can say this, BRK
8  has testified that they made no design change
9  attempts as a consequence of the consumer product
10 complaint reports.
11    Q.  Would you agree that it's possible that a
12 consumer could complain that the smoke detector
13 failed to alarm but it may have lacked an adequate
14 power source?
15    A.  Anything is possible.  We could speculate
16 all day long about any given one of the scores to
17 hundreds of these product complaint reports and why
18 it happened.
19    Q.  Or it could have been a component failure,
20 other than the ionization chamber?
21    A.  Absolutely.  However, if that had been
22 properly followed up on, that would have been
23 detectable.
24    Q.  Well, on those circumstances where the
25 consumer failed to send in the smoke detectors that

**Page 189**

1  had allegedly failed, it be difficult for First
2  Alert -- or BRK to make that determination.
3     A.  If they didn't have the detector, they
4  couldn't.  But the question is, did they attempt to
5  get the detector.
6     Q.  Would you agree that from the consumer
7  complaints alone, that you can't determine the
8  mechanism of failure for the smoke detector?
9     A.  You could in some cases.  If you had the
10 detector and you had a component failure, you had a
11 horn failure, you had a battery wiring failure, you
12 had an integrated circuit failure, you had a fastener
13 failure, you had some other failure, and you tested
14 it, you could certainly determine that if you tested
15 it.  Many of these were never tested.
16    Q.  And many of them were never returned to
17 BRK.
18    A.  I'm not disputing how many were or weren't.
19    Q.  My question is more towards the documents
20 that you reviewed.
21         It is possible to determine from the
22 documents you reviewed, what the mechanism of failure
23 was?
24    A.  Those documents are generally simply
25 documents which state what the consumers themselves

Stanley, Rice & Associates - A Legalink Company          214-720-4567
global court reporting * legal videography * litigation support          legalink.com

B. DON RUSSELL                                    1/14/2003

**Page 190**

1  have stated. They are filled out to state there was
2  a fire, it occurred in the kitchen, it occurred this
3  date, it was -- here's the subjective description,
4  this is the kind of detector, that's the kind of
5  information. Certainly, I would not expect to read
6  on there that the consumer told us that there was a
7  component failure, absolutely not.
8      Q.  And -- but accompanying some of those
9  documents are documents prepared by BRK concerning
10  their follow-up, correct?
11     A.  Very few. Most of the consumer product
12  complaint reports have no documented follow-up by BRK
13  at all.
14     Q.  And you've made no attempt in this case to
15  relate the facts of any of the consumer complaints to
16  the facts of this case?
17     A.  I don't -- that was not my purpose. I
18  believe they serve as notice of the design issues and
19  potential failures of this product. They have
20  nothing, in my opinion, to relate to us with respect
21  to the specific facts of this case in terms of having
22  one or two exact scenarios that occurred in the same
23  way, such as a dryer fire in a small residence with,
24  a -- whatever. I don't think that's a relevant
25  issue. I certainly didn't use them that way. I used

**Page 191**

1  them for the notice that they provided as to the
2  failures, in practice, in the public's hands, of
3  their smoke detector problems.
4      Q.  You would agree that there are some consumer
5  complaints where the smoke may have never reached the
6  smoke detector in sufficient quantities to cause it
7  to alarm?
8      A.  Could well be true. I would not dispute any
9  given scenario that might have occurred.
10     Q.  Are you going to offer opinion testimony in
11  this case concerning the theory of fretting corrosion
12  as it applies to smoke detectors?
13     A.  I have said that this is one -- corrosion
14  and displacement of the horn contacts, such that the
15  horn is incapable of sounding, is one of the failure
16  mechanisms of any separable, pressure contact
17  piezo-electric horn. That's what I've said. That is
18  one explanation of why a horn might not sound, along
19  with others I have given you. I am not going to make
20  a specific -- I am not going to make a specific
21  determination that that occurred in this case.
22     Q.  Do you know of any BRK Brands model
23  battery-powered ionization smoke detector that has
24  failed to operate, failed to sound its alarm, because
25  of fretting corrosion on the separable contacts of

**Page 192**

1  the piezo horn?
2      A.  I don't have an example that's testable.
3  They could have. They had unexplained failures.
4  That was one of the potential failure mechanisms.
5  But I have no testable example to cite you. But,
6  again, I've already told you, I'm not the one that
7  does that analysis.
8      Q.  I just want to be sure before I go through
9  this portion of my outline that it's your opinion in
10  this case that if this smoke detector did not sound
11  during the course of the Morales fire, it was likely
12  due to the fact that it was an ionization smoke
13  detector that has been shown to slowly respond or not
14  respond to certain types of fires; is that correct?
15     A.  That is the first mechanism of failure that
16  I would point to with heavy dependence upon the fire
17  modeler and cause and origin experts' testimony as to
18  the type and progression of this fire and the period
19  of time of its smouldering and the smoke products
20  that would have come therefrom. That's their
21  business. I did not do such a study. But to the
22  extent that that occurred over the initial period of
23  time from whatever initial ignition was, then that
24  most certainly would have been a known, documentable
25  failure mechanism of an ionization detector of the

**Page 193**

1  SA67 variety.
2      Q.  Do you know of any smoke detector -- let me
3  start that question again.
4      Do you know of any battery-powered
5  smoke detector that is less than five months old that
6  has failed to sound an alarm because of fretting
7  corrosion of piezo horn contacts?
8      MR. HERNANDEZ: Objection.
9      A.  I've already told you that I don't have an
10  example to cite you of a testable BRK detector as you
11  describe. I don't have one to cite you.
12     Q.  (BY MR. HENRY) My question in that case was
13  more general.
14     Do you know of any smoke detector --
15     A.  Well, by answering the general question,
16  I've answered the specific question. Certainly, if I
17  don't know of any to cite you, I can't cite one
18  that's five months old --
19     Q.  Okay.
20     A.  --right?
21     I'm not trying to be elusive. I mean,
22  I've just already answered the question.
23     Q.  And you understand in this case that
24  Jennifer Morales has testified that this smoke
25  detector alarmed while she was cooking approximately

1              IN THE UNITED STATES DISTRICT COURT
2             FOR THE SOUTHERN DISTRICT OF TEXAS
3                    BROWNSVILLE DIVISION
4
5   JOSE GARCIA, Individually )
    and as Representative of  )
6   the ESTATE OF MANUEL      )
    CRUZ; IDALIA GARCIA,      )
7   Individually; and CYNTHIA )
    COX, as Next Friend of    )
8   BRITTANY COX              )
                             )
9   VS.                       ) CIVIL ACTION NO. B-98-186
                             )
10  BRK BRANDS, INC.          )
11
12  ************************************************
13                   ORAL DEPOSITION OF
14             B. DON RUSSELL, Ph.D., P.E.
15                     May 10, 2000
16                       Volume 1
17  ************************************************
18
19       ORAL DEPOSITION of B. DON RUSSELL, Ph.D., P.E.,
    produced as a witness at the instance of the
20  Defendant(s), and duly sworn, was taken in the
    above-styled and numbered cause on the 10th of May,
21  2000, from 10:05 a.m. to 4:35 p.m., before Annemarie
    Hand, CSR in and for the State of Texas, reported by
22  machine shorthand, at the offices of Q & A Reporting,
    2700 Post Oak Boulevard, Suite 1750, Houston, Texas
23  77056, pursuant to the Federal Rules of Civil
    Procedure and the provisions stated on the record or
24  attached hereto.
25

Page 38

1  but --
2  Q. Okay.
3  A. -- but I don't know all of their screening
4  tests. We'd have to go back here and look at their
5  test protocol.
6  Q. Okay.
7  A. Of those, among the detectors that failed the
8  aerosol smoke test in the field, 25 passed the
9  screening tests in the laboratory subsequently,
10 meaning in the field they failed the aerosol test --
11 Q. How many failed?
12 A. -- and then passed the screening test in
13 the lab.
14 Q. How many failed in the field the aerosol
15 test?
16 A. How many failed in the field? I think, if I
17 understand this right, it's 49.
18 Q. So you're saying that there were 49 detectors
19 that failed in the field and of those 49, 25 passed in
20 the lab?
21 A. Passed the screen -- all of their screening
22 tests. So they should have worked, is the assumption
23 that I have made.
24 Q. Okay.
25 A. And then they say they examined them.

Page 39

1  Q. The 25 or the 49?
2  A. The implication is the 25. They may have
3  done the 49, too, but the statement here only would
4  refer back to the -- I believe the antecedent would be
5  the 25 that's in that paragraph. They examined them
6  and they showed the presence, this is their quote,
7  "presence of deterioration and corrosion on the horn
8  element contacts which can result in the horn becoming
9  inoperative." So they found that as a possible
10 operative cause of why they would pass an aerosol test
11 on the wall but not subsequently --
12     MR. MARCHAN: Wait. Backwards.
13 A. Excuse me, yeah. Not pass the aerosol test
14 on the wall and subsequently would pass the screening
15 test for operability.
16 Q. (By Mr. Heller) Okay. So if I understood
17 it, that's a possible cause; that wasn't determined to
18 be the cause.
19 A. This paragraph says that they found the
20 corrosion. It does not say that they were able to
21 make a -- that paragraph doesn't say they were able to
22 make an absolute connection. But remember it's passed
23 all other tests. That's the only thing that they
24 found that would be an indicative cause.
25 Q. Okay. But that report, at least that

Page 40

1  paragraph of that report does not say that was the
2  cause of the failure in the field and success in the
3  lab.
4  A. My point to you is that that's why you can't
5  do that. They have no way of doing that.
6  Q. You still have to answer my question. Did
7  that report --
8  A. I already said it didn't, yeah.
9  Q. Okay. Because I limited my question to that
10 paragraph. Anywhere in that report, does it say that
11 is the cause?
12 A. I don't know the answer to that. I haven't
13 studied the report that carefully to say that it
14 doesn't state that someplace else.
15 Q. Do you know what detectors were involved in
16 this test?
17 A. It was a broad spectrum of detectors.
18 Q. Does it identify the detectors anywhere in
19 that report by manufacturer or model number?
20 A. I don't know if this copy of the report does
21 or not.
22 Q. Do you know if any copy that you have seen
23 identifies the manufacturer or model number of these
24 detectors?
25 A. I don't recall. Sorry.

Page 41

1  Q. Have you seen any documents anywhere that
2  have suggested that a 6 -- SA67D similar to the
3  detector that was in the Cruz residence did not sound
4  an alarm because of corrosion on the contacts?
5  A. Read that back for me.
6     (Record read)
7  A. I don't think I can point you to a document,
8  no.
9  Q. (By Mr. Heller) Have you seen any documents
10 that suggest any of the BRK manufactured -- BRK
11 Brands, Inc. manufactured detectors failed to sound an
12 alarm because of corrosion on its contacts?
13 A. BRK detectors have specifically been tied to
14 the issue of Piezo electric horn corrosion both based
15 on product recall in the past, as well as UL testing,
16 as well as in-house testing.
17 Q. The product recall I think we can agree
18 occurred around 1990?
19 A. I wouldn't dispute that.
20 Q. And can we agree that the product recall
21 involved detectors identified as 1839 and 2839 models?
22 A. I think it was inclusive of those, yes. May
23 have been limited to those.
24 Q. Okay. Was that what you were referring to
25 when you said BRK has been tied to recall issues?

Page 42

1  A. Yes, it was the specific recall of those
2  residential smoke detectors.
3  Q. What were you referring to when you tied BRK
4  to UL testing?
5  A. BRK has had -- there are issues that have
6  been raised with respect to UL testing in BRK smoke
7  detectors with respect to corrosion of horn contacts,
8  the failure of BRK detectors to pass UL tests due to
9  corrosion of horn contacts and the subsequent
10 modification of BRK smoke detectors by BRK employees
11 so that they would pass UL tests.
12 Q. Are you talking about issues that occurred in
13 the 1980s?
14 A. I won't limit it to that, but yes, that's
15 inclusive of that.
16 Q. Are you aware of any of the contacts that you
17 just described occurring in the 1990s?
18 A. I have no reason to believe that the issues
19 have changed in the 1990s.
20 Q. Are you aware and can you point to any
21 evidence, testimony, documents that suggest that BRK
22 detectors other than the 1839 and 2839 have failed to
23 pass UL tests because of corrosion on the contacts?
24 A. In the 1990s?
25 Q. In the 1990s.

Page 43

1  A. No.
2  Q. Have you been -- do you have any evidence or
3  documents that suggest that there have been any
4  modifications made to smoke detectors that have failed
5  UL tests in the 1990s?
6  A. No.
7  Q. The conduct that you're referring to and the
8  issues that were raised, are you referring to the
9  testimony of an ex-employee of BRK Electronics, Inc.,
10 a division of Pitway, whose name is Dave Minnis?
11 A. That's one of the specific things I was
12 referring to.
13 Q. What else specifically were you referring to?
14 A. The previously produced documents of BRK with
15 respect to their testing of smoke detectors related to
16 corrosion of Piezo electric horns.
17 Q. And I did not see them here today.
18 A. I didn't depend -- plan on depending on those
19 for my opinions because they are BRK documents and
20 I've seen them many times before, but I didn't review
21 them for this case.
22 Q. Do you intend to use them in support of your
23 opinions in this case?
24 A. I don't have a specific need to have that for
25 my opinion unless you have a question about it.

Page 44

```
1    Q.  And in summary form, what do those documents
2  state?
3    A.  That there were issues related to corrosion
4  of Piezo electric horns and that there were tests made
5  inside BRK's, I'll call it laboratories for lack of a
6  better phrase, related to Piezo electric horn
7  corrosion.
8    Q.  Did that discuss the 1839s and 2839s?
9    A.  And also ionization -- battery powered
10  ionization detectors as well as other detectors they
11  made, AC and battery powered.
12    Q.  And is that what you were referring to when
13  you tied BRK to its in-house testing?
14    A.  Yes.
15    Q.  Have we now discussed in at least summary
16  form all of the evidence that you have that BRK-
17  manufactured detectors are affected by corrosion on
18  the contacts?
19    A.  Well, notwithstanding of course all the
20  Consumer Products Safety Commission studies that have
21  been done on it, yeah.  I think that's probably an
22  adequate list.
23    Q.  Okay.  Are you aware of any of the design
24  differences between the 1839 and 2839 detectors and
25  the SA67D detectors?
```

Page 45

```
1    A.  They are different detectors in terms of
2  electronics because one's AC powered and the unit in
3  this case is an ionization battery powered unit.
4    Q.  Are you aware of any of the differences as it
5  affects the corrosion issue?
6    A.  There are alleged differences that the
7  electronic signal to the Piezo electric horn and the
8  AC powered units is different than the signal to the
9  horn in the DC powered units and that somehow that
10  provides compensation or the term has been used
11  "breaks through" the corrosion in the battery powered
12  units differently than the AC units and therefore they
13  are less susceptible.  I have seen no scientific
14  evidence to support that.
15    Q.  Do you have any scientific evidence to
16  contradict that?
17    A.  I don't have any evidence that I've seen of a
18  scientific study to support anything related to the
19  relationship of the electronics to the corrosion.
20    Q.  Okay.  But my question was:  Do you have any
21  scientific evidence to --
22    A.  That answered both questions.
23    Q.  So you don't have any evidence that
24  contradicts or supports that opinion.
25    A.  That's correct.  That's just postulated by
```

Page 46

```
1  BRK and I've never seen the evidence to support it.
2    Q.  And you have not done any tests to determine
3  whether that conclusion is accurate or inaccurate?
4    A.  No, I've not done any tests.
5    Q.  And you're not aware of any tests that
6  have -- that can determine whether that conclusion was
7  accurate or inaccurate?
8    A.  I've never seen a scientific test reported
9  that would do that.
10    Q.  Are you aware of any other design differences
11  of the SA67 type detectors as compared with the 1839
12  and 2839 detectors --
13    A.  Other than --
14    Q.  -- as it relates to corrosion?
15    A.  Other than the electronics and the horn, I
16  don't think there would be anything else relevant to
17  the corrosion issue.
18    Q.  If there is anything else relevant, you don't
19  know of it as you sit here today.
20    A.  No, I don't think the power, itself, other
21  than the way it affects the electronics, the way the
22  electronics is designed is not an issue, itself.  No,
23  I don't think so.
24    Q.  Other than the 1839 and 2839 models, are you
25  aware of any other BRK Brands, Inc. detector -- strike
```

Page 47

```
1  that.
2        Other than the 1839 and 2839 detectors,
3  are you aware of any detector manufactured by BRK
4  Brands, Inc., BRK Electronics, a division of Pitway,
5  or First Alert that has been scientifically determined
6  not to have sounded an alarm because of corrosion?
7    A.  I think the answer is yes in that the devices
8  that were submitted for study as I understand it to
9  the Canadian Underwriters Laboratories were inclusive
10  of not only -- well, were inclusive of DC powered or
11  battery powered devices and there were questions
12  raised about the issue of corrosion or passing those
13  tests.  I don't have that test data.
14    Q.  Anything other than the Canadian UL tests?
15    A.  I don't have any pieces of paper that would
16  answer your question affirmatively or document that.
17    Q.  So in summary, other than the Canadian tests
18  which we're now going to talk about, you don't know of
19  any BRK Electronics, BRK Brands, Inc. or First Alert
20  detector other than the 1839 and 2839s which have been
21  scientifically determined not to have sounded an alarm
22  because of corrosion.
23    A.  Emphasis on the -- me having the list and the
24  scientific determination.  That's correct.
25    Q.  Okay.  When were the Canadian UL tests
```

Page 48

```
1  conducted?
2    A.  I'm sorry, I don't have that date.  I wasn't
3  a participant in that and I haven't seen those
4  results, so I don't have a date.
5    Q.  How did you learn of those tests?
6    A.  Partially because of the testimony of
7  Mr. Minnis and subsequently in others' discussion of
8  those specific tests.
9    Q.  What do you recollect from David Minnis'
10  discussion of the Canadian tests?
11    A.  Only recollection I have that would be
12  relevant to this was that there were smoke detectors
13  that had been previously submitted that had failed the
14  test, and then as a preventative measure there were
15  modifications made to smoke detectors that were
16  subsequently submitted so that they would pass the
17  test.
18    Q.  Are you of the belief that David Minnis
19  testified that the smoke detectors submitted to Canada
20  did not sound an alarm ever as compared with did not
21  sound within the sensitivity requirements of Canadian
22  UL standards?
23    A.  I have no -- I have no specific information
24  that would allow me to make that distinction.
25    Q.  Okay.  And you said that you have
```

Page 49

```
1  subsequently been in discussion with others about the
2  Canadian UL tests.  Who have you been in discussions
3  with?
4    A.  The -- different attorneys concerning the
5  testimony of Mr. Minnis and the information
6  surrounding those -- the production of the documents
7  associated with the UL Canada tests.
8    Q.  And what attorneys are we talking about?
9    A.  Mr. Bruning and Mr. Fetterly.
10    Q.  When did these discussions occur?
11    A.  I couldn't tell you, but sometime over the
12  last year probably.
13    Q.  Did they occur in relation to a specific case
14  you were working on?
15    A.  Both of them would have been in cases related
16  to BRK that I had with those two gentlemen.
17    Q.  Are you currently working on any cases with
18  Mr. Bruning?
19    A.  No.
20    Q.  Are you currently working on any cases with
21  Mr. Fetterly?
22    A.  Yes.
23    Q.  What cases are they?
24    A.  The Warner case, which as I understand has
25  recently been set aside, was a case that I was most
```

9 (Pages 44 to 49)



Page 50

```
 1   recently working with Mr. Fetterly on, which was
 2   probably the time when I had these discussions.
 3       Q.   When you say "act aside," was it dismissed by
 4   a court?
 5       A.   I don't know the legal issues involved.  I
 6   don't have the specifics.
 7       Q.   Dismissed by summary judgment?
 8       A.   I wouldn't -- you'd have to tell me that.
 9       Q.   Okay.  What specifically did Mr. Bruning or
10   Mr. Fetterly tell you with regard to the Canadian UL
11   tests that led you to the conclusion that some
12   detectors submitted to UL Canada did not sound an
13   alarm because of corrosion?
14       A.   I didn't say that.  What I said was there
15   were tests -- there were smoke detectors that were
16   submitted to UL that didn't pass the test.  I am not
17   here to pass judgment on why they didn't pass.
18       Q.   Okay.  So you --
19       A.   I don't have that information.
20       Q.   So you can't say that any --
21       A.   Let me finish.
22       Q.   I'm sorry.
23       A.   And then subsequently there were actions
24   taken, ostensibly for the purpose of ensuring
25   preventatively that the units would pass the test.
```

Page 53

```
 1       A.   No, I've already said I have no evidence of
 2   any of this except Mr. Minnis' testimony.
 3       Q.   Okay.  You keep characterizing testimony.
 4   Answer my question:  Do you have any evidence that any
 5   detectors submitted to UL Canada by BRK Electronics,
 6   BRK Brands, Inc./Pitway or First Alert failed to sound
 7   an alarm because of corrosion on the contacts?
 8       A.   I think that's been answered.  No, I don't.
 9       Q.   Okay.
10       A.   I've already said that.
11       Q.   Okay.  If you did, I apologize for reasking.
12       A.   That's all right.
13       Q.   Do you have any evidence that any detector
14   other than the 1839 or 2839 models has ever been
15   scientifically determined to have failed to sound an
16   alarm because of corrosion on the contacts?
17       A.   I think you've already asked that question.
18   I've already answered it very clearly that I --
19   emphasize the words "scientific" and the "evidence"
20   in my possession.  The answer's no, I don't have
21   anything to point you to.
22       Q.   Okay.  Now, when I first asked the question I
23   asked the question of BRK Brands, Inc.  Do you know
24   the difference between BRK Brands, Inc. and BRK
25   Electronics, a division of Pitway?
```

Page 51

```
 1   There's no reason to take a preventative action to
 2   work on the horn contacts unless there was some mental
 3   linkage made by someone that that was the reason they
 4   weren't passing the test, but that is an assumption on
 5   my part because I haven't seen that documentation.
 6       Q.   What documentation or information did you --
 7   or do you have that says that the preventative action
 8   taken was related to the horn contacts?
 9       A.   Well, putting oil on the horn contacts is
10   obviously related to them.
11       Q.   What evidence do you have that suggests that
12   there was oil placed on the horn contacts in smoke
13   detectors submitted to UL Canada?
14       A.   Mr. Minnis' testimony.
15       Q.   You believe Mr. Minnis testified that there
16   was oil placed on contacts submitted to UL Canada?
17       A.   No, on all paste-on contacts on smoke
18   detectors.
19       Q.   Okay.  You or I or both are confusing two
20   issues, so let me try to make sure we're clear.
21       A.   Okay.
22       Q.   The initial question on the UL Canada was do
23   you know of any smoke detectors manufactured by BRK
24   Electronics, BRK Brands, Inc. or First Alert other
25   than the 1839 and 2839 that has been scientifically
```

Page 54

```
 1       A.   I'm making no distinction between any of
 2   those companies with respect to this Ionization -- the
 3   stream of ionization smoke detector designs that have
 4   occurred over the last 20 years.
 5       Q.   How about placing oil on the contacts, did
 6   you make any distinction between the companies?
 7       A.   I made no distinction between any of those
 8   manufacturers specifically to that said, because with
 9   respect to design I didn't see any real difference.
10       Q.   Do you know what if any steps the BRK
11   Electronics, BRK Brands, Inc. or First Alert has taken
12   to avoid having corrosion on contacts stop a detector
13   from sounding its alarm?
14       A.   I do know that for a while, a period which I
15   can't quantify, there was some welding of the contacts
16   on Piezo electric horns.  I don't know of any other
17   specific actions that have been applied or that are
18   applied today to keep that from happening.
19       Q.   Do you know if welding on -- welding the
20   contacts prevents corrosion from affecting the
21   sounding of an alarm?
22       A.   Well, it certainly will keep you from having
23   the kind of microscopic corrosion in terms of contact
24   resistance between the pressure contact and the horn
25   plate, because if it's welded there's no way for
```

Page 52

```
 1   determined not to have sounded an alarm because of
 2   corrosion on the contacts?
 3       A.   Okay.
 4       Q.   And your answer is what?
 5       A.   Well, then I'm going to have to have you --
 6   you want me to reanswer it, I'm going to have to hear
 7   it again because you're being now very specific.  I
 8   was trying to answer in all candidness the evidence
 9   that I had based on Mr. Minnis' sworn testimony
10   related to his actions related to horn contacts, oil,
11   et cetera, with respect to UL.  Whether that be UL
12   Canada or UL U.S., it's not a relevant issue in my
13   opinion.
14       Q.   We can go back --
15       A.   What I thought we earlier -- earlier I was
16   telling you that I'd had some discussions and that UL
17   Canada smoke detectors had been submitted that had
18   also failed.  I don't have any evidence to support
19   that that specifically is why they failed.  I've
20   already said that.
21       Q.   Okay.  I don't believe you said that, but
22   let's make it clear:  You don't have any evidence that
23   any detectors submitted to UL Canada failed to sound
24   an alarm because of the corrosion issue on its
25   contacts.
```

Page 55

```
 1   microscopic corrosion to get in between those two.  It
 2   certainly prohibits that.
 3       Q.   Do you know if the SA67D's contacts were
 4   welded?
 5       A.   I haven't seen this unit and I do not know if
 6   at the time this unit was made there were welded
 7   contacts or not, but it's my understanding that it was
 8   not.
 9       Q.   What is your understanding based upon?
10       A.   Based on my knowledge of the way that those
11   have been manufactured in recent years.
12       Q.   Do you know when this specific detector was
13   manufactured?
14       A.   No, it looks to be relative -- it looks to be
15   like a relatively new design.  It is not -- with that
16   number, it is not an archaic detector.
17       Q.   When you say "relatively new," can you give
18   me a time period?
19       A.   Well, it's not 25 years old.
20       Q.   And you believe that in or about the time
21   period that this specific detector was manufactured
22   they were not welding contacts?
23       A.   To my knowledge, this -- that's correct.
24       Q.   Do you know the type of contacts that are on
25   this particular detector?
```

Page 56

1  A. I haven't seen this detector.
2  Q. The answer's no.
3  A. That's right.
4  Q. Do you know the type of contacts that were on
5  any of the SA67s type smoke detectors?
6  A. Pressure contacts.
7  Q. Do you have any other information about the
8  type of contacts, single-arm, bifurcated arm, anything
9  to do?
10  A. I don't have any specific information other
11  than the type of pressure contact on the Piezo
12  electric horn.
13  Q. And you also don't --
14  A. Made no study of that.
15  Q. And you don't have any specific information
16  as to anything else BRK Electronics, BRK Brands,
17  Inc./Pitway or First Alert did to avoid the corrosion
18  issue other than welding its contacts, any
19  modifications?
20  A. I'm not aware of it. I'm not disputing they
21  may have. I just don't know of it.
22  Q. And therefore you wouldn't know the success
23  or failure of these modifications.
24  A. I have no evidence to support the success or
25  failure of any proposed or implemented modifications

Page 57

1  they may have done.
2  Q. How does corrosion build upon the contacts of
3  a smoke detector?
4  A. The microscopic corrosion is a complex
5  mechanism that has to do with environment in which it
6  is placed, the types of metals that are involved, the
7  types of contaminants or pollutants that are in the
8  air in combination, and it's an electrochemical
9  process and it is -- under certain circumstances you
10  can document it with microscopic or submicroscopic
11  study.
12  Q. SEM analysis?
13  A. That would be a certainly adequate way to
14  look at it and see it. You have to be extraordinarily
15  cautious because it is very fragile. Because it is a
16  very thin and not very durable type of corrosion, it
17  is easily broken through. So if you're going to
18  verify that, you have to do so under very careful
19  conditions.
20  Q. What are the metals that are involved? You
21  said it's an issue of metals.
22  A. I'm just giving you a list of the parameters
23  that would be involved. It can be a function of
24  the -- whatever the two surfaces are between which the
25  microscopic corrosion occurs; that's one of the

Page 58

1  parameters. It is a function of heat, humidity --
2  temperature, humidity and environment pollutants, and
3  it is a function of time. And those are all
4  parameters that would affect the issue of the
5  formation initially or the rapid growth or the
6  sustained growth of the corrosion.
7  Q. With regard --
8  A. And I'm not, as you know, a chemist, but it's
9  an electrochemical process.
10  Q. So you can't identify the metals that are
11  involved in the corrosion of the contacts on the smoke
12  detector?
13  A. I've made no study of the specific corrosion
14  mechanism that has been involved in the -- these smoke
15  detectors, no, other than to read some papers where
16  other experts have, you know, analyzed some of that.
17  But I'm not a chemist.
18  Q. And that's not your area of expertise here.
19  A. It's not an area that I have chosen to become
20  an expert in.
21  Q. You said it was a function of time. What do
22  you mean by that?
23  A. It's an electrochemical process which means
24  time is one of the elements. It doesn't go from no
25  corrosion to enormous amounts of corrosion in, you

Page 59

1  know, two seconds. It's a process of building the
2  corrosion and that takes some time and so it's a time
3  function, but it's a time function in terms of the
4  environment. So if you change the other parameters
5  like humidity conditions, temperature conditions and
6  pollutant conditions which could serve as a catalyst,
7  then you could have a longer or shorter time according
8  to how you control those parameters.
9  Q. Do you know the time it would have taken for
10  the detector in the Cruz residence to have built up
11  microscopic corrosion --
12  A. Absolutely not.
13  Q. -- sufficient to prevent the detector from
14  sounding?
15  A. Could be days, could be months, could be
16  longer, but I'm not -- I've made no such study and we
17  have no way of replicating the environmental
18  conditions to which this detector has been exposed and
19  we have no way of really making good assumptions about
20  what those were, so it would be difficult to.
21  Q. Is there anything that could be done by a
22  homeowner or resident to prevent corrosion from
23  occurring?
24  A. In general, no.
25  Q. How about pushing the test button?

Page 60

1  A. That doesn't keep it from occurring, but if
2  you disturb the corrosion on a regular basis, of
3  course, you could eliminate it by wiping it away.
4  That doesn't keep it from happening, it just -- it
5  keeps it from becoming thick enough to cause your
6  problem.
7  Q. Okay. So by pushing the test button, you can
8  prevent corrosion from affecting the sounding of an
9  alarm.
10  A. Possibly.
11  Q. Possibly.
12  A. You don't know that, but possibly.
13  Q. When you say "you don't know that," what do
14  you mean?
15  A. Meaning I've never seen anybody who has done
16  a scientific study that can affirm that that is always
17  true.
18  Q. Okay. But you can't affirm that it is or is
19  not true.
20  A. That's correct.
21  Q. Do you have any evidence that the specific
22  detector that was in the Cruz residence had corrosion
23  on its contacts which prevented it from sounding an
24  alarm in the presence of the combustible products in
25  the air during the Sunday, Monday or Tuesday of

Page 61

1  Mr. Cruz's death?
2  A. Specific evidence?
3  Q. Yes.
4  A. No.
5  Q. Any evidence that you can say you are
6  scientifically relying on?
7  A. No.
8  Q. That you can testify within a reasonable
9  degree of engineering or scientific certainty about?
10  A. I can do that.
11  Q. Okay. What do you say that is within a
12  reasonable degree of scientific or engineering
13  certainty that can establish that these contacts have
14  corrosion sufficient to prevent it from alarming?
15  A. Process of elimination.
16  Q. Okay. What have you done to eliminate other
17  reasons?
18  A. The device was powered with a battery
19  sufficient to sound an alarm as witnessed by both the
20  tests that Mr. McClintock you've already referred to
21  did, and his -- and the subsequent testing I believe
22  by your own experts of the battery. The -- if you
23  eliminate the issue of properly powered, you eliminate
24  the issue of whether the electronics was working,
25  because when the test button was pushed there was

Page 164

```
1    A.  Chamber, no.
2    Q.  Have you ever analyzed the sensitivity
3  settings of a BRK smoke detector?
4    A.  Meaning comparing their sensitivities to,
5  say, what their claimed sensitivity is?
6    Q.  Yeah.
7    A.  No.
8    Q.  Would you agree that a number of features
9  within the sensing chamber of an ionization smoke
10 detector affect its performance and ability to detect
11 smoke?
12   A.  Yes.
13   Q.  Would you agree that one such feature is the
14 shape of the chamber?
15   A.  Yes.
16   Q.  Would another be the volume of the chamber?
17   A.  Yes.
18   Q.  Another would be the arrangement of the
19 baffles of the chamber?
20   A.  Yes.
21   Q.  Another would be the distance between the
22 electrodes in the chamber?
23   A.  Yes.
24   Q.  Another would be the location of the
25 radioactive source in the chamber?
```

Page 165

```
1    A.  Yes.
2    Q.  Another would be the type of material used
3  for the electrodes in the chamber?
4    A.  Yes.
5    Q.  Have you done any study on any of these
6  features?
7    A.  No.
8    Q.  And the same would obviously be true for this
9  SA67.
10   A.  For any ionization detector.
11   Q.  Have you ever analyzed the calibration of the
12 electric circuitry or sensitivity settings of the
13 ionization chamber of a BRK smoke detector?
14   A.  Experimentally or theoretically?
15   Q.  Experimentally.
16   A.  No.
17   Q.  Do you agree that the timeliness of a smoke
18 detector, of an ionization detector's response is
19 related to the sensitivity setting of the chamber and
20 the calibration of the circuitry?
21   A.  There is a relationship, yes.
22   Q.  Have you made any attempt to analyze the
23 various components inside a chamber, an ionization
24 chamber?
25   A.  No, I think you just asked that, didn't you?
```

Page 166

```
1  I said no.
2    Q.  Have you ever studied the way smoke enters an
3  ionization detector's chamber?
4    A.  Other than look at the openings from the
5  chamber external to internal?  Other than that, no.
6    Q.  You've just looked at it?
7    A.  Yeah, just the normal engineering
8  observation.  I've made no study of that.
9    Q.  You would agree that the construction of the
10 smoke detector's air flow exit and entrance and its
11 baffling play a role in determining how quick a
12 detector will respond to given smoke conditions?
13   A.  Absolutely.
14   Q.  And you've never analyzed that issue.
15   A.  No, I have not.
16   Q.  You would agree that not all ionization
17 chambers process smoke the same way?
18   A.  To the degree they have any differences at
19 all, the answer to that would be yes.  They do not.
20   Q.  And you have not analyzed that issue?
21   A.  No, made no comparative studies.
22   Q.  And would you agree that the way it processes
23 smoke determines whether it will sound in a timely
24 manner?
25   A.  That's one of the factors.
```

Page 167

```
1    Q.  Would you agree that the threshold for the
2  reduction in current, which is some preset number,
3  determines when the detector will alarm?
4    A.  That is one of the factors.
5    Q.  And you can affect the response time by
6  setting it higher or lower.
7    A.  That is correct.
8    Q.  Do you know the settings of the SA67?
9    A.  Not specifically.
10   Q.  Would you agree that the components utilized
11 to detect the changes of current affect a smoke
12 detector's response to smoke conditions?
13   A.  Yes.
14   Q.  And would you agree that all components taken
15 individually or collectively have an effect on the
16 performance and ultimately the sensitivity of a
17 detector?
18   A.  Yes.
19   Q.  You haven't analyzed that issue either?
20   A.  No.  It's not relevant to the opinions of
21 this case.  In fact none of that is, the last ten
22 minutes, relevant to the opinions of this case.
23   Q.  In terms of the tests that you have run, did
24 you develop a methodology and protocol which would
25 instrument chambers of different designs, in other
```

Page 168

```
1  words, photoelectric and ionization detectors, and
2  expose them to known quantity types -- known
3  quantified types of particulate matter?
4    A.  We'll have to be very specific about that.
5  Have I made comparative studies of ionization versus
6  photoelectric, yes.  Have I done so under as close a
7  full-scale condition as one can get where you are
8  submitting identical smoke to the chambers, yes.
9  Could one characterize those as absolutely identical
10 in a scientific sense?  Engineering sense, yes;
11 scientific sense, no, because there's no way to do
12 that, it's not possible.
13   Q.  Have you quantified the types of particulate
14 matter that are involved in your tests in any fashion?
15   A.  Quantified in terms of measure of let's say
16 density and size during the test?  No, I do not
17 measure density and size.
18   Q.  You used the word "and."  I'm going to say do
19 you measure density or size?
20   A.  Either or, no, yet.
21   Q.  Do you measure the current flow in the
22 detector's chamber?
23   A.  No.  I'm doing an external noninvasive time
24 to sound measurement.  I make no internal measurements
25 on any of these tests.
```

Page 169

```
1    Q.  I have a couple more just to make sure we're
2  clear.
3    A.  Sure.
4    Q.  Do you measure the recombination rate of ions
5  during any of these tests?
6    A.  No.
7    Q.  Do you determine the actual space between
8  electrodes and/or the size of particulate matter
9  entering the spaces during these tests?
10   A.  No.  No internal or invasive measurements are
11 made during the tests.
12   Q.  And your tests are conducted without any
13 ventilation and/or operating HVAC system.  Is that
14 correct?
15   A.  There is always ventilation.  There is no
16 intentional ventilation of the rooms, no doors open,
17 windows open type of ventilation, and there is no
18 artificial HVAC at the time of the testing for
19 anything I've shown you.
20   Q.  And the kitchen portion of your tests, the
21 kitchen portion of your test facility is sealed?
22   A.  Yes.  It's simply used -- it's a very small
23 area and so it was -- since it was a very small part
24 of the square footage of the facility and conveniently
25 located, it was ideally suited to seal off, make
```

## JESSE ARONSTEIN

1                                                    1

2              UNITED STATES DISTRICT COURT

3           FOR THE SOUTHERN DISTRICT OF TEXAS

4                  BROWNSVILLE DIVISION

5    --------------------------------------------x

6    JOSE GARCIA, Individually and as
     Representative of the Estate of MANUEL CRUZ,
7    IDALIA GARCIA, Individually and CYNTHIA
     COX, as Next Friend of BRITTANY COX,

8

9              vs.

10   BRK BRANDS, INC.,

11   Civil Action No.: B-98-186

12   --------------------------------------------x

13

14                   45 Broadway
                     New York, New York
15

16                   June 14, 2000
                     10:20 A.M.
17

18

19        DEPOSITION UPON ORAL EXAMINATION OF

20   JESSE ARONSTEIN, taken by the defendant,

21   pursuant to Subpoena Duces Tecum, held at

22   the above-mentioned time and place, before

23   a Notary Public within and for the State of

24   New York.

25

---

1                                                    2

2    A P P E A R A N C E S :

3

4

5

6    LAW OFFICE OF MARK A. CANTU
         Attorneys for Plaintiffs Jose
7        Garcia, Idalia Garcia
         1300 North 10th Street
8        McAllen, Texas 78501
     BY:     SHIREE' D. SALINAS, ESQ.

9

10

11

12   HARRIS & WATTS, P.C.
         Attorneys for Plaintiff Cynthia
13       Cox
         192A E. Elizabeth Street
14   BY:   Brownsville, Texas  78520
         RAY MARCHAN, ESQ.

15

16

17   COZEN & O'CONNOR
         Attorneys for Defendant
18       The Atrium
         1900 Market Street
19       Philadelphia, Pennsylvania
         19103
20   BY:     JAMES H. HELLER, ESQ.

21

22

23

24

25

---

1                                                    3

2              FEDERAL STIPULATIONS

3

4        IT IS HEREBY STIPULATED AND AGREED

5    by and between the attorneys for the

6    respective parties herein, that filing

7    and sealing be and the same are hereby

8    waived.

9

10       IT IS FURTHER STIPULATED AND AGREED

11   that all objections, except as to the form

12   of the question, shall be reserved to the

13   time of the trial.

14

15       IT IS FURTHER STIPULATED AND AGREED

16   that the within deposition may be sworn to

17   and signed before any officer authorized to

18   administer an oath, with the same force and

19   effect as if signed and sworn to before the

20   Court.

21

22

23              - oOo -

24

25

---

1                                                    4

2    J E S S E   A R O N S T E I N ,

3        after having been first duly sworn by

4    a Notary Public of the State of New

5    York, was examined and testified as

6    follows:

7    EXAMINATION BY

8    MR. HELLER:

9        Q        State your name for the record,

10   please.

11       A        Jesse Aronstein.

12       Q        State your present address for the

13   record, please.

14       A        50 Pasture Lane, Poughkeepsie,

15   New York 12603.

16            MR. HELLER:   Dr.

17   Aronstein, as we met just prior to this

18   deposition, my name is Jim Heller.  I'm

19   an attorney for defendant in this case,

20   BRK Brands.  We are here today to take

21   your deposition.  Let me give you some

22   instructions, so hopefully this goes as

23   expeditiously as possible.

24            The woman sitting to my right

25   and to your left is a court reporter.

## JESSE ARONSTEIN

57

2  A     The tin plating is detrimental
3  with respect to fretting.  That is my
4  opinion.
5  Q     But not as respects to
6  corrosion?
7  A     I do not know.  I have no tests
8  run on the corrosion.  I believe that when
9  corrosion tests were run by IITRI and by
10 BRK, the results were not good with respect
11 to contact performance under conditions of
12 corrosion.
13 Q     You said you believe the
14 conclusion of IITRI was that there was a
15 corrosion problem?
16 A     No.  I told you that the results
17 that they found when they ran corrosion
18 tests were not good.
19 Q     What do you mean by that?
20 A     I mean that the contact
21 resistance increased substantially, and in
22 some samples I believe it increased to
23 above the threshold, whereby the
24 battery-powered smoke detectors were known
25 not to sound.

58

2  Q     You believe that IITRI has data
3  that suggests that contact resistance of a
4  battery-powered detector increased so that
5  the detector did not sound its alarm?
6  A     Correct.
7  Q     Do you have that data in your
8  office?
9  A     I have copies of the IITRI
10 report, and may have a copy here with
11 Russell's report.
12 Q     Please look for it.
13 A     Pardon me, that should have been
14 Russell's deposition.  I don't see it in
15 this group.  I don't think it was
16 McClintock's.  No, I do not have it with
17 me.
18        MR. HELLER:  I ask that
19 that be produced.
20        THE WITNESS:  If I can.
21 That maybe, the copy that I have maybe
22 not be the Freedom of Information Act
23 Version.
24        MR. HELLER:  If you are
25 going to rely upon it I'm going to

59

2  demand it be produced.  At that point
3  it's up to you guys.
4         THE WITNESS:  I believe I
5  maybe able to get the info IA version
6  in time to use it.
7  Q     The battery-powered detectors
8  that had this increased resistance, that
9  prevented it from alarming, do you know if
10 they were BRK detectors?
11 A     Some of them were.
12 Q     Do you know when these tests
13 were performed, what year?
14 A     I don't recall.
15 Q     Do you know if they were
16 performed after July of 1992?
17 A     I don't recall.
18 Q     Were you familiar with the fact
19 that BRK Brands, the defendant in this
20 case, was not formed as a corporation until
21 July 31, 1992?
22 A     I am not an expert on the
23 corporate entity and its history.
24 Q     You couldn't testify that any of
25 the detectors that were tested by IITRI,

60

2  and displayed the resistance you just
3  described, were BRK Brands detectors?
4  A     I believe the detectors, the
5  horns that they tested were horns that
6  included the types that are used in the BRK
7  battery-powered smoke detectors.
8  Q     I'm differentiating the company
9  BRK Brands from BRK Division of Pittway.
10 I'm asking any of the horns that were
11 tested by IITRI, were any of them
12 manufactured by BRK Brands Inc.?
13 A     They are not identified by the
14 manufacturer of the smoke detector in the
15 report.
16 Q     Can you testify whether any of
17 the battery-powered detectors that had this
18 high resistance problem, had contacts that
19 were made of tin-plated stainless steel?
20 A     I would have to refer to the
21 report for the materials analysis.
22 Q     So you can't testify to that
23 today?
24 A     That's correct.
25 Q     Do you know the type of drive

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSE GARCIA, Individually and as     :
Representative of the Estate of
Manuel Cruz, Idalia Garcia,     :
Individually and Cynthia Cox, as
next friend of Brittany Cox,     :

                       Plaintiffs,     :

             -against-     :

BRK BRANDS, INC.     :

                 Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


           CONTINUED DEPOSITION of JESSE

ARONSTEIN, taken by Defendant, pursuant to

Adjournment, at the offices of Cozen & O'Connor,

Esqs., 1900 Market Street, New York, New York

19103, on November 14, 2000 at 10:15 a.m. before

Lizzete Cubria, a Shorthand Reporter and Notary

Public within and for the State of New York.

2

1

2      A P P E A R A N C E S:

3              LAW OFFICES OF MARK A. MANTU
                   Attorneys for Plaintiff
4                  1300 North 10th Street
                   McAllen, Texas  78501
5
         BY:     SHIREE D. SALINAS, Esq., of Counsel
6

7

         HARRIS & WATTS, P.C.
8              Attorneys for Plaintiff
               Cynthia Cox
9              1626 East Elizabeth Street
               Brownsville, Texas  78520
10
         BY:   RAY MARCHAN, ESQ., of Counsel
11

12       COZEN & O'CONNOR, ESQS.,
               Attorneys for Defendant The Atrium
13             1900 Market Street.
               New York, New York 19103
14
         BY:   JAMES H. HELLER, ESQ., of Counsel
15
      ALSO PRESENT:
16
               THOMAS W. EAGAR, ScD., P.E.
17

18

19

20

21

22

23

24

190

1                          Jesse Aronstein

2    on the contact arm or pad?

3          A.    No, they don't report on each and

4    every detector.  They took some samples here

5    that they analyze as, you know, the numbers that

6    we mentioned.  I don't see anything that  --

7    whereby they inspected or analyzed each and

8    every detector.

9          Q.    Other than the ones that we have

10   just talked about, you can't identify any smoke

11   detector in the IT TRY study that had a tin

12   plated stainless steel contact over a silver

13   pad?

14         A.    That's correct.

15         Q.    I believe at your first deposition

16   you testified that a tin plated stainless steel

17   contact over a silver pad is more suitable than

18   just a stainless steel contact over a silver

19   pad?

20         A.    That is correct.

21         Q.    And you can't tell me whether the

22   detectors referenced in the IT TRY study were

23   stainless steel contacts over a silver pad?

24         A.    That is correct.  They don't give

191

1                           Jesse Aronstein

2     enough information.  The ones that they did

3     analyze of the three that they did analyze were

4     unplated stainless.

5              Q.     The NFPA article that you referred

6     to is that your only basis for the opinion that

7     10 percent of smoke detectors in the field

8     failed?

9              A.     Failed to sound even though

10    properly powered.

11             Q.     Is that your only basis?

12             A.     That's the best survey that I know

13    of.

14             Q.     You have not done any independent

15    study?

16             A.     That is correct.

17             Q.     Do you know of any study that

18    confirms the NFPA article?

19             A.     No.  Nor do I know of any that deny

20    it.

21             Q.     Is the NFPA journal article

22    periodically viewed?

23             A.     I do not believe so.

24             Q.     Do you know whether oxides grow

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3

 4   JOSE GARCIA, Individually )
     and as Representative of  )
 5   the ESTATE OF MANUEL      )
     CRUZ; IDALIA GARCIA,      )
 6   Individually; and CYNTHIA )
     COX, as Next Friend of    )
 7   BRITTANY COX              )
                              )
 8   VS.                       ) CIVIL ACTION NO. B-98-186
                              )
 9   BRK BRANDS, INC.          )

10

11   ****************************************************

12                    ORAL DEPOSITION OF

13                    DOUGLAS LEE HOLMES

14                     June 16, 2000

15   ****************************************************

16

17        ORAL DEPOSITION of DOUGLAS LEE HOLMES, produced as
     a witness at the instance of the Defendant(s), and
18   duly sworn, was taken in the above-styled and numbered
     cause on the 16th of June, 2000, from 9:25 a.m. to
19   5:03 p.m., before Annemarie Hand, CSR in and for the
     State of Texas, reported by machine shorthand, at the
20   offices of Q & A Reporting, 2700 Post Oak Boulevard,
     Suite 1750, Houston, Texas  77056, pursuant to the
21   Federal Rules of Civil Procedure and the provisions
     stated on the record or attached hereto.

22

23

24

25
```

Page 2

1    A P P E A R A N C E S
2
3  FOR THE PLAINTIFF(S) JOSE GARCIA and IDALIA
   GARCIA:
      Ms. Shiree Salinas
4     LAW OFFICES OF MARK CANTU
      1300 North Tenth Street
5     Suite 400
      McAllen, Texas  78501
6
7  FOR THE DEFENDANT(S):
      Mr. Terry M. Henry
8     COZEN AND O'CONNOR
      1900 Market Street
9     Philadelphia, Pennsylvania  19103
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2  Appearances........................................  2
3  DOUGLAS LEE HOLMES
4     Examination by Mr. Henry......................    4
5  Signature and Changes............................. 228
6  Reporter's Certificate............................ 230
7
8            EXHIBITS
9  NO. DESCRIPTION                    PAGE
   1.............................................  12
10    Defendants' Second Amended Notice of
      Intention to Take Oral Deposition of Doug
11    Holmes
12 2.............................................  14
      Updated Curriculum Vitae
13
   3.............................................  15
14    Preliminary Fire Dynamics Report
15 4.............................................  42
      Outline
16
   5............................................. 103
17    Fire Report by Doug Holmes, 12-26-97, re:
      Ayala case testing
18
   6............................................. 104
19    Diagram
20 7............................................. 143
      *35-millimeter photographs of fire scene
21
   8............................................. 143
22    *CD of digital photographs of fire scene
23 9............................................. 156
      Two pages of handwritten notes by Doug Holmes,
24    re: 9-29-99 investigation of fire scene
25 *Retained by witness

Page 4

1            DOUGLAS LEE HOLMES,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. HENRY:
5     Q.  Good morning, Mr. Holmes.
6     A.  Good morning.
7     Q.  My name is Terry Henry and I represent BRK
8  Brands in a case brought by Jose Garcia, Idalia Garcia
9  and Cynthia Cox in the United States District Court
10 for the Southern District of Texas.
11          Could you state your name just for the
12 record.
13    A.  Douglas Lee Holmes.
14    Q.  Now, let me just briefly overview where we're
15 going this morning and most likely this afternoon.  So
16 when I'm asking you questions, maybe that will help
17 put the frame around where we're at.  Start off this
18 morning by going over some of the basic documents, the
19 subpoena, your CV and a report and we'll get those
20 marked.  Then we'll go into your background, work
21 history, some of your professional associations, talk
22 about the relevant documents or documents that you
23 rely upon, learned treatises, things like that.  Then
24 we'll talk about the work you've done related to this
25 case and then your opinions regarding smoke detectors

Page 5

1  generally, talk about the investigation, your
2  follow-up, if any, then finally near the end of the
3  day we'll talk specifically about your report and the
4  opinions that you formed.  Okay?
5     A.  Yes.
6     Q.  All right.  Now, did you know any of the
7  people personally involved in this case, such as
8  Manuel Cruz?
9     A.  No.
10    Q.  Jose or Idalia Garcia?
11    A.  No.
12    Q.  Brittany Cox?
13    A.  No.
14    Q.  Are you familiar with any of the defense
15 experts and I'll name them:  Rick Roby?
16    A.  Where is Roby from?
17    Q.  Combustion --
18    A.  California?
19    Q.  No, Combustion Science and Engineering up in
20 Maryland, I believe it is.
21    A.  Maybe.
22    Q.  Okay.  Michael Klaussen, with a K.
23    A.  From where?
24    Q.  Same place, Combustion Science and
25 Engineering.

Page 210

1  what I feel as a fire marshal. The data is held
2  better by Dr. Russell and he can address it. It was
3  to the sirens. I had the 14-year-old girl that was
4  dead, that alarm didn't go off, and that's exactly why
5  those detectors aren't put real close to a bathroom
6  for the condensation. So it's not a big secret.
7  Anything I knew BRK has long since forgot, any
8  criticism that I had has already been corrected. If
9  you look at my criticism, they fixed them.
10    Q.  Do you know what detector models the contact
11  problem was found in?
12    A.  The four-digit model number of the particular
13  one?
14    Q.  I want to know if you know what model number.
15    A.  Yeah, it's in the material.
16    Q.  Do you know?
17    A.  Can I recite it sitting here?
18        MS. SALINAS:  Objection, form.
19    A.  No, but it's in the material.
20    Q.  (By Mr. Henry)  Do you know if there's any
21  difference between the models in which the contact
22  problem was found and the model that we have in this
23  case?
24    A.  Defer -- no, defer to Mr. Russell for whether
25  they went to a welded contact.

Page 211

1    Q.  Do you know if the models -- strike that.
2        You talked about someone who's given
3  testimony about placing lubricant on smoke detector
4  contacts. Right?
5    A.  Yes.
6    Q.  Do you know when that occurred?
7    A.  It's on the video in the material.
8    Q.  Do you know?
9    A.  Do I know sitting here?  No, I don't.
10    Q.  Do you know what model number -- what models
11  were involved in that?
12    A.  No, I don't.
13    Q.  Do you know any differences between those
14  models and the model involved in this case?
15    A.  No, I don't.
16    Q.  Do you know the mechanics of what causes this
17  purported contact problem?
18    A.  I defer once again to Russell. It's got to
19  do with -- there's a particular word for it and it's
20  better for a metallurgist or Dr. Russell.
21    Q.  Is it fair to say that you're not going to be
22  giving an opinion in this case regarding the siren
23  contacts?
24    A.  No, I know that there's literature that says
25  they were defective and if I'm asked to produce it I

Page 212

1  will. I think that it would be duplicitous for me to
2  do it and that it would better be done and I would
3  refer to either one of the engineers that have looked
4  at the problem. I don't think they would -- that it
5  would be appropriate for me to testify. If I did, I
6  would go get the facts that exist more in detail, but
7  I don't think there's much doubt that they happen.
8  The main thing I know is the things don't work.
9    Q.  Do you know if there's evidence in this case
10  that this detector had the contact problem?
11    A.  I don't have an opinion on that.
12    Q.  I'm asking you if you know if there's
13  evidence of it.
14    A.  There's evidence in the sworn testimony on
15  Russell on what he thinks about that. Whether there
16  is evidence of it, all I can tell you after that is
17  the evidence is Mr. Manuel Cruz is dead. That's the
18  evidence. Past that, it's really up to the engineers.
19    Q.  So you're suggesting because Mr. Cruz died
20  that this smoke detector has contact problems?
21    A.  It's got problems. It didn't work. Short
22  version: He's dead; detector doesn't work.
23    Q.  Okay. Let me just quickly ask you. You've
24  got the comments in here about cold smoke, ionization
25  versus photoelectric detector. Is that still relevant

Page 213

1  in this case?
2    A.  Sure it's relevant. It's got to be
3  considered, either eliminated or considered by
4  Dr. Russell.
5    Q.  Are you giving an opinion in this case as to
6  why the smoke detector may or may not have been
7  defective?
8    A.  In this case I think not. Better done by the
9  engineer. If I'm asked -- well, better's a different
10  question. Do I plan to give the opinion? No. Do I
11  think I would be presented to give the opinion? No,
12  not unless I did research on it. Sitting where I sit
13  right here, no, I wouldn't think so. As long as I'm
14  not asked the question, I'm not going to go there.
15  And if I was going to go there and if I was going to
16  ask the question, I'd need to know that because I
17  would have to study it better. So I would think that
18  I'm not going to testify about that. And if I was, I
19  could supplement and tell you because I would have to
20  go ahead and get the numbers and all of the data in
21  order to support it specifically.
22    Q.  But as you sit here today, you're not going
23  to give an opinion as to any possible defects in this
24  detector.
25    A.  The failure analysis?  No, that's different.