*199*

**IN THE U.S. DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

**FEB 2 5 2003**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JOSE GARCIA, Individually, | : | |
| IDALIA GARCIA, Individually and | : | CIVIL ACTION |
| as Representative of the Estate of | : | |
| MANUEL CRUZ and CYNTHIA COX as | : | |
| Next Best Friend of Brittany Cox, | : | NO. B-98-186 |
| | : | |
| vs. | : | |
| | : | |
| BRK BRANDS, INC. | : | |

---

**SUPPLEMENTAL BRIEF IN SUPPORT OF THE**
**MOTION OF DEFENDANT BRK BRANDS, INC.**
**FOR SUMMARY JUDGEMENT**

---

**ROERIG, OLIVEIRA & FISHER**
Rene O. Oliveira
State Bar No. 15254700
Cameron County I.D. No. 3507
Elizabeth G. Neally
State Bar No. 14840400
Cameron County I.D. No. 3506
855 West Price Road, Suite 9
Brownsville, TX  78520
Tel: 956/542-5666
Fax: 956/542-0016

**COZEN O'CONNOR**
Robert W. Hayes
James Heller
Terry M. Henry
1900  Market Street
Philadelphia, PA   19103
Tel: 215/665-2000
Fax: 215/665-2013

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs have no admissible evidence that the heater produced any amounts of smoke or soot before Mr. Cruz was incapacitated by carbon monoxide, let alone admissible evidence that soot or smoke was produced in sufficient quantities to trigger the smoke detector before he was incapacitated.  Plaintiffs offerings of circumstantial evidence is contrary to the testimony of their experts and disregards this Court's order precluding such testimony.

2.    **ALL** of the circumstantial evidence plaintiffs want the jury to consider was available to and considered by plaintiffs' experts when they attempted to offer the opinion that the smoke detector should have alarmed before Cruz was incapacitated from carbon monoxide. Nevertheless, this Court determined that even after consideration of this circumstantial evidence, the experts could not draw the conclusions that plaintiffs seek the jury to reach.  This Honorable Court determined that such a conclusion is not reasonable or reliable without knowing the "emission rate of the by-products of combustion from the heater" or the "gas pressure that was on the valve on the night of the incident". (See *Daubert Ruling*, Exhibit M, pages 8 and 10-11). If experts, who, in addition to considering the proffered circumstantial evidence, and applying their scientific, technical and other specialized knowledge, are prevented from reaching that conclusion, it can not be argued that a jury could so reasonably conclude.  As such, summary judgement should be granted.

3.    As previously stated, Plaintiffs seek to impose liability upon an allegedly defective smoke detector for the for the carbon monoxide poisoning death of Mr. Cruz.  Because the medical examiner determined that Mr. Cruz died of carbon monoxide poisoning before there was any soot in the air that he was breathing, plaintiffs amended their claims to allege that sufficient amounts of soot was produced by Mr. Cruz's heater such that the detector should have alarmed before Mr. Cruz was incapacitated by the carbon monoxide.

2

4.     Initially, it cannot be disputed that this smoke detector was not designed nor intended to serve as a carbon monoxide detector.  All of plaintiffs agreed to this obvious proposition when they were deposed.  Additionally, this smoke detector was not designed nor intended to serve as a soot detector; it is designed, manufactured and marketed as a smoke detector that will alarm in the presence of a sufficient quantity of smoke emitted from an unwanted **fire**.

5.     Second, even if this Court were to deem this smoke detector to be a device designed, manufactured and/or marketed to detect soot particles, as a result of this Honorable Court's ruling on BRK Brands' *Daubert* motion, plaintiffs have no admissible evidence upon which a jury could <u>reasonably</u> conclude that enough smoke or soot reached the smoke detector to sound its alarm before Mr. Cruz became incapacitated by carbon monoxide.  Significantly, plaintiffs' expert, E. Wayne McCain, acknowledges that the space heater's emissions are based upon science, and before any expert, such as he, can determine whether the heater produced any smoke or soot before Mr. Cruz was incapacitated by carbon monoxide, the expert must know the gas flow rate into the heater, a fact which Mr. McCain admits is unknown.  (*McCain*, pp. 116, 186, Exhibit D.)

6.     Thus, while circumstantial evidence is sometimes admissible, it is not here where such circumstantial evidence would be contrary and irreconcilable with the scientifically based testimony of the plaintiffs' experts and this Court's Daubert ruling.  These questions cannot properly be placed before a jury on the sole basis that, <u>i.e.</u>, the smoke detector was placed between the heater and Mr. Cruz's bedroom.  A jury cannot be permitted to speculate as to whether the smoke detector should have alarmed before Mr. Cruz was incapacitated.

7.     Finally, it is impossible for plaintiffs  to connect their allegations of product defect to the cause of Mr. Cruz's death because plaintiffs also have no evidence of what Mr.

Cruz would have done had the smoke detector alarmed as they claim it should have. Any argument about whether Mr. Cruz would have recognized a danger of carbon monoxide poisoning (particularly in the absence of any smoke or soot) is pure speculation and insufficient as a matter of law to establish causation.

## II.    ARGUMENT

### A.    Plaintiffs Have No Evidence That The Smoke Detector Should Have Alarmed Before Mr. Cruz Became Incapacitated By Carbon Monoxide And Should Not Be Permitted To Reach The Jury On This Issue

8.    To reach a jury, plaintiffs must have admissible evidence (direct or circumstantial) upon which a jury could <u>reasonably</u> conclude that enough smoke, not soot, reached the smoke detector to sound its alarm before Mr. Cruz became incapacitated by carbon monoxide, or that Mr. Cruz would have responded had the alarm sounded.[1] In a typical product liability case, this issue of causation is presented through the testimony of expert witnesses who explain to the jury how the available evidence allows them to form an opinion concerning causation.

9.    Here, however, plaintiffs' experts cannot connect the alleged failure of the smoke detector to Mr. Cruz's death, due in part, to this Court's Order dated September 18, 2002. This Honorable Court determined that plaintiffs cannot present any expert testimony as to the space

---

[1]    NFPA 921, §1.3.108 defines "smoke" as an airborne particulate product of incomplete combustion suspended in gases, vapors or solid and liquid aerosols. NFPA 921, § 1.3.111 defines "soot" as <u>black particles of carbon</u> produced in a flame. The distinction, of course, is that "smoke" is produced by hostile residential fires and "soot" is and can be produced by many desired fires in the home, such as candles, cooking and fire places. UL 217, specifically defines the device at issue here as "a self-contained fire alarm device that consists of an assembly of electrical components including a **smoke chamber**, alarm sounding appliance, and provision for connection to a power supply source...." (UL 217, § 1.2, Exhibit J (emphasis added)). Therefore, it is plaintiffs' burden to prove that smoke, not soot, reached the smoke detector in sufficient quantities to cause it to alarm. Because they are unable to meet this burden, plaintiffs can only argue that soot was produced in sufficient quantities to trigger the alarm. For that reason, plaintiffs' claims must fail. However, the remainder of BRK supplemental brief will treat soot and smoke as synonymous.

4

heater's production of smoke versus carbon monoxide. This Honorable Court also determined that plaintiffs could not produce any expert evidence that there was sufficient amount of smoke or soot at the detector such that it would or should have alarmed before Mr. Cruz was incapacitated by carbon monoxide. Specifically, this Court found plaintiffs' proposed toxicological expert testimony unreliable and barred Dr. Morris Cranmer from offering testimony concerning Mr. Cruz's time of death or time of incapacitation. Likewise, Michael Schulz, plaintiffs' cause and origin expert, is not permitted to testify about when the smoke detector should have alarmed, or on any other issue.

10. More importantly, this Honorable Court held that plaintiffs heater expert, E. Wayne McCain, had admittedly not performed the one test required to determine when soot or smoke was produced by the heater in relation to its production of carbon monoxide, and that without this information, "plaintiffs cannot make the leap that a properly-functioning smoke detector will generally detect the by-products of combustion of a propane-fueled heater." (See *Daubert Ruling*, p. 8, Exhibit M).

11. Consequently, plaintiffs now request that the jury be permitted to infer answers to these questions, from other legally insufficient evidence, separate and apart from their inadmissible expert testimony. Plaintiffs suggest that they will present twelve pieces of evidence, which will allow the jury to infer that the smoke detector should have sounded before Mr. Cruz's death. This circumstantial evidence, however, can never lead to such an inference. Assuming plaintiffs' circumstantial evidence is undisputed, it is still insufficient for the below reasons:

| Plaintiffs' Evidence | Reason For Insufficiency |
|---|---|
| 1. The heater was in the living room, a few feet away from the smoke detector. <br> 2. Mr. Cruz's bedroom is down the hall from the room where the heater and smoke detector were located. | Plaintiffs' expert, E. Wayne McCain, testified that no one can determine whether this heater produced any smoke or soot before Mr. Cruz was incapacitated by the carbon monoxide unless you know the gas flow rate, which he does not. (McCain, pp. 116, 186, Exhibit D.) Thus, as |

| | |
|---|---|
| 3. The smoke detector was on the wall, between the heater and Mr. Cruz's bedroom, so that coming from the heater you would pass the detector before getting to the bedroom. | (*McCain*, pp. 116, 186, Exhibit D.)  Thus, as McCain testified this is not the proper subject of circumstantial evidence – it requires expert testimony.  It has no bearing how close the detector was to the heater if the heater did not produce smoke or soot before Mr. Cruz was incapacitated by the carbon monoxide.  Further, there is no evidence that the smoke detector was in direct effluent stream, or that dead air did not prevent or delay smoke and/or soot from reaching the detector. Thus, there is no evidence that even when soot or smoke was produced that it traveled to and reached the smoke detector in sufficient quantities before Mr. Cruz was incapacitated by the carbon monoxide. |
| 4. The smoke detector is an ionization type, which is sensitive to small soot particles. | Plaintiffs cannot establish that "small soot particles" were produced by the space heater and have no evidence of when sufficient "soot" reached the smoke detector to cause it to alarm. |
| 5. There was a charged battery in the detector. | There is no evidence that the battery was properly connected, or that other requisite conditions were met to cause the detector to alarm.  However, even if there were a properly charged and installed battery in this smoke detector, there is no evidence sufficient smoke reached the smoke detector to cause it to alarm before Mr. Cruz was incapacitated. |
| 6. The heater was producing both soot and carbon monoxide at the same time.<br><br>7. Even microscopic particles of soot would trigger the smoke detector's alarm.<br><br>8. It would take several hours for the carbon monoxide to cause Mr. Cruz to lose consciousness.<br><br>9. When an ionization type smoke detector is that close to a space heater it will trigger an alarm within minutes, not hours. | Plaintiffs' expert, E. Wayne McCain, testified that no one can determine whether this heater produced <u>any</u> smoke or soot before Mr. Cruz was incapacitated by the carbon monoxide unless you know the gas flow rate, which he does not. (*McCain*, pp. 116, 186, Exhibit D.)  Thus, as McCain testified this is not the proper subject of circumstantial evidence – it requires expert testimony.  It has no bearing how close the detector was to the heater if the heater did not produce smoke or soot before Mr. Cruz was incapacitated by the carbon monoxide.  Further, there is no evidence that the smoke detector was in direct effluent stream, or that dead air did not prevent or delay smoke and/or soot from reaching the detector.  Similarly, assuming that sufficient "microscopic particles of soot" did reach the detector, there is no evidence of when this allegedly occurred.  Further, plaintiffs' evidence designated as "6," "8" and "9" are based upon inadmissible expert testimony, and is contradicted by plaintiffs' admission that they cannot determine the exact timing, quantity and flow of soot and carbon monoxide produced by the space heater. |

6

| | |
|---|---|
| 10. BRK states in its user manual for ionization smoke detectors that the detector should not be within 20 feet of a space heater or it will be triggered by the heater. | This evidence is contrary to what is actually stated in BRK's user manual. To the contrary, the user manual advises that the smoke detector may alarm if placed within 20 feet of a space heater. Further, this evidence is contradicted by plaintiffs' admission that they do not know the exact timing, quantity and flow of soot and carbon monoxide produced by the space heater. |
| 11. An ionization detector is sensitive, so that it triggers an alarm when it encounters small amounts of soot particles. | There is no evidence of when these "small amounts of soot particles" reached the smoke detector. |
| 12. The smoke detector never sounded despite the fact there were large quantities of soot found in Mr. Cruz's living room, around the detector, and on the detector. | This evidence is contradicted by plaintiffs' admission that they do not know the exact timing, quantity and flow of soot and carbon monoxide produced by the space heater. |

12. The factual allegations plaintiffs identified as "6," "8" and "9" are inadmissible in light of this Court's *Daubert Ruling* prohibiting plaintiffs' experts from offering testimony as to when the smoke detector should have alarmed, when Mr. Cruz became incapacitated or died from the carbon monoxide and/or whether the detector should have alarmed before Mr. Cruz was incapacitated or died. (See *Daubert Ruling*, Exhibit M). Plaintiffs' remaining assertions do not constitute direct evidence of causation, nor could a jury "reasonably" infer from this evidence that the smoke detector should have sounded before Mr. Cruz became incapacitated.

13. All of this evidence was available to, and considered by, Mr. McCain, as well as the other experts that plaintiffs retained to offer an opinion as to whether the smoke detector should have alarmed before Mr. Cruz was incapacitated by carbon monoxide. However, plaintiffs' experts were nevertheless barred by this Court from offering any opinions on this issue. (See *Daubert Ruling*, Exhibit M). One of the main reasons the Court precluded the testimony of Mr. McCain, as well as plaintiffs' other experts, regarding the production of soot and carbon monoxide is because Mr. McCain admitted that neither he nor anyone else could know the rate at which carbon monoxide was produced in relation to soot based on the facts, and he did no testing to support any proposed testimony. (*McCain*, pp. 116 and 186, Exhibit D.)

7

This Court specifically ruled that without this critical piece of information, "plaintiffs cannot make the leap that a properly-functioning smoke detector will generally detect the by-products of combustion of a propane-fueled heater. (See *Daubert Ruling*, Exhibit M). Accordingly, any opinion plaintiffs' experts could have offered on this issue would have been mere speculation. Obviously, if this Court found these conclusions by plaintiffs' experts as too speculative, any similar conclusions by the jury would also be speculative. In fact, it would be much more speculative for a jury to reach these conclusions after considering the exact same evidence as plaintiffs' expert, but lacking the requisite scientific, technical and other specialized knowledge.

14. Further, even plaintiffs admit that nobody can determine the exact timing, quantity, and flow of soot and carbon monoxide produced by the heater, and that nobody will ever know the exact time Mr. Cruz became incapacitated or when there was enough soot to trigger the alarm. (See Plaintiff Cox's Response to BRK's Motion for Summary Judgment ("Cox Response"), pp. 4 and 7.)

15. Simply stated, plaintiffs and their expert state that it is impossible to determine whether the heater produced any amount of smoke or soot before Mr. Cruz was incapacitated by carbon monoxide, let alone in sufficient quantities to trigger the smoke detector before he was incapacitated. Where the Court rules that plaintiffs' experts cannot infer a fact from the available evidence, a jury should not be permitted to speculate on the issue, or infer the existence of a scientific fact circumstantially. Because the evidence suggests numerous possibilities, and nothing shows that one is more probable than the other, this ultimate fact cannot be reasonably inferred. See Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1388 (5th Cir. 1996); Dreijer v. Girod Motor Co., 294 F.2d 549, 555-556 (5th Cir. 1961); Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001); Wright v. Wal-Mart Stores, Inc., 73 S.W.3d 552, 555 (Tex. App. – Houston 2002).

16.    Further, the ultimate inference proposed by plaintiffs is too speculative and conjectural to support a judgment against BRK, because it is at odds with the undisputed facts that the space heater operated throughout the night, producing carbon monoxide and other products of combustion, but no perceptible soot, (*Garcia Aff.*, p. 3, Exhibit E; *Perez Aff.*, pp. 2-3, Exhibit F), and that Mr. Cruz died of carbon monoxide poisoning before he inhaled any soot or smoke. (*Davenport*, Exhibit H.) Plaintiffs' admissions combined with these undisputed facts can only mean that Manual Cruz's carbon monoxide poisoning death has no relation to the alleged failure of a properly operating smoke detector to alarm.

**B.    Plaintiffs Cannot Establish How Manual Cruz Would Have Responded Had The Alarm Sounded**

17.    Plaintiffs cannot tie the alleged failure of the smoke detector to Mr. Cruz's death given the absence of admissible evidence that Mr. Cruz would have heard and would have been able to respond to the alarm if it had sounded. (*McCain*, p. 193, Exhibit D.)

18.    To perform such an analysis, which can be found in any fire protection engineering handbook, plaintiffs should have considered:  (a) the decibel level of the smoke detector's alarm; (b) the distance from the detector to Mr. Cruz's bedroom door; (c) that Mr. Cruz's door was closed; (d) the thickness and composition of Mr. Cruz's door; (e) the distance from the door to Mr. Cruz's head, where he lay sleeping on his bed; and (f)  Mr. Cruz's state of intoxication.

19.    Because plaintiffs' experts performed no such analysis, plaintiffs cannot say that Mr. Cruz could have heard or physically responded to an alarming smoke detector.

20.    Perhaps more importantly, plaintiffs' entire case rests on the presumption that had the smoke detector alarmed prior to the dangerous accumulation of carbon monoxide in his home, Mr. Cruz would have realized that his space heater was emitting carbon monoxide, shut it off and evacuated or ventilated his house.  This also is pure speculation, in light of plaintiffs'

9

own admission, that there is no way to absolutely know what Mr. Cruz would have done had the alarm sounded. (See *Cox Response*, p. 4.)

21.    Plaintiffs suggest the fact that Mr. Cruz was a policeman and that he purchased a smoke detector are pieces of evidence that demonstrate he was safe and would have recognized the carbon monoxide poisoning hazard and evacuated or ventilated his house. This is an absurd assumption, particularly given that such "habit" evidence is inadmissible, and because these facts can never lead to such a remote and attenuated inference.

22.    It is more likely, particularly if the smoke detector alarmed before the production of visible soot as plaintiffs allege it should have, and hence any visible sign of trouble, that Mr. Cruz would simply have concluded that the detector falsely alarmed, removed or disconnected the battery from his smoke detector and gone back to sleep, which is the most common consumer response to a nuisance alarm. This is particularly true in that by this time, Mr. Cruz would have been exposed to some carbon monoxide (and plenty of alcohol) and his judgment would likely have been further impaired.

C.    **Plaintiffs' Tort Claims Are Without Basis**

23.    A manufacturer is entitled to assume that its product will not be subjected to abnormal and unintended uses, and that it will not be liable for injuries resulting from any unintended or unanticipated use of its product. International Derrick & Equipment Co. v. Croix, 241 F.2d 216, 222 (5th Cir. 1957); see also Ford Motor Co. v. Mathis, 322 F.2d 267, 273 n.8 (5th Cir. 1963).

24.    Accordingly, plaintiffs should not be permitted to recover damages from BRK resulting from a harm against which smoke detectors are not capable of, or intended, to address, such as the risk of carbon monoxide poisoning, which is the precise harm suffered by Manual Cruz. BRK simply has never claimed that its smoke detectors are designed or sold to perform as

10

a carbon monoxide detector. To the contrary, residential smoke detectors are designed to protect exclusively against one hazard; a hostile fire in the home.

    25.    Carbon monoxide poisoning, on the other hand, is a different hazard that may exist in any house depending upon the type of appliances in the home. Carbon monoxide is a colorless, odorless, tasteless gas that is produced by the incomplete burning of solid, liquid and gaseous fuel, usually from fuel-burning appliances in the home. Carbon monoxide is particularly dangerous because its presence is impossible to detect without the aid of a specific instrument and the symptoms of carbon monoxide poisoning are often disguised as the flu. There is a specific home safety device, a carbon monoxide detector, designed to detect and give early warning of carbon monoxide poisoning dangers.

    26.    Smoke detectors, on the other hand, are designed to provide consumers early warning of a fire in the home by sensing smoke produced by the fire. (*NFPA Handbook*, pp. 5-15, 5-16 and 5-62, Exhibit I.) Smoke detectors are not capable of detecting, nor do they claim to be able to detect, carbon monoxide from any source, which necessarily includes carbon monoxide produced by a space heater. (*Holmes*, p. 127, Exhibit C; *McCain*, pp. 89 and 218, Exhibit D; *Russell Vol. I*, p. 144, Exhibit L.) If a person wishes protection from carbon monoxide poison dangers, he or she should purchase a carbon monoxide detector.

    27.    Significantly, the industry and government standards to which smoke detectors are manufactured do not require that they provide early warning of carbon monoxide poisoning hazards. To illustrate, Underwriters Laboratory Standard ("UL") 217, the primary standard to which manufacturers design and manufacture single and multiple station smoke detectors, defines its scope as:

> These requirements cover electrically operated single and multiple station smoke detectors intended for open area protection in ordinary indoor locations of residential units in accordance with the Standard for household Fire Warning Equipment, NFPA 74...

11

\*   \*   \*   \*

> A single station smoke detector, as defined by these requirements, is a **self-contained fire alarm device** that consists of an assembly of electrical components including a smoke chamber, alarm sounding appliance, and provision for connection to a power supply source...

UL 217, §§ 1.1 and 1.2, Exhibit J (emphasis supplied).

28.   This standard does not, in anyway, require a smoke detector to detect carbon monoxide. Thus, products manufactured to UL 217 are not concerned with detecting or giving early warning of the presence of carbon monoxide. Rather, they are designed to detect not just any smoke, but smoke produced by unwanted residential fires and to provide consumers an audible warning of the fire.

29.   Plaintiffs do not claim, nor is there evidence to support a conclusion that the smoke detector in this case was designed or intended to detect or give early warning of a carbon monoxide poisoning hazard. In conceding this point, plaintiffs base their claim solely on the fact that at some point in time between 6:30 a.m. on December 15, when Jose Garcia left Mr. Cruz's house, and 11:30 p.m. on December 16, when Mr. Cruz's body was discovered, the space heater produced soot. The assessment of liability against a product manufacturer can never accompany such a fortuitous and unforeseeable set of circumstances. Had Mr. Cruz's body been discovered shortly after he died, but before the space heater began producing soot, plaintiffs would not have sought to impose liability upon BRK and plaintiffs' claims should have no greater validity merely because his body was discovered after the heater produced soot.

30.   BRK marketed its smoke detectors to address a specific type of harm, i.e. fire, and, therefore, liability should not be imposed upon it for the detector's purported failure to protect Manual Cruz from another type of harm, i.e. carbon monoxide poisoning. To hold BRK responsible for harm that its product was not intended to address would impose liability beyond all reasonable proportion. See, e.g., Bombara v. Rogers Bros. Corp., 734 N.Y.S.2d 617, 289

A.D.2d 356 (N.Y.A.D. 2001) (refusing to hold trailer manufacturer liable in tort for injuries plaintiff sustained while riding on back of a trailer, since the trailer was not designed to transport passengers, and was reasonably safe for its intended use, i.e. to transport construction equipment).

31.    Such is the case where plaintiffs claim a smoke detector should protect a person from carbon monoxide poisoning.   Permitting tort recovery in these situations will expose manufacturers to potential liability for unbargained-for and unforeseeable risks.  If the facts of this case were reversed, this Court would certainly not permit a plaintiff injured in a fire to bring an action against the manufacturer of carbon monoxide detectors.   In light of the above, plaintiffs' tort claims have no basis in fact or logic and BRK is entitled to summary judgment as to plaintiffs' strict products liability, negligence, negligence *per se* and breach of warranty claims.

### D.    A Smoke Detector That Is Fit For Detecting Smoke From Fires Cannot Be Considered Unreasonably Dangerous Because It Does Not Detect Carbon Monoxide

32.    To prevail on their claim for breach of implied warranty of merchantability under the Texas Deceptive Trade Practice Act, plaintiffs must prove that:  (a)  a defect existed in the smoke detector at issue that rendered it unfit for the ordinary purpose for which it is used because of a lack of something necessary for adequacy; (b) the smoke detector at issue was defective when it left BRK's possession; and (c) the smoke detector's unfit condition caused Mr. Cruz's death.  See Hyundai Motor Co. v. Rodriguez, 995 S.W.2d 661, 665 (Tex. 1999); Sipes v. General Motors Corp., 946 S.W.2d 143, 158 (Tex. App. 1997).

33.    The essential element to assessing liability under the Texas Deceptive Trade Practices act in this case is causation.  For the above reasons, plaintiffs' inability to establish that the smoke detector played any part in the death of Mr. Cruz is as fatal to their claims under the

Texas Deceptive Trade Practices Act as it is to their tort claims. This discussion, however, is not academic and is helpful in illustrating why plaintiffs' claims must fail.

34.    A product that performs its ordinary function adequately does not breach the implied warranty of merchantability merely because it does not function as the buyer would prefer. See Chandler v. Gene Messer Ford, 81 S.W.3d 493, 503 (Tex. App. – Eastland 2002). Although Texas law recognizes that strict liability for a design defect and breach of an implied warranty of merchantability are two separate causes of action, in certain situations, whether a defect exists for purposes of products liability often resolves whether a product was defective and, therefore, breached an implied warranty of merchantability. Otis Spunkmeyer, Inc. v. Blakely, 30 S.W.3d 678, 690 (Tex. App. – Dallas 2000). The concept of "defect" for strict products liability is that the product has some condition that renders it unreasonably dangerous for its intended or reasonably foreseeable uses. See Chandler, 81 S.W.3d at 503; USX Corp. v. Salinas, 818 S.W.2d 473, 484 n.8 (Tex. App. – San Antonio 1991).

35.    This is true in cases involving claims for personal injuries where the "defect" at issue in a claim for strict products liability and a claim for breach of implied warranty is factually identical. Otis Spunkmeyer, 30 S.W.3d at 690-91; see also Hyundai Motor Co. v. Rodriguez, 995 S.W.2d at 665. Under these circumstances, a product "cannot be unfit for ordinary use but not unreasonably dangerous, nor can it be unreasonably dangerous but fit for ordinary use; it must be both or neither." Hyundai Motor Co. v. Rodriguez, 995 S.W.2d at 665; Otis Spunkmeyer, 30 S.W.3d at 690.

36.    In the present case, plaintiffs' strict liability and breach of warranty claims are predicated upon the same alleged defect, namely that the piezo-electric horn contacts of the SA67D smoke detector were vulnerable to fretting corrosion and that this corrosion developed to the extent it blocked the transmission of the alarm signal to the horn. Thus, in this case, the

14

question regarding the existence of a defect for purposes of plaintiffs' strict products liability and breach of warranty claims is functionally identical. Accordingly, if the relevant SA67D smoke detector is found to be fit for its ordinary use, it is not unreasonably dangerous. Similarly, if it is determined that this detector is not unreasonably dangerous, it must be found fit for the ordinary purpose for which it is used.

37.    Similar to the discussion in the preceding section, plaintiffs cannot attribute Mr. Cruz's death to the smoke detector not being fit for the ordinary purpose for which it was to be used -- providing early warning of a fire -- because there was no fire. Plaintiffs do not and cannot allege that BRK warranted that its smoke detector would provide early warning of carbon monoxide accumulation and was therefore unfit for its ordinary purpose. Plaintiffs recognize that the ordinary purpose of a smoke detector is to provide early warning of an unwanted residential fire. Mr. Cruz died as a result of ingesting fatal amounts of carbon monoxide.

38.    A smoke detector that is fit for its ordinary purpose of detecting unwanted fires, can never be considered unreasonably dangerous, as a matter of law, simply because it may or may not have failed to provide its user with early warning signs of other hazards that it was never designed to address, such as the risk of carbon monoxide poisoning. See Hyundai Motor Co. v. Rodriguez, 995 S.W.2d at 665; Otis Spunkmeyer, 30 S.W.3d at 690.

39.    Accordingly, BRK is entitled to summary judgment, as a matter of law, on plaintiffs' strict products liability, negligence, negligence *per se* and breach of warranty claims.

## III.    CONCLUSION

40.    In light of the above, and BRK previously filed Briefs In Support Of Its Motion For Summary Judgment, BRK Brands, Inc., respectfully requests this Honorable Court enter judgment in its favor and against plaintiffs Jose Garcia, Idalia Garcia, Individually and as Administratrix of the Estate of Manual Cruz and Cynthia Cox as Next Friend of Brittany Cox and award it fees, costs and grant such other further relief as the Court deems appropriate.

Respectfully submitted,

**ROERIG, OLIVEIRA & FISHER**

BY: _____
        Rene O. Oliveira
        State Bar No. 15254700  /  U.S.D.C. Adm # 4033
        Cameron County I.D. No. 3507
        Elizabeth G. Neally
        State Bar No. 14840400 / U.S.D.C. Adm. # 8044
        Cameron County I.D. No. 3506
        855 West Price Road, Suite 9
        Brownsville, TX 78520
        Tel: 956/542-5666
        Fax: 956/542-0016

**COZEN O'CONNOR**
        Robert W. Hayes
        James Heller
        Terry M. Henry
        1900 Market Street
        Philadelphia, PA 19103
        Tel: 215/665-2000
        Fax: 215/665-2013

Dated: February 25, 2003

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certifies that a true and correct copy of the foregoing **Supplemental Brief in Support of the Motoin of Defendant BRK Brands, Inc. For Summary Judgment,** has been served upon counsel of record by Certified Mail, Return Receipt Requested, on this 25th day of February, 2003, to wit:

Mr. Juan Gonzalez, Esq.
The Atrium, Suite 400
1300 North Tenth Street
McAllen, Texas 78501

Mr. Ray R. Marchan
**Eddington & Associates, L.L.P.**
1926 E. Elizabeth
Brownsville, Texas 78520

Elizabeth G. Neally