United States District Court
Southern District of Texas
FILED

FEB 28 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CYTHIA COX AS NEXT FRIEND | § | |
| OF BRITTANY COX, ET AL | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO. B-98-186 |
| BRK BRANDS, INC. | § | |

PLAINTIFFS' SUPPLEMENTAL RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, PLAINTIFFS in the above entitled and numbered cause, by and through their attorneys of record, and file this their supplemental response to defendant's motion for summary judgment and in support thereof would respectfully show the court as follows:

I.

In support of Plaintiffs' Response to Defendant's Motion for Summary Judgment, plaintiff addresses the four issues discussed with the court on the pending motion.

First, plaintiffs submit that there are circumstantial facts and evidence that support the denial of defendant's motion for summary judgment. Plaintiffs would point out that there are publications identified in discovery including in the deposition of Dr. Morris Cranmer setting forth authoritative reports that the by-products of combustion will set off the alarm of the detector quickly. One such article is the Consumer Reports article identified on page 146 of Dr. Morris Cranmer's deposition and also referred by other experts in the case. He had pointed out that a relatively clean-burning fire, a fire that was not producing visible smoke will set the detector's

1

alarm off within a few minutes. That is, it was relatively rapid in alerting even though the heater would be producing either visible and/or invisible particles of combustion.

One most important fact identified in several depositions including the deposition of Michael Schulz was how extremely close the detector was to the exhaust fuel of the heater. The strength of this evidence would be strong circumstantial proof that the detector, had it been operating properly, was going to detect the production and presence of the by-products of combustion in a very timely and quick manner. *Page 73 and 74 of Schulz deposition of December 5, 2002.* The detector itself is evidence and witnesses observed the outside and inside of the detector housing, as well as, the exterior/interior surface of the detector's chamber having large amounts of soot deposition including the screen protecting the detection chamber.

Furthermore, literature produced by the defendant as regards to their detector, which is identified commencing on page 79 of Mr. Schulz's deposition, identify that one is not to install the detector immediately adjacent to the shower because water vapors of the shower will cause it to activate. Secondly, there are instructions not to locate it in the kitchen area because the by-products of combustion emitted from cooking or from the oven will cause it to sound.

Additional facts supporting that the alarm should have sounded are the observations of Mrs. Idalia Garcia, at page 52 of her deposition, where there were large amounts of soot deposits in the residence that were difficult to remove and took over a month to clean. Also, Mr. Jose Guadalupe Garcia testified on pages 28, 41 and 44 of his deposition that everything in the residence was black and that there was "black stuff" on the walls, ceiling, and windows.

Additional evidence is the opinion from Richard Custer in his deposition of June 20, 2002 on page 52 that the location of the smoke detector as mounted on the wall was

within the defendant's requirements or instruction for placement of the detector. Additionally, Mr. Custer testifies that he does believe that had the detector been properly functioning and energized, with the evidence of the products of combustion that he was aware of in this case, it should have sounded and that it should have sounded prior to Mr. Cruz's body being found. *See page 57 and 58 of Mr. Custer's deposition.* He recognized that at a time prior to the incident, the detector had sounded during a cooking incident. However, in light of the soot deposition upon the detector and the fact that the battery had the full 9 volt charge, that is circumstantial evidence that, in fact, the smoke detector had not sounded.

At the deposition of Michael Klassen, at page 78, Mr. Klassen points out additional facts to support the issue of causation, where he recites that having the window open in the house, is a known and responsible way to prevent or minimize the potential of a heater causing harmful levels of carbon monoxide to accumulate. He goes on to point out at page 81 that there is evidence about how long the battery would continue to power the alarm of the detector until the battery was used up. This would support that the alarm didn't sound because of the retained power of over 9 volts of the battery located in the detector.

Mr. Klassen significantly adds at page 36 et seq. that the alarm should have sounded, according to the defense's theory, in 7 hours and 45 minutes, but admits that the defendants assumed a heater commencing time of 4:00 a.m. He goes on to acknowledge that in this case the facts instead point to the heater actually being started up at midnight to 1:00 a.m. Thus, leaving for the jury the evidence that the plaintiff's contention is correct, and that the alarm of the detector should have sounded before Mr. Cruz was incapacitated by the carbon monoxide.

This factor of an actual start time of the heater at near midnight instead of the assumed time of 4:00 a.m., coupled with his calculation that Mr. Garcia had only a carboxyhemoglobin level of eighteen percent (18%), page 102 of his deposition, at 6:00 a.m. when he left, would show a slower production rate of carbon monoxide than that relied upon by the defense. This position is further supported by Dr. Cranmer's allowed testimony about the lower absorption rate of carbon monoxide, thus extending the time at which Mr. Cruz would have become incapacitated.

Mr. Cruz's carbon monoxide intake was expressed as 49.1% Carboxyhemoglobin in the laboratory tests. Cranmer did do a series of calculations to produce a chart. The chart was for the minimum sustained level of exposure that would result in death. From that chart one could determine minimum times required to obtain different carboxyhemoglobin levels from different carbon monoxide levels. This process is used as a reference. Cranmer did not measure the rate of Cruz's inhalation of Carbon Monoxide since those exact levels at exact times will never be known and cannot be extrapolated from the work of Armstrong.

Cranmer never suggested that Cruz was exposed to a constant level of carbon monoxide. A constant level of Carbon Monoxide has nothing to do with Cranmer's opinion. Cranmer was of the opinion, and remains so, that sustained levels of Carbon Monoxide of less than 500-600 ppm are inconsistent with the Death of Cruz. *See line 24 page 68 of Cranmer Deposition Vol. II.* "A. I don't know that. The level of carbon monoxide is not going to be absolutely fixed."

No experiment has shown that the inhalation of Carbon Dioxide increases the inhalation of carbon monoxide at anything near the levels needed to produce a 49% Carboxyhemoglobin. The average Carbon Monoxide level required to raise Cruz's carboxyhemoglobin to 49.1 was approximately 500 ppm maintained over 5 hours. If

4

there were 10 times as much Carbon Dioxide produced as the 500 ppm Carbon Monoxide, the level required for death, the level of carbon dioxide would only be 5,000 ppm.

Cranmer points out that the United States worker safety standard for Carbon Dioxide is not even exceeded at 5,000 ppm. A level of 5,000 ppm (0.5%) has not been demonstrated to stimulate respiration. Cranmer also points out that while breathing Carbon Dioxide at high levels (20,000 ppm) increases the rate of respiration, more breaths per minute, the intake of breathed gasses is not directly proportional. The quantity of carbon monoxide absorbed by the body is a combination of the number of breaths per minute, volume breathed, residence time of the breath, fluid content of the lung, circulation rate and Carbon Monoxide levels breathed. Cranmer sets forth that there is no scientific literature that demonstrates that breathing Carbon Dioxide increases the intake of Carbon Monoxide at the levels necessary to produce a carboxyhemoglobin level of 49%. Cranmer did, in fact, perform the calculations and the results of time to a given carboxyhemoglobin level were far less than 10 percent different even when assuming maximum Carbon Dioxide stimulation. Cranmer points out that 10 percent of 4 hours is only 24 minutes. Given the fact that Cranmer opined that the range of time was between 10:00 a.m. and 2:00 p.m. the effects of Carbon Dioxide on Carboxyhemoglobin are inconsequential. Cranmer shows that respiration rate may fall as a person sleeps and as a person becomes incapacitated or nears death.

Several facts in making the determination of the best estimate of Mr. Cruz's death include 1) the determination at autopsy that the time of death was approximately 24 hours prior to being found at 11:27 a.m. on December 16; 2) the time of death was after 6:00 - 6:30 a.m. on Monday December 15, 1997 when Mr. Garcia left the Cruz

5

residence; 3) death could only occur after enough time had passed to permit a significant reduction of Mr. Cruz's blood alcohol by metabolism, to that observed by laboratory tests; 4) after sufficient time of exposure to carbon monoxide levels of 500-600 ppm to raise his carboxyhemoglobin levels to lethal levels measured by laboratory tests; and, 5) the house was poorly insulated (not tight) and the bedroom door was closed.

As further legal support that plaintiffs may proceed to trial to prove their case including causation, this Honorable Court is referred to the case of General Motors v. Sanchez, 997 S.W.2d 584 (Tex. 1999). In this case, a man got out of his truck, it reversed and killed him. There were no witnesses, relatively little was known first hand but the Texas Supreme Court approved the trial court allowing plaintiff to present circumstantial evidence to establish their case including causation. Rather than view each piece of circumstantial evidence in isolation, the reviewing court must look at the totality of the known circumstances.

Referring to original authority in Barksdale, v. Dobbins, 141 S.W.2d 1035 (Tex. Civ. App.--Texarkana 1940 writ ref'd.), circumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it. If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable. A plaintiff is not required to exclude an appreciable chance that the event might have occurred in some other way. Expressed otherwise, a conclusion of causal connection may be inferred by a balance of probabilities. Bock v. Fellman Dry Goods Co., 212 S.W.2d 635 (Tex.Com.App.)

The question of causation is a fact question for the jury. The jury has broad latitude to infer proximate cause from the evidence and the circumstances surrounding an accident especially when it is not possible to produce direct proof of proximate cause

6

or lack of proximate cause. Harris v. LaQuinta-Redbird Joint Venture, 522 S.W.2d 232, 236 (Tex. Civ.App.--Texarkana 1975, writ ref'd n.r.e.) In La Quinta-Redbiird, the court recognized that it was not possible in a drowning case to produce direct evidence that a person could have been rescued if a lifeguard or proper lifesaving equipment had been provided. Nevertheless, the court concluded that there was probative evidence of a causal relation and of foreseeability and that the plaintiff was entitled to have a jury issue on proximate cause. Ibid at 237.

Furthermore, the Texas Supreme Court has pointed out that if circumstantial evidence will support more than one reasonable inference, it is for the trier of fact to decide which is more reasonable, see Lozano v. Lozano, No. 99-0121, 2001 Tex. Lexis 17, *54-57, 44 Tex. Sup. J. 499, 503-504 (Mar. 8 2001) (Phillips,C.J. concurring). A jury may consider circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from the evidence it chooses to believe. Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792, 797 (Tex. 1951).

II.

As additional evidence that Manuel Cruz would have responded to the alarm of the detector had it, in fact, sounded, plaintiffs would point to several pieces of evidence and excerpts of depositions. From the deposition of Cynthia Cox, on page 67, she testified that Manuel Cruz was very conscientious about safety and had a history of being a volunteer fireman, a police officer, and a reservist in the United States Army. Thus, these are facts that the jury could perceive that Mr. Cruz would respond to an emergency alarm if it had, in fact, sounded. Plaintiffs will also be utilizing UL standard 217 which prescribes the requirement of how loud the detector alarm should be. Besides that standard containing the information, Michael Schulz testified on page 51 of his deposition that the loudness requirement was 85 decibels.

In Doug Holmes deposition at page 192 through 195, he testifies that Manuel Cruz would be able to hear the alarm of the detector through his closed hollow door and that, in fact, the alarm of the detector is supposed to be loud enough to warn you at a distance. In the deposition of Mac McClintock at page 104, he testifies as to the loudness when he tested the alarm of the smoke detector and that it had a piercing sound. He also testified that his assistant, "Willie" who was outside of the residence heard it when Mr. McClintock tested it and returned to the location of the detector because he had heard it. Additionally, the deposition of Jose G. Garcia, at page 35, sets forth that he had heard the alarm in the detector go off before when some guys and Manny were cooking and that you could hear the thing real loud because it made a loud noise.

### III.

Another area that the court wished to address was whether the plaintiff could recover for a carbon monoxide death from a smoke detector manufacturer when it was not advertised as a carbon monoxide detector. While the defendants market to the general public that the product is a smoke detector, in actuality it is an ionization-sensing device. That is why in this case, had the ionization detector been properly working, it would have alerted Mr. Cruz in time to have saved his life. Defendant's own literature sets forth that there are detectors advertised as devices which will sound an alarm in the presence of the products of combustion that are both visible and invisible. Cranmer deposition page 127. The ionization detector is designed to activate and sound an alarm when the voltage changes within the ionized air within the detection chamber. That occurs in ionization detectors even in the absence of actual soot particulate. A properly operating ionization detector will set off an early alarm in

an event such as this if there is the presence of combustion gases and by-products of combustion.

Additionally, as has been mentioned above the manufacturer even warns against placing this detector too close to sources of water vapor such as showers because the mechanics of ionization will set off the alarm just in sensing steam or water vapor from a bath or shower. As testified by Michael Klassen on pages 25 and 26, "well, the principle upon which these detectors work, either the ionization or photoelectric would both be effected by water vapor. In the ionization case, the water vapor would displace the ion current causing the alarm. Potentially if it is high enough, it would cause it to go off."

As mentioned previously, there are numerous cases of safety devices which do not actually cause the injury or death and held to be responsible because of their malfunction. An example used in argument before the court would be a man in the water who is thrown a life ring which falls apart once he places his weight upon it. It is not the life ring that drowns the man, but rather the water and yet, if the life ring was defective the manufacturer of the life ring would be held responsible. Claims against manufacturers of vehicle as to the crashworthiness are allowed even though they are not the cause of the original wreck in which the victim is injured and/or dies. Likewise, defective deployment of air bags may subject the manufacturer to liability even though it was not the airbag that causes the wreck.

Plaintiffs have pointed out the 5th Circuit case of <u>Koonce</u> and the Texas case of <u>Salazar vs. Wolo Manufacturing</u>. In that case, actions were allowed to be maintained against the manufacturer of the heat resistant safety suit. In the case of <u>Salazar vs. Wolo</u> actions were allowed to be maintained against the manufacturer of "the Club" anti-theft device because it could be argued that it was foreseeable that during the nonuse of the

9

club, it could create a danger to the consumer because of the lack of adequate design and/or warning that it should not be placed on the floor board of the driver's side when the vehicle is not in use.

In fact, some of the most damning evidence against these defendants falls into this fiction that the detector itself did not cause the harm. Contained in the depositions of David Minnis and the defendants corporate officer Mark Devine, especially at pages 38 and 39, are representations made that when Mr. Minnis confronted Mr. Devine about the large failure rate of the detector model with separable contacts during the UL corrosion tests, it was Mr. Devine's position to Mr. Minnis, not to worry about the large failure rate because after all, it was fire that was killing people, not the smoke detector. And further, it wasn't the detector that was causing fire in the first place. This lame excuse and explanation by Mr. Devine shows the illogic of trying to allow the defendants to escape liability when their safety products fail and especially when defendants knew of their high failure rate.

## IV.

The last area of inquiry by the court was whether a product can be fit for its ordinary purpose but then be defective or unreasonably dangerous for a specific use. Undoubtedly, such a cause of action is allowed in allegations that a product which might be fit for its ordinary purposes may be unfit for the specific and foreseeable uses and misuses of the product. The case of <u>Plas-Tex, Inc. v. U.S. Steel Corporation</u>, 772 S.W.2d 442 (Tex. 1989) points out that in action based on implied warranty on fitness for a particular purpose proof of defect is not required. However, Plaintiffs maintain that the detector was in fact defective and unreasonably dangerous for its use as an ionization detector that should have alarmed, as discussed above, in the presence of the by-products of combustion. In the depositions of Mark Devine and Frederick Conforti,

former officers of the defendants, they acknowledged that 2 models of detectors, the 1839-I and 28389-I, were recalled. They go on further to identify that those models had the separable contact design virtually the same as was used in the model involved in this action. Furthermore, Mr. Conforti specifically states that "the electronics of the detector sense something in the environment, expected smoke or particles in the air, particulate matter in the air, the unit would turn on electronically, but the horn would not sound." See pages 25, 26. Most notably in his deposition contained in pages 23 et seq., he testifies as follows,

> "Question: Do you have an understanding of the model or product number involved in this litigation that I am here on today?
>
> Answer: I was told yesterday it was a 67-D.
>
> Question: Does a 67-D have an unsoldered contacts to the piezohorn?
>
> Answer: Yes.
>
> Question: Did the models 1839-I and 2839-I also have the separable contacts to the piezohorn.
>
> Answer: Yes.
>
> Question: What, as far as the subject goes, what will be your testimony as to the difference in the separable contact to the piezo horn between the model 67-D and the recalled models 1839 and 2839-I?
>
> MR. HENRY: What period of time?
>
> MR. MARCHAN: Any time that he is aware of.
>
> By the witness:
>
> Answer: If you limit it to the contact to the piezo electric element, there is no difference."

11

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that defendant's motion for summary judgment be in all things denied and for such other and further relief, at law or in equity, to which they may show themselves to be justly entitled to receive.

Respectfully submitted this the ___28___ day of February, 2003.

WATTS LAW FIRM, L.L.P.
1926 E. Elizabeth
Brownsville, Texas 78520
(956) 544-0500
(956) 541-0255 FAX

_____
RAY R. MARCHAN
State Bar No. 12969050
Federal I.D. No. 9522
*Counsel for Cyntha Cox anf of Brittany Cox*

Juan Gonzalez
Law Offices of Mark Cantu
The Atrium, Suite 400
1300 North Tenth Street
McAllen, Texas 78501

_____
Juan Gonzalez
State Bar No. 08128310
Federal I.D. No. 3472
*Attorney for Jose Garcia, Ind. & as Representative of the Estate of Manuel Cruz, and Idalia Cruz, Individually*

## CERTIFICATE OF SERVICE

On this the _____ 28 day of February, 2003, a true and correct copy of the foregoing instrument was forwarded to opposing counsel via fax, by hand-delivery or by certified mail, return receipt requested.

_____
RAY R. MARCHAN