IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

MAY 2 7 2003

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | | |
|---|---|---|
| JOSE GARCIA, INDIVIDUALLY AND | § | |
| IDALIA GARCIA, INDIVIDUALLY AND AS | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| MANUEL CRUZ, DECEASED, AND | § | |
| CYNTHIA COX AS NEXT BEST FRIEND | § | |
| OF BRITTANY COX, | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-98-186 |
| | § | |
| BRK BRANDS, INC., | § | |
| Defendant. | § | |

## ORDER GRANTING SUMMARY JUDGMENT

Manuel Cruz (hereinafter "Cruz") died in December 1997 when his improperly fueled

and inadequately vented space heater malfunctioned and filled his home with a fatal concentration

of carbon monoxide as well as a substantial amount of particulate matter (smoke and soot). Cruz's

estate, his mother, his daughter, and his mother's husband brought this products liability action

against BRK Brands, Inc. (hereinafter "BRK"), alleging that Cruz's BRK model SA67D smoke

detector failed to alarm due to a design defect and that this failure caused Cruz's death. This court

concludes that BRK is entitled to summary judgment on all of the plaintiffs' claims because the

plaintiffs cannot prove that the alleged smoke detector defect was a cause-in-fact of Cruz's death.

Specifically, they have not produced evidence supporting a reasonable inference that the detector

should have alarmed in time to save him.

## I.    FACTS AND PROCEDURAL POSTURE

Cruz's house in San Benito Texas had no central heating system. Accordingly, in

1

early December 1997 Cruz purchased and installed a natural-gas-burning space heater in his living room, close to the hallway leading to his bedroom. Unfortunately, Cruz improperly supplied the heater with propane gas instead of natural gas, which ultimately caused the heater to produce a large amount of incomplete combustion by-products including carbon monoxide and particulate matter (soot and smoke). Cruz compounded this problem by failing to provide proper exterior venting for the space heater.

Cruz arranged for a double date on Sunday, December 14, 1997, with his friend Jose Garcia and two women, Kenya Sosa and Marrisa.[1] Cruz turned on the heater sometime during the afternoon during dinner preparations and turned it off again when the group left Cruz's house after dinner to go see a movie. Cruz turned on the heater again after he and Garcia returned to his house for the night at approximately 11:00 p.m. A friend of Cruz's named Rosalinda Perez stopped by at approximately 11:30 that night and left at 2:30 the next morning, Monday, December 15, 1997. Cruz and Garcia drank a fair amount of beer and wine over the course of the night. Garcia later stated that by the time Rosalinda Perez left Cruz's house, he "was sure [he and Cruz] were both legally intoxicated and not able to drive." [App. to Mot. of Def. BRK Brands, Inc., for Summ. J., Ex. E, Garcia Aff. at 2] Cruz went to bed at approximately four o'clock in the morning. Jose Garcia dozed in and out of sleep on the living room couch until he fully awoke and left for work between 6:00 and 6:30 in the morning. Garcia had developed a headache and felt dizzy and nauseated by the time he got up. Garcia called out a good-bye to Cruz on his way out, but Cruz did not respond. Garcia did not notice any smoke or soot when he left Cruz's house. The heater was apparently operating this entire time.

---

[1]    Marissa's last name is not clear from the summary judgment record.

2

Cruz was supposed to meet his daughter, Brittany Cox, and her mother, Cynthia Cox, at the zoo on the morning of December 15, but he did not arrive. Sometime between 10:00 and 12:00 that morning Cynthia Cox telephoned Cruz, but he did not answer. Kenya Sosa telephoned Cruz at about 8:00 that night but again he did not answer. She made additional attempts to contact him the next day, to no avail. Finally, she went to his house at approximately 11:30 on Tuesday night, December 16, and found him lying dead on his bed.

An autopsy was performed by Dr. Dewitt S. Davenport at 10:30 A.M. on December 17, 1997. Dr. Davenport's pathology report concluded that Cruz "died of carbon monoxide poisoning" approximately 24 hours prior to the autopsy.[2] [BRK App., Ex. H] A BRK model SA67D ionization smoke detector was installed in the hallway leading to Cruz's bedroom approximately six to seven feet above the space heater. Photographs of Cruz's house show heavy soot damage on the walls and ceiling of the house. Photographs also show soot deposits on the inside and outside of the smoke detector.

The plaintiffs brought suit against BRK alleging several causes of action, including strict products liability, breach of warranty, a Texas Deceptive Trade Practices Act (DTPA) claim based on the breach of warranty, and negligence. The plaintiffs allege that a design defect led to the detector's failure to alarm in response to the substantial quantities of soot and smoke produced by the space heater, and that this failure caused Cruz's death. Specifically, the plaintiffs allege that the detector could not sound its alarm because the separable contact between the horn driver circuit and

---

[2]     Based on the fact that Dr. Davenport found no evidence of soot or smoke inhalation during the autopsy, Dr. Davenport subsequently affied in March 2000 that Cruz "died of carbon monoxide poisoning before he inhaled any smoke or soot and more than 24 hours before his autopsy." [BRK App., Ex. H, Davenport Aff. at 1]

3

the piezo-electric horn element had deteriorated through a process known as "fretting corrosion" to such an extent that the transmission of the alarm signal to the horn element was blocked. The plaintiffs argue that this corrosion could have been prevented by a simple alternative design.

BRK argues that the plaintiffs cannot prove that the alleged smoke detector failure was a cause-in-fact of Cruz's death. The plaintiffs respond by arguing that they have enough evidence to support a reasonable inference that the detector should have alarmed before carbon monoxide poisoning rendered Cruz incapable of responding to an alarm.

BRK also argues that it cannot be held liable because the smoke detector did not directly cause the dangerous condition that lead to Cruz's death. The plaintiffs argue a product defect that causes or exacerbates an injury may be a producing cause even if it does not cause the accident leading to the injury. BRK further contends that, as a matter of law, the detector is not unreasonably dangerous or unfit for the ordinary purposes for which such products are used. BRK asserts that the detector was designed to provide early warning of smoke produced by uncontrolled fires, and that there was no such fire in this case. BRK also argues that Cruz could have purchased a carbon monoxide detector if he wished to be warned of the risk of carbon monoxide poisoning. The plaintiffs argue that the distinction between a controlled and an uncontrolled fire is not dispositive. The plaintiffs further argue that a jury could conclude that the detector was unreasonably dangerous because it failed to do what it was designed to do: sound an alarm when the concentration of smoke in the ambient environment exceeded a certain threshold.

Finally, BRK argues that Jose Garcia, Cruz's mother's husband, is not entitled to recovery because Texas's wrongful death statute limits wrongful death beneficiaries to the surviving spouse, children, and parents of the deceased, and Garcia does not qualify as a parent because he

4

never adopted Cruz. The plaintiffs do not contest this assertion in their opposition to summary judgment.

Both sides retained experts, and BRK ultimately moved the magistrate judge to whom pre-trial matters had been referred to exclude much of the plaintiffs' experts' testimony as inadmissible under Evidence Rule 702. In June 2002 Magistrate Judge John William Black issued a thorough opinion applying Rule 702's test for admissibility of expert evidence as described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Both sides appealed, and in September 2002 this court held that Judge Black's ruling was not clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. Pro. 72(a).

BRK now moves for summary judgment. Aside from the arguments described above, BRK principally argues that the plaintiffs cannot prove that the alleged smoke detector failure was a cause-in-fact of Cruz's death because, in light of the *Daubert* ruling, none of the plaintiffs' experts can testify that the detector should have alarmed before Cruz became incapacitated. The plaintiffs concede that the *Daubert* ruling prevents any of their experts from directly reaching this conclusion, but contend that a reasonable jury would still be able to resolve this issue in their favor based on the combined weight of documentary evidence and admissible expert testimony concerning the space heater and the smoke detector. Alternatively, the plaintiffs ask this court to reconsider the *Daubert* ruling and admit certain testimony excluded therein.

## II.   STANDARD OF REVIEW

While Texas substantive law provides the applicable substantive rules and tests in this diversity case, *see Erie Railroad v. Tompkins,* 304 U.S. 64 (1938), the sufficiency of the evidence is a matter of federal law. *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 986 (5th Cir. 1989).

5

Accordingly, Rule 56 of the Federal Rules of Civil Procedure governs the propriety of summary

judgment. Summary judgment is appropriate if the pleadings and evidence, viewed in the light most

favorable to the non-movant, show that there are no genuine issues of material fact and that the

moving party is entitled to judgment as a matter of law. Fed. Rules of Civ. Pro. 56(c); *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322-23 (1986). A material fact issue exists where "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). A scintilla of evidence in support of the non-movant's position is

insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Id.* "In short, conclusory allegations, speculation, and unsubstantiated assertions are inadequate to

satisfy the nonmovant's burden." *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5[th]

Cir. 1996) (citation omitted).

## III.   DISCUSSION

This court agrees with BRK that the plaintiffs lack sufficient evidence supporting a

reasonable inference that the alleged smoke detector defect was a cause-in-fact of Cruz's death.

Since all of the plaintiffs' claims require this element of proof, BRK is entitled to complete summary

judgment. As a result, with one exception discussed below, this court does not address BRK's

remaining contentions.[3]

### A.   Plaintiffs Must Prove that the Detector Should Have Alarmed Before Cruz Became Incapacitated.

---

[3]      Additionally, this court does not reach the issue of whether the detector was
defectively designed. BRK did not move for summary judgment on this point, and this court's
ruling on the causation issue renders the defect inquiry unnecessary. Accordingly, for purposes
of resolving BRK's summary judgment motion, this court assumes the plaintiffs can prove the
detector is defectively designed.

All of the plaintiffs' claims require proof that the alleged smoke detector defect was a cause-in-fact of Cruz's death.[4]  To meet this burden, the plaintiffs must not only prove that the combustion by-products of the malfunctioning space heater would have caused a properly functioning, non-defective smoke detector to alarm; they must also prove that the detector should have alarmed before carbon monoxide poisoning rendered Cruz incapable of responding to an alarm. If Cruz was either incapacitated or dead before the alarm should have sounded, the alleged defect could not have been a cause-in-fact of his death.

Plaintiffs Jose and Idalia Garcia, as well as the estate of Manuel Cruz, argue that they need only meet the first burden, and evidence of the "timing issue" is not required.  However, without some proof on this point, the jury would be left to guess whether a properly functioning smoke detector would have alarmed in time to save Cruz from carbon monoxide poisoning.[5]  Juries

---

[4]       Specifically, plaintiffs' products liability and DTPA claims require a showing of producing cause, while plaintiffs' negligence and breach of warranty claims require a showing of proximate cause.  *See* Tex. Bus. & Com. Code § 17.50(a) (Vernon 2002) (DTPA claims require proof of producing cause); Tex. Civ. Prac. & Rem. Code § 82.005(a)(2) (Vernon 1997) (products liability claims require showing of producing cause); *Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 238 (5th Cir. 2003) (same); *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993) (stating that negligence claims require proof of proximate cause); *Signal Oil & Gas Co. v. Universal Oil Prods.*, 572 S.W.2d 320, 328 (Tex. 1978) (stating that breach of warranty claims require proof that the breach proximately caused the plaintiff's injury); *see also Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 935 (Tex. App. — Texarkana 1997, writ denied) (collecting cases). Both proximate cause and producing cause contain the element of cause-in-fact. *See Flock*, 319 F.3d at 238 (stating that "[p]roducing cause is the cause-in-fact of the harm, meaning that a defendant's conduct must have been a substantial factor in bringing about the injury and that the injury would not have occurred but for the defendant's conduct") (citations omitted); *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995) (stating that proximate cause consists of cause-in-fact and foreseeability).

[5]       If Cruz claimed that the smoke detector should have responded to the presence of carbon monoxide, then this timing issue would not exist; the plaintiffs would only need to show that the detector failed to alarm in response to an obviously lethal concentration of carbon monoxide.  But the plaintiffs concede that the detector in question should not have been triggered

may reasonably infer that a defendant's act or omission caused a particular result based on circumstantial evidence, but they may not rely on mere guess or conjecture to reach this conclusion. *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997) (citations omitted); *Guitierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir. 1997) (citations omitted).

Accordingly, plaintiffs must produce sufficient evidence to permit reasonable inferences on both prongs of the cause-in-fact inquiry. The plaintiffs can meet the first prong: they can circumstantially prove that the detector was properly powered, that it was exposed to a quantity of particulate matter produced by the malfunctioning heater that should have been sufficient to trigger the alarm, and that the detector did not alarm.[6] The second prong is the plaintiffs' stumbling block. As described below, the plaintiffs have proffered no reliable expert testimony supporting a reasonable inference that the detector should have alarmed in time to save Cruz.

**B.    The *Daubert* Ruling Properly Excludes Expert Testimony Directly or Circumstantially Addressing Plaintiffs' Theory that the Detector Should Have Alarmed Before Cruz Became Incapacitated.**

The plaintiffs contend that the jury may reasonably infer what the *Daubert* ruling

---

by the presence of carbon monoxide, and contend only that it should have alarmed in response to the other combustion by-products such as soot and smoke. Thus, they must prove that the condition that should have triggered the alarm (a certain concentration of detectable material reaching the smoke detector's sensing chamber) occurred before the injury-causing condition (a certain concentration of carbon monoxide in Cruz's bedroom over a certain amount of time). Because this court concludes that the plaintiffs have not submitted evidence supporting a reasonable inference regarding this alleged sequence of events, it need not reach the issue of whether BRK can be held liable for a carbon monoxide-related death when the product in question is a smoke detector, not a carbon monoxide detector.

[6]    For example, the *Daubert* order ruled that plaintiffs' expert Dr. Don Russell may testify that, based on the amount of soot deposits found on and near the detector coupled with evidence that the detector did not alarm, the detector should have alarmed at some point in time, but did not. BRK does not challenge this ruling in its brief supporting summary judgment, although it did appeal Judge Black's resolution of this issue in the *Daubert* order.

precludes the plaintiffs' experts from directly stating: that the detector failed to issue a timely alarm. The plaintiffs argue that while their experts may not be able to testify to this ultimate conclusion, they can lay an admissible circumstantial groundwork which would enable the jury to draw this conclusion on its own. Specifically, plaintiff Cynthia Cox contends that Dr. Don Russell and Dr. Morris Cranmer may testify that while it took several hours for the malfunctioning heater to produce and maintain a sufficient concentration of carbon monoxide to incapacitate and kill Cruz, the detector should have alarmed in response to soot and smoke particles within minutes of the time the heater began to malfunction. Further, Cox contends that Dr. Russell and Mr. E. Wayne McCain may testify that the malfunctioning heater produced both carbon monoxide and detectable soot particles at the same time.[7] Cox asserts that this expert testimony, combined with the fact that the detector

---

[7]     Specifically, Dr. Russell stated in his deposition that the detector should have quickly alarmed because the heater produced a broad distribution of particles, the detector was directly in the path of those particles and in fact was found to be covered in soot, and because ionization detectors are very sensitive to the small, invisible particles that precede or accompany visible soot production. He admitted that he never tested the heater in this case, or any other space heater, for that matter, but stated that it did not matter what the source of combustion was. He explained that "[i]t's almost impossible to keep an ionization detector from going off when exposed to large amounts of small particles that come from this kind of rapid combustion with high heat content." [BRK App., Ex. L, Russell Dep. at 81] He explained that there was no such thing as perfect combustion, and that all types of combustion would produce a sufficient quantity of small particles to quickly set off a nearby ionization detector. *However, Dr. Russell later admitted that a space heater could produce carbon monoxide at lethal levels without setting off an ionization detector.* He admitted that it would be possible to produce large amounts of carbon monoxide without producing much particulate matter, but concluded that this was "clearly not the case here." [*Id.* at 147]
        Mr. McCain stated in his deposition that the alarm should have been triggered within thirty to forty-five minutes of the heater being turned on. Like Dr. Russell, he explained that "[s]ome soot, in whatever size particles, is being produced when you don't have enough oxygen to burn all of the carbon. So with that in mind, some soot is being produced" in every instance of incomplete combustion. [BRK App., Ex. D, McCain Dep. at 11] However, when asked if he would provide an opinion about soot versus carbon monoxide ratios, whether one or other was produced first, or whether they were produced together, McCain stated that "it's an impossibility for anyone to express an opinion about it because . . . you can't say whether soot

was located close to the heater and between the heater and Cruz's bedroom, supports a reasonable inference that the detector should have alarmed before Cruz became incapacitated.

BRK argues that the *Daubert* ruling precludes this testimony just as it precludes the plaintiffs' experts from directly stating that the detector should have sounded a timely alarm.[8] BRK further argues that the proffered testimony would be insufficient even were it admissible, because plaintiffs would also need proof of the concentration of soot and smoke necessary to trigger the alarm, the time necessary for the heater to produce this volume of emissions, and the same concentration and timing information regarding the heater's production of carbon monoxide.

This court agrees with BRK's first point and holds that the proffered testimony is inadmissible. As the *Daubert* order noted, the plaintiffs' experts have rather inexplicably failed to perform even the most basic scientific testing of their timely alarm theory. As a result, all of their statements directly or circumstantially addressing this theory are not "scientific knowledge," but

_____

comes before carbon monoxide or vice versa." [*Id.* at 8]

    Finally, Dr. Cranmer stated in his deposition that it would have taken several hours for Cruz to become incapacitated. Dr. Cranmer performed a series of calculations based on carbon monoxide production estimates contained in one of the defendant's experts' reports to determine that it would have taken approximately two to three hours for Cruz to become incapacitated after the heater began to malfunction, and three to four hours total for Cruz to die.

    [8]    The plaintiffs' implicitly argue that this expert testimony somehow falls outside the purview of the *Daubert* ruling, but this position is logically unsound. These proffered opinions — that the detector should have alarmed within minutes, while it took several hours for Cruz to die of carbon monoxide poisoning — are the grounds for concluding that the detector should have timely alarmed. The *Daubert* ruling precluded the plaintiffs' experts from reaching this conclusion because, in the absence of reliable testing of the heater and smoke detector, any estimate of when the detector should have alarmed would be mere speculation. Accordingly, the *Daubert* ruling precluded the plaintiffs' experts from offering opinions that either directly or circumstantially support their timely alarm theory. Perhaps recognizing this dilemma, the plaintiffs alternatively argue that the *Daubert* ruling should be modified to permit their proffered testimony.

rather mere "unsupported speculation." *Daubert*, 509 U.S. at 590.

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." This rule "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.' " *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert,* 509 U.S. at 589); *Bocanegra v. Vicmar Services, Inc.*, 320 F.3d 581, 584 (5ᵗʰ Cir. 2003).

To be deemed reliable, an expert scientific opinion must be grounded in the "methods and procedures of science," and must be more than mere "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590 (cited in *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5ᵗʰ Cir. 1999)). The party seeking admission bears the burden of proof on this point. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5ᵗʰ Cir. 1998) (en banc). The Supreme Court set out four non-exclusive factors to aid the district court in determining whether expert testimony may be fairly characterized as scientific opinion: 1) whether the proffered conclusion can be and has been tested; 2) whether it has been subjected to peer review; 3) the error rate of the method used to reach the conclusion, and the maintenance of standards controlling the method's operation; and 4) whether the method or theory has been generally accepted by the scientific community. *Daubert*, 509 U.S. at 590 (cited in *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668-69 (5ᵗʰ Cir. 1999).[9]

---

[9]    Rule 702 was amended in response to *Daubert* and its progeny. *See* Fed. R. Evid. 702 committee note (2000). Specifically, the 2000 amendments added three broad standards that proffered testimony must meet to be admissible. Expert testimony is admissible if " 1) the testimony is based on sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of

The first factor — whether the theory or conclusion can be and has been tested — has been described as the "most significant *Daubert* factor," *Cummins v. Lyle Industries*, 93 F.3d 362, 368 (7th Cir. 1996), and numerous cases have held that the failure to subject a proffered opinion to scientific testing justifies exclusion. *E.g.*, *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (holding that failure to test theory of causation justified exclusion of expert testimony); *Moore*, 151 F.3d at 279 (same); *Pride v. BIC Corp.*, 218 F.3d 566, 577-78 (6th Cir. 2000) (holding that theory of manufacturing defect properly excluded where experts failed to timely conduct reliable testing or validate theory by reference to generally accepted scientific principles); *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 536-38 (7th Cir. 2000) (holding that alternative design theory properly excluded where expert conducted no scientific testing in support of theory).

None of the plaintiffs' experts have conducted any reliable or relevant testing of their "timely alarm" theory. The *Daubert* ruling properly rejected the rudimentary timely alarm tests performed by Michael Schulz and Dr. Cranmer, and none of the plaintiffs' remaining experts tested this theory at all. Both Dr. Cranmer and Mr. Schulz conducted their tests only once, so there is no way to reliably estimate an error rate associated with their results. While a single test might constitute "sufficient facts or data" under Rule 702 where repeated tests are unavailable or impracticable because of prohibitive expense or other reasons, this is certainly not such a case.

---

the case." Fed. R. Evid. 702. These standards do not displace judicially developed factors; rather, they "are broad enough to allow consideration of any of the factors set forth in *Daubert* or other opinions whenever they are appropriate." Jack B. Weinstein & Margaret A. Berger, *Wienstein's Federal Evidence*, § 702.05[2][b] (2d ed. 2002) (citing Fed. R. Evid. 702 committee note (2000)). Further, not all of the Rule 702 factors are necessarily appropriate in every case. *Id.* (citing Fed. R. Evid. 702 committee note (2000)).

Further, both experts used *smoke detectors models other than the SA67D* in their tests,[10] and neither Schulz nor Cranmer made sufficient attempts to replicate the conditions in Cruz's residence prevailing at the time of his death.[11]  Thus, even were their tests reliable, they would not be sufficiently relevant to the facts of this case. Indeed, Dr. Cranmer stated that he only undertook his smoke detector test as an "afterthought" following his examination of the space heater, [App. to Plaintiff Cox's Resp. to Def.'s Mot. for Summ. J., Tab 1, Cranmer Dep. Vol II., 133] and freely volunteered that his test was not "a quality experiment in any way." [*Id.* at Vol. I, 79]

Accordingly, neither of the two sets of opinions urged by plaintiff Cox are supported by reliable empirical studies. First, Dr. Russell's and Dr. Cranmer's claim that the detector should have alarmed "within minutes" of heater malfunction, while it must have taken several hours for Cruz to be incapacitated by carbon monoxide poisoning, is not grounded in any reliable testing of the heater or the smoke detector.[12]  Second, Dr. Russell's and Mr. McCain's claim that the heater

---

[10]     In fact, Mr. Schulz used a dual photoelectric/ ionization smoke detector, whereas the BRK model SA67D in Cruz's house was an ionization detector with no photoelectric component. Schulz could not state whether the heater by-products triggered the photoelectric or the ionization component of the detector used in his test. Dr. Cranmer used an ionization detector made by BRK Brands in his test, but it was a different model (SA97V).

[11]     Dr. Cranmer noted that his test "was not done repeated times" and that "[i]t was not done under conditions that would exactly mimic the house." [Cox App., Tab 1, Cranmer Dep. Vol. I, at 78]

[12]     This court notes that the first set of opinions consists of two parts: 1) that the detector should have alarmed "within minutes" of heater malfunction, and 2) that Cruz did not become incapacitated for several hours. For the reasons provided in the text, this court concludes that none of the plaintiffs' experts may reliably testify that the detector should have alarmed within minutes. However, Dr. Cranmer's opinion that a person in Cruz's circumstances would not become incapacitated for several hours may be admissible. As noted above, *supra* n.7, Dr. Cranmer's opinion is based on actual data, unlike the challenged opinions of the plaintiffs' other experts. Ultimately, however, this court need not reach a conclusion regarding the admissibility of this opinion because, even were it admissible, the other opinions necessary to support a

simultaneously produced detectable particles and carbon monoxide is also not grounded in any

reliable testing of the space heater's combustion by-products.[13]  Dr. Cranmer conducted a simple

_____

reasonable inference on the timing issue are not.

[13]     Judge Black reasoned that collection of some fairly sophisticated data would be required to support the plaintiffs' timely alarm theory.  Specifically, Judge Black observed that none of the experts had performed any measurements of the by-products of combustion (specifically, detectable carbonaceous particles and carbon monoxide) produced by the malfunctioning space heater over time.  Thus, none of the experts knew or could reasonably estimate the production rates of any of the combustion by-products, or how those rates might change during heater operation.  Without these data, Judge Black concluded that none of the experts could reliably conclude when the heater produced a concentration of soot sufficient to trigger the alarm, or that this event occurred before Cruz became incapacitated by carbon monoxide poisoning.

BRK argues that the plaintiffs cannot raise a genuine fact issue regarding their timely alarm theory without these data.  That is, BRK contends that even if the plaintiffs' experts' could reliably testify that the detector should have alarmed within minutes of heater malfunction, while Cruz did not become incapacitated until some hours later, this would not be sufficient to meet their burden on the timing issue.

This court doubts whether *all* of these additional data would be required.  Essentially, to support their timely alarm theory the plaintiffs need to reliably estimate when the detector's alarm should have sounded and when Cruz probably became incapacitated.  It seems that a qualified expert could have simply operated the heater at various settings (i.e., from 'low' to 'high') while recording in each instance the time between the heater ignition and detector alarm (if any), and measuring in each instance the increasing carbon monoxide concentrations in Cruz's home.  Then, a qualified toxicologist or pulmonologist could use this minimal set of data to estimate the amount of time required for Cruz to become incapacitated by carbon monoxide poisoning at each of several possible settings.  If, as plaintiffs believe, the data thus produced indicated that the difference between the timing of the two critical events really was a matter of minutes (detector alarm) versus hours (Cruz's incapacitation), then it would seem to be relatively easy for the plaintiffs to conclude to a reasonable degree of scientific and statistical accuracy that the detector should have alarmed before Cruz became incapacitated.  Such a straightforward analysis would of course be open to attack by all of the methods typically available in the adversarial process, but it would probably not be inadmissible.  *Cf. Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Of course, the court need not reach any firm opinion on this issue because, as discussed in the text, the plaintiffs' experts have failed to satisfy even the most lenient interpretation of scientific validation.

flame-color analysis that lends some support to the plaintiffs' simultaneous production theory.[14]

However, Dr. Cranmer freely admitted that his flame-color analysis, like his impromptu smoke

detector test, was "very preliminary," [Cox App., Tab 1, Cranmer Dep. Vol. I, at 129] and not

intended to be used as anything other than a guide for more rigorous analyses that were never

conducted. Similarly, Dr. Russell testified at the *Daubert* hearing that he had not tested any aspect

of the plaintiffs' "timely alarm" theory because he had not been asked to do so.[15]

---

[14]     Dr. Cranmer explained that small detectable particles typically accompany carbon
monoxide as the products of incomplete combustion. He explained that "[t]he incomplete
combustion is extraordinarily unlikely to be exclusively [] carbon monoxide. . . . [I]n order to not
have high enough levels of particles to activate the alarm, you would have to have extraordinarily
efficient conversion to carbon monoxide at the exclusion of producing these particles . . . , and I,
after having looked at the stove, [and after having] made some *very preliminary* observations
with respect to the stove, do not believe that that's so." [Cox App., Tab 1, Cranmer Dep. Vol. I,
at 128-29] (Emphasis added.). Dr. Cranmer then explained he found that the stove consistently
produced yellow flame, and that yellow flame, as opposed to blue flame, indicated the presence
of "unburned hydrocarbon materials other than carbon monoxide." [*Id.* at 129-35]

[15]     Q: In this particular case, you have not examined the heater?
         A: No, I've had nothing to do with the heater at all.
         Q: You have not studied the path or speed of the smoke produced by this heater?
         A: Wasn't asked to do that.
         Q: You have never studied the size or density of the particulate put out by this
         heater on the night or morning of Mr. Cruz's death?
         A: Wasn't asked to do that, and I'm not sure that would even be possible.
         Q: You have never studied the production of carbon monoxide by this heater?
         A: I wasn't asked to do that.
         Q: You have never studied when this heater produced sufficient quantities of
         particulate to make the Cruz ionization detector alarm?
         A: Wasn't asked to do that.
         Q: You have not studied the timing of the production of soot versus carbon
         monoxide in this case?
         A: Wasn't asked to do that.
         Q: You have never examined or seen the Cruz smoke detector?
         A: Wasn't asked to do that either.

         [Cox App., Tab 6, *Daubert* Hr'g Tr., at 87]

The plaintiffs' experts based their challenged opinions regarding the timing theory on their general knowledge of combustion science and ionization smoke detectors rather than on empirical studies. Certainly an expert need not conduct "hands-on" testing in every case. *Cummins*, 93 F.3d at 369. Rule 702 simply requires that scientific testimony be "ground[ed] in the methods and procedures of science," *Daubert*, 509 U.S. at 590, and that when an expert testifies in court, she adheres to "the same level of intellectual rigor" that the expert would use in the regular course of her professional work. *Kumho Tire Co.*, 526 U.S. at 152. Thus, an expert may base his theories or conclusions on the research of other experts if he can demonstrate that he has done so reliably. *E.g., Cummins*, 93 F.3d at 369 (noting that expert may rely on review of experimental, statistical, or other scientific data generated by others in the field); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) (explaining that expert may base testimony on review of research conducted by others if his review and application complies with scientific principles in the field). In this case, however, there is no indication that any of these three experts (Russell, Cranmer, and McCain) conducted any review of scientific literature in either reaching their challenged conclusions or in preparing to defend them at their depositions or at the *Daubert* hearing. Further, "the opinions offered by [Russell, Cranmer, and McCain] clearly lend themselves to testing and substantiation by the scientific method." *Cummins*, 93 F.3d at 369.

The plaintiffs' experts also fail in their attempts to cast their testimony as generally accepted scientific truths that require no case-specific substantiation. It is true that an expert may educate the jury about general scientific principles without ever attempting to apply them to the facts of the case. Fed. R. Evid. 702, committee note (2000). For example, the plaintiffs might call Mr. McCain to testify generally regarding the possible composition of the by-products of the incomplete

combustion of propane.[16]

However, the plaintiffs are not proffering such limited testimony. Rather, they propose that their experts testify regarding the composition and timing of the combustion by-products of Cruz's malfunctioning space heater, and the responsiveness of a properly functioning ionization smoke detector to those combustion by-products. The plaintiffs' experts have not convincingly demonstrated, nor even sought to demonstrate, that their conclusions on these topics amount to general principles as opposed to untested hypotheses.

For example, while it may often be the case that incomplete combustion of propane simultaneously produces both carbon monoxide as well as small detectable particles of soot and smoke, both Dr. Russell and Mr. McCain admitted that this is not always true, and Mr. McCain stated that it was impossible to know whether soot and carbon monoxide were produced simultaneously or sequentially in any given instance. *See supra*, n. 4. Indeed, the only admissible evidence brought to this court's attention suggests that soot and carbon monoxide were *not* produced simultaneously. Specifically, Dr. Davenport's affidavit states that Cruz's lungs did not "show[]evidence of soot or smoke inhalation," [BRK App., Ex. H] a fact which supports the inference that Cruz stopped breathing before the heater produced significant quantities of soot and smoke for Cruz to inhale. Likewise, when Jose Garcia awoke and left Cruz's house on Monday morning, he did not notice any soot or smoke on the walls or in the air.

" 'Under the regime of *Daubert* a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific

---

[16]    Of course, even basic descriptions of general scientific principles must still be reliable and relevant, Fed. R. Evid. 702, committee note (2000).

speculation offered by a genuine scientist.' " *Moore*, 151 F.3d at 278 (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)). The testimony relied upon by the plaintiffs clearly falls into the latter category. While plaintiffs' experts' timely alarm theory is certainly plausible, it does not constitute "scientific knowledge" under *Daubert*; instead, it is at most "scientifically grounded speculation." *Golod v. LaRoche*, 964 F. Supp. 841, 861 (S.D.N.Y. 1997).

### C. Jose Garcia Cannot Recover Damages for Cruz's death Under the Texas Wrongful Death Statute

BRK correctly contends that Jose Garcia, Manuel Cruz's stepfather, may not recover damages for Cruz's death.[17] Only the surviving spouse, children, and parents of the deceased may recover in a wrongful death suit. Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a) (Vernon 1997). A stepparent who takes no steps to legally adopt his stepchild does not qualify as a parent for purposes of Texas's wrongful death statute. *See Boudreaux v. Texas & N.O.R. Co.*, 78 S.W.2d 641 (Tex. Civ. App. — Beaumont 1935, writ ref'd) (holding that stepmother who made no effort to legally adopt stepson could not claim right to recover for his wrongful death). Jose Garcia married Idalia Garcia, Cruz's mother, when Cruz was two years old. Jose Garcia never adopted Cruz. Thus, even if the plaintiffs could survive summary judgment on the causation issue, Jose Garcia would not be able to recover for Cruz's wrongful death.

## IV.    CONCLUSION

For the above reasons, BRK's motion for summary judgment is **granted**, and a take-nothing judgment is hereby **granted** to BRK.

---

[17]    Plaintiffs waived any objection to this argument by failing to address it in their briefs opposing summary judgment.

18

Signed this _____27th_____ day of May, 2003.

Honorable Andrew S. Hanen
United States District Judge